**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIVE VILLAGE OF EKLUTNA,<br>26339 Eklutna Village Road<br>Chugiak, Alaska 99567,<br><br>    Plaintiff,<br><br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>THE INTERIOR; DAVID BERNHARDT,<br>Secretary of Interior; TARA SWEENEY,<br>Assistant Secretary – Indian Affairs; JOHN<br>TAHSUDA, Principal Deputy Assistant<br>Secretary – Indian Affairs; and JAMES<br>CASON, Associate Deputy Secretary,<br>United States Department of the Interior,<br>1849 C Street N.W.<br>Washington, DC 20240,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____ |

**COMPLAINT**

Plaintiff Native Village of Eklutna complains and alleges as follows:

**I.      INTRODUCTION**

1.      The Native Village of Eklutna ("Eklutna," "NVE," or "the Tribe") is a federally recognized Indian Tribe whose members are of the Dena'ina people who have resided in the Upper Cook Inlet region of Alaska since long before the arrival of Europeans into the Tribe's traditional territory approximately 200 years ago.  The Tribe has preserved its cultural heritage and retained its sovereign governmental authority.  In this action, the Tribe seeks to reverse the United States Department of the Interior's decision that the Tribe no longer possesses

1

governmental authority over certain "Indian country" lands within its jurisdiction.  The parcel is located within the Tribe's aboriginal lands.  The Department of the Interior allotted the parcel to an Eklutna tribal member in 1963 and it has been held in restricted status ever since.

2.      The land at issue, known as the Ondola Allotment ("the Allotment"), is located 7 miles from the present-day location of the Native Village of Eklutna, within the Tribe's traditional territory.  It was originally conveyed to Eklutna tribal member Olga Ondola under the Alaska Native Allotment Act, ch. 2469, 34 Stat. 197 (1906) (formerly codified at 43 U.S.C. §§ 270–1 to –3).  Today the land is held by Ms. Ondola's heirs and their heirs, all of whom are Eklutna tribal members.

3.      For decades, the Tribe has actively exercised jurisdiction over and provided governmental services to the Allotment and the Ondola family members residing on the Allotment.

4.      In 2016 the Tribe petitioned the Department of the Interior ("Department" or "Interior") for a determination that the Allotment constitutes "Indian lands" and is eligible for gaming under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721.  The Tribe also requested that the Department approve the Tribe's lease of the land from the Allotment owners for the development and operation of a gaming project.

5.      In June 2018 the Department issued a decision concluding that the Allotment does not constitute "Indian lands" within the meaning of IGRA and disapproving the Tribe's lease of the land.  In reaching this conclusion, the Department's decision relied on outdated legal precedent and misapplied the relevant standards regarding tribal authority over allotments.  On information and belief, the decision was also influenced by improper political considerations.  For these and other reasons, the decision was arbitrary and capricious and contrary to law, in

violation of the Administrative Procedure Act.  The Tribe now seeks reversal of the

Department's unlawful decision pursuant to 5 U.S.C. § 706.

## II.    PARTIES

6.      Plaintiff Native Village of Eklutna is a federally recognized Indian Tribe.  The

Tribe is included on the Department of the Interior's list of "Alaska Native entities recognized

and eligible to receive services," and has been included on every version of this list since the

Department began publishing it in 1982.  Most recently, Eklutna was included in the February 1,

2019 list published at 84 Fed. Reg. 1200, 1204 (Feb. 1, 2019).

7.      The United States Department of the Interior is a Department of the United States

Government.

8.      Defendant David Bernhardt is Secretary of the Interior, with responsibility for

overseeing the United States Department of the Interior.  Secretary Bernhardt is sued in his

official capacity.

9.      Defendant Tara Sweeney is the Assistant Secretary for Indian Affairs, with the

responsibility for overseeing the Bureau of Indian Affairs ("BIA").  BIA is an agency within the

Department of the Interior.  Assistant Secretary Sweeney is sued in her official capacity.

10.     Defendant John Tahsuda is Principal Deputy Assistant Secretary for Indian

Affairs.  Mr. Tahsuda is sued in his official capacity.

11.     Defendant James Cason is an Associate Deputy Secretary in the Department of

the Interior.  Mr. Cason is sued in his official capacity.

12.     All individual defendants are officers or employees of the Department of the

Interior and have direct or delegated statutory duties for carrying out relations with Indian tribes

and the United States' trust obligations to tribes.  25 U.S.C. §§ 1a, 2.

### III.   JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1362, and 5 U.S.C. § 702, which waives the United States' sovereign immunity for actions brought under the Administrative Procedure Act.

14.     Venue is proper in this district because the defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.  28 U.S.C. § 1391(e).

### IV.   FACTS AND ALLEGATIONS

**A.     History of the Native Village of Eklutna and the Allotment**

15.     The Dena'ina people, including the Natives of the Native Village of Eklutna, have occupied the upper Cook Inlet region since well before Captain James Cook made his voyage to the area in 1778 and gave the region its present-day name.

