jnu.law.ecf@alaska.gov

1  Lael A. Harrison
   Assistant Attorney General
2  Alaska Bar No. 0811093
   Alaska Department of Law
3  PO Box 110300
   Juneau, AK 99811-0300
4  Telephone: 907.465.3600
   Facsimile: 907.465.3019
5  Email: lael.harrison@alaska.gov
6
7  *Attorney for State of Alaska*

8              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
9

10 NATIVE VILLAGE OF EKLUTNA          )
   26339 Eklutna Village Road         )
11 Chugiak, Alaska 99567,             )
                                      )
12        Plaintiff,                  )
                                      )
13 v.                                 )   Case No. 1:19-cv-02388
                                      )
14 UNITED STATES DEPARTMENT           )
15 OF THE INTERIOR; DAVID             )
   BERNHARDT, Secretary of the        )
16 Interior; TARA SWEENEY,            )
   Assistant Secretary – Indian Affairs; )
17 JOHN TAHSUDA, Principal Deputy     )
18 Assistant Secretary – Indian Affairs; )
   and JAMES CASON, Associate         )
19 Deputy Secretary, United States    )
   Department of the Interior,        )
20 1849 C Street N.W.                 )
   Washington, DC 20240,              )
21                                    )
22        Defendants.                 )
23

24       **MEMORANDUM IN SUPPORT OF STATE OF ALASKA'S**
              **MOTION TO INTERVENE**
25

26

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

## I.   INTRODUCTION

The State of Alaska moves to intervene in this case in which the Department of the Interior determined that an Alaska Native allotment did not meet the definition of "Indian lands" under the Indian Gaming Regulatory Act (IGRA).[1] Unless the allotment is "Indian lands" under IGRA, it cannot be eligible for IGRA-authorized gaming and any commercial gambling on the allotment is illegal unless it complies with the State's charitable gaming laws. The State only allows limited gambling, and requires all net proceeds from gambling to be dedicated to charity.[2] Alaska also taxes legal gambling.[3] If the allotment is ultimately approved for IGRA gaming, then the State will have limited ability to regulate gambling on it, be unable to collect taxes on gambling that occurs there, and the net proceeds from that gambling will not go to charity.[4]

But this case implicates more than just this allotment. The Department of the Interior's decision that this allotment is not "Indian lands" relied on a 1993 Solicitor General Opinion.[5] In the past, the Department has relied on that Opinion to deny other

---

[1]   25 U.S.C. § 2703(4) ("The term "Indian lands" means—(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power"). *See also* 25 C.F.R. 502.12.

[2]   AS 05.15.150.

[3]   AS 05.15.184.

[4]   This case involves "class II" gaming, which is primarily regulated by the tribe conducting the gaming and National Indian Gaming Commission. 25 U.S.C. § 2710. Complaint page 12 paragraph 57.

[5]   This is Department of the Interior Solicitor General Opinion number M-36975, dated January 11, 1993, entitled "Governmental Jurisdiction of Alaska Native Villages

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*      Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE      Page 2 of 24

requests for "Indian lands" determinations under IGRA within Alaska.[6] The plaintiff

challenges the validity of that Opinion.[7] A ruling that the Opinion is invalid may open

the door to IGRA gaming on other properties across Alaska.

   And this case implicates more than just IGRA. The challenged Solicitor General

Opinion is not about IGRA.[8] It is about the territorial jurisdiction of Alaska tribes in

general.[9] And the definition of "Indian lands" under IGRA requires that a tribe

"exercise[] governmental power" over the land.[10] So this case is also about territorial

jurisdiction and governmental authority over Alaska Native allotments, generally.

   Thus, this case threatens the State's interests in its sovereign jurisdictional,

regulatory, and taxing authority. Only the State can adequately protect those interests.

This Court should grant the State of Alaska's motion to intervene in this case.

**ATTORNEY GENERAL, STATE OF ALASKA**
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

---

Over Land and Nonmembers." It is available online at:
https://www.doi.gov/sites/doi.gov/files/uploads/m-36975.pdf. The Complaint refers to
the opinion by the name of its author, the "Sansonetti Opinion." This Motion to
Intervene will refer to it by its number, Sol. Gen. Op. M-36975. *See* Complaint page 17
paragraphs 82 – 83, and page 21, paragraphs 105 – 106. *See also* Exhibit A at pages 1, 5
– 6.

[6]   *See* Exhibit B at pages 2, 6 – 8.

[7]   Complaint page 21, paragraphs 105 – 106.

[8]   Sol. Gen. Op. M-36975 (entitled "Governmental Jurisdiction of Alaska Native
Villages Over Land and Nonmembers").

[9]   This case particularly implicates Opinion M-36975's conclusions at pages 124-
130 regarding Alaska Native allotments and restricted townsite properties. *See* Sol. Gen.
Op. M-36975 at 129 ("in the absence of a tribal territorial base (e.g. a reservation), there
is little or no basis for an Alaska village claiming <u>territorial</u> jurisdiction over an Alaska
Native allotment" (emphasis in original)).

[10]   25 U.S.C. § 2703(4), 25 C.F.R. 502.12.

