

United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

JUN 1 8 2018

The Honorable Aaron Leggett
President, Eklutna Native Village
26339 Eklutna Village Road
Chugiak, Alaska 99567

Dear President Leggett:

On June 29, 2016, the Native Village of Eklutna (Tribe) transmitted a request to the Department of the Interior (Department) for a determination that an off-reservation, restricted-fee allotment known as the (b) (6) which the Tribe proposes to lease for gaming purposes, qualifies as "Indian lands" under the Indian Gaming Regulatory Act (IGRA).[1] The Tribe included a copy of the proposed lease (Lease),[2] which I have reviewed to determine whether it complies with the requirements of IGRA and whether the Allotment constitutes "Indian lands" as defined by IGRA.

The Tribe separately transmitted a request to the Solicitor seeking the modification or withdrawal of a 1993 M-Opinion (Op. M-36975) by former Solicitor Thomas Sansonetti addressing the effects of the Alaska Native Claims Settlement Act (ANCSA)[3] on Tribal jurisdiction over land and non-members in Alaska.[4] The Tribe claims that Sol. Op. M-36975 has been superseded by changes in law and policy.[5] I have consulted the Office of the Solicitor and I am informed that Sol. Op. M-36975 controls my analysis.

Having completed my review of the Tribe's submissions in support of the Lease, I regret to inform you that I cannot conclude that the (b) (6) constitutes "Indian lands" within the meaning of IGRA, and therefore I disapprove the Lease for the reasons set out below.

**Background**

*Native Village of Eklutna*

The Native Village of Eklutna is a federally recognized tribe headquartered in the Village of Eklutna, about 22 miles northwest of downtown Anchorage, Alaska.[6] The Tribe numbers about

---

[1] Letter, L.B. Miller, Esq. & C. C. Hampson, Esq. to Acting Assistant Secretary Lawrence Roberts (June 29, 2016) (First NVE Submission); Pub. L. No. 100-497, 102 Stat. 2467 (Oct. 17, 1988), codified as 25 U.S.C. § 2701 et seq.
[2] First NVE Submission, Business Lease between the (b) (6) and the Native Village of Eklutna ((b) (6) (b) (6) ) (NVE Lease).
[3] Pub. L. No. 92-203, 85 Stat. 688 (codified as amended at 43 U.S.C. §§ 1601-1628).
[4] Letter, President Lee Stephan, Native Village of Eklutna, to Solicitor Hillary Tomkins, Dept. of the Interior (Nov. 21, 2016); Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers, Op. Sol. Interior M-36975 (Jan. 11, 1993) (Sol. Op. M-36975).
[5] *See also* First NVE Submission at 23-27.
[6] First NVE Submission at 7; *id.*, Ex. 8.

300 members, who descend from the original Dena'ina (or Tanaina) natives of the area.[7] The Tribe has never had a reservation or trust or restricted land set aside for its use by the United States, and today owns about 55 acres of land within the Village of Eklutna in fee.[8] The Tribe does not assert territorial jurisdiction over any other specific allotment, and Bureau of Land Management (BLM) records show no other Alaska Native allotments in the vicinity.

The BLM issued the allotment to (b) (6), an Alaska Native, in 1963 pursuant to the Alaska Native Allotment Act ("ANAA")[9] based on an application filed in 1961.[10] (b) (6) resided on the Allotment until her death in 1964,[11] and the parcel has been owned by her heirs and successors since then. The Allotment's current owners are all Tribal members.[12] The Allotment is located in Chugiak, Alaska, about seven miles southwest of the Tribe's headquarters.[13] It consists of an approximately 8-acre wooded homestead[14] and is surrounded by residential and light-industrial parcels.[15] An Alaska Railroad right-of-way borders the Allotment on the north and the Birchwood municipal airport lies to the immediate north and west.

*Lease Terms*

The Lease is a proposed business lease between the Lessors[16] and the Native Village of Eklutna. The purpose of the Lease is to allow the Tribe, through the (b) (4), a wholly-owned enterprise established under Tribal law, to develop, construct, finance and operate a gaming facility on a portion of the (b) (6) pursuant to IGRA.[17] The land subject to the Lease is described as (b) (6), Seward Meridian Alaska, containing about 8.05 acres more or less, as subject to any prior, valid, existing rights-of-way of record.[18] The Lease preamble provides that the Tribe provides government services to the land subject to the Lease; asserts jurisdiction over the land subject to the Lease; and that the Lessors acknowledge and submit to the Tribe's governmental authority over the land subject to the Lease.[19] The initial term of the Lease is for 25 years, renewable at the Tribe's option for an

---

[7] First NVE Submission at 3; Robert A. Arnold, et al., Federal Field Committee for Development Planning in Alaska, *Alaska Natives and the Land* at 253 (1968) ("Field Report"). The Field Report listed other known settlements in the area as including Zdluiat (south of Nitak), Nitak (near Eklutna), Knakatuk (opposite Nitak on the West side of Knik Arm), and Knik near the mouth of the Knik river).
[8] Third NVE Submission at 1.
[9] Pub. L. No. 59-171, ch. 2469, 34 Stat. 197 (1906), as amended, Pub. L. 84-931, ch. 891, 70 Stat. 954 (Aug. 2, 1956).
[10] First NVE Submission, Ex. 10.
[11] First NVE Submission, Ex. 13, ¶ 4.
[12] Second NVE Submission at 6.
[13] First NVE Submission at 7.
[14] First NVE Submission at 7; *id.*, Ex. 10 (BLM, Native Allotment Deed issued to (b) (6) (Nov. 13, 1963)).
[15] *See* https://www.google.com/maps/place/Chugiak,+Anchorage,+(b) (6)
(b) (6)
[16] The lessors, designated the "(b) (6)," are (b) (6)
(b) (6). NVE Lease, Preamble.
[17] NVE Lease, Recitals para. 1.
[18] NVE Lease, ¶ 1.
[19] NVE Lease, Recitals, paras. 4-5.

additional 25 years.[20] The Tribe will pay Lessors a one-time signing bonus of $(b) (4)[21] The Tribe will pay the Lessors a (b) (4) of the property as of the date of the Lease execution,[22] and a percentage rent consisting of t(b) (4) one-half percent of gross gaming revenue plus (b) nd a-half percent of gross sales receipts from non-gaming operations for each month.[23] Through the Lease, Lessors disclaim any authority to plan, organize, direct, coordinate or control any of Lessee's gaming operations.[24]

**Standard of Review**

    **A.   Indian Gaming Regulatory Act**

By its terms, IGRA applies only to gaming on Indian lands.[25] IGRA defines "Indian lands" as:

> (A) all lands within the limits of any Indian reservation; and
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.[26]

The IGRA's implementing regulations further clarify that "Indian lands" means:

> (A) Land within the limits of an Indian reservation; or
>
> (B) Land over which an Indian tribe exercises governmental power and that is either —
>
>> (1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
>>
>> (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.[27]

---

[20] NVE Lease, ¶ 2.
[21] NVE Lease, ¶ 4(A).
[22] NVE Lease, ¶ 4(B).
[23] NVE Lease, ¶ 4(C).
[24] NVE Lease, ¶ 4(F).
[25] *See, e.g.*, 25 U.S.C. § 2710(a)(2) ("any class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of this chapter"); 25 U.S.C. § 2710(b)(1) (requiring approved tribal gaming ordinance for the conduct of Class II gaming on Indian lands); *id.* (requiring tribal licensure of each gaming facility on Indian lands); 25 U.S.C. § 2710(b)(4)(A) (permitting licensure of individually owned gaming on Indian lands); 25 U.S.C. § 2710(d)(1) (requiring approved tribal gaming ordinance for the conduct of Class III gaming on Indian lands); 25 U.S.C. § 2710(d)(3)(A) (requiring a tribal-state compact for Class III gaming on Indian lands); Sen. Rep. 100-446 at p. A-1. (IGRA results from years of discussions and negotiations between tribes, States, gaming industry, administration, and Congress to formulate a system for regulating gaming on Indian lands).
[26] 25 U.S.C. § 2703(4).
[27] 25 C.F.R. § 502.12.

