

# United States Department of the Interior

OFFICE OF THE SOLICITOR

APR 10 1995

In reply, please address to:
Main Interior, Room 6456

Michael J. Cox, General Counsel
National Indian Gaming Commission
1850 M Street, N.W., Suite 250
Washington, D.C. 20036

Dear Mr. Cox:

You have requested our views as to whether a restricted townsite held by a member of the Native Village of Barrow (Barrow) is "Indian lands" as defined by the Indian Gaming Regulatory Act (IGRA) upon which Barrow may conduct Class II gaming.

IGRA defines Indian lands as including "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4)(b).

The land in question is an individual Native townsite lot held in restricted fee status. Deeds to individual townsite lots were issued to Natives subject to statutory restrictions on alienation, pursuant to the Alaska Native Townsite Act of May 25, 1926, 44 Stat. 629, formerly codified at 43 U.S.C. §§ 733-737, and the Alaska Native Allotment Act of May 17, 1906, 34 Stat. 197, as amended, formerly codified at 43 U.S.C. §§ 270-1 through 270-3 (1970). Thus, as required by IGRA, the land is held by an individual and subject to restriction by the United States against alienation.

However, whether Barrow exercises governmental power over the townsite allotment is unclear. An assertion of tribal jurisdiction over individual restricted lots would be doubtful if there were no clear tribal nexus to the individual restricted lands. The village has the burden of establishing that it satisfies the statutory requirements, including the fact that it exercises governmental authority over the lot. The exercise of governmental authority can not be inferred merely from the fact that the lot is within the village.

Based on the information before us, it is unclear that a tribal nexus between Barrow and the land in question exists. In our review of this issue, we contacted the Regional Solicitor's Office in Alaska, which in turn contacted the Bureau of Indian Affairs. Neither office could provide further information showing that

Barrow exercises governmental power over the land in question. The Regional Solicitor's Office indicated that the Village does not own any land, whether in trust or in restricted status.

We note that the Solicitor's Opinion, M-36975, issued by then-Solicitor Thomas Sansonetti on January 11, 1993, discusses the extent of tribal jurisdiction over townsite lots. The opinion states that the jurisdictional status of individual townsite lots is comparable to that of Alaska Native allotments. With respect to Native allotments, the Solicitor opined that he was "not convinced that any specific villages or groups can claim jurisdictional authority over allotment parcels." Id. at 129. The Sansonetti opinion is subject to review, but unless and until withdrawn or modified, it remains the position of the Department. Therefore, I suggest that the village be asked for additional proof that the townsite lots are subject to the governmental jurisdiction of the Native Village of Barrow. See e.g. Alaska v. Native Village of Venetie, 856 F.2d 1384, 1391 (9th Cir. 1988); Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indians, 498 U.S. 505, 511 (1991); Oklahoma Tax Com'n v. Sac and Fox Nation, 113 S.Ct. 1985, 1991 (1993).

We conclude that while the land in question is held by an individual and subject to restriction by the United States against alienation, we cannot conclude, based on the information before us, that Barrow exercises governmental power over the land. Therefore, we cannot conclude that the land in question is "Indian land" as defined by IGRA.

If Barrow were to provide some additional information regarding a tribal nexus and the exercise of Barrow's governmental power over the land in question, we would reconsider our opinion.

Sincerely,

Robert T. Anderson
Acting Associate Solicitor
Division of Indian Affairs

NATIONAL
INDIAN
GAMING
COMMISSION

FEB - 1 1996

Hans Walker, Jr.
1819 H. Street, N.W.
Suite 800
Washington, D.C. 20006

Dear Mr. Walker:

This responds to the November 6, 1995, appeal of the decision of the Chairman of the National Indian Gaming Commission (NIGC) disapproving the Native Village of Barrow's tribal gaming ordinance 95-01. We have concluded that the Native Village of Barrow (Village) does not have Indian lands on which it can conduct tribal gaming. Therefore, the Village's appeal is denied.

