STATE OF ALASKA

Sarah Palin, Governor

**DEPARTMENT OF LAW**

*OFFICE OF THE ATTORNEY GENERAL*

*Commercial and Fair Business Section*
*P.O. BOX 110300*
*123 4TH ST., DIMOND COURT HOUSE*
*JUNEAU, ALASKA 99811-0300*
*PHONE: (907)465-3600*
*FAX: (907)465-2539*

May 17, 2007

Phillip H. Hogen, Chairman
National Indian Gaming Commission
1441 L Street, N.W. Suite 9100
Washington D.C. 20005

Re: Native Village of Eklutna's Request for Indian Lands Determination Regarding Ondola Allotment and Approval of Gaming Ordinance

Dear Chairman Hogen:

The State of Alaska opposes the request by the Alaska Native Village of Eklutna (Eklutna) for approval of an amended gaming ordinance that would permit the village to conduct Class II gaming on an Alaska Native allotment owned by the Ondola family. The allotment does not qualify as Indian land for purposes of the Indian Gaming Regulatory Act.

## INTRODUCTION

As Eklutna concedes in its submission, the village must prove that they exercise governmental authority over the Ondola allotment in order to establish that it constitutes "Indian lands" upon which Indian gaming may be conducted. Eklutna lacks the threshold jurisdiction over the allotment necessary for the exercise of governmental power. Without jurisdiction over the land, Ekuluta's attempts to exercise governmental authority by adopting ordinances or offering government services to the occupants of the land are irrelevant here.

This is the second attempt by Eklutna to gain approval of a proposed gaming ordinance. The village's first attempt, like the current one, involved a proposal for conducting gaming on an Alaska Native allotment within 20 miles of the village.[1] In 1995 the Commission rejected Eklutna's request to approve a gaming ordinance that would also have permitted gaming on an Alaska Native allotment owned by a tribal member located within 20 miles of the village.[2] The commission concluded that the

---

1 *See*, May 17, 1995 Opinion of the Office of the Solicitor, attached as Exhibit A.

2 *See*, January 24, 1995 Gaming Ordinance, attached to Eklutna's April 2, 2007 letter to Commissioner Hogen as Exhibit 30, at 5 (In the Section 223 where the ordinance

Phillip H. Hogen, Chairman                                                    May 17, 2007
Our File:  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                                                         Page 2 of 31

allotments at issue did not qualify as "Indian lands" for purposes of the Indian Gaming
Regulatory Act.  In rejecting Eklutna's efforts the commission was guided by an opinion
of the Office of the Solicitor M-36975 (Jan. 11, 1993), authored by Solicitor Thomas
Sansonetti ("Sansonetti opinion").

The Commission has rejected each attempt of an Alaska Native village to conduct
Indian gaming on Alaska Native allotments in large part due to the Sansonetti opinion,
which concluded that Congress did not intend "Alaska Native villages to exercise
governmental powers over [Alaska Native allotments]."[3]  A U.S. District Court affirmed
the commission's rejection of the Native Village of Barrow's attempt to conduct Indian
gaming on an Alaska Native allotment.[4]   Therefore, to rule for Eklutna here, the
Commission would have to break with its own precedent and reject the conclusions of the
Sansonetti opinion that has guided the commission since 1993. Nothing in Eklutna's new
submissions to the commission would justify such a radical change of position.

## FACTS

Eklutna is an unincorporated community of 368 people that is located within the
Municipality of Anchorage.[5] According to the State of Alaska Community Database,
approximately 13.2% of Eklutna's population are Alaska Natives or part Native and
approximately 65 community members are also members of the Native Village of
Eklutna, which is a federally recognized tribe.[6] Tribal status is itself disputed by some
Alaskans, including some leaders of the current Alaska Legislature. In their letter to
Chairman Hogen, Eklutna states that only 50 tribal members live in the village.[7]

---

drafters define "Tribe's lands," it says, "…For the limited purpose of this gaming
ordinance, the only tribal lands presently deemed to satisfy this definition [of Indian
lands] are Native allotments held by NVE tribal members and located within a 20 mile
radius of the village center."  Eklutna's April 2, 2007 letter will also be referred to herein
as Eklutna's Request.

[3]      Sol. Op. M-36975 at 124 (January 11, 1993).

[4]      *See*, NIGC Ruling on Appeal to Full Commission by Native Village of Barrow
(February 1, 1996); affirmed by *Native Village of Barrow v. National Indian Gaming
Commission*, Civ. No. 99-CV-886 (RWR) (2001), attached as Exhibit B.

[5]      Alaska Community Database Community Information Summary for Eklutna,
attached as exhibit C.

[6]      *Id.*

[7]      Eklutna's Request at 6.

Phillip H. Hogen, Chairman                                          May 17, 2007
Our File:  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                                              Page 3 of 31

Generally, Eklutna residents are subject to Municipality of Anchorage property taxes, as well as bed, rental car and tobacco taxes.[8]

The Native Village of Eklutna asks the commission to find that an Alaska Native allotment qualifies as "Indian Land" when it is located within the Municipality of Anchorage, seven miles from Eklutna, and 22 miles from Downtown Anchorage.[9] The allotment is owned by the heirs of Olga Ondola. One of those heirs, George Ondola presently lives in a home there.[10] While Mr. Ondola is a member of the Native Village of Eklutna, the village's application twice concedes that not all the owners of the allotment are members of the tribe.[11]

According to one of the maps submitted by Eklutna with their letter to Chairman Hogen, the allotment is within the street grid of Peters Creek.[12] The Municipality of Anchorage identifies one of the three lots which constitute the allotment with the street address 20813 Torkelson, Circle, Chugiak.[13] One of the other lots of the allotment fronts Birchwood Spur Road, a two lane State-owned highway.[14] The City services available to the parcel are outlined in detail on the City's website, http://neighborhood.muni.org/details.aspx. They include police, fire, bus service, road maintenance, animal control, and public schools and utilities.[15]

The State of Alaska, not Eklutna, regulates the public utilities provided to the Ondola allotment and the Eklutna community. The state Regulatory Commission of Alaska regulates the electrical provider (Matanuska Electric Association), the refuse collector (Alaska Waste Service Area), the gas company (Enstar Natural Gas Company),

---

[8]     Alaska Community Database Community Information Summary for Eklutna, attached as Exhibit C.

[9]     Eklutna's Request at 2.

[10]    *Id.*

[11]    Eklutna's Request at 9 and 11.

[12]    *See* Exhibit 3 to Eklutna's Request.

[13]    *See* Chugiak/Eagle River Vicinity Map NW 1457 and Property Info Page, Exhibit D1 to Exhibit D; affidavit of Patricia R. Long, Planning Technician, Municipality of Anchorage.

[14]    *See* State of Alaska Highway Log Report, Exhibit E.

[15]    *See* Affidavit of Monica Jenicek and attachments, Exhibit F.

Phillip H. Hogen, Chairman
Our File: 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

May 17, 2007
Page 4 of 31

and the water and waste water collection utility (Anchorage Water and Wastewater Utiity).[16]

The Municipality of Anchorage and the State of Alaska provide police services to the area.[17] Fire suppression services are provided by the Chugiak Volunteer Fire Station #4,[18] which is registered by the Alaska State Fire Marshall, and regulated by the state.[19] Eklutna does not claim to provide fire or police services to residents of the Ondola allotment. Instead the village attached a copy of a 1996 letter of agreement with the Anchorage Police Department concerning Indian Child Welfare Act matters.[20] The village also alleges that when criminal matters arise involving members "the Alaska State Troopers respect tribal authority and work with NVE Tribal Council to resolve problems."[21]

Documents recorded with the State of Alaska's Recorder's Office suggest that any trust restrictions on the allotment were for the most part ignored by the Ondolas, local government, and the local public utility.  Sometime prior to August 24, 1976, the Municipality of Anchorage obtained a Judgment and Decree of Foreclosure on the allotment from the State Superior Court in Anchorage for the Ondolas' failure to pay property taxes.[22]  On that date George Ondola redeemed the allotment by paying the delinquent taxes.[23]

In 1964, George Ondola granted the Matanuska Electric Association Inc. an Electric Line Right of Way Easement. In that easement, Mr. Ondola asserted that he was the owner of the lands and that the lands were free and clear of encumbrances and liens

---

[16]   Affidavit of Daniel Patrick O'Tierney, attached as Exhibit G.

[17]   Exhibit F.

[18]   *Id.*

[19]   AS 09.65.295 (affecting civil liability of volunteer firefighters), AS 23.30.220, 243 (affecting workers' compensation rights of volunteer fire fighters injured while performing fire fighting duties).

[20]   Eklutna Request at 17 with reference to Eklutna's Exhibit 23.

[21]   Eklutna Request at 17.

[22]   *See* Municipality of Anchorage Certificate of Redemption, attached as Exhibit H.

