NATIONAL INDIAN GAMING COMMISSION

UNITED STATES DEPARTMENT OF THE INTERIOR

In the Matter of the Gaming        )
Ordinance of the Native Village    )
of Eklutna                         )
_____    )

### COMMENTS OF SENATOR LYDA GREEN, PRESIDENT OF THE ALASKA SENATE, AND REPRESENTATIVE JOHN HARRIS, SPEAKER OF THE ALASKA HOUSE OF REPRESENTATIVES

Section 11(b) of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. 2710(b), authorizes an "Indian tribe" to engage in gaming on "Indian lands" if the governing body of the tribe submits to the chairman of the National Indian Gaming Commission (NIGC) an ordinance authorizing such gaming, and the chairman approves the ordinance.

On April 3, 2007 the Native Village of Eklutna (NVE) submitted to the chairman of the NIGC an ordinance to engage in class II gaming on an 8.05-acre Alaska Native allotment parcel located inside the boundaries of the Municipality of Anchorage, Alaska. Pursuant to section 11(e) of IGRA, 25 U.S.C. 2710(e), the chairman must approve or disapprove the ordinance not later than ninety days after the date on which the ordinance was submitted, i.e., not later than July 2, 2007.



LEGIS.
BRF

On April 11, 2007 the Office of General Counsel of the NIGC requested interested parties to submit comments on the NVE's ordinance. These comments are submitted in response to that invitation.

A. The Dena'ina Athabascan Members of the NVE Are Not an "Indian tribe."

Pursuant to section 4(5) of IGRA, 25 U.S.C. 2703(5), an "Indian tribe" is a

tribe, band, nation, or other organized group or community of Indians which –

(A) is recognized as eligible by the Secretary [of the Interior] for the special programs and services provided by the United States to Indians because of their status as Indians, and

(B) is recognized as possessing powers of self-government. (emphasis added).

1. The Dena'ina Athabascan members of the NVE satisfy the first requirement of the section 4(5) of the IGRA, 25 U.S.C. 2703(5), "Indian tribe" test.

In 1868 the U.S. Army began providing medical care to Tlingit Indians who resided in the village located adjacent to the army post at Sitka, Alaska. See ROBERT FORTUINE, CHILLS AND FEVER: HEALTH AND DISEASE IN THE EARLY HISTORY OF ALASKA, at 143 (1989). When the army departed Alaska in 1877, first the U.S. Navy, and then the Revenue Service, continued to do so. Id. 150. The precedent having been established, in 1915 Congress

2

appropriated $25,000 to enable the Secretary of the Interior "to provide for the medical and sanitary relief of the Eskimos, Aleuts, Indians and other natives of Alaska" by, among other means, constructing and operating a Native hospital. <u>See</u> Pub. L. No. 63-263, 38 Stat. 822, 862 (1915). From that modest beginning, the Indian Health Service today operates hospitals and other facilities that provide medical services to all Alaska Natives, including the Dena'ina Athabascan members of the NVE.

In 1884 in the Alaska Organic Act, Congress directed the Secretary of the Interior to provide "for the education of children of school age in the Territory of Alaska, without reference to race." <u>See</u> sec. 13, 23 Stat. 24, 27 (1884). However, as a practical matter the vast majority of school age children were Alaska Native.

At the urging of the Presbyterian missionary Sheldon Jackson, in 1885 Secretary of the Interior Henry Teller delegated responsibility for administering the new Alaska school system to the Commissioner of the Bureau of Education, rather than to the Commissioner of the Bureau of Indian Affairs (BIA), and appointed Jackson as the Bureau of Education's general agent of education in Alaska. <u>See</u> DONALD CRAIG MITCHELL, SOLD AMERICAN: THE STORY OF ALASKA NATIVES AND THEIR LAND 100 (2003) [hereinafter "SOLD AMERICAN"]; SHELDON JACKSON, REPORT ON EDUCATION IN ALASKA

3

(1886). In addition to operating the school system that Congress mandated, whenever Congress appropriated the necessary funds, the Bureau of Education (rather than the BIA) also administered other programs and services for Alaska Natives.

In 1921 Congress enacted the Snyder Act, which authorized the BIA to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the <u>Indians</u> throughout the United States . . . ." (emphasis added). <u>See</u> Pub. L. No. 67-85, 42 Stat. 208 (codified at 25 U.S.C. 13). By that date, programs and services that Congress provided to Alaska Natives had been administered by the Bureau of Education (rather than by the BIA) for thirty-six years. However, in 1931 Secretary of the Interior Ray Lyman Wilbur transferred responsibility for the administration of Alaska Native programs and services to the BIA. <u>See</u> Secretarial Order No. 494 (March 14, 1931).

Prior to that date, there had been decades of disagreement inside the Department of the Interior regarding whether Congress had intended to include Alaska Natives within the purview of its "Indian"-related statutes such as the Snyder Act. <u>See</u> e.g., SOLD AMERICAN 80-81. To settle the matter now that Secretary Wilbur had transferred the administration of Alaska Native programs to the BIA, on February 24, 1932 Edward Finney, the

4

solicitor of the Department of the Interior, issued an opinion,
which Secretary Wilbur approved, in which the solicitor announced
that

> no distinction has been or can be made between
> the Indians and other natives of Alaska so far
> as the laws and relations of the United States
> are concerned whether the Eskimos and other
> natives are of Indian origin or not as they are
> all wards of the Nation, and their status is in
> material respects similar to that of the Indians
> of the United States.

"Status of Alaskan Natives," 53 Decisions of the Department of
the Interior 593, 605 (1932).

Forty-three years later, in 1975 Congress enacted the Indian
Self-Determination and Education Assistance Act, Pub. L. No.
93-638, 88 Stat. 2203 (codified as amended at 25 U.S.C. 450
et seq.)[hereinafter "Self-Determination Act"], in order to
authorize Native Americans to contract with the BIA and Indian
Health Service (IHS) to administer the programs and services that
Congress provides to Indians because of their status as Indians.
To afford Alaska Natives the same right to contract as other
Native Americans, in April 1971 the first Self-Determination Act
bill defined the term "Indian Tribe" (i.e., the entity that was
being given the right to contract) to mean "an Indian tribe,
band, nation, or Alaska Native Community for which the Federal
Government provides special programs and services because of

5

their Indian identity." (emphasis added). <u>See</u> section 1(a),
S. 1573, 92d Cong. (1971).

In December of that same year, Congress settled Alaska
Native land claims by enacting the Alaska Native Claims
Settlement Act (ANCSA), Pub. L. No. 92-203, 85 Stat. 688
(codified as amended at 43 U.S.C. 1601 <u>et seq.</u>). ANCSA authorized
Alaska Native residents of communities designated as "Native
villages" to organize business corporations to which the
Secretary of the Interior would convey fee title to certain
federal land and pay monetary compensation for the extinguishment
of Alaska Native aboriginal title. <u>See</u> sections 3(c), 8, and
11(b) of ANCSA, 43 U.S.C. 1602(c), 1607, and 1610(b).

Responding to ANCSA, in 1975 when it enacted the Self-
Determination Act, Congress defined the term "Indian Tribe" for
the purposes of that Act to mean an

> Indian tribe, band, nation, or other organized
> group or community, <u>including any Alaska Native
> village or regional or village corporation as
> defined in or established pursuant to the Alaska
> Native Claims Settlement Act</u>, which is recognized
> as eligible for the special programs and services
> provided by the United States to Indians because
> of their status as Indians. (emphasis added).

<u>See</u> 25 U.S.C. 450b(e).

