**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIVE VILLAGE OF EKLUTNA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | )   Case No. 1:19-cv-02388-DLF |
| THE INTERIOR, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| STATE OF ALASKA, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**MOTION FOR LEAVE TO TAKE EXTRA-RECORD DISCOVERY AND**
**TO COMPEL PRODUCTION OF DOCUMENTS NOT INCLUDED IN**
**ADMINISTRATIVE RECORD AS PRODUCED**
**AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

## I.      INTRODUCTION

The Native Village of Eklutna ("Eklutna" or "Tribe") respectfully moves this Court for

an order compelling the Defendants to complete the record by producing additional documents

not included in the putative administrative record, and for permission to take extra-record

discovery.[1]  The points and authorities in support of the motion are set out below.

The Tribe filed this suit to challenge the Department of the Interior's erroneous decision

on Eklutna's petition for an Indian lands determination, seeking to exercise its right to a full and

---

[1] After prior discussion with the Federal Defendants regarding the contents of the administrative
record, counsel for the Tribe have conferred with counsel for the Federal Defendants and the
State of Alaska regarding this motion.  Counsel are authorized to state that the Federal
Defendants oppose the motion, and the State of Alaska will likely oppose the motion but defers a
final decision until after reviewing the motion.

1

complete review of that decision under § 706 of the Administrative Procedure Act ("APA").  But the administrative record produced by the Defendants in this action, far from allowing the Court to conduct such a review, contains substantial gaps that frustrate review and tell only a partial story of the Department's actions.  Moreover, the evidence that *does* exist shows that the Department was subject to improper political influence in its decision-making process, as the Tribe alleged in its Complaint, including direct communication from political officials whose views the Department sought.  This reliance on political views is precisely the type of improper agency behavior that necessitates discovery beyond the limited record produced by the Defendants.  Such discovery is both warranted by the evidence and is necessary in order for the Court to fully review the Department's decision.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Tribe's Request for an Indian Lands Determination Under § 2703(4)(B)

The Native Village of Eklutna is a federally recognized Indian Tribe whose members are of the Dena'ina people who have resided in the Upper Cook Inlet region of Alaska since time immemorial.  This action concerns the Tribe's authority over a parcel of land within the Tribe's aboriginal lands, which the Department of the Interior allotted to an Eklutna tribal member in 1963 and which has been held in restricted status ever since.  *See* Compl. ¶ 1, ECF No. 1.  The land at issue, known as the Ondola Allotment ("the Allotment"), is located 7 miles from the present-day seat of the Native Village of Eklutna.  Compl. ¶ 2.

On June 29, 2016, the Tribe petitioned the Department of the Interior ("Department" or "Interior") for a determination that the Allotment constitutes "Indian lands" as defined under § 2703(4)(B) of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721.  AR 774-77.  As applicable here, § 2703(4)(B) defines "Indian lands" to include "any lands title to

2

which is . . . held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." By its plain terms, § 2703(4)(B) contains no provision for consideration of political views.

The Tribe's submission correctly focused on addressing the legal and factual questions relevant to § 2703(4)(B), providing extensive documentation showing the Tribe's status as a federally recognized Indian tribe, the restricted status of the Ondola Allotment, and the Tribe's exercise of governmental power and authority over the Allotment. AR 774-1238.[2] The Tribe supplemented its request with several additional submissions providing further information on these issues, on or about December 16, 2016, June 6, 2017, June 22, 2017, November 6, 2017, and December 4, 2017. AR 1244-55, 2039-43, 2051-61, 2071-91, 2095-2110. The Tribe also requested that the Department approve the Tribe's lease of the land from the Allotment owners for the development and operation of a gaming project. *See* AR 742-73.

The Department took almost two years to reach a decision on the Tribe's request. During the time when it was considering the request, the Defendants and other Department staff met with representatives of the Tribe on several occasions. *E.g.*, AR 2537, 2546, 2550; Ex. A at ¶¶ 4-11 (Declaration of Richard Farber). During one of these meetings, Department staff directly told the Tribe that the Department planned to seek input from Alaska political leaders, including Alaska's congressional delegation ("Alaska Delegation"), and that their support for the project would be needed in order for the Department to issue a positive Indian lands

---

[2] For the sake of clarity, the Tribe notes that the two letters comprising the Tribe's initial submission are reversed in the administrative record index produced by the Department, ECF No. 28-2. The letter appearing at AR 774-77, which is labeled in the index as "Native Village of Eklutna Request for Indian Lands Determination Regarding Ondola Allotment," is in fact the cover letter for the exhibits in support of the request. The letter appearing at AR 778-807, which is labeled in the index as "Exhibits in support of Request for Indian Lands Determination," is in fact the request for an Indian lands determination.

determination.  Farber Decl. ¶ 9; Ex. B at ¶ 6 (Declaration of Anthony Marnell III).  Defendant

Cason also stated at a meeting with the Tribe that the Secretary of the Interior had been "working

closely" with Senator Murkowski and that his office had "reached out to maintain good relats."

(presumably a reference to good relations or relationships) with Senator Murkowski.  AR 2544.

And indeed, the record thus far—the limited portion produced by the agency to date—

demonstrates that the Department did in fact seek, receive, and consider the views of political

officials during the decision-making process.

