## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIVE VILLAGE OF EKLUTNA,    )
    )
        Plaintiff,    )
    )
v.    )
    )
U.S. DEPARTMENT OF THE INTERIOR, )
et al.,    ) Case No. 1:19-cv-02388 DLF
    )
        Defendants,    )
    )
and    )
    )
STATE OF ALASKA,    )
    )
        Intervenor-Defendant.  )
_____)

## REPLY TO OPPOSITION TO MOTION OF THE
## ALASKA CHARITABLE GAMING ALLIANCE TO INTERVENE

The Native Village of Eklutna (NVE) concedes that this motion was timely filed. Nevertheless, it opposes the motion.

First, because the Alaska Charitable Gaming Alliance (ACGA) has not demonstrated that it has Article III standing because it has not demonstrated that any of its members will suffer an injury-in-fact if NVE prevails on any of the causes of action alleged in its complaint and, as a consequence, opens a casino on the Ondola allotment whose gaming floor will contain five hundred video gaming machines. Second, because ACGA has not demonstrated that its interest in the court's adjudication of NVE's causes of action will not be adequately represented by the federal defendants and intervenor-defendant State of Alaska. And third,

1

because ACGA's legal arguments are "legally unfounded and frivolous" and ACGA's counsel having the temerity to suggest otherwise constitutes "vexatious" conduct that "reflects a lack of candor with this Court."

None of those objections are meritorious.

**A. Injury-in-Fact**

NVE is correct that in order to intervene as a matter of right pursuant to Federal Rule of Civil Procedure 24(a) ACGA must demonstrate that it has Article III standing to do so. NVE is correct that to have standing ACGA must demonstrate that its members will suffer an injury-in-fact if NVE prevails on any of the causes of action alleged in its complaint. And NVE is correct that to be an injury-in-fact the harm that will be inflicted on ACGA's members must be "concrete and actual or imminent, not conjectural or hypothetical." *See Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998).

After considering the question, the federal defendants informed the court that, in their judgment, the relief NVE has requested in the prayer of its complaint "implicates the stated interests of the [AGCA's] members." Federal Defendants' Response to Alaska Charitable Gaming Association's Motion to Intervene, at 2.

Consistent with that conclusion, in her declaration Sandy Powers, the president of ACGA, informed the court that

If the NVE casino opens, the consequence for charitable gaming permittees that are members of ACGA, as well as for all other permittees that offer games of chance that are played within the Municipality of Anchorage and the Matanuska-Susitna Borough, will be direct, immediate, and financially adverse because the permittees will not be able to compete against the NVE casino for the continued patronage of the players on which the permittees depend for the revenue they use to fund their charitable activites. First and foremost because beeping and blinking class II video gaming machines (which are similar to the video gaming machines on the gaming floors in Las Vegas casinos except that their software has been programmed to play different games) play a game that is played literally in seconds and then played again and again and again simply by repeatedly punching a button on the front of the machine. By contrast, bingo is a slow game that has been designed to provide players hours of social recreational enjoyment. Similarly, a pull-tab card is another slow game that is played by opening a card to determine whether the player has won a prize, and then by opening another card, and then another, until the cards a player has purchased have all been opened.

Of equal adverse financial consequence for charitable gaming permittees, the Alaska charitable gaming statute caps bingo game jackpots at $1,000 and caps pull-tab card pay-outs at $500. Because the IGRA imposes no limits on jackpots and pay-outs, Indian casinos in the coterminous states attract players by advertising that their video gaming machines pay out multi-thousand dollar jackpots. They also give away automobiles and other expensive consumer items in raffles and as door prizes. Since I have been informed that NVE has informed the BIA that it has contracted with Marnell Gaming, a large gaming management company based in Las Vegas, to manage the NVE casino, there is no reason to believe that the NVE casino will not advertise similar jackpots and giveaways against which it will be impossible for charitable gaming permittees to compete. In addition, because NVE has informed the BIA that the NVE casino will have a bar, it is reasonable to assume that NVE will make alcoholic beverages available. But Alaska and municipal law prohibits alcohol from being served in the bingo halls in which the bingo games that charitable gaming permittees sponsor are played. In the same vein, it is my understanding that inside the boundaries of a parcel of "Indian country" the state in which the parcel is located has no civil regulatory jurisdiction. As a consequence, an IGRA-authorized casino located in "Indian country" in a state that has prohibited

