IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Native Village of Eklutna**, | Case No. 1:19-cv-02388-DLF |
| Plaintiff, | |
| v. | |
| **U.S. Department of the Interior**, et. al, | |
| Defendants, | |
| and | |
| **State of Alaska**, | |
| Defendant-Intervenor. | |

**Federal Defendants' Opposition to
Plaintiffs' Motion for Extra-Record Discovery (ECF No. 36)**

JEAN E. WILLIAMS
Deputy Assistant Attorney General

KRISTOFOR R. SWANSON
Senior Attorney
Natural Resources Section
Envt. & Natural Resources Div.
U.S. Department of Justice
Washington, DC

## TABLE OF CONTENTS

List of Exhibits ..................................................................................................vi

Introduction .....................................................................................................1

Factual Background ..........................................................................................2

    I.    The Ondola Decision. ......................................................................2

    II.   The Administrative Record. ............................................................3

    III.  The Tribe's Present Motion. ...........................................................5

Argument .........................................................................................................6

    I.    Discovery is Not Appropriate Here Absent a "Strong
          Showing" of Improper Behavior ....................................................7

    II.   The Tribe Has Not Made a Strong Showing of Improper
          Political Considerations. ...............................................................13

         A.    The Ondola Decision Is Based Upon Application of a
               Long-Standing Departmental Legal Interpretation. ...........14

         B.    The Tribe Has Not Made Any Showing—Let Alone a
               Strong One—that Interior Based its Decision-Making
               on Senator Murkowski's Views. .................................................18

               1.    Interior's Meeting Notes Do Not Show Any
                    Improper Political Consideration. ..................................19

               2.    The Tribe's Declarations Are Contradicted by
                    the Record and Do Not Make a Strong Showing. ......21

               3.    The Very Cases the Tribe Cites Demonstrate the
                      Tribe's Lax Showing. ......................................................25

          C.    The Tribe Has Not Made a Strong Showing that
                Interior's Decision-Making Timeline Was Driven by
                Political Considerations. ..........................................................28

    III.  Extra-Record Evidence is Not Necessary for Effective
          Judicial Review of the Ondola Decision. ...................................30

IV.   Even if the Tribe Had Met Its Burden, the Proper Remedy
        Would be Further Explanation from Interior, Not Discovery. .....35

Conclusion .................................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*,
  663 F.3d 476 (D.C. Cir. 2011)......................................................................13

*Blue Ocean Inst. v. Gutierrez*,
  503 F. Supp. 2d 366 (D.D.C. 2007) .........................................................13

*Camp v. Pitts*,
  411 U.S. 138 (1973)...............................................................................8, 18

*Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior*,
  667 F. Supp. 2d 111, 115 (D.D.C. 2009) ..................................................11

*China Trade Ctr., LLC v. Wash. Metro. Area Transit Auth.*,
  34 F. Supp. 2d 67 (D.D.C. 1999)...........................................................9, 34

*Cmty. for Creative Non-Violence v. Lujan*,
  908 F.2d 992 (D.C. Cir. 1990).......................................................12, 30, 35

*Community Federal Savings & Loan v. Federal Home Loan Bank Board*,
  96 F.R.D. 619 (D.D.C. 1983)................................................................25, 35

*Connecticut v. Department of the Interior*,
  363 F. Supp. 3d 45 (D.D.C. 2019)..............................................................25

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019).............................8, 9, 17, 18, 23, 27, 31, 32

*Envtl. Def. Fund v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981)....................................................................18

*Envtl. Def. Fund. v. Blum*,
  458 F. Supp. 650 (D.D.C. 1978) .............................................................9, 23

*FTC v. Owens-Corning Fiberglas Corp.*,
  626 F.2d 966 (D.C. Cir. 1980)......................................................................8

*Hercules, Inc. v. EPA*,
  598 F.2d 91 (D.C. Cir. 1978) ........................................................................9

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997).....................................................................12

*In re Subpoena Duces Tecum Served on the Office of the Comptroller of the
  Currency*,
  156 F.3d 1279 (D.C. Cir. 1998) ..................................................................10

*Jagers v. Fed. Crop. Ins. Corp.,*
    758 F.3d 1179 (10th Cir. 2014) ................................................................17

*LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham,*
    347 F.3d 315 (D.C. Cir. 2003)....................................................................8

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ..............................................................................8, 17

*Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.,*
    631 F. Supp. 2d 23 (D.D.C. 2009)......................................................12, 35

*New York v. Salazar,*
    701 F. Supp. 2d 224 (N.D.N.Y. 2010).......................................................27

*Oceana v. Locke,*
    634 F. Supp. 2d 49 (D.D.C. 2009).............................................................10

*Oceana, Inc. v. Pritzker (Oceana I),*
    217 F. Supp. 3d 310 (D.D.C. 2016) .............................................................9

*Oceana, Inc. v. Ross (Oceana III),*
    920 F.3d 855 (D.C. Cir. 2019)........................................................... passim

*Pacific Shores Subdivision v. U.S. Army Corps of Engineers,*
    448 F. Supp. 2d 1 (D.D.C. 2006) .........................................................10, 31

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009)....................................................................8

*Riggs Nat. Corp. & Subsidiaries v. Comm'r of Internal Revenue,*
    295 F.3d 16 (D.C. Cir. 2002) ..................................................................9, 24

*San Louis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,*
    751 F.2d 1287 (D.C. Cir. 1984) .................................................................10

*Saratoga Dev. Corp. v. United States,*
    21 F.3d 445 (D.C. Cir. 1994) ....................................................................31

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981)....................................................................25

*Sokaogon Chippewa Community v. Babbitt,*
    961 F. Supp. 1276 (W.D. Wis. 1997)....................................................25, 26

*Solem v. Bartlett,*
    465 U.S. 463 (1984)....................................................................................2

iv

*Stand Up for Cal. v. U.S. Dep't of Interior,*
   71 F. Supp. 3d 109 (D.D.C. 2014) .............................................................10

*Stand Up for California! v. U.S. Department of the Interior,*
   315 F. Supp. 3d 289 (D.D.C. 2018) ........................................27, 29, 30

*Tafas v. Dudas,*
   530 F. Supp. 2d 786 (E.D. Va. 2008) ...............................................9, 24

**Statutes**

5 U.S.C. § 706(2) .........................................................................................3

25 U.S.C. § 415 ...........................................................................................28

25 USC § 5123(f) and (g) ...........................................................................15

Pub. L. No. 59-171, 34 Stat. 197 (1906) ....................................................2

**Rules**

Fᴇᴅ. R. Eᴠɪᴅ. 301 .........................................................................................9

