# Exhibit 1

To

Federal Defendants' Opposition to Plaintiff's Motion for Extra-Record Discovery

*Administrative Record Excerpts*

# BRIEFING MEMORANDUM

**To:**     James Cason, Associate Deputy Secretary
**From:** Lee Stephan, President, Traditional Tribal Council, Native Village of Eklutna
**Date:**  August 10, 2017
**Re:**     Meeting with Native Village of Eklutna

**_Tribal Background_**.  The Native Village of Eklutna ("NVE" or "Tribe") is a federally recognized tribe in Alaska.  Members of NVE are Dena'ina (Athabascan) people who have occupied the upper Cook Inlet region since long before time of contact.  The village of Eklunta is the oldest inhabited place in the Anchorage bowl area.  The Tribe is governed by a seven-member Traditional Tribal Council and has 351 enrolled members. The Tribe owns 115 acres of fee land within its traditional area.  The Tribe provides a variety of governmental programs for, and exercises jurisdiction over, its members, fee lands and an allotment ("Ondola Allotment") that is owned by nine tribal members and located approximately 7 miles from the Village.

**_Proposed Project_**.  NVE is seeking to develop a small class II gaming facility on the Ondola Allotment.  The Tribe has partnered with Marnell AK LLC for development of the project and has signed Loan, Development and Management Agreements with Marnell for assistance with the development and operation of its planned facility.  The project will consist of a 35,000 sq. ft. single-level building with approximately 500 class II gaming machines.  The complex will include a casual restaurant and bar and a parking area.  The project is expected to create 200 construction related jobs and 100 new permanent jobs after opening.

**_Project Need_**.  The unemployment rate among NVE members is approximately 35% - well above the Anchorage average of 5.3%.  Approximately 85% of tribal members live at or below the poverty level and the average per capita income is around $11,000/year.  These numbers contrast starkly with the neighboring Anchorage population in which 10% of its population is living at or below the poverty level and the average per capita income is $34,511.  NVE relies primarily on grants to fund its governmental operations and to provide much needed social and welfare programs for the benefit of its members.  The Tribe also relies on Eklutna, Inc., the Alaska Native village corporation in its region, for funding assistance.  It has been difficult for NVE to create sustainable businesses due to its distance from the local Anchorage population and the limited number of services it can offer and provide its tribal members.  NVE has been working with Eklutna, Inc. to find ways to become more economically self-reliant and independent. Eklutna, Inc. supports the Tribe's efforts to establish a class II facility; without this project, the Tribe has virtually no other opportunities for sustainable economic development.

**_Request to Interior_**.  On June 29, 2016, NVE submitted a request asking that Interior confirm that the Ondola Allotment is Indian lands within the meaning of IGRA and provided a substantive factual and legal analysis to support such a conclusion, which it has supplemented twice.  As summarized below, NVE believes that the Department currently has all of the information it needs to confirm that the Ondola Allotment constitutes Indian lands and qualifies for gaming under IGRA.

1

AR000001

***Legal Analysis.*** IGRA provides that an "Indian tribe" may authorize gaming on "Indian lands within such tribe's jurisdiction."[1]

(1) The Ondola Allotment is Indian lands. "Indian lands" under IGRA includes trust lands held by tribes or land "title to which is . . . held by any . . . individual subject to restriction by the United States against alienation[.]"[2] The Ondola Allotment qualifies as "Indian lands" under IGRA because since 1963[3] it has been owned by tribal members subject to a restriction against alienation. The allotment was granted pursuant to the Alaska Native Allotment Act, which was enacted to give "Indians, Eskimos and Aleuts" the same ability to obtain allotments as their Indian counterparts in the lower 48; courts have made no distinction between allotment acts.

(2) NVE has jurisdiction and exercises governmental authority over the Ondola Allotment. Courts have found that satisfying the requirement of tribal authority depends "upon the presence of concrete manifestations of [governmental] authority."[4] The Tribe exercises its jurisdictional authority over the Ondola Allotment in numerous ways, as detailed in NVE's June 29, 2016 submission. The Ondola family has historically been a part of the Eklutna community and has recognized and submitted to the jurisdiction of the Tribe. The Ondolas reaffirmed this in the Lease Agreement between the family and the Tribe. It is also understood within the Eklutna community that the Ondola Allotment is subject to tribal authority and all tribal laws and ordinances apply to and govern activities on the Allotment. Mrs. Ondola, the original allottee, and her family, all of whom are tribal members, have maintained active involvement with the Tribe, including serving in leadership positions. Interior and NIGC have both determined that similarly situated allotments in the lower 48 qualified as "Indian lands" under IGRA. *See* NIGC, Big Sandy Rancheria Indian Lands Determination (Sept. 6, 2006); Opinion of the Solicitor, Sampson Johns Allotment (September 26, 1996) (involving the Quinault Tribe). The Ondola Allotment presents no significant factual or legal differences to distinguish it from the allotments at issue in those other decisions. 25 U.S.C. § 476(f) and (g) (the privileges and immunities provisions) prohibit the Department from treating its analysis of this Project differently based on its location in Alaska.

(3) A favorable Indian lands determination is consistent with the Sansonetti Opinion. Solicitor Sansonetti's M-36975 Opinion (Jan. 11, 1993) acknowledged that: Alaska Native allotments are Indian country; its analysis of such allotments was necessarily tentative because the Opinion did not address specific fact patterns; and, in the event of later federal legislation on the issue, such legislation would supersede the Opinion. The Opinion's analysis of allotments comprises just a few paragraphs of the 133-page opinion, is flawed and contrary to case law, and furthermore Congress enacted superceding legislation. In any event, the Opinion said that where an Indian allottee has maintained tribal relations to a tribe, or where there is otherwise a tribal nexus with the allotment, tribal jurisdiction may exist. Here, as amply demonstrated in NVE's submissions, there is a clear tribal nexus to the Ondola Allotment, and there is no evidence that the allotment has been held by "an Indian who had abandoned tribal relations."

---

[1] 25 U.S.C. § 2710(b).

[2] *Id.* at § 2703(4)(B).

[3] Olga Ondola, the original allottee, resided on the land beginning in the 1920's.

[4] *See, e.g., Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 701-03 (1st Cir. 1994), *superseded by statute as stated in Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n,* 158 F.3d 1335 (D.C. Cir. 1998); *Cheyenne River Sioux Tribe v. South Dakota,* 830 F. Supp. 523 (D.S.D.), *aff'd* 3 F.3d 273 (8th Cir. 1993).

AR000002



**DON YOUNG**
CONGRESSMAN FOR ALL ALASKA
**WASHINGTON OFFICE:**
2314 RAYBURN BUILDING
WASHINGTON, DC 20515
202-225-5765

COMMITTEE ON
NATURAL RESOURCES

CHAIRMAN, SUBCOMMITTEE ON
INDIAN, INSULAR, AND
ALASKA NATIVE AFFAIRS

COMMITTEE ON
TRANSPORTATION & INFRASTRUCTURE

Congress of the United States
House of Representatives
Washington, D.C. 20515

November 21, 2017

James Cason
Associate Deputy Secretary
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C.  20240

Dear Mr. Cason,

I write to express my strong support for the Native Village of Eklutna's ("NVE") proposed tribal gaming project and NVE's Indian lands determination request pending before the Interior Department.

NVE is the only federally recognized Indian tribe located in the immediate Anchorage, Alaska area, a region it has occupied for thousands of years.  NVE has approximately 350 tribal members, many of whom live below the poverty line and require various forms of government assistance.  The proposed project revenues will benefit NVE and its members and their families, which have long suffered from high unemployment and poor health, education, and housing conditions.

I recently met with NVE representatives and learned the details surrounding the project.  As you know, the proposed gaming facility will be a modestly sized class II casino.  It will be located on allotted tribal member land approximately 20 miles from downtown Anchorage, 7 miles from the Village headquarters and squarely within NVE's aboriginal territory.  The site is in a mixed commercial-industrial area next to the Birchwood Airport.  The casino will be operated under the Indian Gaming Regulatory Act and professionally managed.

This project will be good for Alaska and will bring much-needed economic development to the Anchorage and Matanuska-Susitna areas.  It will create a substantial number of construction jobs and valuable full- and part-time jobs. Independent studies estimate that the project will support as many as 150 new full-time equivalent positions, plus as many as 500 indirect new jobs.  The casino and its employees will pay applicable income, sales and use, and other taxes. These jobs, tax revenues, and economic development are desperately needed in my state. Unfortunately, Alaska recently ranked 51st in unemployment, behind all other states and the District of Columbia.

VISIT OUR WEBSITE
HTTP://DONYOUNG.HOUSE.GOV

4241 B STREET
SUITE 203
ANCHORAGE, ALASKA 99503
907-271-5978

100 CUSHMAN STREET, SUITE 307
P.O. BOX 73110
FAIRBANKS, ALASKA 99707
907-456-0210

CALL TOLL-FREE
1-866-990-5979

AR000030

NVE's request for an Indian lands determination was first submitted in June of 2016, over 16 months ago.  Since that date, it is my understanding that NVE has engaged in several in-person and telephonic conferences with Interior Department and Solicitor's Office representatives.   The Indian lands determination represents an important component of the project, and I urge you to finalize your response as quickly as possible before December, 2017.

Thank you for your time and consideration.

Sincerely,

DON YOUNG
Congressman for All Alaska

LAW OFFICES

# SONOSKY, CHAMBERS, SACHSE MILLER & MUNSON, LLP

900 WEST FIFTH AVENUE, SUITE 700
ANCHORAGE, ALASKA 99501
(907) 258-6377
FAX (907) 272-8332
WEBSITE: WWW.SONOSKY.COM

LLOYD B. MILLER E-MAIL: lloyd@sonosky.net
MARISSA K. FLANNERY E-MAIL: marissa@sonosky.net

HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER***
DONALD J. SIMON
DOUGLAS B. L. ENDRESON
MYRA M. MUNSON*
ANNE D. NOTO
MARY J. PAVEL
JAMES E. GLAZE***
DAVID C. MIELKE
GARY F. BROWNELL
COLIN C. HAMPSON
RICHARD D. MONKMAN**
MARISSA K. FLANNERY*
MATTHEW S. JAFFE
WILLIAM STEPHENS
VANESSA RAY-HODGE
LIA C. CARPENETI**
FRANK S. HOLLEMAN
MATTHEW L. MURDOCK
REBECCA A. PATTERSON^^
MAILE TAVEPHOLJALERN^
KENDRI M. M. CESAR*
NATHANIEL AMDUR-CLARK***

OF COUNSEL
ROGER W. DUBROCK*
KAY E. MAASSEN GOUWENS*
ARTHUR LAZARUS, JR.

MARVIN J. SONOSKY (1909-1997)

POLICY ADVISORS
HON. MARK BEGICH
JODI A. GILLETTE

JUNEAU OFFICE
302 GOLD STREET, SUITE 201
JUNEAU, ALASKA 99801
(907) 586-5880·FAX(907) 586-5883

SAN DIEGO , CA OFFICE
600 W. BROADWAY, SUITE 700
SAN DIEGO, CA 92101
(619) 267-1306·FAX(619) 267-1388

WASHINGTON, D.C. OFFICE
1425 K STREET, SUITE 600, N.W.
WASHINGTON, D.C. 20005
(202) 682-0240·FAX (202) 682-0249

ALBUQUERQUE, NM OFFICE
500 MARQUETTE AVE, N.W.
SUITE 660
ALBUQUERQUE, NM 87102
(505)247-0147·FAX (505) 843-6912

*ALASKA BAR
**ALASKA AND WASHINGTON BAR
*** ALASKA AND D.C. BAR
^HAWAI'I AND D.C. BAR
^^ALASKA AND ILLINOIS BAR

June 29, 2016

**VIA HAND DELIVERY**

Lawrence Roberts, Acting Assistant Secretary
Bureau of Indian Affairs
MS-3642-MIB
1849 C Street, N.W.
Washington, D.C. 20240

      Re:    Native Village of Eklutna Request for Indian Lands Determination Regarding
               Ondola Allotment

Dear Secretary Roberts:

      On behalf of the Native Village of Eklutna Tribal Council, we respectfully request a confirmation that the site where the Tribe proposes to conduct gaming, the Ondola Allotment, qualifies as "Indian lands" pursuant to the Indian Gaming Regulatory Act (hereinafter "IGRA" or "the Act"). The Ondola Allotment (the "Allotment") is located off of Birchwood Road, approximately seven miles from the Village and twenty-two miles north of Anchorage. It is owned by the Ondola family, all of whom are members of the Tribe, and is subject to a restriction on alienation pursuant to the Alaska Native Allotment Act.

      As discussed below, the Ondola Allotment qualifies as Indian lands under the Act and the Tribe exercises governmental authority over the Allotment.

AR000778

## I.    Brief History of the Native Village of Eklutna.

The tribal members of the Native Village of Eklutna (hereinafter "NVE" or "Tribe") are of the Dena´ina who have occupied the upper Cook Inlet region since well before Captain James Cook made his historic voyage and gave this region its present-day name.  NVE has a well-documented role as an important tribal center.  All the important geographic features in and around Eklutna carry Dena´ina place names, and the Village itself is significant enough to have a creation story about how it got its name.  *See* James Kari et al., *Shem Pete's Alaska: The Territory of the Upper Cook Inlet Dena´ina* 281-82, 299-301 (1987) (Ex. 1).  A cemetery filled with the "spirit houses" of deceased tribal members lies next to the church in the Village.  The church and cemetery are among the culturally significant sites in the Village, and the church is the oldest standing building in the Anchorage area.  These sites and the oral histories recorded in *Shem Pete's Alaska* and elsewhere demonstrate the importance and historical significance that the Eklutna region has had in the lives of past and present NVE tribal members.

The Native Village of Eklutna and its tribal members have steadfastly resisted the onslaught of European migration into the Tribe's traditional territory, at least to the extent of preserving the Tribe's cultural heritage and its sovereign authority over some, if not all, of its former lands.  *See* Aff. of George Ondola ¶3 (Jan. 26, 1995) (hereinafter "Ondola 1995 Aff.") (Ex. 2); *Shem Pete's Alaska*, Intro. & Ch. 15 (Ex. 1).  In 1784, for example, Captain Cook recorded that the Dena´ina people of the region approached his ship and traded furs and fish for iron.  *See* 6 *Handbook of North American Indians: Subarctic* 635-38 (June Helm vol. ed., 1981).  But while the Dena´ina and others were "eager to extend their trading enterprises to include Europeans, they were adamant in opposing any attempted settlement." *Id.* at 635.  And although the larger area over which the various villages and bands of the Dena´ina people traditionally exercised tribal jurisdiction was ultimately settled by Americans searching for gold in the 1870's, the environs in and around the Eklutna Native Village have retained their distinctly Native character.  *See* Fed. Field Comm. for Dev. Planning in Alaska, *Alaska Natives & the Land* 253 (1968) (hereinafter "Field Committee Report") (Ex. 3).  Indeed, at the time it was noted that "Anchorage, the largest European town within Tanaina limits, is located on Knik Arm, but the principle modern Indian village is farther up the coast at Eklutna."  *Id.*  And

> [d]uring this latter period [of white settlement in the 1900's], most Tanaina villages were either abandoned or taken under white cultural and political dominance so that today only two identifiable Tanaina villages – Tyonek and Eklutna – exist in a region where a score were present about the turn of the century.

*Id.* at 255.

In addition, to preserve the distinctly Native character of the greater Eklutna region, the current NVE Tribal Council and its predecessor "nonwestern" form of tribal government[1] have long

---

[1]    As Dr. James Fall explains in *Shem Pete's Alaska*:

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 3 of 30

maintained a defiant attitude towards any encroachment onto traditional Eklutna lands. Before his death, respected Dena´ina elder Shem Pete reported the Tribe's willingness to defend its territory from encroachment by Russian traders:

> They [Russians] had their headquarters in Kenai. They killed lots of people, and they took their women. They didn't move into the [Dena´ina] villages. They [were] scared the Dena´ina would kill them. They didn't trap much [on the Kenai Peninsula]. . . . They [Russians] were too cheap [in trading]. They don't allow them. They kill them. Not even ten or twenty in a group go there, because too many natives.

*Shem Pete's Alaska* at 17 (Ex. 1) (alterations in original). As a result of these attitudes, the Eklutna people were, by and large, left unmolested in the use and occupancy of their territory until after the beginning of the twentieth century. *Id.* at 20.[2]

When white settlers began to enter the Eklutna region and it became evident that the tide of American migration would not stop, Eklutna tribal leaders began to petition the United States government for the protection of their tribal lands. Express federal recognition and protection of Eklutna's traditional territory goes back to 1927 when President Calvin Coolidge set aside by Executive Order a reserve of 1,818 acres for the benefit and education of the Eklutna and other Alaska Natives. *See* Executive Order 4778 (Dec. 5, 1927); Field Committee Report at 445 (Ex. 3);

---

> In the nineteen and early twentieth centuries, the Upper Inlet Dena´ina comprised several regional bands. These included the **Tubughna** of the northwest shores of upper Cook Inlet, the **Susitnuht´ana** of the Susitna River drainage as far upstream as the mouth of the Yentna River, the **Yentnuht´ana** of the Yentna River drainage, the **Dashq´eht´ana** of the middle Susitna drainage up to the mouth of the Talkeetna River, and the **K´enaht´ana** of the Knik Arm and the Matanuska River. Within each regional band were several villages, each containing multi-family dwellings called **nichił**. The houses contained groups of kin – usually men of the same clan, their wives, and children. Leading each **nichił** or group of **nichił** was a **qeshqa** 'rich man'. The **qeshqa** organized his **ukilaqa** 'clan helpers' into cooperative hunting and fishing groups. In addition to this economic role, **qeshqa** instructed the young, settled disputes, and organized warriors for battles with the **Ułchena** (Alutiiq, or Chugach Eskimo). The village served as a base for the Dena´ina's resource harvesting activities. It was occupied for much of the year and contained many caches of preserved foods.

*Id.* at 21. In short, the "qeshqa" and his "ukilaqa" acted as the governing body of the Village much as the NVE Tribal Council does today.

Among the Native Village of Eklutna's previous "qeshqa" are Eklutna Alex and Mike Alex. *Id.* at 28. The Ondola and Alex families are direct descendants of these former Village "Chiefs." *See* Ondola 1995 Aff. ¶9 (Ex. 2). The Stephan and Ezi families are also present-day NVE tribal members who can trace their family lineage back to famous "qeshqa" of Eklutna or other Dena´ina Native villages. *Id.*

[2]    Contemporary reports of American and Russian explorers also indicate that, as late as 1900, the upper Cook Inlet region had been left almost completely unexplored by white settlers. *Id.*

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 4 of 30

1995 Aff. ¶4 (Ex. 2).[3]  The Departmental Order of October 30, 1936 withdrew approximately 9,221 acres of land for purposes of a Native reservation, and in 1961 the Department reduced the reserve to 1,958 acres and set them aside to be "reserved under the jurisdiction of the Bureau of Indian Affairs for use in connection with administration of Native affairs in the vicinity of Eklutna." Public Land Order 2427, 26 Fed. Reg. 6243 (1961); Public Land Order 2516, 26 Fed. Reg. 9832 (1961).  In 1953, Bill Ezi filed a claim before the Indian Claims Commission seeking to establish that the Dena´ina peoples of Eklutna and what is now Palmer, Alaska held aboriginal title to the lands they had historically occupied.  *See* Field Commission Report at 445, fig.V-6 (Docket No. 370, Natives of Palmer, Alaska) (Ex. 3).  When Alaska became a state in 1959 and began selecting tribal lands around Eklutna, the Native Village of Eklutna filed official "protests" with the Bureau of Land Management (Application Nos. AA-368 & AA-574) to establish the Tribe's aboriginal title to nearly 470,000 acres of land in and around the Village, including the Birchwood area where the Ondola Allotment is located. Field Commission Report at 499-501 (Ex. 3).  The federal government took no effective action to resolve these conflicting land claims, until the passage of ANCSA in 1971.  In ANCSA, Congress recognized Eklutna's status as a Native village and included it on the list of villages eligible to receive land selections as part of the settlement of aboriginal title claims.  *See* 43 U.S.C. § 1610(b).  Although ANCSA resolved and clarified the ownership structure for these lands, the statute itself actually says nothing about these Native villages' continuing right to exercise governmental power over traditional tribal lands or restricted lands held by tribal members.[4]  *See id.* §§ 1601-1603.

Both before and after ANCSA's passage, successive NVE tribal governments have continued to exercise governmental authority over tribal members and the lands they owned or occupied. Ondola 1995 Aff. ¶3 (Ex. 2).  In the 1960's, NVE's traditional Tribal Council protested efforts by non-tribal authorities to regulate tribal members and instead asserted its own authority to regulate tribal members' access to natural resources. *Id.* ¶6.  The Tribal Council also passed an ordinance requiring Tribal Council permission before anyone could move into the Village.  *Id.*  The Tribal Council also passed ordinances controlling dogs and limiting noise levels in and around the Village and generally took actions necessary to promote the peace, safety, health and general welfare of the Village members. *Id.*  After a period of reduced activity in the 1970's, while the community addressed issues related to ANCSA and the ANCSA Village Corporation, the Tribal Council again

---

[3]     The reservation was abolished following passage of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601, 1629(a), in 1971. Nonetheless, NVE and other Dena´ina tribal leaders continued to claim jurisdiction over their traditional territories throughout the latter half of the twentieth century. *See generally* David S. Case & David. A. Voluck, *Alaska Natives and American Law*s 73-79(3d ed., Univ. of Alaska Press 2012); *see also* Ann Chandonnet, *On the Trail of Eklutna* (1979) (Ex. 4); Ann Chandonnet, *The Once & Future Village of Ikluat/Eklutna: The History of a Tanaina Athapaskan Settlement* (1979) (Ex. 5).

[4]     Congress' intention not to address tribal territorial jurisdiction and other "Indian country" issues in ANCSA is further underscored by the "Disclaimer" which it included in its 1987 Amendments to the Act. *See* Pub. L. No. 100-241, § 17(a), 101 Stat. 1788, 1814 (1988).  In this Disclaimer, Congress expressly forbade the use of the new statutory language to either help or hinder the legal arguments made for or against the power of Alaska Native villages to exercise governmental authority over "lands" or "persons." *Id.* § 17(a)(1).  Congress, in other words, expressed its desire that these legal issues be resolved without reference to the land settlement statutes.

assumed its prominent governmental role in the community in the mid-1980's. *Id.* ¶¶7, 8. The Tribe formally adopted a written Traditional Constitution containing broad assertions of tribal sovereignty, territorial jurisdiction and governmental powers. *See* Constitution of the Native Village of Eklutna (1988) (Ex. 6). This Constitution was amended in 1996. *See* Constitution of Native Village of Eklutna (1996) (Ex. 7).

## II. Eklutna's Prior Requests for Indian Lands Determination.

In 1995 the Tribe submitted a Gaming Ordinance to the National Indian Gaming Commission ("NIGC" or "Commission") for approval. The NIGC requested an opinion from the Solicitor's office of the Department of the Interior. By letter dated May 17, 1995 Robert Anderson, the Associate Solicitor for Indian Affairs issued a draft opinion, a copy of which is enclosed. Letter from Robert T. Anderson, Assoc. Solicitor, Div. of Indian Affairs, Office of Solicitor, Dep't of Interior, to Michael J. Cox, Gen. Counsel, Nat'l Indian Gaming Comm'n (May 17, 1995) (Ex. 8). The draft opinion concluded that an Alaska Native allotment on which gaming was proposed was subject to restriction and thus came within the second prong of the definition of Indian lands under IGRA. However, Mr. Anderson found, "[w]hether Eklutna meets the remaining IGRA requirement, that it exercises governmental power over the land, is unclear." *Id.* at 2. While Mr. Anderson noted that "[r]estricted deed allotments have the status as trust allotments for purposes of 18 U.S.C. § 1151 and thus, are considered Indian country," the draft letter found insufficient evidence of the exercise of governmental power over the land. *Id.* In a footnote, Mr. Anderson explained that in light of pending litigation, "the Solicitor's opinion remains subject to review." *Id.* at 2 n.2.

In a subsequent letter dated May 18, 1995 Mr. Anderson wrote to the NIGC that the draft opinion was "not finalized and will not be issued," based on information that the Tribe had withdrawn its ordinance from review by the NIGC. Mr. Anderson explained that his May 17th opinion was a "draft copy of a letter" which "is not binding." *See* Letter from Robert T. Anderson, Assoc. Solicitor, Div. of Indian Affairs, Office of Solicitor, Dep't of Interior, to Michael J. Cox, Gen. Counsel, Nat'l Indian Gaming Comm'n (May 18, 1995) (Ex. 9).

By letter dated April 2, 2007, the Tribe submitted a Tribal Gaming Ordinance and renewed its request for an Indian lands determination for the Ondola Allotment from the Commission. The Tribe later withdrew this request.

## III. The Indian Gaming Regulatory Act.

IGRA provides that an "Indian tribe" may authorize gaming on "Indian lands within such tribe's jurisdiction." 25 U.S.C. § 2710(b).

As discussed below, the Ondola Allotment qualifies as "Indian lands" under IGRA because it is owned by members of the Tribe subject to a restriction against alienation without approval of the Secretary of Interior and a prohibition on taxation. The Ondola Allotment has been held subject to restriction on alienation since 1963. Furthermore, as discussed below, NVE is an Indian tribe possessing jurisdiction and exercising governmental authority over the Ondola Allotment.

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 6 of 30

## IV.    The Native Village of Eklutna is an Indian Tribe Under IGRA.

NVE falls squarely within IGRA's definition of an "Indian tribe." IGRA defines "Indian tribe" as:

> any Indian tribe, band, nation, or other organized group or community of Indians which –
> > (A) is recognized as eligible by the Secretary of the Interior for the special programs and services provided by the United States to Indians because of their status as Indians, and
> > (B) is recognized as possessing powers of self government.

25 U.S.C. § 2703(5). NVE has been included on all lists of "Alaska Native entities recognized and eligible to receive services" which have been published by the Department, beginning with the first such list published in 1982. Most recently, NVE was included in the May 4, 2016 list of Alaska tribal entities published at 86 Fed. Reg. 26,826, 26,831.

Congress has enacted numerous laws reaffirming the federal status of Alaska's tribes, including the Federal Recognized Indian Tribe List Act, 25 U.S.C. § 479a note, the Tlingit and Haida Status Clarification Act, Pub. L. No. 103-454, tit. II, 108 Stat. 4791, 4792-93 (1994), and the 1994 amendment to the Indian Reorganization Act (IRA), which prohibits federal agencies from making any distinction in the "privileges and immunities" of any federally recognized tribe, 25 U.S.C. § 476(f)-(g).[5]

## V.    The Ondola Allotment Is Indian Land Because it is Restricted Fee.

### A.    The Ondola Allotment is in restricted fee.

The Ondola Allotment is "Indian lands." IGRA defines "Indian lands" to include:

> Any lands title to which is either held in trust by the Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

*Id.* at § 2703(4)(B).

The Ondola Allotment was conveyed to Olga Ondola pursuant to the Alaska Native Allotment Act. The Alaska Native Allotment Act expressly provided that "lands so allotted [under the Act] shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be

---

[5]    The Alaska Supreme Court has recognized that "Native villages retain those fundamental attributes of sovereignty – which have not been divested by Congress or by necessary implication of the tribes' dependent status." *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 439 (Alaska 2004); *John v. Baker*, 982 P.2d 738, 751 (Alaska 1999) (Native village "sovereign powers exist unless divested").

AR000783

inalienable and nontaxable until otherwise provided by Congress." Act of May 17, 1906, ch. 2469, 34 Stat. 197 (formerly codified at 43 U.S.C. § 270-1). The deed conveying the Ondola Allotment contains this same restriction, (Ex. 10), and is considered by the Bureau of Indian Affairs to be held in restricted status for members of the Ondola family. Moreover, the BIA provides services and exercises control (along with the Tribe) over the Allotment. Ondola 1995 Aff. ¶¶7, 16, 19, 20 (Ex. 2); Aff. of Daniel Alex, Tribal Adm'r, Native Vill. of Eklutna (Mar. 16, 2007) ¶9 (hereinafter "Alex Aff.") (Ex. 11).

More specifically, the Ondola Allotment includes lots 64, 66, and 67, located within Section 5, T15N, R1W, Seward Meridian Alaska. *See* Native Allotment Deed (Ex. 8).[6] The allotment is located seven miles from the Village and twenty-two miles from downtown Anchorage, firmly within NVE's aboriginal territory. *See* Maps Showing Distances (Ex. 12). Today the Allotment is owned by the eight heirs of Olga Ondola. The Ondolas are a prominent family in the Eklutna community. Susie Ondola owns a 2/8 interest in the Allotment and presently resides on the Allotment where she lived for many years with her husband, George Ondola. Bus. Lease Between the Ondola Family & the Native Vill. of Eklutna, Recitals ¶3, § 5(A) (May 27, 2016) (Ex. 14); Aff. of George Ondola (Mar. 26, 2007) (hereinafter "Ondola 2007 Aff.") ¶¶2, 4 (Ex. 1313). George Ondola served as Tribal Council President from 1961 to 1971 and 1995 to 1997. Ondola 2007 Aff. ¶1 (Ex. 13).

These facts, in and of themselves, are sufficient and show that the Ondola Allotment fits squarely within the definition of "Indian lands" because it is an allotment subject to restrictions against taxation and alienation. *See* 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b).

Moreover, the Ondola Allotment has been and remains in restricted status since it was allotted in 1963. (Olga Ondola, the original allottee, resided on the land beginning in the 1920's. Ondola 2007 Aff. ¶4 (Ex. 13).) The Allotment does not come within the prohibition on after-acquired lands in 25 U.S.C. § 2719(a).

