UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIVE VILLAGE OF EKLUTNA,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>        Defendants,<br><br>and<br><br>STATE OF ALASKA,<br><br>        Defendant-Intervenor. | Case No. 1:19-cv-02388-DLF |

**REPLY IN SUPPORT OF MOTION FOR LEAVE TO TAKE EXTRA-RECORD DISCOVERY AND TO COMPEL PRODUCTION OF DOCUMENTS NOT INCLUDED IN ADMINISTRATIVE RECORD AS PRODUCED**

The Native Village of Eklutna ("Tribe") has presented significant evidence of political influence on the Department of Interior's decision regarding the Tribe's request for an Indian lands determination. The State of Alaska and the Federal Defendants attempt to downplay this evidence, suggesting that because the Department's decision contained legal reasoning that did not overtly discuss political considerations, it could not have been influenced by political concerns. *See* ECF No. 41 ("State Opp."); ECF No. 42 ("Fed. Opp."). But this attempt to leap to the merits stage is not the proper focus of the inquiry here, nor is that argument borne out by the facts or the case law. The Tribe presented unrebutted evidence that Defendant Cason sought the views of the Alaska Delegation, and that he later told representatives of the Alaska Delegation (but not the Tribe) that the decision would be affected by "other Alaska issues" unrelated to the proper considerations under the Indian Gaming Regulatory Act. Contrary to the Defendants'

1

assertions, the Tribe has made the necessary strong showing of improper agency behavior, warranting production of deliberative materials and additional extra-record discovery at this stage.

## I. THE TRIBE HAS MADE THE NECESSARY SHOWING TO WARRANT PRODUCTION OF DELIBERATIVE MATERIALS AND OTHER DISCOVERY

### A. Legal Standard

Both the State and Federal Defendants acknowledge that a plaintiff is entitled to extra-record discovery and production of deliberative materials in an action under the Administrative Procedure Act ("APA") if the plaintiff has made a strong showing of bad faith or improper agency behavior. State Opp. 3; Fed. Opp. 8. The Federal Defendants emphasize that deliberative materials are not typically part of the administrative record under D.C. Circuit law, *see, e.g.*, Fed. Opp. 10, 12, but that standard only applies where there has *not* been a showing of bad faith or improper behavior, and thus it is not the proper rule to apply here. The Federal Defendants quote *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency* for the proposition that "the actual subjective motivation of agency decisionmakers is immaterial as a matter of law." Fed. Opp. 10 (quoting 156 F.3d 1279, 1279 (D.C. Cir. 1998)). But they conspicuously omit the rest of the sentence in which that quote appears, which continues, "—unless there is a showing of bad faith or improper behavior." 156 F.3d at 1279-80. Accordingly, where such a showing has been made, as is the case here, the subjective motivation of the decisionmakers *is* relevant and deliberative materials must be included in the administrative record.[1] *See also, e.g.*, *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019)

---

[1] The *In re Subpoena Duces Tecum* decision therefore explained that "the deliberative process privilege is unavailable [in] those circumstances in which the cause of action is directed at the agency's subjective motivation." 156 F.3d at 1280. While the Federal Defendants note that the Department has not yet specifically asserted the deliberative process privilege, *see* Fed. Opp. 11, the two concepts are analytically similar, *see, e.g.*, *In re Subpoena Duces Tecum*, 156 F.3d at

2

("*[A]bsent a showing of bad faith or improper behavior*, agency deliberations not part of the record are deemed immaterial." (emphasis added) (quotation and alteration omitted)).

