**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIVE VILLAGE OF EKLUTNA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:19-cv-02388-DLF |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF ALASKA, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT**
**OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATUTORY BACKGROUND ......................................................................................... 2

STATEMENT OF FACTS .................................................................................................. 6

    I.    Facts Regarding The Native Village Of Eklutna ................................................. 6

    II.    Procedural History ............................................................................................ 11

STANDARD OF REVIEW ............................................................................................... 12

SUMMARY OF ARGUMENT ......................................................................................... 13

ARGUMENT ..................................................................................................................... 14

    I.    EKLUTNA EXERCISES GOVERNMENTAL POWER OVER THE
    ALLOTMENT, AND THE DEPARTMENT ACTED CONTRARY TO LAW IN
    CONCLUDING OTHERWISE .......................................................................... 14

        A.    Under the Broadly Applicable Test, Eklutna Showed it Has Jurisdiction and
        Exercises Governmental Power Over the Allotment. .......................................... 15

        B.    The Sansonetti Opinion is Flawed and Has Been Superseded, and the
        Department's Reliance on it Violates the Privileges and Immunities Guarantee of 25
        U.S.C. § 5123(f). ............................................................................................... 23

        C.    Even if the Sansonetti Analysis Were Properly Applicable, Eklutna Met that
        Test Because it Showed a "Tribal Nexus" to the Allotment. ............................... 35

    II.    THE LEASE DISAPPROVAL WAS ARBITRARY AND CAPRICIOUS
    BECAUSE IT WAS BASED ENTIRELY ON THE FLAWED INDIAN LANDS
    DETERMINATION. .......................................................................................... 43

    III.    THE TRIBE IS ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF
    REVERSING THE DEPARTMENT'S FLAWED DETERMINATION. .............. 44

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. United States*,
474 F. Supp. 840 (D. Alaska 1979) ....................................................................27

*Akiachak Native Cmty. v. Jewell*,
995 F. Supp. 2d 7 (D.D.C. 2013), *vacated as moot*, 827 F.3d 100 (D.C. Cir.
2016) ...................................................................................................................45

*\*Akiachak Native Cmty. v. Salazar*,
935 F. Supp. 2d 195 (D.D.C. 2013), *vacated as moot*, 827 F.3d 100 (D.C. Cir.
2016) ........................................................................................................5, 23, 34

*Akiachak Native Cmty. v. United States Dep't of Interior*,
827 F.3d 100 (D.C. Cir. 2016) ...................................................................4, 5, 34

*Alaska v. Babbitt*,
38 F.3d 1068 (9th Cir. 1994) .............................................................................27

*Alaska v. Native Vill. of Venetie Tribal Gov't*,
522 U.S. 520 (1998)................................................................................... *passim*

*Alaska, Dep't of Pub. Works v. Agli*,
472 F. Supp. 70 (D. Alaska 1979) .....................................................................27

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).............................................................................................12

*Cheyenne River Sioux Tribe v. South Dakota*,
830 F. Supp. 523 (D.S.D. 1993), *aff'd*, 3 F.3d 273 (8th Cir. 1993).....................19

*Citizens Exposing Truth about Casinos v. Kempthorne*,
492 F.3d 460 (D.C. Cir. 2007)..............................................................................2

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971), *abrogated on other grounds by Califano v. Sanders*, 430
U.S. 99 (1977)................................................................................................12, 13

*Cobell v. Salazar*,
573 F.3d 808 (D.C. Cir. 2009)............................................................................24

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*,
442 F. Supp. 3d 53 (D.D.C. 2020) .....................................................................24

*Dep't of Commerce v. New York*,
 139 S. Ct. 2551 (2019) .................................................................................12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020) ....................................................................12, 13, 44

*K2 Am. Corp. v. Roland Oil & Gas, LLC*,
 653 F.3d 1024 (9th Cir. 2011) ...................................................................42

*Koi Nation of N. Cal. v. U.S. Dep't of Interior*,
 361 F. Supp. 3d 14 (D.D.C. 2019) ................................................... *passim*

*Maniilaq Ass'n v. Burwell*,
 72 F. Supp. 3d 227 (D.D.C. 2014) ........................................................13, 24

*Masayesva v. Zah*,
 792 F. Supp. 1160 (D. Ariz. 1992)  ..........................................................3, 17

*Mashpee Wampanoag Tribe v. Bernhardt*,
 No. CV 18-2242 (PLF), 2020 WL 3037245 (D.D.C. June 5, 2020).................37, 38

*\*Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*,
 853 F.3d 618 (1st Cir. 2017).................................................................15, 20

*McGirt v. Oklahoma*,
 140 S. Ct. 2452 (2020).................................................................31, 36, 42

*Merrion v. Jicarilla Apache Tribe*,
 455 U.S. 130 (1982).......................................................................33, 41

*Michigan v. Bay Mills Indian Cmty.*,
 572 U.S. 782 (2014).......................................................................13, 14

*Mitchel v. United States*,
 34 U.S. 711 (1835).................................................................................4

*Montana v. Blackfeet Tribe of Indians*,
 471 U.S. 759 (1985).......................................................................13, 31

*In re Naturalization of Minook*,
 2 Alaska 200, 1904 WL 355 (D. Alaska 1904)..........................................3

*Okla. Tax Comm'n v. United States*,
 319 U.S. 598 (1943).............................................................................18

*\*Pence v. Kleppe*,
 529 F.2d 135 (9th Cir. 1976)  ..........................................................3, 17, 27

*In re Petition of Carmen,*
  165 F. Supp. 942 (N.D. Cal. 1958), *aff'd,* 270 F.2d 809 (9th Cir. 1959) ...............................18

*Rhode Island v. Narragansett Indian Tribe,*
  19 F.3d 685 (1st Cir. 1994) .................................................................................................15

*Seifert v. Winter,*
  555 F. Supp. 2d 3 (D.D.C. 2008) ........................................................................................16

*Tee-Hit-Ton Indians v. United States,*
  348 U.S. 272 (1955) ..............................................................................................................3

*United States v. Bowling,*
  256 U.S. 484 (1921) ............................................................................................................17

*United States v. Eberhardt,*
  789 F.2d 1354 (9th Cir. 1986) ............................................................................................31

*United States v. Pelican,*
  232 U.S. 442 (1914) ............................................................................................................17

*United States v. Ramsey,*
  271 U.S. 467 (1926) ............................................................................................................18

*United States v. Santa Fe Pac. R.R. Co.,*
  314 U.S. 339 (1941) ............................................................................................................31

**Federal Statutes**

Administrative Procedure Act .............................................................................. *passim*

  5 U.S.C. § 704 ......................................................................................................................12

  5 U.S.C. § 706 ..................................................................................................................1, 12

18 U.S.C. § 1151 ........................................................................................................... 17, 19

18 U.S.C. § 1162(a) .............................................................................................................41

Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* .................................... *passim*

  25 U.S.C. § 2701(1) ..............................................................................................................2

  25 U.S.C. § 2702(1)-(2) ........................................................................................................2

  *25 U.S.C. § 2703(4)(B) ............................................................................................ *passim*

  25 U.S.C. § 2703(5) ........................................................................................................2, 14

Indian Reorganization Act of 1934 ..................................................................... *passim*

    25 U.S.C. § 5108 .......................................................................................4

    *25 U.S.C. § 5123(f) ............................................................................ *passim*

    25 U.S.C § 5123(g) ............................................................................ *passim*

28 U.S.C. § 1360(a) .......................................................................................41

Alaska Native Allotment Act, ch. 2469, 34 Stat. 197 (1906) (formerly codified at
    43 U.S.C. §§ 270–1 to –3) ................................................................. *passim*

    43 U.S.C. § 270–1 ....................................................................................3

Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 *et seq.* ........................ *passim*

    43 U.S.C. § 1601(a) ...............................................................................29

    43 U.S.C. § 1617(a) ............................................................................5, 30

    43 U.S.C. § 1634(a) ...............................................................................30

**Session Laws**

Act of May 1, 1936, Pub. L. No. 74-538, §§ 1, 2, 49 Stat. 1250 ....................................4

General Allotment Act of Feb. 8, 1887, ch. 119, §§ 4-5, 24 Stat. 388, 389 ............................3, 17

Pub. L. No. 73–383, § 13, 48 Stat. 984, 986 (1934) ....................................................4

Pub. L. No. 100-241, 101 Stat. 1788 (1988) ..................................................... *passim*

    § 2(8)(B), 101 Stat. at 1789 ...............................................................5, 29

    § 2(9), 101 Stat. at 1789.........................................................................31

    § 17(a), 101 Stat. at 1814........................................................................33

Pub. L. No. 103-263, § 5(b), 108 Stat. 707, 709 (1994) (codified at 25 U.S.C §
    5123(f)-(g)) ..........................................................................................32

Federally Recognized Indian Tribe List Act, Pub. L. No. 103-454, 108 Stat. 4791
    (1994) (codified at 25 U.S.C. § 5131) ................................................... *passim*

    § 103, 108 Stat. at 4791 ......................................................................6, 31

    § 104, 108 Stat. at 4792 .........................................................................5

Tlingit and Haida Status Clarification Act, Pub. L. No. 103-454, tit. II, 108 Stat. 4791, 4792-93 (1994)................................................................................6, 32

§ 202(4), 108 Stat. at 4792.......................................................................6, 32

§ 203, 108 Stat. at 4792 ...............................................................................32

Treaty of Cession .............................................................................2, 3, 23, 31

15 Stat. 539, 542 ............................................................................................2

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................12

**Regulations**

25 C.F.R. § 502.12(b) .....................................................................................14

**Other Authorities**

58 Fed. Reg. 54,364, 54,366 (Oct. 21, 1993)..................................................32

79 Fed. Reg. 76,888 (Dec. 23, 2014) .........................................................23, 34

85 Fed. Reg. 5462, 5466 (Jan. 30, 2020) ..................................................6, 14

Hearings on S. 2065 before the Subcommittee on Public lands of the Senate Committee on Energy and Natural Resources, 99th Cong., 2d Sess. 329 (1986) (statement of Senator Stevens) ........................................................30

Cohen's Handbook of Federal Indian Law 560-61 (2005 ed.) ......................41

Exec. Order No. 4778 (Dec. 5, 1927) .........................................................8, 35

H.R. Rep. No. 99-712 (1986)......................................................................30, 33

Public Land Order No. 2427, 26 Fed. Reg. 6243 (1961)..............................9, 35

Public Land Order No. 2516, 26 Fed. Reg. 9832 (1961)..............................9, 35

Letter from Montie Deer, Chairman, NIGC, to Christopher Karns, Dorsey & Whitney LLP, at 1 (Apr. 18, 2000), *available at* https://www.nigc.gov/images/uploads/indianlands/Organized%20Village%20 Kake2.pdf................................................................................................14

Memorandum from Jo-Ann M. Shyloski, Senior Atty., NIGC, to Philip N. Hogen,
    Chairman, NIGC (Nov. 15, 2005), *available at*
    https://www.nigc.gov/images/uploads/indianlands/01_kiowatribefinalldsopn.p
    df. ....................................................................................................................15

Native Vill. of Eklutna Const. art. II, § I .......................................................10, 40, 41

**INTRODUCTION**

The Native Village of Eklutna ("Eklutna" or "Tribe") is a federally recognized Indian Tribe whose members are of the Dena'ina people who have resided in the Upper Cook Inlet region of Alaska since time immemorial. Eklutna has retained its sovereign authority over its members and their lands, and preserved the culture that binds Eklutna to the Dena'ina people, while enduring the myriad of changes that began upon European arrival approximately 250 years ago.

In this action, Eklutna seeks to reverse a 2018 decision by the United States Department of the Interior ("Department"), which erroneously concluded that the Tribe does not have governmental authority over land that was allotted to Eklutna member Olga Ondola and that constitutes "Indian country." The Ondola Allotment, as it is known, is located within the Tribe's aboriginal territory; it was obtained in 1963 as part of the Tribe's strategy to preserve its rapidly shrinking land base; and it has been held in restricted status ever since then. Eklutna exercises governmental authority over the Ondola Allotment, as it has done for decades, as shown by the wide range of governmental services it provides and its enforcement activity there. The Allotment therefore constitutes "Indian lands" under the widely applied test for determining the status of such lands pursuant to the Indian Gaming Regulatory Act ("IGRA").

