IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Native Village of Eklutna**,<br><br>            Plaintiff,<br><br>   v.<br><br>**U.S. Department of the Interior**, et. al,<br><br>            Defendants,<br><br>  and<br><br>**State of Alaska**,<br><br>            Defendant-Intervenor | Case No. 1:19-cv-02388-DLF |

**Federal Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross-Motion**

<div align="right">

PAUL E. SALAMANCA
Deputy Assistant Attorney General

KRISTOFOR R. SWANSON
Natural Resources Section
Envt. & Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611

</div>

December 18, 2020

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Relevant Background ................................................................................. 2

    I.    Legal Background ........................................................................ 3

    II.   The Native Village of Eklutna & the Ondola Allotment .............. 8

    III.  The Decision at Issue.................................................................... 9

Standard of Review ................................................................................... 11

Argument .................................................................................................. 12

    I.    The Department's Decision is Well-Reasoned and Supported
        by the Record ............................................................................. 13

        A.   The Department's Interpretation of the Alaska Native
             Allotment Act is Consistent with the Act's Plain
             Language ........................................................................... 14

        B.   The Record Supports the Conclusion that the Ondola
             Allotment Was Never Part of Any Reservation Held for
             the Benefit of the Native Village of Eklutna...................... 28

        C.   The Department Did Not Act Arbitrarily in
             Concluding the Tribe Had Not Shown Any Other
             Tribal Nexus That Would Justify a Finding of Tribal
             Territorial Jurisdiction....................................................... 35

    II.   Because the Ondola Allotment Does Not Constitute "Indian
        Lands" Under IGRA, the Department Appropriately Decline
        to Approve the Lease ................................................................... 42

    III.  Even If the Department Had Acted Arbitrarily, the Tribe
        Would Not Be Entitled to An Order Establishing the Ondola
        Allotment as "Indian Lands"....................................................... 43

Conclusion ............................................................................................... 44

## INTRODUCTION

This case involves a parcel of land in Alaska that was never part of any Indian reservation held for the Plaintiff Native Village of Eklutna.  The parcel was allotted from public domain lands in 1963 to an individual Indian without any requirement that she be a member of, or that the land have a link to, any tribe.  And the parcel has no other nexus to tribal territorial jurisdiction.  The Native Village of Eklutna (an Indian tribe) nonetheless asked the Department of the Interior to declare the parcel "Indian lands" under the Indian Gaming Regulatory Act (IGRA) so that the Tribe could lease the property and open a casino.  The Department, however, concluded that the property did not constitute "Indian lands" because the Tribe had not shown that it has territorial jurisdiction over the parcel, a threshold requirement under IGRA.  The Tribe challenges that decision under the Administrative Procedure Act.

The Department of the Interior's decision was well-reasoned.  The allotment was issued under the 1906 Alaska Native Allotment Act, which the Department has long interpreted—absent some site-specific circumstance— not to have created tribal territorial jurisdiction over allotments.  Further, the administrative record supports the Department's conclusion that the Allotment was never part of any Indian reservation held for the benefit of the Native Village of Eklutna, and that the Tribe had not shown any other tribal

1

nexus to the site that would substantiate a finding of tribal territorial jurisdiction.

The Tribe argues that it has been treated differently than other tribes. Yet the Tribe does not identify any circumstance in which a tribe has been found to have territorial jurisdiction over a similarly situated allotment issued under the 1906 Act. And the Department focused its inquiry on the same thing the government has is similar situations: the statutes and circumstances surrounding the allotment. The Tribe has not shown that the Department's assessment or conclusion was arbitrary and capricious or contrary to law. Summary judgment should be therefore granted in favor of the Federal Defendants.

## RELEVANT BACKGROUND

At issue in this case is what the parties call the Ondola Allotment. The Allotment is an eight-acre parcel of land owned by individuals in fee, but with statutorily-imposed restrictions against alienation. AR_45.[1] The current allotment holders are members of the Native of Village of Eklutna, a federally recognized Indian tribe in Alaska. AR_45–46. The Tribe seeks to open a "class II" Indian gaming facility on the Ondola Allotment. *See* AR_1;

---

[1] Citations to AR_xxxx are to the Bates numbering on the Department of the Interior's administrative record. For simplicity, we have replaced excessive digits with an underscore (for example, AR000045 is cited as AR_45).

AR_46.  "Class II" gaming generally includes bingo and certain non-banked card games, meaning the players compete against one another, rather than the house.  *See* 25 U.S.C. § 2703(7)(A), (B).

## I.    Legal Background

The Indian Gaming Regulatory Act (or IGRA) provides that, under certain conditions, "[a]n Indian tribe may engage in, or license and regulate, class II gaming on [1] Indian lands [2] within such tribe's jurisdiction."  25 U.S.C. § 2710(b)(1).  "Indian lands" can include "lands title to which is . . . held by any . . . individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 C.F.R. § 502.12(b)(2); *see also* 25 U.S.C. § 2703(4) (providing same definition).

Thus—assuming other statutory and regulatory requirements are met—an Indian allotment can only be eligible for class II gaming under IGRA if the tribe has jurisdiction over the land *and* actually uses that jurisdiction to exercise governmental authority.  *See Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460, 462 (D.C. Cir. 2007) ("A tribe may conduct gaming only on "Indian lands" *within its jurisdiction*." (emphasis added)); *Kansas v. United States*, 249 F.3d 1213, 1228 (10th Cir. 2001); *Rhode*

3

*Island v. Narragansett Indian Tribe*, 19 F.3d 685, 702–03 (1st Cir. 1994).[2]

Because Congress has plenary authority over Indian affairs (*South Dakota v.*

*Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998)), the threshold inquiry into

territorial jurisdiction necessarily requires, in part, consideration of the

statutes that define a given parcel's land status.  *See Kansas*, 249 F.3d at

1229; *Narragansett*, 19 F.3d at 701–702.

   Tribal jurisdiction over land in Alaska is unique, including with respect

to allotments held individually by those who may be members of an Alaskan

tribe.  "Unlike most tribes, Alaska Native villages occupy no reservations and

for the most part possess no Indian country."  *John v. Baker*, 982 P.2d 738,

750 (Alaska 1999).  This is due, in part, to Alaska's unique history; for

example, there were never any treaties between the United States and

Alaskan tribes.  *See United States v. Atl. Richfield Co.*, 435 F. Supp. 1009,

1014–19 (D. Alaska 1977) (summarizing history of Alaska Native land

claims), *aff'd* 612 F.2d 1132 (9th Cir. 1980).  But the unique circumstances

are also driven by the fact that Congress has frequently legislated in Indian

affairs on an Alaska-specific basis.  Among these Alaska-specific statutes are

---

[2] The distinction may appear subtle, but it is significant.  A tribe's ability to exercise authority is important given IGRA's requirements for tribal regulation of class II gaming.  *See* 25 U.S.C. § 2710(b); AR_2513 at 2517 (National Indian Gaming Commission "Indian lands" determination for the United Keetoowah Band of Cherokee Indians).

the 1906 Alaska Native Allotment Act and 1971 Alaska Native Claims
Settlement Act.

