Lael A. Harrison
Assistant Attorney General
Alaska Bar No. 0811093
Alaska Department of Law
PO Box 110300
Juneau, AK 99811-0300
Telephone: 907.465.3600
Facsimile: 907.465.3019
Email: lael.harrison@alaska.gov

Laura Wolff
Assistant Attorney General
Alaska Bar No. 1411108
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: 907.269.5275
Facsimile: 907.276.3697
Email: laura.wolff@alaska.gov

*Attorneys for State of Alaska*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIVE VILLAGE OF EKLUTNA )<br><br>)<br>        Plaintiff,        )<br><br>)<br>    v.                    )<br><br>)<br>U.S. DEPARTMENT OF THE )<br>INTERIOR, et. al,        )<br><br>)<br>        Defendants,        )<br><br>)<br>    and                   )<br><br>)<br>STATE OF ALASKA,        )<br><br>)<br>        Defendant-Intervenor. )<br>_____ ) | Case No. 1:19-cv-02388-DLF<br><br>**MEMORANDUM IN SUPPORT OF INTERVENOR STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |

1

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................ 1

II.     The legal question this Court must answer is whether the Ondola allotment is
        "Indian lands" for purposes of IGRA, not whether it is "Indian country" for
        purposes of federal criminal jurisdiction. ......................................... 2

III.    FACTUAL BACKGROUND ............................................... 6

        A.      The History of Tribal Jurisdiction in Alaska ......................... 6

        B.      Alaska Native Allotments Today ....................................... 12

        C.      Indian Gaming and Alaska ............................................ 13

        D.      Eklutna and the Ondola Allotment ................................... 15

        E.      Procedural History of This Case ..................................... 17

IV.     STANDARD OF REVIEW .............................................. 18

V.      ARGUMENT ............................................................... 19

        A.      This Court should uphold Interior's determination that Eklutna does
                not have jurisdiction over the Ondola allotment. ................... 19

        B.      This Court need only address tribal jurisdiction as a question of
                Congressional intent. ................................................. 27

                1.      This Court need not address whether the allotment is "Indian
                        country" under 18 U.S.C. § 1151. ........................... 28

                2.      This Court need not address the "privileges and immunities"
                        provision of the Indian Reorganization Act. .............. 34

                3.      This Court need not address the "disclaimer" in the 1988
                        ANCSA Amendments. ........................................ 37

        C.      Interior's decision that Eklutna has no special "nexus" to the Ondola
                allotment is not arbitrary and capricious. ......................... 38

        D.      Even if this Court agrees with Eklutna that it has jurisdiction over the
                Ondola allotment, this Court must remand to Interior. ............ 39

VI.     CONCLUSION ........................................................... 42

I.      INTRODUCTION

This Court should deny the Native Village of Eklutna's ("Eklutna") motion for summary judgment and grant the State of Alaska's ("State") and Department of the Interior's ("Interior") cross motions because Interior correctly denied Eklutna's request to conduct Indian Gaming on the Ondola allotment. A tribe must have jurisdiction over land in order for it to be eligible for Indian Gaming under the Indian Gaming Regulatory Act ("IGRA"). Tribal jurisdiction is a question of Congressional intent. As Interior correctly concluded, the relevant Congressional actions here, the Alaska Native Allotment Act and Alaska Native Claims Settlement Act ("ANCSA"), foreclose the possibility of tribal jurisdiction over the Ondola allotment. Therefore, the allotment cannot be eligible for IGRA gaming and this Court should uphold Interior's denial of Eklutna's request.

Eklutna tries to evade this straightforward conclusion by raising irrelevant legal issues, such as the definition of "Indian country" under 18 U.S.C. § 1151, the "privileges and immunities" provision of the Indian Reorganization Act, and disclaimer language in the 1988 amendments to ANCSA. But those provisions are irrelevant to the basic question in this case, which is the intent of Congress. Congress did not create or recognize tribal jurisdiction over this land by creating a reservation for Eklutna or otherwise setting it aside for Eklutna's use and benefit. Congress did not create or recognize tribal jurisdiction over this land when it allotted it to an Alaska Native individual pursuant to the 1906 Alaska Native Allotment Act. And Congress

comprehensively extinguished any claim of tribal jurisdiction based solely on historical use and occupancy in ANCSA.

Therefore, for the reasons stated in Interior's cross-motion for summary judgment, and further developed in this memorandum, this Court should affirm Interior's conclusion that the Ondola allotment is not Eklutna's "Indian lands" under IGRA.

## II.   The legal question this Court must answer is whether the Ondola allotment is "Indian lands" for purposes of IGRA, not whether it is "Indian country" under 18 U.S.C. § 1151.

Eklutna attempts to frame the legal question in this case as whether the Ondola allotment is "Indian country" under 18 U.S.C. § 1151.[1] That is not the question. The correct legal question is whether the Ondola allotment is "Indian lands" under IGRA.

"Indian country" in 18 U.S.C. § 1151 defines the limits between federal and state criminal jurisdiction.[2] The definition of Indian country in § 1151 predates IGRA, and Congress was fully aware of it at the time of passing IGRA.[3] Yet Congress chose to

---

[1]      Plaintiff's Statement of Points and Authorities in Support of Motion for Partial Summary Judgment (Dkt. 51-1, Oct. 30, 2020) ("Eklutna Memo") at 15.

[2]      However, Alaska and a few other states have criminal jurisdiction in "Indian country" by virtue of 18 U.S.C. § 1162, § 1360 (together known as "Public Law 280").

[3]      *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987) (holding that Public Law 280, which generally extends the criminal and civil jurisdiction of certain states to "Indian country" did not extend state gambling regulation to Cabazon reservation); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) ("Congress adopted IGRA in response to this Court's decision in *California v. Cabazon Band of Mission Indians*, which held that States lacked any regulatory authority over gaming on Indian lands") (internal citation omitted).

*Native Village of Eklutna v. U.S. Dep't of Interior, et al.*     Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment     Page 2

define "Indian lands" differently in IGRA.[4] As Interior also explains, "Indian country" is

not the same as "Indian lands."[5]

IGRA applies on "Indian lands" which 25 U.S.C. § 2703(4) defines as follows:

Indian lands means:
(A) all lands within the limits of any Indian reservation; and
(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

Federal regulation further develops that definition at 25 C.F.R. § 502.12 as:

(a) Land within the limits of an Indian reservation; or
(b) Land over which an Indian tribe exercises governmental power and that is either—
(1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
(2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

In this case, Eklutna is seeking to conduct "class II" gaming on the Ondola

allotment,[6] and IGRA states that "[a]n Indian tribe may engage in, or license and

regulate, class II gaming on Indian lands *within such tribe's jurisdiction.*"[7] Thus, the

analysis of whether a particular property is "Indian lands" under IGRA first determines

---

[4]     *See Citizens Against Casino Gambling in Erie County v. Chaudhuri*, 802 F.3d 267, 280 n. 12 (2nd Cir. 2015) ("The term 'Indian country' is not to be confused with the term 'Indian lands,' which is statutorily defined in IGRA").

[5]     Federal Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross-Motion (Dkt. 55-1, Dec. 18, 2020) ("Interior Memo") at 20-21.

[6]     AR 4.

[7]     25 U.SC. § 2710(b) (emphasis added).

whether a tribe has jurisdiction over the property[8] and second determines whether the

tribe actually exercises governmental power over the property through "concrete

manifestations of authority."[9]

Eklutna recognizes that the first step in the "Indian lands" analysis is to determine

whether the tribe has jurisdiction over the property.[10] But Eklutna then incorrectly defines

the test for tribal jurisdiction as being whether the land is "Indian country" under 18

U.S.C. § 1151, thus jettisoning Congress's clear choice to define "Indian lands"

differently under IGRA.[11] In fact, tribal jurisdiction is a question of Congressional

intent.[12] And, "an Indian tribe may not unilaterally create sovereign rights in itself that do

not otherwise exist."[13]

There are two, separable, forms of tribal jurisdiction: jurisdiction over members

and jurisdiction over land.[14] A tribe may have jurisdiction over its individual members

---

[8]    *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) ("A proper analysis of whether the tract is 'Indian lands' under IGRA begins with the threshold question of the Tribe's jurisdiction").

[9]    *Rhode Island. v. Narragansett Indian Tribe*, 19 F.3d 685, 702-03 (1st Cir. 1994) ("In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger the Gaming Act. Meeting this requirement does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority.")

[10]   Eklutna Memo at 15.

[11]   Eklutna Memo at 15.

[12]   *See e.g. Kansas*, 249 F.3d at 1229 ("A proper analysis of whether the tract is "Indian lands" under IGRA begins with the threshold question of the Tribe's jurisdiction. That inquiry, in turn, focuses principally on congressional intent and purpose.")

[13]   *Id.*

[14]   *See, e.g,. U.S. v. Mazurie*, 419 U.S. 544, 577 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their

even though it has no jurisdiction over any land.[15] Federally recognized tribes may be

sovereign entities although "severe[d] from the land" and "lack[ing] territorial reach."[16]

This is particularly common in Alaska due to its unique history.[17] As Interior explains,

Eklutna's jurisdiction over the individuals inhabiting the Ondola allotment is not

determinative of whether Eklutna has territorial jurisdiction over the Ondola allotment.[18]

In this case, Interior correctly concluded that the Ondola allotment is not Eklutna's

"Indian lands" for purposes of IGRA.[19] Because Eklutna did not meet the first prong of

the "Indian lands" test—it failed to demonstrate tribal territorial jurisdiction over the

allotment—Interior did not address the second prong.[20] There was no need for Interior to

---

territory") (citing *Worcester v. Georgia*, 31 U.S. 515 (1832)); *Montana v. U.S.,* 450 U.S. 544, 563 (1981) (same) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).

