# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIVE VILLAGE OF EKLUTNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) | Case No. 1:19-cv-02388-DLF |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF ALASKA, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____ | ) | |

**PLAINTIFF'S COMBINED OPPOSITION TO FEDERAL DEFENDANTS' AND STATE OF ALASKA'S CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ........................... 1

STANDARD OF REVIEW ........................................................................................ 2

ARGUMENT ............................................................................................................. 3

   I.     THE TRIBE HAS JURISDICTION OVER THE ALLOTMENT .................................... 3

       A.    The Defendants' Statutory Arguments Are Flawed, As Are the Sansonetti
Interpretations on Which They Rely. ........................................................................ 7

           1.    *Alaska Native Allotment Act* ......................................................................... 7

           2.    *ANCSA* ............................................................................................... 11

           3.    *IGRA's "Indian lands" provision* ..................................................... 17

       B.    The Tribe Has Jurisdiction Under General Principles Applicable to Indian
Allotments, Including Allotments under the Alaska Native Allotment Act ....................... 19

       C.    Even if the Sansonetti Test Applied, the Tribe Has Jurisdiction Because it Has
Shown a Tribal Nexus to the Allotment. ............................................................... 27

       D.    The Defendants are Not Entitled to Summary Judgment on Count II ......................... 31

   II.    THE LEASE DISAPPROVAL WAS UNLAWFUL FOR THE SAME
REASONS AS THE INDIAN LANDS DETERMINATION. ................................ 32

   III.   THE TRIBE'S REQUESTED REMEDY IS PROPER. ................................... 32

CONCLUSION ......................................................................................................... 33

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aguilar v. United States*,
    474 F. Supp. 840 (D. Alaska 1979) ...................................................................9

*Akiachak Native Cmty. v. Jewell*,
    995 F. Supp. 2d 1 (D.D.C. 2013), *vacated sub nom. Akiachak Native Cmty. v.*
    *United States Dep't of Interior*, 827 F.3d 100 (D.C. Cir. 2016)..............................26

*Alaska v. Babbitt*,
    38 F.3d 1068 (9th Cir. 1994) ...........................................................................9

\*  *Alaska v. Native Village of Venetie Tribal Government*,
    522 U.S. 520 (1998).........................................................13, 14, 18, 19, 26

*Alaska, Dep't of Pub. Works v. Agli*,
    472 F. Supp. 70 (D. Alaska 1979) .....................................................................9

*AT&T Corp. v. FCC*,
    349 F.3d 692 (D.C. Cir. 2003) ..........................................................................2

*Barker v. Harvey*,
    181 U.S. 481 (1901).......................................................................................25

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987).........................................................................................4

*Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*,
    350 F. Supp. 2d 1 (D.D.C. 2004).................................................................31, 32

*City of Roseville v. Norton*,
    348 F.3d 1020 (D.C. Cir. 2003) .......................................................................17

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) ....................................................................2, 10

*Cobell v. Salazar*,
    573 F.3d 808 (D.C. Cir. 2009) ..............................................................2, 15, 17

*Confederated Tribes of the Chehalis Reservation. v. Mnuchin*,
    976 F.3d 15 (D.C. Cir. 2020)...........................................................................16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)....................................................................................18

*Diamond Game Enters., Inc. v. Reno*,
    230 F.3d 365 (D.C. Cir. 2000) .................................................................20

*Hutchins v. Dist. of Columbia*,
    188 F.3d 531 (D.C. Cir. 1999) ...............................................................32

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) .............................................................20

*John v. Baker*,
    982 P.2d 738 (Alaska 1999) ....................................................................28

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ................................................................6

*Kirkwood v. Arenas*,
    243 F.2d 863 (9th Cir. 1957) ..................................................................11

*Koi Nation of N. Cal. v. U.S. Dep't of Interior*,
    361 F. Supp. 3d 14 (D.D.C. 2019) ....................................................25, 26

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) ...............................................................31

*Leisnoi, Inc. v. Stratman*,
    154 F.3d 1062 (9th Cir. 1998) ..................................................................3

*Maniilaq Ass'n v. Burwell*,
    72 F. Supp. 3d 227 (D.D.C. 2014) ............................................................2

*Masayesva v. Zah*,
    792 F. Supp. 1160 (D. Ariz. 1992) ...........................................................9

\* *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*,
    853 F.3d 618 (1st Cir. 2017) ........................................................6, 11, 18

*McGirt v. Oklahoma*,
    140 S. Ct. 2452 (2020) ......................................................................14, 22

*Merrion v. Jicarilla Apache Tribe*,
    455 U.S. 130 (1982) ..................................................................................4

*Miami Tribe of Oklahoma v. United States*,
    656 F.3d 1129 (10th Cir. 2011) ................................................................6

*Michigan v. EPA*,
    576 U.S. 743 (2015) ................................................................................32

*Mustang Prod. Co. v. Harrison,*
   94 F.3d 1382 (10th Cir. 1996) ..................................................................22

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians,*
   471 U.S. 845 (1985)..................................................................................30

\* *Native Village of Venetie I.R.A. Council v. Alaska,*
   944 F.2d 548 (9th Cir. 1991) ........................................................4, 5, 28, 29

*Nisqually Indian Tribe v. Gregoire,*
   649 F. Supp. 2d 1203 (W.D. Wash. 2009).................................................4, 5, 23

*Oklahoma Tax Comm'n v. Sac & Fox Nation,*
   508 U.S. 114 (1993)..................................................................................15

*Pence v. Kleppe,*
   529 F.2d 135 (9th Cir. 1976) ......................................................................9

*In re Petition of Carmen,*
   165 F. Supp. 942 (N.D. Cal. 1958) ............................................................22

*Republic Airline Inc. v. U.S. Dep't of Transp.,*
   669 F.3d 296 (D.C. Cir. 2012).....................................................................20

\* *Rhode Island v. Narragansett Indian Tribe,*
   19 F.3d 685 (1st Cir. 1994).............................................................5, 6, 11, 18

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt,*
   442 F. Supp. 3d 53 (D.D.C. 2020) ..............................................................3

*United States v. Eberhardt,*
   789 F.2d 1354 (9th Cir. 1986) .................................................................5, 11

*United States v. Jackson,*
   280 U.S. 183 (1930)..................................................................................10

*United States v. Mazurie,*
   419 U.S. 544 (1975)..................................................................................28

\* *United States v. Santa Fe Pac. R.R. Co.,*
   314 U.S. 339 (1941)............................................................................5, 11, 13

*United States v. Sohappy,*
   770 F.2d 816 (9th Cir. 1985) ...................................................................5, 23

*United States v. Wheeler,*
   435 U.S. 313 (1978)..............................................................................5, 10

iv

*Weisberg v. Webster*,
749 F.2d 864 (D.C. Cir. 1984) ................................................................26

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701-706 ...............................2, 20, 24, 32

\* 18 U.S.C. § 1151 ................................................................................17, 28

§ 1151(b) ................................................................................13

§ 1151(c) ................................................................................13, 18

General Allotment Act ................................................................*passim*

25 U.S.C. § 334 ................................................................................8, 15

\* Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ................................*passim*

25 U.S.C. § 2703(4) ................................................................17, 25

\* Indian Reorganization Act, 25 U.S.C. § 5101 *et seq.* ................................*passim*

25 U.S.C. § 5123(f) ................................................................*passim*

25 U.S.C. § 5123(g) ................................................................16

\* Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 *et seq.* ........................*passim*

43 U.S.C. § 1603(b) ................................................................27

43 U.S.C. § 1617 ................................................................13

43 U.S.C. § 1617(a) ................................................................14

\* Alaska Native Allotment Act, 34 Stat. 197 (1906) (formerly codified at 43 U.S.C.
§§ 270–1 to –3) ................................................................*passim*

**Session Laws**

Alaska Native Claims Settlement Act Amendments, Pub. L. No. 100-241, 101
Stat. 1788 (1988) ................................................................3, 12

Alaska Native Allotment Subdivision Act, Pub. L. No. 108-337, § 3, 118 Stat.
1357 (2004) (codified at 43 U.S.C. § 1617 note) ................................14

Federally Recognized Indian Tribe List Act, Pub. L. No. 103-454, 108 Stat. 4791
(1994) ................................................................16

Tlingit and Haida Status Clarification Act, Pub. L. No. 103-454, tit. II, 108 Stat 4792 (1994)...................................................................................................16

**Rules and Regulations**

43 C.F.R. § 67.5(e) (1958) ............................................................................8

43 C.F.R. § 2531.1 ........................................................................................8

43 C.F.R. pt. 2560, subpt. 2561 ..............................................................8, 10

35 Fed. Reg. 9502 (June 13, 1970) ...............................................................8

79 Fed. Reg. 76,888 (Dec. 23, 2014) ....................................................15, 26

LCvR 7(a) .....................................................................................................31

**Other Authorities**

H.R. Rep. No. 99-712 (1986)........................................................................12

Hearings on S. 2065 before the Subcommittee on Public lands of the Senate Committee on Energy and Natural Resources, 99th Cong., 2d Sess. 310 (1986) (statement of Senator Stevens) ....................................................12

*Bureau of Indian Affairs Certificate of Degree of Indian or Alaska Native Blood Instructions*, https://www.bia.gov/sites/bia.gov/files/assets/public/raca/online_forms/pdf/Ce rtificate_of_Degree_of_Indian_Blood_1076-0153_Exp3-31-21_508.pdf (last accessed Mar. 18, 2021)..............................................................................8

## INTRODUCTION

This case centers on the Native Village of Eklutna's rights under the Indian Gaming Regulatory Act ("IGRA"), which Congress enacted to promote self-determination and economic self-sufficiency for Indian tribes. Eklutna has been denied those benefits.

