IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Native Village of Eklutna**,

       Plaintiff,

   v.

**U.S. Department of the Interior**, et. al,

       Defendants,
    and
**State of Alaska**,
       Defendant-Intervenor.

Case No. 1:19-cv-02388-DLF

**Federal Defendants' Reply Brief in
Support of Summary Judgment**

JEAN E. WILLIAMS
Acting Assistant Attorney General

KRISTOFOR R. SWANSON
Natural Resources Section
Envt. & Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611

April 9, 2021

T<span style="font-variant:small-caps;">ABLE OF</span> C<span style="font-variant:small-caps;">ONTENTS</span>

Introduction..................................................................................................... 1

Argument......................................................................................................... 1

I.    The Tribe's Response Is Premised On Two Inapplicable
Legal Principles ...................................................................... 2

II.   The Department Did Not Act Arbitrarily or Contrary to Law
in Concluding that the Tribe Had Not Demonstrated
Territorial Jurisdiction Over the Ondola Allotment...................... 5

    A.    The Department's Interpretation of the Alaska Native
Allotment Act is Consistent with the Act's Plain
Language ...................................................................... 5

        1.    The Requirements in the Alaska Native
Allotment Act and Section 4 of the 1887 General
Allotment Act Are Plainly Different ........................... 6

        2.    Legislative History and the *In Pari Materia*
Doctrine Are Inapplicable and, In Any Event, Do
Not Undercut the Department's Interpretation ........ 8

        3.    An Allotment's Status as Indian Country Does
Not, Standing Alone, Equate to Tribal
Territorial Jurisdiction ............................................. 11

    B.    The Record Supports the Department's Conclusion
that the Ondola Allotment Was Never Part of Any
Reservation Held for the Benefit of the Native Village
of Eklutna .......................................................................... 16

    C.    The Department Did Not Act Arbitrarily in
Concluding the Tribe Had Not Shown Any Other
Tribal Nexus That Would Justify a Finding of
Territorial Jurisdiction ....................................................... 20

III.  Summary Judgment Should Be Granted In Favor of Federal
Defendants on Count II Because the Tribe Has Not
Attempted to Meet Its Burden ...................................................... 23

Conclusion .................................................................................................... 25

i

## INTRODUCTION

The Department of the Interior did not act arbitrarily or contrary to law in concluding that the Native Village of Eklutna had not demonstrated tribal territorial jurisdiction over the Ondola Allotment, and that the Allotment therefore did not constitute "Indian lands within [the] tribe's jurisdiction" for purposes of the Indian Regulatory Gaming Act (IGRA). The Department's conclusion that the 1906 Alaska Native Allotment Act did not, standing alone, create tribal jurisdiction over allotments issued under the Act is consistent with the statute's plain meaning. The administrative record supports the Department's conclusions that the Allotment had never been part of any reservation held for the benefit of the Tribe and that the Tribe had not shown any other "tribal nexus." Finally, the Tribe, by not pursuing the argument in its summary judgment papers, has waived its claim that the Department's decision resulted from undue political influence. Summary judgment should be granted in favor of Federal Defendants.

## ARGUMENT

The Department of the Interior's decision was driven by its consideration of the statutes and circumstances surrounding the Ondola Allotment and an assessment of whether the Tribe had demonstrated some other tribal nexus to the site. The Tribe's response is effectively that it is entitled to game on allotments held by its members—regardless of the circumstances and authorities under which the allotment issued—because

1

Congress has not explicitly said otherwise and because other tribes have been able to successfully demonstrate tribal jurisdiction over allotments. The Tribe's response is legally incorrect and largely ignores the agency conclusions that are before the Court for review in this Administrative Procedure Act (APA) case. *See FCC v. Prometheus Radio Project*, __ S. Ct. __, 2021 WL 1215716 at *5 (Apr. 1, 2021) (Under the APA standard of review, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." (citations omitted)).

I.   **The Tribe's Response Is Premised On Two Inapplicable Legal Principles.**

As an initial matter, the Tribe builds much of its response brief from two inapplicable points of law.

First, the Tribe spends several pages arguing that only Congress can abrogate tribal territory or sovereignty. *See* Pl.'s Combined Opp'n to Fed. Defs.' & State of Alaska X-Mots. For Summ. J. ("Pl.'s Resp.") 1, 4–7, 9–13, 24, 28–29, ECF No. 61. The argument is a strawman. The Department's conclusion here was not that the Tribe had, and then lost, territorial jurisdiction over the Ondola Allotment. Rather, the Department concluded that the Tribe had not shown itself to ever have had territorial jurisdiction over the Allotment to begin with. *See* AR_61. Further, the concept of tribal sovereignty is not coterminous with tribal territorial jurisdiction. *See John v.*

*Baker*, 982 P.2d 738, 751–53 (Alaska 1999).  Thus, the legal truisms that Indian tribes possess sovereignty over their members and territory (*see* Pl.'s Resp. at 28), and that the Tribe maintains its sovereignty, do not answer the question of whether the Tribe has (or ever had) territorial jurisdiction over the Ondola Allotment.

