Lael A. Harrison
Assistant Attorney General
Alaska Bar No. 0811093
Alaska Department of Law
PO Box 110300
Juneau, AK 99811-0300
Telephone: 907.465.3600
Facsimile: 907.465.3019
Email: lael.harrison@alaska.gov

Laura Wolff
Assistant Attorney General
Alaska Bar No. 1411108
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: 907.269.5275
Facsimile: 907.276.3697
Email: laura.wolff@alaska.gov

*Attorneys for State of Alaska*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIVE VILLAGE OF EKLUTNA )<br><br>Plaintiff, )<br><br>v. )<br><br>U.S. DEPARTMENT OF THE )<br>INTERIOR, et. al, )<br><br>Defendants, )<br><br>and )<br><br>STATE OF ALASKA, )<br><br>Defendant-Intervenor. ) | Case No. 1:19-cv-02388-DLF<br><br>**INTERVENOR STATE OF ALASKA'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

## I.     INTRODUCTION

The State's argument flows logically: IGRA gaming can take place only on "Indian lands."[1] A tribe must have jurisdiction over a property in order for it to be "Indian lands."[2] IGRA itself does not define tribal jurisdiction, which is a question of congressional intent.[3] The relevant congressional actions here are the Alaska Native Allotment Act and ANCSA, and they demonstrate congressional intent that Alaska Native tribes not have jurisdiction over Alaska Native allotments.

Because Eklutna is unable to identify statutory language or legislative history suggesting that Congress affirmatively intended for Alaska tribes to exercise territorial jurisdiction over Alaska Native allotments, Eklutna argues that the question should be whether Congress intended for these Acts to *abrogate* tribal territorial jurisdiction over Alaska Native allotments. This argument is not legally supported, but would fail Eklutna in any case because Eklutna cannot establish that it had territorial jurisdiction over the allotment area *prior to* these Acts. Eklutna never had territorial jurisdiction over the Eklutna Reserve, which was dedicated to the then-Bureau of Education,[4] and any claim to

---

[1]     25 U.S.C. § 2703(4).

[2]     25 U.S.C. § 2710(b)(1).

[3]     *See, e.g., Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001); *Rhode Island. v. Narragansett Indian Tribe*, 19 F.3d 685, 695 (1st Cir. 1994); *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah),* 853 F.3d 618 (1st Cir. 2017).

[4]     AR 2556.

territorial jurisdiction arising from Eklutna's historical use and occupancy of the property

was unequivocally extinguished by ANCSA.[5]

This Court should affirm Interior's decision that the Ondola allotment is not

"Indian Lands" for IGRA gaming purposes because Eklutna lacks jurisdiction over it.

## II.   STANDARD OF REVIEW

Eklutna claims that there is a conflict in this case between *Chevron* deference to

the Department's interpretation of statutes it is charged with implementing and the canon

of construction that statutes be construed liberally in favor of Indian interests.[6] But these

principles apply only to ambiguities, and Eklutna does not identify any statutory

provisions it considers ambiguous to which either principle could apply.[7]

In any event, even if this Court were to find some provision of ANCSA

ambiguous, the cannon of construction in favor of Indian interests does not apply to that

---

[5]      43 U.S.C. § 1603.

[6]      Plaintiff's Combined Opposition to Federal Defendants' and State of Alaska's
Cross-Motions for Summary Judgment and Reply in Support of Motion for Partial
Summary Judgment (Dkt. 61, March 19, 2021) ("Eklutna Reply") at 2-3.

[7]      *Cobell v. Kempthorne*, 455 F.3d 301, 304 (D.C. Cir. 2006) ("ordinarily we defer to
an agency's interpretations of *ambiguous* statutes entrusted to it for administration," and
"statutes are to be construed liberally in favor of the Indians, with *ambiguous* provisions
interpreted to their benefit") (emphasis added) (internal quotations omitted).

statute.[8] Eklutna distinguishes *Leisnoi, Inc. v. Stratman*,[9] the case the State cited for this point in its cross-motion for summary judgment, arguing that the canon did not apply in that case only because it involved the conflicting rights of two tribes.[10] But the Ninth Circuit's articulation that the canon does not apply to ANCSA pre-dates *Leisnoi, Inc. v. Stratman* and has been applied in broader contexts.[11] The rationale is that, unlike so many prior Indian treaties and laws, Alaska Natives had equal bargaining power in the negotiation of ANCSA:

> The rule of construction of ambiguous statutes in favor of Indians is based on a concern that the powerful not take advantage of the helpless and uneducated. A similar concern guides modern law on the construction of contracts of adhesion. Where, as here, the Inupiats were represented before Congress [in the negotiation of ANCSA] by such illustrious counsel as former Supreme Court Justice Arthur Goldberg and former Attorney General Ramsey Clark, we think the rule of construction operates with less force.[12]

---

[8]   The 1988 amendments to ANCSA cited by Eklutna are irrelevant to this question. Eklutna Reply at 3. The language cited by Eklutna addresses Congress's constitutional authority for the enactment: "the Alaska Native Claims Settlement Act and this Act are Indian legislation enacted by Congress pursuant to its plenary authority under the Constitution of the United States to regulate Indian affairs." Pub. L. No. 100-241, § 2(9), 101 Stat. 1788 (1988). Despite decades of legal disputes over the interpretation of ANCSA, it does not appear that any party has ever argued, nor has any court ever held, that this language should be interpreted in the way that Eklutna suggests.

