**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIVE VILLAGE OF EKLUTNA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:19-cv-02388-DLF |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| THE INTERIOR, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| STATE OF ALASKA, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**JOINT APPENDIX**
**VOLUME 3 OF 4**
**(AR001239 – AR002298)**

Colin Cloud Hampson
SONOSKY, CHAMBERS, SACHSE,
  ENDRESON & PERRY, LLP
D.C. Bar No. 448481
145 Willow Road, Suite 200
Bonita, CA 91902
Telephone: (619) 267-1306
Facsimile: (619) 267-1388
champson@sonoskysd.com

Whitney A. Leonard
SONOSKY, CHAMBERS, SACHSE,
  MILLER & MONKMAN, LLP
Alaska Bar No. 1711064
Montana Bar No. 36409732
*Pro hac vice*
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
Telephone:  (907) 258-7388
Facsimile:  (907) 272-8332
whitney@sonosky.net

*Attorneys for the Native Village of Eklutna*

**Page**

—— **VOLUME 1 OF 4** ——

| | | | |
|---|---|---|---|
| 1 | Briefing Memorandum, Lee Stephan to James Cason | AR 1-2 | 8/10/2017 |
| 12 | Alaska Department of Law, Legal status of tribal governments in Alaska | AR 12-27 | 10/19/2017 |
| 43 | Affidavit of Aaron Leggett | AR 43-44 | 12/4/2017 |
| 45 | Indian Lands Opinion on Ondola Allotment | AR 45-61 | 6/18/2018 |
| 87 | Olga Ondola Native Allotment Deed | AR 87-88 | 11/13/1963 |
| 594 | State of Alaska, 2007 Letter on Native Village of Eklutna ILD Request (with exhibits) | AR 594-624 | 5/17/2007 |
| 625 | Ex. A: Letter from Robert T. Anderson, US DOI, to Michael Cox, NIGC | AR 625-627 | 5/17/1995 |
| 628 | Ex. B: Memorandum Opinion, *Native Village of Barrow v. NIGC*, Civil Action No. 99-886 (RWR) | AR 628-642 | 12/31/2001 |
| 672 | Ex. E: Alaska Department of Transportation Highway Log Report | AR 672-673 | 4/23/2007 |
| 674 | Ex. F: Affidavit of Monica Jenicek | AR 674-679 | 5/16/2007 |
| 680 | Ex. G: Affidavit of Daniel Patrick O'Tierney | AR 680-685 | 5/10/2007 |

—— **VOLUME 2 OF 4** ——

| | | | |
|---|---|---|---|
| 701 | Ex. M: Geographical Information Systems (MapOptix 4.2 Interface) | AR 701-702 | 4/20/2007 |
| 703 | Ex. N: Eklutna-2.jpg - Aerial Map | AR 703-704 | undated |
| 711 | Ex. R: Department of Interior, 8.3 Indian Allotment, Anch. Ser. No. 055026 | AR 711-714 | 10/21/1963 |
| 720 | Ex. T: Letter from Robert T. Anderson, U.S. Department of Interior, Div. of Indian Affairs, to Michael J. Cox, NIGC | AR 720-722 | 5/12/1995 |

**Page**

| | | | |
|---|---|---|---|
| 723 | Ex. U: Senate Report No. 108-251, Alaska Native Allotment Subdivision Act | AR 723-728 | 5/14/2007 |
| 742 | Business Lease Between the Ondola Family and the Native Village of Eklutna | AR 742-773 | 4/14/2016 |
| 774 | Native Village of Eklutna cover letter and index to Exhibits in support of 6/29/2016 request for Indian lands determination | AR 774-777 | 7/13/2016 |
| 778 | Native Village of Eklutna Request for Indian Lands Determination Regarding Ondola Allotment and Index to Exhibits | AR 778-807 | 6/29/2016 |
| 808 | Ex. 1: James Kari et al. *Shem Pete's Alaska: The Territory of the Upper Cook Inlet Dena'ina* (1987) | AR 808-867 | 6/29/2016 |
| 868 | Ex. 2: Affidavit of George Ondola | AR 868-872 | 1/26/1995 |
| 873 | Ex. 3: Fed. Field Comm, for Dev. Planning in Alaska; *Alaska Natives & the Land* (1968) | AR 873-901 | 6/29/2016 |
| 902 | Ex. 4: Ann Chandonnet, *On the Trail of Eklutna* | AR 902-919 | 1979 |
| 920 | Ex. 5: Ann Chandonnet, *The Once and Future Village of Ikluat/ Eklutna: The History of a Tanaina Athapaskan Settlement* | AR 920-941 | 1979 |
| 952 | Ex. 7: Constitution of the Native Village of Eklutna (1996) | AR 952-963 | 1/27/1996 |
| 965 | Ex. 8: Letter from Office of Solicitor to NIGC (5/17/1995) | AR 964-966 | 5/17/1995 |
| 967 | Ex. 9: Letter from Office of Solicitor to NIGC (5/18/1995) | AR 967-968 | 5/18/1995 |
| 969 | Ex. 10: Native Allotment Deed Nov. 13, 1963 | AR 969-971 | 11/13/1963 |

**Page**

| 972 | Ex. 11: Affidavit of Daniel Alex, Eklutna Tribal Administrator | AR 972-976 | 3/16/2007 |
|---|---|---|---|
| 977 | Ex. 12: Maps Showing Distances | AR 977-979 | 6/29/2016 |
| 980 | Ex. 13: Affidavit of George Ondola | AR 980-985 | 3/26/2007 |
| 986 | Ex. 14: Lease Agreement Between the Native Village of Eklutna and the Ondola Family | AR 986-1008 | 6/6/2016 |
| 1019 | Ex. 15: Native Village of Eklutna Dog Ordinance | AR 1019-1021 | undated |
| 1022 | Ex. 16: Native Village of Eklutna Des'na'ka, Ka'nash - Relatives Talk Code | AR 1022-1031 | 4/25/2003 |
| 1032 | Ex. 17: Native Village of Eklutna Tribal Court Codes, Res. No. 98-0026 | AR 1032-1043 | 5/1/1998 |
| 1068 | Ex. 19: Native Village of Eklutna Res. No. 97-22, Environmental Protection Ordinance | AR 1068-1072 | 7/19/1997 |
| 1073 | Ex. 20: Native Village of Eklutna Ordinance 04-001 | AR 1073-1077 | 3/26/2004 |
| 1078 | Ex. 21: Native Village of Eklutna Res. No. 2006-24 | AR 1078-1082 | 12/21/2006 |
| 1083 | Ex. 22: Letter of Agreement Between Native Village of Eklutna and Anchorage Police Department (Dec. 10, 1996) | AR 1083-1085 | 12/10/1996 |

—— **VOLUME 3 OF 4** ——

| 1239 | Request for Withdrawal of the Sansonetti Opinion | AR 1239-1243 | 11/21/2016 |
|---|---|---|---|
| 1244 | Native Village of Eklutna Supplement to Request for Indian Lands Determination | AR 1244-1255 | 12/16/2016 |
| 2039 | Native Village of Eklutna Supplemental Information regarding Request for Indian Lands Determination | AR 2039-2043 | 6/7/2017 |

**Page**

| 2046 | Olga Ondola Allotment Application | AR 2046-2048 | 6/28/1961 |
|---|---|---|---|
| 2051 | Native Village of Eklutna Second Supplemental Submission with attachments | AR 2051-2061 | 6/22/2017 |
| 2071 | Native Village of Eklutna Letter to James Cason | AR 2071-2091 | 11/6/2017 |
| 2095 | Native Village of Eklutna Letter to James Cason and Affidavit of Aaron Leggett | AR 2095-2099 | 12/4/2017 |
| 2100 | Attachments to December 1, 2017 Affidavit of Aaron Leggett | AR 2100-2110 | 12/4/2017 |
| 2114 | Native Village of Eklutna Email re: Eklutna Follow-up Questions | AR 2114-2121 | 12/20/2017 |
| 2140 | Sansonetti Opinion - Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers | AR 2140-2275 | 1/11/1993 |
| 2276 | Secretarial Order of October 30, 1936 | AR 2276-2278 | 10/30/1936 |
| 2283 | Memo from Commissioner, GLO, to Secretary of Interior | AR 2283-2293 | 8/9/1937 |
| 2294 | Public Land Order No. 20 | AR 2294-2298 | 8/4/1942 |

—— **VOLUME 4 OF 4** ——

| 2300 | BLM Field Notes of Dependent Resurvey | AR 2300-2431 | 1/27/1954 |
| 2438 | Report of Projects Development Officer Lado A. Kozely | AR 2438-2445 | 7/24/1963 |
| 2446 | Memorandum: Eklutna Reservation Establishment | AR 2446-2447 | 5/7/1971 |
| 2454 | Memorandum: Iowa Tribe of Oklahoma; Whitecloud Allotment | AR 2454-2465 | 1/7/2010 |
| 2466 | Memorandum: Gaming By the Big Sandy Rancheria on the McCabe Allotment | AR 2466-2472 | 9/6/2006 |

**Page**

| 2480 | Memorandum: Kialegee Tribal Town: Proposed Gaming Site in Broken Arrow, Oklahoma | AR 2480-2496 | 5/24/2012 |
|------|-----------------------------------------------------------------------------------|--------------|-----------|
| 2500 | Memorandum re: Native Village of Barrow Tribal Gaming Ordinance | AR 2500-2506 | 2/1/1996 |
| 2507 | Memorandum: Sampson Johns AIIotment as "Indian Iand" under IGRA | AR 2507-2512 | 9/25/1996 |
| 2513 | Memorandum re: United Keetoowah Band of Cherokee Indians | AR 2513-2518 | 9/29/2000 |
| 2519 | Memorandum: Whether the Maria Christiana Reserve No. 35 is "Indian lands" for Purposes of Gaming under the Indian Gaming Regulatory Act? | AR 2519-2536 | 10/31/2002 |
| 2556 | Executive Order No. 4778 | AR 2556 | 12/5/1927 |
| 2557 | Executive Order No. 6734 | AR 2557 | 6/8/1934 |
| 2565 | Public Land Order 2427 | AR 2565 | 7/12/1961 |
| 2566 | Public Land Order 2516 | AR 2566 | 10/13/1961 |
| 2571 | Leasability of Lands in the Vicinity of Eklutna Withdrawn by Public Land Order No. 2427 | AR 2571-2580 | 5/1/1967 |
| 2582 | DOI Departmental Manual, Pt. 209 Ch. 3 | AR 2582-2584 | 3/16/1992 |

5



## NATIVE VILLAGE OF EKLUTNA

November 21, 2016

BY E-MAIL to Hilary.tompkins@sol.doi.gov

Hilary Tompkins, Solicitor
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

      Re:    Request for Withdrawal of the Sansonetti Opinion

Dear Solicitor Tompkins:

On behalf of the Native Village of Eklutna, I request that you withdraw "Governmental Jurisdiction of Alaska Natives Over Land and Nonmembers," Office of the Solicitor, Department of Interior, Opinion M-36975 (Jan. 11, 1993) (the "Sansonetti Opinion"). Withdrawal is necessary because the Sansonetti Opinion has been superseded by later legislation, court opinions and Departmental policy, rendering the opinion's conclusion erroneous. The opinion is no longer relevant or helpful, but rather leads to confusion.

The Sansonetti Opinion faced challenges from the outset because it sought to answer broad questions in the abstract rather than specific questions in the context of particular facts. It was written in response to efforts by BIA to provide technical assistance to Alaska Native villages considering developing and adopting constitutions under the Indian Reorganization Act ("IRA"). *Id*. at 1-2. The first 100 pages of the opinion were devoted to a general discussion of background based on publicly available sources, including 75 pages on the history of Alaskan tribes, their lands, and their relationship to the federal government, and 25 pages discussing the Alaska Native Claims Settlement Act ("ANCSA").

In the final 30 pages, the Sansonetti Opinion examined a question posed by the Secretary regarding the authority that an Alaska Native village may exercise over land and non-members after the enactment of ANCSA. Sansonetti Opinion at 1, 109. It concluded that although there remained certain lands—such as allotted lands and Village-owned townsite lands—meeting the definition of Indian country in Alaska, "ANCSA largely controls" the question and further that "Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise

1

governmental power over lands and nonmembers." *Id.* at 132.  The opinion offered little rationale for inferring such a broad scope in ANCSA.  And since its conclusion was presented in the abstract, it was necessarily tentative, recognizing that certain circumstances might warrant a different conclusion. *Id.* at 127-28 (where "no original tribal nexus" exists, congressional intent to permit tribal jurisdiction over an allotment "*seems unlikely*," and "there is *little or no* basis" for a village to exercise jurisdiction over an allotment); 130 ("an assertion of tribal jurisdiction over individual restricted [townsite] lots *would be doubtful* if there were no clear tribal nexus") (emphasis supplied).

Furthermore, the opinion recognized that Congress may legislate to alter its conclusions. *Id.* Congress did just that.[1]  In 1994, Congress enacted legislation that superseded the Sansonetti Opinion with respect to Alaska tribal status.  The Sansonetti Opinion concluded that Alaska tribes could be federally recognized tribes, but this was later confirmed and unequivocally settled by the 1994 Federally Recognized Indian Tribe List Act, which required that the Secretary of Interior publish annually a list of federally recognized tribes, 25 U.S.C. § 479a-1, and found that once recognized, a tribe "may not be terminated except by an Act of Congress." Pub. L. No. 103-454, § 103(4), (5), 108 Stat. 4791, 4791-4792 (1994).  Congress also enacted the Tlingit and Haida Status Clarification Act, which found that while the Secretary of Interior had omitted the Central Council of Tlingit and Haida Indian Tribes of Alaska from the list of federally recognized tribes, "the Secretary may not administratively diminish the privileges and immunities of federally recognized Indian tribes without the consent of Congress," and reaffirmed the Central Council as a federally recognized tribe. *Id.* §§ 202(4), 203 (codified at 25 U.S.C. §§ 1212, 1213).  The Department has consistently included Alaska Tribes on the annual list of federally recognize tribes.[2]  There is no longer any question about the status as federally recognized tribes of Alaska tribes included on Interior's list of federally recognized tribes.[3]

---

[1] Congress had also done so in 1987 when it approved amendments to ANCSA inserting a provision expressly disclaiming any effect on questions regarding tribal territorial jurisdiction. Pub. L. No. 100-241, § 17(a), 101 Stat. 1788, 1814 (1988).

[2] In 1993, Assistant Secretary—Indian Affairs Ada Deer announced in the preamble to the list then published that "[t]his list is published to clarify that the villages and regional tribes listed below are not simply eligible for services, or recognized as tribes for certain narrow purposes.  Rather, they have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States; are entitled to the same protection, immunities, privileges as other acknowledged tribes; have the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law on other tribes." Cabazon Band of Cahuilla Mission Indians of the Cabazon Reservation, Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54365 (Oct. 21, 1993).

[3] In the 1995 publication of the list, the BIA noted that the 1993 list "represents a list only of those villages and regional tribes which the Department believes to have functioned as political entities, exercising governmental authority," again recognized Alaska Native tribes, citing the privileges and immunities provisions, explaining, "[i]nclusion on the list . . . establishes that the listed tribes have the same privileges, immunities, responsibilities and obligations as other Indian tribes under the same or similar circumstances including the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes" and cited the List Act and the privileges and immunities provisions of the IRA that "confirmed that the Secretary can make no distinctions among tribes as a general matter of Federal law." Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 60 Fed. Reg. 9250, 9251 (Feb. 16, 1995).

2

AR001240

In 1994 Congress also amended the IRA to add "privileges and immunities" provisions, which prohibit the federal government from treating federally recognized tribes differently.[4] These provisions directly undercut the conclusion in the Sansonetti Opinion that ANCSA implicitly altered tribal territorial jurisdiction because they prohibit the Department from treating tribes differently, and the inference drawn in the Sansonetti Opinion regarding ANCSA's effect violates that provision. Consistent with that Congressional intent, Interior and the courts have adopted a narrower view of ANCSA to avoid discriminating between Alaska tribes and Tribes in the Lower 48. In *Akiachak Native Community v. Salazar*, 935 F. Supp. 2d 195 (D.D.C. 2013), *vacated sub nom. Akiachak Native Cmty. v. United States DOI*, 827 F.3d 100 (D.C. Cir. 2016),[5] the District Court for the District of Columbia held that Interior's rule in 25 C.F.R. Part 151 prohibiting Alaska tribes to take land into trust under the IRA was not supported by law. The court rejected the argument that ANCSA implicitly repealed the Secretary's authority to take land into trust under the IRA. Accordingly, the reasoning underlying the ruling directly upsets the conclusion drawn by Interior in the Sansonetti Opinion that ANCSA's broad scope means it controls all questions relating Alaska tribes and Indian land.

Then in 2014, in a formal rulemaking, the Department removed the Alaska exception from the fee-to-trust regulations to exercise its authority under the IRA to acquire land into trust for Alaska tribes. The Department reexamined the impact of ANCSA and concluded that it was not as broad as previously thought and did not implicitly diminish the Secretary's authority to take land into trust under the IRA. 79 Fed. Reg. 76890 (Dec. 23, 2014).[6] The Department explained in the publication of the final rule that:

> T]he Department has carefully reexamined the legal basis for the Secretary to take land into trust in Alaska under Section 5 of the IRA (25 U.S.C. 465). In

---

[4] Pub. L. No. 103-263, § 5(b), 108 Stat. 707, 709 (1994) (codified at 26 U.S.C. § 476). Those provisions state:

(f) Privileges and immunities of Indian tribes; prohibition on new regulations. Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

(g) Privileges and immunities of Indian tribes; existing regulations. Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

[5] *Akiachak* was vacated on appeal on mootness grounds because the D.C. Circuit Court of Appeals determined that all live claims in the suit were founded on the Department's Alaska exception regulation, which by the time of the appeal had been removed through a formal rulemaking.

[6] On January 16, 2001, Solicitor Leshy rescinded a prior opinion questioning the Department's authority to take land into trust citing ANSCA. "Rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian Affairs entitled 'Trust Land for the Natives of Venetie and Arctic Village,'" Memorandum to Assistant Secretary—Indian Affairs from Solicitor John D. Leshy (Jan. 16, 2001). The Sansonetti Opinion cited the prior opinion that is now withdrawn. Sansonetti Opinion at 112 n.276, 123 n.296.

3

particular, we have reviewed the statutory text of ANCSA and other Federal laws
and have concluded that this authority was never extinguished. Congress
explicitly granted the Secretary authority to take land into trust in Alaska under
the IRA and its amending legislation. See 25 U.S.C. 465, 25 U.S.C. 473a.
Although Congress, through the enactment of ANCSA and other laws, repealed
other statutory provisions relevant to Alaska Native lands, it has not passed any
legislation that revokes the Secretary's authority to make trust land acquisitions in
Alaska, as codified in 25 U.S.C. 473a and 25 U.S.C. 465. See Memorandum from
Hilary C. Tompkins, Solicitor, to Kevin Washburn, Assistant Secretary—Indian
Affairs (April 29, 2014).... Moreover, the Department's policy is that there
should not be different classes of federally recognized tribes....

It is important to remember that Alaska Native land and history did not
commence with ANCSA, and that ANCSA did not terminate Alaska Native tribal
governments.... The Department agrees that the IRA provides legal authority for
the removal of the Alaska exception.

*Id.* It is now clear that the privileges and immunities provisions prohibit Interior from construing
ANCSA to diminish Alaska tribal authority over territory and nonmembers where ANSCA does
not do so expressly. The Sansonetti Opinion's conclusion that such an inference may be drawn
from ANCSA is contrary to the IRA and the Department's policy.

The Sansonetti Opinion's conclusion with regard to allotments also cannot be reconciled
with the privileges and immunities provision and Interior policy. The Sansonetti Opinion
acknowledged that allotments are Indian Country and cannot be distinguished from other tribal
land held in restriction or trust but nonetheless concluded that "there is little or no basis for a
Native village to claim territorial jurisdiction over an allotment." *Id.* at 132; *but see id.* at 127
(citing *U.S. v. Jackson*, 280 U.S. 183 (1930), in which "the Supreme Court held that restricted
Indian homestead allotments carry the same federal rights and privileges as other Indian
allotments."). This conclusion directly <mark>violates</mark> the anti-discrimination mandate of the privileges
and immunities provisions. The Sansonetti Opinion's unsupported reasoning in distinguishing
Alaska Native allotments from allotments in the Lower 48 is also in conflict with controlling
case law and an earlier Solicitor's Opinion, M-36662 at 1934-35 (Sept. 21, 1964) ("Allotment of
Land to Alaska Natives"), not cited by Sansonetti.[7]

Perhaps the only salvageable conclusion from the Sansonetti Opinion is that "[t]he
statutory scheme established in ANCSA precludes the treatment of lands received under that Act
as Indian county." Sansonetti Opinion at 131. But there is no need to rely on this conclusion
from Sansonetti, as the Supreme Court made this determination in *Alaska v. Native Vill. of
Venetie*, 522 U.S. 520, 527, 533-34 (1998).

---

[7] In M-36662, Acting Solicitor Edward Weinberg reviewed the Alaska Allotment Act of 1906, as amended in 1956,
and concluded that nation-wide, allotment acts were numerous, did not have consistent language regarding
requirements, and "[t]he use of the word 'homestead' in the Alaska statute is not necessarily indicative of an
intention to superimpose the requirements of the general homestead laws on the express requirements of the Alaska
Allotment Act. Congress has frequently used the word 'homestead' in connection with the allotment of land to
Indians to indicate merely that the land allotted was to be subject to special status." *Id.* at 1934-35.

4

AR001242

The key underpinning of the Sansonetti Opinion's conclusions is that ANSCA's reach was so broad as to govern questions involving the scope of tribal power over lands and non-members.  However, Congress has now clarified that tribes may not be treated differently, and the Department has recognized that means that Alaska tribes may not be treated differently from tribes in the Lower 48.  Accordingly, the Sansonetti Opinion no longer serves as a useful guide regarding the law and in fact engenders confusion, and must be withdrawn.

Sincerely,

Lee Stephan, President

cc:
Jody.cummings@sol.doi.gov
Eric.sherpard@sol.doi.gov
Jennifer.turner@sol.doi.gov
James.debergh@sol.doi.gov
Lawrence_roberts@ios.doi.gov
Alison.grigonis@bia.gov

5

AR001243

LAW OFFICES

# SONOSKY, CHAMBERS, SACHSE MILLER & MUNSON, LLP

900 WEST FIFTH AVENUE, SUITE 700
ANCHORAGE, ALASKA 99501
(907) 258-6377
FAX (907) 272-8332
WEBSITE: WWW.SONOSKY.COM

LLOYD B. MILLER E-MAIL: lloyd@sonosky.net
MARISSA K. FLANNERY E-MAIL: marissa@sonosky.net

HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER***
DONALD J. SIMON
DOUGLAS B. L. ENDRESON
MYRA M. MUNSON*
ANNE D. NOTO
MARY J. PAVEL
JAMES E. GLAZE***
DAVID C. MIELKE
GARY F. BROWNELL
COLIN C. HAMPSON
RICHARD D. MONKMAN**
MARISSA K. FLANNERY*
MATTHEW S. JAFFE
WILLIAM STEPHENS
VANESSA RAY-HODGE
LIA C. CARPENETI**
FRANK S. HOLLEMAN
MATTHEW L. MURDOCK
REBECCA A. PATTERSON^^
MAILE TAVEPHOLJALERN^
KENDRI M. M. CESAR*

OF COUNSEL
ROGER W. DUBROCK*
KAY E. MAASSEN GOUWENS*
ARTHUR LAZARUS, JR.

MARVIN J. SONOSKY (1909-1997)

POLICY ADVISORS
HON. MARK BEGICH
JODI A. GILLETTE

JUNEAU OFFICE
302 GOLD STREET, SUITE 201
JUNEAU, ALASKA 99801
(907) 586-5880·FAX(907) 586-5883

SAN DIEGO , CA OFFICE
600 W. BROADWAY, SUITE 700
SAN DIEGO, CA 92101
(619) 267-1306·FAX(619) 267-1388

WASHINGTON, D.C. OFFICE
1425 K STREET, SUITE 600, N.W.
WASHINGTON, D.C. 20005
(202) 682-0240·FAX (202) 682-0249

ALBUQUERQUE, NM OFFICE
500 MARQUETTE AVE, N.W.
SUITE 660
ALBUQUERQUE, NM 87102
(505)247-0147·FAX (505) 843-6912

*ALASKA BAR
**ALASKA AND WASHINGTON BAR
*** ALASKA AND D.C. BAR
^ALASKA, HAWAII AND D.C. BAR
^^ALASKA AND ILLINOIS BAR

December 16, 2016

**VIA E-MAIL**

Lawrence Roberts, Acting Assistant Secretary
Bureau of Indian Affairs
MS-3642-MIB
1849 C Street, N.W.
Washington, D.C.  20240

> Re:   Native Village of Eklutna Supplement on its
> Request for Indian Lands Determination
> Regarding the Ondola Allotment

Dear Secretary Roberts:

We provide this supplement to the Native Village of Eklutna's June 29, 2016, Indian lands determination request to make two important points.  First, the determination whether a tribe in Alaska exercises jurisdiction over an allotment is the same as in the lower 48, as has been made clear by congressional and Departmental actions that have superseded the Sansonetti Opinion on the "Governmental Jurisdiction of Alaska Natives Over Land and Nonmembers," M-36975 (Jan. 11, 1993) (the "Sansonetti Opinion" or "Opinion").  Second, and alternatively, the Opinion's statements relevant to the Ondola Allotment in no way preclude an affirmative Indian lands determination here.  We more fully explain these points below.

Doc.#275954

Lawrence Roberts, Acting Assistant Secretary                     December 16, 2016
Bureau of Indian Affairs                                                     Page 2 of 12

## I.   <u>Summary of Points</u>

The Sansonetti Opinion does not prevent the Department from finding that the Native Village of Eklutna ("NVE" or "Tribe") has jurisdiction over the Ondola Allotment.  The Tribe made a powerful and thorough demonstration of jurisdiction in its June 29, 2016 Indian lands determination request consistent with a fair and up-to-date reading of the Sansonetti Opinion.  In that request the Tribe demonstrated that it possess jurisdiction over the Ondola Allotment under precedent established in decisions finding tribal jurisdiction over tribal member-owned allotments.

The Sansonetti Opinion is of limited use today.  It was written in 1993 at a time when the Alaska Native Claims Settlement Act ("ANCSA") created confusion about many issues, including the status of certain lands in the State.  However, Congress created new law in 1994 that put all tribes in Alaska and the lower 48 on an equal footing.  And in 2015, the Department of the Interior applied Congress's directives, examined the impact of ANCSA on the extension of the Indian Reorganization Act to Alaska, and revised its regulations to permit Alaska tribes to acquire title to land in trust.  The new law and policy supersede the Opinion's tentative and ambiguous conclusions about the effect of ANCSA on tribal power.  Thus, the Opinion's chief conclusions relevant to the immediate matter have been outdated and cannot be followed.

Even so, the Opinion acknowledges that allotments are Indian country subject to federal and potentially tribal jurisdiction.  While Mr. Sansonetti asserts that Alaska Native allotments are distinguishable from other allotments, the Opinion offers no valid support for his conclusions.  Instead, the Opinion cites to ample law that directly contradicts his assertions and concedes that potential fact-specific inquiries could demonstrate the legitimate exercise of a tribe's jurisdiction over an Alaska Native allotment.  Mr. Sansonetti's suggestion that there is "little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment," *Id.* at 129, conflicts with his own statement that a sufficient tribal nexus to an allotment may support tribal jurisdiction.  Indeed, the Tribe has demonstrated significant and sufficient nexus to the Ondola Allotment to satisfy that test.  Moreover, since his Opinion, the law concerning tribal jurisdiction over an allotment has evolved and must be equally applied to the Tribe's current request.  *See* June 29, 2016 Indian lands determination request, at 10-24.

## II.   <u>The Sansonetti Opinion Has Been Superseded</u>

### A.  Two Subsequent Acts of Congress Nullify Sansonetti's Conclusions.

Congress has superseded Sansonetti's expression of "doubt" regarding, among other things, allotments in Alaska and the exercise of jurisdiction by Alaska Native tribes over allotted lands.  Sansonetti recognized that Congress may legislate to alter the Opinion's conclusions.  *Id.* at 131-132 ("Should the outcome of this opinion be at variance with what lawmakers believe is the proper view of Native village jurisdiction, Congress is free to legislate again in this area to

Doc.#275954

AR001245

Lawrence Roberts, Acting Assistant Secretary                     December 16, 2016
Bureau of Indian Affairs                                          Page 3 of 12

provide certainty.")  Congress did just that in 1994.[1]

        In 1994, Congress enacted legislation that superseded the Sansonetti Opinion with respect
to Alaska tribal status.  The Sansonetti Opinion concluded that Alaska tribes could be tribes
under federal law, and Congress confirmed and unequivocally settled this issue in the 1994
Federally Recognized Indian Tribe List Act, which required that the Secretary of Interior publish
annually a list of federally recognized tribes, 25 U.S.C. § 479a-1, and found that once
recognized, a tribe "may not be terminated except by an Act of Congress." Pub. L. No. 103-454,
§ 103(4), (5), 108 Stat. 4791, 4791-4792 (1994).  Congress also enacted the Tlingit and Haida
Status Clarification Act, which found that while the Secretary of Interior had omitted the Central
Council of Tlingit and Haida Indian Tribes of Alaska from the list of federally recognized tribes,
"the Secretary may not administratively diminish the privileges and immunities of federally
recognized Indian tribes without the consent of Congress," and reaffirmed the Central Council as
a federally recognized tribe. *Id.* §§ 202(4), 203 (codified at 25 U.S.C. §§ 1212, 1213).  The
Department has consistently included Alaska tribes on the annual list of federally recognize
tribes.[2]  There is no longer any question about the federally recognized status of Indian tribes in
Alaska included on Interior's list of federally recognized tribes.[3]

        In 1994 Congress also amended the IRA to add "privileges and immunities" provisions,

---

[1] Congress had also done so in 1987 when it approved amendments to ANCSA inserting a provision expressly
disclaiming any effect on questions regarding tribal governmental authority over lands or persons. Pub. L. No. 100-
241, § 17(a), 101 Stat. 1788, 1814 (1988).

[2] Prior to the List Act, the Department recognized that there were federally recognized tribes in Alaska.  For
example, in 1993, Assistant Secretary—Indian Affairs Ada Deer announced in the preamble to the list then
published that "[t]his list is published to clarify that the villages and regional tribes listed below are not simply
eligible for services, or recognized as tribes for certain narrow purposes.  Rather, they have the same governmental
status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-
government relationship with the United States; are entitled to the same protection, immunities, privileges as other
acknowledged tribes; have the right, subject to general principles of Federal Indian law, to exercise the same
inherent and delegated authorities available to other tribes; and are subject to the same limitations imposed by law
on other tribes." Cabazon Band of Cahuilla Mission Indians of the Cabazon Reservation, Indian Entities Recognized
and Eligible To Receive Services From the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54365 (Oct.
21, 1993).

[3] In the Federally Recognized List Act, Congress required, for the first time, the Secretary to publish an accurate
and regularly updated list of federally recognized tribes. Pub. L. No. 103-454, § 104, 108 Stat. 4791, 4792 (Nov. 2,
1994).  In the first publication under the List Act in 1995, the BIA noted that the 1993 list "represents a list only of
those [Alaska Native] villages and regional tribes which the Department believes to have functioned as political
entities, exercising governmental authority," and their "[i]nclusion on the list . . . establishes that the listed tribes
have the same privileges, immunities, responsibilities and obligations as other Indian tribes under the same or
similar circumstances including the right, subject to general principles of Federal Indian law, to exercise the same
inherent and delegated authorities available to other tribes."  Indian Entities Recognized and Eligible To Receive
Services From the United States Bureau of Indian Affairs, 60 Fed. Reg. 9250, 9251 (Feb. 16, 1995).  However,
unlike the 1993 list, the Department recognized in the 1995 list that in passing the List Act and the privileges and
immunities provisions of the IRA, Congress expressly "confirmed that the Secretary can make no distinctions
among tribes as a general matter of Federal law." *Id.*

which prohibit the federal government from treating federally recognized tribes differently.[4] Because they prohibit the Department from treating tribes differently,[5] these statutory provisions fundamentally upset the Sansonetti Opinion's conclusion that ANCSA implicitly altered tribal territorial jurisdiction over allotted lands in Alaska. The provisions make clear that trust or restricted lands in Alaska must be treated the same as those in the lower 48. Indeed, as noted by Sansonetti, Congress could clarify whether Alaska Native tribes were to have different rights or privileges post-ANCSA, and it did by mandating just the opposite – requiring the Secretary to treat all federally recognized tribes, including those in Alaska as having the same rights, privileges and immunities.

### B. As a Result of the Congressional Action, the Department's Policy Shifted Substantially To Treat Tribes in Alaska Like Tribes in Lower 48.

Interior's view on the exercise of governmental power by Alaska Natives over land, and the effect of ANCSA has evolved significantly since the Sansonetti Opinion. The Sansonetti Opinion reasoned "that ANCSA largely controls in determining whether territory exists over which Alaska villages might exercise governmental powers." *Id.* at 108.[6] Since then, a major ground-shift has occurred. Interior and the courts have adopted a more expansive view of tribal power and a have entirely rejected the Sansonetti Opinion's conclusion that ANSCA controls such questions. In *Akiachak Native Comty v. Salazar*, 935 F. Supp. 2d 195 (D.D.C. 2013),

---

[4] Pub. L. No. 103-263, § 5(b), 108 Stat. 707, 709 (1994) (codified at 26 U.S.C. § 476). Those provisions state:

(f) Privileges and immunities of Indian tribes; prohibition on new regulations. Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

(g) Privileges and immunities of Indian tribes; existing regulations. Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

[5] As Interior recently noted, "the Department's policy is that there should not be different classes of federally recognized tribes." Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76888, 76890 (Dec. 23, 2014).

[6] The Sansonetti Opinion did determine that "[a]t a minimum, it is clear that ANCSA did not affect retained governmental powers of these tribes to determine membership and to regulate internal tribal relations." Sansonetti Opinion at 107. Other than an attempt to differentiate ANCSA from termination acts, however, it is unclear why the Solicitor decided that Alaska tribes retained some governmental powers akin to tribes in the lower 48, but not others. Despite the fact that ANCSA did not intend to create reservations, it did intend for Alaska Natives to retain power over land and resources (albeit in a different way for some activities). *See* Sansonetti Opinion at 98 (recognizing that land and resources went to Native corporations for their control). But nothing in ANCSA purported to extinguish all territorial jurisdiction over land moving forward, or even address the issue of whether tribes, outside of Native corporations, could exercise their governmental power over their members' existing allotments; allotments, which were not, in fact, affected by ANCSA. *See generally, Akiachak Native Community v. Salazar,* 935 F. Supp. at 205 (ANCSA intended only to prohibit *claims* against the United States by Alaska Natives).

*vacated sub nom. Akiachak Native Cmty. v. United States DOI*, 827 F.3d 100 (D.C. Cir. 2016),[7]
the District Court for the District of Columbia held that Interior's rule in 25 C.F.R. Part 151
prohibiting Alaska tribes from placing land into trust under the IRA was not supported by law.
The court rejected the argument that ANCSA implicitly repealed the Secretary's authority to take
land into trust under the IRA. The court's ruling directly unhinges the main assumptions relied
upon by Sansonetti in his opinion that ANCSA was intended to control all questions relating to
land for Alaska tribes, including the ability to take land into trust.

        Consistent with the court's decision, the Department published the final rule removing
the Alaska exception from Part 151 on December 23, 2014, and it took effect on January 22,
2015.  79 Fed. Reg. 76888 (Dec. 23, 2014).  In light of *Akiachak* and the "urgent policy
recommendations" of the Indian Law and Order Commission and the Secretarial Commission on
Indian Trust Administration and Reform, the final rule explained the Department's "careful[]
reexamin[ation]" of the relevant law.  *Id.* at 76889-90.  The Department reexamined the impact
of ANCSA and concluded that it was not as broad as previously thought and did not implicitly
diminish the Secretary's authority to take land into trust under the IRA. 79 Fed. Reg. 76890.[8]
The Department concluded that the Secretary's discretion to take land into trust in Alaska
pursuant to the IRA had remained intact notwithstanding the enactment of ANCSA.  The
Department further concluded that the Alaska exception improperly treated Alaska tribes
differently from tribes in the lower 48 contrary to federal law and policy.  *Id.*  Importantly here,
in the final rule the Department explained: "[a]s a legal matter, <u>an Alaska tribe possessing trust
lands would be able to exercise jurisdiction over such land consistent with the manner in which
Indian tribes exercise authority over trust lands located in the rest of the country.</u>" (Emphasis
supplied.)  It also explained that "[i]t is important to remember that Alaska Native land and
history did not commence with ANCSA, and ANCSA did not terminate Alaska Native tribal
governments" and "the Department's policy is that there should not be different classes of
federally recognized tribes . . . ." *Id.*

        The Department's final rule removing the Alaska exception marks a major shift in the
Department's approach regarding Alaska tribes and their wrongly suppressed territorial
jurisdiction—both as a policy and a legal matter.  Several important conclusions can be drawn
from this significant reform.

        First, ANCSA did not revoke the Secretary's IRA Section 5 authority to acquire title to
lands in trust for an Alaska tribe. Second, any trust lands acquired under IRA Section 5 are
"Indian country" under 18 U.S.C. § 1151(c), and they are subject to federal and tribal territorial

---

[7] *Akiachak* was vacated on appeal on mootness grounds because the D.C. Circuit Court of Appeals determined that
all live claims in the suit were founded on the Department's Alaska exception regulation, which, by the time of the
appeal, had been removed through a formal rulemaking.

[8] On January 16, 2001, Solicitor Leshy rescinded a prior opinion questioning the Department's authority to take land
into trust citing ANSCA. "Rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian Affairs
entitled 'Trust Land for the Natives of Venetie and Arctic Village,'" Memorandum to Assistant Secretary—Indian
Affairs from Solicitor John D. Leshy (Jan. 16, 2001).  Notably, the Sansonetti Opinion cited the prior opinion that is
now withdrawn. Sansonetti Opinion at 112 n.276; 123 n.296.

AR001248

Lawrence Roberts, Acting Assistant Secretary                    December 16, 2016
Bureau of Indian Affairs                                        Page 6 of 12

jurisdiction.  Thus, despite ANCSA and the Sansonetti Opinion, if an Alaska tribe's application for trust lands is approved under the new rule's criteria, the Secretary will create new lands over which an Alaska tribe will possess territorial jurisdiction.

It therefore logically follows that ANCSA does not and could not impair an Alaska tribe's ability to possess and exercise jurisdiction over lands that currently constitute "Indian country" under 1151(c).  *See, e.g.*, Answering Brief for the Federal Appellees, *Akiachak Native Community v. United States and State of Alaska*, No. 13-5360 (D.C. Cir., December 3, 2015) at 73 ("Although ANCSA repealed the Native Allotment Act, it preserved both the claims of individuals whose allotment applications filed pursuant to the Allotment Act were "pending before the Department of the Interior on December 18, 1971," (43 U.S.C. § 1617(a)), and the restrictions on existing allotments. Accordingly, Native allotments in Alaska continued to be granted after ANCSA's enactment and continue to be held under restrictions functionally equivalent to those applicable to trust land[.]"); *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.2 (1998) ("Other Indian country exists in Alaska post-ANCSA only if the land in question . . . constitutes 'allotments' under § 1151(c).").  If ANCSA contained such impairment, the Department could not have altered Part 151 as it has.

Furthermore, Congress's enactment of the privileges and immunities provisions prohibit Interior from construing ANCSA, as the Sansonetti Opinion does, to diminish Alaska tribal authority over territory and nonmembers where ANSCA does not do so expressly.  And the Sansonetti Opinion's expressed doubt "that any specific villages or groups can claim jurisdictional authority over allotment parcels," *id.* at 129, is directly contrary to the privileges and immunities provisions, as well as, judicial and Departmental action interpreting those provisions.[9]

As a result, as shown in the Tribe's June 29, 2016 submission, NVE is a federally-recognized tribe with the legal power to exercise territorial jurisdiction over the Ondola Allotment.  Indeed, NVE possesses and actively exercises governmental authority over the allotment.  This allotment is owned entirely by NVE tribal members.  Based on controlling law, the Department must now conclude that that NVE, the tribe of the original allottee and of all current allottees, possesses and lawfully exercises jurisdiction over the allotment. *See* Big Sandy Indian Lands Determination (September 6, 2006); Opinion of the Solicitor, Sampson Johns Allotment (September 26, 1996).

---

[9] Even at the time of the Opinion, Sansonetti's broad statements regarding the ability of tribes to exercise jurisdiction over Indian lands in Alaska after enactment of ANCSA went beyond the scope of the analysis and constitute dicta. *See e.g.*, Sansonetti Opinion, at p. 108 ("We conclude that ANCSA largely controls in determining whether any territory still exists over which Alaska villages might exercise governmental powers.").

AR001249

Lawrence Roberts, Acting Assistant Secretary        December 16, 2016
Bureau of Indian Affairs                                   Page 7 of 12

**III.   The Sansonetti Opinion Does Not Preclude the Department's Determination that the Ondola Allotment is Indian Lands**

> **A.   Sansonetti Concedes that Allotments are Indian country and Cites Good and Relevant Law in Support.**

The Sansonetti Opinion acknowledged that Alaska Native allotments are Indian country. *Id.* at 127 (citing *U.S. v. Jackson*, 280 U.S. 183 (1930), in which "the Supreme Court held that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments."). In support of this conclusion, the Sansonetti Opinion cited several cases upholding the Indian country status of allotments notwithstanding the diversity in the procedures for granting the allotments. *Id.* at 124-126 (*citing United States v. Pelican*, 232 U.S. 442 (1914); *United States v. Ramsey*, 217 U.S. 467 (1926); *In re Carmen's Petition*, 165 F. Supp. 942 (N.D. Cal. 1958), *aff'd* 270 F.2d 809 (9th Cir. 1959). *See, also e.g., United States v. Pelican*, 232 U.S. at 449 (1914) (Indian country includes individual Indian allotments held in trust by the United States because they "remain Indian lands set apart for Indians under governmental care"); *United States v. Bowling*, 256 U.S. 484, 487 (1921) ("as respects both [trust and restricted] allotments . . . the United States possesses a supervisory control over the land"); *United States v. Jackson*, 280 U.S. 183, 193 (1930) (explaining that "it has long been the settled ruling of the Department of the Interior, both under the very statutes here involved and under other statutes enacted by Congress with similar purpose and pursuant to its general plan with respect to Indian allotments and homesteads, that Indian allotments and Indian homesteads are in all essential respects upon the same footing, and that each is equally within the purview of a statute in which the Congress may use only the terms 'allottee' and 'allotment'" and holding that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments); *In re Carmen's Petition*, 165 F. Supp. at 945-46 (public domain trust allotment not carved out of a reservation was Indian country; "Respondent interprets the *Pelican* decision to mean that an allotment to be Indian County must have been made from lands which were previously Indian Country. But this is an unduly restricted view of that decision . . . . Since all Indian allotments, regardless of their source, are maintained under the same type of Governmental supervision, either by holding title in trust for the allottee or by restricting alienation, there is no logical reason for making the application of protective criminal statutes dependent upon the source of the allotment."). The clear implication of the Opinion's citation of these authorities is that Alaska Native allotments may not be distinguished from other tribal land held in trust or restricted fee.

Courts have continued to uphold the Indian country status of allotments. For example, in *Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 123-125 (1993), the Supreme Court rejected Oklahoma's attempt to distinguish between the various forms of Indian country and instead held that its presumption against states having taxing authority over Indians living on reservations applied to all forms of Indian country. *Id.* After pointing out that "Congress defined Indian country broadly to include . . . Indian allotments, whether restricted or held in trust" and noting that Indian sovereignty "provides a backdrop against which the applicable treaties and statutes must be read," the Court concluded that tribal members living in "Indian

Lawrence Roberts, Acting Assistant Secretary                      December 16, 2016
Bureau of Indian Affairs                                                    Page 8 of 12

country" of any type would be exempt from Oklahoma taxes unless Congress expressly
authorized the state to exercise such taxing jurisdiction.  *Id.* at 128.

### B.  Controlling Law Does not allow Alaska Native Allotments to be Treated Differently from Allotments in the Lower 48.

Courts agree that Alaska Native allotments are Indian country.   In *Alaska v. Native Village of Venetie*, 522 U.S. 520 (1998), the Supreme Court observed that Section 1151 reflects the two criteria the Supreme Court "previously . . . had held necessary for a finding of 'Indian country' . . . first, [the lands] must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence."  522 U.S. at 527. Although the Supreme Court held in *Venetie* that ANCSA fee lands were not Indian country, the Court also noted that, "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of § 1151(b), or if it constitutes 'allotments' under § 1151(c)."  522 U.S. at 527 n.2 (emphasis supplied).

The courts have consistently treated Alaska Native allotments the same as allotments in the lower 48.  For example, in *Pence v. Kleppe*, 529 F.2d 135, 138 (9th Cir. 1976), the court found it had jurisdiction to adjudicate Alaska Natives' claims under the Alaska Native Allotment pursuant to 25 U.S.C. § 354,[10] a "grant of general jurisdiction to United States District Courts in [allotment] actions . . ." *See also Pence v. Kleppe*, 529 F.2d at 138 n.5, 140 (Alaska Natives come within statutes applicable to "Indians" and because "there was doubt whether the General Allotment Act did apply to [Alaska Natives] . . . . Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act[, which] . . . merely plugged a hole in the coverage of the [General Allotment Act of 1887]"); *Masayesva for and on Behalf of Hopi Indian Tribe v. Zah*, 792 F. Supp. 1160, 1163 (D.Ariz. 1992) ("Alaska Native Allotment Act, legislation which is interpreted similarly to the General Allotment Act").  Additionally, the courts have held that the federal government has a fiduciary duty to administer Alaska Native allotments for the benefit of Natives based on the federal trust responsibility.  *Aguilar v. United States*, 474 F. Supp. 840, 846 (D.Alaska 1979).

And the Alaska Native Allotment Act must be construed according to the principles applicable to other statutes affecting Indians.  *See Olympic v. U.S.*, 615 F. Supp. 990, 995 (D.Alaska 1985) (applying "general principle that statutes passed for the benefit of Indians (including Alaska Natives) are to be liberally construed, and doubtful expressions should be resolved in the Indians' favor"); *State of Alaska, Dept. of Public Works v. Agli*, 472 F. Supp. 70, 72 (D.Alaska 1979) ("[t]he federal government has the plenary and exclusive power to regulate

---

[10] 25 U.S.C. § 345 provides that "All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper circuit court [district court] of the United States . . . ."

Doc.#275954

AR001251

Lawrence Roberts, Acting Assistant Secretary                    December 16, 2016
Bureau of Indian Affairs                                            Page 9 of 12

Indian affairs," and "[w]here a dispute involves trust or restricted property, the state may not adjudicate the dispute nor may its laws apply.") (*quoting In re Humboldt Fir, Inc.*, 426 F. Supp. 292, 296 (N.D. Cal.1977)); *State of Alaska v. Babbitt*, 38 F.3d 1068, 1073 (9th Cir. 1994) ("The government's interest in the lands described in [Alaska Native] allotment applications is, therefore, of the type contemplated by the 'trust or restricted Indian lands' limitation of the [federal Quiet Title Act"); *Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440, 1443 (9th Cir. 1987) (Alaska Native allotments may be condemned pursuant to 25 U.S.C. § 357).

As such there is no basis to treat the Ondola Allotment any different from allotments that exist in the lower 48. And because the Ondola Allotment is Indian country and held by NVE tribal members, as discussed in Section II.B above and the Tribe's June 29, 2016 letter request, in making its Indian lands determination, the Department must apply the same legal standards as applied in the lower 48. *See supra*, pp. 6 (citing, for example, the Big Sandy Opinion).

### C.  In Any Event, NVE Meets Sansonetti's Nexus Analysis.

The Sansonetti Opinion concluded, among other things, that "Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands and nonmembers." *Id.* at 132. However, the Opinion acknowledged that its conclusion is necessarily tentative because it was made in the abstract and in the absence of specific facts. A careful reading shows that the Opinion did not say that a tribe can never establish jurisdiction; rather it *suggested* that there is "little or no room for tribes in Alaska to exercise governmental authority over land or nonmembers" and "little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment." *Id.* at 108, 129 (emphasis supplied). Indeed, Sansonetti opined that a tribal nexus may support a finding of tribal jurisdiction over an allotment. Specifically, Sansonetti says:

- "While we are unaware of any court decisions addressing the question, it is our view that an assertion of tribal jurisdiction over an Indian homestead allotment obtained by an Indian who has abandoned tribal relations would fail. In such a case, it seems unlikely that there would be any indication of congressional intent to permit such jurisdiction, and there would be no original tribal nexus to support such jurisdiction over the allotment." *Id.* at 127.

- "[A]n assertion of tribal jurisdiction over individual restricted lots would be doubtful if there were no clear nexus to the individual restricted lands." *Id.* at 130.

Both of these passages indicate that where an Indian allottee has maintained tribal relations to a tribe, or where there is otherwise a tribal nexus with the allotment, tribal jurisdiction may exist. Here, as amply demonstrated in Section I (Brief History of the Native Village of Eklutna) and Section VI(A) (Ondola Allotment) of the Tribe's June 29, 2016 letter request, there is a clear tribal nexus to the Ondola Allotment, and there is no evidence that the allotment has been held by "an Indian who had abandoned tribal relations." In short, the Ondola Allotment was allotted to an NVE tribal member and continues to be held by members of the Ondola family, a prominent family of tribal members. The allotment is seven miles from the

Doc.#275954

Village of Eklutna, firmly within the Eklutna Tribe's aboriginal territory.   And the Tribe exercises its jurisdictional authority over the Ondola Allotment in numerous ways detailed in the June 29, 2016 letter at Section VII (Native Village of Eklutna Exercises Jurisdiction and Governmental Power Over the Ondola Allotment).

### D.  Sansonetti's Conclusion that Alaska Native Allotments Are Distinguishable from All Other Allotments is Severely Flawed.

Finally, the rationale for Sansonetti's "doubt" about tribal jurisdiction over allotments is flawed. After detailing the law supporting the Indian country status of Alaska Native allotments, the Sansonetti Opinion expressed such doubt based on its finding of distinctions between Alaska Native allotments and other allotments.  Sansonetti Opinion at 129.  As noted above, such doubt runs contrary to Congress's anti-discrimination mandate in the privileges and immunities provisions and controlling case law pertaining to the Indian-country status of allotments. Furthermore, the alleged distinction between Alaska Native allotments and other allotments fails. Of the 133 pages of the Opinion, only one page is dedicated to the conclusion on allotments, which, in its entirety (including footnotes), reads as follows:

> A number of facts, however, do distinguish Alaska Native allotments from most allotments in the contiguous 48.  First, the statute does not make tribal membership a criteria for receiving an allotment, probably because in 1906, Congress was not considering the Alaska Native allotments in a tribal context. This makes Alaska Native allotments more like Indian homestead allotments, rather than those issued pursuant to the General Allotment Act or other tribe-specific allotment acts. [fn. 305, "… express[ing] no opinion concerning tribal jurisdiction over § 4 public domain allotments."]  Second, Alaska Native allotments were not carved out of any reservation.  While we consider this factor insignificant for federal jurisdictional purposes, we believe it has at least some significant in determining questions of tribal authority.  Third, the statute specifically provides that the allotment "shall be deemed the homestead of the allottee and his heirs."  Again, while not a controlling factor as such, the language makes the Alaska Native Allotment Act appear more similar to a general Indian homestead act than a tribal or reservation related allotment act.

> We wish to make clear that Alaska Native allotments, like other Indian allotments, remain under federal superintendency and subject to federal protection while in restricted status.  Thus, we conclude that Congress has not divested the Federal Government of its jurisdictional authority over such lands, and they are Indian country.

> However, after examining the statute and circumstances related to Alaska allotments, we are not convinced that any specific villages or groups can claim jurisdictional authority over allotment parcels.  As we noted above, particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native

Lawrence Roberts, Acting Assistant Secretary                    December 16, 2016
Bureau of Indian Affairs                                        Page 11 of 12

> allotment.

*Id*. at 128-129.

 This reasoning does not square with history or logic. The Opinion attempts to distinguish the 1906 Alaska Native Allotment Act ("1906 Act") from other allotment acts on the basis that it did not require tribal membership. Yet the Act was available to "any Indian or Eskimo of full or mixed blood who resides in and is a native of [Alaska]." 1906 Act. Mr. Sansonetti noted that allotments under the 1906 Act were not carved out of any reservation, but that was merely a result of circumstance and the proposition that an allotment must be carved out of a reservation has been squarely rejected. *See In re Carmen's Petition*, 165 F. Supp. 942. Moreover, the belated acquisition of Alaska by the United States meant that the settlement of Alaska happened after the United States' Indian reservation policy was replaced by the allotment policy. The historical circumstances that lead to the 1906 Act are described in a Senate Committee report:

> The Natives of Alaska were in an anomalous position. They were omitted from the General Allotment Act which applied to Indian tribes of other parts of the United States. They were omitted from the Homestead Act as being neither citizen nor alien capable of attaining citizenship. They were forbidden by Congress to enter into treaties with the United States for the cession of some lands and the retention of other. Physically they comprised the major part of Alaska's population. Officially they were invisible. They had no recognizable legal title to lands despite the general policy of the courts to recognize their right to possession against third parties. This was a right which could be enforced only through civil action in courts which, as a practical matter, were inaccessible to Alaska Natives by reason of distance, expense, and lack of knowledge. The Alaska Native Allotment Act was passed for the purpose of providing legal title to some of the lands occupied.

Senate Report No. 92-405, 92d Congress, 1st Session, at 90-91. Mr. Sansonetti conceded that any lack of tribal nexus to a 1906 Act allotment is "probably because in 1906, Congress was not considering the Alaska Native allotments in a tribal context." *Id*. at 128. But this is mere conjecture that is unsupported by any evidence or facts. Moreover, his arbitrary conclusion conflicts with the fact that Congress recognized that Alaska natives had been excluded from the homestead act but had similar needs, so it enacted a separate allotment act in Alaska for Alaska Natives, just as it has done throughout the lower 48.

 Reaching a conclusion that some meaningful legal distinction exists between this allotment and other allotments only propagates the assimilationist- and termination-era notions that Alaska groups are not truly Indian tribes and do not, and ought not, have governmental authority over Indian country lands. But ANCSA was not termination legislation, and Alaska tribes, like those in the lower 48, must be treated the same as other tribes, including with respect to their exercise of territorial jurisdiction over trust and qualifying allotted lands.

Lawrence Roberts, Acting Assistant Secretary
Bureau of Indian Affairs

December 16, 2016
Page 12 of 12

## IV.  **Conclusions**

For the reasons stated above, the Sansonetti Opinion is no obstacle to the Department's determination that the Ondola Allotment is Indian lands subject to the Tribe's jurisdiction.

Respectfully Submitted,

SONOSKY, CHAMBERS, SACHSE,
MILLER & MUNSON, LLP

By:   Lloyd B. Miller
Colin C. Hampson
Vanessa Ray-Hodge

Doc #275954

**June 6, 2017**

*Via Email*

Dear Eric,

In follow-up to our call in early May, on behalf of the Native Village of Eklutna ("Tribe" or "NVE"), we are informally providing supplemental background information about the Ondola Allotment and additional legal analysis of the Alaska Native Allotment Act. This is the Tribe's second supplement to its original request for an Indian Lands Determination relating to the Ondola Allotment.

### 1. Additional Factual Background

As explained in the Tribe's June 29, 2016 Indian lands determination request, the allotment is located in the Birchwood community seven miles from the Village of Eklutna ("Village") and twenty-two miles from Anchorage. *See* Letter from Colin C. Hampson to Lawrence Roberts, Acting Assistant Secretary, Bureau of Indian Affairs at 7 (hereinafter "June 29, 2016 Submission"). A map showing the location of the allotment is enclosed as Attachment 1.

The Village occupies approximately 55 acres of fee land and approximately 50 people reside on Village owned lands. The Tribe provides a range of governmental services to Village residents and tribal members, including a tribal court, housing, health care services in a recently constructed health care clinic, employment services, water services, waste services, snow plowing, food bank services, lunches for seniors, environmental disposal services (disposal of used appliances and furniture), trespass inspection and monitoring, archeological and cultural surveys, historical and cultural preservation, Indian child welfare advocacy and case management services, youth activities (including a dance and drum group and culture camp), holiday baskets and school supplies, a biannual potlatch and powwow, and signage. In recent years, the Tribe installed a street light within the Village for safety purposes.

The Tribe provides many of the same governmental and tribal member services to the Ondola allotment. *See* June 29, 2016 Submission at 14 – 23.

### 2. Alaska Native Allotment Act

As discussed in the Tribe's June 29, 2016 letter and supplemental letter dated December 16, 2016, *see* June 29, 2016 Submission *and* Letter from Colin C. Hampson to Lawrence Roberts, Acting Assistant Secretary, Bureau of Indian Affairs (hereinafter "Dec. 16, 2016 Submission"), the precedents for recognizing tribal jurisdiction over tribal member-owned allotments, including allotments located off-reservation and allotments issued from the public domain, establish the Tribe's right to a favorable determination with respect to the Ondola Allotment. In the contiguous United States, allotments acquired by individual Indians from the public domain and outside of a current or former reservation have been found to qualify as "Indian lands" under the Indian Gaming Regulatory Act ("IGRA"). For example, as we noted in

AR002039

our initial submission on June 29, 2016, the National Indian Gaming Commission ("NIGC") concluded that an Indian allotment held in trust for a member of the Big Sandy Rancheria constitutes Indian lands. *See* June 29, 2016 Submission at 11-12. The allotment at issue in the Big Sandy determination was an allotment that was patented to the individual Indian from the public domain and was located twelve miles outside the Tribe's Rancheria. *Id.*; *see also* Memorandum from John R. Hay, Staff Attorney, National Indian Gaming Comm. to Philip N. Hogan, Chairman, NIGC at 2(Sept. 6, 2006) ("The McCabe Allotment was originally allotted out of the public domain to Mary McCabe, a member of the Tribe, in 1920 and immediately placed in trust."). There, the determinative facts with respect to whether the land at issue qualified as an allotment were whether the land was held in trust[1] for a member of the Tribe. *See generally, id.*

Similarly, in the Office of the Solicitor's opinion for the Quinault Indian tribe, the Associate Solicitor found that the Sampson Johns Allotment was "Indian land" under IGRA. Memorandum from Robert T. Anderson, Associate Solicitor, Division of Indian Affairs to Director, Indian Gaming Management Staff (Sept. 25, 1996). The Solicitor's Office determined that the land qualified as an allotment because the "land is trust land owned by Quinault tribal members" despite the fact that the land was "allotted . . . out of the public domain." *Id.* at 1, 2. The Solicitor's Office did not focus on the fact that the allotment was outside the Tribe's reservation but that "[t]he land has been continuously held in trust since 1916 for the beneficial owners of the land and is currently held in trust by the United States for a number of Quinault tribal members, heirs and successors of Sampson Johns." *Id.* at 2.

There is no legal basis on which to distinguish allotments issued by the Secretary of the Interior pursuant to the Alaska Native Allotment Act of 1906 ("ANAA") from other Indian allotments. The ANAA, as amended, 34 Stat. 197 (May 17, 1906), gave the Secretary the authority to

> allot not to exceed one hundred and sixty acres of nonmineral land . . . to any Indian, Aleut, or Eskimo of full or mixed blood who resides in and is a native of [the district of Alaska] . . . and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable . . . .

43 U.S.C. § 270-1. While not identical, the ANAA is similar to the General Allotment Act ("GAA"), which allowed individual Indians to establish allotments outside of federally created or recognized reservations. More specifically, the GAA provided that "any Indian not residing upon a reservation, or for whose tribe no reservation has been provided . . . shall make settlement upon any surveyed or unsurveyed lands of the United States . . . shall be entitled . . . to have the same allotted to him or her . . . ." 24 Stat. 388 § 4. Further, the GAA provided that approval of the patent by the Secretary "shall be of legal effect, and declare that the United States does and will hold the land thus allotted . . . in trust for the sole use and benefit for the Indian . . . ." *Id.* §

---

[1] As discussed in the Tribe's previous submissions, land held by an individual Indian in restricted fee is treated as equivalent to trust land.

5.  The GAA was not limited to providing individual Indians land within their existing or former Indian reservation.

The GAA is generally understood as the central piece of legislation of the allotment era, but the GAA was preceded and succeeded by numerous allotment acts providing more specificity with regard to certain reservations, types of lands, or classes of individuals.  *See Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 328 (2008) (referring to "[t]he history of the General Allotment Act and its successor statutes"); F. Cohen, HANDBOOK OF FEDERAL INDIAN LAW § 16.03[2][a]-[b], pp. 1072–1074 (2012 ed.).  The allotment statutes vary somewhat as to the terms used to define the land and individuals to which they apply, yet they all are part of the congressional policy to provide homesites for individual Indians and must therefore be construed *in pari materia. See United States v. Jackson*, 280 U.S. 183, 193-94, 196 (1930) (approving the Department of the Interior's construction of Indian homestead laws and GAA "in para materia" and ruling "Indian allotments and Indian homesteads are in all essential respects upon the same footing, and that each is equally within the purview of a statute in which the Congress may use only the terms 'allottee' and 'allotment'"); *see also Kirkwood v. Arenas*, 243 F.2d 863, 866 (9th Cir. 1957) (holding Mission Indian Act and GAA to be construed *in pari materia* and so Section 6 of GAA regarding taxability of allotments is applicable to allotment made under former Act).  Accordingly, allotments issued under the ANAA should be treated in the same manner as allotments issued under the GAA or other allotment statutes.

Differences in historical circumstances or terminology provide no basis for distinguishing the two statutes.  First, in enacting the ANAA Congress intended to eliminate confusion existing at the time about the categorization of Alaska Natives by providing for their treatment similar to Indians in the contiguous United States.  The Ninth Circuit has noted that the ANAA was passed "because a number of lower courts found that Alaska Natives were not within the definition of 'Indian,' [and so] there was doubt whether the General Allotment Act did apply to them.  Thus Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act." *Pence v. Kleppe*, 529 F.2d 135, 140 (9th Cir. 1976); *see also, Masayesva v. Zah*, 792 F. Supp. 1160, 1163 and n.6 (D. Ariz. 1992) ("the Alaska Native Allotment Act [is] legislation interpreted similarly to the General Allotment Act" and "'plugged a hole' in the General Allotment Act's failure to address Alaska Natives.").  The ANAA was thus meant to fill the gap that existed at the time between the treatment of Alaska Natives and Indians in the contiguous United States.  The House Committee on the Public Lands explained the need for the ANAA as follows:

> The necessity for this legislation arises from the fact that Indians in Alaska are not confined to reservations . . . they live in villages and small settlements . . . .  It does not signify that because an Alaska Indian has lived for many years in the same hut and reared a family there that he is to continue in peaceable possession of what he has always regarded his home.  Some one who regards that particular spot as a desirable location for a home can file upon it for a homestead, and the Indian or Eskimo . . . is forced to move and give way to his white brother.

H.R. REP. No. 59-3295, at 1 (1906).[2]

Second, case law supports the conclusion that there is no substantive difference between the status of Alaska Natives and Indians in the contiguous United States. In *Pence v. Kleppe*, in discussing the court's jurisdiction, the court noted that:

> The Alaska Native Allotment Act . . . deals with allotments to Indians, Aleuts and Eskimos without making any distinction between them. There are many statutes dealing specifically with Alaska, such as the Alaska Native Allotment Act, which refer expressly to Indians, Aleuts, and Eskimos. On the other hand, many other statutes which are of general application throughout the United States and its territories refer only to 'Indians.' It has been held that in those statutes, the word 'Indian,' as applied in Alaska, includes Aleuts and Eskimos. The Act of June 2, 1924, Public No. 175, 43 Stat. Ch. 233, p. 253, confers citizenship on 'all non-citizen Indians.' *In Hynes v. Grimes Packing Co.*, 9 Cir., 1948, 165 F.2d 323, 326, we said that the statute conferred citizenship upon the Eskimo of Alaska. The Act of August 13, 1946 . . . created the Indian Claims Commission and granted it jurisdiction of claims 'on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska.' (§ 2, 25 U.S.C. § 70a). *In United States v. The Native Village of Unalakleet*, 1969, 411 F.2d 1255, 188 Ct.Cl. 1, the Court of Claims, in an exhaustive opinion, held that the word 'Indian' as used in the statute, included Eskimos and Aleuts. The court pointed out that the word 'Indian' is commonly used in this country to mean 'the aborigines of America.' See also 42 C.J.S. Indians s 1, p. 647. We agree . . . .

529 F.2d at n. 5.  This discussion shows that there is no rational basis for distinguishing the Alaska Native Allotment Act from other allotment acts.  In fact, the opposite is true – the terms are most often used synonymously.[3]  In any event, the Tribe has demonstrated a direct tribal

---

[2] As discussed previously, the fact that the ANAA used the term "homestead" rather than "allotment" is also not a sufficient basis on which to distinguish Alaska Native allotments. *See* June 29, 2016 Submission at 8-10, 25 n.13. There is in reality no difference in the treatment by the United States of a "homestead" under the ANAA from other Indian allotments. Indeed, allotments made under the ANAA are held in restricted fee by the individual Indian, Aleut or Eskimo and "subject to the same restrictions on taxation and alienation as trust lands, and are generally treated by Congress and Interior as the equivalent of trust land." Office of the Solicitor, M-37043 "Authority to Acquire Land into Trust in Alaska" at 21, n. 134 (Jan. 13, 2017); id. at 2, n.18. *See also*, NVE Submission at 7-9. (Dec. 16, 2016). In any event, the ANAA and its implementing regulations repeatedly uses terms like "allot," "allotment" and "allottee" notwithstanding the one reference to "homestead" in the Act. 34 Stat. 197. *See also* 43 U.S.C. 1634 (discussing "Alaska Native allotment applications"); 43 C.F.R. 2561.0-8 (regulations implementing the Act and referring to applications for and the granting of an "allotment").

[3] The implementing regulations of the GAA required that an individual Indian show tribal membership or eligibility for tribal membership, 43 C.F.R. § 2531.1.  The ANAA required an analogous showing that the applicant was Alaska Native.  Interior required certification that there was nexus or affiliation between the individual applicant and a native Alaska aboriginal group or entity recognized by Congress in the Act. *See* 43 C.F.R. § 67.5(e) (1958) (43 C.F.R. Pt. 67 was amended and later reorganized into 43 C.F.R. § 2561.1, *see* 35 Fed. Reg. 9502 (June 13, 1970)). For example, the ANAA allotment application required BIA to certify that the individual is "a full or mixed blood Indian, Aleut or Eskimo, born and now residing in the State of Alaska." *See e.g.*, Olga Ondola Allotment

nexus because the Ondolas are tribal members of NVE, a federally recognized tribe. *See* NVE Indian lands determination request at 5-7 (June 29, 2016).

Any doubt regarding the treatment of allotments made to Alaska Natives under the ANAA and Indians in the lower 48 is resolved by the privileges and immunities provisions enacted in 1994, which prohibit Interior from treating NVE and the Ondola allotment differently than the tribes or allotments at issue in the Big Sandy and Sampson Johns decisions. *See* June 29, 2016 Submission at 24.

### 3. Conclusion

The only question that remains is to determine whether the Ondola Allotment qualifies as "Indian land" is whether NVE exercises governmental power over the allotment. As discussed in our June 29, 2016 Submission, we have provided ample facts to support a positive determination on this question. *Id.* at 10-23; *see also generally* Dec. 16, 2016 Submission.

Please let us know if you have any further questions.

Thank you,

Colin & Vanessa

---

Application, Form 4-021 (Nov. 1958), Alaska Native Allotment Application, Department of the Interior, Bureau of Land Management (Jul. 3, 1961); GAO Report to the Chairman, Committee on Interior and Insular Affairs, House of Representatives, "Alaska Native Allotment Eligibility Process Can be Improved" at 11, 14 (July 1988). In accordance with the ANAA and regulations, BIA certified that Olga Ondola met the criteria for being "Indian, Aleut or Eskimo" as part of the process for issuing the Ondola Allotment. Notwithstanding the confusion at the time over whether groups of Alaska Natives were "tribes," the application requirements under the ANAA were consistent with the GAA and its requirement that an individual Indian show a nexus to a tribal group in the lower 48. Regardless, today BIA requires that for certification of Alaska Native Blood, an individual must show his or her "relationship to an enrolled member(s) of a federally recognized Indian tribe . . . which appears on the list of recognized tribes published in the Federal Register by the Secretary of the Interior."). *See* https://www.bia.gov/cs/groups/public/documents/text/idc-001805.pdf (last accessed May 11, 2017).

IN REPLY REFER TO:

**UNITED STATES
DEPARTMENT OF THE INTERIOR**

BUREAU OF INDIAN AFFAIRS
Area Field Office
1220 East 5th Avenue
Anchorage, Alaska

055026

June 30, 1961

Mr. Warner T. May
Manager, Land Office
Bureau of Land Management
6th and Cordova
Anchorage, Alaska

Dear Mr. May:

You will find enclosed in quadruplicate the application of
_____ Olga Ondola _____ of _____ Chugiak _____, Alaska
for a Native Land Allotment under the Act of May 17, 1906,
as amended, covering _____ 10 _____ acres of land.

A representative of this office has certified that the above
named applicant is a Native entitled to an allotment under the
regulations of 43 CFR, Part 67.  Please acknowledge receipt of
this application furnishing us your serial number covering the
case.  There is also enclosed, in triplicate, Alaska Native
Allotment Evidence of Occupancy properly executed by the
applicant.                     Sincerely yours,

*acknowledged
7/3/61
Reb*

*Charles P. Mathes*
Charles P. Mathes
Real Property Officer

Enclosure

CPM/es

cc:  Realty, JAO
     Subj. file
     Chrony file

BUREAU of LAND MANAGEMENT

JUL 3  1961  10·00 AM

ANCHORAGE LAND OFFICE

AR002046

Form 4–021
(November 1958)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

FORM APPROVED
BUDGET BUREAU NO. 42–R1359

Land Office    Anchorage

ALASKA NATIVE ALLOTMENT APPLICATION
(Act of May 17, 1906, 34 Stat. 197, 48 USC 357, as amended)

Serial Number   055026

1. Name of Applicant          (First Name)               (Middle Initial)                    (Last Name)

               Olga                                                                Ondola

2. Address of Applicant

               General Delivery
               Chugiak, Alaska

3. Applicant is a full or mixed blood  [X] Indian  [ ] Aleut, or  [ ] Eskimo, born and now residing in the State of Alaska.

4. Sex of Applicant:  [ ] Male  [X] Female    5. Applicant is  [X] head of a family;  [ ] at least 21 years of age.

6. Legal description of the lands applied for (if lands are unsurveyed, describe them in a manner sufficient to permit their ready identification on the ground):

        Lot Nos. 64, 66 and 67, Sec. 5, Twp. 15, North R 1 West,
        Seward Meridian

BUREAU of LAND MANAGEMENT

JUL 3 1961 10·00 ᴬᴹ

ANCHORAGE LAND OFFICE

approximately
containing   10   acres.

7. The land applied for is:

a. Nonmineral except for_____
   and not claimed for mining purposes by any person

b. Not occupied or improved by any other person.

8. Applicant has not received any other allotment under the act of May 17, 1906, supra, except as follows (if none, write "none"):

       None.

9. Applicant has occupied the land applied for since (date)   May of 1937   and has marked its corners and posted the land as required by the regulations.   [X] Yes   [ ] No

AR002047

10. Evidence of substantially continuous use and occupancy of the land for a period of 5 years is attached in *triplicate* ☒ Yes ☐ No

11. I HEREBY CERTIFY that I am well acquainted with the character of the lands herein applied for, have personally examined each and every legal subdivision or portion thereof, and I further certify that the statements made herein are true, complete, and correct to the best of my knowledge and belief, and are made in good faith.

*6 / 28 / 1961*
(Date)

HER

Olga    †    Ondola
MARK
(Signature or mark of applicant)

*Helen Munson*
(Signature of witness)

WITNESSES MUST SIGN ONLY IF APPLICANT ENDORSES APPLICATION WITH HIS MARK OR THUMB PRINT RATHER THAN BY SIGNATURE

*Mrs Herbert Alex*
(Signature of witness)

## FOR USE OF BUREAU OF INDIAN AFFAIRS

I HEREBY CERTIFY that the above-named applicant is a native entitled to an allotment under the regulations of 43 CFR, Part 67.

June 30, 1961
(Date)

*Charles P. Mathes*
(Signature)

Charles P. Mathes,
Real Property Officer.
(Title)

Title 18, USC, Sec. 1001, makes it a crime for any person knowingly and willfully to make to any Department or Agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

File in proper land office, in *triplicate*.

GPO 885471

AR002048

| **From:** | Vanessa L. Ray-Hodge |
|---|---|
| **To:** | "eric.shepard@sol.doi.gov"; Turner, Jennifer; "matthew.kelly@sol.doi.gov" |
| **Cc:** | Colin C. Hampson; Padraic McCoy; Carrie C. Doyle |
| **Subject:** | Eklutna |
| **Date:** | Thursday, June 22, 2017 2:49:43 PM |
| **Attachments:** | NVE Second Supplemental Submission ILD June 21, 2017.pdf |
| | Olga Ondola Allotment Application.pdf |
| | Attachment 1 Second Supplemental Submission June 21 2017.pdf |

Eric,

We have completed the second supplemental submission and given that this submission is in response to specific questions we discussed with you all on the phone, we are not submitting a formal letter.  Instead, attached is our informal second supplement that addresses the issues we previously discussed and supporting documents.

Thanks,
Vanessa

Vanessa L. Ray-Hodge
Sonosky, Chambers, Sachse, Mielke & Brownell
500 Marquette Ave, Suite 660
Albuquerque, NM  87102
Office: 505.247.0147
Cell: 202.460.4519

AR002051

**June 6, 2017**

*Via Email*

Dear Eric,

In follow-up to our call in early May, on behalf of the Native Village of Eklutna ("Tribe" or "NVE"), we are informally providing supplemental background information about the Ondola Allotment and additional legal analysis of the Alaska Native Allotment Act. This is the Tribe's second supplement to its original request for an Indian Lands Determination relating to the Ondola Allotment.

### 1. Additional Factual Background

As explained in the Tribe's June 29, 2016 Indian lands determination request, the allotment is located in the Birchwood community seven miles from the Village of Eklutna ("Village") and twenty-two miles from Anchorage. *See* Letter from Colin C. Hampson to Lawrence Roberts, Acting Assistant Secretary, Bureau of Indian Affairs at 7 (hereinafter "June 29, 2016 Submission"). A map showing the location of the allotment is enclosed as Attachment 1.

The Village occupies approximately 55 acres of fee land and approximately 50 people reside on Village owned lands. The Tribe provides a range of governmental services to Village residents and tribal members, including a tribal court, housing, health care services in a recently constructed health care clinic, employment services, water services, waste services, snow plowing, food bank services, lunches for seniors, environmental disposal services (disposal of used appliances and furniture), trespass inspection and monitoring, archeological and cultural surveys, historical and cultural preservation, Indian child welfare advocacy and case management services, youth activities (including a dance and drum group and culture camp), holiday baskets and school supplies, a biannual potlatch and powwow, and signage. In recent years, the Tribe installed a street light within the Village for safety purposes.

The Tribe provides many of the same governmental and tribal member services to the Ondola allotment. *See* June 29, 2016 Submission at 14 – 23.

### 2. Alaska Native Allotment Act

As discussed in the Tribe's June 29, 2016 letter and supplemental letter dated December 16, 2016, *see* June 29, 2016 Submission *and* Letter from Colin C. Hampson to Lawrence Roberts, Acting Assistant Secretary, Bureau of Indian Affairs (hereinafter "Dec. 16, 2016 Submission"), the precedents for recognizing tribal jurisdiction over tribal member-owned allotments, including allotments located off-reservation and allotments issued from the public domain, establish the Tribe's right to a favorable determination with respect to the Ondola Allotment. In the contiguous United States, allotments acquired by individual Indians from the public domain and outside of a current or former reservation have been found to qualify as "Indian lands" under the Indian Gaming Regulatory Act ("IGRA"). For example, as we noted in

AR002052

our initial submission on June 29, 2016, the National Indian Gaming Commission ("NIGC") concluded that an Indian allotment held in trust for a member of the Big Sandy Rancheria constitutes Indian lands. *See* June 29, 2016 Submission at 11-12. The allotment at issue in the Big Sandy determination was an allotment that was patented to the individual Indian from the public domain and was located twelve miles outside the Tribe's Rancheria. *Id.*; *see also* Memorandum from John R. Hay, Staff Attorney, National Indian Gaming Comm. to Philip N. Hogan, Chairman, NIGC at 2(Sept. 6, 2006) ("The McCabe Allotment was originally allotted out of the public domain to Mary McCabe, a member of the Tribe, in 1920 and immediately placed in trust."). There, the determinative facts with respect to whether the land at issue qualified as an allotment were whether the land was held in trust[1] for a member of the Tribe. *See generally, id.*

Similarly, in the Office of the Solicitor's opinion for the Quinault Indian tribe, the Associate Solicitor found that the Sampson Johns Allotment was "Indian land" under IGRA. Memorandum from Robert T. Anderson, Associate Solicitor, Division of Indian Affairs to Director, Indian Gaming Management Staff (Sept. 25, 1996). The Solicitor's Office determined that the land qualified as an allotment because the "land is trust land owned by Quinault tribal members" despite the fact that the land was "allotted . . . out of the public domain." *Id.* at 1, 2. The Solicitor's Office did not focus on the fact that the allotment was outside the Tribe's reservation but that "[t]he land has been continuously held in trust since 1916 for the beneficial owners of the land and is currently held in trust by the United States for a number of Quinault tribal members, heirs and successors of Sampson Johns." *Id.* at 2.

There is no legal basis on which to distinguish allotments issued by the Secretary of the Interior pursuant to the Alaska Native Allotment Act of 1906 ("ANAA") from other Indian allotments. The ANAA, as amended, 34 Stat. 197 (May 17, 1906), gave the Secretary the authority to

> allot not to exceed one hundred and sixty acres of nonmineral land . . . to any Indian, Aleut, or Eskimo of full or mixed blood who resides in and is a native of [the district of Alaska] . . . and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable . . . .

43 U.S.C. § 270-1. While not identical, the ANAA is similar to the General Allotment Act ("GAA"), which allowed individual Indians to establish allotments outside of federally created or recognized reservations. More specifically, the GAA provided that "any Indian not residing upon a reservation, or for whose tribe no reservation has been provided . . . shall make settlement upon any surveyed or unsurveyed lands of the United States . . . shall be entitled . . . to have the same allotted to him or her . . . ." 24 Stat. 388 § 4. Further, the GAA provided that approval of the patent by the Secretary "shall be of legal effect, and declare that the United States does and will hold the land thus allotted . . . in trust for the sole use and benefit for the Indian . . . ." *Id.* §

---

[1] As discussed in the Tribe's previous submissions, land held by an individual Indian in restricted fee is treated as equivalent to trust land.

5.  The GAA was not limited to providing individual Indians land within their existing or former Indian reservation.

The GAA is generally understood as the central piece of legislation of the allotment era, but the GAA was preceded and succeeded by numerous allotment acts providing more specificity with regard to certain reservations, types of lands, or classes of individuals.  *See Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 328 (2008) (referring to "[t]he history of the General Allotment Act and its successor statutes"); F. Cohen, HANDBOOK OF FEDERAL INDIAN LAW § 16.03[2][a]-[b], pp. 1072–1074 (2012 ed.).  The allotment statutes vary somewhat as to the terms used to define the land and individuals to which they apply, yet they all are part of the congressional policy to provide homesites for individual Indians and must therefore be construed *in pari materia. See United States v. Jackson*, 280 U.S. 183, 193-94, 196 (1930) (approving the Department of the Interior's construction of Indian homestead laws and GAA "in para materia" and ruling "Indian allotments and Indian homesteads are in all essential respects upon the same footing, and that each is equally within the purview of a statute in which the Congress may use only the terms 'allottee' and 'allotment'"); *see also Kirkwood v. Arenas*, 243 F.2d 863, 866 (9th Cir. 1957) (holding Mission Indian Act and GAA to be construed *in pari materia* and so Section 6 of GAA regarding taxability of allotments is applicable to allotment made under former Act).  Accordingly, allotments issued under the ANAA should be treated in the same manner as allotments issued under the GAA or other allotment statutes.

Differences in historical circumstances or terminology provide no basis for distinguishing the two statutes.  First, in enacting the ANAA Congress intended to eliminate confusion existing at the time about the categorization of Alaska Natives by providing for their treatment similar to Indians in the contiguous United States.  The Ninth Circuit has noted that the ANAA was passed "because a number of lower courts found that Alaska Natives were not within the definition of 'Indian,' [and so] there was doubt whether the General Allotment Act did apply to them.  Thus Congress moved in 1906 to eliminate this doubt by passing the Alaska Native Allotment Act." *Pence v. Kleppe*, 529 F.2d 135, 140 (9th Cir. 1976); *see also, Masayesva v. Zah*, 792 F. Supp. 1160, 1163 and n.6 (D. Ariz. 1992) ("the Alaska Native Allotment Act [is] legislation interpreted similarly to the General Allotment Act" and "'plugged a hole' in the General Allotment Act's failure to address Alaska Natives.").  The ANAA was thus meant to fill the gap that existed at the time between the treatment of Alaska Natives and Indians in the contiguous United States.  The House Committee on the Public Lands explained the need for the ANAA as follows:

> The necessity for this legislation arises from the fact that Indians in Alaska are not confined to reservations . . . they live in villages and small settlements . . . . It does not signify that because an Alaska Indian has lived for many years in the same hut and reared a family there that he is to continue in peaceable possession of what he has always regarded his home.  Some one who regards that particular spot as a desirable location for a home can file upon it for a homestead, and the Indian or Eskimo . . . is forced to move and give way to his white brother.

AR002054

H.R. REP. NO. 59-3295, at 1 (1906).[2]

Second, case law supports the conclusion that there is no substantive difference between the status of Alaska Natives and Indians in the contiguous United States. In *Pence v. Kleppe*, in discussing the court's jurisdiction, the court noted that:

> The Alaska Native Allotment Act . . . deals with allotments to Indians, Aleuts and Eskimos without making any distinction between them. There are many statutes dealing specifically with Alaska, such as the Alaska Native Allotment Act, which refer expressly to Indians, Aleuts, and Eskimos. On the other hand, many other statutes which are of general application throughout the United States and its territories refer only to 'Indians.' It has been held that in those statutes, the word 'Indian,' as applied in Alaska, includes Aleuts and Eskimos. The Act of June 2, 1924, Public No. 175, 43 Stat. Ch. 233, p. 253, confers citizenship on 'all non-citizen Indians.' *In Hynes v. Grimes Packing Co.*, 9 Cir., 1948, 165 F.2d 323, 326, we said that the statute conferred citizenship upon the Eskimo of Alaska. The Act of August 13, 1946 . . . created the Indian Claims Commission and granted it jurisdiction of claims 'on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska.' (§ 2, 25 U.S.C. § 70a). *In United States v. The Native Village of Unalakleet*, 1969, 411 F.2d 1255, 188 Ct.Cl. 1, the Court of Claims, in an exhaustive opinion, held that the word 'Indian' as used in the statute, included Eskimos and Aleuts. The court pointed out that the word 'Indian' is commonly used in this country to mean 'the aborigines of America.' See also 42 C.J.S. Indians s 1, p. 647. We agree . . . .

529 F.2d at n. 5. This discussion shows that there is no rational basis for distinguishing the Alaska Native Allotment Act from other allotment acts. In fact, the opposite is true – the terms are most often used synonymously.[3] In any event, the Tribe has demonstrated a direct tribal

---

[2] As discussed previously, the fact that the ANAA used the term "homestead" rather than "allotment" is also not a sufficient basis on which to distinguish Alaska Native allotments. *See* June 29, 2016 Submission at 8-10, 25 n.13. There is in reality no difference in the treatment by the United States of a "homestead" under the ANAA from other Indian allotments. Indeed, allotments made under the ANAA are held in restricted fee by the individual Indian, Aleut or Eskimo and "subject to the same restrictions on taxation and alienation as trust lands, and are generally treated by Congress and Interior as the equivalent of trust land." Office of the Solicitor, M-37043 "Authority to Acquire Land into Trust in Alaska" at 21, n. 134 (Jan. 13, 2017); id. at 2, n.18. *See also*, NVE Submission at 7-9. (Dec. 16, 2016). In any event, the ANAA and its implementing regulations repeatedly uses terms like "allot," "allotment" and "allottee" notwithstanding the one reference to "homestead" in the Act. 34 Stat. 197. *See also* 43 U.S.C. 1634 (discussing "Alaska Native allotment applications"); 43 C.F.R. 2561.0-8 (regulations implementing the Act and referring to applications for and the granting of an "allotment").

[3] The implementing regulations of the GAA required that an individual Indian show tribal membership or eligibility for tribal membership, 43 C.F.R. § 2531.1. The ANAA required an analogous showing that the applicant was Alaska Native. Interior required certification that there was nexus or affiliation between the individual applicant and a native Alaska aboriginal group or entity recognized by Congress in the Act. *See* 43 C.F.R. § 67.5(e) (1958) (43 C.F.R. Pt. 67 was amended and later reorganized into 43 C.F.R. § 2561.1, *see* 35 Fed. Reg. 9502 (June 13, 1970)). For example, the ANAA allotment application required BIA to certify that the individual is "a full or mixed blood Indian, Aleut or Eskimo, born and now residing in the State of Alaska." *See e.g.*, Olga Ondola Allotment

AR002055

nexus because the Ondolas are tribal members of NVE, a federally recognized tribe. *See* NVE Indian lands determination request at 5-7 (June 29, 2016).

Any doubt regarding the treatment of allotments made to Alaska Natives under the ANAA and Indians in the lower 48 is resolved by the privileges and immunities provisions enacted in 1994, which prohibit Interior from treating NVE and the Ondola allotment differently than the tribes or allotments at issue in the Big Sandy and Sampson Johns decisions. *See* June 29, 2016 Submission at 24.

### 3. Conclusion

The only question that remains is to determine whether the Ondola Allotment qualifies as "Indian land" is whether NVE exercises governmental power over the allotment. As discussed in our June 29, 2016 Submission, we have provided ample facts to support a positive determination on this question. *Id.* at 10-23; *see also generally* Dec. 16, 2016 Submission.

Please let us know if you have any further questions.

Thank you,

Colin & Vanessa

---

Application, Form 4-021 (Nov. 1958), Alaska Native Allotment Application, Department of the Interior, Bureau of Land Management (Jul. 3, 1961); GAO Report to the Chairman, Committee on Interior and Insular Affairs, House of Representatives, "Alaska Native Allotment Eligibility Process Can be Improved" at 11, 14 (July 1988). In accordance with the ANAA and regulations, BIA certified that Olga Ondola met the criteria for being "Indian, Aleut or Eskimo" as part of the process for issuing the Ondola Allotment. Notwithstanding the confusion at the time over whether groups of Alaska Natives were "tribes," the application requirements under the ANAA were consistent with the GAA and its requirement that an individual Indian show a nexus to a tribal group in the lower 48. Regardless, today BIA requires that for certification of Alaska Native Blood, an individual must show his or her "relationship to an enrolled member(s) of a federally recognized Indian tribe . . . which appears on the list of recognized tribes published in the <u>Federal Register</u> by the Secretary of the Interior."). *See* https://www.bia.gov/cs/groups/public/documents/text/idc-001805.pdf (last accessed May 11, 2017).

IN REPLY REFER TO:

## UNITED STATES
## DEPARTMENT OF THE INTERIOR

BUREAU OF INDIAN AFFAIRS
Area Field Office
1220 East 5th Avenue
Anchorage, Alaska

**055026**

June 30, 1961

Mr. Warner T. May
Manager, Land Office
Bureau of Land Management
6th and Cordova
Anchorage, Alaska



Dear Mr. May:

You will find enclosed in quadruplicate the application of _____Olga Ondola_____ of ____Chugiak____, Alaska for a Native Land Allotment under the Act of May 17, 1906, as amended, covering____10____acres of land.

A representative of this office has certified that the above named applicant is a Native entitled to an allotment under the regulations of 43 CFR, Part 67.  Please acknowledge receipt of this application furnishing us your serial number covering the case.  There is also enclosed, in triplicate, Alaska Native Allotment Evidence of Occupancy properly executed by the applicant.
Sincerely yours,

*acknowledged 7/3/61 Reb*

*Charles P. Mathes*
Charles P. Mathes
Real Property Officer

Enclosure

CPM/es

cc: Realty, JAO
Subj. file
Chrony file

BUREAU of LAND MANAGEMENT

JUL 3 1961 10·00 AM

ANCHORAGE LAND OFFICE

AR002057

Form 4–021
(November 1958)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

FORM APPROVED
BUDGET BUREAU NO. 42–R1359

Land Office     **Anchorage**

Serial Number   **055026**

ALASKA NATIVE ALLOTMENT APPLICATION
(Act of May 17, 1906, 34 Stat. 197, 48 USC 357, as amended)

1. Name of Applicant     (First Name)     (Middle Initial)     (Last Name)

Olga                                              Ondola

2. Address of Applicant

General Delivery
Chugiak, Alaska

3. Applicant is a full or mixed blood [X] Indian [ ] Aleut, or [ ] Eskimo, born and now residing in the State of Alaska.

4. Sex of Applicant: [ ] Male [X] Female | 5. Applicant is [X] head of a family; [ ] at least 21 years of age.

6. Legal description of the lands applied for (if lands are unsurveyed, describe them in a manner sufficient to permit their ready identification on the ground):

Lot Nos. 64, 66 and 67, Sec. 5, Twp. 15, North R 1 West,
Seward Meridian

BUREAU of LAND MANAGEMENT

JUL 3 1961 10·00 ᴀᴹ

ANCHORAGE LAND OFFICE

approximately
containing ___10___ acres.

7. The land applied for is:

a. Nonmineral except for_____
and not claimed for mining purposes by any person | b. Not occupied or improved by any other person.

8. Applicant has not received any other allotment under the act of May 17, 1906, supra, except as follows (if none, write ''none''):

None.

9. Applicant has occupied the land applied for since (date) ___May of 1937___ and has marked its corners and posted the land as required by the regulations. [X] Yes [ ] No

AR002058

10. Evidence of substantially continuous use and occupancy of the land for a period of 5 years is attached in *triplicate*  [X] Yes  [ ] No

11. I HEREBY CERTIFY that I am well acquainted with the character of the lands herein applied for, have personally examined each and every legal subdivision or portion thereof, and I further certify that the statements made herein are true, complete, and correct to the best of my knowledge and belief, and are made in good faith.

6 / 28 / 1961
(Date)

HER
Olga        +        Ondola
MARK
(Signature or mark of applicant)

*Helen Munson*
(Signature of witness)

WITNESSES MUST SIGN ONLY IF APPLICANT ENDORSES APPLICATION WITH HIS MARK OR THUMB PRINT RATHER THAN BY SIGNATURE

*Mrs Herbert Alex*
(Signature of witness)

## FOR USE OF BUREAU OF INDIAN AFFAIRS

I HEREBY CERTIFY that the above-named applicant is a native entitled to an allotment under the regulations of 43 CFR, Part 67.

June 30, 1961
(Date)

*Charles P. Mathes*
(Signature)

Charles P. Mathes,
Real Property Officer.
(Title)

Title 18, USC, Sec. 1001, makes it a crime for any person knowingly and willfully to make to any Department or Agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

File in proper land office, in *triplicate*.

GPO 885471

AR002059



# Property Information

http://muniorg.maps.arcgis.com/apps/Solutions/s2.html?appid=d98a480863e14e0eb61d6d7818c16e82

NVE Village     Ondola Allotment

6/13/2017

AR002060



 Anchorage

 Ondola Allotment

| From: | Karin Gustafson |
|---|---|
| To: | James_cason@ios.doi.gov |
| Cc: | eric.shepard@sol.doi.gov; jennifer.turner@sol.doi.gov; matthew.kelly@sol.doi.gov; Colin C. Hampson; Lloyd B. Miller; Cory L. Ickes; Lynne Hernandez |
| Subject: | Eklutna Letter to James Cason--11-06-2017 |
| Date: | Monday, November 6, 2017 3:56:03 PM |
| Attachments: | Eklutna Letter from Firm to DOI Cason transmitting opinion regarding opinion on tribal status and power in Alaska 11 2017.PDF |
| | AG Opinion re Tribal Government in Alaska.pdf |

Good morning, Mr. Cason,

Attached is a letter (and attachment) to you from Colin Hampson.  Please let me know if you have any problems opening the attached documents.

Thank you,
Karin

Karin Gustafson

Legal Assistant to Rebecca A. Patterson, Roger W. DuBrock, and
   Whitney A. Leonard

Sonosky, Chambers, Sachse, Miller & Monkman, LLP

725 East Fireweed Lane, Suite 420

Anchorage, AK  99503

karin@sonosky.net

phone: (907) 258-6377

fax:  (907) 272-8332

* * * * NOTICE * * * *

This message is intended solely for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee, you are hereby notified that any use, distribution or copying of this message is strictly prohibited. If you received this message in error, please notify us by reply e-mail or by telephone (call us collect at (907) 258-6377) and immediately delete this message and any and all of its attachments. Thank you.



HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER***
DONALD J. SIMON
DOUGLAS B. L. ENDRESON
ANNE D. NOTO
MARY J. PAVEL
JAMES E. GLAZE***
DAVID C. MIELKE
GARY F. BROWNELL
COLIN C. HAMPSON
RICHARD D. MONKMAN**
MATTHEW S. JAFFE
WILLIAM STEPHENS
VANESSA RAY-HODGE
FRANK S. HOLLEMAN
REBECCA A. PATTERSON^
KENDRI M. M. CESAR*
LIA C. CARPENETI**
MATTHEW L. MURDOCK
WHITNEY A. LEONARD^^

OF COUNSEL
ROGER W. DUBROCK*
KAY E. MAASSEN GOUWENS*
ARTHUR LAZARUS, JR.
MYRA M. MUNSON*

MARVIN J. SONOSKY (1909-1997)

LAW OFFICES
# SONOSKY, CHAMBERS, SACHSE MILLER & MONKMAN, LLP
725 EAST FIREWEED LANE, SUITE 420
ANCHORAGE, ALASKA 99503
(907) 258-6377
FAX (907) 272-8332
WEBSITE: WWW.SONOSKY.COM

LLOYD B. MILLER E-MAIL: LLOYD@SONOSKY.NET

POLICY ADVISORS
HON. MARK BEGICH
JODI A. GILLETTE

JUNEAU OFFICE
302 GOLD STREET, SUITE 201
JUNEAU, ALASKA 99801
(907) 586-5880 FAX (907) 586-5883

SAN DIEGO, CA OFFICE
600 W. BROADWAY, SUITE 700
SAN DIEGO, CA 92101
(619) 267-1306 FAX (619) 267-1388

WASHINGTON, D.C. OFFICE
1425 K STREET, SUITE 600, N.W.
WASHINGTON, D.C. 20005
(202) 682-0240 FAX (202) 682-0249

ALBUQUERQUE, NM OFFICE
500 MARQUETTE AVE, N.W.
SUITE 660
ALBUQUERQUE, NM 87102
(505) 247-0147 FAX (505) 843-6912

*ALASKA BAR
**ALASKA AND WASHINGTON BAR
***ALASKA AND D.C. BAR
^ALASKA AND ILLINOIS BAR
^^MONTANA BAR

November 6, 2017

**VIA E-MAIL**
James_cason@ios.doi.gov

James Cason, Associate Deputy Secretary
Department of Interior
1849 C Street, NW, Room 6653
Washington, DC 20240

    Re:    Supplemental Information related to Native Village of Eklutna's June 29, 2016
            Indian Lands Determination Request regarding Ondola Allotment

Dear Mr. Cason:

    The Alaska Attorney General recently issued the attached opinion regarding tribal status and power in Alaska. The Native Village of Eklutna submits it in support of its request for a determination that the Ondola allotment is "Indian land" within the meaning of the Indian Gaming Regulatory Act over which the Tribe has jurisdiction and exercises governmental authority. The opinion is consistent with the Tribe's request because it acknowledges that Alaska Tribes are sovereign tribal governments on the same basis as Indian Tribes in other parts

Doc.# 336646

James Cason, Associate Deputy Secretary                    November 6, 2017
Department of Interior                                          Page 2 of 2

of the United States, and that the Alaska Native Claims Settlement Act did nothing to alter tribal
sovereignty.

                              Sincerely,

                              SONOSKY, CHAMBERS, SACHSE,
                               MILLER & MONKMAN, LLP

                       By:    Lloyd B. Miller
                              Colin C. Hampson

Enclosure
cc (w/encl by email):  Eric Shepard, Office of Solicitor (eric.shepard@sol.doi.gov)
                       Jennifer Turner, Office of Solicitor (jennifer.turner@sol.doi.gov)
                       Matthew Kelley, Office of Solicitor (matthew.kelly@sol.doi.gov)

LAW OFFICES

HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER***
DONALD J. SIMON
DOUGLAS B. L. ENDRESON
ANNE D. NOTO
MARY J. PAVEL
JAMES E. GLAZE***
DAVID C. MIELKE
GARY F. BROWNELL
COLIN C. HAMPSON
RICHARD D. MONKMAN**
MATTHEW S. JAFFE
WILLIAM STEPHENS
VANESSA RAY-HODGE
FRANK S. HOLLEMAN
REBECCA A. PATTERSON^
KENDRI M. M. CESAR*
LIA C. CARPENETI**
MATTHEW L. MURDOCK
WHITNEY A. LEONARD^^

OF COUNSEL
ROGER W. DUBROCK*
KAY E. MAASSEN GOUWENS*
ARTHUR LAZARUS, JR.
MYRA M. MUNSON*

MARVIN J. SONOSKY (1909-1997)

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP
725 EAST FIREWEED LANE, SUITE 420
ANCHORAGE, ALASKA 99503
(907) 258-6377
FAX (907) 272-8332
WEBSITE: WWW.SONOSKY.COM

LLOYD B. MILLER E-MAIL: LLOYD@SONOSKY.NET

POLICY ADVISORS
HON. MARK BEGICH
JODI A. GILLETTE

JUNEAU OFFICE
302 GOLD STREET, SUITE 201
JUNEAU, ALASKA 99801
(907) 586-5880 FAX (907) 586-5883

SAN DIEGO, CA OFFICE
600 W. BROADWAY, SUITE 700
SAN DIEGO, CA 92101
(619) 267-1306 FAX (619) 267-1388

WASHINGTON, D.C. OFFICE
1425 K STREET, SUITE 600, N.W.
WASHINGTON, D.C. 20005
(202) 682-0240 FAX (202) 682-0249

ALBUQUERQUE, NM OFFICE
500 MARQUETTE AVE, N.W.
SUITE 660
ALBUQUERQUE, NM 87102
(505) 247-0147 FAX (505) 843-6912

*ALASKA BAR
**ALASKA AND WASHINGTON BAR
***ALASKA AND D.C. BAR
^ALASKA AND ILLINOIS BAR
^^MONTANA BAR

November 6, 2017

**VIA E-MAIL**
James_cason@ios.doi.gov

James Cason, Associate Deputy Secretary
Department of Interior
1849 C Street, NW, Room 6653
Washington, DC 20240

      Re:    Supplemental Information related to Native Village of Eklutna's June 29, 2016
             Indian Lands Determination Request regarding Ondola Allotment

Dear Mr. Cason:

      The Alaska Attorney General recently issued the attached opinion regarding tribal status
and power in Alaska. The Native Village of Eklutna submits it in support of its request for a
determination that the Ondola allotment is "Indian land" within the meaning of the Indian
Gaming Regulatory Act over which the Tribe has jurisdiction and exercises governmental
authority. The opinion is consistent with the Tribe's request because it acknowledges that
Alaska Tribes are sovereign tribal governments on the same basis as Indian Tribes in other parts

James Cason, Associate Deputy Secretary                                November 6, 2017
Department of Interior                                                        Page 2 of 2

of the United States, and that the Alaska Native Claims Settlement Act did nothing to alter tribal
sovereignty.

                                    Sincerely,

                                    SONOSKY, CHAMBERS, SACHSE,
                                     MILLER & MONKMAN, LLP

                                    By:    Lloyd B. Miller
                                           Colin C. Hampson

Enclosure
cc (w/encl by email):  Eric Shepard, Office of Solicitor (eric.shepard@sol.doi.gov)
                       Jennifer Turner, Office of Solicitor (jennifer.turner@sol.doi.gov)
                       Matthew Kelley, Office of Solicitor (matthew.kelly@sol.doi.gov)



THE STATE
*of* ALASKA

GOVERNOR BILL WALKER

**Department of Law**

Office of the Attorney General
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-5903
Main: 907-269-5100
Fax: 907-269-5110

October 19, 2017

The Honorable Bill Walker
Governor
State of Alaska
P.O. Box 110001
Juneau, AK 99811-0001

    *Re:    Legal status of tribal governments in Alaska*

Dear Governor Walker:

You have asked for a legal opinion about the sovereign status of Alaska Native tribes (Alaska Tribes) and their relationship with the State of Alaska (the State). This opinion covers the following: (1) tribes do exist in Alaska; (2) Alaska Tribes are governments with inherent sovereignty; and (3) the areas where the scope of that sovereignty is clear.

## I.    There are 229 federally recognized tribes in Alaska.[1]

The existence of a tribe or tribal government does not require a federal determination and tribal sovereignty does not originate with the federal government.[2] That said, the United States Constitution gives Congress the authority to legislate with respect to Indian tribes.[3] Thus, the sovereign status of tribal governments, for the purpose

---

[1]    *Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 82 Fed. Reg. 4,915, 4,919-20 (Jan. 17, 2017).

[2]    *John v. Baker*, 982 P.2d 738, 751 (Alaska 1999) (quoting *U.S. v. Wheeler*, 435 U.S. 313, 322-33 (1978) ("Before the coming of the Europeans, the tribes were self-governing sovereign political communities."); F. Cohen, *Handbook of Federal Indian Law* 132-34, 206-11 (2012 ed.) [hereinafter *Cohen's Handbook*].

[3]    U.S. Const. art I, § 8, cl. 3; *U.S. v. Lara*, 541 U.S. 193, 200-02 (2004); *Cohen's Handbook* 383-86.

AR002076

The Honorable Bill Walker, Governor

October 19, 2017

*Re: Legal status of tribal governments in Alaska*

Page 2 of 16

of determining tribes' relationships with states, is a question of federal law and federal recognition of a tribe is dispositive.[4]

While Alaska Native people and Alaska Tribes have existed in what is now the State of Alaska for thousands of years, Alaska Tribes have undoubtedly been recognized by the federal government since 1994. Alaska Tribes' inherent sovereignty has been recognized by all three branches of federal government and the Alaska Supreme Court. This inherent sovereignty exists regardless of whether the land that Alaska Tribes possess or inhabit is considered "Indian country."

### A.     The legal status of Alaska Tribes.

Tribes are legal entities separate from either the federal government or states.[5] However, the status of Alaska Tribes was unclear for many years. The State initially took the legal position that tribes did not exist in Alaska.[6] And the Alaska Supreme Court, in a 1988 dispute between an Alaska Native village and a contractor, held that "[t]here are not now and never have been tribes of Indians in Alaska as that term is used in federal Indian law."[7]

An early 1993 Department of the Interior solicitor opinion, however, concluded that the federal government's "course of dealings" with Alaska Native villages conferred

---

[4]     *See Atkinson v. Haldane*, 569 P.2d 151, 162 (Alaska 1977) ("Once the [federal] executive branch has determined that the Metlakatla Indian Community is an Indian tribe . . . the Community is entitled to all of the benefits of tribal status."); *John*, 982 P.2d at 750; *Cohen's Handbook* 134 (explaining that federal recognition confirms a tribe's existence as a distinct political society).

[5]     *Worcester v. Georgia*, 31 U.S. 515, 561-62 (1832); *see, e.g., Cotton Petrol. Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989) (noting that tribes are not "states" within the scope of the Interstate Commerce Clause); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980) (tribal reservations are not states); *U.S. v. Kagama*, 118 U.S. 375, 381-82 (1886) ("[Indians] were, and always have been, regarded as having a semi-independent position.").

[6]     *See* Alaska Admin. Order No. 125 (1991) (stating the State was opposed to the existence of tribes in Alaska); *see also* U.S. Dep't Interior, Solic. Op. M–36,975 at 48-60 (Jan. 11, 1993) (summarizing arguments against finding that Alaska Tribes existed).

[7]     *Native Vill. of Stevens v. Alaska Mgmt. & Planning*, 757 P.2d 32, 36 (Alaska 1988).

The Honorable Bill Walker, Governor                October 19, 2017
*Re: Legal status of tribal governments in Alaska*                Page 3 of 16

upon the villages the same status as Indian tribes in the contiguous 48 states.[8] Later that year, citing the solicitor opinion, the Department of the Interior, Bureau of Indian Affairs (BIA) issued a list of federally recognized Alaska Tribes.[9] That publication was intended to "eliminate any doubt" as to the status and rights of Alaska Tribes; it recognized that Alaska Tribes have "the same status as tribes in the contiguous 48 states" and "the same inherent and delegated authorities available to other tribes."[10]

Through the Federally Recognized Tribe List Act of 1994 (1994 List Act), Congress effectively affirmed the BIA's recognition of Alaska Tribes. That legislation directed the BIA to publish lists of recognized tribes and, rather than reversing the 1993 List, overrode the omission of one Alaska Tribe.[11] Subsequent lists published pursuant to the 1994 List Act have continued to include Alaska Tribes.[12]

Initially, the State litigated the federal determination.[13] But in 1996, the State discontinued this legal challenge and the state Attorney General issued an opinion outlining the status of federally recognized tribes in Alaska.[14]

---

[8]     *Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*, U.S. Dep't Interior, Solic. Op. M–36,975 at 47 (observing that for over fifty years Congress and the Department of the Interior treated Alaska Native people as members of sovereign tribes).

[9]     *Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 538 Fed. Reg. 54,364, 54,364, 1993 WL 420646 (Oct. 21, 1993) [hereinafter 1993 List]; *see* H.R. REP. No. 103-781, at 2-3, *reprinted in* 1994 U.S.C.C.A.N. 3768 (explaining "recognition" means the federal government acknowledging, as a matter of law, that a particular Native American group is a tribe and permanently establishes a government-to-government relationship between U.S. and tribe).

[10]    1993 List, at 54,365-66.

[11]    Federal Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, §103, 108 Stat 4791 (1994), *discussed in John v. Baker*, 982 P.2d 738, 750 (Alaska 1999).

[12]    *See, e.g., Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 60 Fed. Reg. 9,250, 9,255 (February 16, 1995); *Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs*, 82 Fed. Reg. 4,915, 4,919-20 (Jan. 17, 2017).

[13]    *See, e.g., Native Vill. of Venetie I.R.A. Council v. State*, 1994 WL 730893, at *7 (D. Alaska, Dec. 23, 1994), *supplemented sub nom. State ex rel. Yukon Flats Sch. Dist. v.*

   The Alaska Supreme Court resolved any remaining questions about the legal status of Alaska Tribes in its 1999 decision, *John v. Baker*.[15] The court acknowledged that in *Native Village of Stevens v. Alaska Management & Planning* it had concluded the federal government never recognized Alaska Tribes, but that the Department of Interior's definitive 1993 List and the 1994 List Act demanded a different conclusion. The court stated "[i]f Congress or the Executive Branch recognizes a group of Native Americans as a sovereign Tribe, we 'must do the same.' "[16] The court explained that tribal status is a non-justiciable political question, requiring courts to defer to the express recognition of tribal status by the political branches of the federal government.[17] Federal courts likewise defer to the executive or legislative branches' tribal recognition determinations.[18]

   Since *John v. Baker*, the Alaska Supreme Court has consistently recognized the sovereign status of Alaska Tribes.[19]

---

*Native Vill. of Venetie Tribal Gov't*, F87-0051 CV (HRH), 1995 WL 462232 (D. Alaska Aug. 2, 1995), *rev'd sub nom. State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Vill. of Venetie Tribal Gov't*, 101 F.3d 1286 (9th Cir. 1996), *rev'd sub nom. Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520 (1998).

[14]     1996 Op. Att'y Gen. No. 1 (Jan. 11).

[15]     982 P.2d 738 (Alaska 1999).

[16]     *John*, 982 P.2d at 749 (quoting *United States v. Holliday*, 70 U.S. 407, 419 (1865)) (citing *Native Vill. of Stevens v. Alaska Mgmt. & Planning*, 757 P.2d 32 (Alaska 1988)); *In re C.R.H.*, 29 P.3d 849, 851 n.5 (2001) (stating that the court follows Congress's determination that Alaska Tribes are sovereign under federal law).

[17]     *John*, 982 P.2d at 749.

[18]     *Holliday*, 70 U.S. at 419 (deferring to actions of political departments regarding tribal determination); *see Samish Indian Nation v. United States*, 419 F.3d 1355, 1370 (Fed. Cir. 2005) ("[T]ribal recognition is not justiciable."); *Cherokee Nation v. Babbitt*, 114 F.3d 1489, 1496 (D.C. Cir. 1997) (deferring to Congress and executive branch regarding tribal determination); *Atkinson v. Haldane*, 569 P.2d 151, 162 (Alaska 1977) (holding tribal determination "is a non-justiciable political question").

[19]     *See, e.g., McCrary v. Ivanof Bay Vill.*, 265 P.3d 337, 342 (Alaska 2011) (Alaska Native village was federally recognized Indian tribe); *Healy Lake Vill. v. Mt. McKinley Bank*, 322 P.3d 866, 867 (Alaska 2014); *State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 259 (Alaska 2016); *Simmonds v. Parks*, 329 P.3d 995, 999 (Alaska 2014).

AR002079

The current state of the law is clear—there *are* 229 sovereign tribes within Alaska. Yet there continue to be misunderstandings about the existence of tribes in Alaska and their inherent sovereignty. A common misunderstanding is that ANCSA[20] extinguished or terminated Alaska Tribes. But ANCSA settled, and extinguished, tribal claims to aboriginal title; it did not extinguish tribal governments. [21] Because ANCSA did not explicitly terminate Alaska Tribes, it does not affect Alaska Tribes' status as sovereign governments.

Misunderstandings may have been furthered by unsuccessful, but well-publicized, arguments in litigation asserting that Alaska Tribes did not exist and lacked inherent sovereignty.[22] Nevertheless, the Alaska Supreme Court has rejected several direct requests to overturn *John v. Baker*, and has consistently held that Alaska Tribes exist and

---

[20]     Pub. L. No. 92-203, 85 Stat. 688 (1971) (current version at 43 U.S.C. §§ 1601-1629h (2012)).

[21]     43 U.S.C. § 1603(b) (2012); *see Inupiat Cmty. of the Arctic Slope v. United States*, 680 F.2d 122, 129 (1982) (right to sue for trespass damages extinguished); *Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*, U.S. Dep't Interior, Solic. Op. M–36,975 at 132 (concluding ANCSA was a land settlement and did not terminate Alaska Tribes); Pub. L. 103-454, §103, 108 Stat 4791 (1994) (terminating federal recognition requires explicit Act of Congress).

[22]     *See, e.g.*, Mot. to Intervene at 10, *Alaska v. Native Vill. of Tanana*, No. S-13332 (Alaska Feb. 3, 2009) (post-oral argument) ("[T]his appeal presents an appropriate procedural occasion for this court to revisit—because—with all due respect, it was error—its holding in *John v. Baker I*."); *see also* Brief of Edward Parks & Donielle Taylor as *Amici Curiae* in Supporting Petitioners at 18 n.9, *Hogan v. Kaltag Tribal Council*, 562 U.S. 827 (2010) (No. 09-960), 2010 WL 1049413 ("*John v. Baker I* illustrates the continued confusion regarding Alaska Native tribal status"); Brief for the Legislative Council of the Alaska Legislature as *Amicus Curiae* Supporting Appellants at 8, *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437 (2004) (Nos. S-10772, S-10838), 2003 WL 24048558 ("[T]he conclusion regarding Alaska Native tribal status that the Court announced in *John v. Baker I* was erroneous."); Complaint at 14-24, *S.P. v. Native Vill. of Minto*, No. 3:09-CV-0092 HRH, 2009 WL 9124375, at *1 (D. Alaska, Dec. 2, 2009), *aff'd*, 443 F. App'x 264 (9th Cir. 2011) (arguing federal recognition was wrongfully obtained as a product of the "native sovereignty movement" whose goal was becoming "federally recognized tribes").

are sovereign governments.[23] Thus, there are no unresolved legal questions regarding the legal status of Alaska Tribes as federally recognized tribal governments.

### B.      The legal status of Indian country in Alaska.

Past confusion about the status of Alaska Tribes may also stem from misunderstandings about the relationship between Alaska Tribes and land status. Tribes and tribal governments exist regardless of the status of tribal lands.[24] Land status does not determine the existence of tribes and tribal governments.

There is, however, a "significant territorial component" to tribal authority.[25] For that reason in discussing Alaska Tribes, it is also important to discuss the status of Indian country in Alaska.

The term "Indian country" means: (a) all land within the limits of any Indian reservation, (b) "dependent Indian communities," and (c) Indian allotments.[26] ANCSA extinguished all reservations in Alaska except for the Annette Islands Reserve of the Metlakatla Indian Community.[27] There was a question for many years regarding whether

---

[23]     *See e.g., Runyon,* 84 P.3d 437, 439 n.3 (Alaska 2004) (declining "the invitations of the Runyons and amicus Legislative Council to revisit *John v. Baker*"); *McCrary,* 265 P.3d 337, 340 (Alaska 2011) ("McCrary argues that *John v. Baker* should not be considered binding precedent because no party in that appeal argued against recognition of the sovereign status of Alaska Native tribes. He contends this legal issue was not tested by the adversarial process. But our conclusion regarding the Executive Branch's tribal recognition and Congress's approval through the Tribe List Act was carefully considered and adopted by the entire court. Our conclusion in *John v. Baker* was not dictum—it was decisional . . . ."); *Simmonds v. Parks,* 329 P.3d at 1005 (citing with approval the superior court's conclusion that *John v. Baker* "definitively rejected" the argument "that the Native Village of Minto is not a federally recognized tribe").

[24]     *John,* 982 P.2d at 754; *Kaltag Tribal Council v. Jackson,* 344 F. App'x 324, 325 (9th Cir. 2011) (stating that "[r]eservation status is not a requirement of jurisdiction because [a] Tribe's authority over its reservation or Indian country is incidental to its authority over its members" (quoting *Native Vill. of Venetie I.R.A. Council v. Alaska,* 944 F.2d 548, 559 n.12 (9th Cir. 1991))).

[25]     *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 142 (1982).

[26]     18 U.S.C. § 1151.

[27]     43 U.S.C. § 1618(a).

The Honorable Bill Walker, Governor                          October 19, 2017
*Re: Legal status of tribal governments in Alaska*                    Page 7 of 16

lands patented under ANCSA constituted "dependent Indian communities" and was therefore, Indian country. This question was answered in *Alaska v. Native Village of Venetie*. In that decision the U.S. Supreme Court concluded that former reservation land transferred to an ANCSA village corporation and then subsequently transferred in fee to the Tribe did not qualify as a "dependent Indian community" and the land was therefore not Indian country.[28]

However, there remain open questions about Indian country in Alaska. Throughout Alaska, there are currently scattered non-ANCSA Alaska Native lands with federal interests:  it is estimated that there are close to one million acres of restricted fee land granted under the Alaska Native Allotment Act of 1906 and the Alaska Native Townsite Act of 1926.[29] The *Venetie* decision solely addressed dependent Indian communities; it did not address the status of Alaska Native allotments or townsites.[30] No case has determined whether Alaska Native allotments are Indian country.[31] There is also an open question about the territorial jurisdiction, if any, of Alaska Tribes over Alaska Native allotments and restricted Alaska Native townsite lots even if they are determined to be Indian country.[32]

---

[28]     *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 534 n.2 (1998).

[29]     Act of May 17, 1906, Pub. L. No. 59-171, ch. 2469, 34 Stat. 197 (repealed 1971); Act of May 25, 1926, Pub. L. No. 69-280, ch. 379, 44 Stat. 629 (repealed 1976)).

[30]     *Native Vill. of Venetie Tribal Gov't*, 522 U.S. at 534 n.2 (observing that because there was only one Indian reservation in Alaska, "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y] under our interpretation of § 1151(b), or if it constitutes 'allotments' under § 1151(c)").

[31]     *But see U.S. v. Ramsey*, 271 U.S. 467, 471-72 (1926) (holding that both trust allotments and restricted fee Osage allotments qualify as Indian country); *Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 US 114, 123-26 (1993) (Indian country includes allotments held in trust and in restricted fee); *In re Carmen*, 165 F. Supp. 942, 946 (N.D. Cal. 1958), *aff'd sub nom. Dickson v. Carmen*, 270 F.2d 809 (9th Cir. 1959) (holding that an Indian allotment made from the public domain, not from an allotted reservation, was Indian country).

[32]     U.S. Dep't Interior, Solic. Op. M–36,975 at 48-60, 129 (Jan. 11, 1993) (finding that Alaska Native restricted allotments are Indian country for federal government protection and jurisdiction, but questioning whether such would be subject to an Alaska Tribe's claim of territorial jurisdiction).

AR002082

In addition, the Department of Interior recently altered the land-into-trust regulations and removed the exception that prevented Alaska Tribes from petitioning for land to be placed in federal trust.[33] This means that there will be more Indian country within Alaska. However, because Public Law 280 granted the State of Alaska concurrent jurisdiction over certain matters in Indian country within the State, the Indian country status of land does not change the State's ability to enforce its criminal or prohibitory laws.[34]

## II.   Alaska Tribes are sovereign governments.

Tribal governments are separate sovereigns. As a starting point, tribal sovereignty can perhaps be understood as self-rule—the right to make one's own laws and be governed by them.[35] Tribes possess inherent powers of self-government and exercise these powers to the extent they have not been extinguished.[36] It is presumed that a tribe's

---

[33]   *See Land Acquisitions in the State of Alaska*, 79 Fed. Reg. 76,888, 76,889 (Dec. 23, 2014) (altering the land-into-trust regulations); *see also Akiachak Native Cmty. v. Salazar*, 935 F. Supp. 2d 195 (D.D.C. 2013).

[34]   Public Law 280 granted prohibitory jurisdiction to the State, however, tribes retain concurrent jurisdiction in Indian Country. *See TTEA v. Ysleta del Sur Pueblo*, 181 F.3d 676, 685 (5th Cir. 1999); *Walker v. Rushing*, 898 F.2d 672, 675 (8th Cir. 1990); 18 U.S.C. § 1162; A state's laws that are "prohibitory" are included in Public Law 280's authorization of state jurisdiction in Indian country. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 210-11 (1987) (explaining "if the intent of a state law is generally to prohibit certain conduct" it falls within Public Law 280's grant of state jurisdiction).

[35]   *See, e.g., Williams v. Lee*, 358 U.S. 217, 220 (1959); *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008) (explaining tribes are "distinct, independent political communities"); *U.S. v. Lara*, 541 U.S. 193, 205 (2004) (noting tribes are capable of governing themselves).

[36]   The fundamental principle of Indian law is "that those powers lawfully vested in an Indian tribe are not, in general, delegated powers granted by express acts of Congress, but rather inherent powers of a limited sovereignty which has never been extinguished." *Cohen's Handbook* 207; *see also John v. Baker*, 982 P.2d 738, 751 ("[S]overeign powers exist unless divested.").

AR002083

inherent sovereignty remains intact unless it has been divested or limited by Congress "or by implication as a necessary result of their dependent status."[37]

Numerous federal laws have limited tribal sovereignty. For example, the Major Crimes Act extended federal criminal law into Indian country, an area where tribal jurisdiction had originally been exclusive.[38] Public Law 280 then allowed limited state authority in Indian country in some states, including Alaska.[39] And the U.S. Supreme Court held in *Oliphant v. Suquamish Indian Tribes* that tribes were divested of criminal jurisdiction to prosecute non-Indians, finding that such jurisdiction was "inconsistent with their status" as sovereigns subordinate to the federal government.[40]

Tribes' inherent powers of self-governance over tribal citizens[41] have long been recognized, and there is no evidence that Congress intended to extinguish Alaska Tribes' powers in enacting ANCSA.[42] Federal courts have likewise concluded that tribes in Alaska retain inherent sovereign authority.[43] As a general matter, sovereign governments have authority, or jurisdiction, over citizens, over land, and over people who enter their

---

[37]     *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *John*, 982 P.2d at 751 (explaining tribes retain sovereign powers to regulate internal affairs unless Congress specifically limits authority to act).

[38]     18 U.S.C. § 1153; *Ex Parte Crow Dog*, 109 U.S. 556, 568 (1883).

[39]     Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588 (1953), codified at 18 U.S.C. § 1162.

[40]     *Oliphant v. Suquamish Indian Tribes*, 435 U.S. 191 (1978) (holding tribes do not have inherent criminal jurisdiction to try and punish non-Indians, and may not assume such jurisdiction unless specifically authorized by Congress), *superseded in part by statute as stated in U.S. v. Lara*, 541 U.S. 193 (2004).

[41]     The term "tribal citizen" (the modern trend and more accurate term) is synonymous with "tribal member" (the term used in caselaw).

[42]     *John*, 982 P.2d at 753 ("Congress intended ANCSA to free Alaska Natives from the dictates of ' "lengthy wardship or trusteeship," ' not to handicap tribes by divesting them of their sovereign powers.").

[43]     *Native Vill. of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 556-59 (9th Cir. 1991); *Native Vill. of Venetie I.R.A. Council v. Alaska*, 1994 WL 730893, at *12-21 (D. Alaska, Dec. 23, 1994); *Kaltag Tribal Council v. Jackson*, 344 F. App'x 324 (9th Cir. 2011).

AR002084

land. Similarly, this "dual nature of Indian sovereignty" derives from two intertwined sources: tribal citizenship and tribal land. These two aspects of jurisdiction, or authority, while intertwined, have been "teased apart" in Alaska.[44]

### A.    Sovereignty includes the power to establish a form of government.

Forming a government is a basic element of sovereignty. Tribes possess the inherent authority to establish their form of government, including justice systems, that best suits their own practical or cultural needs.[45] Constitutions adopted by tribes following the passage of the Indian Reorganization Act (IRA) were based on sample documents developed by the BIA. However, tribes exercising powers under IRA constitutions are still acting under their inherent sovereign authority.[46] Tribal governments can also be formed or organized outside of the IRA framework, whether or not a written constitution has been adopted.[47]

Alaska Tribes have several types of governments including traditional councils and IRA governing councils. Additionally, tribes may choose to form a governmental entity, such as the Central Council of Tlingit and Haida Indian Tribes of Alaska, which receive federal recognition, in addition to the constituent Tribes, which are also recognized.[48] All of these entities, however, are governments of Alaska Tribes. Federal law prohibits the federal executive branch from classifying tribes as having different

---

[44]    *John*, 982 P.2d at 754; *Kaltag Tribal Council v. Jackson*, 344 F. App'x 324, 325 (9th Cir. 2011) ("Reservation status is not a requirement of jurisdiction because '[a] Tribe's authority over its reservation or Indian country is incidental to its authority over its members."(quoting *Venetie*, 944 F.2d at 559 n.12)).

[45]    *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62-63 (1978) (recognizing tribes' "power to make their own substantive law in internal matters and to enforce that law in their own forums"); *see also Talton v. Mayes*, 163 U.S. 376, 384 (1896) (stating that "the powers of local self-government enjoyed by [tribes] existed prior to the constitution"); *Indian Tribal Justice Act*, 25 U.S.C. § 3601(4) (2000) ("Indian tribes possess the inherent authority to establish their own form of government, including tribal justice systems.").

[46]    *See Washington v. Confederated Tribes*, 447 U.S. 134, 152-54 (1980).

[47]    *Kerr-McGee Corp. v. Navajo Tribe of Indians*, 471 U.S. 195 (1985) (holding IRA requirement that a tribal constitution be approved by the Secretary does not apply to Tribes that decline to accept the IRA); *see also* 25 U.S.C. § 5123.

[48]    *Cohen's Handbook* 133.

powers or status based on when or how the tribe was recognized.[49] Therefore, there is no
basis for treating these different types of tribal governments differently from each other.

### B.      Sovereignty includes the power to determine tribal citizenship.

Determining tribal citizenship is also a fundamental attribute of sovereignty.[50]
Tribal citizenship can determine, among other things, the right to vote in tribal elections,
to hold tribal office, and to receive tribal resources. Eligibility for federal benefits and
assistance provided to Alaska Native people because of their status as Alaska Native may
be based upon tribal citizenship. And while denial of tribal citizenship may result in the
denial of federal health and education benefits, tribal citizenship decisions are decisions
solely made by tribes.[51]

### C.      Sovereignty includes the ability to assert sovereign immunity.

As sovereign governments tribes are generally immune from lawsuits unless
Congress has authorized the suit or the tribe has waived its immunity.[52] The State and the
federal government likewise have sovereign immunity from suit, but by statute, have
provided limited waivers of sovereign immunity for certain types of suits.[53] When
entering into agreements with tribes it is important for state agencies to consult with the
Department of Law to determine whether a tribe has waived its sovereign immunity by

---

[49]      25 U.S.C. § 5123; H.R. REP. No. 103-781, at 2-3, reprinted in 1994 U.S.C.C.A.N.
3768.

[50]      Santa Clara, 436 U.S. 49 (1978); John v. Baker, 982 P.2d 738, 751 (Alaska 1999)
(holding core sovereign powers remain; in particular, those internal functions involving
tribal citizenship and domestic (i.e., not foreign) affairs); Healy Lake Vill. v. Mt.
McKinley Bank, 322 P.3d 866, 874 (Alaska 2014); Kimball v. Callahan, 590 F.2d 768,
777-78 (9th Cir. 1979) (holding terminated tribe without land base retained power to
determine citizenship).

[51]      Santa Clara Pueblo, 436 U.S. at 54 (holding equal protection guarantee of the
Indian Civil Rights Act does not authorize the Court to determine which traditional
values should be preserved, that determination was best made by the people of Santa
Clara); Healy Lake Vill., 322 P.3d at 877 (explaining tribe's right to define its own
citizenship standards is central to its existence as an independent political community).

[52]      McCrary v. Ivanof Bay Vill., 265 P.3d 337 (Alaska 2011); Douglas Indian Ass'n v.
Cent. Council of Tlingit & Haida Indian Tribes of Alaska, No.7198, 2017 WL 3928701,
at *2 (Alaska Sept. 8, 2017).

[53]      AS 09.50.250; 28 U.S.C. § 1346.

AR002086

The Honorable Bill Walker, Governor
*Re: Legal status of tribal governments in Alaska*

October 19, 2017
Page 12 of 16

tribal law, whether a waiver is necessary, and, if so, the scope of the waiver that is necessary to protect the State.

### D.    Sovereignty includes the ability to enter agreements under the ISDEAA.

Numerous Alaska Native organizations provide services to, or otherwise represent the interests of, tribal citizens in Alaska. In particular, through the Indian Self Determination Education Assistance Act (ISDEAA),[54] Alaska Tribes may enter into agreements with the federal government to take over federally-administered programs and services as a matter of self-governance. The ISDEAA broadly defines "Indian tribe" to include ANCSA village and regional corporations as entities that are eligible to enter into ISDEAA agreements.[55] Alaska Tribes may also authorize "tribal organizations" or "inter-tribal consortiums" to provide services to tribal communities.[56] Some of these programs and services may be those that would be provided by a government, such as child welfare, law enforcement, and lands or realty management. While these organizations provide important, needed programs and services, they are not themselves federally recognized tribes possessing inherent sovereignty under federal law.[57]

### E.    Tribes possess non-territorial sovereignty outside of Indian country.

A tribe's authority to adopt laws flows from its status as a sovereign political entity. This authority includes the power to enforce laws and administer justice systems

---

[54]    25 U.S.C. §§ 5301–5423.

[55]    25 U.S.C. § 5304(e).

[56]    25 U.S.C. § 5321(a)(1)-(2) (setting out that ISDEAA contracts with the BIA or Indian Health Service are initiated by an "Indian tribe" although the contract may be with a "tribal organization"); 25 U.S.C. § 5362(b)(2) (recognizing that two or more tribes to agree to participate in ISDEAA as an "inter-tribal consortium"); 25 U.S.C. § 5381(b) (defining "Indian tribe" to include "tribal organization" or "inter-tribal consortium").

[57]    *See, e.g., Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 58 Fed. Reg. 54,364, 54,364 (Oct. 21, 1993) (distinguishing federally recognized tribal governments and ANCSA corporations); *Runyon v. Ass'n of Vill. Council Presidents*, 84 P.3d 437 (Alaska 2004) (non-profit Alaska corporation, whose members are tribes, does not share sovereign immunity of member tribes where non-profit corporation is legally and financially insulated from the tribes).

AR002087

The Honorable Bill Walker, Governor                           October 19, 2017
*Re: Legal status of tribal governments in Alaska*                Page 13 of 16

such as courts.[58] Several Alaska Supreme Court decisions have established the contours
of tribes' inherent powers "to conduct internal self-governance functions" outside of
Indian country.[59] A summary of each type of matter the Alaska Supreme Court has
addressed follows.

Alaska Tribes' subject matter jurisdiction outside of Indian country is derived
from their "inherent, non-territorial sovereignty"—and the "ability to retain fundamental
powers of self-governance."[60] In determining the scope of Alaska Tribes' subject matter
jurisdiction, the Alaska Supreme Court has evaluated "two dimensions" of non-territorial
subject matter jurisdiction.

The first dimension involves the character of the legal questions that can properly
be decided by the Alaska Tribe's court. These are matters that involve the regulation of
"internal affairs" of tribal citizens and those that go to the "core of sovereignty."[61] The
second dimension involves the categories of individuals and families who might properly
be brought before the tribal court and whose disputes the tribal court can properly
resolve.

Tribes' inherent sovereignty includes the subject matter jurisdiction to grant
legally binding adoptions of tribal citizen children. The State must give full faith and
credit to adoptions issued by tribes.[62]

---

[58]   *See Indian Tribal Justice Act*, 25 U.S.C. § 3601(4) (2000) ("Indian tribes possess
the inherent authority to establish their own form of government, including tribal justice
systems.").

[59]   *See John v. Baker*, 982 P.2d 738, 758 (Alaska 1999); *State v. Cent. Council of
Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 265 (Alaska 2016).

[60]   *Cent. Council*, 371 P.3d at 262 (quoting *John*, 982 P.2d at 758).

[61]   *Id.* at 262; *John*, 982 P.2d at 759.

[62]   25 U.S.C. § 1911(d); *Native Vill. of Venetie I.R.A. Council v. Alaska*, 944 F.2d
548, 562 (9th Cir. 1991) (holding Public Law 280 does not prevent tribes from exercising
jurisdiction and Congress affirmed such jurisdiction in ICWA, therefore state must
recognize tribe's adoption); *Kaltag Tribal Council v. Jackson*, 2008 WL 9434481, at *7
(D. Alaska, 2008) (holding that tribal adoption order involving tribal citizen child was
entitled to full faith and credit), *aff'd Kaltag Tribal Council v. Jackson*, 344 F. App'x 324
(9th Cir. 2009); *Alaska v. Native Vill. of Tanana*, 249 P.3d 734, 736 (Alaska 2011).

The Honorable Bill Walker, Governor

*Re: Legal status of tribal governments in Alaska*

October 19, 2017

Page 14 of 16

Tribes' inherent sovereignty includes the subject matter jurisdiction to decide the custody, outside of the ICWA context, of tribal citizen children or children eligible for tribal citizenship.[63] Tribes' custody orders are entitled to comity recognition by Alaska courts. This means the state court will conduct an analysis to ensure that the court participant's due process rights were protected. As part of its due process analysis, the state court looks at: (1) whether the parties received notice of the tribal court proceedings; (2) whether the parties were granted "a full and fair opportunity to be heard"; and (3) whether the tribal court judges were impartial and the proceedings were conducted in a regular fashion.[64]

Tribes' inherent sovereignty includes the subject matter jurisdiction to accept transfer of ICWA cases from state courts regardless of whether the tribe petitioned the federal government to reassume jurisdiction under ICWA.[65] Tribes' inherent sovereignty also includes the jurisdiction to initiate ICWA child custody proceedings, and the tribal court orders in these proceedings are entitled to full faith and credit by the state courts and agencies.[66]

Tribes' inherent sovereignty includes a "colorable and plausible claim to jurisdiction" to terminate parental rights to tribal citizen children, even when the parent is not a citizen of that tribe.[67] Further, tribal court remedies must be exhausted before a tribal court decision can be collaterally attacked in state court.[68] As a result, in *Simmonds v. Parks*, where a non-tribal-citizen parent failed to appeal in tribal court the tribe's

---

[63]   *John*, 982 P.2d at 759 (holding that Alaska Tribes have jurisdiction over domestic (*i.e.,* internal) disputes involving tribal citizen children even in the absence of territory).

[64]   *See id.* at 763 (noting that due process does not require tribes to use procedures identical to state courts and that comity analysis is "not an invitation for [state] courts to deny recognition to tribal judgments based on paternalistic notions of proper procedure").

[65]   *See In re C.R.H.*, 29 P.3d 849, 852 (Alaska 2001).

[66]   *See Native Vill. of Tanana*, 249 P.3d at 736, 750–51; *Kaltag Tribal Council,* 2008 WL 9434481, at *7.

[67]   *Simmonds v. Parks*, 329 P.3d 995, 1017-19 (Alaska 2014); *S.P. v. Native Vill. of Minto*, No. 3:09-CV-0092 HRH, 2009 WL 9124375, at *6 (D. Alaska, Dec. 2, 2009), *aff'd*, 443 F. App'x 264 (9th Cir. 2011) (unpublished).

[68]   *Simmonds*, 329 P.3d at 1011-14.

The Honorable Bill Walker, Governor                    October 19, 2017
*Re:  Legal status of tribal governments in Alaska*            Page 15 of 16

termination of his parental rights, the Alaska Supreme Court held he could not attack that holding in state court and gave the termination full faith and credit.[69]

Adjudicating a parent's obligation to pay child support for tribal citizen children, or children eligible for tribal citizenship, is within Alaska Tribes' inherent subject matter jurisdiction.[70] Tribal court child support orders must be processed by the Alaska Child Support Services Division (CSSD) under the Alaska Uniform Interstate Family Support Act just as child support orders entered by courts in other states.[71]

In conclusion, it is important to note three things. First, in each of the above types of cases, an Alaska Tribe's jurisdiction is concurrent with the State's. This means that cases can be started in either a tribal or state court. Second, in each of the cases that established the scope of tribes' non-territorial jurisdiction, due process was given to the court participants. Courts will refuse to grant either full faith and credit or comity when due process was not provided to the court participants.[72]

Finally, the matters identified above are not a definitive list of those matters included within Alaska Tribes' inherent powers "to conduct internal self-governance functions" outside of Indian country.[73] The matters listed above are those that have been identified through litigation. The Alaska Supreme Court has stated that the "key inquiry" in determining the scope of a Tribe's non-territorial sovereignty is whether the tribe "needs jurisdiction over a given context to secure tribal self-governance."[74] This means that some matters that are clearly internal self-governance functions, such as marriages,

---

[69]      *Id.* at 1022.

[70]      *State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 267 (Alaska 2016) (explaining that "[s]etting, modifying, and enforcing" child support obligations plays a vital role in tribal self-government).

[71]      AS 25.25.101(26).

[72]      *Starr v. George*, 175 P.3d 50, 59 (Alaska 2008).

[73]      *See John v. Baker*, 982 P.2d 738, 758 (Alaska 1999); *Cent. Council*, 371 P.3d 255, 265 (Alaska 2016).

[74]      *See John*, 982 P.2d at 756 (Alaska 1999) ("The key inquiry. . . is not whether the tribe is located in Indian country, but rather whether the tribe needs jurisdiction over a given context to secure tribal self-governance." (internal quotations and citations omitted)).

AR002090

divorces, or paternity determinations involving tribal citizens, may also be recognized as within the inherent sovereignty of Alaska Tribes.

## III.   Conclusion

The law is clear. There are 229 Alaska Tribes and they are separate sovereigns with inherent sovereignty and subject matter jurisdiction over certain matters. Indian country is not a prerequisite for Alaska Tribe's inherent sovereignty or subject matter jurisdiction, but it may impact the extent of that jurisdiction.

Sincerely,

Jahna Lindemuth
Attorney General

| | |
|---|---|
| **From:** | Karin Gustafson |
| **To:** | James_cason@ios.doi.gov |
| **Cc:** | eric.shepard@sol.doi.gov; jennifer.turner@sol.doi.gov; matthew.kelly@sol.doi.gov; Colin C. Hampson; Lloyd B. Miller |
| **Subject:** | Native Village of Eklutna Indian Lands Determination Request |
| **Date:** | Monday, December 4, 2017 2:10:20 PM |
| **Attachments:** | Affidavit of Aaron Leggett.pdf |
| | Letter to J Cason DOI with Aaron Leggett Affidavit.pdf |

Good morning, Mr. Cason,

Attached is a copy of a letter to you from Lloyd Miller and Colin Hampson and the Affidavit of Aaron Leggett.  Please let me know if you have any problems opening the attachments.

Thank you,
Karin

Karin Gustafson
Legal Assistant to Rebecca A. Patterson, Roger W. DuBrock, and
   Whitney A. Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK  99503
karin@sonosky.net
phone: (907) 258-6377
fax: (907) 272-8332
* * * * NOTICE * * * *
This message is intended solely for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee, you are hereby notified that any use, distribution or copying of this message is strictly prohibited. If you received this message in error, please notify us by reply e-mail or by telephone (call us collect at (907) 258-6377) and immediately delete this message and any and all of its attachments. Thank you.



## AFFIDAVIT OF AARON LEGGETT

STATE OF ALASKA      )
                         ) ss
THIRD JUDICIAL DISTRICT  )

Aaron Leggett, being first duly sworn, deposes and says:

I serve on the Traditional Tribal Council of the Native Village of Eklutna along with my brother Adam Leggett. Olga Ondola is our great-grandmother.

I have knowledge and expertise about the history of the Eklutna people. I am Curator of Alaska History and Culture at the Anchorage Museum. I had a role in bringing the first exhibition of the Dena'ina Athabascan people to a major museum. I have worked on the Anchorage Historic Preservation Commission. I was the Dena'ina cultural historian at the Alaska Native Heritage Center and I interned at Cook Inlet Region, Inc. as an assistant historian. I have published scholarly articles about the Dena'ina language and people and co-authored several publications including "Dena'ina Heritage and Representation in Anchorage, AK," "Dena'ina Nat'uh: Our Special Place" and "Sakuuktugut: Alaska Native Corporations, an Overview of ANCSA." I also served as one of the editors and contributors to the exhibition catalog for "Dena'inaq' Huch'ulyeshi: The Dena'ina Way of Living."

Olga Ondola resided on the Ondola Allotment since at least 1930. According to family oral history, an important purpose in petitioning for the land that became the Ondola Allotment was to protect the land base of the Eklutna people. In the mid-twentieth century the Eklutna people became very concerned about the reduction of lands

1

AR002096

set aside for them from over 300,000 acres to under 2,000 acres. This concern is illustrated in the attached congressional testimony by Peter Ezi in 1970 and my great uncle George Ondola's testimony before Congress in 1968 stating, "[w]e became concerned about the matter so I wrote a letter in 1961 to the Bureau of Land Management about the status of the lands surrounding our village," and "[t]o our amazement, the BLM informed us we had lost another 5,100 acres."[1] 1961 was the same year when my great-grandmother applied for the allotment. My great-uncle George Ondola assisted her with the application.

My great-grandmother observed the federal government's actions in reducing the land set aside for the Eklutna people from hundreds of thousands of acres to a few thousand and then to a little over a thousand acres and she wanted to protect the Tribe's land base from further losses and believed that securing the allotment would help achieve that objective for the Eklutna people.

Aaron Leggett

SUBSCRIBED AND SWORN to before me this ___1st___ day of December, 2017.

NOTARY PUBLIC
KARIN S. GUSTAFSON
STATE OF ALASKA
My Commission Expires August 14, 2018

Notary Public in and for Alaska
My commission expires:____8-14-2018____

---

[1] The testimony was a given in hearings on February 8, 9 and 10, 1968 before the Committee on Interior and Insular Affairs, United States Senate, Ninetieth Congress, Second Session on S. 2906, a bill to authorize the Secretary of the Interior to grant certain lands to Alaska Natives, settle Alaska Native land claims, and for other purposes and S. 1964, S. 2690, and S. 2020 related bills.

2

LAW OFFICES

## SONOSKY, CHAMBERS, SACHSE, MILLER & MONKMAN, LLP

725 EAST FIREWEED LANE, SUITE 420
ANCHORAGE, ALASKA 99503
(907) 258-6377
FAX (907) 272-8332
WEBSITE: WWW.SONOSKY.COM

LLOYD B. MILLER E-MAIL: lloyd@sonosky.net

HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER***
DONALD J. SIMON
DOUGLAS B. L. ENDRESON
ANNE D. NOTO
MARY J. PAVEL
JAMES E. GLAZE***
DAVID C. MIELKE
GARY F. BROWNELL
COLIN C. HAMPSON
RICHARD D. MONKMAN**
MATTHEW S. JAFFE
WILLIAM STEPHENS
VANESSA RAY-HODGE
FRANK S. HOLLEMAN
REBECCA A. PATTERSON^
KENDRI M. M. CESAR*
MATTHEW L. MURDOCK
WHITNEY A. LEONARD^^

OF COUNSEL
ROGER W. DuBROCK*
KAY E. MAASSEN GOUWENS*
ARTHUR LAZARUS, JR.
MYRA M. MUNSON*

MARVIN J. SONOSKY (1909-1997)

POLICY ADVISORS
HON. MARK BEGICH

JUNEAU OFFICE
302 GOLD STREET, SUITE 201
JUNEAU, ALASKA 99801
(907) 586-5880·FAX (907) 586-5883

SAN DIEGO , CA OFFICE
600 W. BROADWAY, SUITE 700
SAN DIEGO, CA 92101
(619) 267-1306·FAX (619) 267-1388

WASHINGTON, D.C. OFFICE
1425 K STREET, SUITE 600, N.W.
WASHINGTON, D.C. 20005
(202) 682-0240·FAX (202) 682-0249

ALBUQUERQUE, NM OFFICE
500 MARQUETTE AVE, N.W.
SUITE 660
ALBUQUERQUE, NM 87102
(505) 247-0147·FAX (505) 843-6912

*ALASKA BAR
**ALASKA AND WASHINGTON BAR
***ALASKA AND D.C. BAR
^ALASKA AND ILLINOIS BAR
^^ALASKA AND MONTANA BAR

December 4, 2017

**VIA E-MAIL**
James_cason@ios.doi.gov

James Cason, Associate Deputy Secretary
Department of Interior
1849 C Street, NW, Room 6653
Washington, DC 20240

    Re:    Supplemental information in support of Native Village of Eklutna Indian lands
           determination request

Dear Mr. Cason:

    On behalf of the Native Village of Eklutna we enclose an additional document in support
of  its request for a determination that the Ondola allotment is "Indian land" within the meaning
of the Indian Gaming Regulatory Act over which the Tribe has jurisdiction and exercises
governmental authority.  The document is an affidavit of Aaron Leggett, who is a Tribal
Councilmember and descendent of Olga Ondola, the original allottee, describing Ms. Ondola's
purposes in securing the allotment to include the protection of the tribal land base in the face of
the government's reduction of  that land base.  Her son George Ondola assisted her with the
application and testified before Congress that in 1961, the year when his mother submitted the
application for the allotment, he was communicating with the federal government about the
status of lands set aside for the Eklutna village and was distressed to learn that the tribal land
base had recently been reduced by over 5,000 acres.  This provides additional evidence of a
strong nexus between the Tribe and the allotment which further demonstrates the Tribe's
jurisdiction.

Doc.# 338823

James Cason, Associate Deputy Secretary                     December 4, 2017
Department of Interior                                          Page 2 of 2

                                  Sincerely,

                                  SONOSKY, CHAMBERS, SACHSE,
                                   MILLER & MONKMAN, LLP

                                  *Colin C. Hampson*
                                                            BY KSG
                                  By:    Lloyd B. Miller
                                         Colin C. Hampson


Enclosures
cc (w/encl by email):  Eric Shepard, Office of Solicitor (eric.shepard@sol.doi.gov)
                       Jennifer Turner, Office of Solicitor (jennifer.turner@sol.doi.gov)
                       Matthew Kelley, Office of Solicitor (matthew.kelly@sol.doi.gov)

AR002099

| | |
|---|---|
| **From:** | Colin C. Hampson |
| **To:** | Karin Gustafson; James_cason@ios.doi.gov |
| **Cc:** | eric.shepard@sol.doi.gov; jennifer.turner@sol.doi.gov; matthew.kelly@sol.doi.gov; Lloyd B. Miller |
| **Subject:** | RE: Native Village of Eklutna Indian Lands Determination Request |
| **Date:** | Monday, December 4, 2017 2:32:20 PM |
| **Attachments:** | 20171201 Affidavit of Aaron Leggett Attachments.pdf |

Mr. Cason,

I attach the attachments referenced in Mr. Leggett's affidavit.

Colin Cloud Hampson
Sonosky, Chambers, Sachse, Endreson & Perry, LLP
*Phone*: (619) 267-1306
(619) 267-1812 (direct)
(619) 267-1388 (fax)
(619) 855-7050 (cell)

**From:** Karin Gustafson [mailto:Karin@sonosky.net]
**Sent:** Monday, December 04, 2017 11:10 AM
**To:** James_cason@ios.doi.gov
**Cc:** eric.shepard@sol.doi.gov; jennifer.turner@sol.doi.gov; matthew.kelly@sol.doi.gov; Colin C. Hampson; Lloyd B. Miller
**Subject:** Native Village of Eklutna Indian Lands Determination Request

Good morning, Mr. Cason,

Attached is a copy of a letter to you from Lloyd Miller and Colin Hampson and the Affidavit of Aaron Leggett.  Please let me know if you have any problems opening the attachments.

Thank you,
Karin

Karin Gustafson
Legal Assistant to Rebecca A. Patterson, Roger W. DuBrock, and
  Whitney A. Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK  99503
karin@sonosky.net
phone: (907) 258-6377
fax:  (907) 272-8332
* * * * NOTICE * * * *
This message is intended solely for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the addressee, you are hereby notified that any use, distribution or copying of this message is strictly prohibited. If you received this message in error, please notify us by reply e-mail or by telephone (call us collect at (907) 258-6377) and immediately delete this message and any and all of its

attachments. Thank you.



STATEMENT OP PETER EZI, TREASURER, VILLAGE
COUNCIL OF EKLUTNA

Mr. Chairman, my name is Peter Ezi from the village of Eklutna. I
am the treasurer of the village council. On behalf of the people of
Eklutna, I would like to welcome you to Alaska and to Anchorage
our largest city. Our village is only 26 miles from Anchorage. The
Palmer Highway runs right by our doorstep. Telephone and electric
lines service our village. These are all new developments in the
history of Eklutna. The first white men to visit our people were the
Russians. Many tourists traveling the highway stop to see our
Russian Orthodox Church which is over a hundred years old, but
our ancestors were here long before the building of this church.

In terms of history, then, it is only recently that the Eklutna people
have given up the subsistence way of life. Our people once roamed
widely over the whole Cook Inlet area and beyond in search of
game and fish. Not too long ago, a father of one of my friends used
to set rabbit snares right about where Fourth and Gambell cross.
We had no money then, but we did have the pride of self-
sufficiency. This has all changed now, for our once proud
subsistence way of life has been replaced by the wardship way of
life.

There has been much progress in the Cook Inlet area as Anchorage
grew from a tent city to the largest city in Alaska. The people of
Eklutna want to be part of that progress. But we can never make
progress until we are allowed to manage our own land and affairs.

The present village location and surrounding area is ideal for
commercial development, but we have no land that is really ours to
use as we think wise. Over 30 years ago, a reserve of 328,000 acres
was set aside for the benefit and use of the Eklutna Indians.
Unfortunately, our rights in the reserve land were never made
clear, and as a result everyone took the opportunity to take some

AR002102

land from us, so that today less than 2,000 acres remain. Even now, we cannot do anything with this small amount of land because our rights still have never been clarified. As wards of the BIA we had no control over our land. As we struggled for a living, the very land we lived on was being taken away bit by bit. Our supposed guardian, BIA, was sitting idly by while Federal and State agencies came and helped themselves to our land, and the only thing the BIA did was to take some more of the land for itself. The people of Eklutna were never consulted about any of this.

If and when Congress does resolve the land question, I hope with all my heart that control and management of any land and settlement money will be given to the natives rather than leaving the natives under the thumb of the BIA or any other guardian or Government agency.

The native does not want dependency and welfare, but the present system forces him to be dependent and destroys his well-being. We are very proud to be American citizens. We only ask that in the settlement of the land question we be given the means to leave dependency and welfare behind so that we may have the full rights and responsibilities of American citizens.

I can further state that our village and its council supports the Alaska Federation of Natives' position in the land claims bill.

That is all.

**Question:** *Mr. Ezi, would you give us further details regarding the Federal and State agencies that have taken your land? Can you tell us what some of the agencies are, what their land takings have been for?*

The Department of Highways for right-of-way. The Alaska Railroad for right-of-way also, and also lands that were leased to the Army on a freeze permit and I believe that they took the other

AR002103

but I didn't bring any specifics of that.

**Question:** *The Eklutna power project was also a great area that was taken away from you, was it not?*

Yes.

**Question:** *Was there no compensation to the people for any of these taken?*

There was no compensation. The State of Alaska Highway Department is going to come through probably sometime this year or next year with the right-of-way of a 300-foot strip. But the land status as it stands now, being on BIA selection, we can negotiate with the highway department to get compensation, but, technically, compensation would go into the Federal general fund under BIA.

**Question:** *You mean you wouldn't know if you negotiated the settlement whether it would be available to you for your own family's use?*

No; for our village improvement and other things the council wants.

**Question:** *Are there any other people other than Government agencies who have taken the land?*

There is a couple of patents, one that I can think of to the National Bank of Alaska. This happened back in the 1920's or early 1900's.

**Question:** *For what purpose did the bank acquire that?*

That also remains unclear to us.

**Question:** *How large a tract was that?*

A hundred and sixty acres.

**Question:** *That would have been before the reserve's establishment, would it not?*

It would be closer to the 1900's, yes, before that.

**Question:** *I would like to ask Mr. Ezi to give us a breakdown, through the Bureau of Indian Affairs, or through their own council, as to who took or who now has 326,000 acres of what you said originally belonged to you. I would like to have that. Can you supply it for the record?*

I believe I could try, yes.

**Question:** *Mr. Chairman, I would like to ask that counsel staff for the committee be asked to contact the Bureau of Indian Affairs to get that information directly from the Bureau of Indian Affairs because I think they have the resources to get it, and the gentleman before us has not.*

Without objection, the counsel will attempt to get this from the Bureau of Indian Affairs.

(Information supplied for the record follows:)

U.S. DEPARTMENT OF THE INTERIOR,

BUREAU OF INDIAN AFFAIRS,

*Washington, D.C., December 5, 1969.*

Mr. LEWIS A. SIGLER,

*Counsel and Consultant on Indian Affairs, Committee on Interior and Insular Affairs, House of Representatives, Washington, D.C.*

Dear Mr. Sigler: In response to your letter of November 24, we are pleased to furnish you information concerning land set aside for the Eklutna Indians.

The United States Bureau of Education established at Eklutna in 1924 an industrial boarding school for Natives of Alaska. By 1927 seven buildings had been erected on a tract of approximately 1,400 acres of public domain land. Upon recommendation of the Bureau of Education and the Secretary of the Interior this tract was "reserved for the use of United States Bureau of Education for educational purposes" by Executive Order No. 4778 on December 5, 1927. The order was slightly modified June 8, 1934, By Executive Order No. 6734, in order to accommodate a homestead entry man who had mistakenly occupied part of the reserved land, thus reducing the school reserve from 1,368 acres to 1,365 acres.

On October 30, 1936, the Acting Secretary of the Interior temporarily withdrew a tract of 328,000 acres, including the original 1.365 acres, "for the use and benefit of the said Eklutna Industrial School, subject to all outstanding withdraw-al and existing valid rights, until the matter of their permanent withdrawal as a reservation can be taken up with the Indian or Eskimo occupants, as provided by Section 2 of the Act of May 1, 1936 (Public No. 538; 74th Congress)" (49 Stat. 1250).

The expansion of the Eklutna school area effected by the 1936 order had been proposed by the Office of Indian Affairs (which In 1931 had taken over the Bureau of Education's functions in Alaska) on the basis of recommendations by the Supervisor and the Director of Education at Juneau. Their reports stressed the expanding vocational program at the Eklutna school and the need for large land areas for training in farming, fishing, grazing,

AR002106

hunting, timbering, etc. They referred also to an increase in settlement near the original reserve because of the fact that it was traversed by the Alaska Railroad and the Anchorage-Matanuska Valley Highway, the need for protecting the school from outside "encroachment," the beneficial effect of such a large withdrawal on the preservation of game, and the usefulness of the larger area to graduates of the school. Sixty-seven students attended in 1927; by 1936 the number had increased to 112.

On January 21, 1942, however, the General Superintendent at Juneau recommended revocation of the 1936 order and establishment of a smaller reserve of 9,200 acres. Reasons given were increased pressures from the Anchorage community for use of woodland within the larger area due to establishment of the Fort Richardson military reserve; the probability of locating the school at a more central area; and the fact that the anticipated increase in native population on the reserve area had not occurred.

On December 18, 1942, the Secretary, again citing the 1936 Act, revoked the 1936 order, except as to 9,200 acres. The approved recommendation states that a "much smaller area than at first anticipated will meet the needs of the natives living in the vicinity," and requested that "the 9.200 acres he retained in a withdrawal or reserved status with a view to later recommending establishment of a reservation for the native inhabitants, should it be determined that such a reservation is desirable and necessary."

The Eklutna school discontinued in 1946, and the buildings were sold or transferred to the Alaska Railroad. So thereafter the General Superintendent of the Alaska Native Service recommended reduction of the reserve to approximately 2,000 acres.

In 1950, the Natives of Eklutna village petitioned for a hearing to determine their possessory rights to the 9,200 acres, and requested

that "those lands, plus any additional lands necessary to protect our way of life and assure us the chance to make a decent living be reserved to our use in accordance with the Act of May 1, 1936". However, the Area Director by telegram of May 25, 1953, recommended giving up the entire reserve.

After the Bureau's proposal to abandon the entire area, the Natives again requested a reservation, this time limited to 1,938.31 acres. Thereupon an investigation was made to determine native needs, which resulted in a recommendation to secure legislation reserving 1,900 acres for the Indians and returning the remainder of the land to public domain status. The reasons indicated for use of the legislative method appear to be based on a misunderstanding of the requirements of the Act of May 1, 1936, and the desire to assure the Natives a compensable interest in the land.

From correspondence in the Bureau files it seems clear that the subsequent decision to retain 1,819 acres rather than to relinquish the entire reserve was made in order to provide for the needs of the natives. Public Land Order No. 2427 (26 Fed. Reg. 6343, issued by the Secretary on July 5, 1961: corrected October 13, 1961 by Public Land Order No. 2516, 26 Fed. Reg. 9832) revoked preceding Executive and Secretarial orders, effected a new withdrawal of 1,819 acres, and reserved the area "under jurisdiction of time Bureau of Indian Affairs for use in connection with administration of native affairs in the vicinity of Eklutna,"

If we can furnish you any further information, please let us know.

Sincerely yours,

T. W. TAYLOR,

*Acting Commissioner.*

**Comment:** *I would like to thank Peter Ezi for being here and I*

*would like to say that I think this is one of the grossest examples of the encroachment of civilization, if you please, and of the white man in pushing the Indian aside. They once had a broad, broad reservation, and it encompassed a lot of the area and the whole development around Anchorage has just pushed and grown and gone into their areas. I think this would be an interesting history for the committee to receive.*

Source: **Alaska Native Land Claims Part II**, "Hearings before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs, House of Representatives, Ninety-first Congress First Session on H.R. 13142, H.R. 10193, and H.R. 14212, Bills to Provide for the Settlement of Certain Land Claims of Alaska Natives, and for Other Purposes. U.S. Government Printing Office, 1970

378

## STATEMENT OF GEORGE ONDOLA, CHAIRMAN, VILLAGE COUNCIL OF EKLUTNA

Mr. ONDOLA. Mr. Chairman, my name is George Ondola, from Eklutna. It is indeed a pleasure to appear before you and your Committee on Interior and Insular Affairs. I am speaking to you on behalf of the Eklutna people. I was recently reelected by the people as chairman of the village council.

Our village is located 26 miles northeast of Anchorage. At present, the native population of the village is about 30 adults and children. Our unofficial tribal roll has approximately 200 men, women, and children.

Our village is located within the greatest concentration of people in the State of Alaska. The population growth has been so great that people began moving in closer to our village. We welcome all of these people for we believe in progress. Our economy benefits from this progress. It creates jobs for our people. Our children attend the best in schools and churches. Our village is one of the few in Alaska that has telephones and electricity available. We also have a major highway right through our village. Tourists often stop by to visit our church and graveyard.

We believe in progress and development of our area. We are not in conflict with progress but we are in conflict with the manner in which land was taken from us. At one time, our reserve contained 328,000 acres. In the past quarter of a century, as this area developed and progressed, our reserve was cut down to less than 2,000 acres. Not only did we lose land but no one bothered to advise us about the changes taking place upon the reserve. We became concerned about the matter so I wrote a letter in 1961 to the Bureau of Land Management about the status of the lands surrounding our village. To our amazement, the BLM informed us we had lost another 5,100 acres. We began protesting but there was no help forthcoming. There was nothing anyone could do to help us because our rights to the land was never clarified. We urge that this committee clarify our rights to land we have lost and also to clarify our rights to the remaining 2,000 acres. We feel certain that our rights to the lands we lost will be in the affirmative and that we expect a monetary settlement for the fair market value of the land at the time of taking. We hope that you and your committee will resolve the land problem as soon as possible.

I would like to say a few words about our destiny. At the present time we are considered wards of the Federal Government. I believe that the native people have advanced far enough in our society that I can't see why we can't get out from under the BIA. The BIA has not done much for us. They were responsible for the loss of most of our land in this area. We have sought assistance from the BIA many times but we never seem to get action, only promises. The whole bureaucracy just isn't doing the job it was created for. I believe we can handle our own problems better than any Government agency. I would like to see the natives choose their own destiny, not by some bureaucratic agency of the Federal Government. I urge you and your committee to study this situation carefully and see what can be done for the natives to determine their own destiny, so that we can live our own life as first-class citizens of the United States of America.

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

AR002110

| | |
|---|---|
| **From:** | Colin C. Hampson |
| **To:** | Kelly, Matthew; Vanessa L. Ray-Hodge; Susan Jones |
| **Cc:** | Jennifer Turner; Shepard, Eric; Hay, John |
| **Subject:** | RE: Eklutna Follow-up Questions |
| **Date:** | Wednesday, December 20, 2017 2:25:19 AM |
| **Attachments:** | Ezi land claim petition.pdf |
| | Fairbanks_Daily_News_Miner_July_1__1966.pdf |
| | 1181967 tundra times .pdf |

All,

I set out the questions and our responses below.

   *1.    Land claim petitions submitted by the Tribe to the Department in the 1950s and 1960s, the areas encompassed by the claims, including whether the claims included the area around the Ondola allotment, and details of the claims themselves, Copies of the original petitions, if available, would be much appreciated.*

   The claim filed by William Ezi includes the Ondola Allotment within the area of lands claimed.  The claim document is attached.  While the Tribe's request dated June 30, 2016 attributes the claim to 1953, the claim document states that it was signed in 1951. Chief Ezi filed the claim on behalf of the "Natives of Palmer, Alaska" who included people of Eklutna. The description of the land claimed is below.

   > Beginning at Point McKenzie on the north side of Knik Arm; thence north along longitude 150°, west to a point at latitude 62° north, longitude 150° west, thence east along latitude 62° north to longitude 148° west, thence south along longitude 148°, west to latitude 61° 15' north, thence west to Knik Arm; thence along Knik Arm in a southwesterly direction to a point due east of the point of beginning, thence due west across Knik Arm to the point of beginning; all of the waters and submerged lands for a distance of 3000 feet from the shores of Knik Arm at mean low tide and the lakes and streams empty into said waters.

William Ezi was the grandfather of Maria Coleman, a current member of the Tribal Council.

   The land claim is part of a long history of the Eklutna people to retain their lands.  We submitted an affidavit from Aaron Leggett, who is a Tribal Councilmember, a member of the Ondola family, and an expert on Eklutna history.  He reports that the Ondolas had a tribal, as well as an individual purpose, in securing the Ondola allotment; that was to stem the tide of losses of Eklutna lands.  Attached is a 1967 editorial in the *Tundra Times* which recounts the concerns about Eklutna land losses and intrusions on Eklutna land rights, and the Tribe's struggle against them, including through "Chief George Ondola," who helped his mother file the application for the Ondola allotment.  George Ondola also filed suit on behalf of the Eklutna Indians to challenge the State excavation of gravel on lands claimed by the Eklutna Indians.  This is reported on in the *Tundra Times* editorial and a July 1, 1966 article in the *Fairbanks Daily News-Miner,* a copy of which is also attached.

   These facts provide additional evidence of a nexus between the Ondola Allotment and the Tribe, as they show that the Ondola Allotment was part of a broader struggle by the Eklutna people, led by George Ondola, to protect their lands.

   *2.    The Tribe's assessment of other options for acquiring interests in the site*

AR002114

*consistent with the Tribe's gaming plans, including, for example, acquisition in trust or in restricted fee status.*

The Tribe considered acquisition of the parcel in trust or restricted fee status and determined that they were not viable under the circumstances.

3.      *Whether the Tribe prefers to receive an Indian lands determination in writing or not.*

The Tribe requests the decision in writing if it is positive.  If it will be negative, the Tribe would like to discuss the matter with your office before responding to this question.

4.      *How the Tribe envisions moving forward in the event of a positive ILD, and an estimated timetable for doing so.*

If the Tribe receives a positive Indian lands determination, it will then focus its efforts on working with the Department on processing the Tribe's lease agreement with the Ondola family and with the NIGC on the Tribe's agreements with the developer/manager.

We note that Indian gaming is not new to Alaska.  The NIGC has already approved gaming enterprises under IGRA in Alaska for four tribes: Metlakatla, Kake, Klawock, and Tlingit Haida.  These Indian gaming approvals are publicly available on the NIGC website. The NIGC website lists two existing tribal gaming operations in Alaska: the Klawock bingo operation near Craig and the Metlakatla bingo hall.

Colin Cloud Hampson
Sonosky, Chambers, Sachse, Endreson & Perry, LLP
*Phone*: (619) 267-1306
(619) 267-1812 (direct)
(619) 267-1388 (fax)
(619) 855-7050 (cell)

---

**From:** Kelly, Matthew [mailto:matthew.kelly@sol.doi.gov]
**Sent:** Wednesday, December 13, 2017 4:58 AM
**To:** Colin C. Hampson; Vanessa L. Ray-Hodge; Susan Jones
**Cc:** Jennifer Turner; Shepard, Eric; Hay, John
**Subject:** Eklutna Follow-up Questions

Good morning everyone. Following up on Monday's call, here are the items we briefly discussed and on which we would appreciate additional information:

- Land claim petitions submitted by the Tribe to the Department in the 1950s and 1960s, the areas encompassed by the claims, including whether the claims included the area around the Ondola allotment, and details of the claims themselves, Copies of the original petitions, if available, would be much appreciated.

- The Tribe's assessment of other options for acquiring interests in the site consistent with the Tribe's gaming plans, including, for example, acquisition in trust or in restricted fee

AR002115

status.

- Whether the Tribe prefers to receive an Indian lands determination in writing or not.

- How the Tribe envisions moving forward in the event of a positive ILD, and an estimated timetable for doing so.

Thanks very much.

**Matthew Kelly**
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor, Division of Indian Affairs
Branch of Environment and Lands
MS-6513
1849 C Street, NW
Washington, DC  20240
(202) 208-5353 (Direct)
(202) 208-4115 (Fax)
matthew.kelly@sol.doi.gov

This email (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its content is strictly prohibited. If you receive this email in error, please notify the sender immediately and destroy all copies.

AR002116

C L A I M

We, the undersigned natives of Palmer, Alaska, by and
through William Ezi, Chief of the Native Village, desire to file
our lawful claim before the Indian Claims Commission under the
Act of August 13, 1946 (p.25 U.S.C. 70; 60 STAT. 1049) requesting
the Commission to hear and determine our claim and claims against
the United States, and that settlement of said claims be made
therefore.

The basis of our claim or claims is that from time
immemorial up to the present time, we claimed the following
described lands on the grounds of continuous prior use and
occupancy and possessory rights and we claim that we have been
deprived of the continuous use of such lands and waters below de-
scribed, and that the said land surrounds Palmer, Alaska, taken in
the greater portion of the Matanuska Valley and adjacent areas and
is described as follows:

Beginning at Point McKenzie on the north side of
Knik Arm; thence north along longitude 150°, west to a point
at latitude 62° north, longitude 150° west, thence east along
latitude 62° north to longitude 149° west, thence south along
longitude 149°, west to latitude 61° 15' north, thence west to
Knik Arm; thence along Knik Arm in a southwesterly direction
to a point due east of the point of beginning; thence due west
across Knik Arm to the point of beginning; all of the waters
and submerged lands for a distance of 3000 feet from the shores
of Knik Arm at mean low tide and the lakes and streams emptying
into said waters.

That we have never given up said lands, sold or disposed of
our lands. That said lands have never been surveyed nor any steps
whatsoever taken to protect our rights and we are now in danger of
losing all of the rest of our land.

NATIVE VILLAGE OF PALMER.

By

UNITED STATES OF AMERICA )
TERRITORY OF ALASKA ) SS.
THIRD JUDICIAL DIVISION )

THIS IS TO CERTIFY that on this 3rd day of August, 1951,
personally appeared before me, the undersigned, a notary public
in and for the Territory of Alaska, duly commissioned and sworn
as such, personally appeared WILLIAM EZI, known to me to be the
Chief of the Native Village of Palmer, Alaska, and known to me
to be the person who signed the within claim, and he acknowledged
to me that he signed the same freely and voluntarily for the
uses and purposes therein mentioned.

IN WITNESS WHEREOF I have hereunto set my hand and
affixed my official seal the day and year first above written.

Notary Public in and for Alaska
My commission expires: _____

WILLIAM H. OLSEN
ATTORNEY AT LAW

AR002118

Newspapers.com

Fairbanks Daily News-Miner (Fairbanks, Alaska) · Fri, Jul 1, 1966 · Page 7

Downloaded on Dec 12, 2017

# Indians Sue State on Gravel Loss

ANCHORAGE (AP) — The Eklutna Indians filed a $510,000 suit against the State of Alaska Thursday, claiming the state took 400,000 cubic yards of gravel from their reservation.

The complaint was filed by George Ondola and Mike Alex for themselves and the Eklutna Indians.

Some 328,000 acres of land were withdrawn Oct. 19, 1936 by the Interior Department to establish an Indian reservation, the suit said.

However, since 1960, the suit charges, the State Department of Highways or contractors employed by the state have taken an estimated 400,000 cubic yards of gravel from the reservation land.

The value of the gravel was placed at $120,000.

Recovery of triple that sum was sought in the federal court suit, which also asked $150,000 punitive damages.

Taking of the gravel by the state and the taking of land "by other government agencies" is part of a plan "to harass and injure" the Indians and "drive them from their ancestral homes," the suit charges.

Fairbanks Daily News-Miner July 1, 1966

Clipped By:



**aleggett2000978**
Tue, Dec 12, 2017

Copyright © 2017 Newspapers.com. All Rights Reserved.



AR002119

*Editorial—*

# The Shrinking Lands
# Of the Eklutnas

The disturbing course of events that have plagued the Indian people of Eklutna ever since World War II is getting to be one of the glaring examples of what land hunger can do to the Native people who, along with their ancestors, occupied and used their lands. Knowing this, they are claiming lands they deem rightfully theirs. Flagrant disregard of their rights hits the core of human feelings but, apparently, there is not enough of those kinds of people to offset the wave of grabbing of the lands that have sustained our fellow Indians, Aleuts and Eskimos. Land to any person in the world is a treasured possession and it means no less to our people. The in-

(Continued on Page 2)

AR002120

# The Shrinking Lands

(Continued from Page 1)

timacy of living with it, upon it, and tasting of the meat thereof is to feel its blessing--the closeness of it to our well-being.

The taking of this land, however poor it might seem to some people, is an injury so profound that it leaves a void--a grievous feeling that something most precious has been wrested from one's grasp. It is something that somehow goes beyond tears because it also represents the habitation grounds of one's ancestors--the lands on which we live. To have it wrested from one's grasp is a grievous and a profound loss.

Back in 1930's our government, under an executive order, set aside 328,000 acres of land of the Eklutnas as an education reserve for the benefit of those people. World War II came and the Eklutna Indians, along with many others of course, felt the brunt of that war. The impact mostly involved land and a lot of it. Of the 328,000 acres that had been set aside, the military acquired more than 318,000 leaving less than 10,000 acres to the Eklutna Indians and this, apparently, without consulting them. Subsequently, other agencies kept nibbling away at the Eklutna lands until now there is about 1,800 acres left of the original acreage. When the initial big bite of land was made, the Eklutna people felt the pinch and they were forced to make a request of the military for permission to get firewood which they were acustomed to getting on the lands.

"They had a hard time getting the permit," said Anchorage attorney Stanley McCutcheon who has been assisting Native people legally on their land problems. McCutcheon is the man who successfuly aided the Tyonek Indians on their land matters.

Another, and most recent disregard of the Eklutna people's rights, was when the federal government allowed the State Department of Highways to take gravel from the remaining 1,800 acres. It has been reported that between $125,000 and $230,000 worth of gravel has been excavated from the site. None of this money, according to Chief George Ondola of the Eklutnas, has found its way to his people who, apparently, had been considered "squatters" on the lands they occupied. The village people, however, have gone to court in an effort to get some of the money.

The Anchorage Daily News said recently, "Then early last year, a solicitor for the Department of the Interior stated that the Eklutnas did indeed have rights to the lands they occupied and could control that land. These rights, according to solicitor Richard Bradley, included those of leasing similar to that enjoyed by the Tyoneks.

"Harry O. Arend, then Interior Department solicitor for Alaska, agreed with Bradley's opinion. It was sent to Washington, D.C., where, apparently, it was filed away and forgotten. Nothing more was heard of the rights of the Eklutnas."

"Nothing more was heard" is getting to be too much of an OUT where our people's rights are concerned.

AR002121



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240



JAN | | 1993

M-36975

Memorandum

To:        Secretary

From:      Solicitor

Subject:   Governmental Jurisdiction of Alaska Native Villages
           Over Land and Nonmembers

In the fall of 1990 at your request, we conducted an Office-wide
review of all pending legal issues in Alaska.  On June 19, 1991,
following that review and briefings with your policy and program
staff, you issued a memorandum establishing as a priority the
resolution of three of those issues.  Among your priorities was a
request that we work with the Department of Justice to develop
the legal position of the United States on "the nature and scope
of so-called governmental powers over lands and nonmembers that a
Native village can exercise after the Alaska Native Claims
Settlement Act."  You indicated that the opinion would be useful
in resolving questions that arise in the context of approving the
constitutions put forward by villages and would aid you in
deciding whether the jurisdictional claims made by the villages
were consistent with law.  You limited your request noting that
you were not seeking "to question the existence of a
long-recognized special relationship between the United States
and Alaska natives" or "to revisit the eligibility of villages to
participate in programs administered by the Department and
available to Indians."

## I.   INTRODUCTION

Prior to the enactment of the Alaska Native Claims Settlement
Act, Act of December 18, 1971, Pub. L. No. 92-203, 85 Stat. 688
(codified as amended at 43 U.S.C. §§ 1601-1628) (ANCSA), sixty-
nine Alaska Native villages and regional groups adopted
constitutions pursuant to section 16 of the Indian Reorganization
Act, Act of June 18, 1934, § 16, 48 Stat. 987 (codified as
amended at 25 U.S.C. § 476) (IRA).  All but two of these
constitutions were adopted during the 1930's, 1940's and
1950's.[1]

---

[1]     Bureau of Indian Affairs, __American Indians and Their Federal
Relationship__ 2-5 (1972).  Two constitutions were adopted in 1971:
Inupiat Community of the Arctic Slope, approved on June 28, 1971,
and adopted August 26, 1971; and Kenaitze Indian Tribe, approved
June 21, 1971, and adopted August 1, 1971.

AR002140

Although there was some interest in IRA constitutions during the 1970's,[2] it was not until the 1980's that there was evidence of widespread renewal of Native interest in IRA constitutions. As a result of this renewed interest, three villages have adopted amended constitutions[3] and three have adopted constitutions for the first time.[4] During this time, several Native groups have considered proposed constitutions or constitutional amendments and rejected them.[5] Approximately a dozen villages are currently considering proposed constitutions. The Bureau of Indian Affairs (BIA) is corresponding with these villages to provide technical comments.

The 1988 amendments to the IRA, Act of November 1, 1988, § 101, Pub. L. No. 100-581, 102 Stat. 2938 (codified 25 U.S.C. § 476), require that, 30 days prior to calling an election on the adoption or amendment of a tribal constitution, you advise a tribe in writing of any provision of the constitution that you believe is contrary to applicable law. Your request to this Office arises in the context of this provision. Legal guidance on the scope of village jurisdiction over land and nonmembers is necessary to determine whether the jurisdictional claims made by the villages are contrary to law.

As the length and detail of the opinion that follows indicates, the question you have asked is an exceedingly difficult and complex one. As you are aware, both the federal and state courts in Alaska have been grappling with issues concerning the sovereignty and powers of Alaska Native groups for several years. The results have been, to say the least, less than consistent.[6]

---

[2]     Several elections on the adoption of village constitutions were authorized in the 1970's but, for some reason, were never held.

[3]     Tanana, adopted June 13, 1989, and approved July 26, 1989; Stevens Village, adopted June 25, 1990, and approved August 8, 1990; and Sitka, adopted November 26, 1991, and approved January 8, 1992.

[4]     Eagle, adopted April 29, 1989, and approved June 13, 1989; Circle, adopted August 20, 1991, and approved October 4, 1991; and Seldovia, adopted April 3, 1992, and approved May 18, 1992.

[5]     For example, the Metlakatla Indian Community of the Annette Islands Reserve rejected a proposed revised constitution on March 1, 1983, and the Native Village of Port Graham rejected a proposed constitution on January 30, 1992.

[6]     Federal cases include: Native Village of Tyonek v. Puckett, 957 F.2d 631 (9th Cir.), superseding 953 F.2d 1179 (9th Cir. 1992); Alyeska Pipeline Service Company v. Alaska, No. A87-201

2

In formulating our opinion, we have attempted to step back from the details of these specific cases and examine the question of the impact of ANCSA on Native village jurisdiction over land and nonmembers from the perspective of the 125 year history of federal dealings with Alaska Natives and of general principles of Federal Indian law.

In our effort, we have consulted with the Governor and Attorney General of Alaska; numerous Native leaders in Alaska and the contiguous 48 states, as well as their counsel; the Alaska congressional delegation and other congressional leaders; and the members of the Joint Federal-State Commission on Policies and Programs Affecting Alaska Natives established by section 12 of the Act of August 18, 1990, Pub. L. No. 191-379, 104 Stat. 473, 478. We have received numerous comments, including several detailed legal briefs. These comments have been very helpful in developing our opinion.

As we discuss further below, the complexity of questions concerning the sovereign powers of Alaska Native groups arises in considerable measure from Alaska's unique circumstances and history.[7] Alaska was the last territorial acquisition of the United States on the North American continent. The remote location, large size and harsh climate of Alaska further delayed the need to confront questions concerning the relationship between the Native peoples of Alaska and the United States. As a result, all three branches of the Federal Government have dealt with the relationship in a tentative and reactive way. Often, decisions on issues concerning the relationship with Natives have been postponed, rather than addressed. Where aspects of the relationship have been addressed, they have often been resolved without a clear or consistent understanding or application of the fundamental legal principles governing the relationship.

---

Civil (D. Alaska)(Tentative Decision, filed January 17, 1992); Blatchford v. Native Village of Noatak, 111 S.Ct. 2578 (1991), rev'g Noatak v. Hoffman, 896 F.2d 1157 (9th Cir. 1990); Native Village of Venetie I.R.A. Council v. Alaska, 944 F.2d 548 (9th Cir. 1991)(Venetie II), superseding 918 F.2d 797 (9th Cir. 1990); Chilkat Indian Village v. Johnson, 870 F.2d 1469 (9th Cir. 1989); Alaska v. Native Village of Venetie, 856 F.2d 1384 (9th Cir. 1988)(Venetie I).

State cases include: Nenana Fuel Co., Inc. v. Native Village of Venetie, 834 P.2d 1229 (Alaska 1992); Hydaburg Cooperative Association v. Hydaburg Fisheries, Inc., 826 P.2d 751 (Alaska 1992); Matter of City of Nome, 780 P.2d 363 (Alaska 1989); Native Village of Stevens v. Alaska Management & Planning, 757 P.2d 32 (Alaska 1988).

[7]    See Part III, infra.

3

This is not to say that there has been a wholly consistent pattern of dealing with Native Americans in the contiguous 48 states. There obviously has not. But there is a fundamental difference between the approach to issues of Indian law and policy in the contiguous 48 and the situation in Alaska. The shifts in dealing with Native Americans in the contiguous 48 have been characterized by fundamental changes in national policy. An initial policy of separation of Native Americans from the rest of society through removal and reservations gave way in the 1880's to a policy of assimilation as reflected in the General Allotment Act of 1887. 24 Stat. 388. Assimilation gave way in turn to a policy of reinvigorated Native self-government as reflected in the IRA and other policies of the New Deal. There followed a brief period of termination and then, in the early 1970's, the current policy of tribal self-determination.[8] Dealings with Native groups in Alaska have, to be sure, reflected elements of then-current national policies. There has been, however, no consensus on the appropriate comprehensive framework for the relationship with Alaska Natives taking into account the unique circumstances of Alaska.

ANCSA is the most comprehensive statute to address Alaska Native issues. However, even with ANCSA, the primary impetus for, and focus of, the statute was resolution of a specific issue: Native claims to the land of Alaska.[9] A comprehensive statutory scheme to address this issue was enacted. In our opinion, as we detail below, this scheme has decisive implications for the current status of Native village jurisdiction over land and nonmembers.

In several statutes subsequent to ANSCA, Congress has disclaimed an intention to address the issue of Alaska Native village sovereign powers. Most recently, in the so-called "1991 Amendments" to ANSCA, Congress said that no provision shall "confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands . . . or persons in Alaska . . . ." Act of February 3, 1988, Pub.L. No. 100-241, § 2(8)(B), 101 Stat. 1788, 1789 (1988) (43 U.S.C. § 1601 note). The Senate Energy and Natural Resources Committee explained, in its report on the legislation, that, "[t]his is an issue which should be left to the courts in interpreting applicable law and that these amendments should play no substantive or procedural

---

[8]    A concise history of Federal Indian policy through 1940 can be found in F. Cohen, Handbook of Federal Indian Law 1-88 (1942) (1942 Cohen). An update through 1981 is contained in F. Cohen, Handbook of Federal Indian Law 47-206 (1982) (1982 Cohen). A recent comprehensive history is F. Prucha, The Great Father (1984).

[9]    See Part IV.B, infra.

4

AR002143

role in such court decisions."[10]  There is an element of self-fulfilling prophecy in the Senate Committee's statement.  In the absence of further guidance from Congress, the courts will of necessity have to struggle with this issue.  However, the courts must do so within the framework of laws enacted by the Congress and within the context of the specific cases and controversies that are brought before them.  There is no assurance that the courts can comprehensively address the sovereign powers of Native villages.  Further, the cases decided to date indicate that a judicial consensus on even specific issues will be elusive.

In the opinion that follows, we attempt to provide a broader perspective on the issue of Native village jurisdiction over land and nonmembers than can be provided in a specific case or controversy.  However, the conclusions we reach can be no more than our best legal judgment.  Further, like the courts, we are constrained by the framework of laws enacted by the Congress.

The ultimate and most satisfactory answer to the question you have posed should be provided by the Congress.  Unlike the courts or the Department of the Interior, the Congress has the constitutional authority to craft general principles of Federal Indian law to address the unique circumstances of Alaska.  Only with careful and deliberate action by the legislative branch, taken in consultation with the Native and non-Native citizens of Alaska, will there be an answer that will provide certainty and fairness in the future governance and development of Alaska.

II.  OUTLINE

In 1975 Congress established the American Indian Policy Review Commission to conduct the most comprehensive review of American Indian policy since the 1930's.[11]  The Commission's review included examination of the status of Alaska Natives and is particularly relevant to our inquiry because its views on Alaska Natives and ANCSA were framed in the context of national Indian policy and were issued in 1977, six years after the Settlement Act.  While we do not find persuasive everything said by the

---

[10]    S. Rep. No. 201, 100th Cong., 1st Sess. 35 (1987).  See discussion Part IV.B.2, *infra*.

[11]    Pub. L. No. 93-580, 88 Stat. 1910, as amended by Act of August 9, 1975, Pub. L. No. 94-80, §§ 1-4, 89 Stat. 415 and Pub. L. No. 95-5, 91 Stat. 13.  The Commission was charged with conduct of "a comprehensive review of the historical and legal developments underlying the Indians' unique relationship with the Federal Government in order to determine the nature and scope of the necessary revisions in the formulation of policies and programs for the benefit of Indians."  The work of the Commission is discussed in 1982 Cohen, *supra* n. 8, at 205-06.

5

AR002144

Commission concerning Alaska Natives, the broad outlines of the Commission's findings provide a useful starting point for this opinion.

In Chapter 12 of its Final Report, the Commission described the status of Alaska Natives, in part, as follows:

> In aboriginal social and political organization, the Alaska Natives did not differ markedly from other American native peoples.  They organized themselves into social and political units (groups or tribes) as various and multiform, but of the same general nature, as those evolved by the Indians of the lower 48.
>
> * * *
>
> When, after the beginning of the 20th century, the United States began to take notice of the Alaska Natives, it dealt with them in much the same way as it was then dealing with the Indians of the lower 48.

American Indian Policy Review Commission, Final Report 95th Cong., 1st Sess. 489 (Comm. Print 1977) (footnotes omitted).

The Commission went on to conclude:

> By and large, the United States recognized that the Native tribes of Alaska were of the same genus as the other Indian tribes within its jurisdiction, and formed its relationships with them and their members accordingly.  In short, it regarded the Alaska Native tribes as dependent domestic sovereigns, possessed of the same attributes and powers as the Native tribes of the lower 48.  And, just as in the case of other Native tribes, it acknowledged that a special relationship existed between it and the Alaska Native tribes and their members, as an incident of which it undertook to provide them with special services.
>
> * * *
>
> The Alaska Native tribes (referring, of course, to the historic and traditional tribal entities, not to the Native corporations organized under the Settlement Act), just as the tribes of the lower 48, are domestic sovereigns.  They possess all of the attributes and powers normally appertaining to such status, except those that have been specifically denied or taken from them by Congress.

Id. at 490-91 (footnote omitted).

6

AR002145

The Commission found that ANCSA did not "effect a termination of the traditional Alaska Native tribes." Rather, the Commission found that, "as its very title implies," ANCSA was a settlement of aboriginal land claims.  Id. at 491.  It observed that:

> No such [land claim] settlement has ever been held to have abolished the tribes concerned as political entities, to have affected their legal status, to have diminished their sovereign powers, or to have terminated the special relationship previously existing among them and their members and the United States.
>
> The Settlement Act did not alter in any way the legal nature or status of any of the Alaska Native tribes. Nor did it alter the preexisting relationship between the United States and the Alaska Natives as members of such tribes.  Particularly the Settlement Act neither terminated the tribes nor the status as "Natives" of the members thereof.

Id. at 491-92 (footnote omitted).

The Commission relegated to a deceptively simple footnote the essential conclusion for our present inquiry.  After concluding that Alaska Natives "possess all of the attributes and powers normally appertaining to such [domestic sovereign] status, except those that have been specifically denied or taken from them by Congress," the Commission noted:

> Although, technically, the Alaska Native Tribes still possess a number of sovereign powers relating to the governance of territory (e.g., to regulate hunting and fishing on tribal domain), these powers are largely in abeyance at the present time because the tribes currently do not possess tribal domains.  However, were the United States in the future to set aside or acquire land in trust for an Alaska Native tribe, all of the slumbering powers of that tribe pertaining to the governance of territory would immediately rejuvenate. In short, lacking the subjects to which certain of the sovereign powers they still possess relate, the Alaska Native tribes at present have no occasion to exercise them.

Id. at 491 n. 2.

Our review of the history of Alaska Natives and their relationship with the United States that follows is consistent with the factual conclusions of the Commission.  Similarly, our analysis of the law confirms the Commission's basic analysis and conclusions.  Events and judicial decisions since the Commission's Final Report refine or expand upon the principles

7

AR002146

the Commission discussed.  They do not repudiat  them.

Our analysis must start, as did that of the American Indian
Policy Review Commission, with the question of whether there are
tribes in Alaska.  Whatever governmental powers Alaska Native
villages have, they have by virtue of being "tribes," as that
term is used in Indian law.  Powers of inherent sovereignty are
dependent on the villages being tribes.[12]

In Part III we review the ethnological history and the history of
dealings between the United States and Alaska Natives for the
light it sheds on villages as tribes.  We then consider the legal
issue of whether there are tribes in Alaska and the arguments
that have been advanced against the conclusion that villages may
be tribes.  In Part IV, we tur  to ANCSA and consider its effect
on village exercise  f governm  tal powe s over  and and
nonmembers.

III.  VILLAGE TRIBAL STATUS

        A.    History

In examining questions relating to the status and powers of
Indians, it is useful, if not essential, to review the historical
backdrop for the issues.[13]  In the current case, such a review is
particularly important.  As indicated above, an understanding of
the current status and powers of Alaska Native groups depends on
an understanding of the unique history and circumstances of
Alaska and its Native peoples.

        1.    Early History

The consensus of anthropological opinion is that man first
entered Alaska from Asia across a then-existing land bridge.
The land bridge is estimated to have emerged more than 40,000
years ago and to have existed on-and-off until 10,000 years ago.
The first migrations may have occurred 25,000 to 40,000 years
ago.  At Old Crow Flats in the Yukon, east of Alaska in an area
never glaciated, evidence has been found that man was present
between 25,000 and 30,000 years ago or more.  More than 2,700
archaeological sites have been identified in Alaska proper, some

_____

[12]    See Powers of Indian Tribes, 55 I.D. 14, 1 Op. Sol. on
Indian Affairs 445 (1934).

[13]    C. Wilkinson, American Indians, Time, and the Law 32-52
(1987).

AR002147

dating back 9,000 to 10,000 years.[14]

A first migration across the land bridge is believed to have moved through Alaska and spread east and south, reaching the east coast of North America and into South America as the Clovis and other fluted point cultures. A second migration is believed to have moved through the interior of Alaska, east into Canada, and south along the west coast of North America. Descendants of this migration include the Navajo and Apache tribes, the Indians of the Pacific Northwest and the Athabascan Indians of Alaska. The final prehistoric migrants were the ancestors of the Eskimos and Aleuts.[15]

At the time of Russian arrival in the 1700's several distinct cultural groups of Alaska Natives existed: (1) the Inupiat (Northern Eskimo) and the Yupik (Southern Eskimo); (2) the Aleuts; (3) the Athabascans; and (4) the related, but distinct, tribes of southeastern Alaska, the Tlingit and the Haida. These groups were, in turn, further stratified into several dozen linguistic and cultural groups.[16]

Significant information is available concerning the various Native groups, dating from the period of early contact. Most groups had social/political ranking or hierarchy. Groups were organized to perform, regulate or accommodate subsistence and economic activity (including trading with other groups), accomplish distribution of wealth, recognize land boundaries, conduct war, maintain a slavery system, and regulate domestic matters, such as marriage, descent and distribution, and intergroup alliances and partnerships.[17]

---

[14]   R.D. Arnold, Alaska Native Land Claims 2-7 (2d ed. 1978) (Arnold). See also, J.D. Jennings, Prehistory of North America 323-52 (1968).

[15]   C. Turner, Ancient Peoples of the North Pacific Rim, in Crossroads of Continents 111, 115 (Fitzhugh & Crowell eds. 1988) (Crossroads). See also, Jennings, Origins, in Ancient Native Americans 141 (Jennings ed. 1978); United States v. Berrigan, 2 Alaska Repts. 442, 447 (D. Alaska 1905).

[16]   Arnold, supra n. 14, at 8-17.

[17]   The summary that follows discusses key aspects of the organization and operation of Alaska Native groups. It necessarily does not probe in detail the complexities of the history and culture of the various groups. For in-depth information on the rich history and distinct culture of each Native group see Smithsonian Institution, Handbook of North American Indians, Vol. 5 (Arctic) and Vol. 6 (Subarctic) (1984) (Handbook). For information on the recent culture and

9

### a. Social Organization

Some form of village, clan or band grouping was a common denominator of pre-contact Native Alaskan life. The sense of affiliation with a group, even for the relatively loosely organized Eskimos, was described as follows by anthropologist Jean Ray:

> The Eskimos were extremely conscious of their tribal affiliations, extent of their territory, and relations with foreign groups. Inhabitants of the smaller villages felt a strong tie with members of the larger capital. Wherever they went they identified themselves as belonging to the specific larger group and were acutely aware of their crossing over into other tribal territory.[18]

The Tlingits were divided into two large moieties, the Raven and the Wolf. These were in turn divided into a number of matrilineal clans. In addition, each Tlingit also belonged to one of about 18 or 20 kwaan, large territorial groupings. Each kwaan had one or more permanent winter villages. In the complex Tlingit social structure, each of these levels played a role. The clan, for example, regulated marriage and ceremonial activities and owned specific hunting, fishing and gathering sites.[19]

The Athabascans were loosely organized in bands made up primarily of persons related by blood or marriage. During much of the year, these bands subsisted as small local groups, but during summer fishing and fall caribou migrations, they came together as larger regional bands.[20] For the Eskimo, permanent clan or

---

organization of the Native groups, see Federal Field Committee for Development Planning in Alaska, Alaska Natives and the Land (1968) (Alaska Natives and the Land).

[18]    Arnold, supra n. 14, at 15.

[19]    A. Shinkwin, Traditional Natives Societies in D. Case, Alaska Natives and American Laws 333, 335-336 (1984) (Shinkwin). Haida social structure was similar to that of the Tlingits. See also, Tlingit and Haida Indians of Alaska v. United States, 177 F. Supp. 452, 147 Ct. Cl. 315, 361-380 (1959). The Federal Supplement publication of the Tlingit and Haida opinion includes only the court's legal opinion. The Court of Claims Reports also includes extensive findings of fact. Accordingly, subsequent citations are to the Court of Claims Reports.

[20]    J. Van Stone, Northern Athapaskans: People of the Deer, in Crossroads, supra n. 15, at 64-68.

10

AR002149

family based villages were usually the basic social unit, but
villagers also identified themselves with other villagers as part
of a larger group.[21]  Aleut society was also village based.[22]

      b.   Leadership

All Alaska Native groups had leadership or political structures,
although the nature of political leadership varied considerably.
The complex social organization of the Tlingit and Haida was
reflected in a complex structure of nobles, chiefs, commoners and
slaves.[23]  Each Athabascan band had a chief, with authority
derived from economic success or demonstrated ability in hunting
or warfare.  Persons with shamanistic power exercised the
greatest authority.[24]  Among the Aleut, each village had a
dominant family and a chief, with chieftainship usually
inherited.  In some instances, several villages were affiliated
under a higher chief, who had authority to protect hunting
grounds, control behavior and lead in war.[25]  Eskimo government
was such that many observers have "assumed a lack of
government."[26]  However, a complex web of family and economic
leaders and religious and cultural beliefs provided "naturally
developed means of social control which serve the purposes of
government and in fact are government."[27]

      c.   Land Ownership

The social/political subgroups of the major Alaska Native groups
all, to varying degrees, controlled regions, consisting of
well-defined territories used for a variety of purposes.  Among
the Tlingit and Haida, clans exercised control of land and there
were "very definite concepts of proprietary rights in their
territories extending to well known landmarks, such as rivers,
rocks, reefs, mountain peaks, valleys, or natural characteristics

---

[21]    Arnold, supra n. 14, at 15.

[22]    L. Black and R.G. Liapunova, Aleut: Islanders of the North Pacific, in Crossroads, supra n. 15, at 52-57.

[23]    F. de Laguna, Tlingit: People of the Wolf and Raven, in Crossroads, supra n. 15, at 58-63.

[24]    C-M. Naske & H. Slotnick, Alaska: A History of the 49th State 19-20 (1979) (Naske & Slotnick).

[25]    Handbook, supra n. 17, Vol. 5 at 176.

[26]    H.D. Anderson & W.C. Eells, Alaska Natives 48 (1935).

[27]    Id.

AR002150

or points on the shores, bays, inlets or watersheds."[28]
Athabascan bands had subsistence use areas with well known
boundaries.  Band territory was ordinarily closed to other
groups, unless permission for its use was granted.[29]  Each Aleut
village similarly had a specified territory.  Boundaries of these
territories were often marked by permanent look-out stations.[30]
Eskimo groups exercised common possession of territory.  Indeed,
the name for an Eskimo social unit was "nunnatgatigiit," meaning
"people who are related to one another through their common
ownership of land."[31]

> d.   Law Ways

Alaska Native groups did not have legal systems in the modern
European sense, but all had systems of social and political
control, some quite elaborate.  The Tlingits had relatively
sophisticated legal arrangements.  Disputes within clans and
between clans were resolved by clan leaders, although each
village also had a "peacemaker" whose position was marked by a
special paddle.  The Tlingit legal system included
well-understood principles of liability and compensation for
death and injury.[32]  Among the Athabascans, justice for serious
offenses was administered by a village chief, but was subject to
question by a village council.  A system of punishment for
various offenses was understood.[33]  Dispute resolution among the
Aleuts and Eskimos was aimed primarily at restoring group social
harmony, although punishment for serious crimes, such as murder

---

[28]   _Tlingit and Haida Indians of Alaska v. United States_, 147
Ct. Cl. 315, 384 (1959).  _See also_, F. de Laguna, _Tlingit: People
of the Wolf and Raven_, _in_ _Crossroads_, _supra_ n. 15, at 60.

[29]   Shinkwin, _supra_ n. 19, at 341.

[30]   _Id._ at 345.

[31]   Arnold, _supra_ n. 14, at 12.

[32]   Alaska Judicial Council, _Resolving Disputes Locally:_
_Alternatives for Rural Alaska_ 26-27 (1992).  During the Navy's
administration of Alaska between 1879-1884, which was centered at
Sitka, Tlingit customary law was employed by the Navy to insure
order.  The Navy also employed Tlingits as policemen under the
supervision of a Tlingit chief.  Harring, _The Incorporation of_
_Alaska Natives Under American Law: United States and Tlingit_
_Sovereignty, 1867-1900_, 31 Ariz. L. Rev. 280, 301-02 (1989)
(Harring).

[33]   _Resolving Disputes Locally_, _supra_ n. 32, at 22-23.

AR002151

and theft, was imposed.[34]

      2.    Russian Rule and the Treaty of Cession

Russian traders and hunters ventured into Alaska in the mid-18th
Century.  In 1766, Russia declared sovereignty over Alaska.  In
1799, the Russian American Company was granted a trading monopoly
in Alaska.  The Company, which was modeled on the British East
India Company, served as the government of Alaska until the
territory's sale to the United States in 1867.[35]

The Russian presence was initially centered in the Aleutians, but
later expanded eastward into southeastern Alaska, with
headquarters at what is now Sitka.  The Russians had a major
impact on Aleut society.  To harvest furs for trade, the Russians
impressed Aleuts, and some Eskimos, into forced labor.  Aleut
villages were disrupted and some destroyed.  The Aleut population
was devastated by infectious diseases brought by the Russians.
In southeastern Alaska, the Tlingit opposed the Russian presence,
destroying posts at Sitka in 1802 and Yakutat in 1805.
Eventually, however, the Tlingit accommodated to the Russians,
becoming active suppliers and trading partners.  Contact with
interior groups was limited, and often occurred through Tlingit
intermediaries.[36]

The first charter of the Russian American Company did not
significantly address the status of Natives.  In contrast, the
second charter, issued in 1821, and the third and final charter,
issued in 1844, distinguished between classes of Natives.[37]
Under the 1844 Charter, "settled tribes" under Russian
administration were recognized as Russian subjects.  These tribes
were not subject to taxation and were allowed to remain under the
governance of Native chiefs.  However, the chiefs were subject to

---

[34]    Shinkwin, supra n. 19, at 346; A. Hippler and S. Conn, The
Village Council and Its Offspring: A Reform for Bush Justice, 5
UCLA-Alaska L. Rev. 22 (1975).

[35]    Useful brief summaries of Russian rule in Alaska are found
in Naske & Slotnick, supra n. 24, at 27-56, and L.T. Black, The
Story of Russian America, in Crossroads, supra n. 15, at 70-82.
For more detail, see H.H. Bancroft, History of Alaska 1730-1885
(1886).

[36]    Id.

[37]    Relevant provisions of the charters are set out in Russian
Administration of Alaska and the Status of Alaska Natives, a
report prepared by the Library of Congress for the Senate
Interior and Insular Affairs Committee in 1950, S. Doc. No. 152,
81st Cong., 2d Sess. 43-52 (1950).

13

AR002152

appointment by the Administrator General of the Company and supervision by Company superintendents.[38] "Not wholly dependent tribes" living within the boundaries of Russian colonies were to "enjoy the protection of the colonial administration only on making a request therefor, and when such request is deemed worthy of consideration." Those "independent tribes" not dependent on the Company, were beyond its authority. Relations with these tribes were limited to "the exchange, by mutual consent, of European wares for furs and native products." The Company could establish posts within the territory of these groups only with their consent.[39]

A memorandum prepared by the Russian Ministry of Foreign Affairs in 1867 stated that, although an informal system of allotting homesites to settlers existed, Russia had not established a formal system of land titles. In the Aleutians, the memorandum said, "[t]he division of land between the Aleutian settlements was established at a time anterior to the Russian occupation and . . . [n]either the imperial government . . . nor agents of the company . . . ever interfered with the internal division of lands." In the interior, "no attempts were ever made, and no necessity ever occurred, to introduce any system of land ownership."[40]

In the 1850's the Russian American Company's fur markets declined. The Company's efforts to diversify into other areas, such as fishing were not economically successful. At the same time, the Russian Government became interested in the sale of Alaska, partly to raise funds for Czar Alexander II's program of social reform and partly because of concern about Russia's ability to defend the colony against the United States. Initial discussions with the United States Government were suspended because of the American Civil War. In 1867 the Russian ambassador to Washington reached agreement with Secretary of State Seward for sale of Alaska to the United States for $7.2 million.[41]

Article VI of the Treaty of Cession by which the United States

--------

[38]    Id. at 49-51 (Charter §§ 247-279).

[39]    Id. at 52 (Charter §§ 280, 281-285).

[40]    "Explanatory memorandum in answer to the communication of the ministry of foreign affairs, department of interior relations, dated August 31, 1867, pursuant to the communication addressed by Hon. W.H. Seward, Secretary of State, August 6, 1867, to St. Petersburg, to the American envoy near the imperial court." Id. at 53-56.

[41]    Naske & Slotnick, supra n. 24, at 53-55.

AR002153

acquired Alaska provided, in part, as follows:

> The cession of territory and dominion herein made is
> hereby declared to be free and unencumbered by any
> reservations, privileges, franchises, grants or
> possessions, by any associated companies, whether
> corporate or incorporate, Russian, or any other, or by
> any parties, except merely private individual property
> holders; and the cession hereby conveys all the rights
> and franchises, and privileges now belonging to Russia
> in said territory or dominion, and appurtenances
> thereto.

15 Stat. 539, 543 (1867).

In Article III, the Treaty addressed the status of the
inhabitants of Alaska:

> The inhabitants of the ceded territory, according to
> their choice, reserving their natural allegiance, may
> return to Russia within three years; but if they should
> prefer to remain in the ceded territory, they, with the
> exception of uncivilized native tribes, shall be
> admitted to the enjoyment of all the rights, advantages
> and immunities of citizens of the United States, and
> shall be maintained and protected in the free enjoyment
> of their liberty, property and religion.  The
> uncivilized tribes will be subject to such laws and
> regulations as the United States may, from time to
> time, adopt in regard to aboriginal tribes of that
> country.

Id. at 542.

          3.    Early United States Administration 1867-1900

In the early years of United States ownership, little attention
was paid to the administration of Alaska.[42]  The country was
preoccupied with recovery from the Civil War and controversies of
the Reconstruction Era.  Alaska was geographically remote and did
not offer the prospect of early, profitable economic development.
No formal government was established until the first Organic Act
for the territory was adopted in 1884.[43]  Before this
legislation, such administration as existed in the territory was

---

[42]    C-M. Naske, An Interpretative History of Alaska Statehood
2-3 (1973) (Naske).

[43]    Act of May 17, 1884, 23 Stat. 24.  Owing to this delay in
forming a territorial government, the Department of the Interior
did not assume responsibility for Alaska until 1884.

AR002154

provided by the military and, for a brief period, the Treasury Department.[44]

The lack of attention paid to Alaska extended to the question of relations with the Native population.  Treaty-making with Indians was ended by Congress in 1871, only four years after the Alaska Purchase, but the conflicts leading to the negotiation of treaties in the continental United States were not present in Alaska.[45]  The American immigrant population was initially small.[46]  Although tensions existed between the Natives and immigrants, including increasing immigrant encroachment on Native resources, the vast size of Alaska resulted in a relative lack of intense or continuous competition and conflict over land or resources.[47]  Military skirmishes with Natives occurred, but not on the scale seen in what became the contiguous 48 states.[48]  Natives were not confined to reservations.[49]  No Indian agents were dispatched and the Indian Office was not given

---

[44]    Nichols, _Alaska: A History of Its Administration_ 34-82 (1927); Naske, _supra_ n. 42, at 1-2.

[45]    1942 Cohen, _supra_ n. 8, at 405.

[46]    Of a total population of 33,426 reported in the 1880 Census, only 430 were whites.  Arnold, _supra_ n. 14, at 71.  The details of the 1880 Census are reported in Petrov, _Preliminary Report on the Population, Industry and Resources of Alaska_, H.R. Exec. Doc. No. 40, 46th Cong., 3rd Sess. (1881).

[47]    An important factor in this acceleration was the discovery of gold in 1880.  This began a series of gold rushes that increasingly penetrated and exploited the Alaskan interior. Along with the influx of an alien population came new and disruptive economic developments such as commercial fishing, cannery operations, and aggressive hunting of local game populations.  See generally, Naske & Slotnick, _supra_ n. 24, at 195-97.

[48]    Harring, _supra_ n. 32, at 295-98 (1989).  In 1870, the Army burned the Village of Kake after villagers killed two white traders in retaliation for the killing of two Kake warriors by the Army.  In 1884, the Navy shelled and burned Angoon after villagers seized hostages in an effort to obtain compensation for the death of a Tlingit shaman in a whaling accident.  _Id._ Wrangell was shelled by the Army in 1870 in retaliation for the killing of a white trader.  _Report of the Governor's Task Force on Federal-State-Tribal Relations_ 75 (1986) (Governor's Task Force).

[49]    See _supra_ n. 74.

16

responsibility for Alaska Natives until 1931.[50]  No provision was
initially made for separate Indian schools.[51]

Under these circumstances, official decisions on the legal status
and rights of Natives were fitful at best and less than
consistent.  In 1869, Secretary Seward declared to the Secretary
of War that laws regulating intercourse with Indian tribes
applied to the new territory.  Quoting the definition of "Indian
country" from the Indian Trade and Intercourse Act of June 30,
1834, Seward said, "This [definition] by a happy elasticity of
expression, widening as our dominion widens, includes the
territory ceded by Russia."[52]  Based on this guidance, and
perhaps their experience in the contiguous states, the military
in Alaska proceeded to treat Alaska as Indian country.[53]

However, in 1872, the U.S. District Court for Oregon (which then
had judicial jurisdiction for Alaska) dismissed a prosecution for
sale of liquor to Indians, finding that Alaska was not Indian
country.  United States v. Seveloff, 27 F. Cas. 1021, 1 Alaska
Fed. 64 (D. Ore. 1872) (No. 16,252).[54]  The court held that the
1834 Trade and Intercourse Act's definition of Indian country was
territorially limited to areas east of the Rocky Mountains,
except as specifically extended by Congress.  The court rejected
an argument that an 1868 statute extending the laws of the United

[50]   Secretarial Order No. 494 (March 14, 1931).  Secretary
Delano  appointed an Indian agent for Alaska in 1873, but the
Comptroller of the Treasury held that no authority existed to pay
him and he was recalled.  D. Case, Alaska Natives and American
Laws, 223 n. 2 (1984) (Case).

[51]   The 1884 Organic Act authorized the Secretary of the
Interior to provide for "the education of the children of school
age in the Territory of Alaska, without regard to race . . . ."
Act of May 17, 1884, § 13, 23 Stat. 24, 27.

[52]   Letter of January 30, 1869, quoted in, Brief on the Subject
of the Jurisdiction of the War Department over the Territory of
Alaska, H.R. Exec. Doc. No. 135, 44th Cong., 2d Sess. 5 (1876).
Seward's letter was supported by a legal opinion issued by E.
Peshine Smith, Examiner of Claims of the State Department.  The
opinion is set out in full in the findings of fact in Tlingit and
Haida Indians of Alaska v. United States, 147 Ct. Cl. 315, 388-90
(1959).

[53]   Id. at 4-6.

[54]   The decision relied heavily on a decision of the Supreme
Court of the Oregon Territory holding that Oregon was not Indian
country for purposes of the 1834 Act, United States v. Tom, 1
Ore. 27 (1853).

17

AR002156

States "relating to commerce" to Alaska was sufficient to extend the 1834 Act to the territory, id. at 1024,[55] and impliedly rejected the view that Article III of the Treaty of Cession made the 1834 Act applicable.  Id. at 1023.

This decision alarmed the War Department.[56]  Congress promptly reacted by extending the liquor control provisions of sections 20 and 21 of the 1834 Act to Alaska.[57]  This action led, in turn, to a series of decisions concluding that, because the only liquor control provisions of the 1834 Act, and not other provisions, had been extended to Alaska, the territory Alaska was not Indian country for any other purposes.  In Waters v. Campbell, 29 F. Cas. 411, 1 Alaska Fed. 91 (D. Ore. 1876) (No. 17,246), the Oregon District Court held the trader licensing provision of the 1834 Act inapplicable.  In United States v. Williams, 2 F. 61, 1 Alaska Fed. 101 (D. Alaska 1880), the court held the general, non-liquor related criminal provisions of the Act inapplicable. And, in an 1878 opinion, the Attorney General held that section 3 of the 1834 Act could not be invoked to restrict the importation of molasses into Alaska.  16 Op. Att'y Gen. 141.[58]

The early Alaska Indian country decisions have been criticized by

---

[55]    The 1868 Act also made customs and navigation laws applicable to Alaska and was the source of the Oregon District Court's jurisdiction over the territory.  Act of July 27, 1868, 15 Stat. 240.

[56]    Brief on the Subject of the Jurisdiction of the War Department over the Territory of Alaska, H.R. Exec. Doc. No. 135, 44th Cong., 2d Sess. 49, 54 (1876), quoting Letter, Brig. Gen. Edward Canby to Assistant Adj. Gen., Military Division of the Pacific, December 13, 1872.

[57]    17 Stat. 485, 530 (1873).  14 Op. Att'y Gen. 327 (1873) confirms that this statute had its intended effect of designating Alaska as Indian country for purposes of restriction of liquor. The opinion agrees with Seveloff that importation of liquor had not previously been prohibited, but does so on the basis that a provision of the 1868 Act superseded operation of the 1834 Trade and Intercourse Act in Alaska, not on the basis of the 1834 Act's Indian country definition. This opinion was signed by Attorney General George Williams.  As Justice of the Supreme Court of the Oregon Territory, Williams authored United States v. Tom, which was relied on in Seveloff.

[58]    See also, 19 L.D. 323 (1894) (Opinion of Assistant Attorney General Hall) (Approval under R.S. 2103 of contract between Native and non-Native not required).

AR002157

modern commentators[59] and were controversial even when issued.
An Army Assistant Adjutant General wrote in 1875:

> I do not comprehend that fine, metaphysical, vague
> reasoning which regards Alaska as Indian country in one
> case, but perhaps not in another case. If one desires
> to introduce liquor, it is Indian country . . . if he
> does not it is not Indian country, or doubtful. This
> method of reasoning calls to mind the interview between
> Hamlet and Polonius. Yonder cloud has the shape of a
> camel, weasel, or whale, depending upon the medium
> through which it is seen. Alaska is Indian country or
> not, according to the stand-point from which it is
> viewed. My opinion is that Alaska is Indian country,
> or it is not Indian country. If it is Indian country
> for any purpose it is Indian country for all.[60]

Whether correct or not, the early Alaska Indian country cases
were based on technical issues of statutory construction. They
did not turn on whether general Indian law principles were
applicable in Alaska. The status of Natives was more
substantively addressed in an 1886 habeas corpus case, In re Sah
Quah, 31 F. 327 (D. Alaska 1886). The newly created District
Court for Alaska held that ownership of a Tlingit slave by
another Tlingit, as permitted by tribal law, violated the
Thirteenth Amendment and the 1866 Civil Rights Act. The court
contrasted the status of Alaska Natives to other Indians:

> The United States has at no time recognized any tribal
> independence or relations among these Indians, has
> never treated with them in any capacity, but from every
> act of congress in relation to the people of this
> territory it is clearly inferable that they have been
> and are now regarded as dependent subjects, amenable to
> the penal laws of the United States, and subject to the
> jurisdiction of its courts. Upon a careful examination
> of the habits of these natives, of their modes of
> living, and their traditions, I am inclined to the

---

[59]    Harring, supra n. 32, at 284-93; Niedermeyer, Note, "The
True Interests of a White Population": The Alaska Indian Country
Decisions of Matthew P. Deady, 21 N.Y.U. J. Int'l. L. & Pol. 195
(1988). See also, Native Village of Venetie I.R.A. Council v.
Alaska, 944 F.2d 548, 558 (9th Cir. 1991).

[60]    Brief on the Subject of the Jurisdiction of the War
Department over the Territory of Alaska, H.R. Exec. Doc. No. 135,
44th Cong., 2d Sess. 49, 54 (1876), quoting, Letter, H. Clay Wood
to Brig. Gen. O.O. Howard, December 16, 1875 (emphasis in
original). A contrary view was stated by Judge Advocate H.P.
Curtis, id. at 44-48.

19

AR002158

> opinion that their system is essentially patriarchal,
> and not tribal, as we understand that term in its
> application to other Indians.

Id. at 329.

In an 1886 report under the heading "Not Indians," Sheldon
Jackson, the Interior Department's general agent for education in
Alaska, asserted that popular opinion classing Natives as Indians
"is a mistake." Adding gloss to the Sah Quah opinion Jackson
asserted that the District Court's decision on the legal status
of the Natives supports this view.[61]

Congress was not so sure that there were not Indians in Alaska.
At an early date, it recognized that questions on the status of
Alaska Natives and their relation to the land of Alaska had not
been resolved.  The 1884 Organic Act provided that persons should
not be disturbed in the possession of any lands actually in their
use or occupation, or claimed by them, until terms for
acquisition of title were established in future legislation.
Although this provision was applicable to all Alaskans, Congress
took care to distinguish between claims of "Indians" and "other
persons." Act of May 14, 1884, § 8, 23 Stat. 24, 26.

The Senate Report on the legislation explained:

> [T]he rights of the Indians to the land, or some
> necessary part of it, have not yet been the subject of
> negotiation or treaty.  It would be obviously unjust to
> throw the whole district open to settlement under our
> land law until we are advised what just claim the
> Indians may have upon the land, or, if such a claim is
> not allowed, upon the beneficence of the Government.

S. Rep. No. 3, 48th Cong., 1st Sess. 2 (1883).  On the floor, the
bill's sponsor, Senator Benjamin Harrison, said, "It was the
object of the committee absolutely to save the rights of all
occupying Indians until . . . the Secretary of the Interior could
ascertain what their claims were and could definitely define any
reservations that were to be set apart for their use." 15 Cong.
Rec. 531 (1884).  To aid the Secretary's determination, the Act,
in a provision presaging future legislation, provided for a
commission to examine, inter alia, "the condition of the Indians
residing in [Alaska], what lands, if any, should be reserved for

---

[61]     According to Jackson, in Sah Quah, "[t]he United States
district court . . . affirmed that [Natives] are not Indians--
that they can sue and be sued, make contracts, go and come at
pleasure, and do whatever any other person can do lawfully."
Jackson, Report on Education in Alaska, S. Exec. Doc. No. 85,
49th Cong., 1st Sess. 10 (1886).

AR002159

their use, [and] what provision shall be made for their education
. . . ." Act of May 14, 1884, § 12, 23 Stat. 24, 27.[62]  The Act
also made special provision for continued use of land "occupied
as missionary stations among the Indian tribes."  Id. at § 8, 23
Stat. 24, 26.

The second Organic Act for Alaska, adopted in 1900, reaffirmed
that Indians were not to be disturbed in their actual use and
occupancy of land pending application of general land laws to
Alaska.  Act of June 6, 1900, § 27, 31 Stat. 321, 330.  In 1891
and 1898, the right of Alaska Natives to continued use and
occupation of land, at least pending further congressional
action, was addressed in two additional statutes.[63]

The state of affairs at the end of the 19th Century is reflected
in the 1891 report of Territorial Governor Lyman E. Knapp, H.R.
Exec. Doc. No. 1, 52d Cong., 1st Sess. 496-501 (1892), and in an
article published by Governor Knapp in the American Law Register,
the leading law journal of the day.[64]  The article summarizes the
history between the United States and the Natives in terms
paralleling the language of Sah Quah, concluding that the United
States dealt with the Natives only as individuals, not as tribes.
However, at the end of the article, Governor Knapp ventures a
cautious opinion that, as a matter of law, the "uncivilized
tribes" of Alaska may in fact be "subject to the 'laws and
regulations' adopted by the United States in regard to its
aboriginal tribes, and those laws and regulations already in
force in other sections of the country are equally applicable
here because the conditions are the same."[65]

In his 1891 report, Governor Knapp urges that "[t]he legal and
political status of the native population ought to be defined by
legislative enactment."  He urges that Congress, in so doing,
avoid what he characterizes as the "errors of policy" in dealing
with Indians in the contiguous 48 states:  "The Government is not

---

[62]   The work of this Commission is discussed at n. 159, infra.

[63]   Act of March 3, 1891, § 14, 26 Stat. 1095, 1100 (Right of
citizens to purchase public land for trade or manufacture
inapplicable to lands "to which the natives of Alaska have prior
rights by virtue of actual occupation."); Act of May 14, 1898,
§ 10, 30 Stat. 409, 413 (Secretary to reserve from homestead
entry "suitable tracts of land along the water front of any
stream, inlet, bay or sea shore for landing places for canoes and
other craft used by [the Natives of Alaska]").

[64]   L.E. Knapp, A Study Upon the Legal and Political Status of
the Natives of Alaska, 39 Am. L. Reg. 325 (1891).

[65]   Id. at 331-32, 338.

21

AR002160

embarrassed by treaties with [Alaska Natives] or other precedents
of recognition of tribal relations, and it has a fair and open
field for inaugurating a system which shall yield better results
than the old one."  H.R. Exec. Doc. No. 1, 52d Cong., 1st Sess.
496-501 (1892).

          4.   Evolution of Federal Law and Policy 1901-1932

After the turn of the century, a degree of consensus on the legal
status of Alaska Natives began to emerge. In 1904, U.S. District
Court Judge James Wickersham found that an Alaska Native could
obtain citizenship under a provision of section 6 of the General
Allotment Act of 1887 applicable to Indians of the United States.
In re Naturalization of Minook, 2 Alaska 200 (D. Alaska 1904).
This conclusion, Judge Wickersham held, was compelled by the
final sentence of Article III of the Treaty of Cession:

     The meaning of this sentence . . . is clear; it is
     intended to and does extend all general laws and
     regulations which the United States may from time to
     time adopt in regard to the Indian tribes of the United
     States to and over the [uncivilized] Indian tribes of
     Alaska.  Upon its ratification and its further approval
     by Congress, this treaty and this clause became the
     supreme law of the land.  It gave the Indian tribes of
     Alaska the same status before the law as those of the
     United States, and, unless a different intention
     appears upon the face of the law, extends all Acts of
     Congress, applicable and of a general nature, relating
     to the Indians of the United States, to Alaska.

Id. at 220-21.  The same conclusion concerning the availability
of the General Allotment Act citizenship provision to Natives was
reached by the Ninth Circuit in Nagle v. United States, 191 F.
141 (1911).

In 1905, Judge Wickersham returned to the status of Natives in
United States v. Berrigan, 2 Alaska 442 (D. Alaska 1905).  He
declined to give effect to the purported sale of land by
Athabascans to non-Natives, holding that the 1900 Organic Act[66]
forbade disturbing Indians in their use and occupancy of land
"and renders void all attempts to dispossess them by deed or
contract."  Id. at 449-50.[67]  In reaching this conclusion, Judge
Wickersham analogized the situation of Alaska Natives to the

---

[66]     See p. 22, supra.

[67]     An earlier territorial decision reached a contrary
conclusion.  Sutter v. Heckman, 1 Alaska Repts. 188 (D. Alaska
1901), aff'd on other grounds, Heckman v. Sutter, 119 F. 83 (9th
Cir. 1902).

AR002161

situation of Indians generally:

> The United States has the right, and it is its duty, to
> protect the property rights of its Indian wards. . . .
> [A rule allowing a Native to convey property] would
> completely nullify the act of Congress, or at least
> permit the Indian to do it, and thus leave him a prey
> to the very evil from which Congress intended to shield
> him.  Congress alone has the right to dispose of the
> lands thus specially reserved for his occupancy, and
> any attempt to procure him to abandon them is void.  He
> is a dependent ward of the government, and his reserved
> lands are not subject to disposal or sale or
> abandonment by him.

Id. at 450-51.[68]  This shift in the judiciary was matched by a
trend in congressional action to provide services and protection
to Alaska Natives on the same or similar terms as provided to
Indians in the contiguous 48 states.

Both section 13 of the 1884 Organic Act, 23 Stat. 24, 27-28, and
section 28 of the 1900 Organic Act, 31 Stat. 321, 330, provided
for all Alaskan children to be educated in territorial schools
without regard to race.  In 1905, the Nelson Act, 33 Stat. 616
(1905), conformed the practice in Alaska to that in the
contiguous 48 states, establishing a dual system of education,
with the Department of the Interior remaining responsible for the
education of Indian children and local authorities becoming
responsible for the schooling of non-Natives.

In 1906, Congress passed the Alaska Native Allotment Act, 34
Stat. 616 (1906), which permitted any Indian or Eskimo to acquire
up to 160 acres of non-mineral land as an "inalienable and
nontaxable" homestead.[69]  However, unlike most allottees in other
states for whom the United States holds title in trust, Alaska
Native allottees under the 1906 Act held the title in fee,
subject to restraints on alienation.[70]  In 1926, Congress passed
the Alaska Native Townsite Act, 44 Stat. 629, which provided for
individual Alaska Natives to obtain title to lots they occupied
subject to restrictions on taxation, and prohibited alienation

---

[68]   Accord, United States v. Cadzow, 5 Alaska Repts. 125 (D.
Alaska 1914).

[69]   In 1956, the Act was extended to Aleuts.  Act of August 2,
1956, Pub. L. No. 84-931, 70 Stat. 954.

[70]   See State of Alaska, 45 IBLA 318, 322 (Feb. 6, 1980).

23

AR002162

without Secretarial approval.[71]

A limited exception for Natives to restrictions on taking of fur
seals appeared as early as 1894.  Act of April 6, 1894, § 6, 28
Stat. 52, 53.  Beginning in 1902, a series of wildlife
conservation statutes made various special exceptions for Alaska
Natives.[72]  The 1916 Migratory Bird Treaty with Great Britain
excepted Eskimos and Indians from seasonal restrictions on taking
of migratory nongame birds.  39 Stat. 1702, Article II, Clause 3.
Statutes were also passed encouraging raising of reindeer by
Natives for their own subsistence and for sale on the market.
Eventually, Congress provided in the Alaska Reindeer Act for
purchase of all non-Native reindeer enterprises and prohibited
future non-Native reindeer ownership to assure a Native monopoly
in the reindeer business.[73]  In 1925, Solicitor E.C. Finney held
that the Territory of Alaska could not impose a tax on reindeer
controlled or killed by Alaska Natives, stating "[i]f the
Territory has the power to levy and collect that tax, it might
. . . very materially interfere with this instrumentality which
the Government has adopted for the advancement of these natives.
That act, in so far as it relates to reindeer killed by natives
is, consequently, repugnant to the Constitution and hence without
effect."  51 L.D. 155, 157 (1925).

[71]   Over the years Interior Department interpretation of this
statute varied with regard to whether Alaska Native townsites
were to be administered identically to predominantly non-Native
townsites established pursuant to the 1891 authority, 26 Stat.
1095, but the courts ultimately concluded that they were, and
that the 1926 Act was intended to do no more than establish a
different protected form of individual ownership for Alaska
Natives, rather than to create two distinct types of townsites.
Klawock v. Gustafson, No. K74-2 (D. Alaska, Nov. 11, 1976),
discussed in Klawock v. Gustafson, 585 F.2d 428 (9th Cir. 1978).

[72]   These statutes are summarized in 1942 Cohen, supra n. 8, at
409.

[73]   The reindeer laws are summarized in 1942 Cohen, supra n. 8,
at 409-10 and Case, supra n. 50, at 208-09.  The House Report on
the Alaska Reindeer Act explained the need for the legislation as
follows:  "The Natives of Alaska, including Eskimos, are held to
have essentially the same status as the Indians of the United
States.  The Federal Government has recognized and acknowledged
this responsibility through appropriations for their support,
education and medical treatment as well as by the introduction
and distribution of reindeer.  It is likewise the responsibility
of the Federal Government to look after the social and economic
welfare of the Natives."  H.R. Rep. No. 1188, 75th Cong., 1st
Sess. 3 (1937).  See generally, R.O. Stern, E.L. Arobio, L.L.
Naylor and W.C. Thomas, Eskimos, Reindeer and Land (1980).

24

AR002163

The trend in judicial and legislative action was reflected as
well in executive action.  Between 1914 and 1933, at least 13
Executive Order Indian reserves were established.[74]  The
President's authority for establishment of such reserves was
upheld in a May 18, 1923 Solicitor's opinion dealing with the
Tyonek Reserve.  49 I.D. 592.  In this opinion, Solicitor Edwards
held that Alaska Natives had been treated by Congress and the
courts as "within the spirit, if not within the exact letter, of
the laws relative to American Indians."  Id. at 595.

In a later opinion, Solicitor Finney upheld the validity of
marriage by custom among Alaska Natives.  54 I.D. 39, 1 Op. Sol.
on Indian Affairs 329 (1932).  "It must now be regarded as
established," Finney said, "that the laws of the United States
with respect to the American Indians are applicable generally to
the natives of Alaska."  Id. at 42.  Under general Indian law
principles, "the relations of the Indians among themselves in
matters of this kind are to be controlled by the customs of the
tribe [not state or territorial law] save where Congress
expressly or clearly directs otherwise."[75]

While this preponderance of opinion on the fundamental legal
status of Alaska Natives was developing, there was also a
consensus that Alaska Natives should be subject to many of the

---

[74]   Alaska Natives and the Land, supra n. 17, at 445 (1968).
Two other reserves, Hydaburg and Klawock, were established and
subsequently revoked by Executive Order.  Case, supra n. 50, at
117 n. 31.  A motivation for establishing the Executive Order
reserves was to protect continued traditional Native use of land.
Governor's Task Force, supra n. 48, at 111 n. 179, quoting U.S.
Dept. of the Interior, Bureau of Education, Report on the Work of
the Bureau of Education for the Natives of Alaska 1913-1914 7
(1915).  Prior to the Executive Order reserves, three significant
reserves specifically for reindeer culture were established.
Repeal Act Authorizing Secretary of Interior to Create Indian
Reservations in Alaska:  Hearings on S. 2037 and S.J. Res. 162
Before the Senate Subcomm. of the Committee on Interior and
Insular Affairs, 80th Cong., 2d Sess. 53 (1948)  Small reserves
for school purposes had also been established.  Id.  The only
statutory reservation at that time in Alaska was the Annette
Islands Reserve for immigrant Canadian Metlakatla Indians,
established by Congress in the Act of March 30, 1891, 26 Stat.
1101 (codified as 48 U.S.C. § 358).

[75]   Id. at 46.  See also 54 I.D. 15, 1 Op. Sol. on Indian
Affairs 320 (1932) (General laws enacted by Congress conferring
jurisdiction on the Secretary, in matters on probating estates of
deceased American Indians, might be applied with respect to the
restricted allotments and other restricted property of deceased
Alaskan Natives.)

25

AR002164

same laws as the non-Native residents of the Territory.

This was particularly true in the area of criminal law.  The 1884 Organic Act made the Oregon criminal code applicable to Alaska.  Act of May 14, 1884, § 7, 23 Stat. 24, 25-26.[76]  Based on the decisions that Alaska was not Indian country for purposes other than liquor control, application of territorial law to Natives was upheld.  <u>Kie v. United States</u>, 27 F. 351, 1 Alaska Fed. 125 (C.C.D. Oregon 1886).[77]  The Supreme Court's decision in <u>Ex parte Crow Dog</u>, 109 U.S. 556 (1883), which had held that a murder committed by a Sioux in Indian country could not be prosecuted under either Federal or Dakota territorial law, was said to be inapplicable in "the anomalous condition of Alaska." <u>Kie</u> at 353.

In 1899, Congress enacted a comprehensive criminal code for the Territory.  Act of March 3, 1899, 30 Stat. 1253-1343.  The Code provided no exception for Natives and it applied to them.  <u>United States v. Doo-Noch-Keen</u>, 2 Alaska 624 (D. Alaska 1905).  In 1909, Congress confirmed this result by authorizing the Attorney General to appoint Alaska school service employees as special police officers with authority "to arrest . . . any native of the district of Alaska charged with the violation of any provisions of the [1899] Criminal Code of Alaska."[78]  Section 142 of the 1899 Code prohibited the unauthorized sale of liquor to Indians, 30 Stat. at 1274.[79]  This section was subsequently found to supersede applicability of the general Federal liquor prohibition.  55 I.D. 137, 147-48 (1937).

In 1912, Congress enacted a new Territorial Organic Act delegating much of its civil and criminal jurisdiction to a territorial legislature.  37 Stat. 312.  Nothing on the face of that Act indicated that the Territory's authority over Native individuals and communities was not coextensive with its authority over other inhabitants. The new legislature proceeded to act on the basis of that presumed jurisdiction.  In 1913, it enacted a criminal statute punishing Native parents for failing to send their children to federally-funded schools for Natives operated by the Interior Department's Bureau of Education.  § 3, Ch. 44 SLA 1913.  And in 1915, the legislature passed a so-called

---

[76]    The statute also made the civil law of Oregon applicable. <u>Id</u>.

[77]    This holding was <u>dicta</u>, as the prosecution under review was brought under a general Federal criminal statute.

[78]    Act of March 3, 1909, 35 Stat. 837.

[79]    This section defined "Indian" to include "the aboriginal races inhabiting Alaska when annexed to the United States. . . ."

AR002165

Indian Village Act, which authorized Alaska Natives living in
communities of 40 or more residents to organize self-governing
village councils of limited authority, which authority could be
exercised so long as the ordinances enacted did not conflict with
federal or territorial law.[80]  Ch. 11 SLA 1913.  Taxes levied by
the legislature were applicable to, and collected from, Natives
to the same extent as other residents, at least in villages were
tax collection was logistically feasible.[81]

        5.    Alaska Natives on the Eve of the New Deal

In January 1932, Representative Edgar Howard, Chairman of the
House Indian Affairs Committee, wrote to Secretary Wilbur seeking
an opinion on the legal status of Alaska Natives.  In response,
Solicitor Finney issued a comprehensive opinion, which was
forwarded to Chairman Howard by Secretary Wilbur in March 1932.[82]
Finney concluded his opinion by stating:

> From the foregoing it is clear that no distinction has
> been or can be made between the Indians and other
> natives of Alaska so far as the laws and relations of
> the United States are concerned whether the Eskimos and
> other natives are of Indian origin or not as they are
> all wards of the Nation, and their status is in
> material respects similar to that of the Indians of the
> United States.

53 I.D. 593, 605, 1 Op. Sol. on Indian Affairs 303, 310 (1932).
In reaching his conclusions, Solicitor Finney quoted extensively
from Solicitor Edward's 1923 opinion on the Tyonek Reserve.  That
opinion succinctly summarizes the ground covered above and is
worth restating:

> In the beginning, and for a long time after the cession
> of this Territory, Congress took no particular notice
> of these natives; has never undertaken to hamper their
> individual movements; confine them to a locality or
> reservation, or to place them under the immediate
> control of its officers, as has been the case with

---

[80]   The powers of Native villages under the statute were similar
to those of second class municipal governments in white
communities, Governor's Task Force, supra n. 48, at 92, but
Native villages were forbidden to tax property of white
residents, Ch. 25 SLA 1917.

[81]   Governor's Task Force, supra n. 48, at 97.

[82]   Letter, Edgar Howard, Chairman, House Committee on Indian
Affairs to Secretary Roy Lyman Wilbur (January 28, 1932); Letter,
Secretary Wilbur to Edgar Howard (March 14, 1932).

27

American Indians; and no special provision was made for
their support and education until comparatively
recently.  And in the earlier days it was repeatedly
held by the courts and the Attorney General that these
natives did not bear the same relation to our
Government, in many respects, that was borne by the
American Indians.

            *    *    *

Later, however, Congress began to directly recognize
these natives as being, to a very considerable extent
at least, under our Government's guardianship and
enacted laws to protect them in the possession of the
lands they occupied; made provision for the allotment
of lands to them in severalty, similar to those made to
the American Indians; gave them special hunting,
fishing and other particular privileges to enable them
to support themselves, and supplied them with reindeer
and instructions as to their propagation.  Congress has
also supplied funds to give these natives medical and
hospital treatment and finally made and is still making
extensive appropriations to defray the expenses of both
their education and their support.

Not only has Congress in this manner treated these
natives as being wards of the Government but they have
been repeatedly so recognized by the courts.

From this it will be seen that these natives are now
unquestionably considered and treated as being under
the guardianship and protection of the Federal
Government, at least to such an extent as to bring them
within the spirit, if not within the exact letter, of
the laws relative to American Indians.

49 I.D. 592, 594-95 (1923) (citations omitted; emphasis in
original).

        6.   Indian Reorganization Act

            a.   Background

In 1934, Congress enacted the Indian Reorganization Act (IRA).
Act of June 18, 1934, 48 Stat. 984 (codified as 25 U.S.C. §§ 461-
479).  The "overriding purpose" of the Act was to establish
"machinery whereby Indian tribes would be able to assume greater
self-government, both politically and economically."  Morton v.
Mancari, 417 U.S. 535, 542 (1974).  The allotment statutes of the
late 19th Century and early 20th Century focused on assimilation

28

of individual Indians into the larger society.  The IRA took a
community-based approach through the preservation of a tribal
land base and reorganization of tribal governments.  Section 16
of the Act provided that tribes could organize for their common
welfare and adopt appropriate constitutions and bylaws.  Section
17 authorized formation of tribal corporations, with the power to
own, hold, manage, operate and dispose of property.  25 U.S.C. §§
476, 477.

Section 19 of the IRA provided that "Eskimos and other aboriginal
peoples of Alaska shall be considered Indians" for purposes of
the Act.  25 U.S.C. § 479.  Section 13 applied portions of the
statute, including section 16, to Alaska.  25 U.S.C. § 473.

Despite these provisions, initial administrative examination
found that the IRA had limited practical applicability to
Alaska.[13]  The section 16 authorization for constitutional
governments applied, by its own terms, only to tribes residing on
reservations.  Since most Alaska Natives did not reside on
reservations,[14] this limitation effectively precluded many Native
groups from organizing under the Act.  Further, the list of
sections applicable to Alaska omitted section 17.  This prevented
the formation of corporations and, as a result, made loans for
economic development unavailable.

    b.   Alaska Amendment

T.H. Watkins, in his recent biography of Harold Ickes,
characterizes the failure to fully extend the IRA to Alaska as a
"mistake."[15]  This is certainly true to a degree.  The
legislative history shows that both the House and Senate clearly
intended the corporate organization provisions in section 17 to
apply to Alaska.  When the legislation's sections were renumbered
in conference, the cross references in the Alaska section of the
bill were not properly conformed.[16]  However, the failure to

[13]   1942 Cohen, supra n. 8, at 413-14; M-28978, 56 I.D. 110, 1
Op. Sol. on Indian Affairs 744 (1937).

[14]   There were approximately 19 large reserves of different
origins in Alaska at the time of the IRA.  See Alaska Natives and
the Land, supra n. 17, at 443-46.

[15]   T.H. Watkins, Righteous Pilgrim: The Life and Times of
Harold Ickes 1874-1952 542 (1990).  See also, 1942 Cohen, supra
n. 8, at 413-14.

[16]   Compare S. Rep. No. 1080, 73rd Cong., 2d Sess. 1-3 (1934)
with H.R. Rep. No. 1084, 73rd Cong., 2d Sess. 1-5 (1934) and H.R.
Rep. No. 2049, 73rd Cong., 2d Sess. 1-6 (1934).

29

AR002168

consider the problem of the absence of reservations in Alaska appears to have been less a drafting error than a failure to focus on the unique circumstances of Alaska.[87]

In 1936, Anthony J. Dimond, the territorial delegate for Alaska, introduced legislation to amend the IRA at the request of Secretary Ickes.[88] Hearings on the bill were held on March 20, 1936, and the legislation passed the House on April 1, 1936. Prompt Senate action followed and the legislation became law on May 1, 1936. 49 Stat. 1250.

The full extension of the IRA to Alaska, Felix Cohen wrote, "removed almost the last significant difference between the position of the American Indian and that of the Alaska native."[89] In the Alaska Amendment, Congress extended to Alaska section 17 and several other sections not originally applicable under the IRA. It also authorized the Secretary to establish reservations on any area of land which had been reserved for the use and occupancy of the Natives and any other public lands actually occupied by them. Finally, it allowed Native groups not recognized as bands or tribes before May 1, 1936, to organize under Federal constitutions and business charters pursuant to sections 16 and 17 of the IRA if they had "a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district." 25 U.S.C. § 473a.

In providing for establishment of reservations, Congress relied on a letter from Secretary Ickes, who listed three reasons for establishing Alaska reservations. First, he said, reservations would define Alaskan tribes by identifying particular groups with the land they occupied. H.R. Rep. No. 2244, 74th Cong., 2nd Sess. 4 (1936). In this connection, Secretary Ickes pointed to the historical differences between Alaska and the continental United States:

> Indian tribes do not exist in Alaska in the same sense as in [the] continental United States. Section 19 of the Indian Reorganization Act defines the word "tribe" as referring to "Any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." With a few exceptions the lands occupied by natives of Alaska have not been designated as reservations. In

---

[87]   The IRA legislation originally proposed by the Interior Department did not address Alaska at all. H.R. 7902, 73rd Cong., 2d Sess. (1934).

[88]   The legislation was drafted by Felix Cohen. Watkins, supra n. 85, at 542.

[89]   1942 Cohen, supra n. 8, at 406.

AR002169

> order, therefore, to define an Alaskan tribe it is
> necessary to identify it with the land it occupies and
> in terms of the language of the act, "reservation."

Id.

Second, reservations would define geographic limits of
jurisdiction so that Alaska Native communities could exercise
powers of local government:

> [I]f native communities of Alaska are to set up systems
> of local government, it will be necessary to stipulate
> the geographic limits of this jurisdiction.
> Reservations set up by the Secretary of the Interior
> will accomplish this.

Id.

Third, reservations would enable the United States to segregate
Native lands and resources, thereby preserving the "economic
rights" of the Natives.  This was particularly important,
Secretary Ickes wrote.  By designating reservations, the United
States would fulfill in part "its moral and legal obligations"
undertaken in section 8 of the 1884 Organic Act, the section
providing that Natives were not to be disturbed in their use and
occupation of land pending further congressional action.  Id.
The House Report on the Alaska Amendment echoed this view,
stating "[t]his provision in reality carries out the promise of
this Government contained in its act approved on May 17, 1884 . .
. ."  Id. at 3.

In explaining the need for the provision allowing groups not
recognized as bands or tribes before 1936 to organize based on
occupational or residential bonds, the House Report stated:

> The proposed amendment . . . is necessary because of
> the peculiar nontribal organizations under which the
> Alaska Indians operate.  They have no tribal
> organizations as the term is understood generally.
> Many groups that would otherwise be termed "tribes"
> live in villages which are the bases of their
> organization.

Id. at 1-2, 3-5.

> c.   Instructions for Implementation of the Alaska
>      Amendment

On December 22, 1937, the Department of the Interior issued
detailed Instructions providing for the organization of Alaska

31

AR002170

Native groups under the IRA.[90]  The Instructions provided for
three different kinds of organizations, with varying powers and
authorities.  In differentiating among the three types, the
Instructions followed the lead of Secretary Ickes' comments ⁻⁻ɔ
the Alaska Amendment and stressed the importance of reserva⁀ɔns
to the exercise of governmental powers.

The first kind of organization provided for was a group
consisting of all of the Native residents of a community
organized to carry on municipal and public activities, as well as
economic enterprises.  The Instructions indicated that this kind
of organization was most suitable for Indian or Eskimo villages.
The Instructions assumed that it would be accompanied by a
petition to create a reservation and stressed that "[t]he power
to prescribe ordinances for civil government, relating
particularly to law and order, may extend on⁀ ʸ to such lands as
may be held as an Indian reservation for the ᵘse of the
community."[91]

The other two kinds of organizations, in contrast, were not to be
reservation based and were not to be authorized to exercise
governmental powers.  The second kind of organization would
consist of a group of all Native persons in a community and was
said to be especially suitable for a group of Natives living
among non-Natives in a town or city already organized to exercise
governmental powers, as well as for Native groups already
incorporated as a municipality under territorial law.  Groups of
this kind would be authorized to engage in business and to
provide for the common welfare, but not to exercise municipal and
public powers.[92]

The third kind of organization contemplated by the Instructio⁻
was for a group, not a community, comprised of persons ᵃving
common bond of occupation or association, or of reside⁀ ᵃ wit  ᵃ

---

[90]     Instructions for Organization in Alaska Under the
Reorganization Act of June 18, 1934 (48 Stat. 984), and the
Alaska Act of May 1, 1936 (49 Stat. 1250), and the Amendments
Thereto (1937) (Instructions).  The Instructions were issued over
the signatures of Assistant Commissioner of Indian Affairs
Zimmerman and Secretary Ickes.  The Instructions were
supplemented by Supplementary Instructions Applicable to Alaska
West of the 141st Meridian (May 10, 1939) that addressed the
particular problems of communicating with remote areas of Alaska.
The Instructions are discussed in 1942 Coh  supra n. 8, at 414
and Governor's Task Force, supra n. 48, at ⁀⁀2.

[91]     Instructions, supra n. 90, at 1.

[92]     Id.

AR002171

a definite neighborhood.  This kind of organization was to be given authority to "engage in business and to provide for the welfare of its members (excluding municipal and public powers)."[93]

### d.   IRA Organizations

Pursuant to the IRA, sixty-nine Alaska Native villages and regional groups adopted constitutions prior to enactment of ANCSA in 1971; more than sixty of those also adopted corporate charters.  However, only six villages obtained reservations under section 2 of the 1936 Act.[94]

The Department's Instructions called for information to be submitted with proposed constitutions showing the basis of organization in terms of the three categories of organization.[95]  Surveys conducted by the Indian Office to comply with the Instructions consistently failed to discuss the basis of organization.[96]  Similarly, most constitutions followed standard forms.[97]  Fifty-two constitutions contain only a general statement of powers.  Seventeen contain enumerated powers.  It is difficult to determine from the constitutions the basis of organization.  For example, the constitution of the Village of Wales, for which a reservation was eventually established, contains only a general statement of powers, while a more expansive statement of powers is found in the constitution of the Douglas Indian Association, one of three Native associations

---

[93]    Id.

[94]    See 1982 Cohen, supra n. 8, at 744; Alaska Natives and The Land, supra n. 17, at 442-48.  The six reserves were Akutan (72,000 acres); Venetie (1.4 million acres); Unalakleet (870 acres) Karluk (32,200 acres); Wales (7,200 acres of land and 14,000 acres of water); and Diomede (3,000 acres).  The six reserves totaled 1.54 million acres.  Withdrawals for two additional reserves (White Mountain and Shismaref) were revoked after the villages disapproved them in elections conducted under section 2 of the Alaska Amendment, which required that withdrawals be approved by a majority of voters in an election in which at least 30 percent of eligible residents participated.  Id. at 443.

[95]    Instructions, supra n. 90, at 4, ¶9.

[96]    The surveys are reprinted in H.R. Rep. No. 2503, 82d Cong. 2d Sess. 1406-1537 (1952).

[97]    Copies of the constitutions are contained in the files of the BIA's Branch of Tribal Relations.

33

AR002172

clearly organized on the basis of common bond of occupation.[98]

### 7.   Extension of Public Law 280 to Alaska

When Congress compiled the Revised Statutes in 1874, it included a chapter entitled "Government of Indian Country." R.S. title 28, ch. 4, §§ 2127-2157. However, it omitted from the chapter any definition of "Indian country." This fact, together with the development of new approaches to Indian administration, such as the allotment policy, left it to the courts to determine the scope of Indian country.[99] In a series of decisions early in the 20th Century, the Supreme Court took up this challenge. In Donnelly v. United States, 228 U.S. 243 (1913), the Court held that a reservation created by Executive Order from public domain land to which original Indian title had been extinguished was Indian country. In United States v. Sandoval, 231 U.S. 28 (1913), it held that Pueblo lands owned in fee and not denominated a reservation were Indian country. In United States v. Pelican, 232 U.S. 442 (1914), it held a single trust allotment was Indian country for purposes of the Indian Major Crimes Act. And in United States v. McGowan, 302 U.S. 535 (1938), it found that a tract of land purchased by the Federal Government and held in trust for Indians was Indian country.

In codifying Title 18 of the United States Code in 1948, Congress relied on these decisions to fashion a new statutory definition of "Indian country."[100] As is discussed in greater detail below, this definition, found in 18 U.S.C. § 1151, defines "Indian country" to include reservations, dependent Indian communities, and Indian allotments.

This new statutory definition led to the reopening of the

---

[98]   The Douglas Indian Association was organized for the Juneau Douglas area pursuant to its members' common bond of occupation in the arts, crafts and fishing industries. Constitution and By-Laws of the Douglas Indian Association. At the time of organization, the Association was located in a racially mixed community governed by the municipalities of Juneau and Douglas, both of which were organized under the laws of the Territory of Alaska. The Natives at the time of organization were from various surrounding Native villages and elsewhere. H.R. Rep. No. 2503, 82d Cong., 2d Sess. 1442 (1952). With respect to Wales, as well as all other villages for which reservations were established, the adoption of an IRA constitution predated establishment of a reservation.

[99]   1982 Cohen, supra n. 8, at 31-33.

[100]   1982 Cohen, supra n. 8, at 34. See 18 U.S.C. § 1151, reviser's note.

AR002173

question of whether, for purposes of criminal jurisdiction,
Indian country existed in Alaska.  In <u>United States v. McCord</u>,
151 F. Supp. 132, 17 Alaska 162 (1957), the District Court for
Alaska held that the Moquawkie Indian Reserve at Tyonek was
Indian country and that an Indian resident of the Reserve could
not be prosecuted under territorial law for the statutory rape of
another Indian resident.  The Reserve, the court found, had been
set aside and treated as Indian land, bringing it within the
ambit of section 1151.  The court rejected as "novel" and
"inaccurate" a prosecution contention that "Alaska natives have a
different status than Indians of the States."  <u>Id.</u> at 135.  The
court, however, carefully limited the scope of its decision:

> This decision should not be interpreted by members of
> the native groups, be they Indian or Eskimo, as a
> general removal of the territorial penal authority over
> them, for the reason that this court will take judicial
> notice that there are few tribal organizations in
> Alaska that are functioning strictly within Indian
> country. . . .  Testimony indicates that the Tyonek
> area, unlike most other areas inhabited by Alaska
> natives, has been set aside for the use of and is
> governed by an operational tribal unit.

<u>Id.</u> at 136.


Less than a year later, a different judge of the District Court
of Alaska, in <u>United States v. Booth</u>, 161 F. Supp. 269, 17 Alaska
561 (1958), faced the question of whether the Metlakatla Reserve
was Indian country.  He held that it was not.  He found that
Metlakatla had no tribal organization and was not a "traditional
Indian Reservation" because "it is not made up of aboriginal
Indians but largely of the descendants of immigrants who came
from Canada during the 19th Century" and "Alaska natives who
choose to join them," including "Aleut and Eskimo members of the
community who are not of the Indian race."  <u>Id.</u> at 271.  He
distinguished <u>McCord</u> on the ground that the Indians of
southeastern Alaska "live under entirely different conditions"
from the Indians on the Tyonek Reservation.  In this connection,
he quoted <u>with approval</u> a passage from <u>United States v. Libby,
McNeil & Libby</u> stating:

> the Indians of Southeastern Alaska *** have not only
> abandoned their primitive ways and adopted the ways of
> civilized life but are now fully capable of competing
> with the whites in every field of endeavor *** It is a
> matter of common knowledge that today the Indians of
> Southeastern Alaska prefer the white man's life despite
> all its evils and shortcomings.

<u>Id.</u> at 272, quoting <u>United States v. Libby, McNeil & Libby</u>, 107

35

AR002174

F. Supp. 697, 699 (D. Alaska 1952).[101]

Congress reacted promptly to the McCord decision.  In 1958, it enacted legislation amending Pub. L. No. 83-280, Act of August 15, 1953, 67 Stat. 164 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321-1326, 28 U.S.C. §§ 1360, 1360 note), which conferred criminal and civil cause of action jurisdiction to Indian country on several named states, to extend the law's coverage "to all Indian country" in the Territory of Alaska.  Act of August 8, 1958, 72 Stat. 545 (codified as amended at 18 U.S.C. § 1162, 28 U.S.C. § 1360).  On statehood, Pub. L. No. 83-280 was amended to extend the same jurisdiction to the State of Alaska.[102]

Extension of Pub. L. No. 83-280 was recommended by the Department of the Interior, a recommendation consistent with the Department's then current policy of extending criminal and civil jurisdiction to the states whenever opportune.  In accepting the Department's recommendation, the House Judiciary Committee explained the need for the legislation as follows:

> In construing [18 U.S.C. § 1151] the court also decided that the native village of Tyonek, Alaska  . . . came within the definition of Indian country.  Such a construction, of course, affects a large number of other native villages in Alaska similarly situated. The committee has been advised that these native villages do not have adequate machinery for enforcing law and order.  They have no tribal court, no police, no criminal code, and in many instances no formal organization.  This is for the reason that the Territorial government in Alaska has maintained law and order in the native villages as well as in the rest of Alaska and the native tribal councils have had no reason to nor have they ever exercised these functions. Since the natives are not prepared to take over these activities, the recent court decision has left the villages and the people without protection.  The instant legislation seeks to remedy this situation by restoring what, until the court decision, was the actual—practice in the enforcement of the law in the Indian country in Alaska.

---

[101]   Libby, McNeil & Libby is discussed, n. 185, infra.

[102]   18 U.S.C. § 1162, note.

36

H.R. Rep. No. 2043, 85th Cong., 2d Sess. 2 (1958).[103]  Congress
also modified <u>Booth</u>, although less rapidly and in the context of
modifying the applicability of Pub. L. No. 83-280 to the
Metlakatla Indian Community.  In 1970, legislation was enacted to
allow the Community to exercise concurrent criminal jurisdiction
with the State over offenses committed by Indians on its reserve
in the Annette Islands.  Act of November 25, 1970, Pub. L. No.
91-523, § 1, 84 Stat. 1358 (1970), amending 18 U.S.C. § 1162.[104]
This legislation was sought not only by the Community, but also
by the State of Alaska and the Department of the Interior.  In
supporting the legislation, Under Secretary Fred Russell
explained:

> The Metlakatla community is not a part of the Alaska
> mainland, but is located offshore on one of the Annette
> Islands.  This island's location creates a serious
> isolation problem, resulting in the lack of adequate
> law and order services for members of the Metlakatla
> Indian community . . . . [T]he limited manpower of the
> State police makes it impossible for them to deal
> effectively with minor crimes in the isolated community
> of Metlakatla.[105]

In urging adoption of the legislation, the House floor manager
explained that, contrary to the finding in <u>Booth</u>, the Metlakatla
Community had a long history of policing misdemeanor offenses
extending back to the founding of the Community.  Extension of
Pub. L. No. 83-280 disrupted this arrangement:

> [T]he discussion centered on the fact that native
> villages in Alaska could be regarded as Indian country
> and most such villages did not have machinery for
> enforcing law and order.  As is obvious from the
> history I have outlined, this was not the case as to
> Metlakatla.  It is apparent that this community which
> has been operating perfectly satisfactory law
> enforcement system for over half a century was simply
> forgotten. . . .  Strangely enough, neither the
> territory nor the Federal Government notified
> Metlakatla after enactment of the new statute to inform
> the community that its court and police had lost their

---

[103]   The Senate Interior Committee report contained an identical
statement of the need for the legislation.  S. Rep. No. 1872,
85th Cong., 2d Sess. 2 (1958).

[104]   See 1982 Cohen, <u>supra</u> n. 8, at 765.

[105]   Letter of June 2, 1970 to James O. Eastland, Chairman,
Senate Judiciary Committee, <u>reprinted in</u>, S. Rep. No. 1180, 91st
Cong., 2d Sess. 4 (1970).

AR002176

authority to function.  In the mid-sixties, when this
fact became known, the community discontinued its
practice of employing a magistrate and police.  It
tried [unsuccessfully] to make arrangements with the
State of Alaska for the enforcement of law and order on
the Annette Islands . . . .

116 Cong. Rec. 37,353 (1970) (statement of Rep. Donohue).

          8.  ANCSA and Post-ANCSA Legislation

During the 1950's and 1960's, the focus of Federal-Alaska Native
relations was on the long unresolved Native land claims.  These
claims, the role they played in consideration of Alaska
Statehood, and the impact of the claims on implementation of the
Statehood Act are discussed in Part IV, infra.  We also postpone
until Part IV consideration of the details of the approach to
claims settlement adopted in ANCSA.  For purposes of this Part,
it is necessary only to consider those provisions of ANCSA
bearing on the question of the tribal status of Native villages.

ANCSA settled aboriginal title claims, including any claims to
aboriginal hunting and fishing rights, and all claims based on
aboriginal title.  43 U.S.C. § 1603.[106]  For purposes of the
settlement, most Natives were enrolled to the villages where they
resided.[107]  In the absence of proof that an individual possessed
the required quarter-degree Native blood quantum, the individual
could be placed on the roll if he was regarded as an Alaska
Native by the village of which he claimed to be a member.  43
U.S.C. § 1602(b). Section 3(c) of ANCSA, 43 U.S.C. § 1602(c),
defines "Native village" to mean "any tribe, band, clan, group,
village, community or association in Alaska" listed in sections
11 and 16 of the Act.  43 U.S.C. §§ 1610, 1615.  Section 11
listed the names of 205 villages.  Section 11(a) withdrew the
township in which each village was located and the surrounding
townships for Native selection.  43 U.S.C. § 1610(a).  Section
11(b)(2) provided for the Secretary to review the list of named
villages and remove those that were of an urban and modern
character and in which a majority of the residents were non-
Native.  Section 11(b)(3) provided for the addition to the list
of any village which was not of an urban and modern character and

---

[106]    See United States v. Atlantic Richfield Co., 435 F. Supp.
1009, 1029-30 (D. Alaska 1977), aff'd, 612 F.2d 1132 (9th Cir.),
cert. denied, 449 U.S. 888 (1980).

[107]    Those who were not residents of villages were enrolled to
regions at large.  See 25 C.F.R. §§ 43h.4 and 43h.6(c) (1977); 37
Fed. Reg. 5615.  Columns 16-21 of enrollment application were to
establish ties to village and region.

AR002177

in which a majority of the residents were Native.[108]  Section 16
listed 10 villages in Southeast Alaska, which were treated
somewhat differently because the Natives of Southeast Alaska had
already participated to some extent in the Tlingit and Haida
settlement.  <u>Tlingit and Haida Indians of Alaska v. United
States</u>, 389 F.2d 778 (Ct. Cl. 1968).

Although Congress utilized Native villages as a basis for
organizing the settlement, it determined not to convey settlement
lands to the villages.  Rather, as is discussed in Part IV,
<u>infra</u>, land and associated property rights were conveyed to newly
established Village and Regional Corporations established under
state law.  43 U.S.C. §§ 1606, 1607.  Village Corporations were
defined in the Act as a "business for profit or nonprofit
corporation to hold, invest, manage and/or distribute lands,
property, funds and other rights and assets for and on behalf of
a Native village."  43 U.S.C. § 1602(j).  However, ANCSA did not
revoke the village IRA constitutions or the IRA corporate
charters for those villages that also had charters.[109]  Nor did
it repeal the authority in section 1 of the Alaska Amendment of
the IRA for the Natives to reorganize and adopt constitutions.[110]

Contemporaneously with the consideration and passage of ANCSA,
the Federal Government was reassessing its relationship with
Native Americans.  In 1968, Congress enacted the Indian Civil
Rights Act.  25 U.S.C. §§ 1301-1326.  The Act extended to Indians
protections similar to those in the Bill of Rights against

---

[108]    To be eligible for land and money benefits under ANCSA, the
listed and the unlisted villages also had to establish that they
had at least 25 residents.  Those which had less than 25 Native
residents which were otherwise eligible could qualify for
benefits as a Native group.  43 U.S.C. §§ 1602(d), 1613(h)(2).
Natives in four urban areas (Juneau, Sitka, Kodiak and Kenai)
were also eligible for benefits if they incorporated.  43 U.S.C.
§§ 1602(o), 1613(h)(3).

[109]    As discussed in Part III.A.6.d., more than 60 charters were
issued to villages pursuant to § 17 of the IRA, which expressly
provides that no charter shall be revoked or surrendered except
by act of Congress.  25 U.S.C. § 477.

[110]    Indeed, while § 19 of ANCSA, 43 U.S.C. § 1618, did revoke
all reservations, except the Annette Islands Reserve for the
Metlakatla Indian Community, it was not until the passage of the
Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat.
2743, 43 U.S.C. § 1701, that Congress expressly revoked the
Secretary's authority to establish reservations under § 2 of the
Alaska Amendment.  FLPMA § 704(a).

AR002178

actions by their tribal governments.[111]  While the Act imposed
some constraints on tribal governments by guaranteeing certain
individual rights, 25 U.S.C. § 1302, President Johnson urged its
enactment as part of a legislative and administrative program
with the overall goal of furthering "self-determination,"
"self-help," and "self-development" of Indian tribes.  114 Cong.
Rec. 5518, 5520 (1968).  Moreover, the Act contained restrictions
on states obtaining civil, 25 U.S.C. § 1322, and criminal, 25
U.S.C. § 1321, jurisdiction over Indian country and provided for
a model code aimed at strengthening tribal government.  The Act
thus marked the beginning of a broad congressional policy shift
toward strengthening tribal governments and a marked departure
from the termination policies of the 1950's and early 1960's.  On
July 8, 1970, President Nixon sent a major Message to Congress
transmitting his recommendations on an Indian policy, rejecting
termination and encouraging self-determination for Indians.[112]

As part of the new approach to relations with Native Americans,
Congress began to shift from a pattern of services provided
directly to individual Indians through the BIA and the Indian
Health Service to direct grants to tribes and administration of
programs by tribes.[113]  The pivotal point in this shift was the
enactment of the Indian Self-Determination and Education
Assistance Act of 1975.  25 U.S.C. §§ 450-458e.  That Act directed
the Secretaries of the Interior and Health and Human Services to

---

[111]   The central purpose of the Act was to "secur[e] for the
American Indian the broad constitutional rights afforded to other
Americans," and thereby to "protect individual Indians from
arbitrary and unjust actions of tribal governments."  S. Rep. No.
841, 90th Cong., 1st Sess. 5-6 (1967); see also Santa Clara
Pueblo v. Martinez, 436 U.S. 49, 56-60 (1978).

[112]   President's Message to Congress Transmitting Recommendations
for Indian Policy, 6 Weekly Comp. Pres. Doc. 894-905, H.R. Doc.
No. 363, 91st Cong., 2d Sess. (1970).

[113]   1982 Cohen, supra n. 8, at 180-206.  Prior to 1921 most
services to Native Americans were provided for in appropriations
acts or tribal-specific statutes.   From 1921 to the early 1970's
the principal source of authority for programs operated by the
BIA was the Snyder Act, 25 U.S.C. § 13, which authorized
appropriations to the BIA for "the benefit, care, and assistance
of Indians throughout the United States . . . ." Because Alaska
Natives were under the jurisdiction of the Bureau of Education,
rather than the BIA, the Snyder Act did not initially authorize
appropriations for Alaska. Case, supra n. 50, at 243.  However,
in 1931 Alaska Natives were placed under the jurisdiction of BIA,
supra n. 50, and the Bureau began to provide services to Alaska,
e.g., Interior Appropriations Act, FY 1933, Act of April 22,
1932, 47 Stat. 91, 108, 110.

AR002179

contract with any Indian tribe which requested to contract for the services and benefits provided by the Departments.  25 U.S.C. §§ 450f, 450g.  The Act defined "Indian" to mean "a person who is a member of an Indian tribe."  25 U.S.C. § 450b(a).  It defined "Indian tribe" to mean:

> [A]ny Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. § 450b(b).[114]

In addition to authorizing tribes to contract with the Secretary to perform services the Federal Government had been performing, the Act also authorized making grants to tribes, as defined in the Act to include Native villages, for the "strengthening or improvement of tribal government."  25 U.S.C. § 450h.  Under the authority of this provision, the BIA has made numerous grants to Native villages.[115]

In 1972, the 92nd Congress, which enacted ANCSA, also enacted federal revenue sharing.[116]  Alaska Native villages were included with Indian tribal governments as eligible to participate along with state and local governments nationally.  General revenue sharing was enacted for the purpose of sharing federal revenues with other levels of government to provide fiscal assistance to

---

[114]   In 1988, Congress enacted major amendments to the Act adding to its statement of policy that the "United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities," thus further demonstrating the congressional trend toward strengthening tribal governments.  25 U.S.C. § 450a(b), Pub. L. No. 100-472, § 102, 102 Stat. 2285.

[115]   See, e.g., "FY 1991 Report to Congress" filed by the BIA as required by 25 U.S.C. § 450j-1(c).

[116]   Pub. L. No. 92-512, §§ 102-109, 86 Stat. 919 (codified as amended at 31 U.S.C. §§ 1221-1228).

AR002180

them in exercising their powers and performing their
responsibilities.[117]

The Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901-1963,
gives force and effect to tribal court proceedings concerning
child custody, stating, "[t]he United States, every State, every
territory or possession of the United States, and every Indian
tribe shall give full faith and credit to the public acts,
records, and judicial proceedings of any Indian tribe applicable
to Indian child custody proceedings." 25 U.S.C. § 1911(d).
Under the Act, a tribe may assume child custody jurisdiction, 25
U.S.C. § 1918, and may enter into intergovernmental agreements
with states. 25 U.S.C. § 1919. The Act defines "Indian tribe"
to mean "any Indian tribe, band, nation, or other organized group
or community of Indians recognized as eligible for the services
provided to Indians by the Secretary because of their status as
Indians, including any Alaska Native village as defined in
section 1602(c) of Title 43 [the definitional section of ANCSA]."
25 U.S.C. § 1903(8).

The Tribally Controlled Community College Act of 1978 requires
that a college under the Act must by one sanctioned or chartered
by a tribal governing body. 25 U.S.C. § 1801(a)(4). The
legislation assumes, without specifying, that a tribal government
will create a legal entity, able to enter into contracts, 25
U.S.C. §§ 1805, 1806, and able to receive and administer federal
grants. 25 U.S.C. § 1807. "Tribe" is defined to include Alaska
Native village. 25 U.S.C. § 1801(a)(2).

In 1982 Congress passed the Indian Tribal Government Tax Status
Act providing that Indian tribes would be treated as states for
certain enumerated purposes.[118] As originally passed, the Act
defined Indian tribal government to mean: "the governing body of
any tribe, band, community, village, or group of Indians which is
determined by the Secretary [of the Treasury], after consultation
with the Secretary of the Interior, to exercise substantial
governmental functions and in Alaska shall include only the
Metlakatla Indian Community." 128 Cong. Rec. 33238 (1982).
However, after passage but before the President signed the bill,
Congress adopted House Concurrent Resolution 439, substituting
new language for the definition in the enrolled bill. 128 Cong.
Rec. 33310 (1982). The substituted language defined Indian
tribal government to include "the governing body of any . . .
group of . . . (if applicable) Alaska Natives, which is

---

[117]    The statute defined "units of local government" to include
"the recognized governing body of an Indian tribe or Alaska
native village which performs substantial governmental
functions." 86 Stat. 919, 927.

[118]    96 Stat. 2605, as amended by 97 Stat. 65.

42

AR002181

determined by the Secretary [of the Treasury], after consultation
with the Secretary of the Interior, to exercise governmental
functions."[119]

Generally, Congress has seen fit to include Alaska Native
villages, along with Indian tribes, in other legislation dealing
with federal relations with other governments, such as the
Intergovernmental Personnel Act, 42 U.S.C. § 4762
(intergovernmental personnel programs in cooperation with other
levels of government); public works legislation,  13
U.S.C. § 301.2 (assistance provided under the Public Works
Economic Development Act); the Public Library Services and
Construction Act, 20 U.S.C. § 351a (assistance in public library
services and construction); and census legislation, 13
U.S.C. § 184 (inclusion as "local unit of general purpose
government" for collecting interim current census data).

In addition, the following statutes are examples of instances
where Alaska Native villages have been included in the statutory
definition of Indian tribes or where Native villages have been
included along with tribes in definitions of units of government
affected by statutes (citations are mostly to the definition
sections involved):[120]

> 5 U.S.C. § 3371.  Provisions for personnel assignments to
> and from states.
>
> 15 U.S.C. § 637.*  Aid to small businesses.
>
> 16 U.S.C. § 470w.*  Assistance in the conservation of
> historic sites, buildings, objects, and antiquities.
>
> 16 U.S.C. § 470bb.*  Programs for archaeological resources
> protection.
>
> 20 U.S.C. § 3232.  Assistance in bilingual education
> programs.

---

[119]   This legislation included a disclaimer similar to that in
the 1991 Amendments to ANCSA, Part IV.A.2.d.iii, infra,
concerning the effect of the definition on Native claims of
jurisdiction over land and nonmembers.  These disclaimers address
jurisdiction over land and persons, not tribal status.

[120]   The statutes marked with asterisks include the Village or
Regional Corporations in the definition of "tribe" as well as the
Native village.  Several of the statutes also include Group (43
U.S.C. § 1602(n)) or Urban Corporations (43 U.S.C. § 1602(o)) in
the definition of tribe as well and they are also marked with
asterisks.

43

AR002182

20 U.S.C. § 4402.  Assistance in development of American Indian, Alaska Native, and Native Hawaiian culture and art.

23 U.S.C. § 101.  Assistance provided for public roads under the program for federal aid for highways.

25 U.S.C. § 472a.  Included as a "tribal organization" in applying Indian preference laws.

25 U.S.C. § 1452.*  The Indian Financing Act of 1974.

25 U.S.C. § 1603.*  The Indian Health Care Amendments of 1980.

25 U.S.C. § 1622.  Eligibility of tribal organizations for health care grants and contracts.

25 U.S.C. §§ 2011 and 2019*.  Establishing a new national Indian education system.

25 U.S.C. § 2401.  Indian alcohol and substance abuse prevention and treatment.

26 U.S.C. § 4225.  Exemption of articles manufactured or produced by Indians.

29 U.S.C. § 706.*  Provision of vocational rehabilitation and other rehabilitation services.

29 U.S.C. § 1671.  Employment and training programs for Native Americans and migrant and seasonal farm workers.

31 U.S.C. § 7501.*  The single audit requirement for state and local governments.

42 U.S.C. § 628.*  HHS payments to Indian tribal organizations for child welfare services.

42 U.S.C. § 1471.  USDA financial assistance for farm housing.

42 U.S.C. § 2991b.*  HHS financial assistance for Native American projects under the HHS Native American Program, administered by ANA.

42 U.S.C. § 2992c.  HHS programs for Native Americans.

42 U.S.C. § 3002.*  HHS programs for older Americans.

42 U.S.C. § 5061.  HHS programs for administration and coordination of domestic volunteer services.

44

42 U.S.C. § 5122.  Provision of federal assistance to other
levels of government for disaster relief.

42 U.S.C. §§ 5302 and 5318.  Assistance in providing public
facilities under the Housing and Urban Development Act of
1968.

42 U.S.C. § 6707.  Grants for public works projects.

42 U.S.C. § 6723.  Assistance under anti-recession
provisions for public works employment.

42 U.S.C. § 6903.  Assistance in the planning and
administration of solid waste disposal.

42 U.S.C. § 8802.  Assistance in the development of biomass
energy and alcohol fuels.

42 U.S.C. § 9601.*  Special programs and assistance relating
to hazardous substance releases, liability and compensation.

42 U.S.C. § 10101.  Assistance in handling nuclear waste.

42 U.S.C. § 11472.*  Set-asides to assist in education,
training, and community services for the homeless.

In 1980 when Congress addressed the subsistence needs of Alaska
Natives and rural residents in Title VIII of the Alaska National
Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, 94
Stat. 2371, it found and declared that: "in order to fulfill the
policies and purposes of the Alaska Native Claims Settlement Act
and as a matter of equity, it is necessary for the Congress to
invoke its constitutional authority over Native affairs and its
constitutional authority under the property clause and the
commerce clause to protect and provide the opportunity for
continued subsistence uses on the public lands by Native and non-
Native rural residents." 94 Stat. 2422.

In 1987, citing its "plenary authority" over Indian affairs,
Congress enacted extensive amendments to ANCSA.[121]  Section 15 of
the amendments provided that: "Alaska Natives shall remain
eligible for all Federal Indian programs on the same basis as
other Native Americans." 43 U.S.C. § 1626(d).  While the
congressional reports give no explanation for section 15,[122] the
plain meaning of the provision is that Alaska Natives are to be

[121]   Alaska Native Claims Settlement Act Amendments of 1987, Pub.
L. No. 100-241, § 2(9), 101 Stat. 1788, 1789 (1988) (1991
Amendments).

[122]   S. Rep. No. 201, 100th Cong., 1st Sess. (1987).

45

AR002184

treated on the same basis as Indians in the rest of the United
States for all federal program purposes.

    B.   Analysis

        1.   Treatment of Native Villages by Congress

From the foregoing historical review, several points are clear.
First, Alaska Natives are aboriginal Americans who lived in
organized societies prior to European contact and governed
themselves.  Like other Native Americans, the Alaska Natives
migrated across the land bridge from Asia.  Some Alaska Native
groups are closely related ethnologically to tribes in the
contiguous 48 states.  Second, prior to the beginning of this
century, the special legal status of Alaska Natives was unclear.
During this period, territorial law was frequently made
applicable to Natives on the same terms as to non-Natives.
Third, although Natives continued to be subject to territorial
law and are today subject to State law for many purposes, a
degree of consensus on their legal status developed in the 20th
Century.  By the time of enactment of the IRA, the preponderant
opinion was that Alaska Natives were subject to the same legal
principles as Indians in the contiguous 48 states, and had the
same powers and attributes as other Indian tribes, except to the
extent limited or preempted by Congress.

When he was confronted with an inquiry as to the status of Alaska
Natives more than 60 years ago, Solicitor Finney suggested:

    Reference to the provisions of certain acts will give a
    definite idea of the extent to which the natives of
    Alaska have been recognized by the Congress as well as
    show the similarity of their treatment to that accorded
    the Indians of the United States.

53 I.D. 593, 596.  Part III.A.5, supra.

His conclusion was that Alaska Natives are "all wards of the
Nation and are treated in material respects the same as are the
aboriginal tribes of the United States."  Id. at 595.

The logic of Solicitor Finney's approach was sound.  Where
questions have developed as to whether a particular group of
Indian descendants exists as an Indian tribe, the courts have
generally deferred to political branches, i.e., Congress and the
Executive.[123]  The Supreme Court established this principle of

_____

[123]   See James v. Department of Health and Human Services, 824
F.2d 1132, 1138; Cogo v. Central Council of Tlingit & Haida
Indians, 465 F. Supp. 1286, 1289 (D. Alaska 1979).  Cf. Mashpee
Tribe v. Town of Mashpee, 447 F. Supp. 940 (D. Mass. 1978), aff'd

AR002185

judicial deference to the political branches when it considered
whether Federal Indian liquor laws applied to a Saginaw Chippewa
Indian of Michigan.  The Court concluded:

> In reference to all matters of this kind [tribal
> status], it is the rule of this court to follow the
> action of the executive and other political departments
> of the government, whose more special duty is to
> determine such affairs.  If by them those Indians are
> recognized as a tribe, this court must do the same.

United States v. Holliday, 70 U.S. (3 Wall.)  407, 419 (1865).

The continuing validity of this principle today was reaffirmed in
the 1982 version of Felix Cohen's Handbook of Federal Indian Law.
Although pointing out that Congress may not arbitrarily designate
a body of people as a tribe,[124] the revision states, "judicial
deference to the findings of tribal existence is still mandated
by the extensive nature of congressional power in the field."[125]

Congress applied a Federal Indian statute (the Trade and
Intercourse Act) in Alaska as early as 1873.  Early in this
century several statutes treated Alaska Natives on a basis
parallel to the treatment of Native Americans in the contiguous
48 states.  The Alaska Amendment to the IRA authorized
organization of Native groups as tribes.  Most recently, and
perhaps most importantly, Congress has repeatedly defined the
term "tribe" to include Alaska Native groups, usually villages.
Although Congress has not, with the sole exception of the
Metlakatla Indian Community, explicitly designated specific
groups as tribes, the pervasive inclusion of Alaska Native groups
as "tribes" must be viewed as reflecting congressional
determination that there are tribal groups in Alaska.

What constitutes a tribe in the contiguous 48 states is sometimes
a difficult question.  So also is it in Alaska.  The history of
Alaska is unique, but so is that of California, New Mexico and
Oklahoma.  While the Department's position with regard to the
existence of tribes in Alaska may have vacillated between 1867
and the opening decades of this century, it is clear that for the
last half century, Congress and the Department have dealt with
Alaska Natives as though there were tribes in Alaska.  The fact
that the Congress and the Department may not have dealt with all

---

sub nom., Mashpee Tribe v. New Seabury Corp., 592 F.2d 575 (1st
Cir. 1979), cert. denied, 444 U.S. 866 (1979).

[124]   1982 Cohen, supra n. 8, at 5, citing United States v.
Sandoval, 231 U.S. 28 (1913).

[125]   Id. at 3.

47

AR002186

Alaska Natives as tribes at all times prior to the 1930's did not preclude it from dealing with them as tribes subsequently. City of Sault Ste. Marie v. Andrus, 532 F. Supp. 157, 161 (D.D.C. 1980).

In the summer of 1990, Congress enacted legislation directing the establishment of the "Joint Federal-State Commission on Policies and Programs Affecting Alaska Natives." Act of August 18, 1990, Pub. L. No. 101-379, § 12, 104 Stat. 473, 478-83.  That Commission has a broad mandate to review public policies affecting Alaska Natives.  When the Commission completes its work and files its recommendations, Congress may revisit how it deals with Alaska Native villages.  For now, we cannot say that Alaska Native villages are not tribes for purposes of federal law. We do not mean to conclude that every Native village is an Indian tribe.[126]  Which specific Alaska Native villages are tribes is a factual determination beyond the scope of this opinion.

### 2.    Arguments Against Finding Tribes

Before turning to a more detailed discussion of ANCSA and its implications for the scope of governmental powers the Native villages may have, we will consider the arguments which have been raised with regard to the tribal status of Native villages. The Attorney General of Alaska has suggested that there may not be "tribes" in Alaska.[127]  This position is supported by the Alaska Supreme Court's decision in Native Village of Stevens v. Alaska Management & Planning, 757 P.2d 32 (Alaska 1988), and by some academic writers.[128]  In reaching our conclusion that there are tribes for purposes of Federal Indian law, we have carefully considered these arguments.  Although the arguments are effectively presented and supported by citations of authority, we do not find that they provide a basis to disregard prior Solicitor's opinions or the recent treatment by the Congress of Native villages as tribes.

---

[126]    Cf. Native Village of Venetie I.R.A. Council v. Alaska, 944 F.2d 548, 552, 556 (9th Cir. 1991)(Venetie II)(finding that the present-day Native villages of Venetie and Fort Yukon were tribes for purposes of federal court jurisdiction, 28 U.S.C. § 1362, but not necessarily tribes with inherent sovereignty over domestic relations and child custody).

[127]    Letters of May 20 and October 17, 1992, from Charles E. Cole, Attorney General, State of Alaska, to the Solicitor.

[128]    Comment, Alaska Native Sovereignty: The Limits of the Tribe-Indian Country Test, 17 Cornell International Law Review 375, 394-395 (1984); Comment, Alaskan Native Indian Villages: The Question of Sovereign Rights, 28 Santa Clara L. Rev. 875 (1988).

48

AR002187

The key arguments against tribal status, and our analysis of each, are as follows:

1.  Native organization is not "tribal".

As early as the Alaska district court's In re Sah Quah decision, it was argued that Native organization is "essentially patriarchal, and not tribal."  31 F. 327, 329 (D. Alaska 1886). In Stevens Village, 757 P.2d at 35, the Alaska Supreme Court found that "the village rather than the ethnological tribe has been the central unit of organization."[129]

Unfortunately, there is no commonly accepted definition of the term "Indian Tribe," either by statute or from other generally accepted sources.[130]  The Supreme Court in 1901 defined an Indian tribe simply as a "body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." Montoya v. United States, 180 U.S. 261, 266 (1901).  In retrospect, that definition appears to be overly simplistic.[131] However, what is significant is that the United States has not relied on ethnological unity in determining what is a "tribe." As Felix Cohen summarized the problem:

> The term "tribe" is commonly used in two senses, an
> ethnological sense and a political sense.  It is
> important to distinguish between the two meanings of
> the term.  Groups that consist of several ethnological

---

[129]   Citing Atkinson v. Haldane, 569 P.2d 151 (Alaska 1977) (a wrongful death action in which the Alaska Supreme Court found that the Metlakatla Indian Community of the Annette Islands Reserve was entitled to sovereign immunity notwithstanding that the Community was composed of descendants of Tsimshian Indians who had migrated from British Columbia following a Christian missionary in the late 1880's).

[130]   1982 Cohen, supra n. 8, at 3-5.

[131]   The decision set a liberal standard for what constitutes a tribe.  The case involved the question of whether a group of Chiricahua, Mescalero and Southern Apache Indians constituted a tribe or band within the meaning of the Indian Depredations Act of 1891, 26 Stat. 851.  The Court found that at the time of the depredations the military had been conducting operations against a group identified by name as Victoria's band for "two years or more."  Under the statute, if Victoria's group constituted a band under the Act, as the Court ultimately held, their depredations were acts of war and the United States was not liable for damages.

AR002188

> tribes, sometimes speaking different languages, have
> been recognized as single tribes for administrative and
> political purposes . . . Likewise what is a single
> tribe, from the ethnological standpoint, may sometimes
> be divided into a number of independent tribes in the
> political sense.[132]

There is great variety in what is considered a "tribe" in the
contiguous 48 states.  The tribes vary from the large Navajo
Nation with several hundred thousand members and a huge
reservation to small rancherias of two dozen members and only
small parcels of land.[133]  Some bands of Indians may have had
little or no tribal organization while others were highly
organized.  Washington v. Washington State Commercial Passenger
Fishing Vessel Ass'n, 443 U.S. 658, 664 (1979).  Groups that were
not historically Indian tribes have been considered tribes for
purposes of federal law.  For example, the Supreme Court found
that the Mississippi Choctaws, a community of half-blood Choctaw
Indians descendants, was a tribe for purposes of federal law even
though they were not historically an Indian tribe.  United States
v. John, 437 U.S. 634, 650 n.20 (1978).[134]  In other instances,
consolidated or confederated tribes consisting of several
ethnological tribes have been treated as a single entity even
though they may even speak different languages.[135]

In 1974, the District Court for the Western District of
Washington decided that several "unrecognized" tribes were
successors to treaty tribes and had maintained a tribal
structure.  Thus, they, as well as the recognized tribes which
were either plaintiffs or represented by the United States in the
suit, were entitled to the protection of the United States and,
if they could demonstrate that they had self-regulating capacity,
they could exercise their off-reservation treaty fishing rights
free of state regulation.  United States v. Washington, 384 F.
Supp. 312 (W.D. Wash. 1974) ("Boldt decision"), aff'd, 520 F.2d
676 (9th Cir. 1975), cert. denied, 423 U.S. 1086 (1976).  On the

---

[132]   1942 Cohen, supra n. 8, at 268.  Accord 1982 Cohen, supra n.
8, at 3-6.

[133]   The Cabazon Band of Mission Indians, for example, had only
25 enrolled members at the time of the Supreme Court's decision
in California v. Cabazon Band of Mission Indians, 408 U.S. 202,
204 n.1 (1987).

[134]   Brendale v. Confederated Tribes and Bands of the Yakima
Indian Nation, 492 U.S. 408 (1989) (fourteen distinct bands
considered a tribe).

[135]   1982 Cohen, supra n. 8, at 6; 1942 Cohen, supra n. 8, at
268.

AR002189

other coast, the First Circuit Court of Appeals affirmed the
district court's holding that the United States could not refuse
to consider the Passamaquoddy Tribe's request that the United
States sue the State of Maine to recover tribal lands conveyed by
the State in violation of the Indian Trade and Nonintercourse
Act, 25 U.S.C. § 177, simply because the United States did not
"recognize" the tribe.  The United States had admitted that the
tribe existed as an Indian tribe in the historical sense.  Joint
Tribal Council of Passamaquoddy Tribe v. Morton, 388 F. Supp. 649
(D. Me.), aff'd, 528 F.2d 370 (1st Cir. 1975).

These decisions encouraged a number of requests to the Department
by groups of Indian descendants wanting to be recognized as
Indian tribes.  The Department responded by developing for the
first time standardized procedures for determining that a group
of Indian descendants was entitled to be acknowledged to exist as
an Indian tribe.[136]

Since the late 1970's and the development of the Department's
regulations, courts have clarified that a tribe need not have
acquired or maintained a tribal structure that never existed.  In
addition, they have clarified that neither change, adaptation nor
a degree of assimilation, which the courts viewed as inevitable,
destroyed the tribal status or meant the abandonment of the
tribal community.  United States v. Washington, 641 F.2d 1368,
1373-74 (9th Cir. 1981), cert. denied, 454 U.S. 1143 (1982).

Support for the view that Alaska Native groups are not tribes has
been found in Secretary Ickes' statement in his letter on the
Alaska Amendment to the IRA that, "Indian tribes do not exist in
Alaska in the same sense as in [the] continental United States."
Native Village of Stevens v. Alaska Management & Planning, 757
P.2d 32 (Alaska 1988) (citing H.R. Rep. No. 2244, at 4).  Read in
context, this statement was not intended to suggest that there
were not tribes in Alaska.  In the two sentences immediately
following the statement, Secretary Ickes says that the IRA
defines "tribe" as referring to groups of Indians residing on a

---

[136]  43 Fed. Reg. 39361 (1978).  The regulations require that
groups of Indian descendants petitioning for acknowledgment as
Indian tribes establish, among other things: (a) facts
establishing that the group has been identified from historical
times until the present on a substantially continuous basis, as
"American Indian," or "aboriginal"; (b) evidence that a
substantial portion of the group inhabits a specific area or
lives in a community viewed as American Indian and distinct from
others in the area, and that its members are descendants of an
Indian tribe which historically inhabited a specific area; and
(c) facts which establish that the petitioner has maintained
tribal political influence or other authority over its members.
25 C.F.R. § 87.7.

51

reservation and that there are few reservations in Alaska. Therefore, Secretary Ickes concludes, designation of reservations is necessary to define "tribes" for IRA purposes.  H.R. Rep. No. 2244, 74th Cong., 2d Sess. 4 (1936).  Clearly, in this context, Secretary Ickes' statement was no more than a technical comment on the nature of village organization.

This view of Secretary Ickes' statement is confirmed by his subsequent discussion of the status of Native groups in a 1945 opinion on the claims of three villages in Southeast Alaska to fishing rights.  He found that the villages were "Indian communities organized along tribal lines and have been traditionally recognized as such by the Indians, by scientific observers, and by administrative authorities."[137]  More specifically, the Secretary concluded that:

> [T]he forms of tribal organizations in Alaska differ somewhat from the forms of tribal organizations which are most prevalent in the States (though not from the forms of tribal organizations utilized by the coast Indians of Washington, who are culturally similar to the Tlingit and Haida Indians).  There are, however, Indian village groups in the United States proper, e.g., the New Mexico Pueblos, the California Rancherias, and the [Creek] tribal towns, which have all been considered tribal organizations for purposes of Federal jurisdiction.
>
> It is clear, therefore, that native tribes exist in Alaska.[138]

The similarity of Alaska Natives to Indian groups in the contiguous 48 states which the Secretary noted in his 1945 decision reflects the greater understanding of the distinctions between Indian groups that first began to emerge at the time of the IRA.  Prior to the IRA, statutes commonly referred simply to "Indians" or an "Indian tribe."[139]  The IRA, however, defines

---

[137]   Decision of July 27, 1945, reprinted in S. Rep. No. 1366, Repeal Act Authorizing Secretary of Interior to Create Indian Reservations in Alaska:  Hearings on S. 2037 and S.J. Res. 162 Before the Senate Subcomm. of the Committee on Interior and Insular Affairs, 80th Cong., 2d Sess. 435 (1948) (1948 Hearings).

[138]   Id. at 442-43.

[139]   See, e.g., 25 U.S.C. § 13 (the Act of November 2, 1921, commonly called the Snyder Act, providing for assistance for Indians throughout the United States) and 25 U.S.C. § 81 (R.S. 2103, requiring approval of any contract with any Indian tribe).

AR002191

"tribe" to include: "any Indian tribe, organized band, pueblo, or
the Indians residing on one reservation." 25 U.S.C. § 479.

As with Secretary Ickes' statement, much emphasis has been placed
on the statement in the House report on the Alaska Amendment
referring to "the peculiar nontribal organization under which
Alaska Indians operate" and on the provision of the amendment
allowing Alaska Native groups to organize on the basis of "a
common bond of occupation, or association, or residence within a
well-defined neighborhood, community or rural district." Stevens
Village, supra at 39-40. Again, as with Secretary Ickes'
statement, these must be viewed in context. As our historical
summary shows, although Alaska Natives were recognized as subject
to general Indian law principles, and there had been some
dealings with groups, the absence of treaties and a pervasive
reservation system meant that there had been no formal definition
of Native groups. In applying the IRA to Alaska, it was
therefore necessary to craft an approach to defining the specific
groups with which the Federal Government would deal. The "common
bond" provision did this.[140]

.2.   The United States did not enter treaties with Alaska Natives.

Many Indian tribes were initially recognized by the United States
through the treaty process.[141]  The absence of treaties with
Alaska groups is not dispositive of their tribal status, however.
See Joint Tribal Council of the Passamaquoddy Tribe v. Morton,
388 F. Supp. at 655-57, aff'd, 528 F.2d at 376-79.  As pointed
out in the historical summary, Congress ended treaty making in
1871, only four years after the acquisition of Alaska. Based on
this fact, the Ninth Circuit's decision in United States v.
Nagle, 191 F.2d 141 (9th Cir. 1911), found the absence of
treaties irrelevant to determining the tribal status of Tlingits
under Federal Indian law.

This is not to say that the existence of treaties is not
significant. In the years immediately following the IRA, the
Department was compelled to consider extensively what groups
constituted "tribes" or "bands" because a showing that the group
seeking to reorganize under the IRA constituted a tribe or band

---

[140]   This is not to say that every group organized under the
"common bond" provision constitutes a "tribe" that can exercise
inherent sovereign powers in addition to those powers delegated
by Congress. Organization under the Alaska Amendment to the IRA
has been held not to constitute conclusive evidence of historic
tribal status. Stevens Village, 757 P.2d 32, 40 (Alaska 1988);
Native Village of Venetie I.R.A. Council v. Alaska, 944 F.2d 548
(9th Cir. 1991).

[141]   1982 Cohen, supra n. 8, at 3-4.

AR002192

was a prerequisite to holding an election on a proposed constitution pursuant to section 16.[142]  From the Department's experience in implementing the IRA, Cohen distilled five criteria which were relied on singly or jointly to support a finding that a group constituted a "tribe" or "band."[143]  One of the factors was the existence of a treaty.  However, the existence of a treaty is not essential.  Indeed, courts have rejected the notion that tribes which had not been the subject of some specific act of recognition, such as a federal treaty or a statute naming the tribe, were therefore unrecognized as tribes for the purpose of federal statutes and programs.  As the First Circuit Court of Appeals stated in Joint Tribal Council of the Passamaquoddy Tribe v. Morton:

> No one in this proceeding has challenged the Tribe's identity as a tribe in the ordinary sense.  Moreover, there is no evidence that the absence of federal dealings was or is based on doubts as to the genuineness of the Passamaquoddies' tribal status, apart, that is from the simple act of recognition.  Under such circumstances, the absence of specific federal recognition in and of itself provides little basis for concluding that the Passamaquoddies are not a "tribe" [within the meaning of] the [Nonintercourse] Act.

528 F.2d at 378.

The absence of treaties has not prevented the Pueblos of New Mexico or the Indians of California from being recognized and dealt with as Indian tribes.  It was 23 years between the time the United States acquired the territory of New Mexico pursuant

---

[142]   1942 Cohen, supra n. 8, at 270-71.

[143]   The factors are:

a.   That the group has had treaty relations with the United States.
b.   That the group has been denominated a tribe by act of Congress or Executive order.
c.   That the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe.
d.   That the group has been treated as a tribe or band by other Indian tribes.
e.   That the group has exercised political authority over its members, through a tribal council or other governmental forms.

Id. at 271.

AR002193

to the Treaty of Guadalupe Hidalgo, 9 Stat. 922, and the end of the President's treaty making authority. However, no treaties were ever negotiated with any of the Pueblos.[144] Treaties were negotiated with California Indians, but none were ever ratified.[145]

In short, the United States has dealt, and continues to deal, with many Indian tribal groups which do not have treaties with the United States.   Some tribes with which it had treaties have evolved into new entities and some have ceased to exist as distinct political entities.[146]   It would be arbitrary to now impose the existence of treaty relations with the United States as a prerequisite for dealing with Alaska Natives villages as tribes.

3.  Alaska Natives have consistently been subject to territorial and state law.

It cannot be denied that Alaska Natives have been subject to territorial and state law for many purposes.   We are not persuaded, however, that the subjection of Alaska Natives to territorial or state law divests them of their status as tribes.

In 1978, the Supreme Court considered whether the United States had jurisdiction under the Major Crimes Act to prosecute a member of the Mississippi Band of Choctaw Indians for assault on lands belonging to the tribe.   The State argued that the United States did not have jurisdiction because the State had exercised jurisdiction over the Choctaws and their lands.   The Court assumed for purposes of the argument that there had been times when Mississippi's exercise of jurisdiction over the Choctaw lands had gone unchallenged but found that fact did not divest the Federal Government of its authority over them.   United States v. John, 437 U.S. 634, 652-53 (1978); see also United States v. South Dakota, 665 F.2d 837 (8th Cir. 1981), cert. denied, 459 U.S. 823 (1982).   Similarly, the Passamaquoddy and Penobscot Tribes of Maine were subjected to complete state jurisdiction yet

---

[144]     1942 Cohen, supra n. 8, at 387.

[145]     S. Rep. No. 441, 102d Cong., 2d Sess. 3 (1992) relating to Advisory Council on California Indian Policy Act of 1992, Pub. L. No. 102-416, 106 Stat. 2131.

[146]     Interestingly, while the existence of a treaty is not essential, we should also note that the existence of a treaty is not dispositive either. Once a group has had a treaty with the United States, the existence of that treaty does not, in and of itself, establish a presumption that the treaty group continues to exist as a tribe.   United States v. Washington, 641 F.2d 1368, 1374 (9th Cir. 1981), cert. denied, 454 U.S. 1143 (1982).

55

did not lose their status as tribes.   <u>Joint Tribal Council of the
Passamaquoddy Tribe v. Morton</u>, 388 F. Supp. at 652, <u>aff'd</u>, 528
F.2d at 372, 374, 378.

Oklahoma, like Alaska, has a unique history.   While substantial
land in Oklahoma is still owned by Indian tribes and individual
Indians, Indian reservations similar to those in other states
have disappeared.   Yet, the Tenth Circuit Court of Appeals found
that lands still held by the Creek Nation in fee and used for a
bingo operation were beyond state regulation.   <u>Indian Country,
U.S.A., Inc. v. Oklahoma Tax Comm'n</u>, 829 F.2d 967 (10th Cir.
1987).   The court found that the fact that the State had
previously exercised jurisdiction over the lands without
challenge was not inconsistent with continued tribal authority.

Even when Congress has permitted states to assert jurisdiction
over Indian lands or tribal members within Indian country, that
alone has not meant that Congress was revoking recognition or
declining to recognize the Indian tribes and members affected.
If anything, it reinforces Congress' recognition of the continued
existence of tribes, even while it may seek to adjust
jurisdictional authority for particular and usually limited
purposes.[147]

There is no clearer example of a tribe being subjected to state
jurisdiction than when the federal relationship with the tribe is
terminated.   Typically, although termination statutes revoked
Secretarial powers and responsibilities under tribal
constitutions, the acts did not expressly terminate the
governmental authority of the tribes involved.[148]   In 1979 the
Ninth Circuit had occasion to consider the effects of the Klamath
Termination Act, 25 U.S.C. §§ 564-564x, on the hunting and

---

[147]   Public Law 280, discussed <u>supra</u> at n. 102, provides examples
of both broad and limited grants to states of authority  within
Indian country.   In that statute, Congress granted to certain
states broad criminal, but only very limited civil jurisdiction
over Indian country.   Yet it cannot reasonably be suggested that
Public Law 280 constitutes an expression of congressional intent
not to recognize the tribal status of tribes existing in Public
Law 280 states.   <u>See</u> <u>Bryan v. Itasca County</u>, 426 U.S. 373 (1976);
<u>California v. Cabazon Band of Mission Indians</u>, 480 U.S. 202
(1987).

[148]   Indeed, the acts commonly provided "such termination shall
not affect the power of the tribe to take any action under its
constitution and bylaws that is consistent with this subchapter
without the participation of the Secretary or other officer of
the United States,"   25 U.S.C. §§ 758(b) (Utah Paiute tribes),
704 (60 Western Oregon tribes) and 723 (Alabama and Coushatta
Indians of Texas).

56

fishing rights of members of the Klamath Tribe.  The Act provided in part:

> Upon removal of Federal restrictions on the property of the tribe and individual members thereof, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians and, except as otherwise provided in this Act, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and <u>the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.</u>

25 U.S.C. § 564q(a) (emphasis added).  The Ninth Circuit found, however, that:

> Although the [Klamath Termination] Act terminated federal supervision over trust and restricted property of the Klamath Indians, disposed of federally owned property, and terminated federal services to the Indians, it specifically contemplated the continuing existence of the Klamath Tribe.  It did not affect the power of the tribe to take any action under its constitution and bylaws consistent with the Act. § 564r.  The Klamaths still maintain a tribal constitution and tribal government, which among other things establishes criteria for membership in the Tribe.  The tribal roll created by the Act was for purposes of determining who should share in the resulting distribution of property.  <u>Kimball I</u> [<u>Kimball v. Callahan</u>, 493 F.2d 564 (9th Cir.), <u>cert. denied</u>, 419 U.S. 1019 (1974)] held that the Act did not abrogate tribal treaty rights of hunting, fishing, and trapping. Neither did the Act affect the sovereign authority of the Tribe to regulate the exercise of those rights.

<u>Kimball v. Callahan</u>, 590 F.2d 768, 775-76 (9th Cir.), <u>cert. denied</u>, 444 U.S. 826 (1979) (<u>Kimball II</u>) (footnotes omitted).

In short, the fact that a state has exercised jurisdiction over a tribe does not mean that a group of Indians is not a tribe or has ceased to exist as a tribe for purposes of federal law.  We recognize that the exercise by a state of jurisdiction over a tribe may, among other factors, contribute to a voluntary or forced abandonment of tribal relations.  If the members of a tribe have not maintained tribal relations, they will cease to be

AR002196

a tribe regardless of the reasons.  <u>Mashpee Tribe v. Town of</u>
<u>Mashpee</u>, 447 F. Supp. 940 (D. Mass. 1978), <u>aff'd sub nom.</u>,
<u>Mashpee Tribe v. New Seabury Corp.</u>, 592 F.2d 575 (1st Cir.),
<u>cert. denied</u>, 444 U.S. 866 (1979).  However, the mere exercise of
state jurisdiction does not in itself cause that result.

### 3.   Which Villages are Tribes

It is not necessary for resolution of the question that you have
asked to determine specifically which Native villages in Alaska
are tribes.[149]  However, a brief address to this point is
necessary.  Some Native leaders and other commenters have
expressed concern that our opinion may threaten continued
participation of Native villages in the programs of the BIA, the
Indian Health Service and other federal agencies.  Presumably,
the concern is that, if some Native villages are not tribes,
their participation in federal programs would be open to
question.[150]  To address these comments, as well as to provide
guidance to the BIA and other agencies in administration of
programs in Alaska, we turn briefly to the question of the number
of tribes in Alaska.

There is an argument that Congress has recognized the existence
of specific Native villages as tribes.  This argument starts with
the definition of "Native village" in ANCSA section 3(c).  43

---

[149]    See <u>supra</u> p. 1.

[150]    The principal constitutional basis for Indian affairs
legislation is the Constitution's Commerce Clause, which empowers
Congress "[t]o regulate commerce with foreign nations, and among
the several States, and with <u>Indian tribes</u>."  U.S. Const. art. I,
§ 8, cl. 3 (emphasis added).  1982 Cohen, <u>supra</u> n. 8, at 208;
<u>McClanahan v. Arizona State Tax Comm'n</u>, 411 U.S. 164, 172 n. 2
(1973); <u>United States v. Antelope</u>, 430 U.S. 461, 645 (1977);
<u>United States v. Holliday</u>, 70 U.S. (3 Wall.) 407, 419 (1865).
This clause provides broad authority for congressional action and
has been a basis for sustaining federal laws singling out Indians
as a class against claims that they violate the equal protection
standard of the Fifth Amendment.  In <u>Morton v. Mancari</u>, 417 U.S.
535 (1974), the Supreme Court upheld the Indian preference law,
25 U.S.C. § 472, against an equal protection challenge, finding
that the preference was not "racial," but was rather based on the
political relationship of the United States to tribes. In <u>United</u>
<u>States v. Antelope</u>, 430 U.S. 641 (1977), the Court upheld the
prosecution of an Indian under the Major Crimes Act, 18 U.S.C. §
1153, on the same basis.  However, a necessary corollary to these
decisions is that the authority of Congress to deal specially
with Indians outside of the context of the relationship with
tribes has limits.  <u>See</u> <u>United States v. Mazurie</u>, 419 U.S. 556
(1975); <u>United States v. Sandoval</u>, 231 U.S. 28 (1913).

AR002197

U.S.C. § 1602(c).  This definition makes reference to lists
appearing in sections 11 and 16, which identify 215 Native
villages.  43 U.S.C. §§ 1610, 1615.  ANCSA made provision for the
Department to add or delete Native villages from the section 11
list using specific criteria.  In implementing ANCSA, the
Department made additions to and deletions from the section 11
list, producing a modified list.  A number of post-ANCSA statutes
have included Alaska Native villages within the definition of
"tribe" by reference to the ANCSA definition of "Native village."
These latter statutes arguably are a congressional determination
that Native villages on the modified ANCSA list are tribes.

The counter-argument is that Congress has not been consistent in
its inclusion of Alaska Native entities in definitions of
"tribe."  The statutes discussed and listed above use a variety
of formulations in defining what is a "tribe" in Alaska.  The
repeated inclusion of Alaska Native entities as tribes
establishes that Congress believes that there are tribes in
Alaska.  However, it also may be argued that the variety of
definitions used by Congress forecloses a finding that Congress
has recognized any specific entity as a tribe.

While we do not express a final conclusion on which of these
arguments is better, we do believe that there is sufficient merit
to the first argument for the BIA and other agencies to proceed
in the administration of programs on the presumption that Native
villages listed on the modified ANCSA list are tribes.  Should
new or additional information indicate that any particular entity
does not, in fact, meet the accepted criteria for a tribe, the
BIA is not compelled to continue to deal with the entity as a
tribe.[151]  Similarly, should it become apparent that an entity,
although once a tribe, has ceased to maintain tribal relations,
for whatever reason, BIA may cease to treat it as a tribe.[152]

---

[151]    The BIA has adopted substantive standards for determining
whether a group of Indian descendants is a tribe based on the
Department's experience with issues of tribal existence during
the mid-1970's.  43 Fed. Reg. 39361 codified at 25 C.F.R. Part 83
(1992).  The regulations currently apply to all groups in the
continental United States, including those in Alaska.  25 C.F.R.
§ 83.1(n) (1992).  Although a question has been raised whether
the acknowledgment process (but not the substantive standards) is
appropriate for Alaska, 53 Fed. Reg. 52832 (1988), the proposed
revised acknowledgment regulations would still apply in Alaska.
56 Fed. Reg. 47320 (1991).

[152]    If some entities are found under appropriate procedures not
to qualify as tribes, the continued participation of individual
members of these entities in programs is not necessarily at risk.
The Supreme Court has upheld special treatment "[a]s long as the
special treatment can be tied rationally to the fulfillment of

59

We now turn to Part IV to discuss the question of village
jurisdiction over land and nonmembers.

IV.   VILLAGE GOVERNMENTAL JURISDICTION OVER LAND AND NONMEMBERS

    A.   Native Land Claims

        1.   Early Land Claims

The Russians did not introduce a system of land ownership to
Alaska or significantly interfere with aboriginal use of the
land.[153]   When news of the sale of Alaska to the United States

_____

Congress' unique obligation toward the Indians . . . ."   Morton
v. Mancari, 417 U.S. at 555 (emphasis added).   See also Delaware
Tribal Business Comm. v. Weeks, 430 U.S. 73 (1977); 1982 Cohen,
supra n. 8, at 654-58.   We believe that, on this basis, continued
participation of individual Alaska Natives in programs for which
they are eligible would generally be upheld.   Cf.   25 C.F.R. §
83.9(j).

In a January 30, 1989 letter to Chairman Daniel K. Inouye of the
Senate Select Committee on Indian Affairs, Thomas M. Boyd, the
Assistant Attorney General, Office of Legislative Affairs, argued
that language in a statute and implementing regulations of the
Department of Education that give a preference to certain
classifications of persons, including Alaska Natives, was
unconstitutional under Mancari because they were not clearly
predicated on tribal membership.   We believe that this letter
does not correctly read the Mancari "rationally tied" standard
and that it does not give adequate consideration to the Supreme
Court's decision in United States v. John, 437 U.S. 634 (1978),
which upheld the constitutionality of the Indian Reorganization
Act's definition of "Indian," 25 U.S.C. § 479, which includes
both members of tribes and "all other persons of one-half or more
Indian blood."

We should also note the issue that, as mentioned at supra at n.
120, some statutes include within the definition of "tribe"
Alaska entities that are clearly not tribes, usually the ANCSA
Village and Regional Corporations.   For example, the Indian Self-
Determination Act includes the Corporations as tribes eligible to
contract to operate federal programs and to receive grants under
the Act.   25 U.S.C. § 450b(b).   Because the starting point for
organization of the Corporations and the settlement of aboriginal
claims was the Native villages, inclusion of the Corporations in
the Self-Determination Act can be said to be tied rationally to
Congress' constitutional authority.

[153]   Section III.A.2, supra.

60

AR002199

reached the Natives, objections to the transaction were raised and there was talk of armed resistance to the "Boston men."[154]

A Treasury Department agent reported in 1869 that the objections did not arise from "any special feeling of hostility" to Americans.  Indeed, he found that the Natives were satisfied with the prices paid for furs by American traders.  Their objections, he reported, were due to the fact that "their fathers originally owned all of the country" and were merely allowing the Russians to occupy it for the conduct of trade.  The Natives asserted that the Russians did not have the right to sell the territory, "except with the intention of giving them the proceeds."[155]

Both the Treaty of Cession[156] and the 1884 Organic Act[157] recognized the existence of these claims and Senator Harrison, the sponsor of the Organic Act, expressed hope that they would be promptly resolved.[158]  The vehicle for this resolution was to be the commission provided for in section 12 of the Act.  23 Stat. 24, 27.  The commission would study the Natives' situation and report on what land should be reserved for their use.  A commission report was submitted to the Secretary of the Interior on June 30, 1885.  It dealt only with the Natives of southeastern Alaska.  It recommended that the Natives be granted title to the land they actually used and occupied for homes and gardens and be secured in the use of their fishing sites.  The land was otherwise recommended to be open for white settlement and exploitation.[159]  No action was taken on this report.[160]  Rather,

---

[154]   H.H. Bancroft, History of Alaska, 1730-1885 609 (1886). Because most Native dealings had been with whalers sailing out of Boston, Americans generally were referred to as "Boston men."

[155]   C. Bryant, Report on Alaska, in S. Exec. Doc. No. 32, 41st Cong., 2d Sess. 14 (1869).

[156]   Section III.A.2, supra.

[157]   Section III.A.3, supra.

[158]   15 Cong. Rec. 531 (1884).

[159]   The commission's report is summarized and portions quoted in Tlingit and Haida Indians of Alaska v. United States, 147 Ct. Cl. 315, 336-37, 414-15 (1959).

[160]   The brevity and limited scope of the report were criticized at the time.  Governor Swineford, on first arriving in Alaska in late 1885, wrote that the report "fails to show that [the Commission's] duties have been more than in very small part performed."  Report of the Secretary of the Interior, Message and Documents, Vol. II, 923 (1885).  See also, E. Gruening, The State

61

AR002200

as discussed above, several subsequent statutes repeated the
Organic Act's preservation of the status quo.

During the early administration of the land laws in Alaska, the
Department acted to protect from non-Native entry lands actually
occupied by Natives. In 1897, the Department refused to approve
a townsite that included a waterway actually used by a Native
village as a source of fresh water for domestic use and
consumption. 24 I.D. 312 (1897). In 1898, the Department
required exclusion from a claim of a trail used by Natives to
obtain access from their village to a harbor site. 26 I.D. 512
(1898).[161] However, protection was generally limited only to
permanent villages and other areas actually and visibly occupied
and improved by Natives, and not to broader areas that Natives
had aboriginally used for hunting, fishing and gathering.[162]

Throughout the 1890's and into the 20th Century, various protests
concerning rights in land were made by Natives to the Secretary
of the Interior, the President and Congress. These protests
received little, if any, response.[163]

The extension of the allotment laws to Natives in 1906 was viewed
by some as a vehicle to provide Natives title to land,[164] but
relatively few Natives took advantage of it. Through 1960, only
80 allotments were sought.[165] Ernest Gruening says this was due
to lack of appropriations for implementation of the law.[166]
However, a more persistent problem was that allotments of 160
acres were not particularly suited to the subsistence based

of Alaska 356 (1954) (Gruening, Alaska).

[161]    Both this opinion and the 1897 opinion were prepared under
the supervision of Willis Van Devanter, then the Assistant
Attorney General for the Interior Department and later a Justice
of the Supreme Court. In 1913, the title of Assistant Attorney
General was changed to Solicitor. A result in accord with these
opinions was reached in Johnson v. Pacific Coast S.S. Co., 2
Alaska 224 (D. Alaska 1904).

[162]    Tlingit and Haida Indians of Alaska v. United States, 147
Ct. Cl. 315, 336-40 (1959).

[163]    Id. at 426-37.

[164]    Gruening, Alaska, supra n. 160, at 362.

[165]    Alaska Natives and the Land, supra n. 17, at 435. See also,
Land Use in Alaska, Preliminary Report, Advisory Committee on
Land Use and Subcommittees to Alaska Planning Council 50 (1938).

[166]    Gruening, Alaska, supra n.160, at 362.

AR002201

communities of Alaska, many of them semi-nomadic.[167]  A 1962
Department of the Interior task force observed that "[h]omestead
laws designed for farmers who live and work upon the same piece
of ground, and through cultivation of the soil . . . are scarcely
suitable for hunters who live in villages often far removed from
the land upon which they seek their quarry."[168]

As the non-Native population of Alaska increased, encroachments
on land occupied and used by Natives increased and the problem of
Native land claims became more pressing.[169]  By the Census of
1900, non-Natives constituted a majority of the population of
Alaska.[170]  In 1915, a group of Athabascan chiefs and headmen met
in Fairbanks with Delegate James Wickersham to discuss protection
of their lands against settlement by others.  Delegate Wickersham
offered an option of homesteads or creation of reservations.  The
chiefs told him that neither option was acceptable.  Homesteads
would separate community members and did not account for the fact
that Natives lived at many different places throughout the year.
Reservations too were viewed as unduly restrictive.  "[W]e wish
to stay perfectly free just as we are now and go about just the
same as now . . . ," one chief said.[171]

Delegate Wickersham promised to report the Athabascans' concerns
to Washington, but nothing came of the matter.  The 1926 Native
Townsite Act made available to Natives restricted deeds to
surveyed townsite lots.  But, like the Homestead Act, this
legislation failed to address the broader issue of claims related
to subsistence use of the land.[172]

---

[167]    Alaska Natives and the Land, supra n. 17, at 435; Naske &
Slotnick, supra n. 24, at 199-200.

[168]    Report to the Secretary of the Interior by the Task Force on
Alaska Native Affairs 62 (Dec. 28, 1962).

[169]    Arnold, supra n. 14, at 72-79.

[170]    Id. at 71.  The Native population in 1900 was 29,536 against
a non-Native population of 34,056.  The non-Native population
peaked in 1910 and then declined in the wake of the end of the
gold rushes, before beginning a sharp climb in the 1930's.  By
1960, the Native population was 43,081 and the non-Native
population 250,461.  Id.  In 1990, the totals were 85,698 and
464,345.  1990 Census of Population, General Population
Characteristics, Alaska (May 1992).

[171]    Arnold, supra n. 14, at 81-82; Naske & Slotnick, supra n.
24, at 199-200.

[172]    Report to the Secretary of the Interior by the Task Force on
Alaska Native Affairs 60-62 (Dec. 28, 1962).

63

AR002202

2. Proposed Repeal of the Alaska Amendment to the IRA

As was discussed earlier, some proponents of the Alaska Amendment to the IRA viewed the creation of IRA reservations as a solution to Native land claims.[173] However, the establishment of the first six IRA reservations in Alaska generated intense opposition from non-Natives in Alaska. Of particular concern was the Venetie Reservation, which totalled 1.4 million acres. What startled Alaskans, Ernest Gruening wrote, was that these were "announced to be only the first of one hundred similar reservations from which all but local native residents would be excluded."[174] Reservations on this scale would, many non-Natives feared, stifle economic development. Concern was expressed that mining and other activities would be precluded "except on payment for the privilege to resident natives" and that the fishing and canning industries could be crippled by Native claims to exclusive fishing rights.[175]

In 1948 an effort was made in Congress to repeal the applicability of the IRA to Alaska and to rescind the reservations established pursuant to the Act. Lengthy hearings were held early in the year on two measures, Senate Joint Resolution 162 and S. 2037.[176] Senate Joint Resolution 162 asserted that the United States had never recognized rights of Alaska Natives based on use and occupancy, that the Secretary of the Interior had established a number of reservations and was considering a number of additional ones, and that the inclusion of vast areas of land within Indian reservations was retarding settlement and development of Alaska. The Joint Resolution proposed to rescind the Secretarial Orders establishing reservations under the IRA and to repeal section 2 of the Act of May 1, 1936, which gave the Secretary authority to establish IRA reservations in Alaska.[177]

The provisions of S. 2037 were broader. That bill proposed to transfer all duties, powers and functions of the Secretary of the Interior and Commissioner of Indian Affairs to the Alaska Territorial Government. Section 4 of the bill would have deleted the language of section 13 of the IRA that made certain provisions of the IRA applicable to Alaska, amended section 19 of

---

[173]   Section III.A.5, supra.

[174]   Gruening, Alaska, supra n. 160, at 367.

[175]   Id. at 367-68. Accord, reprinted in 1948 Hearings, supra n. 137, at 453.

[176]   1948 Hearings, supra n. 137.

[177]   S. Rep. No. 1366, 80th Cong., 2d Sess. (1948).

AR002203

the IRA to delete the inclusion of Eskimos and other aboriginal
peoples of Alaska from the definition of "Indian," and repealed
the 1936 Alaska Amendment in its entirety.

In letters to the Senate Interior Committee, Secretary Krug
opposed both proposals.[178]  The IRA reservations, he wrote, were
in areas used by the Natives "since time immemorial" and
"constitute the economic bases for native life."  He further
stated:

> The exploitation and spoliation of some of the
> ancestral hunting, fishing, and trapping grounds of the
> natives by nonnatives have already worked a hardship on
> many of the native groups and seriously jeopardized
> their economic situation.  Unless the natives are
> protected in their occupancy and use of these ancestral
> areas and are permitted to establish their local
> governments, the virtual destruction of these people is
> the almost sure result.  They must be assisted in their
> efforts to become self-supporting and to combat the
> introduction of intoxicating liquor within the native
> communities.[179]

Secretary Krug also recalled the circumstances of the adoption of
the Alaska Amendment to the IRA.  A purpose of the amendment, he
pointed out, was to fulfill the "moral and legal" obligation to
the Natives arising from the 1884 Organic Act.  A repeal of the
Alaska Amendment would "repudiate" the commitment to fulfill this
obligation.[180]

Proponents of the legislation in testimony before the Committee
disputed Krug's position.  R.E. Robertson, an attorney
representing the Juneau Chamber of Commerce, testified that he
had made an extensive study of aboriginal claims and had
concluded that "no aboriginal rights existed, that none had
existed under the Russian regime [and] that if any had existed .
. . they would have been abolished by the Treaty of Cession."
If the rights were not terminated by the Treaty, he said, they
were extinguished by "nonrecognition of them by the Congress . .

---

[178]   Letter of February 18, 1948 to Senator Hugh Butler, re: S.J.
Res. 162; Letter of February 19, 1948 to Senator Hugh Butler, re:
S. 2037, reprinted in 1948 Hearings, supra n. 137, at 3-5.

[179]   Letter of February 18, 1948 to Senator Hugh Butler,
reprinted in 1948 Hearings, supra n. 137, at 3.

[180]   Id. at 3-4.

AR002204

. and abandonment by the Indians or by adverse use and possession
for many y rs either by the Indians or private individuals."[181]

Felix Cohe.., who had recently left federal service, appeared in
support of Secretary Krug.  He said, "[I]n the case of the Alaska
Indians we have more than a moral obligation, we have a legal
obligation."  The idea of reservations in Alaska "as being a
menace suddenly created out of the brain of Harold Ickes or
myself or some other disagreeable individual, does not take
sufficient account of the actual history."[182]

Assistant Secretary William Warne, who then supervised the Indian
Office, rebutted the argument that reservations would impede
development of the Territory.  He recalled the long history of
Native land claims. It took 17 years after acquisition of Alaska
for Congress to first address Native land rights, he said.
Congress then dealt with them by providing simply that they
should not be disturbed until Congress addressed them in further
legislation.  Another 62 years elapsed before Congress, in the
Alaska Amendment, authorized the Secretary of the Interior "to
mark out and protect Indian land titles."  During the 12 years
that have passed since the Amendment, the Department has been
"continually beset by pleas for delay."  Further delay, Mr. Warne
said, was not in the interest of Alaska's development:

> [P]ostponing action on these issues is also postponing
> the clarification of Alaskan land titles and thus
> postponing the settlement and industrial development of
> Alaska.  If that is the case, then either the Congress
> or the Interior Department is going to have to choose
> between facing the brickbats that any solution of this
> problem will draw, on one hand, and, on the other,
> leaving a vital segment of our national frontier
> undeveloped and almost uninhabited.[183]

No action was taken on S. 2037.  In mid-June, the Senate adopted
Senate Joint Resolution 162, but only after significantly
amending it.  The amendments deleted the provision which would
have rescinded the Secretarial Orders establishing reservations
under the IRA, reworded the provision relating to the repeal of
section 2 of the Alaska Amendment, and added a provision
authorizing the Secretary to issue patents to appropriate "native

---

[181]     Id. at 353.  Robertson later represented the defendant in
United States v. Libby, McNeil & Libby, 107 F. Supp. 697 (D.
Alaska 1952), in which the Hydaburg IRA reserve was held to have
been improperly established.

[182]     Id. at 540, 544.

[183]     1948 Hearings, supra n. 137, at 41-42.

66

tribes and villages or individuals for lands actually possessed,
used or occupied for town sites, villages, smoke houses, gardens,
burial grounds, or missionary stations."  94 Cong. Rec. 9097
(1948).  The House took up the Joint Resolution in the early
hours of Sunday, June 20, but deferred consideration of it until
another time because of the early hour.  94 Cong. Rec. 9348
(1948).  The House never returned to the matter.


            3.   Land Claims in Court

Despite the failure of the IRA repeal legislation, the resolution
of Native land rights through IRA reservations, as foreseen by
Assistant Secretary Warne, did not materialize.  Numerous
reservation applications remained before the Department.[184]
However, only one additional reservation was established and its
establishment was later invalidated.[185]  Further, the status of
the first six IRA reservations was undermined in litigation
concerning the exclusivity of Native fishing rights within one of
the reserves.[186]

This left the issue of the rights of Natives to land uncertain
and the subject of further litigation.  In <u>Miller v. United
States</u>, 159 F.2d 997 (9th Cir. 1947), the Ninth Circuit held that
the Treaty of Cession had extinguished "original Indian title" in
Alaska, but that individual Tlingit Indians had a compensable
interest in lands taken by condemnation because the 1884 Organic
Act constituted congressional recognition of their title as
"individual" Indians.  However, in <u>Tee-Hit-Ton Indians v. United
States</u>, 348 U.S. 272, <u>reh'g denied</u>, 348 U.S. 965 (1955), the
Supreme Court took a different approach.

_____

[184]   <u>Alaska Natives and the Land, supra</u> n. 17, at 443, 446.

[185]   A reserve at Hydaburg was established on November 30, 1949.
Its establishment was invalidated in <u>United States v. Libby,
McNeil and Libby</u>, 107 F. Supp. 697 (D. Alaska 1952).  Two other
reserves (Barrow and Shungnak-Kobuk) were preliminarily
established at the same time as Hydaburg, but these were revoked
after votes of disapproval in village elections.  <u>Alaska Natives
and the Land, supra</u> n. 17, at 443.

[186]   <u>Hynes v. Grimes Packing Co.</u>, 337 U.S. 86 (1949).  This case
is analyzed in detail in Case, <u>supra</u> n. 50, at 101-11.  Native
support for reservations, which was hardly unanimous in the first
instance, also appears to have waned.  In 1962, a Departmental
task force found Indians, Eskimos and Aleuts "generally opposed
to having reservations."  <u>Report to the Secretary of the Interior
by the Task Force on Alaska Native Affairs</u> 57 (1962).

67

Tee-Hit-Ton was an inverse condemnation action by a clan of the
Tlingit Tribe.   The clan sought compensation for timber taken by
the United States from lands it claimed.   The Court found that
the clan's use of the land in question was "like the use of
[land] by the nomadic tribes of the States Indians" and that its
claim was "wholly tribal."   Id. at 287-88.   This conclusion did
not, however, give rise to a right to compensation.   Aboriginal
title, the Court said, is "a right of occupancy which the
sovereign grants and protects against intrusion by third
parties," but is not a compensable property right unless
specifically recognized as such by Congress.   Such title "may be
terminated and such lands fully disposed of by the sovereign
itself without any legally enforceable obligation to compensate
the Indians."   Id. at 279 (citing Johnson v. McIntosh, 21 U.S. (8
Wheat.) 542 (1823)).

Because of its conclusion, it was unnecessary for the Court to
consider whether the Treaty of Cession had extinguished
aboriginal title.   However, it was necessary to address the 1884
Act to determine whether the Act provided the requisite
congressional recognition to convert "mere Indian title" to a
compensable possessory interest.   The Court said that it had
carefully examined the Act and its legislative history and that
"it clearly appears that what was intended was merely to retain
the status quo until further congressional or judicial action was
taken."   Id. at 277-79.

Justice Douglas, joined by Chief Justice Warren and Justice
Frankfurter, dissented.   Based on his own review of the
legislative history of the 1884 Act, Douglas concluded that the
Act recognized the Natives' title to their lands.   "What those
lands were was not known.   Where they were located, what were
their metes and bounds was also unknown . . . . But all agreed
that the Indians were to keep them, wherever they lay."   Id. at
292-94.

The issue of aboriginal title and the Treaty of Cession was
revisited by the Court of Claims in Tlingit and Haida Indians of
Alaska v. United States, 177 F. Supp. 452, 147 Ct. Cl. 315
(1959).   A special 1935 jurisdictional statute authorized "all
those Indians of the whole or mixed blood of the Tlingit and
Haida Tribes" to bring suit for damages for taking by the United
States of lands or other tribal or community property rights.
Act of June 19, 1935, § 2, 49 Stat. 388.   After lengthy delays,
the Tlingit and Haida brought suit in 1947.[187]   The case was
tried in the mid-1950's and a decision issued by the Court of
Claims on liability in 1959.   The court held that the United

---

[187]    The period for the Tlingit and Haida to bring the case was
twice extended.   Act of June 5, 1942, 56 Stat. 232; Act of June
4, 1945, 59 Stat. 231.

AR002207

States had taken over 18 million acres of land aboriginally used and occupied by the Tlingit and Haida in southeastern Alaska, 147 Ct. Cl. at 340-41.  The court rejected the argument that aboriginal title was extinguished by Article VI of the Treaty of Cession, in which Russia had warranted that Alaska was "free of any reservations, privileges, franchises, grants or possessions." The court adopted a finding of its trial commissioner that the warranty went only to claims of the Russian government, the Russian American Company and other commercial enterprises.  Id. at 334, 385-88.[188]

### 4.   The Statehood Act

Alaska's first statehood bill was introduced in 1916 by Alaska Delegate James Wickersham, who as a district court judge had authored the early 20th Century decisions on the status of Alaska Natives.  At this time, however, the people of Alaska were largely disinterested in statehood, and Congress took no action on the bill.[189]  Alaska's rapid economic development and population growth during World War II, however, brought renewed interest in Alaska Statehood.[190]  Statehood bills were before Congress almost continuously from 1943 until Statehood was achieved in 1958.  After World War II, Alaska's strategic position and security value in the Cold War with the Soviet Union generated support for Alaska Statehood among members of Congress. In 1950, a statehood bill passed for the first time in the United States House of Representatives.  The Senate Interior and Insular Affairs Committee revised the bill and reported it favorably, but the measure did not pass the Senate.  The Korean War halted debate on Alaska Statehood, which did not resume until 1952.  On April 4, 1954, the Senate passed a combined Alaska-Hawaii Statehood measure, with no like action from the House.[191]

---

[188]   A money judgment for the taking found in the 1959 decision was not rendered until 1968.  Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778 (Ct. Cl. 1968).

[189]   Naske & Slotnick, supra n. 24, at 136.

[190]   Id. at 143-45.

[191]   Naske, supra n. 42, at 67-79, 95-126.  For a detailed inside account of the statehood movement, see E. Gruening, The Battle for Alaska Statehood (1967).  Mr. Gruening was Director of the Division of Territories and Island Possessions, U.S. Department of the Interior, for 5 years before his appointment as Governor of the Territory of Alaska in 1939.  Mr. Gruening served as Governor until 1953.  In 1956 he was elected a provisional Senator and in 1959, after Alaska became a state, a Senator.  He served until 1969.

AR002208

In 1955, the people of Alaska held a constitutional convention, partly to impress Congress with the Territory's political maturity and partly to win public support for Alaska Statehood. A convention of 55 delegates met for the first time on November 8, 1955.  On February 5, 1956, the delegates signed a newly drafted Alaska Constitution, which was approved by the people of Alaska in April 1956, by a vote of 17,447 to 8,180.[192] The final push in Congress for Alaska Statehood began in March 1957.  On July 1, 1958, Congress passed the Alaska Statehood Act.[193]  Alaska joined the Union on January 3, 1959.

Throughout consideration of Alaska Statehood during the 1950's, proponents of Statehood sought to separate the question of Native land claims from the issue of whether Alaska should be a state. In hearings in 1950, Governor Gruening was asked if he regarded the matter of Indian title as important.  He replied:

> I think it is of great importance; I think it should be disposed of, but I doubt whether the statehood bill is the place to do it.  It is a Federal matter, after all, and will be decided by the Federal Government whether Alaska is a State or a Territory, and I think you will needlessly complicate the statehood bill if you put it in there.[194]

Robert Atwood, editor and publisher of the Anchorage Times, echoed this view:

> The Indians, with their aboriginal rights, are a Federal problem.  We have no control over it, and we cannot dispose of it, and we have nothing to say about it.  Whatever happens to Alaska, it will still be a Federal problem.[195]

---

[192]  Naske, supra n. 42, at 131-47.

[193]  Act of July 7, 1958, Pub. L. No. 85-508, 72 Stat. 339, amended by Act of June 25, 1959, Pub. L. No. 86-70, 73 Stat. 141.

[194]  Alaska Statehood: Hearings on H.R. 331 and S. 2036 Before the Senate Committee on Interior and Insular Affairs, 81st Cong., 2nd Sess. 351-52 (1950).

[195]  Id. at 293.  Other participants in the hearing expressed similar views, e.g., Delegate E.L. Bartlett, id. at 149; Democratic Committeewoman Essie R. Dale, id. at 261-62.  See also, statement of Mildred R. Hermann, Secretary, Alaska Statehood Commission, Statehood for Alaska: Hearings on H.R. 20, H.R. 207, H.R. 1746, H.R. 2684, H.R. 2982, and H.R. 1916, Before the Subcommittee on Territories and Insular Possessions of the House Committee on Interior and Insular Affairs, 83rd Cong., 1st

70

AR002209

In 1955, Congressman Clair Engle expressed the same position:

> We do not want to get into a discussion of what the
> ultimate decision as to those rights should be, because
> it is not in the framework of the bill.

> \*      \*      \*

> We do not undertake to define them, and when we
> undertake to define those rights, we actually undertake
> to define the Indian and Eskimo problem in Alaska.  We
> want to leave that undecided, without prejudice and
> without adding to it.  We do not have to decide it, and
> we should not, in [this] legislation, try to decide
> it.[196]

The implementation of this position is found in section 4 of the
Statehood Act.   72 Stat. 339.   Section 4 contains three
interrelated provisions addressing Native claims.   It provides
first that by accepting Statehood, Alaska disclaims any right to
Native lands or other property:

> As a compact with the United States the State and its
> people do agree and declare that they forever disclaim
> . . . all right and title to . . . any lands or other
> property (including fishing rights), the right or title
> to which may be held by any Indians, Eskimos, or
> Aleuts, (hereinafter called natives) or is held by the
> United States in trust for such natives; that all such
> lands or other property (including fishing rights), the
> right or title to which may be held by said natives or
> is held by the United States in trust for said natives,
> shall be and remain under the absolute jurisdiction and
> control of the United States until disposed of under
> its authority, except to such extent as the Congress
> has prescribed or may hereafter prescribe, and except
> when held by individual natives in fee without
> restriction on alienation . . . .

---

Sess. 195-96 (1953).

[196]    Hawaii-Alaska Statehood:  Hearings Before the Committee on
Interior and Insular Affairs, House of Representatives on H.R.
2535 and H.R. 2536, Bills "To Enable the People of Hawaii and
Alaska Each to Form a Constitution and State Government and to be
Admitted into the Union on Equal Footing with the Original
States, and Related Bills H.R. 49, H.R. 185, H.R. 187, H.R. 248,
H.R. 511, H.R. 555, and H.R. 2531, 84th Cong. 1st Sess. 130
(1955).

71

AR002210

It also provides that land taken in trust by the United States
for Natives shall be free from state taxation:

> _And provided further_, That no taxes shall be imposed by
> said State upon any lands or other property now owned
> or hereinafter acquired by the United States or which,
> as hereinafter set forth, may belong to said natives,
> except to such extent as Congress has prescribed or may
> hereinafter prescribe, and except when held by
> individual natives in fee without restrictions on
> alienation.

However, the third provision makes clear that neither of the
other provisions is to be construed as recognizing Native land
claims:

> _Provided_, That nothing contained in this Act shall
> recognize, deny, enlarge, impair, or otherwise affect
> any claim against the United States, and any such claim
> shall be governed by the laws of the United States
> applicable thereto; and nothing in this act is intended
> or shall be construed as a finding, interpretation, or
> construction by the Congress that any law applicable
> thereto authorizes, establishes, or confirms the
> validity or invalidity of any such claim, and the
> determination of the applicability or effect of any law
> to any such claim shall be unaffected by anything in
> this Act . . . .

The House Committee Report stated that the section 4 disclaimer
applies to "any lands or other property (including fishing
rights), the right or title to which may be held by any Indians,
Eskimos, or Aleuts, or is held by the United States in trust for
them." The report stated that the purpose of the disclaimer was
to provide "that no attempt will be made to deal with the legal
merits of the indigenous rights but to leave the matter in status
quo for either future legislative action or judicial
determination." H.R. Rep. 624, 85th Cong., 1st Sess. 19 (1957).

In 1962, the Supreme Court held that, based on the legislative
history of the Statehood Act, section 4 was intended to "preserve
the status quo with respect to aboriginal and possessory Indian
claims, so that statehood should neither extinguish them nor
recognize them as compensable." _Kake v. Egan_, 369 U.S. 60, 65
(1962).

### 5. Move Toward Settlement

The 1958 passage of the Alaska Statehood Act, even though it
explicitly purported to preserve the status quo, set in motion
forces which finally brought the issue of Native land claims to a
head. Chief among these forces, at least initially, was the

AR002211

Native peoples' opposition to the State of Alaska's selection
under the Statehood Act of lands that the Native people clearly
regarded as being subject to their use, occupancy and claims of
right.[197]  The Statehood Act granted the State the right to
select and receive title to approximately 105 million of Alaska's
375 million acres, and conflicts between state selections and
specific Native claims began to arise almost as soon as the State
began to make its selections.  Spurred to action by the
threatened transfer of lands they regarded as their own, Native
villages and regional groups began to organize, and to more
actively assert their claims.  They filed administrative protests
against specific state selections with the Department of the
Interior, and also submitted broader claims to the geographic
areas as to which they claimed federal protection for their use
and occupancy.  Eventually these claims practically blanketed the
State.[198]

By the mid-1960's the issue of Native land rights had become a
serious obstacle to most land transfers, and to land-related
economic development.  In the face of Native protests Secretary
Udall in 1966 announced a moratorium pending congressional
settlement of Native land claims, applicable to all dispositions
of federal lands in Alaska, including the award to the State of
title to lands it had selected, as well as federal oil and gas
lease sales.[199]  The State responded by filing suit to overturn
the discretionary moratorium and to compel conveyance of
Statehood Act selections, but a trial court decision in the
State's favor was reversed in Alaska v. Udall, 420 F.2d 938 (9th
Cir. 1969), cert. denied, 397 U.S. 1076 (1970).  The Ninth
Circuit concluded its decision reversing and remanding the case
with the following observation:

---

[197]   Arnold, supra n. 14, at 100-03.

[198]   Alaska Natives and the Land, supra n. 17, at 537, placed the
total acreage claimed at about 340 million acres as of 1968, some
of which consisted of overlapping claims.  Arnold, supra n. 14,
at 119, cited a figure of 380 million acres (with the difference
presumably reflecting later additional claims), a total which
exceeds the entire area of the State (as a result of overlapping
or conflicting claims of neighboring groups).

[199]   Simasko, Alaska Land Problems, 10 National Institute for
Petroleum Landmen 333, 350-51 (SW Legal Foundation 1969).  No
official order was issued for the land freeze.  Instead,
Secretary Udall, utilizing his discretionary authority, ordered
the federal land offices in Alaska to discontinue the issuance of
oil and gas leases, patents under the Homestead Act or Small
Tract Act, processing of State of Alaska land selections, and
other dispositions.  The action was effective the third week of
October 1966.  Id.

AR002212

> In view of the pendency in Congress of proposed legis-
> lation which, if enacted, would probably resolve all or
> most of the issues involved in this complex litigation,
> the district court may, in the exercise of this discre-
> tion, hold the trial in abeyance for a reasonable
> period of time.

Id. at 940.  While that litigation was pending, Secretary Udall,
as one of his last acts in office, formalized the federal "land
freeze" with the issuance of Public Land Order 4582 on
January 17, 1969.[200]  In addition to obstructing selection of
land by the State and others, this freeze had the effect of
blocking issuance of a right-of-way for construction of the
Trans-Alaska Pipeline.  Anxious to move forward with the pipeline
oil companies joined the Natives and the State in calling for a
legislative resolution of the Alaska Native land claims
question.[201]

Meanwhile, as the early settlement bills were introduced,
beginning in 1967, and the House and Senate Committees on
Interior and Insular Affairs began to consider them, relevant
developments continued apace back in Alaska under existing
federal and state legislative authorities.  Two were particularly
noteworthy.  First, in anticipation of the possible repeal of the
Native Allotment Act, a flood of applications poured into the
Interior Department.[202]  Secondly, an increasing number of Native
villages organized as municipal governments under provisions of
state law.[203]

---

[200]   34 Fed. Reg. 1025 (1969).  The order was amended to postpone
the expiration of the period of withdrawal by PLO 4962, 35 Fed.
Reg. 18874 (1970) (signed by Acting Secretary Fred J. Russell),
and PLO 5081, 36 Fed. Reg. 12017 (1971) (signed by Secretary
Rogers C.B. Morton).

[201]   Arnold, supra n. 14, at 123.

[202]   Only 80 allotments were issued between 1906 and 1960.
Alaska Natives and the Land, supra n. 17, at 435.  By the time
ANCSA was passed on December 18, 1971, over 9,000 applications
had been submitted to the Department of the Interior.

[203]   1967 figures reported to Congress in Alaska Natives and the
Land, supra n. 17, at 47, indicated that 21 predominantly Native
places were organized under state law only, another 21 under both
state law and the IRA, 38 under the IRA only, and that 98
villages were "governed by councils without formal legal status."
According to state records, the number of villages incorporated
under state law basically doubled between 1968 and the time ANCSA
was passed on December 18, 1971, although the substantial
majority of villages were then, and roughly half today still

74

AR002213

As Alaska Natives organized to press their land claims during the 1960's, considerable thought was given to the best means of protecting Native lands.[204]  With the experience of the Tlingit and Haida claims litigation[205] fresh in their minds, Native leaders and others soon rejected the idea of depending on the courts to protect their lands.  Not only had the claims litigation taken a long time, but the compensation recovered was viewed as inadequate.[206]  Furthermore, Natives recognized the Court of Claims had no authority to grant legal title to Native lands.[207]  Thus, a comprehensive legislative solution became the preferred approach.

The developments leading up to enactment of ANCSA, just described in the most abbreviated fashion, comprise in fact a subject matter of sufficient complexity to justify book-length treatment. Indeed, several authors have undertaken such an effort, although each has understandably brought a different perspective and emphasis to the subject.[208]  But such a detailed consideration is beyond the scope of this discussion.  Instead, our further

---

remain, unincorporated under state law.

[204]   Arnold, supra n. 14, at 106, 114.

[205]   The original jurisdictional statute was enacted in 1935, 49 Stat. 388, but damages were not recovered until more than three decades later.  Tlingit & Haida Indians of Alaska v. United States, 177 F. Supp. 452, 147 Ct. Cl. 315 (Ct. Cl. 1959) (viability); 389 F.2d 778 (Ct. Cl. 1968) (damages).

[206]   See, e.g., Alaska Native Land Claims: Hearings on S. 2906 and Related Bills Before the Senate Committee on Interior and Insular Affairs, 90th Cong., 2d Sess. 345-46 (1968) (statement of John Borbridge, Jr., President of the Tlingit and Haida Central Council) (1968 hearings).

[207]   In fact, the first settlement bills proposed in 1967, H.R. 1964 and H.R. 11164, 90th Cong., 1st Sess., would have given the Court of Claims jurisdiction to award land title as well as money, but the 1968 bill developed by a state-sponsored task force with important Native input, as well as all subsequent proposals, abandoned the idea of a judicial solution as far too time-consuming.  Id. at 64-65, 79 (testimony of Willie Hensley).

[208]   See, e.g., Gallagher, Hugh, Etok: A Story of Eskimo Power (1974); Berry, Mary Clay, The Alaska Pipeline:  The Politics of Oil and Native Land Claims (1975); Groh, Clifford John, Oil, Money, Land, and Power:  The Passage of the Alaska Native Claims Settlement Act of 1971 (unpublished manuscript, in the collection of the BLM Alaska Resources Library, 1976); and Arnold, supra n. 14.

AR002214

discussion will emphasize primarily those selected aspects of the statute which have the greatest relevance to the subject of Native governmental powers.  In particular, clues to congressional intent will be sought by tracing the development of the congressional findings and declaration of policy, the provisions making corporations established under state law the post-settlement landholding entities, the legislative revocation of existing reservations, and the statutory provisions assuring a land base to state-incorporated municipal governments.

     B.    Alaska Native Claims Settlement Act

        1.    Overview

ANCSA as enacted was first and foremost an aboriginal land claims settlement.  ANCSA § 2(d), 43 U.S.C. § 1601(d).  After a century of postponing the question, or authorizing partial and incomplete solutions, Congress finally did its best to face and resolve the Alaska Native land claims issue in a single, comprehensive and conclusive legislative package.  The bare bones of the settlement transaction were straight forward enough.  The Act provided for extinguishment of all claims by Alaska Native groups based on aboriginal title.  ANCSA § 4, 43 U.S.C. § 1603.  In exchange, the Natives were granted full legal title to approximately 44 million acres of land intended to be located, by and large, near their Native villages.  ANCSA §§ 12, 14, 16, 19, 43 U.S.C. §§ 1611, 1613, 1615, 1618.  Additionally, Natives were to be paid cash compensation of $962.5 million for the extinguishment of all aboriginal land claims.  ANCSA §§ 6, 9, 43 U.S.C. §§ 1605, 1608.

Of course, the statutory settlement structure was far more complex than a simple swap of uncertain claims for land and money.  This statutory complexity is a reflection of the scope and difficulty of the task Congress confronted in accommodating in some fashion the needs and interests of a whole variety of groups.[209]  Section 2 set forth the congressional findings and a declaration of policy, portions of which will be considered in more detail below.  The most often cited subsection of that declaration amounted to a legislative description of some of the policy goals Congress was seeking to advance through enactment of ANCSA:

    [T]he settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting

---

[209]    Congressman Udall noted:  "[i]f we serve here another 20 years, I do not think we will ever deal with a more complicated piece of legislation."  117 Cong. Rec. 46786 (1971).

AR002215

> their rights and property, without establishing any
> permanent racially defined institutions, rights,
> privileges, or obligations, without creating a
> reservation system or lengthy wardship or trusteeship,
> and without adding to the categories of property and
> institutions enjoying special tax privileges or to the
> legislation establishing special relationships between
> the United States Government and the State of Alaska;

ANCSA § 2(b), 43 U.S.C. § 1601(b).

Section 3 provided definitions for key terms, including "Native
village":

> "Native village" means any tribe, band, clan, group,
> village, community or association in Alaska listed in
> sections 11 and 16 of this Act, or which meets the
> requirements of this Act, and which the Secretary
> determines was, on the 1970 census enumeration date (as
> shown by the census or other evidence satisfactory to
> the Secretary, who shall make findings of fact in each
> instance), composed of twenty-five or more Natives;

ANCSA § 3(d), 43 U.S.C. § 1602(d).

Native villages and regional organizations were in some respects
the true parties to the settlement, in that it was their
assertion of land claims that had helped to prompt the
settlement, and their locations which determined what lands would
be conveyed to Native Corporations under the statutory scheme.
However, the only active role assigned to the Native villages in
the implementation of ANCSA was to organize Village Corporations
as a prelude to receiving lands or benefits under the Act.   ANCSA
§ 8(a), 43 U.S.C. § 1607(a).

Provisions dealing with the organizational structure of the
settlement included section 5, 43 U.S.C. § 1604, establishing an
enrollment scheme, and sections 7, 8, and 14(h), 43 U.S.C. §§
1606, 1607 and 1613(h), providing for Native Regional, Village,
Urban and Group Corporations.   Twelve Regional Corporations, to
be formed pursuant to state law, were provided for in section 7
(along with the possibility, eventually realized, for the
creation of a 13th region), and the organization of Village
Corporations was required by section 8.   The roughly 200 villages
entitled to benefits under the Act were to be those which were
determined to be eligible under section 11(b), including the ten
villages automatically eligible under section 16.   43 U.S.C.
§§ 1610(b), 1615.   Native groups of less than 25 residents, and
Natives residing in four named urban centers were also authorized
to incorporate and receive benefits under the Act pursuant to
sections 14(h)(2) and (3).   43 U.S.C. § 1613(h)(2) and (3).

77

AR002216

Implications of this corporate structure will be more fully examined below.

The basic monetary aspects of the settlement were set forth in sections 6, 7, and 9.  Section 6 established the Alaska Native Fund and provided for federal appropriations of $462.5 million to it over an 11 year period.  43 U.S.C. § 1605.  Section 7 specified the distribution scheme for this money.  43 U.S.C. § 1606.  This scheme involved varying payments to different categories of enrolled Native Regional Corporation shareholders, payments to Village Corporations for their corporate use and shareholder distributions, and retention of funds by individual Regional Corporations.  Section 7(i) contained a unique requirement for mandatory sharing among the Regional Corporations of revenues from timber resources and subsurface estate.  43 U.S.C. § 1606(i).  The other source of funds for payment into the Alaska Native Fund was established in section 9, which required the State and Federal governments to pay a 2% royalty and 2% of rentals and bonuses under leases and sales of minerals until the cumulative payments from such sources reached $500 million.  43 U.S.C. § 1608.

Other miscellaneous financial matters were addressed elsewhere in ANCSA, including provisions to deal with audits, attorney and consultant fees, and taxation, ANCSA §§ 7(o), 20, and 21, 43 U.S.C. §§ 1606(o), 1619, and 1620, but perhaps the most elaborate and important aspect of the Act was its treatment of land owner-ship issues.  Of the approximately 44 million acres granted to Alaska Natives, the surface estate in 22 million acres was to be divided among the Village Corporations for Native villages identified in section 11.  ANCSA §§ 12(a) and (b), 43 U.S.C. §§ 1611(a) and (b).[210]  Almost 16 million more acres of surface and subsurface estate were to be divided among the 12 Regional Corporations, according to a formula which in practice resulted in six of the twelve receiving the entire 16 million acres of surface and subsurface estate.  ANCSA § 12(c), 43 U.S.C. § 1611(c).[211]  All 12 Regional Corporations received the

_____

[210]   Each section 11 Village Corporation's total acreage entitlement depended on: (1) its enrolled population, which determined its total acreage entitlement by application of a sliding scale set forth in section 14(a), 43 U.S.C. § 1613(a), which ranged between 3 and 7 townships (69,120 to 161,280 acres); and (2) to a lesser extent, equitable allocation decisions made by its Regional Corporation in consideration of historic use, subsistence needs, and population of the villages within its Region.

[211]   Doyon, Ltd., received over half of the 16 million acres, and Arctic Slope Regional Corporation roughly a quarter, with the remainder divided among Cook Inlet Region, Inc., NANA Corp.,

AR002217

subsurface estate in lands conveyed to Village Corporations within their region.

For their land entitlement under ANCSA, the Village Corporations had to select the township or townships in which the village was located (the so-called "core townships"), plus additional contiguous acreage.  43 U.S.C. §§ 1611(a)(1)-(2).  The surface estate of the selected lands was to be patented in fee to these new Village Corporations, subject to valid existing rights.  Congress specifically decided not to transfer any of the benefits of the settlement under ANCSA to any traditional Native entities, including those previously organized under the IRA, even though the settlement extinguished all aboriginal land claims, including any aboriginal hunting and fishing rights. 43 U.S.C. § 1603. Instead, the benefits of the settlement went to the state-chartered Village Corporations, which were completely distinct legal entities from the traditional or federally-organized IRA village entities.  Even the traditional villages' core townships were patented to the new ANCSA corporate entities.[212]

Other provisions of the land settlement included the variety of special categories of conveyance entitlement established by section 14(h), including cemetery sites and historic places, Native Groups, Urban Corporations, primary places of residence, and allotments approved in the first four years following ANCSA's passage.  43 U.S.C. § 1613(h).  Two million acres were initially set aside to meet entitlements in those categories, with any unconveyed acreage eventually to be allocated to the Regional Corporations on the basis of population in accordance with section 14(h)(8).  Special provision was also made in section 16, 43 U.S.C. § 1615, for ten villages in Southeast Alaska, which were given reduced acreage entitlements, each amounting to a single township, in light of their already having been at least indirect recipients of the funds appropriated to satisfy the judgment awarded by the Court of Claims in Tlingit & Haida Indians of Alaska v. United States, 389 F.2d 778 (Ct. Cl. 1968).

Also relating to the subject of land were ANCSA sections 18 and 19, which respectively repealed the 1906 Native Allotment Act and revoked all but one of the reservations that had been established in the State by various means between 1891 and 1943.  43 U.S.C. §§ 1617 and 1618.  Under section 19, the Village Corporation formed by each village located within a revoked reserve had the option of taking full surface and subsurface title to its former reserve in lieu of the surface estate acreage to which it would

Ahtna, Inc., and Chugach Natives, Inc.  Arnold, supra n. 14, at 259.

[212]   See discussion of Alaska Native Townsite Act, infra nn. 237, 306, 307.

otherwise have been entitled.  43 U.S.C. § 1618.  The acreage transferred to the seven villages,[213] located on five reserves, that did elect to take title to their former reserves amounted to roughly 3.7 million acres, which were conveyed in lieu of land and cash under the otherwise applicable provisions of the statute.[214]

Another important aspect of ANCSA was creation of the statutory structure by which Congress sought to reconcile the Natives' land claims with those of other potential land claimants, both private and public.  This legislative reconciliation is expressed through three basic statutory mechanisms.  First, the conflicts between Native claims and the State of Alaska's land selection rights under the Statehood Act were resolved both as to location and priority.  Under ANCSA, neither Village nor Regional Corporations were given as much freedom as the State enjoyed to select public domain land anywhere in the State on the basis of its economic value or other criteria, without regard to its location.  Instead, the areas available for Native Corporation selections were limited to those locations withdrawn by Congress or the Secretary.  ANCSA §§ 11(a), 16(a), 43 U.S.C. §§ 1610(a), 1615(a).  Each Village Corporation, however, was entitled to select up to 69,120 acres of land within its withdrawal area which had been previously selected by, but not yet patented to, the State.  ANCSA §§ 11(a)(2), 12(a), 43 U.S.C. §§ 1610(a)(2), 1611(a).

A second major accommodation of third party interests in land incorporated into ANCSA was that represented by the reconveyance obligations imposed on Village Corporations pursuant to section 14(c).  43 U.S.C. § 1613(c).  This section established the rights of Native and non-Native residents, business operators, subsistence campsite users, reindeer herders, nonprofit corporations, Municipal Corporations, and the government agencies operating airports to receive reconveyance of lands which they

---

[213]   The seven were Venetie, Arctic Village, Tetlin, Gamble, Savoonga, Elim and Klukwan.  In Klukwan's case, a subsequent amendment to ANCSA allowed the Village Corporation to belatedly select land under § 16, and thereby in effect side-stepped an original election made by Klukwan under § 19.  See § 9 of the Act of January 2, 1976, Pub. L. No. 94-204, adding subsection (d) to 43 U.S.C. § 1615; and § 1 of the Act of October 4, 1976, Pub. L. No. 94-456, amending the newly-added subsection 16(d).

[214]   A special appropriation of $100,000 to each of the corporations which opted out of the cash portion of the claims settlement by their election to take full surface and subsurface title to their former reservations under ANCSA § 19 was subsequently enacted as § 14 of the Act of January 2, 1976, Pub. L. No. 94-204, 89 Stat. 1154.

AR002219

actually occupied.  Section 14(c)(3) entitled a Municipal
Corporation to a reconveyance of title to improved lands,
appropriate rights-of-way, and lands for community expansion and
other foreseeable community uses.  43 U.S.C. § 1613(c)(3).

Finally, provisions such as ANCSA sections 14(g) and 22(b) and
(c) were inserted in the Act to assure that the Native
Corporations' selections would not be construed to invalidate
prior claims validly initiated under other laws.  43 U.S.C.
§§ 1613(g) and 1621(b) and (c).  Among these were over 9000
Native allotment applications filed prior to ANCSA's passage.
ANCSA § 18, 43 U.S.C. § 1617.

ANCSA also provided for submission of a number of reports.
Section 2(c) required the Secretary of the Interior to prepare
and submit to Congress within 3 years a study of all federal
programs designed to benefit Alaska Natives.  43 U.S.C.
§ 1601(c).  Section 23 called for the Secretary to submit annual
reports on the implementation of the Act through 1984 to be
culminated in 1985 with a report on the status of the Natives and
Native groups in Alaska, and a summary of actions taken under the
Act.  43 U.S.C. § 1622.  In addition, sections 7(o) and 8(c)
required annual audit reports from the Native Village and
Regional Corporations. 43 U.S.C. §§ 1606(o) and 1607(c).


            2.   Key Provisions

                 a.   Use of Newly-Created Corporate Entities
                      as the Vehicles for Implementing the
                      Settlement

One of ANCSA's most significant departures from the government's
past practice in resolving Indian or Native land claims was the
choice made to deliver compensation and land title to corporate
entities organized under state law, rather than directly to, or
in trust for the benefit of, traditional tribal groups.  Sections
7(d) and 8(a) required the incorporation of Regional and Village
Corporations, and sections 14(h)(2) and (3) allowed for

81

AR002220

incorporation of Native Groups[215] and of Urban Corporations for Native residents of four named cities,[216] all for the purpose of receiving the land title and other benefits to be conveyed under the Act.

ANCSA as enacted was the result of a substantial rewrite by the members of the Conference Committee. As they explained in their Joint Statement:

> The language agreed upon by the managers is the result of long and careful consideration of the House passed bill and the Senate's amendment in the nature of a substitute to the House passed bill. The House bill and the Senate amendment were in major respects substantially different and the conference report -- the compromise between the two measures -- is in some respects different from the measures passed by the House and the Senate. The conference report is the final product of nine days of meetings by the conference committee since November 30, 1971.
>
> \*    \*    \*
>
> The conference report reflects a willingness on the part of the individual conferees after careful study of the issues involved to concur in the clear necessity for adoption of a settlement package, while reserving the right of all Members of Congress to debate further, at another time and in connection with other legislation, their individual views on some of the specific policies which are of necessity incorporated in this complex omnibus settlement.

S. Conf. Rep. No. 581, 92d Cong., 1st Sess. 34 (1971) (emphasis in original).

_____

[215]   A Native Group is "any tribe, band, clan, village, community, or village association of Natives in Alaska composed of less than twenty-five Natives, who comprise a majority of the residents of the locality." ANCSA § 2(d), 43 U.S.C. § 1602(d).

[216]   In contrast to Regional and Village Corporations which were entitled to direct and indirect distributions of cash from the Alaska Native Fund pursuant to §§ 6 and 7(j)-(m), only land conveyances to the Native Groups and the named Urban Corporations were originally authorized. Special one time cash grants to the §§ 14(h)(2) and 14(h)(3) entities were later authorized by amendment. Pub. L. No. 96-487, § 1413, 94 Stat. 2498 and Pub. L. No. 94-204, § 14(a), 89 Stat. 1154.

82

AR002221

In particular, the final congressional decision to confer the
land and other benefits of the settlement exclusively on state-
chartered corporations was the result of a compromise between the
approaches in the Senate and House passed bills:

> The Conferees retained the provisions of the House bill
> providing for twelve Regional Corporations and a
> Village Corporation for each Native Village, but made
> one addition and one modification.  The addition is the
> option of the Natives who are not permanent residents
> of Alaska to organize a 13th Regional Corporation which
> will receive and administer their share of the
> $962,500,000 grant.  The modification is the restric-
> tion of membership in the Village Corporations to
> Natives, rather than all residents.

Id. at 39 (emphasis added).

The above report language in a sense understates the difference
between the House and Senate bills.  Section 12 of the House-
passed bill, H.R. 10367, called for conveyance of lands and other
benefits to "any native village . . . which is an incorporated
native village," and section 3(h) defined "incorporated native
village" as one "incorporated as a governmental unit under the
laws of the State of Alaska."  Thus, under the House version, the
Village Corporations would have been multi-racial institutions
from the day of their formation.  In contrast, section 15 of S.
35, the more complex Senate bill, provided for conveyance of
lands to Village Corporations, defined in section 3(o) as
"organized under the laws of the State of Alaska to hold, invest,
manage and distribute lands, property, funds, and other rights
and assets for and on behalf of a Native Village."  That ANCSA as
enacted adopts the Senate's approach is confirmed by the
Conference Report, which explains that section 8, 43 U.S.C.
§ 1607, of ANCSA:

> [W]as drawn from section 11 of the Senate amendment.
> The House bill provided for land and revenue grants to
> units of municipal government, or to Village
> Corporations.  Under the conference report, before any
> lands may be granted an eligible village must organize
> as a non-profit or business for profit corporation to
> hold title to lands.

Id. at 42.

Over the five year period that settlement bills were before the
Congress, a number of different organizational entities or
institutions had been proposed as vehicles for the settlement,
but the corporate model utilized in the final enactment came
under consideration fairly early in the legislative process, and
eventually prevailed.  The earliest bills would have allowed a

AR002222

very broad and inclusive range of organizational entities to assert claims, or receive title.[217] The original 1967 administration bills[218] provided for the grant "to each tribe, band, clan, village, community or group of natives in Alaska" of title to its village site and other lands used and occupied by the group, with group membership to be determined by the Secretary. The Natives' bills[219] authorized claims by "any tribe, band, village, community, association or other identifiable group of Indians, Aleuts or Eskimos of Alaska, resident in Alaska, including identifiable groups of residents of a locality." Both these original formulations were certainly inclusive enough to allow for granting land title directly to IRA and traditional village councils, and few would question the proposition that Congress could have made such governmental entities the vehicle for the settlement. In ANCSA, Congress did not choose to do so.

Instead, beginning with the various bills introduced in 1968, conferring the benefits of the settlement on some sort of incorporated entity was a common theme.[220] It appears to have been a consensus point reached by a Governor's Task Force formed in late 1967, which included substantial Native representation.[221] The bill developed by the Task Force, S. 2906, 90th Cong., 1st Sess., was one of the first to include the corporate concept. Both reports and witness testimony offered to the Senate Committee on Interior and Insular Affairs in a February 1968 hearing reflected a basic endorsement of such an approach.[222] A draft of the Task Force Commentary explained the new approach as follows:

---

[217]   Section 1(c) of S. 2690, 90th Cong., 1st Sess., for example, defined a claimant as "any tribe, band, village, community, association, or other identifiable group of Indians, Aleuts, or Eskimos of Alaska, resident in Alaska, including identifiable groups of residents of a locality." Section 3(a) of S. 1964, 90th Cong., 1st Sess., contains similar language.

[218]   The identification of S. 1964 and S. 3586 as administration bills comes from the "Comparative Analysis of Land Claims Settlement Proposals" prepared by the Federal Field Committee as a supplement to Alaska Natives and the Land, supra n. 17, at 6.

[219]   This characterization of S. 2020 and S. 2690 is stated in Alaska Natives and the Land, supra n. 17, at 7.

[220]   Arnold, supra n.14, at 153.

[221]   Id. at 119-20.

[222]   See generally, 1968 Hearings, supra n. 206.

AR002223

The aim of this chapter is to establish a form of business corporation by which the native beneficiaries of the state and federal acts can engage in business enterprise under conditions of modern commercial and corporate law.

The basic model is the general business corporation contemplated by existing Alaska law, which in turn is based on the Model Business Corporation Act. A number of sections then alter this basic form so that certain safeguards are provided against the dissipation of native assets, and so that the benefits of the corporate assets, for several generations to come, will be made available only to proper native beneficiaries. There are also provisions whereby there can be distributions of assets to natives under conditions not normally encountered in an ordinary business corporation.

\*   \*   \*

The Task Force views this chapter as embodying the best current thought on how native businesses should be conducted. It would place these enterprises on a modern and businesslike footing, but would permit these corporations to serve native group needs adequately.[223]

Some insight as to the Natives' reasons for supporting such an approach can be gleaned from the testimony presented to the Senate Committee, which reflected a desire on the part of Native spokesmen for economic self-determination, and in particular to be freed from the heavy hand of BIA supervision of their economic activities.[224] By the time passage had become a realistic pros-

---

[223]   Task Force Commentary Draft of February 24, 1968, reprinted in 1968 Hearings, supra n. 206, at 109-10.

[224]   For example, Willie Hensley, chairman of both the Alaska Federation of Natives Land Claims Task Force, and the task force appointed by the Governor, reported the view of the Governor's Task Force that "the use of the corporate form would enable the village and regional groups to participate in the modern economy." Statement of William L. Hensley, reprinted in 1968 Hearings, supra n. 206, at 65. See also the remarks of Byron I. Mallott, then AFN Second Vice-President:

[T]he native people have arrived at the point where we can pick up the reins, as it were, and move forward and make these corporate provisions in Senate Bill 2906 work to the betterment of Alaska natives.

AR002224

pect, the concept that some sort of entity incorporated under
state law would be the settlement vehicle was a common feature of
all the bills.[225]    the intermediate stage, some bills provided
for village councils to exercise the villages' land selection
rights,[226] although title was then to be conveyed to corporate
entities, but by the final year of consideration both the House
and Senate versions that were taken to conference provided for

---

1968 Hearings, supra n. 206, at 52 and his prepared statement as
well:

> The corporate provisions of S. 20906 [sic] providing
> for the establishment of village, regional
> corporations, and a statewide corporation owned and
> or ated solely by, and for the betterment of Alaska's
> n.  /es-I submit will, if make reality, be one of the
> mc  t significant development stories in Alaska's
> history.  With this opportunity the natives will prove
> conclusively their worth as productive citizens both to
> the State of Alaska and to the Nation.  Freed of their
> own volition and by their accomplishments, from
> dependency upon the Government, the native of Alaska
> will be able to take his rightful place in this Nation
> and the Government will be freed from this haunting
> responsibility in a nation of plenty.

Id. at 55.

[225]    Some of the earlier bills allowed either incorporation under
the IRA or under state corporation law.  Section 11(a) of the
October 21, 1971 version of S. 35, 92d Congress, 1st Sess., the
primary bill developed by Senator Jackson's Interior Committee in
1971, provided for organization of villages as nonprofit
membership corporations under Alaska law.  ANCSA itself as
eventually passed, wound up allowing incorporation of a village
as either "a business for profit or nonprofit corporation," 43
U.S.C. § 1607(a).  None of the villages went the non-profit route
because they were advised that such an organizational form would
present corporate law obstacles to the distribution of dividends
to their members.  Arnold, supra n. 14, at 198.

[226]    Section 11 of the October 2, 1969 version of S. 1830, 91st
Cong., 1st Sess., for example, provided for exercise of selection
rights by a recognized village governing body, but § 12(b)
provided that lands could only be conveyed when "such village
organizes as a corporation, or otherwise qualifies to own real
property."

86

AR002225

entities incorporated under state law to both select and receive title to the lands to be conveyed.[227]

The corporate mechanism was fully consistent with relevant parts of the section 2(b) policy declaration, which stated that:

> [T]he settlement should be accomplished . . . in con-
> formity with the real economic and social needs of
> Natives, . . . with maximum participation by Natives in
> decisions affecting their rights and property, without
> establishing any permanent racially defined institu-
> tions, rights, privileges, or obligations, without
> creating a reservation system or lengthy wardship or
> trusteeship, and without adding to the categories of
> property and institutions enjoying special tax privi-
> leges . . . .

43 U.S.C. § 1601(b).

ANCSA's requirement that villages incorporate under state law thus reflects a rejection of both an immediate commitment to non-Native institutions, such as H.R. 10367 would have required, and a rejection of the idea of utilizing pre-existing Native institutions as the organizational vehicles for the settlement.

However, the approach adopted in ANCSA was clearly a transitional one.  The corporations, exclusively Native-owned at the time of their initial organization, were not required to remain so. Although corporate control was to be vested exclusively in Native shareholders for the first 20 years, section 7(h) of the original Act provided that voting stock would become freely alienable at the end of that period, and expiration of the original partial exemptions from state and local real property taxation after 20 years was also provided for in section 21(d).  43 U.S.C. § 1620(d).

### b.    Revocation of Reservations

A total of 23 reserves created between 1891 and 1943 were still in existence in 1971, two established by statute, six pursuant to the IRA, and the remainder by Executive Order.[228]  In total these

---

[227]    Section 11 of S. 35, 92d Cong., 1st Sess., dictated that non-profit membership corporations be organized under Alaska law; § 12 of H.R. 10367, 92d Cong., 1st Sess., required villages to incorporate as governmental units under state law.

[228]    Arnold, supra n. 14, at 106; Alaska Natives and the Land, supra n. 17, at 438 and 443-46; see generally Case, supra n. 50, at 83-129.

AR002226

reserves encompassed a little over four million acres, or
slightly more than one percent of the land in Alaska.

With one exception, section 19(a) of ANCSA revoked all of these
reserves:

> Notwithstanding any other provisions of law, and except
> where inconsistent with the provisions of this Act, the
> various reserves set aside by legislation or by
> Executive or Secretarial Order for Native use or for
> administration of Native affairs, including those
> created under the Act of May 31, 1898 (52 Stat. 593),
> are hereby revoked subject to any valid existing rights
> of non-Natives.  This section shall not apply to the
> Annette Island Reserve established by the Act of
> March 3, 1891 (26 Stat. 1101) and no person enrolled in
> the Metlakatla Indian community of the Annette Island
> Reserve shall be eligible for benefits under this Act.

43 U.S.C. § 1618(a).

ANCSA's legislative history confirms the evident statutory intent
that after enactment there was to be no reservation or trust
relationship between the United States and Alaska Native groups
with respect to ANCSA lands, such as exists between the
government and many Indian tribes in other states.  The Joint
Statement of the Conference Committee makes the point in
unmistakable terms that "lands granted to Natives under this Act
[are not to be] considered 'Indian reservation' lands for
purposes other than those specified in this Act.  The lands
granted by this Act are not 'in trust' and the Native villages
are not Indian 'reservations.'"  S. Conf. Rep. No. 581, 92nd
Cong., 1st Sess. 40 (1971).  The same point had been emphasized
in the final House Report:

> The [ANCSA] bill does not establish any trust rela-
> tionship between the Federal Government and the Na-
> tives.  The regional corporations and the village
> corporations will be organized under State law, and
> will not be subject to Federal supervision except to
> the limited extent specifically provided in the bill.
> All conveyances will be in fee -- not in trust.

H.R. Rep. No. 523, 92nd Cong., 1st Sess. 9 (1971).

There were no relevant differences between the Senate and House
bills on this crucial point.  As enacted, section 19 comes
primarily from the House-passed bill rather than the more complex
Senate version.  S. Conf. Rep. No. 581, supra.  But the House and
Senate bills and the final Conference Committee version all had
in common an unambiguous rejection of the reservation system or
any categories of trust or restricted land.

88

Like the decision to utilize corporations rather than village
entities as the vehicle for the land claims settlement, the
choice to do away with the reservation system was one proposed
and endorsed by the Native leadership relatively early on.  The
possibility of getting the executive branch to create more
reservations under authority of section 2 of the Alaska Amendment
to the IRA, 25 U.S.C. § 473a, had been considered and rejected by
the Native leadership as a possible alternative to settlement
legislation before the first land claims bill was even
introduced.[229]  Reservations were viewed with disfavor because
land held in trust by the United States could not be leased,
developed, or sold without government permission.[230]  The
reservation model was viewed by the Native leadership as
incompatible with maximum economic self-determination.

The Alaska Federation of Natives (AFN), from the time of its
inception in 1966, had as a primary goal the enactment of federal
legislation to protect Native land rights by some mechanism other
than by placing large tracts into trust status.  Towards that end
the original AFN-supported bill, introduced in 1967, would have
authorized the grant to the Natives of complete title to an
unspecified acreage.[231]  In contrast, the original bill endorsed
by the Department of Interior was criticized by Native spokesmen
because it called for the Federal Government to hold the land in
trust for the villages.[232]  Alaska Natives and the Land, the
October 1968 report prepared for the Congress by the Federal
Field Committee for Development Planning in Alaska, clearly
delineated these two approaches to management of lands and other
forms of compensation to be given to the Natives in exchange for
extinguishment of their more extensive land claims.[233]  The two
choices under consideration were the grant of assets in trust or
the direct transfer of assets to the beneficiary groups them-
selves.  As we have seen, the final decision was to reject the
trust model and, in the words of the ANCSA section 2(b)
declaration of policy, to settle the Natives' land claims
"without creating a reservation system or lengthy wardship or
trusteeship."

---

[229]   Arnold, *supra* n. 14, at 106.

[230]   *Id.* at 106.

[231]   Section 4(b) of S. 2690, 90th Cong., 1st Sess. (1967).  It
would also have given Native villages the option of receiving
land in trust status.

[232]   Section 3(e) of S. 1964, 90th Cong. 1st Sess. (1967).  See
Arnold, *supra* n. 14, at 119; *Alaska Natives and the Land*, *supra*
n. 17, at 532, 546.

[233]   *Alaska Natives and the Land*, *supra* n. 17, at 546.

89

AR002228

Tracing the development of the reservation revocation provision
of ANCSA down through the claims settlement bills introduced
before three successive Congresses reveals relatively little
relevant evolution.   The chief variations resolved by the final
enactment concerned the means of putting the villages located on
the revoked reserves on at least equal footing with the
substantial majority of other villages in terms of land and money
benefits to be received as a result of the settlement.   The final
legislative solution, of course, gave the newly formed Village
Corporations for villages on former reserves the option of
either: (1) taking fee title to both the surface and subsurface
estate of their former reserve, without sharing in the
distribution of cash from the Alaska Native Fund; or else (2)
participating fully in the settlement scheme as if no reserve had
ever been created for their village in the first place.   43
U.S.C. § 1618(b).

### c.   Encouragement of Local Government Through State-Chartered Municipalities

One additional feature of the Settlement Act of particular
relevance to issues of Alaska Native governmental authority is
the provision which ultimately became section 14(c)(3), 43 U.S.C.
§ 1613(c)(3).   That section imposes an obligation on each Village
Corporation to reconvey certain acreage to a Municipal Corpora-
tion in the Native Village, or to the State of Alaska in trust
for any Municipal Corporation which might be organized in the
future.

The Conference Committee Report indicates that section 14(c)(3)
as enacted was drawn from S. 35, the Senate passed bill.   S.
Conf. Rep. No. 581, supra at 43.   No reconveyance to a state-
chartered municipality would have been necessary under H.R. 10367
as it passed the House, because section 12 of that bill would
have made the Municipal Corporations themselves the direct
recipients of the federal land conveyances to villages.   However,
the Conference Committee which crafted the final version of ANCSA
rejected the idea of making state-chartered municipal governments
the organizational recipients of the land claims settlement
precisely because the claims being extinguished were Native
claims, and municipalities could not be formed or maintained even
temporarily as exclusively Native institutions.[234]

In light of the nature of the surrounding reconveyance
provisions, section 14(c)(3) can be seen in context as part of
the general effort to protect or accommodate not only the land

---

[234]   Explaining the new provision requiring formation of Village
Corporations, the committee highlighted "the restriction of
membership in the Village Corporations to Natives, rather than
all residents."   S. Conf. Rep. No. 581, supra at 39.

AR002229

rights of Alaska Natives, but those of other users and claimants as well.[235]  Nonetheless, concern for the land ownership needs of local governments did differ to some degree from that expressed in regard to other land occupants granted reconveyance rights under section 14(c), in that municipal entitlements were not limited to land already in use.  Under section 14(c)(3), each state-chartered municipality, or the State in trust on its behalf, was also granted the right to "as much additional land as is necessary for community expansion . . . and other foreseeable community needs."  Satisfaction of this entitlement was enforced by a sizeable minimum acreage reconveyance requirement of 1280 acres, or two square miles.[236]

In the context of a settlement scheme granting exclusively Native-owned Village Corporations extensive surface estate, and mandating their selection of core townships,[237] which comprised the land in and immediately surrounding each village, it is unsurprising that such protections would be provided for local government.  Indeed, even though ANCSA section 14(c)(3), 43 U.S.C. § 1613(c)(3), only appeared in its final form as part of the conference committee rewrite on the eve of passage, its provisions were basically consistent with the declared legislative purposes that the settlement be accomplished "without establishing any permanent racially defined institutions."  43 U.S.C. § 1601(b).

---

[235]    Section 14(c) also required the Village Corporation to convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied as of December 18, 1971, as a primary place of residence or business, or as a subsistence campsite, or as a headquarters for reindeer husbandry.  43 U.S.C. § 1613(c)(1).  Nonprofit organizations also had certain rights to a reconveyance from the Village Corporation of the surface estate in any tract they occupied on December 18, 1971.  43 U.S.C. § 1613(c)(2).

[236]    The mandatory 1280 acre reconveyance requirement was later amended by § 1405 of ANILCA to permit a lesser quantity of land to be transferred if the Village Corporation and the Municipal Corporation or the State in trust could agree in writing on such an acreage reduction.  Pub. L. No. 96-487, § 1405, 94 Stat. 2494.

[237]    The actual land tenure situation in improved Village sites of roughly one-half of the Native Villages was complicated by withdrawals and conveyances for federal townsites under the Acts of March 3, 1891, 26 Stat. 1099, and May 25, 1926, 44 Stat. 629, formerly codified at 43 U.S.C. §§ 732-736, repealed with a savings clause by §§ 701 and 703 of the Federal Land Policy Management Act (FLPMA) of October 21, 1976, 90 Stat. 2744, 2789-90.  The existence and effect of the townsites established under those authorities was not addressed in ANCSA.

91

Moreover, the concern for municipal government interests reflected in ANCSA section 14(c)(3) is also fully consistent with the congressionally declared policy that:

> [N]o provision of this Act shall replace or diminish any right, privilege, or obligation of Natives as citizens of the United States or of Alaska, or relieve, replace, or diminish any obligation of the United States or of the State or [sic] Alaska to protect and promote the rights or welfare of Natives as citizens of the United States or of Alaska.

43 U.S.C. § 1601(c)(3).

Clearly, municipal government is a major institution by which the State of Alaska protects and promotes the rights and welfare of Natives <u>as citizens of Alaska</u>, and just as clearly, Congress took pains in ANCSA section 14(c)(3) to avoid diminishing the effectiveness of that institution.

Further indication of congressional support for State-chartered municipal government is found in the explicit <u>provisos</u> in ANCSA Section 21(d):

> <u>Provided</u>, that municipal taxes, local real property taxes, or local assessments may be imposed upon leased or developed real property within the jurisdiction of any governmental unit under the laws of the State: <u>Provided further</u>, That easements, rights-of-way, leaseholds, and similar interests in such real property may be taxed in accordance with State or local law.

43 U.S.C. § 1620(d).

Clearly, Congress took care in ANCSA to accommodate the interests of State-chartered local governments, which it must surely have recognized as local governments of and for Native people, as well as others, in the Native communities dealt with as Native Villages under ANCSA.

            d.    Amendments

                  i.    Numerous Technical Adjustments to a
                        Novel and Complex Statute

In the twenty-one years since the December 18, 1971, passage of ANCSA, there has been extensive litigation over its

92

provisions,[238] and Congress has also enacted myriad technical
amendments.  In general, these amendments have dealt with
specific problems encountered by the Natives, the State or the
Department of the Interior as they worked to implement the
original statutory scheme.  By and large the amendments proposed
and enacted were the product of the continuing oversight role
Congress assumed due to the novel and complex approach that was
adopted in ANCSA to deal with the settlement of the Alaska
Natives' land claims.

Many amendments dealt with land selection and entitlement
questions arising out of a wide variety of unique circumstances
encountered by particular Native Corporations.  General
considerations of equity and practicality, along with other case-
by-case factors, have led the Congress to enact amendments
affecting the situations of specific Native Corporations on
frequent occasions.[239]  While some of these provisions absorbed a
good deal of legislative attention, none fundamentally altered
the overall settlement scheme in any relevant way.  No
reservations were re-established, and none of the benefits of the

_____

[238]    See, e.g., Sealaska Corporation v. Roberts, 428 F. Supp.
1254 (D. Alaska 1977) (§ 5, enrollment); Alaska Public Easement
Defense Fund v. Andrus, 435 F. Supp. 664 (D. Alaska 1977)
(§ 17(b), location, nature and extent of public easements
reserved across ANCSA conveyances); United States v. Atlantic
Richfield Co., 435 F. Supp. 1009 (D. Alaska 1977), aff'd, 612
F.2d 1132 (9th Cir.), cert. denied, 449 U.S. 888 (1980) (§ 4,
extinguishment of aboriginal claims); Chugach Natives, Inc. v.
Doyon, Ltd., 588 F.2d 723 (9th Cir. 1978) (§ 7(i), revenue
sharing among corporations; surface-subsurface estate
distinction).  Indeed, Congress has on more than one occasion
cited the extraordinary cost and burden of such litigation, and
the delays in implementing the Act to which it contributed, in
explaining the need for subsequent amendments.  See, e.g., § 2(3)
of the 1991 Amendments, Pub. L. No. 100-241, 101 Stat. 1788
("frequent and costly litigation ha[s] delayed implementation of
the settlement and diminished its value"); S. Rep. No. 201, 100th
Cong., 1st Sess. 20, ("the inordinate and prohibitively expensive
amount of litigation engendered by the settlement"); S. Rep. No.
413, 96th Cong., 2d Sess. 237 ("Because there have been
unanticipated delays in the conveyance of lands to Native
Corporations, the 20-year tax moratorium originally proposed by
Congress on undeveloped lands has become much less meaningful.").

[239]    See, e.g., §§ 9, 10, 11, 12, 14, 15 and 16 of Pub. L. No.
94-204, 89 Stat. 1145; §§ 1 and 3-5 of Pub. L. No. 94-456, 90
Stat. 1934; § 2 and 3 of Pub. L. No. 95-178, 91 Stat. 1369; §§ 1
and 2 of Pub. L. No. 96-55, 94 Stat. 947; §§ 1415-1436, Pub. L.
No. 96-487, 94 Stat. 2371; and §§ 13, 15 and 17-21, Pub. L. No.
102-415, 106 Stat. 2112.

AR002232

settlement were redirected specifically to Native villages as villages.

Congress also enacted a variety of amendments of more general applicability, either to clarify ambiguous provisions of ANCSA, or to respond to unanticipated problems encountered during the implementation process. Issues dealt with by amendments included enrollment,[240] securities law,[241] the cash settlement,[242] and taxation,[243] among others. As already noted with respect to the special provisions affecting only a single Native Corporation, none of these provisions of more general applicability evince any purpose to alter the fundamental scheme established by the Congress in the original 1971 Settlement Act. If anything, Congress took pains to avoid any contrary interpretation. For example, in a section relating to the status of funds in the Alaska Native Fund, the following proviso was included:

> Provided, That nothing in this section shall be con-
> strued to create or terminate any trust relationship
> between the United States and any corporation or indi-

---

[240]   Section 1 of Pub. L. No. 94-204 established a second enrollment period for those who had missed the deadline in 43 U.S.C. § 1604, with the proviso that new enrollments would not affect the allocation of benefits among corporations. 89 Stat. 1145.

[241]   Section 3 of Pub. L. No. 94-204, which added a new section to ANCSA, codified at 43 U.S.C. § 1625, temporarily exempting ANCSA corporations from certain federal securities laws, was further amended by section 14 of the 1991 Amendments, 101 Stat. 1811. Section 6 of Pub. L. No. 94-204 added a provision codified at 43 U.S.C. § 1627, governing Native Corporation mergers.

[242]   Pub. L. No. 93-153, 87 Stat. 591, accelerated receipt of funds by Native Corporations "in view of the delay in construction of the pipeline," and amended ANCSA § 9 to adjust for the change.

[243]   Section 541 of Pub. L. No. 95-600, 94 Stat. 2887, added several new subsections to ANCSA § 21, specifying details relating to tax treatment of various types of corporate income and expenses. ANILCA §§ 904, 1407 and 1408, at 94 Stat. 2434 and 2495-2496 further amended tax-related provisions of ANCSA § 21, and § 12(b) of Pub. L. No. 100-241, 101 Stat. 1810 (the 1991 Amendments) further amended ANCSA §§ 21(a) and 21(j), relating to the tax treatment of Alaska Native Fund distributions and Native Corporation homesite programs.

94

AR002233

vidual entitled to receive benefits under the Settle-
ment Act.[244]

The two aspects of the original 1971 settlement scheme most
relevant to our analysis, which Congress has substantially
modified are: (1) the provisions relating to maintenance of
Native control of their corporations; and (2) the provisions
relating to protection of the Native land base created by ANCSA.

ii.   Stock Alienability Provisions Modified
to Allow Preservation of Native Control

Under sections 7(h) and 8(c) of the original Act, Native Regional
and Village Corporation stock, initially issued only to enrolled
Natives was, subject to certain limited exceptions, inalienable.
43 U.S.C. §§ 1606(h) and 1607(c).  Sale, pledge, execution,
assignment, or other transfer of the stock, other than upon
death, or pursuant to a court decree of separation, divorce or
child support, was prohibited.  In addition, any non-Native who
acquired stock by a permissible means did not also acquire the
voting rights which such stock would otherwise carry.  However,
under the terms of the original Act, and in keeping with the
stated objective of section 2(b) not to "establish . . . any
permanent racially defined institutions, rights, privileges, or
obligations," the restrictions on stock alienation and non-Native
voting were to expire on January 1, 1992.  43 U.S.C. § 1606.
This fact was a source of concern to Native corporations and
their shareholders alike.  There was a fear that with the poten-
tial loss of Native stock ownership, Natives were at risk of
indirectly losing control and ownership of corporate[245] lands and
resources viewed as crucial to both their economic advancement
and continued access to subsistence resources.

---

[244]   Pub. L. No. 94-204, § 5, 89 Stat. 1147-1148.  See also
substantially identical language included in § 2 of the same
statute, which established an escrow account for revenues re-
ceived by the Federal Government with respect to lands withdrawn
for selection  and conveyance to Native Corporations.  89 Stat.
1146.  Congress has also included analogous language in
amendments relating to the land entitlements of particular Native
Corporations.  See, e.g., Pub. L. No. 94-456, § 1, 90 Stat. 1934,
relating to Chilkat Indian Village, and ANILCA §§ 1430(f)(4), 94
Stat. 2532-33, relating to Chugach Natives, Incorporated.

[245]   Of course, Native Corporation lands had been subject to
voluntary and involuntary disposal from the day they were first
conveyed, without any restrictions, or requirements of federal
review or approval.  See further discussion in Part IV.C.2.d.i.,
infra.

95

AR002234

In response to this concern, Congress revisited the issue in 1980, and included amendments to the original scheme in section 1401 of the ANILCA.   Section 1401 amended section 7(b) of ANCSA to give Native Corporations significant new tools which they could use to defend against the perceived threat of loss of corporate control by Native shareholders.   Specifically, section 1401 authorized Native Corporations to amend their Articles of Incorporation prior to December 18, 1991, upon the affirmative vote of a majority of voting shares outstanding, to permanently preclude exercise of voting rights by stockholders who were neither Natives nor descendants of Natives.   It also allowed amendments to a corporation's Articles of Incorporation which would grant the corporation and a stockholder's immediate family a first right to purchase his stock prior to any form of voluntary or involuntary transfer.

However, the opportunity presented by section 1401 was not widely utilized in the years following its 1980 passage, and the question of preserving Native corporate control again became a focus of attention in connection with congressional consideration of the 1991 Amendments, which were ultimately enacted as the "Alaska Native Claims Settlement Act Amendments of 1987," Pub. L. No. 100-241, 101 Stat. 1788 (1991 Amendments).   Relevant portions of the congressional findings and declaration of policy, at section 2, provide as follows:

> (4) Natives have differing opinions as to whether the Native Corporation, as originally structured by the Alaska Native Claims Settlement Act, is well adapted to the reality of life in Native villages and to the continuation of traditional Native cultural values;

> (5) to ensure the continued success of the settlement and to guarantee Natives continued participation in decisions affecting their rights and property, the Alaska Native Claims Settlement Act must be amended to enable the shareholders of each Native Corporation to structure the further implementation of the settlement in light of their particular circumstances and needs;

> (6) among other things, the shareholders of each Native Corporation must be permitted to decide--
>> (A) when restrictions on alienation of stock issued as part of the settlement should be terminated, and
>> (B) whether Natives born after December 18, 1971, should participate in the settlement;

> (7) by granting the shareholders of each Native Corporation options to structure the further implementation of the settlement, Congress is not expressing an  inion on the manner in which such

96

AR002235

shareholders choose to balance individual rights and
communal rights.

43 U.S.C. § 1601 note.

A detailed review of the extensive substantive rewrite of the
stock-related provisions of ANCSA, enacted as sections 4 through
9 of the 1991 Amendments is not required, but it should be noted
that they are indeed essentially consistent with the above-quoted
declared statutory policy.  Section 4 of the 1991 Amendments
allows for the issuance of additional stock to Natives born after
ANCSA was passed, or over the age of 65, or eligible but not
enrolled pursuant to the enrollment provisions of ANCSA.   43
U.S.C. § 1606(g).   Section 5 creates another exception to the
restrictions on stock alienability to permit stockholders to make
inter vivos transfers to certain relatives, and section 6 extends
the amended provisions of ANCSA sections 7(g), (h) and (o) to
Village Corporations, Urban Corporations, and Group Corporations.
43 U.S.C. §§ 1606(g), 1607(c).

But the most salient change effected by the amendments was the
change in the duration of alienability restrictions on Native
Corporation stock.   Instead of merely permitting individual
Native Corporations to extend the alienability restrictions on
their own stock, as ANILCA section 1401 had done, section 8 of
the 1991 Amendments provided that such restrictions would auto-
matically continue indefinitely, unless and until a Native
Corporation might choose to act affirmatively to amend its
Articles of Incorporation to provide otherwise.[246]  Procedures
for consideration of amendments to Articles of Incorporation, and
special rules governing dissenter's rights were also set forth in
sections 7 and 9 of the 1991 Amendments.   43 U.S.C. §§ 1629b,
1629d.

Thus, the 1991 Amendments do in effect represent a reversal of
Congress' original plan for a scheduled expiration of the unique-
ly Native character of the corporations formed pursuant to ANCSA.
However, they do not disturb the original 1971 scheme under which
benefits of the land claims settlement devolved upon corporations
organized under state law, rather than Native governmental
entities.   The 1991 Amendments, for all the specialized rules and
corporate reorganization options they may prescribe or authorize,
do not alter the character of Native Corporations as non-govern-
mental business organizations.

---

[246]     43 U.S.C. §§ 1629c(a) and (b).  An exception to this so-
called "opt-out" procedure, which applied to most Native
Corporations under 43 U.S.C. § 1629c(b), was made for the Bristol
Bay and Aleut Regions and their Village Corporations.   43 U.S.C.
§ 1629c(d).

97

AR002236

### iii. Provisions for Protection of the Native Land Base

Under ANCSA, lands, including former reserves, were conveyed to Native Corporations and others in fee simple status, not in trust or restricted status.  The primary original limitation to this approach was the provision for a transitional 20-year moratorium on property taxation of undeveloped ANCSA lands.  ANCSA § 21(d), 43 U.S.C. § 1620(d).  As it did with the original temporary provisions relating to the corporate control issue, Congress has seen fit through a series of statutory amendments to broaden the scope and extend the period of applicability of special federal protections for Native Corporation land.

The first such amendment, relating to the original limited property tax moratorium, was section 904 of ANILCA, which merely altered the beginning date of the twenty-year tax exempt period from the December 18, 1971 date of passage of ANCSA, to a date twenty years after vesting of title or conveyance of the particular undeveloped parcel.  43 U.S.C. § 1620(d).  However, ANILCA also provided the opportunity for Native Corporations and other ANCSA land recipients to obtain a much more extensive package of protections for their fee lands.  The Alaska Land Bank provisions enacted as section 907 of ANILCA permitted a landowner to obtain additional immunities for its undeveloped lands by entering into a cooperative management agreement with federal or state land management agencies holding adjacent lands, subject to certain specified terms placing significant limitations on the landowners' use of covered lands for a period of ten years.  43 U.S.C. § 1636.  In exchange, said lands were to enjoy, in addition to a tax exemption, immunities from adverse possession, or judicial enforcement of judgments, so long as they were included in the Land Bank Program.  43 U.S.C. § 1636(c).

In practice, the ANILCA Land Bank Program proved difficult to implement, with only two agreements executed by 1987.[247]  As a result, Congress elected to provide a simpler mechanism for achieving the same ends in the 1991 Amendments.  Instead of requiring the negotiation and execution of a Land Bank Agreement to trigger the available protections, Congress broadened them somewhat[248] and made them automatically applicable to all

---

[247]   S. Rep. No. 201, 100th Cong., 1st Sess. 36 (1987).

[248]   Generally, the number of categories of possible creditors' rights from which undeveloped ANCSA lands are protected was increased to explicitly include bankruptcy and other insolvency laws, and involuntary corporate dissolutions.  A change in the wording of the tax exemption clause was also made.  Where the 1980 ANILCA version had protected against real property taxes and assessments by "the United States, the State, or any political

98

undeveloped ANCSA lands not leased or sold to third parties, with or without a Land Bank Agreement, and also without regard to whether they were reconveyed to a Settlement Trust.

Section 10 of the 1991 Amendments, authorizing a state-chartered Settlement Trust option, was enacted "[t]o accommodate the desire of certain Native Corporations to transfer a portion of their assets out of the corporate form."[249]  This Settlement Trust option simply permits an ANCSA corporation to convey assets, not including subsurface estate, to a trust established and administered in accordance with state law, "to promote the health, education, and welfare of its beneficiaries and preserve the heritage and culture of Natives."  43 U.S.C. § 1629e.  It does not provide additional <u>federal</u> statutory protections for ANCSA corporation assets, but does explicitly authorize the utilization of state trust law mechanisms to insulate transferred assets from most claims which might be asserted against the property of the transferor Native Corporation if still in the corporation's hands.

This Settlement Trust option was not included in the bill that originally passed the House in both 1986 and 1987.[250]  Instead, it was inserted in the Senate as a substitute for a provision, approved twice by the House, but dropped from the final bill, which would have authorized transfer of ANCSA Native Corporation assets to so-called "qualified transfer entities" (QTE's).  As a means of assuring preservation of Native land ownership, section 7 of the House-passed bills[251] authorized the Native Corporations to transfer some of their lands to QTE's without complying with those provisions of Alaska corporate law which require shareholder action when a corporation transfers all or substantially all of its assets, and which recognize dissenter's rights.  The idea was that the corporations could protect their assets by using this provision to transfer their land or some of it to an IRA or

_____

subdivision of the State," the clause in the 1991 Amendments provide for exemption from "real property taxes by any government entity."  43 U.S.C. § 1636(d)(1)(A)(ii).

[249]   ANCSA § 39(b), 43 U.S.C. § 1629e(b), added by § 10 of the 1991 Amendments, Pub. L. No. 100-241, 101 Stat. 1804-06.

[250]   S. Rep. No. 201, 100th Cong., 1st. Sess. 35 (1987).

[251]   H.R. 4162, 99th Cong., 2d Sess. (1986); H.R. 278, 100th Cong., 1st Sess. (1987).

AR002238

traditional Native village council possessing immunities under
general principles of Federal Indian law.[252]

During the hearings leading to the 1991 Amendments, a great deal
of the testimony was related to concerns over the possible
existence of Indian country in Alaska and the existence of
village governmental powers.[253]  Ultimately, Congress expressly
declined to address the issue.  The congressional findings and
declaration of policy section of the 1991 Amendments provided
that no provision shall:

> [C]onfer on, or deny to, any Native organization any
> degree of sovereign governmental authority over lands
> (including management, or regulation of the taking, of
> fish and wildlife) or persons in Alaska . . . .[254]

In commenting on this provision in the section-by-section
analysis of its report, the Senate Committee on Energy and
Natural Resources stated:

> Although this section is largely self-explanatory, the
> Committee is aware that there is a controversy in
> Alaska over the issue of Native sovereignty; i.e.,
> whether there are tribal entities in Alaska . . . that
> can exercise governmental authority over lands and
> individuals in Alaska. . . .
>
> The finding set forth in section 2(8)(C) of the
> Committee reported bill states and reiterates, that
> neither the amendments nor any action taken pursuant to
> the 1991 amendments affect the sovereignty controversy
> one way or the other.  It is the Committee's clear
> intent that this bill leave parties in the sovereignty
> issue, in exactly the same status as if the amendments
> were not enacted.
>
> This is an issue which should be left to the courts in
> interpreting applicable law and that these amendments

---

[252]    See _Alaska Native Claims Settlement Act:  Hearings Before
the House Interior and Insular Affairs Committee_, 99th Cong., 1st
Sess. 229, 264 (1985).  These QTE provisions resulted in
considerable debate over whether they would enhance the Natives'
argument that there was Indian country in Alaska, and enhance the
arguments for Native sovereignty contrary to Congress' desire to
remain neutral on the issue.  _See also, infra_ n. 293.

[253]    _Id._

[254]    Section 2(8)(B), 101 Stat. 1789; 43 U.S.C. § 1601 note.

100

AR002239

should play no substantive or procedural role in such court decisions.

S. Rep. No. 201, 100th Cong., 1st. Sess. 23 (1987).

Given the debate over the possible governmental powers of the villages which had occurred during the hearings, Congress left nothing to chance in case its findings and declaration of policy were not sufficiently clear.  In section 17 of the 1991 Amendments, Congress added a disclaimer to further emphasize its intended neutrality on the issue of Native village powers by providing in part that:

> (a) No provision of this Act (the Alaska Native Claims Settlement Act Amendments of 1987), exercise of author-ity pursuant to this Act, or change made by, or pursu-ant to, this Act in the status of land shall be con-strued to validate or invalidate or in any way affect--
>> (1)  any assertion that a Native organization (including a federally recognized tribe, traditional Native council, or Native council organized pursuant to the Act of June 18, 1934 (48 Stat. 987), as amended) has or does not have governmental authority over lands (including management of, or regulation of the taking of, fish and wildlife) or persons within the boundaries of the State of Alaska, or
>> (2)  any assertion that Indian country (as defined by 18 U.S.C. 1151 or any other au-thority) exists or does not exist within the boundaries of the State of Alaska.[255]

Pub. L. No. 101-241, § 17, 101 Stat. 1788, 1814, 43 U.S.C. § 1601 note.

    C. Analysis

Having set out the history and key provisions of ANCSA, we now turn to the question of the effect of the statutory scheme adopted in this novel statute on the governmental powers of Native villages.  We consider, first, whether ANCSA constituted a termination statute that forecloses the exercise of all governmental powers by Native villages.  We then consider the effect of ANCSA on village governmental jurisdiction over land and nonmembers.

        1.   ANCSA as Termination Legislation

---

[255]    See also S. Rep. No. 201, 100th Cong., 1st. Sess. 41 (1987).

AR002240

The unprecedented approach and structure of ANCSA has led some to characterize ANCSA as "termination" legislation that forecloses the exercise of governmental jurisdiction by Native villages.  In his concurring opinion in the Alaska Supreme Court's recent decision in <u>Nenana Fuel Co. v. Native Village of Venetie</u>, 834 P.2d 1229, 1234 (Alaska 1992), Justice Daniel Moore concludes that "Congress expressly pronounced in its 1971 enactment of ANCSA that no Native Alaska group other than the Metlakatla Indian community of the Annette Island Reserve may be entitled to sovereign tribal status." <u>Id.</u> at 1238.

To evaluate this view, it is appropriate to compare ANCSA with the termination legislation enacted during the so-called termination era of the 1950's and the 1960's.  This legislation involved a comprehensive and fundamental approach to ending the relationship between the United States and specific tribes.  The experience of this legislation was clearly fresh at the time ANCSA was considered.  The last termination act was passed in 1962, only five years before the first versions of ANCSA were introduced in Congress.  Terminations under previously enacted legislation occurred as late as 1970.  The first legislation restoring a terminated tribe was not enacted until 1973.[256]

a.    Termination Legislation

On August 1, 1953, Congress adopted House Concurrent Resolution 108, declaring as congressional policy the termination of federal control and supervision over Indian tribes and the freeing of tribes and their members "from all disabilities and limitations specially applicable to Indians." 67 Stat. B132.  Individual acts were then passed to implement this policy.[257]

The individual acts followed a fairly standard pattern.[258] Incident to termination, Congress typically provided for fundamental changes in land ownership, requiring sale of tribal land previously held in trust by the United States or transfer of the land to a private trust or state corporation.  The federal trust relationship was ended for most purposes. Tribes and their individual members were made subject to state jurisdiction for

---

[256]    1982 Cohen, <u>supra</u> n.8, at 811-18.  For a more detailed history and analysis of termination legislation, see C. Wilkinson & E. Biggs, <u>The Evolution of Termination Policy</u>, 5 Am. Indian L. Rev. 139 (1977).

[257]    Fourteen such termination statutes were enacted involving approximately 100 tribes, bands and California rancherias.  1982 Cohen, <u>supra</u> n. 8, at 811.

[258]    These standard provisions are summarized in 1982 Cohen, <u>supra</u> n. 8, at 812-13.

102

AR002241

most purposes.  Eligibility for special federal services for tribes and tribal members was ended.

Procedurally, termination statutes called for preparation of a final tribal roll and a termination plan to govern implementation of the termination.  After a vote of tribal members for the termination plan, the federal-tribal relationship was proclaimed ended by Secretarial proclamation.[259]

The following operative provisions of the Paiute Termination Act, which terminated four bands of Paiute Indians in Utah, are typical of 1950's termination statutes:

> Upon removal of Federal restrictions on the property of each tribe and individual members thereof, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated.  Thereafter individual members of the tribe shall not be entitled to any of the services performed for Indians because of their status as Indians, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

> \* \* \*

> Effective on the date of the proclamation provided for in [this Act], all powers of the Secretary or other officer of the United States to take, review or approve any action under the constitution and bylaws of the tribe are terminated.  Any powers conferred upon the tribe by such constitution which are inconsistent with the provisions of [this Act] are terminated. . . .

25 U.S.C. §§ 757, 758(b).

### b.   ANCSA

ANCSA does parallel termination statutes in significant respects. Because of Alaska's unique history, most of the land title affected by the statute was not held in trust.  However, as discussed above, all reservations (save the Annette Islands Reserve) were revoked and all aboriginal claims to land were extinguished.  The land provided to the Natives as part of the settlement was provided to Village and Regional Corporations

---

[259]   Id.

103

chartered under state law and subject to state jurisdiction for most purposes. Federal responsibility for and supervision of the corporations provided in ANCSA was minimal, indirect and of limited duration.

However, key elements of a 1950's termination statute were not included in ANCSA. ANCSA did not provide for a termination plan, a vote by members on termination, or a Secretarial proclamation of termination. Eligibility of Native groups and individual natives for federal services was not ended. The Secretary's authority over then-existing IRA entities was not ended and the Secretary's authority to issue new constitutions or charters under the IRA was not repealed.

c.  ANCSA Legislative History

The legislative history of ANCSA confirms that it cannot be regarded as a termination statute of the kind enacted in the 1950's. One of the bills considered in the 91st Congress, S. 1830, contained language proposing to terminate federal services to Alaska Natives, if not the entirety of the special Native-federal relationship. Section 4 of the bill provided in part:

> (b)(1)  The Secretary is authorized and directed, together with other appropriate agencies of the United States Government, promptly to initiate a study and to develop programs for the orderly transition of education, health, welfare, and other responsibilities for the Alaska Native people from the United States to the State of Alaska. Within five years from the date of enactment of this Act, the United States shall cease to provide services to any citizen of Alaska solely on the basis of his racial or ethnic background. . . .

116 Cong. Rec. 24408 (1970) (emphasis added).

When S. 1830 was considered on the Senate floor, Senator Harris offered an amendment to strike this provision. His amendment triggered debate over whether the bill was a termination act.[260] The debate came shortly after President Nixon's 1970 policy statement renouncing the policy of termination and calling for self-determination for all Indian people.[261] One side of the

---

[260]  116 Cong. Rec. 24216, 24220-27, 24234-35 and 24378-82 (1970).

[261]  President's Message to Congress Transmitting Recommendations for Indian Policy, 6 Weekly Comp. Pres. Doc. 894-905 (July 8, 1970); H.R. Doc. No. 363, 91st Cong., 2d Sess. (1970).

104

AR002243

Senate debate focused on whether this provision of the Act
rendered it a termination statute.  The other side of the debate
emphasized that the statute as a whole represented a new approach
to the Federal Government's relations with its Indian wards,
characterizing the bill as one which provided for
self-determination.  Toward the close of the floor debates on the
entire bill, Senator Allott stated:

> Therefore, the underlying concept of the bill is
> largely one of self-determination by the Natives, but
> beyond that, it also includes a type of termination of
> the Federal trustee obligation and assumption of part
> of those obligations by the State of Alaska.

116 Cong. Rec. 24404 (1970).  Senator Harris' amendment was
defeated and the language providing for the termination of
services remained in the bill as finally passed by the Senate.[262]

When settlement legislation was introduced by Senators Jackson,
Gravel and Stevens in the 92d Congress as S. 35, it again
contained the termination of services provision.[263]  However,
when S. 35 went to the Senate floor, it had been revised and the
provision for automatic termination of BIA services was no longer
included.  On November 1, 1971, addressing his colleagues on S.
35, Senator Harris stated that he had opposed the legislation the
year before because of the provision for termination of services,
that "that matter had been substantially altered" and that there
had been substantial improvement toward self-determination.  117
Cong. Rec. 38445 (1970).

Although ANCSA as enacted contained no provision for termination
of services, one provision related to the proposed termination
did remain.  In section 4(b)(1) of S. 1830 and the original S.
35, the automatic termination of services provision was linked to
a requirement that the Secretary in cooperation with other
agencies, study and develop programs for the orderly transition
of responsibility for the programs from the United States to the
State.  Section 2(c) of the statute as enacted carried forward
this thought.  It directs the Secretary, together with all other
appropriate agencies:

> to make a **study of all Federal programs** primarily
> designed to benefit Native people and to report back to

---

[262]   116 Cong. Rec. 24382 (1970).  Because no bill passed the
House of Representatives, the Senate-passed bill did not become
law.

[263]   **Alaska Native Land Claims: Hearings on S. 35 and S. 835
Before the Senate Comm. on Interior and Insular Affairs**, 92d
Cong., 1st Sess. 265-66 (1971).

AR002244

the Congress with his <u>recommendations for the future management and operation</u> of these programs within three years of the date of enactment of the Act.

43 U.S.C. § 1601(c) (emphasis added).  Thus, in the Act as finally passed, the Senate proposal for a study of programs to be followed by automatic termination of services had been replaced by a provision directing the Secretary to make a program study, to be followed by recommendations for "future management and operation" of programs for Natives.[264]

A report in response to section 2(c) was submitted in 1975.[265] However, the report was only a factual report.  It contained no recommendations.  No immediate congressional action was taken on the report.[266]  When Congress enacted the 1991 Amendments it included a provision explicitly calling for the continued provision of services.  43 U.S.C. § 1626(d).

        d.    Effect of ANCSA

---

[264]    The study of the status of Natives provided for in § 23 of ANCSA similarly can be viewed as presaging further congressional consideration of the relationship of the United States to Alaska Natives.  43 U.S.C. § 1622.

[265]    Secretary Morton by letter of April 22, 1975 submitted to Congress a four-volume report entitled <u>2(c) Report: Federal Programs and Alaska Natives</u>.

[266]    One instance in which Congress did later act specifically to discontinue a program for the benefit of Alaska Natives involved the BIA general assistance program, authorized by the Snyder Act, 25 U.S.C. § 13, and administered in the early 1980's under 25 C.F.R. § 20.21.  Congress first attempted to cut-off funds for the program in Alaska in committee report language associated with the FY 1982 Interior and Related Agencies Appropriations Act, Pub. L. No. 97-100, 95 Stat. 1399 (1981).  H.R. Rep. No. 315, 97th Cong., 1st Sess. 17 (1981).  This cut-off was enjoined in <u>Wilson v. Watt</u>, 703 F.2d 395 (9th Cir. 1983).  In bill language in the FY 1985 Interior and Related Agencies Appropriations Act, Congress terminated for that year the BIA general assistance program in Alaska.  Pub. L. No. 98-473, 98 Stat. 1848.  Identical provisions were included in the Interior Appropriations Acts for FY 1986 (Pub. L. No. 99-190, 99 Stat. 1235); FY 1987 (Pub. L. No. 99-591, 100 Stat. 3341-256); FY 1988 (Pub. L. No. 100-202, 101 Stat. 1329-228) and FY 1989 (Pub. L. No. 100-446, 102 Stat. 1794).  The provision was dropped in FY 1990, H.R. Rep. No. 120, 101st Cong., 1st Sess. 53-54 (1989); S. Rep. No. 85, 101st Cong., 1st Sess. 45 (1989) and BIA general assistance was reinstated in Alaska.

106

As we have discussed earlier,[267] the classic termination statutes
were held not to have terminated the tribal existence of the
tribes involved.   Court decisions also concluded that 1950's
termination legislation did not terminate tribal rights and
privileges not expressly addressed in the legislation, such as
the treaty hunting and fishing rights of the Menominee and
Klamath Tribes.[268]   Against this background, we cannot conclude
that ANCSA, which is a less complete address to the Federal-
Native-State relationship, can be construed as completely
extinguishing the sovereign powers of Native villages that are
tribes.   At a minimum, it is clear that ANCSA did not affect the
retained governmental powers of these tribes to determine
membership and to regulate internal tribal relations.[269]   They
may also exercise powers delegated to them by Congress, such as
authority under the Indian Child Welfare Act.   25 U.S.C.
§§ 1901-1963.[270]   However, ANCSA contains a very complete address
to the issue of land.   We now turn to consideration of the effect
of ANCSA on native village jurisdiction over land and nonmembers.

> 2.   Jurisdiction over Land and Nonmembers after ANCSA

Although we have concluded that ANCSA did not terminate the
politica⌐ government-to-government relationship between the
Federal Government and those entities that may qualify as tribes
in Alaska, ANCSA did reflect a new approach on an unprecedented
scale in defining the relationship between Alaska Natives and the
Federal Government.   Most significantly, the land and money
assets provided in exchange for the extinguishment of Native
claims were distributed not to the existing Native organizations,
but to entirely new, state-chartered corporate organizations.
With the exception of the Annette Islands Reserve for the
Metlakatla Indian Community, ANCSA revoked all Native
reservations in Alaska.   43 U.S.C. § 1618(a).   With only two
exceptions, even where there was an existing beneficial interest
in reservation lands, the interest in the land was conveyed to

---

[267]   Part III.B, supra.

[268]   Menominee Tribe of Indians v. United States, 391 U.S. 404
(1968); Kimball v. Callahan, 590 F.2d 768 (9th Cir.), cert.
denied, 444 U.S. 826 (1979) (Callahan II) (Klamath Tribe).   See
also, United States v. Felter, 752 F.2d 1505 (10th Cir. 1985)
(Mixed-Blood Utes).

[269]   See Native Village of Venetie I.R.A. Council v. Alaska, 944
F.2d 548 (9th Cir. 1991) (Venetie II).

[270]   See In re Matter of J.M. DOB 02/04/84, 718 P.2d 150 (Alaska
1986) (Kaltag Village Council vested with exclusive jurisdiction
as "tribal court" over matter of custody of Indian child).

AR002246

the newly state-chartered Native Corporations rather than
existing IRA or traditional Native village organizations.[271]

We must therefore consider whether the terms of this newly
defined relationship are such that the status of the Natives
under it has implications for the scope of their powers.  We
conclude that ANCSA largely controls in determining whether any
territory still exists over which Alaska villages might exercise
governmental powers.  We also conclude that, notwithstanding the
potential that Indian country still exists in Alaska in certain
limited cases, Congress has left little or no room for tribes in
Alaska to exercise governmental authority over land or
nonmembers.

We begin our examination by discussing the general principles of
Indian law that form the backdrop for our specific inquiry into
the effect of ANCSA on Native village powers in Alaska.

        a.     The Territorial Component of Tribal Powers
             Generally

The Supreme Court has recognized that "there is a significant
territorial component to tribal power."  Merrion v. Jicarilla
Apache Tribe, 455 U.S. 130, 142 (1982); see White Mountain Apache
Tribe v. Bracker, 448 U.S. 136, 142 (1980) (Indian tribes retain
attributes of sovereignty over both their members and their
territory).  Generally speaking, the Court has relied upon the
concept of "Indian country" to define those territorial
boundaries.  Indian tribes are "invested with the right of self-
government and jurisdiction over the persons and property within
the limits of the territory they occupy, except so far as that
jurisdiction has been restrained and abridged by treaty or act of
Congress."  Merrion, 455 U.S. at 140 (quoting 1879 Senate
Judiciary Committee report).  Within the limitations that
Congress has imposed, "Indian tribes within 'Indian country'
. . . possess[] attributes of sovereignty over both their members
and their territory."  Merrion, 455 U.S. at 140 (quoting United
States v. Mazurie, 419 U.S. 544, 557 (1975)).

---

[271]    Because ANCSA did not revoke the Annette Islands Reserve,
the Metlakatla Indian Community's beneficial title interest
remained unchanged.  Although ANCSA did revoke the reservation
for the Natives of the Village of Klukwan, the reservation lands
were not conveyed to the ANCSA corporation for the Village of
Klukwan.  Instead, Klukwan became a special case during ANCSA's
implementation when Congress amended § 16 of ANCSA in 1976 by
adding § 16(d), 43 U.S.C. § 1615(d).  As a result, the IRA-
chartered "Chilkat Indian Village," organized in 1941 by the
Natives of Klukwan, ended up holding fee title to the 897.4 acres
of its prior statutory reservation.

AR002247

In order to address the question of "the nature and scope of so-called governmental powers over lands and non-members that a Native village can exercise after ANCSA,"[272] we examine whether, after ANCSA, there is any Indian country in the State of Alaska, and if so, whether Congress has imposed limitations on the sovereign authority of whatever tribes may exist in the State to exercise tribal powers within that Indian country.

In <u>Indian Country, U.S.A. v. Oklahoma Tax Comm'n</u>, 829 F.2d 967 (10th Cir. 1987), <u>cert. denied</u>, 478 U.S. 1218 (1988), the court summarized the significance of determining whether lands are Indian country:

> Although [18 U.S.C.] section 1151 by its terms defines Indian country for purposes of determining federal criminal jurisdiction, the classification <u>generally</u> applies to questions of both civil and criminal jurisdiction. . . . Numerous cases confirm the principle that the Indian country classification is the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands. . . . We note that the Supreme Court of Oklahoma has also recognized the importance of this classification:
>
> > The touchstone for allocating authority among the various governments has been the concept of "Indian Country," a legal term delineating the territorial boundaries of federal, state and tribal jurisdiction. Historically, the conduct of Indians and interests in Indian property within Indian Country have been matters of federal and tribal concern. Outside Indian Country, state jurisdiction has obtained.

<u>Indian Country, U.S.A. v. Oklahoma Tax Comm'n</u>, 829 F.2d at 973 (emphasis added) (quoting <u>Ahboah v. Housing Auth. of the Kiowa Tribe</u>, 660 P.2d 625, 627 (Okla. 1983)) (other citations omitted); <u>see</u> <u>DeCoteau v. District County Court</u>, 420 U.S. 425, 427 n.2 (1975); <u>California v. Cabazon Band of Mission Indians</u>, 480 U.S. 202, 207 n.5 (1987); <u>see also</u> <u>Alaska v. Native Village of Venetie</u>, 856 F.2d 1384, 1390 (9th Cir. 1988) (<u>Venetie I</u>).

In general, lands not falling within the classification of Indian country are subject to state jurisdiction. Tribes and tribal members going outside the boundaries of Indian country generally are subject to state jurisdiction, though such state jurisdiction may still be limited. <u>See</u> <u>Mescalero Apache Tribe v. Jones</u>, 411 U.S. 147, 148-49 (1973) (off-reservation tribal activity: state

---

[272]   See <u>supra</u> p. 1.

AR002248

could impose gross receipts tax on tribal enterprise, but state
could not impose compensating use tax on tribal property).
Within Indian country, the Federal Government and tribes
generally have primary authority.[273]

Once the threshold determination is made whether the particular
lands involved are properly classified as Indian country, the
analysis must proceed from the above-stated general principles
concerning tribal, federal, and state jurisdiction to the
specific facts and law applicable to the particular situation to
determine whether Congress has acted to alter the general
principles.  For example, in Public Law 280, Congress granted to
certain states the authority to exercise broad criminal and
limited civil jurisdiction over Indians within Indian country.
Bryan v. Itasca County, 426 U.S. 373 (1976); California v.
Cabazon Band of Mission Indians, 480 U.S. 202 (1987).  In 1958,
Congress extended Public Law 280 to Alaska.  Act of Aug. 8, 1958,
Pub. L. No. 85-615, 72 Stat. 545 (codified as amended at 18
U.S.C. § 1162; 28 U.S.C. § 1360).[274]

                b.    Indian Country and Alaska

Having discussed the general relevance of the concept, we now
turn to the language of the statute.  In 1948, Congress defined
"Indian country" as follows:

---

[273]    For cases il  strating some of these jurisdictional
principles in the   Aaska context, compare the companion cases of
Metlakatla Indian Community v. Egan, 369 U.S. 45 (1962)
(upholding the Federal Government's authority to permit state-
prohibited fish traps within the boundaries of the Annette
Islands Reserve) and Organized Village of Kake v. Egan, 369 U.S.
60 (1962) (upholding the application of state fish trap laws to
off-reservation Indian fishing).

[274]    Other examples illustrating that state law is not always
excluded from Indian country include Cotton Petroleum Corp. v.
New Mexico, 490 U.S. 163 (1989) (permitting state taxation of
nonmember lessee) and County of Yakima v. Yakima Indian Nation,
112 S. Ct. 638 (1992) (permitting state taxation of certain
Indian fee lands).  Conversely, tribal jurisdiction within Indian
country is not absolute, and has been limited in certain
instances.  See, e.g., Montana v. United States, 450 U.S. 544
(1981) (tribe could not regulate nonmember hunting and fishing on
individual nonmember and state-owned lands); Brendale v.
Confederated Tribes and Bands of the Yakima Indian Nation, 492
U.S. 408 (1989) (tribe could zone certain nonmember fee lands on
the reservation, but lacked jurisdiction over other nonmember fee
lands).

                             110

AR002249

Except as otherwise provided in sections 1154 and 1156
of this title, the term "Indian country", as used in
this chapter, means (a) all land within the limits of
any Indian reservation under the jurisdiction of the
United States Government, notwithstanding the issuance
of any patent, and, including rights-of-way running
through the reservation, (b) all dependent Indian
communities within the borders of the United States
whether within the original or subsequently acquired
territory thereof, and whether within or without the
limits of a state, and (c) all Indian allotments, the
Indian titles to which have not been extinguished,
including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added).[275]

We will address in turn each of the three categories of Indian
country, and the relevance of each to Alaska.

c.    Reservations

The term "Indian reservation" generally refers to the territory
or specific lands that "Congress intended to reserve for a tribe
and over which Congress intended primary jurisdiction to rest in
the federal and tribal governments." Indian Country, U.S.A., 829
F.2d at 973.  Where formal reservation boundaries exist, all
lands within those boundaries are Indian country.  18 U.S.C.
§ 1151(a); see Seymour v. Superintendent, 368 U.S. 351 (1962).
However, no formal designation is required.  In the absence of a
formal reservation boundary, lands held in trust for the benefit
of a tribe qualify as Indian country because they have been
"validly set apart for the use of the Indians as such, under the
superintendence of the Government." Oklahoma Tax Comm'n v.
Citizen Band Potawatomi Indian Tribe of Oklahoma, 111 S. Ct. 905,
910 (1991); see United States v. John, 437 U.S. 634 (1978).  Even
when the boundaries of a reservation may have been
disestablished, lands remaining in Indian ownership, including
tribal fee lands, remain Indian country when there is no clear
evidence that Congress intended to divest such lands of their
Indian country status.  Indian Country, U.S.A., 829 F.2d at 973-
75 & n.3 (Creek tribal fee lands held to be Indian country).

In our view, it is beyond question that no reservations exist in
Alaska, with the single exception of the Annette Islands Reserve.
In section 19 of ANCSA, 43 U.S.C. § 1618, Congress expressly and

---

[275]    With the exception of a 1949 amendment, 63 Stat. 94,
inserting the special exception for §§ 1154 and 1156 (Indian
country is defined more narrowly for purposes of Indian liquor
laws than for other purposes), Congress has not changed the 1948
definition.

AR002250

completely revoked all existing reservations in Alaska except the Annette Islands Reserve for the Metlakatla Indian Community in Southeast Alaska.[276] The statutory language satisfies the requirement that Congress explicitly and clearly evince its intent to revoke or diminish reservation boundaries. See Solem v. Bartlett, 465 U.S. 463, 470 (1984). Furthermore, except for the Annette Islands Reserve and a few small and isolated parcels, the United States holds no lands in trust for the benefit of an Alaska Native village.[277]

We recognize that some statutes and regulations do include ANCSA Native Corporation lands, as well as the former reservations of some tribes in the contiguous 48 states, within their definitions

---

[276]  The Secretary's prospective authority to create Indian reservations in Alaska eventually was also expressly revoked in the Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (repealing section 2 of the Act of May 1, 1936, 49 Stat. 1250 (formerly 25 U.S.C. § 496)).

In 1978, the Acting Solicitor accepted the conclusion of the Associate Solicitor, Division of Indian Affairs, that although § 5 of the IRA, 25 U.S.C. § 465 (authority to acquire lands in trust for Indians), was not repealed with respect to Alaska, in light of the clear expression of congressional intent in ANCSA not to create trusteeship or a reservation system, it would be an abuse of discretion for the Secretary to acquire lands in trust in Alaska for the Natives of Venetie and Arctic Village. Letter to Donald Wright, Agent, Native Village of Venetie Tribal Government from the Acting Solicitor, Sept. 20, 1978 (enclosing Memorandum to the Assistant Secretary - Indian Affairs from the Associate Solicitor, Division of Indian Affairs, Sept. 15, 1978).

[277]  During the 1940's and 1950's, the Government acquired by purchase, and took title in trust to, cannery properties in three Southeast Alaska communities. The BIA has not viewed trust title to these parcels as having been revoked by ANCSA § 19, 43 U.S.C. § 1618, and these lands have not been conveyed to the local Village Corporations under ANCSA § 16, 43 U.S.C. § 1615. BIA views these as valid existing rights under ANCSA § 14(g), 43 U.S.C. § 1613(g). In one case, Kake, both the Department of the Interior and Congress have accepted as fact that the United States holds trust title to the lands. 124 Cong. Rec. 33468 (1978) (remarks of Sen. Stevens and letter, dated September 13, 1978, from Assistant Secretary Gerard to Rep. Morris Udall). Beneficial title to these trust lands is still held by the IRA community and/or association as follows:  Angoon (13.24 acres); Kake (15.9 acres); Klawock (1.91 acres).

AR002251

of reservations for purposes of specific programs.[278]  However,
in light of the clear congressional expression in ANCSA, we
conclude that these limited cases do not evince congressional
intent to classify these lands as reservations for general
jurisdictional purposes, and are confined to their specific
terms.[279]

d.    Dependent Indian Communities

A more complex issue is whether there may be lands in Alaska that
form a jurisdictional Indian country enclave because they
constitute "dependent Indian communities."  Although there are
tribal fee lands, Native townsites, and Native Corporation lands
in Alaska, all of which have some Indian character and some of
which fall within the protection of certain federal laws, we
conclude that the nature of Native land tenure in Alaska after
ANCSA leaves little if any room for finding the existence of a
dependent Indian community for purposes of classifying lands as
Indian country.  Our conclusion is not stated in absolute terms
because the test for a dependent Indian community is a highly
fact-specific and functional one, resting on a number of
variables.  Nevertheless, in our view, tribal fee lands, so-
called Native townsites, and Native Corporation lands, generally

---

[278]    Examples include 25 U.S.C. § 1452(d) (Indian Financing Act);
29 U.S.C. § 750(c) (Indian Vocational Rehabilitation Services);
42 U.S.C. § 2992c(2) (Native American Economic Opportunity
Programs); 25 C.F.R. § 101.1(h) (Indian Revolving Loan Fund) and
§ 103.1(h) (Indian Loan Guaranty, Insurance, and Interest Subsidy
Program); 34 C.F.R. § 361.1(c)(2) (Vocational Rehabilitation
Services); 42 C.F.R. § 36.10 (Indian Health Service Programs);
and 48 C.F.R. § 352.270-3(b)(2) (Indian Preference).

[279]    In § 2(g) of ANCSA, Congress specified for what purposes
ANCSA lands are to be considered "in trust" or as "reservation"
lands.  As described in the conference report:

    Subsection 2(g) of the conference report is to be
    strictly construed and the conference committee does
    not intend that lands granted to Natives under this Act
    be considered "Indian reservation" lands for purposes
    other than those specified in this Act.  The lands
    granted by this Act are not "in trust" and the Native
    villages are not Indian "reservations."

S. Conf. Rep. No. 581, 92d Cong., 1st Sess. 40 (1971).

113

AR002252

speaking, will not qualify as Indian country, as that term is used in 18 U.S.C. § 1151(b).[280]

The phrase "dependent Indian community" is a term of art which, like the term "reservation," reflects congressional intent to classify as Indian country certain lands intended for the use, occupancy, and special federal protection of dependent Indians, over which federal and tribal authority remain primary.  The phrase was included within the definition of Indian country to ensure that certain lands not formally designated as a reservation, nor held in trust by the United States, nor even technically reserved by treaty or statute, would nevertheless have Indian country status.

Section 1151(b) essentially codified the results reached and the phrase adopted by the Supreme Court in United States v. Sandoval, 231 U.S. 28 (1913) and United States v. McGowan, 302 U.S. 535 (1938).  In Sandoval, the Court held that Pueblo fee lands are Indian country because the Federal Government "regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection."  Sandoval, 231 U.S. at 47. In McGowan, the Court held that the Reno Indian Colony, the lands of which were held in trust by the United States but not designated a reservation, was nevertheless Indian country.[281]

In light of the willingness of the Supreme Court to treat tribal trust lands as reservation lands under section 1151(a), notwithstanding the lack of formal designation, see Potawatomi, 111 S. Ct. 905, it is apparent that the distinction between sections 1151(a) and 1151(b) is not always clear.  One court has observed that, at least with respect to classifying lands as Indian country, "Indian reservations and dependent Indian communities are not two distinct definitions of place, but definitions which largely overlap."  Blatchford v. Gonzales, 100

_____

[280]   As we discuss below, while the lands within the boundaries of a so-called Native townsite would not constitute a dependent Indian community simply by virtue of their Native townsite status, individual Native townsite lots issued in restricted fee to Alaska Natives in some communities may qualify as Indian country under § 1151(c).  As discussed supra n. 71, at least one court has held that there is no distinction between so-called Native and non-Native townsites.

[281]   The Reno Indian Colony lands were purchased by the United States to provide lands for needy Indians scattered over the State of Nevada.  United States v. McGowan, 302 U.S. 535, 537 (1938).  Thus, it was neither a reservation in the formal sense of the word, nor was it set aside for a particular historic tribe or tribes.

114

AR002253

N.M. 333, 335, 670 P.2d 944, 946 (1983).[282]  In each case, the
"crucial consideration [is] whether such lands have been set
apart for the use, occupancy and protection of dependent Indian
peoples."  Weddell v. Meierhenry, 636 F.2d 211, 213 (8th Cir.
1980) (citations omitted).

In Alaska v. Native Village of Venetie, 856 F.2d 1384 (9th Cir.
1988) (Venetie I), the Ninth Circuit summarized a number of
factors that have been developed to determine whether a dependent
Indian community exists:

> In [United States v.] Martine, [442 F.2d 1022 (10th
> Cir. 1971)] the Tenth Circuit approved a three-pronged
> analysis, considering:
>> 1)   the nature of the area;
>> 2)   the relationship of the area inhabitants to Indian
>>      tribes and the federal government; and,
>> 3)   the established practice of government agencies
>>      toward that area.
> 442 F.2d at 1023.
>
> In [United States v.] South Dakota, [665 F.2d 837 (8th Cir.
> 1981), cert. denied, 459 U.S. 823 (1982)] the Eighth Circuit
> applied a more extensive analysis, including the Martine
> considerations as well as:
>> 1)   the degree of federal ownership of and control
>>      over the area;
>> 2)   the degree of cohesiveness of the area
>>      inhabitants; and,
>> 3)   the extent to which the area was set aside for the
>>      use, occupancy, and protection of dependent Indian
>>      peoples.
> 665 F.2d at 839.

Venetie I, 856 F.2d at 1391.


In Martine, the court held that certain unrestricted Navajo
tribal fee lands, purchased with tribal money, were Indian

---

[282]    In Blatchford, the New Mexico Supreme Court held that the
Yah-Ta-Hey community, located approximately two miles from the
Navajo reservation, was not a dependent Indian community.  The
land at issue was the site of a non-Indian owned "Indian trading
post" and other businesses, and was owned in fee title.
Notwithstanding the fact that 60 to 70 percent of the community
was Indian and was within a "checkerboard" area near the Navajo
reservation, the court, relying on McGowan and referring to the
factors identified in United States v. Martine, 442 F.2d 1022
(10th Cir. 1971), concluded that the community was not Indian
country.  Blatchford, 670 P.2d at 949.

115

AR002254

country.[283]  The lan   were located in a checkerboard area[284]
known as the Ramah _ommunity near to but outside the boundaries
of the Navajo reservation.  Based on an examination of the above-
cited elements, the court concluded that the area in question was
a dependent Indian community.  The court made specific mention of
the testimony of law enforcement officers and Bureau of Indian
Affairs officials as supporting the trial court's conclusion that
the lands were Indian country.  Martine, 442 F.2d at 1023-24.[285]

In South Dakota, the court held that a tribal housing project
located within the original boundaries of the disestablished Lake
Traverse Indian Reservation on land held by the United States in
trust for the tribe was a dependent Indian community and
therefore Indian country.  While the decision is useful because
of the court's identification of relevant factors for finding a
dependent Indian community, we note that in light of Potawatom,
the trust status of the land probably would now be considered
dispositive factor.  In fact, the United States contended in
South Dakota that the housing project was Indian country under
section 1151(a), but the court declined to reach that argument
because of its determination under section 1151(b).  South
Dakota, 665 F.2d at 841 n.9.


It is worth reiterating here that the above factors have been
developed by the courts to ascertain the congressional intent
underlying the phrase "dependent Indian community."  The ultimate
question in each case is whether the particular facts and
circumstances fit within the congressional scheme intended to
protect certain areas under federal and usually tribal control.
In that respect, we repeat the guiding principle that Indian
country comprises those lands that Congress intended, as a
general matter, to be beyond the jurisdictional reach of the
state and subject to the primary jurisdiction of the Federal
Government and tribes, even though those lands are geographically
within the boundaries of a state.

---

[283]    25 U.S.C. § 635(b) provides congressional consent for the
Navajo Tribe to alienate fee lands, notwithstanding any other
provision of law.

[284]    A checkerboard area is an area generally on or near an
existing or former reservation in which Indian and non-Indian
owned lands are interspersed.

[285]    It is also worth noting that the Ramah community has a clear
history as a distinct and cohesive Indian community associated
with the Navajo reservation.  Cf. Ramah Navajo School Bd. v.
Bureau of Revenue, 458 U.S. 832 (1981) (striking down as
preempted New Mexico's tax on gross receipts received by non-
Indian construction company from Ramah Navajo School Board).

116

AR002255

As the Ninth Circuit noted after reviewing the Indian country
cases: "the ultimate conclusion as to whether an Indian community
is Indian country is quite factually dependent." <u>Venetie I</u>, 856
F.2d at 1391.[286]  In his "tentative decision" in <u>Alyeska Pipeline
Service Company v. Kluti Kaah Native Village of Copper Center</u>,
No. A87-201 Civil, slip op. at 43-45 (D. Alaska, January 17,
1992), Judge Holland recognized that the title to the land in
question was held by an ANCSA corporation but found that
determining whether the land was Indian country required a
complex factual inquiry.  As a result he denied the plaintiffs'
motion for summary judgment.  He found that title was only one
factor, albeit a significant one, in determining whether the land
was Indian country.[287]

We need not decide here whether title may be a dispositive
factor.  After consideration of the tests summarized in <u>Venetie
I</u>, we have concluded that Native Corporation lands and village-
owned fee lands in Alaska do not as a general rule qualify as
dependent Indian communities.  We acknowledge, as pointed out by
the Native American Rights Fund (NARF), one of the groups
offering comments in connection with this opinion, that there are
many Natives in Alaska who receive federal Indian program
services, and who may thus be characterized in certain respects
as "dependent" Indians or Native peoples, and that villages
qualifying as tribes are "domestic dependent nations" as are
tribes in the contiguous 48 states.[288]  We also accept, for

---

[286]    In <u>Venetie I</u>, the State brought an action in federal court
to enjoin the village from attempting to enforce a five percent
gross receipts tax on a state contractor who was building a
public high school in the village.  The ANCSA Village
Corporations for Venetie and Arctic Village had voted to take
their former reservation in fee pursuant to § 19(b) of ANCSA.
The Corporations subsequently transferred their interest to the
IRA-organized Native Village of Venetie.

[287]    This case arose when the Kluti Kaah Village Council enacted
a property tax ordinance which by its terms applies to that
portion of the Trans-Alaska Oil Pipeline passing through Native
Corporation lands.  Alyeska, the owners' agent for management of
the pipeline, brought suit in federal court, seeking to enjoin
enforcement of the taxation ordinance on the grounds, <u>inter alia</u>,
that the Village Council was not an Indian tribe with sovereign
taxing authority, and that it had no territorial jurisdiction
over the pipeline.

[288]    We have considered the arguments presented by NARF,
reflected in letters submitted to this office, which attached
NARF's brief filed in <u>Alaska v. Native Village of Venetie</u>, No. F
87-51 Civ. (D. Alaska) (Opposition to Plaintiffs' Renewed Motion
for Summary Judgment), and its draft brief prepared in connection

AR002256

purposes of this review, that many Alaska Natives live in cohesive Native communities. But cf. Martine, 442 F.2d at 1024 ("The mere presence of a group of Indians in a particular area would undoubtedly not suffice."). We even recognize that in some respects Native Corporation lands in Alaska have been set aside for the Natives, although not "under federal superintendence" as that phrase is understood in determining Indian country.[289] Nevertheless, Congress has treated ANCSA lands in a dispositive way. Our evaluation of all the factors, particularly in light of ANCSA's disposition of lands in Alaska for Natives, and the resulting nature of the land title, leads us to conclude that ANCSA lands, whether currently held by Native Corporations or by tribes, do not constitute dependent Indian communities, and that a contrary conclusion would be inconsistent with the ANCSA scheme.

### i.    Alaska Native Corporation Lands

In light of Congress' express revocation in ANCSA of Indian reservations in Alaska and the clearly evinced intent not to create a reservation system, we are unable to conclude that the lands that Congress provided for Alaska Native Corporations as part of the settlement constitute dependent Indian communities and thus Indian country. In both legal and practical effect, classifying Native Corporation lands as Indian country would create huge jurisdictional enclaves, presumptively outside the reach of state jurisdiction (except as provided by Congress), set aside for primary federal and tribal jurisdiction. Such a result, in our view, is inconsistent with the will of Congress expressed in ANCSA, notwithstanding Congress' willingness for

---

with Alyeska Pipeline Service Co. v. Kluti Kaah Native Village, No. A87-201 Civil (D. Alaska). NARF contends that lands occupied by a tribe are Indian country by definition, regardless of ownership status. We are not persuaded that the ownership status of land can be so easily dismissed, nor that tribal occupancy, even when combined with tribal ownership, necessarily creates Indian country. This seems particularly true with respect to ANCSA lands, because in ANCSA Congress so clearly revoked tribal reservation boundaries and disposed of the lands to entities other than the tribes.

[289]    Given the effect of the federal townsite laws, and the reconveyance provisions of ANCSA § 14(c), it is clear that few Native communities are physically located on Native Corporation-owned lands, but given ANCSA's dispositive treatment of these lands, even the presence of such communities on Corporation lands would not alter our conclusion.

AR002257

limited purposes to treat ANCSA lands as distinct or to afford
limited special protection to ANCSA corporations.[290]

Congress created a comprehensive system under ANCSA which did not
assert any permanent or even long term federal supervisory
control over the land owned or occupied by Native Corporations.
Instead, such land has been patented to state-chartered
corporations in fee pursuant to ANCSA.  The substantive
provisions of ANCSA as enacted in 1971 set a schedule for a 20-
year transition, at the end of which the Native Corporation stock
would be freely alienable, Native Corporation lands could be
subject to state taxation, and other federal protections removed.

At the same time, even in 1971, Congress specifically
contemplated that adjustments might be necessary and appropriate
along the way in order to fulfill the Act's declared intent to
effect a settlement "in conformity with the real economic and
social needs of Natives."  ANCSA § 2(b).  Section 23 of ANCSA
required annual reports that would be culminated by a 1985
Report.  In other words, in 1971 Congress reserved the
possibility of continued federal supervision over the settlement,
which it exercised to some extent in ANILCA in 1980, and in the
1991 Amendments.  Such subsequent adjustments, of course, were
constrained by whatever property rights had already vested
pursuant to the original Act.  Recognizing that Congress provided
for continued federal oversight, we nevertheless are not
convinced that by reserving and exercising a limited continuing
federal role in adjusting and effectuating the settlement,
Congress intended to create the type of federal superintendence
similar to that exercised over reservations or dependent Indian
communities, or that Congress intended that the ANCSA lands would
at some point be impressed with the status of Indian country.

This congressional declaration of policy and accompanying
statutory scheme completely preclude any finding that under
ANCSA, Congress somehow created a trust relationship between the

---

[290]     Examples of these limited forms of special treatment or
protection include:  the continued extension of federal forest
fire protection services under ANCSA § 21(e), 43 U.S.C.
§ 1620(e); provision of technical assistance to Native
Corporations under § 313 of the National Indian Forest Resources
Management Act of 1990, Pub. L. No. 101-630, 104 Stat. 4040, 25
U.S.C. § 3112; the several provisions of ANCSA affording special
tax treatment collected in § 21, 43 U.S.C. § 1620, and amendments
thereto; and the land bank and settlement trust options afforded
respectively by the provisions of ANILCA § 907, 43 U.S.C. § 1636
and ANCSA, as amended by the 1991 Amendments, 43 U.S.C. § 1629e.
Both the existence and narrowly targeted focus of these special
provisions undercut any argument that the basic thrust of ANCSA
has been redirected.

119

AR002258

Federal Government and these Native Corporations with respect to their lands.[291]  In the absence of such a relationship, there is no basis for concluding that ANCSA corporate landholdings are <u>per se</u> dependent Indian communities simply by virtue of their Native Corporation ownership or their relationship to a Native land claims settlement.

In the 1991 Amendments, Congress did provide substantial automatic protections for undeveloped Native Corporation lands, including open-ended blanket exemptions from adverse possession, real property taxes, satisfaction of debts or judgments, or involuntary corporate dissolutions.  43 U.S.C. § 1636(d).  In addition, Congress authorized Native Corporations to establish settlement trusts, in order to obtain additional state-law protection for certain assets, including stock and some categories of undeveloped lands.  43 U.S.C. § 1629e.  While these expanded statutory protections reflect continuing congressional interest in protecting the resources granted to the Natives under ANCSA, they fall short of evincing any congressional intent that these Native Corporation fee lands be considered Indian country.[292]

The settlement trust provision permits a Native Corporation to convey assets (including stock or beneficial interests therein) to a settlement trust in accordance with the laws of the State of Alaska.  43 U.S.C. § 1629e.  However, invoking or retaining the settlement trust protections is left to the free choice of the Native Corporations, not the Federal Government, and as indicated, the trusts involved are governed by Alaska law.[293]

_____

[291]   See <u>Cape Fox Corp. v. United States</u>, 456 F. Supp. 784, 799 (D. Alaska 1978); <u>see also</u> H.R. Rep. No. 523, 92d Cong., 1st Sess. (1971); S. Rep. No. 405, 92d Cong., 1st Sess. (1971); and <u>Governor's Task Force</u>, <u>supra</u> n. 48, at 128-34.

[292]   See <u>supra</u> pp. 104-105 for a discussion of the 1991 Amendments and the congressional disclaimer precluding use of the legislation to either support or refute claims of Native governmental authority in Alaska.

[293]   In choosing state law settlement trusts as a vehicle for providing additional protection to Native Corporation lands, Congress rejected an earlier proposal that would have authorized Native Corporations to transfer some of their lands to "qualified transferee entities" (QTE's).  The QTE proposal would have created a wholly federal scheme, and would have permitted transfer of lands to IRA or traditional Native villages.  See <u>Alaska Native Claims Settlement Act:  Hearings Before the House Interior and Insular Affairs Committee</u>, 99th Cong., 1st Sess. 229, 264 (1985).  Considerable debate ensued over whether the QTE provisions, which could be viewed as similar to a more

120

AR002259

Having granted lands to Native Corporations responsible only to their shareholders and the State, the Federal Government no longer exercises the kind of control and superintendence that led to the findings of dependent Indian communities in <u>Sandoval</u> and <u>McGowan</u>. The present relationship between ANCSA-conveyed Native landholdings and the Federal Government, particularly in light of the express language in ANCSA rejecting lengthy wardship or trusteeship, cannot be characterized as a guardianship or as related to a trust. Because Native Corporations have complete freedom to control their lands, those lands and the Natives located on them cannot be regarded as dependent Indian communities as that term has been understood. It would be anomalous to conclude that Native Corporation lands are the jurisdictional equivalent of reservations, when Congress specifically abolished reservations and designed a comprehensive system of landholdings purposely intended not to be the functional equivalent of reservations. Nor do any of the many and in some cases substantial amendments to the original ANCSA blueprint signal a significant modification or a reversal of the original 1971 Act's effect in this regard.

We do not discount nor minimize Congress' continuing interest and involvement in the affairs of the Native Corporations, but we cannot conclude that the lands conveyed to Native Corporations under ANCSA became, by virtue of that fact, Indian country. Simply put, we do not believe that Congress, in ANCSA or in subsequent legislation, has expressed an intent that Native Corporation lands be classified as Indian country, or has treated

---

conventional Federal Indian law form of Indian land protection, would enhance the Natives' argument that the corporation lands were Indian country. See <u>Alaska Native Claims Settlement Act: Hearings on H.R. 4162 Before the House Interior and Insular Affairs Committee</u>, 99th Cong., 2d Sess. 137-78, 189-246 (1985); <u>Amendments to the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act and to Establish a Memorial in D.C.: Hearings on S. 2065 (and other bills) Before the Subcommittee on Public Lands, Reserved Water, and Resource Conservation, Senate Energy and Natural Resources Committee</u>, 99th Cong., 2d Sess. 184-96, 223-48, 307-32 (1986); <u>Alaska Native Claims Settlement Act Amendment of 1987: Hearings on S. 1145 and H.R. 278 Before the Senate Subcommittee on Public Lands, National Parks, and Forests, Senate Energy and Natural Resources Committee</u>, 100th Cong., 1st Sess. 151, 157, 165, 249-59 (1987). Shortly before the 1991 Amendments were finalized, the QTE provisions were replaced with the settlement trust option. Particularly in light of Congress' selection of state-chartered settlement trusts over the federal QTE provisions, we are not convinced that this additional Native land protection is analogous to the type of federal protection contemplated in the definition of dependent Indian communities.

121

AR002260

these lands and areas in the manner contemplated in the factors
summarized in <u>Venetie I</u>.[294]

### ii.   Village Fee Lands

At least two ANCSA corporations that held former reservation
lands have conveyed those lands to a traditional Native entity.
<u>See</u> <u>Venetie I</u>, 856 F.2d 1384.   In another case, lands not
formerly held as a reservation were conveyed to a traditional
Native entity.   Act of October 20, 1978, Pub. L. No. 95-487, 92
Stat. 1635 (conveyance of lands to Village of Kake in
unrestricted fee title).[295]   Other villages apparently have
acquired or may acquire lands in fee from Village Corporations.

Without a co-existing reservation system or tribal trust lands
creating federal jurisdictional enclaves for tribes in Alaska, we
are not convinced that the mere acquisition of lands in fee by a
Native village confers upon such lands the status of Indian
country.   Indian country depends primarily upon congressional,
not tribal, intent.   The ANCSA statutory scheme simply does not
permit tribes to create Indian country in Alaska by unilateral
action, nor by virtue of such tribal ownership to impose federal
restrictions on the land that Congress in ANCSA sought to avoid.
The declaration against a reservation system, implemented by the
1971 Act and undiluted by any subsequent amendments, is simply
too strong to square with the proposition that tribes in Alaska

---

[294]     We also note that ANCSA § 14(c)(3), 43 U.S.C. § 1613(c)(3),
requires each Village Corporation to convey lands of a specified
quantity and character to the Municipal Corporation in the Native
village, or to the State in trust for any Municipal Corporation
established in the future.   Although Congress rejected the option
of making state-chartered municipalities the vehicle for the land
claims settlement, and did not require Native villages to
incorporate as political subdivisions of the State, it did make
substantial and universally applicable provisions for state-
chartered municipal governments to acquire title to lands in
Native villages.   In contrast, except as discussed <u>**supra**</u> p. 84,
ANCSA contains no provision making land available to any other
local governmental entities for either proprietary or
governmental purposes.   Such a scheme, while not necessarily
dispositive with respect to tribal jurisdiction, appears
inconsistent with any congressional intent that the Federal
Government and tribes, and not municipal governments, would
exercise primary jurisdiction over the lands and territory in and
immediately surrounding Native villages.

[295]     See 124 Cong. Rec. 32880 (1978) (adoption by House); 124
Cong. Rec. 33467-69 (1978) (consideration and adoption by
Senate).

AR002261

can create unilaterally what Congress sought so clearly to
avoid.[296]

### iii. Village-Owned Townsite Lands

There is one unique category of non-ANCSA village fee lands, for
which the Indian country question is more difficult.  In the past
several years, unoccupied lands within federal townsites have
been conveyed in fee to 27 Native villages.  These 27 villages
are not incorporated as state law municipalities.  In <u>Aleknagik
Natives Ltd. v. United States</u>, 886 F.2d 237 (9th Cir. 1989), the
court of appeals affirmed the district court's order requiring
the federal townsite trustee to convey to the Native villages of
Port Graham and English Bay title to the unoccupied townsite
lands in those communities.  The decision in effect overruled the
Department of the Interior's prior refusal to convey unoccupied
townsite lands to any entity other than a municipality organized
under state law.  As a result of this case, and the townsite
trustee's compliance with the decision, the Federal Government
has conveyed varying amounts of land in fee to 27 Native
villages.

These townsite lands differ significantly from lands owned by
ANCSA corporations, or even Native Corporation lands conveyed in
fee to an IRA entity or traditional village council.  In contrast
to those cases, these townsite lands have been conveyed, pursuant
to federal law, directly to Native villages in the capacity of
local governments.  While the townsite statutes do not explicitly
refer to Native local governments, and are not properly

---

[296]    Our conclusion is consistent with the 1978 Acting
Solicitor's conclusion discussed <u>supra</u> n. 276, that in light of
Congress' clearly expressed intent in ANCSA, it would be an abuse
of discretion for the Secretary to take lands in trust for
Venetie and Arctic Village.  To now conclude that the villages,
by acquiring lands in fee, could essentially accomplish on their
own what the Secretary cannot, is a proposition we cannot accept.
<u>See also</u> 25 C.F.R. § 151.1 (BIA land acquisition regulations
exclude Alaska, except for Metlakatla); 45 Fed. Reg. 62034 (same;
"the Alaska Native Claims Settlement Act does not contemplate
further acquisition of land in trust status, or the holding of
land in such status, with the exception of . . . Metlakatla").

This is not to say that the acquisition of lands in fee by an IRA
entity is without some legally significant consequences.  <u>See,
e.g., In re 1981, 1982, 1983, 1984 and 1985 Delinquent Property
Taxes</u>, 780 P.2d 363 (Alaska 1989) (§ 16 of IRA barred City of
Nome from foreclosing on lands owned by the IRA-organized Nome
Eskimo Community, without its consent).

AR002262

considered to be "Indian legislation,"[297] the fact remains that titles to these townsite lands in 27 villages are now owned by those villages **as villages**.

With respect to these non-ANCSA lands, we believe the extent of village governmental powers will depend upon the particular status of the village itself and upon a fact-specific inquiry into whether the area at issue qualifies as a dependent Indian community and thus Indian country. Congress simply did not address this specific situation in ANCSA. The outcome would depend upon the particular history of the village, specific applicable statutes, and general principles of Indian law.

### e.   Native Allotments

With respect to Alaska Native allotments, we conclude that they do fall within the statutory definition of Indian country. However, we also conclude that while Native allotments are Indian country for purposes of federal protection and jurisdiction, it does not necessarily follow that allotments are subject to tribal jurisdiction.

The language of section 1151(c) includes as Indian country "**all Indian allotments**, the Indian titles to which have not been extinguished, including rights-of-way running through the same" (emphasis added). Based upon the plain language of the statute, the court decisions interpreting section 1151(c), and an examination of the Alaska Native Allotment Act, we conclude that Alaska Native allotments are Indian country. Nevertheless, although we conclude that these allotments are Indian country for purposes of federal authority and protection, for the most part we are not persuaded that Congress intended Alaska Native villages to exercise governmental powers over these lands. Alaska Native allotments appear to be an exception to the general rule that the territorial basis for tribal authority coincides with the federal Indian country status of lands. **See Native Village of Venetie IRA Council v. Alaska**, 944 F.2d 548, 558 n.12 (9th Cir. 1991) (**Venetie II**).

### i.   Indian Allotments as Indian Country

Indian allotments were included within the definition of Indian country based on the Supreme Court's decision in **United States v. Pelican**, 232 U.S. 442 (1914). **See** reviser's note to 18 U.S.C. § 1151. In **Pelican**, the Court held that a trust allotment carved out of an existing reservation continued to be Indian country because it continued to be validly set apart for the use of Indians under the superintendence of the Government.

---

[297]   See **supra** n. 71.

In the contiguous 48 states, Congress used two principle forms in creating Indian allotments: trust allotments and restricted fee allotments. In <u>United States v. Ramsey</u>, 271 U.S. 467 (1926), the Supreme Court rejected any distinction between the two types of allotments with respect to their Indian country status. The Court concluded that a restricted fee patent allotment carved out of the Osage Indian reservation "remained Indian lands set apart for Indians under governmental care." <u>Id.</u> at 471. The Court stated:

> [I]t would be quite unreasonable to attribute to Congress an intention to extend the protection of the criminal law to an Indian upon a trust allotment and withhold it from one upon a restricted allotment; and we find nothing in the nature of the subject matter or in the words of the statute which would justify us in applying the term Indian country to one and not to the other.

<u>Id.</u> at 471-72.[298]

Indian allotments that were not carved out of existing Indian reservations also have been held to be Indian country. In <u>In re Carmen's Petition</u>, 165 F. Supp. 942 (N.D. Cal.), <u>aff'd</u>, 270 F.2d 809 (9th Cir.), <u>cert. denied</u>, 361 U.S. 934 (1958), the court held that a public domain trust allotment was Indian country and thus

---

[298]  See <u>Heckman v. United States</u>, 224 U.S. 413, 437 (1912) (federal guardianship continues over restricted fee Indian lands; "national interest" not to be expressed in terms of property, or limited to assertion of rights incident to ownership or reversion or "to the holding of a technical title in trust"); <u>State v. Burnett</u>, 671 P.2d 1165, 1166-67 (Okla. Cr. 1983) (restricted fee allotment held to be Indian country).

In <u>United States v. Sands</u>, 968 F.2d 1058 (10th Cir. 1992), petition for cert. filed, No. 92-6105 (U.S. Oct. 5, 1992), the Tenth Circuit concluded that a restricted fee allotment in the former territory of the Five Civilized Tribes in Oklahoma was Indian country, noting that "[b]y 1948, when § 1151 was enacted, 'Indian country' included both trust allotments and restricted fee allotments." <u>Id.</u> at 1062. In <u>Sands</u>, following defendant's conviction, the United States contended before the court of appeals that the United States lacks jurisdiction because the particularly unique history of the former Indian territory in present-day Oklahoma evinces congressional intent that restricted fee allotments of the Five Civilized Tribes not be treated as Indian country. Obviously, the fact that trust allotments and restricted fee allotments in general fall within the definition of Indian country would not preclude Congress from treating certain allotments differently.

125

subject to federal jurisdiction.  In that case, California
asserted that the public domain allotment was not Indian
country because it had not been carved out of an existing
reservation, as was the case in <u>United States v. Pelican</u>, 232
U.S. 442 (1914),[299] and was not land to which an underlying
"Indian title" remained. The district court, affirmed by the
Ninth Circuit, squarely rejected these assertions:

> Respondent interprets the Pelican decision to mean that an
> allotment to be Indian Country must have been made from
> lands which were previously Indian Country.  But this is an
> unduly restricted view of that decision.
>
> *    *    *
>
> In Pelican, the reservation from which the allotment
> was made had itself been created out of the public
> domain rather than from land which had previously been
> in Indian possession. . . .  Since all Indian
> allotments, <u>regardless of their source</u>, are maintained
> under the same type of Governmental supervision, either
> by holding title in trust for the allottee or by
> restricting alienation, there is no logical reason for
> making the application of protective criminal statutes
> dependent upon the source of the allotment.

<u>In re Carmen's Petition</u>, 165 F. Supp. at 946 (emphasis added).
Based on the above considerations, we conclude that the language
of section 1151(c) indeed encompasses Alaska Native allotments
while they remain in restricted status.[300]

While the Indian country status of allotments provides the
statutory basis for the exercise of federal jurisdiction, it does
not necessarily follow that all Indian allotments are subject to
tribal jurisdiction.  Because of the distinct history of certain
off-reservation allotments, we believe that whether an individual
allotment is subject to tribal jurisdiction depends upon a

---

[299]    In <u>United States v. Pelican</u>, 232 U.S. 442 (1914), the Court
determined that an Indian allotment was Indian country, even
though it was within a reservation area restored to the public
domain, which the Court appears to have presumed was no longer
within the reservation's boundaries.  The Court concluded that
the same considerations apply to allotments as to other Indian
lands in determining whether they are Indian country--whether the
lands "had been validly set apart for the use of the Indians as
such, under the superintendence of the Government."  <u>Id.</u> at 449.

[300]    Of course, because Alaska is a Public Law 280 state, it has
broad criminal and limited civil jurisdiction over Indian
country.

particularized inquiry into the relevant statutes and circumstances surrounding the creation of the allotment.

For example, various statutes enacted by Congress during the allotment era permitted certain Indians to acquire homesteads on the public lands.  The Act of March 3, 1875, § 15, 18 Stat. 402, 420, permitted an Indian born in the United States, "who has abandoned, or may hereafter abandon, his tribal relations," to obtain a homestead under the Homestead Act of 1862, 12 Stat. 392.[301]  The Indian homestead was restricted for a period of five years from the date of issuance of a fee patent.  The Indian Homestead Act of 1884 also permitted Indians to avail themselves of the homestead laws of the United States, with the special provision that 25-year trust patents would issue.  Act of July 4, 1884, 23 Stat. 76, 96.  In United States v. Jackson, 280 U.S. 183 (1930), the Supreme Court held that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments, upholding the authority of the Secretary to extend the trust period for a restricted Indian homestead pursuant to 25 U.S.C. § 391.

While we are unaware of any court decisions addressing the question, it is our view that an assertion of tribal jurisdiction over an Indian homestead allotment obtained by an Indian who had abandoned tribal relations would fail.  In such a case, it seems unlikely that there would be any indication of congressional intent to permit such jurisdiction, and there would be no original tribal nexus to support such jurisdiction over the allotment.

Public domain allotments obtained pursuant to section 4 of the 1887 General Allotment Act, 25 U.S.C. §§ 334, 336, differ from the homestead allotments in that Indians applying for such allotments must demonstrate membership or entitlement to membership in a recognized Indian tribe.  43 C.F.R. § 2531.1(a); see Regulations Governing Indian Allotments on the Public Domain Under Section 4, Act of February 8, 1887, as amended, 46 L.D. 344 (1918) ("applicant is required to show that he is a recognized member of an Indian tribe or is entitled to be so recognized").

Without addressing or deciding the possible scope of tribal jurisdiction over public domain allotments in the contiguous 48, we conclude that allotments issued pursuant to the Alaska Native Allotment Act are more similar to homestead act allotments rather than tribal-affiliation public domain allotments, and that particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village

---

[301]   Repealed by FLPMA, Pub. L. No. 94-579, § 702, 90 Stat. 2743, 2787 (1976).

AR002266

claiming territorial jurisdiction over an Alaska Native
allotment.

## ii.   Alaska Native Allotments

Most allotments in Alaska have been issued pursuant to the Alaska
Native Allotment Act of 1906,[302] although there are a few
allotments issued under the General Allotment Act.[303]   Although
Alaska Native allotments are held in fee by the allottee subject
to restrictions against alienation, we have already noted that
the distinction between restricted fee and trust allotments is
not significant for our purposes.[304]

A number of facts, however, do distinguish Alaska Native
allotments from most allotments in the contiguous 48.  First, the
statute does not make tribal membership a criteria for receiving
an allotment, probably because in 1906, Congress was not
considering the Alaska Native allotments in a tribal context.
This makes Alaska Native allotments more like Indian homestead
allotments, rather than those issued pursuant to the General
Allotment Act or other tribe-specific allotment acts.[305]   Second,

---

[302]    Act of May 17, 1906, Pub. L. No. 59-171, 34 Stat. 197, as
amended by Act of August 2, 1956, Pub. L. No. 84-931, 70 Stat.
954. The 1906 Act was repealed, with a savings clause for
applications pending on December 18, 1971, by ANCSA § 18(a), 43
U.S.C. § 1617(a). The repealer does not purport to alter the
status of Alaska Native allotments.

[303]    See United States v. Clarke, 445 U.S. 253 (1980).

[304]    Because the possible distinctions between restricted fee and
trust allotment forms are not significant in our context, it is
also not significant that the Interior Department initially
viewed the Alaska Native Allotment Act as providing for trust
allotments.  See Charlie George, 44 L.D. 113 (1965); Status of
Alaskan Natives, 53 I.D. 593, 602 (1932) (Solicitor's Opinion)
(allotment creates reservation of land for allottee but title
remains in the United States).  In 1980, the Interior Board of
Land Appeals overruled Charlie George and concluded instead that
Alaska Native allotments were held in restricted fee title.
State of Alaska, 45 IBLA 318 (1980).  Regardless of the form of
title, this Department consistently has taken the position that
general federal statutes and Departmental regulations applicable
to trust and restricted Indian property also apply to Native
allotments and restricted Native townsite lots in Alaska.

[305]    The Solicitor's Opinion, Status of Alaskan Natives, 53 I.D.
593, 602 (1932), also analogized Alaska Native allotments to
public domain allotments issued pursuant to § 4 of the General
Allotment Act of 1887, 25 U.S.C. § 334, 336.  While they are

128

AR002267

Alaska Native allotments were not carved out of any reservation. While we consider this factor insignificant for <u>federal</u> jurisdictional purposes, we believe it has at least some significance in determining questions of <u>tribal</u> authority. Third, the statute specifically provides that the allotment "shall be deemed the homestead of the allottee and his heirs." Again, while not a controlling factor as such, the language makes the Alaska Native Allotment Act appear more similar to a general Indian homestead act rather than a tribal or reservation related allotment act.

We wish to make clear that Alaska Native allotments, like other Indian allotments, remain under federal superintendency and subject to federal protection while in restricted status. Thus, we conclude that Congress has not divested the Federal Government of its jurisdictional authority over such lands, and they are Indian country.

However, after examining the statute and circumstances related to Alaska allotments, we are not convinced that any specific villages or groups can claim jurisdictional authority over allotment parcels. As we noted above, particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village claiming <u>territorial</u> jurisdiction over an Alaska Native allotment.

### iii.   Individual Native Townsite Lots

One other category of individual Native landholdings in restricted status is that of Native restricted fee townsite lots. It is our understanding that there are over 3,800 of these lots. To a limited extent, deeds to individual townsite lots are still being issued to Natives subject to statutory restrictions on alienation, pursuant to the former 43 U.S.C. § 733.[306]  In <u>People of South Naknek v. Bristol Bay Borough</u>, 466 F. Supp. 870 (D. Alaska 1979), the court held that for purposes of federal court jurisdiction, the restricted Native townsite lots have the same status as allotments.

Our analysis and conclusions concerning potential tribal jurisdiction over these lots are the same as those set forth

---

indeed analogous in many respects, § 4 allotments did require tribal affiliation, which conceivably provides a basis for tribal jurisdiction.  Of course, we express no opinion concerning tribal jurisdiction over § 4 public domain allotments.

[306]    43 U.S.C. § 733 was repealed in 1976 by FLPMA § 703(a), Pub. L. No. 94-579, 90 Stat. 2743, 2790.  Only applicants who can establish entitlement based on occupancy commenced prior to the enactment of FLPMA are eligible for a deed.

AR002268

above with respect to Native allotments, with one possible
exception.  If individual restricted townsite lots properly are
treated as allotments for purposes of section 1151, they would be
Indian country.  Those restricted lots located in one of the 27
Native villages receiving fee title to unoccupied townsite lots
could conceivably be affected if the village qualifies as a tribe
and if the area qualifies as a dependent Indian community.  Even
so, an assertion of tribal jurisdiction over individual
restricted lots would be doubtful if there were no clear tribal
nexus to the individual restricted lands.[307]

### f.    Authority over Nonmembers After ANCSA

We have previously established that there is a significant
territorial component to tribal powers.  In effect, by abolishing
previously-existing reservations and avoiding federal trusteeship
over Native lands, Congress largely removed a territorial base
over which entities in Alaska qualifying as tribes could assert
jurisdiction.  Furthermore, except for the uncertainty
surrounding some village-owned townsite lands, in the limited
cases in which Indian country may still exist in Alaska for
purposes of federal jurisdiction and protection, we are not
convinced that Congress has in practical and legal effect left
room for the exercise of tribal jurisdiction over land.

Our disposition of the issue of jurisdiction over land also
resolves in large measure the question of the extent of tribal
governmental authority over nonmembers.  Indian tribes are
possessed of sovereignty over "their members and their
territory."  Montana v. United States, 450 U.S. 544, 563 (1981).
Without a tribal territory, tribal governmental power is limited
to authority over members, unless Congress has clearly authorized
the exercise of tribal power over nonmembers.[308]  Absent such
congressional consent, we conclude that Alaska tribes without
territories are also without power over nonmembers.

---

[307]    If the area is not a dependent Indian community, we are not
convinced that a village that qualifies as a tribe could assert
jurisdiction over individually owned restricted townsite lots.
Even if the lots are Indian country for federal jurisdictional
purposes, the village would lack a distinctly tribal territorial
base related to the lots, from which to assert extended
jurisdiction over discreet individual Native-owned parcels.
Nothing in the townsite laws even remotely suggests that the
individual restricted lots issued to Natives could, by
themselves  constitute any sort of tribal territorial base.

[308]    For    ample, the Indian Child Welfare Act, discussed supra
pp. 43-44  gives force and effect to tribal court child custody
proceedings, and may affect nonmembers claiming parental or
custody rights to an Indian child.

AR002269

V.   CONCLUSION

This opinion has been one of the most difficult to prepare during
my tenure at the Department of the Interior.  We hope the
research into the history, law and government policy toward
Native Alaskans will be beneficial to all who are dealing with
jurisdictional questions, whether they agree with the conclusions
or not.  The issues surrounding jurisdiction and governmental
power are complex and easily susceptible to misinterpretation.
In this opinion, we have provided the answer to the specific
question posed by the Secretary: whether Alaska Native villages
exercise jurisdiction over lands and nonmembers.  In posing this
issue, the Secretary made clear that he did not intend to revisit
the unique relationship of the Federal Government to the Natives.
That policy is sound in light of this legal review.

We have spent considerable time on the status of Native villages
and the ongoing federal relationship with them to avoid any
misapprehension that this opinion is intended to answer the
question of whether or not the ongoing provision of federal
benefits to Natives and federal recognition of Native villages is
appropriate.  In our view, Congress and the Executive Branch have
been clear and consistent in their inclusion of Alaska Natives as
eligible for benefits provided under a number of statutes passed
to benefit Indian tribes and their members.  Thus, we have stated
that it would be improper to conclude that no Native village in
Alaska could qualify as a federally recognized tribe.

However, this opinion does conclude that, even if certain Native
villages qualify as tribes for purposes of federal law,  Congress
clearly limited Native village exercise of sovereign jurisdiction
over lands and nonmembers in a decisive fashion.  The statutory
scheme established in ANCSA precludes the treatment of lands
received under that Act as Indian country.  The purposes of ANCSA
to develop state chartered business entities and to avoid the
establishment of any permanent reservation system, trusteeship or
other racially based institutions would be frustrated by a
determination that enclaves of federal and tribal jurisdiction
continue to exist.

I understand the significant impact of this decision.  To
conclude that areas are not Indian country greatly limits the
powers those Native villages may exercise with respect to the
establishment of courts, police powers and other sovereign
attributes that attach to jurisdiction over land.  Yet, this
opinion reflects what we believe is the best reading of the law.

Our decision on this matter is very much based on what Congress
did in ANCSA, and subsequent amendments and other legislation do
not change this conclusion.  As noted in the body of the opinion,
the exercise of Congress' authority over Indian Affairs is broad.
Should the outcome of this opinion be at variance with what

AR002270

lawmakers believe is the proper view of Native village jurisdiction, Congress is free to legislate again in this area to provide certainty.

In summary:

1.   We have rejected the notion that there are no tribes in Alaska.  Which Native villages are tribes is a fact-specific determination beyond the scope of this Opinion.  See Part III.B.

2.   ANCSA is not a termination statute.  It did not terminate tribes or the provision of federal services to Alaska Native individuals or entities.  Congress and the Executive Branch have consistently extended to Alaska Natives benefits provided to Indian tribes and their members in the contiguous 48 states. See Part IV.C.1.

3.   There is a territorial component to tribal power.  Whether a Native village has governmental powers over lands and nonmembers depends, as a threshold matter, upon the existence of Indian country.  See Part IV.C.2.a.

4.   ANCSA reflected a new approach in defining the relationship between Alaska Natives and the federal government.  ANCSA largely controls the determination whether any territory exists over which Alaska Native villages might exercise governmental powers. Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands and nonmembers.  See Part IV.C.2.

5.   Native Corporation lands in Alaska do not qualify as Indian country.  See Part IV.C.2.b.ii.

6.   ANCSA does not permit Native villages to create Indian country in Alaska by unilateral action.  Native village acquisition of former ANCSA land will not impose federal superintendence over the land that Congress in ANCSA sought to avoid.  See Part IV.C.2.b.iv.

7.   The extent of Native village governmental powers over village-owned townsite lands will depend upon the status of the village itself and upon a fact-specific inquiry as to whether the village is a dependent Indian community.  See Part IV.C.2.b.v.

8.    Although an Alaska Native allotment constitutes Indian country, there is little or no basis for a Native village to claim territorial jurisdiction over an allotment.  See Part IV.C.2.c.i.

9.   Although individually owned restricted Native townsite lots may constitute Indian country, there is little or no basis for a

132

Native village to claim territorial jurisdiction over the lots.
See Part IV.C.2.c.iii.

Thomas L. Sansonetti
Solicitor

I concur _____
Frank A. Bracken
Acting Secretary

Date: January 11, 1993

133



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240



JAN 1 9 1993

M-36975 (Supp. I)

Memorandum

To:        Secretary

From:      Solicitor

Subject:   Governmental Jurisdiction of Alaska Native Villages
           Over Land and Nonmembers

On January 11, 1993 you concurred in the Opinion issued by our
Office on the same date concerning the extent of governmental
jurisdiction of Alaska Native Villages over land and nonmembers.
Upon review of our Opinion, the Office of Legal Counsel,
Department of Justice has informed us that the wording of
footnote 152 which appears on pages 59-60 does not comport with
the official legal policy established by that Office.  We
acknowledge the role of the Department of Justice in establishing
the Federal Government's legal policies and hereby state below
verbatim the Office of Legal Counsel's position regarding
footnote 152:

Legislation providing benefits to Indians on the basis of their
race, rather than on the basis of tribal membership, raises
questions under the equal protection component of the Fifth
Amendment.

In general, explicit governmental classifications based on race
or ethnicity are constitutionally highly suspect.  See Richmond
v. J.A. Croson Co., 488 U.S. 469 (1988) (majority of court
imposes "strict scrutiny" on racial classification); see also
Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979) ("A
racial classification, regardless of purported motivation, is
presumptively invalid and can be upheld only upon an
extraordinary justification."); Bolling v. Sharpe, 347 U.S. 497,
499 (1954) (invalidating racial classification in District of
Columbia under strict scrutiny).  In certain circumstances,
racial classifications ordained by Congress are sustainable, but
only if, at a minimum, "they serve important governmental
objectives within the power of Congress and are substantially
related to the achievement of those objectives."  Metro
Broadcasting, Inc. v. FCC, 110 S. Ct. 2997, 3000 (1991).  Even
under that standard of review, such "characteristics provide a
relevant basis for disparate treatment only in extremely rare
situations," and the justification for "'any such classification

[must] be clearly identified and unquestionably legitimate.'" Id. at 3028 (Stevens, J., concurring) (quoting Fullilove v. Klutznick, 448 U.S. 448, 534-35 (1980) (Stevens, J., dissenting)).

Although Indians enjoy a special position under the law, the Supreme Court has consistently emphasized that racially-based legislation is not exempt from constitutional prohibitions on racial discrimination simply because the legislation involves or benefits Indians. See, e.g., Washington v. Yakima Indian Nation, 439 U.S. 463, 500-01 (1979); Craig v. Boren, 429 U.S. 190, 209 n.22 (1976) (laws which discriminate with respect to Indians on racial grounds are of "questionable constitutionality").

Acts of Congress conferring benefits on Indian tribes -- as distinct from Indians defined as a racial class -- stand on a different constitutional footing. Accord Memorandum for Diane Weinstein, Acting General Counsel, Dep't of Education, from Douglas W. Kmiec, Ass't Att'y Gen., Office of Legal Counsel, Dep't of Justice, re: Constitutionality of Preferences Contained in Public Law No. 100-297 (Nov. 9, 1988). In Morton v. Mancari, 417 U.S. 535 (1974), the Supreme Court upheld the Indian preference contained in the Indian Reorganization Act of 1934 against a limited constitutional challenge. The regulations in Mancari defined eligibility for the preference as follows:

> To be eligible for preference in appointment,
> promotion, and training, an individual must be one-
> fourth or more degree Indian blood and be a member of a
> federally-recognized tribe.

417 U.S. at 553 n.24, quoting 44 BIAM 335, 3.1 (emphasis supplied). The Court explicitly relied on this definition to uphold the preference against the claim that it was racially discriminatory:

> The preference, as applied, is granted to Indians not
> as a discrete racial group, but, rather, as members of
> quasi-sovereign tribal entities . . . .
>
> The preference is not directed towards a "racial" group
> consisting of "Indians"; instead, it applies only to
> members of "federally recognized" tribes. This
> operates to exclude many individuals who are racially
> to be classified as Indians. In this sense, the
> preference is political rather then racial in nature.

417 U.S. at 554 and 553 n.24 (emphasis supplied). Moreover, it is significant that throughout its constitutional discussion the Court refers to those Indians receiving benefits as "tribal Indians." See, e.g., id. at 552-55.

Although the classification at issue in Mancari contained a racial element (an "Indian blood" requirement), the Court held

that the classification's further requirement of tribal
membership sufficed to save the preference.  The Court also noted
that the preference only applied to employment in the Indian
service and therefore was reasonably and directly related to a
legitimate, nonracially based goal -- that of furthering the
cause of Indian self-government.  417 U.S. at 554.  We do not
believe that by adducing this additional distinction the Court
implied that Indian preferences based on racial rather than
tribal classifications would be constitutional if confined to
positions relating to Indian self-government.

The Supreme Court has repeatedly relied upon this distinction
between tribal and racial classifications in upholding Indian
preferences against attack on racial discrimination grounds.
See, e.g., Washington v. Yakima Indian Nation, supra, 439 U.S. at
500-01 ("It is settled that 'the unique legal status of Indian
tribes under federal law' permits the Federal Government to enact
legislation singling out tribal Indians, legislation that might
otherwise be constitutionally offensive," quoting Mancari);
United States v. Antelope, 430 U.S. 641, 647 (1977) ("Federal
regulation of Indian tribes, therefore, is governance of once-
sovereign political communities; it is not to be viewed as
legislation of a '"racial" group consisting of "Indians" . . .,'"
quoting Mancari); Moe v. Salish and Kootenai Tribes, 425 U.S.
463, 480 (1976) ("statutes . . . according special treatment to
Indian tribes and reservations" are "neither 'invidious' nor
'racial,'" citing Mancari); Fisher v. District Court, 424 U.S.
382, 390 (1976) (statute granting exclusive jurisdiction over
certain claims to the Cheyenne Tribal Court, challenged as
"impermissible racial discrimination," upheld on grounds that
jurisdiction "does not derive from the race of the plaintiff but
rather from the quasi-sovereign status of the Northern Cheyenne
Tribe under federal law.")

Nothing in United States v. John, 437 U.S. 634 (1978),
contradicts our conclusion.  The Court's opinion in John involved
questions of state and federal criminal jurisdiction over "Indian
country," as that phrase was used in several statutes.  The
Opinion did not address any equal protection challenge to a
racial classification.

*Tom Sansonetti*

Thomas L. Sansonetti
Solicitor

Reference No. 494 H

SECRETARIAL ORDER
Eklutna Industrial
Part Affected:   School Reserve
Date Signed:  10/19/36
Date Approved:  10/30/36

<u>COPY</u>
*from last week's bin*

L-A
82150
A P

7

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF INDIAN AFFAIRS
WASHINGTON

October 19, 1936

The Honorable.

*Notice Res*
*Sec 2 Act Mar. 1, 1936*

The Secretary of the Interior.
(Through the Commissioner
of the General Land Office.)

My dear Mr. Secretary:

*E.O. 7713    #31        E.O.6754    June 8*

By Executive orders of December 5, 1927, and June 8, 1934,
copies herewith, certain lands in Alaska were reserved for use by
the Eklutna Industrial School.

There is transmitted herewith recommendation from Claude M.
Hirst, Director of Education, Juneau, Alaska, for enlargement of
the area required for the successful operation of this school. The
report and accompanying papers clearly disclose the necessity and
advisability of enlarging the reserve. Since the report was made,
Mr. George Dale, Supervisor, Juneau, Alaska, has requested that the
area to be withdrawn be enlarged. This office, after carefully
considering the matter believes that Mr. Dale's recommendation is
fully justified. There is transmitted herewith map upon which is
shown enclosed within a red line the area proposed for withdrawal
at this time. Since only a very small part of this area is covered
by public survey it has been found necessary to identify the lands
by a metes and bounds description. The lands proposed <u>for with-</u>
drawal are, therefore, identified as <u>follows</u>:

"Beginning at the middle of the mouth of Eagle River
at the line of mean high tide Knik Arm, in Sec. 1 T. 14
N., R. 3 W., Seward Meridian, Alaska, approximately in
latitude 61" 19' 30"N., longitude 149" 44' 30" W.: Thence
northeasterly with meanders of Knik Arm to the middle of
the mouth of the main channel of Knik River; Thence up the
middle of the main channel of Knik River to Knik Glacier;
Thence westerly and southerly along the foot of Knik
Glacier approximately 10 miles to the northwesterly end
of a large unnamed lake; Thence S. 57" W., 18 miles (approx-
imate bearing distance) to head of Eagle River; Thence
northwesterly down the middle of the main channel of Eagle
River approximately 28 miles to Knik Arm, the place of be-
ginning, containing approximately 515 square miles of sur-
veyed and unsurveyed lands.

"The surveyed lands embraced in the above described
area, "all referred to the Seward Meridian, are as follows

AR002276

Reference No. 494 **H** (cont.)

SECRETARIAL ORDER
Eklutna Industrial
Part Affected:   School Reserve
Date Signed:  10/19/36
Date Approved:  10/30/36

"T. 16N., R. 1 E., all lands lying south of Knik Arm and
                      south of the middle of the main channel
                      of Knik River.
T. 14 N., R. 1 W., all lands lying north of Eagle River
T. 15 N., R. 1 W., all lands lying south of Knik Arm.
T. 16 N., R. 1 W., all lands lying south of Knik Arm.
T. 14 N., R. 2 W., all lands lying north of Eagle River.
T. 15 N., R. 2 W., all lands lying south of Knik Arm.
T. 14 N., R. 3 W., all lands in Sec. 1 and 12, lying north
                      and east of Eagle River".

        Authority for the Secretary of the Interior to reserve Alaska
lands for the benefit of Indians of Alaska is contained in section 2
of the act of May 1, 1936 (Public No. 538 – 74th Congress), which
provides as follows:

            "That the Secretary of the Interior is hereby author-
        ized to designate as an Indian reservation any area of land
        which has been reserved for the use and occupancy of Indians
        or Eskimos by section 8 of the Act of May 17, 1884 (23Stat.
        26), or by section 14 or section 15 of the Act of March 3,
        1891 (26 Stat. 1101), or which has been heretofore reserved
        under any executive order and place under the jurisdiction
        of the Department of the Interior or any bureau thereof, to-
        gether with additional public lands adjacent thereto, within
        the Territory of Alaska, or any other public lands which are
        actually occupied by Indians or Eskimos within said Territory:
        Provided. That the designation by the Secretary of the In-
        terior of any such area of land as a reservation shall be
        effective only upon its approval by the vote, by secret
        ballot, of a majority of the Indian or Eskimo residents
        thereof who vote at a special election duly called by the
        Secretary of the Interior upon thirty days' notice: Provided.
        however, That in each instance the total vote cast shall not
        be less than 30 per centum of those entitled to vote: Provided
        further. That nothing herein contained shall affect any valid
        existing claim, location, or entry under the laws of the
        United States, whether for homestead, mineral, right of way.
        or other purpose whatsoever, or shall affect the rights of
        any such owner, claimant, locator, or entryman to the full
        use and enjoyment of the land so occupied."

        It is respectfully recommended that the public domain lands of
Alaska embraced within the area described above be temporarily with-
drawn from further disposition for the use and benefit of the Eklutna

AR002277

Reference No. 494 H (cont.)

SECRETARIAL ORDER

Eklutna Industrial
Part Affected:   School Reserve
Date Signed:  10/19/36
Date Approved:  10/30/36

Industrial School of Alaska, subject to all outstanding withdrawals
and existing valid rights, until the matter of having the said
area permanently reserved as an Indian reservation can be placed
before the Indian or Eskimo occupants of the lands, in the manner
prescribed by the Act of May 1, 1936, _supra_, for their consideration/

Sincerely yours,

(signed) JOHN COLLIER

Commissioner.

Enclosure No. 1053855

10-OL-7 (3)

General Land Office
Washington D. C.      October 22, 1936

There are no reasons appearing in the records of this office
why the foregoing recommendation should not be approved.

(signed) D.K. PARROTT
Acting Assistant Commissioner.

Department of the Interior
Office of the Secretary.      October 30, 1936

The foregoing recommendation is hereby approved and the **vacant**,
unappropriated and undisposed-of public domain lands within the **area**
described above, proposed for reservation for the Eklutna Industrial
School, are hereby temporily within from further disposition
for the use and benefit of the said Eklutna Industrial School, subject
to all outstanding withdrawals and existing valid rights, until the
matter of their permanent withdrawal as a reservation can be taken up
**with** the Indians or Eskimo occupants, as provided by section 2 of **the**
Act of May 1, 1936 (Public No. 538 - 74th Congress).

W. C. MENDENHALL
Acting Secretary

AR002278

copy

ADDRESS ONLY THE COMMISSIONER OF THE GENERAL LAND OFFICE

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
### GENERAL LAND OFFICE
#### WASHINGTON  AUG 9 - 1937

IN REPLY PLEASE REFER TO

☞ .......... "L" CGF ......................................

MEMORANDUM for the Secretary:

Reference is made to letter of the Office of Indian Affairs
dated July 12, 1937, submitted through this office, recommending
the withdrawal under the act of May 1, 1936 (49 Stat. 1250), sub-
ject to outstanding withdrawals and existing valid rights, of
public lands and navigable waters in Alaska, as follows, "for the
benefit of the graduates of the Eklutna Industrial School and such
other native residents within that region":

(1) The withdrawal of approximately 1,600,000
acres of partially surveyed land situated on the east
side of Cook Inlet and the south side of Turnagain
Arm.  The northern portion of said tract is situated
15 or 20 miles south and west of the city of Anchorage.
The tract includes approximately 100 miles of land
along the shore on the east side of said inlet and the
south side of said arm.  The rectangular system of
surveys has been authorized to be extended along the
Kenai River, which traverses the middle of the pro-
posed reservation, in anticipation of the settlement
and development which it was expected would follow
the construction of the Kenai Highway through this area.

(2) The withdrawal of the waters off the coast
of said tract of 1,600,000 acres "at least three miles
from the shore at mean low tide."  Such waters embrace
the equivalent of a strip approximately 100 miles long
and 3 miles wide.

The said letter read as a whole indicates that it is the intention
to make the withdrawal in behalf of the graduates of the Eklutna
Industrial School and any other native residents within that area,

AR002283

6

. "L" CGF

rather than for such graduates and "such other native residents
within that area" as stated therein.

The said letter of July 12, 1937, refers to an order approved
by the Department on October 30, 1936, issued under authority of the
said act of May 1, 1936, which withdrew approximately 328,000 acres
south of Knik Arm, a portion of which tract is situated about 10
miles north and east of Anchorage,"for the use and benefit of the
Eklutna Industrial School of Alaska, subject to all outstanding
withdrawals and existing valid rights, until the matter of having
the said area permanently reserved as an Indian reservation can be
placed before the Indian or Eskimo occupants of the lands, in the
manner prescribed by the act of May 1, 1936, supra, for their con-
sideration." This reservation embraces more than one-half of the
shore space on the south side of Knik Arm. The main line of The
Alaska Railroad from Anchorage to Matanuska and also the Anchorage-
Palmer Highway cross the reserved area. The railroad and highway
were built at public expense and no doubt were constructed for the
purpose of encouraging the settlement and development of this portion
of Alaska by all classes of citizens. If these lands should be
permanently included in an Indian reservation under authority of the
said act of May 1, 1936, as proposed, further settlement and develop-
ment of the area by all classes of citizens would be prevented, and
the lands, together with the mineral and other resources thereof,
would pass to permanent tribal ownership.

Section 2 of the said act of May 1, 1936, reads as follows:

"That the Secretary of the Interior is hereby
authorized to designate as an Indian reservation any
area of land which has been reserved for the use and
occupancy of Indians or Eskimos by section 8 of the
Act of May 17, 1884 (23 Stat. 26), or by section 14
or section 15 of the Act of March 3, 1891 (26 Stat.
1101), or which has been heretofore reserved under
any executive order and placed under the jurisdiction
of the Department of the Interior or any bureau
thereof, together with additional public lands adjacent
thereto, within the Territory of Alaska, or any other
public lands which are actually occupied by Indians
or Eskimos within said Territory: Provided, That the
designation by the Secretary of the Interior of any
such area of land as a reservation shall be effective
only upon its approval by the vote, by secret ballot,

-2-                                    AR002284

copy

"L" CGF

> of a majority of the Indian or Eskimo residents thereof
> who vote at a special election duly called by the
> Secretary of the Interior upon thirty days' notice:
> Provided, however, That in each instance the total
> vote cast shall not be less than 30 per centum of
> those entitled to vote: Provided, further, That nothing
> herein contained shall affect any valid existing claim,
> location, or entry under the laws of the United States,
> whether for homestead, mineral, right-of-way, or other
> purpose whatsoever, or shall affect the rights of any
> such owner, claimant, locator, or entryman to the full
> use and enjoyment of the land so occupied."

Certain matters relating to the establishment of Indian reserva-
tions under the authority of the said act of May 1, 1936, were re-
cently considered by the Acting Solicitor of this Department, and in
an opinion dated April 19, 1937, M. 28978, approved by the Department
on the same date, it is stated:

> "The reservations to be designated under section 2
> must fall within one of the following three classes:
> first, areas which have already been reserved under the
> legislation specified or by Executive order. The specifi-
> cation in this class of the legislation which created
> the Annette Islands Reservation is further evidence of
> the fact that Congress intended adjacent waters to be
> included in the reservations designated, since if the
> Secretary is to exercise his authority under section 2
> to declare the Annette Islands an Indian reservation,
> it would be obligatory upon him to include the adjacent
> waters already recognized as part of the reservation.
> The second category consists of existing reservations,
> 'together with additional public lands adjacent thereto,
> within the Territory of Alaska.' In view of the rul-
> ings of the Supreme Court previously discussed, this
> language may be said to permit the Secretary to declare
> territorial waters adjacent to existing reservations to
> be part of the reservations. The third category con-
> sists of other public lands not connected with existing
> reservations but occupied by Indians or Eskimos. This
> permits entirely new reservations. If the language in
> this category were not modified elsewhere in the act, it
> might be reasonable to hold, in reply to question (b)
> of the Indian Office, that fishing waters used by the

-3-

AR002285

·"L" CGF

> natives but not connected with any reservation might
> be reserved under this section. However, I believe
> that the act read as a whole indicates that the
> principal part of every reservation designated under
> section 2 must be land upon which the natives are
> actually residing. The first proviso in section 2
> requires that the designation be approved by a
> majority vote of the native residents of the proposed
> reservation. This proviso could not be fulfilled if
> a reservation were declared which consisted only of
> fishing waters. Moreover, the phrase, 'actually oc-
> cupied' implies residence rather than mere use."

Inquiry has developed the fact that the Eklutna Industrial
School of Alaska has about 112 pupils, mòstly minors, ranging in
age from 14 to 21 years. As the order of withdrawal states that
it is made "for the use and benefit of the Eklutna Industrial
School", the question is presented whether such natives or any
others are now capable of approving the designation of the reserva-
tion in the manner required by said section 2 of the said act of
May 1, 1936.

The said reservation of 328,000 acres was made as an addition
to a tract containing approximately 1,358 acres, which theretofore
had been reserved by Executive orders for use by the Bureau of
Education for educational purposes. This reservation originally
embraced about 1,378 acres, which by change of boundary was sub-
sequently reduced to about 1,358 acres. It is assumed that the
Eklutna Industrial School is situated upon this tract and that the
pupils reside thereon and not on the 328,000 acres which have been
withdrawn as an addition thereto. It appears that the said reserva-
tion was made as an addition to the school site rather than as an
addition to an Indian reservation, which fact presents the further
question whether the act of May 1, 1936, authorizes the withdrawal
of public lands as additions to school sites.

The said order of withdrawal of October 30, 1936, does not state
what part, if any, of the said 328,000 acres is now occupied by
natives. If no substantial part of the area is so occupied, the
reservation does not appear to conform to the requirement set forth
in the above-mentioned opinion of the Acting Solicitor: "That the
principal part of every reservation designated under section 2
must be land upon which the natives are actually residing."

-4-

AR002286

"L" CGF

The said letter of July 12, 1937, recommends that the depart-
mental order of October 30, 1936, be amended to embrace the ad-
ditional area described above (the said reservation of an additional
tract of approximately 1,600,000 acres of land), together with the
waters of Cook Inlet bordering thereon for a distance of three miles
from mean low tide, and it requests "that the said order be further
amended so as to have it clearly understood that the lands covered
by the withdrawal of October 30, 1936, bordering on Knik Arm, Cook
Inlet and Turnagain Arm carry with them such water frontage as may
be necessary to enable the native occupants to properly conduct
fishing operations."

The act of May 1, 1936, authorizes the Secretary of the Interior
to designate as an Indian reservation certain tracts which theretofore
had been reserved, "together with additional public lands adjacent
thereto, within the Territory of Alaska, or any other public lands
which are actually occupied by Indians or Eskimos within said Ter-
ritory."

The said proposed reservation of approximately 1,600,000 acres
of land is not contiguous to the approximately 328,000 acres which
were reserved by the aforesaid order of October 30, 1936. It does
not appear, therefore, that said order of October 30, 1936, should
be amended to include the said 1,600,000 acres. It would seem that
the reservation of such area, if made, must be considered as a
reservation separate and apart from that made by the order of
October 30, 1936.

With reference to the present population of the area for which
the said reservation of 1,600,000 acres has been recommended, Mr.
Claude M. Hirst, Director of Education in Alaska, in a memorandum
furnished the Commissioner of Indian Affairs under date of December
26, 1936, states:

"There are, at present, few if any natives living in
this region except on the coast, particularly in the
villages of Kenai and Kasiloff."

and in respect to this matter the above-mentioned letter of the
Office of Indian Affairs of July 12, 1937, states also that the
land "is practically unsettled, and, with the exception of the
coastal region, is remote from any villages which might be sources
of undesirable influence." In view of the above-mentioned opinion,

-5-

AR002287

copy

"L" CGF

"that the principal part of every reservation designated under sec-
tion 2 must be land upon which the natives are actually residing",
it would seem that the reservation under section 2 of the said act
of May 1, 1936, of 1,600,000 acres of practically unsettled country
for the benefit of a small number of natives residing on the coast
is not authorized.

It is understood that not more than approximately 500 natives
reside in the coastal region. A reservation of approximately
1,600,000 acres, as proposed, would average about 3200 acres for
each of such natives.

In addition to the said proposed reservation of 1,600,000 acres
of land and the surrounding waters, recommended by the said letter
of July 12, 1937, the Office of Indian Affairs, under date of July
22, 1937, recommends that the present Tyonek or Moquawkie Reserve,
which now has a population of 106 natives, be enlarged from 25,000
acres to 1,170,000 acres, for the natives of such reservation and
such other natives as may now or hereafter make their homes on this
land. Such enlargement, if made, would mean an addition to the exist-
ing reservation of approximately 1,145,000 acres. No showing has
been made as to the number of the natives, if any, who now make
their homes in the additional area.

In the opinion of this office the reservation of 1,145,000 acres
of public land, very little if any of which is now occupied by natives,
as an addition to a reservation now occupied by them embracing 25,000
acres, is not authorized by the said act of May 1, 1936, as that act
has been construed with departmental approval.

The said letter of the Office of Indian Affairs of July 22, 1937,
further recommends the reservation of the waters of Cook Inlet ad-
jacent to the said 1,170,000 acres of land, extending three miles
from the shore at low tide. As the proposed reservation occupies a
shore space approximately 100 miles in length, such reservation of
the waters, if made, would include a strip the equivalent of ap-
proximately 100 miles in length and 3 miles in width opposite the
strip of water of equal length and width on the east side of the
inlet, the reservation of which has also been recommended as herein-
above set forth.

This office is not particularly concerned with the proposed
reservation of the navigable waters for three miles opposite the

AR002288

"L" CGF

shores of the proposed reservations.  If the proposed reservations
of land are in excess of the authorization contained in the act of
May 1, 1936, it would seem to follow that the proposed reservations
of waters adjacent thereto are also unauthorized.  The above-mentioned
opinion of the Acting Solicitor states that it is his opinion "that
the waters not connected with any reservation of the uplands cannot
be independently reserved under section 2 of the Alaska act."  The
opinion also states:

> "An extension of the area of Indian reservations
> to great lengths in the territorial waters of Alaska
> would seriously conflict with the authority of the
> Secretary of Commerce, given in various acts of
> Congress, to regulate fishing in the territorial
> waters, and with the policy of Congress expressed in
> those acts of providing equal fishing opportunities
> to all citizens."

If under any construction of the law the reservation of lands
should be made as proposed, the reservation of the adjacent waters,
to the extent of three miles from the shore, would seem to exceed
in extent the permissible limits as indicated.

It may be further stated that in the opinion of this office
the request contained in the above-mentioned letter of July 12,
1937, that the order of October 30, 1936, be amended so as to have
it clearly understood that the reservation made by such order carries
with it "such water frontage as may be necessary to enable the native
occupants to properly conduct fishing operations", should not in
any event be approved in such form, as the language used is not such
as would enable the identification of the reserved waters with any
degree of certainty.

It is noted that the above-mentioned opinion of the Acting
Solicitor, which concludes that navigable waters in Alaska may be
included in Indian reservations established under authority of the
said act of May 1, 1936, in support of such conclusion, relies to
a large extent upon an opinion of the Circuit Court of Appeals of
the Ninth Circuit, rendered March 19, 1917, in the case of Alaska
Pacific Fisheries, et al., vs. United States, 240 Fed. 274.  This
case involved a fishing trap erected in 1916 without the consent of
the Indians or the Secretary of the Interior.  The trap was located
approximately 600 feet from the high tide line of the island and
was intended to catch about 600,000 salmon in a single season.

-7-

AR002289

"L" CGF

The Circuit Court of Appeals, in effect, held that Congress, by the act of March 3, 1891 (26 Stat. 1101), having reserved a body of lands known as Annette Islands in southeastern Alaska for the use of a tribe of Indians and such other Alaskan natives as might join them, the President might, though not specifically authorized by said act, reserve the adjacent waters for useful purposes.

The Proclamation of the President reserving the waters adjacent to Annette Island, issued April 28, 1916 (39 Stat, Part 2, page 1777), recited that the Secretary of the Interior, with a view to assisting the Metlakahtlans to self-support, had decided to place in operation a cannery on Annette Island; that it was therefore necessary that the fishery in the adjacent waters be reserved for the purpose of supplying fish and other aquatic products for the cannery. Based on such recitals, the Proclamation reserved the waters within 3,000 feet from the shore line at mean low tide "to be used by them (the natives) under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce."

The said decision of the Circuit Court of Appeals subsequently was affirmed by the Supreme Court of the United States (248 U.S. 78), on the ground that both the upland and adjacent waters had been reserved for the natives by the said act of March 3, 1891. This ruling made it unnecessary for the Supreme Court to consider the question of the authority of the President to reserve the adjacent waters.

Neither the opinion of the Circuit Court of Appeals nor of the Supreme Court of the United States indicates that the waters adjacent to Annette Island had ever been used for fishing purposes by the general public prior to their reservation by the said act of March 3, 1891.

The situation as to the waters of Cook Inlet appears to be much different than that which obtained at the time of the reservation of the waters of Annette Island. It appears that there are a number of canneries operating within the exterior limits of the proposed reservations and that a considerable number of persons have placed fish traps in the adjacent waters. In addition, the waters, no doubt, have otherwise been used for fishing by the general public.

For consideration in this connection I am enclosing herewith a photostat copy of a map, the latest available, which was obtained informally from the Bureau of Fisheries of the Department of Commerce,

-8-

AR002290

"L" CGF

showing the fish traps in this area in 1936.

The proposed reservation of the waters of Cook Inlet and arms thereof states that it is made subject to "existing valid rights." In this respect it is unlike the Proclamation of May 28, 1916, respecting the waters of Annette Island, which Proclamation does not contain such exception. It also differs from the Annette Island Proclamation in that it does not state the purpose of the withdrawal or that the future use of the waters is to be had by the natives under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce.

The proposed reservation of the waters presents a number of other questions to which attention is called for such consideration as the Department may deem appropriate:

(1) If the waters should be reserved as proposed, and the withdrawal should be approved by the natives as provided for by section 2 of the said act of May 1, 1936, would the reserved waters become the absolute property of the Indians, subject to their exclusive use and regulation, in like manner as land which may be reserved for their use and benefit under authority of the said act?

(2) Would any person wishing to use such waters for navigation, fishing or other purposes, after the effective date of reservation, have to obtain permits for such use from such Indians?

(3) Would the reservation have the effect of excluding from the waters natives other than those for whose benefit the particular reservation is made and would the natives of such reservation have the right to grant fishing rights to other natives or to persons other than natives?

(4) Where permits heretofore have been issued by the War Department to maintain fish traps in this area, could such traps continue to be maintained after the effective date of reservation and for the period of the permits? Also, could such permits be renewed and would the renewals have to be secured from the War Department or from the Indians or both?

-9-

AR002291

copy
"L" CGF

(5)  To what extent, if any, would such reserva-
tion of the waters interfere with the jurisdiction and
control over the fisheries now exercised by the Depart-
ment of Commerce?

(6)  To what extent, if any, would the designa-
tion of such waters as an Indian reservation prevent
the taxation by the Territory of the fish traps in the
waters or the assessment of related taxes?

There has been no classification of any of the land areas here
involved as to their value for coal, oil, gas or other minerals or
for timber, power site, or other natural resources.  Upon the designa-
tion of these areas as Indian reservations and the approval of such
designation by the Indians, such areas, including the natural re-
sources thereof, become the absolute property of the natives, that is,
the title to such property thereafter is held by the United States
in trust for such natives.

The public lands of Alaska were purchased by the Federal Govern-
ment at Government expense and they constitute an asset of all the
people of the United States.  Much of the land, no doubt, contains
mineral, timber and other natural resources.  If all the 30,000
Indians in Alaska should be provided with reservations of lands and
waters corresponding in extent with those above indicated without
advance examinations of the lands by the Federal Government as to
their value for minerals and other resources, such resources in
Alaska to a large extent would pass from Federal into tribal owner-
ship and would be irretrievably lost as assets of the Federal
Government.

In view of the facts hereinabove set forth, it is recommended:

(1)  That the proposed reservations of land and
water be not approved as recommended.

(2)  That consideration be given to the matter of
revoking the reservation made by the above-mentioned
order of October 30, 1936.

(3)  That hereafter no lands in Alaska be designated
as Indian reservations or additions thereto under section
2 of the act of May 1, 1936, until reports have been

-10-

AR002292

"L" CGF

secured from the Geological Survey or the Division of
Investigations of this Department, or both if necessary,
as to the value of the lands for coal, oil, gas or other
minerals, timber, power site and other natural resources;
also as to the area of such land which is necessary for
the present and reasonable future needs of the particular
natives for whom the reservation is requested; that the
reservations, when designated, conform to the requirements
of the statute, as construed with departmental approval
in the above-mentioned opinion of the Acting Solicitor;
and that the reservations otherwise be restricted to areas
of such extent and value as are reasonably necessary for
the purpose intended.

Commissioner.

Enclosure

-11-

AR002293

Reference No. 661

## Federal Register Data

Published:  8/02/46
No. :  150

Volume:  11
Page:  8362

PLO No. 20
Date Signed:  8/04/42
Filed Date:  7/31/46

[Public Land Order 20]

ALASKA

WITHDRAWING PUBLIC LANDS FOR USE OF THE
WAR DEPARTMENT FOR MILITARY PURPOSES

By virtue of the authority vested in the
President and pursuant to Executive Or-
der No. 9146 of April 24, 1942, and section
2 of the act of May 1, 1936, c. 254, 49 Stat.
1250 (U. S. C. title 48, sec. 358a), it is
ordered as follows:

Subject to valid existing rights and
to the transmission line withdrawal un-
der Federal Power Project No. 350, the
following-described public lands are
hereby withdrawn from all forms of ap-
propriation under the public-land laws,
including the mining laws, and reserved
for the use of the War Department for
military purposes:

SEWARD MERIDIAN

T. 15 N., R. 1 W.,
    Secs. 5, 6, and 7;
    Sec. 8, W½;
containing 1614.27 acres.

The order of the Secretary of the In-
terior of October 30, 1936, temporarily
withdrawing certain lands for the use
and benefit of the Eklutna Industrial
School, is hereby modified to the extent
necessary to permit the use of the above-
described lands as herein provided.

This order shall take precedence over,
but shall not rescind or revoke, the Ex-
ecutive Order of January 23, 1918, cre-
ating Power Site Reserve No. 674, so far
as such order affects any of the above-
described lands.

It is intended that the lands described
herein shall be returned to the admin-
istration of the Department of the In-
terior when they are no longer needed
for the purpose for which they are re-
served.

This order is confidential and shall not
be published in the FEDERAL REGISTER or
otherwise be made public except upon
prior authorization by the Secretary of
War.

NOTE: Confidential status released by let-
ter of the Secretary of War dated June 27,
1946.

HAROLD L. ICKES,
Secretary of the Interior.

AUGUST 4, 1942.

[F. R. Doc. 46–13333; Filed, July 31, 1946;
4:08 p. m.]

AR002294

Reference No. **681A**

DEPARTMENTAL ORDER
Part Affected: A-050035
Date Signed: 10/26/42
Date Approved: 12/18/42

**Land Division**
**Acquisition**
8●50-36
25627-42

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF INDIAN AFFAIRS
CHICAGO

(COPY)

October 26, 1942

The Honorable,
     The Secretary of the Interior,
          Through the Commissioner,
               of the General Land Office.

My dear Mr. Secretary:

Sect. Order
#494 ↛

    In accordance with the recommendation of this Office, the Department, on October 30, 1936, withdrew, subject to valid existing rights, approximately 328,000 acres of public domain land in Alaska. These lands were withdrawn with the view of having them later permanently reserved and declared an Indian Reservation pursuant to the Act of May 1, 1936 (49 Stat. 1250). As only a small part of the area embraced in the withdrawal had been surveyed, the lands covered thereby were described by metes and bounds as follows:

    Beginning at the middle of the mouth of Eagle River at the line of mean high tide Knik Arm, in Sec. 1, T. 14 N., R. 3 W., Seward Meridian, Alaska, approximately in latitude 61* 19' 30" N., longitude 149* 44' 30" W.; Thence northeasterly with meanders of Knik Arm to the middle of the mouth of the main channel of Knik River; Thence up the middle of the main channel of Knik River to Knik Glacier; Thence westerly and southerly along the foot of Knik Glacier approximately 10 miles to the northwesterly end of a large unnamed lake; Thence S. 57* W., 18 miles (approximate bearing and distance) to head of Eagle River; Thence northwesterly down the middle of the main channel of Eagle River approximately 28 miles to Knik Arm, the place of beginning, containing approximately 515 square miles of surveyed and unsurveyed lands.

    The above area includes approximately 1,358 acres of public lands reserved by Executive Orders for educational purposes and 640 acres of land purchased for use at Eklutna School. The original order of October 30, 1936 is still in force and effect, with the exception that in 1941 it was revoked as to the small area north of Eagle River and northwesterly of the Alaska Railroad, which area was desired by the War Department.

Sect. Order
#494±

*Approximately extends to ___ wand by ___*
*This ___ on ___ ___ ___*

AR002295

→ Sect. Order of 5-8-41 - see 59-A

Reference No. 681A (cont.)

F. 2

DEPARTMENTAL ORDER
Part Affected:  A-050035
Date Signed:  10/26/42
Date Approved:  12/18/42

     Since the original withdrawal was made, several requests have been made for revocation in whole or in part of the withdrawal order. It now appears that due to changed conditions at and in the vicinity of Eklutna, a much smaller area than at first anticipated will meet the needs of the natives living in that vicinity.  In this connection there is enclosed a letter from the Director of Education at Juneau, approved by the General Superintendent, recommending that the withdrawal of October 30, 1936 be revoked, except as to approximately 9,200 acres of land immediately surrounding the Town of Eklutna.

     In view of the foregoing and of the fact that part of the lands within the withdrawal area is needed by the War Department for military purposes, it is believed that the lands involved, with the exception of the 9,200 acres referred to, should now be released from the withdrawal order.  It is desired that the 9,200 acres be retained from a withdrawal or reserved status with the view to later recommending establishment of a reservation for the native inhabitants, should it be determined that such a reservation is desirable and necessary.  It is accordingly recommended that the withdrawal order of October 30, 1936 be revoked except as to the approximately 9,200 acres of land described below.

     A tract of land in Ts. 16 N., R. 1 E., and R. 1 W., lying south of the south bank of Knik River and Knik Arm, more particularly described as follows:

Township 16N., Range 1 E., Seward Meridian

     Section 15, (unsurveyed)
     Section 16, (unsurveyed)
     Section 17,
     Section 18,
     Section 19,
     Section 20,
     Section 21, (unsurveyed)
     Section 22, (unsurveyed)
     Section 30,

Township 16 N., Range 1 W., Seward Meridian

     Section 13, Lot 2
     Section 22
     Section 23
     Section 24, Lots 1, 2, 3, 4, NE¼NE¼, S½N½,
              SW¼, NW¼SE¼, S½SE¼
     Section 25
     Section 26
     Section 27
     Section 28

Reference No. 681A (cont.)

P. 3

DEPARTMENTAL ORDER
Part Affected:  A-050035
Date Signed:  10/26/42
Date Approved:  12/18/42

Section 32
Section 33
Section 34
Section 35
Section 36 (unsurveyed)

containing approximately 9,200 acres.

Sincerely yours,


(sgd. William Zimmerman Jr.
Assistant Commissioner.

Enclosure 2973576


/

DEPARTMENT OF THE INTERIOR
Office of the Secretary
Dec. 18 1942

Order of October 30, 1936 revoked in part as recommended.


(sgd. Oscar L. Chapman
Assistant Secretary

AR002297

Reference No. 688

## Federal Register Data

Published: 8/02/46     Volume: 11

No. : 150     Page: 8364 & 8365

PLO No. 95
Date Signed: 3/12/43
Filed Date: 7/31/46

[Public Land Order 95]

ALASKA

WITHDRAWING PUBLIC LANDS FOR USE OF THE WAR DEPARTMENT FOR MILITARY PURPOSES

By virtue of the authority vested in the President and pursuant to Executive Order No. 9146 of April 24, 1942, it is ordered as follows:

Subject to valid existing rights, all those portions of the public lands in the following-described areas, lying between the east right-of-way line of the Alaska Railroad and the west right-of-way line of the Palmer-Anchorage Highway, and between Peter's Creek on the north and Eagle River on the south, are hereby withdrawn from all forms of appropriation under the public-land laws, including the mining and mineral-leasing laws, and reserved for the use of the War Department for military purposes:

SEWARD MERIDIAN

T. 15 N., R. 1 W.,
    Secs. 4, 5, 6, 7, 8, 18, and 19;
    Secs. 9, 16, 17, 20, and 30, unsurveyed.
T. 14 N., R. 2 W.,
    Secs. 1, 2, 3, 10, 11, and 14.
T. 15 N., R. 2 W.,
    Secs. 24, 25, 26, 34, 35, and 36.
    The areas described, including both public and non-public lands, aggregate 6,360 acres.

This order shall take precedence over, but shall not rescind or revoke, (1) the withdrawal for water-power sites made by the Executive order of January 23, 1918 (Power Site Reserve No. 674), and (2) the classification of certain lands as power-site lands made by the order of June 12, 1925, of the Secretary of the Interior (Power Site Classification No. 107), so far as such orders affect any of the above-described lands.

Jurisdiction over the above-described lands shall revert to the Department of the Interior and the Federal Power Commission, according to their respective interests; upon expiration of the six months' period following the termination of the unlimited national emergency declared by Proclamation No. 2487 of May 27, 1941 (55 Stat. 1647). The lands described, however, shall remain withdrawn from all forms of appropriation under the public-land laws, until otherwise ordered, pending classification and a determination as to whether the lands, or portions thereof, are needed for public purposes.

This order is confidential and shall not be filed in the Division of the Federal Register, or published in the FEDERAL REGISTER, or be given other publicity, until publication thereof has been expressly authorized by or at the direction of the Secretary of War.

NOTE: Confidential status released by letter of the Secretary of War dated June 27, 1946.

ABE FORTAS,
*Acting Secretary of the Interior.*

MARCH 12, 1943.

[F. R. Doc. 46-13340; Filed, July 31, 1946; 4:07 p. m.]

AR002298