## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIVE VILLAGE OF EKLUTNA,

        *Plaintiff*,

   v.

U.S. DEPARTMENT OF THE INTERIOR,
*et al.*,

        *Defendants*,

   and

STATE OF ALASKA,

        *Defendant-Intervenor*.

No. 19-cv-2388 (DLF)

## <u>MEMORANDUM OPINION</u>

"[O]ne problem has always plagued most Alaska Native governments—the lack of a clearly defined territory subject to their jurisdiction."  David S. Case & David A. Voluck, *Alaska Natives and American Laws* 33 (3d ed. 2012).  The complexity of this problem—and what sets it apart from federal-Indian relations in the Lower 48—is due in no small part to Alaska-specific federal statutes and the lack of treaties between Alaska Natives and the federal government.  *See id.* at 42.  As a result, when it comes to federal-Indian relations, "Alaska is often the exception, not the rule."  *Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 141 S. Ct. 2434, 2438 (2021) (quoting *Sturgeon v. Frost*, 577 U.S. 424, 440 (2016)).

In this action, the Native Village of Eklutna ("Tribe" or "Eklutna") challenges the Department of the Interior's ("Interior") rejection of its application for an "Indian lands" determination under the Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467

(1988) (codified at 25 U.S.C. § 2701 *et seq.*), as arbitrary and capricious and contrary to law under the Administrative Procedure Act (APA). The State of Alaska has intervened in support of Interior.  Before the Court is Plaintiff's Partial Motion for Summary Judgment, Dkt. 51, Interior's Cross-Motion for Summary Judgment, Dkt. 54, and Alaska's Cross-Motion for Summary Judgment, Dkt. 58.  For the reasons that follow, the Court will grant summary judgment in favor of Interior and Alaska and deny the plaintiff's motion.

## I.  BACKGROUND

Eklutna is a federally recognized Indian tribe of the Dena'ina people whose traditional homeland is the upper Cook Inlet region of Alaska.  *See* A.R. 779, 811–12 (Eklutna Indian Lands Submission & Ex. 1); Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5466 (Jan. 30, 2020).  The Tribe is headquartered about twenty-seven miles northeast of Anchorage on the Knik Arm of Cook Inlet where it owns fifty-five acres of fee land.  A.R. 977–99, 2052 (Eklutna Indian Lands Submission Exs. 12–13; Eklutna Indian Lands Third Submission).  A tribal council exercises the Tribe's inherent sovereign powers under a constitution enacted in 1996.  A.R. 953–63 (Eklutna Indian Lands Submission Ex. 7).

In June 2016, the Tribe requested that the Bureau of Indian Affairs permit the Tribe to use a parcel of land known as the Ondola Allotment for gambling under Indian Gaming Regulatory Act.  A.R. 778–805 (Eklutna Indian Lands Submission).  Eklutna submitted its request—known as an "Indian lands determination"—along with a proposed commercial lease of the Allotment for Department approval.  A.R. 742–73, 778 (Proposed Lease, Eklutna Indian Lands Submission).

The Ondola Allotment is an 8.05-acre parcel of land that the Bureau of Land Management issued to Olga Ondola in November 1963 under the Alaska Native Allotment Act, Pub. L. No. 59-171, ch. 2469, 34 Stat. 197 (1906), *amended by* Pub. L. No. 84-931, ch. 891, 70 Stat. 954 (1956), *repealed by* Alaska Native Claims Settlement Act, Pub. L. No. 92-203, § 18(a), 85 Stat. 688, 710 (1971) (codified as amended at 43 U.S.C. §§ 1601–28).  A.R. 87–88 (Ondola Native Allotment).  Ondola lived there until her death in 1964, and her son, George Ondola, inherited an interest in the land and lived there from 1985 until his death.  *See* A.R. 743, 981 (Proposed Lease, Eklutna Indian Lands Submission Ex. 13).  George was also an Eklutna tribal member and served twice as the Tribal Council President.  A.R. 981.  Their heirs and successors now own the land, and they are all members of the Tribe.  A.R. 742–43, 981, 1249 (Proposed Lease, Eklutna Indian Lands Submission Ex. 13; Eklutna Indian Lands Second Submission).  The allotment sits twenty-two miles northeast of Anchorage and seven miles southwest of the Village.  A.R. 784, 977–99 (Eklutna Indian Lands Submission & Ex. 12).

