TREG TAYLOR
ATTORNEY GENERAL

Jessica Moats Alloway
Christopher Orman
Assistant Attorneys General
Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK  99501
Telephone: (907) 269-5232
Email:  jessie.alloway@alaska.gov
         christopher.orman@alaska.gov

Attorneys for the State of Alaska

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIVE VILLAGE OF EKLUTNA,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>THE INTERIOR, et al.,<br><br>    Defendants,<br><br> and<br><br>STATE OF ALASKA,<br><br>    Defendant-Intervenor. | Civil Action No.: 1:19-cv-02388<br>(DLF)<br><br>**STATE OF ALASKA'S<br>MOTION TO REOPEN AND FOR<br>FURTHER RELIEF UNDER<br>28 U.S.C. § 2202** |

This Court granted the State of Alaska's Cross-Motion for Summary Judgment

[Dkt. 70] and entered an order declaring that a 1993 Solicitor Opinion, known as the

Sansonetti Opinion, was "valid in the first instance and remains so today." Memorandum

Opinion, Dkt. 71, at 8; *Native Village of Eklutna v. U.S. Dep't of the Interior*, 2021 WL

4306110 (D.D.C. September 22, 2021).[1] It further held that by applying the Sansonetti Opinion, "Interior [had] applied the correct legal standard when making the Ondola Allotment Indian lands determination." *Id.*, at *8. The Native Village of Eklutna (the Tribe) did not appeal this Court's decision.

The State returns to this Court now and asks it to reopen the matter and grant it further relief under 28 U.S.C. § 2202. That provision allows a party to move for "further relief" to effectuate a prior declaratory judgment. *See Powell v. McCormack*, 395 U.S. 486, 498 (1969) ("A declaratory judgment can then be used as a predicate to further relief, including an injunction."); *Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 548 (D.C. Cir. 1988) ("The 'further relief' provisions of both state and federal declaratory judgment statutes clearly anticipate ancillary or subsequent coercion to make an original declaratory judgment effective.").

The State needs further relief here because, in the last year of President Biden's administration, the former Solicitor for the Department of the Interior, Robert Anderson, concluded in a new Solicitor's Opinion that this Court had wrongly decided the legal standard to be applied to the Ondola Allotment. [Exhibit A (Anderson Opinion)] Without seeking relief from this Court under Federal Rule of Civil Procedure 60(b), the former Solicitor then applied a different legal standard to reconsider the status of the Ondola Allotment and did so without giving the State any opportunity to participate or to oppose

---

[1]     For ease of reference the State will cite to the version of the Court's order found on Westlaw.

his decision.[2] Interior then relied on the Solicitor's decision as the basis for additional decisions. The practical consequences are that the Native Village of Eklutna is purporting to exercise governmental powers over the Ondola Allotment and that allotment is now being treated as "Indian lands" under the Indian Gaming Regulatory Act (IGRA) while the State is being deprived of its sovereign jurisdictional, regulatory, and taxing authority.

The State respectfully asks this Court to reopen this matter and grant it additional relief by (1) enjoining Interior from applying any standard other than that articulated in the Sansonetti Opinion when addressing the "Indian lands" status of the Ondola Allotment; and (2) enjoining Interior and the Tribe from engaging in any activity authorized by decisions that applied a standard other than the Sansonetti Opinion to the Ondola Allotment.

## BACKGROUND

Given the passage of time, the State provides some background on the law and then updates the Court on the most recent history.

---

[2]     Federal Rule of Civil Procedure 60(6)(5) allows a party to make a showing that "'a significant change either in factual conditions or in law' render[ed] continued enforcement [of the judgment] 'detrimental to the public interest.'" *Jordan v. U.S. Dep't of Labor*, 331 F.R.D. 444, 453 (D.D.C. 2019) (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009)). Notably, had either the Tribe or Interior properly filed a Rule 60(b) motion, it would have been in this Court and the State would have received notice and had an opportunity to participate.

I.    **The Indian Gaming Regulatory Act regulates gaming on "Indian lands," and Interior's longstanding position had been that Alaska Native Allotments were not "Indian lands."**

The Indian Gaming Regulatory Act (IGRA) regulates gambling conducted by "Indian Tribes" on "Indian lands." *See* 25 U.S.C. § 2701 *et seq.* "Indian lands" are defined as follows:

> Indian lands means:
> (A) all lands within the limits of any Indian reservation; and
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).

> A regulation further explains "Indian lands" to mean:

> (a) Land within the limits of an Indian reservation; or
> (b) Land over which an Indian tribe exercises governmental power and that is either—
> (1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
> (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12.

Here, the Tribe wanted to conduct "class II" gaming on the Ondola Allotment, an Alaska Native Allotment. IGRA states that "[a]n Indian tribe may engage in, or license and regulate, class II gaming on Indian lands *within such tribe's jurisdiction.*" 25 U.S.C. § 2710(b) (emphasis added). Thus, the analysis of whether a particular property is "Indian lands" under IGRA first determines whether a tribe has jurisdiction over the property and second determines whether the tribe exercises governmental power over the property through "concrete manifestations of authority." *Kansas v. United States*,

249 F.3d 1213, 1229 (10th Cir. 2001) ("A proper analysis of whether the tract is 'Indian lands' under IGRA begins with the threshold question of the Tribe's jurisdiction."); *Rhode Island. v. Narragansett Indian Tribe*, 19 F.3d 685, 702–03 (1st Cir. 1994) ("In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger the Gaming Act. Meeting this requirement does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority.").