16.     The Native Village of Eklutna is located approximately 27 miles northeast of Anchorage, Alaska.  The Village has a well-documented role as an important tribal center within that region.  All the important geographic features in and around Eklutna carry Dena'ina place names, and the Village itself has a traditional creation story about how it got its name.  Even today, a cemetery filled with the "spirit houses" of deceased tribal members lies next to the church in the Village, which is the oldest standing building in the Anchorage area.  These sites and the oral histories of Dena'ina elders demonstrate the enduring cultural and spiritual importance of the Eklutna region for the Tribe and its members.

17.     The Native Village of Eklutna and its people have steadfastly resisted European migration into the Tribe's traditional territory.  Records from the late 1700s and early 1800s

show that the Dena'ina were open to trading with Europeans but "were adamant in opposing any attempted settlement."

18.     Throughout those times of transition, and into the modern era, the Tribe has consistently fought to protect its traditional lands.  As soon as it became evident that the tide of American migration into the Eklutna region would not stop, Eklutna tribal leaders began to petition the United States government for the protection of their tribal lands.

19.     In particular, when Alaska became a state in 1959 and began selecting tribal lands around Eklutna, the Native Village of Eklutna filed official protests with the Bureau of Land Management to establish the Tribe's aboriginal title to over 470,000 acres of land in and around the Village, including the Birchwood area where the Ondola Allotment is located.

20.     In 1961 George Ondola, Chairman of the Village Council, expressed concern over the repeated reductions in the size of the Tribe's land base in correspondence with the federal government and in testimony before Congress.  That same year George Ondola helped his mother, Olga Ondola, apply for the allotment that is the subject of this action.[1]  Olga Ondola observed the federal government's actions in reducing the land set aside for the Eklutna people from hundreds of thousands of acres to a few thousand and then to a little over a thousand acres. She wanted to protect the Tribe's land base from further losses and believed that securing the Allotment would help achieve that objective for the Eklutna people.

21.     The Department awarded the Allotment to Olga Ondola in 1963 pursuant to the Alaska Native Allotment Act,[2] and it has been held as an Indian allotment in restricted status ever since.

---

[1] The Ondola Allotment includes lots 64, 66 and 67, located within Section 5, T15N, R1W, Seward Meridian Alaska.

[2] Although Congress repealed the Alaska Native Allotment Act when it passed the Alaska Native

22.     Mrs. Ondola was a member of the Native Village of Eklutna and had active ties to the Eklutna people.  Mrs. Ondola's heirs and their heirs, who continue to live on the Allotment, are tribal members and have retained ties to the Tribe.

23.     Alaska Tribes have long been recognized by the courts, Congress, and the Department as possessing governmental authority over lands on the same basis as Tribes in the Lower 48 states.  The 1867 Treaty of Cession provided: "The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country," art. III, U.S.-Russ., May 28, 1867, 15 Stat. 539, which has been construed to apply to Alaska tribes the principles of tribal sovereignty and the federal trust responsibility that governs Tribes in other states.  Congress applied the Indian Reorganization Act to Alaska Tribes, 25 U.S.C. § 5119, and in 1994 Congress enacted numerous laws reaffirming the federal status of Alaska's tribes, including the Federally Recognized Indian Tribe List Act, 25 U.S.C. § 5130, and the Tlingit and Haida Status Clarification Act, Pub. L. No. 103–454, § 201–205, 108 Stat. 4791.  Congress also enacted the 1994 Amendments to the Indian Reorganization Act, 25 U.S.C. § 5123 (f), (g), which prohibit federal agencies from making any distinction in the "privileges and immunities" of any federally recognized tribe.  Congress's actions confirm that Alaska Tribes enjoy the same benefits and special relationship with the United States that Tribes in the Lower 48 enjoy.

24.     In 1971, in an effort to resolve the many disputed Native land claims in the State, Congress passed the Alaska Native Claims Settlement Act ("ANCSA").  In ANCSA, Congress recognized Eklutna's status as a Native Village and included it on the list of Villages eligible to

Claims Settlement Act, all allotments which had been or were subsequently patented under the Act retained their restricted (nontaxable and inalienable) status.  *See* 43 U.S.C. § 1617.

receive land selections as part of the settlement of aboriginal title claims.  *See* 43 U.S.C.

§ 1610(b).  A later amendment to ANCSA expressly disclaims any effect on tribal governmental

authority of lands or persons in Alaska.  Pub. L. No. 100–241 §§ 2(8)(B), 17(1), 101 Stat. 1788

(1988).

    **B.**      **The Tribe's Exercise of Authority over the Village and the Allotment**

       25.     Both before and after ANCSA's passage, successive NVE tribal governments

have continued to exercise governmental authority over its lands, tribal members, and the lands

they owned or occupied.