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1

2      **II.    FACTUAL BACKGROUND**

3            **A.  State law allows limited gambling for charitable benefit.**

4            As a general rule, gambling is illegal in Alaska.[11] Charitable gaming is a limited

5

6      exception to that general rule.[12] Alaska's charitable gaming laws allow certain limited

7      types of gaming for the benefit of Alaskan not-for-profit organizations.[13] Net proceeds

8      of allowed games, after payment of prizes, taxes, and specific expenses, go to permitted

9
       not-for-profit entities within Alaska.[14] The majority of those entities are charitable and
10
       educational organizations, but they also include civic, religious and other types of
11
       organizations.[15] Municipalities and villages can hold permits, and, in fact, the plaintiff
12

13     _____

14     [11]      AS 11.66.200 – 280.

15     [12]      AS 11.66.280(3)(C) (exempting "activity authorized by the Department of
       Revenue under AS 05.15" from the definition of "gambling"). *See generally* AS
16     05.15.010 et seq., which is referred to as the Alaska Gaming Reform Act
       (AS 05.15.695).

17     [13]      AS 05.15.020(a) ("a municipality or qualified organization may conduct an
18     activity permitted under this chapter"), AS 05.15.690(39) (defining "qualified
       organization"). Permitted games are listed in AS 05.15.180 and AS 05.15.690. They are
19     primarily pull-tabs, bingo, raffles, and local competitions like salmon derbies and
       betting on when the ice will break up in the spring.
20
       [14]      AS 05.15.150 ("The authority to conduct the activity authorized by this chapter is
21     contingent upon the dedication of the net proceeds of the charitable gaming activity to
       the awarding of prizes to contestants or participants and to political, educational, civic,
22     public, charitable, patriotic, or religious uses in the state"); AS 05.15.160 (listing
23     authorized expenses that may be deducted from "net proceeds").

24     [15]      *See* Alaska Department of Revenue Tax Division, "Charitable Gaming 2018
       Annual Report" at page 5 available online at
25     http://tax.alaska.gov/programs/documentviewer/viewer.aspx?1543r and attached as
       Exhibit C. A complete list of active permit holders may be found online at the website
26     www.tax.alaska.gov, selecting "Charitable Gaming" from the "Tax Types" menu,

holds a permit.[16] In 2018, the State collected about two-and-a-half million dollars in revenue from charitable gaming.[17] And permitted not-for-profit organizations received more than thirty-five million dollars in revenue from charitable gaming.[18]

The State comprehensively regulates charitable gaming.[19] It regulates the issuance of permits to qualified not-for-profit organizations;[20] it regulates the games that can be played;[21] it regulates the maximum value of prizes;[22] it regulates the frequency with which some games can be played;[23] it regulates who can play some games;[24]

---

selecting "Search Permits and Licenses" from the "Links" menu, selecting "Search for a License" from the "Quick Links" menu, selecting "Gaming Queries" from the "License Search" menu, selecting "Permitee Permit Query" from the "Gaming Permit/License Search" menu, and sorting results by "active" permits.

[16]     This can be verified by conducting the search described in footnote 15, above, and filtering results for "Eklutna."

[17]     *See* Exhibit C at page 8.

[18]     *See* Exhibit C at page 6.

[19]     *See generally* AS 05.15.010 *et seq.* and 15 AAC 160.010 *et seq.*

[20]     AS 05.15.020 – 120; AS 05.15.690(39); 15 AAC 160.010 – 020.

[21]     AS 05.15.180; AS 05.15.690(2), (4) – (8), (11) – (13), (17), (20), (23), (26), (28), (31), (33), (38), (40) – (42), (44), (46) – (47).

[22]     AS 05.15.180 (setting total annual prize limits generally); 15 AAC 160.480 (setting prize limit for single pull tab at $500); 15 AAC 160.600 (setting annual prize limits for bingo).

[23]     15 AAC 160.580 (limiting bingo sessions per month, sessions per day, and games per session).

[24]     AS 05.15.180(f) and (h) (bingo players must be 19 or older, Calcutta pool players must be 18 or older), AS 05.15.187 (pull-tabs players must be 21 or older), 15 AAC 160.710 (employees of the Department of Fish and Game may not participate in salmon classics).

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*          Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE                    Page 5 of 24

it regulates serving alcohol in conjunction with games;[25] it regulates manufacturing and distribution of some games;[26] it regulates operators and vendors of games;[27] it regulates the relationship between operators and vendors of games and permit holders;[28] and it regulates advertising and promotion of games,[29] among other things. The State has the power to conduct background checks on certain key individuals involved in charitable gaming,[30] to examine books and records of charitable gaming,[31] inspect premises used for charitable gaming,[32] to issue subpoenas and compel testimony,[33] and to suspend and revoke permits and licenses.[34] State law also gives important rights to municipalities,

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

[25]     AS 05.15.690(48)(c)(i) (allowing a "vendor" of pull-tabs to be an establishment holding a beverage dispensary license from the Alcoholic Beverage Control Board), 15 AAC 160.480(c) (prohibiting sale of pull-tabs to a drunken person); 15 AAC 160.500 (prohibiting alcohol access where bingo is played).

[26]     Regulation of manufacturing and distribution of pull-tabs can be found at: AS 05.15.181, AS 05.15.183, AS 05.15.185; 15 AAC 160.040 – 50, 15 AAC 160.370 – 440.

[27]     An "operator" is licensed to operate games on behalf of permit holders, "vendors" are licensed to sell pull-tabs on behalf of permit holders. AS 05.15.690(34), (48). AS 05.15.187, AS 05.15.188; 15 AAC 160.190 – 360. Operators are subject to reporting, bonding, and insurance requirements. AS 05.15.167; 15 AAC 160.200 – .220, .250, .290, .320 – 330.