3

The (b) (6) is a restricted-fee Indian allotment that is not within an existing reservation. To satisfy IGRA's definition of "Indian lands," the Tribe must therefore demonstrate that it possesses territorial jurisdiction and exercises governmental authority over the site.[28]

Tribal jurisdiction is a threshold requirement to the exercise of governmental power.[29] This is consistent with IGRA, which limits its key provisions to Tribes "having jurisdiction over Indian lands" or to "Indian lands within such tribe's jurisdiction."[30] Generally speaking, an Indian Tribe possesses jurisdiction over land it inhabits if the land qualifies as "Indian country."[31] Congress has defined "Indian country" as including "all Indian allotments, the Indian titles to which have not been extinguished."[32] The (b) (6) may be considered "Indian country."[33] The question remains whether the Native Village of Eklutna possesses jurisdiction over it.

The inquiry into a Tribe's jurisdiction focuses principally on congressional purpose and intent and on construing legislation that may otherwise limit a Tribe's jurisdiction or determine which Tribe possesses jurisdiction over a particular parcel of land.[34] The relevant statutes in this case are the Alaska Native Allotment Act of 1906 (ANAA) and the Alaska Native Claims Settlement Act of 1971 (ANCSA).

Congress has authority to create or eliminate Tribal rights, and Tribes retain those aspects of sovereignty that Congress has not otherwise withdrawn.[35] This legal underpinning cannot be squared with the Tribe's initial claim that an Alaska Tribe automatically has territorial jurisdiction over an Alaska Native allotment based solely on the owners' membership.[36] Such a system could exacerbate jurisdictional conflicts resulting from the Federal Government's allotment policies generally, while changes in Tribal enrollment could hinder a Tribe's ability to

---

[28] NIGC, Iowa Tribe of Oklahoma, Whitecloud Allotment at 6 (Jan. 7, 2010) ("Whitecloud ILO"); NIGC, Gaming by Big Sandy Rancheria on the McCabe Allotment at 4 (Sept. 6, 2006) ("Big Sandy ILO").
[29] Whitecloud ILO at 6, citing *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-703 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), superseded by statute as stated in *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998); *see also State ex. rel. Graves v. United States*, 86 F.Supp.2d 1094 (D. Kan. 2000), *aff'd and remanded, Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001); *Mechoopda Indian Tribe of Chico Rancheria v. Schwarzenegger*, 2004 U.S. Dist. LEXIS 8334, at *23 (E.D. Cal. Mar. 12, 2004). NIGC, Muscogee (Creek) Nation ILO at 2 (Apr. 23, 2008).
[30] 25 U.S.C.§ § 2710(d)(3)(A), 2710(b)(1); *see also Narragansett Indian Tribe*, 19 F.3d at 701-03.
[31] *Alaska v. Native Village of Venetie Tribal Gov't.*, 522 U.S. 520, 527 n. 1 (1998); *United Keetoowah Band of Cherokee Indians of Oklahoma v. United States Dept. of Housing and Urban Development*, 567 F.3d 1235 (10th Cir. 2009).
[32] 18 U.S.C. § 1151(c). Though this definition directly applies only to criminal jurisdiction, the courts apply it to questions of civil jurisdiction as well. *Venetie*, 522 U.S. at 527.
[33] Sol. Op. M-36975 at 124-128.
[34] Whitecloud ILO at 8 citing *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001); NIGC, Status of Puyallup Tribal Property for Gaming Purposes at 4-7 (Nov. 12, 2004); NIGC, Kialegee Tribal Town Proposed Gaming Site in Broken Arrow, Oklahoma at 10-13 (May 24, 2012).
[35] Whitecloud ILO at 8, citing *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001).
[36] Whitecloud ILO at 8. *Cf.* First NVE Submission at 12, citing *John v. Baker*, 982 P.2d 738, 754-55 (Alaska 1999). The Tribe offers no information on the enrollment status of Olga Ondola or her predecessors who lived at the site. *See* Alaska 2007 Submission, Ex. R (BLM, Allotment Report for (b) (6) Application) (noting purchase of home from previous resident; stating applicant is Indian descendant born and residing in Alaska).

conduct long-term planning concerning any allotted lands within its jurisdiction.[37]

### B. Solicitor Opinion M-36975

Congress enacted ANCSA in 1971 for the purpose of extinguishing aboriginal land claims in Alaska.[38] The Act revoked all Federal reserves in Alaska established between 1891 and 1943 but one and it repealed the ANAA.[39] In 1993, Solicitor Thomas Sansonetti issued Sol. Op. M-36975 interpreting ANCSA's effects on Alaska Tribal authority over land and non-members.

Sol. Op. M-36975 set its analysis against the backdrop of Federal Indian law and the general principle that within Indian Country, Tribes possess sovereignty over their members and territory unless otherwise limited by Congress.[40] It concluded that while ANCSA did not "completely extinguish[] the sovereign powers" of Alaska tribes,[41] its revocation and conveyance of beneficial interests in reservation lands to state-chartered Native Corporations constituted "a very complete address to the issue of land" that reflected "a new approach" to defining the relationship between Alaska Natives and the United States.[42]

Sol. Op. M-36975 concluded that Indian Country in Alaska continued to exist after ANCSA only "in certain limited cases"[43] that included Alaska Native allotments.[44] Nevertheless it found Alaska Native allotments to be an exception to the general rule that tribal authority coincides with Indian Country.[45] While the Indian Country status of an allotment provided the statutory basis for the exercise of *federal* jurisdiction, it did not necessarily mean that the allotment was also subject to *tribal* jurisdiction.[46]

Solicitor Sansonetti conducted a detailed analysis of the authorities under which Alaska Native allotments issued. Because he found Alaska Native allotments more like homestead allotments than Tribally-affiliated public domain allotments,[47] he concluded there generally existed "little or no" basis to support Tribal jurisdiction over them.[48] But due to the distinct history of some off-reservation allotments in Alaska,[49] he conceded there could be some that were subject to tribal authority. Determining which required a particularized inquiry into the relevant statues and circumstances surrounding an allotment's creation, or a demonstration of a clear or original tribal nexus to the site.[50]

---

[37] Whitecloud ILO at 8.
[38] Sol. Op. M-36975 at 79.
[39] Sol. Op. M-36975 at 79.
[40] Sol. Op. M-36975 at 108, citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982). Sansonetti acknowledged that "Indian country" is the touchstone for allocating authority among the various governments. *Id.* at 109, citing *Indian Country, U.S.A. v. Oklahoma Tax Comm'n*, 829 F.2d 967, 973 (10th Cir. 1987).
[41] Sol. Op. M-36975 at 107.
[42] Sol. Op. M-36975 at 107-108.
[43] Sol. Op. M-36975 at 108.
[44] Sol. Op. M-36975 at 124-126.
[45] Sol. Op. M-36975 at 124.
[46] Sol. Op. M-36975 at 126.
[47] Sol. Op. M-36975 at 127-129.
[48] Sol. Op. M-36975 at 127-129.
[49] Sol. Op. M-36975 at 126.
[50] Sol. Op. M-36975 at 127, 130.