## BACKGROUND

On January 11, 1995, the Native Village of Barrow submitted for approval a tribal gaming ordinance. The Village's submission included a 12 month lease, from January 1, 1995, to January 1, 1996, between the Native Village of Barrow and Arnold Brower, Sr. The lease was not signed by the Village. It was not approved by the Bureau of Indian Affairs (BIA). Nothing in the record indicates any kind of tribal approval of the lease. A second lease between Joshua Nashaknik and the Village is signed by Nashaknik and Arnold Brower. The lease recites that it is for 12 months but the dates are listed as November 11, 1994, through November 11, 1999. It was also not approved by the BIA and there is no indication of tribal approval of the lease.

The third enclosure to the January 11 submission was the Constitution and By-Laws of the Native Village of Barrow. Article 3, Section 1 provides:

> Choice of Governing Body-At a general meeting following the acceptance of this Constitution, the Village membership shall decide what kind of governing body it wishes to set up to speak and act for the Village and to use the powers of the Village. If there is a governing body already set up in the Village, at the time this Constitution is accepted, the membership may decide to keep that governing body, or it may choose a new form of government.

Section 4 of Article 3 provides:

> Record and Report of Village Decisions-A record shall be made and kept of all the rules made under sections 1, 2, and 3 of this Article, which record shall be called the Record of Organization of the Native Village of Barrow. Copies of this record shall be given to the teacher or other representative of the Office of Indian Affairs serving the Village. There shall be put in the record the names of all persons chosen to be officers of the Village.

No copy of a Record of Organization was provided.

The powers of the Village are described in Article 4, Section 1, of the Constitution as follows:

> To do all things for the common good which it has done or has had the right to do in the past and which are not against Federal law and such Territorial law as may apply.
> To deal with the Federal and Territorial Governments on matters which interest the Village, to stop any giving or taking away of Village lands or other property without its consent, and to get legal aid, as set forth in the act of June 18, 1934.
> To control the use by members or nonmembers of any reserve set aside by the Federal Government for the Village and to keep order in the reserve.
> To guard and to foster native life, arts and possessions and native customs not against law.

In an April 10, 1995, memorandum, the Acting Associate Solicitor, Division of Indian Affairs, Department of the Interior, stated that:

> whether Barrow exercises governmental power over the townsite allotment is unclear. An assertion of tribal jurisdiction over individual restricted lots would be doubtful if there were no clear tribal nexus to the individual restricted lands. The village has the burden of establishing that it satisfies the statutory requirements, including the fact that it exercises governmental authority over the lot. The exercise of governmental authority can not be inferred merely from the fact that the lot is within the village.

The Acting Associate Solicitor also contacted the Office of the Regional Solicitor in Alaska and the BIA. Neither office could provide further information showing that the Village exercises governmental power over the land in question. The Regional Solicitor's Office further stated that the Village does not own any trust or restricted land. As a result, the Acting Associate

Solicitor concluded that the land in question is held by an individual and subject to restriction by the United States against alienation but that he could not conclude, based on the information before him, that the Village exercises governmental power over the land.

Based on the Associate Solicitor's determination that the Village did not establish that it held Indian lands on which it could conduct gaming and two other technical requirements, the Chairman of the National Indian Gaming Commission disapproved the Village's gaming ordinance on April 11, 1995.

On July 7, 1995, the Village submitted an amended gaming ordinance which cured the two technical problems mentioned above. The Village also submitted evidence which the Village alleged establishes it exercises governmental authorities over the two leased lots which appear to be a townsite lot and a Native allotment. The evidence included 1) a Memorandum of Agreement Between the Ukpeagvik Inupiat Corporation and Native Village of Barrow dated June 23, 1994; 2) Graphs establishing annual expenditures on subsistence activities and household consumption of subsistence foods; 3) a May 30, 1995, letter to Hans Walker from Price Leavitt, Grants Administrator listing services which are provided including Real Estate and Wildlife Management; 4) Native Village of Barrow IRA Tribal Government Resolution 95-23, Dog Control Law; 5) Native Village of Barrow IRA Tribal Government Resolution 95-24, All Terrain Vehicle and Snowmobile Law; 6) Public Land Order 324; and 7) Chronological Outline of Events Relating to the Proposed Reservation for the Native Village of Barrow Alaska.