[23]   *Id.*

**Exhibit D, Page 4 of 31**

Phillip H. Hogen, Chairman                                    May 17, 2007
Our File: 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                                          Page 5 of 31

of whatsoever character."[24] The easement was recorded April 1, 2005 with the Alaska
Department of Natural Resources Recorder's Office.[25]   Mr. George Ondola granted
another Electric Line Right of Way Easement to the Matanuska Electric Association
Inc.in 1984.[26] Again, Mr. Ondola certified that he was the owner of the lands and that
"said lands are free and clear of encumbrances and liens of whatsoever character." No
mention was made in either easement of the trust restrictions on Mr. Ondola's title. There
is nothing on either easement to indicate that the Bureau of Indian Affairs or another
federal government agency approved granting of the easement.

        In 1985 Carl Ondola, then living in the Southeast Alaska town of Douglas, sold his
$1/8^{th}$ interest in the allotment to George Ondola for $10,625.  The deed and memorandum
of agreement for sale were recorded with Anchorage Recording District for the State of
Alaska[27] This agreement was approved by the Area Director of the BIA.[28]

        Lots 64 and 67 of the Ondola property have been zoned by the Municipality of
Anchorage as R-6 residential land.[29] This zoning designation "is designed to encourage
low-density residential development while at the same time protecting and enhancing
those physical and environmental features which add to the desirability of suburban
residential living."[30] Construction or operation of a gaming facility on the property would
violate Anchorage's zoning laws. Mr. Ondola's other lot, 66, has been zoned I-1 Sl-1.[31]
While this zoning classification permits light industrial type uses of the land, no

---

[24]     Electric Line Right of Way Easement, attached as Exhibit I.

[25]     Cover sheet to Exhibit I, Anchorage Recording District 301, attached as page 1 of
Exhibit I.

[26]     *See* Matanuska Electric Association Inc. Electric Right of Way Easement, attached
as Exhibit J.

[27]     *See* Memorandum of Agreement for Sale of Restricted Native Land by Deferred
Payment and Deed, attached as Exhibits K and L respectively.

[28]     Agreement, Exhibit K at 3.

[29]     Affidavit of Patricia R. Long, Planning Technician, Municipality of Anchorage
attached as Exhibit D at D2.

[30]     Anchorage Municipal Code 21.40.080  R-6 suburban residential district (large lot).

[31]     Affidavit of Patricia R. Long, Exhibit D, at D2.

Phillip H. Hogen, Chairman                                              May 17, 2007
Our File: 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                                                   Page 6 of 31

development may take place until Mr. Ondola successfully submits a site plan to the Municipality of Anchorage Community Planning Department:

> ...depicting ingress, egress, landscaping, location, and operation of loading facilities, illumination, height of structures and internal pedestrian and vehicular circulation.[32]

Agents of the Municipality of Anchorage have authority to enter the Ondola property for inspection if they have reasonable cause to believe there is a violation of the zoning ordinances.[33] The Municipality may impose fines[34] or pursue a civil action against Mr. Ondola if he should violate the zoning ordinances. Any person aggrieved by a violation of the zoning ordinance may initiate a private enforcement action before the municipality's administrative hearings officer.[35]

The Native Village of Eklutna participates in Municipality of Anchorage zoning proceedings when it is in its interest. As recently as February 10, 2007, Daniel Alex, who executed multiple affidavits in this case on behalf of the village, testified at a public hearing before the Planning and Zoning Commission in support of Eklutna, Inc.'s petition for a revised municipal ordinance permitting gravel extraction from a property just south of Eklutna village. Mr. Alex identified himself as the Tribal Administrator for the Native Village of Eklutna as well as member of the board of directors of Eklutna, Inc. Both Eklutna, Inc.'s representative and Mr. Alex testified in support of the project, and Mr. Alex specifically pointed to the common interest of voting members of the Village and the shareholders of Eklutna, Inc.[36]

Eklutna has been a party to three lawsuits to enjoin quarry operations on land adjacent to the village for alleged violations of the Municipality of Anchorage's zoning

---

[32]    Anchorage Assembly Ordinance 85-125, attached as Exhibit D3 at 4.

[33]    AMC 21.25.040.

[34]    AMC 21.25.050.

[35]    AMC 21.25.035.

[36]    Municipal Assembly file AM 193-2007/AIM 41-2007, AO 2007-47, An Ordinance Adopting a Planned Community Master Development Plan Designating Allowed Permitted and Accessory Land Uses and Design Standards for a Portion of Sections 24 and 25, T16N, R1W, S.M., Ak. Public Testimony, Bates 016, 019, 022-23, Exhibit D4, at pp. 5, 8, 11 and 12 of 14.

Phillip H. Hogen, Chairman                                                    May 17, 2007
Our File:  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                                                         Page 7 of 31

ordinances.[37] In *Alaska Railroad Corporation v. Native Village of Eklutna,* the village argued that the quarry was a nonconforming use of land within the Eklutna land use district of the Municipality of Anchorage.[38]

Exhibits M-Q[39] provide the Commission with graphic evidence of the residential character of the allotment, in relation to surrounding municipal land in the immediate vicinity.  Exhibit M shows an aerial view of the allotment, which has been used as a homesite by the Ondola family for many years.[40] Exhibit N shows the allotment in relation to multiple surrounding residential properties, the Alaska Railroad, and the Birchwood Airport, all within the Municipality of Anchorage.  Exhibit O shows the residential nature of the surrounding properties in the south west corner, and the undeveloped nature of Eklutna village in the northeast corner.  Exhibits P and Q show a closer view of the undeveloped character of the Native Village of Eklutna.

In 1995 the Native Village of Eklutna requested the Commission's permission to conduct gaming on an Alaska Native allotment owned by one of its tribal members.[41] The request was denied because the village could not establish that it exercised jurisdiction over the allotment. In its letter to Chairman Hogen, Elkutna does not state on which Alaska Native allotment it then intended to conduct gaming.[42]  Recently, the state was thwarted in its efforts to obtain a description of the 1995 allotment when the Commission was unable to locate any relevant documents to satisfy the state's Freedom of Information Act request.[43] However, the proposed gaming ordinance submitted for approval in 1995

---

[37]     *Native Village of Eklutna v. Alaska Railroad Corp.* 87 P.3d. 41 (Alaska 2004); *Alaska Railroad Corporation v. Native Village of Eklutna,* 43 P.3d 588 (Alaska 2002); and *Native Village of Eklutna v. Board of Adjustment,* 995 P.2d 641 (Alaska 2000).

[38]     43 P.2d at 590.

[39]     Exhibits M-Q consist of  4 aerial photographs and one plat map obtained from Mark J. Hall, Land Surveyor, Realty Services, Division of Mining Land and Water, Department of Natural Resources, State of Alaska.

[40]     United States Dept. of the Interior BLM Alaska Native Allotment Evidence of Occupancy, Exhibit R.

[41]     May 17, 1995 Opinion of the Office of the Solicitor, attached as Exhibit A.

[42]     Eklutna Request at 7.

[43]     *See* April 25, 2007 Letter from NIGC FOIA/PA Officer Regina Ann McCoy to Dan Branch, attached as Exhibit S.

Phillip H. Hogen, Chairman
Our File: 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

informed the reader that Eklutna intended to conduct the gaming on an Alaska Native allotment within 20 mile radius of the village center.[44]

## LEGAL STANDARDS

The Indian Gaming Regulatory Act prohibits Alaska Native villages from conducting gaming activities except on land that qualifies as "Indian lands."[45]   Indian lands under the Act are those lands within an Indian reservation and any lands owned by a tribe or individual Indian that are subject to restriction against alienation *and* over which an Indian tribe exercises government power.[46]   There are very few places in Alaska that qualify as "Indian lands." The Metlakatla Indian Community reservation and Pre-IGRA trust acquisitions owned by the Klawock Cooperative Association and the Organized Village of Kake are the notable exceptions.[47]   Eklutna does not have a reservation like Metlakatla or Pre-IGRA trust acquisitions like Kake and Klawock. The village intends to conduct Indian gaming on an Alaska Native allotment occupied by Mr. Ondola, a tribal member.

## EKLUTNA HAS NO JURISDICTION OVER
## ALASKA NATIVE ALLOTMENTS

As a threshold matter, IGRA requires Ekutna to show that it has jurisdiction over the allotment in question.[48]   Therefore, before addressing whether the steps taken by Eklutna constitute a sufficient demonstration of governmental power over the allotment,

---

[44]   *See* proposed 1995 gaming ordinance, attached to Eklutna Request as Exhibit 30 at 5.

[45]   25 U.S.C. §§ 2710(b)(1), 2710(d)(1).

[46]   25 U.S.C. 2703(4)(B).

[47]   NIGC Approval Letter of Metlakata Indian Gaming Ordinance (June 27, 1997); Indian Lands Decision Concerning Klawock Cooperative Association (November 15, 1993); NIGC Approval Letter and Finding Regarding Organized Village of Kake (April 18, 2000).