In section 11(b)(1) of ANCSA, 43 U.S.C. 1610(b)(1), Congress
listed "Eklutna, Cook Inlet" as a "Native village." For that

6

reason, in 1982 when the Assistant Secretary of the Interior for Indian Affairs published in the Federal Register a list of "Alaska Native Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs," he included "Eklutna Native Village" on the list. See 47 Fed. Reg. 53,134 (1982). However, when he did so, the Assistant Secretary explained that

> While eligibility for services administered by the Bureau of Indian Affairs is generally limited to historical tribes and communities of Indians residing on reservations, and their members, unique circumstances have made eligible additional entities in Alaska which are not historical tribes. Such circumstances have resulted in multiple, overlapping eligibility of native entities in Alaska. To alleviate any confusion which might arise from publication of a multiple eligibility listing, the following preliminary list shows those entities to which the Bureau of Indian Affairs gives priority for purposes of funding and services. (emphasis added).

Id. 53,133-34.

The Assistant Secretary's recognition that, while they were eligible both to receive and to contract to administer programs and services from the BIA and IHS, the Dena'ina Athabascan members of the NVE were not members of an "historical tribe" is determinative insofar as the NVE's inability to satisfy the second requirement of the section 4(5) or IGRA, 25 U.S.C. 2703(5), "Indian tribe" test is concerned.

2. The Dena'ina Athabascan Members of the NVE
   Do Not Satisfy the Second Requirement of the
   Section 4(5) of IGRA, 25 U.S.C. 2703(5),
   "Indian Tribe" Test.

As described above, the Secretary of the Interior (acting lawfully pursuant to authority that Congress delegated to the Secretary in the Self-Determination Act and similar statutes) has recognized that the Dena'ina Athabascan members of the NVE are eligible for the programs and services that the United States provides to Indians because of their status as Indians. However, as described below, neither Congress nor the Secretary of the Interior (acting lawfully pursuant to authority that Congress has delegated to the Secretary) has recognized that the "governing body" of the NVE "possess[es] powers of self-government." For that reason, the Dena'ina Athabascan members of the NVE are not members of an "Indian tribe" for the purposes of IGRA.

a. The Dena'ina Athabascan Members of
   the NVE Are Not Descendants of an
   "Ethnological Tribe" Whose Members
   Resided at Eklutna.

In 1942 the Indian law scholar Felix Cohen cautioned that "[t]he term 'tribe' is commonly used in two senses, an ethnological sense and a political sense" and that "[i]t is important to distinguish between these two meanings of the term." FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 268 (1st ed. 1942).

8

In other words, because a group of Native Americans is a "tribe" in an ethnological sense does not mean that Congress (or the Secretary of the Interior acting lawfully pursuant to authority that Congress has delegated to the Secretary) has designated the group as a "federally recognized tribe" whose governing body, as a consequence of the designation, possesses the "powers of self-government" that Congress requires a governing body to possess in order for the members of the group to be an "Indian tribe" for the purposes of IGRA.

In Montoya v. United States, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901), the U.S. Supreme Court described an ethnological "tribe" as a group of Native Americans "of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory; . . ."

When it submitted its ordinance to the chairman of the NIGC, the NVE filed a brief. See Letter from Sonosky, Chambers, Sachse, Endreson & Perry to Philip N. Hogen, Chairman, NIGC (April 2, 2007)[hereinafter "NVE Brief"].

In its brief, the NVE asserts that its members are the descendants of an ethnological tribe that resided at the location that today is known as Eklutna. See NVE Brief, at 3-6. However, the available evidence indicates that no ethnological tribe

9

resided at that location. Rather, the evidence suggests that the members of the NVE are descendants of Dena'ina Athabascan family groups that first congregated at Eklutna in the late 1920s when the Bureau of Education opened, first an orphanage, and then a boarding school, at that location.

Between 1867 and 1930, the United States conducted six censuses in Alaska: 1880, 1890, 1900, 1910, 1920, 1930. But in those censuses, no mention is made of Eklutna until 1930 when, for the first time, 158 persons were recorded as living at "Eklutna village."[1] See Attachment A.[2]

The reason why is as follows:

For hundreds, if not thousands, of years, extended family groups of Dena'ina Athabascans whose members traveled nomadically

---

[1] In support of its amended gaming ordinance, the NVE submitted to the chairman of the NIGC a document entitled: "The Once & Future Village of Ikluat/Eklutna: The History of a Tanaina Athapaskan Settlement." See NVE Exhibit 9. In that document, the author states that "[a]t or very near the present site of Eklutna, [Ivan] Petroff [who conducted the 1880 census] noted a village called 'Nitakh,' population 15." See id. 9. However, Petroff actually reported that Nitakh was located on the Knik River (miles distant from the Eklutna River at which Eklutna is located). See Attachment A (Ivan Petroff, Special Agent, Report on the Population, Industries, and Resources of Alaska, at 28 (1882))

[2] Attachment A reproduces relevant portions of the 1880, 1890, 1920, and 1930 censuses. In 1880 and 1890 communities in northern Cook Inlet were recorded in the Kadiak census division. In 1920 and 1930 they were recorded in the third judicial division.

occupied the upper Cook Inlet region. But in historic times, there was no permanent settlement at Eklutna.

In 1918 the worldwide influenza pandemic killed thousands of Alaska Natives and left hundreds of Native orphans. To deal with the situation in Cook Inlet, the Bureau of Education opened an orphanage at Tyonek, an Indian village on the west side of the inlet.[3] As the Alaska superintendent of the Bureau of Education reported in 1920:

> As the result of the epidemic of influenza among the natives of northern and western Alaska during the autumn of 1918 and the spring of 1919 about 250 children were left orphans. In the Nome region it was found possible to distribute the orphans among Eskimo families, but in the Bristol Bay and Cook Inlet districts it was necessary for the [B]ureau [of Education] to assume their entire care in orphanages which were erected at Kanakanak and Tyonek. (emphasis added).

Attachment B (Report of Governor of Alaska to the Secretary of the Interior, at 62 (1920)).

When Tyonek proved to be a poor location for an orphanage, the Bureau of Education relocated the orphanage to Eklutna. At that time, Eklutna was an unoccupied tract of land northeast of Anchorage that bordered the railroad track that the Alaska

---

[3]Unlike Eklutna, Tyonek is listed in all six of the Alaska censuses that were conducted between 1880 and 1930. According to Petroff, in 1880 "Toyonek station and village" had 117 residents, 109 of whom were Athabascans. See Petroff, at 29.

Railroad had constructed between Seward and Fairbanks. The Bureau of Education selected Eklutna as the new site for its orphanage because it already had selected the location as the site for a boarding school. As the Governor of Alaska reported in 1924:

> Special industrial schools are in the process of organization at Eklutna, Kanakanak, and White Mountain, where the Government has made appropriations and buildings have been erected and teachers especially qualified sent in to develop industrial courses along the lines of animal husbandry, carpentry, household management and home making, nursing and sanitation, art, music, and physical education. (emphasis added).

Attachment C (Report of Governor of Alaska to the Secretary of the Interior, at 66 (1925)).

While the boarding school still was under construction, in 1924 the Bureau of Education relocated the orphans in its care from Tyonek to Eklutna. See Attachment D (Bureau of Education, Superintendent Central District, Monthly Report (October 1924)("The Tyonek children were successfully moved, arriving at Eklutna on the twenty seventh").[4]

---

[4] Attachments D and F are documents that are located at the National Archives and Records Administration. Record Group 75, United States. Department of the Interior. Bureau of Indian Affairs. Alaska Division. General Correspondence; District Files 1908-1935; Central 1922-1934.