       As a starting point, representatives of the Tribe were informed by a senior Department

official that the Department engaged in communications with representatives of the Alaska

Delegation on multiple occasions.  Farber Decl. ¶ 13.  More specifically, in at least one instance

the record shows that high-level Departmental political appointees—including Defendants

Associate Deputy Secretary Cason and Principal Deputy Assistant Secretary-Indian Affairs

Tahsuda, Senior Advisor to the Secretary on Alaska Affairs Steve Wackowski, and others—met

with representatives of the Alaska Delegation and state political leaders without any

representatives of the Tribe present.  *See* Compl. ¶ 95; Ans. ¶ 95, ECF No. 18; AR 2553-55.  At

one such meeting on April 4, 2018, the Department heard the views of *every member* of the

Alaska Delegation[3] and the Governor of Alaska regarding the Tribe's request.  AR 2555.  At this

meeting, staff for Senator Lisa Murkowski specifically expressed concerns about the project

based on "concerns for gaming effects statewide," and based on the fact that the Senator was

"not a fan of gaming."  *Id.*  At the same meeting, Defendant Cason stated that the Department's

---

[3] During the relevant time period, Alaska's congressional delegation included Senator Lisa
Murkowski, Senator Dan Sullivan, and Congressman Don Young.  *See* Congressional Pictorial
Directory, S. Prt. 115–4, at 4 (2018), *available at* https://www.govinfo.gov/content/pkg/GPO-
PICTDIR-115/pdf/GPO-PICTDIR-115.pdf.

decision was "largely done" but then explicitly acknowledged that "other Alaska issues may affect" it.  *Id.*  Meanwhile, the Department had made repeated representations to the Tribe that it would issue a decision on the Tribe's request soon, initially promising to issue a decision by the end of 2017.  Farber Decl. ¶ 9.  As that date came and went, the Department continued to communicate with political representatives, while the Tribe continued to press for a decision.

In May 2018, Senator Murkowski directly expressed her disapproval for the proposed project to the Tribe's President and Tribal Administrator, stating that her objections were based on personal and moral objections to Indian gaming.  Farber Decl. ¶ 12; Ex. C at ¶ 7 (Declaration of Aaron Leggett).

The Department finally issued its decision on June 18, 2018.  AR 2122-39 ("Decision").  The Decision concluded that the Ondola Allotment does not constitute "Indian lands" within the meaning of § 2703(4)(B) of IGRA.  *Id.*  The written explanation issued by the Department relied heavily on a 1993 M-Opinion issued by Department Solicitor Thomas L. Sansonetti.  AR 2127-38; *see also id.* at 2140-2275 (Sansonetti Opinion).  The Department also disapproved the Tribe's proposed lease in a half-sentence conclusion on the final page of the written decision.  AR 2139.

## B.  Proceedings in This Action

Eklutna filed this action on August 7, 2019, seeking judicial review of the Department's decision under § 706 of the APA.  Compl. ¶ 5.  In its Complaint, Eklutna alleges that the Department's decision was arbitrary and capricious, in violation of IGRA and the APA, because it misapplied controlling law (Count I) and because it was improperly influenced by political considerations (Count II).  *Id.* ¶¶ 101-16, 117-22.  Eklutna also alleges that the Department's

denial of the Tribe's proposed gaming lease was arbitrary and capricious because it rested solely on the flawed Indian lands determination (Count III). *Id.* ¶¶ 123-27.

Relating to the improper political influence claim in Count II, which is at the heart of the current Motion, Eklutna alleges in the Complaint that the Department sought, received, and relied on the views of political officials. This includes specific allegations that: Defendant Cason stated he would need to know the views of the Alaska Delegation, *id.* ¶ 89; that on a separate occasion Department staff stated he was certain Defendant Cason would seek the views of the Alaska Delegation, *id.* ¶ 91; that Department staff stated on multiple occasions that the outcome of the Department's decision might depend on political considerations, *id.* ¶ 94; that the members of the Alaska Delegation and their staff communicated their views on the Tribe's request and proposed project to the Department during the Department's decision-making process, *id.* ¶ 93; that Department employees, including Defendant Cason, had multiple meetings with the Alaska Delegation during the decision-making process, including a meeting on April 4, 2018, *id.* ¶¶ 95-96; that the Department's decision was repeatedly delayed while discussions with political officials and their representatives continued, *id.* ¶¶ 90, 92; and that the Department's final decision ultimately relied on improper political considerations, *id.* ¶ 121.

In its Answer, the Department admitted that several of the communications alleged by the Tribe had occurred, including the meeting with political representatives on April 4, 2018. Ans. ¶ 95. The Department nonetheless denied that its decision had been improperly influenced by political considerations. *Id.* ¶¶ 121-22.

The Department produced an initial administrative record on February 14, 2020. ECF No. 28-2 (Index for AR 1-2275). This initial record was plainly deficient on its face. Among other flaws, the initial record omitted numerous documents that the Department cited and relied

on in the written decision.  *See* ECF No. 29, at ¶ 2.  It also contained long temporal gaps, including a six-month gap leading up to the issuance of the Department's decision on June 18, 2018, during which the record (as produced) included no materials whatsoever.  *See* AR 2122. Prior to the date of the decision, the last item in the record was an email from the Tribe's counsel (Mr. Hampson) to the Department on December 20, 2017, responding to a number of questions from the Department.  AR 2114.  And despite the Tribe's allegations regarding improper political influence, including specific allegations about meetings to which the Department had admitted in its Answer, *see* Ans. ¶¶ 89, 95, the initially produced record contained no documentation of such meetings.  In several instances the initial record contained emails referencing meetings with the Tribe but then included no documentation or notes from the meetings themselves.  *E.g.*, AR 2111 (email dated December 13, 2017, referencing a call with Tribal representatives on the preceding Monday); AR 2062, 2065, 2068 (emails referencing an upcoming meeting on August 15, 2017).  Indeed, the initial record contained *no* internal documentation of meetings, discussions, or memoranda regarding Eklutna's request, but instead primarily consisted only of the Tribe's own submissions, *e.g.*, AR 62-741, 774-1238, 1244-55, 1405-1898, 2005-31, 2039-48, 2051-61, 2071-91, 2095-2110, and of communications between the Department and the Tribe, *e.g.*, AR 2032-34, 2037-38, 2049-50, 2062-70, 2111-21.