smoking in public places can ignore the prohibition. As a result, it also is my understanding that most, if not all, IGRA-authorized casinos in the State of California allow smoking. Because the State of Alaska, the Municipality of Anchorage, and the Matanuska-Susitna Borough prohibit smoking in public places, bingo halls and facilities in which pull-tab cards are sold are required to comply with that prohibition. That is another extremely unfair advantage that the NVE casino will have over the bingo halls and facilities in which pull-tab cards are sold on which charitable gaming permittees depend.

Declaration of Sandy Powers in Support of Alaska Charitable Gaming Alliance Motion to Intervene, para. nos. 6 and 7, at 2-3.

NVE dismisses Ms. Powers's description of the economic harm NVE's casino will inflict on ACGA members as "speculative and conclusory allegations." But, apparently oblivious to the irony, NVE then asserts that, rather than patronizing NVE's casino, "many [of ACGA members's] patrons may prefer the familiar atmosphere of ACGA's bingo halls, in which families often gather for a social evening in population centers that are convenient for local residents to visit." Plaintiff's Opposition to Motion to Intervene Filed By Alaska Charitable Gaming Association, at 6.

Families often gather for social evenings in ACGA members's bingo halls? Really? What is the factual basis for that rank (and ridiculous) conjecture? In its opposition memorandum NVE doesn't say.

In the same vein, NVE suggests that the only way ACGA can demonstrate that NVE's casino will inflict an injury-in-fact on ACGA members is for NVE to open its casino and inflict the

injury.

But that is not the Article III rule.

Rather, the rule is, as Justice White in a related context explained in *Babbitt v. United Farm Workers Union*, 442 U.S. 289, 298 (1979): "A plaintiff who challenges a statute must demonstrate a <u>realistic</u> danger of sustaining a direct injury as a result of the statute's operation or enforcement. But one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." (emphasis added) (citations and internal quotation marks omitted).

With respect to this motion, is it realistic for the court to conclude that NVE's casino will inflict an injury-in-fact on ACGA members by diverting customers from the members' bingo halls and the facilities in which they sell pull-tab cards to NVE's casino whose gaming floor will contain five hundred video gaming machines? In reasoning to its decision regarding that question, here are uncontroverted facts the court should consider:

1. The only gambling the State of Alaska allows is charitable gaming, principally in the form of bingo games and the sale of pull-tab cards with the revenue derived from that gaming used exclusively to fund charitable endeavors.

2. The Alaska Department of Revenue has issued charitable gaming permits to ACGA members and those members and other

5

permittees in the city of Anchorage and in towns in the Matanuska-Susitna Borough depend on the revenue they derive from bingo and the sale of pull-tab cards to fund their charitable endeavors.

3. If it prevails in this action NVE (and its business partner, Marnell Gaming) will construct a 35,000 square foot casino on the Ondola allotment that will contain five hundred video gaming machines. NVE has informed the Bureau of Indian Affairs (BIA) that it intends to make alcohol available to its customers. And in Indian casinos smoking can be allowed in violation of the law of the state in which a casino is located.

4. The Ondola allotment is an eight-acre parcel of land that is located proximate to the North Birchwood exit of the Glenn Highway, the freeway that runs from the city of Anchorage north to the Matanuska-Susitna Borough. The North Birchwood exit is approximately twenty miles north of Anchorage, the most populous city in Alaska, and twenty-two miles south of Wasilla, the most populous city in the Matanuska-Susitna Borough. As a consequence, the Ondola allotment is located less than a half hour automobile drive from either direction.

The U.S. Supreme Court has instructed that judges should employ "common sense" in their decision-making. *Trump v. Hawaii*, 138 S.Ct. 2392, 2415 (2018). *Accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)(a reviewing court should "draw on its judicial

experience and common sense").