# LIST OF EXHIBITS

| Exhibit | Document |
|---|---|
| Ex. 1 | Administrative Record Excerpts |
| Ex. 2 | March 27, 2020, Letter from Kristofor Swanson to Colin Hampson |
| Ex. 3 | April 16, 2020, Letter from Kristofor Swanson to Colin Hampson |
| Ex. 4 | Indian Lands Determination for Akiachak Native Community — June 2, 1995 Fax from Scott Keep to Michael Cox |
| Ex. 5 | Indian Lands Determination for Native Village of Barrow — April 10, 1995, Letter from Robert Anderson to Michael Cox |
| Ex. 6 | Prior Indian Lands Determination for Native Village of Eklutna — May 17, 1995, Letter from Robert Anderson to Michael Cox |
| Ex. 7 | Excerpts from Transcript & Order, *New York v. Dep't of Commerce,* Case No. 18-cv-2921 (S.D.N.Y. June 8, 2018) |
| Ex. 8 | Authority to Approve Leases of Lands for Gaming Purposes (April 1, 2002) |
| Ex. 9 | Excerpts from Department of the Interior Departmental Manual |
| Ex. 10 | Indian Lands Determination for Big Lagoon Rancheria — October 4, 2018, Letter from Michael Hoenig to Virgil Moorehead |
| Ex. 11 | Indian Lands Determination for Ponca Tribe of Oklahoma — January 25, 2017, Letter From Michael Hoenig to Earl Howe |
| Ex. 12 | Department of the Interior Standardized Guidance on Compiling a Decision File and Administrative Record (June 2006) |
| Ex. 13 | Department of Justice Memorandum re: Administrative Record Compilation in light of *In re Thomas E. Price*, Ninth Cir. No. 17-71121 (October 20, 2017). |
| Ex. 14 | U.S. Army Corps of Engineers Administrative Record [Index], *Am. Bird Conservancy v. Brouillette*, No. 19-cv-3694-TJK, ECF No. 8-1 (D.D.C. April 23, 2020) |

# INTRODUCTION

The merits of this case involve a request by the Native Village of Eklutna—which we will call the Tribe—for a determination from the Department of the Interior that a piece of land in Alaska is eligible for gaming under the Indian Gaming Regulatory Act. Interior concluded, relying on a long-standing Departmental legal opinion, that it is not. The Tribe's present motion ignores that legal opinion and the detailed reasons Interior gave for its decision. Instead, the Tribe theorizes that Interior made the decision it did because Senator Murkowski does not support the Tribe's planned gaming project. On that theory, the Tribe seeks leave to take discovery in this record review case.

The Tribe has failed to make, as it must, a "strong showing" that Interior's decision was motivated by Senator's Murkowski views. To the contrary, the Tribe has only shown that Interior—unremarkably and in the context of the ever-contentious topic of Indian gaming—was aware of (and maybe even interested in) the views of the Alaska Congressional delegation regarding a proposal in the State whose residents the delegation represents. But there is nothing improper about that knowledge (or interest). And, in any event, the administrative record shows that it was largely *the Tribe's* representatives who raised the delegation's views on the topic.

The Tribe has similarly failed to demonstrate that effective judicial review could not occur on Interior's administrative record. Even if the Tribe

1

were correct in its belief of what constitutes improper political consideration, the record already reflects that Interior knew of the Congressional delegation's views.  The Tribe's motion should therefore be denied.

## Factual Background

### I.     The Ondola Decision.

This case is a challenge to a June 2018 Department of the Interior decision, which we will call the Ondola Decision.  AR002123–39.[1]  Two years earlier, in June 2016, the Tribe had submitted a request to Interior for: (1) a determination that a tribal allotment in Alaska (the Ondola Allotment) constituted "Indian lands" under the Indian Gaming Regulatory Act, and (2) approval of a related business lease.[2]  *See* AR002123; AR000778–807.  The Tribe intends to operate a gaming facility on the property.  *See* AR000778, AR000798–99.  Interior ultimately concluded that the Allotment did not constitute "Indian lands," and therefore also declined to approve the lease.  *See* AR002123, AR002139.

---

[1] The ARxxxxx citing format is to the Bates numbers on the bottom-right-hand corner of documents in Interior's administrative record.  We have attached as Exhibit 1 an excerpt of the record materials to which we cite.

[2] "Allotment" refers to Congress's past practice of dividing, or "allotting," lands into individualized parcels for private ownership by tribal members.  *See Solem v. Bartlett*, 465 U.S. 463, 466–67 (1984).  The Ondola Allotment was made under the Alaska Native Allotment Act, Pub. L. No. 59-171, 34 Stat. 197 (1906), as amended by Pub. L. 84-931, 70 Stat 954 (Aug. 2, 1956).

Interior based the Ondola Decision on a detailed analysis of the Tribe's application under a 1993 legal opinion by the Department's then-Solicitor (such opinions are called M-Opinions).   *See* AR002127–38; AR002140–2275.[3] In short, Interior concluded the Tribe had not shown that it had "territorial jurisdiction" over the Ondola Allotment, which, consistent with the M-Opinion, could therefore not be considered "Indian lands" eligible for gaming. *See* AR002139.

The Tribe filed suit in August 2019, challenging the Ondola Decision under the Administrative Procedure Act, 5 U.S.C. § 706(2).   *See* Compl. ¶¶ 5, 101–127, ECF No. 1.  Section 706(2) authorizes courts to "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

## II.   **The Administrative Record**.

Interior certified its administrative record for the Ondola Decision on February 13, 2020.  *See* Decl. of John Tahsuda, III, ECF No. 28-1.  The Tribe and Interior then entered a period of dispute resolution to attempt to resolve any concerns the Tribe had regarding the administrative record's contents. *See* Report Under Local Rule 16.3 and Proposed Scheduling Order at 3, ECF No. 27; Minute Order, Feb. 3, 2020 (adopting schedule).

---

[3] Given the M-Opinion's length, we have not included the entire document in our administrative record excerpts.  It can also be found at https://www.doi.gov/solicitor/opinions.

3

On March 12, 2020, the Tribe communicated its concerns with the administrative record, none of which included a request for discovery. *See* Mar. 12, 2020, Letter from Colin Hampson to Kristofor Swanson, ECF No. 36-4. Two of the Tribe's concerns are relevant to its present motion. First, the Tribe asserted that the record was incomplete because it did not contain any documents for a months-long period leading up to the June 18 decision. *See id.* at 2. Second, the Tribe noted that the record did not contain any notes or other documentation of Interior meetings with outside parties. *See id.* at 2–3. Specifically, the Tribe identified an April 4, 2018, meeting with the Alaska Congressional delegation, and four meetings or phone calls with the Tribe (June 29, 2016; August 15 and December 11, 2017; and May 7, 2018). *See id.*[4]

Interior responded to the Tribe's concerns on March 27. *See* Mar. 27, 2020, Letter. With respect to the purported gap in the record, Interior reminded the Tribe that documents reflecting internal agency deliberations are properly excluded from an administrative record. *See id.* at 2 (citing *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019)). Thus, it was "not

---

[4] Some of the substantive materials cited in the Ondola Decision had been inadvertently excluded from the record. *See* Mar. 12, 2020, Letter at 3. Interior added those documents to the record on May 28, 2020. *See* Mar. 27, 2020, Letter from Kristofor Swanson to Colin Hampson, attached as Ex. 2; 2d Decl. of John Tahsuda, III, ¶ 3, ECF No. 31-1 ("2d Tahsuda Decl.").

surprising that the record contains no documents for the few months prior to June 2018, when Interior was deliberating and drafting its decision." *Id.*

With respect to the meeting notes, Interior agreed to undertake an additional search for notes from the meetings the Tribe had identified, and (should they exist in the first place) add to the record any that contain record material (i.e., that are not deliberative in nature). *See id.* After a Covid-19-related delay, the agency located, and added to the record, notes from the April 4, 2018, meeting with the Alaska Congressional delegation; the August 15, 2017, meeting with the Tribe; and the December 11, 2017, phone call with the Tribe. *See* April 16, 2020, Letter from Kristofor Swanson to Colin Hampson, attached as Ex. 3; 2d Tahsuda Decl. ¶ 3; Index of Admin. Record. Supp. at 2–3, ECF No. 31-2. Interior also located, and added to the record, notes from an April 3, 2018, meeting with the Tribe that the Tribe had not identified in its March 12 letter. *See* Index of Admin. Record. Supp. at 3.