**B.   The Ondola Allotment is considered Indian land under general principles of law.**

Even assuming *arguendo* that the above facts are not determinative whether the Allotment constitutes Indian land, case law relating to what types of land constitutes Indian country necessitates the same finding. Historically, the term "Indian country" has been used to identify land that is subject to the "primary jurisdiction . . . [of] the Federal Government and the Indian tribe inhabiting it." *Alaska v. Native Vill. of Venetie*, 522 U.S. 520, 527 n.1 (1998). And allotments, whether held in trust or under a restricted deed, have long been recognized as "Indian country." *See United States v. Ramsey*, 271 U.S. 467 (1926) (restricted deed allotment is Indian country, notwithstanding the fact that the deed is held by the Native rather than in trust by the federal government); *Okla. Tax Comm'n*

---

[6]   Although Congress repealed the Alaska Native Allotment Act when it passed ANCSA, all allotments which had been or were subsequently patented under the Act retain their nontaxable and inalienable status. *See* 43 U.S.C. § 1617.

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 8 of 30

v. United States, 319 U.S. 598, 618 (1943) ("there are no differences of substance between the two forms of tenure," i.e. restricted fee or trust).

Further, the United States Code defines "Indian country" as:

(a)     all land within the limits of any Indian reservation . . .
(b)     all dependent Indian communities . . . and
(c)     all Indian allotments, the Indian titles to which have not been extinguished . . . .

18 U.S.C. § 1151. But even prior to the enactment of section 1151 in 1948, the Supreme Court had already ruled that allotments are Indian country. See, e.g., United States v. Pelican, 232 U.S. 442, 449 (1914) (Indian country includes individual Indian allotments held in trust by the United States because they "remain Indian lands set apart for Indians under governmental care"); United States v. Bowling, 256 U.S. 484, 487 (1921) ("as respects both [trust and restricted] allotments . . . the United States possesses a supervisory control over the land"); In re Carmen's Petition, 165 F. Supp. 942 (N.D. Cal.), aff'd, 270 F.2d 809 (9th Cir. 1958) (public domain trust allotment not carved out of a reservation was Indian country; "Respondent interprets the Pelican decision to mean that an allotment to be Indian County must have been made from lands which were previously Indian Country. But this is an unduly restricted view of that decision . . . . Since all Indian allotments, regardless of their source, are maintained under the same type of Governmental supervision, either by holding title in trust for the allottee or by restricting alienation, there is no logical reason for making the application of protective criminal statutes dependent upon the source of the allotment.").

And, with respect to Alaska, in Venetie, the Supreme Court observed that Section 1151 reflects the two criteria the Supreme Court "previously . . . had held necessary for a finding of 'Indian country' . . . first, [the lands] must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." 522 U.S. at 527. Although the Supreme Court held in Venetie that ANCSA fee lands were not Indian country, the Court also noted that, "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of § 1151(b), or if it constitutes 'allotments' under § 1151(c)." 522 U.S. at 527 n.2 (emphasis supplied).

The courts in many instances have treated Alaska Native allotments like allotments in the Lower 48. For example, in Pence v. Kleppe, 529 F.2d 135, 138 (9th Cir. 1976), the court found it had jurisdiction to adjudicate Alaska Natives' claims under the Alaska Native Allotment Act pursuant to 25 U.S.C. § 354,[7] a "grant of general jurisdiction to United States District Courts in

---

[7]     25 U.S.C. § 345 provides that "All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper circuit court [district court] of the United States . . . ."

Case 1:19-cv-02388-DLF   Document 42-1   Filed 07/20/20   Page 14 of 109

actions such as this one."   Additionally, the courts have held that the federal government has a fiduciary duty to administer Alaska Native allotments for the benefit of Natives based on the federal trust responsibility. *Aguilar v. United States*, 474 F. Supp. 840, 846 (D. Alaska 1979).   And the Alaska Native Allotment Act is construed according to the principles applicable to other statutes affecting Indians. *Olympic v. United States*, 615 F. Supp. 990, 995 (D. Alaska1985) (applying "general principle that statutes passed for the benefit of Indians (including Alaska Natives) are to be liberally construed, and doubtful expressions should be resolved in the Indians' favor"); *Alaska, Dep't of Pub. Works v. Agli*, 472 F. Supp. 70, 72-73 (D. Alaska 1979) ("[t]he federal government has the plenary and exclusive power to regulate Indian affairs," and "[w]here a dispute involves trust or restricted property, the state may not adjudicate the dispute nor may its laws apply.") (*quoting In re Humboldt Fir, Inc.*, 426 F. Supp. 292, 296 (N.D. Cal. 1977)).

Also, the courts have held that the Quiet Title Act applies to Alaska Native allotments. *Alaska v. Babbitt*, 38 F.3d 1068, 1073 (9th Cir. 1994) ("The government's interest in the lands described in [Alaska Native] allotment applications is, therefore, of the type contemplated by the 'trust or restricted Indian lands' limitation of the QTA"). As the Ninth Circuit pointed out in that decision, Congress' purpose in exempting trust and restricted lands, including Alaska Native allotments, from the waiver of sovereign immunity in the Act was based on the federal trust duty:

> The federal government's trust responsibility for Indian lands is the result of solemn obligations entered into by the United States government.  The federal government has over the years made specific commitments to the Indian people through written treaties and through informal and formal agreements.  The Indians, for their part, have often surrendered claims to vast tracts of land.  President Nixon has pledged his administration against abridging the historic relationship between the federal government and the Indians without the consent of the Indians.

*Id.* at 1073 n.4 (quoting H.R. Rep. No. 92-1559 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4556-57). The federal trust duty accordingly is applicable to dealings with Alaska Natives.

Further, Alaska Native allotments may be condemned pursuant to 25 U.S.C. § 357. *Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440, 1443 (9th Cir. 1987).  *See also Pence v. Kleppe*, 529 F.2d 135, 138 n.5, 140 (9th Cir. 1976) (Alaska Natives come within statutes applicable to "Indians" and because "there was doubt whether the General Allotment Act did apply to [Alaska Natives] . . . . Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act[, which] . . . . merely plugged a hole in the coverage of the [General Allotment Act of 1887]"); *Masayesva ex rel. Hopi Indian Tribe v. Zah ex rel. Navajo Indian Tribe*, 792 F. Supp. 1160, 1163 (D. Ariz. 1992) ("Alaska Native Allotment Act, legislation which is interpreted similarly to the General Allotment Act").

Moreover, allotments in Alaska may not be subject to discrimination on the ground that they were allotted under different allotment acts than those used in the lower 48.  In *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123-25 (1993), the Supreme Court rejected Oklahoma's attempt to

AR000786

distinguish between the various forms of Indian country and instead held that the presumption against states having taxing authority over Indians living on reservations applied to all forms of Indian country.  *Id.*  After pointing out that "Congress has defined Indian country broadly to include . . . Indian allotments, whether restricted or held in trust" and noting that Indian sovereignty "provid[es] a backdrop against which the applicable treaties and federal statutes must be read," *id.* at 123-24, the Court concluded that tribal members living in "Indian country" of any type would be exempt from Oklahoma taxes unless Congress expressly authorized the state to exercise such taxing jurisdiction, *id.* at 128.  *United States v. Jackson*, 280 U.S. 183, 193 (1930) (explaining that "it has long been the settled ruling of the Department of the Interior, both under the very statutes here involved and under other statutes enacted by Congress with similar purpose and pursuant to its general plan with respect to Indian allotments and homesteads, that Indian allotments and Indian homesteads are in all essential respects upon the same footing, and that each is equally within the purview of a statute in which the Congress may use only the terms 'allottee' and 'allotment'" and holding that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments).  *See also infra* note 14.

The Allotment constitutes Indian lands because it belongs to individual Indians (members of NVE) and the land was set aside for Indian use and has remained under federal superintendence and protection, which federal superintendence and protection was reaffirmed by ANCSA's preservation of existing allotments and provision for completion of pending allotment applications.  43 U.S.C. § 1617(a).  Thus, the facts presented here require a finding under both Section 1151 and *Venetie* that the Allotment constitutes Indian country.

## VI.    The Native Village of Eklutna Exercises Jurisdiction and Governmental Power Over the Ondola Allotment.

A site may qualify as Indian lands if it is restricted fee lands over which an Indian tribe exercises governmental power.  *See* 25 U.S.C. § 2703(4)(B); 25 CFR § 502.12(b).  *See, e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-03 (1st Cir. 1994), *superseded by statute as stated in Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335 (D.C. Cir. 1998); *Kansas ex rel. Graves v. United States*, 86 F. Supp. 2d 1094 (D. Kan. 2000), *aff'd and remanded, Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001).  Tribal jurisdiction is a threshold requirement to the exercise of governmental power as required by IGRA's definition of Indian lands.  Generally speaking, an Indian tribe possesses jurisdiction over its Indian country.  18 U.S.C. § 1151(c); *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998).  We first discuss the standards for determining whether an Indian tribe exercises governmental power over Indian land and then show that NVE exercises governmental power over the Ondola Allotment and the allottees acknowledge the tribe's jurisdiction.

### A.    Standards for the Exercise of Governmental Power Under IGRA.

In *Cheyenne River Sioux Tribe v. South Dakota*, 830 F. Supp. 523 (D.S.D.), *aff'd* 3 F.3d 273 (8th Cir. 1993), the District of South Dakota identified several factors that might be relevant to a

determination of whether off-reservation trust lands constitute Indian lands. The factors were: (1) Whether the areas are developed; (2) Whether the tribal members reside in those areas; (3) Whether any governmental services are provided and by whom; (4) Whether law enforcement on the lands in question is provided by the Tribe; and (5) Other indicia as to who exercises governmental power over those areas. *Id.* at 528. Similarly, in *Narragansett* the First Circuit held that the satisfying requirement of tribal authority depends "upon the presence of concrete manifestations of [governmental] authority." 19 F.3d at 703. The court cited the establishment of a housing authority, administration, through the Indian Self-Determination and Education Assistance Act, of health care programs, job training, public safety, conservation, and other governmental programs as examples of the Narragansett's exercise of governmental over Indian land. *Id.*

A similar analysis applies when determining whether a particular Indian tribe exercises governmental authority over an allotment. For example, in 2005 the Commission concluded that lands of a former allotment of a member of the Kiowa Tribe of Oklahoma transferred to the Tribe was Indian land. Kiowa Tribe of Oklahoma Indian Lands Determination (Nov. 11, 2005). The NIGC found "significant" the following actions by the Tribe related to the former allotment: fencing property and posting signs that trespassers are subject to tribal authority, preparation of an environmental assessment and grading portions of the property, enactment of "several tribal resolutions authorizing and approving certain governmental activities and oversight regarding the property and/or lands within the Tribe's jurisdiction, including a liquor ordinance, governing the sale, use, and purchase of alcoholic beverages; a gaming ordinance, governing the conduct of gaming; a resolution authorizing financing, development, and construction of a gaming facility on the property; and a resolution authorizing a tribal entity to have exclusive use of the property for purposes of gaming." *Id.* at 6. Many such actions were taken a short time before the Commission's determination.[8]

In addition, in the Big Sandy Rancheria Indian Lands Determination (Sept. 6, 2006) the Commission concluded that an allotment owned by a member of the Big Sandy Rancheria in northern California constitutes Indian lands under IGRA. The land is an Indian allotment held in trust for the benefit of tribal member Sherrill McCabe. The allotment is located twelve miles outside of the lands of the Rancheria. The allottee leases the parcel to the Tribe pursuant to a lease which was submitted to the BIA for approval. The NIGC found that the Tribe possesses and exercises jurisdiction over the Allotment because the Allotment is owned by a tribal member who is a descendant of the original allottee's family, and the Allotment has been held in trust continuously since 1920 and is located within twelve miles of the Tribe's Rancheria.[9] The Commission explained:

---

[8]  While in its Native Village of Barrow Indian Lands Determination at 7 (Feb. 1, 1996), the Commission rejected the evidence of two resolutions because they had only been passed recently by the Village, in more recent decisions the NIGC has relied on evidence of recent assertions of governmental authority by tribes to finding in favor of Indian lands, for example, in the Kiowa and Big Sandy Indian Lands Determinations.

[9]  The Ondola allotment is closer to the Village at seven miles distance. *See also* Opinion of the Solicitor, Sampson Johns Allotment (September 26, 1996) (concluding that Quinault Tribe possesses jurisdiction over Indian

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 12 of 30

In this case, the Tribe's Constitution provides that the Tribe has jurisdiction over any allotment of a tribal member. The Tribe provides governmental services to off-reservation Indian allotments owned or occupied by tribal members including the McCabe allotment and other allotments in the surrounding area. According to the Tribe, such services have included, for example, tribally and HUD funded housing services, housing and facility maintenance, social, welfare and property maintenance services (including food and meal delivery, home repair, refuse removal, etc.).

The McCabe allotment is largely vacant and undeveloped.[10] However, the Tribe provides some governmental services to the Allotment, including site inspection by tribal police officers, fence repair, maintenance, inspections for unauthorized grazing, and general supervision. The Tribe provided a sworn statement from Ric Contreras, Big Sandy Tribal Administrator, recounting a recent situation where a tribal employee noticed signs that cattle had been illegally grazing on the land. The Tribe took action to seal-off possible entries that cattle may have used to gain access to the property.

Big Sandy Rancheria Indian Lands Determination 5-6 (also citing a Tribal Council resolution requiring trespassing signage and placement of such signs on the McCabe allotment). The NIGC's determination in Big Sandy/McCabe and Quinault/Sampson Johns that a tribe's jurisdiction over an allotment flows from or is incident to the allotment owner's tribal membership is consistent with the case law. *See, e.g, Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 558 n.12 ("A tribe's authority over its reservation or Indian country is incidental to its authority over its members."). As explained by the Alaska Supreme Court in *John v. Baker*, 982 P.2d 738, 754-55 (Alaska 1999) (footnotes omitted):

The federal decisions discussing the relationship between Indian country and tribal sovereignty indicate that the nature of tribal sovereignty stems from two intertwined sources: tribal membership and tribal land. The United States Supreme Court has recognized the dual nature of Indian sovereignty for more than a century and a half; the Court has explained that, under federal law, "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory." [citing *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, (1832)).] Tribes not only enjoy the authority to exercise control within the boundaries of their lands, but they also possess the inherent "power of regulating their internal and social relations."

---

allotment owned by a member of the Quinault tribe and located 12 miles from the Quinault reservation and noting that a tribe would possess jurisdiction over lands within Indian country unless the "land in question is not owned or occupied by tribal members and is far removed from the tribal community."); *compare* Sitka Tribe Indian Land Determination (June 23, 1993) (negative Indian lands determination relying in part on finding that the land was not within the "immediate vicinity" of village).

10       In contrast, members of the Ondola family have always lived on the Allotment.

> Mr. Baker and the dissent argue that many federal decisions construing the nature of tribal sovereignty view the existence of Indian country as the critical factor in determining the existence or extent of tribal authority.  But the case law does not fairly support the view that the existence of Indian country is an absolute prerequisite to the existence of sovereign tribal power.
>
> To the contrary, in a series of decisions exploring the nature of tribal sovereignty, the Court has noted the crucial role tribal membership plays in defining the scope of tribal authority.  The distinction between members and nonmembers has often been treated as a dispositive factor in federal Indian jurisprudence. [citing *United States v. Wheeler*, 435 U.S. 313 (1978).]

*See also DeCoteau v. Dist. Cnty. Ct.*, 420 U.S. 425, 446 (1975) ("But, as the historical circumstances make clear . . . the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs.  In such a situation, exclusive tribal and federal jurisdiction is limited to the retained allotments.").

The United States and its agencies have also upheld the concept that jurisdiction is in part tied to membership.  *See* Agreement of Compromise & Settlement Recitals ¶4, *Comanche Nation, Okla. v. United States*, 393 F. Supp. 2d 1196 (W.D. Okla. 2007) (No. CIV-05-328-F) ("The United States agrees that henceforth the United States Department of Interior . . . will not process or approve any trust transfers of real property located within an original Comanche Allotment . . . without prior written notice to and prior written consent from the governing body of the Comanche Nation" and no such consent required "for the transfer of original Comanche Allotments among individuals and remaining in trust, provided that tribal jurisdiction over the parcel shall remain with the Comanche Nation.").  For example, in regulations issued on July 30, 1974, the Bureau of Land Management's procedure to process applications for allotments under the Alaska Native Allotment Act included an examination of occupancy of use of which "the applicant, the appropriate village council, and the appropriate regional corporation" are notified and, if the applicant is unable to attend, "the village council or corporation is asked to appoint someone to accompany the examiner." *Pence v. Kleppe*, 529 F.2d 135, 137 (9th Cir. 1976).

As explained by the United States in its recent amicus curiae brief in support of the Wampanoag Tribe of Gay Head (Aquinnah), *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, No. 16-1137 (1st Cir. appeal docketed Feb. 2, 2016):

> The NIGC has not formulated a uniform definition of "exercise of governmental power" but rather engages in a case-specific evaluation as the circumstances of individual tribes vary widely.  However, NIGC has considered the following examples relevant:  . . . supervision of the land [N.6: Letter from NIGC Acting General Counsel to Chairperson Walker-Grant, at 4 (Jan. 10, 2014) (tribal police patrol lands to protect cultural sites and water-storage facility)]; governmental services [N.7: Mem. to NIGC Chairman from NIGC Office of General Counsel re:

AR000790

Big Sandy Rancheria, at 5-6 (Sept. 6, 2006) (provision of housing services, food delivery, home repair, and refuse removal)]; and adoption of tribal ordinances.

*Id.* at 14-15 (footnotes omitted). *See also* Quinault Indian Lands Determination at 6 (same). As the United States explained in its Aquinnah brief, at 18-19, "IGRA requires only that a tribe has exercised such power; it does not require that any particular degree of governmental power be demonstrated" and furthermore, a "high standard for assessing governmental powers would undermine IGRA's applicability and frustrate Congress's intent to use gaming as a mechanism to promote tribal economic development."

### B. The Tribe Exercises Governmental Authority Over the Ondola Allotment.

The Ondola family has historically been a part of the Eklutna community and has recognized and submitted to the jurisdiction of the Tribe. *See* Ondola 1995 Aff. ¶¶6, 16 (Ex. 2). The Ondolas reaffirmed this in the Lease Agreement between the family and the Tribe. Bus. Lease Between the Ondola Family & the Native Vill. of Eklutna, Recitals ¶¶3-5, § 27 (May 27, 2016) (Ex. 14). It is understood within the Eklutna community that the Allotment is subject to tribal authority. Alex Aff. ¶11 (Ex. 11). Furthermore, Mrs. Ondola, the original allottee, and her family have retained their relations with the Village of Eklutna. All of the owners of the Allotment are tribal members, and they have been and continue to be active in tribal affairs, including in leadership positions.

Below we discuss specific examples of the exercise by the Tribe of governmental authority over the Ondola Allotment, through the provision of governmental services and establishment of rules. In light of the precedents discussed above, the Tribe exercises governmental authority over the Ondola Allotment through the exercise of its laws and its governmental operations.

#### 1. Tribal Constitution

The Tribe's Constitution (Ex. 7) extends the Tribe's authority over the Ondola Allotment. Article II, Section I of the Constitution provides that:

[t]he government of the Native Village of Eklutna shall have jurisdiction of the land and waters constituting Indian Country of the Eklutna Tribe as defined by federal law. To the extent consistent with federal law, such lands and waters customarily and traditionally used by the Eklutna people, including within such 'traditional land and waters' all lands withdrawn for selection by Eklutna, Incorporated, under the ANCSA Act, (PL:9-90), all fee and allotment lands within the traditional lands of Eklutna, not withstanding the issuance of any patent or unrestricted fee title to such lands.

In addition, Article II, Section II of the Constitution provides that "[j]urisdiction authority shall extend to the tribal members of the Native Village of Eklutna, regardless of location including those who do not reside within territorial jurisdiction, for the purpose of tribal affairs, (such as the Indian Child Welfare Act and other as may arise)." Article II, Section III provides that "all persons

AR000791

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 15 of 30

who enter upon lands of our tribe, shall be governed by this constitution, tribal ordinances, customs, traditions and applicable laws to the extent not by acts of congress."

Tribal constitutional assertion of authority over the land supports a finding of the exercise of governmental authority. *See* Big Sandy Indian Land Determination at 5-6; *compare* Native Village of Barrow Indian Lands Determination at 7 (Feb. 1, 1996) (negative Indian lands determination relying in part that "the Constitution asserted limited authority over the land").

## 2.      *Dog Ordinance*

The Dog Ordinance imposes a number of requirements on all dogs within the Eklutna area. *See* Native Village of Eklutna, Dog Ordinance (Ex. 15). For example, owners must keep their dogs tied up at all times and leashed while walking. Dog owners are subject to fines for loose dogs. Dog barking, whimpering, howling, and other noises creating a disturbance for more than five minutes are subject to action by Animal Control. Female dogs in heat must be maintained in a confined area. If a loose dog injures or bites a person, the owner must pay expenses to the injured person. Finally, it is illegal for a dog owner to neglect his or her dogs, let them starve, fail to get them the proper medical attention, or allow them to bark in distress or freeze to death because of neglect of care.

George Ondola and his family complied with the Dog Ordinance on the Ondola Allotment. Ondola 1995 Aff. ¶15 (Ex. 2).

## 3.      *Tribal Court and Governmental Administration*

In 2003, the Tribal Council approved the Relatives Talk Code, which provides for the establishment of a forum for the resolution of disputes by application of traditional customs and principles. *See* Native Village of Eklutna, Des'na'ka, Ka'nash - Relatives Talk Code (Apr. 25, 2003) (hereinafter "Relatives Talk Code") (Ex. 16). The Code provides that "[s]ince time immemorial, we the Athabascan (Dena-ina) people, including the Eklutna Tribe, have resolved disputes and conflicts, maintained community peace, and delivered justice within our tribal territory through the use of our traditional Athabascan Laws, Custom and Practices." Relatives Talk Code, ch. 3A. The purpose of the Code is to "honor and acknowledge our prior customs, history, traditions and experiences for the purpose of preserving, strengthening and continuing the Dena´ina society into the future." *Id.* at ch. 3B. The Code sets out qualifications for Rules Keepers, procedures for decisions, disqualification and removal, *id.* at ch. 6, consultation with advisors, *id.* ch. 7, the appointment of a clerk, *id.* ch. 8, enforcement of orders, *id.* at ch. 9, confidentiality, *id.* ch. at 10A, and full faith and credit and comity, *id.* at ch. 11.

The Code provides further,

Rule Keeper(s) may further exercise their powers to preserve, maintain and protect historic sites, cultural landscapes, sacred sites, traditional cultural properties, buildings, monuments, and cemeteries situated within the Native Village of Eklutna traditional tribal area (jurisdiction), as well as ruling on other matters such as dog

control, land development and permitting, and unnamed matters that may be brought
before them.

*Id.* at ch. 3B. The territorial jurisdiction of the Rule Keepers includes "such lands and waters
customarily and traditionally used by the Eklutna People," including within such "traditional land
and waters," all lands withdrawn by the Bill Ezi Claim of 1958, for selection by Eklutna, Inc. under
the Alaska Native Claims Settlement Act, and "all lands within the traditional lands of Eklutna,
notwithstanding the issuance of any patent or unrestricted fee title to such lands." *Id.* at ch. 5B, The
Code extends personal jurisdiction of the Rule Keepers over tribal members, persons eligible for
membership in the Tribe, non-member Natives, "any other person(s) residing within or traveling
through the territorial jurisdiction of the Eklutna Tribe consistent with Federal Law," or any person
consenting to the jurisdiction of the NVE Tribe. *Id.* at ch. 5C. The Ondola Allotment is within the
territorial jurisdiction of the Rule Keepers and is subject to Tribal laws.

The current Code replaced the prior Tribal Court Code adopted in 1998. *See* Native Village
of Eklutna, Tribal Court Codes, Res. No. 98-0026 (May 1, 1998) (Ex. 17).

The Tribal Court has on several occasions reviewed and assessed the Ondola home on the
Allotment for child custody placement. Ondola 1995 Aff. ¶8 (Ex. 2); Alex Aff. ¶8F (Ex. 9). Since
1971, the Tribal Court has on several occasions placed Tribal foster children in Mr. and Mrs.
Ondola's home. Ondola 2007 Aff. ¶8 (Ex. 13). Over the years George Ondola and his wife have
been foster parents to as many as five children. *Id.*

The Tribe provides governmental administration more generally, including the operations of
the Tribal Council, enrollment, and financial operations, with assistance from the Bureau of Indian
Affairs pursuant to a self-determination contract. *See* Contract Agreement No. A16AV00272
between Sec'y of Dep't of Interior & Native Vill. of Eklutna (Oct. 1, 2015) (Ex. 18). These services
benefit the Ondola Allotment by supporting the services and authority described *infra* and *supra*.

### 4.    *Environmental Protection*

The Environmental Protection Ordinance approved by Resolution 97-22 makes it unlawful
for any individual to contaminate or cause to "contaminate, or cause to be contaminated the air, land
and/or water within Native Village of Eklutna's traditional jurisdictional area with any substance
known or suspected of causing damage or harm to humans (living or not yet born), animals, plants,
air or water table." *See* Native Village of Eklutna, Res. No. 97-22, Environmental Protection
Ordinance (July 19, 1997) (Ex. 19). The Resolution further makes it unlawful for any person to
engage in any private or commercial activity (*i.e.,* mining, dumping, toxic waste disposal, weapons
testing, etc.) which has the potential for such contamination without applying to the Traditional
Council for a permit. *See id.* § I.b. The Ordinance provides for monitoring and enforcement, *id.* § II,
and provisions to encourage environmental restoration through, *inter alia*, recycling clean-up and
development of alternative energy sources, the use of natural non-polluting products, *id.* § III.

AR000793

Ordinance 04-001 prohibits the discharge of "any pollutants into the waters within the exterior boundaries of all lands of 'Id' Louyt'Nu,' which means the Native Village of Eklutna." *See* Native Village of Eklutna, Ordinance 04-001 (Mar. 26, 2004) (Ex. 20). Any person discharging a pollutant in violation of the Ordinance may be fined up to $5,000. *Id.* § D. The Ordinance also requires immediate clean-up of any discharges into waters of the Eklutna Tribe and notification of the discharge. *Id.* § E.

On March 30, 2006, the Tribal Land Environmental Director conducted an inspection of the Ondola Allotment for compliance with tribal environmental laws. Ondola 2007 Aff. ¶15 (Ex. 13); Alex Aff. ¶9 (Ex. 11). As part of the Tribe's environmental clean-up efforts, the Tribe removed junk cars and trash from the Allotment. Ondola 2007 Aff. ¶15 (Ex. 13).

The First Circuit in *Narragansett, supra,* found that tribal conservation programs provide evidence of governmental authority. The Commission has recognized tribal enforcement of tribal law as evidence of the exercise of governmental authority. *See* Big Sandy Indian Lands Determination at 5-6. And, in the Bear River Band of Rohnerville Indian Lands Determination at 7, the Commission found that monitoring by a tribal environmental department provided evidence of the exercise of governmental authority. Thus, the Tribe's environmental protection programs illustrate governmental authority over the Ondola Allotment.

### 5. Resolution No. 2006-24 Regarding Posting Signs on Entry to Village Lands and Access to Allotment Lands

The Ordinance Regarding Posting Signs on Entry to Village Lands and Access to Allotment Lands (hereinafter "Access Ordinance") requires that signs be posted at public access points to lands located within the village site, lands owned or administered by the Tribe and allotments subject to a restriction on alienation pursuant to the Alaska Native Allotment Act, in which members of the Tribe hold an ownership interest and which are located within fifteen miles of the Village site. *See* Native Village of Eklutna, Res. No. 2006-24 (Dec. 21, 2006) (Ex. 21). The signs must state that the lands are subject to tribal authority. Section 3 requires a tribal permit or landowner authorization for entry to an allotment and sets out procedures for obtaining permits from the Tribal Administrator when required. It also sets out procedures for appealing the denial of a permit to the Tribal Council.

The Access Ordinance applies to "lands 1) within the village site established pursuant to Alaska Native Townsite Act, 2) lands owned or administered by the Native Village of Eklutna, and 3) Allotments." *Id.* § 1. An Allotment is defined as "a parcel of land: i) which is subject to a restriction on alienation pursuant to the Alaska Native Allotment Act, ii) in which one or more members of Native Village of Eklutna hold an ownership interest, and iii) which is located within 15 miles of the village site." *Id.*

Pursuant to the Access Ordinance the Tribe posted nineteen signs along the perimeter of the Allotment which state as follows: "These lands are within the territory of the Native Village of

Eklutna and are under the Jurisdiction of the Tribal Government.  Entrance only by permission of landowner or Tribal government."  Ondola 2007 Aff. ¶16 (Ex. 2); Alex Aff. ¶10 (Ex. 9).

The Commission has recognized protection of land from trespass, like what NVE has and is doing at the Ondola Allotment, as evidence of government authority.  Kiowa Indian Lands Determination at 6; Big Sandy Indian Lands Determination at 6; *see also* Rohnerville Indian Lands Determination at 7 (tribal marking of exterior boundaries with fence provided evidence of governmental authority).

### 6.      *Public Safety*

The Tribe entered into a Letter of Agreement with the Municipality of Anchorage Police Department.  *See* Letter of Agreement Between Native Village of Eklutna and Anchorage Police Department (Dec. 10, 1996) (Ex. 22).  The Letter of Agreement is intended to "utilize[e] provision of comprehensive service to members of the Tribe of Eklutna."  It provides "[b]oth agencies acknowledge mutual commitment to avoid duplication of services."  Each agency agrees to make and receive referrals of tribal members under the guidelines of the Indian Child Welfare Act, provide information about programs, report any significant changes that may affect tribal members, and adhere to regulations governing confidentiality.  When criminal matters arise involving tribal members, the Alaska State Troopers respect tribal authority and work with the NVE Tribal Council to resolve problems.  The Tribe has also contracted with IHS to provide public safety services, including "community education, community patrols, liaison with the local, state and federal agencies directed at preventing intentional and non-intentional injury and death."  Funding Agreement between Native Vill. of Eklutna & Sec'y of Dep't of Health & Human Servs. of U.S., Fiscal Years 2010-12 § 3.3 (Mar. 5, 2010) (hereinafter "Annual Funding Agreement") (Ex. 23).