The Federal Defendants and the State strive to hold the Tribe to an impossible—and incorrect—standard, failing to acknowledge that the requisite "strong" or "significant" showing at the discovery stage does not require a plaintiff to *prove* improper behavior. This is, of course, the key distinction between the discovery stage and the merits stage. At the discovery stage, the plaintiff need only show a sufficient likelihood that it "*will find* material in the agency's possession indicative of bad faith or an incomplete record," *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011) (citing, *inter alia*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971))," which opens the door to limited discovery of information that may (or may not) allow the plaintiff to prove its case at the merits stage. If the agency were permitted to withhold all deliberative material and block any discovery—even where the plaintiff has made a claim of improper political influence and a significant showing of grounds to support that claim—courts would never be able to accurately assess a claim of improper influence. For this reason courts *do* allow limited discovery in cases challenging an agency's subjective reasons for reaching a decision. As one court explained, "[r]ealistically, . . . a court cannot require a plaintiff to present *conclusive* evidence of political improprieties" before being allowed access to any discovery that might show those

---

1279-80. Thus, where a showing of improper political influence makes deliberative material relevant, by the same token the deliberative process privilege does not apply. *See, e.g.*, *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) ("[W]here there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied."); *New York v. Salazar*, 701 F. Supp. 2d 224, 238 (N.D.N.Y. 2010) ("[B]ecause the DOI's decision-making process is at the heart of this action, I find that the deliberative process privilege imposes no restriction on plaintiffs' access to pre-decisional materials, and all documents withheld from the administrative record on this basis must therefore be produced.").

improprieties.  *New York v. Salazar*, 701 F. Supp. 2d 224, 243 (N.D.N.Y. 2010) (emphasis added); *see also, e.g.*, *Schaghticoke Tribal Nation v. Norton*, No. 3:06CV81(PCD), 2006 WL 3231419, at *4 (D. Conn. Nov. 3, 2006) ("[I]t is improper to require the moving party to come forward with conclusive evidence of political improprieties at a point when they are seeking to discover the extent of those improprieties." (internal quotation and alteration omitted)).  The rule requiring a showing of sufficient "grounds to suspect bad faith or improper behavior" before obtaining discovery, therefore, properly prevents unfounded fishing expeditions while allowing plaintiffs and courts access to the information necessary to assess a valid claim of improper influence or other improper agency behavior.  *See Cmty. Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983).

   The Federal Defendants and the State are also wrong to suggest that consideration of political viewpoints does not constitute improper agency behavior in the context of an Indian lands determination, relying on language from the Supreme Court's recent decision in *Department of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019); *see* Fed. Opp. 18, 23, State Opp. 3.  In that case, the Court explained that in the context of a policy decision like the census question at issue in that case, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."  139 S. Ct. at 2573.  But as the Court's own words suggest, the broadly applicable "policymaking decision" in that case was entirely different from the type of individualized determination at issue this case, which is equivalent to an agency adjudication and consists solely of applying the law to a set of facts.[2]  Here, as the Tribe previously explained,

---

[2] Even in the policymaking context of *New York v. Department of Commerce*, the Court did not suggest that this principle gives agencies carte blanche to consider political views; rather, the Court vacated the agency's action precisely because it was a pretextual decision designed to

4

consideration of political views is improper if it leads the agency "to rely on considerations not made relevant by Congress in the IGRA." *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 63 (D.D.C. 2019) (quotation omitted). And because 25 U.S.C. § 2703(4)(B) leaves no room for political viewpoints, the agency may not rely on political considerations in making an Indian lands determination. *See* ECF No. 36 ("Motion") at 13. Thus, contrary to the State and Federal Defendants' assertions, dictum from *New York v. Department of Commerce* involving an entirely different type of agency decision does not give the Department of the Interior a free pass to consider political views here.

B. **The Tribe Has Made a Strong Showing of Improper Behavior**

Under this standard, the Tribe has made a sufficiently strong showing of improper agency behavior and bad faith to overcome the presumption of regularity and warrant extra-record discovery. The Federal Defendants attempt to discredit the Tribe's declarants and downplay the evidence that does not support the government's version of events. But the Defendants' arguments fail to grapple with key pieces of evidence. When viewed as a whole, the facts presented by the Tribe amply support a showing of improper political influence.