In concluding otherwise, the Department fashioned a different test, based on an outdated internal opinion that has been superseded by congressional enactment, executive action, and court decision. In so doing, the Department misapplied legal precedent, inadequately considered the Tribe's factual showings, and acted contrary to law by treating Eklutna differently from tribes in the contiguous states (the "Lower 48") and depriving the Tribe of its right under IGRA to pursue economic development. The Department disapproved the Tribe's proposed lease of the Ondola Allotment for the same invalid reasons by relying solely on the erroneous Indian lands determination. To remedy these illegal actions, under § 706 of the Administrative Procedure Act

1

Eklutna respectfully requests an order granting summary judgment on Counts I and III of the Tribe's complaint in this action, ECF. No. 1, reversing the Department's negative Indian lands determination and its disapproval of the Tribe's proposed land lease for the Tribe's gaming project.

## STATUTORY BACKGROUND

Eklutna seeks to establish its sovereign authority over allotted lands for the same purpose as do tribes in the Lower 48, namely to exercise its rights under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*  Congress enacted IGRA in 1988 "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," and for "the regulation of gaming by an Indian tribe adequate to . . . ensure that the Indian tribe is the primary beneficiary of the gaming operation," *id.* § 2702(1)-(2); *see also Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460, 468 (D.C. Cir. 2007) (quoting 25 U.S.C. § 2702(1)-(2)).  Congress found in IGRA that tribes engage in gaming "as a means of generating tribal governmental revenue," 25 U.S.C. § 2701(1), and that "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government," *id.* § 2701(4).  In accord with that policy, IGRA requires that tribal gaming revenues be used only to fund tribal government operations and programs, provide for the general welfare of the tribe, promote tribal economic development, and for charitable and local governmental purposes.  *Id.* § 2710(b)(2)(B).

IGRA applies to Eklutna because it is an Indian tribe, *id.* § 2703(5), which under federal law holds the same rights as other Indian tribes.  That was made clear when the United States purchased the Territory of Alaska from Russia in 1867 by the Treaty of Cession, which provides: "The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country."  Treaty Concerning the Cession of the Russian Possessions in North America art. III, June 20, 1867, 15 Stat. 539, 542 ("Treaty of

Cession"). That treaty promise has long been understood to apply the entire body of federal Indian law to Alaska Natives. As early as 1904, the U.S. District Court for the District of Alaska held that the Treaty of Cession meant what it said: "It gave the Indian tribes of Alaska the same status before the law as those of the United States, and, unless a different intention appears upon the face of the law, extends all Acts of Congress, applicable and of a general nature, relating to the Indians of the United States, to Alaska." *In re Naturalization of Minook*, 2 Alaska 200, 220-21, 1904 WL 355 at *14 (D. Alaska 1904); *see also Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 285 (1955) (there is "no distinction between . . . use of the land [by Alaska Natives] and that of the Indians of the Eastern United States"). Thus, unless specifically provided otherwise, federal common law and statutes comprising federal Indian law, including IGRA, apply equally to Alaska Natives as to Indians in the Lower 48.

In 1906, amid changes in land holdings and encroachment on Native land that mirrored patterns occurring in the Lower 48, Congress enacted the Alaska Native Allotment Act, ch. 2469, 34 Stat. 197 (1906) (formerly codified at 43 U.S.C. §§ 270–1 to –3). The Act gave the Secretary of the Interior the authority to

> allot not to exceed one hundred and sixty acres of nonmineral land . . . to any Indian or Eskimo of full or mixed blood who resides in and is a native of [the district of Alaska] . . . and the land so allotted shall be deemed the homestead of the allottee and his heirs . . . and shall be inalienable and nontaxable . . . .

*Id.* (formerly codified at 43 U.S.C. § 270–1 (1970) (repealed 1971)). The Act resolved some initial confusion over whether Alaska Natives were eligible for allotments under the General Allotment Act, 24 Stat. 388 (1887) (repealed 2000). *Pence v. Kleppe*, 529 F.2d 135, 140 (9th Cir. 1976) ("Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act."); *see also Masayesva v. Zah*, 792 F. Supp. 1160, 1163 n.6 (D. Ariz. 1992) (Alaska Native Allotment

3

Act "plugged a hole" in the perceived failure of the General Allotment Act to include Alaska Natives).

Congress corrected a similar omission in the Indian Reorganization Act or 1934 ("IRA"), which provides Indian tribes with a means of reorganizing their governments under formal, written constitutions and Anglo systems of government.  Section 5 of the IRA authorizes the Secretary of the Interior to acquire lands in trust for Indian tribes, 25 U.S.C. § 5108, and to designate Indian reservations, *id.* § 5110.  Alaska Native tribes were included within the scope of the IRA when it was enacted, but they were initially excluded from the trust land provisions.  *See* Pub. L. No. 73– 383, § 13, 48 Stat. 984, 986 (1934).  Congress corrected this omission in 1936, extending the IRA's trust land provisions to Alaska and authorizing the Department to designate Indian reservations within Alaska.  Act of May 1, 1936, Pub. L. No. 74-538, §§ 1, 2, 49 Stat. 1250; *see also Akiachak Native Cmty. v. United States Dep't of Interior*, 827 F.3d 100, 102 (D.C. Cir. 2016) (recounting this history).

However, "these ownership schemes left unresolved many outstanding land claims by Alaska Natives based on aboriginal rights, that is, 'possessory rights of Indian tribes to their aboriginal lands . . . extinguishable only by the United States.'" *Akiachak Native Cmty.*, 827 F.3d at 102-03 (quoting *Oneida Indian Nation of N.Y. v. Oneida Cnty.*, 414 U.S. 661, 667 (1974)).  In 1971 Congress passed the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601 *et seq.*, to settle those pending claims.[1]  "'[D]esigned to settle all land claims by Alaska Natives,'

---

[1] Aboriginal land claims (also referred to as "aboriginal title" or "Indian title") have long been understood as seeking only to vindicate the "right of occupancy," as distinct from "any other rights of soil or jurisdiction."  *Mitchel v. United States*, 34 U.S. 711, 746 (1835).  The settlement of aboriginal land claims in ANCSA addressed only those "possessory rights," *Akiachak Native Cmty.*, 827 F.3d at 102, not tribal sovereign authority or tribal power.

4

ANCSA extinguished aboriginal claims and revoked all designated reservations, except for one: the Annette Island Reserve inhabited by the Metlakatla Indians, who, as immigrants from Canada, had no aboriginal claims to Alaska lands." *Akiachak Native Cmty.*, 827 F.3d at 103 (alteration in original) (quoting *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 523-24 (1998)).  In exchange for the settlement of aboriginal land claims and hunting and fishing rights, ANCSA created Alaska Native corporations that received title to 44 million acres of land in fee simple. *Venetie*, 522 U.S. at 523-24.  ANCSA also repealed the Alaska Native Allotment Act, but all allotments which had been patented under the Act retained their restricted (nontaxable and inalienable) status, and pending applications could still be granted.  43 U.S.C. § 1617(a); *see Akiachak Native Cmty. v. Salazar*, 935 F. Supp. 2d 195, 199 (D.D.C. 2013), *vacated as moot*, 827 F.3d 100 (D.C. Cir. 2016).  The passage of ANCSA did not alter the legal status of Alaska tribes as sovereign entities.  *See* Pub. L. No. 100-241, § 2(8)(B), 101 Stat. 1788, 1789 (1988) (codified at 43 U.S.C. § 1601 note); *see also infra* at 29-30.

In 1994, Congress amended the IRA again, this time to bar federal agencies from treating tribes differently from one another with respect to their rights as federally recognized tribes.  The amendment provides:

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the [IRA], or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. § 5123(f).  A parallel provision invalidated then-existing regulations or decisions that violate this "privileges and immunities" protection.  *Id.* § 5123(g).

That same year, Congress passed the Federally Recognized Indian Tribe List Act ("List Act"), which requires the Secretary of Interior to publish annually "a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United

States to Indians because of their status as Indians.".  Pub. L. No. 103-454, § 104, 108 Stat. 4791, 4792 (1994) (codified at 25 U.S.C. § 5131).  These tribes are known as federally recognized tribes. The Act also provides that, once recognized, a tribe "may not be terminated except by an Act of Congress."  *Id.* § 103(4), (5), 108 Stat. at 4791-4792.  The Department has consistently included Alaska tribes on its list of federally recognized tribes, and the Native Village of Eklutna has been on every version of the list the Department has published, beginning with the first list published (even before the Act required it) in 1982.  *See* Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5466 (Jan. 30, 2020); AR 783 (June 2016 Submission at 6 ("Submission")).  At the same time as the List Act, Congress also passed the Tlingit and Haida Status Clarification Act, which restored federally recognized status to the Central Council of Tlingit and Haida Indian Tribes of Alaska.  Pub. L. No. 103-454, tit. II, 108 Stat. 4791, 4792-93 (1994).  The Act's findings reiterated that the Secretary of the Interior "may not administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress," making clear that these privileges and immunities protections apply to Alaska tribes just as they do to all other tribes.  *Id.* § 202(4), 108 Stat. at 4792.

## STATEMENT OF FACTS

### I.   Facts Regarding The Native Village Of Eklutna

The Native Village of Eklutna is located on the Knik Arm of Cook Inlet, approximately 27 miles northeast of what is now Anchorage, Alaska.  AR 977-79 (Submission Ex. 12); AR 2060-61 (June 2017 Supp. Submission).  The Dena'ina people of the Native Village of Eklutna have occupied the upper Cook Inlet region since long before Captain James Cook made his voyage to the area in 1778 and gave the region its present-day name.  AR 779 (Submission at 2); *see generally* AR 808-67 (Submission Ex. 1) (describing the territory and history of the Dena'ina people).  The

Village is an important tribal center within that region, as it has long been for the Dena'ina people. All the important geographic features in and around Eklutna carry Dena'ina place names, and the Village itself has a traditional creation story about how it got its name.  AR 779 (Submission at 2); AR 864-66 (Submission Ex. 1).  Even today, a cemetery filled with the "spirit houses" of deceased tribal members lies next to the church in the Village, which is the oldest standing building in the Anchorage area.  AR 779 (Submission at 2); AR 847 (Submission Ex. 1).  These sites and the oral histories of Dena'ina elders highlight the enduring cultural and spiritual importance of the Eklutna region for the Tribe and its members.

Historically, Eklutna's governing structure was similar to that of the other Dena'ina bands in the upper Cook Inlet region.  Each Village contained multi-family dwellings called "nichił," which were each led by a "qeshqa" (rich man).  Each qeshqa directed the organization of "ukilaqa" (clan helpers) into hunting and fishing groups and carried out other leadership responsibilities, such as instructing the young, settling disputes, and organizing warriors for battles.  AR 779-80 n.1 (Submission at 2-3); AR 829 (Submission Ex. 1).  Today, the Eklutna Tribal Council carries out like responsibilities and acts as the governing body of the Village, as the "qeshqa" and his "ukilaqa" had earlier done.[2]

The Native Village of Eklutna and its people resisted European migration into the Tribe's traditional territory when non-Native settlers began to visit the region in the late 1700s and early 1800s.  The Dena'ina were open to trading with Europeans but adamantly opposed any attempted settlement.  AR 779 (Submission at 2).  Although Americans searching for gold in the 1870s ultimately settled on much of the Dena'ina people's land, the environs in and around Eklutna

---

[2] The Ondola family members are direct descendants of these "qeshqa," or former Village chiefs. AR 872 ¶ 9 (Submission Ex. 2).

retained their distinctly Native character and the Village retained its status as a tribal center. *Id.* Even in the modern era, as Anchorage became "the largest European town within Tanaina [Dena'ina] limits," a 1968 Federal Field Committee report explained that "the principal modern Indian village is farther up the coast at Eklutna."  AR 874 (Submission Ex. 3, Fed. Field Comm. for Dev. Planning in Alaska, Alaska Natives & the Land 253 (1968) ("Field Comm. Report")).