The 1906 Allotment Act granted Alaska Natives the ability to obtain
legal title to public domain lands in Alaska. *See* An Act Authorizing the
Secretary of the Interior to allot homesteads to the natives of Alaska, Pub. L.
No. 59-171, 34 Stat. 197 (May 17, 1906) (attached for the Court's convenience
as Ex. 1). The Act, as later amended, authorized the Secretary of the Interior
"to allot" to Indians "of full or mixed blood" who resided in (and were natives
of) Alaska up to 160 acres of public "vacant, unappropriated, and unreserved
nonmineral land in the district of Alaska" to be "the homestead of the allottee
and his heirs in perpetuity." *Id.*, *as amended by* Pub. L. No. 84-931, 70 Stat.
954 (Aug. 2, 1956) (attached for the Court's convenience as Ex. 2). The
Allotment Act applied to federal public domain lands. *Accord* An act
providing a civil government for Alaska, § 8, 23 Stat. 24, 26 (May 17, 1884)
(creating the "district of Alaska" as a federal "land district"). And the Act did
not require that the allottee be a member of, or have an affiliation with, any
tribe. *See* 34 Stat. at 197; 70 Stat. at 954.[3]

---

[3] Congress repealed the Allotment Act in 1971, but allotments already issued
or then-pending remained valid. *See* 43 U.S.C. § 1617(a).

The 1971 Settlement Act extinguished all aboriginal title in Alaska and revoked all but one of the federal land reserves that had been established for the use and occupancy of tribes in Alaska.  43 U.S.C. §§ 1603, 1618(a). Congress authorized the creation of native corporations, *see id.* §§ 1606, 1607, to receive (to be allocated among them) $962.5 million and full legal title to 44 million of acres of land.  *See id.* §§ 1605, 1611, 1613.  The Settlement Act was intended to avoid "creating a reservation system or lengthy wardship or trusteeship."  *Id.* § 1601(b).

In 1990, the Secretary of the Interior asked the Department of the Interior Solicitor to "develop the legal position of the United States on 'the nature and scope of so-called governmental powers over lands and nonmembers that a Native village can exercise after the Alaska Native Claims Settlement Act."  *See* Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers, Opinion M-36975 1 (Jan. 11, 1993) (in the administrative record at AR_2140–2275).  In response, then-Solicitor Thomas Sansonetti issued in 1993 a formal legal opinion, which the Department of the Interior calls "M-Opinions."  *See id.*  M-Opinions are binding on the Department.  AR_2582–84 at 2583.  We will refer to the M-Opinion as the "Sansonetti Opinion."

As relevant here, the Solicitor opined on tribal jurisdiction over native allotments in Alaska, including those issued under the 1906 Alaska Native

Allotment Act. *See* AR_2263–68. "[W]hether an individual allotment is subject to tribal jurisdiction depends upon a particularized inquiry into the relevant statutes and circumstances surrounding the creation of the allotment." AR_2265–66.

The Sansonetti Opinion compared the 1906 Allotment Act with other Indian allotment statutes, including the 1887 General Allotment Act. *See* AR_2266–68. Typically, "Indians applying for such allotments must demonstrate membership or entitlement to membership in a recognized Indian tribe." AR_2266, AR_2267–68. Allotments under the 1906 Act, however, did not require tribal affiliation and "are more similar to homestead act allotments." AR_2266, AR_2267–68; *see* 34 Stat. at 197 (titled "An Act Authorizing the Secretary of the Interior to allot homesteads to the natives of Alaska").[4]

The Solicitor concluded that, in 1906, "Congress was not considering the Alaska Native allotments in a tribal context." AR_2267. As a result, and "particularly in the absence of a tribal territorial based (e.g., a reservation), there is little or no basis for an Alaskan village claiming *territorial* jurisdiction over an Alaska Native allotment." AR_2267–68.

---

[4] Congress extended the 1862 Homestead Act to Indians in 1875. Act of March 3, 1875, § 15, 18 Stat. 402, 420. In 1884, Congress also passed the Indian Homestead Act. *See* Act of July 4, 1884, 23 Stat. 76, 96.

The Sansonetti Opinion is careful to note, however, that the question of tribal territorial jurisdiction is distinct from the question of whether allotments under the 1906 Act continue to be "Indian country" for purposes of federal authority under 18 U.S.C. § 1151(c).  *See* AR_2263–68.  While Alaska Native allotments constitute "Indian country," "it does not necessarily follow that all Indian allotments are subject to tribal jurisdiction."  AR_2265.

## II.    The Native Village of Eklutna & the Ondola Allotment

The Native Village of Eklutna is headquartered about twenty-two miles northwest of Anchorage.  AR_45.  The Tribe has never had a reservation, and the United States has never set aside any trust or restricted land for the Tribe's use and occupancy.  AR_46 (citing Tribe's submissions).  The Tribe currently owns land in fee.  AR_46.

In 1963, the Bureau of Land Management issued an allotment under the 1906 Alaska Native Allotment Act to Olga Ondola.  AR_87–88.  The Ondola Allotment is an eight-acre wooded homestead that today is surrounded by residential and light-industrial development.  AR_46.  Neither Ms. Ondola's allotment application nor the allotment deed reference the Native Village of Eklutna or any other tribe.  *See* AR_87–88 (deed); AR_2046–48 (application).  Prior to allotment, the land had never formed part of a federal land reserve for any tribe, let alone for the use and occupancy of the Native Village of Eklutna.  *See* AR_51–53, AR_54.  The land

8

had briefly (between 1936 and 1942) been part of a reserve set aside for use by the federal government for education of Alaska Natives.  *See* AR_51–53, AR_54.

The Tribe desires to make use of the Ondola Allotment for tribal economic development in the form of a gaming facility.  *See* AR_1. Specifically, the Tribe hopes to develop a 35,000 square foot building with 500 class II gaming machines, a restaurant, and a bar.  AR_1.  The Tribe therefore signed a lease with the current Ondola Allotment holders (who are members of the Tribe) in 2016.  AR_46; AR_742–73.  Because the Tribe's proposed lease was of land held by individual Alaska Natives in restricted fee, the Department of the Interior must approve the lease.  *See* 25 U.S.C. § 415(a); 25 C.F.R. §§ 162.004, 162.010(a)(3) (establishing when Secretarial approval required); 25 C.F.R. §§ 162.003, 162.004 (defining terms and scope). In June 2016, the Tribe applied to the Department of the Interior for a determination that the Ondola Allotment qualified as "Indian lands" under IGRA, and for approval of the lease.  *See* AR_778–807.

## III.   The Decision at Issue

In June 2018, the Department of the Interior concluded that the Ondola Allotment did not constitute "Indian lands" under IGRA because the Tribe had not shown itself to have territorial jurisdiction over the Allotment. AR_45–61.  The Department relied upon the Sansonetti Opinion to conclude

9

that the 1906 Alaska Native Allotment Act provided little, if any, basis for tribal territorial jurisdiction.  AR_49.  And, looking to the circumstances of the Ondola Allotment, the Department found that, prior to allotment, the site had been part of the public domain and not part of any Indian reservation set aside for the benefit of a tribe, including the Native Village of Eklutna.  AR_61.

The Department also recognized, however—again consistent with the Sansonetti Opinion—that, even where the statutes and circumstances surrounding an allotment's issuance do not indicate tribal territorial jurisdiction, there could theoretically be a historical basis for tribal territorial jurisdiction over an off-reservation allotment in Alaska.  AR_49.  The Department therefore assessed whether such a "tribal nexus" existed between the Native Village of Eklutna and the Ondola Allotment, using factors the government has used in other cases to determine whether an off-reservation allotment constitutes "Indian lands" under IGRA.  AR_55–60.  The Tribe submitted information regarding services it had provided at the Ondola Allotment, including cutting trees at the site and providing food to the Ondola family.  AR_59.  But the Tribe never had a reservation, and it had not shown any other lands (near the Allotment or otherwise) over which it currently possesses territorial jurisdiction.  *See* AR_57–58.  The Department therefore concluded that the Tribe's provision of services could not be based

10

on any *territorial* jurisdiction, instead resting, if anywhere, in the Tribe's sovereignty and jurisdiction over its members. *See* AR_58–60. The Tribe also had not shown that state or local authorities acknowledge that the Tribe has territorial jurisdiction over the Ondola Allotment. AR_59. A tribe's unilateral claim of territorial jurisdiction could not create that jurisdiction where it did not otherwise exist. *See* AR_59–60.