[15]      *See  Runyon ex rel. B.R. v. Ass'n of Village Council Presidents,* 84 P.3d 437, 439 (Alaska 2004) ("Although Alaska no longer contains Indian country, its Native villages retain those fundamental attributes of sovereignty ... which have not been divested by Congress or by necessary implication of the tribe's dependent status"); *State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska,* 371 P.3d 255, 267 (Alaska 2016) (tribal courts have "inherent, non-territorial" subject matter jurisdiction to adjudicate child support obligations of members).

[16]      *See  Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 526 (1998) ("[ANCSA] attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land; it attempted to leave them as sovereign entities for some purposes, but as sovereigns without territorial reach") (quoting *Alaska v. Native Village of Venetie Tribal Gov't,* 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J. concurring)).

[17]      *See . John v. Baker,* 982 P.2d 738, 754 (Alaska 1999) ("Because the traditional reservation-based structure of tribal life in most states forms the backdrop for the federal cases, courts have not had occasion to tease apart the ideas of land-based sovereignty and membership sovereignty").

[18]      Interior Memo at 38.

[19]      AR 45.

[20]      AR 61.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*      Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment      Page 5

address whether Eklutna had demonstrated that it exercises governmental power over the allotment through "concrete manifestations" of authority. Therefore, that aspect of the "Indian lands" analysis is not at issue in this lawsuit and this Court should not engage with Eklutna's arguments about it.[21] Furthermore, because Eklutna lacks jurisdiction over the allotment and it is therefore ineligible for IGRA gaming, Interior correctly denied Eklutna's request to lease the allotment for purposes of IGRA gaming.[22]

Tribal territorial jurisdiction depends on Congressional intent, and this Court's duty here is to interpret the relevant Congressional acts, including the Alaska Native Allotment Act and ANCSA, to determine whether Congress intended that Eklutna possess territorial jurisdiction over this land. This Court should conclude, based on these authorities, that Congress did not and affirm Interior's decision.

## III.    FACTUAL BACKGROUND

### A.    The History of Tribal Jurisdiction in Alaska

Alaska is unlike the contiguous United States both in its history of reservations and in its history of allotments. Although Alaska is home to hundreds of tribes, Alaska

---

[21]    *See* Eklutna Memo at 10, 20. *See also* Interior Memo at 35 (addressing manifestations of governmental authority as potentially relevant to whether a "nexus" exists between Eklutna and the allotment for purposes of determining whether Eklutna has jurisdiction over it, not for purposes of the second prong of the Indian lands analysis). An agency must have the opportunity to review both parts of a two-part test in the first instance. *See Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489, 514 (5th Cir. 1982).

[22]    AR 61.

historically had only seven reservations.[23] It is beyond dispute that Eklutna has never inhabited a reservation. As demonstrated by Interior in detail, the federal government briefly reserved property in the Eklutna area for use by the then-Department of Education and the military, but never for Eklutna or any other tribe.[24]

Most allotments in Alaska were granted pursuant to the unique Alaska Native Allotment Act.[25] Very few allotments were granted in Alaska under the statutes that created the Indian allotments found in the lower forty-eight.[26] As demonstrated in Interior's memorandum, the Alaska Native Allotment Act granted allotments to individual Alaska Natives as homesteads and did not create or recognize any form of tribal jurisdiction over those parcels.[27]

ANCSA extinguished all Alaska Native land claims based on historical use and occupancy, thus resolving disputed issues between the United States, Alaska's tribes, and

---

[23]     *See United States v. Atlantic Richfield Co.,* 435 F. Supp. 1009, 1015 (D. Alaska 1977) ("Congress created only one reservation in Alaska… for the Metlakatla Indians. … In 1936 the Secretary of the Interior was authorized to designate reservations in Alaska upon vote of the adult Native residents within the proposed reservation. Only six such reservations were created.")

[24]     Interior Memo at 28-32.

[25]     Act of May 17, 1906, Ch. 2469, 34 Stat. 197 (attached as Exhibit 1 to Interior Memo).

[26]     Other forms of allotments do exist in Alaska on a limited basis, including General Allotment Act allotments. AR 2267.

[27]     Interior Memo at 14-22. *See also United States v. Atlantic Richfield Co.,* 435 F. Supp. 1009, 1015 (D. Alaska 1977) ("In the Alaska Native Allotment Act, Congress for the first time provided a means by which *individual* Alaska Natives could obtain legal title *to land they occupied*") (emphasis added).

the State of Alaska.[28] In exchange, Congress settled funds and lands on state-chartered,

Native-owned business corporations.[29] The goal of this settlement structure was to allow

for economic self-determination by Alaska Natives and "to end the sort of federal

supervision over Indian affairs that had previously marked federal Indian policy."[30]

ANCSA's plain language broadly extinguished all claims "relating to Native use

or occupancy" as follows:

> All aboriginal titles, if any, and claims of aboriginal title in Alaska based on
> use and occupancy, including submerged land underneath all water areas,
> both inland and offshore, and including any aboriginal hunting or fishing
> rights that may exist, are hereby extinguished.[31]

Further:

> All claims against the United States, the State, and all other persons that are
> based on claims of aboriginal right, title, use, or occupancy of land or water
> areas in Alaska, or that are based on any statute or treaty of the United States
> relating to Native use and occupancy, or that are based on the laws of any
> other nation, including any such claims that are pending before any Federal
> or state court or the Indian Claims Commission, are hereby extinguished.[32]

---

[28]    *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp.2d 1, 4, 8
(D.D.C. 2008) (as a settling party to ANCSA, the State has an interest in its
interpretation).

[29]    *See* 43 U.S.C. §1605-1613.

[30]    *Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 524 (1998). *See
also* 43 U.S.C. § 1601 (reciting that ANCSA "should be accomplished rapidly, with
certainty, in conformity with the real economic and social needs of Natives, without
litigation, with maximum participation by Natives in decisions affecting their rights and
property, without establishing any permanent racially defined institutions, rights,
privileges, or obligations, without creating a reservation system or lengthy wardship or
trusteeship").

[31]    43 U.S.C. § 1603.

[32]    *Id.*

ANCSA terminated all reservations in Alaska except one.[33] ANCSA repealed the Alaska Native Allotment Act, but allowed pending applications to remain open.[34]

In the wake of ANCSA, there was a great deal of debate over whether Alaska tribes continued to exist at all, and, if so, whether they possessed any territorial jurisdiction.[35] In 1988, this question had not been resolved, and Congress wished to amend certain provisions of ANCSA.[36] Congress did not want its amendments "to affect the sovereignty controversy one way or another," but rather wished "to leave… the sovereignty issue, in exactly the same status as if the amendments were not enacted."[37] Thus, Congress added language disclaiming intent that *the amendment* alter the tribal

---

[33]    43 U.S.C. § 1618(a).

[34]    43 U.S.C. § 1617.

[35]    *See* Case, A. & Voluck, D., *Alaska Natives and American Laws* (University of Alaska Press, 3d. Ed. 2012) at 389 ("Some observers initially assumed that the Alaska Native Claims Settlement Act extinguished every aspect of special Native American status in Alaska").

[36]    *See* Senate Report 100-201 (1987) ("the Committee is aware that there is a controversy in Alaska over the issue of Native sovereignty; i.e., whether there are tribal entities in Alaska, other than the Metlakatla Indian Community on the Annette Island Reserve, that can exercise governmental authority over lands or individuals in Alaska. The controversy involves several complex questions—which Native groups might qualify as tribal organizations, what powers such organizations might possess, and whether there is Indian country in Alaska over which such organizations might exercise governmental jurisdiction.")

[37]    *Id.* (the disclaimer language in the bill "states and reiterates, that neither the amendments nor any action taken pursuant to the … amendments affect the sovereignty controversy one way or the other. It is the Committee's clear intent that this bill leave parties in the sovereignty issue, in exactly the same status as if the amendments were not enacted").

sovereignty—including territorial sovereignty—analysis.[38] The disclaimer did *not* alter the effect of ANCSA itself on tribal sovereignty and territorial jurisdiction,[39] which Congress wished to be "left to the courts in interpreting applicable law and that *these amendments* should play no substantive or procedural role in such court decisions."[40]

In the early 1990s, the questions of Alaska tribal sovereignty post-ANCSA, including tribal territorial jurisdiction, remained unresolved. The federal government needed guidance on these questions and therefore commissioned what became the Sansonetti Opinion.[41] The Sansonetti Opinion reached two major conclusions: Tribes continue to exist as sovereigns in Alaska and they do not have territorial jurisdiction over ANCSA settlement lands.[42] The Opinion also concluded that, based on the unique nature of the Alaska Native Allotment Act and the general lack of tribal territorial jurisdiction post-ANCSA, Alaska tribes generally do not have territorial jurisdiction over Alaska

---

[38]   PL 100–241, February 3, 1988, 101 Stat 1788, §2(8) ("no provision of this Act shall … confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands (including management or regulation of the taking, of fish and wildlife) or persons in Alaska"). *See also* AR 2143-44.

[39]   *Id.* ("no provision of this Act shall … unless specifically provided, constitute a repeal or modification, implied or otherwise, of any provision of the Alaska Native Claims Settlement Act").

[40]   *See* Senate Report 100-201 (1987) (emphasis added).

[41]   AR 2140 (reciting that in 1991 the Secretary of Interior requested the General Solicitor "to develop the legal position of the United States on 'the nature and scope of so-called governmental powers over lands and nonmembers that a Native village can exercise after the Alaska Native Claims Settlement Act'").

[42]   AR 2246-47.