Tribal authority can only be abrogated by express Congressional directive, and in applying IGRA elsewhere, the Department has accordingly presumed that tribes have jurisdiction over Indian allotments unless the allotment is not held by tribal members or is located far from the respective tribal community. Here, in its submissions to the Department and its briefing before this Court, Eklutna has amply shown that it has jurisdiction for IGRA purposes over the Ondola Allotment under the Department's test for allotments.

In arguing otherwise, the State and Federal Defendants rely on the rationale in the Department's flawed decision, which itself relied on the outdated analysis of the 1993 Sansonetti Opinion. They fail to show that the Department's Decision was consistent with its treatment of other tribes that exercise jurisdiction over public domain allotments. Their arguments that Alaska's statutory backdrop justifies this disparity—either through the Alaska Native Allotment Act or the Alaska Native Claims Settlement Act ("ANCSA")—are unmoored from the history and text of both Acts. And those arguments are entirely divorced from IGRA's Indian lands provision, which makes no distinction whatsoever between Alaska tribes and tribes in the contiguous states ("Lower 48"). Accordingly, the Court should grant summary judgment in favor of the Tribe as to Counts I and III and should deny the Federal Defendants' and State of Alaska's cross-motions for summary judgment as to all Counts.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

While the State attempts to introduce new facts regarding State-licensed gaming in Alaska, *see* ECF No. 58 ("State Br.") 14-15, whether tribes benefit from State gaming is irrelevant to

questions regarding their entitlement to participate in gaming under IGRA, which is governed by an entirely separate federal framework, 25 U.S.C. § 2701 *et seq.* All other pertinent facts and background on Eklutna, the Ondola Allotment, and the Department's decision are set out in Eklutna's opening brief. ECF No. 51-1 ("Eklutna Br.") 6-12. At this stage the Court's review is focused on the Administrative Record, following the Court's denial of Eklutna's motion for extra-record discovery.[1] ECF No. 47.

## STANDARD OF REVIEW

Although review under the Administrative Procedure Act ("APA") is generally deferential, as the State and Federal Defendants emphasize, *e.g.*, *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003); *see* ECF No. 55-1 ("Fed. Br.") 11; State Br. 18-19, the Defendants fail to acknowledge that the standard shifts significantly when the challenged agency decision involves construction of a statute (or statutes) passed for the benefit of Indians. First, issues of statutory interpretation, like all questions of law, are reviewed *de novo* even in APA cases. *Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227, 234 (D.D.C. 2014). And when the relevant statutes were enacted for the benefit of Indians, "the normally-applicable deference" to the agency's interpretation of a statute is "trumped by the requirement that 'statutes are to be construed liberally in favor of the Indians.'" *Cobell v. Kempthorne*, 455 F.3d 301, 304 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001)). The State's reliance on out-of-circuit precedent to argue for agency deference, State Br. 19 nn.85-86, holds no weight where the D.C. Circuit has expressly held that *Chevron* applies only "with muted effect" when a court is reviewing an agency interpretation of Indian legislation, *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009).

---

[1] Eklutna expressly retains its right to appeal that decision, if necessary, upon entry of final judgment.

Here, *all* of the relevant statutes—the Alaska Native Allotment Act, ANCSA, and IGRA—are Indian legislation that must be interpreted for the benefit of the Tribe.   Contrary to the Defendants' suggestion that they are entitled to deference, *see* Fed. Br. 11-12, any ambiguity in IGRA's "Indian lands" provision must be construed in favor of the Tribe, meaning that if the Tribe's interpretation of the statute is reasonable, "the Indian canon 'trump[s]' *Chevron* deference" and the "court 'must' defer to [the] tribe's reasonable interpretation."   *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 442 F. Supp. 3d 53, 79–80 (D.D.C. 2020) (citations omitted) (first alteration in original)), *appeal filed*, No. 20-5127 (D.C. Cir. May 8, 2020).   The State is simply wrong that the Indian canon does not apply to ANCSA, as Congress expressly stated that "the Alaska Native Claims Settlement Act . . . [is] Indian legislation," making the canon applicable. Pub. L. No. 100-241, § 2(9), 101 Stat. 1788 (1988) (codified at 43 U.S.C. § 1601 note); *see* State Br. 19.[2]   The Alaska Native Allotment Act must also be construed in favor of the Tribe, and the Department's interpretation of it is not entitled to deference.

## ARGUMENT

### I.   THE TRIBE HAS JURISDICTION OVER THE ALLOTMENT

Eklutna has shown that it possesses jurisdiction and exercises governmental authority over the Ondola Allotment under any applicable test, either the general test for jurisdiction over Indian allotments, which the Department should have applied, or the more restrictive test set forth in the Sansonetti Opinion, which is flawed and outdated but which the Tribe nonetheless satisfied.   The Defendants misapply the general jurisdiction test by assuming that Congress must confer jurisdiction on the Tribe through the Alaska Native Allotment Act or other enactment.   They have

---

[2] In the decision cited by the State, *Leisnoi, Inc. v. Stratman*, 154 F.3d 1062, 1066 n.7 (9th Cir. 1998), *see* State Br. 19 n.89, the court declined to apply the Indian canon only because in that particular case "the rights of Tribes [we]re in conflict with one another."   That is not the case here.

it backward.  As a federally-recognized Indian tribe, the Tribe is entitled to a presumption of jurisdiction over the Ondola Allotment.  As the Tribe established in its opening brief, under the Treaty of Cession and other authority, Alaska Tribes are subject to the same legal principles governing tribes in the Lower 48—and under those principles Tribes are presumed to possess jurisdiction in Indian country, including over tribal member allotments.  Eklutna Br. 2-3, 15-18. Accordingly, the rule that the Department applied in the Big Sandy and Quinault Determinations, namely that the tribe possesses jurisdiction "unless the 'land in question is not owned or occupied by tribal members and is far removed from the tribal community,'" AR 2469 (Big Sandy Determination at 4) (quoting Quinault Determination at 5), controls the "Indian lands" analysis here.  Eklutna Br. 18-20.

Such a presumption has its source in general principles of law applicable to Indian tribes. The Supreme Court "has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory.'"  *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)).  The Court has also stated that Indian tribes are "invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress."  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982) (quoting S. Rep. No. 698, 45th Cong., 3d Sess., 1–2 (1879)).  Similarly, the Ninth Circuit has recognized that a "tribe's authority over its reservation or Indian country is incidental to its authority over its members."  *Native Village of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 558 n.12 (9th Cir. 1991).  Applying these principles, courts have held that tribes have jurisdiction over off-reservation allotments and other Indian country occupied by their members.  *See Nisqually Indian Tribe v. Gregoire*, 649 F. Supp. 2d 1203, 1211 (W.D.

Wash. 2009), *aff'd on other grounds*, 623 F.3d 923 (9th Cir. 2010) (Squaxin Island Tribe could exercise taxation authority over an allotment held by a tribal member within Frank's Landing Indian Community, an off-reservation Indian community of allotments that is not part of any federally recognized tribe); *United States v. Sohappy*, 770 F.2d 816, 822–23 (9th Cir. 1985) (finding that lands set aside "*for the use and benefit* of certain Indians"—but not for one specific tribe—were Indian country subject to both federal and tribal jurisdiction).

General principles of law also hold that the Tribe's authority over the Ondola Allotment may be divested only by express congressional action. *United States v. Wheeler*, 435 U.S. 313, 323 (1978) ("until Congress acts, the tribes retain their existing sovereign powers"); *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 354 (1941) (even where Congress has power to extinguish tribal territorial rights, such "extinguishment cannot be lightly implied"); *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701 (1st Cir. 1994) ("While tribal rights are retained at congressional sufferance and are subject to defeasance should Congress so elect, tribes retain their sovereign powers in full measure unless and until Congress acts to circumscribe them." (citing *Wheeler*, 435 U.S. at 323)); *Native Village of Venetie I.R.A. Council*, 944 F.3d at 558 (Alaska tribes are presumed to possess sovereignty on same terms as Lower 48 tribes, which sovereignty can be divested only by affirmative Congressional act); *United States v. Eberhardt*, 789 F.2d 1354, 1361 (9th Cir. 1986) ("Only Congress can modify or abrogate Indian tribal rights; it will be held to have done so only when its intention to do so has been made absolutely clear."); *Nisqually Indian Tribe*, 649 F. Supp. 2d at 1210 ("absent explicit divestiture by Congress, the Court cannot interfere with the Squaxin's sovereign power to conduct economic activity on the tribal member's trust land and charge a corresponding sales tax"). No such congressional abrogation exists here. Furthermore, as the court in *Narragansett* explained, the question of tribal jurisdiction over "Indian

land" under IGRA must be evaluated against the backdrop of Indian sovereignty, which recognizes that "Indian tribes are "distinct, independent political communities, retaining their original natural rights" in matters of local governance.  19 F.3d at 701 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978)).