The Tribe and the State debate the 1971 Alaska Native Claims Settlement Act's effect on tribal territory and sovereignty in Alaska.  *See* Mem. in Supp. of Intervenor State of Alaska's Opp'n to Pl.'s Mot. and X-Mot. 7–10, 22–24, ECF No. 58; Pl.'s Resp. at 11–16.  The Settlement Act, however, played only a limited role in the Department's decision here.  AR_50 ("As relevant here, [the Settlement Act] extinguished all claims by Alaska Native groups based on aboriginal title . . . [and] revoked all reserves set aside by legislation or by Executive or Secretarial Order for Native use 'or for administration of Native affairs.'").  Thus, much of the debate about the Settlement Act's effects (and the Sansonetti Opinion's lengthy analysis of that statute) is not relevant to the Court's review.[1]

Second, the Tribe misapplies the Indian canon of statutory construction.  *See* Pl.'s Resp. at 2–3, 17.  The canon requires that *ambiguous* statutory provisions enacted for the benefit of Indians be construed in the

---

[1] The Tribe is correct (Pl.'s Resp. at 14 n.5) that the quote and citation to *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 526 (1998), on page 34 of our opening brief should have included a parenthetical noting the Supreme Court was quoting the concurring circuit court opinion.

Indians' favor.  *See El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1278 (D.C. Cir. 2011).  The canon cannot be used to disregard "the clearly expressed intent of Congress."  *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).

The statutory provisions implicated here are not ambiguous.  The 1906 Alaska Native Allotment Act plainly does not include a link to tribal membership or tribal land, and the Sansonetti Opinion did not read the 1906 Act as ambiguous on that question.  *See* Pub. L. No. 59-171, 34 State. 197 (May 17, 1906), *as amended by* Pub. L. No. 84-931, 70 State. 954 (Aug. 2, 1956); AR_2267–68.  The 1971 Alaska Native Claims Settlement Act plainly (and retroactively) extinguished all claims based upon aboriginal title in Alaska.  *See* 43 U.S.C. § 1603(a).  And IGRA plainly provides that, under certain conditions, "[a]n Indian tribe may engage in, or license and regulate, class II gaming on [1] Indian lands [2] within such tribe's jurisdiction."  25 U.S.C. § 2710(b)(1).  Further, even if the Indian canon were applicable, it would not mean that the Court must adopt the Tribe's desired interpretation simply because it comes from a tribe.  *See Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 314 (D.D.C. 2018) (noting that the canon-demanded interpretation must be one that benefits Indians generally, not just the tribe advocating for a result in the litigation).

The Tribe compounds upon its error with respect to IGRA by stating "the Court's primary task here is to construe the 'Indian lands' provision of

4

IGRA[,]" and that the Department "reli[ed] on the Sansonetti Opinion to interpret IGRA's 'Indian lands' provision . . . ." Pl.'s Resp. at 17. The Department was *applying* IGRA's requirements, not attempting to interpret ambiguous IGRA provisions. *See* AR_47–49. No one disputes that tribal jurisdiction over the Ondola Allotment is necessary for the land to qualify as "Indian lands" under IGRA. *See* Pl.'s Stmt. of Points & Auths. in Supp. of Mot. for Partial Summ. J. 15, ECF No. 51-1. The fact that the Department applied Indian-focused statutes does not erase the deference the Department's conclusions are otherwise due when being reviewed under the APA. *Accord Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199, 216–17 (D.D.C. 2020) (once a statutory interpretation is settled, an agency's application of that interpretation is subject to the normal arbitrary and capricious standard).

## II. The Department Did Not Act Arbitrarily or Contrary to Law in Concluding that the Tribe Had Not Demonstrated Territorial Jurisdiction Over the Ondola Allotment.

The Department's decision here was consistent with governing law and supported by the administrative record.

### A. The Department's Interpretation of the Alaska Native Allotment Act is Consistent with the Act's Plain Language.

To assess whether the Tribe had demonstrated territorial jurisdiction over the Ondola Allotment, the Department began with the statute under which the allotment issued (the 1906 Alaska Native Allotment Act). AR_48,

5

AR_50; *see also* AR_2263–68 (Sansonetti Opinion).  The Department concluded that the 1906 Act, standing alone, provides "little to no basis" for a finding of territorial jurisdiction because: (1) the Act did not reference tribal membership nor require tribal membership to receive an allotment; (2) the Act did not carve allotments out of any tribal reservation; and (3) the Act stated that the allotments were for homesteading.  AR_2267–68; AR_49.