[9]   *Leisnoi, Inc. v. Stratman*, 154 F.3d 1062, 1066 n.7 (9th Cir. 1998).

[10]   Eklutna Reply at 3.

[11]   *See, e.g., Seldovia Native Ass'n, Inc. v. Lujan,* 904 F.2d 1335, 1342 (9th Cir. 1990) (rejecting application of canon of construction in favor of Indians to ANCSA); *Haynes v. United States,* 891 F.2d 235, 239 (9th Cir. 1989) ("As this court has stated, "[t]he principal responsibility for administering the [ANCSA] lies with the Secretary and his interpretation of the statutes are entitled to 'great' weight upon judicial review") (quoting *Doyon, Ltd. v. Bristol Bay Native Corp.,* 569 F.2d 491, 496 (9th Cir. 1978)).

[12]   *U.S. v. Atlantic Richfield Co.*, 612 F.2d 1132, 1139 (9th Cir. 1980) (rejecting application of canon to limit effect of ANCSA's broad extinguishment of claims).

And, although Eklutna argues that the canon should apply to the Alaska Native Allotment Act, Eklutna does not point to any language in the Act that it deems ambiguous.[13] Eklutna simply argues that Alaska Native allotments should be treated the same as General Allotment Act allotments, not that there is anything ambiguous about the language of the Alaska Native Allotment Act.[14] Nor does Eklutna suggest that there is any ambiguity in IGRA's requirement that a tribe have jurisdiction over "Indian lands."[15]

Ultimately, because Eklutna does not point to any ambiguous statutory provisions at issue, the question of conflict between the two principles of statutory construction appears purely academic in this case.

## III.   ARGUMENT

### A.   Tribal jurisdiction over an allotment is a question of pure congressional intent; no presumptions attach.

The test for tribal jurisdiction over an allotment is congressional intent; no "presumptions" apply to weight the analysis one way or another.[16] Eklutna argues that

---

[13]   Eklutna Reply at 10.

[14]   *Id.* Interior's brief rebuts this argument. Federal Defendants' Reply Brief in Support of Summary Judgment (Dkt. 64, April 9, 2021) ("Interior Reply") at 6-11.

[15]   *See* 25 U.S.C. § 2703(4); 25 U.SC. § 2710(b)(1) ("An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction"). Even had it identified some ambiguous provision, Eklutna appears to acknowledge that *Chevron* deference would apply at least with "muted effect" to interpretation of IGRA. Eklutna Reply at 3 (quoting *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009)).

[16]   *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) ("A proper analysis of whether the tract is 'Indian lands' under IGRA begins with the threshold question of the Tribe's jurisdiction. That inquiry, in turn, focuses principally on congressional intent and purpose.")

tribes are "presumed" to have territorial jurisdiction over allotments owned by their

membership, but that argument is not legally supported.[17] Eklutna cites a number of cases

for the very general principle that only Congress can abrogate inherent tribal powers

through treaty, legislation, or implication.[18] But none of these cases address tribal

jurisdiction over allotments or suggest that a "presumption" of tribal jurisdiction exists

even with regard to "Indian country." [19] Although some cases, such as *Venetie*, state that

"generally speaking" tribal jurisdiction coincides with "Indian country," that language

simply recognizes that Congress often intended that result, although not in all cases.[20] It

does not create a "presumption" one way or another.

Other cases cited by Eklutna in support of this supposed presumption actually

undertake an unweighted statutory analysis to determine Congressional intent with regard

to tribal jurisdiction, and do not address tribal jurisdiction over allotments or "Indian

---

[17]     Eklutna Reply at, e.g., 1, 5, 11.

[18]     Eklutna Reply at 4-5.

[19]     *See, e.g., United States v. Wheeler*, 435 U.S. 313 (1978) (holding, without addressing tribal territorial jurisdiction over allotments or "Indian country," and without using the word "presumption," that tribe had not lost its inherent power to criminally prosecute its members through treaty, statute or by implication); *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339 (1941) (holding, without addressing tribal territorial jurisdiction over allotments or "Indian country," and without using the word "presumption," that extinguishment of aboriginal title cannot be lightly implied); *United States v. Eberhardt*, 789 F.2d 1354 (9th Cir. 1986) (holding, without addressing tribal territorial jurisdiction over allotments or "Indian country," and without using the word "presumption," that federal jurisdiction existed under the Lacey Act to prosecute Indian defendants for fishing violations on Indian reservation).