On June 18, 2018, John Tahsuda, the Acting Assistant Secretary of Interior, issued a determination that the Ondola Allotment is not Indian lands under Indian Gaming Regulatory Act and thus is ineligible for an Indian gaming facility.  A.R. 45–61.  In his letter, the Assistant Secretary explained that his analysis was governed by a 1993 opinion by then-Solicitor of Interior, Thomas Sansonetti (hereinafter "Sansonetti Opinion"), and he rejected the Tribe's argument that the Sansonetti Opinion had been superseded by intervening changes in law.  A.R. 45, 49–50 (discussing Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers, Op. Sol. Interior M-36975 (Jan. 11, 1993)).  Under the Sansonetti Opinion's framework for Alaska Native tribal authority, the Assistant Secretary examined the history of

statutes governing Alaska Natives, the Eklutna people, and the Ondola Allotment site.  A.R. 50–55.

He then employed five factors "that reflect the fact-specific concerns expressed in" the Sansonetti Opinion to determine whether the Allotment had the requisite nexus with the Tribe to be "Indian lands"—that is, whether tribal jurisdiction existed.  A.R. 56.  Those factors were "(1) "Tribal membership of the original allottees and their heirs; (2) proximity to an existing Indian reservation; (3) allotment location relative to treaty-recognized hunting, fishing, and gathering territories; (4) the provision of Tribal police and other services in the area; and (5) acknowledgment by local governments of Tribal regulatory and enforcement authority at the site."  A.R. 56; *see* A.R. 56–60 (analyzing each factor).  Weighing these factors, the Assistant Secretary concluded they counseled against a finding of tribal jurisdiction because there was never an Indian reservation near the Allotment, the local authorities did not acknowledge the Tribe's territorial authority over the site, and the ownership by Tribal members alone was insufficient to counteract all the other factors.  A.R. 61.  Since the Allotment was not "Indian lands," the Assistant Secretary rejected the Tribe's proposed lease of the Allotment.  A.R. 61.

On August 8, 2019, the Tribe filed the instant action in this Court bringing three claims against Interior and its officers.  *See generally* Compl., Dkt. 1.  First, the Tribe alleges that Department of Interior's Indian lands determination was arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A), (C).  Compl. ¶¶ 101–16.  Second, the Tribe alleges that Interior's decision was improperly influenced by political considerations in violation of the APA, 5 U.S.C. § 706(2)(A).  Compl. ¶¶ 117–22.  Third, the Tribe alleges that the disapproval of the proposed lease was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).  Compl. ¶¶ 123–27.  The Tribe requests declaratory relief holding that the Ondola

Allotment is Indian lands and an injunction requiring Interior to approve the proposed lease.  *Id.* at 26.

Before briefing on the cross-motions for summary judgment and in furtherance of Eklutna's second count, the Tribe sought extra-record discovery in the form of depositions of senior Department officials.  *See* Motion for Leave to Take Extra-Record Discovery, Dkt. 36. This Court denied the motion because the plaintiff failed to adduce evidence that "r[o]se to a 'strong showing of bad faith or improper behavior.'"  Order at 6, Dkt. 47 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).  Thereafter, the plaintiff moved for partial summary judgment as to counts one and three.  Motion for Partial Summary Judgment, Dkt. 51.  Interior filed a cross-motion for summary judgment in December, followed by intervenor-defendant Alaska in January.  Cross-Motion for Summary Judgment, Dkt. 55; Cross-Motion for Summary Judgment, Dkt. 59.  These motions are now ripe for resolution.

## II.    LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90

(D.D.C. 2006).  The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary-and-capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained."). The court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted).  The court "is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (internal quotation marks omitted).  When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (internal quotation marks omitted). For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  "The party challenging an agency's action as arbitrary and capricious bears the burden of proof."  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015) (internal quotation marks and citation omitted).

To the extent that an agency action is based on the agency's interpretation of a statute it administers, the court's review is governed by the two-step *Chevron* doctrine. At Step One, a court must determine "whether Congress has directly spoken to the precise question at issue" or instead has delegated to an agency the legislative authority to "elucidate a specific provision of the statute by regulation." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843–44 (1984). If the latter, a court must reach Step Two, which asks whether the agency action "is based on a permissible construction of the statute" or instead is "manifestly contrary to the statute." *Id.* at 843, 844. *Chevron* deference applies "with muted effect" when an agency interprets Indian legislation. *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009). In such cases, a court shall "liberally construe the statute in favor of Native Americans." *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1278 (D.C. Cir. 2011).

## III.   ANALYSIS

### A.   The Indian Lands Determination Was Not Arbitrary and Capricious or Contrary to Law

The Tribe argues that Interior's determination that the Ondola Allotment is not Indian lands under Indian Gaming Regulatory Act and thus ineligible for an Indian gaming facility is incorrect for two reasons: First, Interior applied the wrong legal standard for determining whether the Ondola Allotment is Indian lands; and second, Interior's application of the Sansonetti Opinion was arbitrary and capricious. *See* Pl.'s Mem. in Supp. of Summ. J. at 13, Dkt. 51-1. The Court takes each argument in turn.