There are two, separable, forms of tribal jurisdiction: jurisdiction over members and jurisdiction over land. *See, e.g, United States v. Mazurie*, 419 U.S. 544, 577 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory") (citing *Worcester v. Georgia*, 31 U.S. 515 (1832)); *Montana v. U.S.,* 450 U.S. 544, 563 (1981) (same) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)). Only jurisdiction over land, or territorial jurisdiction, matters here. A tribe may have jurisdiction over its individual members even though it has no jurisdiction over any land. *See Runyon ex rel. B.R. v. Ass'n of Village Council Presidents*, 84 P.3d 437, 439 (Alaska 2004) ("Although Alaska no longer contains Indian country, its Native villages retain those fundamental attributes of sovereignty . . . which have not been divested by Congress or by necessary implication of the tribe's dependent status.") (internal quotation marks omitted), *overruled on other grounds by Ito v. Copper River Native Ass'n*, 547 P.3d 1003 (Alaska 2024); *see also State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 267 (Alaska 2016) (tribal courts have "inherent, non-territorial" subject matter jurisdiction to adjudicate child support obligations of members). Federally recognized tribes may be sovereign entities although

"severe[d] from the land" and "without territorial reach." *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 526 (1998) ("[The Alaska Native Claims Settlement Act] attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land; it attempted to leave them as sovereign entities for some purposes, but as sovereigns without territorial reach.") (quoting *Alaska v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J. concurring)). This is particularly common in Alaska due to its unique history. *See John v. Baker,* 982 P.2d 738, 754 (Alaska 1999) (stating, in a case of first impression, that "[b]ecause the traditional reservation-based structure of tribal life in most states forms the backdrop for the federal cases, courts have not had occasion to tease apart the ideas of land-based sovereignty and membership sovereignty"). The Tribe's jurisdiction over the individuals inhabiting the Ondola Allotment therefore does not answer the question of whether the Tribe has territorial jurisdiction over the Ondola Allotment.

In the early 1990s, twenty years post enactment of the Alaska Native Claims Settlement Act (ANCSA), the extent of tribal sovereignty, including tribal territorial jurisdiction, remained unresolved in Alaska. The federal government requested guidance and commissioned Interior to research and produce what became the Sansonetti Opinion, which was issued in 1993. [Exhibit B; AR 2140–2275] The Sansonetti Opinion reached two major conclusions: (1) tribes continue to exist as sovereigns in Alaska, but (2) they do not have territorial jurisdiction over ANCSA settlement lands. [Exhibit B, at 107–08]. The Opinion pointed to the unique nature of the Alaska Native Allotment Act and the general lack of tribal territorial jurisdiction post-ANCSA to conclude Alaska tribes

generally do not have territorial jurisdiction over Alaska Native Allotments. [*Id.* at 127–28]. It also explained that "Congress ha[d] left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands." [*Id.* at 132]

In 1993, Interior formally acted on the Sansonetti Opinion's first conclusion and added Alaska tribes to the list of federally recognized tribes, which was formally ratified by Congress the following year. *See* 58 Fed.Reg. 54,364, 54,365 (describing the Sansonetti Opinion and stating, "in view of the foregoing … the Department of the Interior has determined it necessary to publish a new list of Alaska tribal entities"); Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(4), (5), 108 Stat. 4791, 4791-92. This act was a recognition and validation of the Sansonetti Opinion. And in 1998, the Supreme Court vindicated the second conclusion of the Sansonetti Opinion by holding that Alaska tribes lack jurisdiction over ANCSA settlement lands. *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520 (1998).

In *Alaska v. Native Village of Venetie*, the Supreme Court held that ANCSA settlement lands are not subject to tribal jurisdiction based on reasoning largely consistent with the Sansonetti Opinion.[3] 522 U.S. 520 (1998). Like the Sansonetti Opinion, the Court directly interpreted ANCSA to reach its holding that the structure and Congressional intent of ANCSA precluded settlement lands from being considered "dependent Indian communities" for purposes of federal or tribal jurisdiction, even when owned by a tribe in fee. *Venetie,* 522 U.S. at 534; [Exhibit B, at 117–120]. However,

---

[3]    Note that, unlike Eklutna, Venetie was one of the few Alaska tribes to inhabit a reservation before ANCSA, and the land in question was former reservation land. 522 U.S. at 523.

*Venetie* left open the question of whether a tribe could have territorial jurisdiction over Alaska Native Allotments. *Venetie,* 522 U.S. at 528 & n. 2 ("Because ANCSA revoked the Venetie reservation, and because *no Indian allotments are at issue*, whether the Tribe's land is Indian country depends on whether it [is a] "dependent Indian communit[y]") (emphasis added). The allotment question was not before the Court so the Court did not address it. The following year, the Alaska Supreme Court held that ANCSA did not extinguish the non-territorial sovereignty of Alaska tribes over their own members. *John v. Baker*, 982 P.2d 738, 748–49 (Alaska 1999); *see also State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 267 (Alaska 2016) (tribal courts have inherent, non-territorial subject matter jurisdiction to adjudicate child support obligations of members).