       26.     Historically, Eklutna's governing structure was similar to that of the other

Dena'ina bands in the upper Cook Inlet region.  Each Village contained multi-family dwellings

called "nichił," which were each led by a "qeshqa" (rich man).  Each qeshqa directed the

organization of "ukilaqa" (clan helpers) into hunting and fishing groups, and also carried out

other leadership responsibilities such as instructing the young, settling disputes, and organizing

warriors for battles.  In short, the "qeshqa" and his "ukilaqa" acted as the governing body of the

Village, much as the Eklutna Tribal Council does today.

       27.     The Ondola family members are direct descendants of these "qeshqa," or former

Village "Chiefs."

       28.     Although the governing structure has evolved over time, the Eklutna Tribal

Council continues to exercise governmental authority over its members and over lands in and

around the Village and the Allotment.

       29.     In the 1960's, NVE's traditional Tribal Council protested efforts by non-tribal

authorities to regulate tribal members and instead asserted its own authority to regulate tribal

members' access to natural resources.  The Tribal Council enacted ordinances requiring Tribal

Council permission to move into the Village, controlling dogs, and limiting noise levels in and around the Village and took actions necessary to promote the peace, safety, health, and general welfare of the Village members.

30.     In 1988 the Tribe formally adopted a written Constitution containing broad assertions of tribal sovereignty, jurisdiction, and governmental powers.  This Constitution was amended in 1996.

31.     Article II, Section I of the Tribe's Constitution provides that

[t]he government of the Native Village of Eklutna shall have jurisdiction of the land and waters constituting Indian Country of the Eklutna Tribe as defined by federal law.  To the extent consistent with federal law, such lands and waters customarily and traditionally used by the Eklutna People, including . . .  all fee and allotment lands within the traditional lands of Eklutna, not withstanding the issuance of any patent or unrestricted fee title to such lands.

32.     Today, examples of the Tribe's exercise of jurisdiction and provision of governmental services include, but are not limited to, a tribal court, housing, health care services in a recently constructed health care clinic, employment services, water services, waste services, snow plowing, food bank services, lunches for seniors, environmental disposal services (disposal of used appliances and furniture), trespass inspection and monitoring, archaeological and cultural surveys, historical and cultural preservation, Indian child welfare advocacy and case management services, youth activities (including a dance and drum group and culture camp), holiday baskets and school supplies, a biannual potlatch and powwow, and signage.  In recent years, the Tribe installed street lighting within the Village for safety purposes.

33.     It is understood within the Eklutna community that the Ondola Allotment is subject to tribal authority.  The Ondola family has historically been a part of the Eklutna community and has both recognized and submitted to the jurisdiction of the Tribe.  The Ondolas reaffirmed this in the Lease Agreement between the family and the Tribe for the gaming project.

*See infra* at ¶¶ 62-64.  Olga Ondola and her heirs have retained their relations with the Village of Eklutna.

34.     All of the owners of the Allotment are tribal members.  Susie Ondola, a tribal member, owns a 1/4 interest in the Allotment and presently resides on the Allotment, where she lived for many years with her husband, George Ondola.  George Ondola lived on the Allotment from 1985 until his death in 2014 and served as Tribal Council President from 1961 to 1971 and from 1995 to 1997.

35.     The Tribe exercises jurisdiction and governmental authority over the Ondola Allotment through the exercise of its laws and governmental operations, including but not limited to the examples described above and below.

36.     Through the language cited in paragraph 31, *supra*, the Tribe's Constitution extends the Tribe's authority over the Ondola Allotment.

37.     In 2003, the Tribal Council enacted the Relatives Talk Code, which provides for the establishment of a forum for the resolution of disputes.  The Ondola Allotment is within the scope of the Relatives Talk Code.

38.     The Tribe provides governmental administration generally, with assistance from the Bureau of Indian Affairs pursuant to a contract under the Indian Self-Determination and Education Assistance Act ("ISDEAA").  These services benefit the Ondola Allotment by supporting the services and authority described *infra* and *supra*.  These governmental administration services include, but are not limited to:

   a.   Tribal Council operations,

   b.   Tribal enrollment administration, and

   c.   Financial operations.

9

39.     The Tribe has exercised its governmental authority over the Ondola Allotment through instances of land management and environmental protection, including but not limited to:

    a.   Managing timber,

    b.   Building a septic system,

    c.   Cutting trees on the Allotment to create a fire perimeter around the Ondola house, and

    d.   Providing road maintenance services on the Allotment.

40.     In 1997 the Tribe paid for drilling a well and upgrading the septic system on the Allotment.

41.     The Tribe regulates access to tribal land, including the Ondola Allotment, by adoption and enforcement of an ordinance limiting access to tribal land.  The Tribe posted numerous signs along the perimeter of the Ondola Allotment.

42.     The Tribe has adopted an Environmental Protection Ordinance that regulates contamination of air, land, and water within the Tribe's traditional jurisdictional area, including the Ondola Allotment.

43.     In 2006, the Tribal Land Environmental Director conducted an inspection of the Ondola Allotment for compliance with tribal environmental laws.

44.     As part of the Tribe's environmental compliance and clean-up efforts, the Tribe has caused junk cars and trash to be removed from the Allotment.