[28]     AS 05.15.115, 15 AAC 160.220 (governing operator contracts with permit holders); AS 05.15.188, 15 AAC 160.340 (governing vendor contracts with permit holders); 15 AAC 160.250 (governing operator reports to permit holders); 15 AAC 160.270 (governing operator payments to permit holders).

[29]     AS 05.15.640; 15 AAC 160.780, 15 AAC 160.945 – .950.

[30]     AS 05.15.060(a)(5), AS 05.15.105; 15 AAC 160.100, 15 AAC 160.934.

[31]     AS 05.15.070; 15 AAC 160.980.

[32]     15 AAC 160.980.

[33]     AS 05.15.070.

[34]     AS 05.15.170.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*     Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE     Page 6 of 24

including the opportunity to ban charitable gaming entirely within the municipality,[35] the opportunity to object to issuance of a specific permit within the municipality,[36] and the ability to prohibit specific vendors or operators from engaging in charitable gaming within the municipality.[37]

But the centerpiece of the State's gaming law is the requirement that all net proceeds of permitted gaming be dedicated to charitable purposes.[38] Net proceeds are all revenues from charitable gaming after payment of limited, specific expenses.[39] Net proceeds cannot be saved or allowed to accrue; permit holders must spend all net proceeds from charitable gaming within one year of receipt.[40] This system implements the Alaska Legislature's policy goal that gaming in Alaska benefit all Alaskans by redistributing profits for public benefit through permitted organizations.

**B. The Indian Gaming Regulatory Act regulates gaming on "Indian lands."**

The Indian Gaming Regulatory Act (IGRA) regulates gambling conducted by "Indian Tribes" on "Indian lands."[41] IGRA defines three "classes" of gaming, and has

---

[35]     AS 05.15.620 – .625.

[36]     AS 05.15.030.

[37]     AS 05.15.124.

[38]     AS 05.15.150.

[39]     AS 05.15.690(32) (defining "net proceeds"), AS 05.15.160 (listing authorized expenses that a permit holder may deduct from "net proceeds").

[40]     AS 05.15.150(b); 15 AAC 160.822.

[41]     *See* 25 U.S.C. § 2701 *et seq.*

different provisions for each.[42] This case involves "class II" gaming of the type

permitted under the State's charitable gaming laws, including pull-tabs and bingo.[43]

Class II gaming on "Indian lands" is subject to regulation primarily by the tribe

conducting the gaming and the National Indian Gaming Commission.[44] Although there

are open questions regarding a State's ability to regulate Class II gaming on "Indian

lands," it is generally accepted that State taxes and State law requiring dedication of net

profits to charity will not apply. Further, other state regulations such as prize limits and

frequency of games may not be enforceable.[45] And, even if certain State regulations do

apply, the State may face challenges in enforcing them.[46]

---

[42]     *See* 25 U.S.C. § 2710. *See also Alabama v. PCI Gaming Auth.,* 801 F.3d 1278, 1283-84 (11th Cir. 2015) (summarizing IGRA's provisions regarding classes of gaming).

[43]     25 U.S.C. § 2703(7)(A) (defining "class II gaming" to include bingo, and pull-tabs when "played in the same location" as bingo), 25 C.F.R. 502.3, AS 05.15.180. IGRA allows class II gaming on "Indian lands" to the extent that the State "permits such gaming for any purpose by any person, organization or entity." 25 U.S.C. § 2710(b).

[44]     25 U.S.C. § 2710.

[45]     *See e.g. Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 539 (9th Cir. 1994) ("[A]t least insofar as the State's argument is directed at Class II-type gaming … the state cannot regulate and prohibit, alternately, game by game and device by device, turning its public policy off and on by minute degrees"). *But see Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 41 F.3d 421, 427 (9th Cir. 1994) ("IGRA does not require a state to negotiate over one form of a gaming activity simply because it has legalized another, albeit similar form of gaming. Instead, the statute says only that, if a state allows a gaming activity 'for any purpose by any person, organization, or entity,' then it also must allow Indian tribes to engage in that same activity … In other words, a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have.")

[46]     *See, e.g., Alabama v. PCI Gaming Auth.,* 801 F.3d 1278 (11th Cir. 2015) (holding Tribe's sovereign immunity barred State lawsuit to enjoin gaming on "Indian lands" as a public nuisance and in violation of IGRA).

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*          Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE          Page 8 of 24

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

**C. This is not the first time that the legal issues involved in this case have arisen.**

This case is about an Alaska Native allotment. There are more than 16,000 Native allotments in Alaska.[47] The majority of those allotments were issued under the Alaska Native Allotment Act of 1906, which provided for homestead allotments for individual Natives and their families.[48] The Act did not condition allotments on tribal membership or location within traditional tribal territory.[49] Thus, allotments are located according to where individuals made their homesteads, not according to that individual's connection to a tribe or traditional tribal areas.[50] They are dispersed throughout Alaska, and are generally located amid other types of land ownership, including private, municipal, state and federal.[51] In other words, a Native allotment can be anywhere.

---

[47]    *See* U.S. Department of the Interior, Bureau of Land Management, "Alaska Native Allotment Act Entitlements," *available online at* https://www.blm.gov/programs/lands-and-realty/regional-information/alaska/land_transfer/ak-native-allotment-act. Each allotment may be a maximum of 160 acres, although many, including the allotment at issue in this case, are much smaller. *Id.*

[48]    *See* Alaska Native Allotment Act of May 17, 1906, 34 Stat. 197. The Alaska Native Allotment Act was repealed by the Alaska Native Claims Settlement Act in 1971. *See* 43 U.S.C. § 1617. *See also Jones v. State,* 936 P.2d 1263, 1264 – 65 (Alaska App. 1997) (describing history of Alaska Native Allotment Act).