Sol. Op. M-36975 is binding on the Department until modified or withdrawn.[51] An Alaska Tribe seeking an "Indian lands" opinion under IGRA therefore bears the burden of rebutting the presumption created by ANCSA that Alaska tribes generally lack territorial jurisdiction over Alaska Native allotments. In accordance with Sol. Op. M-36975, this may be done by a particularized inquiry into the relevant statutes and circumstances surrounding the allotment's creation or by demonstrating a clear or original tribal nexus to the allotment site.[52]

**Discussion**

    A.    **Relevant Statutes & Circumstances**

        1.    **Statutes**

Congress enacted ANAA in 1906 to provide a means "by which individual Alaska Natives could obtain legal title to the land they occupied."[53] As enacted, ANAA provided that any "Indian or Eskimo of full or mixed blood" who resided in and was a native of Alaska could acquire an allotment from the public domain of up to 160 acres of nonmineral lands.[54] The Act deemed the lands so allotted "the homestead of the allottee and his [or her] heirs in perpetuity."[55] Congress amended ANAA in 1956 to expand eligibility to Aleuts of full or mixed blood and to narrow the lands that could be allotted to "vacant, unappropriated, and unreserved nonmineral" lands.[56] To date, over 13,000 parcels of land have been allotted under ANAA.[57]

Sol. Op. M-36975 discusses the purpose, intent, and legislative history of ANCSA in exhaustive detail. As relevant here, ANCSA extinguished all claims by Alaska Native groups based on aboriginal title.[58] This terminated pending claims to aboriginal lands in the Cook Inlet region.[59] Though ANCSA repealed ANAA, it included a savings provision for allotment applications already pending.[60] The ANCSA further revoked all reserves set aside by legislation or by Executive or Secretarial Order for Native use "or for administration of Native affairs."[61]

---

[51] A signed M-Opinion binds all Departmental offices and officials and may be overruled or modified only by the Solicitor, the Deputy Secretary, or the Secretary. 209 DM 3.2(A)(11).
[52] Sol. Op. M-36975 at 127, 130; NIGC, Native Village of Barrow Indian Lands Opinion at 2 (Feb. 1, 1996) (tribe bears burden of establishing that it satisfies statutory requirements of IGRA).
[53] *United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1015 (D. Alaska 1977).
[54] 34 Stat. 197.
[55] 34 Stat. 197.
[56] Act of Aug. 2, 1956, ch. 891, 70 Stat. 954.
[57] U.S. Department of the Interior, BLM, Acting Deputy Director for Operations, *Statement to the Senate Energy and Natural Resources Committee Subcommittee on Public Lands, Forests and Mining on S.785, Alaska Native Veterans Land Allotment Equity Act* (July 26, 2017), available at https://www.doi.gov/ocl/s-785. *See also* Field Report at 450; *Atlantic Richfield*, 435 F. Supp. at 1015; Sol. Op. M-36975 at 62.
[58] Sol. Op. M-36975 at 76.
[59] *See Natives of Palmer, Alaska v. The United States of America*, 27 Ind. Cl. Comm. 135 (1972).
[60] *Alaska Dep't of Nat. Res. v. United States*, 816 F.3d 580, 583 (9th Cir. 2016); ANCSA, § 18(a). Section 18(a) of ANCSA also terminated the ability of Natives covered by the Act to avail themselves of the General Allotment Act as amended.
[61] Sol. Op. M-36975 at 88, citing ANCSA, § 19(a).

2. **Circumstances**

   a. *Eklutna Industrial School Reserve*

The site of the (b) (6) once formed part of an area reserved by the Federal Government for use for an education facility known as the Eklutna Industrial School. The record of the Federal Government's use of these lands does not support the Tribe's arguments that establishment of the School reserve constituted express recognition of the Tribe's traditional territory.[62]

The United States appears to have first surveyed the Upper Cook Inlet region in about 1912.[63] In 1924, the U.S. Bureau of Education (BOE) established the Eklutna Industrial School (School) near the Village of Eklutna as a vocational boarding school for Alaska Natives.[64] In 1927 President Coolidge withdrew about 1,400 acres of public lands for the School's use[65] in an Executive Order that omitted any reference to Natives or Native lands.

After Congress extended the IRA to Alaska in June 1936 (Alaska IRA),[66] the Secretary of the Interior (Secretary) ordered the temporary withdrawal of an additional 328,000 acres of public lands to be added to the School reserve.[67] Such lands were to be held until the question of having the additional lands "permanently reserved as an Indian reservation" could be put to "the Indian or Eskimo occupants" thereof.[68] Less than a year later, the Assistant Commissioner of Indian Affairs recommended adding a further 1.6 million acres "for the benefit of the graduates of the Eklutna Industrial School and such other native residents within that region."[69] But the Bureau of Indian Affairs (BIA) Director of Lands recommended that the Department "not ask the few Indian occupants" of the School reserve, mostly students, to vote on the question of establishing a reservation under the Alaska IRA, but instead seek special legislation.[70] The Commissioner of the General Land Office (GLO) argued that the proposal was contrary to the

---

[62] First NVE Submission at 3.
[63] https://sdms.ak.blm.gov/scanned_images/surveyindex.html. Additional federal surveys were conducted in 1952 and 1953.
[64] Letter from T.W. Taylor, Acting Commissioner Indian Affairs, to Lewis A. Sigler, Counsel and Consultant on Indian Affairs, Committee on Interior and Insular Affairs, House of Representatives (Dec. 5, 1969) ("Taylor Letter"), in *Alaska Native Land Claims Part II, Hearings before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs, House of Representatives, Ninety-First Congress, First Session, on H.R. 13142, H.R. 10193, and H.R. 14212, Bills to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes* at 587 (Washington 1970).
[65] E.O. 4778 (Dec. 5, 1927) (reserving T16N, R1E and R1W, Seward Meridian). The School reserve was slightly reduced on June 8, 1934 to accommodate a homestead entry that had mistakenly occupied part of the reserved land. *See* E.O. 6734 (June 8, 1934). Sixty-seven students attended the School in 1927. Taylor Letter at 587. By its terms, E.O. 4778 reserved certain lands at Eklutna and Cordova, Alaska, respectively, "for use of the United States Bureau of Education for educational purposes," without reference to Alaska Natives.
[66] Act of May 1, 1936, 49 Stat. 1250, codified at 25 U.S.C. § 5119; Pub. L. No. 73-383, § 5 (June 18, 1934), 48 Stat. 984.
[67] Secretarial Order of Oct. 30, 1936 ("S.O. 1936"). *See also* Leasability of Lands in the Vicinity of Eklutna Withdrawn by Public Land Order No. 2427, Op. Sol. Interior M-36761 at 3 (May 1, 1967) ("Sol. Op. M-36761").
[68] S.O. 1936.
[69] Letter, Assistant Commissioner, Office of Indian Affairs, to Secretary of the Interior (Jul. 12, 1937).
[70] Memorandum, BIA Director of Lands to BIA Assistant Commissioner (Jul. 24, 1937).