On October 5, 1995, the NIGC Chairman disapproved the Village's ordinance, once again relying on the Associate Solicitor's April 10 memorandum. There was no reference to the seven documents submitted by the Village or to the Village's accompanying memorandum.

On November 6, 1995, the Village appealed the Chairman's disapproval of the Village's gaming ordinance. The Village alleges that the NIGC failed to consider the new evidence it provided with its July 7, 1995, submission of a new gaming ordinance. The appeal contained two additional documents, a Barrow Community Profile and an October 30, 1995, Affidavit of Charles Hopson with two deeds attached (These deeds are not for the lands which were leased). The Barrow Community Profile indicates that the City of Barrow is incorporated under state law as a first class city and that it has a municipal government consisting of a city council and mayor, Donald Long, as well as other city offices.

The Associate Solicitor, Division of Indian Affairs, was once again contacted for an opinion on whether the Village had established that there are Indian lands on which the Village could game. Because the Department of the Interior has the special expertise

3

and information necessary to make such decisions, the NIGC traditionally defers to the Department on the question of the existence of Indian lands. However, we were informally advised that the Department would not provide the NIGC with any further assistance on the question of Indian lands held by the Village.

## ANALYSIS

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (1988) (IGRA) requires that Indian gaming be conducted on "Indian lands." IGRA defines "Indian lands" as:

> (A) all lands within the limits of any Indian reservation; and
>
> (B) any land title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation <u>and over which an Indian tribe exercises governmental power</u>.

25 U.S.C. § 2703 (4) (1994 Supp.) (emphasis added).

The NIGC traditionally defers to the expertise of the Department of the Interior on the existence of Indian lands. Thus, we are guided by the Acting Associate's April 10, 1995, legal opinion and the opinion of the Solicitor of the Department of the Interior, M-36975, which discusses the extent of tribal jurisdiction over Alaska Native allotments and individual Native townsite lots. (The Department of the Interior is bound by the published opinion of the Solicitor unless overturned by the Solicitor, Deputy Secretary, or the Secretary. 209 DM 3.2A(11).)

The Solicitor, in his opinion, concludes that the Native Villages in Alaska will not be able to establish that they exercise jurisdiction over Alaska Native allotments and individual townsite lots. He states that:

> Most allotments in Alaska have been issued pursuant to the Alaska Native Allotment Act of 1906, although there are a few allotments issued under the General Allotment Act. Although Alaska Native allotments are held in fee by the allottee subject to restrictions against alienation, we have already noted that the distinction between restricted fee and trust allotments is not significant for our purposes.
>
> A number of facts, however, do distinguish Alaska Native allotments from most allotments in the contiguous 48. First, the statute does not make tribal membership a criteria for receiving an allotment, probably because in

4

1906, Congress was not considering the Alaska Native allotments in a tribal context. This makes Alaska Native allotments more like Indian homestead allotments, rather than those issued pursuant to the General Allotment Act or other tribe-specific allotment acts. Second, Alaska Native allotments were not carved out of any reservation. While we consider this factor insignificant for <u>federal</u> jurisdictional purposes, we believe it has at least some significance in determining questions of <u>tribal</u> authority. Third, the statute specifically provides that the allotment "shall be deemed the homestead of the allottee and his heirs." Again, while not a controlling factor as such, the language makes the Alaska Native Allotment Act appear more similar to a general Indian homestead act rather than a tribal or reservation related allotment act.

We wish to make clear that Alaska Native allotments, like other Indian allotments, remain under federal superintendency and subject to federal protection while in restricted status. Thus, we conclude that Congress has not divested the Federal government of its jurisdictional authority over such lands, and they are Indian country.

However, after examining the statute and circumstances related to Alaska allotments, we are not convinced that any specific villages or groups can claim jurisdictional authority over allotment parcels. As we noted above, particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment.

One other category of individual Native landholdings in restricted status is that of Native restricted fee townsite lots. It is our understanding that there are over 3,800 of these lots. To a limited extent, deeds to individual townsite lots are still being issued to Natives subject to statutory restrictions on alienation, pursuant to the former 43 U.S.C. § 733. <u>In People of South Naknek v. Bristol Bay Borough</u>, 466 F. Supp. 870 (D. Alaska 1979), the court held that for purposes of federal court jurisdiction, the restricted Native townsite lots have the same status as allotments.