[48]   *Kansas v. U.S.*, 249 F3d 1213, 1228 (10th Cir. 2001)(" For the Kansas tract to qualify as "Indian lands" of the Miami Tribe within the meaning of IGRA, (1) the Tribe must have jurisdiction over the tract, (2) fee title to the tract must be restricted or not freely alienable, and (3) the Tribe must exercise governmental power over the tract. *See* 25 U.S.C. § § 2703(4)(B), 2710(b)(1), (d)(1)(A)(i).").

Phillip H. Hogen, Chairman
Our File: 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

May 17, 2007
Page 9 of 31

the Commission must first find that the village has jurisdiction over the tract.[49] In addressing jurisdiction, the Commission is bound by its own precedent, the Sansonetti opinion and case law, all of which supports the state's position that Eklutna lacks the necessary jurisdiction over the Ondola allotment to establish that the parcel constitutes Indian land.

In analyzing this threshold jurisdictional issue, the state first examines the Sansonetti opinion and the Commission's precedent. Next, the state examines the unique nature of Alaska Native allotments and explains why they are not Indian lands.

### THE COMMISSION WOULD HAVE TO
### IGNORE ITS OWN PRECEDENT AND THE BINDING
### SANSONETTI OPINION TO GRANT EKLUTNA'S REQUEST

The Commission has rejected every attempt by an Alaska Native village – including an earlier attempt by Eklutna – to conduct Indian gaming on an Alaska Native Allotment or Alaska Townsite Lot because the requesting villages were unable to establish that they had jurisdiction over the land in question.[50] With one exception, the authors of the Commission's Indian lands decisions relied upon the formal opinion by Solicitor Thomas L. Sansonetti, who concluded that Alaska villages do not have jurisdiction over allotments or townsite lots because Congress did not intend it.[51] The

---

[49]     *Kansas* 249 F3d at 1229 (Quoting with approval *Miami Tribe of Okla. v. United States,* 927 F.Supp. 1419, 1423 (D.Kan.1996) ("Absent jurisdiction, the exercise of governmental power is, at best, ineffective, and at worst, invasive.") and *State v. Narragansett Indian Tribe,* 19 F.3d 685, 701 (1st Cir.1994) ("jurisdiction is an integral aspect of retained sovereignty").

[50]     *See* Indian Lands Decision regarding Akiachak Native Community by Assistant Solicitor Scott Keep (1995); Indian Lands Decision regarding Kenaitze Indian Tribe by Associate Robert Anderson (May 12, 1995); Indian Lands Decision regarding Native Village of Akiak by Acting Associate Solicitor David Etherridge (March 2, 1995); Indian Lands Decision regarding Native Village of Barrow by then Acting Associate Solicitor Robert Anderson (April 10, 1995); Indian Lands Decision regarding Native Village of Eklutna by Associate Solicitor Robert Anderson (May 17, 1995).

[51]     Solicitor's Opinion M-36975 at 124 ("we are not persuaded that Congress intended Alaska Native villages to exercise governmental powers over these lands."), 129 ("As we noted above, particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment.") and 130 ("Even so, an assertion of tribal jurisdiction over individual [Townsite] restricted lots would be doubtful if there were no clear tribal nexus to the

Phillip H. Hogen, Chairman                                    May 17, 2007
Our File: 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                                         Page 10 of 31

Commission "traditionally defers to the expertise of the Department of the Interior on the existence of Indian lands."[52]  The Department of the Interior, in turn, is bound to follow the published opinions of the Solicitor, such as the Sansonetti opinion, unless overturned by the Solicitor or the Secretary or Deputy Secretary of the Interior.[53]   The Sansonetti opinion has not been overturned.   Therefore, the Commission is bound by this strong precedent and must comply with the Sansonetti opinion and reject Eklutna's claim that the Ondola allotment qualifies as Indian lands.

The Sansonetti opinion concluded that Congress expressed its intent that Alaska Native allotments be treated as individually owned pieces of property rather than tribal properties, by not making tribal membership a criterion for qualifying for an allotment.[54] In addition, Alaska Native allotments were not carved out of existing reservations, a fact that may not prevent the federal government from exercising criminal jurisdiction over crimes committed on an allotment, but may be significant in determining whether a particular tribe has jurisdiction over the land.[55] Finally the Solicitor recognized that "the [Alaska Native Allotment] statute specifically provides that the allotment 'shall be deemed the homestead of the allottee and his heirs.'[56] The Solicitor found that this language "makes the Alaska Native Allotment Act appear more similar to a general Indian homestead act rather than a tribal or reservation related allotment act."[57]  Solicitor Sansonetti concluded that "particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment."[58]

---

individual restricted lands."); Akiachak decision at 2; Kenaitze decision at 2; Barrow decision at 2; Eklutna decision at 2.

[52]    Final Decision regarding November 6, 1995 appeals of the Decision of the Chairman of the National Indian Gaming Commission disapproving the Native Village of Barrow's tribal gaming ordinance 95-01 at 4. (February 1 1996).

[53]    *Id.*

[54]    Sansonetti Opinion at 128.

[55]    *Id.* at 129.

[56]    *Id.*

[57]    *Id.*

[58]    *Id.*

Phillip H. Hogen, Chairman
Our File: 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

May 17, 2007
Page 11 of 31

In their submission, Eklutna suggests that the value of the Sansonsetti opinion in interpreting the Indian Gaming Regulatory Act "is marginal at best."[59] Eklutna is wrong. Even if the Commission were not bound to follow the letter of the opinion, its logic compels the rejection of Eklutna's bid. As the Commission recognized in its ruling concerning the Native Village of Barrow, "[t]he Solicitor, in his opinion, concludes that the Native Villages in Alaska will not be able to establish that they exercise jurisdiction over Alaska Native allotments and individual townsite lots."[60]

Eklutna does not address Solicitor Sansonetti's reasoning or conclusions in their submission. Instead the village argues that the opinion is not helpful here because the Solicitor "did not have the benefit of the evidence presently before the Commission and discussed below which clearly establishes Eklutna's authority over the Ondola allotment."[61]

The evidence offered by Eklutna concerns the actions taken by the village in an attempt to establish control over the allotment. They argue that these documents clearly establish the village's authority over the Ondola allotment.[62] But the documents, which are at best evidence of the village's *attempt* to exercise authority over an allotment seven miles away from their community, are only meaningful if Eklutna has the power to exercise such authority. They do not. As the solicitor pointed out, Congress did not intend that Alaska Native allotments be subject to tribal jurisdiction. Eklutna's steps are meaningless because Eklutna lacks the jurisdictional authority over the land to which they seek to apply those ordinances.

Without jurisdiction over an Alaska Native allotment, a Native village has no power to exercise governmental authority over it. Thus, Eklutna is unable to establish the threshold jurisdiction over land that it needs to exercise governmental power.[63] It does not matter, then, whether Eklutna passes a dog ordinance or posts no trespassing signs on the Ondola allotment since the village lacks jurisdiction over the land.

---

[59]    Eklutna Request at 11.

[60]    Final Decision regarding November 6, 1995 appeals of the Decision of the Chairman of the National Indian Gaming Commission disapproving the Native Village of Barrow's tribal gaming ordinance 95-01 at 4 (February 1, 1996).

[61]    Eklutna Request at 11.

[62]    Eklutna Request at 11.

[63]    25 U.S.C. 2703(4)(B).

Phillip H. Hogen, Chairman                                      May 17, 2007
Our File:  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                                          Page 12 of 31

## THE COMMISSION'S ALASKA DECISIONS REGARDING
## ALASKA NATIVE ALLOTMENTS SUPPORT THE STATE'S POSITION

In 1995 Robert Anderson, Associate Solicitor for the Bureau of Indian Affairs, issued opinions rejecting assertions by the Kenaitze Indian Tribe and the Native Village of Eklutna that an Alaska Native allotment held by a tribal member was Indian land for purposes of the Indian Gaming Regulatory Act.  While Mr. Anderson found that Alaska Native allotments are subject to federal jurisdiction for purposes of federal criminal laws involving Native Americans, Eklutna was unable to establish a clear *tribal* nexus to Alaska Native allotments in order to establish *tribal* jurisdiction over them.[64]   The Commission accepted Mr. Anderson's opinion concerning the Kenaitze Indian Tribe and disapproved the Tribe's gaming ordinance.[65]   It did not have to take formal action on Eklutna's request because the village withdrew its request after receiving a copy of Mr. Anderson's Indian lands opinion.[66]

In an apparent effort to downplay the importance of Mr. Anderson's 1995 opinion, Eklutna describes his 1995 rejection of their claims as a draft opinion that was subject to review in light of then-pending litigation.[67]   Mr. Anderson's opinion is not marked "draft" but he described it as such in a letter to the Commission he sent after Eklutna opted to withdraw its request for approval of the gaming ordinance.[68]

---

[64]     Opinion, Officer of the Solicitor Regarding Whether a Restricted Allotment held by a Member of the Native Village of Eklutna is Indian Land by Associate Solicitor Robert T. Anderson (May 17, 1995) at 2 (...an assertion of tribal jurisdiction, as opposed to Federal jurisdiction, over individual restricted lots would be doubtful if there were no clear tribal nexus to the Native allotment. The village has the burden of establishing ...that it exercises government authority over the lot....[w]e are not convinced, based on the information before us, that the Eklutna Indian Tribe exercises government power over the land. Therefore, we cannot conclude that the land in question is "Indian land" as defined by IGRA.").