**Exhibit F, Page 12 of 48**

The boarding school opened in 1926. <u>See</u> Attachment E (Report of the Governor of Alaska to the Secretary of the Interior, at 73 (1928)).

Significantly, insofar as the question of whether the members of the NVE are the descendants of an ethnological tribe is concerned, in 1924 B.B. Mozee, the superintendent of the central district of the Bureau of Education's Alaska Division, reported to Jonathan Wagner, the chief of the Alaska Division, that

> On receipt of word from you that funds had been allotted for construction work at Eklutna, the District Superintendent [i.e., Mozee] made another trip to that point in order to study thoroughly the conditions affecting the location. After extensive investigation a definite building site was selected.      . . .
>
> The necessary workmen were secured at Anchorage and [at the Alaska Railroad flag station at] Eklutna and are now busily engaged. <u>Since our efforts are not in the vicinity of a settlement</u>, it is necessary for us to run our own mess and hire our own cook.
>
> Believing implicitly in the possibilities of Eklutna, I have filed upon a large area for a reserve.[5] Though over nineteen hundred acres comprise the tract, a great deal of it is tideland, some is high land, and much is level

---

[5]In response to that filing, three years later, President Calvin Coolidge reserved 1,819 acres of land at Eklutna "for the use of the United States Bureau of Education for educational purposes." <u>See</u> Executive order No. 4778 (December 5, 1927).

13

**Exhibit F, Page 13 of 48**

or gently sloping. <u>Included within this filing
is the deserted native village of E</u>klutna;
owners of some of the cabins may wish to return.
By having the old village site within our
confines we shall be able to prevent the
unscrupulous from exercising "squatter's rights"
and thereby forcing themselves upon former
native holdings. (emphasis added).

Attachment F (Letter from B.B. Mozee, Superintendent Central
District, to Jonathan H. Wagner, Chief of the Alaska Division,
Bureau of Education (August 14, 1924).

Superintendent Mozee was not correct that the cabins he had
noticed had been abandoned. Rather, they apparently were summer
fish camps, since the Bureau of Education's annual report on the
Eklutna boarding school for 1930 states:

An old native village is located about a mile
north of the school. There are at present about
eight good houses where the villagers come at
certain times. They travel in and out and are
never very long at the village.

Attachment G (1930 Annual Report, Eklutna Industrial School. U.S.
Department of the Interior. Bureau of Education. Alaska Division.
Historical Album 1925, 1929-1931). The same report also states
that in 1930 there were 102 residents at the Eklutna boarding
school, 92 Natives and 10 whites. <u>Id</u>.

The 1930 census reports that, in 1929 when the census was
conducted, 158 individuals resided at "Eklutna village."
<u>See</u> Attachment A (Bureau of the Census, U.S. Department of

14

Commerce, <u>Fifteenth Census of the United States: 1930</u>, <u>Outlying Territories and Possessions</u>, at 8 (1932)). The actual census returns show 157 residents. Eighty-three Native boarding school students, 24 Caucasian school employees and their family members, 25 other Caucasians, many of whom worked at a nearby steam-generated power plant, 1 Japanese who was employed as the cook at the power plant, and 24 Natives who the enumerator described as "Aleuts", although it is reasonable to assume that they were Dena'ina Athabascans. <u>See</u> Attachment H (1930 Alaska Census. Anchorage Recording District. Roll 2627, Pages 216a-219a. Pacific Alaska Region - Anchorage. National Archives and Records Administration).

Of the 13 Dena'ina Athabascan male adults, several worked at the school or the power plant. One who apparently did not was Simeon Ezi whose occupation is listed on his census return as "Chief Tribes."

Throughout the upper Cook Inlet region, Dena'ina Athabascans considered Ezi a respected traditional leader. But rather than Eklutna, Ezi and his wife, Olga, actually were from Niteh, which, as previously discussed, was a village some miles distant from Eklutna. Simeon and Olga Ezi traveled nomadically around Cook Inlet, from Niteh, to a fish camp at Point Woronzof west of what today is the Ted Stevens Anchorage International Airport to a

trapping cabin on Jim Creek. See Attachment I (JAMES KARI AND JAMES A. FALL, SHEM PETE'S ALASKA: THE TERRITORY OF THE UPPER COOK INLET DENA'INA 293-295, 315 (2003)).

In summary, the available historical evidence indicates that the land in and surrounding Eklutna is a geography that, like all of the land in the upper Cook Inlet region, Dena'ina Athabascans occupied nomadically, and that several Dena'ina Athabascan families may have had summer fish camps in the vicinity prior to the arrival of the Bureau of Education in 1924. The historical evidence also indicates that when the Bureau of Education opened its boarding school, several Dena'ina Athabascan families, including Simeon and Olga Ezi, settled near the school. But it cannot be concluded from that evidence that, based on the standards the U.S. Supreme Court set out in Montoya v. United States, supra, there was an "ethnological tribe" at Eklutna.

Finally, it should be noted that according to the Division of Community Advocacy of the Alaska Department of Commerce, Community & Economic Development, in 2000, of the 394 residents of the community of Eklutna, 309 were Caucasian. Only 52 were of Dena'ina Athabascan ancestry. See http://www.commerce.state.ak.us/dca/commdb/CF-BLOCK.cfm.[6]

---

[6]Those numbers are consistent with the NVE's representation that today, of 276 members of the NVE, only "approximately 50

16

b.  Neither Congress nor the Secretary of the Interior Acting Lawfully Pursuant to Authority That Congress Has Delegated to the Secretary Has Designated the Members of the NVE as Members of a "Federally Recognized Tribe" Whose Governing Body Possesses the "Powers of Self-Government" That the NVE Must Possess in Order to Be an "Indian Tribe" for the Purposes of the IGRA.

In 1884 Congress enacted the Alaska Organic Act, 23 Stat. 24, which granted the District of Alaska a civil government. By that date, both in Congress and within the Department of the Interior officials interested in Native American policy believed that the objective of that policy should be to assist Native Americans who by then had been sequestered on reservations in the contiguous states to prepare themselves for eventual citizenship by assimilating into the economy and polity of the states within which the reservations on which they resided were located. See generally FRANCIS PAUL PURCHA, AMERICAN INDIAN POLICY IN CRISIS: CHRISTIAN REFORMERS AND THE INDIAN (1976).

The Reverend Sheldon Jackson, a prominent member of that group, held that same view insofar as Congress's Alaska Native policy was concerned. See Donald Craig Mitchell, Alaska v. Native Village of Venetie: Statutory Construction or Judicial

_____

live in the village." See NVE Brief, at 6. In other words, 82 percent of the members of the NVE reside elsewhere, presumably elsewhere within the boundaries of the Municipality of Anchorage.

17

Usurpation? Why History Counts, 14 Alaska Law Review 353, 360
(1997)(Sheldon Jackson testimony before Senate Committee on
Territories)[hereinafter "Why History Counts"].

At Jackson's urging, Congress decided that, at all locations
in Alaska, Alaska Natives should be subject to the same criminal
and civil statutes as those with which Congress required all non-
Native residents of Alaska to comply. Congress established that
policy in the Alaska Organic Act and reaffirmed it repeatedly in
its subsequent Alaska-related enactments.

Almost fifty years after the enactment of the Alaska Organic
Act, in 1932 Secretary of the Interior Ray Lyman Wilbur
summarized the history of Congress's Alaska Native-related
enactments to that date as follows:

> In the United States statutes Alaska has
> never been regarded as Indian country. The
> United States has had no treaty relations
> with any of the aborigines of Alaska nor
> have they been recognized as the independent
> tribes with a government of their own. The
> individual native has always and everywhere
> in Alaska been subject to the white man's
> law, both Federal and territorial, civil and
> criminal. (emphasis added).