When the Tribe brought these flaws to the Defendants' attention,[4] the Department agreed to supplement the administrative record with the documents that had been cited in the written

---

[4] The Tribe asked the Department to supplement the initial record with "any and all relevant documents that have not yet been included in the record" and a privilege log "[t]o the extent that the Department asserts that any of the omitted documents may be withheld on the basis of privilege," noting that the initial record includes only one reference to an attorney-client communication and four references to redactions of personally-identifiable information, and it was "highly unlikely that the Department holds only one document related to the decision that

decision.  AR 2276-2536; *see* ECF No. 31-2 (Index for AR Supplement); ECF No. 29, at ¶ 2

(Joint Motion describing parties' discussions and Department's intent to supplement).  The

Department also agreed to conduct an additional search for record material relating to the

meetings the Tribe had identified in its Complaint.  ECF No. 29, at ¶ 3.  Through this process,

the Department identified a notebook that might contain record material that should have been

produced, though the Department represented that the notebook was "extremely unlikely to[]

contain record material." *Id.*  Nonetheless, the Tribe opted to wait until Department staff were

able to review the notebook. *Id.*  When Department staff reviewed the notebook, they

determined that it did in fact contain record material, and the Department supplemented the

administrative record with notes from four meetings and phone calls documented in the

notebook.  AR 2537-55; *see* ECF No. 31-2, at 2-3; ECF 30, at 1-2 (Joint Status Report).  The

Department's supplement also included the materials cited in the written decision, as discussed

above.  AR 2276-2536.

     The meeting notes produced in the supplemental administrative record included the

August 15, 2017 meeting and the December 11, 2017 phone call specifically referenced in other

portions of the record, and another phone call with the Tribe on April 3, 2018.  AR 2537-52.

Crucially, the supplement also included notes from the April 4, 2018 meeting between the

Department and Alaska political officials.  AR 2553-55.  As discussed above, these notes reflect

that the officials did discuss Eklutna's request at this meeting, despite the Department's earlier

representations to the contrary.  The Department did not provide any explanation as to why this

record material had not been produced in the original compilation of the administrative record.

---

includes attorney-client communications."  Ex. D, Attachment 1 (Letter from C. Hampson and
W. Leonard to K. Swanson (Mar. 12, 2020)).

### III.    LEGAL STANDARD

In APA cases, a court's review of agency action is "to be based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977). To allow the court to conduct such a review, "[i]t is the agency's responsibility to compile for the court all information it considered either directly or indirectly." *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010) (citation omitted); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574 (2019).

The record typically does not include "material that reflects internal deliberations," *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005) (citation omitted), in recognition of the general principle that "inquiry into the mental processes of administrative decisionmakers is usually to be avoided," *Overton Park*, 401 U.S. at 420 (citation omitted). But in laying out the foundational principles of judicial review of administrative actions, the Supreme Court explained in *Overton Park* that a "court may require the administrative officials who participated in the decision to give testimony explaining their action" if there has been "a strong showing of bad faith or improper behavior." *Id.*

In accordance with this principle, the deliberative process privilege only applies "absent a showing of bad faith or improper behavior." *Oceana, Inc v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019). It does not apply in "circumstances in which the cause of action is directed at the agency's subjective motivation." *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 156 F.3d 1279, 1280 (D.C. Cir. 1998); *see also In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) ("[W]here there is reason to believe the documents sought may shed light on government misconduct, 'the [deliberative process] privilege is routinely denied.'" (citation

omitted)); *Stand up for California! v. U.S. Dep't of Interior*, 315 F. Supp. 3d 289, 296-98
(D.D.C. 2018) (ordering production of a privilege log to identify whether the privilege was
properly applied).

The Supreme Court recently reiterated this principle in a case challenging the
government's pretextual rationale for adding a citizenship question to the census, in which the
Court held that extra-record discovery was justified under the principle that "[o]n a 'strong
showing of bad faith or improper behavior,'" inquiry into decisionmakers' mental processes
"may be warranted and may justify extra-record discovery." *Dep't of Commerce*, 139 S. Ct. at
2573-74 (quoting *Overton Park*, 401 U.S. at 420). In sum, as the D.C. Circuit has explained, "if
a party makes a significant showing—variously described as a strong, substantial, or prima facie
showing—that it will find material in the agency's possession indicative of bad faith or an
incomplete record, it should be granted limited discovery." *Air Transp. Ass'n of Am., Inc. v.
Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011) (citing, *inter alia*, *Overton Park*,
401 U.S. at 420).