Common sense suggests that when/if NVE opens its casino it is not only realistic, but absolutely certain, that one, or a dozen, or a hundred, or a thousand, or some other unknown number of individuals who had regularly played bingo or purchased pull-tab cards will stop doing so and will instead motor up or down the Glenn Highway to NVE's casino in order to play the machines.

Because that is a certainty, NVE's casino will inflict an injury-in-fact on ACGA members.

### B. INADEQUATE REPRESENTATION

If the court grants this motion ACGA will present two legal arguments that the federal defendants and intervenor-defendant State of Alaska will not present.

The first argument is that the members of the NVE have not been lawfully designated by the Senate in a ratified treaty, by Congress in a statute, or by the Secretary of the Interior acting lawfully pursuant to authority that Congress has delegated to the Secretary in a statute as a "federally recognized tribe" that, as a consequence of that designation, possesses the "powers of self-government" that Congress has required a group of individuals of Native American descent to possess in order to qualify as an "Indian tribe" as section 4(5) of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. 2703(5), defines that term.

7

NVE suggests that ACGA cannot present that legal argument because the federal defendants did not consider it when they were deciding whether the Ondola allotment qualified as "Indian lands" as section 4(4)(B) of the IGRA, 25 U.S.C. 2703(4)(B), defines that term.

In that regard, it merits mention that - if the BIA had informed ACGA members and other interested members of the public that NVE had requested the Secretary of the Interior to determine whether the Ondola allotment qualified as "Indian lands" - ACGA members could have presented their legal arguments to the federal defendants.

But, inexplicably, section 5(b)(2)(B) of the IGRA, 25 U.S.C. 2704(5(b)(2)(B), which requires the Secretary to publish in the *Federal Register* the names of individuals he nominates to serve as members of the National Indian Gaming Commission (NIGC), section 11(d)(2(B) and (D)(ii) of the IGRA, 25 U.S.C. 2710(d)(2) (B) and (D)(ii), which require the chairman of the NIGC to publish in the *Federal Register* a notice that he has approved a gaming ordinance or resolution that an "Indian tribe" has submitted for his approval or that an "Indian tribe" has revoked an approved ordinance or resolution, and section 11(d)(3)(B) and (8)(D) of the IGRA, 25 U.S.C. 2710(d)(3)(B) and (8)(D), which require the Secretary to publish in the *Federal Register* a notice that he has approved a Tribal-State compact, are the only public

notice requirements relating to the general implementation of the IGRA that Congress included in the IGRA.

As a consequence, NVE's argument that this court cannot consider ACGA's legal argument regarding tribal status because it was not presented to the federal defendants during an informal administrative proceeding conducted inside the BIA bureaucracy that ACGA members did not know, and had no way to know, was occurring offends considerations of fundamental fairness.

In any case, ACGA's legal argument regarding tribal status is consequential because, while NVE did not need Article III standing to ask the federal defendants to make an "Indian lands" determination, it is a blackletter constitutional rule that this court has no Article III jurisdiction to adjudicate NVE's causes of action until and unless NVE demonstrates that it has standing to invoke the court's jurisdiction. *Wildearth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)("The party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing").

It also is a blackletter constitutional rule that "As a jurisdictional requirement, standing to litigate cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, 139 S.Ct. 1945, 1951 (2019). So the fact that the federal defendants have decided not to contest NVE's implicit assertion that it has standing is of no consequence. Because "When there is doubt about

a party's constitutional standing, the court must resolve the doubt, *sua sponte* if need be." *Lee's Summit, Missouri v. Surface Transportation Board*, 231 F.3d 39, 41 (D.C. Cir. 2000)(court determined standing *sua sponte* when executive branch agency defendant declined to contest standing).

If the court grants this motion and ACGA is permitted to present its legal argument regarding tribal status (or, more accurately, NVE's lack thereof), ACGA will demonstrate that there is considerable doubt that the members of NVE are an IGRA section 4(5) "Indian tribe."