## III.  **The Tribe's Present Motion**.

Though judicial review under the Administrative Procedure Act is normally limited to the agency's administrative record, the Tribe has now moved for extra-record discovery. *See* Mot. for Leave to Take Extra-Record Discovery & To Compel Production of Documents Not Included in Admin. R. ("Pl.'s Mot."), ECF No. 36. The Tribe asks for four forms of relief.

First, the Tribe seeks to depose three senior Interior officials: James Cason, John Tahsuda III, and Stephen Wackowski. *See* [Proposed] Order ¶ 1,

ECF No. 36-5.  Mr. Cason is the Associate Deputy Secretary.  Mr. Tahsuda signed the Ondola Decision when we was the Principle Deputy Assistant Secretary for Indian Affairs.  He is currently Counselor to the Secretary.  Mr. Wackowski is the Secretary's Senior Adviser for Alaska Affairs, based in Anchorage.

Second—and somewhat redundantly—the Tribe also seeks to propound written deposition questions and interrogatories on Mr. Cason, Mr. Tahsuda, and Mr. Wackowski.  *See* [Proposed] Order ¶ 2.

Third, the Tribe requests that Interior be "directed to produce to Plaintiff Native Village of Eklutna all non-privileged documents relating to the Department's decision that were erroneously withheld from the administrative record, and all documents that were withheld solely on the basis of the deliberative process privilege." [Proposed] Order ¶ 3.

And, fourth, the Tribe asks that Interior be "directed to produce to Plaintiff Native Village of Eklutna a privilege log identifying all documents withheld on the basis of any privilege other than the deliberative process privilege, including the date of the document, and identifying the basis of the privilege asserted for each." [Proposed] Order ¶ 4.

## ARGUMENT

To be entitled to extra-record discovery, the Tribe must make either a "strong showing of bad faith or improper behavior," or demonstrate that the

administrative record is so bare that effective judicial review of its claims would be impossible absent extra-record evidence. The Tribe has made neither showing. There was nothing improper about Interior's knowledge of the Alaska Congressional delegation's views, and the Tribe points to nothing to indicate that the Ondola Decision—which contained a detailed analysis of the facts under a long-standing legal opinion—was just a pretextual cover for some improper political consideration. Further, effective judicial review can proceed on the existing administrative record, which contains the Tribe's factual submissions and the M-Opinion's legal analysis, and already documents that Interior met with representatives from the Alaska delegation and was aware of their respective views on the Tribe's project. The Tribe's motion should be denied.

## I.    Discovery is Not Appropriate Here Absent a "Strong Showing" of Improper Behavior.

The Tribe's motion implicates three principles of judicial review under the Administrative Procedure Act, which ultimately coalesce into the standard of review governing the motion.

First, discovery is generally not appropriate in APA cases because "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (citations omitted); *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009).

The court's role is to determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). "[F]urther judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of government and should normally be avoided." *Dep't of Commerce*, 139 S. Ct. at 2573 (citation omitted).

In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Rempfer*, 583 F.3d at 865 (citation omitted, alteration omitted). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 141–42 (1973) (per curiam).

Second, an agency's decision-making process is entitled to a presumption of regularity. *See LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003) (citation omitted). This includes a presumption that agency officials have acted in good faith. *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 975 (D.C. Cir. 1980). Only "[o]n a 'strong showing of bad faith or improper behavior'" would an inquiry into the "mental processes of administrative decisionmakers" be warranted. *Dep't of Commerce*, 139 S. Ct. 2573–74. That is the case even when the mental

processes in question are alleged to have been driven by improper political considerations. *Envtl. Def. Fund. v. Blum,* 458 F. Supp. 650, 663 (D.D.C. 1978).

The burden to overcome the presumption is a heavy one, and it is the Tribe's. *See Dep't of Commerce*, 139 S. Ct. at 2573–74.; Fed. R. Evid. 301 ("the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption"); *accord China Trade Ctr., LLC v. Wash. Metro. Area Transit Auth.*, 34 F. Supp. 2d 67, 70–71 (D.D.C. 1999) (requiring a showing of "well-nigh irrefragable proof" of bad faith). Clear evidence is required to overcome the presumption of regularity; allegations, assumptions, and speculation are not sufficient. *See Riggs Nat. Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 295 F.3d 16, 21 (D.C. Cir. 2002); *Hercules, Inc. v. EPA*, 598 F.2d 91, 123–24 (D.C. Cir. 1978); *see also Tafas v. Dudas*, 530 F. Supp. 2d 786, 797–98 (E.D. Va. 2008) (compiling cases).

Third, in the D.C. Circuit, "predecisional and deliberative" documents are properly excluded from an administrative record. *See Oceana, Inc. v. Ross (Oceana III)*, 920 F3d 855, 865 (D.C. Cir. 2019); *Oceana, Inc. v. Pritzker (Oceana I)*, 217 F. Supp. 3d 310, 319–20 (D.D.C. 2016), *aff'd*, 920 F.3d 855. Thus, the Tribe is wrong in contending that Interior "has taken an overly narrow view of what constitutes the administrative record in this case." Pl.'s Mot. at 22.

9

The D.C. Circuit and District Court have consistently upheld the exclusion of documents reflecting intra- or inter-agency deliberations from administrative records, including (as the Tribe seeks here) memoranda and notes from internal meetings. *See Oceana v. Locke*, 634 F. Supp. 2d 49, 53 (D.D.C. 2009) (collecting cases), *rev'd and remanded on other grounds*, 670 F.3d 1238 (D.C. Cir. 2011). The courts have done so because where, as here, the agency has provided an explanation for its chosen action, "the actual subjective motivation of agency decisionmakers is immaterial as a matter of law." *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 156 F.3d 1279, 1280 (D.C. Cir. 1998); *see also San Louis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1325–26 (D.C. Cir. 1984) ("judges review administrative action on the basis of the agency's stated rationale and findings"), *vacated in part on other grounds*, 760 F.2d 1320 (D.C. Cir. 1985) (en banc).

The Tribe is therefore incorrect in articulating the document-focused portion of its motion as seeking to "complete" the administrative record. *See* Pl.'s Mot. at 1. The deliberative materials the Tribe seeks are properly not part of the administrative record to begin with. Thus, the Tribe is actually seeking discovery of extra-record evidence. *See Stand Up for Cal. v. U.S. Dep't of Interior*, 71 F. Supp. 3d 109, 123 (D.D.C. 2014); *Pacific Shores*

*Subdivision*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006).[5]  To bring extra-record evidence into this case, the Tribe must first demonstrate that the existing record does not allow for meaningful judicial review of Interior's decision.  *See Cape Hatteras Access Pres. All. v. U.S. Dep't of the Interior*, 667 F. Supp. 2d 111, 115 (D.D.C. 2009).  That is all the more difficult here because the extra-record evidence the Tribe seeks is deliberative and predecisional, which, "absent a showing of bad faith or improper behavior," is "immaterial" to the Court's review.  *Oceana III*, 920 F.3d at 865.