The First Circuit in *Narragansett, supra*, found that tribal public safety programs, like those of NVE which support the Ondola Allotment, provide evidence of governmental authority.  *See also Cheyenne River Tribe, supra* (law enforcement services evidence of tribal governmental authority).

### 7.      *Health Care*

The Tribe provides health care to tribal members pursuant to a self-governance compact with the Indian Health Service under Title V of the ISDA.  *See* Alaska Tribal Health Compact Between Certain Alaska Native Tribes &. U.S. (amended and restated Oct. 1, 2010) (Ex. 24); Annual Funding Agreement (Ex. 24); and Alex Aff. ¶3 (Ex. 11).  These contracts are authorized under the Indian Self Determination and Education Assistance Act, Pub. L. No. 93-638 (codified as amended at 25 U.S.C. § 450 et seq.), a statute specifically designed to help build "strong and stable tribal governments."  The Tribe provides a broad range of services pursuant to the Compact with IHS including primary health care services; Emergency Medical/First Responder Services; public safety services; child and family advocacy services; assisting the community with health maintenance, interpretation, access and/or referral to other services; provision of health promotion and disease prevention services and educational opportunities; provision of substance abuse prevention, intervention, assessment, in-

patient and after-care services; tribal wellness activities; and provision of counseling on a wide variety of concerns. Annual Funding Agreement §§ 3.1-.7. (Ex. 23). For years, the Tribal Family Nurse Practitioner made regular house calls to the Allotment to provide health care services to the Ondola family. Ondola 2007 Aff. ¶13 (Ex. 13); Alex Aff. ¶8A (Ex. 11). Also, as part of the Tribal elder health services program, the Tribal Wellness Director frequent visits to the Allotment to check on George Ondola and his wife. Ondola 2007 Aff. ¶13 (Ex. 13); Alex Aff. ¶8A (Ex. 11). The Ondolas obtained health care services at the Eklutna Village Clinic. *Id.* ¶12 (Ondola 2007 Aff., Ex. 13); Alex Aff. ¶8A (Ex. 11).

The First Circuit in *Narragansett, supra*, held that tribal health care and other services provided pursuant to the Indian Self Determination and Education Assistance Act are evidence of governmental authority. NVE's programs, which include visits to the Ondola Allotment just like the programs in *Narrangansett*, reflect the exercise of governmental power over the Allotment.

### 8.    *Social Services*

For decades the Tribe has provided social services to the Ondola Allotment. The Tribe provided Olga Ondola, George Ondola's mother, moose meat and salmon to her and the family approximately two or three times per year. Ondola 2007 Aff. ¶7 (Ex. 13). This was part of the Tribe's effort to preserve and maintain Eklutna's traditional culture and subsistence lifestyle. *Id.*

The Tribe also operates a Tribal food bank program, and as part of that program has delivered boxes of food to the Allotment for the Ondola family and their foster children. *Id.* ¶14; Alex Aff. ¶8D (Ex. 11). The Tribe has also provided them with smoke detectors, a fire extinguisher, and a first aid kit to keep in their home on the Allotment. Ondola 1995 Aff. ¶13 (Ex. 2); Alex Aff. ¶8B (Ex. 11).

The Commission has recognized that the provision of these services constitutes evidence of governmental authority. *See* Big Sandy Indian Land Determination at 5-6, *Narragansett, supra*.

### 9.    *Children's Services*

The Tribal Court has placed children in foster and adoptive homes, acting as the Tribe for tribeless Native children within the Municipality of Anchorage for purposes of the Indian Child Welfare Act. The Tribal Court has placed five children in the Ondola household on the Allotment. Ondola 2007 Aff. ¶8 (Ex. 13). The Tribe operates an Indian Child Welfare program pursuant to a contract with the Bureau of Indian Affairs pursuant to the Indian Self-Determination Act. *See* Aff. of Millard R. Farber, Eklutna Tribal Adm'r (June 27, 2016) (hereinafter "Farber Aff.") (Ex. 25).

In *Narragansett, supra*, the court held that the provision of government programs like these provide evidence of governmental authority, including services provided pursuant to the Indian Self-Determination Act.

### 10.   Natural Resource Management and Sanitation Services

Between 1965 and 1969 the Tribe regularly cut trees on the Allotment to create a fire perimeter around the house in the case of a wild fire. Ondola 2007 Aff. ¶9 (Ex. 13); Alex Aff. ¶8B (Ex. 11). Also, the Tribe has frequently used the cut trees for fire wood and cultural events. Ondola 2007 Aff. ¶9 (Ex. 13). In the 1960's the Tribe used the cut trees to build traditional sleds. *Id.* More recently the Tribe has cut wood on the Allotment for its annual powwow. *Id.* The Tribe provides roads maintenance services pursuant to a self-determination contract with the Bureau of Indian Affairs.

The Tribe submitted an application to IHS to have the Allotment's well and septic system upgraded. Ondola 2007 Aff. ¶10 (Ex. 13). Then, in 1997 the Tribe paid for drilling a well and upgrading the septic system on the Allotment. *Id.*; Alex Aff. ¶8C (Ex. 11). The Tribe operated water resources programs pursuant to a grant from the Bureau of Indian Affairs operated under the Indian Self-Determination Act. *See* Farber Aff. (Ex. 25)

The Commission has recognized provision of these types of services as evidence of governmental authority. *See* Big Sandy Indian Land Determination at 5-6. Similarly, in *Narragansett, supra,* the court held that the provision of government programs provide evidence of governmental authority.

### 11.   Gaming Ordinance and Amended and Restated Gaming Ordinance

The Tribe enacted a gaming ordinance in 1995. *See* Native Village of Eklutna, Gaming Ordinance (Jan. 24, 1995) (Ex. 27). The 1995 Gaming Ordinance authorized and regulated gaming on lands within twenty miles of the village center held by the Tribe or NVE tribal members which are subject to restriction by the United States against alienation and the governmental authority of the NVE Tribal Council. *Id.* § 223. On April 26, 2006 the Tribal Council adopted the Amended and Restated Gaming Ordinance (Ex. 28), which it amended on March 22, 2007, Ordinance 2007O-03 (Ex. 29).

The Amended and Restated Gaming Ordinance provides for extensive regulation of gaming activity on the "Tribe's lands," which are defined as the "allotment owned by the Ondola family located at Lots 64, 66 and 67, located within Section 5, T15N, R1W, Seward Meridian Alaska, containing approximately 8.05 acres, more or less and subject to a restriction on alienation pursuant to the Alaska Native Allotment Act." Amended and Restated Gaming Ordinance § 223 (Ex. 28); Ordinance 2007O-03 § 1 (Ex. 29).

Section 303(e) of the Gaming Ordinance regulates Class I gaming on the Ondola Allotment by requiring any gaming activity be registered with the Tribal Council to permit a determination that such activity does not constitute class II gaming. (Ex. 28); Ordinance 2007O-03 § 2 (Ex. 29).

The Amended and Restated Gaming Ordinance has not been approved by the NIGC. Nevertheless, the Commission has previously recognized that a gaming ordinance provides evidence

of the exercise of governmental authority, Kiowa Indian Lands Determination at 6, and the same conclusion must also be reached here.

### 12. Gaming Authority Ordinance

On December 21, 2006 the Tribal Council adopted the Native Village of Eklutna Gaming Authority Ordinance. That Ordinance established the Eklutna Gaming Authority, which is charged with powers and duties related to gaming enterprises, including the evaluation of proposals for gaming enterprises and to operate and manage gaming enterprises established by the Tribal Council. *See* Native Village of Eklutna, Res. No. 2006-26 (Dec. 21, 2006) (hereinafter "Gaming Authority Ordinance") (Ex. 30). The Tribal Council specifically approved the Gaming Authority Ordinance to pursue and develop the proposed gaming project on the Ondola Allotment, noting in a clause of the Resolution adopting the Ordinance that the Tribal Council "has determined to pursue a proposal to establish a gaming enterprise on the Ondola Allotment within Eklutna territory ('Project') and to pursue initial approvals for such Project," and "finds it necessary to establish an entity charged with oversight and management of the Project . . . ." On February 19, 2016 the Council delegated authority over the current gaming project to the Gaming Authority. Native Village of Eklutna, Res. No. 2016-06 (Feb. 19, 2016) (Ex. 31).

Members of the Tribal Council serve as members of the Board of Directors of the Gaming Authority along with two other members. On April 16, 2016 the Gaming Authority Board of Directors met to assume control over the gaming project. Eklutna Gaming Authority, Res. No. 2016-01 (Apr. 16, 2016) (Ex. 32).

This is structured much like the situation presented in the Kiowa decision, where the Commission cited the Tribe's establishment of an entity to oversee the gaming project as evidence of the exercise of governmental authority.

### 13. Eklutna Public Health and Safety and Anti-Discrimination at Gaming Facility Ordinance

The Tribal Council has adopted standards for gaming projects, governing building codes, food and beverage handling, water quality, anti-discrimination, workplace and occupational safety, and public health and safety. *See* Native Village of Eklutna, Ordinance 2007O-01 (Mar. 22, 2007) (Ex. 33). The building codes and food and beverage handling are based on Anchorage standards while the other standards are based on federal law. Section 701(b) of the Amended and Restated Gaming Ordinance (Ex. 28) provides for application of state standards where the Tribe has adopted no specific standard such as those in Ordinance 2007O-01.

### 14. Lease of Ondola Allotment for Gaming Project

The Tribe entered into a lease agreement dated April 14, 2016 with the members of the Ondola family who own the Ondola Allotment. *See* Lease Agreement (Ex. 14). The Ondola family and the Tribe will soon submit the lease agreement to the Bureau of Indian Affairs for approval

pursuant to 25 U.S.C. § 415. The purpose of the lease is "to develop, construct, finance and operate gaming facility, including related enterprises and facilities, support structures and parking areas." Lease Agreement § 7A. (Ex. 14). The Lease Agreement is for a term of 25 years with a right to renew for an additional 25-year term. *Id.* § 2. It acknowledges that:

> The NVE provides government services to the land subject of this Lease, including, but not limited to child welfare, snow removal, sanitation, health care, transportation, fire safety and tree cutting services, and has enforced and will continue to enforce tribal law applicable to the land, including, and without limitation, ordinances regarding animal control and environmental protection.

*Id.* Recitals § 4. The Agreement further provides:

> The NVE asserts jurisdiction over the land which is the subject of this Lease with the power to regulate the activities of all persons on the land for the public welfare, including to permit and limit, under terms established by NVE through regulation, gaming and other commercial activity on the land. The ONDOLA FAMILY acknowledges and submits to the governmental authority of NVE over the land subject to this Lease.

*Id.* Recitals § 5. Finally, the Agreement provides:

> Each LESSOR acknowledges and submits to the authority of NVE to continue to exercise governmental powers, including police powers, with respect to the Premises, including the enforcement of existing laws related to environmental protection, trespass and animal control and to enact and enforce additional laws, including for the regulation of the sale and consumption of alcohol. LESSOR acknowledges the authority of the NVE to take measures to prevent trespass, including construction of a fence surrounding the Premises and postage of additional signs providing notice that the Premises is subject to the sovereign authority of the NVE.

*Id.* § 27.

The Tribe has agreed to pay the Ondola family a share of the profits of the casino and related enterprises as rent. *Id.* § 4.

This is much like the facts of the Big Sandy Indian Lands Determination where the Commission noted that the Tribe had negotiated a lease with the allottee and submitted it to the BIA for approval. *Compare* Native Village of Barrow Indian Lands Determination (Feb. 1, 1996) (negative Indian lands determination relying in part on finding that the Tribe's leases of the lands "were not properly established" as they were not signed). And, in the Quinault Indian Nation Lands Determination at 6, the Department of the Interior found that consent to tribal jurisdiction in lease agreement related to an allotment provided evidence of the exercise of governmental authority.

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 23 of 30

### 15.    *Gaming Revenue Allocation Plan Ordinance*

The Tribal Council adopted on March 22, 2007 a Revenue Sharing Allocation Plan Ordinance. *See* Native Village of Eklutna, Ordinance 2007O-02 (Mar. 22, 2007) (Ex. 34). The Ordinance provides for the allocation of gaming revenues, including for per capita distributions to tribal members. The plan "govern[s] the allocation of available net revenues from the tribally-owned casino on the Ondola Allotment . . . and other gaming enterprises owned by the Native Village of Eklutna." *Id.* § 1.

### 16.    *Liquor Control Ordinance*

By Ordinance 2007O-04 (Mar. 22, 2007) (Ex. 35), the Tribal Council adopted a liquor control ordinance requiring a permit from the Tribal Council, along with state-required permits, in order to sell alcoholic beverages within Indian Country under the Tribe's jurisdiction. It provides "[t]he purpose of this Ordinance is to regulate the sale of alcoholic beverages on the lands within the jurisdiction of the Native Village of Eklutna, including the Ondola Allotment . . . ." *Id.* § 2.

Similarly, in the past the Commission has found that a tribe's enactment of a liquor ordinance supports the finding of governmental authority. Kiowa Indian Lands Determination at 6.

### 17.    *Approvals of Gaming Project on Ondola Allotment*

The Tribe has taken a number of formal actions and granted approvals in connection with the gaming project on the Ondola Allotment.

- By Resolution No. 2016-10 (Apr. 14, 2016), the Tribal Council approved a memorandum of understanding with the owners of the Ondola Allotment setting out the terms under which parties would negotiate an agreement granting the Tribe the right to use the Ondola Allotment for the Project. (Ex. 36).

- By Resolution No. 2016-11 (Apr. 14, 2016), the Tribal Council approved a lease agreement with the Ondola family for the gaming project. (Ex. 37).

In the Kiowa Indian Lands Determination at 6, the Commission found these types of tribal approvals constituted evidence of governmental authority.

### C.    The Sansonetti Opinion Does Not Apply Here

In 1993, the Solicitor issued the Sansonetti Opinion on the "Governmental Jurisdiction of Alaska Natives Over Land and Nonmembers." Office of the Solicitor, Dep't of Interior, Opinion M-36975 (Jan. 11, 1993). The Sansonetti Opinion is not relevant to the determination whether the Ondola Allotment constitutes Indian lands under IGRA. In the years since the Sansonetti Opinion was issued, its conclusions regarding tribal power over allotments and ANCSA have been superseded by statute, court decision, and policy. Furthermore, it offers broad conclusions,

untethered to specific facts, about tribal jurisdiction over allotments which lacks historical or legal support.

The Sansonetti Opinion was written in response to efforts by BIA to provide technical assistance to Alaska Native villages considering developing and adopting constitutions under the Indian Reorganization Act. *Id.* at 1-2. It was intended to supply a discussion of tribal power over lands and nonmembers after enactment of ANCSA to assist evaluation of provisions in constitutions submitted for Secretarial approval. *Id.* at 1. As discussed below, however, much of the Sansonetti Opinion is inapplicable today and does not apply or control the questions at issue here.

The Sansonetti Opinion recognizes that it was written when courts were struggling with "issues concerning sovereignty and powers of Alaska Native groups" and in response to arguments advanced at the time that Alaska Native groups were not tribes. *Id.* at 2, 48-60. However, the year following issuance of the Sansonetti Opinion, Congress enacted the Federally Recognized Tribe List Act, Pub. L. No. 103-454, 108 Stat. 4791 (1994), requiring, as a matter of statute, that the Department of the Interior to annually publish a list of Federally recognized Indian tribes. The confusion that pervaded at the time of the Sansonetti Opinion regarding the status of Alaska tribes, including the status of NVE, has since disappeared.

The Sansonetti Opinion has also been superseded by a statute enacted in 1994 prohibiting Interior from discriminating between tribes. It states:

> (f) Privileges and immunities of Indian tribes; prohibition on new regulations. Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

> (g) Privileges and immunities of Indian tribes; existing regulations. Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

Pub. L. No. 103-263, §5(b), 108 Stat. 707, 709 (1994) (codified at 25 U.S.C. § 476). These privileges and immunities provisions prohibit Interior from treating NVE differently than Indian tribes in the Lower 48.[11]

---

[11] As Interior recently noted, "the Department's policy is that there should not be different classes of federally

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 25 of 30

These provisions defeat the statement in the Sansonetti Opinion doubting "that any specific villages or groups can claim jurisdictional authority over allotment parcels." Sansonetti Opinion at 124-29.[12] As discussed *supra*, Section VI.A, general principles of law recognize tribal authority over members and over their members' Indian country allotments. Accordingly, this conclusion in the Sansonetti Opinion has been superseded by the privileges and immunities provisions.

Interior's view on the exercise of governmental power by Alaska Natives over land and the effect of ANCSA has evolved significantly since the Sansonetti Opinion. The Sansonetti Opinion reasoned "that ANCSA largely controls in determining whether any territory exists over which Alaska villages might exercise governmental powers." *Id.* at 107-08.[13] Since then, Interior and the courts have adopted a more expansive view of tribal power and a have rejected the conclusion in the Sansonetti Opinion that ANCSA controls such questions. In *Akiachak Native Community v. Salazar*, 935 F. Supp. 2d 195 (D.D.C. 2013), *appeal docketed*, No. 13-5360 (D.C. Cir. argued Mar. 4, 2016), the district court for the District of Columbia held that Interior's rule in 25 C.F.R. Part 151 prohibiting Alaska tribes to take land into trust under the IRA was not supported by law. The court's ruling directly upsets and unhinges the main assumptions relied upon by Interior in its 1993 Sansonetti Opinion that ANCSA was intended to control all questions relating to land for Alaska tribes, including the ability to take land into trust.

As a result of the court's decision, the Department published a final rule removing the Alaska exception from the 25 CFR Part 151 regulations on December 23, 2014, and it took effect on January 22, 2015. Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888 (Dec. 23, 2014). In light of *Akiachak* and the "urgent policy recommendations" of the Indian Law and Order Commission and the Secretarial Commission on Indian Trust Administration and Reform, the final rule explained the Department's "careful[] . . . reexamin[ation]" of the relevant law. *Id.* at 76,889-90. The Department concluded that the Secretary's discretion to take land into trust in Alaska pursuant to the IRA had

---

recognized tribes." Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888, 76,890 (Dec. 23, 2014).

[12]     The Sansonetti Opinion was tentative, for not only did it recognize that allotments were Indian country, it concluded that there was "little or no room for tribes in Alaska to exercise governmental authority over land or nonmembers." *Id.* at 108. The recognition that room existed for the exercise of such governmental authority demonstrates the tentative nature of its conclusion.

[13]     The Sansonetti Opinion, however, did determine that "[a]t a minimum, it is clear that ANCSA did not affect the retained governmental powers of these tribes to determine membership and to regulate internal tribal relations." *Id.* at 107. Other than an attempt to differentiate ANCSA from termination acts, it is unclear why the Solicitor decided that Alaska tribes retained some governmental powers akin to tribes in the Lower 48, but not others. Despite the fact that ANCSA did not intend to create reservations, it did intend for Alaska Natives to retain power over land and resources (albeit in a different way for some activities). *See id.* at 107-08 (recognizing that land and resources went to Native corporations for their control). But nothing in ANCSA purported to extinguish all territorial jurisdiction over land moving forward, or even address the issue of whether tribes, outside of Native corporations, could exercise their governmental power over their members' existing allotments, as those allotments that were not affected by ANCSA. *See generally, Akiachak Native Community v. Salazar*, 935 F. Supp. 2d 195, 205 (D.D.C. 2013), *appeal docketed*, No. 13-5360 (D.C. Cir. argued Mar. 4, 2016) (ANCSA intended only to prohibit *claims* against the United States by Alaska Natives).

remained intact notwithstanding the enactment of ANCSA. The Department further concluded that the Alaska exception improperly treated Alaska tribes differently from tribes in the Lower 48 contrary to federal law and policy. *Id.* Importantly here, in the final rule the Department explained: "[a]s a legal matter, an Alaska tribe possessing trust lands would be able to exercise jurisdiction over such land consistent with the manner in which Indian tribes exercise authority over trust lands located in the rest of the country." *Id.* at 76,893. It also stated, "[i]t is important to remember that Alaska Native land and history did not commence with ANCSA, and that ANCSA did not terminate Alaska Native tribal governments." *Id.* at 76,890.

Furthermore, the reasoning underlying the Sansonetti Opinion's expression of doubt regarding tribal authority over allotments was unsupported. It set out these conclusions notwithstanding the caution "we are unaware of any court decisions addressing the question . . . ." Sansonetti Opinion at 127. For example, the Opinion attempted to distinguish the 1906 Alaska Native Allotment Act, Pub. L. No. 59-171, 34 Stat. 197 ("1906 Act"), from other allotment acts on the basis that it did not require tribal membership, yet the Act was available to "any Indian or Eskimo of full or mixed blood who resides in and is a native of [Alaska]." *Id.* Mr. Sansonetti noted that allotments were not carved out of any reservation, but that was merely a result of circumstance. The belated acquisition of Alaska by the United States meant that the settlement of Alaska happened after the reservation policy was replaced by the allotment policy. The historical circumstances that lead to the 1906 Act are described in a Senate Committee report:

> The Natives of Alaska were in an anomalous position. They were omitted from the General Allotment Act which applied to Indian tribes of other parts of the United States. They were omitted from the Homestead Act as being neither citizen nor alien capable of attaining citizenship. They were forbidden by Congress to enter into treaties with the United States for the cession of some lands and the retention of other. Physically they comprised the major part of Alaska's population. Officially they were invisible. They had no recognizable legal title to lands despite the general policy of the courts to recognize their right to possession against third parties. This was a right which could be enforced only through civil action in courts which, as a practical matter, were inaccessible to Alaska Natives by reason of distance, expense, and lack of knowledge. The Alaska Native Allotment Act was passed for the purpose of providing legal title to some of the lands occupied.

S. Rep. No. 92-405, at 90-91 (1971). And Mr. Sansonetti attempted to distinguish the 1906 Act because the statute used the word "homestead," but this reasoning is inconsistent with a prior opinion on the question[14] and court decisions. *See supra* 8-10, 25.

---

[14]     In Solicitor's Opinion M-36662 at 1934-35 (Sept. 21, 1964) ("Allotment of Land to Alaska Natives"), Acting Solicitor Edward Weinberg reviewed the Alaska Allotment Act of 1906, as amended in 1956, and concluded that nation-wide, allotment acts were numerous, did not have consistent language regarding requirements, and "[t]he use of the word 'homestead' in the Alaska statute is not necessarily indicative of an intention to superimpose the requirements of the general homestead laws on the express requirements of the Alaska Allotment Act. Congress has frequently used the word

AR000803

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 27 of 30

There is now little basis upon which to rely upon the Sansonetti Opinion and it provides no basis for denial of the Tribe's request for a favorable Indian land determination with respect to the Ondola Allotment.  As discussed above, this is because of two primary reasons.  First, the opinion left open the ability of Indian tribes in Alaska to make a factual showing that they exercise governmental powers over land, like the Ondola allotment, which is held in restricted fee for NVE tribal members.[15]  Second, the Opinion's expression of doubt whether Alaska Natives have governmental power over allotments was premised upon an interpretation of ANCSA and the powers of tribal government that has been superseded by statute, court decisions and Departmental policy.

### D.   Conclusion Regarding Evidence of Governmental Authority Over Ondola Allotment.

On the basis of the foregoing, NVE has jurisdiction and exercises governmental power over the Ondola Allotment as a matter of law and fact.  The *Cheyenne River Tribe* criteria, 830 F. Supp. at 528, are satisfied here.  As discussed above, tribal members have resided on the Ondola Allotment in a home.  The Tribe provides substantial services to the Allotment and exercises authority through many enactments and enforcement of those laws.

The extensive history outlined in the first section is more than sufficient to establish NVE's exercise of governmental power as a factual matter.  The fundamental principles of federal Indian law support NVE's assertion of jurisdiction as a legal matter.

---

'homestead' in connection with the allotment of land to Indians to indicate merely that the land allotted was to be subject to special status.  [FN 8: For example, Indian allotment acts passed in 1898, 1906, 1919, and 1920 provided that homestead allotments should be inalienable and non-taxable. 30 Stat. 495, 505-513 (1898); 34 Stat. 539 (1906); 41 Stat. 16 (1919); 41 Stat. 751, 756 (1920).]"  Based on the legislative history surrounding the 1906 Alaska Allotment Act, Acting Solicitor Weinberg concluded that "the legislation proposed by Senator Nelson and examined by his committee was designed to authorize the Secretary to develop a program for the allotment of land to the natives of Alaska according to the particular needs of each group."  *Id.* at 1940.

[15]   Indeed, Mr. Sansonetti acknowledged at the outset that his opinion was to be an attempt to "step back from the details" of specific cases and address Alaska's tribal jurisdictional issues from a broad perspective.  Sansonetti Opinion at 3.  His opinion did not attempt to address IGRA's specific language nor did it conclude that Alaska Native villages are unable to partake of the Act's benefits.  In over 130 pages, the opinion does not even reference IGRA and is irrelevant to interpreting IGRA's statutory language regarding what constitutes "Indian land" or the "exercise of governmental power" over Indian lands.

Lawrence Roberts, Acting Assistant Secretary
June 29, 2016
Page 28 of 30

## VII.   Conclusion.

Based on the foregoing discussion, we respectfully request that Interior confirm that the Native Village of Eklutna is an "Indian tribe" which exercises governmental power over the Ondola Allotment, which qualifies as "Indian lands" under IGRA. If you require further information of any kind, please do not hesitate to contact either Colin Hampson at (619) 267-1306 or Lloyd Miller at (907) 258-6377.

Respectfully submitted,

SONOSKY, CHAMBERS, SACHSE,
MILLER & MUNSON, LLP

By:     Lloyd B. Miller
Colin Cloud Hampson

LBM/CCH

AR000805

# LIST OF EXHIBITS

Exhibit 1—James Kari et al., *Shem Pete's Alaska: The Territory of the Upper Cook Inlet Dena´ina* (1987)

Exhibit 2—Aff. of George Ondola (Jan. 26, 1995)

Exhibit 3—Fed. Field Comm. for Dev. Planning in Alaska, *Alaska Natives & the Land* (1968)

Exhibit 4—Ann Chandonnet, *On the Trail of Eklutna* (1979)

Exhibit 5—Ann Chandonnet, *The Once and Future Village of Ikluat/Eklutna: The History of a Tanaina Athapaskan Settlement* (1979)

Exhibit 6—Constitution of the Native Village of Eklutna (1988)

Exhibit 7—Constitution of the Native Village of Eklutna (1996)

Exhibit 8—Letter from Office of Solicitor to NIGC (May 17, 1995)

Exhibit 9—Letter from Office of Solicitor to NIGC (May 18, 1995)

Exhibit 10—Native Allotment Deed (Nov. 13, 1963)

Exhibit 11—Aff. of Daniel Alex, Tribal Adm'r, Native Vill. of Eklutna (Mar. 16, 2007)

Exhibit 12—Maps Showing Distances

Exhibit 13—Aff. of George Ondola (Mar. 26, 2007)

Exhibit 14—Lease Agreement between Native Vill. of Eklutna & Ondola Family (May 27, 2016)

Exhibit 15—Native Village of Eklutna, Dog Ordinance

Exhibit 16—Native Village of Eklutna, Des'na'ka, Ka'nash – Relatives Talk Code (Apr. 25, 2003)

Exhibit 17—Native Village of Eklutna, Tribal Court Codes, Res. No. 98-0026 (May 1, 1998)

Exhibit 18—Contract Agreement No. A16AV00272 between Sec'y of Dep't of Interior & Native Vill. of Eklutna (Oct. 1, 2015)

Exhibit 19—Native Village of Eklutna, Res. No. 97-22, Environmental Protection Ordinance (July 19, 1997)

Exhibit 20—Native Village of Eklutna, Ordinance 04-001 (Mar. 26, 2004)

Exhibit 21—Native Village of Eklutna, Res. No. 2006-24 (Dec. 21, 2006)

Exhibit 22—Letter of Agreement Between Native Village of Eklutna and Anchorage Police Department (Dec. 10, 1996)

Exhibit 23—Funding Agreement between Native Vill. of Eklutna & Sec'y of Dep't of Health & Human Servs. of U.S., Fiscal Years 2010-12 (Mar. 5, 2010)

Exhibit 24—Alaska Tribal Health Compact Between Certain Alaska Native Tribes &. U.S. (amended and restated Oct. 1, 2010)

Exhibit 25—Aff. of Millard R. Farber, Eklutna Tribal Adm'r (June 27, 2016)

Exhibit 27—Native Village of Eklutna, Gaming Ordinance (Jan. 24, 1995)

Exhibit 28—Native Village of Eklutna, Amended Gaming Ordinance (Apr. 26, 2006)

Exhibit 29—Native Village of Eklutna, Ordinance 2007O-03 (Mar. 22, 2007)

Exhibit 30—Native Village of Eklutna, Res. No. 2006-26 (Dec. 21, 2006)

Exhibit 31— Native Village of Eklutna, Res. No. 2016-06 (Feb. 19, 2016)

Exhibit 32—Eklutna Gaming Authority, Res. No. 2016-01 (Apr. 16, 2016)

Exhibit 33—Native Village of Eklutna, Ordinance 2007O-01 (Mar. 22, 2007)

Exhibit 34—Native Village of Eklutna, Ordinance 2007O-02 (Mar. 22, 2007)

Exhibit 35—Native Village of Eklutna, Ordinance 2007O-04 (Mar. 22, 2007)

Exhibit 36—Native Village of Eklutna, Resolution No. 2016-10 (Apr. 14, 2016)

Exhibit 37—Native Village of Eklutna, Resolution No. 2016-11 (Apr. 14, 2016)



## NATIVE VILLAGE OF EKLUTNA

November 21, 2016

BY E-MAIL to Hilary.tompkins@sol.doi.gov

Hilary Tompkins, Solicitor
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

      Re:    Request for Withdrawal of the Sansonetti Opinion

Dear Solicitor Tompkins:

On behalf of the Native Village of Eklutna, I request that you withdraw "Governmental Jurisdiction of Alaska Natives Over Land and Nonmembers," Office of the Solicitor, Department of Interior, Opinion M-36975 (Jan. 11, 1993) (the "Sansonetti Opinion"). Withdrawal is necessary because the Sansonetti Opinion has been superseded by later legislation, court opinions and Departmental policy, rendering the opinion's conclusion erroneous. The opinion is no longer relevant or helpful, but rather leads to confusion.