1. *The Defendants Have Not Rebutted the Tribe's Evidence of Improper Political Influence.*

First, the record establishes unequivocally that high-level Department employees met with Alaska political officials and discussed the Tribe's request on at least one occasion shortly before the Department's decision was issued. AR 2553-55 (ECF No. 42-1 at 107-09).[3] The

---

obscure the actual political motivations behind the agency's action. 139 S. Ct. at 2575. In doing so, the Court noted that it is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quotation omitted).

[3] The Tribe's Motion and this reply memorandum cite various portions of the administrative record that has been produced by the Department thus far. Many of these record documents are included as attachments to the Federal Defendants' opposition, ECF No. 42-1. Additional record

Tribe has also presented evidence of other communications between Senator Murkowski's office and the Department. ECF No. 36-1 (Farber Decl.) ¶ 13. In attempting to downplay this evidence, the Department disingenuously contends there is no evidence of "a statement from the Senator's office opposing the Tribe's application [that] was actually conveyed to Interior." Fed. Opp. 20-21. But, in fact, the record shows just that. At the April 4, 2018 meeting, Senator Murkowski's representative stated that the Senator had "concerns for gaming effects statewide / state-level action" and was "not a fan of gaming." AR 2555 (ECF No. 42-1 at 109). Senator Murkowski's representative made these statements specifically during the discussion of the Tribe's request. *Id.* While one attorney who attended the meeting now says he does not recall Senator Murkowski making a direct demand for a negative determination on the Tribe's request, this is hardly conclusive evidence that the Senator did not exert pressure or that the Department was not swayed by her views. ECF No. 42-15 (Kelly Decl.) ¶ 25. Indeed, the declarant admits there are other elements of this meeting he does not recall. *Id.* ¶ 23(b), (d). And the *only* statements by Senator Murkowski's representative reflected in the meeting notes express negative views of the Tribe's request. AR 2555 (ECF No. 42-1 at 109). That the Department and the Tribe had *previously* discussed that Senator Murkowski's position was believed to be neutral, as the Federal Defendants emphasize, Fed. Opp. 20; *see* AR 2552 (ECF No. 42-1 at 106), does not change the fact that Senator Murkowski's office *actually* expressed negative views directly to the Department at the April 4 meeting, *see* AR 2555 (ECF No. 42-1 at 109).[4]

---

documents that are substantively cited in the Tribe's Motion or this memorandum, but are not included in the Federal Defendants' exhibit, are attached hereto as Exhibit 1. For the sake of brevity, the Tribe is not attaching documents that are *not* substantively cited herein; these documents can be referenced by title in the administrative record indices filed by the Department, ECF Nos. 28-2, 31-2.

[4] The Federal Defendants mischaracterize the Tribe's motion as alleging that the Tribe was unaware of Interior's meeting with Senator Murkowski's staff. Fed. Opp. 20. But the Tribe's

Moreover, the record also shows that the Department expressed a willingness to actively consider views and issues beyond those "made relevant by Congress" in § 2703(4)(B). *See Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d at 63. The notes of the April 4, 2018 meeting reflect Defendant Cason specifically saying that "other Alaska issues may affect" the Department's decision, indicating that the outcome might be affected by factors beyond the proper scope of an Indian lands determination. AR 2555 (ECF No. 42-1 at 109). This statement by Defendant Cason strongly supports the Tribe's position that the Department was influenced by improper considerations, and the Federal Defendants' arguments have done nothing to show otherwise. The Federal Defendants vaguely suggest, in passing, that this statement relates to the Alaska-specific nature of the Tribe's request. Fed. Opp. 16. But this contention ignores the clear import of the word "other" in the statement "*other* Alaska issues may affect," AR 2555 (ECF No. 42-1 at 109), which strongly suggests that outside considerations were at play.