As non-Native settlement expanded in the twentieth century, Native people were forced off many of the lands they had historically controlled.  So too for Eklutna.  In response, the federal government set aside an area of land for the benefit and education of the Eklutna people and other Alaska Natives in 1927.  This first reserve spanned 1,819 acres in the Eklutna area of Cook Inlet's Knik Arm.  *See* Exec. Order No. 4778 (Dec. 5, 1927); AR 893 (Field Comm. Report at 445, fig. V-5).  In 1936, additional acreage was withdrawn for the reservation.  AR 2276-78 (Secretarial Order of October 30, 1936).  That still left the vast majority of the Tribe's historical lands unprotected as white settlers continued to encroach on Dena'ina lands.  In 1951, Eklutna tribal leader Bill Ezi filed a claim before the Indian Claims Commission seeking to establish that the Dena'ina people of Eklutna and Palmer, Alaska held aboriginal title to the lands they had historically occupied.  AR 2114, 2117-18; *see also* AR 893 (Field Comm. Report at 445, fig.V-6 (Docket No. 370, Natives of Palmer, Alaska)).

Pressure on Eklutna lands intensified when Alaska became a state in 1959 and began selecting tribal lands around Eklutna for state ownership.  At that point the Native Village of Eklutna filed official "protests" with the Bureau of Land Management, seeking to establish the Tribe's aboriginal title to nearly 470,000 acres of land in and around the Village, including the Birchwood area where the Ondola Allotment is located.  AR 899-900 (Field Comm. Report at 500-01, fig. V-57 (BLM Application Nos. AA-368 & AA-574; AR 899-900).  Nevertheless, in 1961

the limited federal set-aside of Eklutna land was scaled back, as the Department reduced the Eklutna reserve to 1,958 acres to be "reserved under jurisdiction of the Bureau of Indian Affairs for use in connection with administration of Native affairs in the vicinity of Eklutna."  Public Land Order No. 2427, 26 Fed. Reg. 6243 (1961); Public Land Order No. 2516, 26 Fed. Reg. 9832 (1961).

George Ondola, President of the Village Council, expressed concern over the repeated reductions in the size of the Tribe's land base in a 1961 correspondence with the federal government and in later testimony before Congress.  AR 2110 (Suppl. Submission, Statement of George Ondola).  In 1961 President Ondola also helped his mother, Olga Ondola, apply for the allotment that is the subject of this action.[3]  Ms. Ondola had also observed the federal government's actions in reducing the land set aside for the Eklutna people.  AR 43-44 (Aff. of Aaron Leggett).  The land that would become the Allotment, on which Ms. Ondola and her family lived, lay in an area that was earlier within the Eklutna reserve but had been removed from it.  AR 2276 (Secretarial Order of October 30, 1936) (describing extension of reserve to encompass area between the Eagle and Knik Rivers, which includes the Ondola Allotment).  Ms. Ondola wanted to protect the Tribe's land base from further losses and believed that securing the Allotment would help achieve that objective for the Eklutna people.  AR 43-44 (Aff. of Aaron Leggett).

The Department awarded the Allotment to Olga Ondola in 1963 pursuant to the Alaska Native Allotment Act; *see* AR 969-71 (Submission Ex. 10, Allotment Deed).  The Allotment has been held as an Indian allotment in restricted status ever since.  Today the land is held by Ms. Ondola's heirs and their heirs, all of whom are Eklutna tribal members.

---

[3] The Ondola Allotment includes lots 64, 66, and 67, located within Section 5, T15N, R1W, Seward Meridian Alaska.  AR 970 (Submission Ex. 10, Allotment Deed).

Throughout this period, the Native Village of Eklutna remained an active tribal government that has continued to exercise governmental authority over its members and lands in and around the Village and the Allotment.  In the 1960s, Eklutna's Tribal Council protested efforts by non-tribal authorities to regulate tribal members and instead asserted its own authority to regulate tribal members' access to natural resources.  Under the Tribe's written constitution in effect today, the Tribe exercises jurisdiction over "the land and waters constituting Indian Country of the Eklutna Tribe as defined by federal law."  AR 954 (Submission Ex. 7, Native Vill. of Eklutna Const. art. II, § I).  The Tribe exercises governmental functions on those lands, including a tribal court, tribal housing programs, public safety programs, health care services in a recently constructed clinic, Indian child welfare case management, employment services, water and waste services, snow plowing, food bank and meal delivery services, signage, trespass inspection and monitoring, archaeological and cultural surveys, environmental protection, historical and cultural preservation, youth activities, a biannual potlatch and powwow, and other cultural services.  *See* AR 792-97 (Submission at 15-20); AR 2052 (June 2017 Suppl. Submission).

Yet these efforts have not ended the Eklutna tribal community's struggles with severe poverty and economic distress.  As of 2017, the unemployment rate among Eklutna members was approximately 35 percent, well above the Anchorage average of 5.3 percent. AR 1 (Briefing Mem. from Lee Stephan to James Cason).  Approximately 85 percent of tribal members live at or below the poverty level, and the average per capita income is around $11,000 per year.  *Id.*  These numbers contrast starkly with the neighboring Anchorage population in which 10 percent of its population is living at or below the poverty level and the average per capita income is $34,511. *Id.*  The Tribe seeks to alleviate these challenges through economic development under the Indian Gaming Regulatory Act, just as Indian tribes in the Lower 48 have done.

10

## II.  Procedural History

On June 29, 2016, the Tribe petitioned the Department for a determination that the Allotment constitutes "Indian lands" as defined by IGRA, 25 U.S.C. § 2703(4)(B).  AR 778-807.[4] In pertinent part, § 2703(4)(B) of IGRA defines "Indian lands" to include "any lands title to which is . . . held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  The Tribe's submission documented the Tribe's status as a federally recognized Indian tribe, the federally restricted status of the Ondola Allotment, and the Tribe's jurisdiction and exercise of sovereign authority over the Allotment.  AR 774-1238.  The Tribe supplemented its request with additional submissions providing further information on these issues, on or about December 16, 2016, June 6, 2017, June 22, 2017, November 6, 2017, and December 4, 2017.  AR 1244-55, 2039-43, 2051-61, 2071-91, 2095-2110.  The Tribe also requested that the Department approve the Tribe's lease of the Allotment from its owners for the development and operation of a tribal gaming project.  *See* AR 742-73.

The Department issued its decision nearly two years later, on June 18, 2018.  AR 45-61 ("Decision").  The Decision concluded that the Ondola Allotment does not constitute "Indian lands" under § 2703(4)(B) of IGRA, relying principally on a 1993 M-Opinion (M-36975) issued by then-Department Solicitor Thomas L. Sansonetti.  AR 49-60 (Decision at 5-16); *see also* AR 2140-2275 (the "Sansonetti Opinion").  The Department disapproved the Tribe's proposed lease in a half-sentence conclusion on the final page of the decision.  AR 61 (Decision at 17). The Tribe

---

[4] The Tribe previously submitted requests for Indian lands determinations in 1995 and 2007, but on both occasions the Tribe withdrew its request before a final decision was issued.  AR 782 (Submission at 5); *see also* AR 964-68 (Submission Exs. 8-9).

filed this action on August 7, 2019, seeking judicial review of the Department's negative Indian lands determination and its disapproval of the proposed lease.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 33 (D.D.C. 2019).

Under § 706(2) of the Administrative Procedure Act ("APA"), a court may "hold unlawful and set aside" final agency action that is "arbitrary, capricious . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also id.* at § 704.  It is undisputed that the Department's decision constitutes final agency action within the meaning of the APA.  Compl. ¶ 100, ECF No. 1; Answer ¶ 100, ECF No. 18.

In APA cases, a court's review of agency action is "to be based on the full administrative record that was before the Secretary at the time he made his decision."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  This means review is typically limited to the administrative record, though a court may consider—and allow discovery of—extra-record evidence if a party makes a "strong showing of bad faith or improper behavior."[5]  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-74 (2019) (quoting *Overton Park*, 401 U.S. at 420).  Furthermore, "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action'" (except as to claims of bad faith or improper behavior).  *Dep't of Homeland Sec. v. Regents of the Univ. of*

---

[5] Here, the Tribe moved for extra-record discovery on the basis of improper political influence on the agency's decision-making process.  ECF No. 36.  The court denied that motion.  ECF No. 47.

*Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).  Under this "foundational principle of administrative law," an agency decision can be upheld only on the basis of arguments articulated in the decision itself, "not . . . on the basis of impermissible '*post hoc* rationalization.'"  *Id.* at 1907, 1908 (quoting *Michigan*, 576 U.S. at 758, and *Overton Park*, 401 U.S. at 420).  In this analysis, "[q]uestions of law are reviewed de novo under the APA as in ordinary cases."  *Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227, 234 (D.D.C. 2014) (citing *Citizen Potawatomi Nation v. Salazar*, 624 F.Supp.2d 103, 114 (D.D.C. 2009); and citing *Nebraska HHS v. United States HHS*, 340 F.Supp.2d 1, 12 (D.D.C. 2004)).

When a court reviews an interpretation of a statute passed for the benefit of Indians, such as IGRA, ANCSA, and the Alaska Native Allotment Act, the statute must "be construed liberally in favor of the Indians."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

## SUMMARY OF ARGUMENT

The Native Village of Eklutna amply demonstrated that it has jurisdiction and exercises governmental power over a Native allotment that lies within its traditional territory and has been held by Eklutna tribal members for over 60 years.  The Department's decision failed to apply the correct test for jurisdiction over such an allotment, under which the Tribe easily established jurisdiction because the Allotment is neither far from the Native Village of Eklutna nor owned by non-members.  And even under the much more restrictive test applied by the Department—based on a Solicitor's opinion that has been superseded and is contrary to law—the Tribe still met the test to demonstrate that it exercises jurisdiction and governmental authority over the Allotment.  Because the Department's decision failed to apply the correct law or adequately consider the facts presented by the Tribe, the Decision should be reversed, and the accompanying lease disapproval should be vacated.

## ARGUMENT

I. **EKLUTNA EXERCISES GOVERNMENTAL POWER OVER THE ALLOTMENT, AND THE DEPARTMENT ACTED CONTRARY TO LAW IN CONCLUDING OTHERWISE.**

IGRA "creates a framework for regulating gaming activity on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 & n.1 (2014). "Indian lands" include "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b) (incorporating this definition).

In its Decision, the Department acknowledged that Eklutna is a federally recognized Tribe, making it an "Indian tribe" within the meaning of IGRA, 25 U.S.C. § 2703(5).[6]  AR 45; *see also* 85 Fed. Reg. at 5466.  The Department also agreed that the Ondola Allotment is held subject to restriction on alienation within the meaning of IGRA § 2703(4)(B), because it was allotted under the Alaska Native Allotment Act, which provides that such allotments "shall be inalienable . . . until otherwise provided by Congress."  AR 48 (Decision at 4); *see* Alaska Native Allotment Act, 34 Stat. 197; *see also* AR 783-84 (Submission at 6-7).  That leaves before the Court only the question whether Eklutna "exercises governmental power" over the Allotment.  In answering "no" to that question, the Department violated controlling law and acted arbitrarily and capriciously in multiple ways.

---

[6] By its plain terms this provision applies to all Indian tribes, including tribes within Alaska.  The National Indian Gaming Commission ("NIGC") has determined that other lands in Alaska qualify as "Indian lands" within the meaning of IGRA.  Letter from Montie Deer, Chairman, NIGC, to Christopher Karns, Dorsey & Whitney LLP, at 1 (Apr. 18, 2000), *available at* https://www.nigc.gov/images/uploads/indianlands/Organized%20Village%20Kake2.pdf (concluding that parcel held in trust for the Organized Village of Kake is eligible for IGRA gaming).

14

**A.      Under the Broadly Applicable Test, Eklutna Showed it Has Jurisdiction and Exercises Governmental Power Over the Allotment.**

Under established principles of federal Indian law, as described below, an Indian tribe presumptively possesses jurisdiction over its members' allotments *unless* the specific facts or circumstances demonstrate that this jurisdictional tie has been severed.  No such severance has occurred  here, and under this standard the Tribe has shown that it both possesses jurisdiction and exercises governmental power over the Ondola Allotment.