Based on the statutes and circumstances surrounding the issuance of the Ondola Allotment and the lack of any sufficient tribal nexus to the site, the Department concluded that the Tribe had not shown itself to have territorial jurisdiction over the Ondola Allotment, and that the Allotment therefore did not constitute "Indian lands" under IGRA. AR_61. Because the Allotment is not eligible for gaming, the Department also declined to approve the proposed lease of the Allotment for gaming purposes. AR_61.

## STANDARD OF REVIEW

The Tribe brings its case under the Administrative Procedure Act cause of action in 5 U.S.C. § 706(2)(A). *See* Compl. ¶¶ 5, 116, 122, 126–27. Section 706(2)(A) authorizes federal courts to "hold unlawful and set aside agency action, findings, and conclusions found to be-- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of judicial review is narrow and "highly deferential."

11

*Rosebud Mining Co. & Parkwood Res., Inc. v. Mine Safety & Health Admin.*, 827 F.3d 1090, 1101 (D.C. Cir. 2016) (citation omitted). The court's review is limited to the agency's administrative record. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). And the court is to uphold an agency action if the administrative record shows that the agency "considered all the relevant factors and articulated a rational connection between the facts found and the choice made." *Rosebud Mining Co.*, 827 F.3d at 1101 (citation omitted). "[A] court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The plaintiff holds the burden to demonstrate that an agency acted arbitrarily and capriciously or contrary to law. *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000).

## ARGUMENT

Summary judgment should be granted in favor of Federal Defendants on all of the Tribe's claims.[5] The Department of the Interior did not act

---

[5] The Tribe has dropped its second claim for relief, which alleged the Department's decision was based upon undue political considerations. *See* Pl.'s Mem. at 2, 45 (seeking summary judgment on only Counts I and III); Compl. ¶¶ 117–22. Summary judgment should therefore be granted in favor of Federal Defendants on Count II. *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014). In any event, Count II would fail for the reasons stated in the Court's denial of the Tribe's request for extra-record discovery. *See* Order (Aug. 26, 2020), ECF No. 47.

arbitrarily in concluding that the Native Village of Eklutna did not have territorial jurisdiction over the Ondola Allotment.  The Department therefore also did not act arbitrarily in determining that the Allotment did not constitute "Indian lands" eligible for gaming under the Indian Gaming Regulatory Act, or in declining to approve the Tribe's proposed lease of the Allotment.

## I.     The Department's Decision is Well-Reasoned and Supported by the Record.

The Department's determination that the Tribe had not shown tribal territorial jurisdiction over the Ondola Allotment was driven by its consideration of the statutes and circumstances surrounding the allotment and an assessment of whether the Tribe had demonstrated some other tribal nexus to the site.  First, relying on the Sansonetti Opinion, the Department concluded that it is difficult for a tribe to show territorial jurisdiction over an allotment awarded under the 1906 Alaska Native Allotment Act because the Act did not require tribal membership or a link to a tribal reservation.  *See* AR_49.  Second, the Department concluded that the Allotment had never been part of any Indian reservation created for the Tribe's use and occupancy. *See* AR_51–55, AR_61.  And, third, the Department concluded that the Tribe had not submitted any other evidence demonstrating a tribal nexus to the site that would be sufficient to show territorial-based jurisdiction over the

Allotment.  *See* AR_55–61.  Each of the Department's conclusions was well-reasoned, supported by record, and consistent with governing law.

## A.  The Department's Interpretation of the Alaska Native Allotment Act is Consistent with the Act's Plain Language.

Any inquiry into tribal territorial jurisdiction must focus "principally on congressional purpose and intent and on construing legislation that may otherwise limit a Tribe's jurisdiction or determine which Tribe possesses jurisdiction over a particular parcel of land."  AR_48 (citing, among others, *Kansas*, 249 F.3d at 1229).  Thus, in considering whether the Tribe has territorial jurisdiction over the Ondola Allotment, the Department, consistent with the Sansonetti Opinion, first turned to the statutory authority under which the allotment issued.  *See* AR_48, AR_50.

The Ondola Allotment was issued under the 1906 Alaska Native Allotment Act.  AR_87–88.  In relevant part, the 1906 Act—with brackets to reflect the 1956 amendments—authorized the Secretary of the Interior

> to allot not to exceed one hundred and sixty acres of [vacant, unappropriated, and unreserved] nonmineral land in the district of Alaska[, or, subject to the provisions of the Act of March 8, 1922 (42 Stat. 415, 48 U. S. C. 376–377), vacant, unappropriated, and unreserved land in Alaska that may be valuable for coal, oil, or gas deposits,] to any Indian[, Aluet,] or Eskimo of full or mixed blood who resides in and is a native of said district, and who is the head of a family, or is twenty-one years of age; and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress.

14

34 Stat. at 197, *as amended by* 70 Stat. at 954.[6]

The Department's review was necessarily guided by the Sansonetti Opinion's analysis of the 1906 Allotment Act's implications for tribal territorial jurisdiction.  *See* AR_2263–68.  The Opinion concluded that "there is little to no basis for" a tribe to claim territorial jurisdiction over an allotment issued under the 1906 Act.  AR_2268.  The Opinion based its conclusion on three characteristics of the 1906 Act: (1) the Act did not contain any reference to tribal membership nor require it in order to receive an allotment; (2) the Act did not carve allotments out of any tribal reservation, but from vacant, unappropriated, and unreserved public land; and (3) the Act explicitly stated that the allotments were for homesteading.  AR_2267–68.

Each of the three conclusions that the Sansonetti Opinion drew from the 1906 Act is apparent in the statute's plain language.  The Tribe does not seriously argue that the statutory text can be read any other way.  *See* Pl.'s Mem. at 26–29.  The Tribe's only effort to do so is its statement that the 1906 Act "kept those allotments within the sphere of the federal Indian land system."  Pl.'s Mem. at 16.  But that reading is contrary to the Act's plain

---

[6] The Tribe is incorrect in arguing that allotments issued under the 1906 Act remain inalienable unless authorized by Congress.  *See* Pls.' Mem. at 16 (quoting 34 Stat. at 197).  The 1956 amendments authorized allotment holders, with the Secretary of the Interior's approval, to convey "complete title" without any restrictions.  *See* 70 Stat. at 945, § 1(d).

language, which did not reference tribes or "federal Indian land" in any way and neither required nor authorized allotments to be drawn from existing Indian reservations. *See* 34 Stat. at 197, *as amended by* 70 Stat. 954 (applying only to "unreserved nonmineral land").[7]

The Sansonetti Opinion then compared the 1906 Act to public domain allotments under 1887 General Allotment Act. AR_2266 (citing 25 U.S.C. §§ 334, 336 and 43 C.F.R. § 2531.1(a)).[8] Unlike the 1906 Act, Section 4 of the General Allotment Act draws an express link between applicants and tribes and tribal reservations:

> Where any Indian not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, act of Congress, or executive order, shall make settlement upon any surveyed or unsurveyed lands of the United States not otherwise appropriated, he or she shall be entitled . . . to have the same allotted to him or

---

[7] The Tribe makes passing reference to the Indian canon of statutory construction and the 1906 Allotment Act. *See* Pl.'s Mem. at 13. Under the canon, *ambiguous* statutory provisions enacted for the benefit of Indians are generally construed in the Indians' favor. *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1278 (D.C. Cir. 2011). The Sansonetti Opinion, however, did not view the 1906 Act as ambiguous on the question of whether it required an allotment applicant to demonstrate a tribal link—the statute plainly did not. *See* AR_2267–68.