Native allotments.[43] The Opinion concluded, "Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands."[44]

In 1993, Interior formally acted on the Sansonetti Opinion's first conclusion and added Alaska Native tribes to the list of federally-recognized tribes, which was formally ratified by Congress the following year.[45] As described by Interior, this act was a recognition and validation of the Sansonetti Opinion.[46] And in 1998, the United States Supreme Court vindicated the second conclusion of the Sansonetti Opinion by holding that Alaska Native tribes lack jurisdiction over ANCSA settlement lands.[47]

In *Alaska v. Native Village of Venetie*, the United States Supreme Court held that ANCSA settlement lands are not subject to tribal jurisdiction.[48] The Court's reasoning is largely consistent with the reasoning of the Sansonetti Opinion. Like the Sansonetti Opinion, the Court directly interpreted ANCSA to reach its holding.[49] Like the

---

[43]   AR 2266-67.

[44]   AR 2271.

[45]   *See* 58 Fed.Reg. 54,364, 54,365 (describing the Sansonetti Opinion and stating, "in view of the foregoing … the Department of the Interior has determined it necessary to publish a new list of Alaska tribal entities"); Pub. L. No. 103-454, § 103(4), (5), 108 Stat. 4791, 4791-92 (1994).

[46]   Interior Memo at 27.

[47]   *Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520 (1998).

[48]   522 U.S. 520 (1998). Note that, unlike Eklutna, Venetie was one of the few Alaska tribes to inhabit a reservation before ANCSA, and the land in question was former reservation land. *Id.* at 523.

[49]   Eklutna's assertion that ANCSA did not affect tribal territorial jurisdiction is truly bizarre in light of *Venetie*. Eklutna Memo at 29. Although it is true that the word "jurisdiction" does not appear in ANCSA, the United States Supreme Court has clearly

Sansonetti Opinion, the Court concluded that the structure and Congressional intent of ANCSA precluded settlement lands from being considered "dependent Indian communities" for purposes of federal or tribal jurisdiction, even when owned by a tribe in fee.[50] However, *Venetie* left open the question of whether a tribe could have territorial jurisdiction over Alaska Native allotments.[51] That question was not before the Court so the Court did not address it. The following year, the Alaska Supreme Court held that ANCSA did not extinguish the non-territorial sovereignty of Alaska tribes over their own members.[52]

### B.   Alaska Native Allotments Today

As described in the State's Motion to Intervene, there are more than 16,000 Alaska Native allotments scattered all across the state.[53] Their locations are based on where individuals had their homes, not tribal centers or territories.[54] They are intermixed with

---

interpreted ANCSA to foreclose tribal jurisdiction over settlement lands, including lands that were formerly part of reservations. *Venetie,* 522 U.S. at 534.

[50]    *Venetie,* 522 U.S. at 534; AR 2257-60.

[51]    *Venetie,* 522 U.S. at 528 & n. 2 ("Because ANCSA revoked the Venetie reservation, and because *no Indian allotments are at issue*, whether the Tribe's land is Indian country depends on whether it [is a] "dependent Indian communit[y]") (emphasis added).

[52]    *John v. Baker,* 982 P.2d 738, 748-49 (Alaska 1999). *See also State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 267 (Alaska 2016) (tribal courts have inherent, non-territorial subject matter jurisdiction to adjudicate child support obligations of members).

[53]    Memorandum in Support of State of Alaska's Motion to Intervene (Dkt. 19-2, Dec. 21, 2019) ("Motion to Intervene Memo") at 9.

[54]    *Id.* at 14-15.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*    Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment   Page 12

all other forms of land ownership, and are typically treated the same as other private

properties except as to the specific federal provisions regarding alienation and taxation.[55]

To date, no court has ruled on the question of whether Alaska Native tribes have

territorial jurisdiction over allotments granted under the Alaska Native Allotment Act.

The Alaska Supreme Court has recognized federal subject matter jurisdiction over

allotment-related disputes, but those cases, like the federal cases addressing Alaska

Native allotments, have involved only the rights of individual allottees, not tribes.[56] No

court has ever held that a tribe has any interest, jurisdictional or otherwise, in an Alaska

Native allotment.

### C.      Indian Gaming and Alaska

As described in the State's Motion to Intervene, this is not the first time this

question has arisen.[57] Interior has consistently denied all requests for "Indian lands"

determinations for Alaska Native allotments (and similar restricted townsite lots) with

which it has been presented.[58] Those denials have all been consistent in their basic

---

[55]      *Id.* Maps of Native allotments across Alaska can be viewed online using the Spatial Data Management System operated by the United States Department of the Interior, Bureau of Land Management here: https://sdms.ak.blm.gov/isdms/imf.jsp?site=sdms or using the State of Alaska Open Data Geoportal here: https://gis.data.alaska.gov/datasets/native-allotment-py.

[56]      *See, e.g., Foster v. State, Dep't of Transp.,* 34 P.3d 1288 (Alaska 2001) (holding state court without jurisdiction over trespass claim by individual Native Allotment holder against State); *Pence v. Kleppe,* 529 F.2d 135, 139-40 (9th Cir 1976) (holding individual Alaska Natives have protected property interest in allotment applications).

[57]      Motion to Intervene Memo at 11-12.

[58]      *See* AR 626-627 (1994 memorandum concluding that Alaska Native allotment is not Eklutna's Indian lands under IGRA), AR 629-642 (2001 D.C. District Court decision

conclusion that Alaska Native allotments are not subject to tribal jurisdiction or governmental power.[59] At least one of those denials was appealed to this Court where it was affirmed.[60] One of those denials responded to a prior request for an Indian lands determination from Eklutna for the same allotment at issue in this case.[61]

Despite being generally[62] ineligible for IGRA gaming, Alaska tribes can and do benefit from the proceeds of gaming authorized under Alaska's charitable gaming laws. As described in the State's Motion to Intervene, Alaska law creates a system whereby net

---

affirming Interior's conclusion that restricted townsite is not Native Village of Barrow's Indian lands under IGRA), AR 721-22 (1995 memorandum concluding that Alaska Native allotment is not Kenaitze Indian Tribe's Indian lands under IGRA).

[59]    See AR 627 (Alaska Native allotment not Eklutna's Indian lands based on conclusion of Sansonetti Opinion that "tribal jurisdiction…over individual restricted lots" is "doubtful"), AR 641 (D.C. District Court affirming Interior's conclusion that restricted townsite was not Native Village of Barrow's Indian lands because Barrow failed to demonstrate that it exercised governmental power over the property, "irrespective of jurisdiction"), AR 722 (Alaska Native allotment not Indian lands of Kenaitze Indian Tribe based on conclusion of Sansonetti Opinion that "tribal jurisdiction…over individual restricted lots" is "doubtful").

[60]    See AR 629-42, 2500-06.

[61]    AR 626-27. Although the denial does not specify the Ondola allotment, there is no dispute that it is the only allotment in the Eklutna region.

[62]    Interior has approved some "Indian lands" determinations in Alaska for lands held by the United States in trust for a tribe (not allotments), which is a rare form of land ownership in Alaska. At present, there are two IGRA gaming cites operating in Alaska, one in Metlakatla (the only tribe in Alaska inhabiting a reservation) and the other in Klawock. See https://www.nigc.gov/map/ And a favorable Indian lands determination was issued to the Organized Village of Kake in 2000, although it does not presently have an IGRA operation. See https://www.nigc.gov/images/uploads/indianlands/Organized%20Village%20Kake2.pdf (finding lands held in trust by United States for Organized Village of Kake "Indian lands").

proceeds of legal gambling flow to charitable beneficiaries, which include Alaska Native tribes.[63]

### D.    Eklutna and the Ondola Allotment

The history of Eklutna and the Ondola allotment is in no way unusual. Eklutna is one of the many Alaska tribes that never occupied a reservation.[64] Eklutna presently occupies land deeded to it in fee.[65] Post-*Venetie*, it is entirely clear that Eklutna does not possess territorial jurisdiction over the land it occupies and owns in fee.[66] Eklutna's provision of some services to allotment residents over the years is not relevant to territorial jurisdiction.[67] It appears that these services would be available to any tribal member living in the vicinity, regardless of whether they live on an allotment, demonstrating that the services are based on membership not territory. Eklutna does not operate a police department, fire department, sanitation department, or public utilities, and all these services are provided to the allotment by the State and Municipality of

---

[63]    *See* Motion to Intervene Memo at 4. However, it appears that since the Motion to Intervene was filed, Eklutna has allowed its charitable gaming permit to expire. This can be verified by conducting the search described in notes 15 and 16 on pages 4 and 5 of the Motion to Intervene Memo.

[64]    As Interior's memorandum correctly explains, the short-lived federal "reserves" in the area were not for the use or benefit of Eklutna. Interior Memo at 28-32.

[65]    AR 46, 2039.

[66]    *See Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 524 (1998) (Court found no tribal jurisdiction over land constituting former Venetie reservation that "United States conveyed [in] fee simple title … to [ANCSA] corporations…thereafter, they transferred title to respondent Native Village of Venetie").

[67]    AR 59 ("the Tribe also relies on its provision of services to Tribal members at the site").

Anchorage.[68] Although Eklutna purports to have a pollution ordinance that applies to the allotment, it does not appear to have any kind of criminal or civil enforcement mechanisms.[69]

The Ondola allotment is the only allotment in the vicinity. It is approximately seven miles from Eklutna's fee lands and access is by state-owned and operated roads.[70] Ms. Ondola purchased the home on what is now the allotment from the prior owner and later applied for an allotment patent to the home and surrounding area.[71] All land-based services and regulation on the allotment are provided by the State and Municipality to the same extent as other private properties in the area.[72] These services include fire suppression, police protection, ambulance, electricity, gas, garbage removal, water, sewer, animal control, and so forth.[73] The record shows that at various points both the

---

[68]    AR 59, 597.