In the cases cited by the Defendants in which courts found tribal jurisdiction lacking, each decision relied on express congressional actions that showed "unambiguous[] inten[t] to abrogate the Tribe's authority" over the land and to "move the Tribe to new lands in Oklahoma." *Kansas v. United States*, 249 F.3d 1213, 1230 (10th Cir. 2001); *see also Miami Tribe of Oklahoma v. United States*, 656 F.3d 1129, 1145 (10th Cir. 2011) (finding Miami Tribe had no jurisdiction over the same land for purposes of the Indian Land Consolidation Act).  And where no such express divestiture exists, the courts have found that tribal jurisdiction remains.  *E.g.*, *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 624 (1st Cir. 2017) (finding settlement lands were "Indian land" because "language only confirms that the Tribe retains the jurisdiction it has not surrendered in the Federal Act"); *Narragansett*, 19 F.3d at 702 (holding that Settlement Act should be construed narrowly and did not expressly deprive tribe of jurisdiction, notwithstanding grant of jurisdiction to the State).  Here, as in *Narragansett*, the question is "whether the Tribe's retained jurisdiction has been forfeited by statute."  19 F.3d at 702.  And as in *Narragansett*, the answer is no:  the Tribe has demonstrated that its jurisdiction has not been forfeited by express congressional action, either in the Alaska Native Allotment Act, which preserved tribal jurisdiction over allotments (just like other Indian allotment acts), or by ANCSA, which did not affect jurisdiction over non-ANCSA lands.  The Defendants' arguments otherwise are unavailing.

A. **The Defendants' Statutory Arguments Are Flawed, As Are the Sansonetti Interpretations on Which They Rely.**

The State and the Federal Defendants rely heavily on the Sansonetti Opinion's analyses of the Alaska Native Allotment Act and ANCSA.  But as discussed in Eklutna's opening brief, in addition to ignoring applicable principles of tribal sovereignty, the Opinion failed to properly understand the history and purpose of those statutes, and it therefore cannot provide a valid justification for treating Alaska tribes differently from tribes in the Lower 48 in analyzing jurisdiction over their members' allotments.  *See* Eklutna Br. 23-31.  Moreover, the Sansonetti Opinion has been superseded by subsequent Congressional enactments.  *See* Eklutna Br. 31-35. None of the statutes cited by the Defendants—the Alaska Native Allotment Act, ANCSA, or IGRA—provide a basis for concluding that Congress intended to create a separate jurisdictional category for Alaska tribes or abrogate the jurisdiction that Eklutna exercises over the Ondola Allotment.

### 1. *Alaska Native Allotment Act*

The Alaska Native Allotment Act contains no indication of congressional intent to deprive the Tribe of jurisdiction, and it is clear Congress intended that allotments under the Act be treated consistent with allotments under the General Allotment Act.  The Defendants' assertion that congressional intent related to the Alaska Native Allotment Act must affirmatively support tribal jurisdiction is contrary to the basic Indian law principles described above.  *Supra* at 4-5.  The Federal Defendants emphasize that the Alaska Native Allotment Act did not expressly require an affiliation with a specific tribe in authorizing allotments to "any Indian, Aleut or Eskimo of full or mixed blood who resides in and is a native of [Alaska]."  Alaska Native Allotment Act, 34 Stat. 197 (1906), *as amended* (formerly codified at 43 U.S.C. §§ 270–1 to –3); *see* Fed Br. 15-17.  But the General Allotment Act, on which the Department relies as a contrasting example, *see* Fed. Br.

16, also did not include a requirement of affiliation with a specific tribe in the statutory text. Section 4 of the General Allotment Act provided for Indian allotments to be allotted from the public domain to "any Indian not residing upon a reservation, *or* for whose tribe no reservation has been provided." 25 U.S.C. § 334 (emphasis added).  For individual Indians falling within the first category—that is, "*any* Indian not residing upon a reservation," *id.* (emphasis added)—the plain text of the statute included no specific tribal affiliation requirement, and *any* Indian in *any* tribe was eligible if he was not living on a reservation.  Instead, it is the Department's implementing *regulations* for the General Allotment Act which required an individual Indian to show tribal membership or eligibility for tribal membership in a specific tribe.  43 C.F.R. § 2531.1; *see* Fed. Br. 17 (citing 43 C.F.R. § 2531.1).[3]  Thus, Congress did not make such a distinction.

The legislative history and circumstances surrounding the passage of the Alaska Native Allotment Act demonstrate Congress's unequivocal intent that allotments under that Act be treated as functionally equivalent to allotments made under the General Allotment Act.  A primary purpose of the Alaska Native Allotment Act was to eliminate confusion existing at the time about the categorization of Alaska Natives, by providing for their treatment similar to Indians in the Lower 48.  As the Ninth Circuit has explained, the Alaska Native Allotment Act was passed

---

[3] The Federal Defendants' assertion that the Alaska Native Allotment Act regulations did not require "any link to an Alaskan tribe," Fed. Br. 17, is undermined by the regulations' requirement of a certification that the individual was "a full or mixed blood Indian, Aleut or Eskimo, born and now residing in the State of Alaska," thereby requiring a nexus or affiliation between the applicant and one of the recognized Alaska aboriginal groups specified by Congress in the Act, *see* AR 2047 (Olga Ondola allotment application); *see also* 43 C.F.R. § 67.5(a), (e) (1958) (43 C.F.R. pt. 67 was amended and later reorganized into 43 C.F.R. subpt. 2561, *see* 35 Fed. Reg. 9502 (June 13, 1970)). In any event, today the Bureau of Indian Affairs requires that for certification of Alaska Native Blood, an individual must show his or her "relationship to an enrolled member(s) of a federally recognized Indian tribe." *Bureau of Indian Affairs Certificate of Degree of Indian or Alaska Native Blood Instructions*, https://www.bia.gov/sites/bia.gov/files/assets/public/raca/online_forms/pdf/Certificate_of_Degree_of_Indian_Blood_1076-0153_Exp3-31-21_508.pdf (last accessed Mar. 18, 2021).

"because a number of lower courts found that Alaska Natives were not within the definition of 'Indian' [and so] there was doubt whether the General Allotment Act did apply to them. Thus Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act." *Pence v. Kleppe*, 529 F.2d 135, 140 (9th Cir. 1976). The Alaska Native Allotment Act recognized "that Indians in Alaska are not confined to reservations as they are in the several States" and thus sought to give Alaska Natives the right to obtain allotments on a similar basis as non-reservation Indians in the Lower 48. *Id.* at 141 (quoting H.R. Rep. No. 3295, 59th Cong. 1st Sess. (Apr. 16, 1906)). Accordingly, as noted in Eklutna's opening brief, "all indications are that the 1906 [Alaska Native Allotment] Act merely plugged a supposed hole in the coverage of the . . . 1887 [General Allotment] Act." *Id.* at 140; *see* Eklutna Br. 3-4; *see also Masayesva v. Zah*, 792 F. Supp. 1160, 1163 n.6 (D. Ariz. 1992) ("The Alaska [Native Allotment] Act 'plugged a hole' in the General Allotment Act's failure to address Alaska Natives.").

The Alaska Native Allotment Act was thus meant to fill the gap that existed at the time between the treatment of Alaska Natives and Indians in the Lower 48. For this reason, "the Alaska Native Allotment Act [is] legislation interpreted similarly to the General Allotment Act," *Masayesva*, 792 F. Supp. at 1163 (citing *Pence*, 529 F.2d at 141), and courts have repeatedly treated allotments granted under the Alaska Native Allotment Act the same as allotments granted under other the General Allotment Act and other parallel Indian allotment Acts, *e.g.*, *Pence*, 529 F.2d at 140; *Alaska v. Babbitt*, 38 F.3d 1068, 1073 (9th Cir. 1994); *Aguilar v. United States*, 474 F. Supp. 840, 846 (D. Alaska 1979); *Alaska, Dep't of Pub. Works v. Agli*, 472 F. Supp. 70, 72-73 (D. Alaska 1979); *see* Eklutna Br. 27. Here Congress's intent was that the Alaska Native Allotment Act be construed *in pari materia* with the General Allotment Act, under which tribes frequently *do* exercise jurisdiction over their members' allotments. There is *no* indication of

Congressional intent to abrogate tribal jurisdiction in the Alaska Native Allotment Act.  Moreover, to the extent that any ambiguity exists, the Act must be construed in favor of the Tribe and to preserve tribal jurisdiction.  *Cobell*, 455 F.3d at 304; *Wheeler*, 435 U.S. at 323.