Because the 1906 Act did not require a link to a tribe, a tribe could not profess to have gained territorial jurisdiction solely by virtue of an allotment having been issued to a tribal member.  *See* AR_2266–68.  Our opening brief explained how the Department's conclusion is consistent with the statute's plain language and is contrasted from that in Section 4 of the 1887 General Allotment Act.  *See* Fed. Defs.' Mem. at 14–19.

The Tribe makes three points in response.  None of them demonstrate that the Department of the Interior acted arbitrarily or contrary to law.

> 1.     *The Requirements in the Alaska Native Allotment Act and Section 4 of the 1887 General Allotment Act Are Plainly Different.*

The Tribe first attempts to equate the 1906 Act with Section 4 of the General Allotment Act by arguing that the latter also did not include a tribal link.  Pl.'s Rep. at 7–8.  The Tribe is incorrect.  Section 4 references tribes or tribal reservations three times.  The statute makes allotments available to "any Indian not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, act of Congress, or executive order . . . in

6

quantities and manner as provided in this act for Indians residing upon reservations." 25 U.S.C. § 334. The 1906 Act does not include any similar references, which the Sansonetti Opinion found to mean that "Congress was not considering Alaska Native allotments in a tribal context." AR_2267.

The Tribe attempts to separate from the statutory differences by pointing out that it is the Department's regulations that interpret Section 4 as requiring tribal membership. *See* Pl.'s Resp. at 8 (citing 43 C.F.R. § 2531.1). But the Tribe does not argue that the Department's interpretation is inconsistent with Section 4. And the Tribe also does not dispute that the 1906 Act's implementing regulations did not contain a similar requirement. *See* 43 C.F.R. §§ 67.1–67.9 (1964) (attached to our opening brief at ECF No. 55-4). Indeed, Ms. Ondola's application made no reference to the Native Village of Eklutna or any other tribe. AR_2046–48.

The Tribe also draws a distinction between the 1906 Act's implementing regulations and the Department's current certification process for Alaska Native blood. *See* Pl.'s Resp. at 8 n.3. But the current certification process has nothing to do with the 1906 Act, which was repealed in 1971. *See* 43 U.S.C. § 1617(a). Thus, the Tribe's effort only serves to highlight that Native Alaskan descent (which the Department concluded to be the 1906 Act's focus) is distinct from the concept of tribal membership (as the Department has found to be the focus in Section 4 of the General Allotment Act). Native heritage, standing alone, does not equate to tribal membership

7

nor provide a link to tribal territorial jurisdiction.  *Accord Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978) (recognizing a tribe's right to define its own membership); *Williams v. Gover*, 490 F.3d 785, 790 (9th Cir. 2007) ("Mooretown Rancheria had the power of squeeze the plaintiffs out [of the tribe], because it has the power to define its own membership.").[2]

2. *Legislative History and the* In Pari Materia *Doctrine Are Inapplicable and, In Any Event, Do Not Undercut the Department's Interpretation.*

The Tribe next argues that the 1906 Act's legislative history "demonstrate[s] Congress's unequivocal intent that allotments under the Act be treated as functionally equivalent to allotments under the General Allotment Act."  Pl.'s Resp. at 8–9.  But legislative history is not relevant where a statute's meaning is plain on its face.  *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) (courts should "not resort to legislative history to cloud a statutory text that is clear").  The 1906 Act plainly does not make any reference to tribes, tribal territory, or tribal membership.  Even if Congress intended the 1906 Act to fill a gap in Section 4 of the General Allotment Act (Pl.'s Resp. at 9), the differing language in the two statutes undercuts any

_____

[2] The Tribe again makes the point that the 1906 Act did not require applicants to abandon tribal relations, favoring a distinction with Congress's extension of the 1862 Homestead Act to Indians (which required applicants to abandon tribal relations) instead of an analogy to the 1884 Indian Homestead Act (which did not).  Pl.'s Resp. at 10.  As we previously explained, the distinction with the 1862 Homestead Act's extension is not meaningful because the 1906 Act did not require allotment applicants to have any tribal relationship to begin with.  *See* Fed. Defs.' Mem. at 19.

8

conclusion that Congress intended the two allotment schemes to be identical. Congress could have included in the 1906 Act the same language it included in Section 4 of the 1887 General Allotment Act.  It chose not to.