[20]     *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998).

country." For example, in *Rhode Island v. Narragansett Indian Tribe*,[21] and

*Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah")*,[22] the First Circuit

undertook traditional statutory interpretation analyses of congressional settlement acts to

determine whether tribes had jurisdiction over their settlement lands. Neither case

addressed "Indian country," and allotments were not at issue. The only "presumption" the

court refers to in either of those cases is "the strong presumption that Congress expresses

its intent through the language it chooses."[23]

Interior's Indian Lands advisory opinions do not change this analysis. Eklutna

misreads the State's argument with regards to the advisory nature of these opinions.[24]

The State does not argue that Interior has no obligation to treat like cases alike.[25] Rather,

the State's point is that Interior cannot create a new rule of law through these advisory

opinions.[26] If Congress and the courts have not created a presumption of tribal

jurisdiction over allotments, Interior cannot create such a presumption through its

advisory Indian Lands opinions.[27]

---

[21]    19 F.3d 685 (1st Cir. 1994).

[22]    853 F.3d 618 (1st Cir. 2017).

[23]    *Rhode Island*, 19 F.3d at 698.

[24]    Eklutna Reply at 20.

[25]    In fact, Interior has treated like cases alike, consistently denying prior Indian Lands requests for Alaska Native allotments and townsites based on the Sansonetti Opinion. *See* AR 626-27, 629-42, 721-22.

[26]    *Butte County, California. v. Hogen*, 613 F.3d 190, 195 n.3 (D.C. Cir. 2010).

[27]    Interior explains why those Indian Lands opinions do not contain a presumption in any case at pages 12-15 of its Reply.

In conclusion, no presumption exists that tribes exercise jurisdiction over allotments owned by their members, regardless of whether these lands might constitute "Indian country,"[28] and this Court must analyze Congress's intent with regards to this particular property according to its relevant actions.[29]

### B. Congress did not intend for Eklutna to have territorial jurisdiction over the Ondola allotment.

There are essentially four sources to which Eklutna looks in an effort to establish territorial jurisdiction over this allotment: the documents related to the Eklutna Reserve, the Alaska Native Allotment Act, ANCSA, and its own historical use and occupancy of the area. But none of these sources provide grounds for tribal jurisdiction. The Reserve set aside land for the use and benefit of the then-Department of Education,[30] and, in any case, at that time Congress had prohibited creation of Indian reservations by executive

---

[28]     The question of *federal* jurisdiction over Alaska Native allotments under 18 U.S.C. § 1151 is not presented in this case, and that question remains open for litigation in another case that might present it. Eklutna wrongly asserts that the State does not dispute that the Ondola allotment is "Indian country" for purposes of federal jurisdiction. Eklutna Reply at 18. There are strong arguments why an Alaska Native allotment would not be subject to federal jurisdiction under 18 U.S.C. § 1151, and the State has expressly reserved the right to litigate that question in any future case that presents it. *See* Memorandum in Support of Intervenor State of Alaska's Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Dkt. 59-1, January 22, 2021) at 30, n.127. *See Jones v. State,* 936 P.2d 1263, 1266 (Alaska 1997) (describing the argument that Alaska Native allotments are "Indian country" as "problematic" and explaining: "because the definition of 'Indian country' in 18 U.S.C. § 1151 specifically refers to Indian allotments but omits any mention of Alaska Native allotments, it is far from clear whether Congress meant for Alaska Native allotments to be considered 'Indian country'").

[29]     And, as demonstrated by Interior, even if such a presumption were to apply, it would be rebutted in this instance. *See* Interior Reply at 15.

[30]     *See* AR 2556.

action.[31] Neither the Alaska Native Allotment Act nor ANCSA intended for Alaska tribes to have territorial jurisdiction over small, scattered parcels of 160 acres or less, located solely based on where an individual had a homestead, in the absence of reservations or tribal jurisdiction over settlement lands.[32] And, after ANCSA's broad extinguishment of claims, Eklutna cannot rely on historical use and occupancy as a basis for territorial jurisdiction.[33]

Interior correctly explains why the executive acts creating the Eklutna Reserve did not create or recognize tribal jurisdiction over the Ondola allotment area.[34] The executive order creating the Reserve declared that the land was "reserved for use of the United States Bureau of Education for educational purposes," and made no reference to any tribe or individual Alaska Natives.[35] Further, a leading treatise on Alaska Native legal issues,

---

[31]    See 43 U.S.C. § 150 (1919).

[32]    As the Sansonetti Opinion concluded both with regards to the Alaska Native Allotment Act and ANCSA, "in the absence of a tribal territorial base (e. g., a reservation), there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment." AR 2266-67, 2268.

[33]    43 U.S.C. § 1603.

[34]    Interior Reply at 17-18.