7

1.     *The Sansonetti Opinion Is the Governing Standard and Has Not Been Superseded*

As a matter of law, "[a]n agency's decision is an abuse of discretion if the agency has applied an incorrect legal standard in making its decision." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109 (D.D.C. 2018) (citing *Price v. District of Columbia*, 792 F.3d 112, 114 (D.C. Cir. 2015)).  When making an Indian lands determination in Alaska, Interior applies the legal standard set forth in the 1993 Sansonetti Opinion.  *See* A.R. 45 (Ondola Allotment Determination).  The Tribe challenges the application of that standard to the Ondola Allotment because it claims the 1993 Opinion was incorrect, and even if it was not, it has been undermined by intervening changes in the law.  *See* Pl.'s Mem. at 21–35.  The Court disagrees.  The Sansonetti Opinion was valid in the first instance and remains so today.

i.     Statutory Framework and Sansonetti Opinion

The Indian Gaming Regulatory Act is the statutory scheme through which the federal government approves and regulates Indian gaming.  *See generally* 25 U.S.C. § 2702 (statement of policy).  The Act allows Indian tribes to conduct gaming activity on "Indian lands" subject to approval by the Bureau of Indian Affairs and under the regulation of National Indian Gaming Commission.  *Id.* §§ 2704–06, 2710(a)(2), (b).  As both parties agree, the Indian Gaming Regulatory Act lays the initial legal foundation for the Indian lands determination by defining "Indian lands" as:

(A) all lands within the limits of any Indian reservation; and
(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

*Id.* § 2703(4).  Congress has delegated the authority to make Indian lands determinations to the Assistant Secretary of Interior for Indian Affairs.

In 1993, the Secretary of Interior commissioned Solicitor Sansonetti "to develop the legal position of the United States on 'the nature and scope of so-called governmental powers over lands and nonmembers that a Native village can exercise after the Alaska Claims Settlement Act.'" A.R. 2140 (Sansonetti Opinion).  In a 133-page opinion that Sansonetti described as "one of the most difficult to prepare during [his] tenure," he extensively reviewed the history of Alaska, its acquisition from Russia, the status of the native groups from the time of acquisition to the present, the legislation dealing with Alaska Natives, and the various actions Interior had taken with respect to Alaska Native groups.  A.R. 2270; *see generally* A.R. 2140–2272.  Interior relies on the standards set forth in this Opinion to the determine whether a plot of land is one "over which an Indian tribe exercises governmental power" as required by Indian Gaming Regulatory Act.  25 U.S.C. § 2703(4)(B); *see* A.R. 45 (Ondola Allotment Determination).

Sansonetti began by noting that the questions surrounding the Alaska Natives were complex because of "Alaska's unique circumstances and history." A.R. 2142.  He recognized that there was one key statute for understanding Alaska Native tribes without any parallel in federal Indian law—the Alaska Native Claims Settlement Act.  *See* A.R. 2215–46.  Although this Act did not terminate the tribal governments, it dealt primarily with "new, state-chartered corporate organizations" when it allocated land and money in exchange for the renunciation of aboriginal title claims.  A.R. 2246.  As such, Sansonetti found it necessary to determine how the Alaska Native Claims Settlement Act interacts with traditional Indian-law principles for determining tribal territorial power.  A.R. 2246–47.

The general rule, Sansonetti explained, is that Indian tribes have jurisdiction over persons and property in "Indian country" within the limitations imposed by Congress.  A.R. 2247 (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982)).  But that is not the end of the

tribal-jurisdiction inquiry.  For lands that are Indian country, the analysis proceeds from "general principles concerning tribal, federal, and state jurisdiction to the specific facts and law applicable to the particular situation to determine whether Congress has acted to alter the general principles."  A.R. 2249.