Between 1993 and 2024, Interior consistently applied the conclusions reached in the Sansonetti Opinion. During this period, Interior denied at least three separate requests for an "Indian lands" determination on the Ondola Allotment under IGRA. Interior denied the Tribe's request in 1995 on grounds similar to the denial challenged by the Tribe in this case: specifically, that the allotment was not "Indian lands" because the Tribe did not exercise governmental power over the allotment. [Dkt. 19-9][4] The Tribe tried again in 2007, but withdrew its request after the State and the Alaska legislature opposed it. [Dkt. 19-8, 19-10, 19-11 (note that, although the withdrawal states that the request would be resubmitted, as far as the State is aware the request was not re-

---

[4]    Although this denial does not identify the Ondola allotment, there are no other allotments in the Eklutna area.

submitted)] The third attempt resulted in litigation, with this Court concluding in 2021 that "Sansonetti's interpretation of the Alaska Native Allotment Act was correct." *See Native Village of Eklutna*, 2021 WL 4306110, at *5.

The Native Village of Eklutna is not the only federally recognized tribe in Alaska that wants to engage in gaming under IGRA. In the late 1990s, the Native Village of Barrow, the Native Village of Akiachak, and the Kenaitze Indian Tribe requested IGRA "Indian lands" determinations for certain Alaska Native Allotments (and analytically similar Native townsite lots). [Exhibit C; Dkt. 19-12, and 19-14] Interior denied those applications too, on grounds similar to the grounds challenged in this case. [Exhibit C, at 1-2; Dkt. 19-12, at 2] The tribes challenged those denials in this Court. *See Akiachak Native Cmty., Kenaitze Indian Tribe, IRA v. Dep't of the Interior*, Case No. 1:96-cv-02302 (D.D.C.); *Native Vill. of Barrow v. Nat'l Indian Gaming Comm'n*, Case No. 1:99-cv-00886 (D.D.C.). And, as it ultimately did in 2021, the court upheld the denial of the Native Village of Barrow's application in 2001. [Dkt. 19-13] The Native Village of Akiachak and the Kenaitze Indian Tribe subsequently dropped their requests. [Dkt. 19-14, Exhibit D] The question of whether an Alaska Native Allotment may be considered "Indian lands" for IGRA purposes may have arisen in additional situations of which the State is not aware. But in sum, Interior had consistently held that Alaska Native Allotments are not "Indian lands" and thus are ineligible for IGRA gaming.

II.    **In 2021, this Court confirmed that the Sansonetti Opinion articulated the correct legal standard for determining whether Alaska tribes hold territorial jurisdiction over Alaska Native Allotments.**

After Interior denied the Tribe's *third* application for an Indian lands determination on the Ondola Allotment in 2018, the Tribe filed a complaint in this Court. [*See* Dkt. 1] It alleged, among other things, that Interior "failed to recognize that the Sansonetti opinion was based on a flawed analysis and ha[d] been superseded by important changes in law and policy." [*Id.*, at 21] It further alleged that even if the Sansonetti Opinion was correct, Interior improperly applied the test to conclude the Tribe had not shown a sufficient "original tribal nexus" to the Ondola Allotment. [*Id.*, at 22] As relief, the Tribe asked the Court to "revers[e] the Department's negative Indian lands determination," "declar[e] that the Allotment constitute[s] 'Indian lands' within the meaning of 25 U.S.C. § 2703(4)," and issue an injunction that would require Interior "to approve the Tribe's proposed lease of the Ondola Allotment." [*Id.*, at 26]

Interior defended its decision and the Sansonetti Opinion. It argued that "[e]ach of the three conclusions that the Sansonetti Opinion drew from the 1906 [Alaska Native Allotment Act] [were] apparent in the statute's plain language." [Dkt. 15-4, at 15] Nowhere in Interior's pleadings did it cite to the now overturned *Chevron* decision to argue the Court must defer to the agency's determination as reasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). [*See* Dkt. 54 and 64].

The State intervened as a defendant to protect "its sovereign jurisdictional, regulatory, and taxing authority." [Dkt. 19, at 3] Like Interior, the State argued that the

Court should "affirm Interior's decision as a correct interpretation of Congressional intent in the Alaska Native Allotment Act and ANCSA." [Dkt. 58, at 29]

This Court agreed with the State and Interior on the merits, concluding the Sansonetti Opinion was correct on the law. It recognized that because of "Alaska-specific federal statutes and the lack of treaties between Alaska Natives and the federal government," Alaska tribes "lack clearly defined territory subject to their jurisdiction." *Native Village of Eklutna*, 2021 WL 4306110, at *1. As such, when it comes to federal-Indian relations, "'Alaska is often the exception, not the rule.'" *Id.* (quoting *Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 141 S. Ct. 2434, 2438 (2021)).