45.     The Tribe has exercised its governmental authority to protect public safety on tribal lands, including the Ondola Allotment.

46.     The Tribe has adopted a Dog Ordinance that imposes a number of requirements on all dogs within the Eklutna area, including on the Ondola Allotment.

47.     The Tribe has also entered into a Letter of Agreement with the Municipality of Anchorage Police Department regarding coordination of public safety and law enforcement matters.

48.     Under the ISDEAA, the Tribe has contracted with Indian Health Service to provide public safety services, including "community education, community patrols, [and] liaison with the local, state and federal agencies."

49.     The Tribe provides health care and social services to tribal members, including at the Ondola Allotment, including:

   a.   Home visits by health care providers,

   b.   Delivery of food and safety equipment, and

   c.   Placement of foster children.

50.     For a period of time, the Tribal Family Nurse Practitioner and the Tribal Wellness Director made periodic visits to the Allotment to provide health care services to George Ondola and his family.

51.     The Tribe provided moose meat and salmon to Olga Ondola and the family approximately two or three times per year.  This was part of the Tribe's effort to preserve and maintain Eklutna's traditional culture and subsistence lifestyle.

52.     The Tribal food bank program serves the Ondola family on the Allotment.

53.     The Tribe has provided the Ondolas with smoke detectors, a fire extinguisher, and a first aid kit to keep in their home on the Allotment.

54.     On several occasions the Tribe assessed George and Susie Ondola's home on the Allotment for child custody placement.  Over the years, through its authority under the Indian Child Welfare Act, the Tribal Court has placed five children in the Ondola household on the Ondola Allotment.

55.     The Tribe has taken numerous actions exercising its governmental authority over gaming on tribal lands.

56.     The Tribe enacted a gaming ordinance in 1995.  NVE's Gaming Ordinance authorized under tribal law and provided for regulation of any gaming on lands within 20 miles of the Village center that are held by the Tribe or NVE tribal members, and are subject to restriction by the United States against alienation and the governmental authority of the NVE Tribal Council.  On April 26, 2006, the Tribal Council adopted an Amended and Restated Gaming Ordinance, which it again amended in March 2007 and May 2018.

57.     The Ondola Allotment is within the scope of the Gaming Ordinance.  The Amended Gaming Ordinance provides for extensive regulation of any gaming activity on the "Tribe's lands," which are defined to include the "allotment owned by the Ondola family located at Lots 64, 66 and 67, located within Section 5, T15N, R1W, Seward Meridian Alaska, containing approximately 8.05 acres, more or less and subject to a restriction on alienation pursuant to the Alaska Native Allotment Act."  Sections 301 and 302 of the Gaming Ordinance provide for regulation of Class I and II gaming on the Ondola Allotment.  Class III gaming is not permitted under the Amended Gaming Ordinance.  In 2018 the Tribe submitted the Amended and Restated Gaming Ordinance to the National Indian Gaming Commission for approval under IGRA but later withdrew its request.

12

58.     On December 21, 2006, the Tribal Council adopted the Native Village of Eklutna

Gaming Authority Ordinance, establishing the Eklutna Gaming Authority, which is charged with

powers and duties related to gaming enterprises, including to evaluate proposals for gaming

enterprises and to operate and manage gaming enterprises established by the Tribal Council.  The

Tribal Council specifically approved the Gaming Authority Ordinance to pursue and develop the

proposed gaming project on the Ondola Allotment.  On February 19, 2016, the Council delegated

authority over the current gaming project to the Gaming Authority.

59.     On April 14, 2016, the Tribal Council approved a lease agreement with the

Ondola family, granting the Tribe the right to use the Ondola Allotment for the gaming project.

60.     The Ondola family and the Tribe submitted the lease agreement to the Bureau of

Indian Affairs for approval pursuant to 25 U.S.C. § 415.

61.     The purpose of the lease is "to develop, construct, finance and operate a gaming

facility."  The Lease Agreement is for a primary term of 25 years with a right to renew for an

additional 25-year term.

62.     The lease acknowledges that the Tribe exercises governmental authority over the

Allotment:

> NVE provides government services to the land subject to this Lease, including social
> services, and has enforced and will continue to enforce tribal law applicable to the land,
> including, and without limitation, ordinances regarding trespassing and environmental
> protection.

Lease Agreement, Recitals, § 4.

63.     The Agreement further provides that the tribal government asserts jurisdiction

over the Allotment:

> NVE asserts jurisdiction over the land which is the subject of this Lease with the power
> to regulate the activities of all persons on the land for the public welfare, including to
> permit and limit, under terms established by NVE through ordinances, resolutions, and
> regulations, gaming and other commercial activity on the land.  The ONDOLA FAMILY

acknowledges and submits to the governmental authority of the NVE over the land subject to this Lease.

*Id.* Recitals § 5.

64.     Finally, the Agreement provides that the Ondola family members acknowledge the Tribe's authority to exercise governmental power over the Allotment. *Id.* § 27.