[49]    *See Jones*, 936 P.2d at 1265.

[50]    *See* former 43 U.S.C. § 270-3 (requiring proof of substantially continuous use and occupancy of land by individual applicant for five years) (repealed by 43 U.S.C. § 1617).

[51]    A map of Native allotments across Alaska can be viewed online using the Spatial Data Management System operated by the United States Department of the Interior, Bureau of Land Management here: https://sdms.ak.blm.gov/isdms/imf.jsp?site=sdms.

*Native Village of Eklutna v. U.S. Dep't of Interior, et al.*        Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE        Page 9 of 24

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Ondola allotment is located within the Municipality of Anchorage in the community of Chugiak.[52] It shares boundaries with two parcels owned by the for-profit corporation Eklutna, Inc. and with three parcels owned by private individuals.[53] Its northern boundary abuts the Alaska Railroad right-of-way.[54] It has vehicle access via Birchwood Spur Road, which is maintained by the Municipality of Anchorage and connects to State highways.[55] The allotment is about seven miles by road from the plaintiff's headquarters, and about twenty-two miles by road from downtown Anchorage to the south, and about twenty-two miles by road from Wasilla and Palmer to the North.[56] There are no other Native allotments in the area.[57]

---

Using the "Map Layers" toolbar at the viewer's right of the map, select "Land Status—Detailed" and select "Native Allotments." Then zoom in on areas of interest.

[52]     *See* Exhibit A at page 2. The location of this property can be determined using the Municipality of Anchorage's online Real Property Information website: http://www.muni.org/Departments/finance/property_appraisal/Pages/PropInfo.aspx. This website allows the user to "search properties" and "find property on map." The property can be located by entering the property information as alleged on page 5, footnote 1 of the Complaint.

[53]     *See* note 52, above. After locating the allotment on the Real Property Information map, ownership of neighboring parcels can be determined by clicking on them. Ekultna, Inc. is a business corporation created under the Alaska Native Claims Settlement Act, and is the largest private landholder in Anchorage. *See* www.eklutnainc.com. It is a distinct entity from the plaintiff.

[54]     *See* note 52, above. *See also* Exhibit A at page 2.

[55]     *See* note 52, above. *See also* Exhibit D at pages 3, 7

[56]     Approximate driving distances can be determined through many online map systems, including www.maps.google.com, www.mapquest.com, and the like.

[57]     *See* Exhibit A at page 2. This can be verified using the Bureau of Land Management's Spatial Information System (*See* note 51, above).

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*       Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE              Page 10 of 24

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1
2
3
4
5
6
7

This is at least the third time that the plaintiff has requested a determination that this allotment is "Indian lands" under IGRA. The Department of the Interior denied the plaintiff's request in 1995 on grounds similar to the denial challenged in this case: specifically that the allotment was not "Indian lands" because the plaintiff did not exercise governmental power over the allotment.[58] The plaintiff tried again in 2007, but withdrew its request after the State and the Alaska Legislature opposed it.[59]

8
9
10
11
12
13
14
15
16

In the late 1990s, the Native Village of Barrow, the Native Village of Akiachak and the Kenaitze Tribe requested IGRA "Indian lands" determinations for certain Alaska Native allotments (and analytically similar Native townsite lots).[60] The Department of the Interior denied those applications on grounds similar to the grounds challenged in this case.[61] Those tribes challenged those denials in this Court.[62] This Court upheld the denial of the Native Village of Barrow's application, and the Native Village of Akiachak and the Kenaitze Tribe dropped their suit.[63] The question of

17
18

[58]     Exhibit E. Although this denial does not identify the Ondola allotment, there are no other allotments in the Eklutna area.

19
20

[59]     Exhibit D, Exhibit F, Exhibit G (note that, although the withdrawal states that the request would be resubmitted, as far as the State is aware the request was not re-submitted).

21
22

[60]     See Sol. Gen. Op. M-36975 at pages 124 – 30 (analyzing question of tribal jurisdiction over Alaska Native allotments and townsite lots similarly). Exhibit B, Exhibit H at page 2.

23

[61]     Exhibit B.

24
25

[62]     See Akiachak Native Cmty., Kenaitze Indian Tribe, IRA v. Dep't of the Interior, Case No. 1:96-cv-02302 (D.D.C.); Native Vill. of Barrow v. Nat'l Indian Gaming Comm'n, Case No. 1:99-cv-00886 (D.D.C.).

26

[63]     Exhibit I, Exhibit J.

Native Village of Eklutna v. U.S. Dep't. of Interior, et al.
MEMO IN SUPPORT OF MOTION TO INTERVENE

Case No. 1:19-cv-02388
Page 11 of 24

whether an Alaska Native allotment may be considered "Indian lands" for IGRA

purposes may have arisen in additional situations of which the State is not aware. But in

sum, the Department of the Interior has consistently considered Alaska Native

allotments ineligible for IGRA gaming, absent unusual circumstances.