7

Alaska IRA and a 1937 Solicitor's Opinion interpreting its application.[71] The GLO recommended that no additional lands be withdrawn for the School and that the lands added in 1936 be revoked.[72]

The Secretary revoked the 1936 Order several years later as to all but 9,200 acres of School land "immediately surrounding the Town of Eklutna."[73] This had the effect of removing the (b) (6) site from the School reserve. The Secretary explained that changing conditions in and around Eklutna meant that "a much smaller area than at first anticipated [would] meet the needs of the natives living in that vicinity."[74] This included pressure for use of woodland from a nearby military reserve; the probability of moving the School to a different location; and the fact that the anticipated increase in the Native population on the School reserve did not occur.[75] While the Office of Indian Affairs continued to recommend that the remaining lands be held "with the view to later recommending establishment of a reservation for the native inhabitants should it be determined that an Indian reservation is desirable and necessary,"[76] the Federal Government never did so,[77] and it gradually disposed of the School's lands in the years after World War II.

In 1946 the School discontinued and its buildings were sold or transferred to the Alaska Railroad. The General Superintendent of the Alaska Native Service then recommended reducing the School reserve to about 2000 acres.[78] The Alaska Natives of the Eklutna Village later petitioned the Department to determine any rights they might have in the School reserve. The BIA ultimately concluded that it lacked authority to do so under the Alaska IRA and instead recommended that "legislation be prepared…which will authorize the establishment of an Indian Reservation…at Eklutna, Alaska, for the benefit of the Natives thereof and thereby vest the equitable title in the Natives."[79] This never occurred.

In 1961 the Secretary restored to the public domain what remained of the School reserve, separately transferring about 1800 acres near the Village of Eklutna to the BIA for the administration of Native affairs.[80] In 1963, BIA prepared a history of the Village and its inhabitants while considering whether to use the BIA reserve as a possible industrial or

---

[71] Memorandum, Commissioner, GLO, to Secretary of the Interior (Aug. 9, 1937) ("GLO Memo."), citing Sol. Op. M-28978, "Authority of the Secretary of the Interior to Reserve waters in Connection with, and Independently of, Land Reservations for Alaskan Natives under the Act of May 1, 1936," 56 I.D. 110 (Apr. 19, 1937).
[72] GLO Memo. at 11. The GLO Memo. further recommended that no new Indian reservations be designated in Alaska until the U.S. Geological Survey could determine the value of lands for natural resources. *Id.*
[73] Secretarial Order of Dec. 18, 1942 at 2 ("S.O. 1942"); Sol. Op. M-36761 at 3.
[74] S.O. 1942 at 2.
[75] Taylor Letter at 587.
[76] S.O. 1942 at 2.
[77] Sol. Op. M-36761 at 3.
[78] *Id.* at 4; Taylor Letter at 587. In 1951 the Secretary withdrew 205 acres from the School reserve for the Alaska Railroad for gravel. Public Land Order. No. 755 (Sept. 26, 1951), 16 Fed. Reg. 9816 (Sept. 27, 1951) (205 acres). Another 20 acres was withdrawn in May 1961 for use by the Federal Aviation Agency. Public Land Order. No. 2259 (Feb. 3, 1961), 26 Fed. Reg. 1185 (Feb. 10, 1961).
[79] *See* U.S. Dept. of the Interior, Bureau of Indian Affairs, Chief Branch of Realty, Memorandum re Establishment of an Indian Reservation at Eklutna, Alaska at 2 (Jan. 26, 1955).
[80] Public Land Order. No. 2427 (Jul. 5, 1961), 26 Fed. Reg. 6243 (July 12, 1961), corrected, 26 Fed. Reg. 9832 (Oct. 13, 1961). The revocation excepted 10 acres of land withdrawn by S.O. 1936 in Cordova, Alaska.

vocational school.[81] The BIA concluded that the Village "isn't older than some 40 years" and noted that the Russian Orthodox Church in the Village had been moved there from Knik on the opposite shore of the Cook Inlet in the early 20th century.[82] The BIA concluded that the "Eklutna group of Tanaina Indians" residing in and around the Village had "no formal organization, no written constitution, no formal government."[83] The village was then drafting a formal written constitution under which it intended to formally organize,[84] and its unwritten constitution at the time defined membership as "all descendants of the original Indian residents upon the Eklutna [School] Reserve on the date when the latter was created (1927)."[85] The BIA report concluded with the expectation that the Native Village of Eklutna would ultimately organize as a "federal corporation" under the Alaska IRA.[86]

In 1967, the Solicitor determined that the creation of the BIA reserve had "not establish[ed] or provide[d] for the establishment of a reservation under the [Alaska IRA]," adding that the lands were not on an equal footing with other reservations designated by Secretarial order for the use and occupancy of the natives and confirmed as reservation in elections by them.[87] In 1971, ANCSA had the effect of revoking the BIA reserve.[88]

      b. *Land Claims*

In the 1950s, Natives from the areas around the Village of Eklutna began asserting claims to the lands in the upper Cook Inlet region.[89] In 1951, the Natives of Palmer, Alaska filed a petition with the Indian Claims Commission (ICC) seeking compensation for the taking of roughly 3,000 square miles of aboriginal lands and waters.[90] The claim area included most of what is now the Municipality of Anchorage and the present-day locales of the Native Villages of Eklutna, Knik, and Chickaloon. The Tribe suggests these claims were to establish aboriginal title of the "Dena'ina peoples of Eklutna and…Palmer…to the lands they had historically occupied," but the petition neither mentions Eklutna nor refers to the Tribe itself.[91] The ICC dismissed the claim in 1972 as having been extinguished by Section 4(b) of ANCSA.[92]

---

[81] U.S. Dept. of the Interior, Bureau of Indian Affairs, Anchorage Field Office, Report of Projects Development Officer Ledo A. Kozely at 10 (Jul. 24, 1963) ("Kozely 1963").
[82] Kozely at 7.
[83] Kozely 1963 at 7, 9.
[84] Kozely 1963 at 7.
[85] Kozely 1963 at 7. The Tribe's current, written constitution defines membership eligibility as including any person who is a "Native resident since 1940." First NVE Submission, Ex. 7 (Constitution of Native Village of Eklutna, art. X, sec. I(a) (1996)).
[86] Kozely 1963 at 11.
[87] Sol. Op. M-36761 at 4-5. The Solicitor further concluded that the BIA's reserve at Eklutna did not come within the regulatory definition of "tribal land" at 25 C.F.R. Part 131 (1967).
[88] *See* ANCSA, § 19(a) (revoking reserves set aside for administration of Native affairs).
[89] *See* First NVE Submission at 4 ("Dena'ina peoples of Eklutna and...Palmer, Alaska."); Email from Colin C. Hampson, Esq. to Matthew Kelly, Office of the Solicitor (Dec. 20, 2017) (Fifth NVE Submission), Ex. 1 (Claim Petition filed by William Ezi, Chief of the Native Village of Palmer).
[90] First NVE Submission at 4; citing Field Report at 445.
[91] First NVE Submission at 4.
[92] *Natives of Palmer, Alaska v. The United States of America*, 27 Ind. Cl. Comm. 135 (1972).