Our analysis and conclusions concerning potential tribal jurisdiction over these lots are the same as those set forth above with respect to Native allotments, with one possible exception. If individual restricted townsite lots properly are treated as allotments for purposes of section 1151, they would be Indian country. Those

5

restricted lots located in one of the 27 Native villages receiving fee title to unoccupied townsite lots could conceivably be affected if the village qualifies as a tribe and if the area qualifies as a dependent Indian community. Even so, an assertion of tribal jurisdiction over individual restricted lots would be doubtful if there were no clear tribal nexus to the individual restricted lands.

Governmental Jurisdiction of Alaska Native Villages Over Lands and Members, M-36975, Sol. Op. 110, pp. 128-130 (January 11, 1993).

Based on the Solicitor's opinion, the Acting Associate Solicitor concluded that the land in question was not Indian land because the Village does not have jurisdiction over the land. We defer to that conclusion.

Furthermore, to the extent that the Village claims that it is in fact exercising present day governmental powers over such land, we conclude that the Village has not provided sufficient evidence to establish its exercise of governmental powers. The Village provided additional documentation with its July 7, 1995, submission and its November 6, 1995, appeal. This documentation essentially purports to establish what authorities are presently exercised over the lands. It completely fails to establish any ongoing power which was exercised over time. It also fails to establish any clear present day exercise of authority over the land.

The Community Profile establishes that Barrow is a municipality incorporated under the auspices of the State of Alaska with its own city government. Such city governments are typically not related in any way to tribal governments and nothing in the documentation indicates otherwise. The offices of the mayor and city council are entities separate from the Village government. The municipality apparently provides the police and fire services to the lands within the city limits, and the Planning and Zoning Commission operates under the North Slope Borough.

The May 30, 1995, letter, which references real estate and wildlife management services, provides no description of such services and fails to establish that any such services are related to the restricted lots in question. The only reference to any direct dealings with lands is the Affidavit of Charles Hopson which indicates that he keeps the land records. This function, however, is a Federal Government function which was contracted to the Village presumably to keep track of land records over which the Federal Government exercises authority. It fails to establish that the Village exercises independent authority.

A June 23, 1995, Memorandum of Agreement (MOA) between the Ukpeagvik Inupiat Corporation and the Village similarly fails to establish any independent tribal authority over lands. The MOA

specifically limits any kind of tribal authority to limited hunting, fishing and trapping jurisdiction over village corporate lands for one year. This agreement has expired, and the village corporate lands are not the same lands as the restricted lots.

The Village also passed two resolutions, Resolution 95-23: Dog Control Law, and Resolution 95-24: All Terrain Vehicle and Snowmobile Law. While providing some limited evidence of asserted jurisdiction over the lands, the resolution numbers indicate that they were only just passed in 1995 which weighs against their probative value as evidence of the Village's exercise of governmental power.

The two leases provide no evidence supporting a determination that the Village exercises governmental powers. They were not properly entered into. One was not signed by any tribal representative. Neither are supported by tribal resolutions or some other indication that they were approved by the Village's governing body. One has expired while the other may have expired depending on whether you rely on the lease language indicating that the term of the lease is for 12 months or until 1999. Neither was approved by the BIA.

Finally, the Village's constitutional authority over lands appears limited. There are two references to the Village's land based authority. Article 4, Section 1, authorizes the Village to stop giving and taking away of Village lands or other property without its consent, a power which does not appear relevant here. It further authorizes the tribal government to control the use of any reserve set aside by the Federal government and to keep order over the reserve. No reserve was ever set aside for the Village. Therefore, this authority was never implemented. Consequently, the people of the Village, through their constitutional delegation of authority, did not grant expansive tribal authority over their individual lands.

For all of the forgoing reasons, the Village's appeal is denied.