[65]     Final Order, *In re: Class II Gaming Ordinance of The Kenaitze Indian Tribe* (March 18, 2004).

[66]     Eklutna Request at 7.

[67]     *Id.*

[68]     *See* Robert Anderson Letter to Commission, May 18, 1995 attached to Eklutna Request as Exhibit 13.

Phillip H. Hogen, Chairman                                                              May 17, 2007
Our File: 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                                                                   Page 13 of 31

     The fact that Eklutna avoided having the opinion finalized by withdrawing its
request should not lessen the negative impact of the 1995 Anderson opinion on Eklutna's
present gaming application. Mr. Anderson had reviewed Ekluna's submissions and
completed the analysis and sent an opinion to the Commission before the village
withdrew its application. It is significant that five days prior to his issuance of the 1995
Eklutna Indian lands opinion, Mr. Anderson issued one with almost identical wording in
response to the Kenaitze Indian Tribe's attempt to conduct Indian gaming on an Alaska
Native allotment.[69] The question of whether either village could conduct Indian gaming
turned on whether Alaska Native villages have jurisdiction over Alaska Native
allotments. The Kenaitze Indian Lands opinion concluded that Alaska native villages did
not possess such jurisidiction.

     Even if the Commission were not bound to follow the logic of the Eklutna 1995
Indian lands opinion, it would still be bound to follow the Kenaitze Indian Tribe Indian
lands opinion because its logic applies to *all* Alaska Native allotments. The Kenaitze
opinion establishes that Alaska Native villages have no jurisdiction over Alaska Native
allotments owned by village members.

     Mr. Anderson added a footnote to each of these 1995 Indian lands opinions
acknowledging that the Sansonetti Opinion remains subject to review pending resolution
of the legal issues raised in *Alaska v. Native Village of Venetie* and *Alyeska v. Kluti Kaah
Native Village of Copper Center*.[70] There is no reason for the Commission to
acknowledge Mr. Anderson's concern today. Both of the cases were pending in U.S.
District Court in 1995 but have since been resolved in a manner consistent with the
Sansonetti opinion. In fact, the villages in each case lost their Indian country claims.

     In 1998 the U.S. Supreme Court resolved the issues raised in the *Venetie* case by
ruling against them on the question of Indian country.[71] In *Venetie*, the U.S. Supreme
Court recognized that no Indian reservation (except the Annette Island Reserve) survived
ANCSA and determined that ANCSA lands underlying Alaska Native villages are not
"dependent Indian communities" under 18 U.S.C. § 1151. *State v. Alaska Native Village
of Venetie*, 522 U.S. 520, 532 (1998). In *Kluti Kaah*, the Ninth Circuit held that the Trans

---

[69]    Kenaitze Indian Lands Opinion, May 12, 1995, attached as Exhibit T.

[70]    The opinion is attached to the Eklutna Request as Exhibit 12.

[71]    *State of Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 521, 525
(1998) (Alaska Native Village of Venetie case F87-0051 was combined with other cases
for purposes of this appeal).

Phillip H. Hogen, Chairman                                              May 17, 2007
Our File: 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                                                   Page 14 of 31

Alaska Pipeline System easements were not Indian country under the six factor test that the Ninth Circuit adopted in its *Venetie* decision.[72]

In 1996, the year that the Ninth Circuit ruled against Kluti Kaah Native Village in the *Kluti Kaah* case, the Commission relied heavily on the Sansonetti opinion to reject the Native Village of Barrow's bid to have a town site lot declared Indian lands.[73] No representations were made that the Sansonetti opinion was under review. Instead the Commission members noted that, "The Department of the Interior is bound by the published opinion of the Solicitor unless overturned by the Solicitor, Deputy Secretary, or the Secretary. 209 DM 3.2A(11)."[74] Barrow appealed the Commission's rejection to the United States District Court for the District of Columbia where the Commission was upheld.[75]

Nothing has changed since 1996 that would justify ignoring the Sansonetti opinion and the Commission's previous rulings concerning Alaska Native allotments. The Commission must find that the very nature of Alaska Native allotments prevents Alaska Native villages from possessing land-based jurisdiction over them. Since Eklutna lacks jurisdiction, the village's attempt to exercise governmental control over the Ondola allotment is void *ab initio*.

## ALASKA NATIVE ALLOTMENTS ARE NOT INDIAN COUNTRY OVER WHICH ALASKA NATIVE VILLAGES HAVE JURISDICTION

Contrary to Eklutna's claim, Alaska Native allotments are not Indian country.[76] For the purposes of IGRA, "Indian lands" do not have to be "Indian country."[77]

---

[72]    *Alyeska Pipeline Co. v. Kulti Kaah Native Village of Copper Center*, 101 F.3d 610, 612-13 (9th Cir. 1996). The Supreme Court subsequently rejected the Ninth Circuit's six-factor test its *Venetie* decision, holding that ANCSA lands were not set aside for Indians as such and were not under continuing federal superintendence. *Venetie*, 522 U.S. at 532-34.

[73]    Decision Affirming Decision of the Chairman of the National Indian Gaming Commission disapproving the Native Village of Barrow's gaming ordinance (February 1, 1996) at 4-6.

[74]    *Id.* at 4.

[75]    *Native Village of Barrow v. National Indian Gaming Commission*, Civil Action No. 99-886 (RWR). A copy of the opinion is attached Exhibit B.

[76]    Eklutna claims all restricted-deed allotments are Indian country. Eklutna Request at 8.

Phillip H. Hogen, Chairman                                          May 17, 2007
Our File:  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                                              Page 15 of 31

Nevertheless, the reasoning and analysis of the U.S. Supreme Court in *Alaska v. Native Village of Venetie Tribal Government* underscores the conclusion of the Sansonetti opinion that Alaska Native villages lack the nexus with Native allotments that establishes a tribal land-based jurisdiction over them.

After the enactment of ANCSA and the issuance of the Supreme Court's *Venetie* decision, lands in Alaska are Indian country only if they constitute "allotments" under 18 U.S.C. § 1151(c).[78]  Although *Venetie* did not include a holding on the Indian country status of allotments under 18 U.S.C. § 1151(c), the Court did hold that, *any land* that is classified as "Indian country" under 18 U.S.C. § 1151 must be (1) validly set aside for *the use of Indians as such* and (2) must be under continuing *federal superintendence*.[79]

With specific reference to Indian allotments, the Court held that the Indian country definition of "Indian allotments" codified the Court's decision in *U.S. v. Pelican*, 232 U.S. 442 (1914).[80]  The allotments at issue in *Pelican* were allotments that had originally been within an Indian reservation.  According to the Court, the allotments remained Indian country after the Indian reservation was diminished because *the reservation* had originally "been validly set aside for the use of the Indians as such, under the superintendence of the Government" *and* because the allotments *remained* set aside and under federal superintendence after the reservation boundaries were diminished.[81]  Indeed, the *Pelican* decision specifically held that the allotments at issue in that case "were *excepted* from the portion [of the reservation] restored to the public domain."[82]

---

[77]     *Miami Indians of Oklahoma v. U.S.,* 5 F.Supp.2d 1213, 1218 (D. Kan., 1998). ("The Tribe's position is further undermined by the fact that Congress used (and separately defined) the term 'Indian lands' instead of 'Indian country,' the term generally used to define the limits of a tribe's jurisdiction. *See Mustang Production Co. v. Harrison,* 94 F.3d 1382, 1385 (10th Cir.1996) [tribal jurisdiction determined by status as Indian country].")

[78]     *Venetie*, 522 U.S. at 527 n. 2.

[79]     *See Venetie*, 522 U.S. at 530 (Concluding that land under 18 U.S.C. § 1151 must meet "both a federal set-aside and federal superintendence" requirement in order to qualify as Indian country under that statute).

[80]     *Venetie*, 522 U.S. at 530.

[81]     *Venetie*, 522 U.S. at 529.

[82]     *Pelican*, 232 U.S. 442, 449 (emphasis added).

**Exhibit D, Page 15 of 31**

Phillip H. Hogen, Chairman                                    May 17, 2007
Our File: 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                                         Page 16 of 31

Thus, the *Pelican* allotments never ceased to be set aside for the use of tribal Indians, never ceased to be under federal superintendence and, therefore, never lost their original tribal connection. The *Pelican* allotments were Indian country because they had originally been lands set aside for a tribe and were inhabited by the tribe.[83]

Because 18 U.S.C. § 1151(c) codifies *Pelican*, the restricted "Indian allotments" included in the Indian country definition of 18 U.S.C. § 1151(c) are those that were either carved out of reservations or for which there is a tribal nexus. Alaska Native allotments do not qualify as Indian country under § 1151(c). First, Alaska Native allotments were not carved out of reservations. Eklutna concedes that a reservation was never established for the village.[84] In fact, Alaska Native allotments could only be obtained through the applicant's use and occupancy of "vacant, unappropriated, and unreserved" land.[85] If the land were inhabited by a tribe or others, it was not lawfully available for allotment.