Letter from Ray Lyman Wilbur to the Hon. Edgar Howard (March 14,
1932), reprinted in Authorizing the Tlingit and Haida Indians to
Bring Suit in the United States Court of Claims: Hearing on
S. 1196 before the Senate Comm. on Indian Affairs, 72d Cong.

18

15-16 (1932). Significantly, Secretary Wilbur sent his letter to Representative Howard, the chairman of the House Committee on Indian Affairs, three weeks _after_ Solicitor Edward Finney issued the opinion, above discussed, in which he pronounced that "no distinction has been or can be made between the Indians and other natives of Alaska so far as the laws and relations of the United States are concerned."

Fifty-six more years later, in 1988 the Alaska Supreme Court summarized the history of Congress's Alaska Native-related enactments to that date as follows:

> In a series of enactments following the Treaty of Cession and extending into the first third of this century, Congress has demonstrated its intent that Alaska Native communities not be accorded sovereign tribal status. The historical accuracy of this conclusion was expressly recognized in the proviso to the [1936] Alaska Indian Reorganization Act . . . No enactment subsequent to the Alaska Indian Reorganization Act granted or recognized tribal sovereign authority in Alaska.

Native Village of Stevens v. A.M.P., 757 P.2d 32, 41 (Alaska 1988). See also accord John v. Baker I, 982 P.2d 738. 749 (Alaska 1999)(reaffirming Native Village of Stevens and holding that "[p]rior to 1993, no such recognition of Alaska villages [as sovereign tribes] had occurred").

19

In its brief, the NVE attempts to circumvent the legal consequence of Congress's Alaska Native-related enactments by asserting that

> NVE has been included on all lists of "Alaska Native entities recognized and eligible to receive services" which have been published by the Department [of the Interior], beginning with the first such list published in 1982. Most recently, NVE was included in the March 22, 2007 list of Alaska tribal entities published at 72 Fed. Reg. 13,651.
>
> Congress has enacted numerous laws reaffirming the federal status of Alaska's tribes, including the Federal (sic) Recognized Indian Tribe List Act, 25 U.S.C. sec. 479a note, Tlingit and Haida Status Clarification Act, Pub. Law 103-454, tit. II, and the 1994 amendment to the Indian Reorganization Act (IRA), which prohibits federal agencies from making any distinction in the "privileges and immunities" of any federally recognized tribe. 25 U.S.C. 476(f),(g).

NVE Brief, at 2.

But what the NVE fails to mention is that the lists of Alaska Native entities that the Department of the Interior published between 1982 and 1988 were lists of entities that the Secretary of the Interior had determined were eligible to receive programs and services that Congress provides to Indians because of their status as Indians. They were not lists of "federally recognized tribes" whose governing bodies possess the "powers of self-government" that an entity's governing body must possess in order to be an "Indian tribe" for the purposes of the IGRA.

20

In 1993 when she republished the list, Assistant Secretary of the Interior for Indian Affairs Ada Deer fully intended her act of republication to transform the listed Alaska Native entities, including the NVE, into "federally recognized tribes" whose governing bodies henceforth would possess "powers of self-government." See 58 Fed. Reg. 54,366 (1993)(preamble announcing that as a consequence of the republication the listed Alaska Native entities now have "the same governmental status as other federally acknowledged tribes" and are empowered "to exercise the same inherent and delegated authorities available to other tribes"). And that same year when he approved a class II gaming ordinance that the Klawock Cooperative Association (KCA) had submitted, at the direction of the same solicitor who had been advising Assistant Secretary Deer, the chairman of the NIGC decided that the members of the KCA were members of an "Indian tribe" for the purposes of the IGRA for no reason other than that Assistant Secretary Deer's Federal Register notice had said that they were. See Letter from Michael J. Anderson, Associate Solicitor, Division of Indian Affairs, Office of the Solicitor, U.S. Department of the Interior, to Michael Cox, General Counsel, NIGC (November 15, 1993). Posted at: http://www.nigc.gov/ LinkClick.aspx?link=NIGC+Uploads%2findianlands%2f19_ klawockcooperativeassociation.pdf&tabid=120&mid=957. However,

21

Assistant Secretary Deer's attempt to transform the members of the KCA, the NVE, and more than 200 other Alaska Native entities into members of "federally recognized tribes" was <u>ultra</u> <u>vires</u>.

In 1993 when, simply by publishing a new list of Alaska Native entities in the Federal Register, Assistant Secretary Deer attempted to reverse 109 years of Congress's Alaska Native policy by administrative fiat, her authority to do so was "no greater than that delegated . . . by Congress," <u>Lyng v. Payne</u>, 476 U.S. 926, 937, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986), because "[t]he legislative power of the United States is vested in Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress <u>and subject to limitations which that body imposes</u>." (emphasis added). <u>See</u> <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979).[7]

---

[7]<u>See also</u> <u>Alaska v. Native Village of Venetie Tribal Government</u>, 522 U.S. 520, 531 n. 6, 118 S.Ct. 948, 955 n. 6, 140 L.Ed.2d 30 (1998)(unanimous U.S. Supreme Court holding that "because Congress has plenary power over Indian affairs, some explicit action by Congress (or the Executive, <u>acting under delegated authority</u>) must be taken to create or to recognize Indian country [in Alaska]")(emphasis added).

Exhibit F, Page 22 of 48

In the preamble she published with her new list of Alaska Native entities, Assistant Secretary Deer explained that the administrative decision she had made that her publication of the list now was implementing had been made as an "exercise of authority delegated to the Assistant Secretary – Indian Affairs under 25 U.S.C. 2 and 9 . . . ." See 58 Fed. Reg. 54, 364 (1993). But those statutes did not delegate Assistant Secretary Deer the authority she purported to exercise.

To discern the intent of Congress embodied in a statute, the first step is to read the statutory text. See Williams v. Taylor, 529 U.S. 420, 431, 120 S.Ct. 1479, 1487, 146 L.Ed.2d 435 (2000) ("start, as always, with the language of the statute"). The U.S. Supreme Court has instructed that when it analyzes that text, rather than focusing on a single word, sentence, or paragraph, the Court "look[s] to the provisions of the whole law, and to its object and policy," Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987), since "the meaning of statutory language, plain or not, depends on context," King v. St. Vincent's Hospital, 502 U.S. 212, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991). And when identifying that context, the Court construes the statutory text "with reference to the circumstances existing at the time of the [statute's] passage," United States v. Wise, 370 U.S. 405, 411,

23

82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962). If after doing so the Court determines that the intent of Congress embodied in the text is clear, "that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

Applying those rules of statutory construction to discern the intent of Congress embodied in 25 U.S.C. 2 and 9 results in the conclusion, easily reached, that Congress did not intend those statutes to delegate Assistant Secretary Deer authority to decide on her own to reverse Congress's long-held decision that it would not designate groups of Alaska Natives – either in Eklutna or elsewhere – as "federally recognized tribes."