Importantly, such a showing does not require the plaintiff to *prove* that improper behavior
or bad faith conduct occurred on the basis of existing evidence; rather, at the discovery stage the
plaintiff must only show "grounds to *suspect* bad faith or improper behavior," *Cmty. Fed. Sav. &
Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983) (emphasis added)
(citations omitted), or that it "*will find* material" indicating improper behavior, *Air Transp. Ass'n
of Am.*, 663 F.3d at 487–88 (emphasis added); *see also New York v. Salazar*, 701 F. Supp. 2d
224, 243 (N.D.N.Y. 2010) ("Realistically, . . . a court cannot require a plaintiff to present
conclusive evidence of political improprieties to support a request for discovery." (citation
omitted)). In determining whether this showing has been made, courts consider the existing

evidence as a whole.  So even if each individual fact or piece of evidence "is not dispositive standing alone," the circumstances may "all together establish a *prima facie* case."  *Stand Up for California!*, 315 F. Supp. 3d at 296.  Thus, "courts 'should not overlook plausible, competing inferences that might be drawn from the evidence presented,' and . . . even if 'events of which plaintiffs complain could be considered innocent in and of themselves . . . their combination [may] raise[] substantial suspicion.'"  *Id.* at 298 (quoting *Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1281, 1286 (W.D. Wis. 1997)) (second alteration in original).

Where the plaintiff has established that discovery is appropriate, the scope of that discovery varies with the strength of the showing made by the plaintiff.  As *Overton Park* itself acknowledged, depositions of "administrative officials who participated in the decision" may be permitted if there has been "a strong showing of bad faith or improper behavior."  *Overton Park*, 401 U.S. at 420.  In this context, "the more senior the official to be deposed the stronger the showing to be demanded."  *Cmty. Fed. Sav. & Loan Ass'n*, 96 F.R.D. at 621; *see Dep't of Commerce*, 139 S. Ct. at 2564, 2574 (allowing deposition of Acting Assistant Attorney General to proceed but suggesting that deposition of Secretary of Commerce would not have been warranted); *New York v. Salazar*, 701 F. Supp. 2d at 243 (permitting deposition of Defendant Cason (in a matter unrelated to the current case) because plaintiffs had "made a sufficient showing to warrant limited discovery on the issue of bias and bad faith").  In addition, where the agency has produced "an inadequate administrative record," circumstances "may warrant a deposition of an agency official where it might not otherwise be appropriate if there is no other way to effect judicial review" on the relevant issues.  *Cmty. Fed. Sav. & Loan Ass'n*, 96 F.R.D. at 621 (citations omitted).  And "the deposition of an agency official may be permitted when the official has relevant first-hand personal knowledge of matters material to the decision which are

not a part of the administrative record and not available from some other source." *Id.* (citations omitted).

Finally, even if a plaintiff has not made a sufficiently strong showing to justify deposition of agency officials, courts may still permit other forms of discovery.  In such circumstances, courts will, for instance, order the agency to produce a privilege log showing all documents that were withheld on the basis of the deliberative process privilege, to determine whether the privilege was properly asserted.  *E.g.*, *Stand Up for California!*, 315 F. Supp. 3d at 298 (holding that the "combination of circumstances . . . establishes a *prima facie* case to warrant ordering the production of a privilege log").  Courts may also, of course, simply order production of the documents withheld from the administrative record on that basis, if the court has determined that the plaintiff has made a sufficient showing of bad faith or improper behavior such that "the deliberative process privilege does not shield certain predecisional documents withheld by the agency."  *New York v. Salazar*, 701 F. Supp. 2d at 244; *see also Dep't of Commerce*, 139 S. Ct. at 2574 (upholding district court's order compelling agency to complete administrative record).

## IV.   ARGUMENT

### A.   The Existing Evidence Strongly Indicates Improper Agency Behavior and Bad Faith Conduct.

Even with the limited administrative record produced by the Defendants here, the evidence strongly indicates that the Department engaged in improper behavior and bad faith conduct by seeking and relying on political views in its decision regarding the Tribe's request. Under any articulation of the applicable standard—whether it be "described as a strong, substantial, or prima facie showing"—extra-record discovery is therefore warranted.  *See Air Transp. Ass'n of Am.*, 663 F.3d at 487.

An agency's consideration of political views is improper when it causes the agency "to rely on 'considerations not made relevant by Congress in the'" applicable statute. *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 63 (D.D.C. 2019) (quoting *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971)); *see also Sierra Club v. Costle*, 657 F.2d 298, 409 (D.C. Cir. 1981) (improper political influence justifies reversal of the agency decision if "factors not made relevant by Congress in the applicable statute" affect the Secretary's ultimate decision).  So, for instance, where a plaintiff alleged in another IGRA-related case that "the Secretary [of the Interior] had private meetings and conversations with a United States Senator . . . and the White House Deputy Chief of Staff . . . , both of whom pressured the Secretary to not approve the proposed" amendment to tribal gaming procedures, and where a "United States Representative . . . similarly pressured Assistant Deputy Secretary of the Interior James Cason," this Court found the plaintiffs had "plausibly alleged that significant political pressure was brought to bear on the issue and the Secretary may have improperly succumbed to such pressure." *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d at 64-65.  Similarly, where the Department dramatically shifted its timeline for reaching a decision on a tribal land-into-trust issue on the eve of a change in Administration, made inconsistent remarks about what was driving the timeline, and received "political pressure from the Senate Committee on Indian Affairs," this Court concluded the evidence "establish[ed] a *prima facie* case that the Department acted improperly in making its decision," justifying extra-record discovery.  *Stand Up for California!*, 315 F. Supp. 3d at 296, 298.