Since an IGRA section 4(5) "Indian tribe" is the only entity that may conduct gaming on "Indian lands" pursuant to the IGRA, if its members are not an IGRA section 4(5) "Indian tribe," then NVE has no authority to conduct gaming on the Ondola allotment. And if NVE has no such authority it has no standing to invoke the court's Article III jurisdiction to adjudicate the causes of action alleged in its complaint.

ACGA's second legal argument is that, if *arguendo* the members of NVE are an IGRA section 4(5) "Indian tribe," the Eightieth Congress that enacted 18 U.S.C. 1151 did not intend to include Alaska Native allotments within the purview of the term "Indian allotments" in section 1151(c). And if *arguendo* the Eightieth Congress did so intend, in 1971 in section 4(b) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. 1603(b),

the Ninety-second Congress extinguished the Indian title underlying all Alaska Native allotments, including the Ondola allotment; for which reason, if it ever was, today the Ondola allotment is not "Indian country" over which an IGRA section 4(5) "Indian tribe" can "exercise[] governmental power" as the IGRA section 4(4) "Indian lands" definition requires.

NVE (and the federal defendants) assert that the court also cannot consider that legal argument because the federal defendants did not consider it when they were deciding whether the Ondola allotment qualified as "Indian lands."

But the decisions of this court and the circuit court in *AmFac Resorts, LLC v. U.S. Department of the Interior* instruct that in making that assertion NVE (and the federal defendants) misunderstand the constitutional role of the federal judiciary in deciding questions of statutory construction.

In *AMFac Resorts* the National Park Service (NPS) promulgated two regulations that established a new procedure for negotiating contracts with concessionaires that eliminated a preferential right of renewal. When three concessionaires and a concessionaire trade association challenged the validity of the regulations on the ground that they violated the Contract Disputes Act (CDA), this court determined that the regulations did not violate the CDA.

NPS had adopted a regulation that announced that a concessionaire contract was not a "contract" within the meaning of that term in the CDA. This court decided that, because the relevant section of the CDA was ambiguous and because the interpretation NPS had announced in its regulation was reasonable, NPS's interpretation of the CDA was entitled to *Chevron* deference. *AmFac Resorts, LLC v. U.S. Department of the Interior*, 142 F. Supp.2d 54, 80-82 (D.C.D.C. 2001).

When the concessionaires appealed that ruling, the circuit court affirmed the district court. But it did so on a different ground: the circuit court determined that the text of the relevant section of the CDA was not ambiguous, and, based on its reading of the unambiguous text, held that there was no conflict between the CDA and NPS's regulations. *AmFac Resorts, LLC v. U.S. Department of the Interior*, 282 F.3d 818, 834-835 (D.C. Cir. 2002).

Although the U.S. Supreme Court subsequently vacated the circuit court decision on the ground that the dispute between the parties was not ripe for judicial resolution - *see National Park Hospitality Association v. U.S. Department of the Interior*, 538 U.S. 803 (2003), the circuit court decision illustrates that this court is not bound by the interpretation of the intent of Congress embodied in the text of a statute made by an executive branch agency. The reason it is not is because, as the U.S.

12

Supreme Court noted in *Chevron*, 467 U.S. at 843 n. 9, the federal judiciary - not NPS, BIA, or any other executive branch agency - "is the final authority on issues of statutory construction."

If the court grants this motion, ACGA will request the court to exercise its independent judgment regarding the intent of the Eightieth Congress embodied in the term "Indian allotments" in 18 U.S.C. 1151(c). If ACGA's reading of the intent of the Eightieth Congress is correct, the court will adopt an interpretation of the term "Indian allotments" that is different from the interpretation Solicitor Thomas Sansonetti adopted in Solicitor's Opinion M-36975, which Principal Deputy Assistant Secretary of the Interior for Indian Affairs John Tahsuda announced in his June 18, 2018 letter to Aaron Leggett controlled the federal defendants' determination regarding whether the Ondola allotment qualified as IGRA section 4(4)(B) "Indian lands."

The circuit court decision in *AmFac Resorts* instructs that this court doing so would be entirely appropriate.

## C. Are ACGA's legal arguments "legally unfounded and frivolous" and is ACGA's counsel's presentation of those arguments "vexatious" conduct that "reflects a lack of candor with this Court?"