The Tribe is also incorrect in focusing on the deliberative process privilege, which Interior has not (as of yet) invoked.  *See* Pl.'s Mot. at 9–10, 12, 20, 21–22, 24.  The deliberative process privilege is a qualified privilege allowing agencies to withhold advisory opinions and recommendations that are part of the agency's decision-making process where the public release of

---

[5] The case law on this distinction is not always clear because courts have not been consistent in their use of the phrases "completing the administrative record," "supplementing the administrative record," and "extra-record evidence."  The point is that there is a difference between: (1) a request to add to an administrative record documents that are properly part of an administrative record but were not included, and (2) a request for a court to consider information that clearly could not have been part of the administrative record.  Here, the Tribe is asking for the latter because it focuses solely on deliberative materials.  To the extent the Tribe is also making an argument under the former, it has failed to meet its burden to demonstrate that a *specific document* contains information that was "directly or indirectly considered" but is not already reflected in the record.  *See Cape Hatteras*, 667 F. Supp. 2d at 114.  A bare allegation that documents are missing does not meet that burden.  *See id.*

the material could chill future deliberations.  *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).  But *all* deliberative materials—regardless of whether the deliberative process privilege would apply to a given document— are properly excluded from an administrative record.  *See Oceana III*, 920 F.3d at 865 ("The fact that the agency could also assert the deliberative process privilege over such predecisional documents does not change the analysis.").  Only if deliberative materials were part of the administrative record (or if an agency otherwise intentionally produced those materials) would a privilege log be necessary to identify documents withheld from the record (or production) on the basis of the deliberative process privilege.  *See Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.*, 631 F. Supp. 2d 23, 27–28 (D.D.C. 2009) (because deliberative materials are not part of the record, there is no need to provide a log of the excluded documents).

A synthesis of these three principles provides the standard of review governing the Tribe's motion.  The Tribe is not entitled to discovery (including production of deliberative materials) unless the Tribe can: (1) make "a *strong showing* of bad faith or improper behavior;" or (2) demonstrate that Interior's administrative record and explanation for its decision are so bare that they prevent effective judicial review.  *See Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997–98 (D.C. Cir. 1990) (emphasis added).  Under the circumstances here, the latter also requires a

12

strong showing of improper behavior because the Tribe's alleged record insufficiency relates to internal agency deliberations. *See Oceana III*, 920 F.3d at 865.

Under either of the two possibilities, however, the Tribe's mere hope that it may find documents or information supporting its theory is insufficient. *See Blue Ocean Inst. v. Gutierrez*, 503 F. Supp. 2d 366, 368, 371 (D.D.C. 2007) (describing what is necessary to overcome the presumption of regularity). Instead, the Tribe must make a "significant showing" that it will uncover material indicating that Interior made the decision it did as a result of improper political considerations. *See Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011). The Tribe has failed to meet this burden.

## II.    The Tribe Has Not Made a Strong Showing of Improper Political Considerations.

The Tribe's main focus is its allegation of improper behavior. *See* Pl.'s Mot. at 12–20. The Tribe relies on three sets of alleged facts that it claims, when combined with the timing of Interior's decision, amount to a strong showing that Interior improperly based the Ondola Decision on political considerations. *See* Pl.'s Mot. at 12–20. The first involves Interior meetings with the Tribe and, separately, the Alaska Congressional delegation. *See* Farber Decl. ¶¶ 9, 11, ECF No. 36-1; Marnell Decl. ¶ 6, ECF No. 36-2. The second involves things the Tribe claims Senator Murkowski or her staff said

to the Tribe.  *See* Pl.'s Mot. at 18; Farber Decl. ¶¶ 8, 10, 12; Legget Decl. ¶ 7. The third involves things that an unidentified Interior employee supposedly said to one of the Tribe's representatives.  *See* Farber Decl. ¶ 13; Marnell ¶ 5. When one digs into the facts, however, nothing the Tribe offers—even collectively—constitutes a strong showing that Interior improperly "considered" or "relied on" Senator Murkowski's views as the basis for the Ondola Decision.  *See* Pl.'s Mot. at 2, 6, 12, 14, 18, 25.

### A.   The Ondola Decision Is Based Upon Application of a Long-Standing Departmental Legal Interpretation.

The first (and significant) obstacle to the Tribe's motion is the Ondola Decision itself.  Nowhere in its decision did Interior make any reference to political objectives.  *See* AR002123–39.  Instead, Interior undertook a detailed analysis of the Tribe's application under a long-standing legal interpretation in the M-Opinion.  *See* AR002133–38.

In short, the M-Opinion interprets the Alaska Native Claims Settlement Act and its impact on tribal authority over land and non-members, including what, if any, authority Alaskan tribes may have over allotments.  *See* AR002247, 2263–69.  The M-Opinion concluded that, because of nature of the Settlement Act, tribes generally did not have territorial jurisdiction over allotments, though there could be exceptions where a tribe may be able to show the contrary.  AR002263–69, 2271; AR002127–28.  The

Ondola Decision concluded, after considering the Tribe's submissions, that the Ondola Allotment was not one of those exceptions.  AR002133–39.

The Ondola Decision is not the only time the M-Opinion has served as a basis for a negative "Indian lands" determination for similarly situated lands in Alaska.  *See* June 2, 1995 Fax from Scott Keep to Michael Cox, attached as Ex. 4; April 10, 1995, Letter from Robert Anderson to Michael Cox, attached as Ex. 5.  Indeed, *the very same Ondola Allotment* has previously been the subject of a negative Indian lands opinion.  *See* May 17, 1995, Letter from Robert Anderson to Michael Cox, attached as Ex. 6; AR000782.

The Tribe was clearly aware of the M-Opinion and its likely impact on the Tribe's most-recent request.  *See* AR000002 (Tribe's briefing memo to Mr. Cason); AR000800–804.  The Tribe's attorneys made repeated efforts to analogize the Tribe's request to Indian lands opinions in the lower forty-eight States.  *See* AR002542 (April 15, 2017, meeting notes showing Tribe's attorney Colin Hampson referring to "DOI precedent re: [Indian Lands] – Big Sandy, Quinault");[6] AR002552 (April 3, 2018, meeting notes showing Tribe's attorney Colin Hampson stating that "DOI obligated by [25 USC § 5123(f) and (g)] to treat tribes the same"); Decl. of Matthew Kelly ("Kelly Decl.")

---

[6] The Big Sandy Rancheria is located in California; the Quinault Tribe in Washington State.

¶¶ 7(m), 19(c), (*l*) (defining shorthand).  The Tribe even went so far as to request that Interior withdraw the M-Opinion.  *See* AR001239–43.

Indeed, in both of the Interior meetings upon which the Tribe now relies in an effort to demonstrate improper behavior, Interior actually signaled that—consistent with the M-Opinion—the Ondola Allotment's status as a restricted fee allotment in Alaska presented a potential issue.  *See* AR002543 (notes from April 15, 2017, showing Cason statement that the Tribe's request "sounds unusual"); AR002545 (statement from Interior attorney at August 15, 2017, meeting that "Different overlay in [Alaska] we're looking at"); *accord* AR002555 (April 4, 2018, meeting showing Cason stating that "other Alaska issue may affect" application).