The Sansonetti Opinion faced challenges from the outset because it sought to answer broad questions in the abstract rather than specific questions in the context of particular facts. It was written in response to efforts by BIA to provide technical assistance to Alaska Native villages considering developing and adopting constitutions under the Indian Reorganization Act ("IRA"). *Id*. at 1-2. The first 100 pages of the opinion were devoted to a general discussion of background based on publicly available sources, including 75 pages on the history of Alaskan tribes, their lands, and their relationship to the federal government, and 25 pages discussing the Alaska Native Claims Settlement Act ("ANCSA").

In the final 30 pages, the Sansonetti Opinion examined a question posed by the Secretary regarding the authority that an Alaska Native village may exercise over land and non-members after the enactment of ANCSA. Sansonetti Opinion at 1, 109. It concluded that although there remained certain lands—such as allotted lands and Village-owned townsite lands—meeting the definition of Indian country in Alaska, "ANCSA largely controls" the question and further that "Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise

1

AR001239

governmental power over lands and nonmembers." *Id.* at 132. The opinion offered little rationale for inferring such a broad scope in ANCSA. And since its conclusion was presented in the abstract, it was necessarily tentative, recognizing that certain circumstances might warrant a different conclusion. *Id.* at 127-28 (where "no original tribal nexus" exists, congressional intent to permit tribal jurisdiction over an allotment "*seems unlikely,*" and "there is *little or no* basis" for a village to exercise jurisdiction over an allotment); 130 ("an assertion of tribal jurisdiction over individual restricted [townsite] lots *would be doubtful* if there were no clear tribal nexus") (emphasis supplied).

Furthermore, the opinion recognized that Congress may legislate to alter its conclusions. *Id.* Congress did just that.[1] In 1994, Congress enacted legislation that superseded the Sansonetti Opinion with respect to Alaska tribal status. The Sansonetti Opinion concluded that Alaska tribes could be federally recognized tribes, but this was later confirmed and unequivocally settled by the 1994 Federally Recognized Indian Tribe List Act, which required that the Secretary of Interior publish annually a list of federally recognized tribes, 25 U.S.C. § 479a-1, and found that once recognized, a tribe "may not be terminated except by an Act of Congress." Pub. L. No. 103-454, § 103(4), (5), 108 Stat. 4791, 4791-4792 (1994). Congress also enacted the Tlingit and Haida Status Clarification Act, which found that while the Secretary of Interior had omitted the Central Council of Tlingit and Haida Indian Tribes of Alaska from the list of federally recognized tribes, "the Secretary may not administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress," and reaffirmed the Central Council as a federally recognized tribe. *Id.* §§ 202(4), 203 (codified at 25 U.S.C. §§ 1212, 1213). The Department has consistently included Alaska Tribes on the annual list of federally recognize tribes.[2] There is no longer any question about the status as federally recognized tribes of Alaska tribes included on Interior's list of federally recognized tribes.[3]

---

[1] Congress had also done so in 1987 when it approved amendments to ANCSA inserting a provision expressly disclaiming any effect on questions regarding tribal territorial jurisdiction. Pub. L. No. 100-241, § 17(a), 101 Stat. 1788, 1814 (1988).

[2] In 1993, Assistant Secretary—Indian Affairs Ada Deer announced in the preamble to the list then published that "[t]his list is published to clarify that the villages and regional tribes listed below are not simply eligible for services, or recognized as tribes for certain narrow purposes. Rather, they have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; are entitled to the same protection, immunities, privileges as other acknowledged tribes; have the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes." Cabazon Band of Cahuilla Mission Indians of the Cabazon Reservation, Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54365 (Oct. 21, 1993).

[3] In the 1995 publication of the list, the BIA noted that the 1993 list "represents a list only of those villages and regional tribes which the Department believes to have functioned as political entities, exercising governmental authority," again recognized Alaska Native tribes, citing the privileges and immunities provisions, explaining, "[i]nclusion on the list . . . establishes that the listed tribes have the same privileges, immunities, responsibilities and obligations as other Indian tribes under the same or similar circumstances including the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes" and cited the List Act and the privileges and immunities provisions of the IRA that "confirmed that the Secretary can make no distinctions among tribes as a general matter of Federal law." Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 60 Fed. Reg. 9250, 9251 (Feb. 16, 1995).

2

AR001240

In 1994 Congress also amended the IRA to add "privileges and immunities" provisions, which prohibit the federal government from treating federally recognized tribes differently.[4] These provisions directly undercut the conclusion in the Sansonetti Opinion that ANCSA implicitly altered tribal territorial jurisdiction because they prohibit the Department from treating tribes differently, and the inference drawn in the Sansonetti Opinion regarding ANCSA's effect violates that provision. Consistent with that Congressional intent, Interior and the courts have adopted a narrower view of ANCSA to avoid discriminating between Alaska tribes and Tribes in the Lower 48. In *Akiachak Native Community v. Salazar*, 935 F. Supp. 2d 195 (D.D.C. 2013), *vacated sub nom. Akiachak Native Cmty. v. United States DOI*, 827 F.3d 100 (D.C. Cir. 2016),[5] the District Court for the District of Columbia held that Interior's rule in 25 C.F.R. Part 151 prohibiting Alaska tribes to take land into trust under the IRA was not supported by law. The court rejected the argument that ANCSA implicitly repealed the Secretary's authority to take land into trust under the IRA. Accordingly, the reasoning underlying the ruling directly upsets the conclusion drawn by Interior in the Sansonetti Opinion that ANCSA's broad scope means it controls all questions relating Alaska tribes and Indian land.

Then in 2014, in a formal rulemaking, the Department removed the Alaska exception from the fee-to-trust regulations to exercise its authority under the IRA to acquire land into trust for Alaska tribes. The Department reexamined the impact of ANCSA and concluded that it was not as broad as previously thought and did not implicitly diminish the Secretary's authority to take land into trust under the IRA. 79 Fed. Reg. 76890 (Dec. 23, 2014).[6] The Department explained in the publication of the final rule that:

> T]he Department has carefully reexamined the legal basis for the Secretary to take land into trust in Alaska under Section 5 of the IRA (25 U.S.C. 465). In

---

[4] Pub. L. No. 103-263, § 5(b), 108 Stat. 707, 709 (1994) (codified at 26 U.S.C. § 476). Those provisions state:

(f) Privileges and immunities of Indian tribes; prohibition on new regulations. Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

(g) Privileges and immunities of Indian tribes; existing regulations. Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

[5] *Akiachak* was vacated on appeal on mootness grounds because the D.C. Circuit Court of Appeals determined that all live claims in the suit were founded on the Department's Alaska exception regulation, which by the time of the appeal had been removed through a formal rulemaking.

[6] On January 16, 2001, Solicitor Leshy rescinded a prior opinion questioning the Department's authority to take land into trust citing ANSCA. "Rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian Affairs entitled 'Trust Land for the Natives of Venetie and Arctic Village,'" Memorandum to Assistant Secretary— Indian Affairs from Solicitor John D. Leshy (Jan. 16, 2001). The Sansonetti Opinion cited the prior opinion that is now withdrawn. Sansonetti Opinion at 112 n.276, 123 n.296.

AR001241

particular, we have reviewed the statutory text of ANCSA and other Federal laws and have concluded that this authority was never extinguished. Congress explicitly granted the Secretary authority to take land into trust in Alaska under the IRA and its amending legislation. See 25 U.S.C. 465, 25 U.S.C. 473a. Although Congress, through the enactment of ANCSA and other laws, repealed other statutory provisions relevant to Alaska Native lands, it has not passed any legislation that revokes the Secretary's authority to make trust land acquisitions in Alaska, as codified in 25 U.S.C. 473a and 25 U.S.C. 465.  See Memorandum from Hilary C. Tompkins, Solicitor, to Kevin Washburn, Assistant Secretary—Indian Affairs (April 29, 2014).... Moreover, the Department's policy is that there should not be different classes of federally recognized tribes....

It is important to remember that Alaska Native land and history did not commence with ANCSA, and that ANCSA did not terminate Alaska Native tribal governments.... The Department agrees that the IRA provides legal authority for the removal of the Alaska exception.

*Id*. It is now clear that the privileges and immunities provisions prohibit Interior from construing ANCSA to diminish Alaska tribal authority over territory and nonmembers where ANSCA does not do so expressly.  The Sansonetti Opinion's conclusion that such an inference may be drawn from ANCSA is contrary to the IRA and the Department's policy.

The Sansonetti Opinion's conclusion with regard to allotments also cannot be reconciled with the privileges and immunities provision and Interior policy.  The Sansonetti Opinion acknowledged that allotments are Indian Country and cannot be distinguished from other tribal land held in restriction or trust but nonetheless concluded that "there is little or no basis for a Native village to claim territorial jurisdiction over an allotment." *Id*. at 132; *but see id*. at 127 (citing *U.S. v. Jackson*, 280 U.S. 183 (1930), in which "the Supreme Court held that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments.").  This conclusion directly ==violates== the anti-discrimination mandate of the privileges and immunities provisions.  The Sansonetti Opinion's unsupported reasoning in distinguishing Alaska Native allotments from allotments in the Lower 48 is also in conflict with controlling case law and an earlier Solicitor's Opinion, M-36662 at 1934-35 (Sept. 21, 1964) ("Allotment of Land to Alaska Natives"), not cited by Sansonetti.[7]

Perhaps the only salvageable conclusion from the Sansonetti Opinion is that "[t]he statutory scheme established in ANCSA precludes the treatment of lands received under that Act as Indian county." Sansonetti Opinion at 131.  But there is no need to rely on this conclusion from Sansonetti, as the Supreme Court made this determination in *Alaska v. Native Vill. of Venetie*, 522 U.S. 520, 527, 533-34 (1998).

---

[7] In M-36662, Acting Solicitor Edward Weinberg reviewed the Alaska Allotment Act of 1906, as amended in 1956, and concluded that nation-wide, allotment acts were numerous, did not have consistent language regarding requirements, and "[t]he use of the word 'homestead' in the Alaska statute is not necessarily indicative of an intention to superimpose the requirements of the general homestead laws on the express requirements of the Alaska Allotment Act. Congress has frequently used the word 'homestead' in connection with the allotment of land to Indians to indicate merely that the land allotted was to be subject to special status." *Id*. at 1934-35.

4

AR001242

The key underpinning of the Sansonetti Opinion's conclusions is that ANSCA's reach was so broad as to govern questions involving the scope of tribal power over lands and non-members.  However, Congress has now clarified that tribes may not be treated differently, and the Department has recognized that means that Alaska tribes may not be treated differently from tribes in the Lower 48.  Accordingly, the Sansonetti Opinion no longer serves as a useful guide regarding the law and in fact engenders confusion, and must be withdrawn.

Sincerely,

Lee Stephan, President

cc:
Jody.cummings@sol.doi.gov
Eric.sherpard@sol.doi.gov
Jennifer.turner@sol.doi.gov
James.debergh@sol.doi.gov
Lawrence_roberts@ios.doi.gov
Alison.grigonis@bia.gov

5

| | |
|---|---|
| **From:** | Vanessa L. Ray-Hodge |
| **To:** | "eric.shepard@sol.doi.gov"; Turner, Jennifer; "matthew.kelly@sol.doi.gov" |
| **Cc:** | Colin C. Hampson; Padraic McCoy; Carrie C. Doyle |
| **Subject:** | Eklutna |
| **Date:** | Thursday, June 22, 2017 2:49:43 PM |
| **Attachments:** | NVE Second Supplemental Submission ILD June 21, 2017.pdf |
| | Olga Ondola Allotment Application.pdf |
| | Attachment 1 Second Supplemental Submission June 21 2017.pdf |

Eric,

We have completed the second supplemental submission and given that this submission is in response to specific questions we discussed with you all on the phone, we are not submitting a formal letter.  Instead, attached is our informal second supplement that addresses the issues we previously discussed and supporting documents.

Thanks,
Vanessa

Vanessa L. Ray-Hodge
Sonosky, Chambers, Sachse, Mielke & Brownell
500 Marquette Ave, Suite 660
Albuquerque, NM  87102
Office: 505.247.0147
Cell: 202.460.4519

**June 6, 2017**

*Via Email*

Dear Eric,

In follow-up to our call in early May, on behalf of the Native Village of Eklutna ("Tribe" or "NVE"), we are informally providing supplemental background information about the Ondola Allotment and additional legal analysis of the Alaska Native Allotment Act. This is the Tribe's second supplement to its original request for an Indian Lands Determination relating to the Ondola Allotment.

## 1. Additional Factual Background

As explained in the Tribe's June 29, 2016 Indian lands determination request, the allotment is located in the Birchwood community seven miles from the Village of Eklutna ("Village") and twenty-two miles from Anchorage. *See* Letter from Colin C. Hampson to Lawrence Roberts, Acting Assistant Secretary, Bureau of Indian Affairs at 7 (hereinafter "June 29, 2016 Submission"). A map showing the location of the allotment is enclosed as Attachment 1.

The Village occupies approximately 55 acres of fee land and approximately 50 people reside on Village owned lands. The Tribe provides a range of governmental services to Village residents and tribal members, including a tribal court, housing, health care services in a recently constructed health care clinic, employment services, water services, waste services, snow plowing, food bank services, lunches for seniors, environmental disposal services (disposal of used appliances and furniture), trespass inspection and monitoring, archeological and cultural surveys, historical and cultural preservation, Indian child welfare advocacy and case management services, youth activities (including a dance and drum group and culture camp), holiday baskets and school supplies, a biannual potlatch and powwow, and signage. In recent years, the Tribe installed a street light within the Village for safety purposes.

The Tribe provides many of the same governmental and tribal member services to the Ondola allotment. *See* June 29, 2016 Submission at 14 – 23.

## 2. Alaska Native Allotment Act

As discussed in the Tribe's June 29, 2016 letter and supplemental letter dated December 16, 2016, *see* June 29, 2016 Submission *and* Letter from Colin C. Hampson to Lawrence Roberts, Acting Assistant Secretary, Bureau of Indian Affairs (hereinafter "Dec. 16, 2016 Submission"), the precedents for recognizing tribal jurisdiction over tribal member-owned allotments, including allotments located off-reservation and allotments issued from the public domain, establish the Tribe's right to a favorable determination with respect to the Ondola Allotment. In the contiguous United States, allotments acquired by individual Indians from the public domain and outside of a current or former reservation have been found to qualify as "Indian lands" under the Indian Gaming Regulatory Act ("IGRA"). For example, as we noted in

our initial submission on June 29, 2016, the National Indian Gaming Commission ("NIGC") concluded that an Indian allotment held in trust for a member of the Big Sandy Rancheria constitutes Indian lands. *See* June 29, 2016 Submission at 11-12. The allotment at issue in the Big Sandy determination was an allotment that was patented to the individual Indian from the public domain and was located twelve miles outside the Tribe's Rancheria. *Id.*; *see also* Memorandum from John R. Hay, Staff Attorney, National Indian Gaming Comm. to Philip N. Hogan, Chairman, NIGC at 2(Sept. 6, 2006) ("The McCabe Allotment was originally allotted out of the public domain to Mary McCabe, a member of the Tribe, in 1920 and immediately placed in trust."). There, the determinative facts with respect to whether the land at issue qualified as an allotment were whether the land was held in trust[1] for a member of the Tribe. *See generally, id.*

Similarly, in the Office of the Solicitor's opinion for the Quinault Indian tribe, the Associate Solicitor found that the Sampson Johns Allotment was "Indian land" under IGRA. Memorandum from Robert T. Anderson, Associate Solicitor, Division of Indian Affairs to Director, Indian Gaming Management Staff (Sept. 25, 1996). The Solicitor's Office determined that the land qualified as an allotment because the "land is trust land owned by Quinault tribal members" despite the fact that the land was "allotted . . . out of the public domain." *Id.* at 1, 2. The Solicitor's Office did not focus on the fact that the allotment was outside the Tribe's reservation but that "[t]he land has been continuously held in trust since 1916 for the beneficial owners of the land and is currently held in trust by the United States for a number of Quinault tribal members, heirs and successors of Sampson Johns." *Id.* at 2.

There is no legal basis on which to distinguish allotments issued by the Secretary of the Interior pursuant to the Alaska Native Allotment Act of 1906 ("ANAA") from other Indian allotments. The ANAA, as amended, 34 Stat. 197 (May 17, 1906), gave the Secretary the authority to

> allot not to exceed one hundred and sixty acres of nonmineral land . . . to any Indian, Aleut, or Eskimo of full or mixed blood who resides in and is a native of [the district of Alaska] . . . and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable . . . .

43 U.S.C. § 270-1. While not identical, the ANAA is similar to the General Allotment Act ("GAA"), which allowed individual Indians to establish allotments outside of federally created or recognized reservations. More specifically, the GAA provided that "any Indian not residing upon a reservation, or for whose tribe no reservation has been provided . . . shall make settlement upon any surveyed or unsurveyed lands of the United States . . . shall be entitled . . . to have the same allotted to him or her . . . ." 24 Stat. 388 § 4. Further, the GAA provided that approval of the patent by the Secretary "shall be of legal effect, and declare that the United States does and will hold the land thus allotted . . . in trust for the sole use and benefit for the Indian . . . ." *Id.* §

---

[1] As discussed in the Tribe's previous submissions, land held by an individual Indian in restricted fee is treated as equivalent to trust land.

5. The GAA was not limited to providing individual Indians land within their existing or former Indian reservation.

The GAA is generally understood as the central piece of legislation of the allotment era, but the GAA was preceded and succeeded by numerous allotment acts providing more specificity with regard to certain reservations, types of lands, or classes of individuals. *See Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 328 (2008) (referring to "[t]he history of the General Allotment Act and its successor statutes"); F. Cohen, HANDBOOK OF FEDERAL INDIAN LAW § 16.03[2][a]-[b], pp. 1072–1074 (2012 ed.). The allotment statutes vary somewhat as to the terms used to define the land and individuals to which they apply, yet they all are part of the congressional policy to provide homesites for individual Indians and must therefore be construed *in pari materia. See United States v. Jackson*, 280 U.S. 183, 193-94, 196 (1930) (approving the Department of the Interior's construction of Indian homestead laws and GAA "in para materia" and ruling "Indian allotments and Indian homesteads are in all essential respects upon the same footing, and that each is equally within the purview of a statute in which the Congress may use only the terms 'allottee' and 'allotment'"); *see also Kirkwood v. Arenas*, 243 F.2d 863, 866 (9th Cir. 1957) (holding Mission Indian Act and GAA to be construed *in pari materia* and so Section 6 of GAA regarding taxability of allotments is applicable to allotment made under former Act). Accordingly, allotments issued under the ANAA should be treated in the same manner as allotments issued under the GAA or other allotment statutes.

Differences in historical circumstances or terminology provide no basis for distinguishing the two statutes. First, in enacting the ANAA Congress intended to eliminate confusion existing at the time about the categorization of Alaska Natives by providing for their treatment similar to Indians in the contiguous United States. The Ninth Circuit has noted that the ANAA was passed "because a number of lower courts found that Alaska Natives were not within the definition of 'Indian,' [and so] there was doubt whether the General Allotment Act did apply to them. Thus Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act." *Pence v. Kleppe*, 529 F.2d 135, 140 (9th Cir. 1976); *see also, Masayesva v. Zah*, 792 F. Supp. 1160, 1163 and n.6 (D. Ariz. 1992) ("the Alaska Native Allotment Act [is] legislation interpreted similarly to the General Allotment Act" and "'plugged a hole' in the General Allotment Act's failure to address Alaska Natives."). The ANAA was thus meant to fill the gap that existed at the time between the treatment of Alaska Natives and Indians in the contiguous United States. The House Committee on the Public Lands explained the need for the ANAA as follows:

> The necessity for this legislation arises from the fact that Indians in Alaska are not confined to reservations . . . they live in villages and small settlements . . . . It does not signify that because an Alaska Indian has lived for many years in the same hut and reared a family there that he is to continue in peaceable possession of what he has always regarded his home. Some one who regards that particular spot as a desirable location for a home can file upon it for a homestead, and the Indian or Eskimo . . . is forced to move and give way to his white brother.

H.R. REP. NO. 59-3295, at 1 (1906).[2]

Second, case law supports the conclusion that there is no substantive difference between the status of Alaska Natives and Indians in the contiguous United States. In *Pence v. Kleppe*, in discussing the court's jurisdiction, the court noted that:

> The Alaska Native Allotment Act . . . deals with allotments to Indians, Aleuts and Eskimos without making any distinction between them. There are many statutes dealing specifically with Alaska, such as the Alaska Native Allotment Act, which refer expressly to Indians, Aleuts, and Eskimos. On the other hand, many other statutes which are of general application throughout the United States and its territories refer only to 'Indians.' It has been held that in those statutes, the word 'Indian,' as applied in Alaska, includes Aleuts and Eskimos. The Act of June 2, 1924, Public No. 175, 43 Stat. Ch. 233, p. 253, confers citizenship on 'all non-citizen Indians.' *In Hynes v. Grimes Packing Co.*, 9 Cir., 1948, 165 F.2d 323, 326, we said that the statute conferred citizenship upon the Eskimo of Alaska. The Act of August 13, 1946 . . . created the Indian Claims Commission and granted it jurisdiction of claims 'on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska.' (§ 2, 25 U.S.C. § 70a). *In United States v. The Native Village of Unalakleet*, 1969, 411 F.2d 1255, 188 Ct.Cl. 1, the Court of Claims, in an exhaustive opinion, held that the word 'Indian' as used in the statute, included Eskimos and Aleuts. The court pointed out that the word 'Indian' is commonly used in this country to mean 'the aborigines of America.' See also 42 C.J.S. Indians s 1, p. 647. We agree . . . .

529 F.2d at n. 5. This discussion shows that there is no rational basis for distinguishing the Alaska Native Allotment Act from other allotment acts. In fact, the opposite is true – the terms are most often used synonymously.[3] In any event, the Tribe has demonstrated a direct tribal

---

[2] As discussed previously, the fact that the ANAA used the term "homestead" rather than "allotment" is also not a sufficient basis on which to distinguish Alaska Native allotments. *See* June 29, 2016 Submission at 8-10, 25 n.13. There is in reality no difference in the treatment by the United States of a "homestead" under the ANAA from other Indian allotments. Indeed, allotments made under the ANAA are held in restricted fee by the individual Indian, Aleut or Eskimo and "subject to the same restrictions on taxation and alienation as trust lands, and are generally treated by Congress and Interior as the equivalent of trust land." Office of the Solicitor, M-37043 "Authority to Acquire Land into Trust in Alaska" at 21, n. 134 (Jan. 13, 2017); id. at 2, n.18. *See also*, NVE Submission at 7-9. (Dec. 16, 2016). In any event, the ANAA and its implementing regulations repeatedly uses terms like "allot," "allotment" and "allottee" notwithstanding the one reference to "homestead" in the Act. 34 Stat. 197. *See also* 43 U.S.C. 1634 (discussing "Alaska Native allotment applications"); 43 C.F.R. 2561.0-8 (regulations implementing the Act and referring to applications for and the granting of an "allotment").

[3] The implementing regulations of the GAA required that an individual Indian show tribal membership or eligibility for tribal membership, 43 C.F.R. § 2531.1. The ANAA required an analogous showing that the applicant was Alaska Native. Interior required certification that there was nexus or affiliation between the individual applicant and a native Alaska aboriginal group or entity recognized by Congress in the Act. *See* 43 C.F.R. § 67.5(e) (1958) (43 C.F.R. Pt. 67 was amended and later reorganized into 43 C.F.R. § 2561.1, *see* 35 Fed. Reg. 9502 (June 13, 1970)). For example, the ANAA allotment application required BIA to certify that the individual is "a full or mixed blood Indian, Aleut or Eskimo, born and now residing in the State of Alaska." *See e.g.*, Olga Ondola Allotment

AR002055

nexus because the Ondolas are tribal members of NVE, a federally recognized tribe. *See* NVE Indian lands determination request at 5-7 (June 29, 2016).

Any doubt regarding the treatment of allotments made to Alaska Natives under the ANAA and Indians in the lower 48 is resolved by the privileges and immunities provisions enacted in 1994, which prohibit Interior from treating NVE and the Ondola allotment differently than the tribes or allotments at issue in the Big Sandy and Sampson Johns decisions. *See* June 29, 2016 Submission at 24.

### 3. Conclusion

The only question that remains is to determine whether the Ondola Allotment qualifies as "Indian land" is whether NVE exercises governmental power over the allotment. As discussed in our June 29, 2016 Submission, we have provided ample facts to support a positive determination on this question. *Id.* at 10-23; *see also generally* Dec. 16, 2016 Submission.

Please let us know if you have any further questions.


Thank you,

Colin & Vanessa


---

Application, Form 4-021 (Nov. 1958), Alaska Native Allotment Application, Department of the Interior, Bureau of Land Management (Jul. 3, 1961); GAO Report to the Chairman, Committee on Interior and Insular Affairs, House of Representatives, "Alaska Native Allotment Eligibility Process Can be Improved" at 11, 14 (July 1988). In accordance with the ANAA and regulations, BIA certified that Olga Ondola met the criteria for being "Indian, Aleut or Eskimo" as part of the process for issuing the Ondola Allotment. Notwithstanding the confusion at the time over whether groups of Alaska Natives were "tribes," the application requirements under the ANAA were consistent with the GAA and its requirement that an individual Indian show a nexus to a tribal group in the lower 48. Regardless, today BIA requires that for certification of Alaska Native Blood, an individual must show his or her "relationship to an enrolled member(s) of a federally recognized Indian tribe . . . which appears on the list of recognized tribes published in the <u>Federal Register</u> by the Secretary of the Interior."). *See* https://www.bia.gov/cs/groups/public/documents/text/idc-001805.pdf (last accessed May 11, 2017).

IN REPLY REFER TO:

# UNITED STATES
## DEPARTMENT OF THE INTERIOR

### BUREAU OF INDIAN AFFAIRS
Area Field Office
1220 East 5th Avenue
Anchorage, Alaska

055026

June 30, 1961

Mr. Warner T. May
Manager, Land Office
Bureau of Land Management
6th and Cordova
Anchorage, Alaska



Dear Mr. May:

You will find enclosed in quadruplicate the application of
___Olga Ondola____ of ___Chugiak___, Alaska
for a Native Land Allotment under the Act of May 17, 1906,
as amended, covering___10____ acres of land.

A representative of this office has certified that the above
named applicant is a Native entitled to an allotment under the
regulations of 43 CFR, Part 67.  Please acknowledge receipt of
this application furnishing us your serial number covering the
case.  There is also enclosed, in triplicate, Alaska Native
Allotment Evidence of Occupancy properly executed by the
applicant.

*acknowledged*
*7/3/61*
*Reb*

Sincerely yours,

*Charles P. Mathes*
Charles P. Mathes
Real Property Officer

Enclosure

CPM/es

cc: Realty, JAO
    Subj. file
    Chrony file

BUREAU of LAND MANAGEMENT

JUL 3 1961 10·00 AM

ANCHORAGE LAND OFFICE

AR002057

Form 4–021
(November 1958)

**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

ALASKA NATIVE ALLOTMENT APPLICATION
(Act of May 17, 1906, 34 Stat. 197, 48 USC 357, as amended)

FORM APPROVED
BUDGET BUREAU NO. 42–R1359

Land Office    Anchorage

Serial Number    055026

1. Name of Applicant    (First Name)    (Middle Initial)    (Last Name)

Olga    Ondola

2. Address of Applicant

General Delivery
Chugiak, Alaska

3. Applicant is a full or mixed blood ☒ Indian ☐ Aleut, or ☐ Eskimo, born and now residing in the State of Alaska.

4. Sex of Applicant: ☐ Male ☒ Female | 5. Applicant is ☒ head of a family; ☐ at least 21 years of age.

6. Legal description of the lands applied for *(if lands are unsurveyed, describe them in a manner sufficient to permit their ready identification on the ground):*

Lot Nos. 64, 66 and 67, Sec. 5, Twp. 15, North R 1 West,
Seward Meridian

BUREAU of LAND MANAGEMENT

JUL 3 1961 10·00

ANCHORAGE LAND OFFICE

approximately
containing 10 acres.

7. The land applied for is:

a. Nonmineral except for _____
and not claimed for mining purposes by any person

b. Not occupied or improved by any other person.

8. Applicant has not received any other allotment under the act of May 17, 1906, *supra,* except as follows *(if none, write ''none''):*

None.

9. Applicant has occupied the land applied for since *(date)* May of 1937 and has marked its corners and posted the land as required by the regulations. ☒ Yes ☐ No

AR002058

10. Evidence of substantially continuous use and occupancy of the land for a period of 5 years is attached in *triplicate*  [X] Yes   [ ] No

11. I HEREBY CERTIFY that I am well acquainted with the character of the lands herein applied for, have personally examined each and every legal subdivision or portion thereof, and I further certify that the statements made herein are true, complete, and correct to the best of my knowledge and belief, and are made in good faith.

6 / 28 / 1961
(Date)

HER
Olga    †    Ondola
MARK
(Signature or mark of applicant)

Helen Munson
(Signature of witness)

WITNESSES MUST SIGN ONLY IF APPLICANT ENDORSES APPLICATION WITH HIS MARK OR THUMB PRINT RATHER THAN BY SIGNATURE

Mrs Herbert Alex
(Signature of witness)

## FOR USE OF BUREAU OF INDIAN AFFAIRS

I HEREBY CERTIFY that the above-named applicant is a native entitled to an allotment under the regulations of 43 CFR, Part 67.