Defendant Cason's statement at the April 4, 2018 meeting is also consistent with his earlier statements to the Tribe and its representatives, as reflected in the evidence presented by the Tribe. Two of the Tribe's representatives recall Defendant Cason directly stating at the August 15, 2017 meeting that he would need to know the views of the Alaska Delegation, and their support would be needed. Farber Decl. ¶ 9 (ECF No. 36-1); Marnell Decl. ¶ 6 (ECF No. 36-2). The fact that a Department attorney does not recall this particular statement, and did not mention it in his notes from the meeting, does not directly show that such a statement was not made. Notably, the Kelly declaration does not affirmatively state that such a statement was

---

points are that the meeting—and the discussion of the Tribe's request with political officials—occurred, and the Tribe "was not present at this meeting but learned about it through informal conversations with Department staff," which is accurate. *See* Motion 16. The Federal Defendants' attempts to call this statement into question are a red herring. *See* Fed. Opp. 20.

never made.  Thus the only concrete evidence in the record are the statements made by the Tribe's representatives, both of whom recall Defendant Cason making this statement.[5]  The Federal Defendants also argue that it was the Tribe that first broached the subject of Senator Murkowski and the Alaska Delegation at the August 15 meeting, suggesting an inference that the Department itself was not actively seeking the Delegation's views.  Fed. Opp. 19.  But even before the August 15, 2017 meeting—and before the Tribe had any contact with the Delegation on this issue—a member of the Solicitor's Office had confirmed to the Tribe that he was certain Defendant Cason and other political appointees would seek the views of the Alaska Delegation.  *See* Ex. 2 (Ray-Hodge Decl.) ¶¶ 4-5.  The Department's subsequent actions confirmed this view, including Defendant Cason's statement at the August 15, 2017 meeting.

Similarly, the Tribe presented evidence that Department employees told tribal representatives that the Department was seeking Senator Murkowski's views and that the Senator communicated her negative views to the Department.  Farber Decl. ¶ 13 (ECF No. 36-1).  This evidence is unrebutted.  The Federal Defendants point out that Senator Murkowski did not express a negative opinion directly to the Tribe until May 2018, and they suggest these two facts are incongruous but do not explain why that is so.  In fact, there is nothing implausible about a situation in which—as the evidence demonstrates here—Senator Murkowski said she would be remain neutral in her communications to the Tribe until almost the end of the decisionmaking process, while simultaneously expressing her negative views to the Department in separate

---

[5] The Federal Defendants take issue with the fact that the Farber Declaration and the Marnell Declaration use similar language to describe this meeting.  Fed. Opp. 21.  But both declarations are sworn statements in which the declarants affirm to this Court that they recollect the events described.  Merely using similar language does not negate a declarant's sworn statement, made pursuant to 28 U.S.C. § 1746, that the facts described "are true to the best of [the declarant's] knowledge, information, and belief."  *See* Farber Decl. ¶ 1; Marnell Decl. ¶ 1.

8

communications that did not involve the Tribe.  The fact that other members of the Alaska Delegation were neutral or supportive of the Tribe's request, as the Federal Defendants note, *see* Fed. Opp. 23, does not negate the Tribe's showing that the Department was swayed by Senator Murkowski's negative views.  As Alaska's senior senator and the Chair of the Senate Energy and Natural Resources Committee as well as the appropriations subcommittee that controls the Department's budget, *see* Motion at 18 n.7, Senator Murkowski held unique power with respect to the Department.

      The Department's attempts to undermine the Tribe's evidence on the timing of the decision are similarly unavailing.  Although the attorney notes in the record from the August 15, 2017 meeting do not specifically reflect the Department making a commitment to reach a decision by the end of calendar year 2017, again the Tribe has provided unrebutted evidence that Defendant Cason made this statement.  Farber Decl. ¶ 9 (ECF No. 36-1); Marnell Decl. ¶ 6 (ECF No. 36-2).  Moreover, the attorney notes in the record *do* reflect the Tribe stating during a December 11, 2017 phone call that Defendant Cason had said the Department would issue a "determination by 12/31."  AR 2549 (ECF No. 42-1 at 103).  This record evidence fits with the tribal representatives' recollections of Defendant Cason's statement at the August 15 meeting.  At the time of the December 2017 phone call, the Department staff on the call did not suggest otherwise; rather, the Department attorneys said they were "[w]rapping up" their options memorandum and were "moving quickly."  AR 2548-49 (ECF No. 42-1 at 102-03).  Although the Department had some remaining questions regarding factual records at that time, *see id.*, the Tribe responded to the Department's questions within one week, AR 2114-21.  There was no indication from the Department that it anticipated another *six months' delay* before reaching a decision on a request that had already been pending for a year and a half.  Nor did the