*i.   The Tribe Satisfies the Test for Jurisdiction and Governmental Power.*

In determining whether a Tribe "exercises governmental power" within the meaning of IGRA § 2703(4)(B), the analysis generally proceeds in two steps.  First, a determination is made whether the Tribe possesses jurisdiction over the land.[7]  *See* AR 48 (Decision at 4) (citing, *inter alia*, *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-03 (1st Cir. 1994)); *see also, e.g.*, *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 624-25 (1st Cir. 2017); AR 2469-71 (Big Sandy Rancheria Indian Lands Determination at 4-6 (Sept. 6, 2006) ("Big Sandy Determination")).  If the tribe possesses jurisdiction, a determination must then be made whether the tribe in fact exercises governmental power over the relevant land as shown by "concrete manifestations of that authority." *Narragansett*, 19 F.3d at 703.  Here the Department concluded that Eklutna lacks jurisdiction under the first prong of this test.  That conclusion was arbitrary and capricious.

To determine whether a tribe possesses jurisdiction under the first prong, the first question is whether the land constitutes "Indian country" under federal law.  *E.g.*, AR 2467-70 (Big Sandy Determination at 2-5); Memorandum from Jo-Ann M. Shyloski, Senior Atty., NIGC, to Philip N.

---

[7] Both the Department and the NIGC have authority to issue an IGRA Indian lands determination.

Hogen, Chairman, NIGC (Nov. 15, 2005) ("Kiowa Determination");[8] AR 2509-11 (Op. of

Solicitor, Sampson Johns Allotment (September 26, 1996) ("Quinault Determination")); *see also*

*Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d at 625 (parallel inquiry under § 2703(4)(B)

with respect to settlement lands); *Narragansett*, 19 F.3d at 703 (same).  That question is relevant

because "[a]s a general matter, tribes are presumed to possess tribal jurisdiction within 'Indian

country.'"  Kiowa Determination at 4 (citing *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329

(1998); *see also Venetie*, 522 U.S. at 527 n.1 ("Generally speaking, primary jurisdiction over land

that is Indian country rests with the Federal Government and the Indian tribe inhabiting it.")

Like other federal statutes enacted during the so-called "Allotment Era" of federal Indian

policy, the Alaska Native Allotment Act allowed individual Natives to obtain title to tracts of land

for their own use, but it kept those allotments within the sphere of the federal Indian land system

by making them inalienable except by Congressional authorization.  The Alaska Native Allotment

Act did so by providing that such lands "shall be deemed the homestead of the allottee and his

heirs in perpetuity, and *shall be inalienable and nontaxable until otherwise provided by Congress*."

34 Stat. 197 (emphasis added).  This provision is similar to the language in other public-domain

allotment statutes like the General Allotment Act, which provided for allotments to "any Indian

not residing upon a reservation" who had "settle[d] upon any surveyed or unsurveyed lands of the

---

[8] *Available at* https://www.nigc.gov/images/uploads/indianlands/01_kiowatribefinalldsopn.pdf.
The Tribe's June 2016 Submission cited the Kiowa Determination and described it in detail, *see*
AR 788, though the Department did not cite this authority in its decision.  The Court may properly
consider this authority, as it is relevant legal authority that was raised before the agency.  To the
extent that the Kiowa Determination is instead considered evidence that should have been included
in the administrative record, the Court may take judicial notice of the Kiowa Determination
because it is publicly available information whose authenticity is not reasonably subject to doubt.
*See Seifert v. Winter*, 555 F. Supp. 2d 3, 11 n.5 (D.D.C. 2008) (taking judicial notice of publicly
available government document in APA case, and collecting cases).

United States," and which provided that such allotments would be held "in trust for the sole use and benefit of the Indian" or his heirs.  Act of Feb. 8, 1887, ch. 119, §§ 4-5, 24 Stat. 388, 389. Alaska Native allotments have been treated as analogous to General Allotment Act allotments for that reason, and accordingly, "the Alaska Native Allotment Act [is] legislation interpreted similarly to the General Allotment Act." *Masayesva*, 792 F. Supp. at 1163 & n.6; *see also Pence*, 529 F.2d at 140; Sol. Op. 36662 (in light of inconsistent language used across many Indian allotment acts, "[t]he use of the word 'homestead' in the Alaska statute" does not indicate an intent to treat Alaska Native allotments differently from other Indian allotments).

It is well established that Indian allotments, whether made under the Alaska Native Allotment Act or analogous statutes governing Indian allotments in the Lower 48, constitute "Indian country" for purposes of federal law and jurisdictional analyses.  "Indian country" is defined in 18 U.S.C. § 1151(c) to include "all Indian allotments, the Indian titles to which have not been extinguished."[9]  The Supreme Court has acknowledged the applicability of this definition to Indian allotments in Alaska, *Venetie*, 522 U.S. at 527 & n.2, meaning allotments issued under the Alaska Native Allotment Act.  And this statutory definition is consistent with the prior case law that has long recognized allotments as "Indian country."  *E.g.*, *United States v. Pelican*, 232 U.S. 442, 449 (1914) (Indian country includes individual Indian allotments held in trust by the United States because they "remain[] Indian lands, set apart for Indians under governmental care"); *see also United States v. Bowling*, 256 U.S. 484, 487 (1921) ("[a]s respects both [trust and restricted] allotments . . . the United States possesses a supervisory control over the land"); *In re*

---

[9] Although 18 U.S.C. § 1151 "by its terms relates only to federal criminal jurisdiction," the Supreme Court "ha[s] recognized that it also generally applies to questions of civil jurisdiction." *Venetie*, 522 U.S. at 527.

*Petition of Carmen*, 165 F. Supp. 942 (N.D. Cal. 1958), *aff'd*, 270 F.2d 809 (9th Cir. 1959) (public domain trust allotment not carved out of a reservation was Indian country).[10]

Applying the general presumption that tribes possess jurisdiction over Indian country, *see Venetie*, 522 U.S. at 527 n.1, the Department's prior Indian lands determinations regarding off-reservation allotments have concluded that the respective tribe would possess jurisdiction "unless the 'land in question is not owned or occupied by tribal members and is far removed from the tribal community.'"  AR 2469 (Big Sandy Determination at 4) (quoting Quinault Determination at 5). As is directly on point here, both the Big Sandy Determination and the Quinault Determination applied this presumption to "public domain" allotments—meaning Indian allotments that were allotted from federal public lands, like the Ondola Allotment, rather than being carved out of an existing Indian reservation.  In both instances, the Department concluded that the allotment was subject to tribal jurisdiction because it was neither located far away nor owned by non-members. In the Big Sandy Determination, the National Indian Gaming Commission ("NIGC")—an agency of the Interior Department—concluded that the tribe had jurisdiction because the allotment was "owned by a tribal member who is a descendent of the original allottee's family," it had been held in restricted status since it was allotted, and it was "located within 12 miles of the Tribe's Rancheria."  AR 2470 (Big Sandy Determination at 5).  The Department's Office of the Solicitor concurred with NIGC's opinion.  AR 2472.  In the Quinault Determination, the Department undertook a similar analysis and reached the same result, relying on the fact that the allotment was

---

[10] The analysis is the same whether an allotment is held in trust or in restricted fee, like the Ondola Allotment.  *See Okla. Tax Comm'n v. United States*, 319 U.S. 598, 618 (1943) ("there are no differences of substance between the two forms of tenure," *i.e.* restricted fee or trust); *United States v. Ramsey*, 271 U.S. 467, 472 (1926) (restricted deed allotment is Indian country, notwithstanding the fact that the deed is held by the Native rather than in trust by the federal government).

held by a tribal member and his descendants, and that it was located just 12 miles from the Tribe's reservation, "within the Tribe's constitutionally-defined area of tribal jurisdiction" and near the tribe's traditional hunting and fishing grounds.  AR 2512 (Quinault Determination at 6).[11]

The exact same analysis applies to the Ondola Allotment, yielding the exact same conclusion.  Like the off-reservation allotments in the Big Sandy and Quinault Determinations, the Ondola Allotment is Indian country both under 18 U.S.C. § 1151(c) and within the common-law precedent holding that Indian allotments constitute Indian country.  *See supra* at 16-18.  And, also like the allotments in the Big Sandy and Quinault Determinations, the Ondola Allotment was allotted to a tribal member and is held by her heirs and their heirs.  AR 784 (Submission at 7); Compl. ¶¶ 1, 22, 34; Answer ¶¶ 1, 22, 34.  At just seven miles from the Village, the Ondola Allotment is actually *closer* to the tribal community than either the Big Sandy or Quinault allotments.  AR 784 (Submission at 7); AR 977-79 (Submission, Ex. 12); AR 2060-61 (June 2017 Supp. Submission).  Under the same analysis applied in analogous circumstances, the Allotment is therefore Indian country, and Eklutna possesses jurisdiction over it "unless '[it] is not owned or occupied by tribal members and is far removed from the tribal community.'"  AR 2469 (Big Sandy Determination at 4).  Because neither of those exceptions apply here—the Allotment *is* held by

---

[11] The Quinault Determination combined this inquiry with its analysis of the tribe's exercise of governmental authority, following the approach taken in *Cheyenne River Sioux Tribe v. South Dakota*, 830 F. Supp. 523 (D.S.D. 1993), *aff'd*, 3 F.3d 273 (8th Cir. 1993).  As a result, it also looked at factors regarding the tribe's provision of services and exercise of tribal regulation over the allotment.  AR 2512 (Quinault Determination at 6).  Later decisions and court cases have favored the two-step approach described above, where jurisdiction is examined as a threshold question and then the *exercise* of that jurisdiction (or "governmental power") is analyzed in the second step.  *E.g.*, *Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d at 624-25; *Narragansett*, 19 F.3d at 701-03; Kiowa Determination at 3; AR 2469-71 (Big Sandy Determination at 4-6).

tribal members, and it is very close to the Native Village of Eklutna—Eklutna possesses jurisdiction over the Ondola Allotment.

The Tribe then easily satisfies the second prong of the test because it exercises governmental authority over the Allotment in many of the exact same ways considered relevant in the Quinault, Big Sandy, Kiowa, Narragansett, and Aquinnah Wampanoag determinations.  In litigation regarding this prong of the IGRA Indian lands test, the United States itself has acknowledged that "IGRA does not . . . specify the degree to which or how a tribe must exercise [governmental] power" to satisfy this prong of the test.  Brief of United States as Amicus Curiae, *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, No. 16-1137, 2016 WL 3475452, at *14 (1st Cir. June 3, 2016).  Furthermore, "[t]he NIGC has not formulated a uniform definition of 'exercise of governmental power' but rather engages in a case-specific evaluation as the circumstances of individual tribes vary widely."  *Id.*  Relevant indicia of tribal authority include "governmental agreements pertaining to the land; supervision of the land; governmental services; and adoption of tribal ordinances."  *Id.* (footnotes omitted).

Eklutna easily satisfies this evaluation because the jurisdictional indicia are numerous, and many are exercised on the land itself.  The Tribe's constitution and tribal ordinances assert jurisdiction over the allotment, AR 954, 1019-43, 1068-82 (Submission Exs. 7, 15-17, 19-21), and in the exercise of that jurisdiction the Tribe provides, *inter alia*, land management services on the Ondola Allotment, AR 982 ¶ 9 (Submission Ex. 13); it has conducted environmental inspections and engaged in environmental clean-up activities on the Allotment, AR 983 ¶ 15; it installed a well and septic system on the Allotment, AR 982 ¶ 10; it has posted the Allotment with "no trespassing" signs notifying the public that the Allotment is tribal land, AR 983-84 ¶ 16; *see* AR 1080-82 (Submission Ex. 21); it has provided health care and food bank services to the tribal members

20

living on the Allotment, AR 983 ¶ 14 (Submission Ex. 13); AR 975 ¶¶ 8.A., 8.D. (Submission Ex. 11); and it placed multiple foster children in the Ondola home on the Allotment through the Tribe's Indian Child Welfare program, AR 982 ¶ 8 (Submission Ex. 13); AR 975 ¶ 8.F. (Submission Ex. 11).    These are the same types of tribal activities that have demonstrated the exercise of governmental authority in other cases, *see* AR 2470-71 (Big Sandy Determination at 5-6); AR 2512 (Quinault Determination at 6); Kiowa Determination at 5-6, and they do so equally here.[12] The Tribe has amply shown that it meets both prongs of the IGRA test, demonstrating both tribal jurisdiction and exercise of governmental authority over the Allotment, and the Department was wrong to conclude otherwise.