[8] "The public domain was the land owned by the Government, mostly in the West, that was 'available for sale, entry, and settlement under the homestead laws, or other disposition under the general body of land laws.'" *Hagen v. Utah*, 510 U.S. 399, 412 (1994) (quoting E. Peffer, The Closing of the Public Domain 6 (1951)).

her, and to his or her children, in quantities and manner as provided in this act for Indians residing upon reservations.

25 U.S.C. § 334.

The Department of the Interior interprets Section 4 of the General Allotment Act to require an applicant "to show that he is a recognized member of an Indian tribe or is entitled to be so recognized. . . . The possession of Indian blood, not accompanied by tribal affiliation or relationship, does not entitle a person to an allotment on the public domain [under Section 4]." 43 C.F.R. § 2531.1(a). The 1906 Allotment Act, by contrast, did not include a similar tribal link, instead requiring only Native Alaskan or Eskimo descent. *See* 34 Stat. at 197. Nor did the regulations implementing the 1906 Act require an applicant to have any link to an Alaskan tribe. *See* 43 C.F.R. §§ 67.1–67.9 (1964) (codified in 1958 and attached for the Court's convenience as Ex. 3).[9]

---

[9] The General Allotment Act also included provisions for the allotment of a tribe's reservation lands. *See* Act of Feb. 8, 1887, §§ 1–3, 24 Stat. 388, 388–89. The Act's "policy was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished." *Mattz v. Arnett*, 412 U.S. 481, 496 (1973). The 1906 Alaska Native Allotment Act reflects no similar purpose. The policy behind the General Allotment Act effectively ended with the 1934 Indian Reorganization Act. Congress repealed Sections 1 through 3 of the General Allotment Act in 2000. *See* Pub. L. No. 106–462, Title I, § 106(a)(1), 114 Stat. 2007 (Nov. 7, 2000).

The Sansonetti Opinion found the 1906 Act's lack of tribal link to be significant evidence that "Congress was not considering the Alaska Native allotments in a tribal context." AR_2267.  Because the Act did not require a link to a tribe, a tribe could not profess to have gained territorial jurisdiction simply by virtue of an allotment having been issued to a tribal member.  *See* AR_2266–68.

Instead, the Opinion found the 1906 Act to be more like a homesteading act, granting homesteading rights to Indians based on descent rather than on any political connection to a tribe or such tribe's existing or prior land base. *See* AR_2268; *compare* 34 Stat. at 197 (1906 Act) *with* 23 Stat. at 96 (1884 Indian Homesteading Act, legislating "That such Indians as may now be located on public lands, or as may, under the direction of the Secretary of the Interior, or otherwise, hereafter, so locate may avail themselves to the provisions of the homestead laws as fully and to the same extent as may now be done by citizens of the United States[.]").[10]

The Tribe offers that the Department erred in its comparative analysis of the 1906 Allotment Act because the 1906 Act, like the General Allotment

---

[10] This is not stay that tribal territorial jurisdiction could never be shown for allotments issued under homesteading allotment acts, including the 1906 Act.  "[W]hether an individual allotment is subject to tribal jurisdiction depends upon a particularlized inquiry into the relevant statutes *and circumstances* surrounding creation of the allotment."  AR_2265–66.

Act, did not require that allotments be "carved out of a reservation." Pl.'s
Mem. at 26, 27.  But the Tribe creates a false premise.  The Sansonetti
Opinion did not base its interpretation of 1906 Act solely on the fact that the
statute did not create allotments from Indian reservations.  *See* AR_2267–68.
Instead, the relevant distinction from Section 4 of the General Allotment Act
(which also did not create allotments from reservation land) is a lack of *any*
*tribal link at all.  See* AR_2266–67.  The Tribe has chosen to ignore that
important distinction in its legal argument, though concedes in a footnote
that the distinction exists.  *See* Pl.'s Mem. at 28 n.16.

   The Tribe creates a similar strawman in pointing out that the 1906 Act
did not require applicants to abandon tribal relations.  *See* Pl.'s Mem. at 27–
29.  The Department's point, of course, is that the 1906 Act did not require
any tribal relationship to begin with.  The fact that Congress's extension of
the 1862 Homestead Act (18 Stat. at 420) required Indians to abandon tribal
relations, while true, is not a meaningful distinction.  Indeed, the 1884
Indian Homestead Act, which Interior also considered, did not include a
requirement to abandon tribal relations.  *See* 23 Stat. at 96 (apply to "such
Indians as may now be located on public lands").

   Lacking a legitimate statutory reason to disagree with the
Department's interpretation of the 1906 Allotment Act, the Tribe instead
argues that the 1906 Act is irrelevant.  The Tribe posits that, because the

Ondola Allotment constitutes "Indian country," the allotment also constitutes

"Indian lands" under IGRA so long as the Tribe can demonstrate that it

actually exercises governmental authority over the allotment.  *See* Pl.'s Mem.

at 15–16, 17–18.  According to the Tribe, any conclusion to the contrary

would create a new, Alaska-specific test and therefore improperly treat

Alaska tribes differently than tribes in the lower 48 states.  *See* Pl.'s Mem. at

22–23, 26, 32–35.

The Tribe's argument fails for are at least three reasons.

<u>First</u>, the Tribe obscures the distinction between "Indian country" and

IGRA's tribal territorial jurisdiction requirement.  *See* Pl.'s Mem. at 15–16,

17–18.[11]  Any Indian allotment, the Indian title to which has not been

extinguished, constitutes Indian country, regardless of tribal territorial

jurisdiction.  *See* 18 U.S.C. § 1151(c); *see also Venetie*, 522 U.S. at 530–31

(land is "Indian country" if it has been set aside for an Indian and the federal

government maintains superintendence over it).  To constitute "Indian lands"

---

[11] "Indian country" is a statutorily-defined term.  *See* 18 U.S.C. § 1151.  It is
most often used to delineate whether the state or the federal government
(and potentially the tribe) has criminal jurisdiction over given conduct.  *See,
e.g.,* 18 U.S.C. § 1153.  But the concept "also generally applies to questions of
civil jurisdiction."  *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520,
527 (1998) (citation omitted).  The parties do not dispute that the Ondola
Allotment qualifies as Indian country.

under IGRA, by contrast, the tribe must have territorial jurisdiction over the land.  *See* 25 U.S.C. § 2710(b)(1).

An allotment may qualify as Indian country if it was created from land over which a tribe then had territorial jurisdiction, as is frequently the case.  *See id.* at 529 (discussing *United States v. Pelican*, 232 U.S. 442 (1914)).  But it does not follow that an allotment's designation as Indian country, standing alone, equates to tribal territorial jurisdiction over the allotment.  *Accord In re Petition of Carmen*, 165 F. Supp. 942, 946 (N.D. Cal. 1958) (Congress did not limit the definition of Indian country to include only allotments that are created under certain statutory authorities), *aff'd sub nom. Dickson v. Carmen*, 270 F.2d 809 (9th Cir. 1959), *cert. denied*, 361 U.S. 934 (1960).  The Sansonetti Opinion recognized the distinction.  *See* AR_2263–68.  Tribal territorial jurisdiction can only exist over Indian country if the Indian country in question is that which the tribe can be considered to inhabit.