[69]    AR 60, Eklutna Memo at 39. In fact, the ordinance purports to apply "within Native Village of Eklutna's traditional jurisdictional area," not just the Ondola allotment, although Eklutna indisputably lacks territorial jurisdiction over any other part of that area. AR 1071. In fact, in the years since passage of that ordinance, Eklutna has extensively litigated in State court against development of areas adjacent to the village that it considers culturally significant. *See Native Village of Eklutna v. Alaska R.R. Corp.*, 87 P.3d 41, 43-44 (Alaska 2004) (describing extensive history of lawsuits brought by Eklutna to enjoin development in the area including two prior Alaska Supreme Court decisions). Eklutna has also taken action to protect its interests through Municipal processes. *See* AR 599-600.

[70]    AR 46, 596-97.

[71]    AR 54, 713-14.

[72]    AR 59, 596-97.

[73]    AR 59, 596-97.

local authorities and the allotment owners have ignored the property's status as an allotment.[74]

No municipal, state or federal government has ever recognized tribal territorial jurisdiction over the allotment. Eklutna points to a letter agreement with the Municipality of Anchorage, but, as Interior correctly states, that letter agreement addresses sovereignty over individuals, not territory, and therefore is irrelevant to the issues in this case.[75] Eklutna's sovereignty over its membership is not relevant to the question of whether it has any territorial jurisdiction.[76]

### E. Procedural History of This Case

This is the third time that Eklutna has requested an Indian lands determination for this allotment.[77] It withdrew its first application in 1995 after receiving a copy of the denial letter Interior intended to issue.[78] It withdrew its second application in 2007 after the State of Alaska and the Alaska State Legislature opposed the application.[79]

Interior denied the third application that is the subject of this case on the grounds that Eklutna lacks territorial jurisdiction over the allotment.[80] The rationale of this denial

---

[74]   AR 11, 597-98.

[75]   AR 15-16, Interior Memo at 40-41.

[76]   *See John v. Baker,* 982 P.2d 738, 754 (Alaska 1999) (holding that Alaska's tribes retain non-territorial sovereignty over members although ANCSA "separates membership and land completely").

[77]   AR 782.

[78]   AR 626, 782.

[79]   AR 594-624, 782.

[80]   AR 61.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*   Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment   Page 17

is consistent with the Sansonetti Opinion, the 1995 denial, and Interior's denials of

"Indian lands" applications for other Alaska Native allotments and restricted townsites.[81]

Because Interior found Eklutna lacked jurisdiction over the allotment, Interior did not

address whether Eklutna had established "concrete manifestations" of government

authority on the property.[82] Because Interior found the allotment ineligible for IGRA

gaming, Interior also declined to approve a proposed lease of the allotment for IGRA

gaming purposes.[83] Eklutna has appealed these denials to this Court under the

Administrative Procedure Act.

## IV.   STANDARD OF REVIEW

The State agrees with Interior and Eklutna that this case falls under the highly

deferential Section 706(2)(A) of the Administrative Procedure Act, meaning a court may

set aside the agency action only if it is arbitrary and capricious, an abuse of discretion, or

otherwise not in accordance with law.[84] Furthermore, although courts may review pure

questions of law *de novo*, where Congress has not "directly spoken to the precise

question at issue," a court is required to uphold the agency's interpretation "if it is based

---

[81]     AR 49, 626-27.

[82]     AR 61.

[83]     AR 61.

[84]     Interior Memo at 11, Eklutna Memo at 12.

on a permissible construction of the statute."[85] This deference should be accorded to Interior's interpretation of "Indian lands" for purposes of IGRA.[86]

Eklutna argues that this Court should apply the cannon that ambiguous statutes be construed "liberally in favor of the Indians,"[87] but it is not applicable in this case. First, if there is any ambiguity in the meaning of "Indian lands," this Court must defer to Interior's interpretation under principles of administrative law.[88] Second, to the extent this Court must interpret ANCSA, the canon does not apply to it.[89]

## V.    ARGUMENT

### A.    This Court should uphold Interior's determination that Eklutna does not have jurisdiction over the Ondola allotment.

Tribal jurisdiction hinges on Congressional intent.[90] As Interior's motion demonstrates, Congress never created or recognized tribal territorial jurisdiction of Eklutna over this allotment. The executive actions creating the Eklutna "reserve" did not

---

[85]    *Kansas v. United States*, 249 F.3d 1213, 1228 (10th Cir. 2001) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

[86]    *See id.* ("Because the merits of this case involve review of the NIGC's decision that the tract constitutes 'Indian lands' of the Tribe within the meaning of IGRA, the APA review principles enunciated in *Chevron* apply") (internal citation omitted).

[87]    Eklutna Memo at 13.

[88]    *See Koi Nation of N. California v. United States Dep't of Interior*, 361 F. Supp. 3d 14, 48 (D.D.C. 2019) ("*Chevron* deference does not disappear from the process of reviewing an agency's interpretation of those statutes it is trusted to administer for the benefit of the Indians, although that deference applies with muted effect") (quoting *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009)).

[89]    *Leisnoi, Inc. v. Stratman*, 154 F.3d 1062, 1066 n.7 (9th Cir. 1998).

[90]    *Kansas v. United States,* 249 F.3d 1213, 1231 (10th Cir. 2001) ("An Indian tribe's jurisdiction derives from the will of Congress"). *See also* R. 2511, 2529-30.

grant or recognize Eklutna tribal territorial jurisdiction over the land, and the Alaska Native Allotment Act did not grant or recognize Eklutna tribal territorial jurisdiction over the land. And Eklutna's primary argument, that it has territorial jurisdiction over the land based on historical use and occupancy, is clearly foreclosed by ANCSA.

Eklutna's primary claim to jurisdiction over the Ondola allotment is based on historical use and occupancy, not Congressional intent.[91] Its first five exhibits in support of its underlying application all relate exclusively to historical use and occupancy.[92] But, as Interior also points out, Congress terminated any such claims in ANCSA.[93] ANCSA comprehensively extinguished all Alaska Native land claims related to historical use and occupancy.[94] That extinguishment was retroactive and also extinguished claims based on historical use and occupancy to land granted under federal law prior to ANCSA, so there can be no dispute that its terms apply to the Ondola allotment.[95]

When discussing the Alaska Native Allotment Act, Eklutna does not directly address Congressional intent. It simply urges this Court to reach the same conclusions when interpreting the Alaska Native Allotment Act as other courts have reached when

---

[91]     *See e.g.* Eklutna Memo at 1, 13, 36, 39 (arguing that the Ondola allotment is part of Eklutna's "aboriginal" or "traditional" territory).

[92]     *See* AR 808-941.

[93]     Interior Memo at 33.

[94]     43 U.S.C. § 1603(b).

[95]     *Id.* at (a) ("All prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law… shall be regarded as an extinguishment of the aboriginal title thereto, if any"); *United States v. Atlantic Richfield Co.,* 612 F.2d 1132, 1135 (9th Cir. 1980).

interpreting the General Allotment Act.[96] But Eklutna fails to engage with the differences in language and Congressional intent between the two Acts. Interior thoroughly addresses these topics and explains how Congressional intent relevant to tribal jurisdiction differs between the two Acts.[97]

Eklutna also fails to engage with the substance of the analysis in the cases that it cites. First, Eklutna cites exclusively to cases regarding whether an allotment is "Indian country" for purposes of federal or state jurisdiction, not tribal jurisdiction.[98] And when those court have found allotments subject to federal jurisdiction as "Indian country," they have typically considered whether the land was set aside for the use and benefit of a tribe

---

[96]   It may be proper to draw similarities between the Acts when considering the rights of *individuals* in allotments, given that both allotment acts sought to protect the rights of individuals to the land on which they lived. *See Pence v. Kleppe*, 529 F.2d 135, 139-40 (9th Cir. 1976). However, the Acts are distinct in how they relate to tribes and tribal connection to the land, and must also be compared in this regard to the Indian Homestead Acts. *See* Interior Memo at 18-19.

[97]   *See* Interior Memo at 17-19.

[98]   *See, e.g., United States v. Pelican*, 232 U.S. 442 (1914) (addressing whether allotment was "Indian country" for purposes of federal criminal jurisdiction); *In re Petition of Carmen*, 165 F. Supp. 942 (N.D. Cal. 1958) (affirmed by 270 F.2d 809 (9th Cir. 1959)) (same); *United States v. Ramsey*, 271 U.S. 467 (1926) (same); *United States v. Bowling*, 256 U.S. 484 (1921) (addressing federal supervisory authority over allotment); *Okl. Tax Comm'n v. United States*, 319 U.S. 598 (1943) (addressing federal jurisdiction over allotment for matters of taxation). Although Eklutna cites to Indian lands determinations in which Interior determined that tribes possessed jurisdiction over allotments, Eklutna cites no cases to that effect. Contrary to Eklutna's assertions, the Supreme Court did not, in *Venetie*, hold that allotments in Alaska are necessarily "Indian country," and it certainly never addressed, much less concluded, that tribes have territorial jurisdiction over allotments in Alaska. Eklutna Memo at 17; *Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 527 n. 2 (1998) ("Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of § 1151(b), or *if* it constitutes 'allotments' under § 1151(c)") (emphasis added).