The Federal Defendants' (and Sanonsetti Opinion's) assertion that the Alaska Native Allotment Act is more similar to the homestead allotment acts than to the General Allotment Act and other Indian allotment acts, even if it were accurate, does not show congressional intent to abrogate tribal jurisdiction.  Furthermore, as shown in the Tribe's opening brief, Eklutna Br. at 27-29, such a purported distinction is internally inconsistent and contrary to caselaw.  The Tribe pointed out that the asserted distinction is undercut by the absence of a requirement in the Alaska Native Allotment Act that the allottee abandon tribal relations, as the 1862 Homestead Act required.  *Id.* at 28.  The Federal Defendants respond that this is "not a meaningful distinction," Fed. Br. 19, but they provide no support whatsoever for this assertion.  And the absence of such a requirement in the 1884 Indian Homestead Act, without more, *see id.* at 18, does not support the conclusion that the Alaska Native Allotment Act must be interpreted as being more similar to these homesteading acts.  Nor is the single use of the word "homestead" in the text of the Alaska Native Allotment Act dispositive, particularly given that both the statute and its implementing regulations repeatedly use terms like "allot," "allotment" and "allottee."  *See* 34 Stat. 197; 43 C.F.R. pt. 2560, subpt. 2561.  At an even more basic level, the Supreme Court has held that even the Indian homestead acts should be construed *in pari materia* with the General Allotment Act, further undermining the Sansonetti Opinion's attempt to draw a distinction between the effect of the homestead acts and other allotment acts.  *See United States v. Jackson*, 280 U.S. 183, 196 (1930) (approving the Department of the Interior's construction of Indian homestead laws and the General Allotment Act *in pari materia*); *see also id.* at 193 ("Indian allotments and Indian homesteads are

in all essential respects upon the same footing . . . ."); *see also Kirkwood v. Arenas*, 243 F.2d 863, 866–67 (9th Cir. 1957) (holding Mission Indian Act and General Allotment Act to be construed *in pari materia* and so applying the General Allotment Act's taxability provision to an allotment made under the Mission Indian Act).

For all of these reasons, the Sansonetti Opinion's analysis of the Alaska Native Allotment Act is unpersuasive, and the Defendants' defense of it is similarly flawed.  The Act is not distinguishable from the General Allotment Act in any material respect; rather it fits into the existing network of Indian allotment legislation and is properly construed as analogous to other Indian allotment acts like the General Allotment Act.  Finally, and critically to the IGRA jurisdictional analysis, it reflects no congressional intent to abrogate tribal jurisdiction.

### 2. *ANCSA*

Defendants are wrong to contend that ANCSA provides express evidence of congressional divestiture of tribal territorial sovereignty.   The interpretation they offer reaches beyond what the Act requires and even beyond the Department's own prior interpretations of ANCSA's impact.  As noted above, *supra* 3-6, tribes are presumed to have jurisdiction over their members' allotments, and tribal territorial authority may only be abrogated by express indication of Congress's intent to do so.  *See Santa Fe Pac. R.R. Co.*, 314 U.S. at 354; *Narragansett*, 19 F.3d at 701–02; *Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d at 625 (land settlement statute granting certain jurisdiction to the State did not deprive Tribe of jurisdiction for IGRA purposes in the absence of "unequivocal" congressional intent to do so); *Eberhardt*, 789 F.2d at 1361.  The Defendants have pointed to no such express statement; indeed, ANCSA provides none.

The State suggests that ANCSA was intended to impact tribal jurisdiction—despite the fact that ANCSA said nothing to this effect—because of a provision in the 1988 ANCSA amendments *expressly* disclaiming any impact on tribal jurisdiction by virtue of the amendments themselves.

State Br. 37-38; *see* Pub. L. No. 100-241, § 2(8)(B), 101 Stat. 1788, 1789.  But this negative inference falls apart under scrutiny.  Other indications of congressional intent cited by the Tribe, which the State ignores, demonstrate that Congress understood *ANCSA itself* to be intentionally neutral on issues of tribal sovereignty.  The question of whether ANCSA had impacted tribal authority was raised multiple times during the debate over the 1988 amendments, and it was repeatedly made clear that ANCSA had no impact on tribal governments or their authority.  As the House Report on the ANCSA amendments explained, "ANCSA was an Indian land claims settlement act.  *It was not, at the time, the intent of Congress to deal in any way with the issue of governmental authority of villages in Alaska.*"  H.R. Rep. No. 99-712 at 27 (1986).  Similarly, one of ANCSA's primary sponsors, Alaska Senator Ted Stevens, explained that "ANCSA was, and is, a land settlement.  It did not terminate the special relationship between Alaska Natives and the federal government or resolve the question of what governmental status, if any, various Native groups might have."  Hearings on S. 2065 before the Subcommittee on Public lands of the Senate Committee on Energy and Natural Resources, 99th Cong., 2d Sess. 310 (1986) (statement of Senator Stevens).[4]  Thus the legislative history clearly demonstrates that in ANCSA itself—not just the later amendments—Congress intentionally avoided any issues of tribal jurisdiction.  And there is even less reason to believe ANCSA was intended to impact tribal authority over *non-ANCSA* lands like Alaska Native allotments.  The suggestion that ANCSA was intended to impact tribal jurisdiction over Alaska Native allotments simply cannot be squared with Congress' careful

---

[4] As the State notes, there was disagreement at the time regarding the status of Alaska Native tribes, State Br. 9-10; indeed, as the above-quoted legislative history shows, this was part of what led Congress to avoid addressing issues of tribal sovereignty in both ANCSA itself *and* in the 1988 amendments, *see* H.R. Rep. No. 99-712 at 27.  As discussed in the Tribe's opening brief, the debate over Alaska Native tribes' status has since been settled, and it is clear that Alaska Native tribes have the same status as all federally recognized tribes.  Eklutna Br. 32 & n.18.

decision to leave Alaska Native allotments intact, and expressly "grandfather in" pending allotment applications, even as it revoked other forms of Indian land tenure (namely reservations). *See* 43 U.S.C. §§ 1617(a), 1618(a).  Much less can the Defendants' reading of ANCSA satisfy the rule that tribal jurisdiction can only be abrogated by an express Congressional statement.  *E.g.*, *Santa Fe Pac. R.R.*, 314 U.S. at 353-54.

The Supreme Court's decision in *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998), reinforces this conclusion, contrary to the State's mischaracterization of that decision, *see* State Br. 24.  In *Venetie*, the Supreme Court considered whether the Native Village of Venetie's former reservation, which had been revoked by ANCSA and then conveyed to the tribe in fee through another provision of ANCSA, constituted Indian country under the "dependent Indian community" category of 18 U.S.C. § 1151(b).  *Venetie*, 522 U.S. 526–31.  In concluding that the land did not meet the "federal set-aside" and "federal superintendence" requirements for a dependent Indian community, the Supreme Court relied on the fact that "ANCSA transferred reservation lands to private, state-chartered Native corporations, without any restraints on alienation or significant use restrictions," and thus "ANCSA ended federal superintendence over the Tribe's lands."  *Id.* at 532–33.  The Court specifically contrasted the status of these ANCSA lands, which were legally unencumbered, with prior cases involving lands over which the federal government exercised a level of control, including Indian allotments.  *Id.* at 533 (citing, *inter alia*, *Pelican*, 232 U.S. at 447).  And the Court expressly noted that allotments within Alaska would meet the definition of Indian country under 18 U.S.C. § 1151(c).  *Id.* at 527 & n.2.  Thus *Venetie*'s construction of ANCSA does not imply any impact on tribal jurisdiction over allotments—which it specifically distinguished from ANCSA lands, and which it recognized as Indian country.  By no means did *Venetie* confirm or ratify the Sansonetti Opinion's conclusions with respect to

allotments or Indian townsites, as the State seems to suggest, State Br. 11, 25 n. 114,[5] and thus *Venetie* does not support the Defendants' reading of ANCSA with respect to the Ondola Allotment.

The State also reads too much into ANCSA's use of the word "applicant" in the provision that revoked the statutory authority for granting allotments but left intact all existing allotments and pending applications.  43 U.S.C. § 1617(a); *see* State Br. 22-23.  Congress's use of the word "applicant" made perfect sense in that context, in which it was referring only to Alaska Native individuals who already had allotment applications pending.   Moreover, any suggestion that "allotments are grants to individuals," in the State's words, is entirely unremarkable—indeed, making land grants to individual Indians was precisely the point of federal allotment policy (yet that has not dissuaded courts from concluding that tribes continue to exercise jurisdiction over those allotted lands, *see infra* 19-20).  *See, e.g.*, *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2464–65 (2020) ("Congress's expressed policy [during the Allotment Era] 'was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing.'" (quoting *Mattz v. Arnett*, 412 U.S. 481, 496 (1973))).  So even if ANCSA made reference to allotments held by individual Alaska Natives, this does not in any way distinguish these allotments from those held by individual Indians in the Lower 48, over which courts and the Department have consistently found tribal jurisdiction exists.  *See* Eklutna Br. 16-19.  Similarly, the fact that the Alaska Native Allotment Subdivision Act does not expressly mention tribal jurisdiction, *see* State Br. 23-24, cannot be read as demonstrating Congressional intent to limit

---

[5] The Defendants point to the quotation of Judge Fernandez's concurrence as suggesting that ANCSA intended to affect tribal territorial sovereignty in a general sense.  Fed. Br. 34; State Br. 25 n.113.  (The Federal Defendants disingenuously quote the Court of Appeals concurrence without attribution, implying they are the Supreme Court's words, but this is inaccurate.)  But the Supreme Court decision is clearly limited to the statute's effect on ANCSA claim settlement lands.  *E.g.*, *Venetie*, 522 U.S. at 532 ("Tribe's *ANCSA lands* do not satisfy either of [the dependent Indian community] requirements." (emphasis added)).

tribal jurisdiction, *see supra* at 5.  The Act allows Alaska Native allotment holders to subdivide their allotments but *only with the Secretary of the Interior's approval*.  Pub. L. No. 108-337, § 3, 118 Stat. 1357 (2004) (codified at 43 U.S.C. § 1617 note).  The Act also contains a specific savings clause stating that, except for a divestment of land approved by the Secretary of the Interior, "nothing in this Act terminates, diminishes, or otherwise affects *the continued existence and applicability of Federal restrictions against alienation and taxation on restricted land* or interests in restricted land," including not only undivided allotments but also the "restricted land subdivided under" state or local law.  *Id.* § 4.  Thus although this Act does not expressly discuss jurisdiction, as the State emphasizes, *see* State Br. 23, it specifically leaves intact the restrictions on alienation and taxation that have long been the hallmark of Indian country, *see, e.g.*, *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 125 (1993) (presumption against state taxation in Indian country); *Pelican*, 232 U.S. at 449 (1914) (allotments "with restrictions upon alienation" remain Indian country).  In short, nothing in ANCSA or these various later amendments constitutes the express abrogation of tribal rights that would be required in order to strip Alaska tribes of jurisdiction over their Indian country, particularly in light of the Indian canon that requires all of these enactments to be interpreted for the benefit of Tribes.  *See Cobell*, 573 F.3d at 812.