In any event, the only legislative history the Tribe cites is a House of Representatives committee report for the 1906 Act.  *See* Pl.'s Resp. at 9 (citing to quotation in *Pence v. Kleppe*, 529 F.2d 135, 141 (9th Cir. 1976)). The report does not mention the 1887 General Allotment Act.  *See* H.R. Rep. No. 3295, 59th Cong. 1st Sess. (April 16, 1906) (attached for the Court's convenience as Ex. 4).  Instead, the report notes the absence of Indian reservations in Alaska and a desire for an Alaska Native "to continue in peaceable possession of what he has always regarded as his home."  *Id.* There is no stated intent to continue or create a tribal land base.  *See id.*

Relatedly, the Tribe claims that Congress intended that the 1906 Act "be construed *in pari materia* with the General Allotment Act."  Pl.'s Resp. at 9, 10–11.  The Tribe does not cite any statutory language or legislative history to support its assertion of Congressional intent.  *See Kirkwood v. Arenas*, 243 F.2d 863, 866 n.3 (9th Cir. 1957) (noting post-enactment Congressional resolution).  Further, the *in pari materia* doctrine "applies only when the statute to be construed is ambiguous."  *Beverly Enterprises, Inc. v. Herman*, 119 F. Supp. 2d 1, 8 (D.D.C. 2000) (citing *District of Columbia v. Gladding*, 263 F. 628, 629 (D.C. Cir. 1920)).  That is not the case here.  And even if the *in pari materia* doctrine were applicable, the Department

9

effectively made use of it.  The Department assessed the 1906 Act in relation to Section 4 of the General Allotment Act, concluding that the latter included a tribal link while the former did not.  *See* AR_2266–68.  The doctrine requires that statutes be interpreted in recognition of one another, not that they be interpreted to mean the same thing.  *See Erlenbaugh v. United States*, 409 U.S. 239, 243–47 (1972) (refusing to apply one statute's requirements to another where they "play different roles in achieving these broad, common goals").

The Tribe's cases do not go as far in analogizing the 1906 Act to the General Allotment Act as the Tribe desires.  *See* Pl.'s Resp. at 9–10.  In *Pence,* applicants under the 1906 Act brought a procedural due process claim against the Department of the Interior.  529 F.2d at 137.  The court was addressing jurisdictional issues, not any requirement for a tribal nexus.  *See id.* at 138–43.  The court compared the 1906 Act with the General Allotment Act to determine whether the Secretary's authority was wholly discretionary such that no relief was available to the plaintiffs.  *See id.* at 140–41.  And the court referenced the 1906 Act's legislative history to assess whether the Act granted allottees a property interest.  *See id.* at 141–42.  The extent of the Secretary's discretion and the allottees' property interests are not relevant to the question of what, if any, tribal nexus Congress intended.

The issue before the court in *Alaska v. Babbitt* was the Indian lands exception to the Quiet Title Act's waiver of sovereign immunity.  38 F.3d

10

1068, 1070 (9th Cir. 1994).  The court referenced the 1906 Act only to state that the occupants' preference rights vested when they filed their applications.  *Id.* at 1073.  *Aguilar v. United States* similarly involved allottee preference rights under the 1906 Act, not questions of any tribal nexus.  *See* 474 F. Supp. 840, 843–46 (D. Alaska 1979).  Further, the court compared the 1906 Act to rights "granted white settlers who occupied public lands on the American frontier" under the homesteading acts, thus undercutting the Tribe's desired reading.  *Id.* at 845; *see also id.* at 846 (preferences under the 1906 Act "are not based upon aboriginal title").

*Alaska Department of Public Works v. Agli* involved a motion to remand the case (again questioning an allottee's property interest) to state court and mentions the 1906 Act only when stating the source of the allottee's claimed interest.  *See* 472 F. Supp. 70, 71 (D. Alaska 1979).  *Masayesva v. Zah* did not involve the 1906 Act or land in Alaska.  792 F. Supp. 1160, 1162 (D. Ariz. 1992).  The court referenced the 1906 Act (via a citation to *Pence*) to support its conclusion that the allottee had a due process right.  792 F. Supp. at 1163–64.  The Tribe has not shown that the Department of the Interior erred in its reading of the 1906 Act.

### 3. *An Allotment's Status as Indian Country Does Not, Standing Alone, Equate to Tribal Territorial Jurisdiction.*

The Tribe's third point is to again argue that it automatically possesses territorial jurisdiction because the Ondola Allotment constitutes Indian

country.  *See* Pl.'s Resp. at 19–21.  The Tribe is still incorrect.  Unlike IGRA's

requirement for Class II gaming, tribal territorial jurisdiction is not a

prerequisite for an allotment to constitute Indian country.  *Compare* 25

U.S.C. § 2710(b)(1) *with* 18 U.S.C. § 1151(c) (defining "Indian country" to

include allotments "the titles to which have not been extinguished" without

regard to tribal territorial jurisdiction).  The Tribe's contention that tribes are

"presumed to exercise jurisdiction over Indian country" (Pl.'s Resp. at 18, 19)

loses sight of the fact that the Indian country in question must be land which

can be considered that tribe's territory.  *See Venetie*, 522 U.S. at 527 n.1

("Generally speaking, primary jurisdiction over land that is Indian country

rests with the Federal Government and the *Indian tribe inhabiting it* . . . ."

(citation omitted) (emphasis added)).[3]

The Tribe nonetheless posits, based upon two prior Indian lands

opinions, that it is entitled to a "presumption of tribal jurisdiction unless the

allotment is owned by non-members or is far from the tribal community."