[35]    AR 2556. See also AR 2557 (describing executive order creating Eklutna Reserve as "reserving certain lands…for use of the United States Bureau of Education for educational purposes"). This is in contrast to language found to create reservations in other cases, such as United States v. Sohappy, 770 F.2d 816 (9th Cir. 1985), cited by Eklutna in its Reply Brief at 5, 23. One tract of land at issue in that case was "purchased by the United States government 'in trust for the use of the Yakima Indian tribes, the Confederated Tribes of the Warm Springs Reservation, and other Columbia River Indians affiliated with the aforementioned tribes.'" Id. at 822 (internal alterations omitted). Another tract was "transferred…to the Secretary of Interior 'for the use and benefit of certain Indians now using and occupying the land as a fishing camp site.'" Id. at 822-23.

which is generally considered friendly to tribal interests, specifically discusses the Eklutna Reserve and clearly distinguishes it from an Indian reservation: "these reserves could not in any sense be characterized as Indian reservations."[36] Finally, the State would highlight the importance of 43 U.S.C. § 150, passed in 1919, which prohibited the executive branch from creating Indian reservations without express Congressional approval.[37] Therefore, the Eklutna Reserve could not have the legal status of an Indian reservation regardless of the language of the executive order.

The next source to which Eklutna looks is the Alaska Native Allotment Act, but Eklutna does not point to any language in that Act or its legislative history suggesting that Congress intended for Alaska tribes to have jurisdiction over Alaska Native allotments. Eklutna simply argues that the Alaska Native Allotment Act should be interpreted in the same manner as the General Allotment Act with regards to tribal jurisdiction.[38] Interior demonstrates why this argument fails at a textual level,[39] but the State would additionally point to the overarching purposes of each Act. In the General

---

The Court held that these tracts were "reservation land" for purposes of Lacey Act jurisdiction. *Id.* at 823.

[36]    *See Case, A. & Voluck, D., Alaska Natives and American Laws* 98 (University of Alaska Press, 3d. Ed. 2012); *see also id.* at 96-97 (listing executive act reserves, including Eklutna, and explaining: "the reserves created under this authority simply were not 'Indian reserves' in the legal sense of the term").

[37]    43 U.S.C. § 150 ("No public lands of the United States shall be withdrawn by Executive Order, proclamation, or otherwise, for or as an Indian reservation except by act of Congress").

[38]    Eklutna Reply at 7-8.

[39]    Interior Reply at 6-11.

Allotment Act, Congress's intent was to break apart Indian reservations and to "assimilate" Native Americans from semi-nomadic traditions into agrarian ones.[40] However, at the time of the Alaska Native Allotment Act, there were essentially no reservations in Alaska,[41] and the intent of the Alaska Act was to protect Alaska Native homesteads from encroachment by White settlers.[42] Thus, considering the broad purposes of the two Acts, Eklutna's argument that they must be interpreted identically for all purposes does not make sense.[43]

Further, Eklutna's arguments that the Alaska Native Allotment Act did not abrogate preexisting tribal jurisdiction are irrelevant because, as shown above, Eklutna did not have jurisdiction over this land at the time of allotment. Eklutna never had jurisdiction over the Eklutna Reserve, and this property had been excluded from the Reserve at the time of allotment in any case.[44]

---

[40]    *Hagen v. Utah*, 510 U.S. 399, 425 (1994).

[41]    Only one reservation existed in Alaska in 1906. *See* 26 Stat 1101 (1891) (act creating Annette Islands Indian Reservation at Metlakatla).

[42]    *See Pence v. Kleppe*, 529 F.2d 135, 141 (9th Cir. 1976).

[43]    The cases that Eklutna cites for the proposition that the Acts should be interpreted similarly have nothing to do with tribal jurisdiction. None discuss tribal jurisdiction or tribes in relation to these allotments in any context. *See e.g. Pence*, 529 F.2d at 135 (addressing due process rights of individual allotment applicants); *Aguilar v. United States*, 474 F. Supp. 840 (D. Alaska 1979) (same); *Alaska v. Babbitt*, 38 F.3d 1068 (9th Cir. 1994) (holding federal court lacked jurisdiction to hear action to quiet title in State interests over Alaska Native allotment lands, without addressing General Allotment Act); *Alaska, Dep't of Pub. Works v. Agli*, 472 F. Supp. 70 (D. Alaska 1979) (same). In fact, Eklutna cites no case that directly supports its position.

[44]    AR 2557.

Finally, Eklutna fails to engage with the Sansonetti Opinion's conclusion that it does not make sense that Congress would have intended for Alaska tribes to have jurisdiction *only* over Alaska Native allotments in the absence of reservations. Alaska Native allotments have a maximum size of 160 acres, and can be located anywhere in the state based solely on where individuals had homesteads.[45] Alaska essentially lacked reservations at the time of the Alaska Native Allotment Act,[46] and Congress did not draw any connections between allotments and tribes.[47] Without a meaningfully-sized territorial base from which a tribe could extend its jurisdictional reach to an allotment, it does not make sense that Congress would have intended for a tribe to exercise jurisdiction over allotments and *only* allotments. As the Sansonetti opinion concluded: "particularly in the absence of a tribal territorial base (e.g. a reservation) there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment."[48] This is the only sensible interpretation.