In the case of the Alaska Native Allotments (of which the Ondola Allotment is one), Congress created "an exception to the general rule that the territorial basis for tribal authority coincides with the federal Indian country status of lands."  A.R. 2263 (citing *Native Village of Venetie IRA Council v. Alaska*, 944 F.2d 548, 558 n.12 (9th Cir. 1991)).  The Alaska Native Allotments differed from allotments in the Lower 48 because (1) the Alaska Native Allotment Act "d[id] not make tribal membership a criteria for receiving an allotment," A.R. 2267, and (2) these allotments "were not carved out of any reservation," A.R. 2268.  The text of the Act also provided that the allotment "shall be deemed the homestead of the allotee and its heirs."  *Id.*  For these reasons, Sansonetti concluded that the Alaska Native Allotments were "more similar to homestead act allotments rather than tribal affiliation public domain allotments."  A.R. 2266.

ii.    Initial Validity

The Tribe advances two arguments why the Sansonetti Opinion was incorrect from the outset.  First, it argues that Sansonetti was incorrect to consider (1) the lack of a tribal-membership requirement for an allottee and (2) the reservation carve-out status for the allotment in distinguishing between the Alaska Native Allotment Act and other allotment schemes.  *See* Pl.'s Mem. at 26–29.  Second, the Tribe argues that he was wrong to consider the Alaska Native Claims Settlement Act to determine tribal territorial jurisdiction.  *See id.* at 29–31. Both arguments fail.

Sansonetti's interpretation of the Alaska Native Allotment Act was correct.  Although the two factors he identified—tribal membership and reservation carve-out status—may not make a difference in *every* comparison of Alaska and Lower 48 allotments, the Tribe is incorrect that these factors are *irrelevant* in determining tribal territorial sovereignty over a parcel of land, *see* Pl.'s Mem. at 26–28.  For example, there would be no "tribal jurisdiction over an Indian homestead allotment obtained by an Indian who had abandoned tribal relations" because there would be neither "indication of congressional intent to permit such jurisdiction" nor "original tribal nexus to support such jurisdiction."  A.R. 2266.  And the Supreme Court has long held that tribal-membership status is relevant to sovereignty analyses.  *See, e.g.*, *Montana v. United States*, 450 U.S. 544, 557–67 (1981) (considering tribal regulation of fishing and hunting differently depending both on status of land and on status of person).  Similarly, the fact that an allotment was not carved out of a reservation also may not be dispositive of tribal jurisdiction in every case, but it too is informative: When an allotment has been carved out of a reservation, one is certain that the tribe at least once exercised sovereignty over the parcel; otherwise, not.  *Cf. Solem v. Bartlett*, 465 U.S. 463, 466–72 (1984) (explaining the different consequences of carving allotments out of reservations depending on statute for the allotment's status henceforth); *United States v. Nice*, 241 U.S. 591, 595–96 (1916) (explaining that allotments out of reservations land that would eventually be conveyed in fee to the Indian and his heirs did not dissolve the tribal relation while the land was still in trust status).  Because both factors that Sansonetti identified in analyzing the Alaska Native Allotment Act reflect the political connection between the land and the Tribe under the allotment scheme, the Sansonetti Opinion did not misinterpret the Act.

Sansonetti also correctly determined that the Alaska Native Claims Settlement Act "largely controls in determining whether" Alaska Native tribes exercise jurisdiction over

Alaskan lands.  A.R. 2247.  Although the Act's text does not explicitly address tribal governmental authority, its distribution of land in particular tenure to particular parties has legal significance in determining the scope of tribal governmental authority.  *Cf., e.g.*, *United States v. Mazurie*, 419 U.S. 544, 554–55 (1975) (considering land tenure for purposes of federal jurisdiction); *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 467–68 (D.C. Cir. 2007) (considering property's context in determining what qualifies as a reservation). And neither the House committee report nor the 1988 amendment on which the Tribe relies undermines this conclusion.  The fact that a House committee report did not speak to tribal jurisdiction, *see* Pl.'s Mem. at 30 (quoting H.R. Rep. No. 99-712, at 27 (1986)), does not mean that Congress did not affect the status of tribes or tribal jurisdiction.  The 1988 amendment, which provides that "no provision of this Act shall . . . confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands . . . or persons in Alaska," Pub. L. No. 100-241, § 2(8)(B), 101 Stat. 1788, 1789 (1988) (codified at 43 U.S.C. § 1601 note), is inapposite.  That amendment concerned the "degree[s]" of tribal authority—i.e., not whether a tribe has sovereign control over land, but what that sovereignty entails.  The Tribe is incorrect that Alaska Native Claims Settlement Act simply resolved "disputed aboriginal land claims" and played no role in defining the extent of territorial jurisdiction.  *See* Pl.'s Mem. at 29.