The Court expressly rejected the Tribe's argument that the Sansonetti Opinion was incorrect either as a matter of first impression or based on intervening law or policy changes. It instead held that "[t]he Sansonetti Opinion was valid in the first instance and remains so today." *Id*, at *4; *see also id*, at *5 ("Sansonetti's interpretation of the Alaska Native Allotment Act was correct."), *id.* at *6 ("Sansonetti also correctly determined that the Alaska Native Claims Act 'largely controls in determining whether' Alaska Native tribes exercise jurisdiction over Alaskan lands." (quoting Exhibit B)). It held that Congress's subsequent recognition that federally recognized tribes exist in Alaska "had no impact on the validity or applicability of the Sansonetti Opinion to the Tribe's claim." *Id.*, at *6–7. It also concluded that the "privileges-and-immunities" provision of the Indian Reorganization Act, *see* 25 U.S.C. § 5123(g), did not change the circumstances that existed in Alaska. The Court explained that the privileges-and-immunities clause did not require Interior to treat all tribes the same; rather it only required Interior to apply the

same "general Indian lands test" to all tribes. *Id.*, at *7–8. But in applying that test, Interior also had to consider the "unique factual and legal circumstances [that exist] in Alaska," as Sansonetti had done. *Id.*; *see also id.* at *8 (concluding "Interior applied the correct legal standard when making the Ondola Allotment Indian lands determination").

This Court also held that Interior had correctly applied the Sansonetti Opinion when concluding the Tribe did not have a sufficient "tribal nexus" to the Ondola Allotment. It held that Interior properly distinguished its prior decisions regarding tribes in the Lower 48 by recognizing that, unlike those tribes, Eklutna does not have a reservation or "an existing source of Tribal territorial sovereignty." *Id.*, at *8. Moreover, Interior had not acted arbitrarily or capriciously when it concluded the Tribe's evidence was insufficient to establish the required nexus. *Id.*, at *8–9. Such evidence included the Ondola family's tribal membership, the location of the allotment in proximity to the Tribe's traditional lands, and the allotment's inclusion in a now-revoked federal reserve. *Id.*, at *9. Last, the Court noted that Interior considered the services offered by the Tribe to its members and agreed with Interior's position that "there is a difference between jurisdiction over members and jurisdiction over land." *Id.*

The Court issued final judgment in favor of Interior and the State on September 22, 2021, and the Native Village of Eklutna did not appeal. [Dkt. 73]

III.    **With no notice to the State, former Solicitor Anderson issued an Opinion wherein he reconsidered this Court's decision, found it unpersuasive, and reached the opposite conclusion.**

In February 2024, the former Solicitor for the Department of the Interior, Robert Anderson, partially revoked the 31-year-old Sansonetti Opinion and issued his own

opinion that announced Alaska tribes now have territorial jurisdiction over Alaska Native Allotments in most circumstances. [Exhibit A] In doing so, Anderson also declared that this Court's decision in *Native Village of Eklutna* had been wrongly decided. [Exhibit A, at 1–2, 15] Specifically, he disagreed with the Court's analysis of the privileges-and-immunities amendment, concluding "the *Eklutna* court erred in both its reasoning and its ultimate conclusion." [Exhibit A, at 16] Anderson believed that Congress must provide an "explicit statutory mandate" to treat different tribes differently and disagreed with the Court's conclusion that Congress had sufficiently provided such a mandate through the Alaska Native Allotment Act or the Alaska Native Claims Settlement Act. [*See* Exhibit A, at 16] He also declared that "none of the reasons cited by the [Sansonetti] Opinion for distinguishing [Alaska] Native Allotments from those in the lower 48 states [were] persuasive." [Exhibit A, at 20]

Attempting to bolster his decision, Anderson also relied on the Violence Against Women Reauthorization Act of 2022 (VAWA 2022), Pub. L. No. 117-113, 136 Stat. 840. [Exhibit A, at 17–18] Within VAWA 2022, Congress passed the Alaska Tribal Public Safety Empowerment Act to extend certain benefits to Alaska tribes. Pub. L. No. 117-103, subtit. B., §§ 811-13, 136 Stat. 49, 904-10 (2022). One of the purposes of the Alaska-specific Act was to "empower Indian Tribes" with a *person*-based jurisdiction to effectively respond to cases of domestic violence and other related crimes "through the exercise of special Tribal criminal jurisdiction." *Id.* § 811(b)(2). The Act recognized and

affirmed Alaska tribes' inherent authority over Indians in their respective villages.[5]

*Id.* § 813(a). It also granted and extended tribal authority over non-Indians in two ways.

First, it granted tribes civil jurisdiction to issue and enforce protection orders against any

person in matters arising within the village or otherwise within the authority of the Indian

tribe. *Id.* § 813(b). Second, it created a limited criminal jurisdiction for some tribes, based

on the theory that tribes have authority over an Indian victim or an Indian perpetrator. *Id.*

§ 813(d). Anderson believed VAWA 2022 undermined the Sansonetti Opinion because, as

he put it, that Act "supplies a connection by recognizing Alaska Native Village Statistical

Areas as tribal territorial bases from which tribes in Alaska can assert their inherent

jurisdiction."[6] [Exhibit A, at 18] Anderson mistook Congress's special treatment of

Alaska tribes as granting territorial jurisdiction so they looked more like Lower 48 tribes,

---

[5]    A "Village" is defined to mean the "Alaska Native Village Statistical Area covering all or any portion of a Native village (as defined in [ANCSA]), as depicted on the applicable Tribal Statistical Area Program Verification map of the Bureau of the Census." Pub. L. No. 117-113 § 812(7).