65.     The Tribe has adopted standards governing building codes, food and beverage handling, water quality, non-discrimination, workplace and occupational safety, public health, and safety at the proposed gaming facility on the Ondola Allotment.

66.     The Tribe adopted a liquor control ordinance requiring a permit from the Tribal Council, along with state-required permits, in order to sell alcoholic beverages within Indian country under the Tribe's jurisdiction, including the Ondola Allotment.

## C.     The Tribe's Request for an Indian Lands Determination

67.     On June 29, 2016, the Tribe submitted to the Department a request for an Indian lands determination.  Specifically, the Tribe requested "confirmation that the site where [it] proposes to conduct gaming, the Ondola Allotment, qualifies as 'Indian lands' pursuant to the Indian Gaming Regulatory Act."

68.     The Tribe also requested that the Department approve the Tribe's proposed lease of the Ondola Allotment.

69.     The Tribe supplemented its request with several additional submissions, on or about December 16, 2016, June 22, 2017, November 6, 2017, and December 4, 2017.  In its request letter and these supplemental submissions (collectively, "Submission"), the Tribe established the facts and law necessary to support an affirmative Indian lands determination pursuant to IGRA.

70.     IGRA defines Indian lands to include "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C. § 2703(4)(B).

71.     In its Submission, the Tribe explained that the Native Village of Eklutna is an Indian Tribe under IGRA, 25 U.S.C. § 2703(5), because Eklutna is a federally recognized Tribe.

72.     The Tribe's Submission also established that the Ondola Allotment was conveyed to Olga Ondola pursuant to the Alaska Native Allotment Act and has remained in restricted status since it was allotted in 1963.  The Alaska Native Allotment Act expressly provided that "land so allotted [under the Act] shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress."  Act of May 17, 1906, Ch. 2469, 34 Stat. 197 (1906) (formerly codified at 43 U.S.C. §§ 270–1 to –3).

73.     The Tribe's Submission also established that the BIA provides services and exercises control (along with the Tribe) over the Allotment.

74.     Under general principles of Indian law, allotments—whether held in trust or under a restricted deed—have long been recognized as "Indian country."  *See, e.g.*, *United States v. Ramsey*, 271 U.S. 467, 471–72 (1926).

75.     Further, the United States Code defines "Indian country" to include "all Indian allotments, the Indian titles to which have not been extinguished."  18 U.S.C. § 1151(c).

76.     With respect to Alaska, in *Alaska v. Native Village of Venetie*, 522 U.S. 520 (1998), a case involving a question of tribal governmental authority over ANCSA lands, the Supreme Court observed that "Indian country exists in Alaska post-ANCSA" if the land in question is a "dependent Indian communit[y]" as that term is defined under federal law "*or if it*

15

constitutes 'allotments' under § 1151(c)," *id.* at 527 n.2 (emphasis supplied) (alteration in original). *Venetie* thus recognized that tribal authority over non-ANCSA lands, including allotments held by tribal members, was untouched by ANCSA. The principles of tribal sovereignty and federal trust obligation to protect tribal self-government continue in Alaska notwithstanding the enactment of ANCSA.

77.     Courts have repeatedly treated Alaska Native allotments like allotments in the Lower 48 states. *E.g.*, *Pence v. Kleppe*, 529 F.2d 135, 138 (9th Cir. 1976); *Olympic v. United States,* 615 F. Supp. 990, 995 (D. Alaska 1985); *Aguilar v. United States*, 474 F. Supp. 840, 846 (D. Alaska 1979); *State of Alaska, Dept. of Public Works v. Agli*, 472 F. Supp. 70, 72 (D. Alaska 1979).

78.     Controlling federal law prohibits discriminating against allotments in Alaska on the ground that they were allotted under different allotment acts than those used in the Lower 48. There is no legal basis on which to distinguish allotments issued under the Alaska Native Allotment Act from other Indian allotments.

79.     Under these statutes and well-established principles of federal law, the Tribe's Submission demonstrated that the Ondola Allotment constitutes Indian country and is entitled to an affirmative Indian lands determination as a matter of law.

80.     The Tribe's Submission also demonstrated that the Tribe "exercises governmental power" over the Ondola Allotment. 25 U.S.C. § 2703(4)(B).

81.     Prior Indian lands determinations regarding whether a tribe exercises governmental power over a tribal member-owned allotment outside of the tribe's reservation— for purposes of IGRA specifically—have relied on actions similar to those taken by the Tribe

here and described in the Tribe's Submission.  *E.g.*, Big Sandy Rancheria Indian Lands

Determination (September 6, 2006); Quinault Indian Lands Determination (Sept. 26, 1996).

82.     Finally, the Submission explained that a 1993 opinion issued by the Department,

the Opinion on Governmental Jurisdiction of Alaska Native Villages Over Land and

Nonmembers, M-36975 (IBLA Jan. 11, 1993), by Department Solicitor Thomas L. Sansonetti

("the Sansonetti opinion"), did not—and does not—apply here, because it is no longer good law.