After the Department of the Interior denied the plaintiff's most recent request for

a determination that the Ondola allotment meets IGRA's definition of "Indian lands,"

the plaintiff filed this lawsuit challenging the denial under the Administrative

Procedures Act.[64] The plaintiff's complaint challenges the Department's decision as

arbitrary and capricious, including the aspect of the decision that relied on Solicitor

General Opinion M-36975. Such a ruling could alter the status quo in which Alaska

Native allotments are generally considered ineligible for IGRA gaming, and create

uncertainty regarding jurisdiction and governmental power over Alaska Native

allotments generally. The State now seeks to intervene in that lawsuit.

## III.   Argument

### A. This Court should allow the State of Alaska to intervene as of right under Federal Rule of Civil Procedure 24(a).

Federal Rule of Civil Procedure 24(a) states:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who … (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

---

[64]   *See* Exhibit A; Complaint page 123 paragraph 116, page 24 paragraphs 122, 125 – 27.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*   Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE   Page 12 of 24

**ATTORNEY GENERAL, STATE OF ALASKA**
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

**ATTORNEY GENERAL, STATE OF ALASKA**
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1

2        Pursuant to this Rule, this Court requires a party to meet the following conditions

3   in order to intervene as a matter of right:

4              (1) the application to intervene must be timely; (2) the applicant must
               demonstrate a legally protected interest in the action; (3) the action
5              must threaten to impair that interest; and (4) no party to the action
               can be an adequate representative of the applicant's interests.[65]
6

7        As demonstrated below, the State meets these requirements.

8              **i.    The State's motion to intervene is timely.**

9        The plaintiff filed its complaint on August 7, 2019. The federal defendants filed

10  their Answer on December 17, 2019. The administrative record has not yet been

11  certified. The parties have not yet engaged in substantive litigation before this Court.

12

13  The State's motion for intervention is timely.[66]

14             **ii.   The State has a legally protected interest in regulating gambling in
                      Alaska and in the uniform application of state law across Alaska.**
15

16       This case directly involves the State's power to regulate and tax gambling in

17  Alaska. The plaintiff ultimately seeks to remove gambling on the Ondola allotment

18  from the State's regulatory and taxing power, and an Indian lands determination is an

19  essential preliminary step in that process. The State's sovereignty and power to regulate

20  are legally protected interests.[67] Through its comprehensive regulation of gambling in

21

22  _____

23  [65]    *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp.2d 1, 5
    (D.D.C. 2008) (quoting *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C.Cir. 2008)).

24  [66]    *See id.* at 5 – 6 (motion to intervene considered timely when filed before
    dispositive motion practice).

25

26  [67]    *See Akiachak Native Cmty.*, 584 F. Supp.2d at 6 ("A government's loss of
    sovereignty over land within its jurisdiction is a legally protectable interest"). *See also*

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*          Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE                                   Page 13 of 24

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Alaska, the State has demonstrated its significant interest in this particular area. The State Legislature made a policy choice to restrict gambling in Alaska and direct net proceeds of legal gambling to public benefit through permitted not-for-profit organizations. This case implicates the State's interest in enforcing that regulatory scheme on the Ondola allotment.

The State's interest in this case is also about money.[68] Last year, the State collected about two-and-a-half million dollars in revenue from charitable gaming taxes, and the people of Alaska benefited from tens of millions of dollars that permit holders received and used for charitable and civic purposes.[69]

The State also has an interest in the uniform application of its laws across Alaska. Native allotments are spread far and wide throughout the state, often interspersed with other forms of land ownership. Presently, Alaska and Alaskan

---

*Nuesse v. Camp,* 385 F.2d 694, 700 (D.C. Cir. 1967) ("We should not be niggardly in gauging the interest of a state administrative officer in the validity of what his federal counterpart has done in an area of overlapping fact and intertwined law").

[68]     *See Huff v. Comm'r of Internal Rev. Serv.,* 743 F.3d 790, 799 (11th Cir. 2014) (where case implicated "the Virgin Islands' interest in preserving the integrity of its tax system," holding "[t]his type of sovereign interest is precisely the type of legally protectable interest that has long formed the basis for intervention of right under Rule 24(a)(2)"). *See also City of Sault Ste. Marie v. Andrus,* 458 F. Supp. 465, 468 (D.D.C. 1978) (municipality had legally protected interest in avoiding "diminishment of the tax base and impairment of municipal law and zoning enforcement" and therefore had standing to challenge Department of Interior decision to take land within municipality into trust for Indian tribe).

[69]     *See* Alaska Department of Revenue Tax Division, "Charitable Gaming 2017 Annual Report" at page 4 (*available online at:* http://tax.alaska.gov/programs/documentviewer/viewer.aspx?1446r) (net proceeds from 2017 gaming were spent in Alaska in 2018. AS 05.15.150(b)).

---

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*                    Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE                    Page 14 of 24

municipalities provide government services, and exercise governmental authority, generally on Native allotments to the same extent as on other private properties.[70] In order for the Ondola allotment to meet IGRA's definition of "Indian lands," plaintiff must show that it has jurisdiction and "exercises governmental power" over the allotment. Thus, the question of whether the allotment is "Indian lands" under IGRA implicates broader questions of the State's governmental power and jurisdiction over Alaska Native allotments in general.[71] This implicates the State's legally protected sovereign interests.

> ### iii. This action threatens to impair the State's interest in regulating gambling in Alaska and in the uniform application of state law across Alaska.

If this Court grants the plaintiff the relief that it seeks, which includes a declaratory judgment that the allotment meets the IGRA definition of "Indian lands," the State's interests described above will suffer.[72] Such a ruling would both open up this

---

[70]     Naturally, the State and municipal governments respect the restrictions on alienation and taxation of allotments as designated by federal law.