9

During the 1950s, the Natives of Eklutna village petitioned BIA for hearings to determine their possessory rights to the Eklutna Industrial School reserve,[93] though no further action appears to have been taken on the original request.[94] When BIA recommended giving up the School reserve in 1953,[95] the natives of Eklutna Village submitted a new request for a more limited reservation.[96] The Department took no action on the request and ultimately recommended that legislation be secured to reserve part of the School's lands for the Eklutna natives.[97]

Before the enactment of ANCSA, the BIA Juneau Area Director in 1971 issued a memorandum to the Commissioner of Indian Affairs in response to a petition from the Native Village of Eklutna to again consider establishing a Native reservation at Eklutna.[98] The purpose of a reservation would be to provide economic opportunity and "create a much greater cohesiveness" in the Tribe.[99] The Commissioner responded that, given ANCSA's certain enactment, "a Departmental determination has been made against creating any reservations within [Alaska] at this time."[100]

c. History of (b) (6)

As noted, the site of the (b) (6) only briefly formed part of the Eklutna Industrial School reserve. (b) (6) application states that she and her husband moved to the Allotment site in 1937 after purchasing the house from the previous resident.[101] However in 1942, the Department transferred certain public lands, including the (b) (6) site, for use by the War Department for military purposes.[102] Following World War II, the lands were returned to the Department's administration[103] and later "subdivided for the purpose of disposing of most

---

[93] Sol. Op. M-36761 at 4; *see also* Taylor Letter at 588; Field Report at 443.
[94] Field Report at 443, 446. *See also, id.* at 500, Fig. V-57 (listing protests AA-368 and AA-574 filed by Eklutna against transfer of 460,800 acres of land within Kenai Peninsula).
[95] Taylor Letter at 588.
[96] Sol. Op. M-36761 at 4.
[97] Taylor Letter at 588. The Solicitor later concluded that the proposal to use legislation was based on a misunderstanding of the requirements of the Alaska IRA as well as a desire to assure the Natives of a compensable interest in land. Sol. Op. M-36761 at 4.
[98] U.S. Dept. of the Interior, Bureau of Indian Affairs, Juneau Area Office, Memorandum re Eklutna Reservation Establishment (May 7, 1971) ("Juneau Area Director Memo.").
[99] Juneau Area Director Memo. at 1.
[100] U.S. Dept. of the Interior, Bureau of Indian Affairs, Commissioner of Indian Affairs, Memorandum re Eklutna Reservation (May 24, 1971).
[101] *See* Alaska 2007 Submission, Ex. R (U.S. Dept. of the Interior, BLM, Indian Allotment Report on Application of (b) (6) ); *see also* BLM, Alaska Native Allotment (b) (6) (June 28, 1961). The Tribe claims that (b) (6) took up residency in the 1920s. First NVE Submission at 7.
[102] *See* Public Land Order No. 20 (Aug. 4, 1942), "Withdrawing Public Lands for the Use of the War Department for Military Purposes," 11 Fed. Reg. 8362 (Aug. 2, 1946) ("P.L.O. 20"). Due to its confidential status, P.L.O. 20 was not published until 1946. A subsequent order withdrew overlapping public lands for use of the War Department for military purposes and "from all forms of appropriation under the public-land laws, including the mining and mineral-leasing laws" also included the Allotment site. *See* Public Land Order No. 95 (Mar. 12, 1943), "Withdrawing Public Lands for Use of the War Department for Military Purposes," 11 Fed. Reg. 8364 (Aug. 2, 1946) ("P.L.O. 95").
[103] P.L.O. 95 provided that the Department's jurisdiction over the lands withdrawn for the War Department would revert six months after termination of the unlimited national emergency declared by Proclamation No. 2487 of May 27, 1941, 55 Stat. 1647, which occurred on April 28, 1952. *See* Proclamation 2974, Termination of the National

of the public domain land as homesites."[104] In 1961 (b) (6) submitted an application under the ANAA to BLM, which approved it in 1963.[105] While it was pending, BLM granted rights of way across the site for transmission lines belonging to the Matanuska Electric Association (Matanuska Electric) that remain in place today.[106] In 1964 and 1984, (b) (6) son, (b) (6), purported to grant transmission line rights-of-way over the Allotment to Matanuska Electric as well. Though not approved by the Department, they were apparently recorded with the Alaska Department of Natural Resources Recorder's Office in 2005 and 2006.[107] They state that (b) (6) owned the lands and that the lands were free and clear of encumbrances and liens of whatsoever character.

(b) (6) resided on the Allotment until her death in 1964.[108] In that time, the Tribe provided her and her family moose meat and salmon two or three times a year.[109] It is unclear who, if anyone, resided at the Allotment between 1964 and 1985, when (b) (6) took up residence with his family.[110] The Tribe states that it regularly cut trees on the Allotment between 1965 and 1969 to create a fire perimeter around the house and for use for fuel and for Tribal cultural events.[111] In 2003, (b) (6) considered partitioning the Allotment, for which reason BIA surveyed and appraised the lots.[112] According to the Tribe, nine individuals today hold ownership interests in the (b) (6),[113] which is presently occupied by the (b) (6) [114]

### B. Tribal Nexus

Sol. Op. M-36975 provides no examples of what may be considered evidence of "clear or original tribal nexus." "Nexus" is commonly understood to mean a "means of connection; a link or tie."[115] Because Sol. Op. M-36975 addresses territorial jurisdiction, it seems reasonable to interpret "nexus" as referring to a Tribe's connections to land and the activities occurring

---

Emergencies Proclaimed on September 8, 1939, and May 27, 1941 (April 28, 1952) (available at http://www.presidency.ucsb.edu/ws/?pid=87328 (last visited Aug. 10, 2017)). P.L.O. 95 further provided that the lands would remain withdrawn from all forms of appropriation under the public-land laws until otherwise ordered, pending classification and a determination as to whether the lands, or portions thereof, were needed for public purposes.
[104] U.S. Dept. of the Interior, BLM, Hobart B. Hyatt, Field Notes of the Dependent Resurvey of a Portion of...Township 15 North, Range 1 West of the Seward Meridian 127 (Jan. 27, 1954).
[105] First NVE Submission, Ex. 10.
[106] BLM, ROW Nos. 050466 (July 14, 1961), 021429 (Feb. 21, 1962). In 2004, the United States issued a patent to the Alaska Railroad Corporation incorporating Matanuska's rights-of-way. See U.S. Dept. of Transportation, Federal Railroad Administration, Patent No. 50-2205-0046 (Nov. 23, 2004).
[107] Alaska 2007 Submission, Ex. I (Electric Line Right of Way Easement, Recording Dist. 301 – Anchorage (Apr. 1, 2005)); id., Ex. J (Electric Line Right of Way Easement, Recording Dist. 301 – Anchorage (Apr. 26, 2006)).
[108] First NVE Submission, Ex. 13, ¶ 4 (Affidavit of (b) (6) (Mar. 26, 2007)).
[109] First NVE Submission, Ex. 13, ¶ 7 (Affidavit of (b) (6) (Mar. 26, 2007)).
[110] First NVE Submission, Ex. 13, ¶ 4 (Affidavit of (b) (6) (Mar. 26, 2007)).
[111] First NVE Submission, Ex. 13, ¶ 9 (Affidavit of (b) (6) (Mar. 26, 2007)).
[112] First NVE Submission, Ex. 13, ¶ 18 (Affidavit of (b) (6) (Mar. 26, 2007)).
[113] See NVE Lease, Recitals, ¶ 3.
[114] See NVE Lease, Recitals, ¶¶ 2-3.
[115] American Heritage Dictionary, definition of nexus, accessed Sept. 28, 2017 at https://www.ahdictionary.com/word/search.html?q=nexus.

thereon, as opposed to the Tribe's connections to the land's owners or occupants.[116] Such an interpretation finds support in "Indian lands" opinions prepared by the Department and the NIGC for other Tribes subsequent to the issuance of Sol. Op. M-36975.