_____
Harold A. Monteau, Chairman

_____
Tom Foley, Commissioner

_____
Philip N. Hogen, Commissioner

7



**NATIONAL
INDIAN
GAMING
COMMISSION**

AUG 1 2 1997

Hans Walker, Jr.
Hobbs, Straus, Dean & Walker
1819 H Street, NW, Suite 800
Washington, DC 20006

Dear Mr. Walker:

This responds to the May 14, 1997, appeal of the decision of Associate Commissioner Foley's disapproving the Native Village of Barrow Gaming Ordinance No. 01-96. Then Acting Chairman Ada Deer delegated responsibility for ordinance approval or disapproval to Commissioner Foley. We conclude that the Native Village of Barrow (Village) does not have Indian lands on which it can conduct tribal gaming. Therefore, the Village's appeal is denied. We rely on the analysis contained within the February 1, 1996, Commission decision, which denied the Village's appeal of the disapproval of previously submitted tribal gaming ordinance No. 95-01. A copy of that decision is enclosed.

With this latest appeal, Appellant relitigates an issue which the Commission has decided against Appellant on two prior occasions. Appellant provides neither new facts nor new evidence to support its position. Rather, appellant argues that the holding in Alaska v. Native Village of Venetie Tribal Government, 101 F.3d 1286 (9th Cir. 1996), cert. granted, 117 S.Ct. 2478 (1997) is controlling. However, the Venetie decision is on appeal to the United States Supreme Court, and the Ninth Circuit has stayed its ruling pending final disposition. (No. 96-35042, Order dated January 23, 1997).

The question of whether the allotment upon which the Village wishes to conduct gaming is Indian lands was decided first by the Chairman of the Commission on April 11, 1995, and again by the full Commission on February 1, 1996. On April 11, 1995, the Chairman disapproved the Village's gaming ordinance based on an April 10, 1995, determination by the Acting Associate Solicitor, Department of Interior, that the Village had failed to show that the Village exercises governmental power over the allotment, as required by 25 CFR § 502.12. The Commission defers to the Department of Interior on the question of the existence of Indian lands. The Village then submitted a new ordinance, together with documentation alleging to show that the Village did exert governmental authority over the allotment. The Chairman disapproved the ordinance, again relying on the Associate Solicitor's April 10 memorandum. The Village appealed this decision to the full Commission, alleging that the Chairman failed to consider the new evidence. The full Commission considered the new evidence, and on February 1, 1996, denied the appeal, again finding that the Village had failed to show that it exerted governmental authority over the allotment. This decision was based upon a thorough review of the evidence submitted. The Department of Interior declined to provide the Commission with any further assistance on the

question of Indian lands held by the Village.

On November 20, 1996, the Ninth Circuit Court of Appeals decided, in the <u>Venetie</u> case, that the land the Village of Venetie occupies is Indian country. Appellant argues that the <u>Venetie</u> decision controls portions of this appeal, notwithstanding the fact that the United States Supreme Court has granted certiorari in the <u>Venetie</u> case. However, the relevance of the Venetie decision to appellant's argument is unclear. Moreover, the Ninth Circuit stayed its mandate in the <u>Venetie</u> case pending final disposition by the United States Supreme Court.

Finally, appellant argues that the ordinance must be deemed approved because it has not been disapproved by the Chairman; rather it was disapproved by Associate Commissioner Foley. Appellant argues that the power to disapprove an ordinance is reserved exclusively for the Chairman of the NIGC, and that the Chairman is defined as the Chairman of the NIGC "or his or her designee." 25 C.F.R. § 502.1. Appellant recognizes the authority of the Chairman to delegate responsibility as provided for in 25 C.F.R. § 502.1, but states that Appellant is unaware of any separate action whereby Associate Commissioner Foley became the designee of the Chairman. Such separate action was taken. By internal office Memorandum dated March 6, 1997, a copy of which is enclosed, Acting Chairman Ada Deer delegated several of her responsibilities to other members of the Commission. She did so pursuant to Part II, Chap. 1 of the NIGC Manual (enclosed), and her inherent authority to delegate. Acting Chairman Deer designated Associate Commissioner Foley the authority to approve or disapprove tribal gaming ordinances. Therefore, it cannot be found that the ordinance was approved based on an assertion that the Chairman did not personally disapprove it.

For the foregoing reasons, the Village's appeal is denied.

_____
Tom Foley, Commissioner

_____
Philip N. Hogen, Commissioner

Enclosures