Second, unlike applicants for Dawes Act allotments (some of which were carved out of the public domain for tribal Indians living off-reservation and are recognized as Indian country), applicants for Alaska Native allotments did not have to be tribal members. The Dawes Act required an allotment applicant to be a tribal member, a requirement that was made explicit in federal regulation.[86] Moreover, Alaska Native allotments were "deemed the homestead of the allottee and his heirs in perpetuity."[87] Underscoring the nature of Alaska Native allotments as homesteads is the legislative history of the Alaska Native Allotment Act, which establishes that the purpose of the Act

---

[83]     Although *Venetie* did not specifically hold that the Indian country status of land turned on whether it had originally been set aside for a tribe (as opposed to an individual Indian), it clearly implied that *tribal* inhabitance of the land was essential in the Indian country calculus: The Court observed "that it is *the land in question*, and not merely the *tribe inhabiting it*, that must be under the superintendence of the Federal Government." *Venetie*, 522 U.S. at 530 n. 5 (first emphasis in original, second emphasis added, citations omitted).

[84]     Elklutna Request at 5 ("This IRA reservation was never finalized, however, and the initial Reserve's limited acreage was slowly whittled away until the Reserve itself was completely abolished following passage of the Alaska Native Claims Settlement Act in 1971…").

[85]     Alaska Native Allotment Act, 43 U.S.C. §270-1 (now repealed).

[86]     Dawes Act (General Allotment Act of 1887), §4, 24 Stat. 388, 389; *see also* 43 C.F.R. § 2531.1(a).

[87]     *Id.*

was to "extend to the Natives of Alaska the rights, privileges and benefits conferred by the *public land laws* of the United States."[88] Thus, Alaska Native allotments lack the tribal nexus that Dawes Act public domain allotments possess.

Third, Eklutna's land-based claim of tribal jurisdiction was extinguished by the Alaska Native Claims Settlement Act (ANCSA). ANCSA § 4(c) extinguished "*All* claims against . . . the State, based on aboriginal . . . use, *or* occupancy of land . . . that are based on any statute . . . of the United States relating to Native use and occupancy."[89]

In *U.S. v. Atlantic Richfield Co.*, the Ninth Circuit, in an opinion authored by now Justice Kennedy, held that ANCSA § 4(c) extinguished "all claims" where Native use and occupancy "is an element of the claims."[90] Eklutna's claim to jurisdiction over the Ondola allotment is a land-based claim derived from use and occupancy of land under the Alaska Native Allotment Act by one of Eklutna's members. This claim was extinguished by ANCSA § 4(c).[91] Congress extinguished all claims where Native use and occupancy of land is an element of the claim.

Eklutna claims in footnote 3 of its April 2, 2007 letter to Mr. Hogen that Congress disclaimed any effect ANCSA might have otherwise had on tribal jurisdictional claims over land when it enacted amendments to ANCSA in 1987. However, the 1987

---

88 S. Doc. No. 101, 59th Cong., 1st Sess. (1906) (emphasis added).

89 ANCSA § 4(c), 43 U.S.C. § 1603(c) (emphasis added). Although ANCSA contained a savings provision for then-pending Alaska Native allotment applications, it did not include a savings provision for claims of third parties, *i.e.*, for claims that were not personal to the allotment applicant. *See* ANCSA § 18(a), 43 U.S.C. § 1617(a).

90 612 F.2d 1132, 1135 (9th Cir. 1980), *cert. denied*, 449 U.S. 888 (1980). The Ninth Circuit made the quoted statements while construing the phrase "based on" in the first clause of ANCSA § 4(c). The first clause of ANCSA § 4(c) extinguishes claims based on aboriginal use of land. The second clause of the same sentence extinguishes claims based on Native use and occupancy of land under any statute of the United States. Thus, the phrase "based on" means the same thing in both clauses of section 4(c). *Chugach Natives, Inc. v, Doyon, Ltd.*, 588 F.2d 723, 725 (9th Cir. 1978) (In construing ANCSA, the Ninth Circuit held that "the same words or phrases are presumed to have the same meaning when used in different parts of a statute.").

91 In construing ANCSA § 4(c), the Ninth Circuit does *not* apply the Indian canon of construction to liberally construe that section in favor Alaska Native interests. Congress intended ANCSA to be "construed 'broadly' to extinguish all claims and litigation" and thus, the canon does not apply. *Atlantic Richfield*, 612 F.2d at 1139.

Phillip H. Hogen, Chairman                                     May 17, 2007
Our File:  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                                         Page 18 of 31

disclaimer only applies to the 1987 amendments, not to ANCSA § 4, which was enacted in 1971 and remains unaltered.    This fact is made clear in the Senate Report accompanying passage of the 1987 ANCSA amendments, which provides:

> [T]he Committee is aware that there is a controversy in Alaska over the issue of Native sovereignty; i.e., whether there are tribal entities in Alaska . . . that can exercise governmental authority over lands . . . in Alaska.
>
> . . .
>
> It is the Committee's clear intent that this bill leave the parties in the sovereignty issue, in exactly the same status as if the [1987] amendments were not enacted.
>
>    This is an issue which should be left to the courts in interpreting applicable law and that [*sic*] *these amendments* should play substantive or procedural role in such court decisions.[92]

The House explanatory statement for the 1987 ANCSA amendments likewise provides "that the issue should be decided under existing law and that these [1987] amendments . . . should be scrupulously neutral on that question."[93]

    Thus, in 1987 Congress expressed its unequivocal intention that its 1987 ANCSA amendments play no role in deciding whether Alaska Native villages have jurisdiction over land in Alaska and stated its intent that the issue be decided under then-existing law. The then-existing law includes ANCSA § 4(c), which was enacted in 1971 and has remained unchanged.

### THE COMMISSION AND FEDERAL COURT DECISIONS CITED BY EKLUTNA DO NOT SUPPORT THE VILLAGE'S CLAIM TO JURISDICTION OVER THE ONDOLA ALLOTMENT

    Eklutna's April 2, 2007 letter relies on four Commission Indian Land Decisions as support for its claim that it exercises jurisdiction over off-reservation Native allotments. These decisions are inapposite.

#### *Kiowa Tribe* (November 15, 2005)

*Kiowa Tribe* (November 15, 2005) addresses an allotment that was within a former reservation.   This allotment is Indian country under 18 U.S.C. § 1151(c) over which the tribe possesses an undisputed nexus.  As demonstrated above, Alaska Native

---

[92]    S. Rep. No. 100-201 at 23, 100th Cong., 1st Sess. (1987), *as reprinted in* 1987 U.S.C.C.A.N 3269, 3273 (emphasis added).

[93]    House Explanatory Statement, 33 Cong. Rec. H. 11933 (1987), *as reprinted in* 1987 U.S.C.C.A.N. at 3299.

Phillip H. Hogen, Chairman
Our File: 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

May 17, 2007
Page 19 of 31

villages do not have a tribal connection with allotments owned by individual Alaska Natives. Thus, *Kiowa Tribe* is inapposite.

### *Big Sandy* (September 6, 2006)

*Big Sandy* (September 6, 2006) involved an Indian allotment located outside of the Tribe's Rancheria. The decision, however, does not specify whether the allotment was originally part of the tribe's reservation or whether it was carved out of the public domain under the Dawes Act. In either case, as we demonstrated above, Dawes Act allotments required a tribal nexus for their creation that is utterly absent in the case of Alaska Native allotments. Furthermore, unlike the case of Alaska Native allotments, there was no statute like ANCSA in *Big Sandy* that extinguished third party claims based on Native use and occupancy of land. Finally, the *Big Sandy* decision was based in part on the fact that the allotment was not within an incorporated area. That is hardly the case with the Ondola allotment, which is not only within the Municipality of Anchorage, but which receives municipal and state services.

### *Bear River Band* (August 5, 2002)

The land at issue in *Bear River Band* is land *owned by the tribe* and taken into trust *for the tribe* by the BIA. The decision does not concern tribal jurisdiction over a Native allotment owned by an individual.

### *Quinault Indian Lands* (September 25, 1996)

Like the land at issue in *Big* Sandy, the *Quinault* decision concerned a public domain allotment issued under the Dawes Act. *Quinault* is thus distinguishable from cases involving Alaska Native allotments for the reasons set out above.

Eklutna relies on *Merrion v. Jicarilla Apache Tribe*[94] to support its assertion that it has jurisdiction over the Ondola allotment, but the portion of *Merrion* Eklutna quotes undercuts its claim.[95] The quote, which actually is from a Senate report to the 45th Congress states that Indian tribes are "invested with …jurisdiction over the…property within the limits of the *territory they occupy* except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress...."[96] (emphasis added). In *Merrion*, the U.S. Supreme Court cited this language from the Senate report to help determine whether the Jicarilla Apache Tribe had the authority to impose a severance tax on oil and gas extracted from the Tribe's reservation.[97] *Merrion* does not help Eklutna because the

---

[94]   455 U.S. 130 (1982).