25 U.S.C. 2

Congress enacted 25 U.S.C. 2 35 years before the United States purchased Alaska. See ch. 174, sec. 1, 4 Stat. 564 (1832). The text of the statute reads: "The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations." The circumstances that existed when Congress enacted 25 U.S.C. 2 were as follows:

24

In 1806 Congress created the office of Superintendent of Indian Trade inside the War Department to manage the Indian trading posts, called factories, that Congress had authorized the President to operate on the frontier. See 2 Stat. 402 (1806). In 1816 President James Madison appointed Thomas McKenney as superintendent. See HERMAN J. VIOLA, THOMAS L. McKENNEY: ARCHITECT OF AMERICA'S EARLY INDIAN POLICY 4-5 (1974). In 1822 Congress ordered the factories closed. See 3 Stat. 683 (1822). As a consequence, Superintendent McKenney no longer had any statutorily mandated duties. To fill the vacuum, in 1824 "Secretary of War [John C.] Calhoun, by his own order, and without special authorization from Congress, created in the War Department what he called the Bureau of Indian Affairs. To head the office Calhoun appointed McKenney and assigned him two clerks as assistants . . . ." FRANCIS PAUL PRUCHA, AMERICAN INDIAN POLICY IN THE FORMATIVE YEARS: THE INDIAN TRADE AND INTERCOURSE ACTS 57 (1971).

Creating the BIA was a sensible policy decision. But the decision was ultra vires. For that reason, with the approval of Secretary of War James Barbour (who by then had succeeded Calhoun), Thomas McKinney drafted a bill which he submitted to Congress in 1826 and whose enactment in 1832 created the BIA. See id. 58-59.

25

By 1832 Secretary of War Barbour was distributing annually more than $1 million in gratuities to Indians, operating 54 Indian schools, and as recently as 1830 had issued 98 licenses to traders doing business in Indian country. For those reasons, Congress enacted the McKenney bill for the singular purpose of authorizing Secretary Barbour to hire a minor bureaucrat to perform those tasks in the Secretary's stead. As Senator Hugh White, the chairman of the Committee on Indian Affairs, explained to his colleagues when the bill reached the floor of the Senate: "To all these different branches [i.e., the distribution of gratuities, administration of Indian schools, and licensing of Indian traders] the personal attention of the Secretary of War is now required. The creation, therefore, of such an officer [i.e., the Commissioner of Indian Affairs] as is provided by the bill, be deemed to be indispensably necessary." See 8 Gales & Seaton's Register of Debates in Congress, at 988 (1832).

But if Assistant Secretary Deer is to be believed, in 1832 Congress intended its enactment of the McKinney bill to delegate an obscure subordinate employee of the War Department unfettered authority to decide on his or her own which groups of Native Americans would be designated as "federally recognized tribes" whose members henceforth would have a "government-to-government" relationship with the United States.

26

That interpretation of Congress's intent stretches credulity past breaking.

25 U.S.C. 9

Congress enacted 25 U.S.C. 9 33 years before the United States purchased Alaska. See ch. 162, sec. 17, 4 Stat. 738 (1834). The text of the statute reads: "The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs." On its face, 25 U.S.C. 9 delegated Assistant Secretary Deer no authority whatsoever.[8]

Federally Recognized Indian Tribe List Act

In 1994 Congress enacted the Federally Recognized Indian Tribe List Act (FRITLA), Pub. L. No. 103-454, Title I, 108 Stat. 4791 (1994)(codified at 25 U.S.C. 479a et seq.).

---

[8]Assistant Secretary Deer's ultra vires attempt to transform the members of the NVE and more than 200 other Alaska Native organizations into members of "federally recognized tribes" was the end result of a scheme that had been initiated at the beginning of the Clinton administration, and then implemented, by a group of attorneys in Alaska (as well as an attorney inside the Office of the Solicitor) that was led by attorneys in the Anchorage office of the Native American Rights Fund (with which Assistant Secretary Deer had been affiliated prior to her appointment as Assistant Secretary), as well as by the law firm that represents the NVE. See Attachments J - O (Documents relating to Assistant Secretary Deer's 1993 decision obtained through the Freedom of Information Act).

27

In <u>John v. Baker I</u>, 982 P.2d 738, 750 (Alaska 1999), a decision the NVE cites in its brief – <u>see</u> NVE Brief, at 2 n. 1, the Alaska Supreme Court announced that, in its view, if <u>arguendo</u> prior to 1993 Congress had not enacted a statute that delegated Assistant Secretary Deer authority to, through the act of publication in the Federal Register of a list of Alaska Native entities, transform the members of the listed entities (including the members of the NVE) into "federally recognized tribes," "[t]he text and legislative history of the Tribe List Act [FRITLA] demonstrate that Congress also views the recognized tribes [i.e., the listed entities] as sovereign bodies." But the text and legislative history of FRITLA indicate that Congress intended no such result.

<u>FRITLA Statutory Text</u>

Section 103 of FRITLA, 25 U.S.C. 479a, sets out eight findings of fact. One is patently erroneous.[9]  And none has the

---

[9]Finding No. 1 states that "the Constitution . . . invests Congress with <u>plenary</u> authority over Indian Affairs." (emphasis added). But Finding No. 3 then announces that "federally recognized tribes" may be created 1) by Act of Congress, 2) by filing a petition pursuant to 25 C.F.R. 83.1 <u>et seq</u>., and 3) by "a decision of a United States court." But if Congress's authority over Native American affairs is plenary, a United States court's exercise of that authority would violate the Doctrine of Separation of Powers. The draftsman of section 103(3) of FRITLA apparently confused Congress's authority to by statute create "federally recognized tribes" with the United States courts' authority to construe Congress's intent by determining

28

force of law. See 140 CONG. REC. 27,244 (1994)(statement of Representative Craig Thomas, the principal sponsor of FRITLA, explaining that FRITLA's "findings are not legally binding").

Section 104 of FRITLA, 25 U.S.C. 479a-1, is the only operative section of the statute. Section 104 simply directs the Secretary of the Interior to publish annually "a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." On its face, section 104 does not delegate the Secretary authority to designate whatever new groups of Native Americans he wishes (based on no standard other than, in the case of Assistant Secretary Deer, her personal policy views) as "federally recognized tribes."

In 1977 Congress considered bills whose enactment would have delegated the Secretary of the Interior that authority. The 103d

---

whether Congress intends the word "tribe" in a particular statute to mean "tribe in an ethnological sense" or "tribe in a political sense." In any case, assuming arguendo that Finding No. 3 correctly describes the ways a group of Native Americans may become a "federally recognized tribe," there is no statute that designates the Dena'ina Athabascan members of the NVE as a "federally recognized tribe," the Dena'ina Athabascan members of the NVE have not filed a petition pursuant to 25 C.F.R. 83.1 et seq., and no United States court has issued a decision that, in and of itself, designates the Dena'ina Athabascan members of the NVE as a "federally recognized tribe."

**Exhibit F, Page 29 of 48**

Congress that enacted FRITLA considered similar bills. <u>See
Federal Recognition of Indian Tribes: Hearing on H.R. 2549, H.R.
4462, and H.R. 4709 before the Subcomm. on Native American
Affairs of the House Comm. on Natural Resources</u>, 103d Cong.
(1994). <u>And see</u> H.R. 3548, 107th Cong. (2001); S. 504, 107th
Cong. (2001)(Indian Tribal Federal Recognition Administrative
Procedures Act of 2001); S. 1392, 107th Cong. (2001)(Tribal
Recognition and Indian Bureau Enhancement Act of 2001). <u>And see
more recently</u> S. 462, 108th Cong. (2003)(Tribal Acknowledgment
and Indian Bureau Enhancement Act of 2003).

Until one of those bills is enacted, the Secretary of the
Interior has no authority to designate groups of Native Americans
as "federally recognized tribes" in Congress's stead, either in
Alaska or elsewhere.