Here, the statutory provision under which the Tribe sought a determination is § 2703(4)(B) of IGRA, which provides:

> The term "Indian lands" means—
>
> . . .
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

This provision speaks to a purely legal and factual determination.  By its plain terms, it leaves no room for political considerations.[5]  Accordingly, *any* reliance on political views falls outside the "'considerations . . . made relevant by Congress in the' IGRA." *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d at 63 (citation omitted); *cf. Sokaogon Chippewa Cmty.*, 961 F. Supp. at 1281 (finding "strong showing" of improper political influence even where the relevant IGRA provision, 25 U.S.C. § 2719(b)(1)(A), expressly requires consultation with political officials).

The evidence available thus far, which indisputably demonstrates that the Department sought and received communications from multiple political officials and which includes multiple indications that the Department considered these views, makes a strong showing that the agency relied on these improper political considerations in reaching its decision.  As a starting point, the Defendants admit in their Answer that the Department received communications from "at least one member of the Alaska Delegation" regarding the Tribe's request for an Indian lands determination, Ans. ¶ 93, and evidence in the record demonstrates that the Department actually

---

[5] Where Congress intended for political views to be considered under IGRA, it said so expressly. For example, 25 U.S.C. § 2719(b)(1)(A) requires the Secretary to consult with "appropriate State and local officials, including officials of other nearby Indian tribes," in connection with a determination to authorize gaming on land acquired into trust after 1988, and that the governor of the relevant state concur in such determination.  The fact that Congress expressly discussed consultation with political officials in one provision of IGRA (§ 2719) but omitted it from another (§ 2703) is strong evidence that it did not intend for § 2703 to include consideration of political officials' views.  *See Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) ("We have long held that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (alteration in original) (quoting *Bates v. United States*, 522 U.S. 23, 29–30 (1997))).

sought and received the views of *every member* of the Alaska Delegation as well as state political leaders, AR 2555.  Additional evidence fills in other pieces of the puzzle.

Relatively early in the Department's decision-making process, as alleged in the Tribe's Complaint, the Tribe and its representatives were directly informed by Department staff that Defendant Cason and other Department officials would certainly seek the views of the Alaska Delegation, and Eklutna's tribal administrator was made to understand that Defendant Cason wanted to hear Senator Murkowski's views in particular.  Compl. ¶ 91; Farber Decl. ¶ 13.  These communications alone suggest that the Department intended to consider "factors not made relevant by Congress" in § 2703(4)(B).  *Sierra Club*, 657 F.2d at 409.  Defendant Cason conveyed this same message directly to tribal leaders during a formal meeting to discuss the Tribe's request on August 15, 2017, stating that the Alaska Delegation's support would be needed in order for the Tribe's proposed project to go forward.  Farber Decl. ¶ 9; Marnell Decl. ¶ 6.  The notes of a Department attorney from this meeting reflect that Mr. Cason's office was in frequent communication with Senator Murkowski, as Mr. Cason stated that his office was "working closely" with the Senator and was making efforts "to maintain good relats." (presumably "relations" or "relationships") with her.  AR 2544.

Shortly after that meeting, Mr. Cason informed a tribal consultant that he did not believe there were any substantive legal issues that would be a barrier for the Tribe's request.  Marnell Decl. ¶ 5.

As the decision-making process dragged on, in late 2017 or early 2018 the Tribe learned that the Department may have delayed its decision on the Tribe's submission at the request of Senator Murkowski's office, to give the Senator more time to study the proposed project.  Farber Decl. ¶ 13.  Thus, despite the fact that the Department had initially promised to issue a decision

15

by the end of 2017, it did not reach a decision by that date and instead repeatedly told the Tribe

that it needed additional time.  Compl. ¶¶ 90, 92.  Such shifts in timing can be indicative of

political pressures that altered the agency's normal decisional timeline.  Just as the "clearly

hurried review process" in *Stand Up for California!* was evidence of improper political influence

even though it was "not dispositive standing alone," 315 F. Supp. 3d at 296, so too, the

unexplained delay here suggests the presence of improper political influence when it is viewed in

combination with the surrounding circumstances.  Moreover, the Department continued to

represent to the Tribe that it simply needed more time to complete its analysis of the Tribe's

request.  Farber Decl. ¶ 11.  Making this representation to the Tribe while in fact buying time to

consider elected officials' views is further evidence of bad faith conduct.

     High-level Department employees, including both political appointees and members of

the Solicitor's Office, then met directly with staff for the Alaska Delegation and other state

political leaders on April 4, 2018.  *See* AR 2553-55.  The Tribe was not present at this meeting

but learned about it through informal conversations with Department staff, and specifically

alleged in its Complaint that the meeting had taken place.  Compl. ¶ 95.  The Defendants

admitted to the meeting in their Answer, Ans. ¶ 95, but did not include any materials from this

meeting in the originally produced administrative record, *see* ECF 28-2; AR 1-2140.  When the

Tribe pressed the Defendants on this omission (as well as others), the Department eventually

produced the meeting notes that are now in the record, as discussed above.[6]  *See* AR 2553-55.