With respect to deciding whether to grant this motion the only decision for the court regarding ACGA's legal arguments is whether ACGA has met its burden of demonstrating that, if the court denies the motion, the federal defendants or intervenor-defendant State of Alaska will not adequately represent the

13

interests of ACGA in this litigation. Whether ACGA's legal arguments are meritorious is not a question appropriate for resolution in this motion.

However, because NVE devoted almost a third of its opposition memorandum to disparaging those arguments, and not just disparaging, but personally trashing, ACGA's counsel, comment regarding those matters is appropriate.

Insofar as ACGA's counsel is concerned, NVE is represented by Colin Hampson who, like ACGA's counsel, is a member of the bar of this court. To become a member, Mr. Hampson certified that he is familiar with the District of Columbia Bar Voluntary Standards of Civility. One of the General Principles in the Voluntary Standards states: "We will not bring the profession into disrepute by making unfounded accusations of impropriety or making ad hominem attacks on counsel, and, absent good cause, we will not attribute bad motives or improper conduct to other counsel."

The court can read pages 13-18 of the opposition memorandum Mr. Hampson filed on behalf of NVE and decide for itself whether the characterizations of ACGA's counsel and his conduct contained therein are consistent with the professional decorum to which the General Principle above-described expects Mr. Hampson to conform his own conduct.

Whatever the court decides about that, ACGA has filed it's counsel's Curriculum Vitae as ACGA Exhibit F. Reading it may enlighten Mr. Hampson as to why ACGA retained the attorney who is representing the association in this action.

Insofar as his vitriolic expression of low opinion regarding NVE's legal arguments regarding tribal status/Article III standing is concerned, Mr. Hampson is not a member of the Alaska bar. Nor, until his representation of NVE in this action, has Mr. Hampson been involved over the past thirty-plus years in any of the tribal status-related litigation in Alaska that he purports to discuss in NVE's opposition memorandum so authoritatively. However, Mr. Sampson is correct about the tribal status situation in the Alaska Supreme Court.

### 1. Alaska Supreme Court

The tribal sovereignty movement began in Alaska in 1982 and the first lawsuit was filed that same year, *Native Village of Tyonek v. Puckett*, U.S. District Court for the District of Alaska No. A82-369 Civil, which fifteen years later ended in a muddle, *see* 133 F.3d 928 (9th Cir. 1997)(unpublished table decision); 1997 WL 801472 (9th Cir., Dec. 19, 1997).

In 1988 the tribal status issue reached the Alaska Supreme Court. In August in *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32, 41 (Alaska 1988), the Court announced that

> In a series of enactments following the Treaty of Cession and extending into the first third of this century, Congress has demonstrated its intent that Alaska Native communities not be accorded sovereign tribal status. The historical accuracy of this conclusion was expressly recognized in the proviso to the Alaska Indian Reorganization Act . . . No enactment subsequent to the Alaska Indian Reorganization Act granted or recognized tribal sovereign authority in Alaska.

Four months later, in December 1988 Assistant Secretary of the Interior for Indian Affairs Ross Swimmner published a list of "Native Entities Within the State of Alaska Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs" that included not only communities that Congress or the Secretary of the Interior had designated as Native villages for the purposes of ANCSA but also ANCSA village and regional corporations. 53 *Fed. Reg.* 52832.[1]

_____

[1] In 1982 when he published in the *Federal Register* the first list of "Alaska Native Entities Recognized and Eligible to Receiver Services From the United States Bureau of Indian Affairs" Assistant Secretary of the Interior for Indian Affairs Kenneth Smith explained that "While eligibility for services administered by the Bureau of Indian Affairs is generally limited to historical tribes and communities of Indians residing on reservations, and their members, unique circumstances have made eligible additional entities in Alaska which are not historical tribes." 47 *Fed. Reg.* 53133. When Assistant Secretary Smith's successors published their own lists in 1983, 1985, and 1986 that explanation mysteriously disappeared. In 1988 when he published his list Assistant Secretary Swimmer said that Assistant Secretary Smith's explanation had been "inadvertently dropped from the subsequent lists." 53 *Fed. Reg.* 52832. In fact, the disappearance was not inadvertent. But the history of the *Federal Register* lists is a subject beyond the scope of this memorandum.