The Tribe also claims that Mr. Cason represented "in the summer of 2017" that "he did not believe there were any substantive legal issues that would be a barrier to the Tribe's request."  Pl.'s Mot. at 15 (citing Marnell Decl. ¶ 5).  But—even if such preliminary statements could bind the agency—the Tribe's only support for the statement is hearsay from an unidentified tribal consultant.  *See* Marnell Decl. ¶ 5.  As explained above, the record shows the Tribe was well aware of the legal issues.  Further, on August 15, 2017, Mr. Cason was still unfamiliar with the Tribe's application and Alaska-specific legal issues.  *See* AR002542 ("What do you have in mind?"); AR002543 (asking if an "App[lication] is pending?"); AR002544 (noting his "exp[erience] ltd. to gaming on trust land" and that he had "to get up to

16

speed"); Kelly Decl. ¶ 13. Mr. Cason had only started his present
employment at the Department in May 2017. *See* Dep't of the Interior Press
Release, Interior Announces New Hires (May 26, 2017), *available at*
https://www.doi.gov/ pressreleases/interior-announces-19-new-hires.

In addition—and notably absent from the Tribe's factual telling—is a
December 11, 2017, phone call between Interior's and the Tribe's attorneys.
During that call, Interior had questions for the Tribe regarding the substance
of its application, noting that—again consistent with the M-Opinion—
"Jurisd[iction] is the fundamental Q[uestion] here." AR002548; Kelly Decl.
¶¶ 17(*i*), (j). Nowhere are political considerations referenced. *See also*
AR002111 (restating Interior's questions from the December 11 phone call).
Thus, the circumstances here do not support a conclusion that Interior
contrived the reasoning in the Ondola Decision just to hide some separate,
inappropriate motive. *See, e.g., Dep't of Commerce*, 139 S. Ct. at 2574–76
(agency had, among other things, publicly stated one reason for its decision,
only to later supplement the record with a post-hoc memorandum explaining
the contrary).

The lack of any evidence suggesting the Ondola Decision was
pretextual is significant given the "well-established" rule "that an agency's
action must be upheld, if at all, on the basis articulated by the agency itself."
*Motor Vehicle Mfrs.*, 463 U.S. at 50. "[A] court may not reject an agency's
stated reasons for acting simply because the agency might also have had

17

other unstated reasons." *Dep't of Commerce*, 139 S. Ct. at 2573 (citing *Jagers v. Fed. Crop. Ins. Corp.*, 758 F.3d 1179, 1185–86 (10th Cir. 2014)). Interior's application of the M-Opinion will stand or fall on its own, regardless of any subjective political views that Interior leadership may have had. *Accord Dep't of Commerce* 139 S. Ct. at 2574 ("It is hardly improper for an agency head to come into office with policy preferences and ideas, [and] discuss them with affected parties . . . ."). If the Ondola Decision cannot survive APA review on its own terms, the remedy is not discovery, but remand of the decision to Interior for further consideration. *See Camp*, 411 U.S. at 143; *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981).

> **B.      The Tribe Has Not Made Any Showing—Let Alone a Strong One—that Interior Based its Decision-Making on Senator Murkowski's Views**.

Perhaps recognizing that the Ondola Decision was not based on any improper political considerations, the Tribe does not even attempt to undercut the Decision's reasoning. Instead, the Tribe focuses primarily on two meetings Interior held during its decision-making process: (1) an August 15, 2017, meeting with the Tribe; and (2) an April 4, 2018, meeting with representatives from the Alaska Congressional delegation. Pl.'s Mot. at 14–18. The Tribe argues that Interior stated an intent in the August 15 meeting to base its decision on political considerations, and then followed through on that intent, as evidenced by the April 4 meeting and other purported (and

circumstantial) facts.  *See id*.  But the Tribe's arguments—and any semblance of a "strong showing"—quickly fall away when one actually dives into the Tribe's offerings.

1. Interior's Meeting Notes Do Not Show Any Improper
Political Consideration.

For starters, nothing in Interior's notes for the August 15, 2017, meeting demonstrate that Interior was even aware of Senator's Murkowski opposition, let alone that Interior intended to base the Ondola Decision on political considerations.  *See* AR002537–45 (August 15 notes and transcription).  To the contrary, the August 15 notes show that it was *the Tribe's* partners and representatives who first (and twice) broached the subject of Senator Murkowski.  *See* AR002542, AR002544; Kelly Decl. ¶¶ 7(b), (*i*) (clarifying that "Corp." and "Curtis" likely refer to Eklutna, Inc. and its then-CEO, Curtis McQueen); *id*. ¶ 9.  The Tribe had sought the Senator's views in advance of the meeting.  *See* Farber Decl. ¶ 8 (describing August 1, 2017, meeting with Senator Murkowski).  And the Tribe then informed Interior that the Senator was "supportive."  AR002542.  The only time Interior (Mr. Cason) referenced Senator Murkowski at the April 15, 2017, meeting was to note (after the Tribe broached the topic) that the Senator and then-Secretary had a good working relationship on Alaska issues generally.  AR002544; Kelly Decl. ¶ 10.

19

The notes from Interior's August 4, 2018, meeting similarly do not show any actual opposition to the Tribe's application, and certainly do not show anything that could constitute a demand that Interior deny the Tribe's application or a strong showing that Interior potentially acted upon such a demand.  *See* AR002553–55 (April 4 notes and transcription); *see also* Kelly Decl. ¶ 25 (no recollection of request to deny Tribe's application).  To the contrary, the Tribe and Interior had discussed the day prior that Senator Murkowski was "neutral" on the Tribe's application, and that the Tribe had "support from [the] delegation" and "[b]ipartisan support of elected officials." *See* AR002552; Kelly Decl. ¶¶ 21, 22.

The Tribe's contention that it was unaware that Interior would meet with Senator Murkowski's staff on April 4 is surprising.  *See* Pl.'s Mot. at 16. Interior had informed the Tribe the day prior that Senator Murkowski's chief of staff would be at the agency the next day.  *See* AR002552 (transcribed notes from April 3, 2018, meeting); Kelly Decl. ¶¶ 20(o), 21 (noting that "SW" signified Stephen Wackowski).  If anything, that is evidence of good faith transparency, not bad faith decision-making.

Perhaps recognizing that the meeting notes do not support its arguments, the Tribe asserts that statements from the Senator's office *to the Tribe* somehow show that Interior was aware of, and based its decision on, the Senator's views.  *See* Pl.'s Mot. at 18.  But that could only be the case if: (1) there was evidence that a statement from the Senator's office opposing the

Tribe's application was actually conveyed to Interior; and (2) the Tribe could then make the necessary strong showing that Interior improperly based its decision on that information.   Interior's notes from the meetings do not show either.

        2.    <u>The Tribe's Declarations Are Contradicted by the Record and Do Not Make a Strong Showing</u>.

Left with scant record evidence of any improper political consideration, the Tribe turns to its declarants.   But the relevant declaration paragraphs are contrary to the record and, for that and other reasons, do not amount to a "strong showing" that Interior based the Ondola Decision on improper political considerations.