June 30, 1961
(Date)

Charles P. Mathes
(Signature)

Charles P. Mathes,
Real Property Officer.
(Title)

Title 18, USC, Sec. 1001, makes it a crime for any person knowingly and willfully to make to any Department or Agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

File in proper land office, in *triplicate*.

GPO 885471

AR002059



# Property Information

NVE Village    Ondola Allotment

6/13/2017

AR002060



 Anchorage

 Ondola Allotment

AR002061

| | |
|---|---|
| **From:** | Vanessa L. Ray-Hodge |
| **To:** | Eric Shepard; "Jennifer Turner"; matthew.kelly@sol.doi.gov |
| **Cc:** | Colin C. Hampson |
| **Subject:** | FW: Congressman Young Letter to Mr. Cason |
| **Date:** | Tuesday, November 28, 2017 9:58:06 AM |
| **Attachments:** | Eklutna gaming project LOS (signed).pdf |

Eric, Jennifer & Matt,

I hope you all had a great Thanksgiving break.  We wanted to share the attached letter which was sent to Interior from Congressman Young.  We would like to get an update on the status of the draft opinion.

I know things can get busy for you all but we haven't gotten any responses to our prior emails so if we could get an better understanding of where things are on your end it would be much appreciated.

Thanks so much,
Vanessa



**DON YOUNG**
CONGRESSMAN FOR ALL ALASKA
**WASHINGTON OFFICE:**
2314 RAYBURN BUILDING
WASHINGTON, DC 20515
202–225–5765

COMMITTEE ON
NATURAL RESOURCES

CHAIRMAN, SUBCOMMITTEE ON
INDIAN, INSULAR, AND
ALASKA NATIVE AFFAIRS

COMMITTEE ON
TRANSPORTATION & INFRASTRUCTURE

Congress of the United States
House of Representatives
Washington, D.C. 20515

November 21, 2017

James Cason
Associate Deputy Secretary
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C.  20240

Dear Mr. Cason,

I write to express my strong support for the Native Village of Eklutna's ("NVE") proposed tribal gaming project and NVE's Indian lands determination request pending before the Interior Department.

NVE is the only federally recognized Indian tribe located in the immediate Anchorage, Alaska area, a region it has occupied for thousands of years.  NVE has approximately 350 tribal members, many of whom live below the poverty line and require various forms of government assistance.  The proposed project revenues will benefit NVE and its members and their families, which have long suffered from high unemployment and poor health, education, and housing conditions.

I recently met with NVE representatives and learned the details surrounding the project.  As you know, the proposed gaming facility will be a modestly sized class II casino.  It will be located on allotted tribal member land approximately 20 miles from downtown Anchorage, 7 miles from the Village headquarters and squarely within NVE's aboriginal territory.  The site is in a mixed commercial-industrial area next to the Birchwood Airport.  The casino will be operated under the Indian Gaming Regulatory Act and professionally managed.

This project will be good for Alaska and will bring much-needed economic development to the Anchorage and Matanuska-Susitna areas.  It will create a substantial number of construction jobs and valuable full- and part-time jobs.  Independent studies estimate that the project will support as many as 150 new full-time equivalent positions, plus as many as 500 indirect new jobs.  The casino and its employees will pay applicable income, sales and use, and other taxes.  These jobs, tax revenues, and economic development are desperately needed in my state. Unfortunately, Alaska recently ranked 51st in unemployment, behind all other states and the District of Columbia.

VISIT OUR WEBSITE
HTTP://DONYOUNG.HOUSE.GOV

4241 B STREET
SUITE 203
ANCHORAGE, ALASKA 99503
907–271–5978

100 CUSHMAN STREET, SUITE 307
P.O. BOX 73110
FAIRBANKS, ALASKA 99707
907–456–0210

CALL TOLL-FREE
1–866–990–5979

AR002093

NVE's request for an Indian lands determination was first submitted in June of 2016, over 16 months ago.  Since that date, it is my understanding that NVE has engaged in several in-person and telephonic conferences with Interior Department and Solicitor's Office representatives.   The Indian lands determination represents an important component of the project, and I urge you to finalize your response as quickly as possible before December, 2017.

Thank you for your time and consideration.

Sincerely,

DON YOUNG
Congressman for All Alaska

| **From:** | Kelly, Matthew |
|---|---|
| **To:** | Colin Hampson - SD; Vanessa L. Ray-Hodge; Susan Jones |
| **Cc:** | Jennifer Turner; Shepard, Eric; Hay, John |
| **Subject:** | Eklutna Follow-up Questions |
| **Date:** | Wednesday, December 13, 2017 7:57:58 AM |

Good morning everyone. Following up on Monday's call, here are the items we briefly discussed and on which we would appreciate additional information:

- Land claim petitions submitted by the Tribe to the Department in the 1950s and 1960s, the areas encompassed by the claims, including whether the claims included the area around the Ondola allotment, and details of the claims themselves, Copies of the original petitions, if available, would be much appreciated.

- The Tribe's assessment of other options for acquiring interests in the site consistent with the Tribe's gaming plans, including, for example, acquisition in trust or in restricted fee status.

- Whether the Tribe prefers to receive an Indian lands determination in writing or not.

- How the Tribe envisions moving forward in the event of a positive ILD, and an estimated timetable for doing so.

Thanks very much.

**Matthew Kelly**
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor, Division of Indian Affairs
Branch of Environment and Lands
MS-6513
1849 C Street, NW
Washington, DC  20240
(202) 208-5353 (Direct)
(202) 208-4115 (Fax)
matthew.kelly@sol.doi.gov

This email (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240

JUN 1 8 2018

The Honorable Aaron Leggett
President, Eklutna Native Village
26339 Eklutna Village Road
Chugiak, Alaska  99567

Dear President Leggett:

On June 29, 2016, the Native Village of Eklutna (Tribe) transmitted a request to the Department of the Interior (Department) for a determination that an off-reservation, restricted-fee allotment known as the Ondola Allotment, which the Tribe proposes to lease for gaming purposes, qualifies as "Indian lands" under the Indian Gaming Regulatory Act (IGRA).[1]  The Tribe included a copy of the proposed lease (Lease),[2] which I have reviewed to determine whether it complies with the requirements of IGRA and whether the Allotment constitutes "Indian lands" as defined by IGRA.

The Tribe separately transmitted a request to the Solicitor seeking the modification or withdrawal of a 1993 M-Opinion (Op. M-36975) by former Solicitor Thomas Sansonetti addressing the effects of the Alaska Native Claims Settlement Act (ANCSA)[3] on Tribal jurisdiction over land and non-members in Alaska.[4]  The Tribe claims that Sol. Op. M-36975 has been superseded by changes in law and policy.[5]  I have consulted the Office of the Solicitor and I am informed that Sol. Op. M-36975 controls my analysis.

Having completed my review of the Tribe's submissions in support of the Lease, I regret to inform you that I cannot conclude that the Ondola Allotment constitutes "Indian lands" within the meaning of IGRA, and therefore I disapprove the Lease for the reasons set out below.

## Background

*Native Village of Eklutna*

The Native Village of Eklutna is a federally recognized tribe headquartered in the Village of Eklutna, about 22 miles northwest of downtown Anchorage, Alaska.[6]  The Tribe numbers about

---

[1] Letter, L.B. Miller, Esq. & C. C. Hampson, Esq. to Acting Assistant Secretary Lawrence Roberts (June 29, 2016) (First NVE Submission); Pub. L. No. 100-497, 102 Stat. 2467 (Oct. 17, 1988), codified as 25 U.S.C. § 2701 et seq.
[2] First NVE Submission, Business Lease between the Ondola Family and the Native Village of Eklutna (Allotment No. A-055026) (NVE Lease).
[3] Pub. L. No. 92-203, 85 Stat. 688 (codified as amended at 43 U.S.C. §§ 1601-1628).
[4] Letter, President Lee Stephan, Native Village of Eklutna, to Solicitor Hillary Tomkins, Dept. of the Interior (Nov. 21, 2016); Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers, Op. Sol. Interior M-36975 (Jan. 11, 1993) (Sol. Op. M-36975).
[5] *See also* First NVE Submission at 23-27.
[6] First NVE Submission at 7; *id.*, Ex. 8.

AR002123

300 members, who descend from the original Dena'ina (or Tanaina) natives of the area.[7]  The Tribe has never had a reservation or trust or restricted land set aside for its use by the United States, and today owns about 55 acres of land within the Village of Eklutna in fee.[8]  The Tribe does not assert territorial jurisdiction over any other specific allotment, and Bureau of Land Management (BLM) records show no other Alaska Native allotments in the vicinity.

The BLM issued the allotment to Olga Ondola, an Alaska Native, in 1963 pursuant to the Alaska Native Allotment Act ("ANAA")[9] based on an application filed in 1961.[10] Ms. Ondola resided on the Allotment until her death in 1964,[11] and the parcel has been owned by her heirs and successors since then.  The Allotment's current owners are all Tribal members.[12]  The Allotment is located in Chugiak, Alaska, about seven miles southwest of the Tribe's headquarters.[13]  It consists of an approximately 8-acre wooded homestead[14] and is surrounded by residential and light-industrial parcels.[15]  An Alaska Railroad right-of-way borders the Allotment on the north and the Birchwood municipal airport lies to the immediate north and west.

*Lease Terms*

The Lease is a proposed business lease between the Lessors[16] and the Native Village of Eklutna. The purpose of the Lease is to allow the Tribe, through the Eklutna Gaming Authority, a wholly-owned enterprise established under Tribal law, to develop, construct, finance and operate a gaming facility on a portion of the Ondola Allotment pursuant to IGRA.[17]  The land subject to the Lease is described as Lots 64, 66, and 67 within Section 5, T15N, R1W, Seward Meridian Alaska, containing about 8.05 acres more or less, as subject to any prior, valid, existing rights-of-way of record.[18]  The Lease preamble provides that the Tribe provides government services to the land subject to the Lease; asserts jurisdiction over the land subject to the Lease; and that the Lessors acknowledge and submit to the Tribe's governmental authority over the land subject to the Lease.[19]  The initial term of the Lease is for 25 years, renewable at the Tribe's option for an

---

[7] First NVE Submission at 3; Robert A. Arnold, et al., Federal Field Committee for Development Planning in Alaska, *Alaska Natives and the Land* at 253 (1968) ("Field Report"). The Field Report listed other known settlements in the area as including Zdluiat (south of Nitak), Nitak (near Eklutna), Knakatuk (opposite Nitak on the West side of Knik Arm), and Knik near the mouth of the Knik river).

[8] Third NVE Submission at 1.

[9] Pub. L. No. 59-171, ch. 2469, 34 Stat. 197 (1906), as amended, Pub. L. 84-931, ch. 891, 70 Stat. 954 (Aug. 2, 1956).

[10] First NVE Submission, Ex. 10.

[11] First NVE Submission, Ex. 13, ¶ 4.

[12] Second NVE Submission at 6.

[13] First NVE Submission at 7.

[14] First NVE Submission at 7; *id.*, Ex. 10 (BLM, Native Allotment Deed issued to Olga Ondola (Nov. 13, 1963)).

[15] *See* https://www.google.com/maps/place/Chugiak,+Anchorage,+AK+99567/@61.4168094,-149.4908039,1020m/data=!3m1!1e3!4m5!3m4!1s0x56c8e94131aec5fb:0xe136a00ea821f97c!8m2!3d61.3888889!4d-149.4819444.

[16] The lessors, designated the "Ondola Family," are Dorothy Ondola Cook; Sopie Gutierrez; Susie Ondola; Gina D. Ondola; Jerry Ondola; Roy Ondola; Diane Buls; Theresa Hartman; and Franklin Rosenberg. NVE Lease, Preamble.

[17] NVE Lease, Recitals para. 1.

[18] NVE Lease, ¶ 1.

[19] NVE Lease, Recitals, paras. 4-5.

AR002124

additional 25 years.[20]  The Tribe will pay Lessors a one-time signing bonus of $90,000.[21]  The Tribe will pay the Lessors a base rent in the amount of ten per-cent of the fair market value of the property as of the date of the Lease execution,[22] and a percentage rent consisting of two and one-half percent of gross gaming revenue plus one and a-half percent of gross sales receipts from non-gaming operations for each month.[23]  Through the Lease, Lessors disclaim any authority to plan, organize, direct, coordinate or control any of Lessee's gaming operations.[24]

## Standard of Review

### A.      Indian Gaming Regulatory Act

By its terms, IGRA applies only to gaming on Indian lands.[25] IGRA defines "Indian lands" as:

(A) all lands within the limits of any Indian reservation; and

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.[26]

The IGRA's implementing regulations further clarify that "Indian lands" means:

(A) Land within the limits of an Indian reservation; or

(B) Land over which an Indian tribe exercises governmental power and that is either —

(1) Held in trust by the United States for the benefit of any Indian tribe or individual; or

(2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.[27]

---

[20] NVE Lease, ¶ 2.
[21] NVE Lease, ¶ 4(A).
[22] NVE Lease, ¶ 4(B).
[23] NVE Lease, ¶ 4(C).
[24] NVE Lease, ¶ 4(F).
[25] *See, e.g.*, 25 U.S.C. § 2710(a)(2) ("any class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of this chapter"); 25 U.S.C. § 2710(b)(1) (requiring approved tribal gaming ordinance for the conduct of Class II gaming on Indian lands); *id.* (requiring tribal licensure of each gaming facility on Indian lands); 25 U.S.C. § 2710(b)(4)(A) (permitting licensure of individually owned gaming on Indian lands); 25 U.S.C. § 2710(d)(1) (requiring approved tribal gaming ordinance for the conduct of Class III gaming on Indian lands); 25 U.S.C. § 2710(d)(3)(A) (requiring a tribal-state compact for Class III gaming on Indian lands); Sen. Rep. 100-446 at p. A-1. (IGRA results from years of discussions and negotiations between tribes, States, gaming industry, administration, and Congress to formulate a system for regulating gaming on Indian lands).
[26] 25 U.S.C. § 2703(4).
[27] 25 C.F.R. § 502.12.

3

AR002125

The Ondola Allotment is a restricted-fee Indian allotment that is not within an existing reservation. To satisfy IGRA's definition of "Indian lands," the Tribe must therefore demonstrate that it possesses territorial jurisdiction and exercises governmental authority over the site.[28]

Tribal jurisdiction is a threshold requirement to the exercise of governmental power.[29] This is consistent with IGRA, which limits its key provisions to Tribes "having jurisdiction over Indian lands" or to "Indian lands within such tribe's jurisdiction."[30] Generally speaking, an Indian Tribe possesses jurisdiction over land it inhabits if the land qualifies as "Indian country."[31] Congress has defined "Indian country" as including "all Indian allotments, the Indian titles to which have not been extinguished."[32] The Ondola Allotment may be considered "Indian country."[33] The question remains whether the Native Village of Eklutna possesses jurisdiction over it.

The inquiry into a Tribe's jurisdiction focuses principally on congressional purpose and intent and on construing legislation that may otherwise limit a Tribe's jurisdiction or determine which Tribe possesses jurisdiction over a particular parcel of land.[34] The relevant statutes in this case are the Alaska Native Allotment Act of 1906 (ANAA) and the Alaska Native Claims Settlement Act of 1971 (ANCSA).

Congress has authority to create or eliminate Tribal rights, and Tribes retain those aspects of sovereignty that Congress has not otherwise withdrawn.[35] This legal underpinning cannot be squared with the Tribe's initial claim that an Alaska Tribe automatically has territorial jurisdiction over an Alaska Native allotment based solely on the owners' membership.[36] Such a system could exacerbate jurisdictional conflicts resulting from the Federal Government's allotment policies generally, while changes in Tribal enrollment could hinder a Tribe's ability to

---

[28] NIGC, Iowa Tribe of Oklahoma, Whitecloud Allotment at 6 (Jan. 7, 2010) ("Whitecloud ILO"); NIGC, Gaming by Big Sandy Rancheria on the McCabe Allotment at 4 (Sept. 6, 2006) ("Big Sandy ILO").

[29] Whitecloud ILO at 6, citing *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 701-703 (1st Cir. 1994), *cert. denied,* 513 U.S. 919 (1994), superseded by statute as stated in *Narragansett Indian Tribe v. National Indian Gaming Commission,* 158 F.3d 1335 (D.C. Cir. 1998); *see also State ex. rel. Graves v. United States,* 86 F.Supp.2d 1094 (D. Kan. 2000), *aff'd and remanded, Kansas v. United States,* 249 F.3d 1213 (10th Cir. 2001); *Mechoopda Indian Tribe of Chico Rancheria v. Schwarzenegger,* 2004 U.S. Dist. LEXIS 8334, at *23 (E.D. Cal. Mar. 12, 2004). NIGC, Muscogee (Creek) Nation ILO at 2 (Apr. 23, 2008).

[30] 25 U.S.C.§ § 2710(d)(3)(A), 2710(b)(1); *see also Narragansett Indian Tribe,* 19 F.3d at 701-03.

[31] *Alaska v. Native Village of Venetie Tribal Gov't.,* 522 U.S. 520, 527 n. 1 (1998); *United Keetoowah Band of Cherokee Indians of Oklahoma v. United States Dept. of Housing and Urban Development,* 567 F.3d 1235 (10th Cir. 2009).

[32] 18 U.S.C. § 1151(c). Though this definition directly applies only to criminal jurisdiction, the courts apply it to questions of civil jurisdiction as well. *Venetie,* 522 U.S. at 527.

[33] Sol. Op. M-36975 at 124-128.

[34] Whitecloud ILO at 8 citing *Kansas v. United States,* 249 F.3d 1213, 1229 (10th Cir. 2001); NIGC, Status of Puyallup Tribal Property for Gaming Purposes at 4-7 (Nov. 12, 2004); NIGC, Kialegee Tribal Town Proposed Gaming Site in Broken Arrow, Oklahoma at 10-13 (May 24, 2012).

[35] Whitecloud ILO at 8, citing *Kansas v. United States,* 249 F.3d 1213, 1229 (10th Cir. 2001).

[36] Whitecloud ILO at 8. *Cf.* First NVE Submission at 12, citing *John v. Baker,* 982 P.2d 738, 754-55 (Alaska 1999). The Tribe offers no information on the enrollment status of Olga Ondola or her predecessors who lived at the site. *See* Alaska 2007 Submission, Ex. R (BLM, Allotment Report for Olga Ondola Application) (noting purchase of home from previous resident; stating applicant is Indian descendant born and residing in Alaska).

AR002126

conduct long-term planning concerning any allotted lands within its jurisdiction.[37]

**B.     Solicitor Opinion M-36975**

Congress enacted ANCSA in 1971 for the purpose of extinguishing aboriginal land claims in Alaska.[38]  The Act revoked all Federal reserves in Alaska established between 1891 and 1943 but one and it repealed the ANAA.[39]  In 1993, Solicitor Thomas Sansonetti issued Sol. Op. M-36975 interpreting ANCSA's effects on Alaska Tribal authority over land and non-members.

Sol. Op. M-36975 set its analysis against the backdrop of Federal Indian law and the general principle that within Indian Country, Tribes possess sovereignty over their members and territory unless otherwise limited by Congress.[40]  It concluded that while ANCSA did not "completely extinguish[] the sovereign powers" of Alaska tribes,[41] its revocation and conveyance of beneficial interests in reservation lands to state-chartered Native Corporations constituted "a very complete address to the issue of land" that reflected "a new approach" to defining the relationship between Alaska Natives and the United States.[42]

Sol. Op. M-36975 concluded that Indian Country in Alaska continued to exist after ANCSA only "in certain limited cases"[43] that included Alaska Native allotments.[44]  Nevertheless it found Alaska Native allotments to be an exception to the general rule that tribal authority coincides with Indian Country.[45]  While the Indian Country status of an allotment provided the statutory basis for the exercise of *federal* jurisdiction, it did not necessarily mean that the allotment was also subject to *tribal* jurisdiction.[46]

Solicitor Sansonetti conducted a detailed analysis of the authorities under which Alaska Native allotments issued.  Because he found Alaska Native allotments more like homestead allotments than Tribally-affiliated public domain allotments,[47] he concluded there generally existed "little or no" basis to support Tribal jurisdiction over them.[48]  But due to the distinct history of some off-reservation allotments in Alaska,[49] he conceded there could be some that were subject to tribal authority.  Determining which required a particularized inquiry into the relevant statues and circumstances surrounding an allotment's creation, or a demonstration of a clear or original tribal nexus to the site.[50]

---

[37] Whitecloud ILO at 8.
[38] Sol. Op. M-36975 at 79.
[39] Sol. Op. M-36975 at 79.
[40] Sol. Op. M-36975 at 108, citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982). Sansonetti acknowledged that "Indian country" is the touchstone for allocating authority among the various governments. *Id.* at 109, citing *Indian Country, U.S.A. v. Oklahoma Tax Comm'n*, 829 F.2d 967, 973 (10th Cir. 1987).
[41] Sol. Op. M-36975 at 107.
[42] Sol. Op. M-36975 at 107-108.
[43] Sol. Op. M-36975 at 108.
[44] Sol. Op. M-36975 at 124-126.
[45] Sol. Op. M-36975 at 124.
[46] Sol. Op. M-36975 at 126.
[47] Sol. Op. M-36975 at 127-129.
[48] Sol. Op. M-36975 at 127-129.
[49] Sol. Op. M-36975 at 126.
[50] Sol. Op. M-36975 at 127, 130.

AR002127

Sol. Op. M-36975 is binding on the Department until modified or withdrawn.[51]  An Alaska Tribe seeking an "Indian lands" opinion under IGRA therefore bears the burden of rebutting the presumption created by ANCSA that Alaska tribes generally lack territorial jurisdiction over Alaska Native allotments.  In accordance with Sol. Op. M-36975, this may be done by a particularized inquiry into the relevant statutes and circumstances surrounding the allotment's creation or by demonstrating a clear or original tribal nexus to the allotment site.[52]

**Discussion**

    **A.**    **Relevant Statutes & Circumstances**

        **1.**    **Statutes**

Congress enacted ANAA in 1906 to provide a means "by which individual Alaska Natives could obtain legal title to the land they occupied."[53]  As enacted, ANAA provided that any "Indian or Eskimo of full or mixed blood" who resided in and was a native of Alaska could acquire an allotment from the public domain of up to 160 acres of nonmineral lands.[54]  The Act deemed the lands so allotted "the homestead of the allottee and his [or her] heirs in perpetuity."[55]  Congress amended ANAA in 1956 to expand eligibility to Aleuts of full or mixed blood and to narrow the lands that could be allotted to "vacant, unappropriated, and unreserved nonmineral" lands.[56]  To date, over 13,000 parcels of land have been allotted under ANAA.[57]

Sol. Op. M-36975 discusses the purpose, intent, and legislative history of ANCSA in exhaustive detail.  As relevant here, ANCSA extinguished all claims by Alaska Native groups based on aboriginal title.[58]  This terminated pending claims to aboriginal lands in the Cook Inlet region.[59]  Though ANCSA repealed ANAA, it included a savings provision for allotment applications already pending.[60]  The ANCSA further revoked all reserves set aside by legislation or by Executive or Secretarial Order for Native use "or for administration of Native affairs."[61]

---

[51] A signed M-Opinion binds all Departmental offices and officials and may be overruled or modified only by the Solicitor, the Deputy Secretary, or the Secretary. 209 DM 3.2(A)(11).

[52] Sol. Op. M-36975 at 127, 130; NIGC, Native Village of Barrow Indian Lands Opinion at 2 (Feb. 1, 1996) (tribe bears burden of establishing that it satisfies statutory requirements of IGRA).

[53] *United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1015 (D. Alaska 1977).

[54] 34 Stat. 197.

[55] 34 Stat. 197.

[56] Act of Aug. 2, 1956, ch. 891, 70 Stat. 954.

[57] U.S. Department of the Interior, BLM, Acting Deputy Director for Operations, *Statement to the Senate Energy and Natural Resources Committee Subcommittee on Public Lands, Forests and Mining on S.785, Alaska Native Veterans Land Allotment Equity Act* (July 26, 2017), available at https://www.doi.gov/ocl/s-785. *See also* Field Report at 450; *Atlantic Richfield*, 435 F. Supp. at 1015; Sol. Op. M-36975 at 62.

[58] Sol. Op. M-36975 at 76.

[59] *See Natives of Palmer, Alaska v. The United States of America*, 27 Ind. Cl. Comm. 135 (1972).

[60] *Alaska Dep't of Nat. Res. v. United States*, 816 F.3d 580, 583 (9th Cir. 2016); ANCSA, § 18(a). Section 18(a) of ANCSA also terminated the ability of Natives covered by the Act to avail themselves of the General Allotment Act as amended.

[61] Sol. Op. M-36975 at 88, citing ANCSA, § 19(a).

6

2.    **Circumstances**

    *a.  Eklutna Industrial School Reserve*

The site of the Ondola Allotment once formed part of an area reserved by the Federal Government for use for an education facility known as the Eklutna Industrial School. The record of the Federal Government's use of these lands does not support the Tribe's arguments that establishment of the School reserve constituted express recognition of the Tribe's traditional territory.[62]

The United States appears to have first surveyed the Upper Cook Inlet region in about 1912.[63] In 1924, the U.S. Bureau of Education (BOE) established the Eklutna Industrial School (School) near the Village of Eklutna as a vocational boarding school for Alaska Natives.[64] In 1927 President Coolidge withdrew about 1,400 acres of public lands for the School's use[65] in an Executive Order that omitted any reference to Natives or Native lands.

After Congress extended the IRA to Alaska in June 1936 (Alaska IRA),[66] the Secretary of the Interior (Secretary) ordered the temporary withdrawal of an additional 328,000 acres of public lands to be added to the School reserve.[67] Such lands were to be held until the question of having the additional lands "permanently reserved as an Indian reservation" could be put to "the Indian or Eskimo occupants" thereof.[68] Less than a year later, the Assistant Commissioner of Indian Affairs recommended adding a further 1.6 million acres "for the benefit of the graduates of the Eklutna Industrial School and such other native residents within that region."[69] But the Bureau of Indian Affairs (BIA) Director of Lands recommended that the Department "not ask the few Indian occupants" of the School reserve, mostly students, to vote on the question of establishing a reservation under the Alaska IRA, but instead seek special legislation.[70] The Commissioner of the General Land Office (GLO) argued that the proposal was contrary to the

---

[62] First NVE Submission at 3.

[63] https://sdms.ak.blm.gov/scanned_images/surveyindex.html. Additional federal surveys were conducted in 1952 and 1953.

[64] Letter from T.W. Taylor, Acting Commissioner Indian Affairs, to Lewis A. Sigler, Counsel and Consultant on Indian Affairs, Committee on Interior and Insular Affairs, House of Representatives (Dec. 5, 1969) ("Taylor Letter"), in *Alaska Native Land Claims Part II, Hearings before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs, House of Representatives, Ninety-First Congress, First Session, on H.R. 13142, H.R. 10193, and H.R. 14212, Bills to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes* at 587 (Washington 1970).

[65] E.O. 4778 (Dec. 5, 1927) (reserving T16N, R1E and R1W, Seward Meridian). The School reserve was slightly reduced on June 8, 1934 to accommodate a homestead entry that had mistakenly occupied part of the reserved land. *See* E.O. 6734 (June 8, 1934). Sixty-seven students attended the School in 1927. Taylor Letter at 587. By its terms, E.O. 4778 reserved certain lands at Eklutna and Cordova, Alaska, respectively, "for use of the United States Bureau of Education for educational purposes," without reference to Alaska Natives.

[66] Act of May 1, 1936, 49 Stat. 1250, codified at 25 U.S.C. § 5119; Pub. L. No. 73-383, § 5 (June 18, 1934), 48 Stat. 984.

[67] Secretarial Order of Oct. 30, 1936 ("S.O. 1936"). *See also* Leasability of Lands in the Vicinity of Eklutna Withdrawn by Public Land Order No. 2427, Op. Sol. Interior M-36761 at 3 (May 1, 1967) ("Sol. Op. M-36761").

[68] S.O. 1936.

[69] Letter, Assistant Commissioner, Office of Indian Affairs, to Secretary of the Interior (Jul. 12, 1937).

[70] Memorandum, BIA Director of Lands to BIA Assistant Commissioner (Jul. 24, 1937).

AR002129

Alaska IRA and a 1937 Solicitor's Opinion interpreting its application.[71]  The GLO recommended that no additional lands be withdrawn for the School and that the lands added in 1936 be revoked.[72]

The Secretary revoked the 1936 Order several years later as to all but 9,200 acres of School land "immediately surrounding the Town of Eklutna."[73]  This had the effect of removing the Ondola Allotment site from the School reserve.  The Secretary explained that changing conditions in and around Eklutna meant that "a much smaller area than at first anticipated [would] meet the needs of the natives living in that vicinity."[74]  This included pressure for use of woodland from a nearby military reserve; the probability of moving the School to a different location; and the fact that the anticipated increase in the Native population on the School reserve did not occur.[75]  While the Office of Indian Affairs continued to recommend that the remaining lands be held "with the view to later recommending establishment of a reservation for the native inhabitants should it be determined that an Indian reservation is desirable and necessary,"[76] the Federal Government never did so,[77] and it gradually disposed of the School's lands in the years after World War II.

In 1946 the School discontinued and its buildings were sold or transferred to the Alaska Railroad.  The General Superintendent of the Alaska Native Service then recommended reducing the School reserve to about 2000 acres.[78]  The Alaska Natives of the Eklutna Village later petitioned the Department to determine any rights they might have in the School reserve.  The BIA ultimately concluded that it lacked authority to do so under the Alaska IRA and instead recommended that "legislation be prepared…which will authorize the establishment of an Indian Reservation…at Eklutna, Alaska, for the benefit of the Natives thereof and thereby vest the equitable title in the Natives."[79]  This never occurred.