Department's representatives on the April 3, 2018 phone call provide any explanation for the delay or suggest that they had any lingering questions that were holding up the decision. *See* AR 2552 (ECF No. 42-1 at 106).

Now, rather than providing any legitimate explanation for the delay, the Department points to other Indian lands determinations that have taken a similarly long time for the Department to issue. Fed. Opp. 29. But vaguely pointing to other cases cannot explain the delay in *this* case, particularly where the Department indicated that it would reach a decision by the end of 2017 and then provided no explanation for its failure to do so. This timeline, especially when combined with the Tribe's evidence that the Department may have delayed its decision in response to a request from Senator Murkowski and based on other Alaska issues, Farber Decl. ¶ 13 (ECF No. 36-1), supports the Tribe's showing of improper influence in the Department's decisionmaking process.

    2. *The Tribe's Evidence Makes a Sufficient Showing of Improper Political Influence.*

Taken together, the evidence presented by the Tribe makes a strong showing of improper political influence and bad faith, even if the Tribe does not yet possess *conclusive* evidence of the improper influence that occurred. The State and the Federal Defendants attempt to distinguish other cases in which courts found a showing of improper agency behavior, arguing that the evidence of improper influence was stronger in those cases than it is here. They emphasize, for instance, that there is no evidence of White House involvement or conclusive evidence that the Department "suddenly reversed course from a plan to approve the Tribe's request," as there was in *Sokaogon Chippewa Community v. Babbitt*, 961 F. Supp. 1276, 1287-88 (W.D. Wis. 1997); *see* Fed. Opp. 26; *see also* State Opp. 4-6. But the case law on improper political influence does not suggest that a particular set of circumstances must be present;

instead, courts look to whether the circumstances "all together establish a *prima facie* case." *See Stand Up for California! v. U.S. Dep't of Interior*, 315 F. Supp. 3d 289, 296 (D.D.C. 2018). Thus, "courts 'should not overlook plausible, competing inferences that might be drawn from the evidence presented,'" particularly where events in "combination [may] raise[] substantial suspicion.'" *Id.* at 298 (quoting *Sokaogon Chippewa Cmty.*, 961 F. Supp. at 1286) (second alteration in original).

In fact, as described above, the evidence here *does* suggest that the timing and outcome of the Department's decision were directly influenced by Senator Murkowski's negative views, bearing similarities to the last-minute shift that occurred in *Sokaogon Chippewa*. *See* Motion at 16-20; *see also supra* at 6-10. And the record shows that Senator Murkowski directly communicated her negative views to the Department's senior decisionmakers, similar to at least one other case in which Department officials had "private meetings and conversations with a United States Senator" and other political officials. *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 64 (D.D.C. 2019).[6]

Even if the record at this stage did not present as many separate pieces of evidence as existed in some of the other cases—and we do not so concede—the standard for improper political influence is not simply a question of tallying up the number of political contacts that

---

[6] While the decision in *Connecticut v. Department of the Interior* did not involve a discovery request, the Federal Defendants are wrong to suggest that the case is irrelevant. Fed. Opp. 25. To the contrary: in order to show that its claim of improper political influence could survive a motion to dismiss (and thus to be granted leave to amend the complaint to add this claim) the Tribe was required to show that its allegations presented a plausible claim of improper political influence. 363 F. Supp. 3d at 63-65. Because of the procedural posture in that case, the Tribe was not required to prove the truth of its allegations at that stage, but the types of conduct the Tribe alleged—which the court found adequate to state a claim of improper political influence—are directly relevant to the question of what conduct rises to the level of improper political influence.