> ### ii.   *The Department Failed to Apply the Proper Test*

The Department agreed that the Allotment constitutes Indian country, but it concluded that Eklutna nonetheless lacks jurisdiction over it, and thus that the Tribe does not and cannot exercise governmental authority over it.  AR 48, 61 (Decision at 4, 17).  To reach that result, however, the Department applied a different test than the one it used for other tribes in similar circumstances. The Department attempted to distinguish the Big Sandy and Quinault allotment decisions on the basis that in both instances, the allotment was near what it characterized as "an *existing* source of Tribal territorial sovereignty."  AR 57 (Decision at 13) (emphasis in original).  But in both the Big Sandy and Quinault Determinations, the Department defined the relevant test as turning on distance from "the tribal community."  AR 2469, 2511.  The Department cannot retroactively change their analysis by importing different terms into the test to justify a different result.  The Department does not contest that the Ondola Allotment lies just seven miles from the Native

---

[12] The United States itself pointed to many of these same examples in its briefing before the First Circuit in *Wampanoag Tribe of Gay Head (Aquinnah)*.  2016 WL 3475452, at *14 & nn.5-8.

Village of Eklutna, but it inexplicably dismissed this fact and acted contrary to the conclusion it compels.

Similarly, the Department argued that membership of the allottee had little impact on the jurisdiction analysis, and alternately claimed that the Tribe had not presented adequate evidence of Olga Ondola's membership.  AR 56-57 (Decision at 12-13 & n.131).  But the Department's precedent makes clear that whether the "land in question is . . . occupied by tribal members" is indeed a key component of the jurisdiction inquiry.  AR 2469 (Big Sandy Determination at 4); AR 2511 (Quinault Determination at 5).  The Department now concedes that Olga Ondola and the current allotment holders are all Eklutna tribal members.  *See* Compl. ¶¶ 1, 22, 34; Answer ¶¶ 1, 22, 34.  The tribal membership element of the test, therefore, provides no valid reason for the Decision to depart from precedent.

At a minimum, the failure to properly apply this precedent to Eklutna was arbitrary and capricious.  The government's result-driven approach also directly violates the "privileges and immunities" guarantee of 25 U.S.C. § 5123(f), which mandates that federal agencies "shall not . . . make any decision or determination pursuant to . . . any . . . Act of Congress, with respect to a federally recognized Indian tribe that . . . diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes."  25 U.S.C. § 5123(f) (formerly codified at 25 U.S.C. § 476(f)).  The right to engage in gaming under IGRA on Indian lands is a "privilege" within the meaning of this provision.  *See Koi Nation of N. Cal.*, 361 F. Supp. 3d at 52 (holding that "gaming activities on Indian lands under [another provision of IGRA] certainly are 'privileges . . . available to the Indian tribe' by virtue of a tribe's status as a recognized Indian tribe").  And this Court has specifically held that § 5123(f) applies to IGRA.  *Id.* at 53.  It is equally plain that § 5123(f) applies to federally recognized Indian tribes in Alaska, just as it does to all tribes

throughout the country. *See Akiachak Native Cmty.*, 935 F. Supp. 2d at 210-211 (applying parallel provision of § 5123(g), then codified at § 476(g), to invalidate the Alaska exception to the Department's trust land procedures). The Department's own statements further affirm this principle: In the final rule that removed an Alaska-specific exception to the Department's Indian trust land regulations, the Department explained that "the Department's policy is that there should not be different classes of federally recognized tribes." Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888, 76,890 (Dec. 23, 2014). By failing to apply its existing precedent to Eklutna's request—and instead applying a more restrictive test discussed in detail below—the Department thus contradicted its own policy and diminished Eklutna's privileges relative to other tribes, violating 25 U.S.C. § 5123(f).[13] The Decision furthermore runs contrary to the promise in the Treaty of Cession to apply to Alaska Natives the same principles of federal Indian law applicable to tribes in the Lower 48. *Supra* at 2.

### B. The Sansonetti Opinion is Flawed and Has Been Superseded, and the Department's Reliance on it Violates the Privileges and Immunities Guarantee of 25 U.S.C. § 5123(f).

Rather than applying the same test as it had for other tribes, the Department instead relied on a new test purportedly discerned from a 1993 opinion issued by the Department's Solicitor, Thomas Sansonetti. AR 45, 49-50 (Decision at 1, 5-6); *see* AR 2140-2275 (Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers, Op. Sol. Interior M-36975, 1993 WL 13957363 (Jan. 11, 1993)) ("Sansonetti Opinion"). The Department's reliance on this invention violates the privileges and immunities protection of 25 U.S.C. § 5123(f), among other

---

[13] To the extent the Department may argue that Alaska tribes are not similarly situated and thus need not be treated equally under the privileges and immunities provision, that argument is undermined by the Department's own policy, 79 Fed. Reg. at 76,890, and was expressly rejected in *Akiachak Native Cmty.*, 935 F. Supp. 2d at 210-211.

flaws.   The Tribe explained in detail that the Sansonetti Opinion had been superseded by subsequent legal developments, *see, e.g.*, AR 800-04 (Submission at 23-27); AR 1239-43 (Request for Withdrawal), but the Department erroneously concluded that the Sansonetti Opinion should control its analysis, AR 45.   That conclusion—and the Department's resulting analysis founded on the Sansonetti Opinion—was arbitrary, capricious and contrary to law.   And while the Department asserted that it was bound by the Sansonetti Opinion, AR 45 (Decision at 1), neither the Opinion itself nor the Department's reliance on it are entitled to deference here.   Even in APA cases "[q]uestions of law are reviewed *de novo*."  *Maniilaq Ass'n*, 72 F. Supp. 3d at 234.   The Sansonetti Opinion's conclusions regarding tribal jurisdiction (and the Department's reliance on them) are precisely such issues of law and must be reviewed *de novo*.

The Sansonetti Opinion did not purport to construe IGRA, and is irrelevant here for that reason alone.[14]   Instead, the opinion sought to provide guidance on broad questions about tribal jurisdiction in Alaska following the enactment of the ANCSA based on the status of the law at that time.   At the time, courts were struggling with "issues concerning sovereignty and powers of Alaska Native groups," the majority of the opinion was devoted to historical background, including

---

[14] Moreover, as a statute passed for the benefit of Indians, IGRA must be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009) (quotation omitted).  The same is true of both the Alaska Native Allotment Act and ANCSA.  Indeed, "even where the ambiguous statute is one entrusted to an agency, [courts] give the agency's interpretation 'careful consideration' but '[they] do not defer to it.'"  *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 n. 8 (D.C. Cir. 1988)).  Regarding statutory interpretation questions here, therefore, any deference the Department might enjoy under *Chevron* applies, at most, "with muted effect."  *Cobell v. Salazar*, 573 F.3d at 812; *see also Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 442 F. Supp. 3d 53, 79-80 (D.D.C. 2020) ("muted effect" means "a court 'must' defer to a tribe's reasonable interpretation," and in the case of a reasonable tribal interpretation, "the Indian canon 'trump[s]' *Chevron* deference") (citations omitted)), *appeal filed*, No. 20-5127 (D.C. Cir. May 8, 2020).

the history of Alaskan tribes, their lands, and their relationship to the federal government, and a discussion of the context surrounding ANCSA.  AR 2141 (Sansonetti Op. at 2); *see* AR 2140-2272.  Near the end of the opinion, Solicitor Sansonetti addressed a question posed by the Secretary regarding the authority that an Alaska Native village may exercise over land and non-members after ANCSA's enactment.  AR 1240, 2246 (Sansonetti Op. at 1, 107).  Sansonetti opined that although there remained certain lands—such as allotments and Village-owned townsite lands— that met the definition of Indian country in Alaska, "ANCSA largely controls" the question of tribal jurisdiction and that "Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands and nonmembers."  AR 2271 (Sansonetti Op. at 132 ¶ 4).  With respect to allotments specifically, the Sansonetti Opinion undertook a brief review of the Alaska Native Allotment Act and tentatively concluded, without looking to or providing any specific examples, that "there is little or no basis" for an Alaska Native village to assert territorial jurisdiction over an Alaska Native allotment.  AR 2266-67 (Sansonetti Op. at 127-28).  The Sansonetti Opinion surmised that jurisdiction over Alaska Native allotments (and analytically similar individual Native townsite lots) "would be doubtful if there were no clear tribal nexus" to the site.  AR 2268-69 (Sansonetti Op. at 129-30).[15]

---

[15] Like Native allotments, individual Native townsite lots are held by an individual Alaska Native "subject to statutory restrictions on alienation."  AR 2268 (Sansonetti Op. at 129).  The opinion took the position that the "analysis and conclusions concerning potential tribal jurisdiction over [individual Native townsite] lots are the same as those . . . with respect to Native allotments."  AR 2268-69 (Sansonetti Op. at 129-30).  Thus, while the "clear tribal nexus" language technically appears in the section of the opinion discussing Native townsite lots, it appears that Sansonetti viewed this requirement as applying to allotments as well.  *See* AR 2266 (Sansonetti Op. at 127) (opining that if an allotment holder had "abandoned tribal relations," tribal jurisdiction would fail because there would be no "tribal nexus to support such jurisdiction").  In any event, the Department's Decision interpreted this portion of the Sansonetti Opinion as applying to Alaska Native Allotments.  AR 49 (Decision at 5) (reading Sansonetti to require "a demonstration of a clear or original tribal nexus to the site").

In its Decision here, the Department relied on this language to create a new standard under which an Alaskan tribe is presumed to lack jurisdiction over an Alaska Native allotment unless it can show tribal authority based on "a particularized inquiry into the relevant statutes and circumstances surrounding the allotment's creation, or a demonstration of a clear or original tribal nexus to the site." AR 49 (Decision at 5). That standard is met here, as shown *infra* at 35-43. But it never should have been applied in the first place because it is contrary to law. The new effectively reverses the presumption in *favor* of tribal jurisdiction that the government should have applied, *see supra* at 15-19, singling out Alaska tribes for different treatment without a legally sound rationale. The Department's reliance on Sansonetti to deviate from the standard jurisdictional test is legally unsupportable: The Sansonetti Opinion's analysis was flawed even at the time it was issued, and in the intervening 25 years it has been superseded by legal authorities from Congress, the Executive Branch, and the federal courts. It therefore cannot provide a lawful basis for the Department's action here.

i. *The Opinion's Analysis of Alaska Native Allotments*

The Sansonetti Opinion acknowledged that allotments are Indian Country and cannot be distinguished from other tribal land held in restricted fee or trust, but it nonetheless concluded that "there is little or no basis for a Native village to claim territorial jurisdiction over an allotment." AR 2271 (Sansonetti Op. at 132 ¶ 8). This conclusion was based in part on a brief—and flawed— discussion of the Alaska Native Allotment Act, in which Sansonetti distinguished Alaska Native allotments from "most allotments in the contiguous 48" in part because allotments under the Alaska Native Allotment Act "were not carved out of any reservation." AR 2267-68 (Sansonetti Op. at 128-29). Without providing any reasoning that would make that distinction relevant, much less controlling, the Sansonetti Opinion asserted that this fact "has at least some significance in determining questions of tribal authority." AR 2268 (emphasis omitted). As an initial matter, the

lack of a reservation does not distinguish Alaska Native allotments from public domain allotments in the Lower 48, which likewise were not carved out of a reservation, and over which tribes *can and do* exercise jurisdiction. *Supra* at 18. And in drawing this false distinction, the Sansonetti Opinion failed to acknowledge that courts have long treated Alaska Native allotments as equivalent to public domain allotments awarded under Indian allotment acts in the Lower 48. *E.g.*, *Pence*, 529 F.2d at 138 (finding that the court had jurisdiction to adjudicate Alaska Natives' claims under the Alaska Native Allotment Act in the same manner as other Indian allotment claims); *see also Alaska v. Babbitt*, 38 F.3d 1068, 1073 (9th Cir. 1994) ("The government's interest in the lands described in [Alaska Native] allotment applications is . . . of the type contemplated by the 'trust or restricted Indian lands' limitation of the [Quiet Title Act]."); *Aguilar v. United States*, 474 F. Supp. 840, 846 (D. Alaska 1979) (holding that the federal government has a fiduciary duty to administer Alaska Native allotments for the benefit of Natives based on the federal trust responsibility); *Alaska, Dep't of Pub. Works v. Agli*, 472 F. Supp. 70, 72-73 (D. Alaska 1979) ("Where a dispute involves trust or restricted property, the state may not adjudicate the dispute nor may its laws apply.").