Thus, rather than focusing on the Ondola Allotment's status as "Indian country," the Department properly focused its inquiry on whether the Tribe had territorial jurisdiction over the land.  The Department looked to Congressional purpose and intent and the specific circumstances of the allotment in doing so.  *See* AR_48; AR_2265–66.  This is the same inquiry that courts and the government have traditionally made in assessing tribal territorial jurisdiction for purposes of determining "Indian lands" under

21

IGRA.  *See Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1143–45 (10th Cir. 2011); *Kansas*, 249 F.3d at 1229; *Narraganset*, 19 F.3d at 701; AR_2454 at AR_2459–9 (National Indian Gaming Commission determination from Whitecloud allotment); AR_2519 at AR_2532–35 (Department of the Interior determination from Christian Reserve allotment).

Second, the Tribe is wrong that the Department created a new "Indian lands" test.  Pl.'s Mem. at 23, 26.  The Tribe does not dispute that an allotment can constitute "Indian lands" under IGRA only if the tribe (1) possesses territorial jurisdiction over the land, and (2) actually exercises that government authority.  Pl.'s Mem. at 15.  When tribal territorial jurisdiction is squarely at issue, the government has considered the underlying statutory authorities for the land in question.

For example, the Whitecloud opinion—a 2010 National Indian Gaming Commission opinion for the Iowa Tribe of Oklahoma—involved an allotment that had been issued to a member of the Iowa Tribe from then-reservation lands.  *See* AR_2455–56.  The allotment later passed intestate to the original allottee's heirs, some of whom were members of different tribes and from some (but not all) of whom the Iowa Tribe later acquired the beneficial interest in the allotments.  *See* AR_2456–58.  The circumstances presented the question, among others, of whether the Iowa Tribe maintained territorial jurisdiction over the site given the change (at least in part) in tribal

22

affiliation.  *See* AR_2459–62.  In answering that question—and acknowledging that the parcel constituted "Indian country"—the Commission looked to the purpose of the statute under which the allotment had originally been granted and whether any subsequent Congressional acts had intervened to otherwise disrupt that original intent.  *See* AR_2459–62.

The Tribe again creates a false premise in arguing that the Department's assessment of the statutes and circumstances surrounding the issuance of the Ondola Allotment deviated from the standard used in the government's Indian lands opinions for the Big Sandy Rancheria and the Quinault Tribe.  *See* Pl.'s Mem. at 18–19.  The Big Sandy and Quinault opinions were addressing both tribal territorial jurisdiction and the exercise of governmental authority.  *See* AR_2466–72; AR_2507–12.   To the extent the Big Sandy and Quinault opinions gave weight to the respective allotment's status as Indian country in determining tribal territorial jurisdiction, they did so in light of the fact that the allotments were near an existing tribal territorial land base.  *See* AR_2469–70; AR_2508.  As the Department explained, the Ondola Allotment is not similarly situated given that the Native Village of Eklutna currently has (and never has had) a reservation.  AR_57–58; *see* 43 U.S.C. §1603.  The Tribe instead holds its current lands in fee.  AR_46.

<u>Third</u>, and for similar reasons, the Department has not acted contrary to the Indian Reorganization Act's privileges and immunities provision, 25 U.S.C. § 5123(f).  *See* Pl.'s Mem. at 22–23, 32–35.  The provision prohibits the executive branch from making any decision "with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes."  25 U.S.C. § 5123(f).

Here, the Department of the Interior applied the same "Indian lands" applicable to any tribe seeking to conduct Indian gaming on an off-reservation allotment, which starts with Congressional purpose and intent. *See Miami Tribe*, 656 F.3d at 1143–45; *Kansas*, 249 F.3d at 1229; *Narraganset*, 19 F.3d at 701.  The Sansonetti Opinion set forth the Department's general interpretation of the statutory authorities at issue, and a framework for considering, on a parcel-specific basis, how to assess tribal territorial jurisdiction over Indian allotments in Alaska in light of those authorities.  *See* AR_2263–68.  The Department's determination with respect to the Ondola Allotment simply applied that analysis to the circumstances. The Tribe has not identified any situation which the Department of the Interior has concluded a similarly situated allotment under the 1906 Act constitutes Indian lands under IGRA.  *See Koi Nation of N. California v. U.S.*

*Dep't of the Interior*, 361 F. Supp. 3d 14, 53–56 (D.D.C. 2019) (finding Department violated privilege and immunities in applying regulations differently to similarly situated tribes in California).

The Tribe is off-point in its attempted analogy to *Akiachak Native Community v. Salazar.  See* Pl.'s Mem. at 23, 34 (citing 935 F. Supp. 2d 195 (D.D.C. 2013), *vacated as moot on appeal*, 827 F.3d 100, 115 (D.C. Cir. 2016)). At issue in *Akiachak* was the Department of the Interior's conclusion (set forth in regulation) that, contrary to tribes outside of Alaska, the Department could not accept applications to take land into trust under 25 U.S.C. § 465 from any but one Alaska tribe.  935 F. Supp. 2d at 197.[12]  The court concluded that 25 U.S.C. § 465 did not exclude Alaska tribes from its grant of authority and, as a result, the Department's continued reliance on its regulation violated the privilege and immunities provision in 25 U.S.C. § 5123(g).  *See* 935 F. Supp. 2d at 203, 210–11.

Here, by contrast, the Department has not made a broad-sweeping pronouncement about Alaska tribes' ability to game under IGRA.  As this Court has previously acknowledged, the Sansonetti Opinion "did not hold that tribes in Alaska do not have jurisdiction over Indian country.  Instead, the Solicitor questioned whether tribes in Alaska had jurisdiction over

---

[12] 25 U.S.C. § 465 has since been recodified at 25 U.S.C. § 5108.

allotments and townsites and noted the need for a particularized inquiry into the circumstances of each case." *Native Village of Barrow v. Nat'l Indian Gaming Comm'n*, No. 99-cv-886-RWR, slip. op. at 12–13 (D.D.C. Dec. 31, 2001) (available in the administrative record at AR_627–42).[13]

Finally, the Tribe is wrong to argue that the Sansonetti Opinion has been superseded by the 1994 List Act or the Tlingit and Haida Status Clarification Act.  *See* Pl.'s Mem. at 32 (citing Pub. L. No. 103-454, §§ 103(4), (5), 202(4), 203, 108 Stat. 4791, 4791–92 (1994)).  For one, the Tribe's choice of the verb "superseded" is a tacit admission that the Sansonetti Opinion has never been overturned or abrogated in any way.  Further, neither of the supposed superseding authorities relate in any way to the 1906 Alaska Native Allotment Act, or to what can qualify as "Indian lands" under IGRA. The Tribe's point with respect to the Tlingit and Haida Status Clarification Act largely just restates its privileges and immunity argument, which we addressed above.

The Tribe posits that the 1994 List Act superseded the Sansonetti Opinion because the Act confirmed that recognized tribes cannot be

---

[13] The Tribe also points to the Sansonetti Opinion's citation to *United States v. Jackson*, 280 U.S. 183 (1930), for the proposition that "restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments." AR_2266.  But the rights and privileges in question would be those of the allotment holder.

terminated absent an act of Congress.  *See* Pl.'s Mem. at 32.  But the

Sansonetti Opinion agrees with the Tribe's point.  *See* AR_2246 (concluding

that the 1971 Settlement Act did not have the effect of terminating Alaska

tribes).  Further, the Department has not argued that the Native Village of

Eklutna has been terminated as a tribe.  To the contrary, because of the

Sansonetti Opinion, the Department included Alaska native villages

(including the Native Village of Eklutna) on the list of federally-recognized

tribes *before* the 1994 List Act.  *See John*, 982 P.2d at 749; Indian Entities

Recognized and Eligible To Receive Services From the United States Bureau

of Indian Affairs, 58 Fed. Reg. 54364-01, 54366, 54396 (Oct. 21, 1993); Pl.'s

Mem. at 6 (stating that the Native Village of Eklutna has been on the

published list since 1982).  Thus, if anything, Congress has implicitly *agreed*

with the Sansonetti Opinion's conclusions.  The D.C. Circuit has also recently

relied on the Sansonetti Opinion in discussing the relevant authorities

governing the United States' relationship with Alaska native villages.  *See*

*Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 976 F.3d 15, 18,

26 (D.C. Cir. 2020), *cert. filed*, Nos. 20-543, 20-544.