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*   Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment   Page 21

prior to creation of the allotment, and then considered whether the act of allotment

terminated that status.[99] In this case, there was no pre-existing tribal jurisdiction over this

property and the act of allotting it to Ms. Ondola as an individual, without regard to tribal

affiliation, did not create or recognize tribal jurisdiction over it.[100]

Eklutna also fails to engage with the evidence of Congressional intent in ANCSA

itself. ANCSA repealed the Alaska Native Allotment Act, although it allowed pending

applications to go forward.[101] This section of ANCSA refers solely to "applicants" as

individuals.[102] This is consistent with the intent embodied in the Alaska Native Allotment

Act that the allotments are grants to individuals, not to a tribe or under the jurisdiction of

a tribe.[103] The purpose of Alaska Native Allotment Act was to protect individual Alaska

---

[99]     *See, e.g., United States v. Pelican*, 232 U.S. 442 (1914)*. See also Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 529 (1998) ("In *United States v. Pelican*, we held that Indian allotments—parcels of land created out of a diminished Indian reservation and held in trust by the Federal Government for the benefit of individual Indians—were Indian country. We stated that the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the Government. After the reservation's diminishment, the allotments continued to be Indian country, as the lands remained Indian lands set apart for Indians under governmental care [and] we [were] unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the Government retaining control.") (Internal citations and quotations omitted).

[100]    Eklutna cites *Petition of Carmen*, 165 F. Supp. 942 (N.D. Cal. 1959) (affirmed by 270 F.2d 809 (9th Cir. 1959)), for the proposition that an allotment may be "Indian country" for purposes of federal criminal jurisdiction although it was never previously part of a reservation. Despite being sixty years old, this case has not been widely cited for this proposition. It is unclear from that case under what statute the allotment was issued, and, in any case, it does not address tribal jurisdiction.

[101]    43 U.S.C. § 1617.

[102]    *Id.*

[103]    Eklutna cites to various cases regarding the rights of individuals in Alaska Native allotments. *See, e.g., Pence v. Kleppe*, 529 F.2d 135 (9th Cir 1976); *Aguilar v. United*

Natives' homes from encroachment by White settlement, not to preserve or create tribal jurisdiction in any area.[104]

Further evidence is found in a later amendment to ANCSA regarding Alaska Native allotments. The Alaska Native Allotment Subdivision Act, passed 2004, amended ANCSA to allow for subdivision of Alaska Native allotments according to state law without loss of their restrictions on taxation and alienation.[105] Congress was careful to clarify that nothing in the Subdivision Act was intended to diminish federal restrictions on the land, but did not mention tribal authority or jurisdiction.[106] If Congress had believed that tribes had territorial jurisdiction, and therefore land use planning authority, over Alaska Native allotments, surely it would have considered and acknowledged that jurisdiction in the Act.[107] The language of the Act is inconsistent with tribal jurisdiction

---

*States*, 474 F. Supp. 840 (D. Alaska 1979); *Alaska, Dep't of Pub. Works v. Agli*, 472 F. Supp. 70, 72-73 (D. Alaska 1979). But Eklutna cites no case regarding the rights of tribes in Alaska Native allotments, and the State is not aware of any.

[104]   *See, e.g., Pence v. Kleppe*, 529 F.2d 135, 141 (9th Cir 1976) (quoting from legislative history of the Alaska Native Allotment Act as follows: "It does not signify that because an Alaska Indian has lived for many years in the same hut and reared a family there that he is to continue in peaceable possession of what he has always regarded his home. Someone who regards that particular spot as a desirable location for a home can file upon it for a homestead, and the Indian or Eskimo, as the case may be, is forced to move and give way to his white brother. This has in some instances already worked severe hardship upon these friendly and inoffensive natives to the shame of our own race.")

[105]   PL 108–337, October 18, 2004, 118 Stat 1357.

[106]   *See* Senate Report 108-251 (2004) (located in the administrative record at AR 726).

[107]   Instead, the Senate report on the Act is entirely consistent with the interpretation of the Alaska Native Allotment Act as being for the benefit only of individuals: "The

over Alaska Native allotments.[108] At the very least, if Congress believed that tribes had

jurisdiction over these allotments, Congress would have considered and acknowledged

it.[109] The Act demonstrates Congressional understanding that the State is the only

relevant land use planning authority with regard to Alaska Native allotments.

Finally, Eklutna fails to engage with the United States Supreme Court's holding in

*Venetie.* Failing to address *Venetie* when discussing Alaska Native tribal territorial

jurisdiction ignores the elephant in the room. *Venetie* is the most prominent case on that

topic and definitively holds that tribes lack jurisdiction over ANCSA settlement lands.[110]

Furthermore, it reached that holding through reasoning similar to that used by the

Sansonetti Opinion to reach the same conclusion.[111] Therefore, when the Sansonetti

Opinion took that reasoning one step further, to determine that tribes lack territorial

jurisdiction over allotments, the Opinion is not to be discounted. Further, the Sansonetti

---

purpose of the Federal statutory restrictions placed on Alaska Native allotments and restricted Native townsite lots is to protect Alaska Native owners against loss." *Id.*

[108]   *Id.* ("Individual Alaska Native landowners cannot subdivide their native allotments to transfer it either by gift or by sale….[This Act] allows Alaska Natives to own lands with the same obligations and privileges of other private landowners in Alaska.")

[109]   The Act simply states that an allottee, with approval of the Secretary, may subdivide a restricted parcel consistent with State or municipal law with the "same effect under State law as if the restricted land subdivided and dedicated were held by unrestricted fee simple title." PL 108–337, October 18, 2004, 118 Stat 1357. It does not address the possibility of subdivision according to tribal law or a tribal platting authority.

[110]   *Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520 (1998).

[111]   *See* notes 47-50, above, and accompanying text.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*   Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment   Page 24

Opinion engages with the Alaska Native Allotment Act's unique history and thoughtfully

compares it to the General Allotment Act and Indian Homestead Acts.[112]

After *Venetie,* it is now clear that most Alaska tribes, including Eklutna, lack any

jurisdictional land base.[113] A tribe's fee lands may be the physical center of a

community, but *Venetie* makes clear that a tribe does not have jurisdiction over lands just

because it owns them or just because its members reside there. This is an important

distinguishing factor, both as a legal and practical matter, between this case and Interior's

Indian lands determinations regarding General Allotment Act allotments in the

contiguous states. Eklutna attempts to compare itself to tribes with reservations whose

territorial jurisdiction extends to allotments in the general vicinity of the reservation.[114] It

argues that, because Interior has issued favorable Indian lands determinations in such

cases, it is constrained to issue one to Eklutna.[115] To begin with, that significantly

overstates the effect of Indian lands determinations, which are advisory in nature and do

not create binding precedent.[116]

---

[112]     AR 2263-69.

[113]     *See, e.g., Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 526
(1998) ("ANCSA was intended to be a departure from traditional Indian policy: it
attempted to preserve Indian tribes, but simultaneously attempted to sever them from the
land; it attempted to leave them as sovereign entities for some purposes, but as sovereigns
without territorial reach") (quoting *Alaska v. Native Village of Venetie Tribal Gov't,* 101
F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J. concurring)).

[114]     Eklutna Memo at 20-21.

[115]     Eklutna Memo at 22-23.

[116]     *See Butte County, California. v. Hogen*, 613 F.3d 190, 195 n. 3 (D.C. Cir. 2010)
("Indian lands opinions are 'advisory in nature and thus do not legally bind the persons

But, more importantly, the effects of ANCSA and the unique provisions of the Alaska Native Allotment Act were not at issue in those determinations dealing with reservations and allotments under the General Allotment Act. The tribes in those cases were not subject to a general extinguishment of claims based on historical use and occupancy. Furthermore, those tribes each had significant territorial jurisdiction in nearby reservations that extended to encompass the allotment, either by virtue of the allotment being within former reservation boundaries[117] or by virtue of the allottee's association with the tribe as a condition of receiving the allotment.[118] This is an essential distinction between the Alaska Native Allotment Act and the General Allotment Act.

Critically, none of the Indian lands determinations cited by Eklutna involved a tribe like Eklutna that lacked any territorial jurisdictional land base, and whose only

---

vested with the authority to make final agency decisions'") (quoting Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed.Reg. 29,354, 29,372 (May 20, 2008)).

[117]    *See* Indian Lands Determination re: Iowa Tribe of Oklahoma; Whitecloud Allotment (Jan. 7, 2010) at AR 2454-65 (allotment within former reservation boundaries that "never lost its trust status" Indian lands). *See also* Indian Lands Determination re: Kowa Indian Tribe of Oklahoma (Nov. 15, 2005) (not in AR, available online at https://www.nigc.gov/images/uploads/indianlands/01_kiowatribefinalldsopn.pdf) (allotment "located within the exterior boundaries of the former Kiowa…reservation" and "held in trust by the United States on behalf of the Tribe" was "Indian lands" where it was "validly set aside *for the tribe* under the superintendence of the federal government") (emphasis added).

[118]    *See* Memorandum re: Gaming By the Big Sandy Rancheria on the McCabe Allotment (Sept. 6, 2006) at AR 2466-72 (General Allotment Act allotment granted to member of tribe and located near tribal reservation Indian lands); Memorandum Re: Sampson Johns Allotment as Indian Land under IGRA (Sept. 25, 1996) at AR 2507-12 (same). *See also* Whitecloud at AR 2462 (distinguishing allotment within former reservation that never lost trust status from allotment "granted by Congress to an individual of Indian descent, but not a member of any tribe").

claim to territorial jurisdiction was over the allotment in question.[119] The only Indian lands determinations that are truly comparable to this one are those involving other Alaska Native allotments or restricted townsite lots, all of which were denied for reasons consistent with the denial in this case.[120] Thus, when compared to truly similar determinations, Interior has been consistent.

Eklutna's basic argument in this case is foreclosed by ANCSA. Eklutna argues that it has an ongoing aboriginal tribal connection to this land, but any such connection was severed by ANCSA. Although individual allottees maintain their rights to their allotments and protection against alienation and taxation, ANCSA extinguished any tribal claims to jurisdiction over such allotments based on historical use and occupancy.