Finally, the Department itself has expressly recognized that ANCSA did not definitively answer all questions regarding tribal jurisdiction and land tenure in Alaska, particularly with respect to non-ANCSA lands, which is part of the reason why the Department retains the authority to take land into trust for tribes in Alaska, just as it does in the Lower 48.  *See* Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888, 76,890 (Dec. 23, 2014) ("It is important to remember that Alaska Native land and history did not commence with ANCSA, and that ANCSA did not terminate Alaska Native tribal governments."); *see* Eklutna Br. 34.  This alone shows that the

Sansonetti Opinion's broad view of ANCSA is no longer good law.  The Department now attempts to walk back its previous position, but it provides no reason why this Court should adopt the Defendants' expansive reading of ANCSA with respect to allotment lands that were expressly left *untouched* by ANCSA.

Finally, the Federal Defendants' assertion that Congress "implicitly *agreed* with the Sansonetti Opinion's conclusions," Fed. Br. 27, is a significant mischaracterization of the congressional enactments.  In passing the Federally Recognized Indian Tribe List Act,  Pub. L. No. 103-454, 108 Stat. 4791 (1994), and the Tlingit and Haida Status Clarification Act, *id.* tit. II, 108 Stat. at 4792, Congress reached a similar conclusion as Solicitor Sansonetti only with respect to the fact that Alaska tribes continue to exist as sovereign entities (and that issue is not disputed here).  However, Federal Defendants point to no indication—and there is none—that Congress ratified the Sansonetti Opinion with respect to its analysis of ANCSA, the Alaska Native Allotment Act, or the tribal jurisdiction questions that Sansonetti raised or that are at issue here.  Instead, Congress specifically put Alaska tribes on equal footing with all other Indian tribes and dictated that the Secretary of the Interior "may not administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress."  *Id.* § 202, 108 Stat. at 4792.[6]  In short, multiple changes in the law, including the Federally Recognized Indian Tribe List Act, the Tlingit and Haida Status Clarification Act, and the 1994 amendments to the Indian

---

[6] Nor do the Federal Defendants succeed in rehabilitating the Sansonetti Opinion by pointing to *Confederated Tribes of the Chehalis Reservation. v. Mnuchin*, 976 F.3d 15 (D.C. Cir. 2020), *cert. granted*, No. 20-543, 2021 WL 77253 (U.S. Jan. 8, 2021), which cited the Sansonetti Opinion only for its recitation of the historical context and as an example of the unsettled views on tribal sovereignty that have since been settled, *id.* at 18, 26.  In any event, the Supreme Court has now granted certiorari in *Chehalis*.  No. 20-543, 2021 WL 77253 (U.S. Jan. 8, 2021).

Reorganization Act, *see* 25 U.S.C. § 5123(f), (g), have resulted in additional and starker inconsistencies between the Sansonetti Opinion and controlling law.

### 3.  IGRA's "Indian lands" provision

The parties agree that the Court's primary task here is to construe the "Indian lands" provision of IGRA, 25 U.S.C. § 2703(4).  Because IGRA is a statute passed for the benefit of Indians, it must be construed in favor of the Tribe, and any deference to the Department's interpretation of it is "muted."  *Cobell*, 573 F.3d at 812; *see also City of Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003) ("IGRA is designed to promote the economic viability of Indian Tribes," and thus "the Indian canon requires the court to resolve any doubt in favor of the tribe"). Similarly, like all provisions of IGRA, the "Indian lands" provision must be interpreted to further IGRA's purpose of "'promoting tribal economic development' and 'self-sufficiency,'" which likewise counsels in favor of interpreting the provision broadly.  *City of Roseville*, 348 F.3d at 1030 (quoting *Diamond Game Enters., Inc. v. Reno*, 230 F.3d 365, 366–67 (D.C. Cir. 2000); and citing 25 U.S.C. § 2702(1)) (construing IGRA's restored-lands exception broadly for this reason). And the "Indian lands" provision itself provides no basis for differentiating Indian lands in Alaska from Indian lands elsewhere as it makes no mention of Alaska (or any other geographical subdivision, for that matter).  Moreover, Solicitor Sansonetti did not purport to construe IGRA, so the Department's heavy reliance on the Sansonetti Opinion to interpret IGRA's "Indian lands" provision is misplaced.  Both the State and Federal Defendants ignore this key point.

The State instead argues that the Court's *only* task is to construe the "Indian lands" provision of IGRA, and that—in the State's view—the Court need not determine whether the Ondola Allotment constitutes "Indian country" as defined in 18 U.S.C. § 1151.  State Br. 2-6.  The State is correct that this Court need not determine whether the Allotment constitutes Indian country, but for a different reason:  the Department's Decision already concluded that the

Allotment is Indian country, AR 48, and Eklutna has not challenged this portion of the Department's decision, *see* Eklutna Br. 16-17; Fed. Br. 20 n.11 (noting that the parties do not dispute that the Allotment is Indian country).   Any suggestion by the State that the Ondola Allotment is *not* Indian country has no merit.   It is plainly contrary to statute, *see* 18 U.S.C. § 1151(c) (defining Indian country to include "all Indian allotments, the Indian titles to which have not been extinguished"), and a challenge to the Allotment's Indian country status is outside the scope of this Court's review, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015))).

The State is also wrong to suggest that the status of the Allotment as Indian country is irrelevant to the analysis under IGRA, *see* State Br. 21-22, 28-32, and it offers no logical reason why this would be so.   To the contrary, the concepts are plainly linked:   because tribes are presumed to exercise jurisdiction over Indian country, *Venetie*, 522 U.S. at 527 n.1, Indian country status is directly relevant to the tribal jurisdiction inquiry under IGRA's Indian lands provision. Indeed, as the initial step in determining whether the tribal jurisdiction prong of the IGRA inquiry is met, prior decisions from both the Department and the federal courts look first at whether the relevant parcel is Indian country.   *See, e.g.*, *Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d at 625; *Narragansett Indian Tribe*, 19 F.3d at 703; AR 2469 (Big Sandy Determination at 4) ("Historically, the term 'Indian country' has been used to identify land that is subject to the 'primary jurisdiction . . . [of] the Federal Government and the Indian tribe inhabiting it.'" (quoting *Venetie*, 522 U.S. at 527 n.1)); AR 2509-11 (Quinault Determination); *see also* Eklutna Br. 15-16 (discussing same).   As described further below, Eklutna has met that test here.

**B.      The Tribe Has Jurisdiction Under General Principles Applicable to Indian Allotments, Including Allotments under the Alaska Native Allotment Act**

As Eklutna demonstrated, the Tribe has jurisdiction over the Ondola Allotment under general principles of federal Indian law that the Department has applied in other cases, because the Allotment's status as Indian country and Eklutna's connection to the Allotment together satisfy the Department's "Indian lands" test.  *See* Fed. Br. 20 n.11; Eklutna Br. 15-21.

The Defendants do not seriously challenge the proposition that tribes are presumed to exercise jurisdiction over Indian country under general principles of federal Indian law.  *See* Eklutna Br. 15-16; *see also Venetie*, 522 U.S. at 527 n.1 ("Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States.").  And as noted above, *supra* at 18-19, there is simply no merit to the State's argument that the Allotment's status as Indian country is irrelevant to the jurisdictional analysis here.  The Federal Defendants argue that these general principles do not apply to Eklutna for a variety of reasons, each of which is unpersuasive.

The Allotment is indisputably Indian country, *see* AR 49; Fed. Br. 20 n.11, triggering the presumption that tribal jurisdiction over the allotment exists "*unless* '[it] is not owned or occupied by tribal members and is far removed from the tribal community.'"  AR 2469 (Big Sandy Determination at 4) (quoting Quinault Determination) (emphasis added); *see* Eklutna Br. 19. While the Federal Defendants argue that Indian country status is not sufficient, "standing alone," to establish tribal jurisdiction, Fed. Br. 21, this argument misses the point.  The Department's own prior decisions establish that Indian country status creates a *presumption* of tribal jurisdiction unless the allotment is owned by non-members or is far from the tribal community.  AR 2469 (Big Sandy Determination at 4); AR 2511 (Quinault Determination at 5).  This presumption is consistent with a broad reading of IGRA's Indian lands provision, through which the Department carries out

19

"Congress' objective of allowing Indian tribes to use gaming as a means of 'promoting tribal economic development, self-sufficiency, and strong tribal governments.'" *Diamond Game Enters.*, 230 F.3d at 368 (quoting 25 U.S.C. § 2702(1)). Because neither of the exceptions applies to the Ondola Allotment, the presumption is unrebutted, and tribal jurisdiction is undisturbed. *See* Eklutna Br. 19-20.