Pl.'s Resp. at 19 (citing AR_2469, AR_2511).  There are several problems with

the Tribe's theory.

---

[3] The Tribe makes the same error later in its response brief, effectively
arguing that tribes always have territorial jurisdiction over their members'
allotments because the latter may be Indian country.  *See* Pl.'s Resp. at 28
(citing *John*, 982 P.2d at 748 n.45).  *John* does not stand for proposition the
Tribe attempts to draw.  *See* 982 P.2d at 748 (noting the central issue in the
case was "whether tribal courts have jurisdiction over non-[Indian Child
Welfare Act] child custody cases arising outside of Indian country[.]").

For one, the two prior opinions do not create the simple and all-encompassing test the Tribe desires.  The Tribe relies on one sentence in the Quinault opinion's legal background discussion: "Tribal jurisdiction may be lacking when the land in question is not owned or occupied by tribal members and is far removed from a tribal community."  AR_2511.  But the opinion was clearly structured to address the issues raised by the specific allotment in question.  *See generally* AR_2507–12.  For example, the opinion used the phrase "tribal community" in the sense of an existing tribal territorial land base.  *See* AR_2512 ("[T]he land is located twelve miles from the southern border of the Quinault Indian Reservation.").  Here, the Native Village Eklutna holds all its land in fee (AR_46) and, as the Department concluded, does not have a land base from which tribal territorial jurisdiction could extend.  *See* AR_57–58.

The National Indian Gaming Commission's Big Sandy opinion relied on the Quinault opinion to find tribal territorial jurisdiction over an allotment.  *See* AR_2469–70.  But there, too, the allotment was located near a then-existing tribal territorial land base.  AR_2467, AR_2470.[4]  Thus, the

---

[4] The Big Sandy opinion uses the word "Rancheria."  "Rancherias are numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization) for Indian use from time to time in the early years of [the twentieth] century—a program triggered by an inquiry (in 1905–06) into the landless, homeless or penurious state of many California Indians."  *Duncan v. United States*, 667 F.2d 36, 38 (Ct. Cl. 1981).

circumstances from which the Quinault and Big Sandy opinions arose only show that the Native Village of Eklutna fails its own test.  Because the Tribe has not shown any tribal land base from which territorial jurisdiction could have extended to the Allotment, the Tribe is not entitled to the supposed presumption.

In any event, a presumption would be just that: a presumption.  The Tribe nonetheless treats the supposed presumption-triggering factors (member ownership and proximity to tribal territorial land base) as if they constitute unrebuttable evidence of tribal territorial jurisdiction over an allotment.  *See, e.g.,* Pl.'s Mem. at 20 ("Because neither of the exceptions applies to the Ondola Allotment, the presumption is unrebutted, and tribal jurisdiction is undisturbed.").  The Tribe provides no support for its conclusion that those factors, standing alone, are dispositive as a matter of law.  The Tribe's reference to the Big Sandy opinion comes the closest.  Pl.'s Resp. at 4 ("[T]he tribe possesses jurisdiction 'unless the land in question is not owned or occupied by tribal members and is far removed from the tribal community[.]'" (quoting AR_2469)).  But the Big Sandy opinion was quoting (incompletely) the one sentence from the Quinault opinion we quote above, which occurred in the context of discussing a presumption and does not go as far as the Tribe desires.  *See* AR_2469; AR_2510–11.

When circumstances surrounding a given allotment raise questions about tribal membership or an existing territorial land base—and even when

14

the allotment unquestionably constitutes Indian country—Indian lands opinions have made in-depth analyses into tribal territorial jurisdiction.  *See* AR_2459–62 (Whitecloud opinion); AR_2529–35 (Cristiana opinion).  And courts have recognized that such an analysis "focuses principally on congressional intent and purpose . . . ."  *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001).

Thus, even if we assume the Tribe is correct and a presumption of territorial jurisdiction applies here, it would not mean the Department erred by nonetheless examining the question.  The Sansonetti Opinion—which is binding on the Department—concluded thirty years ago that a circumstance-specific inquiry was necessary in the case of the 1906 Alaska Native Allotment Act because, and "particularly in the absence of a tribal territorial land base (e.g., a reservation), there is little or no basis for an Alaska village claiming *territorial* jurisdiction over an Alaska Native allotment."  AR_2268.  Consistent with that conclusion, the Department considered what circumstances could demonstrate tribal jurisdiction over an Alaska Native allotment before exploring the circumstances surrounding the Ondola Allotment and ultimately concluding that the Tribe had not shown itself to have territorial jurisdiction.  AR_45–61.