The Sansonetti Opinion reached a similar conclusion in regards to ANCSA. The Opinion first analyzed tribal territorial jurisdiction over settlement lands and concluded— as the United States Supreme Court later did[49]—that they were not subject to tribal

---

[45]     Act of May 17, 1906, Ch. 2469, 34 Stat. 197.

[46]     Only one reservation existed in Alaska in 1906, see note 41, above.

[47]     *See* Act of May 17, 1906, Ch. 2469, 34 Stat. 197.

[48]     AR 2266-67 (emphasis in original).

[49]     *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520 (1998).

jurisdiction.[50] The Opinion went on to conclude that Congress could not have intended for tribes to exercise territorial jurisdiction *only* over small, scattered allotments, in the absence of a meaningfully-sized territorial land base to which allotments could relate.[51]

Thus, although *Venetie* did not address tribal jurisdiction over Alaska Native allotments (a question that was not before the Court),[52] it confirmed one of the major premises of the Sansonetti Opinion's conclusion: that ANCSA settlement lands are not "dependent Indian communities" subject to tribal jurisdiction.[53] The Sansonetti Opinion took that conclusion a step farther, determining that, in the absence of a large territorial jurisdictional base, a tribe could not exercise jurisdiction over an Alaska Native allotment alone.[54] When considering whether tribally-owned townsite lots could constitute "dependent Indian communities" over which a tribe could exercise jurisdiction, the Opinion further explained this reasoning:

> If the area is not a dependent Indian community, we are not convinced that a … tribe could assert jurisdiction over individually owned restricted townsite lots [or allotments]. Even if the lots are Indian country for federal jurisdictional purposes, the village would lack a distinctly tribal territorial

---

[50]   AR 2257-61.

[51]   AR 2268.

[52]   Contrary to Eklutna's assertion, *Venetie* deliberately left the allotment question open. *Venetie* expressly notes that "no allotments are at issue." *Venetie*, 522 U.S. at 527. And in a footnote, the Supreme Court explained, "As noted, only one Indian reservation, the Annette Island Reserve, survived ANCSA. Other Indian country exists in Alaska post-ANCSA *only if* the land in question meets the requirements of a 'dependent Indian community'" under our interpretation of § 1151(b), or if it constitutes 'allotments' under § 1151(c)." *Id.* at 529 n. 2 (emphasis added).

[53]   *Venetie*, 522 U.S. at 534.

[54]   AR 2266-68.

base related to the lots, from which to assert extended jurisdiction over discreet individual Native-owned parcels.[55]

This is the way in which *Venetie* confirmed the Sansonetti Opinion's conclusion regarding allotments. The Sansonetti Opinion first reached the conclusion later confirmed by *Venetie*, that Alaska tribes lack jurisdiction over ANCSA settlement lands. The Opinion extrapolated from that conclusion to determine that Congress cannot have intended for tribes to exercise jurisdiction *only* over allotments, in the absence of a meaningfully-sized, centrally-located territorial jurisdictional base.

Eklutna does not engage with this aspect of the Sansonetti Opinion, and merely argues that ANCSA had no impact on tribal "sovereignty."[56] To be clear, neither the State nor Interior is arguing that ANCSA extinguished tribal sovereignty. In fact, the Sansonetti Opinion concluded, and courts have since affirmed, that Alaska tribes continue to be sovereigns with governmental authority over their members, although lacking territorial reach.[57] The question is not whether ANCSA abrogated tribal sovereignty, but how ANCSA affected the territorial aspect of that sovereignty. After *Venetie,* it is plainly legally inaccurate to say that ANCSA had no effect on tribal territorial jurisdiction.[58] The United States Supreme Court held in *Venetie* that a tribe

---

[55]     AR 2269, n.307.

[56]     Eklutna Reply at 11-12.

[57]     *See, e.g., John v. Baker,* 982 P.2d 738, 749 (Alaska 1999) (holding that, post-ANCSA, Alaska's tribes retain non-territorial sovereignty and discussing inclusion of Alaska Native tribes on Interior's list of federally-recognized Indian tribes as "based on" the Sansonetti Opinion).

[58]     *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520 (1998).

lacked jurisdiction over its former reservation that was converted into ANCSA settlement lands and then transferred to the tribe in fee.[59] If ANCSA had no effect on tribal territorial jurisdiction, the Native Village of Venetie would have retained jurisdiction over its reservation territory despite ANCSA's conversion of the property to settlement lands. But, regardless, any argument that ANCSA did not alter preexisting jurisdiction is irrelevant because Eklutna lacked territorial jurisdiction over this allotment prior to ANCSA in any case.

Eklutna's failure to engage with this aspect of the Sansonetti Opinion also undercuts its position that existence of a nearby reservation is irrelevant to tribal jurisdiction over an allotment.[60] In fact, one aspect of the Sansonetti Opinion's legal analysis turns on the fact that Congress did not intend for Alaska tribes to have large jurisdictional land bases, like reservations, from which territorial jurisdiction could extend to encompass Alaska Native allotments. In the words of the Opinion:

> "In effect, by abolishing previously-existing reservations and avoiding federal trusteeship over Native lands, Congress largely removed a territorial base over which entities in Alaska qualifying as tribes could assert jurisdiction. Furthermore … in the limited cases in which Indian country may still exist in Alaska for purposes of federal jurisdiction and protection, we are not convinced that Congress has in practical and legal effect left room for the exercise of tribal jurisdiction over land."[61]

---

[59]    *Id.* at 523.