In sum, both of Eklutna's arguments about the Sansonetti Opinion's initial validity are unavailing.  And consistent favorable treatment of the Opinion by courts supports this conclusion.  *See Confederated Tribes of the Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 18, 26 (D.C. Cir. 2020), *rev'd on other grounds*, 141 S. Ct. 2434 (2021); *Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez,

J., concurring), *rev'd on other grounds*, 522 U.S. 520 (1998); *Native Village of Venetie I.R.A.
Council v. Alaska*, 1994 WL 730893, at *12 (D. Alaska Dec. 23, 1994).

iii.    Intervening Law

The Tribe is also incorrect that later-enacted statutes invalidated the 1993 Sansonetti
Opinion.  *See* Pl.'s Mem. at 31–35.  Neither the Federally Recognized Indian Tribe List Act,
Pub. L. No. 103-454, § 103(4)–(5), 108 Stat. 4791, 4791–92 (1994) (List Act), the Tlingit and
Haida Status Clarification Act, *id.* § 202(4), 108 Stat. at 4792, nor the "privileges-and-
immunities" amendment to the Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984
(1934) (codified at 25 U.S.C. § 461 *et seq.*), *amended by* Pub. L. No. 103-263, §5(b), 108 Stat.
707 (1994) (codified at 25 U.S.C. § 5123(f)–(g)), call into question the Opinion's legal
foundation.  As the Assistant Secretary found, the Opinion still provides the proper standard for
Interior's Alaskan Indian lands determinations.

The List Act, the first statute the Tribe highlights, requires the Secretary of Interior to
"publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be
eligible for the special programs and services by the United States to Indians because of their
status as Indians."  § 104(a), 108 Stat. at 4792.  This Act "repudiate[ed] the policy of terminating
recognized Indian tribes" and implemented a new policy of "restor[ing] recognition to tribes that
previously have been terminated."  § 103(5), 108 Stat. at 4791.  It also made clear that only
Congress can terminate a tribe that has been recognized.  § 103(4), 108 Stat. at 4791.  But the
List Act's passage had no impact on the continuing validity of the Sansonetti Opinion for two
reasons.  First, there is no general conflict between the List Act and the Opinion because the
Opinion recognized that Alaska Native tribes had "retained governmental powers" after the
Alaska Native Claims Settlement Act was enacted, and that statute was insufficiently clear to

13

serve as a certain and complete termination statute as to Alaska Native tribes so as to

"extinguish[] the sovereign powers of Native villages that are tribes."  A.R. 2246.  The Opinion

even found that "it would be improper to conclude that no Native village in Alaska could qualify

as a federally recognized tribe."  A.R. 2270.  The List Act merely codified what Solicitor

Sansonetti had already suspected to be the case—that there were federally recognized tribes in

Alaska—and made clear that, once recognized, neither Interior nor the Bureau of Indian Affairs

could disestablish those tribes.  Second, the Opinion does not conflict with the List Act in the

case of this specific tribe because the Eklutna Tribe has been a federally recognized tribe since

before the List Act and the Sansonetti Opinion, and it remains one to this day.  *See* Indian

Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian

Affairs, 58 Fed. Reg. 54364, 54369 (1993); Indian Tribal Entities Recognized and Eligible to

Receive Services from the United States Bureau of Indian Affairs, 48 Fed. Reg. 56862, 56865

(1983).  And as Interior itself recognizes, it lacks the power to disestablish a tribe.  Thus, the List

Act has had no impact on the validity or applicability of the Sansonetti Opinion to the Tribe's

claim.

Nor did the Tlingit and Haida Status Clarification Act undercut the Sansonetti Opinion.

In this Act, Congress reaffirmed the federally recognized tribal status of the Central Council of

Tlingit and Haida Indian Tribes of Alaska after the Secretary left the tribe off the list of federally

recognized tribes.  §§ 202–03, 108 Stat. at 4792 (codified at 25 U.S.C. §§1212–13).  Congress

found this omission improper because the United States had declared them a federally

recognized tribe by statute in 1935, and only Congress has authority to terminate federally

recognized tribes.  § 202, 108 Stat. at 4792.  This response to an improper action by Interior as to

one particular tribe has no bearing on the legal standard set forth in the Sansonetti Opinion.  The

Opinion made no claim as to the Tlingit and Haida's tribal status, nor did it suggest the Secretary had the authority to terminate or otherwise diminish the status of federally recognized tribes.  As such, the passage of this Act did not undermine the ongoing viability of the Sansonetti Opinion.