[6]    That is simply inaccurate. In 2022, Congress took action to extend certain benefits available to Lower 48 tribes to Alaska tribes. The Violence Against Women Reauthorization Act of 2013 (VAWA 2013) included a historic provision that recognized the inherent authority of "participating Tribes" to exercise "special domestic violence criminal jurisdiction" over certain defendants, regardless of their Indian status, who commit acts of domestic violence or dating violence in Indian country. Pub. L. No. 113-4, § 904, 127 Stat. 54 (2013). This had little impact in Alaska, however, because VAWA applied only in Indian country, of which Alaska has little. In VAWA 2022, Congress passed Alaska-specific legislation to extend the "special criminal jurisdiction" provision of VAWA 2013 to Alaska tribes. Congress's solution was not to create Indian country, grant Alaska tribes' territorial jurisdiction, or even recognize that Alaska tribes have jurisdiction over Alaska Native Allotments, but rather to provide Alaska tribes with a limited form of person-based jurisdiction over non-Indians. *See* Pub. L. No. 117-103, subtit. B., §§ 811-13. In sum, through VAWA 2022, Congress continued to recognize how ANCSA and the lack of a reservation system in Alaska made Alaska different.

when the special criminal jurisdiction was granted specifically to Alaska tribes precisely

because they are unlike Lower 48 tribes and lack territorial jurisdiction.

Prior to issuing his new Solicitor Opinion, Anderson did not contact the State of

Alaska or ask for its views. Nor did he request relief from this Court.

## IV. With the Anderson Opinion in hand, federal agencies rushed during the last days of President Biden's administration to issue the other necessary approvals for Indian gaming to the Native Village of Eklutna.

The February 2024 Anderson Opinion was the first of many necessary steps to

authorize gaming under IGRA on the Ondola Allotment. In April 2024, the Tribe asked

the National Indian Gaming Commission (NIGC) to review and approve the Tribe's

gaming ordinance to undertake class II gaming on the Ondola Allotment. [Exhibit E, at 1]

Two months later, in June 2024, Interior's Solicitor's Office relied on the Anderson

Opinion to issue a new analysis of the Ondola Allotment; it now concluded this Allotment

met the Indian lands definition. [*Id.*] Like it did with the Anderson Opinion, Interior went

forward without notifying the State of its intent to reconsider its prior Indian lands

decision regarding the Ondola Allotment. A month after Anderson issued his new Indian

lands decision, the NIGC relied on that decision to approve the Tribe's gaming ordinance.

[*Id.*] The State received no notice and did not have an opportunity to provide comment on

that either.

After the November 2024 election, Interior moved in earnest to grant the Tribe its

remaining approvals. First, it issued a draft environmental assessment on December 20,

2024, giving the public only 17 days (including Holidays) to comment. [Final

Environmental Assessment, at 1-1][7] After it received several requests for additional time, Interior extended the comment period by only three days, until January 9, 2025. [*Id.*] The then Assistant-Secretary signed the Finding of No Significant Impact on January 16, 2025, the Thursday before President Trump's inauguration. [*Id.*, at 16] That same day, he also signed the decision to approve the lease of the Ondola Allotment from the allotment's owners to the Tribe. [*See* Exhibit F] That decision relied heavily on Anderson's new Indian lands decision for the Ondola Allotment, which was based on Anderson's Solicitor Opinion. [*See* Exhibit F, at 4–5]

The Tribe began construction on January 17, 2025, and opened a temporary facility on January 20, 2025.[8]

## V.    The State brought litigation to challenge the federal actions.

On February 4, 2025, the State filed a complaint in the United States District Court for the District of Columbia. *See State of Alaska v. U.S. Department of the Interior, et al.*, 1:25-cv-00330-PLF. The complaint named the necessary federal defendants as well as the Tribe and was brought under the Administrative Procedure Act. Relying on much of the same facts discussed here, the State asked the court to (1) declare that the federal defendants and Native Village of Eklutna were barred by collateral estoppel and/or judicial estoppel from relitigating the issues resolved by this Court in 2021; (2) declare

---

[7]    Available at https://eklutnaea.com/.