The Sansonetti opinion contended that an Alaska tribe's assertion of jurisdiction over an

allotment would be "doubtful" unless there were a "clear nexus to the individual restricted

lands."  *Id.* at 75.

83.     The Sansonetti opinion's analysis was flawed because it conflicted with a prior

opinion on the question and existing court decisions.  Moreover, the Sansonetti opinion has since

been superseded by, among other things, the 1994 Amendments to the Indian Reorganization

Act, Pub. L. No. 103–263, § 5(b), 108 Stat. 707, 709 (1994) (codified at 25 U.S.C. § 5123 (f),

(g)), the 1994 Federally Recognized Indian Tribe List Act, Pub. L. No. 103–454, § 103(4), (5),

108 Stat. 4791, 4791–92 (1994) (codified at 25 U.S.C. § 5130), and the Department's final rule

repealing its earlier policy against taking land into trust in Alaska, Land Acquisitions in Alaska,

79 Fed. Reg. 76,888-02 (Dec. 23, 2014), all of which mandate that tribes in Alaska be treated the

same as tribes in the Lower 48.

84.     Importantly, the Department's 2014 Final Rule noted that "Alaska Native land

and history did not commence with ANCSA, and that ANCSA did not terminate Alaska Native

tribal governments" and "the Department's policy is that there should not be different classes of

federally recognized tribes."  Land Acquisitions in Alaska, 79 Fed. Reg. at 76,890.

85.     The Tribe's Submission demonstrated that, in light of the flaws in the Sansonetti opinion's analysis and these significant legal shifts that occurred after it was issued, the Sansonetti Opinion does not control the analysis here.

86.     Nonetheless, the Tribe also demonstrated that even if the Sansonetti opinion applied, the Tribe's relationship with the Ondola Allotment satisfies the Sansonetti opinion's "tribal nexus" test.  The Ondola family's continuous ties to the Tribe and its government and the Tribe's continued exercise of authority over, and provision of services to, the Allotment, as discussed in detail at ¶¶ 33-66, are among the elements that conclusively establish a strong and enduring nexus between the Allotment and the Tribe.

87.     The Tribe's Submission therefore established that the Ondola Allotment qualifies as "Indian lands" as defined in IGRA, and the Tribe is entitled to an affirmative Indian lands determination.

**D.     The Department's Decision**

88.     During the period in which the Department was considering the Tribe's request, Eklutna tribal leaders met with Department officials on multiple occasions between 2016 and 2018.  This included meetings with the NIGC Commissioner, staff from the Department's Office of the Solicitor, and other Department staff including Lawrence Roberts (in his capacity as Acting Assistant Secretary—Indian Affairs), John Tahsuda (in his capacity as Principal Deputy Assistant Secretary and later in his capacity as Acting Assistant Secretary), and James Cason (in his capacity as Associate Deputy Secretary).

89.     At a meeting on or about August 15, 2017, Associate Deputy Secretary Cason stated that the Tribe would need to seek the views of the Alaska congressional delegation ("Alaska Delegation").  Mr. Cason stated that he wanted to know the views of the Delegation on

the request, and indicated that the Delegation's support would be needed in order for the Tribe's request to move forward.

90.     At the same meeting on or about August 15, 2017, Mr. Cason committed to reaching a decision on the Tribe's request by the end of calendar year 2017.

91.     On a separate occasion, a Department employee stated he was certain Mr. Cason would seek the views of the Alaska Delegation during the Department's decision process.

92.     Despite the Tribe engaging in numerous meetings and providing various supplemental materials requested by the Department, the Department repeatedly stated that it was not ready to make a decision on the Tribe's request for an Indian lands determination and the proposed lease.  The Department repeatedly asserted that the Solicitor's Office needed more time to review the request.  Ultimately the Department did not issue a decision by the end of calendar year 2017.

93.     On information and belief, Members of the Alaska Delegation or their staffs communicated views on the project—positive and negative—to the Interior Department during the Department's decision process.

94.     On multiple occasions, Department staff made comments suggesting that the outcome of the Tribe's request might depend on political considerations.

95.     On information and belief, on or about April 4, 2018, representatives of the Alaska Delegation and state political officials met with Mr. Cason without any representatives of the Tribe present.

96.     On information and belief, other Department staff members had additional meetings with representatives of the Alaska Delegation while the Tribe's request was pending before the Department.

97.     The Department issued its final decision on June 18, 2018.  Letter from John

Tahsuda, Principal Deputy Assistant Secretary—Indian Affairs to Aaron Leggett, President,

Eklutna Native Village (Jun. 18, 2018) ("Decision").  The Decision was issued by John Tahsuda,

Principal Deputy Assistant Secretary—Indian Affairs, in his capacity as Acting Assistant

Secretary—Indian Affairs.

98.     The Decision concluded that the Ondola Allotment does not constitute "Indian

lands" within the meaning of IGRA.  The Department's analysis relied heavily on the Sansonetti

opinion.  Under the Department's interpretation of the Sansonetti opinion's test, the Decision

concluded that the Tribe lacked jurisdiction over the Ondola Allotment because it had shown an

insufficient nexus to the Allotment.