[71]     The plaintiff seeks a ruling that the Department of the Interior's denial of its request was arbitrary and capricious in part because it relied on Solicitor General Opinion M-36975 (which the Complaint refers to as the "Sansonetti Opinion") (*see* Complaint page 21, paragraph 106). The opinion does not address the meaning of "Indian lands" under IGRA, but rather "Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers." (Sol. Gen. Op. M-36975 at 1).

[72]     *See Fund For Animals, Inc. v. Norton,* 322 F.3d 728, 735 (D.C. Cir. 2003) (an unfavorable ruling affecting an interest, even if not binding on non-parties, still impairs that interest: "Regardless of whether the [intervenor] could reverse an unfavorable ruling by bringing a separate lawsuit, there is no question that the task of reestablishing the status quo if the [plaintiff] succeeds in this case will be difficult and burdensome").

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*     Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE          Page 15 of 24

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

particular allotment to eligibility for IGRA gaming,[73] and open up the possibility for

other Native allotments across the state to become eligible.[74] This would impair the

State's interest in regulating gambling within its borders, its ability to collect taxes on

legal gambling, and its interest in dedicating the net proceeds of legal gambling to

general public benefit through the charitable gaming program.[75] And it would create

uncertainty regarding jurisdiction and government authority over Native allotments in

Alaska, generally.

The Ondola allotment is conveniently located on the road system between

Alaska's two largest population centers, Anchorage and the Matanuska-Susitna valley.[76]

---

[73]    Of course, even with such a declaratory judgment, the plaintiff would still have to take significant further steps before receiving National Indian Gaming Commission approval for gaming, such as obtaining approval of its gaming ordinances. *See* Complaint page 12, paragraph 57.

[74]    *See Nuesse v. Camp,* 385 F.2d 694, 700 (D.C. Cir. 1967) (finding impairment of interest in possibility of adverse precedent: "Should this court on appeal render a decision in the Commissioner's absence, and contrary to his view, he would presumably be hampered in seeking to vindicate his approach in another court … [W]e must recognize the practical consequences of [] failure to allow the [State] Commissioner an opportunity to advance his own theories both of law and fact in the … pending case." (Internal quotations and alterations omitted)).

[75]    *See Huff v. Comm'r of Internal Rev. Serv.,* 743 F.3d 790, 800 (11th Cir. 2014) (allowing intervention of right of U.S. Virgin Islands in dispute between taxpayer and IRS regarding whether taxpayer should have paid taxes to Virgin Islands or to IRS, and noting "the potential for a negative *stare decisis* effect may supply that practical disadvantage which warrants intervention of right") (quoting *Stone v. First Union Corp.,* 371 F.3d 1305, 1309 – 10 (11th Cir. 2004)).

[76]    According to the State of Alaska Department of Labor and Workforce Development, the Municipality of Anchorage and the Matanuska-Susitna Borough (nicknamed the "Mat-Su") account for more than half of the population of Alaska. State of Alaska Department of Labor and Workforce Development, "2018 Population Estimates by Borough, Census Area, and Economic Region" (available online at

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*      Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE          Page 16 of 24

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

An IGRA gaming facility on that allotment, exempt from state taxes and not required to dedicate net proceeds to charity, has serious potential to undercut existing state-permitted gaming operations in the area.[77] And undercutting those existing operations would undercut state tax revenue and undercut the State's policy of dedicating gaming profits to charitable and public purposes.[78]

Also, if this Court rejects the Department of the Interior's long-standing position that Alaska Native allotments do not meet IGRA's definition of "Indian lands" absent unusual circumstances, it is possible that other tribes will rely on that holding to request "Indian lands" designations for allotments in their vicinity. Tribes like the Native Village of Barrow and the Kenaitze Tribe may renew their prior applications, and other tribes may join them. Thus, if this Court grants the plaintiff the relief it seeks, it would create the possibility for significant increase in IGRA gaming in Alaska generally. Such an increase in IGRA gaming could further undercut both State tax revenue and charitable permit holder revenues. And it could generally remove much gaming in Alaska from the regulatory control of the State. Also, although it is the State's

---

http://live.laborstats.alaska.gov/pop/). Wasilla and Palmer are two of the larger communities within the Matanuska-Susitna Borough.

77 *See Fund For Animals, Inc. v. Norton,* 322 F.3d 728, 735 (D.C. Cir. 2003) (finding likely impairment of interests for intervention purposes where government entity stood to lose revenue as a result of adverse ruling). A few examples of permit holders in the Anchorage area that stand to lose revenue are The United Way of Anchorage (permit #1671), Habitat for Humanity Anchorage (permit #103066), and Food Bank of Alaska, Inc. (permit #1278).

78 *See* Exhibit C at page 5 (309 of the 1,091 charitable gaming permit holders are located in Anchorage and the associated communities of Chugiak and Eagle River, and an additional 70 are located in the Mat-Su communities of Wasilla and Palmer).