In 1996, the Department prepared an Indian lands opinion (ILO) for an off-reservation allotment known as the Sampson Johns allotment and owned by a Quinault Indian Tribe member.[117] It explained that Tribal territorial jurisdiction over an off-reservation allotment might be found where "there is a tribal nexus to the lands or a political relationship with the owners of the lands."[118] The factors the Department relied on included: (1)Ttribal membership of the original allottees and their heirs; (2) proximity to an existing Indian reservation; (3) allotment location relative to treaty-recognized hunting, fishing, and gathering territories; (4) the provision of Tribal police and other services in the area; and (5) acknowledgement by local governments of Tribal regulatory and enforcement authority at the site.[119] Because these factors reflect the fact-specific concerns expressed in Sol. Op. M-36975, I employ them here in assessing the Tribe's claim of territorial authority over the (b) (6).

1.  **Owners' Membership**

The Tribe claims that its territorial jurisdiction over the (b) (6) "flows from or is incident to" an allotment owner's tribal membership.[120] The Tribe relies partly on a statement in the Sampson Johns ILO that tribal jurisdiction has been recognized where there is "a tribal nexus to the lands or a political relationship with the owners."[121] While a political relationship may ground a Tribe's personal jurisdiction over its members, the Sampson Johns ILO nowhere suggests that membership *alone* may ground Tribal jurisdiction over territory. The authorities relied on in the Tribe's submissions are not to the contrary. The Alaska Supreme Court decision on which the Tribe relies expressly addressed what happens "when a law like ANCSA *separates* [tribal] membership and [tribal] land completely."[122] The question there was whether an Alaska Tribe had jurisdiction over the child custody disputes of its members *outside* Indian country.[123] The Court found that it did since the existence of Indian country was *not* "an absolute

---

[116] *See, e.g., Montana v. United States*, 450 U.S. 544 (1981) (discussing tribal jurisdiction over non-members); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001) (*Montana*'s consensual relationship exception requires tribal nexus to consensual relationship itself).
[117] U.S. Dep't of the Interior, Office of the Solicitor, Quinault Indian Nation ILO (Sept. 25, 1996) ("Sampson Johns ILO").
[118] Sampson Johns ILO at 5, citing *Mustang Production Co. v. Harrison, et al.*, 94 F.3d 1382 (10th Cir. 1996).
[119] In 2006 the NIGC drew upon the Sampson Johns factors to assess tribal authority over an off-reservation allotment owned by a member of the Big Sandy Rancheria in California. Big Sandy ILO. The facts relevant there included (1) the tribal membership of owner, who descended from the original allottee; (2) that the United States had held the allotment in trust for over 70 years; and (3) the proximity of the allotment to an existing Indian rancheria. *Id.* at 5.
[120] First NVE Submission at 12, citing *John v. Baker*, 982 P.2d 738, 754-55 (AK 1999).
[121] Sampson Johns ILO at 5, citing *Mustang Production Co. v. Harrison, et al.*, 94 F.3d 1382 (10th Cir. 1996). *Mustang* found tribal jurisdiction over lands allotted to individual members from the former reservation based on the fact that such lands constituted Indian country and that the statutes authorizing the allotments did not otherwise divest the tribe of its jurisdictional authority.
[122] *Baker v. John*, 982 P.2d at 754 (emphasis added). *See also Native Village of Venetie*, 522 U.S. at 526, citing *Yukon Flats State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J. concurring) (ANCSA made Alaska tribes sovereigns without territorial reach).
[123] First NVE Submission, citing *Baker v. John*, 982 P.2d 738 (Alaska 1999).

prerequisite to the existence of sovereign Tribal power."[124] The issue here is not the Tribe's personal jurisdiction over its members, however, but its territorial authority over their lands within the unique statutory context of Alaska.

The NIGC rejected a similar claim when considering whether the Tribal membership of an allottee's heirs could ground a Tribe's authority over an off-reservation allotment for gaming purposes.[125] In consultation with the Department, the NIGC concluded that the Tribe from whose reservation the allotment was created retained jurisdiction regardless of the Tribal membership of the allottee's heirs, at least absent any transfer of jurisdiction "through legislation or by trust deed."[126]

The statutory context of the (b) (6) also weighs against the Tribe's claim that its territorial jurisdiction flows from the Allotment owners' tribal membership. When it enacted the Alaska Native Allotment Act in 1906, Congress did not consider allotments in a "tribal context,"[127] believing that "Indian reservations were a thing of the past."[128] Though the IRA reversed the allotment policy,[129] it nevertheless provided its provisions should *not* be construed as relating to Indian allotments or homesteads on the public domain "outside of the geographic scope of any Indian reservation" then existing or later established.[130] The Tribe never had a reservation established for its benefit and, as noted earlier, and BLM issued the Allotment to (b) (6) without regard to any Tribal affiliation.[131]

### 2. Proximity to Established Reservation

The Tribe also claims territorial jurisdiction on the fact that the (b) (6) is about seven miles away from the Tribe's headquarters and fee lands,[132] relying on the Sampson Johns ILO and the Big Sandy ILO.[133] What mattered in those ILOs was not proximity to Tribally owned lands per se, but to an *existing* source of Tribal territorial sovereignty, namely, the Quinault

---

[124] Second NVE Submission, citing *Baker v. John*, 982 P.2d at 755.
[125] *See* Whitecloud ILO.
[126] Whitecloud ILO at 8.
[127] Sol. Op. M-36975 at 16; COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.07[3][b][iii] (2017). In 1919, Congress prohibited the withdrawal of public lands for Indian reservations by Executive Order, proclamation, or otherwise except by Congressional enactment. Act of June 30, 1919, ch. 4, §27, 41 Stat. 34, codified at 43 U.S.C. § 150.
[128] *Solem v. Bartlett*, 465 U.S. 463, 468 (1984). *See also Montana v. United States*, 450 U.S. 544, 559 n.9 (1981) (the policy of allotment acts was the eventual assimilation of the Indian population and the gradual extinction of Indian reservations and Indian titles), citing *Organized Village of Kake v. Egan*, 369 U.S. 60, 72 (1962); *Draper v. United States*, 164 U.S. 240, 246 (1896).
[129] *Montana v. United States*, 450 U.S. 544, 559 n.9 (1981).
[130] IRA, § 8, codified at 25 U.S.C. § 5111 (formerly § 468). Congress extended the provisions of IRA § 8 to Alaska in 1936. *See* Alaska IRA, § 1, codified at 25 U.S.C. § 5119 (formerly § 473a); *see also Estate of Larry Michael Oskolkoff*, 37 IBIA 291, 294 (2002).
[131] *See* First NVE Submission, Ex. 10. The Tribe provides no information on the enrollment status of (b) (6) or her predecessors at the site. While (b) (6) tribal membership status has no bearing on the Indian country status of the Allotment, it does go to the question of the Tribe's original nexus to the site.
[132] *See, e.g.*, First NVE Submission at 11, n. 9 (noting (b) (6) closer to Village of Eklutna than the allotment at issue in Big Sandy ILO).
[133] First NVE Submission at 7, 11, *id.* n. 9.