[95]   Eklutna Request at 8.

[96]   *Id* at 140.

[97]   *Id* at 130.

Phillip H. Hogen, Chairman                                          May 17, 2007
Our File: 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                                              Page 20 of 31

village does not have a reservation and the Ondola allotment is owned by the Ondola family, not the village and because, even if the allotment is Indian country, the village has no tribal nexus with it, as the Sansonetti opinion establishes. Moreover, the tribe's land-based jurisdiction claim has been abridged by Congress. It has been extinguished by ANCSA § 4(c).

Eklutna also attempts to bolster its jurisdictional claim over the allotment by citing federal court cases involving Alaska Native allotments.[98] In one, the court found the federal government owed a fiduciary duty to applicant for a Native allotment.[99] In another, an allotment applicant benefited by the application of liberal rules of interpretation to the Alaska Native Allotment Act.[100] Eklutna also cites a case where the court found that the federal rather than state government has the power to adjudicate a dispute involving trust property.[101] None of these cases help Eklutna because they either involve the individual rights of an allotment owner, as opposed to the village, or they address the question of federal authority versus that of the state. The same is true of *State of Alaska v. Babbitt*[102] another case on which Eklutna relies. *Babbitt* held that the federal quiet title act did not waive the sovereign immunity of the United States and thus it did not authorize judicial review of a BIA decision approving a Native allotment and cancelling the state's interest in a right-of-way. The Alaska cases cited by Eklutna simply do not address *tribal jurisdiction* over land in Alaska and are all therefore inapposite.

Eklutna lacks the land-based jurisdictional predicate it needs to exercise governmental control over the Ondola allotment. The Sansonetti opinion, which the Commission has followed in the past, has been vindicated by the analytical approach to 18 U.S.C. § 1151 applied by the U.S. Supreme Court in its 1998 *Venetie* decision. The Sansonetti opinion also addresses the unique situation in Alaska created by ANCSA. There is no reason for the Commission to abandon the Sansonetti opinion. The Commission's other Indian Land decisions do not apply to Alaska Native allotments.

---

[98]     Eklutna Request at 9.

[99]     *Aguilar v. United States*, 474 F.Supp. 840, 846 (D. Alaska 1979), cited on page 9 of Eklutna Request.

[100]    *Olympic v. U.S.*, 615 F.Supp. 990, 995 (D. Alaska 1985), cited on page 9 of Eklutna Request.

[101]    *Alaska Dept.of Public Works v. Agli*, 472 F.Supp. 70, 72 (D. Alaska 1979) cited on page 9 of Eklutna Request.

[102]    38 F.3d 1068, 1073 (9th Cir. 1994).

Phillip H. Hogen, Chairman                                        May 17, 2007
Our File:  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                                            Page 21 of 31

## EKLUTNA LACKS INHERENT AUTHORITY TO EXERCISE JURISDICTION OVER A NATIVE ALLOTMENT

In their submission to the Commission, Eklutna argues that the village has jurisdiction over an Alaska Native allotment based on the allotment's private ownership by some—but not all--members of the Eklutna tribe.  The basis for this assertion of tribal jurisdiction is the tribe's inherent authority to regulate the internal affairs of the tribe.[103] This argument conflates tribal land-based jurisdiction (which, as we demonstrated above, Eklutna does not possess in this case) with a tribe's inherent authority over purely internal tribal affairs.

As a result of their status as domestic dependent sovereigns, tribes have long been recognized as possessing a very limited inherent authority.  Tribes have been divested of jurisdiction where "*the relations between an Indian tribe and nonmembers of the tribe*"[104] are concerned and so have no authority "*independently to determine their external relations.*"  Because of their dependent status, tribes retain no inherent power "*beyond what is necessary to protect tribal self-government or to control internal relations*"[105] and, "what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which *Montana* referred:"[106]  In the area of civil law, inherent tribal authority includes only the power "to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members."[107]  Thus, as the Ninth Circuit has observed, a tribe's inherent authority is limited to "purely intramural matters"[108] of the tribe.

---

[103]     Eklutna Request at 7.

[104]     *Montana v. U.S.*, 450 U.S. 544, 564 (quoting *U.S. v. Wheeler*, 435 U.S. 313, 326 (1978)) (emphasis added by the Court in *Montana*).

[105]     *Nevada v. Hicks*, 533 U.S. 353, 359 (quoting *Montana*, 450 U.S. at 564) (emphasis added by the Court in *Hicks*).

[106]     *Hicks*, 533 U.S. at 360-61.

[107]     *Hicks*, 533 U.S. at 361 (quoting *State v. A-1 Contractors*, 520 U.S. 438, 459 (1997) and *Montana*, 450 U.S. at 564).

[108]     *U.S. v. Farris*, 624 F.2d 890, 893 (9th Cir. 1980).  The tribes might argue that *Farris* addressed only a limited line of cases.  However, *Farris* stated that reservation tribes may have "rights of self-governance in purely intramural matters unless divested of them by Congress" and cited for this proposition *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-556 (1987).  The cited portion of *Martinez*, in turn, contains a general discussion of inherent tribal authority in "internal matters."  *Id.*  *Martinez* does not

Phillip H. Hogen, Chairman                                              May 17, 2007
Our File:  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                                                  Page 22 of 31

Eklutna's reliance on some of the Ondola heirs' membership in the tribe to assert *land-based* jurisdiction over the allotment is misplaced. The ordinances that Eklultna has enacted in an attempt to demonstrate the exercise of governmental power over the Ondola allotment have absolutely nothing to do with determining tribal membership.  Nor do they address domestic relations issues among members or rules of inheritance for members.

Moreover, Eklutna twice concedes in its submission that not all the owners of the allotment are tribal members.[109]  "[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."[110]

In the absence of the allotment's Indian country status and the absence of any tribal nexus with the allotment, the tribe is without the predicate geographic jurisdictional component over the subject tract necessary for a valid exercise of governmental power over the allotment.

Furthermore, even if inherent tribal authority could support Eklutna's claim of jurisdiction over land, it would be ineffective here because the gaming ordinance and other ordinances Eklutna alleges to enforce on the allotment are not matters that are purely internal to the tribe.  They impinge upon the provision of services by the state and local governments to the land, those governments' power to regulate those services and the state's power to regulate gaming in its borders and outside of Indian country.

Eklutna's argument flies in the face of *Mescalero Apache Tribe v. Jones* where the U.S. Supreme Court ruled that "Indians going beyond *reservation boundaries* have generally been held subject to non-discriminatory state law otherwise applicable to all

---

discuss a limited subset of Indian law cases.  Indeed, the cases cited in *Martinez*'s general discussion address all three areas of inherent tribal authority over civil matters – tribal membership, rules of inheritance and domestic relations among members. *Id.*  These topic areas are the same ones that identified by the Supreme Court as being within the limited inherent authority of tribes over "internal relations" the following year in *Montana v. U.S.*, 450 U.S. at 564.  Thus, *Farris* was not marking out a rule applicable only in a narrow line of cases.  *Farris*'s statement that tribes' inherent authority extends only to "purely intramural" tribal matters is an accurate description of the limited nature of inherent tribal power over "internal relations" of tribes and is derived from U.S. Supreme Court precedent.

[109]    Eklutna Request at 9 and 11.

[110]    *Hicks*, 533 U.S. at 358-59 (quoting *Montana*, 450 U.S. at 565).

Phillip H. Hogen, Chairman                                     May 17, 2007
Our File:  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                                          Page 23 of 31

citizens."[111] (emphasis added).  *Mescalero* upheld the imposition of a state gross receipts tax levied on a resort owned by a tribe located outside of the tribe's reservation.

The village is really putting the cart before the horse here. Eklutna wants the Commission to find that, because the Ondola allotment is restricted property and Mr. Ondola is a tribal member, the village has jurisdiction over the allotment. In reality, *Eklutna* must own the trust or restricted land or otherwise have a nexus to its creation as Indian land in order to have jurisdiction over it.    Eklutna does not own the land in question.   The Sansonetti opinion establishes that Eklutna has no tribal nexus with the allotment.

### EKLUTNA HAS NOT DEMONSTRATED THAT IT EXERCISES GOVERNMENTAL POWER OVER THE ALLOTMENT

Eklutna recognizes that it must demonstrate that it exercises governmental power over the Ondola allotment before that land parcel can be considered Indian land.[112] The village attempts to meet this burden by providing copies of village ordinances and assertions of services provided to the Ondola family. These attempts fall short because the village and the allotment are located within the borders of the Municipality of Anchorage.

In order to establish that the Ondola allotment is Indian land, Eklutna must show that they exercise governmental powers over it.[113] "This requirement does not depend upon the Tribe's theoretical authority, [to exercise governmental authority] but upon the presence of concrete manifestations of that authority"[114]

Two federal courts looking at the issue considered the following factors in determining whether a tribe exerted sufficient governmental power: (1) whether the areas are developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or the State; and (5) other indicia as to who

---

[111]     411 U.S. 145, 148-149, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

[112]     Eklutna Request at 11.