<u>FRITLA Legislative History</u>

The plain meaning of the FRITLA statutory text is clear. But
if <u>arguendo</u> it is not, the report of the House Committee on
Natural Resources, which wrote FRITLA, is the next most
"authoritative expression of legislative intent." <u>See In re
Kelly</u>, 841 F.2d 908, 912 n. 3 (9th Cir. 1988). And that report is
consistent with the plain meaning of the statutory text.

30

In 1935 Congress enacted a statute that authorized the Tlingit and Haida Indians of southeast Alaska to file a lawsuit in the Court of Claims to obtain compensation for the extinguishment of their aboriginal title. Pub. L. No. 74-152, 49 Stat. 388 (1935). In 1941 the BIA organized the Tlingit-Haida Central Council (Central Council) for the singular purpose of creating an entity empowered to hire an attorney to file the lawsuit. To provide the Central Council authority to administer the Court of Claims judgment, in 1965 Congress enacted a statute that recognized the Central Council as "the official Central Council of Tlingit and Haida Indians <u>for the purposes of [the 1935] Act</u>." (emphasis added). Pub. L. No. 89-130, 79 Stat. 543 (1965).

That was the Central Council's <u>only</u> purpose. However, subsequent to Congress's enactment of the Self-Determination Act the Central Council convinced the Assistant Secretary of the Interior for Indian Affairs to include, first the "Tlingit & Haida Indians of Alaska," and in 1988 "the Central Council of Tlingit and Haida Indian Tribes of Alaska," on the lists of Alaska Native entities eligible to contract with the BIA and IHS that the Assistant Secretary published in the Federal Register. <u>See</u> 47 Fed. Reg. 53,135 (1982); 48 Fed. Reg. 56,866 (1983);

**Exhibit F, Page 31 of 48**

50 Fed. Reg. 6059 (1985); 51 Fed. Reg. 25,119 (1986); 53 Fed. Reg. 52,833 (1988).

For the Central Council, its inclusion on those lists had the useful benefit of allowing the Central Council to contract directly with the BIA and IHS without having to obtain the village resolutions that the Self-Determination Act requires Alaska Native regional nonprofit corporations to obtain.

In 1993 when she decided to transform the 1988 list of Alaska Native entities eligible to contract under the Self-Determination Act into a list of "federally recognized tribes," Assistant Secretary Deer decided that the Tlingit and Haida Indian residents of Native villages in southeast Alaska, rather than the members of the Central Council, were the "federally recognized tribes" in southeast Alaska. As a consequence, Assistant Secretary Deer did not include the Central Council on her 1993 list.

The Central Council protested its omission from the 1993 list to Alaska Senator Frank Murkowski and Alaska Representative Don Young. At the time, Senator Murkowski was the ranking member of the Senate Committee on Indian Affairs, and Representative Young was the ranking member of the House Committee on Natural Resources, and the second-ranking member of that Committee's Subcommittee on Native American Affairs. See GOVERNMENT PRINTING

32

OFFICE, 1993-1994 OFFICIAL CONGRESSIONAL DIRECTORY: 103d CONGRESS
405, 455-56 (1993).

Representative Young agreed with the Central Council that,
since it had been included on previous lists, Assistant Secretary
Deer should not have omitted the Central Council from her 1993
list. As a consequence, on April 12, 1994 Representative Young
cosponsored H.R. 4180, a bill that Representative Craig Thomas,
the ranking member of the Subcommittee on Native American
Affairs, introduced and whose enactment would have prohibited
"Federal recognition or acknowledgment of an Indian tribe or
Alaska Native Group [from being] withdrawn, except by an Act of
Congress." (emphasis added).

On August 4, 1994 the Subcommittee on Native American
Affairs held a hearing on H.R. 4180. See H.R. Rep. No. 103-781,
at 4 (1994). On October 3, 1994 the Committee on Natural
Resources reported an amendment in the nature of a substitute for
the original text of H.R. 4180. Representative George Miller, the
chairman of the Committee, opposed the idea of Congress
prohibiting the Secretary of the Interior "from withdrawing
recognition for an Indian tribe." See 140 Cong. Rec. 27,246
(1994)(statement of Representative Thomas). For that reason, in
fashioning its amendment the Committee rewrote the original text

**Exhibit F, Page 33 of 48**

of H.R. 4180 into a substitute text that is <u>identical</u> to the text of FRITLA.

By 1994 when the Committee reported its substitute text, Representative Young was aware that Alaska Native tribal status had become an <u>extremely</u> controversial subject in Alaska.

For the same policy reasons that more than a century earlier had caused Congress to decide that it would not create "federally recognized tribes" in Alaska, in the early 1980s when the Native sovereignty movement began in Alaska, Representative Young and Alaska Senators Ted Stevens and Frank Murkowski opposed creating more than 200 new tribal governments whose governing bodies would possess powers of self-government and sovereign immunity.

At the request of the Alaska Federation of Natives, in 1986 Senator Murkowski introduced S. 2065, a bill whose principle objective was to amend ANCSA to repeal the provision that in 1991 terminated the prohibition on the sale of ANCSA corporation stock. By that date, the increasingly vocal assertions by members of the Native sovereignty movement that Alaska Natives were members of "federally recognized tribes" were well-known to Congress. <u>See</u> e.g., <u>To Amend the Alaska Native Claims Settlement Act: Hearings on S. 2065 before the Subcomm. on Public Lands, Reserved Water and Resource Conservation of the Senate Comm. on Energy and Natural Resources</u>, 99th Cong. 557 (1986)(statement of

Charlie Kairaiuak, chairman, United Tribes of Alaska). In response to those assertions, Senator Murkowski announced that

> Whatever the 1971 Native Claims Settlement Act allowed or disallowed with respect to [Alaska Native tribal status] will remain unchanged by [S. 2065]. Senator Stevens, Congressman Young, and I have consistently stated that the 1991 amendments will not foster sovereignty nor will they detract from any self-government powers which Alaska Natives may now possess under existing law . . . I have stated in my opening remarks in each of the hearings I have held in nine communities in Alaska that I will not support any legislation which leads to the creation of a series of independent sovereign entities in Alaska. One can only imagine the confusion that would exist if the State and Federal Government were required to enter into treaties with various sovereign Indian nations. I believe that such a situation is contrary to the best interests of all Alaskans, Native and non-Native alike. From the standpoint of where we go collectively as Alaska citizens, it is our intent to retain the current form of government that we have, and that is the government of the State of Alaska. (emphasis added).

Amendments to the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act and to Establish a Memorial in the District of Columbia: Hearing on S. 485, et al., before the Subcomm. on Public Lands, Reserved Water and Resource Conservation of the Senate Comm. on Energy and Natural Resources, 99th Cong. 3 (1986).

35

The 99th Congress adjourned without passing S. 2065. At the beginning of the 100th Congress Representative Young reintroduced the bill as H.R. 278, which was enacted in 1987 as Pub. L. No. 100-241, 101 Stat. 1788 (1988)[hereinafter "1991 Amendments"]. As Senator Murkowski indicated that it would, the 1991 Amendments contained a disclaimer section that, in pertinent part, stated:

> No provision of this Act (the Alaska Native Claims Settlement Act Amendments or 1987), exercise of authority pursuant to this Act, or change made by, or pursuant to, this Act in the status of land shall be construed to validate or invalidate or in any way affect -
>
> (1) any assertion that a Native organization (including a federally recognized tribe, traditional Native council, or Native council organized pursuant to the Act of June 18, 1934 (48 Stat. 987), as amended) has or does not have governmental authority over lands (including management of, or regulation of the taking of, fish and wildlife) or persons within the boundaries of the State of Alaska . . . .

Pub. L. No. 100-241, sec. 17, 101 Stat. 1788 (1988).