---

[6] There appear to be several minor errors in the transcription of the meeting notes in the record.
The date at the beginning of the notes for the April 3 phone call is transcribed as "9/3/2018" on
AR 2552, but the original notes on AR 2551 appear to say "4/3/2018."  Similarly, the date at the
beginning of the April 4 meeting notes is transcribed as "4/13/2018" on AR 2555, while the
original notes on AR 2554 appear to say "4/4/2018."  The last line of the notes before the
redaction on AR 2555 is transcribed as "pretty new future," while the original notes on AR 2554

These notes show that meeting included Defendant Cason, Defendant Tahsuda, Senior Advisor Steve Wackowski, and attorneys from the Solicitor's Office, as well as multiple representatives of Alaska political leaders, including Senator Murkowski's chief of staff.  AR 2553 (partial attendee list); *see* AR 2552 ("[Murkowski's] COS will be here tomorrow").

At this meeting the Department staff heard the views of the entire Alaska Delegation, the Governor of Alaska, and state political representatives regarding the Tribe's request and proposed project.  AR 2555.   Those views are reflected in the notes, which record that Congressman Don Young ("DY") was "supportive of [the] project" and that Senator Dan Sullivan and Governor Bill Walker were both "neutral."  *Id.*  The notes show that Senator Murkowski, however—in whose views the Department had indicated a particular interest—had "concerns for gaming effects statewide / state-level action" and was "not a fan of gaming."  *Id.* Moreover, the notes directly show that Defendant Cason was considering factors beyond the narrow legal and factual issues relevant to the Tribe's request: he specifically explained to the political representatives that although the determination on the Tribe's request was "largely done," "other Alaska issues may affect [it]."  *Id.*  Even viewed in isolation, this statement evidences an agency decisionmaker's reliance on "factors not made relevant by Congress in the [IGRA]."  *See Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d at 63 (citation omitted). When viewed "in tandem with the other circumstances," *Stand Up for California!*, 315 F. Supp. 3d at 298—particularly as part of the Department's statements that it would need to know the views of members of the Alaska delegation, its direct discussion with political representatives and the sharing of their political views on the Tribe's proposed project—Defendant Cason's

---

appear to say "pretty near future."  These transcription errors do not appear to be significant, and counsel notes them merely to avoid confusion.

statement provides strong evidence that the Department was swayed by improper political considerations in making its decision.[7]

Moreover, Senator Murkowski directly expressed to tribal leaders that her objections to the Tribe's proposed project were moral and personal, and that she believed gaming would "change" the Alaska Native people.  Farber Decl. ¶ 12; Leggett Decl. ¶ 7.  This statement removes any doubt that the political views considered by the Department lay far outside the factors "made relevant by Congress" in IGRA.  Indeed, a moral objection to Indian gaming is antithetical to the very purpose of IGRA, which is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  The Department's reliance on political views driven by a moral disapproval of Indian gaming, therefore, undermines both the purpose and text of IGRA; in short, it provides a textbook illustration of improper political influence.

After two years of delay, the Department then finalized and issued a written decision two months after hearing from the Alaska Delegation at the April 4 meeting, issuing a negative Indian lands determination on June 18, 2018.[8]  AR 2122-39.  The Department has not yet

---

[7] During this time, Senator Murkowski was Chair of the Senate Appropriations Subcommittee on Department of the Interior, Environment, and Related Agencies, as well as being Chair of the Senate Committee on Energy and Natural Resources.  *See* S. of the United States, Comm. & Subcomm. Assignments for the 115th Cong., S. Pub. 115–4, at 4, 12 (Apr. 4, 2017), https://www.govinfo.gov/content/pkg/GPO-CPUB-115spub4/pdf/GPO-CPUB-115spub4.pdf.  She therefore had direct control over the Department's budget, further adding to the impression that Department staff were susceptible to being influenced by her views.  *See, e.g.*, *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1245 (D.C. Cir. 1971) (Congressman's threat to withhold appropriations until agency approved a particular project constituted improper political influence).

[8] The fact that the decision was issued by Acting Assistant Secretary – Indian Affairs Tahsuda is itself highly unusual, as Indian lands determinations are generally issued by the Solicitor's Office or the National Indian Gaming Commission.  *See, e.g.*, Nat'l Indian Gaming Comm'n, Indian

produced any other documents relating to communications that took place between the April 4
meeting and the June decision (including one meeting that the Tribe itself attended, *see* Farber
Decl. ¶ 11), or relating to prior meetings or phone calls (other than a handful of notes recording
meetings that that the Tribe also attended, *see* AR 2537-52).  In fact, the record still contains
long temporal gaps during the Department's decision-making process, which are only partly
filled by the handful of meeting notes the Department produced in the supplemental
administrative record.  These gaps themselves suggest the Department may be improperly
withholding documents showing the true nature of the Department's decision-making process.
*See* Transcript of Order at 80-81, *New York v. U.S. Dep't of Commerce* (S.D.N.Y. July 3, 2018)
(No. 18-CV-2921), ECF No. 205 ("the absence of virtually any documents" during a particular
timeframe "was hard to fathom"), *aff'd*, 139 S. Ct. 2551 (2019).