In February 1990 a group of fifteen attorneys who by that date were staffing the nascent tribal sovereignty movement, led by an attorney in the Anchorage office of the Native American Rights Fund (NARF) and that included Mr. Hampton's law partner, Lloyd Miller,[2] urged Assistant Secretary of the Interior for Indian Affairs Eddie Brown to rescind the 1988 list and "publish a new list which corrects the errors and ambiguities of the 1988 list and explicitly recognizes the tribal status of Alaska Native villages" because "It is clear that Alaska Native villages are tribes and that the 1988 BIA list substantively and procedurally violated federal law." ACGA Exhibit G.

When Assistant Secretary Brown did not do so, in 1993 when President Bill Clinton and Secretary of the Interior Bruce Babbitt assumed office the same attorneys began anew. ACGA Exhibit H. Five months later when President Clinton appointed Ada Deer, the former chair of the NARF board of directors, to succeed Eddie Brown as Assistant Secretary, Assistant Secretary Deer not only agreed to publish a new list, she and her attorney, Assistant Solicitor Scott Keep, allowed the NARF attorneys and Mr. Miller to participate in writing the preamble that Assistant

---

[2] Colin Hampspn is a partner in Sonosky, Chambers, a law firm whose principal office is in Washington, D.C. In 1984 Lloyd Miller opened, and to the present day continues to manage, Sonosky Chambers's office in Anchorage, Alaska. *See* http://www.sonosky.com/attorneys-Lloyd-Benton-Miller.html ("Lloyd B. Miller joined the firm in 1979 and opened the firm's Alaska offices in 1984").

Secretary Deer published in the *Federal Register* in which she announced that the list had been transformed into a list of federally recognized tribes. ACGA Exhibit I.

In October 1993 Assistant Secretary Deer published the preamble and her list. 58 *Fed. Reg.* 54364. "Eklutna Native Village" was one of the listed entities.

In November 1994 Congress enacted the Federally Recognized Indian Tribe List Act (FRITLA), Pub. L. No. 103-454, Title I, 108 Stat. 4791 (codified at 25 U.S.C. 479a and 479a-1). The text of FRITLA makes no mention of Assistant Secretary Deer's list. And the House Committee on Natural Resources, which wrote and reported the bill that Congress enacted as FRITA, took care to explain that it was aware of the controversy regarding tribal status in Alaska and did not intend FRITA to affect or otherwise resolve that controversy in any way. *See* H.R. Rep. No. 103-781, at 4-5 (1994).

Five years later, in 1999 the Alaska Supreme Court issued *John v. Baker*, 982 P.2d 738, *cert. denied* 528 U.S. 1182 (2000).[3]

In a decision written by Justice Dana Fabe the Court began by acknowledging that, as *Native Village of Stevens* instructed,

---

[3] ACGA's counsel was not involved in the appeal that resulted in the *John v. Baker* decision. However, after the decision was issued the Office of Public Advocacy (OPA), the state agency whose attorneys had represented appellee John Baker, retained ACGA's counsel to write the petition for a writ of certiorari OPA filed on behalf of Mr. Baker.

between 1867 and 1993 there had been no federally recognized tribes in Alaska. But Justice Fabe then announced that in 1993 Assistant Secretary's publication of her list had the legal consequence of creating more than two hundred. *Id*. at 749-750. After so holding, Justice Fabe concluded by perorating that "for those who may have doubted the power of the Department of the Interior to recognize sovereign political bodies, a 1994 act of Congress [FRITLA] appears to lay such doubts to rest." *Id*. at 751.