The Tribe starts with the April 15, 2017, meeting.   Mr. Farber and Mr. Marnell both claim (verbatim) that "[m]y recollection is that during this meeting Mr. Cason indicated that he would need to know the views of the Alaska congressional delegation, meaning Senator Lisa Murkowski, Senator Dan Sullivan, and Representative Don Young, and their support would be needed in order for the Department to make a positive Indian lands determination."   Farber Decl. ¶ 9; Marnell Decl. ¶ 6.   The cut-and-paste—done for litigation purposes nearly three years after the meeting in question—is reason enough to question the "recollections."   In any event, the contemporaneous notes from the meeting do not support the statement.   *See*

AR002541–45.  And the Interior employee at the meeting who was working on the Tribe's application does not share the memory.  *See* Kelly Decl. ¶ 16. [7]

Mr. Farber also later claims that an (unidentified) Interior "senior political appointee" told him "that Mr. Cason wanted to know Senator Murkowski's views on the proposed project in particular," and that Senator Murkowski had "communicated her negative views to the Department at some point, or at multiple points, during the Department's decision-making process."  Farber Decl. ¶ 13.  But, here again, other facts do not support the Tribe's apparent theory.  Of the meetings the Tribe claims to have had with Senator Murkowski or her staff, it was not until the third (on May 8, 2018) that the Senator is alleged to have stated any opposition to the Tribe's project.  *See* Farber Decl. ¶¶ 8, 10, 12; Leggett Decl. ¶ 7.  But this was *after* Interior's April 4, 2018, meeting with representatives from the Alaskan delegation.  And the Tribe does not point to any actual evidence of later communications between Senator Murkowski or her staff and Interior.

But let us assume Senator Murkowski had communicated her supposed opposition to Interior.  Even then, knowledge of (or even interest in) the views of Alaska's Congressional delegation—which represents those who would actually be affected by the outcome of Interior's decision—does not,

_____

[7] The "recollection" from the August 15 meeting is not the only example of verbatim language across the Tribe's declarations.  *Compare, e.g.,* Farber Decl. ¶ 12 *with* Leggett Decl. ¶ 7.

standing alone, represent *improper* political consideration.  *See Blum*, 458 F.
Supp. at 662–63.

Indeed, the Supreme Court recently undercut the Tribe's contention
that "*any* reliance on political views" constitutes improper behavior under the
APA.  *See* Pl.'s Mot. at 14.  "Agency policymaking is not a 'rarified
technocratic process, unaffected by political considerations or the presence of
Presidential power.' . . . Such decisions are routinely informed by unstated
considerations of politics, the legislative process, public relations, interest
group relations, foreign relations, and national security concerns (among
others)."  *Dep't of Commerce*, 139 S. Ct. at 2573 (internal citation omitted).
The Tribe itself seems to recognize this reality, having sought Senator
Murkowski's views on its application no less than three times, and discussed
those views with Interior at least twice.  *See* Farber Decl. ¶¶ 8, 10, 12;
AR002552; AR002542.

The Tribe's theory also makes little sense for another reason: even if
Senator Murkowski was opposed to the Tribe's project, the entire Alaska
delegation was not.  Congressman Don Young submitted a letter to Interior
*in support* of the Tribe's application.  *See* AR000030–31.  The Tribe clearly
found it appropriate for Interior to "consider" Congressman Young's views, as
it forwarded the letter to the agency.  *See* AR002092–94.  But if it was
improper for Interior to have "considered" Senator Murkowski's views in
opposition, it would similarly have been improper for Interior to have

"considered" Congressman Young's views in support.  The resulting Catch-22 is evident: any member of Congress who found it necessary to comment on behalf of her constituents with respect to an agency decision would be damning her desired outcome as one based upon the allegedly-improper political considerations the Tribe claims to have occurred here.[8]

Nor would it be remarkable if there was generally "frequent communication" between the offices of Mr. Cason (the Associate Deputy Secretary of Interior) and Senator Murkowski (at the time, Chair of the Senate Subcommittee on Department of the Interior, Environment, and Related Agencies, and of the Senate Committee on Energy and Natural Resources).  *See* Farber Decl. ¶ 13; Pl.'s Mot. at 18 n.7.  The Tribe has pointed to nothing that could be used to justify a conclusion that Senator Murkowski used her position (or those communications) to force Interior to make any specific decision on the Tribe's application, let alone that Interior actually

---

[8] The Tribe also relies on allegations in its Complaint.  *See* Pl.'s Mot. at 6 (citing Compl. ¶¶ 89–96); *id.* at 16 (citing Compl. ¶¶ 90, 92).  Allegations, however, do not equate to a strong showing.  *See Tafas*, 530 F. Supp. 2d at 797.  And Interior largely denied the cited allegations.  *See* Answer ¶¶ 89–96, ECF No. 18.  The Tribe makes much of Interior's limited admission in response to Paragraph 93.  Pl.'s Mot. at 14.  Interior admitted "that at least one member of the Alaska Delegation submitted comments on the Tribe's submission" because of Congressman Young's letter in support.  Answer ¶ 93.  Interior had not yet located the April 4, 2018, meeting notes at the time of its Answer.

based the Ondola Decision on the Senator's views.  *See Sierra Club v. Costle*, 657 F.2d 298, 409–410 (D.C. Cir. 1981).

>    3.   The Very Cases the Tribe Cites Demonstrate the Tribe's
>         Lax Showing.

Thus, all told, the circumstances here pale in comparison to those in the cases upon which the Tribe relies.  For one, the courts in *Sierra Club v. Costle* and *Community Federal Savings & Loan v. Federal Home Loan Bank Board* actually denied the requests for discovery.  *See* 657 F.2d at 389 n.450, 408–410 (D.C. Cir. 1981); 96 F.R.D. 619, 621 (D.D.C. 1983).  And *Connecticut v. Department of the Interior*—upon which the Tribe presumably relies because it references Mr. Cason—did not even involve a motion for leave to conduct extra-discovery.  *See* 363 F. Supp. 3d 45 (D.D.C. 2019).  Rather, the court was resolving a motion for leave to add, in part, *a claim* of improper political influence.  *See id*. at 50, 54.  The plaintiff there, unlike the Tribe here, did not need to make a strong showing of improper behavior.  *See id*. at 54–55; *id*. at 64.

In *Sokaogon Chippewa Community v. Babbitt*, the court allowed extra-record discovery.  *See* 961 F. Supp. 1276, 1287–88 (W.D. Wis. 1997).  But the factual showing made there is easily distinguishable from the one the Tribe makes here.  The court's conclusion was based upon "considerable evidence" showing: (1) Interior had met, at a Senator's request, with tribes opposed to the applicant-tribe's project without informing the latter; (2) involvement of

the White House, which, after having received a request to deny the application from those opposed, contacted Interior and received, in response, draft letters articulating different levels of Interior progress on the application, seemingly for the White House to choose which one it wanted sent; (3) the Secretary of the Interior had stated that the White House had directed the decision's release date; (4) a twenty-day period in which a lengthy staff recommendation to approve the application was changed to a short (apparently pretextual) denial; and (5) Interior had approved a similar application despite the presence of the factors that supposedly led to the denial of the application at issue. *See id.* 1281–84, 1286.

Nothing similar—either separately or collectively—has been shown to have occurred here. Interior informed the Tribe that it would be meeting with Senator Murkowski's chief of staff. AR002552; Kelly Decl. ¶ 21. There is no evidence of any White House involvement. The Tribe has identified no facts showing Interior suddenly reversed course from a plan to approve the Tribe's request. And the M-Opinion has been a foundation from which Interior has previously issued negative Indian lands determinations for restricted fee allotments in Alaska. *See supra* at 15; *see also Menominee Indian Tribe of Wis. v. U.S. Dep't of the Interior*, No. 09-cv-496, at *7–8 (E.D. Wis. Nov. 4, 2010) (distinguishing *Sokaogon* to deny request for extra-record discovery).