In 1961 the Secretary restored to the public domain what remained of the School reserve, separately transferring about 1800 acres near the Village of Eklutna to the BIA for the administration of Native affairs.[80]  In 1963, BIA prepared a history of the Village and its inhabitants while considering whether to use the BIA reserve as a possible industrial or

---

[71] Memorandum, Commissioner, GLO, to Secretary of the Interior (Aug. 9, 1937) ("GLO Memo."), citing Sol. Op. M-28978, "Authority of the Secretary of the Interior to Reserve waters in Connection with, and Independently of, Land Reservations for Alaskan Natives under the Act of May 1, 1936," 56 I.D. 110 (Apr. 19, 1937).
[72] GLO Memo. at 11. The GLO Memo. further recommended that no new Indian reservations be designated in Alaska until the U.S. Geological Survey could determine the value of lands for natural resources. *Id.*
[73] Secretarial Order of Dec. 18, 1942 at 2 ("S.O. 1942"); Sol. Op. M-36761 at 3.
[74] S.O. 1942 at 2.
[75] Taylor Letter at 587.
[76] S.O. 1942 at 2.
[77] Sol. Op. M-36761 at 3.
[78] *Id.* at 4; Taylor Letter at 587. In 1951 the Secretary withdrew 205 acres from the School reserve for the Alaska Railroad for gravel. Public Land Order. No. 755 (Sept. 26, 1951), 16 Fed. Reg. 9816 (Sept. 27, 1951) (205 acres). Another 20 acres was withdrawn in May 1961 for use by the Federal Aviation Agency. Public Land Order. No. 2259 (Feb. 3, 1961), 26 Fed. Reg. 1185 (Feb. 10, 1961).
[79] *See* U.S. Dept. of the Interior, Bureau of Indian Affairs, Chief Branch of Realty, Memorandum re Establishment of an Indian Reservation at Eklutna, Alaska at 2 (Jan. 26, 1955).
[80] Public Land Order. No. 2427 (Jul. 5, 1961), 26 Fed. Reg. 6243 (July 12, 1961), corrected, 26 Fed. Reg. 9832 (Oct. 13, 1961). The revocation excepted 10 acres of land withdrawn by S.O. 1936 in Cordova, Alaska.

8

vocational school.[81] The BIA concluded that the Village "isn't older than some 40 years" and noted that the Russian Orthodox Church in the Village had been moved there from Knik on the opposite shore of the Cook Inlet in the early 20th century.[82] The BIA concluded that the "Eklutna group of Tanaina Indians" residing in and around the Village had "no formal organization, no written constitution, no formal government."[83] The village was then drafting a formal written constitution under which it intended to formally organize,[84] and its unwritten constitution at the time defined membership as "all descendants of the original Indian residents upon the Eklutna [School] Reserve on the date when the latter was created (1927)."[85] The BIA report concluded with the expectation that the Native Village of Eklutna would ultimately organize as a "federal corporation" under the Alaska IRA.[86]

In 1967, the Solicitor determined that the creation of the BIA reserve had "not establish[ed] or provide[d] for the establishment of a reservation under the [Alaska IRA]," adding that the lands were not on an equal footing with other reservations designated by Secretarial order for the use and occupancy of the natives and confirmed as reservation in elections by them.[87] In 1971, ANCSA had the effect of revoking the BIA reserve.[88]

     *b. Land Claims*

In the 1950s, Natives from the areas around the Village of Eklutna began asserting claims to the lands in the upper Cook Inlet region.[89] In 1951, the Natives of Palmer, Alaska filed a petition with the Indian Claims Commission (ICC) seeking compensation for the taking of roughly 3,000 square miles of aboriginal lands and waters.[90] The claim area included most of what is now the Municipality of Anchorage and the present-day locales of the Native Villages of Eklutna, Knik, and Chickaloon. The Tribe suggests these claims were to establish aboriginal title of the "Dena'ina peoples of Eklutna and…Palmer…to the lands they had historically occupied," but the petition neither mentions Eklutna nor refers to the Tribe itself.[91] The ICC dismissed the claim in 1972 as having been extinguished by Section 4(b) of ANCSA.[92]

---

[81] U.S. Dept. of the Interior, Bureau of Indian Affairs, Anchorage Field Office, Report of Projects Development Officer Ledo A. Kozely at 10 (Jul. 24, 1963) ("Kozely 1963").

[82] Kozely at 7.

[83] Kozely 1963 at 7, 9.

[84] Kozely 1963 at 7.

[85] Kozely 1963 at 7. The Tribe's current, written constitution defines membership eligibility as including any person who is a "Native resident since 1940." First NVE Submission, Ex. 7 (Constitution of Native Village of Eklutna, art. X, sec. I(a) (1996)).

[86] Kozely 1963 at 11.

[87] Sol. Op. M-36761 at 4-5. The Solicitor further concluded that the BIA's reserve at Eklutna did not come within the regulatory definition of "tribal land" at 25 C.F.R. Part 131 (1967).

[88] *See* ANCSA, § 19(a) (revoking reserves set aside for administration of Native affairs).

[89] *See* First NVE Submission at 4 ("Dena'ina peoples of Eklutna and…Palmer, Alaska."); Email from Colin C. Hampson, Esq. to Matthew Kelly, Office of the Solicitor (Dec. 20, 2017) (Fifth NVE Submission), Ex. 1 (Claim Petition filed by William Ezi, Chief of the Native Village of Palmer).

[90] First NVE Submission at 4; citing Field Report at 445.

[91] First NVE Submission at 4.

[92] *Natives of Palmer, Alaska v. The United States of America*, 27 Ind. Cl. Comm. 135 (1972).

AR002131

During the 1950s, the Natives of Eklutna village petitioned BIA for hearings to determine their possessory rights to the Eklutna Industrial School reserve,[93] though no further action appears to have been taken on the original request.[94]  When BIA recommended giving up the School reserve in 1953,[95] the natives of Eklutna Village submitted a new request for a more limited reservation.[96]  The Department took no action on the request and ultimately recommended that legislation be secured to reserve part of the School's lands for the Eklutna natives.[97]

Before the enactment of ANCSA, the BIA Juneau Area Director in 1971 issued a memorandum to the Commissioner of Indian Affairs in response to a petition from the Native Village of Eklutna to again consider establishing a Native reservation at Eklutna.[98]  The purpose of a reservation would be to provide economic opportunity and "create a much greater cohesiveness" in the Tribe.[99]  The Commissioner responded that, given ANCSA's certain enactment, "a Departmental determination has been made against creating any reservations within [Alaska] at this time."[100]

### c.  History of Allotment Site

As noted, the site of the Ondola Allotment only briefly formed part of the Eklutna Industrial School reserve. Olga Ondola's allotment application states that she and her husband moved to the Allotment site in 1937 after purchasing the house from the previous resident.[101]  However in 1942, the Department transferred certain public lands, including the Allotment site, for use by the War Department for military purposes.[102]  Following World War II, the lands were returned to the Department's administration[103] and later "subdivided for the purpose of disposing of most

---

[93] Sol. Op. M-36761 at 4; *see also* Taylor Letter at 588; Field Report at 443.

[94] Field Report at 443, 446. *See also, id.* at 500, Fig. V-57 (listing protests AA-368 and AA-574 filed by Eklutna against transfer of 460,800 acres of land within Kenai Peninsula).

[95] Taylor Letter at 588.

[96] Sol. Op. M-36761 at 4.

[97] Taylor Letter at 588. The Solicitor later concluded that the proposal to use legislation was based on a misunderstanding of the requirements of the Alaska IRA as well as a desire to assure the Natives of a compensable interest in land. Sol. Op. M-36761 at 4.

[98] U.S. Dept. of the Interior, Bureau of Indian Affairs, Juneau Area Office, Memorandum re Eklutna Reservation Establishment (May 7, 1971) ("Juneau Area Director Memo.").

[99] Juneau Area Director Memo. at 1.

[100] U.S. Dept. of the Interior, Bureau of Indian Affairs, Commissioner of Indian Affairs, Memorandum re Eklutna Reservation (May 24, 1971).

[101] *See* Alaska 2007 Submission, Ex. R (U.S. Dept. of the Interior, BLM, Indian Allotment Report on Application of Olga Ondola (Oct. 21, 1963)) (Ms. Ondola moved to site in May 1937); *see also* BLM, Alaska Native Allotment Application of Olga Ondola (June 28, 1961). The Tribe claims that Ms. Ondola took up residency in the 1920s. First NVE Submission at 7.

[102] *See* Public Land Order No. 20 (Aug. 4, 1942), "Withdrawing Public Lands for the Use of the War Department for Military Purposes," 11 Fed. Reg. 8362 (Aug. 2, 1946) ("P.L.O. 20"). Due to its confidential status, P.L.O. 20 was not published until 1946. A subsequent order withdrew overlapping public lands for use of the War Department for military purposes and "from all forms of appropriation under the public-land laws, including the mining and mineral-leasing laws" also included the Allotment site. *See* Public Land Order No. 95 (Mar. 12, 1943), "Withdrawing Public Lands for Use of the War Department for Military Purposes," 11 Fed. Reg. 8364 (Aug. 2, 1946) ("P.L.O. 95").

[103] P.L.O. 95 provided that the Department's jurisdiction over the lands withdrawn for the War Department would revert six months after termination of the unlimited national emergency declared by Proclamation No. 2487 of May 27, 1941, 55 Stat. 1647, which occurred on April 28, 1952. *See* Proclamation 2974, Termination of the National

AR002132

of the public domain land as homesites."[104]  In 1961 Ms. Ondola submitted an application under the ANAA to BLM, which approved it in 1963.[105]  While it was pending, BLM granted rights of way across the site for transmission lines belonging to the Matanuska Electric Association (Matanuska Electric) that remain in place today.[106]  In 1964 and 1984, Ms. Ondola's son, George Ondola, purported to grant transmission line rights-of-way over the Allotment to Matanuska Electric as well.  Though not approved by the Department, they were apparently recorded with the Alaska Department of Natural Resources Recorder's Office in 2005 and 2006.[107]  They state that George Ondola owned the lands and that the lands were free and clear of encumbrances and liens of whatsoever character.

Ms. Ondola resided on the Allotment until her death in 1964.[108]  In that time, the Tribe provided her and her family moose meat and salmon two or three times a year.[109]  It is unclear who, if anyone, resided at the Allotment between 1964 and 1985, when Ms. Ondola's son George took up residence with his family.[110]  The Tribe states that it regularly cut trees on the Allotment between 1965 and 1969 to create a fire perimeter around the house and for use for fuel and for Tribal cultural events.[111]  In 2003, Ms. Ondola's children considered partitioning the Allotment, for which reason BIA surveyed and appraised the lots.[112]  According to the Tribe, nine individuals today hold ownership interests in the Ondola Allotment,[113] which is presently occupied by the widow of George Ondola.[114]

## B.    Tribal Nexus

Sol. Op. M-36975 provides no examples of what may be considered evidence of "clear or original tribal nexus."  "Nexus" is commonly understood to mean a "means of connection; a link or tie."[115]  Because Sol. Op. M-36975 addresses territorial jurisdiction, it seems reasonable to interpret "nexus" as referring to a Tribe's connections to land and the activities occurring

---

Emergencies Proclaimed on September 8, 1939, and May 27, 1941 (April 28, 1952) (available at http://www.presidency.ucsb.edu/ws/?pid=87328 (last visited Aug. 10, 2017)).  P.L.O. 95 further provided that the lands would remain withdrawn from all forms of appropriation under the public-land laws until otherwise ordered, pending classification and a determination as to whether the lands, or portions thereof, were needed for public purposes.

[104] U.S. Dept. of the Interior, BLM, Hobart B. Hyatt, Field Notes of the Dependent Resurvey of a Portion of...Township 15 North, Range 1 West of the Seward Meridian 127 (Jan. 27, 1954).

[105] First NVE Submission, Ex. 10.

[106] BLM, ROW Nos. 050466 (July 14, 1961), 021429 (Feb. 21, 1962).  In 2004, the United States issued a patent to the Alaska Railroad Corporation incorporating Matanuska's rights-of-way.  See U.S. Dept. of Transportation, Federal Railroad Administration, Patent No. 50-2205-0046 (Nov. 23, 2004).

[107] Alaska 2007 Submission, Ex. I (Electric Line Right of Way Easement, Recording Dist. 301 – Anchorage (Apr. 1, 2005)); id., Ex. J (Electric Line Right of Way Easement, Recording Dist. 301 – Anchorage (Apr. 26, 2006)).

[108] First NVE Submission, Ex. 13, ¶ 4 (Affidavit of George Ondola (Mar. 26, 2007)).

[109] First NVE Submission, Ex. 13, ¶ 7 (Affidavit of George Ondola (Mar. 26, 2007)).

[110] First NVE Submission, Ex. 13, ¶ 4 (Affidavit of George Ondola (Mar. 26, 2007)).

[111] First NVE Submission, Ex. 13, ¶ 9 (Affidavit of George Ondola (Mar. 26, 2007)).

[112] First NVE Submission, Ex. 13, ¶ 18 (Affidavit of George Ondola (Mar. 26, 2007)).

[113] See NVE Lease, Recitals, ¶ 3.

[114] See NVE Lease, Recitals, ¶¶ 2-3.

[115] American Heritage Dictionary, definition of nexus, accessed Sept. 28, 2017 at https://www.ahdictionary.com/word/search.html?q=nexus.

11

thereon, as opposed to the Tribe's connections to the land's owners or occupants.[116]   Such an interpretation finds support in "Indian lands" opinions prepared by the Department and the NIGC for other Tribes subsequent to the issuance of Sol. Op. M-36975.

In 1996, the Department prepared an Indian lands opinion (ILO) for an off-reservation allotment known as the Sampson Johns allotment and owned by a Quinault Indian Tribe member.[117] It explained that Tribal territorial jurisdiction over an off-reservation allotment might be found where "there is a tribal nexus to the lands or a political relationship with the owners of the lands."[118] The factors the Department relied on included: (1)Ttribal membership of the original allottees and their heirs; (2) proximity to an existing Indian reservation; (3) allotment location relative to treaty-recognized hunting, fishing, and gathering territories; (4) the provision of Tribal police and other services in the area; and (5) acknowledgement by local governments of Tribal regulatory and enforcement authority at the site.[119]   Because these factors reflect the fact-specific concerns expressed in Sol. Op. M-36975, I employ them here in assessing the Tribe's claim of territorial authority over the Ondola Allotment.

1.   **Owners' Membership**

The Tribe claims that its territorial jurisdiction over the Ondola Allotment "flows from or is incident to" an allotment owner's tribal membership.[120]   The Tribe relies partly on a statement in the Sampson Johns ILO that tribal jurisdiction has been recognized where there is "a tribal nexus to the lands or a political relationship with the owners."[121]   While a political relationship may ground a Tribe's personal jurisdiction over its members, the Sampson Johns ILO nowhere suggests that membership *alone* may ground Tribal jurisdiction over territory.  The authorities relied on in the Tribe's submissions are not to the contrary.  The Alaska Supreme Court decision on which the Tribe relies expressly addressed what happens "when a law like ANCSA *separates* [tribal] membership and [tribal] land completely."[122]   The question there was whether an Alaska Tribe had jurisdiction over the child custody disputes of its members *outside* Indian country.[123] The Court found that it did since the existence of Indian country was *not* "an absolute

---

[116] *See, e.g., Montana v. United States*, 450 U.S. 544 (1981) (discussing tribal jurisdiction over non-members); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001) (*Montana*'s consensual relationship exception requires tribal nexus to consensual relationship itself).

[117] U.S. Dep't of the Interior, Office of the Solicitor, Quinault Indian Nation ILO (Sept. 25, 1996) ("Sampson Johns ILO").

[118] Sampson Johns ILO at 5, citing *Mustang Production Co. v. Harrison, et al.*, 94 F.3d 1382 (10th Cir. 1996).

[119] In 2006 the NIGC drew upon the Sampson Johns factors to assess tribal authority over an off-reservation allotment owned by a member of the Big Sandy Rancheria in California. Big Sandy ILO. The facts relevant there included (1) the tribal membership of owner, who descended from the original allottee; (2) that the United States had held the allotment in trust for over 70 years; and (3) the proximity of the allotment to an existing Indian rancheria. *Id.* at 5.

[120] First NVE Submission at 12, citing *John v. Baker*, 982 P.2d 738, 754-55 (AK 1999).

[121] Sampson Johns ILO at 5, citing *Mustang Production Co. v. Harrison, et al.*, 94 F.3d 1382 (10th Cir. 1996). *Mustang* found tribal jurisdiction over lands allotted to individual members from the former reservation based on the fact that such lands constituted Indian country and that the statutes authorizing the allotments did not otherwise divest the tribe of its jurisdictional authority.

[122] *Baker v. John*, 982 P.2d at 754 (emphasis added). *See also Native Village of Venetie*, 522 U.S. at 526, citing *Yukon Flats State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J. concurring) (ANCSA made Alaska tribes sovereigns without territorial reach).

[123] First NVE Submission, citing *Baker v. John*, 982 P.2d 738 (Alaska 1999).

AR002134

prerequisite to the existence of sovereign Tribal power."[124]  The issue here is not the Tribe's personal jurisdiction over its members, however, but its territorial authority over their lands within the unique statutory context of Alaska.

The NIGC rejected a similar claim when considering whether the Tribal membership of an allottee's heirs could ground a Tribe's authority over an off-reservation allotment for gaming purposes.[125]  In consultation with the Department, the NIGC concluded that the Tribe from whose reservation the allotment was created retained jurisdiction regardless of the Tribal membership of the allottee's heirs, at least absent any transfer of jurisdiction "through legislation or by trust deed."[126]

The statutory context of the Ondola Allotment also weighs against the Tribe's claim that its territorial jurisdiction flows from the Allotment owners' tribal membership.  When it enacted the Alaska Native Allotment Act in 1906, Congress did not consider allotments in a "tribal context,"[127] believing that "Indian reservations were a thing of the past."[128]  Though the IRA reversed the allotment policy,[129] it nevertheless provided its provisions should *not* be construed as relating to Indian allotments or homesteads on the public domain "outside of the geographic scope of any Indian reservation" then existing or later established.[130]  The Tribe never had a reservation established for its benefit and, as noted earlier, and BLM issued the Allotment to Olga Ondola without regard to any Tribal affiliation.[131]

## 2.    Proximity to Established Reservation

The Tribe also claims territorial jurisdiction on the fact that the Ondola Allotment is about seven miles away from the Tribe's headquarters and fee lands,[132] relying on the Sampson Johns ILO and the Big Sandy ILO.[133]  What mattered in those ILOs was not proximity to Tribally owned lands per se, but to an *existing* source of Tribal territorial sovereignty, namely, the Quinault

---

[124] Second NVE Submission, citing *Baker v. John*, 982 P.2d at 755.

[125] *See* Whitecloud ILO.

[126] Whitecloud ILO at 8.

[127] Sol. Op. M-36975 at 16; COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.07[3][b][iii] (2017). In 1919, Congress prohibited the withdrawal of public lands for Indian reservations by Executive Order, proclamation, or otherwise except by Congressional enactment. Act of June 30, 1919, ch. 4, §27, 41 Stat. 34, codified at 43 U.S.C. § 150.

[128] *Solem v. Bartlett*, 465 U.S. 463, 468 (1984). *See also Montana v. United States*, 450 U.S. 544, 559 n.9 (1981) (the policy of allotment acts was the eventual assimilation of the Indian population and the gradual extinction of Indian reservations and Indian titles), citing *Organized Village of Kake* v. *Egan*, 369 U.S. 60, 72 (1962); *Draper* v. *United States*, 164 U.S. 240, 246 (1896).

[129] *Montana v. United States*, 450 U.S. 544, 559 n.9 (1981).

[130] IRA, § 8, codified at 25 U.S.C. § 5111 (formerly § 468). Congress extended the provisions of IRA § 8 to Alaska in 1936. *See* Alaska IRA, § 1, codified at 25 U.S.C. § 5119 (formerly § 473a); *see also Estate of Larry Michael Oskolkoff*, 37 IBIA 291, 294 (2002).

[131] *See* First NVE Submission, Ex. 10. The Tribe provides no information on the enrollment status of Ms. Ondola or her predecessors at the site. While Ms. Ondola's tribal membership status has no bearing on the Indian country status of the Allotment, it does go to the question of the Tribe's original nexus to the site.

[132] *See, e.g.*, First NVE Submission at 11, n. 9 (noting Ondola Allotment closer to Village of Eklutna than the allotment at issue in Big Sandy ILO).

[133] First NVE Submission at 7, 11, *id.* n. 9.

AR002135

Indian Reservation and the Big Sandy Rancheria, respectively.[134]  Quinault Tribal police thus already had jurisdiction on the nearby reservation and policed the area surrounding the Sampson Johns Allotment.[135]  As noted earlier, the lands reserved for Federal use in the administration of Native affairs around Eklutna were never set aside as a reservation for Alaska Natives and, in any event, ANCSA revoked existing Native reservations except for the Annette Island Reserve.

The Tribe also suggests that the Ondola Allotment meets IGRA's Indian lands requirement based simply on its Indian Country status, based on judicial and administrative decisions from the Lower 48.[136]  To be sure, IGRA's definition of Indian lands presumes the existence of Indian country.[137]  But "Indian lands" and "Indian country" are distinct statutory terms established by Congress for different purposes,[138] and there may exist Indian Country over which no Tribe exercises governmental power.[139]  As Sol. Op. M-36975 itself explains, Indian Country provides the basis for the exercise of Federal authority[140] but says nothing about the presence of Tribal authority.[141]

### 3.       Tribal Services and Activities at the Site

The Tribe provides little historical evidence showing its use of the area around the Ondola Allotment site for economic or cultural purposes.  With respect to the Village area, it states that Eklutna was a seasonal residence before World War II that included non-native structures and habitations, and that it became a year-round settlement after the war.[142]  The Tribe states that

---

[134] The same was true of the Big Sandy ILO, which discussed the McCabe Allotment's distance from the existing Big Sandy Rancheria.

[135] Sampson Johns ILO at 2-3. The Sampson Johns allotment further lay within the jurisdictional area of Quinault's treaty-recognized hunting, fishing and gathering territories. *Id.*, citing 61 Fed. Reg. 28786, 28795 (June 6, 1996) (defining Quinault's treaty-protected usual and accustomed fishing areas).

[136] *See, e.g.*, First NVE Submission at 6 ("The Ondola Allotment is Indian Land Because it is Restricted Fee"); *id.* at 7 (conveyance pursuant to ANAA sufficient to show Allotment fits squarely within Indian lands definition); *id.* at 10 (Allotment constitutes Indian lands because set aside for use by individual Indians under Federal superintendence); Second NVE Submission at 7-8 (Alaska Native allotments are Indian country); Fourth NVE Submission at 2 (Ondola Allotment "qualifies as 'Indian lands' under IGRA because...owned by tribal members subject to a restriction against alienation").

[137] *See Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1032 (10th Cir. 2003) (IGRA specifically speaks to federal regulatory authority over certain forms of gambling within Indian country); Sampson Johns ILO at 4 (IGRA's jurisdictional reach not precisely equivalent to statutes referring to 'Indian country').

[138] 18 U.S.C. § 1151; 25 U.S.C. § 2703(4)(B). *See also* 25 C.F.R. § 502.12(b); NIGC, Definitions Under the Indian Gaming Regulatory Act, 57 Fed. Reg. 12382, 12388 (1992); *Citizens Against Casino Gambling in Erie County v. Hogen*, 704 F. Supp. 2d 269, 276 (W.D.N.Y. 2010) (distinguishing Indian country from Indian land under IGRA); *United Keetoowah Band of Cherokee Indians v. State ex rel. Kuykendall*, 2006 U.S. Dist. LEXIS 97268 at *22 (E.D. Okla. 2006) (noting that definitions of "Indian country" under 18 U.S.C. § 1151 and "Indian land" under IGRA are not identical).

[139] Sampson Johns ILO at 5; NIGC, Kialegee Tribal Town ILO at 11 (July 18, 2013) (whether allotment constitutes Indian country does not show whether tribe has legal jurisdiction over it); Whitecloud ILO at 7 ("Generally speaking, an Indian tribe posses[es] jurisdiction over land that the tribe inhabits if the land qualifies as 'Indian country.'") *See also* 18 U.S.C. § 1166(d) (making state law applicable to gaming in Indian country outside Indian lands and giving United States exclusive jurisdiction over criminal violations thereof).

[140] NIGC, United Keetoowah Band of Cherokee Indians ILO at 5 (Sept. 29, 2000), citing *Native Village of Venetie*, 522 U.S. at 527.

[141] Sol. Op. M-36975 at 126.

[142] First NVE Submission, Ex. 5 at 14-16, 19, 26, 32.

14

AR002136

after 1961, it cut trees at the Allotment for fire-safety purposes and used the wood for cultural activities elsewhere. It also describes having provided food to Ms. Ondola and her family for a time. But the Tribe offered no evidence to show, for example, that Tribal police patrol the area encompassing the site or that Tribal personnel provided any services to Tribal members in the area, as the Quinault Tribe did for the Sampson Johns allotment.

### 4.     Acknowledgment of Tribal Jurisdiction by Others

The Tribe provides no evidence to show that state or local governments acknowledge the Tribe's territorial jurisdiction over the Ondola Allotment. The Tribe cites a 1996 letter of agreement with the Anchorage Police Department for "utilizing provision of comprehensive services to the members of the Tribe of Eklutna" with respect to the Indian Child Welfare Act as evidence of its governmental authority over the Ondola Allotment.[143] The agreement relates to matters of personal, not territorial jurisdiction, and does not otherwise acknowledge Tribal territorial jurisdiction or reference Tribal lands. While the Department understands that State and local authorities may now support the Tribe's proposed plans for the Ondola Allotment, such support does not address the legal jurisdictional question under IGRA. The Tribe also relies on its provision of services to Tribal members at the site[144] and the activities of Tribal members, including the posting of no-trespass signs proclaiming that the Ondola Allotment lies "within the territory of the Native Village of Eklutna."[145] Such examples conflate IGRA's threshold requirement to demonstrate that the Tribe possesses territorial jurisdiction with its subsidiary requirement to show that the Tribe exercises such authority.

In connection with the Tribe's 2007 request for an Indian lands opinion, the Alaska State Attorney General claimed extensive State and local authority over the Allotment, including the regulation of public utilities.[146] The Attorney General's submissions stated that the State and Municipality of Anchorage provide police services to the area, and the Chugiak Volunteer Fire Station, regulated by the State, provided fire suppression services.[147] The Attorney General has more recently announced its support for Alaska Tribal sovereignty generally,[148] without addressing the issue of tribal territorial jurisdiction over Alaska Native allotments.

Federal laws provide for the exercise of state and local jurisdictional authority over Indian country in Alaska generally and Alaska Native allotments specifically. Public Law 280, as amended, gives the State of Alaska jurisdiction over crimes occurring within Indian Country in the State.[149] In accepting the Department's recommendation that Alaska be given criminal

---

[143] First NVE Submission at 18; *id*. Ex. 22 (Letter of Agreement Between Native Village of Eklutna and Anchorage Police Department (Dec. 10, 1996)).

[144] First NVE Submission at 18-20 (describing available health care; social services; children's services; sanitation services).

[145] First NVE Submission, Ex. 13, ¶ 16; *see also* Ex. 11, ¶ 10 (posting signs asserting proclaiming site under jurisdiction of Tribal government).

[146] Alaska 2007 Submission.

[147] Alaska 2007 Submission at 4.

[148] *See* Letter, Jahna Lindemuth, Attorney General, State of Alaska, to Governor Bill Walker (Oct. 19, 2017) (legal status of tribal governments in Alaska).

[149] Pub. L. 83-280, 67 Stat. 588 (Aug. 15, 1953), as amended; 18 U.S.C. § 1162(a).

AR002137

jurisdiction over Indian country after statehood,[150] the House Judiciary Committee noted that a number of Alaska Native Villages at the time lacked "adequate machinery for enforcing law and order"[151] in contrast with the Metlakatla Community of the Annette Island Reserve, which had "a long history of policing misdemeanor offenses" since the founding of the Community. [152] Further, Congress in 2004 enacted the Alaska Native Allotment Subdivision Act (ANASA)[153] to afford owners of Alaska Native allotments greater flexibility in developing their lands.[154] ANASA authorizes the Alaska Native allotments owners to subdivide their land pursuant to state and local laws and to execute certificates of ownership and dedication with respect to these lands subject to Secretarial approval.[155]

The Tribe concedes that BIA exercises authority over the site,[156] but claims that the Tribe possesses jurisdiction itself.  The Tribe relies primarily on assertions in its constitution and Tribal ordinances.[157]  Most of these provisions relate to Tribal members and their domestic affairs, however.[158]  Because a Tribe's personal jurisdiction over the domestic affairs of its members may extend beyond Indian Country, such assertions have no direct bearing on the question of the Tribe's authority over land.[159]  Other provisions reflect unilateral assertions of territorial jurisdiction over the allotments of its members "to the extent consistent with Federal law."[160]  Some relate only to lands within the Village of Eklutna itself and not the Ondola Allotment.[161]  The Tribe also claims jurisdiction based on the provisions of its proposed Lease.[162] But contractual consent alone cannot establish tribal jurisdiction over an off-reservation allotment for purposes of IGRA if none already exists.[163]

---

[150] Sol. Op. M-36975 at 36.

[151] Sol. Op. M-36975 at 36, citing H. Rep. No. 85-2043 at 2 (1958).

[152] Sol. Op. M-36975 at 37, citing 116 Cong. Rec. 37,353 (Nov. 16, 1970) (statement of Rep. Donohue).

[153] Pub. L. No. 108-337 (Oct. 18, 2004), 118 Stat. 1357.

[154] S. Hrg. 108-163 at 21. *See also* S. Hrg. 108-416 at 21-22 (2004) (ANASA gives Alaska Native allottees option of retaining Secretarial protections or subdividing under state law and passing title on).