occurred.  Rather, the political influence inquiry looks at (1) whether "political pressure was applied to the agency's decisionmakers," a broad standard that does not require any particular piece of evidence or type of influence, and (2) whether that pressure "caused those decisionmakers to rely on improper factors."  *Id.* at 63-64 (citing *Aera Energy LLC v. Salazar*, 642 F.3d 121, 221 (2d Cir. 2011); *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1529 (D.C. Cir. 1994)).  Here, unlike in most other political influence cases, the Tribe has presented direct evidence that Defendant Cason actually expressed a willingness to consider factors beyond the legal and factual considerations relevant to § 2703(4)(B).  AR 2555 (ECF No. 42-1 at 109); Faber Decl. ¶ 9 (ECF No. 36-1); Marnell Decl. ¶ 6 (ECF No. 36-2).  The Tribe has therefore made a significant showing of both prongs of the improper political influence inquiry, demonstrating a likelihood "that it will find material in the agency's possession" indicating improper political influence, thereby justifying extra-record discovery.  *Air Transp. Ass'n of Am.*, 663 F.3d at 487–88 (internal citation omitted).

Finally, both the State and the Federal Defendants argue that the Department was not influenced by improper political considerations because the final written decision contained legal reasoning based on Departmental precedent and did not mention political considerations.  Fed. Opp. 14-18; State Opp. 7.  But even a decision buttressed by extensive legal reasoning may be invalid if it does not reflect the true reasons for the agency's decision.  Indeed, even where it is ultimately revealed that improper political considerations were involved, agency decisions rarely allude to any such influence.[7]  That is the very nature of a pretextual decision.  And that was

---

[7] It is therefore entirely unsurprising that the Department's written decision does not reference the political considerations that fall outside the scope of § 2703(4)(B).  The absence of this discussion in the written decision, *see* Fed. Opp. 17, cannot be taken as evidence that the agency did not consider improper political factors.

12

precisely the situation in *New York v. Department of Commerce*, in which the Supreme Court concluded that evidence of improper agency behavior not only warranted extra-record discovery but also required vacating the agency's decision. 139 S. Ct. at 2574-75. While that case did not involve a claim of improper political influence *per se*, the Court concluded that the agency's written decision was pretextual and the actual decision had been driven by political concerns not addressed in the written decision. *Id.* at 2575. The pretextual decision and the Court's analysis of the threshold for inquiring into the mental processes of agency decisionmakers are therefore directly relevant here: they demonstrate that inquiry into decisionmakers' subjective motivations is warranted where—as here—evidence suggests that the written rationale for the agency's decision was not the agency's true reason for reaching that decision.

The mere fact that the Department's negative determination is consistent with a 25-year-old *draft* decision on the Ondola Allotment, *see* Fed. Opp. 15; State Opp. 2, similarly fails to establish the absence of political considerations influencing that the Department's current decision. The 1995 draft decision, which stretched to barely two pages, included only limited legal analysis and was withdrawn the following day.[8] *See* ECF No. 42-6 at 2-3 (draft opinion); AR 968 (Ex. 1 at 2) (withdrawal letter).[9] By the Department's own terms, therefore, the "opinion was not finalized," would "not be issued," and was accordingly "not binding." AR 968 (Ex. 1 at 2). It is thus self-evident that the draft opinion cannot serve as any basis or justification

---

[8] The draft opinion was withdrawn when the Department learned that the Tribe had previously withdrawn its request for a determination (though the Tribe's correspondence did not reach the Department until after it had already sent the draft opinion to the National Indian Gaming Commission). AR 968 (Ex. 1 at 2).