The Sansonetti Opinion next attempted to distinguish Alaska Native allotments from general Indian allotments on the basis that, in Sansonetti's view, Alaska Native allotments are more akin to a subset of Indian allotments known as "homestead" allotments, issued under a variety of Indian homestead allotment acts in the Lower 48. Unlike the General Allotment Act of 1887 or tribe-specific allotment acts, Indian homestead acts allowed Indians to receive allotments under general (non-Indian) allotment statutes, but nonetheless specified that such allotments would be held in trust rather than in fee. *See* AR 2266 (Sansonetti Op. at 127 (citing Act of March 3, 1874, § 15, 18 Stat. 402, 420; Indian Homestead Act of 1884, 23 Stat. 76, 96)). Sansonetti noted that

these Indian homestead allotment acts did not necessarily require tribal membership.[16]   *Id.*
Sansonetti also emphasized that some Indian homestead allotment acts granted allotments only to
Indians "who ha[d] abandoned, or may hereafter abandon, his tribal relations."   *Id.* (quoting Act
of March 3, 1875, 18 Stat. at 420).   Based on these observations, the Sansonetti Opinion suggested
that "an assertion of tribal jurisdiction over an Indian homestead allotment obtained by an Indian
who had abandoned tribal relations would fail" because in that circumstance "there would be no
original tribal nexus to support such jurisdiction over the allotment."   *Id.*   Relying on this house of
cards, Sansonetti asserted that Alaska Native allotments were "more like Indian homestead
allotments, rather than those issued pursuant to the General Allotment Act or other tribe-specific
allotment acts" because they did not require an allottee to prove membership in a particular tribe
in order to be eligible for an allotment, and because the language of the Alaska Native Allotment
Act provided that the allotment "shall be deemed the homestead of the allottee and his heirs."   AR
2267-68 (Sansonetti Op. at 128-29 & n.305).   Sansonetti then relied on this perceived similarity to
conclude—again without further explanation—that there was "little or no" basis for a tribe to assert
jurisdiction over an allotment issued under the Alaska Native Allotment Act.   AR 2268 (Sansonetti
Op. at 129).   Yet in likening Alaska Native allotments to Indian homestead allotments, the
Sansonetti Opinion entirely ignored the fact that the Alaska Native Allotment Act does not require
an allottee to abandon tribal relations; its broad analogy to Indian homestead allotment acts
therefore sheds no light on whether tribes might exercise jurisdiction over allotments issued under
the Alaska Native Allotment Act.   Nor does the Sansonetti Opinion provide any analysis of

---

[16] Other (non-homestead) Indian allotment acts, like the General Allotment Act of 1887 or certain tribe-specific allotment acts, tended to require that the applicant demonstrate tribal membership. *See* AR 2266 (Sansonetti Op. at 127) (citing 43 C.F.R. § 2531.1(a)).

situations in which the allottee had *not* abandoned tribal relations, as is precisely the case here. *See infra* at 36-38.

Moreover, Sansonetti's attempt to distinguish Indian homestead allotments from other Indian allotments directly conflicts with U.S. Supreme Court precedent which unequivocally "held that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments." AR 2266 (Sansonetti Op. at 127 (citing *United States v. Jackson*, 280 U.S. 183 (1930))). Thus, even if Alaska Native allotments could be likened to Indian homestead allotments, the analogy would have no significance to the jurisdictional inquiry here. The Sansonetti Opinion acknowledged this precedent but made no attempt to reconcile its conclusions with it. Properly understood, both Indian homestead allotments and other Indian allotments may be subject to tribal jurisdiction if they meet the applicable IGRA test, and Alaska Native allotments are no different. In short, because it relied on arbitrary distinctions and conflicted with controlling precedent, the Sansonetti Opinion's analysis of Alaska Native allotments was of limited persuasive value even at the time it was issued.

### ii. *The Opinion's Analysis of ANCSA's Impact*

Even before it was superseded, the Sansonetti Opinion's analysis of ANCSA, too, rested on a weak foundation. The Opinion premised its analysis of tribal jurisdiction in part on the assertion that "ANCSA largely controls" the determination of whether Alaska Native tribes exercise jurisdiction over any lands in question. AR 2247 (Sansonetti Op. at 108). But the opinion offered little rationale for inferring such a broad scope in ANCSA. Congress's purpose in ANCSA was to settle disputed aboriginal claims within Alaska, *see* 43 U.S.C. § 1601(a); by its own terms, ANCSA did not purport to impact the status of tribes or tribal jurisdiction. When Congress amended ANCSA in 1987, it included a provision expressly disclaiming any impact on "sovereign governmental authority over lands . . . or persons in Alaska." Pub. L. No. 100-241, § 2(8)(B), 101

Stat. 1788, 1789 (1988) (codified at 43 U.S.C. § 1601 note).  A House Committee report at the time of the amendments explained:

> ANCSA was an Indian land claims settlement act.  *It was not, at the time, the intent of Congress to deal in any way with the issue of governmental authority of villages in Alaska*.  If village entities had tribal governing powers under existing law prior to the passage of ANCSA, ANCSA did not [a]ffect them.  If they did not have such powers, ANCSA did not bestow them.

H.R. Rep. No. 99-712 at 27 (1986) (emphasis added).[17]  The Sansonetti Opinion's overly broad reading of ANCSA to shed light on issues of tribal jurisdiction therefore finds no basis in the statute itself.

Similarly, although ANCSA repealed the Alaska Native Allotment Act, it had no impact on existing allotments, and it contained a savings provision expressly allowing the Department to continue granting allotments to individuals whose applications were pending at the time of enactment.  43 U.S.C. § 1617(a).  This carefully crafted savings provision evinces Congress's studied intent to avoid any impact on existing allotment rights.  Congress later extended this provision even further, automatically granting some pending allotment applications and reopening previously-denied applications within certain regions. 43 U.S.C. § 1634(a).  This extension shows Congress understood that existing allotments—and the legal framework governing jurisdiction

---

[17] Hearing testimony by Senator Ted Stevens of Alaska, one of ANCSA's primary sponsors, painted a similar picture:

> ANCSA was and is a land settlement.  It did not terminate the special relationship between Alaska Natives from the Federal Government or resolve any question concerning the governmental status, if any, of various Native groups. . . . The Act's declaration of settlement is very clear.  It extinguishes aboriginal claims of settlement and aboriginal hunting and fishing rights, and nothing more or less.

Hearings on S. 2065 before the Subcommittee on Public lands of the Senate Committee on Energy and Natural Resources, 99th Cong., 2d Sess. 329 (1986) (statement of Senator Stevens).

over them—could coexist with ANCSA.  In short, whatever its impact on other aboriginal lands in Alaska, ANCSA did not undercut tribal territorial jurisdiction with respect to Native allotments.

Application of the Indian law canon, which requires statutes "to be construed liberally in favor of the Indians," *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985), counsels the same result.  ANCSA and the ANCSA amendments are "Indian legislation" subject to this canon, and any ambiguity must be construed to the benefit of Indians and Indian tribes.  *See* Pub. L. No. 100-241, § 2(9), 101 Stat. 1788 ("[T]he Alaska Native Claims Settlement Act and this Act are Indian legislation . . . .").  Here, given the lack of any clear or express indication in ANCSA that Congress intended to deprive tribes of jurisdiction over their members' allotments, ANCSA must be construed as preserving such jurisdiction.  *See also, e.g.*, *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 354 (1941) (even where Congress has power to extinguish tribal territorial rights, such "extinguishment cannot be lightly implied"); *United States v. Eberhardt*, 789 F.2d 1354, 1361 (9th Cir. 1986) ("Only Congress can modify or abrogate Indian tribal rights; it will be held to have done so only when its intention to do so has been made absolutely clear.").  This conclusion is compelled by principles of Indian law and the Treaty of Cession's promise that Alaska Native tribes are subject to those same principles of Indian law on the same basis as tribes in the Lower 48.  *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2482 (2020)  ("If Congress wishes to withdraw its promises, it must say so.").

### iii.  *Superseding Changes in the Law*

Even if it had been persuasive when it was issued (and it was not), the Sansonetti Opinion has since been superseded by multiple changes in law.  In 1994 Congress enacted several pieces of legislation that superseded the Sansonetti Opinion in multiple respects.  While the Sansonetti Opinion concluded that Alaska tribes could indeed be federally recognized tribes, this was later confirmed and unequivocally settled by the 1994 Federally Recognized Indian Tribe List Act,

which required that the Secretary of Interior publish annually a list of federally recognized tribes, 25 U.S.C. § 5131, and confirmed that once recognized, a tribe "may not be terminated except by an Act of Congress." Pub. L. No. 103-454, § 103(4), (5), 108 Stat. 4791, 4791-92 (1994). The Department has consistently included Alaska Tribes, including Eklutna, on the annual list, and there is no longer any question about their status as federally recognized Indian tribes with the same rights and powers as other Indian tribes.[18] At the same time as the List Act, Congress also enacted the Tlingit and Haida Status Clarification Act, which found that the Secretary of Interior had erroneously omitted the Central Council of Tlingit and Haida Indian Tribes of Alaska from the list of federally recognized tribes because "the Secretary may not administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress." *Id.* §§ 202(4), 108 Stat. at 4792. The Act then reaffirmed the Central Council as a federally recognized tribe. *Id.* § 203, 108 Stat. at 4792.

Most importantly, in 1994 Congress also amended the IRA to add the "privileges and immunities" provisions discussed above, which prohibit the federal government from treating federally recognized tribes differently. Pub. L. No. 103-263, § 5(b), 108 Stat. 707, 709 (1994)

---

[18] In the preamble to the list of federally recognized tribes published by the Department in 1993, the Department explained:

> This list is published to clarify that the villages and regional tribes listed below are not simply eligible for services, or recognized as tribes for certain narrow purposes. Rather, they have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; are entitled to the same protection, immunities, privileges as other acknowledged tribes; have the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes.

Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 58 Fed. Reg. 54,364, 54,366 (Oct. 21, 1993).

(codified at 25 U.S.C § 5123(f)-(g)). These provisions invalidate the Sansonetti Opinion's conclusions regarding Alaska Native allotments, which drew arbitrary distinctions between tribal jurisdiction over allotments in Alaska and the Lower 48. None of the Opinion's rationales for treating Alaska Native allotments differently—which were legally unfounded in any event—stand up to the clear language of the privileges and immunities provisions, which invalidate *any* prior administrative decision or determination that "diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes." 25 U.S.C § 5123(g). There can be no question that, in addition to gaming rights under IGRA, *see Koi Nation*, 361 F. Supp. 3d at 52, the extent of a tribe's territorial jurisdiction is a "privilege" protected by that provision of the IRA, *see Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982) ("there is a significant territorial component to tribal power").

Nor can the Sansonetti Opinion's expansive interpretation of ANCSA provide a basis on which to diminish Alaska tribes' jurisdiction. Against the backdrop of the privileges and immunities provisions, Alaska tribes may be treated differently with respect to territorial jurisdiction only if ANCSA expressly directs as much. It does not. As noted above, ANCSA dealt only with outstanding land claims and explicitly disclaimed any impact on tribal sovereignty or "sovereign governmental authority over lands . . . or persons in Alaska." Pub. L. No. 100-241, § 17(a), 101 Stat. 1788, 1814 (1988). The Sansonetti Opinion's interpretation of ANCSA reaches beyond ANCSA's statutory framework as "an Indian land claims settlement act," H.R. Rep. No. 99-712 at 27, and diminishes Alaska tribes' privileges with respect to tribal jurisdiction without a statutory basis for that diminishment.