     In sum, the Department of the Interior did not act arbitrarily or

contrary to law in concluding that the 1906 Alaska Native Allotment Act did

not, standing alone, establish the Tribe's territorial jurisdiction over the

Ondola Allotment.

**B.     The Record Supports the Conclusion that the Ondola Allotment Was Never Part of Any Reservation Held for the Benefit of the Native Village of Eklutna.**

In addition to its general conclusions about the 1906 Allotment Act, the Sansonetti Opinion also recognized that, "[b]ecause of the distinct history of certain off-reservation allotments, . . . whether an individual allotment is subject to tribal jurisdiction depends upon a particularized inquiry into the relevant statutes *and circumstances* surrounding the creation of the allotment." AR_2265–66 (emphasis added). Thus, in assessing the Tribe's application, the Department also looked to the circumstances surrounding the allotment site. AR_51–55.

The land that now constitutes the Ondola Allotment was briefly (from 1936 to 1942) part of the Eklutna Industrial School Reserve, which had been created in 1924. *See* AR_51–52. It was during this time that Ms. Ondola claimed she had first moved to the area after having purchased a home from the previous resident. AR_51; AR_2047. In 1942, however, the Department of the Interior transferred an area containing what is now the Allotment out of the School Reserve to the War Department. AR_54 (citing Public Land Order No. 20, AR_2294, and No. 95, AR_2298). After World War II, the land was among that returned to the Department of the Interior and, in 1954, "subdivided for the purpose of disposing of most of the public domain land as

homesites." AR_54–55 (citing Public Land Order No. 95, AR_2298, and field notes, AR_2300–431).

After reviewing the land history, the Department found that the land constituting what is now the Ondola Allotment had never been set aside or held by the United States for the benefit of the Native Village of Eklutna. *See* AR_58. Thus, the Department concluded that the Tribe did not have any reservation-based claim to territorial jurisdiction. AR_61. The administrative record supports that conclusion.

<u>First</u>, the School Reserve—which originally did not include what is now the Ondola Allotment—had not been established for the benefit of the Native Village of Eklutna. *See* AR_2571–77 at 2572 (1967 Solicitor opinion). Instead, the President created the Reserve in 1927 near the present-day Village of Eklutna "for use by the United States Bureau of Education for education purposes," in an order making no reference to Native Alaskans at all. *See* AR_2556 (Exec. Order 4778); AR_2557 (Exec. Order 6734, revising the reserve to exclude a homestead entry); AR_51. The Tribe states that the government set aside the School Reserve because "Native people were forced off many of the lands they had historically controlled." Pl.'s Mem. at 8. But the Tribe cites to no authority or evidence for the proposition. The administrative record reflects that the School Reserve was set aside because, in 1924, the Bureau of Education had established what it called the Eklutna

Industrial School on the site.  *See* AR_51; AR_2572; AR_2579–80.  Nor could the Executive Order have established an Indian reservation on its own.  In 1919, Congress legislated that future Indian reservations could be established only by act of Congress.  *See* Act of June 30, 1919, 41 Stat. 34, § 27 (codified at 43 U.S.C. § 150).[14]

Second, the 1936 order that expanded the School Reserve to cover an area including what is now the Ondola Allotment also did not set aside the land for the Native Village of Eklutna's use and occupancy.  *See* AR_2276–78; AR_2572–74 (1967 Solicitor opinion).  Instead, public domain land was "temporarily with[drawn] from further disposition for the use and benefit of the Eklutna Industrial School."  AR_2278; *see also* AR_2283–93 (1937 memorandum recommending against adding additional lands to the School Reserve and in favor of revoking the Reserve as potentially unlawful).  The 1936 order recognized that the land could later be "permanently withdraw[n] as an Indian reservation" under the Indian Reorganization Act (AR_2278), though this never occurred, as explained in more detail below.  Nor did the 1936 order make any mention of the Native Village of Eklutna or any other tribe.  *See* AR_2278.

---

[14] The 1934 Indian Reorganization Act (as amended in 1936) was one Congressionally-authorized means by which reservations could be set aside for the benefit of Alaska Natives.  *See* Act of June 18, 1934, 48 Stat. 984, *amended by* Act of May 1, 1936, 49 Stat. 1250.

Compare the 1936 order with, for example, a contemporaneous order that, also under the Indian Reorganization Act, "reserved and designated as an Indian reservation, for the use and occupancy of the native inhabitants of the Native Village of Unalakleet, Alaska, and vicinity, [certain land] which includes 40 acres previously reserved by Executive Order of March 30, 1901, for educational purposes." Proclamation Creating Indian Reservation an Indian Reservation for Inhabitants of the Native Village of Unalakleet, Alaska, 7 Fed. Reg. 548-02 (Jan. 27, 1942).

Third, after 1942, the Reserve no longer included what is now the Ondola Allotment. *See* AR_2295–97 (excluding Township 15 North from the new metes and bounds description); AR_46 (metes and bound of Ondola Allotment). And, in any event, the United States never turned any of the land temporarily withdrawn for the School into a permanent Indian reservation, either for the benefit of the Native Village of Eklutna or any other tribe. *See* AR_52–53. In 1961, the Secretary restored to the public domain most of what remained of the School Reserve. *See* AR_2565 (Public Land Order 2427, *corrected as stated in* AR_2566); AR_2438–45 at 2440. The 1961 order also temporarily withdrew 1,800 acres to the Bureau of Indian Affairs "for use in connection with administration of Native affairs in the vicinity of Eklutna." AR_2565; AR_2440; *see also* AR_2575–76 (1967 Solicitor opinion concluding that the 1961 withdrawal did not create an Indian

31

reservation).  As the Department noted, the 1961 Bureau of Indian Affairs withdrawal also did not include what is now the Ondola Allotment.  *Compare* AR_2565 (metes and bounds) *with* AR_46 (metes and bounds of Ondola Allotment).  And the 1971 Settlement Act ultimately revoked the 1961 withdrawal along with all other reserves in Alaska, save one.  *See* 43 U.S.C. § 1618(a).

Ignoring the administrative record and the 1927 Executive Order, the Tribe claims (without citing any factual or legal support) that the School Reserve was initially set aside "for the benefit and education of the Eklutna people."  Pl.'s Mem. at 8, 36.  But the Tribe's brief does not dispute the Department's conclusion that the Tribe never had a reservation and that the United States never held any land in trust for the Tribe's benefit.

The Tribe also cannot rely on what it refers to as efforts in the 1950s and 1960s to "preserve its rapidly shrinking land base."  Pl.'s Mem. at 1, 8–9, 35, 36.  Whatever that land base may have been (the Tribe never says), it could not have been the School Reserve for the reasons explained above.  And, even if the Reserve could have constituted a tribal land base, the land that would later become the Ondola Allotment had been removed from the Reserve by the time the Tribe began its preservation efforts.  The Tribe acknowledges that fact.  *See* Pl.'s Mem. at 9 (the land "lay in an area that was earlier within the Eklutna reserve but had been removed from it.").