### B. This Court need only address tribal jurisdiction as a question of Congressional intent.

Eklutna raises numerous irrelevant legal provisions that this Court need not address. This Court should simply affirm Interior's decision as a correct interpretation of Congressional intent in the Alaska Native Allotment Act and ANCSA. It need not address the meaning of "Indian country" in 18 U.S.C. § 1151, the "privileges and immunities" provision of the Indian Reorganization Act, the disclaimers in the 1988 amendments to ANCSA, or whether Eklutna exercises governmental authority over the

---

[119]   The only such determination in the record found the tribe lacked jurisdiction, although the fact pattern in that situation was quite unique. *See* Memorandum Re: Kialegee Tribal Town: Proposed Gaming Site in Broken Arrow, Oklahoma (May 24, 2012) (AR 2480-92) (reciting "Kialegee tribe does not claim to have an existing reservation" but claiming jurisdiction based on existence of former reservation) (AR 2486).

[120]   AR 626, 721, 629-42, 2500-06.

Ondola allotment. Addressing these extraneous topics would be advisory at best and have the effect of disturbing settled intergovernmental relations in Alaska at worst.

### 1.   This Court need not address whether the allotment is "Indian country" under 18 U.S.C. § 1151.

Rather than engage with Congressional intent, which is the touchstone for determining tribal jurisdiction, Eklutna focuses on arguing that the Ondola allotment is "Indian country" and therefore subject to its jurisdiction.[121] This argument is irrelevant for two reasons. First, the definition of "Indian lands" in IGRA is different from the definition of "Indian country" in 18 U.S.C. § 1151. Arguing that the allotment is "Indian country" does not resolve whether it is "Indian lands." Second "Indian country" is not necessarily coextensive with tribal jurisdiction. So even if the allotment is "Indian country," that does not resolve whether Eklutna has jurisdiction over it.

"Indian country," as defined in the Major Crimes Act at 18 U.S.C. § 1151, delimits the extent of federal criminal jurisdiction, as opposed to state criminal jurisdiction. This definition has had little application in Alaska because separate federal law confers criminal jurisdiction in "Indian country" back to certain states, and Alaska was included as one of those states in 1958.[122] The definition of "Indian country" predates IGRA, and Congress was fully aware of it at the time of passing IGRA, yet

---

[121]   Eklutna Memo at 15-17.

[122]   *See* 18 U.S.C. § 1162, § 1360 (together known as "Public Law 280"); *John v. Baker,* 982 P.2d 738, 807 (Alaska 1999) (Mathews, J., dissenting).

choose to define "Indian lands" differently.[123] As Interior also explains, "Indian country"

is not the same as "Indian lands."[124]

"Indian country" also does not define the extent of tribal territorial jurisdiction.[125]

It is true that, in the absence of other indicia of Congressional intent, § 1151's definition

of "Indian country" may be used as a yardstick of tribal jurisdiction, but courts have been

consistently careful not to directly equate the two.[126] In fact, Interior's Indian lands

opinion concluded that the Ondola allotment *is* "Indian country."[127] However, it also

---

[123]    *See* notes 2-4 and accompanying text, above.

[124]    Interior Memo at 20-21.

[125]    Eklutna asserts that there is a "presumption" that tribes have jurisdiction within "Indian country," but its citations do not support that proposition. Eklutna Br. at 18. Eklutna cites to an Indian land determination (which is advisory), which itself cites *South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329 (1998). That case does not address tribal jurisdiction at all, but rather held that federal environmental law did not apply on unalloted tracts of the diminished Yankton Sioux Reservation which were not "Indian country." The case contains only a brief mention of tribal jurisdiction to state that the tribe had never attempted to assert jurisdiction over the lands in question. *Id.* at 804-5.

[126]    Tribal jurisdiction is an ancillary question to federal jurisdiction and "generally speaking" coincides with federal jurisdiction in "Indian country." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998). *See also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982) ("We have considered Indian tribes as invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, *except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress*") (emphasis added, internal quotation omitted); Cohen's Handbook of Federal Indian Law § 6.03[1] [a] (2012 Ed.) ("This constitutional vesting of federal authority vis-à-vis the states [in 18 U.S.C. §1151] allows tribal sovereignty to prevail in Indian country, *unless Congress legislates to the contrary*") (emphasis added).

[127]    AR 48. No court has ever ruled on whether Alaska Native allotments are "Indian country" for purposes of 18 U.S.C. § 1151 and Public Law 280, and the Sansonetti Opinion is the only authority in support of that proposition. *See, e.g., See Jones v. State,* 936 P.2d 1263, 1267 (Alaska 1997) (declining to hold whether Alaska Native allotment is "Indian country" because state criminal jurisdiction under Public Law 280 applied to

---

concluded that, given Alaska's unique situation, "Indian country" is not coextensive with tribal jurisdiction in this instance.[128]

Eklutna's arguments depend on tribal jurisdiction being coextensive with the definition of "Indian country" in § 1151, but those arguments ignore decades of carefully crafted jurisprudence declining to make such a blanket rule.[129] Courts have consistently maintained that Congressional intent is the ultimate touchstone.[130] This Court should not accept Eklutna's facile suggestion that "Indian country" status is determinative of tribal jurisdiction.

Numerous courts have decided "Indian lands" cases without reference to "Indian country." These courts have based their determinations of tribal jurisdiction solely on the specific statutes, treaties and settlement agreements relevant to the tribe and lands in question. For example, in *Rhode Island v. Narragnsett Indian Tribe*, the First Circuit looked solely to the relevant Congressional settlement act with the tribe when it analyzed

---

hunting violation in question); Case, A. & Voluck, D., *Alaska Natives and American Laws* (University of Alaska Press, 3d. Ed. 2012) at 153 (citing Sansonetti Opinion for proposition that Alaska Native allotments and restricted townsites are "Indian country" "[a]bsent a clear federal decision to the contrary.") This case does not present the question, and the State has not briefed it. Nothing in this brief waives the State's right to contest that proposition in a case in which it is actually presented.

[128]    AR 48, 2265.

[129]    Eklutna Memo at 15 ("To determine whether a tribe possesses jurisdiction under the first prong, the first question is whether the land constitutes 'Indian country' under federal law").

[130]    *See Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) ("A proper analysis of whether the tract is "Indian lands" under IGRA begins with the threshold question of the Tribe's jurisdiction. That inquiry, in turn, focuses principally on congressional intent and purpose.")

the extent of tribal jurisdiction for purposes of IGRA.[131] Similarly, in *Kansas v. United States*, the Tenth Circuit analyzed the extent of tribal jurisdiction for purposes of IGRA solely through interpretation of treaties and Congressional settlement acts with the tribe, without reference to "Indian country."[132] In *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, the First Circuit again decided tribal jurisdiction for purposes of "Indian lands" solely based on Congressional settlement acts and treaties with the tribe without reference to "Indian country."[133] Even those cases that have considered the definition of "Indian country" when considering the question of "Indian lands" have acknowledged that the two terms are defined differently and that Congressional intent is the key to determining tribal territorial jurisdiction.[134]

In fact, Eklutna cites no case law in support of its argument. Instead, it focuses on Indian lands determinations in which Interior used "Indian country" as a yardstick for determining tribal jurisdiction.[135] But those Indian lands determinations have no bearing on this case where ANCSA and the Alaska Native Allotment Act apply. Nor do those Indian lands determinations create any kind of precedent that is binding even on Interior

---

[131]     19 F.3d 685, 695 (1st Cir. 1994) ("Tribal sovereignty (and, hence, jurisdiction) may be neither augmented nor diminished except through congressional enactment").

[132]     249 F.3d 1213, 1229 (10th Cir. 2001).

[133]     853 F.3d 618 (1st Cir. 2017).

[134]     *See Citizens Against Casino Gambling in Erie County v. Chaudhuri*, 802 F.3d 267, 280-81 & n. 12 (2nd Cir. 2015) (analyzing tribal jurisdiction over non-reservation, non-allotment parcel using "dependent Indian community" definition of "Indian country" but recognizing that touchstone is intent of Congress and also interpreting specific settlement act).

[135]     Eklutna Memo at 15-16.

itself, far less this Court.[136] Thus, Eklutna's arguments that there is some kind of "test"

requiring Interior to issue a positive Indian lands determination if an allotment is within a

certain distance of a "tribal community" must fail.[137] That argument is based solely on

Interior's nonbinding Indian lands determinations involving the jurisdiction of tribes with

nearby reservations over General Allotment Act allotments, which have no relevance to

the intent of Congress with regards to the Alaska Native Allotment Act and ANCSA.[138]

Thus, there is no need for this Court to undertake an "Indian country" analysis in

this case. Here Interior correctly determined, based on Congressional intent in ANCSA

and the Alaska Native Allotment Act, that Eklutna lacks jurisdiction over the Ondola

allotment. Because the intent of Congress can be determined from these Alaska-specific

acts, there is no reason to delve into whether this allotment is "Indian country."

To hold that Alaska Native allotments are "Indian country" *per se* subject to tribal

jurisdiction, which seems to be Eklutna's position, is unnecessary to resolve this case and

would create law of first impression with broad impact.[139] As described in the State's

---

[136]     *Butte County, California. v. Hogen*, 613 F.3d 190, 195 n. 3 (D.C. Cir. 2010) ("Indian lands opinions are 'advisory in nature and thus do not legally bind the persons vested with the authority to make final agency decisions'") (quoting Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed.Reg. 29,354, 29,372 (May 20, 2008)).

[137]     *See* Eklutna Memo at 21-22.

[138]     *See, e.g.,* Big Sandy at AR 2466-72 (General Allotment Act allotment located near reservation); Sampson Johns at AR 2507-12 (same), Whitecloud at AR 2454-65 (allotment within former reservation boundaries).