The State's argument that the Big Sandy and Quinault Indian lands opinions are merely advisory, State Br. 25, 32, misses the mark. The Department's decision itself acknowledged the value of these past opinions in guiding current analyses, *see* AR 56 (citing Quinault Decision), and the Federal Defendants' brief does the same, Fed. Br. 35. The Department's treatment of other tribes in prior Indian lands decisions is central to determining—as this Court must—whether the Department's treatment of Eklutna was consistent with these prior decisions or whether it diverged from that standard, in violation of both the privileges and immunities provision, 25 U.S.C. § 5123(f), and the Department's obligation under the Administrative Procedure Act to treat like cases alike, *see, e.g.*, *Republic Airline Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 299–302 (D.C. Cir. 2012) (vacating agency's refusal to allow an airline to transfer a valuable "slot exemption" as part of an airline merger, because agency ignored three of its own precedents that allowed such transfers during prior mergers); *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1115–16, 1119–20 (D.C. Cir. 2010) (vacating Interior's decision on proper methodology for assessing the value of tribal oil and gas, because Interior did not address its departure from three prior decisions). The case cited by the State (and the Departmental rule it quotes) do not suggest otherwise, as they are inapposite: they address whether an NIGC Indian lands opinion is binding on the Department's final decision or whether the Department may undertake its own analysis in determining whether to take land into trust for a tribe. *See* State Br. 25 n.116 (quoting *Butte County*

20

*v. Hogen*, 613 F.3d 190, 195 n.3 (D.C. Cir. 2010); Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,372 (May 20, 2008)).  They do not in any way suggest that the Department's analysis may be untethered from its past precedents, as the State implies.  Eklutna thus properly relied on these prior Departmental Indian lands opinions in its request for an Indian lands determination, and the Department erred in diverging from its own precedent.  And as these prior decisions show, Eklutna has jurisdiction over the Ondola Allotment because it satisfied the test laid out by the Department:  the Allotment is owned by Eklutna tribal members,[7] and it is located just seven miles from the Native Village of Eklutna.

The Department attempts to distinguish the Ondola Allotment from these prior situations by repeatedly emphasizing that Eklutna does not have an Indian reservation, as if this fact were dispositive.  *See* Fed Br. 1, 8, 28-34; *see also* State Br. 26.  Yet the Department did not rely on such a finding in the Big Sandy Determination or the Quinault Determination.  Furthermore, the Federal Defendants simultaneously argue that the Department has not created a requirement of proximity to an existing reservation, Fed. Br. 41, implicitly recognizing that such a rule would be inconsistent with past precedent and general principles of law on tribal jurisdiction.

The Department also fails to properly weigh the Ondola Allotment's prior inclusion in the Eklutna Industrial School Reserve.  *See* Fed. Br. 30-31; *see also* AR 2572-77 (describing history of the Reserve).  The Federal Defendants' contention that the Reserve was not established as an Indian reservation solely for the Native Village of Eklutna, Fed. Br. 29-30, is contradicted by the same Department memorandum cited by the Federal Defendants, which concluded that the government's decision to retain the core of the Reserve "was made in order to provide for the

---

[7] The Federal Defendants acknowledge that "the allotment holders are tribal members."  Fed. Br. 37; *see also* Compl. ¶¶ 1, 22, 34; Answer ¶¶ 1, 22, 34.  Accordingly, that prong of the test is easily satisfied.

needs of the natives," AR 2575, and that the purpose of the final withdrawal (retaining this 1,819-acre core) "was to benefit the Eklutna natives," AR 2576; *see also* AR 2580 (same). This Reserve was a federal reservation set aside for the benefit of Eklutna, and the Department overstates its case by attempting to diminish the connection between the Tribe and the Reserve. The fact that the Ondola Allotment had been removed from the Reserve by the time the Allotment was granted to Olga Ondola is even less dispositive. Shrinking reservation boundaries and providing individual Indians with land was an established federal policy during the allotment era and an *extremely* common practice as the federal government sought, at that time, to assimilate and confine Indians and Alaska Natives to ever-smaller slices of the lands they had once inhabited. *See, e.g.*, *McGirt*, 140 S. Ct. at 2463 (explaining that "during the so-called 'allotment era[]' . . . Congress sought to pressure many tribes to abandon their communal lifestyles and parcel their lands into smaller lots owned by individual tribe members."). And as the precedent on allotments invariably demonstrates, tribes have jurisdiction over allotments regardless of whether they were carved out of existing reservations or out of the public domain (*i.e.*, federal lands outside a reservation). *See In re Petition of Carmen*, 165 F. Supp. 942, 945–46 (N.D. Cal. 1958), *aff'd*, 270 F.2d 809 (9th Cir. 1959) (public domain allotment constitutes Indian country); *Mustang Prod. Co. v. Harrison*, 94 F.3d 1382, 1385–86 (10th Cir. 1996) (allotted lands remained Indian country and tribes retained jurisdiction even after reservation was disestablished); AR 2470 (Big Sandy Determination at 5) (finding tribal jurisdiction over public domain allotment); AR 2512 (Quinault Determination at 6) (same); *see also* Eklutna Br. 17-18.

In any event, a reservation is not required in order for Eklutna to exercise jurisdiction over Indian country allotments held by Eklutna tribal members and within the Tribe's historical territory. Precisely because many General Allotment Act allotments were granted from the public

domain (and *not* from existing reservations), the analysis of tribal jurisdiction is not tied to the existence of a reservation.  *See* AR 2511 (Quinault Determination at 5) (relying on a leading treatise for the proposition that the "basis for tribal jurisdiction over allotments outside of reservations is tribal membership, or that [the] allotments are clustered and thus part of a dependent Indian community" (citing F. Cohen, Handbook of Federal Indian Law 346-48 (1982 ed.))); *see also* AR 2469 (Big Sandy Determination at 4).  While it is true that a reservation existed in many prior instances where a tribe was found to have jurisdiction, this does not necessarily mean that a reservation is required, as even the Federal Defendants seem to acknowledge.  *See* Fed. Br. 41 (denying that it has created a reservation requirement).  The Federal Defendants critique Eklutna's reliance on the term "tribal community" in the Department's prior assessments of whether an allotment is sufficiently close to the tribe to establish jurisdiction, *see* Fed. Br. 41 n.17, yet they offer no reason why the Department's prior analyses should not be read consistent with the plain meaning of their texts.  Indeed, tribes can and do exercise authority over allotments even when the allotment is not linked to a specific Indian reservation.  For example, in *Nisqually Indian Tribe*, 649 F. Supp. 2d at 1210–11, the court held that the Squaxin Island Tribe could exercise taxation authority over an allotment held by a tribal member within Frank's Landing Indian Community, an off-reservation Indian community of allotments that is not part of any federally recognized tribe. Noting that "the Supreme Court has recognized that 'Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory,'" the court held "absent explicit divestiture by Congress, the Court cannot interfere with the Squaxin's sovereign power to conduct economic activity on the tribal member's trust land and charge a corresponding sales tax."  *Id.* (quoting *Mazurie*, 419 U.S. at 557); *see also Sohappy*, 770 F.2d at 822–23 (non-reservation lands set aside "for the use and benefit of certain Indians" were Indian country subject

to federal and tribal jurisdiction) (emphasis omitted).  In short, there is no support for the Defendants' position that Eklutna may never exercise jurisdiction over a tribal member's allotment simply because it does not have a present-day reservation.

Finally, and contrary to the Defendants' suggestion, Eklutna's jurisdiction over the allotment was not terminated by ANCSA.  By allowing allotments to be set aside in federally restricted status, the Alaska Native Allotment Act preserved tribal jurisdiction in applicable circumstances, *see* Eklutna Br. 17-18 (citing, *inter alia*, 18 U.S.C. § 1151(c); *Pence*, 529 F.2d at 140; *Pelican*, 232 U.S. at 449), and that jurisdiction was not altered by ANCSA.  The Defendants point to ANCSA's extinguishment of aboriginal title to lands in Alaska, *see* Fed. Br. 33, 37 (citing 43 U.S.C. § 1603); State Br. 27.  But extinguishment of aboriginal *title* (or claims to aboriginal title) simply settled the pending disputes regarding land *ownership*.  It is separate from the question of whether a tribe continues to exercise jurisdiction over land to which the title is indisputably held in restricted status as an Alaska Native allotment—land whose title was not impacted by ANCSA at all.  And as discussed above, *supra* 11-17, ANCSA expressed no intention of affecting tribal jurisdiction, particularly when it comes to *non*-ANCSA lands.  Accordingly, there is no valid basis on which to distinguish the Ondola Allotment from other allotments over which the Department and the federal courts have found tribal jurisdiction to exist.  And for this reason, the Department's decision to apply a different standard to Eklutna violates the privileges and immunities protection of 25 U.S.C. § 5123(f) and the APA.