The Tribe is similarly mistaken in continuing to argue that the Department has denied the Tribe the benefit of gaming under IGRA, thereby violating the privileges and immunities clause in 25 U.S.C. § 5123(f).  *See*

Pl.'s Resp. at 1, 20, 24–27.  The Department did not conclude that the Native Village of Eklutna is not eligible to game.  Nor did the Department conclude that the Tribe could never demonstrate territorial jurisdiction over an allotment held by one of its members.  Instead, and consistent with the Sansonetti Opinion, the Department assessed the facts and circumstances presented by the Tribe's application and concluded that the Tribe had not demonstrated the tribal territorial jurisdiction necessary to permit gaming on the Ondola Allotment.  AR_45–61.  The privileges and immunities clause did not rewrite IGRA to do away with the requirement that Class II gaming only occur on "Indian lands within such tribe's jurisdiction."  25 U.S.C. § 2710(b)(1).  And the Tribe has not identified a situation in which the Department reached an opposite conclusion based upon the same allotment statute and similar facts.

**B.    The Record Supports the Department's Conclusion that the Ondola Allotment Was Never Part of Any Reservation Held for the Benefit of the Native Village of Eklutna.**

In addition to the 1906 Act, the Department also looked at the circumstances surrounding the allotment site.  *See* AR_51–55; *see also* AR_2265–66 (Sansonetti Opinion explaining "tribal jurisdiction depends upon a particularized inquiry into the relevant statutes *and circumstances* surrounding the creation of the allotment." (emphasis added)).  Our opening brief explained how the record supports the Department's conclusion that the land constituting what is now the Ondola Allotment had never been set aside

16

or held by the United States for the benefit of the Native Village of Eklutna, and that, as a result, the Tribe did not have any reservation-based claim to territorial jurisdiction.  Fed. Defs.' Mem. at 28–34.

The Tribe responds by arguing that the Eklutna Industrial School Reserve was in fact "a federal reservation set aside for the benefit of Eklutna" and, even if it was not, that the land was part of the Tribe's historical territory.  Pl.'s Resp. at 21–24.

The Tribe's first point is contradicted by the document upon which the Tribe relies.  The Tribe cites to a 1967 memorandum from the Department of the Interior's Office of the Solicitor assessing whether lands within the School Reserve could be leased.  *See* Pl.'s Mem. at 22 (citing AR_2575, AR_2576, and AR_2580).  The language the Tribe quotes—"provide for the needs of the natives"—referred to a 1961 order that returned all but 1,819 acres of the Reserve to the public domain.  AR_2575.

But the 1961 order did *not* identify the Native Village of Eklutna as the beneficiary of those remaining 1,819 acres, instead retaining them "under the jurisdiction of the Bureau of Indian Affairs for use in connection with administration of native affairs in the vicinity of Eklutna."  AR_2575; *see* AR_2565 (Public Land Order 2427, corrected as stated in AR_2566).  "It is thus apparent that the 1961 Eklutna order does not establish or provide for the establishment of a reservation . . . ."  AR_2576.  The 1967 memorandum stated this general conclusion several times.  *See* AR_2572 (the order

17

establishing the School Reserve "could not have established a true Indian reservation"); AR_2573–74 ("Elklutna can not be considered a Secretarial reservation[.]").

Further, it was only those 1,819 acres that were retained "in order to provide for the needs of the natives." AR_2575; *see also* AR_2576 ("[T]he purpose *of the 1961 withdrawal* was to benefit the Eklutna natives." (emphasis added)). The 1,819 acres did not include the land that now constitutes the Ondola Allotment, which was removed from the School Reserve in 1942. *See* AR_51–52. The Tribe has not disputed that the 1927 order creating the Reserve and the 1936 order that briefly expanded the Reserve to cover an area that included what is now the Ondola Allotment did not set aside the land for the benefit of any Alaska tribe, much less the Native Village of Eklutna. AR_2556 (Exec. Order 4778); AR_2557 (Exec. Order 6734, revising the reserve to exclude a homestead entry); AR_2276–78 (Oct. 30, 1936 Secretarial Order). Indeed, as we noted in our opening brief, none of the Reserve-related orders could have created an Indian reservation given their date. *See* Fed. Defs.' Mem. at 30 (citing 43 U.S.C. § 150). Further, though the Secretary once contemplated permanently setting aside the lands within the Reserve as an Indian reservation for the students and native residents of the area pursuant to the Act of May 1, 1936, 49 Stat. 1250, the Department never did so. AR_51–52. The Department did not act

arbitrarily in concluding that the Native Village of Eklutna has never had a reservation.

As to the Tribe's point about historical territory, the Tribe provides no authority for the proposition that a tribe gains territorial jurisdiction over an allotment for purposes of IGRA simply because the tribe historically used the area. The Tribe again sites to the Quinault and Big Sandy opinions. *See* Pl.'s Mem. at 23 (citing AR_2511 and AR_2469). But neither opinion rests territorial jurisdiction solely on a conclusion that the allotment is within the tribe's historical territory. *See* AR_2512; AR_2469–70. And, even if they had focused on historical territory, both involved allotments that (unlike the Ondola Allotment) were near a then-existing tribal land base from which territorial jurisdiction could extend. *See supra* at 13–14.