[60]    *See, e.g.,* Eklutna Reply at 21.

[61]    AR 2269.

Thus, Eklutna's lack of a central, jurisdictional land base is relevant to statutory interpretation, not just a fact that distinguishes the Ondola allotment from allotments near reservations in the Lower 48.[62]

Finally, unable to establish jurisdiction through the Eklutna Reserve, the Alaska Native Allotment Act, or ANCSA, Eklutna attempts to rely on its historical use and occupancy of the property as a source of tribal jurisdiction.[63] But ANCSA definitively extinguished any such argument.[64] Eklutna inappropriately attempts to cabin the sweeping effects of ANCSA's extinguishment of claims, which were worded in the broadest possible language.[65] After ANCSA, historical use and occupancy simply cannot be the source of a tribal land-related claim. Thus, when other potential sources of jurisdiction fail it, Eklutna cannot fall back on its historical use and occupation of the area in support of jurisdiction.

---

[62]  Eklutna cites the case of *Nisqually Indian Tribe v. Gregoire*, 649 F. Supp.2d 1203 (2009) to support its proposition that a reservationless tribe may exercise jurisdiction over an allotment, but that case does not support that proposition. In that case, two tribes were competing for tax revenue from tobacco sales on a group of allotments Congress had designated as a "self-governing dependent Indian Community." *Id.* at 1205. The district court actually held that *no* tribe had jurisdiction over the allotments. *Id.* at 1208-09. But, in any case, both tribes competing for the tobacco tax revenue had nearby reservations. *Nisqually Indian Tribe v. Gregoire*, 623 F.3d 923, 926 (9th Cir. 2010) (reciting that both Nisqually and Squaxin are "federally-recognized Indian tribe[s] with reservation lands in Washington State").

[63]  *See, e.g.,* Eklutna Reply 22 ("a reservation is not required in order for Eklutna to exercise jurisdiction over Indian country allotments held by Eklutna tribal members *and within the Tribe's historical territory*") (emphasis added).

[64]  43 U.S.C. § 1603.

[65]  Eklutna Reply at 24.

Eklutna cannot avoid the effect of the Congressional actions directly related to this property by pointing to the "privileges and immunities" clause of the Indian Reorganization Act.[66] The requirement that tribes have territorial jurisdiction over their "Indian Lands" in order to be eligible for IGRA gaming is statutory, and applies equally to all tribes wherever located.[67] Eklutna's lack of territorial jurisdiction over the Ondola Allotment is not the result of some unfair, arbitrary rule by Interior.[68] It is the result of Congress's choice to all but eliminate tribal territorial jurisdiction in Alaska.[69] In the words of the Sansonetti Opinion:

> ANCSA reflected a new approach in defining the relationship between Alaska Natives and the federal government. ANCSA largely controls the determination whether any territory exists over which Alaska Native villages might exercise governmental powers. Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands and nonmembers.[70]

Thus, Congress's unique Alaska-specific legislation governs the result in this case, and the "privileges and immunities" clause of the Indian Reorganization Act is irrelevant.

---

[66]     25 U.S.C. § 5123(f); Eklutna Reply at 24-25.

[67]     25 U.S.C. § 2703(4); 25 USC. § 2710(b).

[68]     Eklutna makes a strained argument that the Sansonetti Opinion is irrelevant to this case because it does not interpret IGRA. Eklutna Reply at 17. But IGRA requires a tribe to have territorial jurisdiction over its "Indian Lands," and the Sansonetti Opinion analyzes tribal territorial jurisdiction over Alaska Native allotments, so the Opinion is directly relevant to the IGRA "Indian Lands" analysis in this instance.

[69]     *See* AR 2270 ("The purposes of ANCSA to develop state chartered business entities and to avoid the establishment of any permanent reservation system, trusteeship or other racially based institutions would be frustrated by a determination that enclaves of federal and tribal jurisdiction continue to exist.")

[70]     AR 2271.

**C.     The Sansonetti Opinion left open the possibility of a different result in an unusual case, and this is not an unusual case.**

The fact pattern in this case—a tribe without a reservation or other jurisdictional land base attempting to assert jurisdiction over an Alaska Native Allotment Act allotment—is precisely the fact pattern that the Sansonetti Opinion contemplated when concluding that tribes lack jurisdiction over Alaska Native allotments.[71] Although the Opinion left open the possibility of a different conclusion in a highly unusual factual situation, this case does not present a highly unusual fact pattern.