Finally, the addition of the "privileges-and-immunities" provisions to the Indian Reorganization Act also did not invalidate the Sansonetti Opinion's legal reasoning.  This amendment provides that "[a]ny regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on the date of the enactment of this Act and that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect."  § 5(b), 108 Stat. at 709 (codified at 25 U.S.C. § 5123(g)).  The key purpose of this clause is to "prohibit[] disparate treatment between similarly situated recognized tribes."  *Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 54 (D.D.C. 2019).  Although Eklutna is correct that its application for an Indian lands determination was denied while applications of other tribes in the Lower 48 were not, Eklutna fails to grapple with the requirement that its different treatment be arbitrary.  And though it is true that a nearly identical statutory provision, § 5123(f), "prohibit[s] the [Bureau of Indian Affairs] from finding [one tribe] lack[ed] territorial jurisdiction while other tribes possess[ed] it," *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1160 (10th Cir. 2019) (citation omitted), both provisions require only that Interior apply the same legal rule in the same manner, not that Interior necessarily reach the same outcome.  Despite Eklutna's contentions otherwise, the Sansonetti Opinion does not set out a new legal test but instead sets forth the starting point for

applying the general legal test for Indian tribal territorial jurisdiction to the unique factual and legal circumstances in Alaska.

As discussed above, the Sansonetti Opinion's starting point was "the general principles of Indian law." A.R. 2247. Sansonetti recognized that the general rule is that Indian tribes have jurisdiction over "Indian country" property "except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress." A.R. 2247 (internal quotation marks omitted) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 140 (1982)). Because Alaska Native tribes have been governed by different acts of Congress—from the Alaska Native Allotment Act to the Alaska Native Claims Settlement Act—than tribes in the Lower 48 for over one hundred years, *see* Case & Voluck, *supra*, at 42, a neutral application of the general Indian lands test necessarily looks different in Alaska than it does in the Lower 48. That is not arbitrary; rather, it reflects the fact that Congress has decided that a different scheme should govern federal–native relations in Alaska.

The Sansonetti Opinion then conducted its analysis of the impact of the Alaska-specific statutes within the parameters established by cases involving a wide range of different tribes. *See, e.g.*, A.R. 2248–49 (discussing, *inter alia*, *Indian Country, U.S.A. v. Oklahoma Tax Comm'n*, 829 F.2d 967 (10th Cir. 1987) (explaining the significance of the "Indian country" determination, *id.* at 973); *Mescalero Apache Tribe v. Jones*, 411 U.S. 147, 148–49 (1973) (discussing off-reservation tribal activity)). After a threshold determination of whether "particular lands involved are properly classified as Indian country," the Opinion considered "the specific facts and law applicable to the particular situation to determine whether Congress ha[d] acted to alter the general principles" when it came to tribal territorial jurisdiction over Indian country lands. A.R. 2249.

The Opinion acknowledged that Alaska Native Allotments were "Indian country," A.R. 2263, and then explained why they differed from allotments in the Lower 48. First, the Alaska Native Allotment Act "d[id] not make tribal membership a criteria for receiving an allotment." A.R. 2267. Second, these allotments "were not carved out of any reservation." A.R. 2268. Finally, "the statute specifically provide[d] that the allotment 'shall be deemed the homestead of the allottee and his heirs.'" A.R. 2268. The Opinion concluded that the first two factors, coupled with the statutory language, made these allotments more akin to general Indian homestead allotments rather than tribal or reservation allotments from which tribal territorial jurisdiction could spring. *See* A.R. 2268. The Alaska Native Allotment Act allotments lacked the key connection to a tribal territorial base such as a reservation. *See* A.R. 2268. This was in no small part because there was not a general federal practice of establishing reservations in Alaska, and to this day only one reservation exists. *See* A.R. 2146, 2168, 2172, 2178 n.110.

Nothing in the Sansonetti Opinion amounts to arbitrary discrimination on behalf of Interior. The Solicitor applied the same legal test that determined tribal territorial jurisdiction across the United States, and that test's statute-specific analysis led to a different conclusion for jurisdiction over Indian country allotments in Alaska. This legal test remains the appropriate legal standard even after the passage of legislation, including the "privileges-and-immunities" amendment to the Indian Reservation Act. And because the statutes at issue are sufficiently clear, there is no need to apply the Indian canon of construction—which "direct[s] courts to liberally construe statutes in favor of Native Americans"—as the Tribe suggests. *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1278 (D.C. Cir. 2011) (declining to apply the Indian canon to the Uranium Mill Tailings Remediation and Control Act for that reason). For all of

these reasons, Interior applied the correct legal standard when making the Ondola Allotment Indian lands determination.

### 2. The Application of the Sansonetti Opinion to the Ondola Allotment Was Not Arbitrary and Capricious

The record also reveals that Interior "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  As discussed above, Interior considered five factors, A.R. 56, to determine whether there was a "tribal nexus" between Eklutna and the Ondola Allotment sufficient to create territorial jurisdiction:

(1) Tribal membership of the original allottees and their heirs;
(2) proximity to an existing Indian reservation;
(3) allotment location relative to treaty-recognized hunting, fishing, and gathering territories;
(4) the provision of Tribal police and other services in the area; and
(5) acknowledgment by local governments of Tribal regulatory and enforcement authority at the site.