[8]    Jeff Landfield, *Native Village of Eklutna rushes to open Birchwood casino before Trump takes office - The Alaska Landmine*, January 17, 2025, available at: https://alaskalandmine.com/landmines/native-village-of-eklutna-rushes-to-open-birchwood-casino-before-trump-takes-office/

that the federal defendants' actions were arbitrary and capricious, an abuse of discretion, and not in accordance with law and therefore a violation of IGRA, ANCSA, the Alaska Native Allotment Act, and the APA; (3) vacate the relevant federal decisions; (4) enjoin Interior from applying the Anderson Opinion; and (5) enjoin the NIGC and Interior from granting gaming ordinances or approving leases for the purposes of gaming on any Native Allotment in Alaska. [*See* Dkt. 1, *State of Alaska v. U.S. Dep't of the Interior*, 1:25-cv-00330-PLF] Later that month, on February 28, 2025, officials within President Trump's administration announced that they were suspending for further review all Solicitor Opinions issued by former Solicitor Anderson. [Exhibit G]

The State's new litigation was assigned to Judge Friedman, and in late June, he granted the Tribe's motion to transfer the State's complaint to the District of Alaska. [*See* Dkt. 33, *State of Alaska v. U.S. Dep't of the Interior*, 1:25-cv-00330-PLF] The State opposed the request to transfer, arguing that it had invoked the court's ancillary jurisdiction and was seeking only to enforce the final judgment that this Court had issued in 2021. [*See* Dkt. 25, *State of Alaska v. U.S. Dep't of the Interior*, 1:25-cv-00330-PLF] Judge Friedman disagreed, "conclud[ing] that th[e] lawsuit d[id] not seek to enforce that prior judgment" and finding that "ancillary jurisdiction [wa]s not appropriate." [*See* Dkt. 33, at 10, *State of Alaska v. U.S. Dep't of the Interior*, 1:25-cv-00330-PLF] Judge Friedman noted that the State had not identified any portion of this Court's judgment that he could enforce and explained the judgment had not created any ongoing obligations that were enforceable. [*Id.*, at 11–12] The litigation has since been transferred,

and the Tribe has filed a motion to dismiss under Federal Rule of Civil Procedure 12, arguing that it is a necessary party that cannot be joined due to its sovereign immunity.

While the State's case was pending in the District of Columbia, it also filed a motion for preliminary injunction. Neither the Tribe nor the federal defendants have responded to that motion. In early June, before Judge Friedman transferred the case, the federal defendants sought an extension of time to respond to the motion for preliminary injunction on the basis that officials within the new presidential administration needed "time to review and consider the United States' position in this matter." [Dkt. 27, at 2, *State of Alaska v. U.S. Dep't of the Interior*, 1:25-cv-00330-PLF] In an email requesting the State's position, counsel for the federal defendants represented that "Interior need[ed] additional time for the new administration to consider its position on the Anderson M-Opinion." [Exhibit H] The State relied on that representation in good faith when deciding not to oppose the federal defendants' motion for extension and in waiting to seek relief from this Court. In mid-July, the State learned from counsel for the federal defendants that Interior intended to defend the decisions and would respond to the State's complaint and motion for preliminary injunction in the District of Alaska litigation.

With the federal defendants indicating that they will continue to defend the disputed decisions, the State returns to this Court and asks it to reopen this matter and provide it with further relief under 28 U.S.C. § 2202. It does not seek the same broad relief it sought in the litigation currently pending in the District of Alaska. Its focus here is solely on the Ondola Allotment and obtaining what Judge Friedman concluded was missing: a coercive order from this Court that can be enforced. Immediately after filing

this motion for further relief, the State will seek a stay of its litigation in the District of

Alaska pending resolution of this motion. If this Court grants the requested relief, the

State will seek to dismiss its complaint without prejudice to end the litigation in the

District of Alaska.

## ARGUMENT

I.    **This Court has the authority under 28 U.S.C. § 2202 to enforce its prior judgment and provide additional relief to the State.**

The Federal Declaratory Judgment Act allows a party to move for "further relief"

to effectuate a prior declaratory judgment. Specifically, 28 U.S.C. § 2202 provides:

> Further necessary or proper relief based on a declaratory judgment or
> decree may be granted, after reasonable notice and hearing, against any
> adverse party whose rights have been determined by such judgment.

No rule of procedure governs such a motion. *Duberry v. District of Columbia*, 2020 WL

13337792, * 5 (D.D.C. 2020).

A court's authority under § 2202 is broad and stems from its "inherent power to

enforce its decrees and to make such orders as may be necessary to render them

effective." *Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 548

(D.C. Cir. 1988). As such, the statute permits the Court to supplement its original

judgment with either damages or equitable relief "'even though coercive relief might not

have been available at the time of the declaratory action.'" *Gant v. Grand Lodge of Texas*,

12 F.3d 998, 1002 (10th Cir. 1993) (quoting 10A C. Wright, A. Miller & Miller &

M. Kane, *Federal Practice & Procedure*, § 2771, at 765–67 (2d ed. 1983)); *see also*

*Powell v. McCormack*, 395 U.S. at 498 ("A declaratory judgment can then be used as a

predicate to further relief, including an injunction."); *Duberry v. District of Columbia*,

2020 WL 13337792, * 5 (D.C. DC 2020) ("Further relief under section 2202 may be injunctive in nature as well as declaratory." (citing *Security Ins. Co. of New Haven v. White*, 236 F.2d 215, 220 (10th Cir. 1956) (granting injunctive relief)). And a motion for further relief may be brought long after the declaratory judgment has been entered, provided that the party seeking relief is not barred by laches. *Horn & Hardart Co.*, 843 F.2d at 548 n.5.