99.     The Department then disapproved the Tribe's proposed lease in a half-sentence

conclusion on the final page of the Decision, providing no further analysis and stating only that

the Allotment "is therefore ineligible for gaming under IGRA, for which reason [the Department]

must disapprove the Tribe's proposed Lease of the Ondola Allotment for gaming purposes."  *Id.*

at 17.

100.    The Decision constitutes final agency action within the meaning of the

Administrative Procedure Act, 5 U.S.C. § 704.

### V.     CAUSES OF ACTION

**FIRST CAUSE OF ACTION:**
**THE DEPARTMENT'S INDIAN LANDS DETERMINATION WAS ARBITRARY AND**
**CAPRICIOUS AND CONTRARY TO LAW, IN VIOLATION OF THE APA**

101.    The Tribe incorporates all previous allegations of fact and law into this Cause of

Action as if set forth in full herein.

102.    A Native allotment constitutes "Indian lands" under IGRA if it is "held by any . . .
individual subject to restriction by the United States against alienation" and if "an Indian tribe
exercises governmental power" over it.  25 U.S.C. § 2703(4).

103.    The Department's Decision agreed with the Tribe that the Ondola Allotment is
land "subject to restriction by the United States against alienation" within the meaning of this
provision.  Decision at 4.

104.    The Decision focused on whether the Tribe "exercises governmental power" over
the Allotment such that the second prong of IGRA's Indian lands test is satisfied.  The
Department concluded that to make such a showing the Tribe must demonstrate that it possesses
Tribal jurisdiction over the Ondola Allotment.

105.    In assessing whether the Tribe possesses jurisdiction over the Allotment, the
Department stated that its analysis relied on the Sansonetti opinion.  *Id.* at 1, 5–6.

106.    In relying on the Sansonetti opinion as the foundation of its analysis, the
Department failed to recognize that the Sansonetti opinion was based on a flawed analysis and
has been superseded by important changes in law and policy.  The Department's reliance on the
Sansonetti opinion was therefore arbitrary and capricious and also contrary to law.

107.    Even if the Department's reliance on the Sansonetti opinion were proper, the
Department's analysis was flawed for additional reasons.

108.    Relying on the Sansonetti opinion, the Decision concluded that there is a
presumption against tribal jurisdiction over allotments unless the Tribe can show "a clear or
original tribal nexus to the site." *Id.* at 5.

109.    The Decision interpreted the term "tribal nexus" "as referring to a Tribe's connections to land and the activities occurring thereon, as opposed to the Tribe's connections to the land's owners or occupants."  *Id.* at 11–12.

110.    The Decision treated the Tribe's claim to jurisdiction as primarily based on the Ondolas' tribal membership, not on the Tribe's assertion of authority over the Allotment land. *Id.* at 4–5.   In choosing to interpret the Tribe's assertion of jurisdiction as membership-based, the Decision arbitrarily and capriciously rejected the numerous undisputed facts provided by the Tribe, which detailed the provision of Tribal services and exercise of tribal jurisdiction over the Allotment itself.

111.    The Decision ultimately concluded that the Tribe had not shown a sufficient "original tribal nexus" to the Ondola Allotment establish tribal jurisdiction under the Sansonetti Opinion's test.  All of the reasons asserted by the Department in support of this conclusion are arbitrary, capricious, and contrary to law.

112.    The Decision asserted that tribal membership was not sufficient alone to support tribal jurisdiction, and it concluded that in this case tribal membership did not weigh in favor of jurisdiction at all.  This conclusion relied on a distinction the Department drew between the Alaska Native Allotment Act and allotment acts outside of Alaska.  *Id.* at 12–13.  In so doing, the Department misapplied the law and failed to follow legal precedent treating allotments made under the Alaska Native Allotment Act in the same manner as allotments made under any of the other parallel Indian allotment acts.

113.    The Decision also concluded that the Big Sandy Rancheria and Quinault decisions were inapplicable because those decisions involved allotments near the Tribes' respective reservations, while the Native Village of Eklutna has no reservation.  *Id.* at 13–14.  In so doing,

22

the Decision arbitrarily and capriciously ignored uncontroverted evidence demonstrating that the Tribe exercises authority and jurisdiction over the Ondola Allotment in many of the *exact same ways* that the Big Sandy and Quinault Tribes exercised authority over their respective allotments. The Decision arbitrarily misapplied the relevant precedent, including the Big Sandy and Quinault decisions.

114.    The Decision next concluded that there was insufficient evidence of tribal services and activities on the Allotment. *Id.* at 14–15. In making this conclusory assertion, the Department arbitrarily and capriciously failed to consider the Tribe's submissions extensively documenting the Tribe's decades-long exercise of authority over, and provision of services to, the Allotment, including natural resource management, signage, public safety ordinances, and on-site healthcare, social services, and children's services.