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1  understanding that the Mayor of Anchorage currently supports the plaintiff's request to

2  conduct gaming on the allotment, a ruling in the plaintiff's favor has the potential to

3  undercut the State's scheme for municipal participation in gaming decisions.[79]

4          Finally, a decision from this Court that the plaintiff has jurisdiction and

5  "exercises governmental power"[80] over this allotment could have far-reaching

6  consequences not just for this allotment but for allotments throughout Alaska. It could

7  create uncertainty about jurisdiction, government power, and government services on

8  every allotment in Alaska.[81] There may be collateral consequences to other state

9  regulatory schemes, such as environmental protection and fish and game.[82] The

10  scattered nature of Native allotments in Alaska further compounds the State's

11  concerns.[83]

12

13

14          **iv.   The United States Department of the Interior, and its officers,
               cannot adequately represent the State's interests.**

15

16  [79]    For example, consider the legal issues that would arise if the Department of the
     Interior were to approve IGRA gaming on an allotment in a municipality that has voted
17  to prohibit gaming entirely. *See* AS 05.15.620 – .625.

18  [80]    25 U.S.C. § 2703(4), 25 C.F.R. 502.12(b).

19  [81]    *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp.2d 1, 7
20  (D.D.C. 2008) (in case regarding United States' authority to take land into trust for
     Alaska tribes, thus removing it from State taxing and regulatory authority, action
21  threatened to impair Alaska's interests for purposes of intervention analysis).

22  [82]    *See Jones v. State,* 936 P.2d 1263 (Alaska App. 1997) (holding that State has
     power to enforce hunting and fishing regulations on Native allotments).

23  [83]    *See id.* at 1267 ("A ruling in Jones's favor would create a checkerboard of small
24  enclaves where the state could not regulate hunting and fishing … Native allotment
     parcels are found throughout the state … If the State could not regulate hunting and
25  fishing on Native allotment parcels, the result would be islands of non-regulation spread
     throughout practically every game-management unit in the state—leading to disruption
26  and endangerment of the State's efforts to protect and conserve game resources.").

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*     Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE              Page 18 of 24

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The burden of demonstrating that the existing parties may not adequately represent an intervener's interests "should be treated as minimal."[84] The Department of the Interior, and its officials, have no interest in protecting Alaska's sovereignty as a general matter or in protecting Alaska's charitable gaming scheme in particular.[85] The Federal defendants also have no interest in protecting the State's tax revenues from charitable gaming, or in protecting the revenues collected by Alaska's not-for-profit charitable gaming permit holders.[86] Furthermore, the State's ability to inform the court regarding the practical aspects of providing government services and exercising governmental power in Alaska is qualitatively different from that of the federal defendants.[87] And the State's legal arguments may be broader than those of the Federal defendants. The Federal defendants may be bound to defend the conclusions of the

[84]    *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp.2d 1, 7 (D.D.C. 2008).

[85]    *See id.* ("In this case, the existing defendants, the DOI and the Secretary, have no clear interest in protecting Alaska's sovereignty or Alaska's interest as a party to ANCSA that would ensure adequate representation of Alaska's interests. Thus, Alaska is not adequately represented by existing parties.")

[86]    *See Huff v. Comm'r of Internal Rev. Serv.,* 743 F.3d 790, 800 (11th Cir. 2014) (granting Virgin Islands' motion to intervene in dispute between individual taxpayer and IRS regarding whether taxes should be paid to IRS or Virgin Islands, stating "the Taxpayers' pecuniary interest is qualitatively different from the Virgin Islands' sovereign interests in the administration of its tax system").

[87]    *See* Exhibit D at pages 3 – 7 (gathering and presenting relevant facts specific to provision of road service, utility service, police and fire service, etc. to Ondola allotment). *See also* Exhibit A at page 15 (citing facts presented by State in its 2007 submission).

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*          Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE          Page 19 of 24

challenged Solicitor General opinion in a way that the State is not.[88] Thus, the State is in

a unique position from the Federal defendants "to provide full ventilation of the legal

and factual context of this critical definition" of "Indian lands."[89]

Because the State's burden of demonstrating that the existing parties may not

adequately represent its interests is "not onerous,"[90] this Court should find that the

Federal defendants cannot adequately represent the State of Alaska's many long-term

interests implicated in this case.

Therefore, this Court should grant the State's motion to intervene as a matter of

right. The State has amply demonstrated that this lawsuit threatens its legally protected

interests, and that the current parties may not adequately represent those interests.

### B. Alternatively, this Court should permit the State to intervene under Rule 24(b)

Even if this Court does not find the State is entitled to intervene under Rule

24(a), it should still permit the State to intervene under Rule 24(b). That Rule reads:

> (b) Permissive Intervention.
>
> (1) In General. On timely motion, the court may permit anyone to intervene who: … (B) has a claim or defense that shares with the main action a common question of law or fact.
>
> (2) By a Government Officer or Agency. On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on: (A) a statute or executive order administered by the officer or agency; or (B) any

---

[88]    Exhibit A at page 6 ("Sol. Op. M-36975 is binding on the Department until modified or withdrawn").

[89]    *See Nuesse v. Camp,* 385 F.2d 694, 704 (D.C. Cir. 1967).

[90]    *Fund For Animals, Inc. v. Norton,* 322 F.3d 728, 735 (D.C. Cir. 2003) (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C.Cir.1986)).

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1

2

        regulation, order, requirement, or agreement issued or made under the statute or executive order.

        (3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

3

4

5

      As can be seen from the Answer lodged with this motion, the State's defenses

6

share common questions of fact and law with the dispute between the plaintiff and the

7

federal defendants. Allowing the State to intervene will not unduly expand the lawsuit

8

or delay adjudication of the dispute between the original parties. In fact, it will provide

9

10

for a well-informed exploration of all the factual and legal issues relevant to the

11

question of whether the federal defendants' decision that the Ondola allotment does not

12

meet IGRA's definition of "Indian lands" was arbitrary, capricious or contrary to law.