13

Indian Reservation and the Big Sandy Rancheria, respectively.[134] Quinault Tribal police thus already had jurisdiction on the nearby reservation and policed the area surrounding the Sampson Johns Allotment.[135] As noted earlier, the lands reserved for Federal use in the administration of Native affairs around Eklutna were never set aside as a reservation for Alaska Natives and, in any event, ANCSA revoked existing Native reservations except for the Annette Island Reserve.

The Tribe also suggests that the (b) (6) meets IGRA's Indian lands requirement based simply on its Indian Country status, based on judicial and administrative decisions from the Lower 48.[136] To be sure, IGRA's definition of Indian lands presumes the existence of Indian country.[137] But "Indian lands" and "Indian country" are distinct statutory terms established by Congress for different purposes,[138] and there may exist Indian Country over which no Tribe exercises governmental power.[139] As Sol. Op. M-36975 itself explains, Indian Country provides the basis for the exercise of Federal authority[140] but says nothing about the presence of Tribal authority.[141]

### 3. Tribal Services and Activities at the Site

The Tribe provides little historical evidence showing its use of the area around the (b) (6) (b) (6) site for economic or cultural purposes. With respect to the Village area, it states that Eklutna was a seasonal residence before World War II that included non-native structures and habitations, and that it became a year-round settlement after the war.[142] The Tribe states that

---

[134] The same was true of the Big Sandy ILO, which discussed the McCabe Allotment's distance from the existing Big Sandy Rancheria.
[135] Sampson Johns ILO at 2-3. The Sampson Johns allotment further lay within the jurisdictional area of Quinault's treaty-recognized hunting, fishing and gathering territories. *Id.*, citing 61 Fed. Reg. 28786, 28795 (June 6, 1996) (defining Quinault's treaty-protected usual and accustomed fishing areas).
[136] *See, e.g.,* First NVE Submission at 6 ("The (b) (6) is Indian Land Because it is Restricted Fee"); *id.* at 7 (conveyance pursuant to ANAA sufficient to show Allotment fits squarely within Indian lands definition); *id.* at 10 (Allotment constitutes Indian lands because set aside for use by individual Indians under Federal superintendence); Second NVE Submission at 7-8 (Alaska Native allotments are Indian country); Fourth NVE Submission at 2 ((b) (6) : "qualifies as 'Indian lands' under IGRA because...owned by tribal members subject to a restriction against alienation").
[137] *See Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n,* 327 F.3d 1019, 1032 (10th Cir. 2003) (IGRA specifically speaks to federal regulatory authority over certain forms of gambling within Indian country); Sampson Johns ILO at 4 (IGRA's jurisdictional reach not precisely equivalent to statutes referring to 'Indian country').
[138] 18 U.S.C. § 1151; 25 U.S.C. § 2703(4)(B). *See also* 25 C.F.R. § 502.12(b); NIGC, Definitions Under the Indian Gaming Regulatory Act, 57 Fed. Reg. 12382, 12388 (1992); *Citizens Against Casino Gambling in Erie County v. Hogen,* 704 F. Supp. 2d 269, 276 (W.D.N.Y. 2010) (distinguishing Indian country from Indian land under IGRA); *United Keetoowah Band of Cherokee Indians v. State ex rel. Kuykendall,* 2006 U.S. Dist. LEXIS 97268 at *22 (E.D. Okla. 2006) (noting that definitions of "Indian country" under 18 U.S.C. § 1151 and "Indian land" under IGRA are not identical).
[139] Sampson Johns ILO at 5; NIGC, Kialegee Tribal Town ILO at 11 (July 18, 2013) (whether allotment constitutes Indian country does not show whether tribe has legal jurisdiction over it); Whitecloud ILO at 7 ("Generally speaking, an Indian tribe posses[es] jurisdiction over land that the tribe inhabits if the land qualifies as 'Indian country.'") *See also* 18 U.S.C. § 1166(d) (making state law applicable to gaming in Indian country outside Indian lands and giving United States exclusive jurisdiction over criminal violations thereof).
[140] NIGC, United Keetoowah Band of Cherokee Indians ILO at 5 (Sept. 29, 2000), citing *Native Village of Venetie,* 522 U.S. at 527.
[141] Sol. Op. M-36975 at 126.
[142] First NVE Submission, Ex. 5 at 14-16, 19, 26, 32.

after 1961, it cut trees at the Allotment for fire-safety purposes and used the wood for cultural activities elsewhere. It also describes having provided food to (b) (6) and her family for a time. But the Tribe offered no evidence to show, for example, that Tribal police patrol the area encompassing the site or that Tribal personnel provided any services to Tribal members in the area, as the Quinault Tribe did for the Sampson Johns allotment.

### 4. Acknowledgment of Tribal Jurisdiction by Others

The Tribe provides no evidence to show that state or local governments acknowledge the Tribe's territorial jurisdiction over the (b) (6). The Tribe cites a 1996 letter of agreement with the Anchorage Police Department for "utilizing provision of comprehensive services to the members of the Tribe of Eklutna" with respect to the Indian Child Welfare Act as evidence of its governmental authority over the (b) (6).[143] The agreement relates to matters of personal, not territorial jurisdiction, and does not otherwise acknowledge Tribal territorial jurisdiction or reference Tribal lands. While the Department understands that State and local authorities may now support the Tribe's proposed plans for the (b) (6), such support does not address the legal jurisdictional question under IGRA. The Tribe also relies on its provision of services to Tribal members at the site[144] and the activities of Tribal members, including the posting of no-trespass signs proclaiming that the (b) (6) lies "within the territory of the Native Village of Eklutna."[145] Such examples conflate IGRA's threshold requirement to demonstrate that the Tribe possesses territorial jurisdiction with its subsidiary requirement to show that the Tribe exercises such authority.

In connection with the Tribe's 2007 request for an Indian lands opinion, the Alaska State Attorney General claimed extensive State and local authority over the Allotment, including the regulation of public utilities.[146] The Attorney General's submissions stated that the State and Municipality of Anchorage provide police services to the area, and the Chugiak Volunteer Fire Station, regulated by the State, provided fire suppression services.[147] The Attorney General has more recently announced its support for Alaska Tribal sovereignty generally,[148] without addressing the issue of tribal territorial jurisdiction over Alaska Native allotments.