[113]     25 U.S.C. 2703(4)(B); 25 C.F.R. § 502.12.

[114]     *Miami Tribe of Oklahoma v. U.S.,* 5 F.Supp.2d 1213, 1218 (D.Kan., 1998) quoting *State of Rhode Island v. Narragansett Tribe of Indians*, 19 F.3d. 685, 702-03 (1st Cir. 1994).

Phillip H. Hogen, Chairman                                          May 17, 2007
Our File:  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                                              Page 24 of 31

exercises governmental power over those areas..[115]  Eklutna sets out these factors at the
beginning of its governmental powers argument.[116]

Applying these Indian lands factors requires the Commission to look at impact of
Eklutna's actions in the light of the exercise of governmental power by state or local civil
governments.  Eklutna's argument concentrates on its actions regarding the allotment.
The village ignores the huge impact of the State of Alaska and Municipality of
Anchorage on the village and the allotment even though factors (4) and (5) require an
identification of the predominant governmental powers in the area. In Eklutna's case the
state and the Municipality of Anchorage are the predominant governmental powers.

As was pointed out in the Facts section, *supra,* the State of Alaska and not Eklutna
regulates the public utilities provided to the Ondola allotment and the Eklutna
community.  The state Regulatory Commission of Alaska regulates the electrical provider
(Matanuska Electric Association), the refuse collector (Alaska Waste Service Area), the
gas company (Enstar Natural Gas Company), and the water and waste water collection
utility (Anchorage Water and Wastewater Utility).[117]

The Municipality of Anchorage and the State of Alaska provide police services to
the area.[118]  Fire suppression services are provided by the Chugiak Volunteer Fire Station,
which is registered by the Alaska State Fire Marshall.[119]  The state regulates volunteer
fire departments.[120]  Eklutna does not claim to provide fire or police services to residents
of the Ondola allotment. Instead they attached a copy of a 1996 letter of agreement with
the Anchorage Police Department concerning Indian Child Welfare Act matters.[121]  The
village also alleges that when criminal matters arise involving members "the Alaska State

---

[115]   *Miami Tribe*, 5 F.Supp. 2d at 1217; *Cheyenne River Sioux Tribe v. State of South
Dakota,* 830 F.Supp. 523, 528 (D.S.D. 1993), *aff'd,* 3 F.3d 273 (8th Cir. 1993).

[116]   Eklutna Request at 11.

[117]   Affidavit of Daniel Patrick O'Tierney, attached as Exhibit G.

[118]   Exhibit F.

[119]   *Id.*

[120]   AS 09.65.295 (affecting civil liability of volunteer firefighters), AS 23.30.220,
243,  (affecting workers' compensation rights of volunteer fire fighters injured while
performing fire fighting duties).

[121]   Eklutna Request at 17 with reference to Eklutna's Exhibit 23.

Phillip H. Hogen, Chairman                                        May 17, 2007
Our File: 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                                              Page 25 of 31

Troopers respect tribal authority and work with NVE Tribal Council to resolve problems."[122] This unsupported statement speaks well of the relationship of the Alaska State Troopers and Eklutna leaders but it does not establish that the village provides police or any other public safety services to residents of the Ondola allotment.

In his affidavit, Tribal Administrator Daniel Alex writes that "[t]he Ondolas have benefited from Tribal safety programs which provide Villager with smoke detectors, fire extinguishers, and first aid kits."[123] He also asserts that the village helped the fire suppression effort on the Ondola allotment by cutting fire perimeters.[124] These actions, while important, do not constitute governmental services. They can and are done by many non-profit agencies and do not require any governmental authority to carry out. The same is true of Eklutna's efforts to provide the Ondola family with food through their food bank.[125]

The Commission, in the Native Village of Barrow case, found that Barrow had not provided sufficient evidence of government power in part because the local municipality provided public safety and zoning services to Barrow residents.[126] The Municipality of Anchorage, not Eklutna provides zoning and land planning services to Ondola allotment and the area occupied by the Elkutna community.[127] As was also pointed out in the Facts, *supra*, the village brought a series of lawsuits in the State of Alaska superior court to enforce its rights under the Anchorage Municipal zoning laws.[128] For example, in *Alaska Railroad Corp. v. Native Village of Eklutna*, the village argued that a quarry was a nonconforming use of land within the Eklutna land use district of the Municipality of Anchorage.

---

[122]    Eklutna Request at 17.

[123]    Alex Affidavit, attached to Eklutna Request as Exhibit 15, at 3.

[124]    *Id.*

[125]    *Id.*

[126]    Decision Denying Appeal of the Decision of the Chairman of the National Indian Gaming Commission disapproving the Native Village of Barrow's tribal gaming ordinance 95-01 at 6.

[127]    Affidavit of Patricia Long, attached as Exhibit D.

[128]    *Native Village of Eklutna v. Alaska Railroad Corp.* 87 P.3d. 41 (Alaska 2004); *Alaska Railroad Corporation v. Native Village of Eklutna,* 43 P.3d 588 (Alaska 2002); and *Native Village of Eklutna v. Board of Adjustment,* 995 P.2d 641 (Alaska 2000).

Phillip H. Hogen, Chairman
Our File:  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

May 17, 2007
Page 26 of 31

Eklutna also points to its dog control, anti-pollution, and liquor control ordinances in an effort to show the village exercises governmental powers over the Ondola allotment. Of these three ordinances, only the one concerning liquor control addresses activities on the Ondola allotment.  By its terms, the dog ordinance only addresses "dogs within the Eklutna area."[129]  The environmental protection ordinance only applies to discharges "within the exterior boundaries of the Eklutna Village.[130]  While the liquor control ordinance would, if enforceable, apply to actions taking place on the Ondola allotment, Eklutna failed to present any evidence of licensing or enforcement activity related to alcohol in the vicinity of the allotment.

In the Kiowa Indian Lands determination the Commission found that the adoption of a liquor ordinance to be a concrete manifestation of governmental authority.[131]  However, the situation is different here. Adopting an ordinance without enforcement is not a concrete manifestation of governmental authority.  In Kiowa, the Tribe had a reservation and the Commission found that the land on which they wished to conduct gaming, an allotment carved out of the reservation, was Indian country because it was held in trust and was occupied by the tribe.[132]  Eklutna concedes it has never had a reservation and the Ondola heirs, not the tribe, possess the Alaska Native allotment. At the risk of repeating a point made several times before, acccording to George Ondola, not all owners of the allotment are tribal members.[133]

Returning the factors set out in *Cheyenne River Sioux*, the Commission must evaluate whether the village, the state, or the Municipality of Anchorage provides dog, pollution and alcohol control services to the residents of Eklutna and the residents of the

---

[129]    Native Village of Eklutna Dog Ordinance, attached as Exhibit 16 to Eklutna Request.

[130]    Native Village of Eklutna Ordinance 04-001, attached as Exhibit 23 to Eklutna Request.

[131]    Kiowa Indian Lands Decision (11/2005) at 6.

[132]    *Id* at 4; *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998). ("Historically, the term "Indian country" has been used to identify land that is subject to the "primary jurisdiction . . . [of] the Federal Government and the Indian tribe inhabiting it."

[133]    Affidavit of George Ondola, attached as Exhibit 4 to Eklutna Request at 1 ("Most of those with an interest in the Allotment are Tribal members of the Native Village of Eklutna.").

Phillip H. Hogen, Chairman

Our File:  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

Ondola allotment.[134] On those issues, case law and state statutes show that the state licenses purveyors of alcohol[135] and otherwise regulates the statewide sale and distribution of alcohol.[136] The state also prohibits pollution of all waters of the state and enforces the prohibition.[137] The Municipality of Anchorage provides animal control services to the area.[138]

Eklutna also submitted evidence that the village provides health services to members[139] as well as social and children's' services. [140] It is difficult for the state to address Eklutna's health services claim because Eklutna did not share a copy of their supporting exhibit with the state.  However, the services are provided pursuant to the Indian Self Determination and Educational Assistance Act.[141] Services provided under such a contract are not indices of tribal authority or power because a for-profit corporation established pursuant to the Alaska Native Claims Settlement Act may enter into Self Determination Act contracts.[142] Those corporations are not Indian Tribes,[143] and Congress intended that state have jurisdiction over them.[144]

---

[134]    *Cheyenne River Sioux*, 830 F.Supp. at 528.

[135]    *State, Alcohol Beverage Control Board v. Decker*, 700 P.2d 483 (Alaska 1985).

[136]    AS 04.16 et. seq.; *Kavorkian v. Tommy's Elbow Room*, 694 P.2d 160 (Alaska 1985).

[137]    AS 46.03.710; *Stock v. State*, 526 P2d 3 (Alaska 1974).