Like the disclaimer section in the 1991 Amendments, seven years later the report of the Committee on Natural Resources that explained the Committee's substitute text for the original text of H.R. 4180, i.e., FRITLA, explained that Representative Young and the other Committee members did not intend FRITLA to delegate the Secretary of the Interior any new legal authority to establish "federally recognized tribes" in Alaska. The report

36

Exhibit F, Page 36 of 48

states that: "If enacted, H.R. 4180 would make <u>no changes</u> in existing law." (emphasis added). <u>See</u> H.R. Rep. No. 103-781, at 6 (1994). The Committee's explanation for that policy choice merits quoting in full:

> The Committee is aware that in January 1993 the Solicitor of the Department of the Interior issued an opinion which concluded that Congress has restricted the sovereign powers of Alaska Native tribes. As the BIA stated in the October 21, 1993 Federal Register Notice of Alaska Native Entities Recognized and Eligible to Receive Services, "[the Solicitor] concluded, construing general principles of Federal Indian law and ANCSA, that 'notwithstanding the potential that Indian country exists in Alaska in certain limited cases, Congress has left little or no room for tribes in Alaska to exercise governmental authority over land or nonmembers.' M-36,975 at 108. That portion of the opinion is subject to review, but has not been withdrawn or modified."

> The Committee notes that the Solicitor's opinion has generated controversy and that there is extensive litigation on the subject of the precise sovereign powers of Alaska Native tribes. While these issues deserve further review by Congress, <u>nothing in this Act should be construed as enhancing, diminishing or changing in any way the status of Alaska Native tribes</u>. It is the intent of the Committee that its previous position taken in the 1987 amendments to the Alaska Native Claims Settlement Act be maintained and that nothing in this Act shall "confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands (including management or regulation of the taking of fish and wildlife) or persons in Alaska." P.L. 100-241, Section 2(8)(B). <u>The Act merely requires that the Secretary continue the current policy of including Alaska Native entities on the list of Federally recognized tribes which are eligible to receive services.</u> (emphasis added).

<u>Id</u>. 4-5.

Later on the day, October 3, 1994, that the Committee on Natural Resources reported H.R. 4180, Representative Bill Richardson, the chairman of the Subcommittee on Native American Affairs, bundled the texts of two other Native American-related bills that the Committee had reported into H.R. 4180, and then moved the House to suspend its rules and pass the bill. At no time during their several minute explanation or H.R. 4180 prior to the House's unrecorded voice vote did Representative Richardson or Representative Thomas indicate that they believed that Congress's enactment of FRITLA would grant the Secretary of the Interior new authority to create "federally recognized tribes," either in Alaska or elsewhere. <u>See</u> 140 Cong. Rec. 27,244-46 (1994). Similarly, when H.R. 4180 reached the other body, the Senate passed the bill by unanimous consent on unrecorded voice votes, and with no debate or explanation of the bill's provisions. <u>Id</u>. 28,832-33, 29,537.

"[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before [an] Act's passage." <u>Blanchette v. Connecticut General Insurance Corps</u>., 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974). And even "<u>post hoc</u> statements of a congressional Committee are not entitled to much weight." <u>Weinberger v. Rossi</u>, 456 U.S. 25, 35, 102 S.Ct. 1510, 1518, 71

**Exhibit F, Page 38 of 48**

L.Ed.2d (1982). But, if they are consistent with both the plain meaning reading of a statutory text and the relevant Committee report, such statements are relevant and informative.

In 1997 the State of Alaska petitioned the U.S. Supreme Court to issue a writ of certiorari and review <u>State of Alaska ex rel. Yukon Flats School District v. Native Village of Venetie Tribal Government</u>, 101 F.3d 1286 (9th Cir. 1996). In the brief he filed in support of the petition, Alaska Senator Ted Stevens informed the Court that, in 1958 "Congress intended Alaska residents, both Native and non-Native, their real property, <u>and the organization of their municipal governments, both in Native villages and elsewhere</u>, to be subject to the jurisdiction of the Alaska State Legislature" and in 1971 Congress intended its enactment of ANCSA to "reaffirm[] that policy." (emphasis added). Senator Stevens' view of the matter is incompatible with the idea that three years earlier the 103d Congress, of which he was an influential member, intended its enactment of FRITLA to ratify Assistant Secretary Deer's <u>ultra</u> <u>vires</u> attempt in 1993 to create more than 200 tribal governments in those same Native villages, including in Eklutna.

Similarly, in 2001 when the U.S. House of Representatives passed H.R. 2538, the Native American Small Business Development Act, Representative Young informed his colleagues that

39

H.R. 2538 as amended does not differ in substance
from the bill as reported by the Committee on Small
Business. Rather, the measure under consideration
today simply recognizes the unique Native American
policies that Congress has implemented in the State
of Alaska, and clarifies how the grant program the
bill authorizes will be implemented in that State.

In the 48 contiguous States, Congress's policy on
Native Americans has focused on recognizing groups
of Native Americans as "federally recognized tribes"
that are distinct political entities and a majority
of whose members reside on reservations and other
land that is owned by the United States in trust.
However, while Congress has routinely designated
groups of Alaska Natives as "tribes," it has done
so for the sole purpose of ensuring that Alaska
Natives are eligible for programs and services
that the United States provides to Native Americans
because of their status as Native Americans.

Congress has not recognized any group of Alaska
Natives as a "federally recognized tribe" that is
a distinct political entity.

Instead, since 1884 Congress has required Alaska
Natives to be, at all locations in Alaska, subject
to the same criminal and civil state laws that non-
Native Alaskans are required to observe.

Consistent with that policy, in 1971 when it
extinguished Alaska Native aboriginal title by
enacting the Alaska Native Claims Settlement Act,
Congress required Alaska Natives to organize business
corporations under the laws of the state of Alaska
and then directed the Secretary of the Interior to
convey the corporations fee title to 44 million
acres of Federal land.

The amendments made to H.R. 2538 as reported by
the Committee on Small Business simply acknowledge
that Congress'[s] Alaska Native policy is quite
different from the Native American policy that
Congress has implemented in the 48 contiguous
States. It will also ensure that the intent of

40

> H.R. 2538 can be effectively met in Alaska for
> the benefit of Alaska Natives. (emphasis added).

See 147 Cong. Rec. H8859 (daily ed. December 5, 2001).

And most recently, in 2006 when Congress enacted H.R. 4472 as the Children's Safety and Violent Crime Reduction Act, Pub. L. No. 109-248, 120 Stat. 587, Representative James Senensenbrenner, the chairman of the House Committee on the Judiciary and the sponsor of H.R. 4472, explained to the House that the undefined term "federally recognized Indian tribe" in H.R. 4472 did not include when its purview any Alaska Native groups or entities because

> In 1884 when Congress created the first civil
> government in Alaska it decided that Alaska
> Natives should be subject at all locations in
> Alaska to the same civil and criminal jurisdiction
> as that to which all non-Native residents of
> Alaska are subject. Alaska Natives today are
> subject at all locations in Alaska, including
> in communities that are "Native villages" for
> the purposes of the Alaska Native Claims
> Settlement Act, to the criminal statutes of the
> Alaska State Legislature and are prosecuted in
> the Alaska State courts for violations of those
> statutes.