   Nonetheless, the evidence that does exist is more than enough to make a strong showing
of "grounds to suspect bad faith or improper behavior," justifying discovery.  *Cmty. Fed. Sav. &
Loan Ass'n*, 96 F.R.D. at 621.  At a bare minimum, evidence in the record establishes that the
Department had expressed a clear interest in working to "maintain good relat[ion]s" with Senator
Murkowski, AR 2544, and so her views on the project were relevant to their decision-making;
that on at least one occasion Senator Murkowski's staff directly expressed to the Department the
Senator's disapproval for the project, AR 2555; and that Department staff stated on multiple
occasions that outside considerations might affect the determination, AR 2555; Farber Decl.
¶¶ 9, 13.  Like the combination of events in *Stand Up for California!*, these circumstances "all

---

Lands Opinions, https://www.nigc.gov/general-counsel/indian-lands-opinions (last accessed June
25, 2020) ("Indian lands opinions are issued by either the Commission or the Department of the
Interior, Division of Indian Affairs, Office of the Solicitor.").  Here the involvement of high-
level political appointees within the Department, including Defendants Cason and Tahsuda,
further suggests that improper political considerations factored into the decision.

together establish a *prima facie* case" to warrant discovery, even if each one may not be "dispositive standing alone." 315 F. Supp. 3d at 296. "Realistically, . . . a court cannot require a plaintiff to present *conclusive* evidence of political improprieties to support a request for discovery," *New York v. Salazar*, 701 F. Supp. 2d at 243 (emphasis added) (citation omitted), because the very purpose of discovery is to allow the plaintiff an opportunity to uncover such evidence.[9] Here, the Tribe has made a strong showing "that it will find material in the agency's possession indicative of bad faith or an incomplete record, [and] it should be granted limited discovery." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011) (citations omitted).

**B.      The Tribe is Entitled to Extra-Record Discovery Including Depositions of Department Officials, Production of All Documents Improperly Withheld, Including Those Withheld Under the Deliberative Process Privilege, and a Privilege Log.**

Based on the strong showing of improper political influence in the Department's decision-making process, the Tribe has established that the deliberative process privilege does not apply here, that the Department should produce any additional record material it has withheld, and that the Tribe is entitled to the full (albeit limited) range of discovery available in APA cases involving improper agency behavior and bad faith.

First, the Tribe's strong showing of improper behavior meets the standard for allowing depositions of key Department officials, who may be "require[d] . . . to give testimony explaining their action" if such a showing has been made. *Overton Park*, 401 U.S. at 420. The

---

[9] Courts have accordingly granted discovery in circumstances where the evidence identified by the plaintiffs was significantly less detailed than the evidence here. In granting a motion for discovery in *Sokaogon Chippewa Community v. Babbitt*, for instance, the court explained: "[P]laintiffs have not been able to specify exactly what was communicated between Fowler or Ickes and Department of the Interior officials, but that is primarily because they have not had the opportunity to ask these individuals about the contacts." 961 F. Supp. at 1286.

fact that the Department has produced a facially "inadequate administrative record," as discussed

above, further "warrant[s] a deposition of an agency official" or officials. *Cmty. Fed. Sav. &*

*Loan Ass'n v*, 96 F.R.D. at 621 (citation omitted).  As courts have recognized, depositions may

be particularly necessary under circumstances such as those here because "agency officials are

not likely to keep . . . written records of improper political contacts." *New York v. Salazar*, 701

F. Supp. 2d at 243 (quoting *Sokaogon Chippewa Cmty.*, 961 F. Supp. at 1281); *cf. Dep't of*

*Commerce*, 139 S. Ct. at 2564, 2574 (concluding that deposition of Justice Department official

(but not Secretary of Commerce) was justified by evidence of improper conduct).  The Tribe

therefore respectfully requests leave to depose Defendant Cason, Defendant Tahsuda, and Senior

Advisor Steve Wackowski, all of whom were personally involved in the Department's review of

the Tribe's request or the Department's decision and all of whom participated in the April 4,

2018 meeting with Alaska political representatives.[10]  AR 2555.  Depositions of these

Department officials are appropriate because, due to their personal participation in discussions

regarding the decision, each of these "official[s] has relevant first-hand personal knowledge of

matters material to the decision which are not a part of the administrative record and not

available from some other source." *Cmty. Fed. Sav. & Loan Ass'n v*, 96 F.R.D. at 621.[11]

    In addition to depositions, the Tribe is also entitled to an order compelling the

Department to produce documents it has withheld on the basis of the deliberative process

privilege.  The Department has taken an overly narrow view of what constitutes the

---

[10] In the event that discovery reveals information about other Department officials who had communications with political decisionmakers regarding the Tribe's request, there may be a need to depose other individuals as well.  The Tribe reserves the right to request additional depositions on this basis.

[11] At a minimum, the Department should be ordered to respond to interrogatories and written deposition questions regarding contacts with Alaska political representatives and the Indian lands determination.

administrative record in this case, suggesting that the deliberative process privilege allows the agency to withhold any documents relating to the Department's internal deliberations and communications.  But as discussed above, the deliberative process privilege only applies "*absent a showing of bad faith or improper behavior.*"  *Oceana, Inc v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (emphasis added); *see also In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 156 F.3d 1279, 1279-80 (D.C. Cir. 1998); *cf. In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) (noting that the deliberative process privilege is "routinely denied" in various types of litigation "where there is reason to believe the documents sought may shed light on government misconduct" (citation omitted)).  The Tribe has made precisely such a showing here. The Tribe is therefore entitled to production of the documents the Department withheld on the basis of the deliberative process privilege.  *See, e.g.*, *New York v. Salazar*, 701 F. Supp. 2d at 244 (directing the Department "to produce to the plaintiffs all documents that were withheld from the administrative record solely on the basis of the deliberative process privilege" after finding plaintiffs had adequately shown improper political influence).