Justice Fabe and the other members of the Court decided the *John v. Baker* appeal without the benefit of adversarial briefing and argument that, as the U.S. Supreme Court noted in Baker v. Carr, 369 U.S. 186, 204 (1962), is necessary in order "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." But having crossed the Rubicon, the Court has declined the invitation to correct its error. *Runyon v. Association of Village Council Presidents*, 84 P.3d 437, 439 n. 3 (Alaska 2004)("We decline the invitations of the Runyons and amicus Legislative Council to revisit *John v. Baker*"); *McCrary v. Ivanof Bay* Village, 265 P.3d 337, 340, 342 (Alaska 2011)("McCrary argues that *John v. Baker* should not be considered binding precedent because no party in that appeal argued against recognition of the sovereign status of Alaska Native tribes

19

. . . . McCrary has not sustained his heavy burden to demonstrate our precedent in *John v. Baker* should be overturned").

While, as it did in *John v. Baker,* the Alaska Supreme Court may express its view regarding a federal question and while that expression of view may be of interest to this court, it is not a precedent, much less a binding one. *See United States v. Miami University*, 294 F.3d 797, 861 (6th Cir. 2002); *Kuhnie Brothers, Inc. V. County of Geauga*, 103 F.3 d 516, 520 (6th Cir. 1997) ("Notions of federalism do not require this court to follow a state court's holdings with respect to federal questions").

## 2. Federal Courts

In 1998 the U.S. Supreme Court held in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, that public land the Secretary of the Interior conveys in fee title to ANCSA village corporations pursuant to ANCSA is not a 18 U.S.C. 1151(b) "dependent Indian community" and, as a consequence, is not 18 U.S.C. 1151 "Indian country."[4]

---

[4] NVE has represented to this court that footnote 2, which the U.S. Supreme Court included in *Alaska v. Native Village of Venetie Tribal Government*, *supra* at 520, is a "direct statement" in which the Court made "clear that allotments within Alaska fall within section 1151(c) and leaves no room for ACGA's theory that section 1151(c) categorically excludes Alaska." Opposition Memorandum, at 18. However, in footnote 2 the Court said no such thing. Rather, the Court simply noted in passing and as a dictum that Alaska Native allotments would be Indian country "if" Alaska Native allotments "constitute[] 'allotments' under section 1151(c)." But the Court expressed no opinion as to whether the Eightieth Congress that enacted 18 U.S.C. 1151 intended to include Alaska Native allotments within the purview of the term

The litigation that resulted in the *Venetie* decision began in 1987 when Alaska Governor Steve Cowper directed his Attorney General[5] to file *State of Alaska, ex rel., Yukon Flats School District v. Native Village of Venetie*, U.S. District Court for the District of Alaska No. 4:87-cv-00051. In 1990 when Walter Hickel succeeded Cowper as Governor he directed his Attorney General to continue to litigate that action. And throughout the Cowper and Hickel administrations the State of Alaska's position was that the Athabascan Indian residents of Venetie (and by inference the Native residents of the more than two hundred other communities that Congress or the Secretary of the Interior had designated as Native villages for the purposes of ANCSA) were not federally recognized tribes.

In November 1994 Tony Knowles was elected to succeed Walter Hickel as Governor in an election Knowles won by 536 votes in an election in which 213,435 votes were cast.[6]

Knowles would not have won if he had not received a disproportionately large number of votes in Native villages. To attract those votes, prior to the election candidate Knowles

---

"Indian allotments" in subsection (c).

[5] Alaska is one of only five states in which the Attorney General is appointed by, and serves at the pleasure of, the Governor.

[6] 1994 Alaska General Election results, *available at* https://www.elections.alaska.gov/Core/Archive/94GENR/result94. php.

promised that Governor Knowles would order his Attorney General
to abandon the State of Alaska's challenge to tribal status in
the *State of Alaska, ex rel., Yukon Flats School District v.
Native Village of Venetie* lawsuit. ACGA Exhibit J ("Native rights
lawyer Heather Kendall-Miller, who argued the case for the
village of Venetie, said Knowles kept his promise on the lawsuit.
He dropped the portion of the lawsuit that opposed recognition of
tribal status for Venetie and other Alaska villages, a move
criticized by Republican legislators").