Further, in *Department of Commerce v. New York*, the district court's conclusion of improper behavior was not based on any improper political considerations, but upon a post-decisional memorandum added to the record that set forth facts contradicting the agency's previously-stated reasons for the decision at issue. *See* 139 S. Ct. at 2574; Transcript & Order, *New York v. Dep't of Commerce,* Case No. 18-cv-2921, at 82–85 (S.D.N.Y. June 8, 2018), excerpt attached as Ex. 7.[9] In *Stand Up for California! v. U.S. Department of the Interior*, the administrative record showed, in addition to other facts not present here, that a Senate staffer had requested a decision before the end of Obama Administration and that Interior had acknowledged and agreed to do just that. *See* 315 F. Supp. 3d 289, 296–98 (D.D.C. 2018). And, in *New York v. Salazar*, letters and emails showed that a lobbyist had requested a specific outcome, and that Interior headquarters leadership had implicitly directed staff to reach that outcome and also withdrawn the delegation of decision-making authority to the regional office. *See* 701 F. Supp. 2d 224, 241–43 (N.D.N.Y. 2010).[10] The Tribe has not made any similar strong showing of improper behavior here.

---

[9] Though the Supreme Court ultimately agreed that limited extra-record discovery was appropriate, the Court noted that "the District Court should not have ordered extra-record discovery when it did." *Dep't of Commerce*, 139 S. Ct. at 2574.

[10] There is no general delegation of authority to Interior's regional offices for gaming-related leasing decisions. *See* Authority to Approve Leases of Lands

### C.   The Tribe Has Not Made a Strong Showing that Interior's Decision-Making Timeline Was Driven by Political Considerations.

The Tribe also fails to demonstrate that political motivations drove Interior's decision-making timeline. *See* Pl.'s Mot. at 15–16, 18. The Tribe claims Interior delayed its decision-making process to "buy[ ] time" in advance of the April 4, 2018, meeting. *See* Pl.'s Mot. at 16, 18; Farber ¶ 9. The only support the Tribe offers, however, is again Mr. Farber's supposed conversation with the (still unidentified) Interior "senior political appointee." *See* Farber ¶ 13. The administrative record contradicts the Tribe's telling. [11]

Contrary to the Tribe's claims, the contemporaneous notes from the August 15, 2017, meeting do not reflect any commitment to issue a decision by the end of 2017. *Compare* AR002541–45 *and* Kelly Decl. ¶ 15 *with* Farber

---

for Gaming Purposes (April 1, 2002), attached as Ex. 8.  Interior conveyed this to the Tribe.  *See* AR002549 (statement to Tribe that "Gaming leases approved by [Assistant Secretary of Indian Affairs]"); Kelly Decl. ¶ 17(k) (defining "ASIA").

[11] The Tribe asserts that is was "highly unusual" that the Indian lands determination was signed by the Principal Deputy Assistant Secretary, rather than the Solicitor's Office or the National Indian Gaming Commission. *See* Pl.'s Mot. at 18.  But the Tribe was not requesting an Indian lands opinion in the abstract.  It had also requested approval of a lease under 25 U.S.C. § 415, for which the Principal Deputy Assistant Secretary holds delegated decision-making authority.  *See* 25 U.S.C. § 415; Department of the Interior Departmental Manual, pt. 109, ch. 8, pt. 200, ch. 1, pt. 209, ch. 8, attached as Ex. 9.  The Tribe was aware of this.  *See* AR002545 (statement from Interior attorney that request was "properly [at Interior]"); Kelly Decl. ¶ 14.

Decl. ¶ 9.  But even if that had been the aspirational target, there is nothing to support the idea that Interior was just sitting on its hands for two years. The Tribe submitted supplemental information to Interior in December 2016, June 2017, November 2017, and December 2017.  Pl.'s Mot. at 3.  Interior attorneys assigned to the matter reached out with substantive questions in June and December 2017, noting during the latter that they were "wrapping up [an] options memo."  *See* AR002051–61 (noting and responding to questions discussed in phone conversation with Interior); AR002548 (statement of Interior attorney Eric Shepard).  The Tribe offers nothing to suggest Interior's efforts were all just a ruse.[12]

In any event, a two-year timeline from request to decision for an Indian lands determination is not out of the ordinary.  *See* Oct. 4, 2018, Letter from Michael Hoenig to Virgil Moorehead, attached as Ex. 10 (October 2018 opinion in response to August 2016 request by Big Lagoon Rancheria); Jan. 25, 2017, Letter From Michael Hoenig to Earl Howe III, attached as Ex. 11 (January 2017 opinion in response to September 2014 request by Ponca Tribe of Oklahoma).  And, here again, the facts are nothing like those in *Stand Up*

---

[12] There is also nothing to the claim that responsibility for the Tribe's application was reassigned within Interior to remove staff who may have supported the project.  *Compare* Faber Decl. ¶ 13 *with* Kelly Decl. ¶ 5 (noting that prior employee assigned left the Department).  The reassignment occurred in November 2016, before Mr. Cason was even at Interior.  *See* Kelly Decl. ¶ 4.

*for California!*.   *See* Pl.'s Mot. at 16 (citing 315 F. Supp. 3d at 296).   There, administrative record materials documented that the timing of Interior's decision was explicitly driven by a desire—in alignment with a request from a Senate staffer—to complete the decision before the change in administrations.   *See id.* at 297.   The court based its conclusion on "the unique and likely rare combination of circumstances leading to the [decision]."   *Id.* at 296.   The Tribe has not even attempted to make an analogy to those unique circumstances and has failed to make a strong showing of improper political considerations.

## III.   Extra-Record Evidence is Not Necessary for Effective Judicial Review of the Ondola Decision.

Perhaps recognizing its weak showing of improper behavior, the Tribe also requests extra-record discovery—primarily document productions relating to Interior's internal deliberations—because it claims Interior's record is "facially inadequate."   Pl.'s Mot. at 21.   But only in a "rare case" would an administrative record be "so bare as to frustrate effective judicial review" to the extent of requiring extra-record discovery.   *Cmty. for Creative Non–Violence*, 908 F.2d at 998.   This is not one of those rare cases for three reasons.

First—and as explained above—the Tribe is wrong as a matter of law that the record is incomplete because it does not contain deliberative materials.   *See supra* at 9–10; *Oceana III*, 920 F.3d at 865.   The Tribe

attempts to support its argument by referencing a 2006 Department of the Interior guidance document. *See* Pl.'s Mot. at 22–23. But that guidance document is just that: guidance. *See* Standardized Guidance on Compiling a Decision File and Administrative Record at 1 ("This guidance establishes internal Departmental guidelines only."), attached as Ex. 12. The "document does not create any rights, substantive or procedural, that are enforceable at law by any party." *Id.* at 1 n.2. And, in any event, the guidance states that "[a]ll *relevant supporting documents*" should be included in an administrative record. Guidance at 6; *see id.* at 8 ("Documents that are not relevant to the decision-making process" should not be included). Internal, predecisional deliberations are not relevant to APA review. *See Oceana III*, 920 F.3d at 865. More-recent guidance to federal agencies from the Department of Justice's Environment and Natural Resources Division is also consistent with that approach. *See* Administrative Record Compilation in light of *In re Thomas E. Price*, Ninth Cir. No. 17-71121 (October 20, 2017), attached as Ex. 13.

Second, an administrative record will generally be considered adequate for judicial review where, as here, the agency has provided a contemporaneous explanation for its decision. *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 458 (D.C. Cir. 1994); *see also Dep't of Commerce*, 139 S. Ct. at 2753 ("[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." (citation omitted)). As explained above, the

circumstances do not support a conclusion that the Ondola Decision was contrived in an effort to cover politically based decision-making. *See supra* at 14–18.