[155] ANASA, § 3(a). Section 4 of the ANASA reiterated that except as otherwise provided, nothing it in its provisions would terminate, diminish, or otherwise affect the continued existence and applicability of federal restrictions against alienation and taxation on restricted lands or interests therein.

[156] *See, e.g.,* First NVE Submission, Ex. 13, ¶ 16 (acknowledging BIA exercise of authority over site); Ex. 11, ¶ 3 (listing Tribal services provided pursuant to self-governance contracts with Indian Health Services and BIA); Ex. 11, ¶ 9 (noting BIA's "active role" in administering the site).

[157] *See, e.g.,* First NVE Submission, Ex. 17 (Tribal Court Code) (asserting territorial jurisdiction over land and water "traditionally used" by Tribal members); *id.,* Ex. 21 (Tribal Access Ordinance), Preamble, §§ 1, 2 (defining "Village Lands" as including Alaska Native allotments).

[158] *See, e.g.,* First NVE Submission, Ex. 16 (Tribal Relatives Talk Code), Preamble (applicable to "domestic relations"); *id.,* Ex. 17 (Tribal Court Code) (purpose "to regulate the domestic relations of our members"); *id.,* Ex. 21 (Tribal Access Ordinance), Preamble, §§ 1, 2 (Tribal Constitution provides jurisdiction over Tribal members within or without territorial jurisdiction and referencing ICWA).

[159] *See, e.g., Baker v. John,* 982 P.2d 738 (Alaska 1999).

[160] First NVE Submission, Ex. 7, art. II, sec. I (1996 constitutional assertion of territorial jurisdiction over "all fee and allotment lands within the traditional lands of Eklutna" to the extent consistent with federal law); *see also* Ex. 6, art. II (1988 constitutional assertion of territorial jurisdiction over ANCSA lands, other lands acquired by Tribe, "or any Indian Country as may exist").

[161] *See, e.g.,* First NVE Submission, Ex. 15 (Tribal Dog Ordinance), ¶¶1, 3, 5-6; Ex. 20 (Pollution Discharge Ordinance), § B.

[162] *See* NVE Lease.

[163] *See* U.S. Dept. of the Interior, Office of the Solicitor, Miami Tribe of Oklahoma (Maria Christiana Reserve No. 35) ILO at 4 (Oct. 31, 2002), citing *Kansas v. United States,* 249 F.3d 1213, 1230-31 (10th Cir. 2001). *See also City*

16

**Conclusion**

Based on the above analysis, I conclude that the Tribe lacks territorial jurisdiction over the Ondola Allotment.  The United States consistently treated the site as part of the public domain from the region's original survey until the site's eventual allotment to an Alaska Native individual in 1963.  The ANCSA revoked all reservations in Alaska but one not relevant here and extinguished all aboriginal claims to land in the state.  The Allotment site only briefly formed part of the Eklutna Industrial School reserve, and the Department never acted on proposals to establish an Indian reservation from the remaining School lands, which the Department disposed of after World War II.  In addition, the Tribe has not demonstrated a clear or original nexus to the Ondola Allotment site.  Tribal territorial jurisdiction cannot be based on the membership of the Allotment's owners alone, and the Allotment is not near a current or previously existing Indian reservation.  State and local authorities, which provide police and other services to the Allotment, have not acknowledged the Tribe's territorial authority at the site.

I therefore regret to inform you that I have determined that the Ondola Allotment does not constitute "Indian lands" and is therefore ineligible for gaming under IGRA, for which reason I must disapprove the Tribe's proposed Lease of the Ondola Allotment for gaming purposes.

Sincerely,

John Tahsuda
Principal Deputy Assistant Secretary – Indian Affairs
Exercising the Authority of the Assistant Secretary –
Indian Affairs

Cc:     Director, Office of Indian Gaming
        Alaska Regional Director (Acting), Bureau of Indian Affairs
        General Counsel, National Indian Gaming Commission

---

of Sherrill v. Oneida Indian Nation, 544 U.S. 197, 203 (2005); Miami Tribe v. United States, 927 F. Supp. 1419, 1427 (D. Kan. 1996).

AR002139



**United States Department of the Interior**

OFFICE OF THE SOLICITOR
Washington. D.C. 20240



JAN 11 1993

M-36975

Memorandum

To:        Secretary

From:      Solicitor

Subject:   Governmental Jurisdiction of Alaska Native Villages
           Over Land and Nonmembers

In the fall of 1990 at your request, we conducted an Office-wide
review of all pending legal issues in Alaska.  On June 19, 1991,
following that review and briefings with your policy and program
staff, you issued a memorandum establishing as a priority the
resolution of three of those issues.  Among your priorities was a
request that we work with the Department of Justice to develop
the legal position of the United States on "the nature and scope
of so-called governmental powers over lands and nonmembers that a
Native village can exercise after the Alaska Native Claims
Settlement Act."  You indicated that the opinion would be useful
in resolving questions that arise in the context of approving
constitutions put forward by villages and would aid you in
deciding whether the jurisdictional claims made by the villages
were consistent with law.  You limited your request noting that
you were not seeking "to question the existence of a
long-recognized special relationship between the United States
and Alaska natives" or "to revisit the eligibility of villages to
participate in programs administered by the Department and
available to Indians."

I.   INTRODUCTION

Prior to the enactment of the Alaska Native Claims Settlement
Act, Act of December 18, 1971, Pub. L. No. 92-203, 85 Stat. 688
(codified as amended at 43 U.S.C. §§ 1601-1628) (ANCSA), sixty-
nine Alaska Native villages and regional groups adopted
constitutions pursuant to section 16 of the Indian Reorganization
Act, Act of June 18, 1934, § 16, 48 Stat. 987 (codified as
amended at 25 U.S.C. § 476) (IRA).  All but two of these
constitutions were adopted during the 1930's, 1940's and
1950's.[1]

---

[1]     Bureau of Indian Affairs, <u>American Indians and Their Federal
Relationship</u> 2-5 (1972).  Two constitutions were adopted in 1971:
Inupiat Community of the Arctic Slope, approved on June 28, 1971,
and adopted August 26, 1971; and Kenaitze Indian Tribe, approved
June 21, 1971, and adopted August 1, 1971.

Although there was some interest in IRA constitutions during the 1970's,[2] it was not until the 1980's that there was evidence of widespread renewal of Native interest in IRA constitutions. As a result of this renewed interest, three villages have adopted amended constitutions[3] and three have adopted constitutions for the first time.[4]  During this time, several Native groups have considered proposed constitutions or constitutional amendments and rejected them.[5]  Approximately a dozen villages are currently considering proposed constitutions.  The Bureau of Indian Affairs (BIA) is corresponding with these villages to provide technical comments.

The 1988 amendments to the IRA, Act of November 1, 1988, § 101, Pub. L. No. 100-581, 102 Stat. 2938 (codified 25 U.S.C. § 476), require that, 30 days prior to calling an election on the adoption or amendment of a tribal constitution, you advise a tribe in writing of any provision of the constitution that you believe is contrary to applicable law.  Your request to this Office arises in the context of this provision.  Legal guidance on the scope of village jurisdiction over land and nonmembers is necessary to determine whether the jurisdictional claims made by the villages are contrary to law.

As the length and detail of the opinion that follows indicates, the question you have asked is an exceedingly difficult and complex one.  As you are aware, both the federal and state courts in Alaska have been grappling with issues concerning the sovereignty and powers of Alaska Native groups for several years. The results have been, to say the least, less than consistent.[6]

---

[2]     Several elections on the adoption of village constitutions were authorized in the 1970's but, for some reason, were never held.

[3]     Tanana, adopted June 13, 1989, and approved July 26, 1989; Stevens Village, adopted June 25, 1990, and approved August 8, 1990; and Sitka, adopted November 26, 1991, and approved January 8, 1992.

[4]     Eagle, adopted April 29, 1989, and approved June 13, 1989; Circle, adopted August 20, 1991, and approved October 4, 1991; and Seldovia, adopted April 3, 1992, and approved May 18, 1992.

[5]     For example, the Metlakatla Indian Community of the Annette Islands Reserve rejected a proposed revised constitution on March 1, 1983, and the Native Village of Port Graham rejected a proposed constitution on January 30, 1992.

[6]     Federal cases include: Native Village of Tyonek v. Puckett, 957 F.2d 631 (9th Cir.), superseding 953 F.2d 1179 (9th Cir. 1992); Alyeska Pipeline Service Company v. Alaska, No. A87-201

2

AR002141

In formulating our opinion, we have attempted to step back from the details of these specific cases and examine the question of the impact of ANCSA on Native village jurisdiction over land and nonmembers from the perspective of the 125 year history of federal dealings with Alaska Natives and of general principles of Federal Indian law.

In our effort, we have consulted with the Governor and Attorney General of Alaska; numerous Native leaders in Alaska and the contiguous 48 states, as well as their counsel; the Alaska congressional delegation and other congressional leaders; and the members of the Joint Federal-State Commission on Policies and Programs Affecting Alaska Natives established by section 12 of the Act of August 18, 1990, Pub. L. No. 191-379, 104 Stat. 473, 478. We have received numerous comments, including several detailed legal briefs. These comments have been very helpful in developing our opinion.

As we discuss further below, the complexity of questions concerning the sovereign powers of Alaska Native groups arises in considerable measure from Alaska's unique circumstances and history.[7] Alaska was the last territorial acquisition of the United States on the North American continent. The remote location, large size and harsh climate of Alaska further delayed the need to confront questions concerning the relationship between the Native peoples of Alaska and the United States. As a result, all three branches of the Federal Government have dealt with the relationship in a tentative and reactive way. Often, decisions on issues concerning the relationship with Natives have been postponed, rather than addressed. Where aspects of the relationship have been addressed, they have often been resolved without a clear or consistent understanding or application of the fundamental legal principles governing the relationship.

---

Civil (D. Alaska)(Tentative Decision, <u>filed</u> January 17, 1992); <u>Blatchford v. Native Village of Noatak</u>, 111 S.Ct. 2578 (1991), <u>rev'g Noatak v. Hoffman</u>, 896 F.2d 1157 (9th Cir. 1990); <u>Native Village of Venetie I.R.A. Council v. Alaska</u>, 944 F.2d 548 (9th Cir. 1991)(<u>Venetie II</u>), <u>superseding</u> 918 F.2d 797 (9th Cir. 1990); <u>Chilkat Indian Village v. Johnson</u>, 870 F.2d 1469 (9th Cir. 1989); <u>Alaska v. Native Village of Venetie</u>, 856 F.2d 1384 (9th Cir. 1988)(<u>Venetie I</u>).

State cases include: <u>Nenana Fuel Co., Inc. v. Native Village of Venetie</u>, 834 P.2d 1229 (Alaska 1992); <u>Hydaburg Cooperative Association v. Hydaburg Fisheries, Inc.</u>, 826 P.2d 751 (Alaska 1992); <u>Matter of City of Nome</u>, 780 P.2d 363 (Alaska 1989); <u>Native Village of Stevens v. Alaska Management & Planning</u>, 757 P.2d 32 (Alaska 1988).

[7]    See Part III, <u>infra</u>.

3

AR002142

This is not to say that there has been a wholly consistent
pattern of dealing with Native Americans in the contiguous 48
states.  There obviously has not.  But there is a fundamental
difference between the approach to issues of Indian law and
policy in the contiguous 48 and the situation in Alaska.  The
shifts in dealing with Native Americans in the contiguous 48 have
been characterized by fundamental changes in national policy.  An
initial policy of separation of Native Americans from the rest of
society through removal and reservations gave way in the 1880's
to a policy of assimilation as reflected in the General Allotment
Act of 1887.  24 Stat. 388.  Assimilation gave way in turn to a
policy of reinvigorated Native self-government as reflected in
the IRA and other policies of the New Deal.  There followed a
brief period of termination and then, in the early 1970's, the
current policy of tribal self-determination.[8]  Dealings with
Native groups in Alaska have, to be sure, reflected elements of
then-current national policies.  There has been, however, no
consensus on the appropriate comprehensive framework for the
relationship with Alaska Natives taking into account the unique
circumstances of Alaska.

ANCSA is the most comprehensive statute to address Alaska Native
issues.  However, even with ANCSA, the primary impetus for, and
focus of, the statute was resolution of a specific issue: Native
claims to the land of Alaska.[9]  A comprehensive statutory scheme
to address this issue was enacted.  In our opinion, as we detail
below, this scheme has decisive implications for the current
status of Native village jurisdiction over land and nonmembers.

In several statutes subsequent to ANSCA, Congress has disclaimed
an intention to address the issue of Alaska Native village
sovereign powers.  Most recently, in the so-called "1991
Amendments" to ANSCA, Congress said that no provision shall
"confer on, or deny to, any Native organization any degree of
sovereign governmental authority over lands . . . or persons in
Alaska . . . ."  Act of February 3, 1988, Pub.L. No. 100-241,
§ 2(8)(B), 101 Stat. 1788, 1789 (1988) (43 U.S.C. § 1601 note).
The Senate Energy and Natural Resources Committee explained, in
its report on the legislation, that, "[t]his is an issue which
should be left to the courts in interpreting applicable law and
that these amendments should play no substantive or procedural

---

[8]   A concise history of Federal Indian policy through 1940 can
be found in F. Cohen, Handbook of Federal Indian Law 1-88 (1942)
(1942 Cohen).  An update through 1981 is contained in F. Cohen,
Handbook of Federal Indian Law 47-206 (1982) (1982 Cohen).  A
recent comprehensive history is F. Prucha, The Great Father
(1984).

[9]   See Part IV.B, infra.

4

AR002143

role in such court decisions."[10]  There is an element of self-fulfilling prophecy in the Senate Committee's statement.  In the absence of further guidance from Congress, the courts will of necessity have to struggle with this issue.  However, the courts must do so within the framework of laws enacted by the Congress and within the context of the specific cases and controversies that are brought before them.  There is no assurance that the courts can comprehensively address the sovereign powers of Native villages.   Further, the cases decided to date indicate that a judicial consensus on even specific issues will be elusive.

In the opinion that follows, we attempt to provide a broader perspective on the issue of Native village jurisdiction over land and nonmembers than can be provided in a specific case or controversy.  However, the conclusions we reach can be no more than our best legal judgment.  Further, like the courts, we are constrained by the framework of laws enacted by the Congress.

The ultimate and most satisfactory answer to the question you have posed should be provided by the Congress.  Unlike the courts or the Department of the Interior, the Congress has the constitutional authority to craft general principles of Federal Indian law to address the unique circumstances of Alaska.  Only with careful and deliberate action by the legislative branch, taken in consultation with the Native and non-Native citizens of Alaska, will there be an answer that will provide certainty and fairness in the future governance and development of Alaska.

II.  OUTLINE

In 1975 Congress established the American Indian Policy Review Commission to conduct the most comprehensive review of American Indian policy since the 1930's.[11]  The Commission's review included examination of the status of Alaska Natives and is particularly relevant to our inquiry because its views on Alaska Natives and ANCSA were framed in the context of national Indian policy and were issued in 1977, six years after the Settlement Act.  While we do not find persuasive everything said by the

---

[10]    S. Rep. No. 201, 100th Cong., 1st Sess. 35 (1987).  See discussion Part IV.B.2, *infra*.

[11]    Pub. L. No. 93-580, 88 Stat. 1910, as amended by Act of August 9, 1975, Pub. L. No. 94-80, §§ 1-4, 89 Stat. 415 and Pub. L. No. 95-5, 91 Stat. 13.  The Commission was charged with conduct of "a comprehensive review of the historical and legal developments underlying the Indians' unique relationship with the Federal Government in order to determine the nature and scope of the necessary revisions in the formulation of policies and programs for the benefit of Indians."  The work of the Commission is discussed in 1982 Cohen, *supra* n. 8, at 205-06.

5

AR002144

Commission concerning Alaska Natives, the broad outlines of the Commission's findings provide a useful starting point for this opinion.

In Chapter 12 of its Final Report, the Commission described the status of Alaska Natives, in part, as follows:

> In aboriginal social and political organization, the Alaska Natives did not differ markedly from other American native peoples.  They organized themselves into social and political units (groups or tribes) as various and multiform, but of the same general nature, as those evolved by the Indians of the lower 48.

* * *

> When, after the beginning of the 20th century, the United States began to take notice of the Alaska Natives, it dealt with them in much the same way as it was then dealing with the Indians of the lower 48.

American Indian Policy Review Commission, Final Report 95th Cong., 1st Sess. 489 (Comm. Print 1977) (footnotes omitted).

The Commission went on to conclude:

> By and large, the United States recognized that the Native tribes of Alaska were of the same genus as the other Indian tribes within its jurisdiction, and formed its relationships with them and their members accordingly.  In short, it regarded the Alaska Native tribes as dependent domestic sovereigns, possessed of the same attributes and powers as the Native tribes of the lower 48.  And, just as in the case of other Native tribes, it acknowledged that a special relationship existed between it and the Alaska Native tribes and their members, as an incident of which it undertook to provide them with special services.

* * *

> The Alaska Native tribes (referring, of course, to the historic and traditional tribal entities, not to the Native corporations organized under the Settlement Act), just as the tribes of the lower 48, are domestic sovereigns.  They possess all of the attributes and powers normally appertaining to such status, except those that have been specifically denied or taken from them by Congress.

Id. at 490-91 (footnote omitted).

6

AR002145

The Commission found that ANCSA did not "effect a termination of the traditional Alaska Native tribes." Rather, the Commission found that, "as its very title implies," ANCSA was a settlement of aboriginal land claims. Id. at 491. It observed that:

> No such [land claim] settlement has ever been held to have abolished the tribes concerned as political entities, to have affected their legal status, to have diminished their sovereign powers, or to have terminated the special relationship previously existing among them and their members and the United States.
>
> The Settlement Act did not alter in any way the legal nature or status of any of the Alaska Native tribes. Nor did it alter the preexisting relationship between the United States and the Alaska Natives as members of such tribes. Particularly the Settlement Act neither terminated the tribes nor the status as "Natives" of the members thereof.

Id. at 491-92 (footnote omitted).

The Commission relegated to a deceptively simple footnote the essential conclusion for our present inquiry. After concluding that Alaska Natives "possess all of the attributes and powers normally appertaining to such [domestic sovereign] status, except those that have been specifically denied or taken from them by Congress," the Commission noted:

> Although, technically, the Alaska Native Tribes still possess a number of sovereign powers relating to the governance of territory (e.g., to regulate hunting and fishing on tribal domain), these powers are largely in abeyance at the present time because the tribes currently do not possess tribal domains. However, were the United States in the future to set aside or acquire land in trust for an Alaska Native tribe, all of the slumbering powers of that tribe pertaining to the governance of territory would immediately rejuvenate. In short, lacking the subjects to which certain of the sovereign powers they still possess relate, the Alaska Native tribes at present have no occasion to exercise them.

Id. at 491 n. 2.

Our review of the history of Alaska Natives and their relationship with the United States that follows is consistent with the factual conclusions of the Commission. Similarly, our analysis of the law confirms the Commission's basic analysis and conclusions. Events and judicial decisions since the Commission's Final Report refine or expand upon the principles

7

AR002146

the Commission discussed.  They do not repudiat· them.

Our analysis must start, as did that of the American Indian
Policy Review Commission, with the question of whether there are
tribes in Alaska.  Whatever governmental powers Alaska Native
villages have, they have by virtue of being "tribes," as that
term is used in Indian law.  Powers of inherent sovereignty are
dependent on the villages being tribes.[12]

In Part III we review the ethnological history and the history of
dealings between the United States and Alaska Natives for the
light it sheds on villages as tribes.  We then consider the legal
issue of whether there are tribes in Alaska and the arguments
that have been advanced against the conclusion that villages may
be tribes.  In Part IV, we tu:· to ANCSA and consider its effect
on village exercise ·f governm·..tal powe.:s over .and and
nonmembers.

III.  VILLAGE TRIBAL STATUS

    A.  History

In examining questions relating to the status and powers of
Indians, it is useful, if not essential, to review the historical
backdrop for the issues.[13]  In the current case, such a review is
particularly important.  As indicated above, an understanding of
the current status and powers of Alaska Native groups depends on
an understanding of the unique history and circumstances of
Alaska and its Native peoples.

    1.  Early History

The consensus of anthropological opinion is that man first
entered Alaska from Asia across a then-existing land bridce.
The land bridge is estimated to have emerged more than 40,000
years ago and to have existed on-and-off until 10,000 years ago.
The first migrations may have occurred 25,000 to 40,000 years
ago.  At Old Crow Flats in the Yukon, east of Alaska in an area
never glaciated, evidence has been found that man was present
between 25,000 and 30,000 years ago or more.  More than 2,700
archaeological-sites have been identified in Alaska proper, some

---

[12]    See Powers of Indian Tribes, 55 I.D. 14, 1 Op. Sol. on
Indian Affairs 445 (1934).

[13]    C. Wilkinson, American Indians, Time, and the Law 32-52
(1987).

8

considered to be "Indian legislation,"[297] the fact remains that titles to these townsite lands in 27 villages are now owned by those villages <u>as villages</u>.

With respect to these non-ANCSA lands, we believe the extent of village governmental powers will depend upon the particular status of the village itself and upon a fact-specific inquiry into whether the area at issue qualifies as a dependent Indian community and thus Indian country. Congress simply did not address this specific situation in ANCSA. The outcome would depend upon the particular history of the village, specific applicable statutes, and general principles of Indian law.

### e.  Native Allotments

With respect to Alaska Native allotments, we conclude that they do fall within the statutory definition of Indian country. However, we also conclude that while Native allotments are Indian country for purposes of federal protection and jurisdiction, it does not necessarily follow that allotments are subject to tribal jurisdiction.

The language of section 1151(c) includes as Indian country "<u>all Indian allotments</u>, the Indian titles to which have not been extinguished, including rights-of-way running through the same" (emphasis added). Based upon the plain language of the statute, the court decisions interpreting section 1151(c), and an examination of the Alaska Native Allotment Act, we conclude that Alaska Native allotments are Indian country. Nevertheless, although we conclude that these allotments are Indian country for purposes of federal authority and protection, for the most part we are not persuaded that Congress intended Alaska Native villages to exercise governmental powers over these lands. Alaska Native allotments appear to be an exception to the general rule that the territorial basis for tribal authority coincides with the federal Indian country status of lands. <u>See</u> <u>Native Village of Venetie IRA Council v. Alaska</u>, 944 F.2d 548, 558 n.12 (9th Cir. 1991) (<u>Venetie II</u>).

### i.  Indian Allotments as Indian Country

Indian allotments were included within the definition of Indian country based on the Supreme Court's decision in <u>United States v. Pelican</u>, 232 U.S. 442 (1914). <u>See</u> reviser's note to 18 U.S.C. § 1151. In <u>Pelican</u>, the Court held that a trust allotment carved out of an existing reservation continued to be Indian country because it continued to be validly set apart for the use of Indians under the superintendence of the Government.

---

[297]   See <u>supra</u> n. 71.

AR002263

In the contiguous 48 states, Congress used two principle forms in creating Indian allotments: trust allotments and restricted fee allotments. In United States v. Ramsey, 271 U.S. 467 (1926), the Supreme Court rejected any distinction between the two types of allotments with respect to their Indian country status. The Court concluded that a restricted fee patent allotment carved out of the Osage Indian reservation "remained Indian lands set apart for Indians under governmental care." Id. at 471. The Court stated:

> [I]t would be quite unreasonable to attribute to Congress an intention to extend the protection of the criminal law to an Indian upon a trust allotment and withhold it from one upon a restricted allotment; and we find nothing in the nature of the subject matter or in the words of the statute which would justify us in applying the term Indian country to one and not to the other.

Id. at 471-72.[298]

Indian allotments that were not carved out of existing Indian reservations also have been held to be Indian country. In In re Carmen's Petition, 165 F. Supp. 942 (N.D. Cal.), aff'd, 270 F.2d 809 (9th Cir.), cert. denied, 361 U.S. 934 (1958), the court held that a public domain trust allotment was Indian country and thus

---

[298]   See Heckman v. United States, 224 U.S. 413, 437 (1912) (federal guardianship continues over restricted fee Indian lands; "national interest" not to be expressed in terms of property, or limited to assertion of rights incident to ownership or reversion or "to the holding of a technical title in trust"); State v. Burnett, 671 P.2d 1165, 1166-67 (Okla. Cr. 1983) (restricted fee allotment held to be Indian country).

In United States v. Sands, 968 F.2d 1058 (10th Cir. 1992), petition for cert. filed, No. 92-6105 (U.S. Oct. 5, 1992), the Tenth Circuit concluded that a restricted fee allotment in the former territory of the Five Civilized Tribes in Oklahoma was Indian country, noting that "[b]y 1948, when § 1151 was enacted, 'Indian country' included both trust allotments and restricted fee allotments." Id. at 1062. In Sands, following defendant's conviction, the United States contended before the court of appeals that the United States lacks jurisdiction because the particularly unique history of the former Indian territory in present-day Oklahoma evinces congressional intent that restricted fee allotments of the Five Civilized Tribes not be treated as Indian country. Obviously, the fact that trust allotments and restricted fee allotments in general fall within the definition of Indian country would not preclude Congress from treating certain allotments differently.

AR002264

subject to federal jurisdiction.  In that case, California
asserted that the public domain allotment was not Indian country
because it had not been carved out of an existing reservation, as
was the case in <u>United States v. Pelican</u>, 232 U.S. 442 (1914),[299]
and was not land to which an underlying "Indian title" remained.
The district court, affirmed by the Ninth Circuit, squarely
rejected these assertions:

> Respondent interprets the Pelican decision to mean that an
> allotment to be Indian Country must have been made from
> lands which were previously Indian Country.  But this is an
> unduly restricted view of that decision.
>
> *    *    *
>
> In Pelican, the reservation from which the allotment
> was made had itself been created out of the public
> domain rather than from land which had previously been
> in Indian possession. . . .  Since all Indian
> allotments, <u>regardless of their source</u>, are maintained
> under the same type of Governmental supervision, either
> by holding title in trust for the allottee or by
> restricting alienation, there is no logical reason for
> making the application of protective criminal statutes
> dependent upon the source of the allotment.

<u>In re Carmen's Petition</u>, 165 F. Supp. at 946 (emphasis added).
Based on the above considerations, we conclude that the language
of section 1151(c) indeed encompasses Alaska Native allotments
while they remain in restricted status.[300]

While the Indian country status of allotments provides the
statutory basis for the exercise of federal jurisdiction, it does
not necessarily follow that all Indian allotments are subject to
tribal jurisdiction.  Because of the distinct history of certain
off-reservation allotments, we believe that whether an individual
allotment is subject to tribal jurisdiction depends upon a

---

[299]   In <u>United States v. Pelican</u>, 232 U.S. 442 (1914), the Court
determined that an Indian allotment was Indian country, even
though it was within a reservation area restored to the public
domain, which the Court appears to have presumed was no longer
within the reservation's boundaries.  The Court concluded that
the same considerations apply to allotments as to other Indian
lands in determining whether they are Indian country--whether the
lands "had been validly set apart for the use of the Indians as
such, under the superintendence of the Government."  <u>Id.</u> at 449.

[300]   Of course, because Alaska is a Public Law 280 state, it has
broad criminal and limited civil jurisdiction over Indian
country.

126

AR002265

particularized inquiry into the relevant statutes and circumstances surrounding the creation of the allotment.

For example, various statutes enacted by Congress during the allotment era permitted certain Indians to acquire homesteads on the public lands.  The Act of March 3, 1875, § 15, 18 Stat. 402, 420, permitted an Indian born in the United States, "who has abandoned, or may hereafter abandon, his tribal relations," to obtain a homestead under the Homestead Act of 1862, 12 Stat. 392.[301]  The Indian homestead was restricted for a period of five years from the date of issuance of a fee patent.  The Indian Homestead Act of 1884 also permitted Indians to avail themselves of the homestead laws of the United States, with the special provision that 25-year trust patents would issue.  Act of July 4, 1884, 23 Stat. 76, 96.  In United States v. Jackson, 280 U.S. 183 (1930), the Supreme Court held that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments, upholding the authority of the Secretary to extend the trust period for a restricted Indian homestead pursuant to 25 U.S.C. § 391.

While we are unaware of any court decisions addressing the question, it is our view that an assertion of tribal jurisdiction over an Indian homestead allotment obtained by an Indian who had abandoned tribal relations would fail.  In such a case, it seems unlikely that there would be any indication of congressional intent to permit such jurisdiction, and there would be no original tribal nexus to support such jurisdiction over the allotment.

Public domain allotments obtained pursuant to section 4 of the 1887 General Allotment Act, 25 U.S.C. §§ 334, 336, differ from the homestead allotments in that Indians applying for such allotments must demonstrate membership or entitlement to membership in a recognized Indian tribe.  43 C.F.R. § 2531.1(a); see Regulations Governing Indian Allotments on the Public Domain Under Section 4, Act of February 8, 1887, as amended, 46 L.D. 344 (1918) ("applicant is required to show that he is a recognized member of an Indian tribe or is entitled to be so recognized").

Without addressing or deciding the possible scope of tribal jurisdiction over public domain allotments in the contiguous 48, we conclude that allotments issued pursuant to the Alaska Native Allotment Act are more similar to homestead act allotments rather than tribal-affiliation public domain allotments, and that particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village

---

[301]    Repealed by FLPMA, Pub. L. No. 94-579, § 702, 90 Stat. 2743, 2787 (1976).

127

AR002266

claiming <u>territorial</u> jurisdiction over an Alaska Native allotment.