[9] Although the Federal Defendants included it as a separate exhibit, the draft opinion is also included in the administrative record at AR 964-66, as the Tribe submitted both the draft opinion and the withdrawal letter as exhibits to the initial request. *See* ECF No. 42-1 at 34 (exhibit list); ECF No. 28-2 (AR index).

for the Department's decision in the current case, and the Defendants' failure to mention the withdrawal of this draft opinion raises significant questions. Even if the 1995 draft opinion had been finalized, there have been significant developments in the law during the intervening 25 years, including a federal court decision holding that the Department may not treat Alaska tribes' trust applications differently from applications in the lower-48 states, and the subsequent elimination of the "Alaska exception" in the Department's trust land regulations. *Akiachak Native Cmty. v. Salazar*, 935 F. Supp. 2d 195 (D.D.C. 2013), *vacated as moot*, 827 F.3d 100 (D.C. Cir. 2016); Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888 (Dec. 23, 2014). While the Court need not—and indeed should not—evaluate the merits of the Department's final decision at this stage, these developments are relevant in showing that the Department may not dodge the Tribe's improper influence claim by relying on a 25-year-old draft opinion written against a very different legal backdrop.

In the end, the assertions of the State and Federal Defendants fail to undermine the Tribe's facts demonstrating improper political influence, which together make the requisite showing to warrant extra-record discovery.

## II. PRODUCTION OF DELIBERATIVE MATERIALS AND EXTRA-RECORD DISCOVERY ARE BOTH APPROPRIATE HERE.

Given the strong showing of improper political influence, the Tribe is entitled to production of deliberative materials that the agency has thus far withheld from the record, as well as extra-record discovery including depositions and interrogatories.

The Tribe has shown that Department officials repeatedly sought, received, and relied on politicians' views in reaching its decision on the Tribe's request. *Supra* at 5-10. This showing of improper political influence triggers the exception to the general principle that deliberative materials are not part of the administrative record. *In re Subpoena Duces Tecum*, 156 F.3d at

1279-80.  Because the general rule only applies "absent a showing of bad faith or improper behavior," *Oceana*, 920 F.3d at 865 (citing *In re Subpoena Duces Tecum*, 156 F.3d at 1279-80), the Federal Defendants make little headway through their repeated invocation of that rule.  Here, because the Tribe has made a strong showing of improper and bad faith agency behavior, the Tribe has established that the agency's deliberative materials must be produced.  Accordingly, this Court should order the Department to produce all deliberative materials relevant to the Tribe's request.[10]  If the Department intends to withhold any of its deliberative materials on the basis of any privilege, it must produce a privilege log allowing the court to assess whether the privilege is properly asserted.

The strength of the Tribe's showing also justifies other extra-record discovery.  *See* Motion at 20-24.  The Federal Defendants object to such discovery because they believe it is overly broad.  Fed. Opp. 35-36.  This contention is unfounded, as the Tribe has already explained that the three Department employees from whom it seeks discovery were all personally involved in discussions with the Alaska Delegation and are likely to have "unique personal knowledge" of the considerations that influenced the Department's final decision.  *See Cmty. Fed. Sav. & Loan Ass'n*, 96 F.R.D. at 621; Motion at 21; *see also* AR 2555 (ECF No. 42-1 at 109).  In opposition to the Tribe's motion, the Federal Defendants have offered the declaration of a Department employee who attended some of these meetings but concededly does not recall or did not know the meaning of Defendant Cason's comments regarding the issues that might affect the

---

[10] The Federal Defendants are correct in explaining that courts have not always been consistent in their use of language describing completion and supplementation of the record, and extra-record discovery.  Fed. Opp. 11 n.5.  Here, regardless of whether the request for production of deliberative documents is characterized as a request for extra-record discovery or a motion to complete the record, the Tribe is entitled to production of deliberative documents as described above.