Consistent with the congressional intent expressed in the privileges and immunities provisions, and in ANCSA itself, recent court decisions have adopted a narrower view of ANCSA

and struck down provisions that discriminate between Alaska tribes and Tribes in the Lower 48. In *Akiachak Native Community v. Salazar*, this Court invalidated an Alaska-specific exception to the Department's trust land regulations, holding that it violated the privileges and immunities protections of 25 U.S.C. § 5123(g) (then codified at 25 U.S.C. § 479a-1(g)). 935 F. Supp. 2d 195. This Court rejected the argument that ANCSA implicitly repealed the Secretary's authority to take land into trust under the IRA. The reasoning underlying that ruling directly upsets the conclusion drawn in the Sansonetti Opinion that ANCSA's broad scope means it controls all questions relating to Alaska tribes and Indian land.

The Department itself reached a similar conclusion in its 2014 promulgation of a Final Rule that eliminated the Alaska exception that had been struck down in the *Akiachak* litigation.[19] 79 Fed. Reg. 76,890 (Dec. 23, 2014). In promulgating the Final Rule, the Department admonished: "It is important to remember that Alaska Native land and history did not commence with ANCSA, and that ANCSA did not terminate Alaska Native tribal governments." *Id.* ANCSA therefore had no impact, the Department concluded, on the Department's ability to take land into trust for Alaska tribes. *Id.* The Final Rule also explained, echoing the privileges and immunities provisions, that "the Department's policy is that there should not be different classes of federally recognized tribes." 79 Fed. Reg. at 76,890.

In sum, in light of the significant superseding changes in the law, it is now clear that the privileges and immunities provisions prohibit the Department from diminishing Alaska tribal authority over territory and nonmembers absent statutory direction to the contrary—and that

---

[19] This 2014 Final Rule had been promulgated by the time the *Akiachak* case reached the D.C. Circuit on appeal. The Circuit therefore vacated the district court's decision as moot, because the challenged rule was no longer in effect. *Akiachak Native Cmty.*, 827 F.3d at 115.

statutory direction cannot be found in ANCSA.  The Department acted arbitrarily and capriciously by ignoring governing legal principles—which have been further informed by relevant developments in the law since 1993—and instead relying on the Sansonetti Opinion's outdated and unjustifiably broad interpretation of ANCSA's scope.  It was similarly arbitrary and capricious to rely on the Sansonetti Opinion's analysis of Alaska Native allotments, which drew impermissible distinctions that had the effect of diminishing Alaska tribes' privileges.  By relying on the Opinion's conclusion that a tribe lacks jurisdiction *unless* it can show an original tribal nexus to the site, the Department impermissibly reversed the jurisdictional presumption that applies to tribes outside Alaska, ignored controlling precedent and directly violated the privileges and immunities protections of 25 U.S.C. § 5123(f) and (g).  The Department's decision is therefore erroneous as a matter of law.

### C.     Even if the Sansonetti Analysis Were Properly Applicable, Eklutna Met that Test Because it Showed a "Tribal Nexus" to the Allotment.

In its Submission the Tribe also demonstrated that, even if the Sansonetti Opinion applied, the Tribe's relationship with the Ondola Allotment satisfies the Opinion's "tribal nexus" test.  The Allotment's unique connection to the Tribe's historic struggle to preserve its land base, the Ondola family's continuous ties to the Tribe and its government, and the Tribe's continued exercise of authority over and provision of services to the Allotment, as discussed in detail below, are among the elements that conclusively establish a strong and enduring nexus between the Allotment and the Tribe.  The Tribe's Submission therefore established that the Ondola Allotment qualifies as "Indian lands" as defined in IGRA, and the Tribe is entitled to an affirmative Indian lands determination.

The Tribe provided numerous facts demonstrating its exercise of jurisdiction and its close connection to the Ondola Allotment, many of which reflected the very same indications that had

been found relevant in prior Indian lands determinations.  As a starting point, the Tribe demonstrated that the Ondola Allotment was located squarely within Eklutna's traditional lands in the upper Cook Inlet region, AR 779, 808-941 (Submission at 2, Exs. 1-5), portions of which were set aside by the federal government in the 20th century for purposes of a Native reservation, AR 780-81, 869-70, 893 (Submission at 3-4, Exs. 2-3); *see also* Executive Order No. 4778 (Dec. 5, 1927); Public Land Order No. 2427; Public Land Order No. 2516.  The record also showed that the Ondola Allotment itself had been included within one of these federal reserves, forming part of the Eklutna School Reserve that had been set aside for the benefit and education of Alaska Natives.  AR 2276 (Secretarial Order of October 30, 1936).  While the Department dismissed the significance of this fact by noting that the Allotment "only briefly formed part" of the reserve, AR 54 (Decision at 10), this amounts to an argument that because the government acted swiftly in shrinking the meager protections it had once afforded to the Tribe's lands, the reserved status of the lands was never significant to begin with.  *Cf. McGirt v. Oklahoma*, 140 S. Ct. 2452, 2474 (2020) (rejecting Oklahoma's argument that loss of Indian lands necessarily means loss of tribal jurisdiction, because it would condone a situations in which "Indian landowners lose their titles by fraud or otherwise in sufficient volume that no one remembers whose land it once was").  Finally, the Tribe showed that the Olga Ondola applied for the allotment, with the assistance of her son George Ondola, the Tribal Council President, as a component of a strategy to preserve the Tribe's dwindling land base. AR 43-44 (Aff. of Aaron Leggett); AR 2110 (Suppl. Submission, Statement of George Ondola).

The Tribe also provided evidence demonstrating that the original allottee and all of the present-day allotment holders are Eklutna tribal members.  AR 783-84 (Submission at 6-7); *see also* Compl. ¶¶ 1, 22, 34; Answer ¶¶ 1, 22, 34.  And the Tribe's evidence showed that Olga

Ondola's son, George Ondola, who lived on the Allotment for decades, had been Eklutna Tribal Council President from 1961 to 1971 and from 1995 to 1997.  AR 784 (Submission at 7); AR 981 ¶ 1 (Submission Ex. 13).  This is precisely the type of evidence on which other Indian land determinations have relied, looking at whether "there is . . . a political relationship with the owners of the lands."  AR 56 (Decision at 12 (citing Quinault Determination at 5)).  One would be hard-pressed to find a more direct political relationship than an allotment holder who is not only a tribal member but also serves as President of the tribal government.[20]  Yet despite purporting to rely on this language from the Quinault Determination, the Department's decision found the Ondolas' membership was not dispositive, and it completely and arbitrarily disregarded the Tribe's evidence regarding the family's active service in tribal government.  *See* AR 56-57 (Decision at 12-13); *see also Mashpee Wampanoag Tribe v. Bernhardt*, No. CV 18-2242 (PLF), 2020 WL 3037245, at *21 (D.D.C. June 5, 2020) (holding the Department's determination of tribal status to be arbitrary and capricious in part because the Secretary had treated a certain type of evidence as helpful in a prior determination, and then "[b]y contrast . . . characterized that same type of evidence very differently and dismissed it as entirely unhelpful for the Mashpee Tribe").[21]

In support of its assertion that the allottees' tribal membership did not support a finding of jurisdiction, the Department cited an Indian lands determination that addressed an entirely different situation, involving an allotment that had been carved out of one tribe's lands and allotted to a

---

[20] Indeed, Sansonetti's speculation that an Alaska tribe's "assertion of jurisdiction over an Indian homestead allotment obtained by an Indian who had abandoned tribal relations would fail" for lack of "original tribal nexus," AR 2266 (Sansonetti Op. at 127), suggests that a showing that the allottee retained tribal relations, as is the case here, in fact provides such tribal nexus.

[21] The Department went so far as to suggest that Olga Ondola's tribal membership was uncertain, alleging that the Tribe had not provided adequate evidence of her enrollment.  AR 57 (Decision at 13 n.131).  The Department now concedes that Olga Ondola and her descendants, who now hold the allotment, are all tribal members.  *See* Compl. ¶¶ 1, 22, 34; Answer ¶¶ 1, 22, 34.

member of that tribe, but then was later held (in part) by heirs who were members of several *different tribes*. AR 57 (Decision at 13 (citing Whitecloud Indian Lands Opinion, AR 2454-65)). In that unique circumstance the NIGC determined that the divergent tribal membership of some heirs did not defeat the original tribe's claim of jurisdiction. AR 2460-61. By no stretch of the imagination is this a "similar claim" to Eklutna's assertion of jurisdiction over the Ondola Allotment, *see* AR 57 (Decision at 13), which was allotted to an Eklutna tribal member and has only ever been held by Eklutna members, *see* Compl. ¶ 34; Answer ¶ 34. The Department's analogy to this claim is misleading at best, and it does not suggest that tribal membership somehow fails to support a finding of a tribal nexus.

The Tribe also submitted extensive evidence that the Tribe had provided governmental services to the Ondola Allotment across many decades and up to the present day, but the Department largely ignored this evidence. This disregard of the Tribe's evidence was arbitrary and capricious, as "[a]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of [the APA]." *Mashpee Wampanoag Tribe*, 2020 WL 3037245, at *18 (second alteration in original) (quoting *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)). Among other things, the Tribe presented evidence that the Tribe provides health care and social services on the Ondola Allotment, including home visits by the Tribal Family Nurse Practitioner and the Tribal Wellness Director, AR 982 ¶ 12 (Submission Ex. 13); AR 975 ¶ 8.A. (Submission Ex. 11), delivered moose meat and salmon to Olga Ondola and the family as part of the Tribe's effort to preserve and maintain Eklutna's traditional culture and subsistence lifestyle, and also delivered food boxes through the Tribal food bank program, AR 983 ¶ 14 (Submission Ex. 13); AR 975 ¶¶ 7, 8.D (Submission Ex. 11), and placed foster children in the Ondola home on the Allotment through the Tribe's Indian Child Welfare program, AR 982 ¶ 8

(Submission Ex. 13).  More specifically, on several occasions the Tribe assessed George and Susie Ondola's home on the Allotment for child custody placement.  *Id.*  Over the years, through its authority under the Indian Child Welfare Act, the Eklutna Tribal Court has placed multiple children in the Ondola home on the Allotment.  *Id.*; *see also* AR 975 ¶ 8.F (Submission Ex. 11).

The Tribe also provided evidence that it had exercised its authority to manage and protect the land itself, including managing timber on the Allotment, cutting trees on the Allotment to create a fire perimeter around the Ondola house, drilling a well and building a septic system on the Allotment, and providing road maintenance services on the Allotment.  AR 982 ¶¶ 9-10 (Submission Ex. 13).  The Tribal Land and Environmental Department has conducted inspections of the Ondola Allotment for compliance with tribal environmental laws, AR983 at 983 ¶ 15, and as part of the Tribe's environmental compliance and clean-up efforts, the Tribe has caused junk cars and trash to be removed from the Allotment, *id.*  The Tribe has adopted an Environmental Protection Ordinance that regulates contamination of air, land, and water within the Tribe's traditional jurisdictional area, including the Ondola Allotment.  AR 1070-72 (Submission Ex. 19).  Similarly, the Tribe regulates access to tribal land, including the Ondola Allotment, by adoption and enforcement of an ordinance limiting access to tribal land.  AR 1080-82 (Submission Ex. 21).  Pursuant to this tribal ordinance, the Tribe has posted numerous signs along the perimeter of the Ondola Allotment, which state that the Allotment is subject to tribal authority.  AR 976 ¶ 10 (Submission Ex. 11); AR 983-84 ¶ 16 (Submission Ex. 13).  Tribal officials continue to visit the Allotment to check for signs of trespassing and for general inspection purposes.  *See* AR 988 ¶ 4.

In its Decision the Department did not directly dispute these facts; instead it attempted to dismiss them by asserting that they "conflate IGRA's threshold requirement to demonstrate that the Tribe possesses territorial jurisdiction with its subsidiary requirement to show that the Tribe

39

exercises such authority." AR 59 (Decision at 15). But this response misses the relevance of the evidence to the Decision's own tribal nexus test under Sansonetti. Under the Sansonetti test, according to the Department, a tribe must demonstrate a tribal nexus to the site in order to show that it has jurisdiction. AR 50 (Decision at 6). And in the Department's own formulation of that test, one of the relevant factors in analyzing whether a tribal nexus exists is the provision of government services in the area. AR 56 (Decision at 12). The government found these exact same indications of authority relevant in other cases. AR 2470-71 (Big Sandy Determination at 5-6); AR 2512 (Quinault Determination at 6). To the extent that the nexus test for jurisdiction requires the Department to look at indications of authority that would typically be considered under the second prong instead, this is a product of the Department's own interpretation of the Sansonetti test. Under that test, the Tribe showed extensive governmental services and exercise of authority on the Allotment, and the Department's attempts to dismiss the Tribe's evidence are unfounded.