32

To the extent the Tribe's "land base" is a reference to supposed aboriginal title to the area, the 1971 Settlement Act extinguished that title. *See* 43 U.S.C. § 1603(a).  And that extinguishment was retroactive.  *United States v. Atl. Richfield*, 612 F.2d 1132, 1135 (9th Cir. 1980).  Thus, any aboriginal title that the Tribe may have held in the land that is now the Ondola Allotment was extinguished when the allotment issued in 1963.  *See* 43 U.S.C. § 1603(a) ("All prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law, . . . shall be regarded as an extinguishment of the aboriginal title thereto, if any.").[15]

The Tribe attempts to overcome the Allotment's factual and legal history by arguing the Tribe has never been terminated and therefore maintains its tribal sovereignty.  *See See* Pl.'s Mem. at 29–30, 33 (quoting Pub. L. No. 100-241 § 17(a), 101 Stat. 1788, 1814 (1988)).  While true, the point is not relevant here.  Tribal sovereignty is not coterminous with tribal territorial jurisdiction.  *See John*, 982 P.2d at 751–53 (discussing U.S.

---

[15] The Tribe also references efforts to establish aboriginal title prior to the 1971 Settlement Act.  *See* Pl.'s Mem. at 8.  Those efforts were not successful. AR_53–54.  Indeed, the efforts in of themselves are evidence that the Tribe did not have a reservation.  *See* AR_2446 (noting in 1971 that a reservation would change the land status of the area).  When, immediately prior to the 1971 Settlement Act, the Department of the Interior considered a reservation for the Native Village of Eklutna (AR_54), the area did not include the Ondola Allotment.  *See* AR_2447 (metes of bounds of 1971 proposal); AR_46 (metes and bounds of Ondola Allotment).

Supreme Court case law).  The distinction is particularly significant in Alaska because the 1971 Settlement Act "attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land; it attempted to leave them as sovereign entities for some purposes, but as sovereigns without territorial reach." *Venetie*, 522 U.S. at 526.  "Although, technically, the Native Village Tribes still possess a number of sovereign powers relating to the governance of territory (e.g., to regulate hunting and fishing on tribal domain), these powers [were] largely in abeyance [after the 1971 Settlement Act] because the tribes [did] not possess tribal domains." AR_2146 (quoting American Indian Policy Review Commission, Final Report, 95th Cong., 1st Sess., 491 n.2 (1977)).

Thus, the Tribe's contention that the Settlement Act did not change "sovereign governmental authority over lands" asks the wrong question and only begs the one that was actually before the Department: is the Ondola Allotment land over which the Tribe possesses territorial sovereignty?  As explained above, the Department reasonably concluded that the Tribe had not shown any basis for tribal territorial jurisdiction from the Eklutna Industrial School Reserve.

**C.    The Department Did Not Act Arbitrarily in Concluding the Tribe Had Not Shown Any Other Tribal Nexus That Would Justify a Finding of Tribal Territorial Jurisdiction.**

The Department of the Interior did not limit its inquiry to the circumstances surrounding the Allotment's creation.  The Department also assessed whether there was any other clear "tribal nexus" to the site that would have created tribal territorial jurisdiction.  *See* AR_49, 55–60; AR_2265–66 (Sansonetti Opinion noting tribal territorial jurisdiction could be particular to a given allotment).

In order to assess any tribal nexus, the Department considered factors relating to the "Tribe's connections to [the] land and the activities occurring thereon."  AR_55–56.  The Department applied factors used in other Indian lands opinions that had considered whether an off-reservation allotment constituted "Indian lands" under IGRA.  In particular, the Department looked to a 1996 Indian lands opinion for the Quinault Tribe in Washington State.  *See* AR_56; AR_2507–12 (Quinault opinion).[16]

The Department ultimately concluded that the Native Village of Eklutna had not demonstrated a relevant tribal nexus to the Ondola

---

[16] The Quinault opinion identified the factors for purposes of assessing exercise of government authority, rather than tribal territorial jurisdiction. *See* AR_2512.  The Department nonetheless looked to the factors because they "reflect the fact-specific concerns expressed in the [Sansonetti Opinion]." AR_56.

Allotment.  *See* AR_56–60.  The Department reasoned that: (1) tribal territorial jurisdiction had to flow from the land and not the fact that the allotment's owners were tribal members or that the Tribe provides services to those members (AR_56–57, 59); (2) there is not (and never was) an Indian reservation for Native Village of Eklutna's use and benefit on or near the Allotment (AR_57–58); (3) state and local governments do not recognize tribal territorial jurisdiction over the site (AR_59); and (4) the Tribe's unilateral assertions of territorial jurisdiction are insufficient to establish territorial jurisdiction where it does not already exists (AR_60).

In attempting to rebut the Department of the Interior's findings and conclusions, the Tribe relies (as it must) on the same materials it submitted to the Department.  But, rather than explain why those materials reflect information that makes the Department's conclusion arbitrary, the Tribe largely just presents its facts and argues that the Department should have concluded differently.  *See* Pl.'s Mem. at 35–43.  The Tribe has therefore failed to meet its burden under the Administrative Procedure Act's standard of review.  In any event, the Department did not act arbitrarily in concluding that none of the Tribe's submissions demonstrate the existence of territorial jurisdiction.

First, the Tribe argues that it holds territorial jurisdiction over the allotment because it is located within the Tribes' traditional lands and the

current holders of the allotments are members of the Tribe.  *See* Pl.'s Mem. at 36–38.  As explained above, however, the Department reasonably concluded that the Ondola Allotment never formed part of any Indian reservation, much less one set aside for the Tribe's benefit, and that the Allotment (made under 1906 Allotment Act) was not issued because of (or with reference to) any link to the Tribe or tribal lands.  *See supra* at 14–34.  Further, the 1971 Settlement Act extinguished any aboriginal title that the Tribe may have had over the Ondola Allotment.  *See* 43 U.S.C. § 1603(a).

The Department also did not act arbitrarily in concluding that tribal territorial jurisdiction does not exist simply because the allotment holders are tribal members.  *See* Decision at 12-13.  The Department relied upon the Alaska Supreme Court's decision in *John v. Baker*, 982 P.2d 738 (Alaska 1999), and the National Indian Gaming Commission's Whitecloud opinion.  *See* AR_56–67; AR_2460–61 (Whitecloud opinion).  Those opinions– themselves relying on other authorities—recognize that the concept of tribal sovereignty includes both territorial and political components, which can exist independently of one another.  *See John*, 982 P.2d at 749–59; AR_2460– 61; *supra* at 33–34.

Tribes frequently exercise sovereignty—forming governments, issuing laws to govern themselves and their members, enforcing those laws, defining the conditions for tribal membership—that have nothing to do with land.

37

Indeed, the Native Village of Eklutna's constitution declares that the Tribe's "jurisdictional authority shall extend to tribal members of the Native Village Eklutna, regardless of location including those who do not reside within territorial jurisdiction, for purposes of tribal affairs, (such as the Indian Child Welfare Act and others as may arise)." AR_954. The Tribe's exercise of its sovereignty over, and with respect to, its membership does not necessarily equate to tribal territorial jurisdiction over the land those members may own. *See Native Village of Venetie I.R.A Council v. Alaska*, 944 F.2d 548, 558 n.12 (9th Cir. 1991) ("A tribe's authority over its reservation or Indian country is incidental to its authority over its members." (citing Supreme Court case law)).

Second, the Tribe argues that the Department ignored evidence of governmental services that the Tribe has provided on the Ondola Allotment—health care, social services, food, and housing for foster children. *See* Pl.'s Mem. at 38–39. To the contrary, however, the Department explicitly considered the services and concluded that they are rooted in the allotment holders' status as tribal members, not in anything to do with tribal land. *See* AR_57–58, 59, 60. The Tribe presents no argument to the contrary. Indeed, the Tribe's reference to the Indian Child Welfare Act only illustrates the Department's point. *See* Pl.'s Mem. at 38–39. The Indian Child Welfare Act's foster care preferences do not require a link to tribal land. *See* 25 U.S.C.