[139]     No court has ever held that Alaska Native allotments are "Indian country" for purposes of 18 U.S.C. § 1151 and Public Law 280. *See* Case, A. & Voluck, D., *Alaska Natives and American Laws* (University of Alaska Press, 3d. Ed. 2012) at 153 (citing

Motion to Intervene, allotments can be found across Alaska and, like the Ondola

allotment, are indistinguishable from other private property (aside from the restrictions

against their taxation and alienation contained in federal law).[140] If this court were to

hold, as Eklutna requests, that Alaska Native Allotments are not only "Indian country"

under 18 U.S.C. § 1151 and Public Law 280 (which no court has previously decided[141])

but invariably subject to tribal jurisdiction based on that status alone, it has the potential

to greatly upset the settled status quo in Alaska. Such a ruling could create randomly-

located pockets of tribal authority across the State, and could result in confusion

regarding who is responsible to provide services to them and regulate them. It could lead

to disputes about the applicability of State regulatory laws on allotments under Public

---

Sansonetti Opinion for proposition that Alaska Native allotments and restricted townsites
are "Indian country," "[a]bsent a clear federal decision to the contrary.")

[140]     Motion to Intervene Memo at 14-15. Eklutna cites the recent United States
Supreme Court decision of *McGirt v. Oklahoma* in support of the proposition that the
State can cannot alter the status of land as "Indian country" through unilateral action. 140
S. Ct. 2452 (2020). But that case is irrelevant here. That case was about defeasance of
tribal land by State and private action in the face of Congressional inaction. *Id.* at 2462.
This case is about the direct effect of Congressional action in the Alaska Native
Allotment Act and ANCSA.

[141]     *See Jones v. State,* 936 P.2d 1263, 1267 (Alaska 1997) (declining to hold whether
Alaska Native allotment is "Indian country" because state criminal jurisdiction under
Public Law 280 applied to hunting violation in question).

Law 280.[142] It could create the kind of jurisdictional "checkerboard" often deplored by courts.[143]

Such a holding could also upset settled expectations regarding the role of IGRA in Alaska. As discussed in the State's Motion to Intervene, Interior has uniformly rejected "Indian lands" requests for Alaska Native allotments going back to the mid-1990s at least.[144] The rationale of those denials have been consistent with the rationale of the denial in this case.[145] If this Court adopts Eklutna's novel argument, it could reopen these long-resolved matters. Thus, judicial economy as well as practical considerations support affirming Interior's decision on the basis of Congressional intent without addressing "Indian country."

> ### 2.   This Court need not address the "privileges and immunities" provision of the Indian Reorganization Act.

The Indian Reorganization Act is wholly irrelevant to this case. The "privileges and immunities" provision of that Act does not alter the meaning or effect of Congressional acts like IGRA, ANCSA or the Alaska Native Allotment Act. It does not

---

[142]    *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987) (holding that Public Law 280 does not extend certain state regulatory laws, including regulation of gambling, to "Indian country"); *Jones v. State,* 936 P.2d 1263, 1266 (Alaska 1997) (addressing whether hunting violation at issue was a criminal or regulatory law covered by Public Law 280 state jurisdiction under *Cabazon* analysis).

[143]    *See Jones v. State,* 936 P.2d 1263, 1267 (Alaska 1997)*.* ("A ruling in Jones's favor would create a checkerboard of small enclaves where the State could not regulate hunting and fishing").

[144]    *See* Motion to Intervene Memo at 11-12 and Exhibits D, E, F, G, H, I and J thereto.

[145]    *Id.*

constrain Congress's ability to make Alaska-specific law or Interior's ability to implement such law. According to its own terms, the "privileges and immunities" provision applies only to regulations and administrative actions that arbitrarily treat federally-recognized tribes differently.[146] In this case, Alaska-specific legislation compelled Interior to reach a different conclusion in this case than it reached in its Indian lands determinations involving General Allotment Act allotments near tribal reservations outside Alaska. Interior's conclusion was based on Congressional intent, not administrative regulation or internal policy. The "privileges and immunities" provision is simply inapplicable here.

Also, it is clear as a practical matter that Interior has not adopted some kind of administrative Alaska exception to IGRA. Interior has approved "Indian lands" requests for land in Alaska that met the definition.[147] These have been in the few instances where a request has been made for land held by the United States in trust for a tribe, which is a rare form of ownership in post-ANCSA Alaska.[148] But it is clear from these instances that

---

[146]     *See* 25 U.S.C § 5123(f). Note that an agency does not act arbitrarily and capriciously for purposes of the Administrative Procedure Act when it treats differently situated entities differently, including tribes that are not federally recognized. *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013).

[147]     At present there are two IGRA gaming cites operating in Alaska, one in Metlakatla (the only tribe in Alaska inhabiting a reservation) and the other in Klawock. *See* https://www.nigc.gov/map/ A favorable Indian lands determination was also issued to the Organized Village of Kake in 2000, although it does not presently have an IGRA operation. *See* https://www.nigc.gov/images/uploads/indianlands/Organized%20Village%20Kake2.pdf.

[148]     *See* https://www.nigc.gov/images/uploads/indianlands/Organized%20Village%20Kake2.pdf

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*     Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment   Page 35

Interior does not have some kind of impermissible internal rule against Indian Gaming in Alaska. Nothing categorically prevents Alaska tribes from taking advantage of IGRA. It is only due to Alaska's unique history that there are few properties in Alaska that will meet the definition of "Indian lands."

Eklutna cites *Akiachak Native Community v. Salazar*, [149] but that case has been vacated, [150] and further does not actually support its argument. In vacating that decision, the D.C. Circuit was clear that the issues it addressed remain open for re-litigation. Because the State was "prevented from appealing the district court's decision for reasons outside its control," the Circuit Court found that "vacatur is appropriate to clear the path for future relitigation of the issues and eliminate a judgment, review of which was prevented through happenstance."[151]

And even were it still good law, which it is not, that decision does not support Eklutna's position. In that case, Interior had made an Alaska-specific exception to the section of the Indian Reorganization Act that allows Interior to take land into trust on behalf of a tribe. [152] Interior's reasoning was that ANCSA demonstrated Congressional intent that the section not apply in Alaska. [153] The court *first* analyzed the effect of

---

(finding lands held in trust by United States for Organized Village of Kake "Indian lands").

[149]   935 F. Supp.2d 195 (D.D.C. 2013) (vacated by 827 F.3d 100 (D.C. Cir. 2016)).

[150]   *Akiachak Native Cmty. v. United States Dep't of Interior*, 827 F.3d 100, 115 (D.C. Cir. 2016).

[151]   *Id.*

[152]   *Id.* at 197.

[153]   *Id.* at 200-201.

ANCSA on that section of the Indian Reorganization Act without reference to the "privileges and immunities" clause.[154] It conducted a purely legal analysis of the effect of ANCSA, and only after concluding that ANCSA did not repeal or extinguish that section of the Indian Reorganization Act in Alaska did the Court consider whether Interior's exception diminished the rights of Alaskan tribes relative to other tribes in violation of the "privileges and immunities" provision.[155]

The "privileges and immunities" provision of the Indian Reorganization Act is simply irrelevant to statutory interpretation or the intent of Congress in the Alaska Native Allotment Act and ANCSA. There is no regulatory Alaska-specific exception to IGRA. This Court need not address Eklutna's arguments regarding this provision in order to affirm Interior's decision in this case.

### 3.   This Court need not address the "disclaimer" in the 1988 ANCSA Amendments.

Eklutna repeatedly refers to the "disclaimer" language in the 1988 amendments to ANCSA, apparently to argue that Congress did not intend ANCSA to have any effect on tribal territorial jurisdiction.[156] This argument ignores both the text of the disclaimer itself and the United States Supreme Court's holding in *Venetie*. First, the language of the

---

[154]   *Id.* at 203-208.

[155]   *Id.* at 210-11. Note that the "privileges and immunities" provision of the Indian Reorganization Act was passed in 1994, before the United States Supreme Court decided *Venetie* in 1998. However *Venetie* directly interpreted the effect of ANCSA on tribal territorial jurisdiction in Alaska without reference to the "privileges and immunities" provision of the Indian Reorganization Act in any context.

[156]   Eklutna Memo at 29-30, 33.

disclaimer is clear that it applies *only* to the 1988 amendments and does not disclaim the

effects of ANCSA as a whole on tribal sovereignty.[157] This makes sense given the

historical context that, in 1988, no court had yet decided whether tribes had jurisdiction

over ANCSA settlement lands.[158] Congress did not want its amendments to ANCSA to

affect that legal analysis whenever it finally occurred.[159] And, when that legal analysis

finally did occur in *Venetie* in 1998, the United States Supreme Court interpreted

ANCSA directly without considering the 1988 amendments.[160] The *Venetie* Court did not

hesitate to interpret Congressional intent in ANCSA regarding tribal territorial

jurisdiction over settlement lands,[161] and this Court should not hesitate to interpret

ANCSA's effect on tribal territorial jurisdiction over Alaska Native Allotments.

### C. Interior's decision that Eklutna has no special "nexus" to the Ondola allotment is not arbitrary and capricious.

Eklutna's argument that it has some kind of special "nexus" to the Ondola

allotment is merely a reiteration of its jurisdictional claims based on historical use and

occupancy claims that are foreclosed by ANCSA.[162] In fact, there is nothing unusual

---

[157]    *See* PL 100–241, February 3, 1988, 101 Stat 1788, §2(8) ("no provision of *this Act* shall—(A) unless specifically provided, constitute a repeal or modification, implied or otherwise, of any provision of the Alaska Native Claims Settlement Act; (B) confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands") (emphasis added).

[158]    *See* notes 35-40 above, and accompanying text.

[159]    *Id.*

[160]    *See generally Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 526 (1998).