The Federal Defendants argue that the privileges and immunities provision does not apply because they have made no "broad-sweeping pronouncement" regarding Alaska tribes' eligibility for IGRA gaming.  Fed. Br. 25; *see also* State Br. 36 (arguing that the Department has not *categorically* excluded Alaska tribes from IGRA gaming).  But application of the privileges and

immunities provision does not require any such "broad-sweeping pronouncement" or categorical exclusion; by its plain terms, the provision prohibits a federal agency from promulgating a regulation or making "*any decision or determination* pursuant to . . . any . . . Act of Congress," that "diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes."   25 U.S.C. § 5123(f) (emphasis added).  There can be little doubt that the Department's decision here—an Indian lands determination as to whether the Ondola Allotment qualifies as "Indian lands" under § 2703(4) of IGRA—is a "decision or determination pursuant to" an "Act of Congress."   Accordingly, the privileges and immunities provision prohibits the Department from diminishing the privileges of Eklutna, relative to other tribes, in making that decision.  And that is precisely what it has done by concocting unfounded reasons to treat Eklutna differently in its jurisdictional analysis.

The Defendants do not appear to dispute that the ability to conduct IGRA gaming on Indian lands is a "privilege" within the meaning of this provision.  *See* Eklutna Br. 22; *see also Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 52 (D.D.C. 2019).  Instead, the Department wrongly argues that the Tribe has not identified other similarly situated tribes that have been treated differently.  Fed. Br. 23-24.  To the contrary, in all respects relevant to the jurisdictional analysis, the Ondola Allotment is analogous to other public-domain allotments over which tribes have been found to exercise jurisdiction, as described above.[8]  And while the State points to older decisions in which Alaska tribes were found *not* to have jurisdiction or exercise governmental

---

[8] The State's attempt to distinguish the Big Sandy Determination on the ground that it was "not subject to a general extinguishment of claims based on historical use and occupancy," State Br. 26, cannot be squared with the 1851 California Land Claims Act, which extinguished land claims in California not presented to a federal commission within two years, and which courts held included Indians claiming occupancy rights under Mexican law and other rights based on aboriginal title.  *Barker v. Harvey*, 181 U.S. 481, 484, 499 (1901); *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 646 (9th Cir. 1986).

power over allotments or Native townsites, *see* State Br. 13-15, each of those decisions is distinguishable.[9]  They thus provide no valid ground on which to single out Eklutna—or any Alaska tribe—and subject it to a different jurisdictional test.[10]

Moreover, by its plain terms the privileges and immunities provision does not require that tribes be similarly situated in order for its protections to apply.  *See Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 1, 5 (D.D.C. 2013) ("[T]here is no requirement that tribes be 'similarly situated' for the anti-discrimination provision to apply."), *vacated sub nom. Akiachak Native Cmty. v. United States Dep't of Interior*, 827 F.3d 100 (D.C. Cir. 2016);[11] *cf. Koi Nation*, 361 F. Supp. 3d at 53–56 (assessing whether a tribe is similarly situated but still not requiring perfect symmetry

---

[9] This Court's decision in *Native Village of Barrow v. National Indian Gaming Commission*, AR 629-42, like the NIGC's decision, AR 2500-06, focused only on the exercise of governmental authority and did not discuss the jurisdictional question on which the Department's decision relied here.  The Department's decision on a request by the Kenaitze Indian Tribe contained very little analysis and concluded only that jurisdiction had not been established by the tribe's submissions but might be established with additional evidence.  AR 722.  Finally, the State again fails to acknowledge that the *draft* decision regarding Eklutna's prior request for an Indian lands determination, AR 965-66, was withdrawn and never finalized, AR 968.

[10] Similarly, there is no merit to the State's attempt to draw a negative inference from the fact that the *Venetie* decision did not rely on the privileges and immunities provision, which was not even at issue in that case.  *See* State Br. 37 n.155.

[11] On appeal the District Court's decision in *Akiachak* was vacated as moot, as the State notes.  827 F.3d at 115; *see* State Br. 36.  Because the District Court's opinion was vacated only due to mootness (as urged by all parties in the case) and was not reversed or otherwise disagreed with by the D.C. Circuit, *see* 827 F.3d at 115, the District Court's reasoning is persuasive authority even though the opinion is not binding.  *See Weisberg v. Webster*, 749 F.2d 864, 870 (D.C. Cir. 1984) (where case "ha[d] been vacated on mootness grounds" and thus was not binding, court could choose to consider it as "enlightening authoritative commentary"); *see also* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 3533.10.3 (3d ed.) (explaining that vacatur is primarily intended to eliminate *preclusive* effect of a decision, and noting that even in courts that ascribe no precedential value to opinions that have been mooted, those opinions are still treated as "persuasive arguments").  The case was found moot because the Department itself repealed the challenged regulation, determining that "there should not be different classes of federally recognized tribes" and that ANCSA had not impacted the Department's authority to take land into trust for tribes in Alaska.  79 Fed. Reg. 76,890; *see Akiachak*, 827 F.3d at 104–06.

among tribes for application of the privileges and immunities protection).  For all of these reasons, 25 U.S.C. § 5123(f) applies here, and the Department violated it by unjustifiably departing from its treatment of other tribes exercising jurisdiction over their members' allotments.

### C.      Even if the Sansonetti Test Applied, the Tribe Has Jurisdiction Because it Has Shown a Tribal Nexus to the Allotment.

Even if it were proper for the Department to reverse the standard presumption and rely on the Sansonetti Opinion's outdated Alaska-specific test, the Tribe has demonstrated that it meets that test.  As interpreted by the Department, the Sansonetti test requires a Tribe to show an "original tribal nexus to the site."  AR 49 (Decision at 5) (citing AR 2266, 2269 (Sansonetti Op. at 127, 130).  The Tribe presented extensive evidence showing an original tribal nexus to the Allotment site, through longstanding historical occupancy of the region, and that it has jurisdiction and exercises governmental authority over the site, through (among other things) numerous services it provides to the Allotment and provisions of tribal law that extend to the Allotment.  Eklutna Br. at 35-43.

The State's contention that ANCSA entirely severed "any . . . connection" between tribes and their lands by extinguishing claims to title based on historical use and occupancy, *see* State Br. 20, 27, 38; Fed Br. 33; 43 U.S.C. § 1603(b), misconstrues the plain text of, and congressional intent in, ANCSA and basic principles regarding tribal sovereignty, *see supra* at 4-5.  It furthermore misapprehends the Sansonetti Opinion.  By framing the question as whether there is an "*original* tribal nexus" to the site, AR 2266 (Sansonetti Op. at 127), the Sansonetti Opinion found that historical connection is one of the relevant factors in determining whether a tribe has jurisdiction over a Native allotment or townsite post-ANCSA, *see also* AR 49 (Decision at 5) (incorporating this "original tribal nexus" language).  And the Federal Defendants concede that "there could theoretically be a historical basis for tribal territorial jurisdiction over an off-

reservation allotment in Alaska."  Fed. Br. 10.  As described in its opening memorandum, Eklutna

has amply shown such historical nexus to the Allotment site, *see* Eklutna Br. 35-43, and the

Defendants do not meaningfully argue otherwise.

The Defendants next suggest there is a stark contrast between tribes' jurisdiction over their

members and territorial jurisdiction over tribal lands.  But such a distinction is not supported by

the caselaw.  As noted above, the Supreme Court has recognized that "Indian tribes are unique

aggregations possessing attributes of sovereignty over both their members and their territory,"

*Mazurie*, 419 U.S. at 557, and there is a presumption of tribal authority over the Allotment, which

may be disturbed only by a showing of express congressional intent. *Supra* at 5.  While the Federal

Defendants argue that "[t]ribal sovereignty is not coterminous with tribal territorial jurisdiction,"

Fed. Br. 33, the case law demonstrates that tribal sovereignty is, in fact, presumed to encompass

jurisdiction over tribal territory *and* tribal members.  The cases holding that even landless tribes

have jurisdiction over their members, *e.g.*, *John v. Baker*, 982 P.2d 738 (Alaska 1999), do not

dictate the inverse conclusion that Alaska tribes *only* have jurisdiction over their members.  *See*

Fed. Br. 37-38.  Indeed, in *John v. Baker* the Alaska Supreme Court recognized that while most

Alaska tribes lack territory over which to exercise jurisdiction, this rule does not necessarily apply

to allotments, as "some Indian country may still exist in Alaska under the second definition [in 18

U.S.C. § 1151], Indian allotments."  982 P.2d at 748 n.45.  Similarly, the principle that a "tribe's

authority over its reservation or Indian country is incidental to its authority over its members,"

which Defendants quote from *Native Village of Venetie I.R.A. Council*, 944 F.2d at 558 n.12,

confirms that tribal sovereignty is not *limited* by the territorial boundaries of Indian country.  *See*

Fed. Br. 38.  The Ninth Circuit in that case applied the same principles the Tribe relies on here,

specifically that Alaska Tribes are presumed to have sovereign authority and jurisdiction to the

same extent as tribes in the Lower 48, unless it is expressly divested by Congress.  *Id.* at 556 (citing *Montana v. United States*, 450 U.S. 544, 564 (1981); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152 (1980)).[12]  Thus, in cases where Indian Country continues to exist within Alaska, and where the land in question meets the general test for tribal jurisdiction as described above, these cases do not bar Alaska tribes from exercising jurisdiction.[13]

While the Federal Defendants focus on the portion of the Tribe's constitution asserting jurisdiction over its members, Fed. Br. 37-38, the Tribe's constitution *also* asserts jurisdiction over tribal lands, including allotments, AR 954; *see* Eklutna Br. 40.[14]  Similarly, much of the evidence the Tribe provided specifically demonstrates its provision of services to and exercise of jurisdiction over the land itself.  These include, among other things, trespass regulation, timber management, waste management, road maintenance, and building a septic system on the allotment.  *See* Eklutna Br. 39.  These services plainly relate to the Allotment itself, not just the tribal members who live there.  Thus, the Federal Defendants are simply wrong that the Tribe has provided no such evidence or argument, *see* Fed. Br. 38, and similarly, the State offers no support for its unfounded assertion

---

[12] The court specifically rejected an argument similar to the Defendants' arguments here, that Congress divested Alaska tribes of their jurisdiction, in that case by Public Law 280, finding Public Law 280 "is not a divestiture statute" and found no indication of congressional intent to divest tribal courts or jurisdiction over child welfare matters in the Indian Child Welfare Act.  *Native Village of Venetie I.R.A. Council*, 944 F.2d at 561.