Finally, as we explained in our opening brief, any claim to territorial jurisdiction based upon aboriginal title necessarily fails given that the 1971 Alaska Native Claims Settlement Act retroactively extinguished that title. *See* Fed. Defs.' Mem. at 33 (citing 43 U.S.C. § 1603(a)). The Tribe posits that the 1971 Settlement Act would not have altered tribal territorial jurisdiction. Pl.'s Mem. at 24. But this again begs the question of where that tribal territorial jurisdiction arose in the first place. The Department did not act arbitrarily or contrary to law in concluding that the Eklutna Industrial School Reserve did not create tribal territorial jurisdiction over what is now the Ondola Allotment.

19

**C.    The Department Did Not Act Arbitrarily in Concluding the Tribe Had Not Shown Any Other Tribal Nexus That Would Justify a Finding of Territorial Jurisdiction.**

The Department also assessed whether there was any other clear "tribal nexus" to the Ondola Allotment that would have created tribal territorial jurisdiction.  *See* AR_49, 55–60; AR_2265–66 (Sansonetti Opinion noting tribal territorial jurisdiction could be particular to a given allotment). Our opening brief explained how the administrative record and governing law supported the Department's conclusions that: (1) many of the Tribe's submissions related to tribal jurisdiction over its membership rather than over land; (2) there is not (and never was) an Indian reservation for the Native Village of Eklutna's use and benefit on or near the Ondola Allotment; (3) the State and local governments do not recognize tribal territorial jurisdiction over the site; and (4) the Tribe's unilateral assertions of territorial jurisdiction are insufficient to establish territorial jurisdiction where it does not already exists.  *See* Fed. Defs.' Mem. at 35–42.

The Tribe makes three retorts.  <u>First</u>, the Tribe suggests that the "contrast between tribes' jurisdiction over their members and territorial jurisdiction over tribal lands . . . is not supported by the caselaw."  Pl.'s Resp. at 28.  But the only case law the Tribe offers is that which states the legal truism that tribes have jurisdiction over their members and their territory. *See* Pl.'s Resp. at 28–29.  This, of course, ignores the question at issue.  *See supra* at 2–3.

20

Further, the Department did not conclude (and we have not argued) "that Alaska tribes *only* have jurisdiction over their members." Pl.'s Resp. at 28 (citing Fed. Defs.' Mem. at 37–38). Instead, the point is that a tribe's "exercise of its sovereignty over, and with respect to, its membership does not necessarily equate to tribal territorial jurisdiction over the land those members may own." Fed. Defs.' Mem. at 38. The Tribe's failure to engage on that point tacitly concedes it. The Tribe also does not dispute that tribes cannot unilaterally establish territorial jurisdiction, instead citing its attempts to exercise jurisdiction over the Allotment as if they establish territorial jurisdiction. *See* Pl.'s Mem. at 29–30. We addressed those points (and the Department's consideration of them) in our opening brief. *See* Fed. Defs.' Mem. at 39–40.[5]

The Tribe is also incorrect that the Department erred because "the test the Department devised" considered the provision of police services. Pl.'s Resp. at 30. As we have explained, the Department identified the "nexus" factors primarily from the Quinault opinion's assessment of the Quinault Tribe's ability to exercise of government authority. *See* Fed. Defs.' at 35 n.16 (quoting AR_56). The factors are not, as the Tribe implies, individually

---

[5] The Tribe also misstates our argument with respect to the Whitecloud opinion. *See* Pl.'s Resp. at 29 n.13 (citing Fed. Defs.' Mem. at 37). The Department of the Interior did not conclude (and we have not argued) that the allottee's tribal membership is irrelevant to the question of tribal territorial jurisdiction.

dispositive regulatory criteria.  They are considerations the Department
identified from past practice to assist it in determining whether the Tribe had
shown a clear "tribal nexus"—a term the Sansonetti Opinion used but did not
define.  AR_55–56.

Second, the Tribe contends the Department "is misplaced" in
concluding "that the Ondola Allotment is not near an existing Indian
reservation."  Pl.'s Resp.  But the Tribe does not challenge the Department's
conclusion that the Tribe owns its current lands in fee.  *See* AR_46.  Nor does
the Tribe disclose where this "existing Indian reservation" is located.
Instead, the Tribe cites back to its reliance on the 1967 Office of the Solicitor
memorandum and its efforts to analogize the Ondola Allotment with those at
issue in the Quinault and Big Sandy opinions.  *See* Pl.'s Resp. at 30 (citing to
*id.* at 21–23).  We have addressed those arguments above.  *See supra* at 13–
15, 17–19.  Further, the Department made clear that, despite its use of the
Quinault opinion's factors to aid in assessing a tribal nexus, the important
question was whether there was any existing source of tribal territorial
jurisdiction which could extend to the Ondola Allotment.  *See* AR_57–58.