The 133-page Sansonetti Opinion uses the word "nexus" only twice, both times when analyzing whether a tribe could have jurisdiction over an off-reservation property. The word first appears when explaining the conclusion that a tribe in the Lower 48 would likely lack jurisdiction over a homestead allotment:

> While we are unaware of any court decisions addressing the question, it is our view that an assertion of tribal jurisdiction over an Indian homestead allotment obtained by an Indian who had abandoned tribal relations would fail. In such a case, it seems unlikely that there would be any indication of congressional intent to permit such jurisdiction, and *there would be no original tribal nexus to support such jurisdiction* over the allotment.[72]

Thus, "nexus" in this context clearly refers to the type of connection that supports tribal jurisdiction over a General Allotment Act allotment created from a reservation or issued on condition of tribal membership.

---

[71]     AR 2267-68.

[72]     AR 2266 (emphasis added).

Sansonetti used the word "nexus" only once more, after addressing whether restricted townsite lots granted to a tribe could be a "dependent Indian community" over which the tribe had territorial jurisdiction.[73] In such a case, the tribe would conceivably have a territorial land base of its own townsite lots.[74] But Sansonetti then concluded that, even in such a situation, a tribe would still not be able to assert jurisdiction over an individual member's restricted townsite lot without a "clear tribal nexus:" "An assertion of tribal jurisdiction over individual restricted lots would be doubtful if there were no clear tribal nexus to the individual restricted lands."[75] Again, in this context, the Opinion seems to refer to the type of connection between General Allotment Act allotments and nearby reservations that supports tribal jurisdiction in those instances. The Opinion did *not* contemplate the possibility of "nexus"-based jurisdiction in the absence of a nearby tribal territorial land base, and only raised the possibility in the context of tribally-owned townsites.[76] Thus, it is highly unlikely that the author of the Opinion would consider a "clear tribal nexus" to be a source of jurisdiction for a tribe that lacks a tribal territorial land base, such as Eklutna.

In any event, there is no evidence in this record of any type of "nexus" that would render this case different from the general fact pattern considered by the Sansonetti Opinion. This is an Alaska Native Allotment Act allotment, which required no tribal

---

[73]     AR 2268-69.

[74]     *Id*.

[75]     AR 2269.

[76]     *Id*.

connection to be issued. It was issued to Ms. Ondola individually based on where she had

purchased a home and homesteaded.[77] Ms. Ondola's subjective state of mind at the time,

or Ms. Ondola's actual connections to Eklutna (even though none were required to obtain

the allotment), are irrelevant to the legal effect of the allotment.[78] And, as discussed

above, after ANCSA, a tribe's historical use and occupancy of the land cannot be the

source of a claim to jurisdiction.[79]

   Eklutna inappropriately focuses its "nexus" argument on services it has provided

over the years to its members living on the allotment. Even if services provided to an

allotment could be grounds for a "clear tribal nexus" to the allotment (which does not

appear to be what the Sanonsetti Opinion meant by "nexus," as explained above), the

distinction between tribal jurisdiction over members and tribal jurisdiction over territory

undermines Eklutna's argument.[80] Eklutna argues that the services it provides on the

allotment are not generally available to tribal members regardless of where they live, but

---

[77] AR 712-14, 2047-48.

[78] *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) ("An Indian tribe's jurisdiction derives from the will of Congress, not from the consent of fee owners").

[79] If historical use and occupancy were grounds for tribal jurisdiction over an allotment based on a "clear tribal nexus," the Sanonsetti Opinion would not have concluded that there is "little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment" because many tribes would be able to assert historical use and occupancy of areas that later contained allotments. AR 2268. In the context of the Sanonsetti Opinion, a "nexus" must be a *legal* connection between an allotment and a nearby jurisdictional land base, which will seldom exist in Alaska even though the Opinion accounted for the theoretical possibility. AR 2266, 2268-69.

[80] *See, e.g., John v. Baker,* 982 P.2d 738 (Alaska 1999).

*Native Village of Eklutna v. U.S. Dep't. of Interior, et al.* Case No. 1:19-cv-02388-DLF
Intervenor SOA's Reply in Support of X-Motion for Summary Judgment Page 20 of 24

that argument is belied by its prior statements in the record.[81] In its supplemental

submission to Interior in support of its "Indian Lands" application, the Tribe stated:

> The Tribe provides a range of governmental services *to Village residents and tribal members*, including a tribal court, housing, health care services in a recently constructed health care clinic, employment services, water services, waste services, snow plowing, food bank services, lunches for seniors, environmental disposal services (disposal of used appliances and furniture), trespass inspection and monitoring, archeological and cultural surveys, historical and cultural preservation, Indian child welfare advocacy and case management services, youth activities (including dance and drum group and culture camp), holiday baskets and school supplies, a biannual potlatch and powwow, and signage.[82]

Further, Eklutna's brief overstates and even misstates some services it has

provided to its members on the allotment. For example, Eklutna asserts that it provides

"waste management" services to the allotment,[83] but the record reflects only that Eklutna

once removed some junk cars and trash from the allotment in approximately 2007,

presumably pursuant to the environmental disposal services described as being available

to all village residents and tribal members.[84] There is no dispute that the Municipality of

---

[81]   *See* AR 60 ("The Tribe relies primarily on assertions in its constitution and Tribal ordinances. Most of the provisions relate to Tribal members and their domestic affairs, however. Because a Tribe's personal jurisdiction over the domestic affairs of its members may extend beyond Indian country, such assertions have no direct bearing on the question of the Tribe's authority over land.")