A.R. 56.  The parties agree that Ondola, the allottee, and her heirs were and are members of the Eklutna Tribe, *see, e.g.,* Pl.'s Mem. at 37 n.21, but they disagree over the remaining factors.  The Court takes their arguments in turn.

The Tribe claims that Interior retroactively recharacterized its earlier Indian lands decisions as turning on proximity to "an existing source of Tribal territorial sovereignty," as opposed to "distance from 'the tribal community.'"  Pl.'s Mem. at 21 (quoting A.R. 57, 2469, 2511).  But that is not what Interior did.  Instead, Interior merely recognized an important distinction between its earlier decisions and the present one—namely, that the other tribes had reservations, which are sources of territorial sovereignty, and Eklutna does not.  *See* A.R. 56–57,

2469, 2511.  This is not an arbitrary or capricious difference in a legal regime determining territorial jurisdiction.

Interior also did not act arbitrarily when it found that the Ondola family's tribal membership was not dispositive.  Nor did it "completely . . . disregard[] the Tribe's evidence."  Pl.'s Mem. at 37.  The Assistant Secretary merely said that the family's tribal membership was not sufficient to answer the tribal jurisdiction question.  A.R. 56–57.  This is not the same as treating particular evidence as helpful in one circumstance and "characterize[ing] that same type of evidence very differently and dismiss[ing] it as entirely unhelpful for" another tribe.  *Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199, 230 (D.D.C. 2020).

Interior considered the Tribe's close connection to lands near and including the Ondola Allotment but also found it insufficient.  *See* A.R. 51–53.  The Tribe notes that the allotment is within their "traditional lands in the upper Cook Inlet region" and that the allotment was once within a federal reserve—"the Eklutna School Reserve that had been set aside for the benefit and education of Alaska Natives."  Pl.'s Mem. at 36.  But the School Reserve is not the same as the reservations considered in other Indian lands determinations because it is for a "vocational boarding school for Alaska Natives" run by the U.S. Bureau of Education, A.R. 51, not for a particular tribe, *see, e.g.*, A.R. 2455 (Whitecloud Indian lands determination).  As the Supreme Court has recognized, "the Indian tribes retain 'attributes of sovereignty over both their members and *their* territory.'"  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (emphasis added) (quoting *Mazurie*, 419 U.S. at 557); *see also id.* at 143 (explicitly discussing "[t]*ribal* reservations" (emphasis added)).  This does not extend to *any* territory placed in reserve by the federal government for use of Indians generally.  *Cf. Montana*, 450 U.S. at 566 ("A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee

lands within *its* reservation . . . ." (emphasis added)).  Interior's decision to distinguish tribal reservations run by Indian tribes from educational reservations run by the federal government is not arbitrary in the context of territorial jurisdiction because the two kinds of reservations are controlled by two different sovereigns—a tribe versus the federal government.

Applying the fourth prong, Interior considered various government services provided by the Tribe but found them insufficient.  The Assistant Secretary looked at the Tribe's provision of services such as cutting trees on the Ondola Allotment "for fire safety purposes and . . . for cultural activities elsewhere" and food delivery "to Ms. Ondola and her family."  A.R. 59. Interior considered this evidence but found it lacking, noting that there was not provision of policing in the area or general services to nearby Tribal members.  A.R. 59.  The Tribe points to other tribal services such as the placement of foster children with the Ondola family under the Indian Child Welfare Act, Pub. L. No. 95-608, 92 Stat. 3069 (1978), land maintenance, and environmental regulation to suggest that there were sufficient tribal services at the site to meet this prong.  *See* Pl.'s Mem. at 40–41.  But as Interior noted, *see* A.R. 60, there is a difference between jurisdiction over members and jurisdiction over land, and given the nature of these services, it was not arbitrary for Interior to conclude that the Tribe exercised only the former here, *cf. Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 327–29 (2008) (distinguishing between authority over tribal members and over land).  Even, to the extent that environmental regulations arguably evidence jurisdiction over territory, that alone is insufficient to tilt this prong in favor of the Tribe when (1) the other provided services are clearly personal— rather than territorial—in nature and (2) there is an absence of core governmental services provided by the Tribe.