Having previously declared the correct legal standard to apply when Interior decides whether the Ondola Allotment qualifies as Indian lands under IGRA, § 2202 gives this Court authority to grant additional relief to ensure that Interior applies that legal standard to the Ondola Allotment.

## II.    This Court has jurisdiction to grant further relief.

The Tribe may attempt to argue that the Court has no jurisdiction, claiming that there is nothing to enforce since the Court denied the Tribe's claims. Not so. In addition to its claims under the Administrative Procedure Act, the Tribe also asked the Court for a "declaratory judgment reversing the Department's negative Indian Lands determination and declaring that the [Ondola] Allotment constitutes 'Indian Lands' within the meaning of 25 U.S.C. § 2703(4)." [Dkt. 1, at 26] As a basis for its request, the Tribe alleged that the Sansonetti Opinion "[wa]s no longer good law," "was flawed because it conflicted with a prior opinion on the question and existing court decisions," and because the Sansonetti Opinion had "since been superseded by, among other things, the 1994 Amendments to the Indian Reorganization Act." [Dkt. 1, at 17]

When the Court denied the Tribe's requested relief, it still declared the rights of the parties as requested. *See Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (stating that

a declaratory judgment "conclusively resolves the legal rights *of the parties*") (internal quotation marks omitted)). This is expressly provided for by the statute itself, which states: "[i]n a case of actual controversy within its jurisdiction, [a court] . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." It also provides that "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

This is not a situation where the Court declined to issue a declaratory judgment based on prudential concerns. *See Wilton v. Seven Falls*, 515 U.S. 277, 282 (1995) (recognizing that the Declaratory Judgment Act gives courts discretion to determine "whether and when to entertain an action"). The Court here ruled on the merits and granted summary judgment in favor of the State. [Dkt. 70] The fact that the declaration was unfavorable to the Tribe does not make it any less enforceable. The Court still declared the jurisdictional rights of the parties over the Ondola Allotment. And, as a declaration of the law, the Court's order is legally enforceable by the State—as a party to the litigation—under 28 U.S.C. § 2202. *Cf. Haaland*, 599 U.S. at 293 (stating that the state officials would not be bound by the declaratory judgment because they were not parties to the action).

## III. Further relief is needed to effectuate the original judgment.

Section 2202 provides for "'necessary or proper relief'—specifically, 'proper relief *based* on the declaratory judgment.'" *Horn & Hardart Co.*, 843 F.2d at 549 (quoting 28 U.S.C. § 2202). Here, the State seeks relief from federal decisions that were based on an incorrect legal standard generated by Interior in 2024. Enjoining Interior and

the Tribe from implementing these decisions is relief that necessarily flows from this

Court's previous judgment.

Additional relief is also necessary and proper. *See id.* (saying that the relief need

only be proper). The Anderson Opinion was express in what it was doing—overruling

this Court's declaration of the law. And Anderson's decision had an immediate impact by

purporting to transfer territorial jurisdiction over the Ondola Allotment from the State to

the Native Village of Eklutna. This led to a series of other federal actions that have

harmed the State including the Indian lands decision, the NIGC decision approving the

gaming ordinance, and the Assistant-Secretary's decision approving the lease.

This harm is no different than that suffered by the State of Kansas in *Kansas v.*

*United States*, 249 F.3d 1213 (10th Cir. 2001), where the Tenth Circuit found Kansas had

sufficiently shown irreparable harm, *id.* at 1127. Like the Tribe here, the Miami Tribe of

Oklahoma sought an Indian lands determination from Interior for a "restricted Indian

allotment." *Id.* at 1128. That parcel was in Kansas, and also like here, there was previous

litigation over this issue for the very same tract of land. *Id.* at 1218–20. After multiple

rounds of litigation, the NIGC ruled in the Miami Tribe's favor and concluded the Tribe

exercised governmental power over the tract. *Id.* at 1220. The State of Kansas filed suit

under the Administrative Procedure Act and sought a preliminary injunction. *Id.*

In affirming the district court's decision to grant Kansas's request for preliminary

relief, the Tenth Circuit had "little difficulty" finding the State would suffer irreparable

harm. *Id.* at 1227. The Court recognized that the NIGC's Indian lands determination

"ha[d] a direct and immediate impact on the sovereign rights which the Miami Tribe, the

Federal Government, and the State of Kansas exercise[d] over the tract." *Id.* at 1223. And, because the "State of Kansas claim[ed] that the NIGC's decision place[d] its sovereign interests and public policies at stake, [the court] deem[ed] the harm the State st[ood] to suffer as irreparable if deprived of those interests without first having a full and fair opportunity to be heard on the merits." *Id.* at 1227.

The only difference between this situation and that addressed by the Tenth Circuit is that here the parties have already had a full and fair opportunity to be heard on the merits and the State prevailed. For over 30 years the Federal Government took the position that Alaska tribes did not have territorial jurisdiction over Native Allotments. That legal position was affirmed by this Court in 2021 as applied to the Ondola Allotment. The Federal Government's position changed in 2024 through a series of decisions that the State had no opportunity to participate in. Now, contrary to this Court's decision, the Native Village of Eklutna is not only exercising territorial jurisdiction over this parcel, but it is also engaging in for-profit, non-taxable class II gaming on this property contrary to Alaska law. Like the State of Kansas, Alaska's "interests in adjudicating the applicability of IGRA, and the ramifications of such adjudication," are sufficient to establish real irreparable harm. *See id.*, at 1228.