115.    Additionally, the Decision concluded that there was insufficient acknowledgment of tribal jurisdiction by other entities. *Id.* at 15–16. This portion of the Decision ignored applicable law and failed to recognize that tribal authority and jurisdiction may coexist with the provision of state or municipal services. It also arbitrarily and capriciously rejected the Tribe's assertion of jurisdiction over the Allotment in the Tribal Constitution and tribal ordinances, without acknowledging that similar constitutional provisions had been considered relevant in other cases.

116.    For all of these reasons, the Decision was both arbitrary and capricious and contrary to law. The Tribe is therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Department's unlawful decision pursuant to 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION:**
**THE DEPARTMENT'S INDIAN LANDS DETERMINATION WAS IMPROPERLY**
**INFLUENCED BY POLITICAL CONSIDERATIONS, RENDERING IT ARBITRARY**
**AND CAPRICIOUS, IN VIOLATION OF THE APA**

117.    The Tribe realleges and incorporates all previous allegations of law and fact as if
set forth in full herein.

118.    During its decision process the Department said that, before it reached a decision,
it would need to learn the Alaska Delegation members' views on the Tribe's request for an
Indian lands determination.  On information and belief, members of the Alaska Delegation or
their staff communicated their views—positive and negative—on the Tribe's request to the
Department.  These communications were inherently political in nature.

119.    Under § 2703(4)(B) of the Indian Gaming Regulatory Act, Congress specified
that whether a parcel constitutes "Indian lands" for purposes of the Act depends *only* on whether
title to the land in question is "held in trust by the United States for the benefit of any Indian
tribe" or "held by any Indian tribe or individual subject to restriction by the United States against
alienation and over which an Indian tribe exercises governmental power."  25 U.S.C.
§ 2703(4)(B).

120.    Under the terms of § 2703(4)(B), political considerations are not relevant to an
Indian lands determination.  *Id.*

121.    On information and belief, due to political communications by members of the
Alaska Delegation or their staff, the Department relied on factors beyond those made relevant by
§ 2703(4)(B) of the Indian Gaming Regulatory Act, which influenced the outcome of the
Department's decision.  Further, the Department's own stated desire to learn the views of the
Alaska Delegation itself exceeded the relevant factors Congress set out in § 2703(4)(B) of the
Indian Gaming Regulatory Act.  The Department's decision was therefore improperly influenced

by its own erroneous interpretation of the statute, and by the views of the Delegation, rather than the proper legal and factual questions presented by § 2703(4)(B).

122.    For these additional reasons, the Decision was arbitrary and capricious.  The Tribe is therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Department's unlawful decision pursuant to 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION:**
**THE DEPARTMENT'S DISAPPROVAL OF THE PROPOSED LEASE WAS**
**ARBITRARY AND CAPRICIOUS, IN VIOLATION OF THE APA**

123.    The Tribe realleges and incorporates all previous allegations of law and fact as if set forth in full herein.

124.    The Department's disapproval of the Tribe's proposed lease is made in a conclusory half-sentence statement at the end of the Decision.  Because it contains no additional analysis, the lease disapproval appears to be based entirely on the Department's negative Indian lands determination.

125.    For the reasons described above, the Indian lands determination is arbitrary, capricious and contrary to law.

126.    The Department acted arbitrarily and capriciously in basing its disapproval of the proposed lease on this unlawful Indian lands determination.  There are no other grounds on which the Department has attempted to support its lease disapproval.

127.    The Tribe is therefore entitled to a judgment "hold[ing] unlawful and set[ting] aside" the Department's unsupported lease disapproval pursuant to 5 U.S.C. § 706(2)(A).

**VI.   PRAYER FOR RELIEF**

Wherefore, the plaintiff Native Village of Eklutna respectfully prays that this Court grant it the following relief:

A.      A declaratory judgment reversing the Department's negative Indian lands determination and declaring that the Allotment constitutes "Indian lands" within the meaning of 25 U.S.C. § 2703(4);

B.      Injunctive relief requiring the Department to approve the Tribe's proposed lease of the Ondola Allotment; and

C.      Such other monetary, declaratory and equitable relief as this Court may find to be equitable and just.

Respectfully submitted this 7th day of August 2019.

> SONOSKY, CHAMBERS, SACHSE
>   ENDRESON & PERRY, LLP
>
> By:   */s/ Colin Cloud Hampson*
>         Colin Cloud Hampson, D.C. Bar No. 448481
>         145 Willow Road, Suite 200
>         Bonita, CA 91902
>         Telephone: (619) 267-1306
>         Facsimile: (619) 267-1388
>         champson@sonoskysd.com
>
>         Whitney A. Leonard
>         Alaska Bar No. 1711064
>         Montana Bar No. 36409732
>         *Pro hac vice* anticipated
>         Sonosky, Chambers, Sachse, Miller &
>           Monkman, LLP
>         725 East Fireweed Lane, Suite 420
>         Anchorage, AK 99503
>         Telephone:  (907) 258-7388
>         Facsimile:  (907) 272-8332
>         whitney@sonosky.net
>
>         *Attorneys for the Native Village of Eklutna*