13

Further, subsection (b)(2)(B) of Rule 24 applies: the State is a government entity, and

14

the claims and defenses in this case involve the Alaska Native Claims Settlement Act, to

15

which the State is a party.[91]

16

17

      The D.C. District Court has held that "[i]ntervention to promote a relevant public

18

interest is permissible when the public official charged with primary responsibility for

19

vindicating that interest seeks to defend it."[92] This Court should allow the State to

20

21

22

[91]    *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp.2d 1, 6 (D.D.C. 2008).

23

24

[92]    *Nuesse v. Camp,* 385 F.2d 694, 705 (D.C. Cir. 1967). *See also id.* at 706 ("It is a living tenet of our society and not mere rhetoric that a public office is a public trust. While a public official may not intrude in a purely private controversy, permissive intervention is available when sought because an aspect of the public interest with which he is officially concerned is involved in the litigation.")

25

26

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*    Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE    Page 21 of 24

intervene in this lawsuit as it has direct significance to the general welfare of the State's population.

### C. The State has standing to intervene in this case.

A party moving to intervene must have standing.[93] Standing has two parts: constitutional standing and prudential standing. Standing under Article III of the United States Constitution requires "(1) injury-in-fact; (2) causation, and (3) redressability."[94] Prudential standing for review of agency action requires "an injury that falls within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit."[95]

For the same reasons that the State may intervene as a matter of right under Rule 24(a), the State has standing.[96] For purposes of Article III standing, the State has shown that granting the plaintiff's requested relief would cause the State injury. Such a ruling would cause injury to the State's sovereign authority and its tax revenues. The injury goes beyond the State's ability to regulate gambling and collect taxes on gambling on the Ondola allotment. It also goes to the State's sovereign interests in jurisdiction and "governmental power" over Alaska Native allotments in general. These injuries are

---

[93]    *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp.2d 1, 7 (D.D.C. 2008).

[94]    *Id.* (quoting *Fund For Animals, Inc. v. Norton,* 322 F.3d 728, 732 – 33 (D.C. Cir. 2003)).

[95]    *Id.* at 8 (internal quotations and alterations omitted).

[96]    *Id.* at 7 (D.D.C. 2008) ("The standing inquiry is repetitive in the case of intervention as of right because an intervenor who satisfies Rule 24(a) will also have Article III standing.")

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

1  legally redressable by a ruling from this Court affirming the federal defendant's

2  conclusion that the Ondola allotment does not meet IGRA's definition of "Indian

3  lands."

4      For purposes of prudential standing, the State has shown that its injury falls into

5  the "zone of interests" involved in this lawsuit.[97] The definition of "Indian lands" in

6  IGRA directly affects the State by determining what properties may be exempted by

7  federal law from the State's regulatory and taxing authority over gambling.[98]

8  Furthermore, this case involves interpretation of the Alaska Native Claims Settlement

9  Act and the Alaska Native Allotment Act. The plaintiff in this case challenges a specific

10  Solicitor General opinion regarding the territorial jurisdiction of tribes over Alaska

11  Native Allotments.[99] This opinion is primarily an interpretation of the Alaska Native

12  Claims Settlement Act, and its conclusions regarding tribal territorial jurisdiction over

13  Alaska Native allotments also interpret the Alaska Native Allotment Act.[100] The State of

14  Alaska's sovereignty is within the zone of interests protected and regulated by the

15  Alaska Native Claims Settlement Act and the Alaska Native Allotment Act. Also, as a

---

[97]     *See id.*

[98]     *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1283 (11th Cir. 2015)
("IGRA provides a comprehensive approach to the controversial subject of regulating
tribal gaming and strikes a careful balance among federal, state and tribal interests"
(internal quotations and alterations omitted)).

[99]     *See* Sol. Gen. Op. M-36975. In particular, it appears that the plaintiff challenges
the Opinion's conclusion on page 129 that "in the absence of a tribal territorial base
(e.g. a reservation), there is little or no basis for an Alaska village claiming territorial
jurisdiction over an Alaska Native allotment." (Emphasis in original).

[100]     *See* Sol. Gen. Op. M-36975 at pages 103 – 33.

*Native Village of Eklutna v. U.S. Dep't of Interior, et al.*          Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE                    Page 23 of 24

settling party to the Alaska Native Claims Settlement Act, the State provided money and gave up certain land selection rights in consideration of the agreement, and is obligated under its terms.[101] The State falls within the "zone of interests" protected by that Act.

## IV.   Conclusion

This Court should grant the State of Alaska's motion to intervene, so that the State may protect its sovereign interests implicated in this case.

DATED:  December 31, 2019.

KEVIN G. CLARKSON
ATTORNEY GENERAL

By:     /s/ Lael A. Harrison
        Lael A. Harrison
        Assistant Attorney General
        Alaska Bar No. 0811093
        Alaska Department of Law
        PO Box 110300
        Juneau, AK 99811-0300
        Telephone: 907.465.3600
        Facsimile: 907.465.3019
        Email: lael.harrison@alaska.gov

ATTORNEY GENERAL, STATE OF ALASKA
Dimond Courthouse
PO Box 110300, JUNEAU, ALASKA 99811
PHONE (907) 465-3600

---

[101]     *See Akiachak Native Cmty.*, 584 F. Supp.2d at 4, 8.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*     Case No. 1:19-cv-02388
MEMO IN SUPPORT OF MOTION TO INTERVENE     Page 24 of 24