Federal laws provide for the exercise of state and local jurisdictional authority over Indian country in Alaska generally and Alaska Native allotments specifically. Public Law 280, as amended, gives the State of Alaska jurisdiction over crimes occurring within Indian Country in the State.[149] In accepting the Department's recommendation that Alaska be given criminal

---

[143] First NVE Submission at 18; *id.* Ex. 22 (Letter of Agreement Between Native Village of Eklutna and Anchorage Police Department (Dec. 10, 1996)).
[144] First NVE Submission at 18-20 (describing available health care; social services; children's services; sanitation services).
[145] First NVE Submission, Ex. 13, ¶ 16; *see also* Ex. 11, ¶ 10 (posting signs asserting proclaiming site under jurisdiction of Tribal government).
[146] Alaska 2007 Submission.
[147] Alaska 2007 Submission at 4.
[148] *See* Letter, Jahna Lindemuth, Attorney General, State of Alaska, to Governor Bill Walker (Oct. 19, 2017) (legal status of tribal governments in Alaska).
[149] Pub. L. 83-280, 67 Stat. 588 (Aug. 15, 1953), as amended; 18 U.S.C. § 1162(a).

jurisdiction over Indian country after statehood,[150] the House Judiciary Committee noted that a number of Alaska Native Villages at the time lacked "adequate machinery for enforcing law and order"[151] in contrast with the Metlakatla Community of the Annette Island Reserve, which had "a long history of policing misdemeanor offenses" since the founding of the Community.[152] Further, Congress in 2004 enacted the Alaska Native Allotment Subdivision Act (ANASA)[153] to afford owners of Alaska Native allotments greater flexibility in developing their lands.[154] ANASA authorizes the Alaska Native allotments owners to subdivide their land pursuant to state and local laws and to execute certificates of ownership and dedication with respect to these lands subject to Secretarial approval.[155]

The Tribe concedes that BIA exercises authority over the site,[156] but claims that the Tribe possesses jurisdiction itself. The Tribe relies primarily on assertions in its constitution and Tribal ordinances.[157] Most of these provisions relate to Tribal members and their domestic affairs, however.[158] Because a Tribe's personal jurisdiction over the domestic affairs of its members may extend beyond Indian Country, such assertions have no direct bearing on the question of the Tribe's authority over land.[159] Other provisions reflect unilateral assertions of territorial jurisdiction over the allotments of its members "to the extent consistent with Federal law."[160] Some relate only to lands within the Village of Eklutna itself and not the (b) (6) (b) (6).[161] The Tribe also claims jurisdiction based on the provisions of its proposed Lease.[162] But contractual consent alone cannot establish tribal jurisdiction over an off-reservation allotment for purposes of IGRA if none already exists.[163]

---

[150] Sol. Op. M-36975 at 36.

[151] Sol. Op. M-36975 at 36, citing H. Rep. No. 85-2043 at 2 (1958).

[152] Sol. Op. M-36975 at 37, citing 116 Cong. Rec. 37,353 (Nov. 16, 1970) (statement of Rep. Donohue).

[153] Pub. L. No. 108-337 (Oct. 18, 2004), 118 Stat. 1357.

[154] S. Hrg. 108-163 at 21. *See also* S. Hrg. 108-416 at 21-22 (2004) (ANASA gives Alaska Native allottees option of retaining Secretarial protections or subdividing under state law and passing title on).

[155] ANASA, § 3(a). Section 4 of the ANASA reiterated that except as otherwise provided, nothing it in its provisions would terminate, diminish, or otherwise affect the continued existence and applicability of federal restrictions against alienation and taxation on restricted lands or interests therein.

[156] *See, e.g.*, First NVE Submission, Ex. 13, ¶ 16 (acknowledging BIA exercise of authority over site); Ex. 11, ¶ 3 (listing Tribal services provided pursuant to self-governance contracts with Indian Health Services and BIA); Ex. 11, ¶ 9 (noting BIA's "active role" in administering the site).

[157] *See, e.g.*, First NVE Submission, Ex. 17 (Tribal Court Code) (asserting territorial jurisdiction over land and water "traditionally used" by Tribal members); *id.*, Ex. 21 (Tribal Access Ordinance), Preamble, §§ 1, 2 (defining "Village Lands" as including Alaska Native allotments).

[158] *See, e.g.*, First NVE Submission, Ex. 16 (Tribal Relatives Talk Code), Preamble (applicable to "domestic relations"); *id.*, Ex. 17 (Tribal Court Code) (purpose "to regulate the domestic relations of our members"); *id.*, Ex. 21 (Tribal Access Ordinance), Preamble, §§ 1, 2 (Tribal Constitution provides jurisdiction over Tribal members within or without territorial jurisdiction and referencing ICWA).

[159] *See, e.g., Baker v. John*, 982 P.2d 738 (Alaska 1999).

[160] First NVE Submission, Ex. 7, art. II, sec. I (1996 constitutional assertion of territorial jurisdiction over "all fee and allotment lands within the traditional lands of Eklutna" to the extent consistent with federal law); *see also* Ex. 6, art. II (1988 constitutional assertion of territorial jurisdiction over ANCSA lands, other lands acquired by Tribe, "or any Indian Country as may exist").

[161] *See, e.g.*, First NVE Submission, Ex. 15 (Tribal Dog Ordinance), ¶¶ 1, 3, 5-6; Ex. 20 (Pollution Discharge Ordinance), § B.

[162] *See* NVE Lease.

[163] *See* U.S. Dept. of the Interior, Office of the Solicitor, Miami Tribe of Oklahoma (Maria Christiana Reserve No. 35) ILO at 4 (Oct. 31, 2002), citing *Kansas v. United States*, 249 F.3d 1213, 1230-31 (10th Cir. 2001). *See also City*

## Conclusion

Based on the above analysis, I conclude that the Tribe lacks territorial jurisdiction over the (b) (6). The United States consistently treated the site as part of the public domain from the region's original survey until the site's eventual allotment to an Alaska Native individual in 1963. The ANCSA revoked all reservations in Alaska but one not relevant here and extinguished all aboriginal claims to land in the state. The Allotment site only briefly formed part of the Eklutna Industrial School reserve, and the Department never acted on proposals to establish an Indian reservation from the remaining School lands, which the Department disposed of after World War II. In addition, the Tribe has not demonstrated a clear or original nexus to the (b) (6) site. Tribal territorial jurisdiction cannot be based on the membership of the Allotment's owners alone, and the Allotment is not near a current or previously existing Indian reservation. State and local authorities, which provide police and other services to the Allotment, have not acknowledged the Tribe's territorial authority at the site.

I therefore regret to inform you that I have determined that the (b) (6) does not constitute "Indian lands" and is therefore ineligible for gaming under IGRA, for which reason I must disapprove the Tribe's proposed Lease of the (b) (6) for gaming purposes.

Sincerely,

John Tahsuda
Principal Deputy Assistant Secretary – Indian Affairs
Exercising the Authority of the Assistant Secretary –
   Indian Affairs

Cc: Director, Office of Indian Gaming
     Alaska Regional Director (Acting), Bureau of Indian Affairs
     General Counsel, National Indian Gaming Commission

---

of *Sherrill v. Oneida Indian Nation*, 544 U.S. 197, 203 (2005); *Miami Tribe v. United States*, 927 F. Supp. 1419, 1427 (D. Kan. 1996).