[138]    Exhibit V.  The Municipality of Anchorage website explains that animal control officers provide domestic animal control services to the entire municipality.  The city boundaries are defined as extending from the Knik River bridge in the north—including Eklutna…"  www.ci.anchorage.ak.us/Healthmsd/animal

[139]    Eklutna Request at 18.

[140]    Eklutna Request at 18-19.

[141]    Eklutna Request at 17. ("These contracts are authorized under the Indian Self Determination and Educational Assistance Act, Pl 93-638.")

[142]    25 U.S.C. 450b(e); *Cook Inlet Native Association v. Bowen*, 810 F.2d. 1471,1476 (9th Cir., 1987)(Court found Congressional intent to permit for profit corporations formed under the Alaska Native Claims Settlement Act to be allowed to contract with federal agencies to deliver services to Indians because it served the purpose of the Indian Self Determination Act to maximize Indian involvement in the delivery of the services.).

Phillip H. Hogen, Chairman
Our File:  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

Eklutna also points to the social services it provides to members of the village pursuant to a BIA Indian Child Welfare Act grant and a cooperative foster care recruitment agreement with the State of Alaska.  The state has not been provided access to the BIA agreement, which makes it difficult to address whether it is a concrete manifestation. However, the Indian Child Welfare Act allows the Secretary of the Interior, through the BIA to make grants to Indian organizations that operate off-reservation Indian child and family service programs.[145]  While these agreements demonstrate a commitment to child protection, they are not concrete manifestations of governmental authority over the Ondola allotment.

Eklutna's child protection services contract with the State is one that the state enters with private community agencies, as opposed to governmental agencies.[146]  Such agreements do not demonstrate Eklutna's governmental authority. In fact they show that the State of Alaska, not the village, provides child protection services to the families of Eklutna.

/ / /

/ / /

---

[143]   *Cape Fox Corporation v. United States*, 456 F.Supp. 784 (D. Alaska 1978), affirmed in part and reversed in part on other grounds 646 F.2d 399 (9th Cir. 1981).

[144]   *Calista v. DeYoung*, 562 P.2d 338 (Alaska 1977).

[145]   25 U.S.C. 1932.

[146]   Community and State Partnerships and Licensing Homes Cooperative Agreement with State of Alaska, attached to Eklutna Request as Exhibit 26, at 1. ("To increase the number of available licensed homes and family care homes in all Alaskan communities through a partnership between private community agencies or individuals (the agency) and the Office of Children's Services.).

Phillip H. Hogen, Chairman
Our File: 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

May 17, 2007
Page 29 of 31

## THE ALASKA NATIVE ALLOTMENT SUBDIVISION ACT SHOWS THAT THE STATE OR LOCAL GOVERNMENT, NOT EKLUTNA, HAS ZONING AUTHORITY OVER THE ALLOTMENT

In 2004, Congress passed the Alaskan Native Allotment Subdivision Act, which made Alaska Native allotments[147] subject to the zoning and land planning authorities of the local government, such as the Municipality of Anchorage or the State of Alaska.[148] The Act was made law so allotment owners could benefit from the state and local land use planning laws without losing the benefit of federal protection against taxation and creditor's claims.[149]

---

[147]   Pub. L. 108–337, Oct. 18, 2004, 118 Stat. 1357, published in note following 43 U.S.C. 1617. Here is the text of Pub. Law 108-337:

SECTION 1. SHORT TITLE.
This Act may be cited as the 'Alaska Native Allotment Subdivision Act'.
SEC. 2. DEFINITIONS.
In this Act:
(1) Restricted land.—The term 'restricted land' means land in the State that is subject to Federal restrictions against alienation and taxation.
(2) Secretary.—The term 'Secretary' means the Secretary of the Interior.
(3) State.—The term 'State' means the State of Alaska.
SEC. 3. SUBDIVISION AND DEDICATION OF ALASKA NATIVE RESTRICTED LAND.
(a) In General.—An Alaska Native owner of restricted land may, subject to the approval of the Secretary—
(1) subdivide the restricted land in accordance with the laws of the—
(A) State; or
(B) applicable local platting authority; and
(2) execute a certificate of ownership and dedication with respect to the restricted land subdivided under paragraph (1) with the same effect under State law as if the restricted land subdivided and dedicated were held by unrestricted fee simple title.
(b) Ratification of Prior Subdivisions and Dedications.—Any subdivision or dedication of restricted land executed before the date of enactment of this Act [Oct. 18, 2004] that has been approved by the Secretary and by the relevant State or local platting authority, as appropriate, shall be considered to be ratified and confirmed by Congress as of the date on which the Secretary approved the subdivision or dedication.
SEC. 4. EFFECT ON STATUS OF LAND NOT DEDICATED.
Except in a case in which a specific interest in restricted land is dedicated under section 3(a)(2), nothing in this Act terminates, diminishes, or otherwise affects the continued existence and applicability of Federal restrictions against alienation and taxation on restricted land or interests in restricted land (including restricted land subdivided under section 3(a)(1).

[148]   Senate Report 108-251 at 3 ("S. 1421 would allow Alaska Natives, subject to approval by the Secretary of the Interior, to legally subdivide certain parcels of land that have been allotted to them by the federal government. Under current law, federal restrictions against alienation and taxation prohibit individuals from subdividing those lands in accordance with state and local law.")

[149]   Senate Report at 4.

Phillip H. Hogen, Chairman                                            May 17, 2007
Our File: 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                                                 Page 30 of 31

The Alaska Native Allotment Subdivision Act demonstrates Congressional recognition of the lack of tribal land planning or zoning by making it clear that federal, as opposed to tribal, restrictions were the only barrier preventing allotment holders from benefiting from state zoning laws. This is confirmed by language in the Act itself.

The term "restricted lands" is used to describe Alaska Native allotments in the Act. "Restricted lands" is defined as "land in the State that is subject to Federal restrictions against alienation and taxation."[150] No mention is made here of the land being subject to tribal restrictions. In addition, Section 4 of the Act warns that nothing in the Act "terminates, diminishes, or otherwise affects the continued existence and applicability of Federal restrictions against alienation and taxation on restricted land or interests in restricted land…" (emphasis added). Tribal jurisdiction isn't mentioned.

If Alaska Native allotments had been subject to tribal jurisdiction at the time Congress drafted the Act, Section 4 and the definition section would have mentioned tribal jurisdiction. Furthermore, if allotments had been subject to tribal jurisdiction at the time, there would have been no need for the Act because allotments could have been subdivided under the land planning authority of an Alaska Native village with jurisdiction.

Even if the allotments had been subject to tribal jurisdiction at an earlier time, they were not after the Act passed. By making allotments subject to state or local government land planning laws, the Act extinguished any tribal jurisdiction over the land parcels. Any inherent authority of Alaska Native villages may have is subject to limitations or elimination by Congress.[151]

As noted above, Eklutna's lack of zoning authority and its acquiescence in the zoning authority of the Municipality of Anchorage is evidenced by the previously cited three lawsuits in which Eklutna was a party in Alaska state courts to enjoin quarry operations on land adjacent to the village for alleged violations of the Municipality of Anchorage's zoning ordinances,[152] and its recent participation in further zoning proceedings before the Municipality's Planning and Zoning Commission.[153]

---

[150]    Pub. L. 108-337, Section 2(1).

[151]    *John v. Baker*, 982 P.2d at 751, ("The extent of tribal self-government depends on the intent of Congress.").

[152]    *Native Village of Eklutna v. Alaska Railroad Corp.* 87 P.3d. 41 (Alaska 2004); *Alaska Railroad Corporation v. Native Village of Eklutna,* 43 P.3d 588 (Alaska 2002); and *Native Village of Eklutna v. Board of Adjustment,* 995 P.2d 641 (Alaska 2000).

[153]    See footnote 36 supra.

Phillip H. Hogen, Chairman
Our File:  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

## CONCLUSION

Eklutna has the burden of convincing the Commission that the Ondola allotment is a piece of Indian land for purposes of the Indian Gaming Regulatory Act. This requires a showing that the village has jurisdiction over the land itself and that it exercises that jurisdiction through concrete manifestations of governmental authority over it.

The Commission is bound by previous land decisions and the Sansonetti Opinion to find that Alaska Native villages, like Eklutna have no jurisdiction over Alaska Native allotments.  The state, not the village, has jurisdiction over the Ondola allotment, which sits within the boundaries of the state's most populated municipality. The residents are dependent on state or local municipal governments rather than Eklutna for fire, police and child protection services. The state regulates the entities that provide public utilities.

For these reasons the state respectfully requests the Commission not approve Eklutna's gaming ordinance and find that the Ondola allotment does not qualify as Indian lands for purposes of the Act.

Sincerely,

TALIS J. COLBERG
ATTORNEY GENERAL

By:

Dan N. Branch
Assistance Attorney General

DNB/jad
Enclosures
cc:     Cloyce V. Choney, Commissioner
        Norman DesRosiers, Commissioner
        Penny J. Coleman, General Counsel
        Colin Cloud Hampson, Esq.
        Marissa K. Flannery, Esq.
        Talis J. Colberg, Attorney General