152 Cong. Rec. H683 (daily ed. March 8, 2006).[10]

---

[10]While it has not designated the members of the NVE or any other groups of Alaska Natives as "federally recognized tribes" whose governing bodies possess powers of self-government, Congress (exercising the plenary authority that the Indian Commerce Clause of the U.S. Constitution confers) has enacted numerous statutes that include groups of Alaska Natives within the "Indian tribe" definitions in those statutes for the specific

41

Representatives Young's and Senensenbrenner's explanations
of Alaska Native tribal status in 2001 and 2006 are consistent
with Senator Stevens' understanding of the situation in 1997,
with the Committee on Natural Resources' explanation in its
report on H.R. 4180 (i.e., FRITLA), and, most determinatively,
with the plain meaning of the text or FRITLA. And what that plain
meaning indicates is that Congress did not intend FRITLA to
delegate Assistant Secretary Deer (or any succeeding Assistant
Secretary of the Interior for Indian Affairs) authority to
transform the Dena'ina Athabascan members of the NVE or the
Alaska Native members of any other Native group into members of

---

purposes of those statutes. As discussed, Congress did so in the
"Indian tribe" definition it included in the Self-Determination
Act. Congress also has done so in statutes such as the Indian
Child Welfare Act, see 25 U.S.C. 1903(8), and the Violence
Against Women Act, see 42 U.S.C. 13925(13). See also Tlingit and
Haida Status Clarification Act (THSCA)(Congress "reaffirm[ing]
and acknowledg[ing] that the Central Council of Tlingit and Haida
Indian Tribes of Alaska is a federally recognized tribe").
Pub. L. No. 103-454, Title II, 108 Stat. 4792 (1994)(codified at
25 U.S.C. 1212 et seq.). While the reason Congress enacted the
THSCA has been discussed above, the entire history of the THSCA
is beyond the scope of these comments. However, what can be said
here is that between its founding in 1941 and the enactment of
the THSCA in 1994, the Central Council did not assert sovereign
immunity or exercise governmental authority of any kind. For
those reasons, the text of the THSCA quoted above may not
accurately reflect Congress's intent. As Chief Justice Rehnquist
noted in Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571,
102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)("in rare cases the
literal application of a statute will produce a result
demonstrably at odds with the intentions of its drafters, and
those intentions must be controlling").

42

"federally recognized tribes" whose governing bodies possess the "powers of self-government" that they must possess in order for the group to be an "Indian tribe" for the purposes of the IGRA.

B. The 8.05-Acre Alaska Native Allotment Parcel on Which the NVE Intends to Engage in Class II Gaming Is Not "Indian Lands."

If arguendo the members of the NVE are members of an "Indian tribe," the NVE may not engage in class II gaming unless the 8.05-acre Alaska Native allotment parcel on which the gaming will be conducted is "Indian lands," a term section 4(4)(B) of the IGRA, 25 U.S.C. 2703(4)(B), defines as

> any lands title to which is either held in
> trust by the United States for the benefit
> of any Indian tribe or individual or held
> by any Indian tribe or individual subject
> to restriction by the United States against
> alienation and over which an Indian tribe
> exercises governmental power. (emphasis added).

Title to the aforementioned 8.05-acre parcel is held by seven individuals who are heirs of Olga Ondola. The heirs apparently all are of Dena'ina Athabascan descent. And several are members of the NVE. See NVE Exhibit 4. It also is reasonable to assume that the heirs' title is "subject to restriction by the United States against alienation."

However, the 8.05-acre parcel does not qualify as "Indian lands" because it does not satisfy the third requirement of the IGRA "Indian lands" test. Because if arguendo its members are an

43

"Indian tribe" for the purposes of the IGRA, the governing body of the NVE does not "exercise governmental power" over the parcel.

The NVE recognizes that, as the U.S. Supreme Court noted in _Alaska v. Native Village of Venetie Tribal Government_, _supra_ at 527-27, 118 S.Ct. at 952, the governing body of a federally recognized tribe that possesses powers of self-government may exercise those powers only within the boundaries of the tribe's "Indian country." See NVE Brief, at 8. For that reason, the NVE argues that "[i]t is clear that the Ondola allotment is Indian country, and the Tribe [i.e., the governing body of the NVE] possesses legal jurisdiction over the allotment." See _id_. 10. However, despite that bald expression of certitude, the 8.05-acre Alaska Native allotment parcel is not "Indian country."

Congress has defined "Indian country" as

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

> (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

44

(c) all Indian allotments, <u>the Indian titles to
which have not been extinguished</u>, including
rights-of-way running through the same.
(emphasis added).

18 U.S.C. 1151.

In its brief, the NVE proffers snippets of purported fact
that, according to the NVE, collectively demonstrate that, for
the purposes of section 4(4)(B) of the IGRA, 25 U.S.C.
2703(4)(B), the governing body of the NVE "exercises governmental
power" within the boundaries of the 8.05-acre parcel (and, by
inference, that the Alaska State Legislature and Anchorage
Municipal Assembly may not assert their regulatory jurisdiction
within the same boundaries). <u>See</u> NVE Brief, at 13-23.

But whether the governing body of the NVE "exercises
governmental power" within the boundaries of the parcel is a
question of law, not fact, whose answer turns on whether the
parcel qualifies as an "Indian allotment" for the purposes of
18 U.S.C. 1151(c); which, for the reason below, it does not.

As a threshold matter, there is considerable question
whether the revisers who drafted 18 U.S.C. 1151(c) intended the
term "Indian allotments" to include Alaska Native allotments
within its purview. <u>See</u> Why History Counts, at 374-378.

45

**Exhibit F, Page 45 of 48**

But that question need not be answered here, because, even if *arguendo* the revisers did so intend, 18 U.S.C. 1151(c) states clearly, unambiguously, and explicitly that the only "Indian allotments" that are "Indian country" are allotments "the Indian titles to which have not been extinguished."[11]

The term "Indian title" and "aboriginal title" are synonymous. Black's Law Dictionary defines "Indian title" as a "right of occupancy that the federal government grants to an American Indian tribe based on the tribe's immemorial possession of the area." See BLACK'S LAW DICTIONARY 787 (8th ed. 1999). And Black's Law Dictionary defines "aboriginal title" as

> 1. Land ownership, or a claim of land ownership, by an indigenous people in a place that has been colonized. – Alaska termed native title.
>
> 2. INDIAN TITLE.

*Id*. 1522 (first emphasis in original, second emphasis added). See also accord COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 969 (Nell Jessup Newton ed.-in-chief 2005)(instructing that "original Indian title, also known as aboriginal Indian title, refers to land claimed by a tribe by virtue of its possession and exercise of sovereignty rather than by virtue of letters of patent or any formal conveyance")(emphasis added).

---

[11] In its brief, the NVE acknowledges this legal requirement - *see* NVE Brief, at 8, but then makes no further mention of it.

46

From Congress's purchase of Russian America in 1867 until its enactment of ANCSA in 1971, the federal government recognized that most, if not all, of the 375 million acres of land in Alaska, including the 8.05-acre Alaska Native allotment parcel at issue here, was subject to Alaska Native aboriginal title. See generally Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955). However, when it settled Alaska Native land claims, in section 4(b) of ANCSA, 43 U.S.C. 1603(b), Congress decreed that

> All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished. (emphasis added).

For that reason, if arguendo it ever was, the 8.05-acre Alaska Native allotment parcel on which the NVE intends to engage in class II gaming has not been "Indian country" for thirty-six years. And if arguendo it ever did, the governing body of the NVE has not exercised "governmental power" inside the boundaries of the parcel for the same thirty-six years.

47

<u>Conclusion</u>

For the purposes of the IGRA, the NVE is not an "Indian tribe" and the 8.05-acre Alaska Native allotment parcel on which the NVE intends to engage in class II gaming is not "Indian lands." For those reasons, the chairman of the NIGC must disapprove the NVE's ordinance.

48