The gaps in the record—particularly the lack of *any* documents during the six-month span between December 2017 and the June 2018 decision, other than the few pages of meeting notes the Tribe specifically pressed the Department to provide—suggest the Department may also have withheld documents that are not necessarily protected by the deliberative process privilege even if it did apply.  *See* Transcript of Order at 80-81, *New York v. U.S. Dep't of Commerce*, (No. 18-CV-2921), ECF No. 205 (citing "the absence of virtually any documents" during a particular timeframe as one reason for ordering record supplementation and granting extra-record discovery).  This impression is amplified by the Department's initial failure to produce notes that it now acknowledges constitute record material.  The Department's own

guidance specifies that "[s]ubstantive meetings that are relevant to the decision-making process should be sufficiently documented" contemporaneously during the decision-making process, and that, among other things, "[m]inutes, transcripts of meetings, and other memorializations of telephone conversations and meetings, including personal memoranda or handwritten notes that were circulated to colleagues or added to the Decision File" should be included in the administrative record. U.S. Dep't of Interior, Standardized Guidance on Compiling a Decision File and an Administrative Record, at 4, 7-8 (June 27, 2006), https://www.fws.gov/midwest/endangered/permits/hcp/pdf/DecFileAdminRecordGuidance.pdf. [12] Yet here, the record is almost entirely lacking in such internal documents; in some cases the record produced by the agency even lacks documentation of meetings the Tribe itself attended. *See, e.g.*, Farber Decl. ¶¶ 5, 7, 11 (describing meetings between tribal representatives and Department employees on June 29, 2016, August 8, 2016, and May 7, 2018). Given that Department employees are instructed to keep contemporaneous documentation of meetings and internal communications, and to include this documentation in the administrative record, the nearly complete lack of such documents here suggests that the Department has not completed a thorough search of its files or has erroneously withheld record material. The Tribe is entitled to production of all record material relating to the Department's consideration of the Tribe's request, including any documents that have thus far been erroneously withheld. *Cf. Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010) ("If an agency did not include materials that were part of its record, whether by design or accident, then supplementation is appropriate." (citation

---

[12] While the guidance notes that personal memorializations need not always be included in the administrative record if they were not circulated to colleagues, in "situations where a personal memorialization is the only evidence that a relevant meeting occurred or contains substantive evidence relevant to the decision-making process, it may be necessary to include a personal memor[i]alization in an AR [Administrative Record]." *Id.* at 9-10.

omitted)); *see also Dep't of Commerce*, 139 S. Ct. at 2574 (upholding district court's order compelling agency to complete administrative record).

Even if this Court chooses not to order production of documents outright, at a minimum the Tribe is entitled to the production of a privilege log identifying all documents that the Department withheld on the basis of privilege.  This would allow the Court to evaluate whether the privilege was properly applied and order the production of documents that are not in fact protected by the deliberative process privilege.  While production of a privilege log is generally only available in cases where the plaintiff has made a *prima facie* showing of bad faith or improper behavior, as is the case here, it is a common first element of discovery in such cases. *See, e.g.*, *Stand Up for California!*, 315 F. Supp. 3d at 298 (ordering production of a privilege log despite denying other related requests); *New York v. Salazar*, 701 F. Supp. 2d at 244 (ordering direct production of documents and production of a privilege log covering any documents not produced).

Due to the strength of the showing the Tribe has made, the Tribe is entitled to depositions of agency officials and production of documents improperly withheld on the basis of the deliberative process privilege.  But even if the Court opts for a more step-by-step approach to discovery, it should begin by ordering the government to complete the administrative record by producing any non-privileged documents that have not yet been produced, including dates for each document, and to produce a privilege log for any documents still withheld on the basis of any asserted privilege.

## V.      CONCLUSION

The Native Village of Eklutna has made a strong showing of improper political influence and bad faith conduct by the Department, pointing to evidence that the Department actively sought and relied on the views of political officials in its decision-making process, which ultimately influenced the Department's decision on the Tribe's request for an Indian Lands determination.  The Tribe therefore respectfully requests an order granting the Tribe leave to take oral depositions of Defendant Cason, Defendant Tahsuda, and Senior Advisor Steve Wackowski, and to serve interrogatories and written deposition questions on Defendant Cason, Defendant Tahsuda, and Senior Advisor Wackowski.  The Tribe further requests an order compelling the Defendants to produce: (1) all documents relating to the Tribe's request that were previously withheld from the record on the basis of the deliberative process privilege; (2) all relevant non-privileged documents that were erroneously withheld from the original administrative record and the supplemental administrative record; and (3) a privilege log identifying all relevant documents that were withheld on the basis of any assertion of privilege, and identifying the privilege asserted for each.

Respectfully submitted this 26th day of June 2020.

SONOSKY, CHAMBERS, SACHSE,
   ENDRESON & PERRY, LLP

By:    */s/ Colin C. Hampson*
          Colin Cloud Hampson, D.C. Bar No. 448481
          145 Willow Road, Suite 200
          Bonita, CA 91902
          Telephone: (619) 267-1306
          Facsimile: (619) 267-1388
          champson@sonoskysd.com

          Whitney A. Leonard
          Alaska Bar No. 1711064
          Montana Bar No. 36409732

Pro hac vice
Sonosky, Chambers, Sachse, Miller &
  Monkman, LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
Telephone:  (907) 258-7388
Facsimile:  (907) 272-8332
whitney@sonosky.net

*Attorneys for the Native Village of Eklutna*