Three weeks after Tony Knowles became Governor, on December
23, 1994 District Judge H. Russel Holland issued an unpublished
decision in which he held that the Athabascan Indian residents of
Venetie were a federally recognized tribe. *Native Village of
Venetie I.R.A. Council v. State*, 1994 WL 730893 (D. Ak., Dec. 23,
1994).

Making good on his campaign pledge, in 1995 Governor Knowles
ordered Bruce Botelho, his Attorney General, not to appeal Judge
Holland's decision to the circuit court. Attorney General Botelho
subsequently conceded to the speaker of the Alaska House of
Representatives that the decision to not file an appeal "was not
driven by litigation considerations." *See* Donald Craig Mitchell,
"Alaska v. Native Village of Venetie: Statutory Construction or
Judicial Usurpation? Why History Counts," 14 *Alaska L. Rev.* 353,

421 (1997).[7]

Because Attorney General Botelho did not appeal Judge Holland's tribal status decision, when the circuit court decided *Yukon Flats School District v. Venetie Tribal Government*, 101 F.3d 1286 (9th Cir. 1996), and the U.S. Supreme Court decided *Alaska v. Native Village of Venetie Tribal Government,* both courts simply assumed, without deciding, that the Athabascan Indian residents of Venetie were a federally recognized tribe.

Because of Governor Knowles's and Attorney General Botelho's politically motivated dereliction in not requesting the U.S. Supreme Court to, in its decision in *Alaska v. Native Village of Venetie Tribal Government*, resolve the tribal status controversy, *Native Village of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548 (9th Cir. 1991), a decision a panel of the U.S. Court of Appeals for the Ninth Circuit issued twenty-nine years ago, remains the controlling precedent in the Ninth Circuit. *See Kaltag Tribal*

---

[7] In NVE's opposition memorandum Colin Hampson attempts to portray ACGA's counsel as an outlier. However, Circuit Judge Janice Rogers Brown recently cited "Why History Counts" as an authoritative legal history that documents the conflict between the foundational tenets of the tribal sovereignty movement in Alaska and the policy objectives Congress codified in ANCSA. *Akiachak Native Community v. U.S. Department of the Interior*, 827 F.3d 100, 121 (D.C. Cir. 2016) (Brown, J., dissenting).

*Council v. Jackson*, 2009 WL 2736172 (9th Cir., Aug. 28, 2009).[8]

However, it is not a controlling precedent in the District of Columbia Circuit. Because it is not, whether NVE's members are a federally recognized tribe and therefore an IGRA section 4(5) "Indian tribe," which Article III requires NVE to demonstrate that they are in order for NVE to invoke the jurisdiction of this court to adjudicate the causes of action alleged in its complaint will be, for this court, a question of first impression.

## CONCLUSION

For the reasons set out in its opening memorandum and above, ACGA requests the court to grant its motion to intervene.

Date: July 15, 2020

---

[8] In *Venetie I.R.A. Council* the panel invented what District Judge Holland would describe as the "common-law test" for tribal recognition. Pursuant to that test the Athabascan Indian residents of Venetie and the nearby community of Fort Yukon were federally recognized tribes if they could make an evidentiary showing that they were "the modern-day successors to sovereign historical bands of natives." But inventing the common-law test was clear error because, as the House Committee on Natural Resources explained when it wrote the bill Congress enacted as FRITLA: "'Recognized' is more than a simple adjective; it is a legal term of art. It means the government acknowledges as a matter of law that a particular Native American group is a tribe by conferring a specific legal status on that group." For a group to obtain that legal status requires "A formal political act." H.R. Rep. No. 103-781, at 2 (1994). In 1941 Felix S. Cohen, who remains an influential commentator on federal Indian law, explained that "The term 'tribe' is commonly used in two senses, an ethnological sense and a political sense." He then cautioned that "It is important to distinguish between these two meanings of the term." Handbook of Federal Indian Law (1942 ed.), at 268. The members of the panel that issued *Venetie I.R.A. Council* did not understand the distinction.

/s/Donald Craig Mitchell
_____

Donald Craig Mitchell
DC Bar No. 277319

1335 F Street
Anchorage, Alaska 99501
dcraigm@aol.com

Attorney for Alaska Charitable
Gaming Alliance