Third, the record already documents that Interior was aware of the Alaska delegation's views on the Tribe's project. *See* AR002555; AR002552; AR002542. If—contrary to the Supreme Court's recent statements on the subject, *Dep't of Commerce*, 139 S. Ct. at 2573—Interior's knowledge (or even interest) in those views is relevant to the question of whether an agency decision is arbitrary and capricious, the Court has all it needs to decide the issue. The Tribe agrees. *See* Pl.'s Mot. at 4 (claiming that the administrative record "demonstrates that the Department did in fact seek, receive, and consider the views of political officials during the decision-making process.").

The Tribe nonetheless claims the administrative record is inadequate because it lacks notes from certain meetings and contains only a few documents from the months leading up to issuance of the Ondola Decision. *See* Pl.'s Mot. at 22–23. Neither contention has any merit.

With respect to the allegedly-lacking notes, just because a meeting occurred does not mean notes were taken. And, as already explained, any notes of meetings reflecting internal agency deliberations were properly excluded. Thus, the only relevant meetings would be meetings with outside parties, including the Tribe. *See* Pl.'s Mot. at 23 (citing Farber Decl. ¶¶ 5, 7, 11).

The record already contains notes from three of the five meetings the Tribe identified during the parties' efforts to resolve any record disputes. *See* Mar. 12, 2020, Letter at 3; AR002553–55 (April 4, 2018, notes); AR002546–49 (Dec. 11, 2017, notes); AR002537–45 (August 15, 2017, notes). The Tribe presents nothing about the remaining two—those on June 29, 2016, and May 7, 2018—that would make the record so bare as to warrant production of Interior's deliberative materials. *See* Farber Decl. ¶¶ 5, 11 (stating that Interior told the Tribe with whom it should meet to facilitate consideration of its application and that Interior needed time to finish its review).[13]

The alleged time gap similarly does not demonstrate the record to be inadequate for effective judicial review. It is not surprising that the record contains few documents for the months prior to June 2018, when Interior was deliberating and drafting its decision. *See* AR002555 (Mr. Cason noting on April 4, 2018, that there were still a "few things to be finished"). In the D.C. Circuit, deliberations and drafts are properly excluded from the

---

[13] The Tribe also implies bad faith because the record did not originally contain the four meeting notes Interior later added. *See* Pl.'s Mot. at 7–8, 22. The facts, however, show the opposite of bad faith: (1) in response to the Tribe's concerns, Interior undertook an additional search for meeting notes, going so far as to locate a specific employee's notebook; (2) Interior disclosed the existence of the notebook, despite an initial belief that it was unlikely to contain notes for the meetings in question; (3) Interior agreed to review the notebook at the Tribe's request; and (4) Interior supplemented the record with those notes found to contain record material. *See* Mar. 27, 2020, Letter; April 16, 2020 Letter; Jt. Mot. to Vacate Briefing Schedule & For Temp. Stay ¶ 3, ECF No. 29.

administrative record.  *See Oceana III*, 920 F.3d at 865.  Other
administrative records have similarly contained few if any documents in the
weeks or months prior to the agency action at issue.  *See, e.g.*, U.S. Army
Corps of Eng'rs Admin. R., *Am. Bird Conservancy v. Brouillette*, No. 19-cv-
3694-TJK, ECF No. 8-1 (D.D.C. April 23, 2020) (showing only three index
entries between September 2018 completion of Environmental Assessment
and March 2019 permit issuance), attached as Ex. 14.

Thus, the Tribe fails in its attempt to analogize to the district court's
ruling in *New York v. U.S. Department of Commerce* (a case originating in the
Second Circuit).  *See* Pl.'s Mot. at 19, 22 (citing July 3, 2008, transcript in
Case No. 18-cv-2921 (S.D.N.Y.)).  To the extent the district court based its
ruling there on a conclusion that the period in question should have been
filled with internal agency deliberations, that conclusion would not be
supportable in the D.C. Circuit.  *See Oceana III*, 920 F.3d at 865.  But that
does not appear to have been the basis for the court's conclusion.  *See*
Transcript & Order, *New York v. Dep't of Commerce,* Case No. 18-cv-2921, at
79–82.  Rather, the court relied on a change in the agency's position
regarding when (and why) it had begun to consider the policy at issue, and
data that the agency had relied upon but that did not appear in the record.
*See id*. at 79–82.  The Tribe is not making a similar argument here.

The Tribe is also wrong in contending a privilege log is necessary.  *See*
Pl.'s Mot. at 24.  No documents that would otherwise constitute record

material have been withheld fully from the record on the basis of any privilege. Interior properly concluded that deliberative materials were not to be part of the administrative record. *See Oceana III*, 920 F.3d at 865. Absent a strong showing of bad faith—which the Tribe has failed to make here—those materials are not relevant to the Court's review of the Ondola Decision. *See id.* Thus, there is no reason to provide a log for those documents, nor for those of them that may also be subject to any privilege. *Nat'l Ass'n of Chain Drug Stores*, 631 F. Supp. 2d at 27–28.

## IV.   Even if the Tribe Had Met Its Burden, the Proper Remedy Would be Further Explanation from Interior, Not Discovery.

Finally, even if the Tribe had made a strong showing of improper behavior (it has not), the requested discovery would be overly broad. The point of extra-record evidence in APA cases is to fill a gap in the record that would otherwise prevent effective judicial review. *Accord Cmty. for Creative Non-Violence*, 908 F.2d at 997–98. Here, the Tribe's alleged gap is the question of whether Interior based the Ondola Decision on improper political considerations. But, to fill that gap (even if it existed), the Tribe would not need three depositions—only one of which would be of the actual decision-maker (Mr. Tahsuda)—written deposition questions, interrogatories, and all the Department's deliberative materials. *See Cmty. Fed. Sav. & Loan*, 96 F.R.D. at 621 (depositions only permitted where information is "not available from some other source" (citations omitted)).

35

Instead, the supposed gap could easily be filled through interrogatory responses or an explanatory declaration. *See Cmty. Fed. Sav. & Loan*, 96 F.R.D. at 621 (agency officials generally not required to sit for deposition where agency is willing to produce documents or respond to interrogatories). But the Court need not reach that question because, for the reasons explained above, the Tribe has not made a strong showing of bad faith or improper behavior that would justify even that (still extraordinary) outcome.

## CONCLUSION

The Tribe has not made a "strong showing" that Interior improperly relied upon the views of the Alaska Congressional delegation. The Ondola Decision is based upon application of long-standing Departmental legal opinion, and there is nothing improper about Interior officials having knowledge of the Congressional delegation's views on the Tribe's proposals. And even if the latter were not the case, the administrative record already documents that Interior was aware of those views. Effective judicial review can therefore be accomplished on the administrative record. The Tribe's motion for extra-record discovery should be denied.


Date: July 20, 2020

JEAN E. WILLIAMS
Deputy Assistant Attorney General

 *s/ Kristofor R. Swanson*

36

KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
Senior Attorney
Natural Resources Section
Envt. & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0248
Fax: (202) 305-0506
kristofor.swanson@usdoj.gov

*Attorneys for Federal Defendants*

Of Counsel:

JONATHAN R. DAMM
Division of Indian Affairs
Office of the Solicitor
U.S. Department of the Interior
Washington, DC

37