## ii.   Alaska Native Allotments

Most allotments in Alaska have been issued pursuant to the Alaska Native Allotment Act of 1906,[302] although there are a few allotments issued under the General Allotment Act.[303]   Although Alaska Native allotments are held in fee by the allottee subject to restrictions against alienation, we have already noted that the distinction between restricted fee and trust allotments is not significant for our purposes.[304]

A number of facts, however, do distinguish Alaska Native allotments from most allotments in the contiguous 48.   First, the statute does not make tribal membership a criteria for receiving an allotment, probably because in 1906, Congress was not considering the Alaska Native allotments in a tribal context. This makes Alaska Native allotments more like Indian homestead allotments, rather than those issued pursuant to the General Allotment Act or other tribe-specific allotment acts.[305]   Second,

---

[302]    Act of May 17, 1906, Pub. L. No. 59-171, 34 Stat. 197, <u>as amended by</u> Act of August 2, 1956, Pub. L. No. 84-931, 70 Stat. 954. The 1906 Act was repealed, with a savings clause for applications pending on December 18, 1971, by ANCSA § 18(a), 43 U.S.C. § 1617(a). The repealer does not purport to alter the status of Alaska Native allotments.

[303]    See <u>United States v. Clarke</u>, 445 U.S. 253 (1980).

[304]    Because the possible distinctions between restricted fee and trust allotment forms are not significant in our context, it is also not significant that the Interior Department initially viewed the Alaska Native Allotment Act as providing for trust allotments.  <u>See</u> <u>Charlie George</u>, 44 L.D. 113 (1965); <u>Status of Alaskan Natives</u>, 53 I.D. 593, 602 (1932) (Solicitor's Opinion) (allotment creates reservation of land for allottee but title remains in the United States).  In 1980, the Interior Board of Land Appeals overruled <u>Charlie George</u> and concluded instead that Alaska Native allotments were held in restricted fee title. <u>State of Alaska</u>, 45 IBLA 318 (1980).  Regardless of the form of title, this Department consistently has taken the position that general federal statutes and Departmental regulations applicable to trust and restricted Indian property also apply to Native allotments and restricted Native townsite lots in Alaska.

[305]    The Solicitor's Opinion, <u>Status of Alaskan Natives</u>, 53 I.D. 593, 602 (1932), also analogized Alaska Native allotments to public domain allotments issued pursuant to § 4 of the General Allotment Act of 1887, 25 U.S.C. § 334, 336.  While they are

AR002267

Alaska Native allotments were not carved out of any reservation. While we consider this factor insignificant for <u>federal</u> jurisdictional purposes, we believe it has at least some significance in determining questions of <u>tribal</u> authority. Third, the statute specifically provides that the allotment "shall be deemed the homestead of the allottee and his heirs." Again, while not a controlling factor as such, the language makes the Alaska Native Allotment Act appear more similar to a general Indian homestead act rather than a tribal or reservation related allotment act.

We wish to make clear that Alaska Native allotments, like other Indian allotments, remain under federal superintendency and subject to federal protection while in restricted status. Thus, we conclude that Congress has not divested the Federal Government of its jurisdictional authority over such lands, and they are Indian country.

However, after examining the statute and circumstances related to Alaska allotments, we are not convinced that any specific villages or groups can claim jurisdictional authority over allotment parcels. As we noted above, particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village claiming <u>territorial</u> jurisdiction over an Alaska Native allotment.

### iii.   Individual Native Townsite Lots

One other category of individual Native landholdings in restricted status is that of Native restricted fee townsite lots. It is our understanding that there are over 3,800 of these lots. To a limited extent, deeds to individual townsite lots are still being issued to Natives subject to statutory restrictions on alienation, pursuant to the former 43 U.S.C. § 733.[306] In <u>People of South Naknek v. Bristol Bay Borough</u>, 466 F. Supp. 870 (D. Alaska 1979), the court held that for purposes of federal court jurisdiction, the restricted Native townsite lots have the same status as allotments.

Our analysis and conclusions concerning potential tribal jurisdiction over these lots are the same as those set forth

---

indeed analogous in many respects, § 4 allotments did require tribal affiliation, which conceivably provides a basis for tribal jurisdiction. Of course, we express no opinion concerning tribal jurisdiction over § 4 public domain allotments.

[306]     43 U.S.C. § 733 was repealed in 1976 by FLPMA § 703(a), Pub. L. No. 94-579, 90 Stat. 2743, 2790.  Only applicants who can establish entitlement based on occupancy commenced prior to the enactment of FLPMA are eligible for a deed.

129

AR002268

above with respect to Native allotments, with one possible
exception.  If individual restricted townsite lots properly are
treated as allotments for purposes of section 1151, they would be
Indian country.  Those restricted lots located in one of the 27
Native villages receiving fee title to unoccupied townsite lots
could conceivably be affected if the village qualifies as a tribe
and if the area qualifies as a dependent Indian community.  Even
so, an assertion of tribal jurisdiction over individual
restricted lots would be doubtful if there were no clear tribal
nexus to the individual restricted lands.[307]

### f.    Authority Over Nonmembers After ANCSA

We have previously established that there is a significant
territorial component to tribal powers.  In effect, by abolishing
previously-existing reservations and avoiding federal trusteeship
over Native lands, Congress largely removed a territorial base
over which entities in Alaska qualifying as tribes could assert
jurisdiction.  Furthermore, except for the uncertainty
surrounding some village-owned townsite lands, in the limited
cases in which Indian country may still exist in Alaska for
purposes of federal jurisdiction and protection, we are not
convinced that Congress has in practical and legal effect left
room for the exercise of tribal jurisdiction over land.

Our disposition of the issue of jurisdiction over land also
resolves in large measure the question of the extent of tribal
governmental authority over nonmembers.  Indian tribes are
possessed of sovereignty over "their members and their
territory."  <u>Montana v. United States</u>, 450 U.S. 544, 563 (1981).
Without a tribal territory, tribal governmental power is limited
to authority over members, unless Congress has clearly authorized
the exercise of tribal power over nonmembers.[308]  Absent such
congressional consent, we conclude that Alaska tribes without
territories are also without power over nonmembers.

---

[307]    If the area is not a dependent Indian community, we are not
convinced that a village that qualifies as a tribe could assert
jurisdiction over individually owned restricted townsite lots.
Even if the lots are Indian country for federal jurisdictional
purposes, the village would lack a distinctly tribal territorial
base related to the lots, from which to assert extended
jurisdiction over discreet individual Native-owned parcels.
Nothing in the townsite laws even remotely suggests that the
individual restricted lots issued to Natives could, by
themselves  constitute any sort of tribal territorial base.

[308]    For   ample, the Indian Child Welfare Act, discussed <u>supra</u>
pp. 43-44  gives force and effect to tribal court child custody
proceedings, and may affect nonmembers claiming parental or
custody rights to an Indian child.

AR002269

V.   CONCLUSION

This opinion has been one of the most difficult to prepare during
my tenure at the Department of the Interior.  We hope the
research into the history, law and government policy toward
Native Alaskans will be beneficial to all who are dealing with
jurisdictional questions, whether they agree with the conclusions
or not.  The issues surrounding jurisdiction and governmental
power are complex and easily susceptible to misinterpretation.
In this opinion, we have provided the answer to the specific
question posed by the Secretary: whether Alaska Native villages
exercise jurisdiction over lands and nonmembers.  In posing this
issue, the Secretary made clear that he did not intend to revisit
the unique relationship of the Federal Government to the Natives.
That policy is sound in light of this legal review.

We have spent considerable time on the status of Native villages
and the ongoing federal relationship with them to avoid any
misapprehension that this opinion is intended to answer the
question of whether or not the ongoing provision of federal
benefits to Natives and federal recognition of Native villages is
appropriate.  In our view, Congress and the Executive Branch have
been clear and consistent in their inclusion of Alaska Natives as
eligible for benefits provided under a number of statutes passed
to benefit Indian tribes and their members.  Thus, we have stated
that it would be improper to conclude that no Native village in
Alaska could qualify as a federally recognized tribe.

However, this opinion does conclude that, even if certain Native
villages qualify as tribes for purposes of federal law,  Congress
clearly limited Native village exercise of sovereign jurisdiction
over lands and nonmembers in a decisive fashion.  The statutory
scheme established in ANCSA precludes the treatment of lands
received under that Act as Indian country.  The purposes of ANCSA
to develop state chartered business entities and to avoid the
establishment of any permanent reservation system, trusteeship or
other racially based institutions would be frustrated by a
determination that enclaves of federal and tribal jurisdiction
continue to exist.

I understand the significant impact of this decision.  To
conclude that areas are not Indian country greatly limits the
powers those Native villages may exercise with respect to the
establishment of courts, police powers and other sovereign
attributes that attach to jurisdiction over land.  Yet, this
opinion reflects what we believe is the best reading of the law.

Our decision on this matter is very much based on what Congress
did in ANCSA, and subsequent amendments and other legislation do
not change this conclusion.  As noted in the body of the opinion,
the exercise of Congress' authority over Indian Affairs is broad.
Should the outcome of this opinion be at variance with what

AR002270

lawmakers believe is the proper view of Native village jurisdiction, Congress is free to legislate again in this area to provide certainty.

In summary:

1.   We have rejected the notion that there are no tribes in Alaska.  Which Native villages are tribes is a fact-specific determination beyond the scope of this Opinion.  See Part III.B.

2.   ANCSA is not a termination statute.  It did not terminate tribes or the provision of federal services to Alaska Native individuals or entities.  Congress and the Executive Branch have consistently extended to Alaska Natives benefits provided to Indian tribes and their members in the contiguous 48 states. See Part IV.C.1.

3.   There is a territorial component to tribal power.  Whether a Native village has governmental powers over lands and nonmembers depends, as a threshold matter, upon the existence of Indian country.  See Part IV.C.2.a.

4.   ANCSA reflected a new approach in defining the relationship between Alaska Natives and the federal government.  ANCSA largely controls the determination whether any territory exists over which Alaska Native villages might exercise governmental powers. Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands and nonmembers.  See Part IV.C.2.

5.   Native Corporation lands in Alaska do not qualify as Indian country.  See Part IV.C.2.b.ii.

6.   ANCSA does not permit Native villages to create Indian country in Alaska by unilateral action.  Native village acquisition of former ANCSA land will not impose federal superintendence over the land that Congress in ANCSA sought to avoid.  See Part IV.C.2.b.iv.

7.   The extent of Native village governmental powers over village-owned townsite lands will depend upon the status of the village itself and upon a fact-specific inquiry as to whether the village is a dependent Indian community.  See Part IV.C.2.b.v.

8.   Although an Alaska Native allotment constitutes Indian country, there is little or no basis for a Native village to claim territorial jurisdiction over an allotment.  See Part IV.C.2.c.i.

9.   Although individually owned restricted Native townsite lots may constitute Indian country, there is little or no basis for a

132

AR002271

Native village to claim territorial jurisdiction over the lots.
See Part IV.C.2.c.iii.

*Tom Sansonetti*

Thomas L. Sansonetti
Solicitor


I concur _____          Date: January 14, 1993
                Frank A. Bracken
                Acting Secretary

133

AR002272

# Meeting August 15, 2017

DOI Attendees:

- Assoc. Dep. Sec. James Cason;
- Assoc. SOL-DIA Eric Shepard;
- DIA attorney-advisor Matthew Kelly.

Eklutna Attendees (incomplete):

- Eklutna Chairman Lee Stephan;
- Gaming Developer;
- Attorney Colin Sampson,
- Attorney Padraic McCoy

AR002537



Non-Record Material

On'do'la

8/15/17    Eklutna
EKLUTNA    1986
   Lee    Traditional jurisdictional area - 250 million sq miles - Anchorage area
           Economic needs of tribe
   JC    What do you have in mind? Is land in trust?
   (Corp):  Midpoint of national land - links Achorage + Fairbanks
           History of "stepping up" to help local govts of land needs
           NVE wants to generate their own revenue.
           NVE + Corp. promote each other Universal in AK.
               Board authorizes support
           met of Murkowski - supportive (maybe not caring?)
               asked for update on meeting of DOI
           cooperation + Corp with DOI/BLM needs in state
               Army Corps. FW
               bring a win home
   Colin Songer: Land in restricted fee. 7 miles from village.
           Req submitted since 2016. Think request is straight forward.
           All owners tribal members; maintain strong relations. Exercises
           govt. auth. over allotment.
                            ↓

Attorney Impressions

( cont.)

Onodas consented to tribal jurisdiction. Feel strongly for DOI
precedent re IL - Big Sandy, Quinault. Fairbos membership.
proximity. Und comm. of SOL - done re Samornette. "Not a
problem." Expressed doubt, over different facts: severance of
Attorney Impressions tribal relate, tribal nexus
Less concerned by subseq. developers - Big Sandy, Quinault.
- ④ Onoda equivalent to sims parcel under 16 BA.
- ④ 476 barring DOI from classifying tribes. Cardpim NVE
    gets same treatment as Big Sandy + Quinault.
- ④ Request decision by end of October, for certainty, avoid costs.

___ Onoda statement ca. 1961 from U Cal.

JC: App pending?

CS: Here in DC. SOL/ASIA office. Lease entered, @ Regional
Office pending.

JC: Ack?

CS: Reg. for ICD.

JC: How anticipate operating after? Normally, land in trust.
Here, restricted fee. Want us to take into trust?

CS: Not plan at this point. Feel ICD on BS + Q. Don't see
need.

PMc: BS "exactly same." "Same exact scenario."

JC: Sounds unusual.

PM: Diff from majority of casinos. But same arrangement.

JC: Is there a res? Own land?

CS: Has traditional village, owns fee lands.

___ Corp. also owns lands w/in village. We give them land
for their proposes. Anchorage made Village immune for
certain modern planning regs.

Lee: 1971 choice for land under ANCSA.
___ 67,000 acres in transition. Chrisie Favorite @ BLM -
Knows history of Eklutna.

Cap.: 9000 acres in Municip; 67,000 acres in Matsu, 17,000 sold
from Shroendorf AirBase.

JC: Any trust? ___ No - all fee. Hint village (NVE) in fee.

Marnell Gaming  Eklutna Corp - Curtis
Las Vegas

Econ. Dev. Introduced to NVE two years ago. Project based on coming. $530MM, couple hundred jobs. All revenue stays local, 15-20MM/yr for Tribe. Thousands of jobs over decade.

Curtis: Highest unemployment rate in years.

6D: Small class II, All Anchorage can benefit. Develop, manage, finance. Ready to go on soon as approved.

Curtis: Lynn _____ SBA, just visited. Appreciated what we're doing. Boulder, opioid facility on Eklutna land.

PM: Eklutna only tribe in area. Nearest tribe is 40 miles north.

Curtis: Murkowski staff invited us to private dinner. Sec. of Interior. Chief of staff - wants briefing. Energy briefing.

JC: Anything to say?

Richard: Tribal Administrator. Always looking for $ for tribal govt. 353 members - Barely get by of services needed now. Lack of jobs. Want training + educ. for jobs. Help develop infrastructure + government.

Curtis: Already doing expanding building.

Richard: Lots already. Mgt. training, eg.

JC: Spoken of AD re resources?

Richard: Yes, about 13 mos ago. B. Loudermilk. Thinks he backs project.

Curtis: We knew the AK folks. planned for positions here.

Jc: Secy + Murkowski working closely for Day 1. Working to select AK folks for key positions. We reached out to maintain good relats.

Anna: Speaking for children - education, opioids. Starting to get big in AK.

JC: Pending how long?

6D: Any feedback?

JC: My exp. led to gaming on trust land. You mention eg on restricted fee - have to get up to speed. This unusual to operate gaming on allotment?

PM: Function of lease to ensure tribal oversight for decades

6D: Not unusual?

SS: Different overlay in AK we're looking at.

PM: Could NIGC help?

EC: Properly here

**TRANSCRIPT**

Meeting August 15, 2017

DOI Attendees:

- Assoc. Dep. Sec. James Cason (JC);
- Assoc. SOL-DIA Eric Shepard (ES);
- DIA Attorney-advisor Matthew Kelly (MK).

Eklutna Attendees (incomplete):

- Eklutna Chairman Lee Stephan (LS);
- Gaming Developer;
- Attorney Colin Sampson (CS);
- Attorney Padraic McCoy (PM).

AR002541

| 8/15/2017 | **Eklutna** | **On'do'la** *[MK-pronunciation note]* |
|---|---|---|

[marginalia:]        **<u>Eklutna</u>**                    **1986**

Lee:                Traditional jurisdictional area 250 million square miles of Anchorage area
                   Economic needs of tribe.

James Cason:        What do you have in mind? Is land in trust?

[Corp]:             Midpoint of traditional land links Anchorage + Fairbanks

                   History of "stepping up" to help local govts w/ land needs.

                   NVE wants to generate their own revenue.

                   NVE + Corp promote each other – unusual in AK.

                       Board authorizes support

                       Met w/ Murkowski - supportive (maybe not gaming?)

                           asked for update on meeting with DOI

                       cooperation of Corp. with DOI/BLM needs in state.

                           Army Corps, FW

                           bring a win home.

Colin Sampson:      Land in restricted fee. 7 miles of village.

                   Req. submitted sometime in 2016. Think request is straight-forward.

                   All owners tribal members; maintain strong relations.  Exercises govtl.
                   Auth over allotment.

                   Ondolas consented to tribal jurisdiction. Feel squarely w/in DOI
                   precedent re IL - Big Sandy, Quinault.  [*Illegible*]; membership, proximity.

2

| | |
|---|---|
| * | Had comms w/ SOL – issue re Sansonetti. "Not a problem." Expressed doubt, over different facts:  severance of tribal relats, tribal nexus [REDACTED ATTY IMPRESSIONS]. Less concerned by subseq develops – Big Sandy, Quinault. |
| * | Ondala Equivalent to trust parcel under IGRA. |
| * | 476 barring DOI from classifying tribes. Confirms NVE gets same treatment as Big Sandy + Quinault. |
| * | Request decisions by end of October. For certainty, avoid costs. |
| _____: | Ondala statement ca. 1961 from U Cal. |
| James Cason: | App pending? |
| Colin Sampson: | Here in DC. SOL/AS-IA office. Lease entered, @ Regional Office pending. |
| James Cason: | Ask? |
| Colin Sampson: | Req. for ILD. |
| James Cason: | How anticipate operating after?  Normally, land in trust. Here, restricted fee. Want us to take into trust? |
| Colin Sampson: | Not plan at _____ point.  Feel ILD on BS + Q. Don't see need. |
| Padraic McCoy: | BS "exactly same." "Same exact scenario." |
| James Cason: | Sounds unusual. |
| Padraic McCoy: | Diff from majority of casinos. But same arrangement. |
| James Cason: | Is there a rez? Own land? |
| Colin Sampson: | Has traditional village, owns fee lands. |
| _____: | Corp. also owns land w/in village. We give them land for their programs. Anchorage made Village immune for certain modern planning requirements. |
| Lee: | 1971 choice for land under ANCSA . |
| Corp.: | 67,000 acres "in transition." Christie Favorite @ BLM – knows history of Eklutna. |
| | 9000 acres in Municip; 67,000 acres in Matsu; In 17,000 acres (owed)from Elmendorf Air Base. |

AR002543

| James Cason: | Any trust? CS – No – all fee. Hist village (NVE) is fee. |
|---|---|
| [marginalia:] | **Marnell Gaming Las Vegas**　　　　**Eklutna Corp - Curtis** |
| Gaming Developer: | Econ. Dev. Introduced to NVE two years ago. Project based on community. $30MM. Couple hundred jobs. All revenue stays local. 15 - $20MM/yr for Tribe. Thousands of jobs over decade. |
| Curtis: | Highest unemployment rate in years. |
| Gaming Developer: | Small class II. All Anchorage can benefit. Develop, manage, finance. Ready to go in as soon as approved. |
| Curtis: | Lynn _____, SBA just visited. Appreciated what we're doing. Building opiate facility on Eklutna land. |
| Padraic McCoy: | Eklutna only tribe in area. Nearest tribe is 40 miles north. |
| Curtis: | Murkowski staff invited us to a private dinner Sat, w/ Zinke staffers - wants briefings. Energy briefing. |
| James Cason: | Anything to say? |
| Richard: | Tribal Administrator. Always looking for $ for tribal govt. 353 members. Barely get by with services needed now. Lack of jobs. Want training + educ for jobs. Help develop infrastructure + government. |
| Curtis: | Already doing capacity building. |
| Richard: | Lots already. Mgt. training, e.g. |
| JC: | Spoken w/ RD re resources? |
| Richard: | Yes. About 13 mos ago B. Loudermilk. Thinks he backs project. |
| Curtis: | We know the AK folks planned for permissions here. |
| James Cason: | Secy + Murkowski working closely from Day 1.  Working to select AK folks for key positions.   We reached out to maintain good relats. |
| Anna: | Speaking for children - education, opioids. Starting to get big in Alaska. |
| James Cason: | Pending how long? |
| Gaming Developer: | Any feedback? |
| James Cason: | My exp. ltd. To gaming on trust land. You mention e.g. on restricted fee – have to get up to speed. Also unusual to operate gaming on allotment? |
| Padraic McCoy: | Function of lease to ensure tribal oversight for decades. |

4

AR002544

| | |
|---|---|
| Gaming Developer: | Not nonsensical? |
| Eric Shepard: | Different overlay in AK we're looking at. |
| Padraic McCoy: | Could NIGC help? |
| Eric Shepard: | Properly here. |

AR002545

# Telephone Call December 11, 2017

DOI Participants:

- Assoc. SOL-DIA Eric Shepard;
- DIA-BEL Assistant Solicitor Jennifer Turner
- DIA-BEL attorney-advisor Matthew Kelly.

Eklutna Participants (incomplete):

- Anthony Marnell, Marnell Gaming
- Kerry Doyle [Marnell Gaming?]
- Attorney Colin Sampson
- Attorney Vanessa Ray-Hodge
- Attorney Padraic McCoy

AR002546

# Non-Record Material

NVE Call   12/11/2017

Anthony Marnell - Marnell Gaming; Keren; Doyle; Colin; Vanessa; Padraic;

VRH: ES had more Qs re our analysis. Have not of Young, who said DOI has Qs/concerns. Don't know what that means.

ES: Wrapping up offReg memo. Have some Qs re records.
1) 1950 - NVE land claims - include Site?
    CH - Think no. Will confirm + get back.
2) Have you looked at acquiring Site in restricted fee?

V: Is that b/c you think there's issues of allotment?

ES: I mind in the fundamental Q here "Options" generally.

V: Don't know if we can get you answer on that. Considerations re allowed economic development.

ES: What's next steps re lease?

CH: Submitted to BIA Anchorage. Provided comments to NVE. Spoke w/ Van, who said DC reviewing comments for Anchorage.

④ Put on the side til ILD finished. Waiting for guidance.

JT: Has NEPA been done?

CH: No. Very early stages of reviews process. Troy Woodward has the lease. Never told it was active.

JT: Right. Eligibility first & eligible, then lease issues. Gaming leases approved by ASIA

ES: Our next steps. Finalizing options. Get your thoughts incorporate into memo.

V: Will get back in next couple of days re Qs.

PM: Met Caron, August, said determination by 12/31.

ES: Moving quickly.

PM: Not know how long front office will take.

JT: E.g, client says no, Tribe may want writing to see. You want to find, still need lease. We think about how to go forward. What kind of written response you want.

Anthony: Either way, NVE wants it in writing.

JT: News of leaving.

Anthony: Re purchase option

AR002547

**Telephone Call December 11, 2017**

DOI Participants:

- Assoc. SOL-DIA Eric Shepard
- DIA-BEL Assistant Solicitor Jennifer Turner
- DIA-BEL Attorney-advisor Matthew Kelly

Eklutna Participants (incomplete):

- Anthony Marnell, Marnell Gaming
- Kerry Doyle [Marnell Gaming?]
- Attorney Colin Sampson
- Attorney Vanessa Ray-Hodge
- Attorney Padraic McCoy

NVE Call        12/11/2017

Anthony Marnell-Marnell Gaming, Kerry Doyle; Colin, Vanessa, Padraic;

| | |
|---|---|
| Vanessa Ray-Hodge: | ES has some Qs re our analysis. Have met w/ Young, who said it DOI has Qs/concerns. Don't know what that means. |
| Eric Shepard: | Wrapping up options memo. Have some Qs re records. |
| | 1) 1950- NVE land claims-include Site? |
| | CH- Think so. We'll confirm + get back. |
| | 2) Have you looked at acquiring Site in restricted fee? |
| Vanessa Ray-Hodge: | Is that b/c you think there's issue with allotment? |
| Eric Shepard: | Jurisd. is the fundamental Q here. "Options" generally. |
| Vanessa Ray-Hodge: | Don't know if we can get you answer on that. Considerations re allottee economic development. |
| Eric Shepard: | What's next step re lease? |

6

AR002548

| | |
|---|---|
| CH: | Submitted to BIA Anchorage. Provided comments to NVE. Spoke w/ Van, who said DC receiving comments from Anchorage. |
| * | Put on the side til ILD finished. Waiting for guidance. |
| Jennifer Turner: | His NEPA been done? |
| CH: | No. Very early stages of review process. Troy Woodard has the lease. Never told it was active. |
| Jennifer Turner: | Right. Eligibility first. If eligible, then lease issues. Gaming leases approved by ASIA. |
| Eric Shepard: | Our next steps. Finishing options. Get your thoughts. Incorporate into memo. |
| Vanessa Roy-Hodge: | Will get back in next couple of days re Qs. |
| Padraic McCoy: | Met Cason, August, said determination by 12/31. |
| Eric Shepard: | Moving quickly. |
| Padraic McCoy: | Not know how long front office will take. |
| Jennifer Turner: | E.g., client says no, Tribe may want writing to sue. Yes won't be final, still need lease. Let's think about how to go forward, what kind of written response you want. |
| Anthony Marnell: | Either way, NVE wants it in writing. |
| Jennifer Turner: | News of leaving. |
| Anthony Marnell: | Re purchase option. |

AR002549

# Telephone Call April 3, 2018

DOI Participants (incomplete):

- Assoc. Dep. Sec. James Cason
- Senior Advisor Steve Wackowski
- DIA-BEL attorney-advisor Matthew Kelly.

Eklutna Participants (incomplete):

- Anthony Marnell, Marnell Gaming
- Kaleb Froehlich, Holland & Hart
- Attorney Colin Sampson
- Attorney Padraic McCoy

AR002550



Non-Record Material

AK - EKLUTNA                                                      NVE    Richard
4/3/2018    Caller Frolich    Colin Hampin    Steve Wilkowski
            Aubrey   Maxwell   P McCoy    J Caser (phone)
            Re June 2016 ILO request
            25 Kft    8ac    500-600    Class II games    small gaming
            Support for delegation; support for Governor, Lt. Gov, Mayor Ach.
            Murkowski is neutral - SW - Her COS will be here tomorrow; her
            objection in mind, but supports econ. self-determination
            AK already has pull tabs + bingo
            Simply want an answer after 7 years one way or the other
            Bipartisan support of elected officials
            Mgt. agt pending @ NIGC, lease pending @ BIA

        C#: Big Sandy had same arrangement. Saugua Johns, too.
            Too DOI obligated by P+I to treat tribes same; those apply
            here. So must apply Big Sandy + Saugua Johns here.
            P+I superseded ANCSA

AR002551

**Telephone Call April 3, 2018**

DOI Participants (incomplete):

- Assoc Dep. Sec. James Cason
- Senior Advisor Steve Wackowski
- DIA-BEL Attorney-advisor Matthew Kelly

Eklutna Participants (incomplete):

- Anthony Marnell, Marnell Gaming
- Kaleb Froehlich, Holland & Hart
- Attorney Colin Sampson
- Attorney Padraic McCoy

| | |
|---|---|
| AK Eklutna | [Marginalia]   NVE Richard _____ |
| 9/3/2018 | Caleb Froehlich, Colin Hampson, Steve Wackowski, Anthony Marnell P. McCoy J Cason (phone) |
| | Re June 2016 ILO request. |
| | 25Kft, 8 ac 500-600 Class II games, small gaming. |
| | Support from delegation, support from Governor, Lt. Gov., Mayor Anch. |
| | Murkowski is neutral – SW – her COS will be here tomorrow: her objection is moral, but supports economic self-determination |
| | AK already has pull tabs + bingo |
| | Simply want an answer after 2 years one way or the other. |
| | Bipartisan support of elected officials. |
| | Mgt agt pending @ NIGC, lease pending @ BIA. |
| | Big Sandy had same arrangement. Sampson Johns, too. |
| CH: | DOI obligated by P&I to treat tribes same; those apply here. So must apply Big Sandy + Sampson Johns here. |
| | P&I suspended ANCSA. |

AR002552

# Meeting April 4, 2018

DOI Participants (incomplete):

- Assoc. Dep. Sec. James Cason
- Acting PDAS John Tahsuda III
- Senior Advisor Steve Wackowski
- Dep Sol-DIA Kyle Scherer
- DIA-BEL attorney-advisor Matthew Kelly.

Alaska Participants (incomplete):

- AK State Rep. Dan Ortiz
- Representatives of AK Governor's Office



ALASKA
4/6/2018   2 issues   1 NUE  + 2 [Non-Record Mat.]

Q   Dawn: DH supportive of project NUE
     willing to help w/ legal dynamics however

MB: Murkowski
     - concern for gaming effects statewide / state-local action
     - not a fan of gaming
     Sullivan - neutral
     Gov - neutral

JC: Now examining. largely done - few things to be finished
     other AK issues may affect
     pretty near future - next couple of months

Non-Record Material

**Meeting April 4, 2018**

DOI Participants (incomplete):

- Assoc. Dep. Sec. James Cason
- Action PDAS John Tahsuda III
- Senior Advisor Steve Wackowski
- Dep SOL-DIA Kyle Scherer
- DIA-BEL Attorney Advisor Matthew Kelly

Alaska Participants (incomplete):

- AK St Rep. Dan Ortiz
- Representatives of AK Governor's Office

ALASKA

4/13/2018                    2 Issues   1 NVE + 2 [REDACTED]

1.          Ortiz:   DY supportive of project NVE

                   willing to help re legal dynamics however

            MB:   Murkowski

                        - concerns for gaming effects statewide / state-level action

                        - not a fan of gaming

                   Sullivan- neutral

                   Gov -neutral

            James Cason: Now examining – largely done - few things to be finished

                   -   other Alaska issues may affect
                   -   pretty new future- next couple of months.

2.  REDACTED

AR002555