Department's decision.  Kelly Decl. ¶ 26.  The paucity of information provided by the Department shows precisely why depositions of the key decisionmakers are necessary.[11]

Relatedly, the Federal Defendants also argue that the discovery is not necessary in order to obtain effective judicial review of the Department's decision, but the gaps they identify in the record show just the opposite.  Fed. Opp. 30-35.  As an initial matter, extra-record discovery in an APA case is available if the plaintiff has made a showing of bad faith or improper agency behavior, *or* if the record is so bare that "there is no other way to effect judicial review" of the claims.  *Cmty. Fed. Sav. & Loan Ass'n,* 96 F.R.D. at 621 (citing *Overton Park*, 401 U.S. at 420).  The Tribe need not satisfy both criteria.  Nevertheless, the Tribe has done so here.  Because the Tribe has alleged improper political influence, effective judicial review requires evidence that allows the court to fully evaluate *that claim*.  Where, as here, a plaintiff makes a claim of improper political influence yet the agency withholds all deliberative materials from the record, the agency has effectively withheld all information that would allow the court to assess the claim of improper political influence.

The Federal Defendants seem to acknowledge this, but they suggest the record is sufficient to allow review of the claim because "the record already documents that Interior was aware of the Alaska delegation's views on the Tribe's project."  Fed. Opp. 32.  In the Defendants' telling, this means no further evidence is required on this point.  But in fact, the

---

[11] It is within the Court's discretion, of course, to limit the scope of such discovery as appropriate.  The Court may, for instance, permit the Tribe to take depositions of key decisionmakers but limit the scope of the depositions.  *See, e.g.*, *Schaghticoke Tribal Nation v. Norton*, No. 3:06CV81(PCD), 2006 WL 3231419, at *6 (D. Conn. Nov. 3, 2006) (allowing depositions of the Secretary of the Interior and Defendant Cason but limiting deposition questions "to any communication he received, directly or indirectly, from members of the Connecticut congressional delegation, Connecticut state officials or any person or entity representing the State of Connecticut, which pertained to the [tribe's] petition . . . and what, if any, role such communications played in the [final decision] on the [tribe's] petition").

opposite is true—the evidence of political contacts demonstrates that political conversations were occurring and suggests a likelihood that other similar evidence exists, necessitating discovery to allow the Court to fully review the political influence claim.  And again, the only evidence the Department has offered to explain the details of the April 4, 2018 meeting with the Alaska Delegation—the Kelly Declaration—cannot explain key details regarding Defendant Cason's statements at that meeting or the Department's actions following the meeting.  The existing record is therefore inadequate to the point that "there is no other way to effect judicial review" on the political influence claim, and discovery is necessary in order to allow full review of the claim.  *See Cmty. Fed. Sav. & Loan Ass'n*, 96 F.R.D. at 621.

In sum, the Tribe has shown multiple reasons why discovery is both justified and necessary here.  The Tribe is accordingly entitled to production of all deliberative documents previously withheld by the Department, a privilege log regarding any documents the Department intends not to produce on the basis of any other privilege, and discovery in the form of depositions, written deposition questions, and interrogatories as discussed in the Tribe's Motion.

### III.   CONCLUSION

For the reasons stated herein and in the Tribe's Motion, the Tribe has made a strong showing of improper political influence and bad faith conduct by the Department.  Accordingly, the Tribe respectfully requests that the Court grant its Motion for Leave to Take Extra-Record Discovery and to Compel Production of Documents Not Included in the Administrative Record As Produced.

Respectfully submitted this 30th day of July 2020.

          SONOSKY, CHAMBERS, SACHSE,
           ENDRESON & PERRY, LLP

    By:   */s/ Colin C. Hampson*
          Colin Cloud Hampson, D.C. Bar No. 448481
          145 Willow Road, Suite 200
          Bonita, CA 91902
          Telephone: (619) 267-1306
          Facsimile: (619) 267-1388
          champson@sonoskysd.com

          Whitney A. Leonard
          Alaska Bar No. 1711064
          Montana Bar No. 36409732
          Pro hac vice
          Sonosky, Chambers, Sachse, Miller &
            Monkman, LLP
          725 East Fireweed Lane, Suite 420
          Anchorage, AK 99503
          Telephone: (907) 258-7388
          Facsimile: (907) 272-8332
          whitney@sonosky.net

*Attorneys for the Native Village of Eklutna*