The Tribe also provided evidence that it had asserted jurisdiction over the Allotment in multiple other ways, including through its Tribal Constitution which provides:

> The government of the Native Village of Eklutna shall have jurisdiction of the land and waters constituting Indian Country of the Eklutna Tribe as defined by federal law. To the extent consistent with federal law, such lands and waters customarily and traditionally used by the Eklutna People, including . . . *all fee and allotment lands within the traditional lands of Eklutna*, not withstanding the issuance of any patent or unrestricted fee title to such lands.

AR 954 (Submission Ex. 7, Native Vill. of Eklutna Const. art. II, § I). The Ondola Allotment also lies within the scope of the Tribe's environmental protection laws, AR 1070-72 (Submission Ex. 19), its animal control ordinance, AR 1021 (Submission Ex. 15), and its Relatives Talk Code, which provides a forum for the resolution of disputes, AR 1024-31 (Submission Ex. 16). The Department dismissed these assertions of jurisdiction as flowing from the Tribe's personal jurisdiction over its members rather than from territorial jurisdiction over Indian country. AR 60

(Decision at 16). But while it is true that personal jurisdiction over tribal members extends beyond Indian country, *see id.* (citing *John v. Baker*, 982 P.2d 738 (Alaska 1999)), that does not mean that a tribe's jurisdiction flows *only* from its personal jurisdiction over tribal members—within Indian country, tribes also possess territorial jurisdiction. *Venetie*, 522 U.S. at 527 n.1 ("[P]rimary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it."); *Merrion*, 455 U.S. at 137 (describing tribe's "general authority, as sovereign, to control economic activity within its jurisdiction" as an "instrument of self-government and territorial management"). And in fact, many of the Tribe's assertions of jurisdiction tie directly to tribal lands, including the Ondola Allotment, so they are not merely assertions of authority over the Tribe's members. *E.g.*, AR 954 (Submission Ex. 7, Native Vill. of Eklutna Const. art. II, § I (asserting jurisdiction over "*allotment lands within the traditional lands of Eklutna*")). The Department's analysis misunderstood this key point.

The Tribe also demonstrated that the Municipality of Anchorage recognizes the Tribe's sovereignty, and the Tribe has entered into a Letter of Agreement with the Municipality of Anchorage Police Department regarding coordination of public safety and law enforcement matters. AR 795 (Submission at 18); AR 1083-85 (Submission Ex. 22). But the Department's Decision instead focused arbitrarily on the fact that the State of Alaska and the Municipality of Anchorage exercise some degree of jurisdiction over the Ondola Allotment. AR 59 (Decision at 15). The Department's emphasis on State jurisdiction was arbitrary and capricious because court precedent makes clear that the existence of concurrent jurisdiction does not defeat tribal jurisdiction for purposes of the IGRA Indian lands analysis. In both *Narragansett*, 19 F.3d at 702, and *Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d at 625, the First Circuit examined the tribal jurisdiction prong of the IGRA Indian lands test and held that the respective tribe retained

41

jurisdiction over certain settlement lands in both cases—despite a statutory grant of jurisdiction to the relevant State—because the statute had not clearly expressed an intent to deprive the tribe of jurisdiction. *Narragansett*, 19 F.3d at 702; *Wampanoag*, 853 F.3d at 625.[22] Moreover, a State's unilateral assertion of jurisdiction, even "for decades," cannot deprive a tribe of jurisdiction or give the State jurisdiction beyond what it would otherwise possess. *McGirt*, 140 S. Ct. at 2470-71. "That would be the rule of the strong, not the rule of law." *Id.* at 2474. The Department's analysis of this factor was thus arbitrary and capricious.

Finally, the Department concluded that the Tribe lacked a tribal nexus to the Ondola Allotment site because it was not near an existing reservation. AR 61 (Decision at 17). But as an initial matter, as shown above, this analysis misapplies previous precedent that requires only proximity to a "tribal community." AR 2469 (Big Sandy Determination at 4); AR 2511 (Quinault Determination at 5). While purporting to rely on this precedent, the Department in fact created a new test that is not borne out anywhere in the law. Furthermore, in requiring proximity to an existing reservation, the Department's analysis imposed a requirement that even the Sansonetti Opinion itself did not demand. Under its own terms, the Sansonetti Opinion cannot be read to require proximity to a reservation in order to establish tribal jurisdiction. The Sansonetti Opinion correctly stated that Indian reservations generally did not exist in Alaska after ANCSA (with the exception of one reservation not relevant here, for a tribe that fell outside ANCSA's scope). AR

---

[22] Concurrent jurisdiction is the norm in so-called "Public Law 280 states" such as Alaska, in which 18 U.S.C. § 1162(a) and 28 U.S.C. § 1360(a) give concurrent jurisdiction to the respective state while leaving "the inherent civil and criminal jurisdiction of Indian nations untouched." *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024, 1028 n.5 (9th Cir. 2011) (first quoting Felix Cohen, Cohen's Handbook of Federal Indian Law 560-61 (2005 ed.); then citing *Native Vill. of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 560-62 (9th Cir. 1991); and then citing *Walker v. Rushing*, 898 F.2d 672, 675 (8th Cir. 1990)).

2250 (Sansonetti Op. at 111). Yet despite the lack of reservations, Sansonetti acknowledged that an Alaska tribe might exercise jurisdiction over a Native allotment or Native townsite lot if the tribe could show an original tribal nexus to the site. AR 2266, 2269 (Sansonetti Op. at 127, 130). The Department's imposition of a reservation requirement is therefore arbitrary and capricious, and it cannot possibly flow from the authority on which the Department purportedly relied.[23]

Because Eklutna provided extensive evidence showing an original tribal nexus to the Allotment site, the Tribe demonstrated that it has jurisdiction and exercises governmental authority under the Sansonetti test. Thus, even if the Sansonetti Opinion had not been superseded and the Sansonetti test were properly applicable, the Tribe has met that test. The Department's decision to the contrary is not supported by the evidence, and it is accordingly arbitrary and capricious.

## II. THE LEASE DISAPPROVAL WAS ARBITRARY AND CAPRICIOUS BECAUSE IT WAS BASED ENTIRELY ON THE FLAWED INDIAN LANDS DETERMINATION.

The Department's decision to disapprove the Tribe's proposed lease of the Allotment is similarly invalid, because it rested wholly on the flawed Indian lands determination. The Department disapproved the Tribe's proposed lease in a brief statement on the final page of the Decision, which stated simply that the Ondola Allotment is "ineligible for gaming under IGRA, for which reason [the Department] must disapprove the Tribe's proposed Lease of the Ondola

---

[23] While the Defendants may attempt to rely on Indian lands determinations involving other Alaska tribes, each of those decisions is distinguishable. In an Indian lands determination involving the Native Village of Barrow, AR 2500-06, the NIGC concluded that individual Native townsite lots held by tribal members were not Indian lands because—in stark contrast to the situation here—the Village could not establish that it had exercised power "over time" and instead many of the indicia of tribal authority were of recent origin. AR 2505-06 (Barrow Determination at 6-7). The Akiachak determination cited by the State in its motion to intervene, ECF No. 19-12, did not involve an allotment and was denied in light of pending litigation and the unsettled state of the law, which has since been resolved, *id.* at 2-3. Finally, the Kenaitze Indian Tribe's request for approval of a gaming ordinance, also cited in the State's motion, ECF No. 19-14, was withdrawn before a final decision was issued, *id.* at 2.

Allotment for gaming purposes." AR 61 (Decision at 17).  After setting out the broad terms of the lease in the background discussion, the Decision contains no analysis of the lease and no further explanation for the lease disapproval.  AR 46-47, 61 (Decision at 2-3, 17).  The disapproval therefore is based entirely on the Department's determination that the Allotment does not constitute Indian lands for purposes of § 2703(4)(B) of IGRA.

Because it is based entirely on the Indian lands determination, which was contrary to law and arbitrary for the many reasons discussed above, the lease disapproval is arbitrary, capricious, and contrary to law for all of the same reasons.  And because "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action,'" any other rationale the Department offers here would be an "impermissible '*post hoc* rationalization.'"  *Regents of the Univ. of Cal.*, 140 S. Ct. at 1907, 1908 (quotations omitted).  If the Indian lands determination is held unlawful, therefore, the lease disapproval must be invalidated as well.

### III. THE TRIBE IS ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF REVERSING THE DEPARTMENT'S FLAWED DETERMINATION.

Because the Department's negative Indian lands determination and the lease disapproval were both invalid, the Tribe is entitled to declaratory and injunctive relief as to both decisions.

With respect to the Indian lands determination, the Tribe has established that the Department failed to apply the proper tribal jurisdiction test established by its own precedent on public domain allotments, instead applying the outdated Sansonetti test that has been superseded by intervening changes in law, including the adoption of the IRA's privileges and immunities protections, 25 U.S.C. § 5123(f).  Because it has been superseded, application of the Sansonetti test was wrong as a matter of law.  At a minimum, therefore, the Tribe is entitled to declaratory and injunctive relief vacating the Department's Decision and holding that the Department's application of the Sansonetti test for tribal jurisdiction was arbitrary, capricious, and contrary to

law because the Sansonetti Opinion violates 25 U.S.C. § 5123(f).  *See Koi Nation*, 361 F. Supp. 3d at 56 (vacating Department's decision as to tribe's IGRA eligibility because the Department's application of an IGRA regulation was "invalid under § 5123(f)"); *cf. Akiachak Native Cmty. v. Jewell* ("*Akiachak II*"), 995 F. Supp. 2d 7, 19 (D.D.C. 2013) (vacating portion of Department's trust land regulations because the Alaska exception violated § 5123(g)), *vacated as moot*, 827 F.3d 100 (D.C. Cir. 2016).  The Tribe is entitled to declaratory and injunctive relief vacating the Department's lease disapproval for the same reason.

Moreover, the Tribe has also demonstrated that it provided extensive evidence satisfying the applicable test for exercise of governmental power under § 2703(4)(B) of IGRA.  The Department's decision did not dispute these facts but rather failed to apply the correct precedent and failed to adequately consider the evidence presented by the Tribe.  Because the Tribe has established as a matter of law that it satisfies the § 2703(4)(B) test, the Tribe is also entitled to declaratory and injunctive relief reversing the Department's decision and holding that the Ondola Allotment constitutes Indian lands within the meaning of § 2307(4)(B).  *See Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d at 624-26 (considering evidence of Tribe's exercise of governmental power and concluding that it meets the jurisdiction and governmental authority prongs of IGRA § 2307(4)); *Narragansett*, 19 F.3d at 701-03 (same).  Nonetheless, if the Court determines that it does not have adequate factual evidence to reverse the Department's Decision and instead chooses to vacate and remand the decision, any remand order should hold that the Sansonetti Opinion has been superseded and bar the Department from applying it to any future decision on the Tribe's Indian lands request.

## CONCLUSION

For the reasons stated above, the Tribe is entitled to summary judgment on Counts I and III, reversing the Indian lands determination and vacating the lease disapproval.

Respectfully submitted this 30th day of October 2020.

SONOSKY, CHAMBERS, SACHSE,
 ENDRESON & PERRY, LLP

By:_____*/s/ Colin Cloud Hampson*_____
        Colin Cloud Hampson, D.C. Bar No. 448481
        145 Willow Road, Suite 200
        Bonita, CA 91902
        Telephone: (619) 267-1306
        Facsimile: (619) 267-1388
        champson@sonoskysd.com

        Whitney A. Leonard
        Alaska Bar No. 1711064
        Montana Bar No. 36409732
        *Pro hac vice*
        Sonosky, Chambers, Sachse, Miller &
          Monkman, LLP
        725 East Fireweed Lane, Suite 420
        Anchorage, AK 99503
        Telephone:  (907) 258-7388
        Facsimile:  (907) 272-8332
        whitney@sonosky.net

        *Attorneys for the Native Village of Eklutna*