§ 1915(b); *id.* § 1903(3) (defining "Indian" to mean "any person who is a

member of an Indian tribe, or who is an Alaska Native and a member of a

Regional Corporation as defined in section 1606 of Title 43.").

Third, the Tribe turns to what it argues are efforts to protect and

manage the Ondola Allotment itself.  Pl.'s Mem. at 39–40.  Here again, the

Department explicitly considered the Tribe's evidence.  *See* AR_55, 59, 60

(citing to exhibits 11, 13, 18 through 20, and 21 to the Tribe's submission);

AR_60 (noting Tribe's reliance on tribal ordinances).  The Department

concluded that the Tribe's efforts to manage and protect what the Tribe may

deem to be tribal land are not relevant because they "conflate IGRA's

threshold requirement to demonstrate that the Tribe possesses territorial

jurisdiction with its subsidiary requirement to show that the Tribe exercises

such authority."  AR_59.  The Tribe attacks the Department's conclusion by

again referencing the Big Sandy and Quinault opinions.  *See* Pl.'s Mem. at 40

(citing AR_2470–71, AR_2512).  But the portions of those opinions to which

the Tribe cites were analyzing the exercise of governmental authority rather

than whether tribal territorial jurisdiction existed to begin with.  *See*

AR_2470–71; AR_2511–12.

Fourth, the Tribe is similarly misplaced in arguing that the

Department acted arbitrarily in concluding that the Tribe's constitution and

several tribal laws create territorial jurisdiction over the Allotment.  *See* Pl.'s

Mem. at 40–41.  The Department correctly noted that these are "unilateral
assertions of territorial jurisdiction."  AR_60.  Congress, not the Tribe,
determines the extent of tribal territorial jurisdiction.  *See Yankton Sioux
Tribe*, 522 U.S. at 343.  In addition, none of the Tribe's cited submissions
refer to the Ondola Allotment; some have no relation to land at all; and the
Tribe's constitution limits its assertion of territorial-based jurisdiction "to the
extent consistent with Federal law."  *See* AR_954 (section 1 of Tribe's 1996
constitution); AR_1021 (dog ordinance); AR_1024–31 (code setting tribal
dispute resolution system); AR_1070–72 (environmental protection
ordinance).

Fifth, the Department did not act arbitrarily in concluding that the
Tribe had not provided any evidence "to show that state or local governments
acknowledge the Tribe's territorial jurisdiction over the Ondola Allotment."
AR_59.  The Tribe counters that some exercise of state or local jurisdiction
cannot overcome tribal territorial jurisdiction.  *See* Pl.'s Mem. at 41–42.  But
the assertion—as shown by authorities upon which the Tribe relies—assumes
tribal territorial jurisdiction exists in the first place.   The Tribe points to no
information in the record showing that the State of Alaska or the
Municipality of Anchorage recognizes tribal territorial jurisdiction over the
Ondola Allotment.  The Department of the Interior considered the letter
agreement to which the Tribe now cites, which relates to matters under the

Indian Child Welfare Act.  *See* AR_59 n.143; AR_1085.  The agreement does not focus on tribal lands, but on "Native Village of Eklutna Tribal members who may need services."  AR_1085.  The Department therefore reasonably concluded that the Tribe had not shown any state or local recognition of tribal *territorial* jurisdiction.  *See* AR_59.

Finally, the Department did not act arbitrarily in concluding that the Ondola Allotment is not near any Indian reservation held for the Native Village of Eklutna's use and benefit.  *See* AR_57–58.  The Tribe does not dispute that it does not have, and has never had, a reservation.  Instead, the Tribe argues that proximity to a "tribal community" is all that is required for tribal territorial jurisdiction.  *See* Pl.'s Mem. at 42.  As explained throughout this brief, that is incorrect as a matter of law.[17]

The Tribe then separately argues that the Department inappropriately required proximity to an existing reservation.  Pl.'s Mem. at 40.  The Department's decision nowhere states such a requirement.  *See* AR_57–58.  The Department was responding to *the Tribe's* argument that it had

---

[17] The Tribe also makes too much of the reference to "tribal community."  The references occurs in the Quinault opinion (which the Big Sandy opinion quotes, in part), as part of a background discussion on jurisdiction: "Tribal jurisdiction may be lacking when the land in question is not owned or occupied by tribal members and is far removed from the tribal community."  AR_2511.  That is hardly the dispositive factor the Tribe makes it out to be, and the fact remains that the tribal communities referenced in the Quinault and Big Sandy opinions were reservation-based  *See* AR_2469–70; AR_2508.

territorial jurisdiction because the Ondola Allotment is near the Village's fee lands. *See* AR_57. The Department, for its part, made clear that, despite its use of the Quinault opinion's factors to aid in assessing a tribal nexus, the important question was whether there was any existing source of tribal territorial jurisdiction which could extend to the Ondola Allotment. *See* AR_57–58. In the case of the Native Village of Eklutna, there is none. *See* AR_58. The record supports that the conclusion and the others that the Department reached.

## II.   Because the Ondola Allotment Does Not Constitute "Indian Lands" Under IGRA, the Department Appropriately Decline to Approve the Lease.

The Department declined to approve the proposed lease because the Ondola Allotment is not eligible for gaming under IGRA—the lease would make use of the Allotment for an unlawful purpose. *See* AR_61. The Tribe's only argument with respect to the lease is that the Department erred in disapproving the lease because that disapproval was based upon the Department's conclusion that the Ondola Allotment did not constitute "Indian lands" under IGRA. *See* Pl.'s Mem. at 43–44. For the reasons explained above, the Department's "Indian lands" determination was not arbitrary and capricious, and it should be upheld. The same is therefore true of the Department's decision not to approve the lease.

### III. Even If the Department Had Acted Arbitrarily, the Tribe Would Not Be Entitled to An Order Establishing the Ondola Allotment as "Indian Lands."

Finally, even if the Tribe had met its burden to show arbitrary and capricious decision-making (it has not), the Tribe's requested remedy goes too far.

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). The Tribe nonetheless asks the Court to step into the shoes of the Department of the Interior and determine that the Ondola Allotment constitutes "Indian lands" and is eligible for gaming. *See* Pl.'s Mem. at 45. The Tribe provides no support for the novel remedy, and the two cases it cites did not involve challenges to agency action under the Administrative Procedure Act. *See Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 623 (1st Cir. 2017) (Commonwealth of Massachusetts sued tribe for breach of a settlement agreement); *Narragansett*, 19 F.3d at 690–91 (State of Rhode Island sued tribe). The Tribe's requested remedy would not be appropriate.

## CONCLUSION

The Department of the Interior did not act arbitrarily in determining that the Native Village of Eklutna had not demonstrated tribal territorial jurisdiction over the Ondola Allotment and that, as a result, the Allotment did not constitute "Indian lands" under the Indian Gaming Regulatory Act. The 1906 Alaska Native Allotment Act did not create tribal territorial jurisdiction where none previously existed.  The record supports the Department's conclusion that the Eklutna Industrial School Reserve was not created for the Tribe's use and benefit, and that the Tribe had not shown any other historical tribal nexus to the site that would substantiate a conclusion of tribal territorial jurisdiction.  Summary judgment should be granted in favor of Federal Defendants.

December 18, 2020.

<div style="margin-left:40%">

PAUL E. SALAMANCA
Deputy Assistant Attorney General

 s/ Kristofor R. Swanson
KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
Senior Attorney
Natural Resources Section
Envt. & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

</div>

44

Tel: (202) 305-0248
Fax: (202) 305-0506
kristofor.swanson@usdoj.gov

*Attorneys for Federal Defendants*