[161]    Note that Venetie's lands were actually former reservation lands.  *Id.* at 523.

[162]    Eklutna Memo at 35-37.

about the Ondola allotment that would warrant some kind of special consideration. It seems quite typical in Alaska history. Ms. Ondola purchased a home and then applied for an allotment for the area where it was located.[163] The allotment was issued under the Alaska Native Allotment Act, the most common type of allotment in Alaska and the type of allotment considered by the Sansonetti Opinion.[164] The fact that the allotment has continued to be owned, for the most part,[165] by tribal members is not some highly unusual circumstance that would set it apart from other allotments.

Ms. Ondola's subjective intent in applying for the allotment is not relevant to tribal jurisdiction.[166] Only Congressional intent matters: "An Indian tribe's jurisdiction derives from the will of Congress, not from the consent of fee owners."[167] The fact is that Ms. Ondola purchased the home and homesteaded the property, irrespective of any tribal connection, and the allotment deed itself makes no mention of Eklutna.[168] This Court should reject Eklutna's argument that special circumstances somehow alter the general application of ANCSA and the Alaska Native Allotment Act in this case.

> **D. Even if this Court agrees with Eklutna that it has jurisdiction over the Ondola allotment, this Court must remand to Interior.**

---

[163]    AR 54, 713-14.

[164]    According to the Sansonetti Opinion, some General Allotment Act reservations do exist in Alaska. AR 2267.

[165]    According to the record, not all owners were tribal members at the time of Eklutna's 2007 Indian lands determination request. AR 981 (George Ondola's affidavit of 2007 states "most of those with an interest in the Allotment are Tribal members of the Native Village of Eklutna").

[166]    *See* Eklutna Memo at 36.

[167]    *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001).

[168]    AR 54, 713-14, 970-71.

As Interior points out, if this Court agrees with Eklutna, it must remand for Interior to reconsider its decision in light of the Court's ruling.[169] This Court is not empowered to simply issue a judicial Indian lands determination. This is true for the reasons stated by Interior, and for the additional reason that this case concerns only the first of the two parts of any Indian lands determination. As explained above, whether a tribe has jurisdiction over a property is only the first part of the "Indian lands" analysis. In addition to proving that it has jurisdiction over the land, a tribe must show it actually exercises governmental authority over the land through "concrete manifestations of authority."[170] Here, Interior determined that Eklutna had not proven the first part of the test and so did not consider the second.

The question of whether a tribe actually exercises governmental authority over a specific property is fact-intensive and should be considered by the agency in the first instance.[171] Even if this Court holds definitively that Eklutna has jurisdiction over the allotment (which it should not), it must remand for Interior to assess the second prong of the "Indian lands" analysis in the first instance.[172] This is particularly true because the

---

[169]   Interior Memo at 43-44.

[170]   *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 702-03 (1st Cir. 1994).

[171]   *Cheyenne River Sioux Tribe v. South Dakota,* 830 F. Supp. 523, 528 (D.S.D. 1993) (affirmed by 3 F.3d 273 (8th Cir. 1993)) (declining to decide whether tribe actually exercised governmental power over land without further factual development).

[172]   *See, e.g., Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489, 514 (5th Cir. 1982) (describing the "time-honored principle relating to appellate review of an agency determination" that, "[w]hen an agency, in order to grant relief in the case before it, must … find that [two conclusions] have been established, but concludes that A has not been established and therefore declines to consider whether B has been

"concrete manifestations" requirement is highly unlikely to be met in this instance. This Court should not gloss over this stringent and fact-based analysis as Eklutna encourages it to do.[173]  Where a tribe provides no police protection, fire protection, ambulance services, public utilities or other services to a property,[174] this part of the test is unlikely to be met.[175] Also, Eklutna has offered no evidence that any other governmental entity has recognized its claimed territorial jurisdiction over this allotment.[176]

---

established, a reviewing court that reverses the conclusion that A has not been established must remand to the agency to permit it to consider in the first instance whether B has been established").

[173]   *See, e.g., Cheyenne River Sioux Tribe v. South Dakota.*, 830 F.Supp. 523, 528 (D.S.D. 1993) (affirmed by 3 F.3d 273 (8th Cir. 1993)) (in holding record inadequate to determine whether tribe exercised governmental authority over certain off-reservation lands, court noted lack of evidence regarding: "(1) whether the areas are developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or the State; and (5) other indicia as to who exercises governmental power over those areas").

[174]   Eklutna relies primarily on manifestations of its authority over its members who live on the allotment in support of its arguments that it meets the second prong of the "Indian lands" analysis. Eklutna Memo at 20-21. But, as discussed extensively in this memorandum and Interior's memorandum, jurisdiction over membership exists independently of jurisdiction over land.

[175]   *C.f. Citizens Against Casino Gambling in Erie County v. Chaudhuri*, 802 F.3d 267, 286 (2nd Cir. 2015) (area policed by tribal marshal's office); *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 626 (1st Cir. 2017) (state and city provided police and fire service to area pursuant to an agreement with tribe and for compensation); Whitecloud at AR 2463 (tribe proves "extensive" law enforcement through its own police department, has prosecuted criminal actions involving incidents on the allotment); Big Sandy at AR 6 (allotment policed by tribal patrol officers); Sampson Johns at 2508-9 (same).

[176]   *C.f., Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 703 (1st Cir. 1994) (federal government recognized tribal jurisdiction for purposes of federal Clean Water Act); Sampson Johns at 2509 (nearby municipalities recognized tribal jurisdiction over allotment); Whitecloud at AR 2463 (state law enforcement and prosecuting attorneys

---

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*   Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment   Page 41

Thus, even if this Court agrees with Eklutna's jurisdictional analysis, it must

remand for Interior to consider the second part of the "Indian lands" analysis in the first

instance.[177]

## VI.    CONCLUSION

Eklutna correctly states that a goal of IGRA is to provide economic self-

determination for tribes and tribal members.[178] But that is also a goal of ANCSA.[179] And

in ANCSA, Alaska Native tribes and tribal members were directly involved in creation of

the ANCSA corporation model of economic self-determination.[180] Holding that IGRA is

---

from surrounding jurisdictions recognized tribe's jurisdiction over allotment).
Recognition of tribal jurisdiction over membership will not satisfy this condition,
especially in Alaska where tribes are generally recognized to possess jurisdiction over
their members but not over territory. *See* Interior Memo at 40-41.

[177]    This Court also may not judicially approve Eklutna's proposed lease with the
allotment owners as demanded in its complaint. Complaint, page 26 ¶C. However,
Eklutna seems to recognize this fact in its memorandum and now asks that this Court
"invalidate" the lease disapproval rather than directly approving the lease. Eklutna Memo
at 44.

[178]    25 U.S.C. § 2702 (one purpose of IGRA is "to provide a statutory basis for the
operation of gaming by Indian tribes as a means of promoting tribal economic
development, self-sufficiency, and strong tribal governments").

[179]    43 U.S.C. § 1601(b) (ANCSA "should be accomplished … in conformity with the
real economic and social needs of Natives, without litigation, with maximum
participation by Natives in decisions affecting their rights and property, without
establishing any permanent racially defined institutions, rights, privileges, or obligations,
without creating a reservation system or lengthy wardship or trusteeship"). *See also
Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 534 (1998)
(describing "ANCSA's primary purposes, namely, to effect Native self-determination and
to end paternalism in federal Indian relations").

[180]    *See e.g. United States v. Atlantic Richfield Co.,* 435 F. Supp. 1009, 1015 18 (D.
Alaska 1977) (reciting history of passage of ANCSA, and noting, inter alia, that
"Alaskans, both Native and non-Native, opposed creation of reservations on the grounds
that reservations were socially divisive and tended to perpetuate wardship rather than

largely inapplicable in Alaska after ANCSA does not frustrate the goal of economic self-determination for Alaska's Native peoples. It fulfills ANCSA's aim of economic self-determination for Alaska Natives "without establishing any permanent racially defined institutions, rights, privileges or obligations, and without adding to the categories of property and institutions enjoying special tax privileges."[181] Furthermore, Alaskan tribes, including Eklutna, can still participate in and benefit from the proceeds of charitable gaming under Alaska state law.[182] This Court should deny Eklutna's motion for summary judgment and grant the State and Interior's cross motions.

DATED:  January 22, 2021.

ED SNIFFEN
ATTORNEY GENERAL

By:    /s/ *Lael A. Harrison*
Lael A. Harrison
Assistant Attorney General
Alaska Bar No. 0811093
Alaska Department of Law
PO Box 110300
Juneau, AK 99811-0300
Telephone: 907.465.3600
Facsimile: 907.465.3019
Email: lael.harrison@alaska.gov

---

equality for the Natives," and that "[b]eginning in 1967, the Alaska Federation of Natives caused bills to be introduced in every session of Congress and lobbied for their passage"); Case, A. & Voluck, D., *Alaska Natives and American Laws* (University of Alaska Press, 3d. Ed. 2012) at 198 ("The Alaska Native Claims Settlement Act is an experiment that is still evolving, but it is an experiment now generally in the hands of Alaska's Indigenous Peoples").

[181]    43 U.S.C. § 1601.

[182]    *See* Motion to Intervene Memo at pp. 4-5.

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.*    Case No. 1:19-cv-02388-DLF
Memo. in Support of Opp. to Plaintiff's Mtn. & X-Mtn. for Summary Judgment   Page 43

By:     /s/ *Laura Wolff*
        Laura Wolff
        Assistant Attorney General
        Alaska Bar No. 1411108
        Alaska Department of Law
        1031 West Fourth Avenue
        Anchorage, AK 99501
        Telephone: 907.269.5275
        Facsimile: 907.276.3697
        Email: laura.wolff@alaska.gov