[13] The Whitecloud opinion cited by the Federal Defendants does not suggest otherwise.  *See* Fed. Br. 37. Far from establishing a general principle that tribal membership does not support jurisdiction, that opinion concluded that the Iowa Tribe retained jurisdiction over an allotment carved "from its own reservation" and held largely by members of the Iowa Tribe, even after some of the fractionated interests in the allotment were transferred to members of different tribes.  AR 2460-61; *see also* Eklutna Br. 37-38.

[14] The Tribe's Constitution provides that the Tribe exercises jurisdiction over such lands "[t]o the extent consistent with federal law."  AR 954; *see* Fed. Br. 40.  As explained here, the Tribe's exercise of jurisdiction over the Ondola Allotment is fully consistent with federal law on jurisdiction over Indian country allotments.

that such services would be available to tribal members regardless of where they live, State Br. 15. The Federal Defendants contend the evidence of the Tribes' services is not relevant to showing jurisdiction, Fed. Br. 39, but the Department's own formulation of the nexus test *for tribal jurisdiction* included "the provision of tribal police and other services in the area," citing this same portion of the Quinault Determination.   AR 56 (Decision at 12); *see* Eklutna Br. 40.   The Department may not reject the Tribe's evidence that satisfies the test *the Department devised*.

The Defendants' argument that the Ondola Allotment is not near an existing Indian reservation, Fed. Br. 41, is misplaced for the reasons discussed above, *supra* at 21-23. Furthermore, it is contrary to the Sansonetti Opinion's recognition that the possibility of tribal jurisdiction over Native allotments still exists in a post-ANCSA context in which all reservations had been revoked.  *See* Eklutna Br. 42-43.  The Federal Defendants implicitly concede as much by recognizing that "there could theoretically be a historical basis for tribal territorial jurisdiction" over an allotment in Alaska, Fed. Br. 10, which is fatal to their reliance on the absence of a reservation as a basis for finding no jurisdiction over the Ondola Allotment.  Similarly, although the Defendants argue that other governments have not recognized Eklutna's jurisdiction over the Allotment, *see* State Br. 41; Fed. Br. 40-41, the recognition of other governments is not strictly required; it is merely one indication that may be weighed in determining whether tribal jurisdiction exists.  If the recognition by other governments were required, it would mean that State and local governments, many of which have a long history of tumultuous relationships with tribes, could affect the scope of tribal jurisdiction under *federal* law simply by refusing to recognize the tribe's jurisdiction.  Such an outcome is at odds with the basic foundations of Indian law, under which the scope of tribal authority is a question of federal law.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 852 (1985).

In sum, the Tribe has provided more than enough evidence to demonstrate that it meets the Sansonetti "original tribal nexus" test for jurisdiction and that it actively exercises governmental authority over the Allotment, as it has for many decades.  The Defendants' arguments to the contrary should be rejected.

> **D.     The Defendants are Not Entitled to Summary Judgment on Count II.**

The Federal Defendants are incorrect that the Tribe has "dropped" its second claim for relief.  *See* Fed. Br. 12 n.5.  The Tribe has simply chosen not to move for summary judgment at this stage, in light of factual issues that remain following the Court's denial of extra-record discovery on this claim.  The Court ruled that the Tribe had not presented sufficient evidence of improper political influence to justify extra-record discovery.  ECF No. 47.  Although the Tribe disagrees with this outcome and expressly preserves its objections to it, the Tribe recognizes that this ruling is the law of the case until the Tribe has an opportunity to appeal the ruling, if necessary, at the conclusion of the district court proceedings.  *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (describing the law-of-the-case doctrine).  Nonetheless, the Court should deny the Federal Defendants' motion for summary judgment as to Count II because the Defendants have offered only a short, conclusory argument in support of their motion, and only in a single footnote. Fed. Br. 12 n.5.  It is proper for this Court to deny (or decline to consider) a summary judgment motion that is not adequately supported by "a statement of . . . specific points of law and authority" as required by Local Rule 7(a).  *See, e.g.*, *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 20 n.18 (D.D.C. 2004), *aff'd*, 173 F. App'x 825 (Fed. Cir. 2006) (declining to decide summary judgment motion with respect to a claim on which one party had moved for summary judgment but "provide[d] no support for this motion" in its memoranda (citing LCvR 7(a); *Arizona v. Shalala*, 121 F.Supp.2d 40, 46 n.4 (D.D.C. 2000); *United States v. Wade*, 992 F. Supp. 6, 21 (D.D.C. 1997))).  And courts "need not consider cursory arguments made only in a

31

footnote." *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 539 (D.C. Cir. 1999).  The State, for its part, has offered no argument whatsoever regarding Count II.  *See generally* State Br. (absence).  The State's motion should therefore be denied with respect to Count II as well.  *See* LCvR 7(a); *Catalyst & Chem. Servs.*, 350 F. Supp. at 20 n.18.

## II.     THE LEASE DISAPPROVAL WAS UNLAWFUL FOR THE SAME REASONS AS THE INDIAN LANDS DETERMINATION.

The parties agree that the Department's only basis for disapproving the lease was its determination that the Ondola Allotment does not constitute "Indian lands" under IGRA.  Eklutna Br. 43-44; Fed. Br. 42.  (The State does not appear to take a position on the validity of the lease approval.)  The Department has provided no further reason why the lease disapproval should be upheld—nor could it, as the Department is bound to "the grounds that the agency invoked" in its original decision.  *Michigan*, 576 U.S. at 758.  Thus, if the Court agrees with Eklutna that the Indian lands determination was arbitrary and capricious or not in accordance with law, then the Court should also invalidate the lease disapproval.

## III.    THE TRIBE'S REQUESTED REMEDY IS PROPER.

Because Eklutna has shown as a matter of law that it "exercises governmental power" over the Ondola Allotment within the meaning of IGRA, this Court is empowered to reverse the Department's decision.  *See* Eklutna Br. 45 (citing *Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d at 624–26; *Narragansett Indian Tribe*, 19 F.3d at 701–03).  The Tribe recognizes, however, that remand to the Department would be a more typical remedy in an APA case.  *See* Fed. Br. 43 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).  If the Court chooses to vacate and remand the Decision to the Department for reconsideration, for the reasons described above, the Court should grant declaratory and injunctive relief vacating the Department's decision and directing the Department to issue a new decision consistent with the

Court's ruling on these issues, including barring the Department from discriminating against Eklutna in its analysis of tribal jurisdiction, as mandated by 25 U.S.C. § 5123(f), and from applying the outdated Sansonetti Opinion to the Tribe's Indian lands request.

## CONCLUSION

Just like other tribes that exercise jurisdiction over off-reservation allotments held by their own members and located near their tribal community, the Native Village of Eklutna has jurisdiction and exercises governmental power over the Ondola Allotment.  This Court should reject the Defendants' attempts to move the goalpost for Alaska tribes, which find no basis in statute and which violate the Tribe's rights and privileges under federal law.  The Native Village of Eklutna therefore respectfully requests that the Court grant summary judgment in favor of the Tribe and against all Defendants as to Counts I and III, and deny the Defendants' motions for summary judgment as to Count II.

Respectfully submitted this 19th day of March 2021.

SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY, LLP

By:_____ */s/ Colin Cloud Hampson*_____
        Colin Cloud Hampson, D.C. Bar No. 448481
        145 Willow Road, Suite 200
        Bonita, CA 91902
        Telephone: (619) 267-1306
        Facsimile: (619) 267-1388
        champson@sonoskysd.com

        Whitney A. Leonard
        Alaska Bar No. 1711064
        Montana Bar No. 36409732
        *Pro hac vice*
        Sonosky, Chambers, Sachse, Miller &
            Monkman, LLP
        725 East Fireweed Lane, Suite 420
        Anchorage, AK 99503
        Telephone:  (907) 258-7388
        Facsimile:  (907) 272-8332

33

whitney@sonosky.net

*Attorneys for the Native Village of Eklutna*