Third, the Tribe claims the fact that State and local authorities do not
recognize the Tribe's territorial jurisdiction over the Allotment is not
dispositive.  Pl.'s Resp. at 30.  But the Department of the Interior did not
conclude it to be dispositive.  The factor was only one of several the
Department considered in assessing whether a "tribal nexus" existed at the

22

Allotment.  *See* AR_55–60.  The Tribe has not disputed the Department's
conclusion that State and local authorities do not recognize the Tribe's
jurisdiction over the allotment.  The administrative record supports that
conclusion and the others the Department reached.

## III. Summary Judgment Should Be Granted In Favor of Federal Defendants on Count II Because the Tribe Has Not Attempted to Meet Its Burden.

As we noted in our opening brief, the Tribe did not move for summary
judgment on Count II (which alleges undue political influence) and is
therefore not entitled to summary judgment on that claim.  *See* Fed. Defs.'
Mem. at 12 n.5 (citing *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C.
2014)).  The Tribe asserts that it "chose[ ] not to move summary judgment at
this stage, in light of the factual issues that remain following the Court's
denial of extra-record discovery on this claim."  Pl.'s Resp. 31.  But the Tribe
misunderstands the nature of judicial review under the APA.

For one, there are no remaining factual issues.  The court's review
under the APA is limited to the agency's administrative record.  *Dep't of
Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).  Under the APA, the
district court does not conduct *de novo* fact-finding; instead "the district court
sits as an appellate tribunal . . . ."  *Pritzker*, 24 F. Supp. 3d at 72.  There are
circumstances in which the district courts may consider evidence beyond the
administrative record.  *See Cape Hatteras Access Pres. All. v. U.S. Dep't of
Interior*, 667 F. Supp. 2d 111, 114–16 (D.D.C. 2009).  But the Court has

already found that extra-record evidence is not appropriate here.  Order, ECF
No. 47.

Further, unlike in *de novo* litigation, summary judgment in APA cases
is not a pre-trial means for resolving certain issues or claims that would
otherwise go to trial.  Instead, summary judgment briefing "serves as the
mechanism for deciding, as a matter of law, whether the agency action is
supported by the administrative record and otherwise consistent with the
APA standard of review."  *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106
(D.D.C. 2011) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir.
1977)).  The Tribe's contention that it chose not to move for summary
judgment on Count II "at this stage" (Pl.'s Resp. at 31) incorrectly assumes
that there is a further stage.  There is not.

The plaintiff holds the burden under the APA to demonstrate that an
agency acted arbitrarily and capriciously or contrary to law.  *Lomak
Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000).  "Thus, a
plaintiff's failure to raise arguments or theories in its motion for summary
judgment results in waiver of those arguments."  *Pritzker*, 24 F. Supp. 3d at
72 (citing *EMILY's List v. FEC*, 569 F. Supp. 2d 18, 25 n.6 (D.D.C. 2008),
*rev'd on other grounds*, 581 F.3d 1 (D.C. Cir. 2009); *New York v. U.S. EPA*,
413 F.3d 3, 20 (D.C. Cir. 2005) (per curiam)).  Here, the Court's scheduling
order set a date by which the Tribe had to move for summary judgment.  *See*
Sept. 8, 2020, Minute Order.  The Tribe's decision not to move for summary

24

judgment on, or present any arguments regarding, Count II means that the Tribe has waived the claim or, at a minimum, failed to meet its burden. Summary judgment on Count II should therefore be granted in favor of Federal Defendants.

## CONCLUSION

The Department of the Interior did not act arbitrarily or contrary to law in determining that the Native Village of Eklutna had not demonstrated tribal territorial jurisdiction over the Ondola Allotment and that, as a result, the Allotment did not constitute "Indian lands" under the Indian Gaming Regulatory Act.  The 1906 Alaska Native Allotment Act did not create tribal territorial jurisdiction where none otherwise existed.  The record supports the Department's conclusion that the Eklutna Industrial School Reserve was not created for the Tribe's use and benefit, and that the Tribe had not shown any other historical tribal nexus to the site that would substantiate a conclusion of tribal territorial jurisdiction.  The Tribe has waived Count II, in which it alleged that the Department's decision resulted from undue political influence.  Summary judgment should be granted in favor of Federal Defendants on all claims.

April 9, 2021

JEAN E. WILLIAMS
Acting Assistant Attorney General

25

_s/ Kristofor R. Swanson_____

KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
Senior Attorney
Natural Resources Section
Envt. & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0248
Fax: (202) 305-0506
kristofor.swanson@usdoj.gov

*Attorneys for Federal Defendants*

26