[82]   AR 2052 (emphasis added). Similarly, Eklutna's original 2016 application to Interior relied heavily on the affidavit of its tribal administrator in support of its assertions regarding services it provided on the allotment. AR 793-797. That affidavit clearly stated: "In my position as tribal administrator, I have knowledge of services provided to *members of the Eklutna Tribe*. The Tribe provides the following services…" AR 973 (emphasis added).

[83]   Eklutna Reply at 29.

[84]   AR 794, 983.

Anchorage, not Eklutna, provides regular garbage removal services to the allotment.[85]

Eklutna also asserts that it provides "road maintenance" on the allotment,[86] but no

statement in the record appears to support that assertion or even suggest that there are

roads to be maintained on this eight-acre parcel.[87]  Again, there is no dispute that the

Municipality and State constructed and maintain all roads that serve the allotment and

that connect the allotment with the community of Eklutna.[88] Similarly, there is no dispute

that Eklutna lacks any form of police force and that the Municipality of Anchorage

provides police protection to the allotment.[89] Thus, Eklutna strays from the record in its

arguments on this topic.

## IV.    CONCLUSION

Eklutna protests that its lack of a reservation should not weigh with this Court, but

its lack of a territorial jurisdictional base is relevant to both the factual and legal analysis.

Neither the Alaska Native Allotment Act nor ANCSA contemplated Alaska Native tribes

having large territorial jurisdictional bases comparable to reservations in the Lower 48.

---

[85]     AR 617, 681-82.

[86]     Eklutna Reply at 29.

[87]     *See* AR 46 (describing allotment as "an approximately 8-acre wooded homestead"). *See also* AR 702, 704 (aerial photos).

[88]     AR 596, 673.

[89]     AR 59-60. Eklutna has now conceded that, in the event this Court finds Interior's denial of Eklutna's Indian Lands request was in contravention of the Administrative Procedure Act, this Court must remand to Interior for a determination in the first instance of whether Eklutna actually exercises governmental authority over the Ondola allotment. Eklutna Reply at 32.

Without a centralized, territorial land base from which a tribe could extend its jurisdiction to encompass nearby allotments, it does not make sense that Congress would have intended in either Act for Alaska Native tribes to exercise jurisdiction *only* over parcels of 160 acres or less issued to individuals based on where those individuals had their homesteads. As the Sansonetti Opinion concluded in regards both to the Alaska Native Allotment Act and ANCSA, "in the absence of a tribal territorial base (e. g., a reservation), there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment."[90] This is a common-sense interpretation that is supported by the language and legislative history of both Acts. As the Sansonetti Opinion explained,

> The purposes of ANCSA to develop state chartered business entities and to avoid the establishment of any permanent reservation system, trusteeship or other racially based institutions would be frustrated by a determination that enclaves of federal and tribal jurisdiction continue to exist.[91]

This Court should affirm Interior's denial of Eklutna's request for a determination that the Ondola allotment is its "Indian Lands" for purposes of IGRA in accordance with the Administrative Procedures Act.[92]

---

[90]   AR 2266-67, 1168.

[91]   AR 2270.

[92]   By doing so, this Court must also affirm Interior's rejection of the proposed lease of the Ondola allotment for IGRA gaming purposes. There can be no grounds to approve the lease in the absence of a positive "Indian Lands" determination. Contrary to Eklutna's assertion, the State did take this position in its cross-motion for summary judgment, and further took the position that this Court cannot judicially approve the proposed lease and its only power is to remand to Interior for further consideration. Eklutna Reply at 32. *See* Memorandum in Support of Intervenor State of Alaska's Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Dkt. 59-1, January

DATED:  April 15, 2021.

TREG R. TAYLOR
ATTORNEY GENERAL

By:    /s/ *Lael A. Harrison*
        Lael A. Harrison
        Assistant Attorney General
        Alaska Bar No. 0811093
        Alaska Department of Law
        PO Box 110300
        Juneau, AK 99811-0300
        Telephone: 907.465.3600
        Facsimile: 907.465.3019
        Email: lael.harrison@alaska.gov

By:    /s/ *Laura Wolff*
        Laura Wolff
        Assistant Attorney General
        Alaska Bar No. 1411108
        Alaska Department of Law
        1031 West Fourth Avenue
        Anchorage, AK 99501
        Telephone: 907.269.5275
        Facsimile: 907.276.3697
        Email: laura.wolff@alaska.gov

---

22, 2021) at 6, 42 n.177. Eklutna is correct, however, that the State takes no position with regards to Eklutna's claims regarding improper political influence on Interior, which have no bearing on the State's interests supporting its intervention. Eklutna Reply at 32.