Finally, under the fifth prong, Eklutna challenges Interior's conclusion that state or local governments do not recognize Eklutna' tribal jurisdiction.  *See* Pl.'s Mem. at 41.  Eklutna points to agreements with the Municipality of Anchorage, *id.*, but as the Assistant Secretary explained, "[t]he agreement [with the Anchorage Police Department] relates to matters of *personal*, not territorial jurisdiction, and does not otherwise acknowledge Tribal territorial jurisdiction or reference Tribal lands."  A.R. 59 (emphasis added).  That is because the agreement, as even the Tribe recognizes, covers "comprehensive service to *members* of the Tribe of Eklutna."  A.R. 795 (Eklutna Indian Lands Submission) (emphasis added).  Indeed, Interior followed the delineation between jurisdiction over territory and jurisdiction over persons that the Supreme Court has consistently recognized.  *See, e.g.*, *Montana*, 450 U.S. at 564–66; *United States v. Wheeler*, 435 U.S. 313, 324–26 (1978), *superseded by statute on other grounds as stated in United States v. Lara*, 541 U.S. 193 (2004); *Mazurie*, 419 U.S. at 557.  Because the purpose of Interior's inquiry was to determine territorial jurisdiction, it is not irrational or arbitrary for Interior to discount agreements about personal jurisdiction under this final prong.

In sum, Interior's conclusion that the Ondola Allotment did not meet the requirements of the Indian lands test was rational.  Though the Tribe may not agree with Interior's application of law to the facts at hand, the record shows that Interior made a reasoned judgment which the Court will not second-guess.  Thus, the Tribe's claim that Interior acted arbitrarily and capriciously in applying the Indian lands test set forth in the Sansonetti Opinion must fail.

**B.      The Indian Lands Determination Was Not Improperly Influenced by**

**Political Considerations**

The Tribe's second claim—that "political communications by members of the Alaska

Delegation . . . influenced the outcome of Interior's decision" such that Interior's decision was

arbitrary and capricious, Compl. ¶¶ 121–22—fails for three reasons.

First, there are no material facts in dispute.  Because the Court is reviewing the agency's

action under the APA, the Court is limited to the administrative record.  *See, e.g.*, *Hill*

*Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter

administrative law that in an APA case, a reviewing court 'should have before it neither more

nor less information than did the agency when it made its decision.'" (quoting *Walter O. Boswell*

*Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir.1984))); *James Madison Ltd. ex rel. Hecht*

*v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Generally speaking, district courts reviewing

agency action under the APA's arbitrary and capricious standard do not resolve factual issues,

but operate instead as appellate courts resolving legal questions.").  On the record before this

Court, summary judgment in favor of Interior is appropriate.

Second, this Court has already addressed the plaintiff's request for extra-record

discovery.  *See* Order, Dkt. 47.  That decision is now the law of the case, not subject to

disturbance on resolution of motions for summary judgment.  *See, e.g.*, *Al Bahlul v. United*

*States*, 967 F.3d 858, 875 (D.C. Cir. 2020).  "The law-of-the-case doctrine dictates that 'the same

issue presented a second time in the same case in the same court should lead to the same result.'"

*Id*. (emphasis omitted) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en

banc)).  That doctrine squarely applies here.

Third, the Tribe's claim fails on the merits.  To succeed on its claim, the Tribe bears the burden of showing that political influence "*actually* affected the outcome on the merits" or "enter[ed] the decision maker's 'calculus of consideration.'"  *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1529–30 (D.C. Cir. 1994).  To do so, the Tribe must "demonstrate clear interference."  *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 169 (D.C. Cir. 1983).  For the reasons discussed in this Court's Order from August 26, 2020, and in section III.A above, the Tribe has not come close to meeting this burden.

For these reasons, the Court will grant summary judgment for Interior on this claim.

**C.      Interior's Disapproval of the Proposed Lease Was Not Arbitrary and Capricious.**

Eklutna's final claim is that the disapproval of their proposed lease was arbitrary and capricious because it was based on a flawed Indian lands determination.  *See* Pl.'s Mem. in Support of Summary Judgment at 43–44.  Because the Indian lands determination was not flawed, *see supra* section III.A, this claim must also fail.  A gaming lease can be approved only on Indian lands.  *See* 25 U.S.C. § 2710(b)(1), (d)(1)(A)(i); *accord Citizens Exposing Truth About Casinos*, 492 F.3d at 462.  Thus, the Secretary lacked discretion to reach any other determination on the proposed lease, which precludes the decision from being arbitrary and capricious.  Summary judgment for Interior is therefore appropriate on this claim as well.

## CONCLUSION

For the foregoing reasons, the defendants' Cross-Motions for Summary Judgment are granted and the plaintiff's Motion for Summary Judgment is denied.  A separate order consistent with this decision accompanies this memorandum opinion.


DABNEY L. FRIEDRICH
United States District Judge

September 22, 2021