The parties previously litigated the proper legal standard to apply to the Ondola Allotment and now the State asks this Court to enforce that decision. Additional relief is necessary and proper because (1) Interior has failed to follow this Court's declaration of the law; and (2) Interior's resulting decisions are now having an immediate and irreparable effect on the State's sovereign interests.

**IV.    The State is entitled to a permanent injunction.**

Solicitor Anderson's purported attempt to overturn this Court's decision merits the equitable remedy of permanently enjoining any decision that applied the Anderson Opinion to the Ondola Allotment. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Not only was his authority to take such an action highly questionable, *see* U.S. Const. article III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"), his decision and the related actions upset the jurisdictional balance that Alaska had operated under for the last 30-plus years without even allowing the State of Alaska the opportunity to comment or provide input.

As the requester of a permanent injunction, the State must make a clear showing that (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the State, the Tribe, and Interior, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc.*, 547 U.S. at 392. The State can easily meet its burden.

First, the State has suffered an irreparable injury. As discussed above, the Indian lands determination had a direct and immediate impact on the sovereign rights of the Tribe, the Federal Government, and the State of Alaska. By relying on the wrong legal standard to conclude the Ondola Allotment qualified as Indian lands, Interior irreparably deprived the State of its sovereign interest over the Ondola Allotment without even giving it an opportunity to be heard.

Second, legal remedies are inadequate to compensate the State for its loss of sovereign jurisdiction and regulatory authority. There is no monetary amount that could cure Interior's finding that the Tribe has territorial jurisdiction over the Ondola Allotment.

Third, considering the balance of hardships, an equitable remedy is warranted. The Tenth Circuit's decision in *Kansas* is helpful when analyzing the equities in this case. As the court there recognized, the answer to the Indian lands question "w[ould] affect the sovereign rights and regulatory powers of all involved." *Id.* at 1228. So, even though the court acknowledged the Miami Tribe's interest in beginning gaming and "reaping its economic benefits" as soon as possible, the court also acknowledged that the Tribe could proceed with its plans "*only if*" the lands qualified as Indian lands. *Id.* As such, the threatened injury to Kansas outweighed any harm the preliminary injunction might cause to the Government. *Id.*

The same holds even more true here. Not only does the State of Alaska have the same interests as Kansas, but it also already litigated these very same issues to resolution in 2021. "The point of a declaratory judgment 'is to establish a binding adjudication that enables the parties to enjoy the benefits of reliance and repose secured by res judicata.'" *Haaland*, 599 U.S. at 293 (18A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4446 (3d ed. Supp. 2022). Having decided to forego its appeal, it is unclear what harm the Tribe may allege that it has suffered. What's more, if the Tribe or Interior truly believed that subsequent law had undermined this Court's decision, they could have sought relief under Rule 60(b).

Fourth, the public interest would be served by a permanent injunction. The Anderson Opinion and the subsequent decisions that followed greatly upset the settled status quo in Alaska and undermined this Court's final judgment. And this analysis does not change even though Interior has now decided to suspend the Anderson Opinion for further review. [*See* Exhibit G] Allowing one tribe to move forward based on unlawfully issued approvals hurts the public interest by allowing Interior to treat similarly situated Alaska tribes differently.

## CONCLUSION

The Court should reopen this matter and grant the State further relief by permanently enjoining Interior and the Tribe from taking any action authorized by the new Indian lands determination for the Ondola Allotment, the NIGC's approval of the Tribe's gaming ordinance, and the Assistant-Secretary's approval of the lease, which were all based on the unlawful Anderson Opinion and in violation of this Court's 2021 order and judgment.

DATED August 22, 2025.

TREG TAYLOR
ATTORNEY GENERAL

By:    */s/ Jessica Moats Alloway*
Jessica Moats Alloway
Assistant Attorney General
Alaska Bar No. 1205045
Email: jessie.alloway@alaska.gov

By:    */s/ Christopher F. Orman*
Christopher Orman
Assistant Attorney General
Alaska Bar No. 1011099
Email: christopher.orman@alaska.gov

**Certificate of Service**

The undersigned certifies that on August 22, 2025, a copy of the **State of Alaska's Motion to Reopen and for Further Relieve under 28 U.S.C. § 2202,** all related **Exhibits,** and the **[Proposed] Order** were served via ECF on:

Colin Cloud Hampson                      Kristofer R. Swanson
champson@sonoskysd.com                   Kristofor.swanson@usdoj.gov


Whitney Angell Leonard                   Donald Craig Mitchell
whitney@sonosky.net                      dcraigm@alaska.com


Undersigned counsel will also email a copy of the ECF notice as well as the pleadings to counsel for the federal defendants in *State of Alaska v. U.S. Department of the Interior, et al.*, 3:25-cv-00148-JLR (D. Alaska):

Charmayne Staloff                        Cody McBride
charmayne.staloff@usdoj.gov              cody.mcbride@usdoj.gov


*/s/ Jessica Moats Alloway*